**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., | |
| Plaintiff, | |
| v. | C.A. No. 21-691-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |

**AVADEL'S BRIEF IN OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR A STAY PENDING APPEAL</u>**

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................... 1

II.  ARGUMENT ........................................................................................................... 3

 A.  Jazz's Strategic Machinations Warrant Denial of Its Motion ............................ 3

 B.  Jazz Fails To Establish The Requisite "Strong Showing" That it is Likely to Prevail
  on Appeal ......................................................................................................... 4

  1.  The Court Correctly Decided That The '963 Patent Should Be
   Delisted Based On The Language Of 21 U.S.C. § 355(c)(3)(D)(ii)(I)
   .................................................................................................................. 4

  2.  Jazz's Disputes With The Court's Ruling Do Not Establish A Strong
   Likelihood Of Success On Appeal ............................................................ 6

 C.  The Equities Resoundingly Disfavor A Stay ................................................... 14

  1.  Jazz Has Not Shown That It Will Be Irreparably Harmed ...................... 14
  2.  Avadel Will Be Irreparably Harmed by a Stay ...................................... 15
  3.  The Public Interest Will Be Harmed by a Stay ...................................... 17

 D.  Jazz's Alternative Request for a 30-Day Stay Should Be Denied ................... 19

 E.  Jazz Has Not Met the Requirement for a Bond ............................................. 20

III.  CONCLUSION ...................................................................................................... 20

i

# TABLE OF AUTHORITIES[1]

**Page(s)**

## CASES

*Abbott Cardiovascular Sys., Inc.,*
No. 19-149 (MN), 2019 WL 2521305 (D. Del. June 6, 2010) .................................................. 17

*Align Tech., Inc. v. 3Shape A/S & 3Shape Inc.,*
No. CV 17-1648-LPS, 2021 WL 7412181 (D. Del. May 28, 2021) ........................................ 11

*Align Tech., Inc. v. 3Shape A/S, No. CV 17-1648-LPS,*
2021 WL 1535530 (D. Del. Apr. 19, 2021) .......................................................................... 11

*Apple Inc. v. Samsung Elecs. Co.,*
735 F.3d 1352 (Fed. Cir. 2013) ............................................................................................ 18

*Baxalta Inc. v. Genentech, Inc.,*
No. 17-509-TBD, 2018 WL 3742610 (D. Del. Aug. 7, 2018) .......................................... 17, 18

*Bianco v. Globus Med., Inc.,*
No. 12-CV-00147, 2014 WL 1049067 (E.D. Tex. Mar. 17, 2014) .......................................... 17

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,*
566 U.S. 399 (2012) .................................................................................................. 6, 8, 10

*Carcieri v. Salazar,*
555 U.S. 379 (2009) ............................................................................................................ 7

*DePuy Synthes Prod., Inc. v. Veterinary Orthopedic Implants, Inc.,*
990 F.3d 1364 (Fed. Cir. 2021) ............................................................................................ 19

*Duramed Pharms., Inc. v. Watson Lab'ys, Inc.,*
426 F. App'x 905 (Fed. Cir. 2011) ........................................................................................ 3

*Galderma Lab'ys, L.P. v. Teva Pharms. USA, Inc.,*
799 F. App'x 838 (Fed. Cir. 2020) ....................................................................................... 19

*GHS Health Maint. Org., Inc. v. United States,*
536 F.3d 1293 (Fed. Cir. 2008) ...................................................................................... 10, 12

*Goodyear Atomic Corp. v. Miller,*
486 U.S. 174 (1988) .......................................................................................................... 12

---

[1] All emphasis added herein unless otherwise noted.

*Hilton v. Braunskill*,
  481 U.S. 770 (1987) ................................................................................ 3

*Hughes Aircraft Co. v. Jacobson*,
  525 U.S. 432 (1999) ................................................................................ 6

*In re Lantus Direct Purchaser Antitrust Litig.*,
  950 F.3d 1 (1st Cir. 2020) ........................................................... 5, 7, 8, 9

*In re THG Holdings LLC*,
  Nos. 19-11689 (JTD), 19-2215 (RGA), 2019 WL 6615341 (D. Del. Dec. 5, 2019) ............... 14

*Kingdomware Techs., Inc. v. United States*,
  579 U.S. 162 (2016) ................................................................................ 6

*Markman v. Westview Instruments*,
  517 U.S. 370 (1996) ............................................................................... 12

*Nat'l Ass'n of Mfrs v. Dep't of Defense*,
  138 S. Ct. 617 (2018) ............................................................................. 8

*Newimar, S.A. v. United States*,
  No. 21-cv-1897, 2022 WL 17072803 (Fed. Cl. Nov. 17, 2022) ................................. 4

*Otsuka Pharm. Co. v. Torrent Pharms. Ltd., Inc.*,
  99 F. Supp. 3d 461 (D.N.J. 2015) ............................................................... 14

*Roberts v. Sea-Land Servs., Inc.*,
  566 U.S. 93 (2012) ................................................................................ 9

*Rotkiske v. Klemm*,
  140 S. Ct. 355 (2019) ............................................................................. 6

*Sciele Pharma Inc. v. Lupin Ltd.*,
  No. CIV. 09-0037 RBK/JS, 2012 WL 113004 (D. Del. Jan. 12, 2012) ........................... 14

*Standard Havens Prod., Inc. v. Gencor Indus., Inc.*,
  897 F.2d 511 (Fed. Cir. 1990) ................................................................. 3, 4

*Takeda Pharms. U.S.A., Inc. v. Mylan Pharms., Inc.*,
  No. CV 19-2216-RGA, 2020 WL 419488 (D. Del. Jan. 27, 2020) ............................... 20

*Vanda Pharms. Inc. v. Roxane Lab'ys, Inc.*,
  203 F. Supp. 3d 412 (D. Del. 2016), *aff'd*, 887 F.3d 1117 (Fed. Cir. 2018) .............. 15

*ViaTech Technologies Inc. v. Microsoft Corporation*,
  733 Fed. App'x. 542 (Fed. Cir. 2018) .......................................................... 11

*ViroPharma, Inc. v. Hamburg*,
   No. 1:12-cv-00584-ESH (D.D.C. Sept. 4, 2012) ..................................................................... 13

**STATUTES AND REGULATIONS**

21 C.F.R. § 314.53 ............................................................................................................. 7, 12, 13

21 U.S.C. §355 ...................................................................................................................... passim

## I.      INTRODUCTION

With its latest motion, Jazz's strategy to delay at all costs reaches new heights.  By refusing to delist the '963 patent even in the face of black-letter law, and by pursuing every conceivable source of delay in this litigation, Jazz has successfully—albeit illegally—excluded competition. No longer.  In a thorough and well-reasoned opinion, this Court held that Jazz must request that the FDA delete the '963 patent from the Orange Book.  That order is not only correct; it is important.  Patients will no longer be deprived of Avadel's revolutionary, once-nightly sodium oxybate treatment, LUMRYZ.

Jazz's stay request seeks to render this Court's delisting order a dead letter.  Given the timeline of Federal Circuit appeals, Jazz's proposal would effectively block delisting for the remaining lifetime of the '963 patent—*rewarding Jazz for its delay*.  That result would undermine the very purpose of the delisting statute, penalize Avadel, and worse, harm the patients desperate for a once-nightly oxybate treatment for narcolepsy.  Indeed, if Jazz wished to ensure sufficient time for an appeal of a delisting order before the '963 patent expired, why did Jazz insist that the delisting motion be delayed for over a year, oppose Avadel's motion to expedite consideration of it, D.I. 120; D.I. 165, and not seek to expedite even this motion to stay?[2]  Jazz's motivation is, and has always been, to delay entry of LUMRYZ to protect Jazz's $5 million per day of oxybate products.

Jazz's machinations should not be rewarded, and Jazz's motion should be denied.  The standard for such extraordinary relief is well established:  Jazz must show a *strong likelihood* of success on appeal and that the equitable factors favor a stay.  Jazz does not come close to meeting either of those requirements.

---

[2] All docket numbers refer to those in C.A. No. 21-691.

On the merits, the delisting statute could not be clearer that patents that do not claim either the drug or a method of using the drug qualify for delisting.  Jazz persuaded the Court to delay resolution of Avadel's delisting motion until claim construction, and the intrinsic record revealed what is obvious on the face of the '963 patent—the claims are directed to systems.  Following that ruling, the Court correctly found that the '963 patent should be delisted based on the plain language of the statute.  Neither claim construction nor the application of the delisting statute to the properly construed claims was a close question, and Jazz has provided no basis for the Court to conclude that its rulings were in error.

Indeed, after months of asserting that the '963 patent claims are directed to "methods" despite their plain language to the contrary, including successfully postponing consideration of Avadel's motion for a year on the theory that it required claim construction, Jazz now has done an about-face.  On appeal, Jazz contends claim construction is irrelevant and indicates that it does not seek review of the *Markman* Order.  Ex. A.  And after two full rounds of briefing before this Court on Avadel's delisting motion, Jazz now raises multiple new arguments in its motion for a stay.  This has gone on for long enough.  The Court rejected Jazz's efforts to delay as well as Jazz's efforts to argue that the '963 patent should not be delisted.  The Court should not now hand Jazz a victory by allowing it to moot by delay the Court's order on Avadel's delisting motion.

The public interest also overwhelmingly militates against further delay.  Much as Jazz may recoil from it, competition serves the public interest.  The FTC's amicus brief on the delisting motion made clear that REMS patents like the '963 patent should never be used to keep competitive products off the market; that is even more true when the new product offers a significant therapeutic benefit for patients.  Narcolepsy patients want and need a drug that will

allow them to sleep through the night, and Jazz's most recent effort to block their access to such a drug should be denied.

## II.     ARGUMENT

In assessing Jazz's stay requests, the Court considers four factors: "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Standard Havens Prod., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 512 (Fed. Cir. 1990) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).  These factors effectively require the Court to consider "movant's chances for success on appeal and weigh[] the equities as they affect the parties and the public."  *Id*. at 513.  The "less likely [the applicant] is to win, the more need" for equitable factors to "weigh in [its] favor."  *Id.*  This test is similar to that used to evaluate a request for an injunction pending appeal, *see Duramed Pharms., Inc. v. Watson Lab'ys, Inc*., 426 F. App'x 905, 906 (Fed. Cir. 2011), and, accordingly, Avadel relies in part on injunction case law.

### A.     Jazz's Strategic Machinations Warrant Denial of Its Motion

A party seeking the extraordinary equitable relief of a stay should come to the Court with clean hands.  But Jazz has done the opposite by delaying resolution of this issue at every turn, and, with regard to this motion, manipulating proceedings to justify seeking an emergency stay from the Federal Circuit.

Jazz waited several days after entry of the Court's delisting order to even raise the prospect of a stay.  *See* D.I. 230; Ex. B.  When it finally did, Jazz made no mention of expedited briefing. *See* Ex. B.  Nor did Jazz do so when the parties met and conferred, insisting it would follow the default local rules when counsel for Avadel expressly raised the issue.  Ex. C.  Jazz then filed its motion, which contains no request to expedite briefing.  *See* D.I. 235, 236.  The Court then *sua*

3

*sponte* expedited Avadel's Opposition, ordering it to be filed December 1.  D.I. 237.  The rationale

for Jazz's inaction has now become clear – Jazz delayed and avoided seeking expedited briefing

so it can purport to have a basis to "file an emergency motion for stay in the Federal Circuit early

next week."  D.I. 238 at 1.

On Sunday, November 27, 2022, Jazz wrote to Avadel's counsel indicating that it intends

"to seek an emergency motion to stay the District Court's order at the Federal Circuit if the District

Court does not act on Jazz's request for a stay by tomorrow afternoon."  Ex. D.  But Jazz never

asked this Court to expedite briefing or consideration of its motion, let alone on a schedule that

allowed it to be acted on by November 28th.  Instead, Jazz waited until Tuesday, November 22nd

at 6:23 p.m. to file its motion, Ex. E, knowing the Court was closed for Thanksgiving November

24th and 25th, and has told the Federal Circuit that it needs emergency relief if the Court does not

rule on November 28th – before the date initially set by the Court for Avadel's Opposition,  Ex. A.

Jazz refrained from seeking expedited briefing and consideration from this Court so it could feign

impracticability to the Federal Circuit and usurp this Court's original jurisdiction.  Jazz's motion

should be denied on that basis alone.  *See Newimar, S.A. v. United States*, No. 21-cv-1897, 2022

WL 17072803, at \*3 (Fed. Cl. Nov. 17, 2022).

### B.  Jazz Fails To Establish The Requisite "Strong Showing" That it is Likely to Prevail on Appeal

As noted, a stay pending appeal is an extraordinary remedy such that Jazz has to establish

"a strong showing that [it] is likely to succeed on the merits."  *Standard Havens*, 897 F.2d at 512.

Jazz cannot possibly meet this burden.

### 1.  The Court Correctly Decided That The '963 Patent Should Be Delisted Based On The Language Of 21 U.S.C. § 355(c)(3)(D)(ii)(I)

The Court correctly found that the '963 patent does not claim "an approved method of

using the drug" for the simple reason that it is directed to a system, and accordingly required Jazz

to request that it be delisted from the Orange Book.  *See* D.I. 231 at 6.  Jazz's attempts to inject confusion and complexity into that straightforward determination are unlikely to be any more successful before the Federal Circuit than they were before this Court.

The delisting statute is clear.  An NDA holder can be required to delete patent information from the Orange Book "on the ground that the patent does not claim either—(aa) the drug for which the application was approved; or (bb) an approved method of using the drug."  21 U.S.C. §355(c)(3)(D)(ii)(I).  Jazz concedes that the '963 patent does not claim the drug.  It also does not claim a method of using the drug – it claims no method of anything.  As the Court correctly found, the "claims of the '963 patent are directed to systems."  D.I. 231 at 6; D.I. 229 at 14-17.

Remarkably, after a year of delay allegedly due to the need for claim construction to resolve Avadel's delisting motion, Jazz *does not challenge the Court's claim construction* for the purposes of its stay motion (nor does Jazz challenge it in the Federal Circuit).  D.I. 236 at 6; Ex. A.  That concession ends the inquiry, as the '963 patent's *system* claims cannot be "an approved *method* of using the drug."  The Court properly construed and applied the plain language of the statute, consistent with the First Circuit's ruling in *In re Lantus Direct Purchaser Antitrust Litig.*, 950 F.3d 1 (1st Cir. 2020), to find that the patent must be delisted.  That analysis is hardly the type of clear error Jazz would have to establish to show a "strong likelihood" of success on appeal.

Jazz's argument that the de-listing statute exempts from its scope patents that were "permissively listed" contradicts the unambiguous language of the delisting statute, which plainly states that patents that do not fall into one of two specific categories should be delisted.  *The statute does not require an inquiry into whether the NDA holder was authorized to list the patent in the first instance*.  Rather, the '963 patent is subject to delisting because it "does not claim . . . *an approved method of using the drug*." 21 U.S.C. § 355(c)(3)(D)(ii)(I).  Statutory construction begins

"with the language of the statute." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016). And when the language of that statute is clear, the Court's inquiry "ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999). Congress could have required a movant to make a showing that the '963 patent was not appropriately "included in the Orange Book under the law that applied at the time of their listing" but did not do so. The Court must enforce the statute according to its plain meaning. *See Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019) ("If the words of a statute are unambiguous, this first step of the interpretive inquiry is our last.").

*N*o court has adopted Jazz's view that the delisting statute in any way depends on the propriety of listing. As the Supreme Court recognized in *Caraco*, an NDA applicant sued for patent infringement may "assert a counterclaim seeking an order requiring the [brand] to correct or delete the patent information submitted by the [brand] under subjection (b) or (c) of § 355 on the ground that the patent does not claim either" a "drug" or "an approved method of using the drug." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 408-409 (2012) (citing 21 U.S.C. § 355(j)(5)(C)(ii)(I)). That is what Avadel did and what this Court correctly found. No further analysis is warranted.

### 2. Jazz's Disputes With The Court's Ruling Do Not Establish A Strong Likelihood Of Success On Appeal

Jazz's motion includes nearly ten pages disputing the Court's decision. Those arguments were either already rejected or are entirely new and waived (both for purposes of this motion and for appeal), and thus cannot show a likelihood of success on appeal. Even if considered, Jazz's new arguments likewise fail to show that Jazz is likely to succeed on appeal.

### a. The Court Correctly Rejected Jazz's Argument that the Delisting Statute Does Not Apply To So-Called "Permissively-Listed" Patents

As noted, the de-listing statute requires no inquiry into whether or not the '963 patent was appropriately listed by Jazz at the time of its listing.  But Jazz's contention that the '963 patent was properly listed is erroneous in any event.

*First*, Jazz's argument is wholly inconsistent with the First Circuit's decision in *Lantus*. D.I. 154 at 6 (*citing* 950 F.3d 1).  The patent at issue there was listed in the Orange Book in 2013, prior to the passage of the Orange Book Transparency Act ("OBTA"), just like the '963 patent. 950 F.3d at 5.  The *Lantus* patent covered a drive mechanism for enabling administration of medicinal products from an injector pen, such as those used to administer insulin.  *Id*.  *Under Jazz's theory, such a patent would be permissibly listed* in the Orange Book because it does not fall into the categories prohibited from listing by 21 C.F.R. § 314.53(b)—patents on processes, packaging, metabolites, and intermediates.  D.I. 236 at 7.  However, the First Circuit found otherwise.

*Second*, Jazz's assertion that, before the passage of the OBTA, the listing statute allegedly permitted any patent to be listed in the Orange Book (other than a few narrow categories of patents that are explicitly prohibited) makes no sense in the context of the overall statutory scheme.  The plain language of the pertinent statutes reveals that they are in perfect harmony.  The listing statute provides that any patent that "claims the drug for which the applicant submitted the application" or "claims a method of using a drug for which approval is sought or has been granted in the application" shall be listed in the Orange Book.  21 U.S.C. § 355(b)(1)(A)(viii).  The listing statute's requirement that NDA applicants "*shall*" list each patent claiming a drug or "a method of using [a] drug" is meant to be an exclusive list.  *See, e.g.*, *Carcieri v. Salazar*, 555 U.S. 379, 391- 92 (2009) (holding that where Congress directed that the definition of "Indian" for purposes of the Indian Reorganization Act "shall" include persons meeting three discrete qualifications, Congress

"explicitly and comprehensively defined the term" by reference to those qualifications).  The delisting statute, in turn, states that patents that do not fall into either of those categories—*i.e.*, patents that do not claim either "the drug for which the application was approved" or "an approved method of using the drug"—are eligible for delisting. 21 U.S.C. §355I(3)(D)(ii)(I).  Read together, Congress provides that patents that do not claim either a drug or method of using a drug can be delisted pursuant to 21 U.S.C. §355(c)(3)(D)(ii)(I) as they were not appropriately listed in the first place.  *See, e.g., Lantus*, 950 F.3d at 7; *Caraco*, 566 U.S. at 408-09.  The plain meaning of each statute shows that they are in harmony.

*Third*, Jazz's assertion that, before the passage of the OBTA, the listing statute allegedly permitted the '963 patent to be listed in the Orange Book and correspondingly exempted from delisting would flout this well-integrated statutory scheme.  The delisting statute was enacted in 2003 and Jazz did not list the '963 patent until a decade later.  Jazz's theory would render that 2003 enactment dead-letter as to the '963 patent (and other categories), an absurd result directly contrary to the Supreme Court's elucidation of the purpose of the delisting statute, which was to alleviate "abuses" from brand companies, where "a brand whose original patent on a drug was set to expire listed a new patent ostensibly extending its rights over the drug, but in fact covering neither the compound nor any method of using it." *Caraco*, 566 U.S. at 408.  Given the backdrop, Jazz's theory cannot be correct. *See Nat'l Ass'n of Mfrs v. Dep't of Defense*, 138 S. Ct. 617, 632 (2018) (rejecting "an interpretation of the statute that would render an entire subparagraph [of the statute] meaningless").

Indeed, the OBTA's mandate that "[p]atent information that is not the type of patent information required by subsection (b)(1)(A)(viii) shall not be submitted" is merely a clarification.  FDA and Congress have confirmed that the OBTA was amended to "clarify[] the types of patent

and exclusivity related information to be listed in" the Orange Book in a Report to Congress.  Ex.

F (FDA Report to Congress) at 1; *see also id.* ("These revisions were generally consistent with the

existing regulations and practices of [FDA]."); Ex. G (H.R. 116-47) at 7 ("[T]he general

performance goal or objective of this legislation is to amend the [FDCA] to clarify which patents

should be submitted to FDA. . . .").  Accordingly, the Federal Circuit is unlikely to agree with Jazz

that the OBTA was intended "to narrow," rather than clarify, "the universe of patents that are

appropriately listed." D.I. 236 at 6.  Jazz's suggestion that the Court strain to identify ambiguity

where none exists stands statutory construction on its head.  This Court's "task is to fit, if possible,

all parts into a harmonious whole."  *Roberts v. Sea-Land Servs., Inc*., 566 U.S. 93, 100 (2012).

 *Fourth*, Jazz's reading is inconsistent with the First Circuit's *Lantus* decision.  There, the

First Circuit found that "[t]he statute and applicable regulations call for the listing of *only* patents

that claim the pertinent drug or a method of using the drug."  *Lantus*, 950 F.3d at 7; *see also id*. at

10.  The Court determined that because the patent at issue did not claim a drug product or method

of using a drug "it was improper for Sanofi to have submitted it for listing in the Orange Book."

*Id*. at 8.  Thus, *Lantus* is directly at odds with Jazz's theory that patents could be "permissibly"

listed in the Orange Book before the OBTA even if they did not fall into one of the categories of

patents recited in the listing statute.  The Federal Circuit likely will agree.

 *Fifth*, the basis for Jazz's theory that listing is proper (and thus that delisting is improper)

is *a regulation*:

> Jazz was at least *permitted* to list the '963 patent in 2014 because the '963
> patent does not fall into one of the categories that the FDA—in interpreting
> and implementing the Orange Book listing statute—prohibited from being
> listed in 21 C.F.R. § 314.53(b)(1).

D.I. 236 at 6-7.  In short, Jazz alleges that the FDA's regulation effectively creates a conflict with

the plain language of the listing and delisting statutes.  But a regulation cannot upend the plain

language of a Congressional statute and were Jazz correct that the regulation was in any way inconsistent with the statutes, it would be void. *See GHS Health Maint. Org., Inc. v. United States*, 536 F.3d 1293, 1297 (Fed. Cir. 2008) ("When a regulation directly contradicts a statute, the regulation must yield.").

That precept likewise disposes of Jazz's contention that its listing was permissible because "[t]here is no question that FDA has primary jurisdiction to interpret and execute the FDCA, including the portions of section 505 that govern the Orange Book." D.I. 236 at 7. To be clear, whether listing was permissible is of no moment, because, as described above, delisting does not depend on permissible listing. Congress alone determines what a counterclaimant must prove to establish delisting and did so plainly and unambiguously. *See supra* at § II.B.1. Any purported FDA regulation or guidance to the contrary would be void on its face.

Worse, Jazz's argument contradicts the delisting statute in another fundamental sense – the salient inquiry is whether "the patent does not *claim*" an "approved method of using the drug." 21 U.S.C. § 355(c)(3)(D)(ii)(i). This Court alone determines what a patent "claims." *Caraco*, 566 U.S. at 406 ("[T]he courts are the appropriate mechanism for the resolution of disputes about the scope of validity of patents."). The FDA itself emphasizes it has no expertise whatsoever in construing patent claims, and as the Supreme Court noted in *Caraco*, FDA "does not independently assess the patent's scope," and makes no determinations regarding delisting, which is the exclusive province of the district court. *Id.* at 406. Hence, Jazz's suggestion that the Federal Circuit is "likely" to defer to "the current policy of the expert federal agency with primary jurisdiction," D.I. 236 at 9, makes no sense.

    **b.** **Jazz's New Argument that the '963 Patent's System Claims Nevertheless Cover Methods Does Not Present "Strong" Grounds for Success on Appeal**

Jazz next relies on the entirely new argument that, even though the '963 patent claims are directed to "systems," they are nevertheless properly listed in the Orange Book because the patent term "method" allegedly means something different than the term "method" as used in the delisting statute.  D.I. 236 at 8-15.  This argument is both waived and plainly erroneous.

First, Jazz waived this argument.  Jazz filed no fewer than four briefs in opposition to Avadel's motions, none of which assert that system claims can nevertheless constitute methods of using a drug within the meaning of the delisting statute.  As this Court correctly pointed out, Jazz advanced "no theory that the '963 patent, construed as claiming systems, could constitute 'an approved method of using the drug.'"  D.I. 231 at 6.  Jazz has now waived any such argument,  *see Align Tech., Inc. v. 3Shape A/S, No. CV 17-1648-LPS*, 2021 WL 1535530, at *6 (D. Del. Apr. 19, 2021), *report and recommendation adopted sub nom. Align Tech., Inc. v. 3Shape A/S & 3Shape Inc.*, No. CV 17-1648-LPS, 2021 WL 7412181 (D. Del. May 28, 2021) (finding defendant's failure to present an argument in its briefing constitutes waiver), and is unlikely to succeed on its argument for that reason alone.  *ViaTech Technologies Inc. v. Microsoft Corporation*, 733 Fed. App'x. 542, 552 (Fed. Cir. 2018).[3]

Jazz's argument is also meritless, as it turns on the allegation that there is "no evidence that Congress meant the word 'method' to import patent-law concepts into the FDCA."  D.I. 236 at 10.  That is baseless.  On its face, the delisting statute requires an inquiry into what an Orange Book-listed patent "*claims*."   21 U.S.C. § 355(c)(3)(D)(ii)(I).   As the Supreme Court emphasized, "construing the patent" is "a question of law, to be determined by the Court."  *Markman v.*

---

[3] If Jazz's belated argument is truly strong enough to establish a likelihood of success, one wonders why Jazz failed to raise it sooner.  And if as Jazz now contends, a "system" claim is nevertheless a "method" within the meaning of the delisting statute, one wonders why Jazz fought to construe the '963 patent claims as methods (in the patent context).  Both questions answer themselves.

*Westview Instruments*, 517 U.S. 370, 384 (1996).  The inquiry as to whether the '963 patent "does not *claim* . . . an approved method of using the drug" is thus one for the Court utilizing claim construction principles.  21 U.S.C. § 355(c)(3)(D)(ii)(I)(bb).  Because "[w]e generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988), the delisting statute plainly contemplates and applies patent terminology as understood in the context of patent law.  The natural reading of the statute is therefore that Congress intended for the phrase "claim . . . an approved method" to be interpreted according to patent law principles.

Further, Jazz's assertion that "the controlling FDA regulation *proves* that patent law definitions *cannot* apply" by forbidding the submission of process patents is incorrect.  D.I. 236 at 10 (emphasis in original).  First, this argument fails because, at best, it would have an FDA regulation trump a congressional statute.  *GHS Health*, 536 F.3d at 1297 ("When a regulation directly contradicts a statute, the regulation must yield.").  Second, the term "process" as used in 21 C.F.R. § 314.53(b)(1) does not refer to methods generally, as Jazz contends—it refers to patents for manufacturing processes.  *See* Ex. F (FDA Report to Congress) at 6 ("In response to a comment suggesting that clarification was needed on whether patent information on *manufacturing processes* is appropriate for submission to FDA, the preamble to the final rule reiterated that the regulation at 21 CFR 314.53(b) clearly states that information on *process patents* should not be submitted to FDA").

Jazz's suggestion that "approved methods of using [a] drug" are allegedly synonymous with the "indications or other conditions of use for which approval is sought or has been granted" is also incorrect.  D.I. 236 at 11.  Jazz quotes from an FDA regulation that limits what information must be listed in the Orange Book, leaving out the beginning of the sentence which states that it

applies to "*patents that claim a method of use*."  21 C.F.R. § 314.53(b)(1) ("For patents that claim a method of use, the applicant must submit information only on those patents that claim indications or other conditions of use for which approval is sought or has been granted.")  Because the '963 patent does not claim a method of use, it does not claim any subset like a condition of use.

In any event, the FDA has not interpreted the term "approved methods of using [a] drug" in the listing and delisting statutes to mean "conditions of use."  D.I. 236 at 11.  Rather, FDA has previously explained in federal court its "longstanding" and "consistent view" is that a "condition of use" is strictly limited to "how, to whom, and for which purposes the drug is *administered*." *ViroPharma, Inc. v. Hamburg*, No. 1:12-cv-00584-ESH (D.D.C. Sept. 4, 2012), ECF No. 53.  As FDA told the court, "'[c]onditions of use' thus include a drug product's indications and dosing regimen," but do not include all contents of a drug product's labeling."  *Id.* at 19-20.  The '963 patent is not a condition of use pursuant to FDA's explicitly stated definition.

Jazz's reliance on so-called "ordinary speech" to try and establish that a "system" includes a "method" utterly fails.  D.I. 236 at 10.  Rather than look to patent law concepts for the meaning of "method of use," Jazz points the Court to a 1999 district court case from West Virginia, Black's Law Dictionary, and an International Dictionary.  *Id.*  How or why Jazz chose these disparate and haphazard references remains unstated.  Were the Court to go down this road (and it should not), other dictionary definitions contradict Jazz's interpretation of the terms "system" and "method."  Merriam-Webster's dictionary defines "method" as "a procedure or process for attaining an object," Ex. H, and "system" as "a regularly interacting or independent group of items forming a unified whole," Ex. I.  This is consistent with how the terms "method" and "system" are used in patent law and does not indicate that these two terms are used "interchangeably" as Jazz argues. D.I. 236 at 10.  While the Federal Circuit is exceedingly unlikely to determine that the term

"method" in the delisting statute means something different than what it means in the patent law context, it is equally unlikely to rely on Jazz's cherry-picked definitions. *Id.*

Finally, Jazz's attempt to heighten the importance of the questions allegedly raised by its appeal falls flat. Lantus already decided that a patent should not have been listed in the Orange Book prior to the OBTA if it neither claims the drug nor an approved method of using the drug. The Federal Circuit is most unlikely to view the additional questions raised by Jazz's appeal as new, important questions given that the crux of Jazz's argument is that a patent construed to cover "systems" is a "method of using [a] drug" pursuant to 21 U.S.C. § 355(c).

### C.   The Equities Resoundingly Disfavor A Stay

#### 1.   Jazz Has Not Shown That It Will Be Irreparably Harmed

Because Jazz fails at the likelihood of success prong, it "would need to make a stronger showing of irreparable harm to succeed on this motion." *Sciele Pharma Inc. v. Lupin Ltd.*, No. CIV. 09-0037 RBK/JS, 2012 WL 113004, at *3 (D. Del. Jan. 12, 2012). Jazz argues it will be irreparably harmed because it will not be able to re-list its patent in the Orange Book if it prevails on appeal, because the patent will have expired. But "the possibility that an appeal may become moot does not alone constitute irreparable harm for purposes of obtaining a stay." *In re THG Holdings LLC,* Nos. 19-11689 (JTD), 19-2215 (RGA), 2019 WL 6615341, at *6 (D. Del. Dec. 5, 2019).

Further, while Jazz claims irreparable harm due to the "expir[ation]" of the '963 patent "while the appeal is pending" D.I. 236 at 3), Jazz has only itself to blame for the timing of this Court's decision, having persuaded the Court to defer ruling on delisting for a year. Jazz can hardly base its claim of irreparable harm on circumstances of its own creation. *See Otsuka Pharm. Co. v. Torrent Pharms. Ltd., Inc.*, 99 F. Supp. 3d 461, 505 (D.N.J. 2015).

In the end, Jazz's arguments on harm to Jazz and to Avadel are in irreconcilable conflict. Jazz's claim of irreparable harm is predicated on a potential "loss of pediatric exclusivity."  D.I. 236 at 15.  But that presumes LUMRYZ is fully approved and marketed – otherwise Jazz will not suffer any harm as a result of any purported loss of exclusivity.  Indeed, in its next breath, Jazz maintains that no harm will befall Avadel because LUMRYZ "cannot be lawfully marketed even if Jazz delists the '963 patent" because of the ostensible "protections of Orphan Drug Exclusivity." D.I. 236 at 16.  If LUMRYZ truly cannot be lawfully marketed even if Jazz delists the 963 patent, then Jazz will suffer no harm even in the absence of a stay.

### 2.     Avadel Will Be Irreparably Harmed by a Stay

The real reasons Jazz wants a stay is to keep LUMRYZ from getting final FDA approval and keep Avadel from selling LUMRYZ.  *See* D.I. 236 at 3 (arguing lack of a stay will make it hard for Jazz "to recover the stay of approval that is currently in force").  Being prevented from getting final approval and being prevented from selling LUMRYZ are, unquestionably, harms to Avadel, and on that basis alone, the Court can find the equities favor Avadel and not Jazz.  Should the Court have any question on that issue, Avadel's CEO, Greg Divis, explains some of the ways the delay in FDA approval has caused harm to Avadel, including that Avadel cannot fund R&D projects it would fund if it had revenue from LUMRYZ sales.  These types of harms are irreparable. *See, e.g.*, *Vanda Pharms. Inc. v. Roxane Lab'ys, Inc*., 203 F. Supp. 3d 412, 436 (D. Del. 2016), *aff'd*, 887 F.3d 1117 (Fed. Cir. 2018) (being unable to use lost revenue to invest in R&D irreparable).

Jazz's attempts to get this Court to ignore the harm to Avadel do not survive scrutiny.

*First*, Jazz observes that the final orphan drug exclusivity ("ODE") determination has not yet been made and suggests Avadel might not be able to launch as a result.  Jazz's delay in removing the '963 patent from the Orange Book is the reason why Avadel has not yet been able

to get a final ODE ruling. As Avadel's regulatory expert explains, it is FDA policy not to communicate a final decision on ODE until final approval, and thus "FDA's silence to date is to be expected" and is not evidence that LUMRYZ's approval will be delayed. Cook Decl. ¶ 7. Jazz cannot rely on the lack of that ODE determination as a reason for granting the equitable relief of a stay—Jazz is the reason that decision is delayed, and its hands are not clean.

*Second*, in a single sentence, Jazz asserts that the other patents in suit must be adjudicated before LUMRYZ can be marketed. Not so. Products are routinely sold during the pendency of patent lawsuits. Jazz does not practice the other six patents in this suit (because Jazz does not have a once-nightly narcolepsy product), they are not listed in the Orange Book, and thus did not trigger any automatic stay of approval of Avadel's NDA. If Jazz wanted this Court to enjoin the sale of LUMRYZ, it needed to move for a preliminary injunction and meet the high bar for such extraordinary relief. Jazz has not done so (even though Avadel repeatedly offered to negotiate a schedule so any such motion could be resolved in an orderly fashion). D.I. 71. Jazz's apparent reluctance to file for an injunction[4] presumably reflects its recognition that it would be exceedingly unusual to enjoin the sale of a highly differentiated medicine that could be transformational for patients. *See infra*, Section II.C.3. Accordingly, the fact that there are other patents in this suit has no bearing on the harm to Avadel that would be imposed by a stay.

*Finally*, Jazz's arguments about when Avadel filed a patent certification for the '963 patent are just another distraction. Avadel followed the statutory framework by filing a counterclaim promptly to have the offending patent removed from the Orange Book. For Jazz to suggest Avadel's *successful* litigation strategy was so wrong as to warrant ignoring the harm to Avadel that would result from a stay of that order is nonsensical.

---

[4] When asked directly by Avadel's counsel, Jazz did not confirm it intended to move for a P.I.

### 3.    The Public Interest Will Be Harmed by a Stay

It is not equitable to grant relief that will harm patients.  *See Baxalta Inc. v. Genentech, Inc.,* No. 17-509-TBD, 2018 WL 3742610, at *12-13 (D. Del. Aug. 7, 2018); *Abbott Cardiovascular Sys., Inc.,* No. 19-149 (MN), 2019 WL 2521305, at *25 (D. Del. June 6, 2010); *Bianco v. Globus Med., Inc.*, No. 12-CV-00147, 2014 WL 1049067, at *11 (E.D. Tex. Mar. 17, 2014) (collecting cases).  Dr. Bruce Corser, a doctor focusing on sleep medicine, explains that narcolepsy is a serious and chronic disorder.  Corser Decl. ¶ 4.  Oxybate is useful in treating narcolepsy, but for the last twenty years has only been available as a twice-nightly product.  *Id.* at ¶¶ 6-8.  As a result, patients suffering from a chronic sleep disorder will never get a full night's sleep, because each and every night, the patient must wake up to take a second dose.  Corser Decl. ¶ 8.  Patients can and do sleep through their middle-of-the-night alarm.  Corser Decl. ¶¶ 12-14. And patients who wake up late for their second dose are faced with a "terrible dilemma": skip the second dose and experience uncontrolled and potentially dangerous narcolepsy and cataplexy, or take the dose and be late to school or work.  Ex. K (Gudeman Dep.) at 33:3-35:21;[5] *see also* Corser Decl. ¶¶ 9, 12; Gudeman Decl. ¶¶ 6, 8, 11.  Narcolepsy patients can experience such difficulty in consistently waking up at the right time that loved ones sometimes take on the role of waking up every night to wake up the patient, such that they, too, can never get a full night's rest.  Gudeman Decl. ¶ 11; Ex. K at 35:10-12.  Narcolepsy patients and their caregivers deserve a once-nightly treatment.

Drug safety is also an issue with Jazz's products, as the second dose of oxybate—a controlled substance with abuse potential—is left out on the nightstand to be taken by the patient

---

[5] Dr. Jennifer Gudeman is the Vice President, Medical and Clinical Affairs at Avadel Pharmaceuticals.

during the night while still in bed.  Corser Decl.  ¶ 17.  Access by children or roommates can pose

a significant danger.  *Id.* at ¶¶ 16-17.

These challenges have caused some patients to stop taking Xyrem or Xywav, or to never

start at all.  *See* Corser Decl. ¶¶ 18-20; Gudeman Decl. ¶ 7; Ex. K at 46:20-47:16, 71:13-22.

Research has concluded there is an "urgent need for a once-at-bedtime sodium oxybate therapy."

Gudeman Decl. ¶¶ 9-11; Gudeman Decl., Ex. A ("TREND Ltr.") at 1.  High numbers of patients

reported issues with the timing of the middle-of-the-night dose, leading to injuries, mental health

issues, and termination of employment.  Gudeman Decl., Ex. A at 1-2.  Patients urge that FDA

approve a once-nightly option without further delay, *see id.* at 2-7.  Every additional day of delay

in getting LUMRYZ approved and on its way to patients is a harm to the public interest.

Jazz's brief says not one word about the harm to these narcolepsy patients whose lives

stand to be greatly improved by LUMRYZ.  Instead, Jazz hides behind its argument that approval

might not actually be imminent.  But if Jazz is correct that LUMRYZ will not be approved for

other reasons, then there is no need to grant a stay.  The only effect of a stay is to prevent Avadel

from launching LUMRYZ, thus preventing patients to benefit from it.

The public interest in protecting IP rights does not outweigh the public interest in protecting

patients.  In the *Baxalta* case, after recognizing the importance of patent rights, Judge Dyk found

a preliminary injunction was against the public interest "given the ample evidence of medical

need" and "unique medical benefits not available from [the plaintiff's] competing products." 2018

WL 3742610, at *12.  So too here.  *See Apple Inc. v. Samsung Elecs. Co*., 735 F.3d 1352, 1372–

73 (Fed. Cir. 2013) (holding district court properly considered, in public interest fact, the scope of

the requested injunction "relative to the scope of the patented features and the prospect that an

injunction would have the effect of depriving the public of access to a large number of non-

infringing features.").  Indeed, Congress could have, but did not, provide for expedited appeals and/or a stay in the case of an order de-listing a patent.  And the public has an interest in stopping anticompetitive misuses of the Orange Book.  *See* D.I. 227 at 14-15 (FTC amicus brief discussing harm to the public from an improper Orange-Book listing and the abuse of REMS patents).

There is a clear and urgent need for LUMRYZ.  On the strength of this factor alone, Jazz's motion should be denied.

### D.    Jazz's Alternative Request for a 30-Day Stay Should Be Denied

Jazz's alternative request for a 30-day stay fares no better. The same factors all apply to warrant denial of that alternative request.  Jazz's cases are not to the contrary.  In *DePuy*, for example, the stay pending appeal related to whether a document should be made public and did not cause the kind of grave harm that will result from a stay here.  *DePuy Synthes Prod., Inc. v. Veterinary Orthopedic Implants, Inc.*, 990 F.3d 1364, 1367 (Fed. Cir. 2021).  Indeed, the stay granted in *Galderma* shows why Jazz should lose its motion.  Defendant Teva won below and thereafter launched its generic product.  Plaintiff Galderma—the party in Jazz's shoes—convinced the court to prevent Teva from acting on its victory and obtained an injunction pending Galderma's appeal.  The Federal Circuit then stayed *that* injunction, permitting Teva to sell its product during the appeal.  *Galderma Lab'ys, L.P. v. Teva Pharms. USA, Inc.*, 799 F. App'x 838, 842 (Fed. Cir. 2020).

Finally, Jazz could have sought expedited consideration in this Court and then filed an emergency motion for a stay in the Federal Circuit that could have been resolved without the need for this extraordinary relief.  *See supra* Section II.A.  Jazz wants a thirty-day stay because that is thirty more days Jazz can avoid competition from LUMRYZ—compare the thirty days sought by Jazz to get that motion on file to the *four days* granted in one of Jazz's primary authorities.  *See*

*Takeda Pharms. U.S.A., Inc. v. Mylan Pharms., Inc.*, No. CV 19-2216-RGA, 2020 WL 419488, at *3 (D. Del. Jan. 27, 2020).

### E.    Jazz Has Not Met the Requirement for a Bond

Jazz's request for a stay pending appeal is governed by Fed. R. Civ. P. 62(d), which permits a court to suspend or modify an injunction pending appeal "on terms for bond or other terms that secure the opposing party's rights."  Jazz fails even to mention this requirement or explain how it proposes to satisfy it.  That failure itself warrants rejecting Jazz's motion.  But even were it otherwise, Jazz would have no basis for objecting to Avadel setting the amount.  Based on Jazz's $5 million in revenue per day on oxybate sales, *see* Divis Decl. ¶ 21, a bond in the amount of approximately $1 million per day for the duration of the stay[6] would provide an appropriate level of security for Avadel pending the outcome of the appellate process.

## III.    CONCLUSION

Jazz's motion for a stay—of either the length of an appeal or 30 days—should be denied.

---

[6] The bond amount for a 30-day stay would be $30 million.

Dated:  November 29, 2022

MCCARTER &ENGLISH, LLP

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Counsel for Defendant*

*Of Counsel*:

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
Sarah W. Wang
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
kenneth.schuler@lw.com
marc.zubick@lw.com
alex.grabowski@lw.com
sarah.wang@lw.com

Herman Yue
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
Herman.Yue@lw.com

Daralyn J. Durie
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
(415) 365-6666
ddurie@durietangri.com

Kira A. Davis
Katherine E. McNutt
DURIE TANGRI LLP
953 East 3rd Street
Los Angeles, CA 90013
(213) 992-4499
kdavis@durietangri.com
kmcnutt@durietangri.com