# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., | **REDACTED PUBLIC VERSION** |
| Plaintiff, | **FILED AUGUST 29, 2023** |
| v. | C.A. No. 21-691-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | ████████████ |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., *et al.*, | |
| Plaintiffs, | |
| v. | C.A. No. 21-1138-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | ████████████ |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., *et al.*, | |
| Plaintiffs, | |
| v. | C.A. No. 21-1594-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | ████████████ |
| Defendant. | |
| AVADEL CNS PHARMACETUICALS LLC and AVADEL PHARMACEUTICALS PLC, | |
| Plaintiffs, | |
| v. | C.A. No. 22-487-GBW |
| JAZZ PHARMACEUTICALS, INC. and JAZZ PHARMACEUTICALS IRELAND LIMITED, | ████████████ |
| Defendants. | |

## LETTER TO THE HONORABLE GREGORY B. WILLIAMS FROM DANIEL M. SILVER, ESQ. REQUESTING STATUS CONFERENCE AND CONSOLIDATION OF CASES

Dear Judge Williams:

We write on behalf of Avadel in the above-captioned actions to respectfully request that the Court consolidate these cases (proposed order attached), which will allow for a single jury trial resolving all disputes between Jazz and Avadel concerning patent infringement, inventorship, and trade secret misappropriation. Alternatively, Avadel requests that the Court schedule a status conference to discuss consolidation. C.A. Nos. 21-691-GBW, 21-1138-GBW, 21-1594-GBW (Jazz's Patent Infringement Cases) are already consolidated, and consolidating C.A. No. 22-487 (Avadel's Misappropriation Case) with Jazz's Patent Infringement Cases will be most efficient for the parties, the Court, and the citizens of Delaware who will sit as jurors in these disputes.

On July 18, 2023, this Court denied Jazz's in full motion for judgment on the pleadings in the Misappropriation Case, and ordered the parties to submit a proposed schedule.  The parties exchanged correspondence regarding potential consolidation and, on August 8th, Jazz informed Avadel that it was still considering whether consolidation was appropriate and delayed providing two of its damages witnesses for deposition based on that potential consolidation.  Despite indicating that it would provide a response by the end of that week, Jazz provided no response.  When Avadel followed up today, Jazz indicated that it did not consider consolidation appropriate.  Contemporaneously with the submission of this letter, the parties submitted their competing schedules in the Misappropriation Case.  All of the salient considerations warrant adopting Avadel's proposed schedule and consolidating the Patent and Misappropriation cases.

***Procedural background***—Jazz filed the Patent Cases in 2021, alleging infringement of U.S. Patent Nos. 10,758,488, 10,813,885, 10,959,956, 10,966,931, 11,077,079, and 11,147,782 (the "Asserted Patents").  Avadel asserted a number of defenses, including derivation and improper inventorship of the Asserted Patents.  The parties are currently conducting damages and expert discovery, in which Jazz is seeking discovery regarding some of the negotiations involved in the Misappropriation Case because Jazz maintains that they are relevant to damages issues.  Trial is set for February 26, 2024.  21-691 D.I. 331.

In April 2022, Avadel filed the Misappropriation Case.  In addition to claims for trade secret misappropriation and breach of contract, Avadel's action includes claims for correction of inventorship of the Asserted Patents.  Jazz moved for judgment on the pleadings, and on July 18, 2023, the Court denied Jazz's motion.  22-487 D.I. 48.

***Consolidation legal standard***:  The Court has broad authority to consolidate cases if the cases "involve a common question of law or fact."  *Eastman Chem. Co. v. AlphaPet Inc.*, No. CV 09-971, 2011 WL 7121180, at *2 (D. Del. Dec. 29, 2011); Fed. R. Civ. P. 42(a).  Where, as here, there are common questions of law and fact, consolidation may be warranted if it would "serve the administration of justice," taking into account "whether there are overlapping parties, witnesses and documents between the actions" and whether there is a risk of "inconvenience, delay, expense or the risk of inconsistent results."  *Eastman*, 2011 WL 7121180, at *4; *see also Syngenta Seeds, Inc. v. Monsanto Co.*, No. CA 04-908, 2005 WL 678855, at *2 (D. Del. Mar. 24, 2005).

***Common questions***:  The Patent Cases and Misappropriation Case share a host of common questions of law and fact.  As set forth in Avadel's Invalidity Contentions in the Patent Cases, the evidence of record shows that the Avadel-related inventors truly invented the subject matter of the

1

Asserted Claims, and Jazz brazenly copied that subject matter from Avadel's published patent applications such that the Asserted Claims are invalid.  *See* Avadel Invalidity Contention Excerpts (Ex. 1) at *passim*.  Two inventors—Herve Guillard and Claire Mégret—will testify to such issues.

With regard to the Resinate Patents (U.S. Patent Nos. 11,077,079, and 11,147,782), Avadel has alleged a variety of facts including "███████████████████████████████████████" its eagerness to meet with Avadel and explore a possible collaboration, allegations surrounding Jazz's internal use of Avadel's confidential information, the timing of Jazz's distancing itself from Avadel, and Jazz's filing of the '899 Applications which matured into the '782 patent" that collectively make "Avadel's correction-of-inventorship claim as to the '782 patent [] plausible." D.I. 48 at 15.  The Court made a similar determination with regard to the SR Patents (U.S. Patent Nos. 10,758,488, 10,813,885, 10,959,956, 10,966,931):  "Avadel's Complaint is replete with allegations concerning Jazz's allegedly inappropriate conduct, including allegations that Jazz monitored Avadel's activities and misused Avadel's confidential information to obtain patents for itself."  *Id*. at 16.  The same Avadel inventors would be expected to testify on these issues.

Thus, a core issue that spans both cases is who invented the Asserted Patents.  In the Patent Cases, Avadel similarly alleges that the Asserted Patents are invalid for improper inventorship and derivation because the inventive work claimed in the patents was Avadel's and not Jazz's.  21-069 D.I. 336 ¶¶ 13-16, 23, 32, 41, 50; Ex. 2 (Charman report) XI, XV, XIX.  In the Trade Secret Misappropriation Case, Avadel alleges that ██████████████████ led it to utilize Avadel's proprietary formulation work in violation of the parties' CDAs and file patent applications on Avadel's inventions.  22-487 D.I. 2 ¶ 7.  Among the relief sought, Avadel requests correction of inventorship under 35 U.S.C. § 256 on the grounds that "[o]ne or more of the Avadel Inventors" (the inventors named on Avadel's Patent No. 10,272,062) "are inventors of" each Asserted Patent.  22-487 D.I. 2 ¶¶ 95, 188, 196, 204, 212, 220, 228.   Both sets of issues turn on the same core set of facts and the legal standards regarding inventorship and derivation.  And if inventorship is corrected, Avadel would be a co-owner of the patents, and co-owners cannot sue each other for patent infringement.  *See generally* 35 U.S.C. § 262 ("In the absence of any agreement to the contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention . . . without the consent of and without accounting to the other owners.")

As can be seen from the Invalidity Contentions and the Court's ruling in the Misappropriation Case, ██████████████████████████████████████ also is common to both pending actions.  *Compare* Avadel's Final Invalidity Contentions, Ex. 1, *Jazz Pharm., Inc., v. Avadel CNS Pharm., LLC*, No. CA 21-691-MN (D. Del, May 6, 2022) *with* D.I. 48 at 15-16 (noting plausibility of allegations concerning ██████████████████████████████████.  It is at the core of the misappropriation and correction claims, and is also relevant to other invalidity issues in the Patent Infringement Cases.  For example, Avadel alleges that Jazz's patent specifications—██████████████████████████████████████—do not describe or enable the claims that Jazz copied from Avadel.  *See, e.g.*, Ex. 2 XIV.C; *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1319 (Fed. Cir. 2007) ("If an inventor attempts but fails to enable his invention in a commercial product . . . that is strong evidence that the patent specification lacks enablement.").

Another issue that spans both sets of cases is the value of the Avadel information that enabled the development of LUMRYZ and ultimately issued as Avadel patents (some of which Jazz appears to have directly copied).  Jazz seeks a reasonable royalty in the Patent Infringement Case, and one

of the *Georgia-Pacific* factors involves "portion of the realizable profit that should be credited to the invention as distinguished from . . . improvements added by the [alleged] infringer." *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified sub nom. Georgia-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971). Avadel points to the value associated with its work developing LUMRYZ—some of the very same information that it claims to have been misappropriated. *Compare* D.I. 48 at 16 (noting plausibility of "allegations that Jazz monitored Avadel's activities and later misused Avadel's confidential information to obtain patents for itself"), *with* Ex. 3, Avadel Resp. to Interrog. No. 13 at 19 (noting that value of Avadel's work that Jazz offered to license is pertinent to *Georgia-Pacific* Factor #13).

Notably, one of the occasions for Jazz-Avadel interactions was termed "Project Zeta," and it spanned a period of interactions from approximately 2015-19. D.I. 2, Exs. 12, 15. Avadel pled myriad claims relating to the Project Zeta interactions. And Jazz recently demanded that Avadel provide a Rule 30(b)(6) designee on Project Zeta alleging that it is "relevant" to damages. Ex. 4, July 31, 2023 Ltr. from K. Rycroft to K. Davis at 4. Thus, Jazz seeks to introduce evidence of the parties' Project Zeta discussions into the Patent case—the jury should hear both parties' claims and defenses arising from those discussions. Given the overlapping factual issues that could lead to inconsistent results, consolidation is warranted. *See, e.g.*, *SZ DJI Tech. Co. v. Autel Robotics USA LLC*, No. CA 16-706-LPS, 2018 WL 1316203, at *1 (D. Del. Mar. 14, 2018) ("Burdening two sets of jurors (as well as the Court and Defendants) with two separate trials, presenting a heightened risk of inconsistent verdicts and wasting resources, is not a more desirable outcome.").

***Efficiencies from consolidation***: Key players identified in the Misappropriation Case, including Jazz employees and Avadel's CEO and its inventors, have been deposed or will soon be deposed in the Patent Cases. Avadel has also taken the depositions of Jazz's 30(b)(6) witnesses on topics that it likely may seek to introduce in the Misappropriation Case, including the origins of Jazz's patent claims, Jazz's monitoring of Avadel patent applications, and Jazz's various attempts to develop a once-nightly oxybate formulation. Jazz's requested discovery in the Patent Cases similarly overlaps with the Misappropriation Case, as mentioned above. The documents overlap as well; indeed, the documents Avadel received and produced in the Patent Infringement Cases support many allegations in Avadel's Misappropriation Case. All of the above witnesses would be likely trial witnesses in both cases, speaking to common issues; consolidation will permit each to testify only once, including several witnesses who must travel from France for trial and Avadel's CEO who has extensive day-to-day responsibilities managing Avadel. Efficiency thus favors consolidation. And instead of convening multiple juries, a single jury can decide all issues.

No considerations point against consolidation. Avadel's proposed schedule involves only a modest extension of the Patent Case trial, and any alleged prejudice is outweighed by the benefits of consolidating the trials and eliminating the need for a second jury and the possibility of inconsistent results. Avadel will proceed expeditiously with the additional discovery, and the overlap among the cases means that the further discovery required will be limited. The alternative—two trials months apart—would be inefficient. *See, e.g.*, *Leonard v. Stemtech Int'l, Inc.*, No. CA 12-86-LPS-CJB, 2012 WL 3655512, at *12 (D. Del. Aug. 24, 2012), *report and recommendation adopted*, No. CA 12-86-LPS-CJB, 2012 WL 4591453 (D. Del. Sept. 28, 2012).

For these reasons, Avadel respectfully requests consolidation of the Patent and Misappropriation Cases. Avadel is available at the Court's convenience for a conference to discuss these issues.

Respectfully submitted,

*/s/ Daniel M. Silver*

Daniel M. Silver (#4758)


cc: Counsel of Record (via CM/ECF and Email)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., | |
| Plaintiff, | |
| v. | C.A. No. 21-691-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., *et al.*, | |
| Plaintiffs, | |
| v. | C.A. No. 21-1138-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., *et al.*, | |
| Plaintiffs, | |
| v. | C.A. No. 21-1594-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |
| AVADEL CNS PHARMACEUTICALS LLC and AVADEL PHARMACEUTICALS PLC, | |
| Plaintiffs, | |
| v. | C.A. No. 22-487-GBW |
| JAZZ PHARMACEUTICALS, INC. and JAZZ PHARMACEUTICALS IRELAND LIMITED, | |
| Defendants. | |

**[PROPOSED] ORDER TO CONSOLIDATE CASES**

WHEREAS, the above-captioned cases present overlapping issues of fact and law and the interests of efficiency and judicial economy would be best served by addressing them in a single trial;

IT IS HEREBY ORDERED, that the above-captioned cases shall be consolidated, and that the case schedules in C.A. No. 21-691, C.A. No. 21-1138, and C.A. No. 21-1594 are modified as set forth in the following table with regard to case events that have not occurred already.  The same schedule is also hereby adopted for C.A. No. 22-487.

| Event | Consolidated Deadline |
|---|---|
| 26(a)(1) Initial Disclosures | August 22, 2023 |
| Protective Order Submission Deadline | August 29, 2023 |
| ESI Paragraph Three (3) disclosures | September 8, 2023 |
| All motions to join other parties, and to amend or supplement the pleadings | October 27, 2023 |
| Substantial Completion of Document Discovery | November 17, 2023 |
| Fact Discovery Cutoff | January 17, 2024 |
| Opening Expert Reports (trade secret) | February 16, 2024 |
| Rebuttal Expert Reports (trade secret) | March 15, 2024 |
| Reply Expert Reports (trade secret) | April 12, 2024 |
| Expert Discovery Cutoff | May 10, 2024 |
| Daubert Motions | June 7, 2024 |
| Case Dispositive Motions served and filed on or before | June 7, 2024 |
| Proposed voir dire, preliminary jury instructions, final jury instructions, and special verdict forms due | October 4, 2024 |
| Pretrial Conference | October [21], 2024 |
| Jury Trial Begins (5-8 days) | October [28], 2024 |

**SO ORDERED** this _____ day of _____, 2023.

_____
United States District Court Judge

# EXHIBIT 1

!IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAZZ PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 21-691-MN |
| | ) | |
| AVADEL CNS PHARMACEUTICALS, LLC, | ) | ██████████████ |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| JAZZ PHARMACEUTICALS, INC. and JAZZ PHARMACEUTICALS IRELAND LIMITED, | ) | |
| | ) | |
| | ) | C.A. No. 21-1138-MN |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| AVADEL CNS PHARMACEUTICALS, LLC, | ) | ██████████████ |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| JAZZ PHARMACEUTICALS, INC. and JAZZ PHARMACEUTICALS IRELAND LIMITED, | ) | |
| | ) | |
| | ) | C.A. No. 21-1594-MN |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| AVADEL CNS PHARMACEUTICALS, LLC, | ) | ██████████████ |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## AVADEL'S FINAL INVALIDITY CONTENTIONS

1

Pursuant to Paragraph 4(d) of the Default Standard for Discovery and the Scheduling Order entered in the above-captioned actions on December 21, 2021 (*see* D.I. 72),[1] Defendant Avadel CNS Pharmaceuticals, LLC ("Defendant" or "Avadel"), hereby provide Plaintiffs Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited (collectively, "Jazz" or "Plaintiffs") its final invalidity contentions regarding the asserted claims of U.S. Patent Nos. 8,731,963 (the "'963 patent"); 10,758,488 (the "'488 patent"); 10,813,885 (the "'885 patent"); 10,959,956 (the "'956 patent"); 10,966,931 (the "'931 patent"); 11,077,079 (the "'079 patent"); and 11,147,782 (the "'782 patent") (collectively the "Patents-in-Suit"). Avadel's document production accompanying these contentions was served contemporaneously herewith.

## I.    GENERAL STATEMENTS

Avadel submits these final invalidity contentions based upon information presently available. Discovery is ongoing and the terms of the asserted claims have not yet been construed by the Court. Therefore, Avadel reserves the right to supplement, alter, amend, and/or modify these contentions based on further investigation, fact or expert discovery, evaluation of the scope and content of the prior art, any claim construction by the Court, or as a result of Jazz's asserted claims and contentions.

On September 7, 2021, Jazz provided Avadel with its Initial Infringement Contentions for the '963 patent ("REMS Patent"), and for the '488 patent, the '885 patent, the '956 patent, and the '931 patent (collectively, the "Sustained Release Patents"). In those Initial Infringement Contentions, Jazz asserted that FT218, as described in Avadel's New Drug Application ("NDA")

---

[1] All matters listed in the caption above are proceeding on a coordinated schedule. All docket cites are to matter C.A. No. 21-691-MN unless otherwise noted.

(1) the quantity of experimentation necessary; (2) the amount of direction or guidance disclosed in the patent; (3) the presence or absence of working examples in the patent; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability of the art; and (8) the breadth of the claims. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). A patent specification must enable the full scope of the claimed invention. *See ALZA Corp.*, 603 F.3d at 939 (affirming invalidity of the claims based on lack of enabling disclosure because "developing non-osmotic oral dosage forms, such as tablets and capsules" requires undue experimentation).

> **1.      The Jazz Sustained Release Patents neither describe nor enable the claimed formulation with the claimed dissolution profile**

The claims of the Jazz Sustained Release Patents are directed to formulations containing "sustained release" components. *See, e.g.*, '488 patent at claim 1 ("A formulation comprising immediate release and sustained release portions . . ."); '885 patent at claim 1; '956 patent at claim 1; and '931 patent at claim 1.  Jazz appears to contend that the claimed formulations are not restricted to particular dosage forms, but can include any dosage form, as indicated by its contention that Avadel's FT218 NDA infringes the Sustained Release Patents, even though FT218 is formulated as a sachet to deliver GHB by oral suspension.  *See, e.g.*, 9/7/21 Jazz's Initial Infringement Chart at 27, 60, 84, 149-150.

The specification's disclosure of formulations containing both "immediate release" and "sustained release" components, however, is limited to two specific solid dosage forms: tablets and capsules.  *See, e.g.*, '488 patent at col. 4:18-22 ("However, the IR component may also be formulated as part of a single dosage form that integrates both the IR and CR components.  In such an embodiment, the pharmaceutical formulation may be provided in the form of the coated tablet or capsules); *id.* at col. 9:31-35 ("In certain embodiments, the controlled release formulations described herein are provided as a coated tablet composition having a controlled release core

107

coated by a functional overcoat."); *see also* '885 patent at col. 4:26-30, 9:39-42 (same); '956 patent at col. 4:26-30, 9:39-42 (same); '931 patent at col. 4:26-30, 9:39-42.

The asserted claims of the Sustained Release Patents specifically require a "functional coating" in the "sustained release portion" of the claimed formulations. *See, e.g.*, '488 Patent at claim 1. The specification describes that the functional "coating composition works to preserve the integrity of the unit dosage form post administration and serves to facilitate controlled release of drug from the CR core." '488 Patent at 11:56-59.

Based on these disclosures, a POSA would not have understood the inventors to have been in possession of the full scope of GHB formulations containing "sustained release" components which would fall within the scope of the claims under Jazz's view of the claims. Specifically, a POSA would not have understood the inventors to have been in possession of solid formulations containing "sustained release" components other than tablets or capsules. Thus, to the extent Jazz asserts the asserted claims of the Jazz Sustained Release Patents encompass GHB formulations containing "sustained release" components other than tablets or capsules (such as FT218's sachet formulation), the claims are invalid for lack of written description support.

The claims of the Jazz Sustained Release Patents are also invalid for lack of written description because the specification fails to disclose that the inventors were in possession of sustained release formulations possessing a "functional coating" containing methacrylic acid-methyl methacrylate co-polymers, let alone in the percentages recited in the asserted claims. As described above, the claims of the Jazz Sustained Release Patents recite formulations in which the sustained release portion possesses a functional coating comprising "one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating," or substantially similar language. *See, e.g.* '488 patent at col. 27:35-38; '885

patent at col. 26:64-67; '956 patent at col. 27:13-15; and '931 patent at col. 28:1-4.   The specification, however, lacks any disclosure of a sustained release formulation in which a functional coating contains methacrylic acid-methyl methacrylate co-polymers comprising "about 20% to about 50% by weight of the functional coating."   The only disclosure of methacrylic acid-methyl methacrylate co-polymers is a passing mention in column 13, which identifies methacrylic acid-methyl methacrylate co-polymers as potential materials for use as pore formers.   *See, e.g.*, '488 patent at col. 13:30-31; '885 patent at col. 13:39-40; '956 patent at col. 13:39-40; and '931 patent col. 13:39-40.   But this cursory disclosure of methacrylic acid-methyl methacrylate co-polymers as part of a broader description of possible polymer materials with no indication of the appropriate quantity for use in a sustained release formulation would not lead a POSA to believe that the inventors were in possession of the full scope of the recited sustained release formulations containing "about 20% to about 50% by weight" of methacrylic acid-methyl methacrylate co-polymers with a particular in vitro dissolution profile in very specific medium (de-ionized water) using a very specific dissolution method.

Nor do any of the examples describe dissolution experiments performed on sustained release formulations containing methacrylic acid-methyl methacrylate co-polymers, let alone at the recited amounts.   The asserted claims of the Jazz Sustained Release Patents require that the recited release of GHB from the immediate and sustained release portions be determined when the claimed formulation is tested in a dissolution apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm.   *See, e.g.*, '488 patent at col. 27:44-46; '885 patent at col. 27:1-5; '956 patent at col. 27:22-24; and '931 patent at col. 28:5-9.   But the specification contains no test results or other data indicating to a POSA that the inventors were in possession of any formulation that contained a sustained release portion comprising a functional coating containing

"about 20% to about 50% by weight" of methacrylic acid-methyl methacrylate co-polymers that results in a formulation exhibiting such *in vitro* characteristics.  *See, e.g.*, '488 Patent at *passim*.

Other than Examples 2 and 3, none of the examples disclosed in the specification utilize USP Apparatus 2.  Further, while Example 2 describes the use of USP Apparatus 2, the sustained release formulation tested contains, in addition to a sodium oxybate tablet core, hydroxypropyl cellulose, dibutyl sebacate, ethylcellulose, ethanol, and water, but no methacrylic acid-methyl methacrylate co-polymer, much less in the concentration range recited in the claims.  *See* '488 patent, Table 2A; '885 patent, Table 2A; '956 patent, Table 2A; and '931 patent, Table 2A.  In addition, the formulation tested in Example 2 only discloses a "functional coating" comprising polymers, and contains no disclosure of a functional coating incorporating, e.g., hydrogenated vegetable oil.  In addition, the formulation tested in Example 2 does not demonstrate possession of the claimed dissolution profile, at least because it fails to demonstrate that the subject "formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37 ºC and a paddle speed of 50 rpm."  *See, e.g.*, '488 patent at col. 20:31-37; *see also* '885 patent at col. 20:43-49; '956 patent at col. 20:27-33; '931 patent at col. 20: 48-54.  Thus, Example 2 fails to disclose a GHB formulation meeting the limitations of the Jazz Sustained Release Patent claims that displays the recited GHB release profile when measured using the recited dissolution apparatus.

Example 3 relies on the sustained release tablets from Example 2 but further adds an immediate release overcoat of GHB.  Thus, like Example 2, Example 3 fails to disclose dissolution of a formulation in USP Apparatus 2 that contains a functional coating with methacrylic acid-methylmethacrylate co-polymer, much less in the concentration range recited in the claims, and

describes only a functional coating made of polymers, with no disclosure of a functional coating incorporate hydrogenated vegetable oil.

Based on the disclosures of formulations tested using USP Apparatus 2 in the Jazz Sustained Release Patents, a POSA would have concluded that the inventors did not demonstrate that they were in possession of the claimed GHB formulations for this additional reason.

Moreover, the asserted claims specifically recite that claimed formulations exhibit behavior whereby "the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours" when tested in the specified manner. *See, e.g.*, '488 Patent at claim 1(a); *see also* '885 patent at claim 1; '956 patent at claim 1(a); '931 patent at claim 1. But the specification contains no teaching as to how a POSA could even discern that the released gamma-hydroxybutyrate comes from the sustained release portion as opposed to any other source. Nor does the specification provide any discussion of how to measure the gamma-hydroxybutyrate from the sustained release portion using the recited equipment, method, and medium that would show the inventors' possession of the claimed subject matter, let alone data showing possession of such subject matter in a sustained release portion with a functional coating containing "about 20% to about 50% by weight" of methacrylic acid-methyl methacrylate co-polymers. *See, e.g.*, '488 Patent at *passim*.

More generally, the asserted claims of the Jazz Sustained Release Patents are functional claims directed to formulations possessing a broad array of functional coatings that would result in the release profiles for GHB when tested using USP Apparatus 2 under the recited conditions. Further, those functional coatings are limited only by the requirement that the include a wide range of possible concentrations of methacrylic acid-methylmethacrylate. As discussed above, the specification provides no working examples of formulations with functional coatings containing

methacrylic acid-methylmethacrylate, much less formulations meeting the recited drug release profile. Nor does the specification provide a POSA with any guidance how one would achieve the claimed GHB release profiles across the entire range of formulations claimed by the Jazz Sustained Release Patents. Further, a POSA would understand that dissolution testing is unpredictable. In view of the breadth of the functional claims of the Jazz Sustained Release Patents, the unpredictability in the art, and the limited disclosures in the specification, a POSA would not believe the inventors were in possession of the full range of possible formulations that met the recited drug release profile. *See Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 330, 1339 (Fed. Cir. 2021) (finding invalid claims covering all scFvs that bind to a target of clinical interest); *Indenix Pharm. LLC v. Gilead Sciences Inc.*, 941 F.3d 1149, 1164-65 (Fed. Cir. 2019) ("The written description requirement specifically defends against such attempts to 'cover any compound later actually invented and determined to fall within the claim's functional boundaries.'" (quoting *Ariad*, 598 F.3d at 1353)); *AbbVie Deutschland GmbH v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1301 (Fed. Cir. 2014) ("Functionally defined genus claims can be inherently vulnerable to invalidity challenge for lack of written description support, especially in technology fields that are highly unpredictable, where it is difficult to establish a correlation between structure and function for the whole genus or to predict what would be covered by the functionally claimed genus."); *Ariad*, 598 F.3d at 1352 ("The written description requirement also ensures that when a patent claims a genus by its function or result, the specification recites sufficient materials to accomplish that function . . . ."). To the extent Jazz contends that the specification of the Jazz Sustained Release Patents and level of skill in the art would lead a POSA to believe the inventors were in possession of the claimed formulations, that only further underscores the obviousness of the claims.

During prosecution of the '488 patent, the Examiner rejected the pending claims for failing to disclose a formulation containing a functional coating comprising the recited range of methacrylic acid-methyl methacrylate co-polymers that displayed the GHB release profile recited in the claims. *See* '488 patent File History, May 2, 2019 Office Action at 3-7.  In response, the Applicant submitted a declaration from Clark Allphin ("Allphin Declaration"), one of the inventors of the Jazz Sustained Release Patents, that purportedly described the claimed release of GHB using a formulation containing "28% (w/w) Eudragit L100 (methacrylic acid-methyl methacrylate copolymer), 55% (w/w) ethylcellulose, and 17% (w/w/) poloxamer 199." *See* '488 patent File History, March 5, 2020 Allphin Declaration at ¶ 13.

Jazz, however, cannot rely on its submissions to the patent office—such as the Allphin Declaration and the accompanying data—to compensate for the lack of written description support of its claims.  It is well established that written description support must be found in the four corners of the patent.  35 U.S.C. § 112, para. 1 (pre-AIA); *see also Enzo Biochem., Inc. v. Gen-Probe, Inc.*, 323 F.3d 956, 969 (Fed. Cir. 2002) ("After all . . . one can show possession of an invention by means of an affidavit or declaration during prosecution . . .  However, such a showing of possession alone does not cure the lack of a written description in the specification, as required by statute.").  Jazz's submission to the patent office is legally irrelevant for purposes of the written description analysis.

Further, even if the Allphin Declaration could be considered, it fails to provide the necessary written description support.  The dissolution study described in the Allphin Declaration was performed using either USP Apparatus 3 or 7, in which the dissolution profile was tested using deionized water at a temperature of 37 ºC and a dip rate of 30/min, where samples were taken at

intervals of 30 minutes until 2 hours, then hourly thereafter.[17]  Allphin Decl. ¶ 13.  In contrast, the claims of the Jazz Sustained Release Patent require the use of USP Apparatus 2, with a paddle speed at 50 rpm.  Because these are distinct dissolution protocols, the disclosure of testing using USP Apparatus 3 or 7 cannot serve as a substitute for dissolution testing using USP Apparatus 2.  As a result, the data provided in the Allphin Declaration would not rescue the lack of written description support in the Jazz Sustained Release Patents.

For similar reasons, the Jazz Sustained Release Patents are invalid for lack of enablement across the full scope of the claims.  For example, the specification provides no guidance how a POSA would generate any type of formulation with the recited GHB release profiles other than tablets and capsules, that would provide the necessary GHB release characteristics.  Nor does the specification provide working examples of any of the foregoing dosage forms.  Given the level of skill in the art, the formulations known in the art, the unpredictability of dissolution testing, and the breadth of the claims, to the extent Jazz contends the asserted claims are not obvious to one of ordinary skill in the art, the Asserted Patents do not enable a POSA to practice the full scope of the claims without undue experimentation.

### 2. The Sustained Release patents neither describe nor enable a functional coating without a "base polymer"

To the extent Jazz contends that FT218 possesses a "functional coating" around its controlled release component, the asserted claims of the Jazz Sustained Release Patents are invalid for lack of written description and enablement for failing to disclose non-polymeric functional

---

[17] The dissolution study described in the Allphin Declaration must have been performed in either USP Apparatus 3 or 7 because it recites a dip rate, rather than a paddle speed, as would be required for Apparatus 2.

coatings.  *See* '488 patent, claim 1 ("the sustained release portion comprises a functional coating and a core"); '885 patent, claim 1; '956 patent, claim 1; '931 patent, claim 1.

FT218's controlled release component includes █████████████████████ components: ████████████████████████████████ AVDL_00044786 at AVDL_00044788.  ███ ████████████████████ ██████████████  *Id.*  To the extent Jazz contends that the asserted claims of the Jazz Sustained Release Patents are broad enough to encompass an outer layer with a vegetable-oil base, the claims are invalid for lack of written description.  The specification only describes "functional coatings" having a base polymer and contains no disclosure of functional coatings made using a non-polymeric base, e.g., vegetable oil.  *See* '488 patent at col. 12:40-13:13; '885 patent at col. 12:48-13:22; '956 patent at col. 12:48-13:22; and '931 patent at col. 12:48-13:22.  A POSA would therefore not believe, based on the disclosures in the specification, that the inventors were in possession of the claimed GHB formulation in which the functional coating was made of hydrogenated vegetable oil.

Similarly, to the extent Jazz contends the Jazz Sustained Release Claims cover functional coatings that include hydrogenated vegetable oil, the claims are also invalid for lack of enablement. The specification provides no guidance that would allow a POSA to make a functional coating comprising a hydrogenated vegetable oil base that would result in the required GHB release profile without undue experimentation.   The specification also fails to provide any working examples of such a formulation.  Given the level of skill in the art, the formulations known in the art, the level of predictability in the art and the breadth of the claims, to the extent Jazz contends the asserted claims are not obvious to one of ordinary skill in the art, the Sustained Release Patents do not enable a POSA to practice the full scope of the asserted claims without undue experimentation.

### 3.   Response to Jazz on Invalidity of the Sustained Release Patents Under 35 U.S.C. § 112

Avadel's initial contentions demonstrate that the asserted claims are invalid for failure to satisfy the requirements of 35 U.S.C. § 112, and Avadel incorporates those contentions herein by reference.  Jazz's responses to Avadel's contentions that the Sustained Release Patents are invalid under 35 U.S.C. § 112 in its Final Validity Contentions are unavailing.  Avadel responds to each of Jazz's arguments below.

*First*, in response to Avadel's argument that a POSA would not have understood the inventors to have been in possession of the full scope of GHB formulations in any solid dosage forms other than tablets or capsules, Jazz contends that "there is no requirement that a patent describe the unclaimed features of an infringing product."  *See* Jazz's Final Validity Contentions at 86-87.  Jazz misses the mark and turns the written description requirement on its head.  To satisfy the written description requirement, the patent specification must demonstrate that "the inventors possessed the full scope of the claimed invention."  *Juno Therapeutics*, 10 F.4th at 1336. Here, a "formulation" containing "sustained release" and "immediate release" portions is a claimed—not unclaimed—feature, and by asserting that the patent claims cover the sachet formulation of Avadel's FT218 product, Jazz necessarily contends that the recited "formulation" should be construed to include formulations other than tablets and capsules, such as sachet formulations.  *See* Jazz's Final Validity Contentions at 87.  As discussed above, however, the specification discloses only tablet and capsule forms of formulations containing sustained release and immediate release portions.  *See, e.g.*, '488 patent at col. 4:18-22.  Other formulation options such as a "dry powder formulation, an immediate release tablet, an encapsulated formulation, or a liquid solution or suspension," are solely disclosed for the immediate release portion.  *Id.* at col. 4: 14-17.  But the specification contains no description of any such options for an integrated

sustained release and immediate release formulation.  Thus, a POSA would not have understood the inventors to have been in possession of the full scope of formulations containing the recited "immediate release" and "sustained release" components that Jazz contends fall within the scope of the claims.  To the extent that Jazz contends that the claimed formulation encompasses more than tablets or capsules, such as FT218's sachet formulation, the claims are invalid for lack of written description support.

Jazz's Final Validity Contentions cite to a few paragraphs in the specification that it contends provides sufficient written description for solid formulations or dosage forms other than tablets or capsules.  *See* Jazz's Final Validity Contentions at 87.  For the reasons stated in Section III.E.1, this argument is unavailing.  In addition to citing portions of the specification that discuss individual components rather than the final formulation containing immediate and controlled release components, the sections that Jazz cites contain only generic terms and explanations such as "other dosage form" and "formulation and structure of integrated dosage forms . . . can be adjusted."  '488 patent at col. 17:59-66; *see also id.* at 11:29-44; 16:3-5.  These general disclosures cited by Jazz would not lead a POSA to believe that the inventors were in possession of any formulations or dosage forms other than a tablet or a capsule.

**Second**, in response to Avadel's argument that a POSA would not have understood the inventors to have been in possession of sustained release formulations possessing a "functional coating" containing a specific amount of methacrylic acid-methyl methacrylate co-polymers that resulted in the recited dissolution profile under the claimed dissolution conditions, Jazz cites two passages from the specification.  *See* Jazz's Final Validity Contentions at 88.  For the reasons stated in Section III.E.1, these citations do not cure the lack of written description support for the "functional coating" containing a specific amount of methacrylic acid-methyl methacrylate co-

polymer.  As an initial matter, Jazz does not contend that either of the passages it cites discloses an *in vitro* dissolution profile of any sustained release formulation with a functional coating containing methacrylic acid-methyl methacrylate co-polymers, let alone one that falls within the ambit of the claim limitations recited in the Sustained Release Patents.  *See* Jazz's Final Validity Contentions at 88 (citing '488 patent at col. 13:14-34, 13:35-47).  That failure alone demonstrates a lack of written description.

Jazz also cites the specification's disclosure of methacrylic acid-methyl methacrylate co-polymer as "pore former" and contends that the methacrylic acid-methyl methacrylate copolymers in the claims perform this function.  *See* Jazz's Final Validity Contentions at 88.  But that does not address the lack of any *in vitro* dissolution data.  *See* disc. *supra*.  Further, a POSA would have known that methacrylic acid-methyl methacrylate co-polymers can perform many different functions in a formulation, and would not have understood based on the patent specification that the methacrylate acid-methyl methacrylate co-polymers in the claim limitations at issue function as a "pore former."  The specification teaches that methacrylic acid-methyl methacryalate co-polymers can perform other functions—it discloses that polymethacrylates, which include methacrylic acid-methyl methacrylate co-polymers, can be used as a binder, for instance.  '488 patent at col. 10:37-45.  In addition, the claims at issue recite a particular function for methacrylic acid-methyl methacrylate co-polymers in the claim limitations at issue – they must behave as a "functional coating."  Jazz cites no information from the specification demonstrating to a POSA that the inventors were in possession of the claimed formulation, including methacrylate acid-methyl methacrylate co-polymers in a functional coating to achieve the claimed dissolution profile. The lone statement from the specification on that score is limited to "combinations of ethylcellulose with ammino methacrylate copolymers, such as EUDRAGIT RS, EUDGRAGIT

118

RL, and combinations thereof." '488 Patent at 12:26-30.  FT218 contains no ethylcellulose.  Thus, while Jazz contends that the scope of the "functional polymer" limitation includes FT218, the specification lacks any written description for the alleged full scope of the claims.

Further, the specification discloses methacrylic acid-methyl methacrylate co-polymers as only one of several examples of possible pore formers.  '488 patent at col. 13:14-34.  This would not have led a POSA to believe that the inventors were in possession of sustained release formulations containing methacrylic acid-methyl methacrylate co-polymers with the recited dissolution profile.  Indeed, in asserting that the claims of the Sustained Release Patents were not obvious over the prior art, Jazz argued that prior art references that disclose "methacrylic acid-methyl methacrylate co-polymers [as] just some of the laundry list of excipients" would not have rendered its inclusion as a part of a functional coating obvious.  *See e.g.*, Jazz's Final Validity Contentions at 50, 53, 82-83.

Moreover, the specification's brief mention of methacrylic acid-methyl methacrylate co-polymers is immediately followed by a warning highlighting the downside of using enteric polymers: "However, incorporating enteric components in the film may result in delivery characteristics that exhibit some level of sensitivity to gastric and intestinal transit times."  '488 patent at col. at 13:33-34.  Hence, the specification discourages the use of the listed pore formers, including methacrylic acid-methyl methacrylate.  For this additional reason, a POSA would not have understood the inventors to be in possession of a formulation having a sustained release component with a functional coating containing methacrylic acid-methyl methacrylate co-polymer—much less in an amount ranging "from about 20% to about 50% by weight of the coating composition."  *Id.* at 13:35-47.

**Third**, Jazz asserts that the '488 patent provides written description support for the claimed "functional coating" based on the disclosures at col. 7:64-8:4, and in Example 2 and Example 3 of the '488 patent.  Jazz's Final Validity Contentions at 88.  At the outset, Jazz does not dispute that neither the cited passage from the specification nor Examples 2 and 3 describe a formulation containing a methacrylic acid-methyl methacrylate co-polymer, much less in the concentration range recited in the claims.  Instead, the cited passage from the specification provides only a generic disclosure of evaluating drug delivery with a "USP type 2 or USP type 7 dissolution apparatus set to 37ºC ± 2ºC" using "dissolution media[] selected from dissolution media known by those of skill in the art such as at least one of purified water, 0.1N, HCl, simulated intestinal fluid, and others."  Nowhere does the specification describe performing dissolution testing using the specific combination of USP Apparatus 2 at 37ºC in deionized water, much less dissolution testing of a controlled release component containing a methacrylic acid-methyl methacrylate co-polymer.  Similarly, while Examples 2 and 3 describe using USP Apparatus 2 to measure drug release from controlled release components containing ethylcellulose, hydroxypropyl cellulose, and dibutyl sebacate, they provide no description of using USP Apparatus 2 to measure drug release from a formulation containing a methacrylic acid-methyl methacrylate co-polymer, nor do they contain any data from any experiment including a formulation with a functional coating comprising a methacrylic acid-methyl methacrylate co-polymer – let alone data showing possession of the dissolution profile recited in the claims.  Because of such unpredictability in dissolution testing, the level of disclosure needed to satisfy the written description requirement is high.  *Ariad Pharms., Inc. v. Eli Lilly & Co.,* 598 F.3d 1336, 1351 (Fed. Cir. 2010) ( "[T]he level of detail required to satisfy the written description requirement varies depending on . . . the complexity and predictability of the relevant technology.").  Here, differences in composition

(including differences in the type of excipient/polymer comprising the alleged functional coating and the percentage of excipient/polymer utilized), apparatus, temperature, and dissolution medium used can substantially impact the measured dissolution profile of a drug formulation.  Jazz's cited disclosures in the specification fall well short of supporting its conclusory assertion that these disclosures would have led a POSA to "also know that the inventors were in possession of the inventions recited the claimed dissolution profile."

To the extent Jazz contends that the specification of the Sustained Release Patents discloses sustained release components with a functional coating containing from about 20% to about 50% methacrylic acid-methyl methacrylate co-polymer, the specification lacks any disclosure of the remaining components of the functional coating needed so that the sustained release component would provide the recited drug dissolution profile.  Further, Jazz has argued that the drug dissolution profile generated by a specific functional coating is unpredictable and highly dependent on the composition of the functional coating.  For example, Jazz argues that Majeed 1986 "demonstrate[s] unpredictability" in drug release profile when the amounts and proportion of co-polymers in the functional coating changes.  *See* Jazz's Final Validity Contentions at 61.  In view of Jazz's asserted unpredictability of the drug release profile when tested using a dissolution apparatus and the absence of any guidance as to the composition of the functional coating required to achieve the recited dissolution profile, the claims of the '488 patent lack written description support for this additional reason.

Jazz also asserts that the law does not require the specification to contain any examples or an actual reduction to practice.  This argument is unavailing because the claim recites more than simply testing formulations containing methacrylic acid-methyl methacrylate co-polymers under the recited conditions.  It also requires a specific drug dissolution profile, yet nothing in the

specification indicates that the inventors were ever in possession of a formulation that would achieve the recited dissolution result (or even that they attempted to achieve the claimed dissolution profile generated under the recited dissolution conditions using a functional coating comprising a methacrylic acid-methyl methacrylate co-polymer).   None of the sections of the patent specification relied on by Jazz describe achieving a claimed dissolution profile in USP Apparatus 2 in deionized water at 37 °C, let alone for a composition containing a sustained release portion comprising a functional coating comprising a methacrylic acid-methyl methacrylate co-polymer.   '488 patent at col. 7:64-8:4; Example 2 and Example 3.   Instead, the passage from the specification cited by Jazz ('488 patent at col. 7:64-8:4) provides only a generic disclosure that drug delivery can be evaluated in USP Apparatus 2 in deionized water at 37°C without any description of the target dissolution profile.   Example 2 and 3 similarly lack any disclosure of the dissolution profile.   A POSA would therefore not have believed that the inventors were in possession of a sustained release formulation possessing a functional coating containing methacrylic acid-methyl methacrylate co-polymers in the percentages recited in the asserted claims and that resulted in the recited GHB dissolution profile.

*Fourth*, in response to Avadel's argument that the specification contains no teaching as to how a POSA would determine that the released gamma-hydroxybutyrate comes from the sustained release portion as opposed to any other source, such as the immediate release component, Jazz asserts in conclusory fashion that "the specification provides clear instruction [sic] how to test and measure the dissolution profile of any claimed formulations."   Jazz's Final Validity Contentions at 89.   Jazz's conclusory assertion, for which it provides no citations, evidence, or support, misses the point.   *Id.*   Nothing in the specification's discussion of dissolution testing describes how to test the claimed formulation—containing both an immediate release and a sustained release

component—to determine the amount of GHB released from the sustained release component, as opposed to the immediate release component.  Thus, a POSA would not have believed that the inventors were in possession of a formulation comprising immediate release and sustained release portions where the sustained release portion released greater than about 40% of its GHB by about 4 to about 6 hours when tested in the recited dissolution testing conditions.

*Fifth*, in response to Avadel's argument that the Sustained Release Patents are invalid for failing to satisfy the enablement requirement, Jazz relies on the same arguments set forth in response to Avadel's written description arguments.  *See* Jazz's Final Validity Contentions at 89-90.  For the same reasons as stated in Section III.E.1 and in this section, none of the disclosures in the specification that Jazz cites would enable a POSA to arrive at a gamma-hydroxybutyrate sustained release formulation with the recited amounts of methacrylic acid-methyl methacrylate co-polymers in its functional coating that possesses the claimed dissolution profile when tested under the recited conditions.

Jazz asserts in its Final Validity Contentions that its nonobviousness theories do not demonstrate the lack of enablement of the Sustained Release Patents because the prior art lacks "any disclosure that (1) would have motivated a POSA to develop a formulation with the claimed characteristics or (2) would have led a POSA to reasonably believe the claimed formulations would exhibit the claimed dissolution profiles."  Instead, Jazz contends that "the specification of the Sustained Release Patents, as set forth above, clearly sets forth methacrylic acid-methyl methacrylate co-polymers used in the functional coating of the claimed formulations in the claimed amounts, and also teaches how to make use of those polymers in the claimed formulations, including to achieve the claimed dissolution profiles."  Jazz's Final Validity Contentions at 90. For the reasons set forth above, Jazz's contentions are meritless: the specification of the Sustained

Release Patents fails to provide any of the additional disclosures Jazz contends are missing from the prior art cited by Avadel demonstrating the obviousness of the Sustained Release Patent claims. Indeed, the prior art cited by Avadel to demonstrate the obviousness of Jazz's claims contains more teachings than set forth in the specification of the Sustained Release Patents. For example, unlike the specification of the Sustained Release patents, Liang 2006 discloses the dissolution profile of a sustained release formulation of GHB with Eudragit FS 30 D (containing methacrylic acid-methyl methacrylate co-polymers) as a component of the functional coating under specified dissolution testing conditions. *See* Liang 2006, Figure 1, Example 6, Example 7. Thus, to the extent Jazz contends that the prior art cited by Avadel does not establish the obviousness of the Sustained Release Patents, the specification could not have provided sufficient disclosure to enable a POSA to practice the claims of Jazz's patents.

*Sixth*, in response to Avadel's contention that the specification does not disclose any functional coatings with a non-polymeric base, Jazz again argues that there is no requirement that a patent describe the unclaimed features of an infringing product. Jazz's Final Validity Contentions at 90-91. This argument is unavailing for the reasons discussed in Section III.E.2. To satisfy the written description requirement, the patent specification must demonstrate that "the inventors possessed the full scope of the claimed invention." *Juno*, 10 F.4th at 1336. Here, "functional coating" is a claimed—not unclaimed—feature, and by arguing that the patent claims cover more than formulations with polymeric base, Jazz necessarily contends that the recited "functional coating" should include functional coatings with a non-polymeric base. *See* Jazz's Final Validity Contentions at 91. As discussed above, however, the specification provides no disclosures of "functional coating[s]" other than those with a polymer base. *See, e.g.*, '488 patent at col. 12:40-42. Thus, a POSA would not have understood the inventors to have been in

possession of the full scope of the various "functional coating[s]" Jazz now asserts are encompassed by the Sustained Release Patent claims.

Further, Jazz's contention that the specification discloses non-polymeric materials in the functional coating ignores the fact that the disclosed non-polymeric materials do not include hydrogenated vegetable oil.  *See* Jazz's Final Validity Contentions at 91 (citing '488 patent at col. 13:59-14:4).  In addition, the cited disclosures are directed to anti-tack agents, not materials for the base of the functional coating.  *See* '488 patent at col. 13:59-14:4 ("The functional coating composition as disclosed herein may also include an anti-tack agent.  For example, certain embodiments of the functional coating composition may include an anti-tack agent selected from one or more of talc, glyceryl monostearate, and magnesium stearate.").  Jazz therefore fails to identify any disclosure in the specification of a "functional coating" possessing a base other than a polymeric base.  To the extent Jazz contends the claimed formulations include "functional coating[s]" with a non-polymeric base, such as hydrogenated vegetable oil, the claims are invalid for lack of written description support.

*Seventh*, Jazz relies on its responses to Avadel's written description challenges to assert that the Sustained Release Patents enable the claimed formulations wherein the functional coating contains functional coatings with a non-polymeric base.  For the same reasons set forth in Section III.E.2 and as stated above, Jazz's assertion that the Sustained Release Patents provide sufficient written description support are meritless.  The patent specification provides no description of a functional coating possessing anything other than a polymer base, and a POSA would therefore be unable to make the claimed formulation where the functional coating possessed a non-polymeric base without undue experimentation.

**F.      The Sustained Release Patents Are Invalid For Improper Inventorship And/Or As Anticipated By Avadel Patent Publications**

The claims of the Jazz Sustained Release Patents are further invalid for derviation or improper inventorship under 35 U.S.C. § 102(f) (pre-AIA) and/or 35 U.S.C. § 101 (post-AIA) because they were derived from the inventive work of Avadel.  The inventive work by Avadel alternatively renders the claims of the Jazz Sustained Release Patents invalid as anticipated.

A patent is invalid for derivation "if the inventors named in the patent did not actually invent the claimed invention." *Apotex v. Cephalon, Inc.*, 2011 WL 6090696, at *17 (E.D. Pa. Nov. 7, 2011).  Put differently "[o]ne cannot claim or reproduce the invention of another and obtain a patent on that 'invention.'" *Id.* (citing *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1401-02 (Fed. Cir. 1997)).  Establishing derivation under section 102(f) requires (1) "establish[ing] prior conception of the invention by another"; and (2) "communication of that conception to the patentee" prior to the date of the patent application.  *In re Bendamustine Consolidated Cases*, 2016 WL 3381219, at *14 (D. Del. June 10, 2016); *Apotex*, 2011 WL 6090696, at *17, 20. "Communication" in this context requires conveying "sufficient information to allow someone or [sic] ordinary skill in the art to construct and operate the invention."  *Adaptix, Inc. v. Apple, Inc.*, 2015 WL 218932, at *2 (N.D. Cal. Jan. 15, 2015).  The asserted claims are subject to the provisions of pre-AIA 35 U.S.C. § 102 because they purport to claim priority to an application filed on March 24, 2010.

To be sure, Avadel contests that the asserted claims are entitled to such a priority date and contend that the asserted claims cannot claim priority before July 2, 2018.  As such, the asserted claims would potentially be subject to post-AIA 35 U.S.C. § 101.  But the pertinent requirement continues to exist under the America Invents Act ('AIA') in 35 U.S.C. § 101.  *See, e.g., Intel Corp. v. Tela Innovations, Inc.*, Case No. 3:18-cv-02848-WHO, 2019 WL 2476620 at *7 n. 5 (N.D. Cal.

Jun. 13, 2019) ("This case cited 35 U.S.C. section 102(f) as embodying this requirement. Although section 102(f) was later eliminated with the passage of the America Invents Act ("AIA"), the requirement stands.") (citing Joe Matal, A Guide to the Legislative History of the America Invents Act: Part I of II, 21 Fed. Circuit B.J. 435, 451 (2012) ("Matal")); *Board of Trustees of University of Illinois v. Micron Tech., Inc.*, 245 F. Supp. 3d 1036, 1041 n.1 (C.D. Ill. 2017) ("Section 102(f) has been eliminated from the statutory scheme, but the defense is presumably still available under § 101, which allows patents to only be provided to "'[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter ....'") (alterations in original); and Matal at 451-52 ("Some may think that, because § 102(f) has been repealed, there is no longer any legal requirement that a patent for an invention be obtained by the inventor. Not so. Both the Constitution and § 101 still specify that a patent may only be obtained by the person who engages in the act of inventing.") (citing U.S. Const. art. I, § 8, cl. 8; and 35 U.S.C. § 101).

Direct evidence is not required to establish derivation. Thus, courts have held, for example, that circumstantial evidence may be used to establish communication. *See, e.g.*, *Adaptix, Inc. v. Alcatel-Lucent USA, Inc.*, 2015 WL 12696205, at *2 (E.D. Tex. Aug. 7, 2015) (finding that "circumstantial evidence of 'communication' is sufficient to defeat a motion for summary judgment of no derivation"); *Adaptix*, 2015 WL 218932, at *2-3 (denying a motion for summary judgment for infringement, finding that circumstantial evidence of communication with the patentee was enough to create a genuine issue of material fact as to whether the patents-in-suit were invalid for derivation); *see also Robert Bosch, LLC v. Pylon Mfg. Co.*, 700 F. Supp. 2d 625, 642-43 (D. Del. 2010) (noting that "the inference that [third party] conceived of the solutions depicted…and communicated them to [patentee]…is supported by circumstantial evidence…" and that this circumstantial evidence "permit[s] a finding of corroboration for [third party's] testimony

regarding his prior conception," although ultimately concluding that not all limitations of the claim were communicated).

Avadel's conception, reduction to practice, and publication of its controlled release formulation prior to the filing of the sustained release claims in Jazz's patents establishes that the claims of the Jazz Sustained Release Patents are invalid for derivation.  The Jazz Sustained Release Patents claim priority to U.S. provisional application No. 61,317,212, filed March 24, 2010.  However, as of January 2018, Jazz had not obtained any issued claims from this family.  Instead, at the time, Jazz was engaged in the prosecution of U.S. Application No. 13/071,369 ("the '369 Application"), a parent application to the applications that would eventually issue as the Jazz Sustained Release Patents.  Unlike the claims of the Jazz Sustained Release Patents, the pending claims of the '369 Application were directed to a "controlled release dosage form for oral administration" including "a compressed tablet controlled release core" containing "at least one polymer comprising ethylcellulose," at least one "polymeric pore former," and also reciting "providing a time dependent release" based on the release of drug measured from the time of administration.  *See* '369 Application File History, Oct. 4, 2017 Response to Final Office Action at Claim 1.  Further, one dependent claim recited that the "at least on polymeric pore-form is at least one of a polyethylene glycol, poloxamer, polyvinyl alcohol, copovidone, povidone, a water soluble sugar, a water soluble organic acid, such as carboxylic acids and their salts, and a hydroxyalkyl cellulose selected from hydroxyethyl cellulose, hydroxypropyl methylcellulose, and hydroxypropyl cellulose." *See id.* at Claim 16.  These pending claims of the '369 Application were consistent with the disclosures in the specification, and in particular the disclosure of exemplary controlled release dosage forms comprising a compressed tablet controlled release core with a

functional coating made of ethylcellulose, and using hydroxypropyl cellulose or poloxamer as pore formers. *See, e.g.*, '369 Application at Examples 1-13.

Notably, the claims of the '369 Application pending as of January 2018 were not the originally-filed claims. Rather, they were the product of narrowing amendments made by Jazz earlier in the prosecution of the '369 Application in order to overcome obviousness rejections by the Examiner in light of the Liang prior art reference. For example, claim 1 of the '369 Application was originally directed broadly to "a controlled release dosage form for oral administration," but was subsequently narrowed by Jazz, first to a "compressed tablet," then to "a compressed tablet controlled release core" following rejections over Liang. *See* '369 Application File History, May 28, 2013 Response to Office Action at Claim 1; Jan. 27, 2014 Response to Office Action at Claim 1. The claims resulting from these narrowing amendments, however, continued to match the disclosures of the '369 Application, which exemplified a compressed tablet controlled release dosage form, but no other controlled release form. Also consistent with the specification's disclosures was the fact that the claims pending as of January 2018 contained no claims directed to dissolution testing or drug release profiles resulting from the dissolution testing of formulations containing methacrylic acid-methyl methacrylate co-polymers, much less testing of such formulations in deionized water using apparatus 2 at a temperature of 37 °C and a paddle speed of 50 rpm, none of which was disclosed in the specification.

On January 25, 2018, the application that ultimately issued as U.S. Patent No. 10,272,062 ("the '062 patent"), and was ultimately assigned to Avadel, was first published. This application demonstrates Avadel's conception—and reduction to practice—of its novel controlled release formulations. Unlike Jazz's pending '369 Application, Avadel's application for the '062 patent described modified release forms of GHB containing methacrylic acid-methyl methacrylate co-

polymers that had specific dissolution release profiles when tested in deionized water using USP Apparatus 2, where the dissolution medium was maintained at 37 ºC ± 0.5 ºC with the rotating paddle speed fixed at 50 rpm.

Less than six months after the publication of the patent application that ultimately was assigned to Avadel, Jazz filed U.S. Application 16/025,487 (the "'487 Application") (which would eventually issue as the '488 patent) as a continuation of its pending '369 Application.  Immediately after filing the original application, Jazz canceled all 108 original claims which, like the parent '369 Application, recited "compressed tablet" controlled release dosage forms comprising at least one polymer comprising ethylcellulose, at least one polymeric "pore former," and "providing time dependent release" as measured by the release of drug from the time of administration.  In their place, Jazz introduced claims directed to a generic formulation (rather than a compressed tablet) comprising specifically methacrylic acid-methyl methacrylate co-polymers (rather than one polymer comprising ethylcellulose and at least one polymeric "pore former"), and reciting specific dissolution profiles defined by tests performed "in a dissolution apparatus 2 in deionized water at a temperature of 37 ºC and a paddle speed of 50 rpm" (rather than reciting attributes following administration).  *See* '487 Application File History, July 2, 2018 Applicant Submission.

The new claims filed by Jazz in the prosecution of the '487 Application hewed closely to the disclosures in Avadel's application for the '062 patent that had published only several months earlier.  Given the timing of the new claims following the publication of descriptions of Avadel's new controlled release formulation, the reasonable inference is that Jazz's new claims were the result of Avadel's communication of its controlled release formulations to Jazz via its published application for the '062 patent.

Further, evidence of Jazz's reliance on Avadel's disclosure in its application for the '062 patent is reflected by the fact that in contrast to the original claims filed with the '487 Application, the new claims are not described or supported by the application's specification. In particular, the specification of the '487 Application does not disclose dissolution testing of formulations containing methacrylic acid-methyl methacrylate co-polymers using apparatus 2 at a temperature of 37 ºC and a paddle speed of 50 rpm, much less the release profiles resulting from such testing. The only source of dissolution testing of that formulation is in Avadel's published application, providing further evidence that the new claims submitted by Jazz were taken directly from the Avadel's inventive work on controlled release formulations.

Much like the '488 patent, which issued from the '487 Application, the remaining Jazz Sustained Release Patents claim formulations comprising methacrylic acid-methyl methacrylate co-polymers and specific dissolution release profiles resulting from testing performed with apparatus 2 at a temperature of 37 ºC and a paddle speed of 50 rpm. *See, e.g.*, '885 patent at claim 1; '956 patent at claim 1; '931 patent at claim 1. And because the Jazz Sustained Release Patents share the same specification, the claims of the remaining Jazz Sustained Release Patents, like the claims of the '488 patent, lack support for those claim limitations in the specification's disclosures. Instead, those claims, like the claims of the '488 patent, reflect Jazz's attempt to claim what Avadel invented and disclosed in its applications, including the application giving rise to the '062 patent.

Because the issued claims of the Jazz Sustained Release Patents lack written description support, they are not entitled to the priority date of the March 24, 2010 provisional application. Instead, they are only entitled to the date of the earliest disclosure of formulations comprising methacrylic acid-methyl methacrylate co-polymers and specific dissolution release profiles resulting from testing performed with apparatus 2 at a temperature of 37 ºC and a paddle speed of

131

50 rpm, i.e., Jazz's July 2, 2018 filing during the prosecution of the '488 patent.  *See* '488 patent File History, July 2, 2018 Claim Amendment.  Because Avadel's application for '062 patent published on January 25, 2018, it is prior art to the claims of the Jazz Sustained Release Patents, and those claims are therefore anticipated.  Further, as demonstrated by the disclosures in the '062 patent, the inventors of the Avadel application had fully conceived of (and reduced to practice) the subject matter claimed in the Jazz Sustained Release Patents prior to communicating their invention to Jazz by way of the published application for the '062 patent.  The claims of the Jazz Sustained Release Patents are therefore invalid for derivation and lack of inventorship.

### 1.      Response to Jazz on Invalidity of the Sustained Release Patents for Improper Inventorship

In its Final Validity Contentions, Jazz contends that the disclosures in the specification of the Sustained Release Patents appeared in Jazz's '369 Application, and the asserted claims of the Sustained Release Patents are therefore entitled to claim priority to the 2011 filing date of the '369 Application.  Jazz's Validity Contentions at 92-93.  Jazz's argument fails because the claims of Jazz's Sustained Release Patents lack written description support.  *See supra* Sections  III.E.1 and III.E.3.  The fact that the same disclosures in the specification of the Sustained Release Patents cited by Jazz appears in the earlier '369 Application thus fails to rebut Avadel's arguments establishing the invalidity of the Sustained Release Patents for derivation and improper inventorship.

Jazz also repeats its assertions that the specification of the Sustained Release Patents (e.g., '488 Patent col. 7:64-8:1) and Example 2 provide adequate support for the claimed formulation with the claimed dissolution profile under the claimed conditions.  Jazz's Validity Contentions at 92-93.  Jazz mischaracterizes Example 2 by describing it as measuring the dissolution profile of the "claimed formulation."  *Id.* at 93.  Example 2, however, only measures the dissolution profile

132

of a GHB tablet that does not contain any methacrylic acid-methyl methacrylate co-polymer. Indeed, neither of the disclosures in the '488 patent cited by Jazz describe any such tests involving any GHB formulation with methacrylic acid-methyl methacrylate co-polymers, much less having the concentration of the co-polymer recited in the claims, or that resulted in the dissolution profile recited in the claims. As such, Jazz's cited disclosures fail to show that the inventors were in possession of a GHB formulation with a functional coating comprising one or more methacrylic acid-methyl methacrylate co-polymers, let alone one having the recited concentration or that possessed the claimed dissolution profile in the recited medium under the recited dissolution conditions. Because the issued claims of Jazz's Sustained Release Patents lack written description support, they are not entitled to the priority date of the March 24, 2010 provisional application.

Jazz also contends that "there is nothing improper or inequitable in filing a patent application for the purpose of obtaining a right to exclude competitor's product." Jazz's Validity Contentions at 93. But Jazz's argument assumes that Jazz invented the subject matter of the asserted claims prior to Avadel. As set forth in Avadel's pleadings and Initial Invalidity Contentions, Jazz did not and is not permitted to "claim or reproduce the invention of another and obtain a patent on that 'invention.'" *Apotex v. Cephalon, Inc.*, C.A. No. 06-cv-2768, 2011 WL 6090696, at *17 (E.D. Pa. Nov. 7, 2011). The claims of Jazz's Sustained Release Patents were derived from the published application for the '062 Patent directed to controlled release formulations developed by Avadel. The fact that the Sustained Release Patent specification lacks any written description showing that the inventors were in possession of a GHB formulation with a functional coating comprising one or more methacrylic acid-methyl methacrylate co-polymers, let alone one having the recited concentration or one that possessed the claimed dissolution profile in the recited medium under the recited dissolution conditions, underscores that fact. Jazz's Final

Validity Contentions does not dispute any of the evidence Avadel presented in its Initial Invalidity Contentions demonstrating that Jazz derived its claims from Avadel's invention.  Further, during discovery, Avadel propounded an interrogatory asking Jazz to identify all facts surrounding its decision during prosecution of the Sustained Release Patents to replace the original claims with claims reciting a formulation comprising a functional coating comprising one or more methacrylic acid-methyl methacrylate co-polymers and a dissolution profile defined by tests performed in a dissolution apparatus 2 in deionized water at a temperature of 37°C and a paddle speed of 50 rpm. ██████████████████████████████████████████████████

██████████████████ As such, the only reasonable inference based on that evidence is that the claims of Jazz's Sustained Release Patents were the result of Avadel's communication of its controlled release formulations to Jazz via its published application for the '062 Patent and/or through the various discussions between the parties concerning a potential collaboration on FT218 (as set forth *supra* Section III.F), which claims Jazz then copied for its pending Sustained Release Patents.

Thus, in addition to the evidence presented in Avadel's Initial Invalidity Contentions, further evidence that Jazz derived the Sustained Release Patent claims from Avadel arises out of Jazz's unique access to Avadel's trade secret and other confidential information regarding Avadel's successful clinical studies and proprietary technology used in its development of its controlled release GHB formulations, including FT218.  Avadel had conceived, reduced to practice, and shared trade secret and other confidential information regarding its controlled release formulations, including FT218, prior to the filing of the claims of the Sustained Release Patents. Jazz improperly used Avadel's trade secret and other confidential information to draft its claims for the Sustained Release Patents.  The factual circumstances are detailed in the Complaint filed

in C.A. No. 1-22-00487 (D. Del.) and detailed below.  To secure such access to Avadel's trade secret and other confidential information, Jazz repeatedly entered into discussions with Avadel in 2010, 2015, and 2018—ostensibly for purposes of assessing a possible collaboration between the companies.  As part of these collaborations, Jazz entered into Confidential Disclosure Agreements (CDAs) that restricted Jazz's access and use of Avadel's confidential information disclosed during these discussions.  The confidential information disclosed included Avadel's clinical data that showed the success of its FT218 product, including clinical trial protocols and critical pK data. But instead of honoring its obligations not to misuse Avadel's confidential information, Jazz distributed that information internally at Jazz and used this confidential information to obtain claims that cover Avadel's FT218 product, despite not having invented the subject matter of those claims or having the requisite written description support in the specification for these claims.

In 2010, Avadel contacted Jazz to discuss a potential partnership that would take advantage of Avadel's experience with its Micropump® platform to develop a once-nightly formulation of sodium oxybate.  At the time, Avadel's business practice and course of conduct when engaging in discussions with potential commercial partners was to disclose confidential information pursuant to written, executed CDAs prohibiting the disclosure or use of Avadel's confidential information. As part of its "confidential discussion[s]" in 2010, JPION00025381, Avadel prepared two slide decks for Jazz describing Avadel's proprietary drug delivery technologies.   One slide deck described the use of Avadel's Trigger Lock™ technology to deter abuse of pharmaceuticals. JPION00030652-53.  The other slide deck described Avadel's Micropump® platform technology and the applicability of certain aspects of it to a potential once-nightly sodium oxybate formulation (the "2010 Micropump® Deck").   JPION00030009-10.   The 2010 Micropump® Deck was prominently marked "CONFIDENTIAL" on every slide and disclosed the solution to this problem

that Avadel had kept confidential: a new liquid suspension system for sodium oxybate once-nightly dosing in the form of microparticulate beads provided in a sachet.  JPION00030010.  After reviewing Avadel's confidential information in the 2010 Micropump® Deck, Jazz eventually concluded that Avadel's technology would not provide the desired release characteristics and declined to partner with Avadel in 2010 to develop a drug product.  *See* JPION00026316.

In October 2014, after Avadel reported that it was successfully advancing its efforts to develop a once-nightly oxybate product, Jazz approached Avadel to "have a conversation about our shared interest in sodium oxybate."  AVDL_00738819.  On March 18, 2015, Jazz, Avadel, and Jazz's Designated Recipient, Dr. Leslie Z. Benet, entered into another confidential disclosure agreement in advance of the diligence for a potential deal, preventing either party from disclosing or misusing any confidential information obtained from the other party (the "2015 CDA").  *Avadel CNS Pharmaceuticals, LLC v. Jazz Pharmaceuticals, Inc.*, C.A. No. 1-22-00487 (D. Del. Apr. 14. 2022), ECF 2-11.  The 2015 CDA states:

> The Designated Recipient and Jazz Pharmaceuticals agree to maintain the Confidential Information in confidence. Without the prior written consent of Flamel, except as set forth herein, the Designated Recipient and Jazz Pharmaceuticals shall not disclose Confidential Information to any third party or use Confidential Information for any purpose other than to evaluate and, if a decision is made to proceed, to negotiate such business relationship (the "Purpose").

*Id.* at ¶ 3.

### The 2015 CDA defines "confidential information" to include:

- Number of subjects

- Population (healthy subjects / or patients), demographics

- Fluid and Food intake

- Dosing/titration schedules

- Time of day of dosing

- Study design (e.g. complete crossover vs parallel groups)

- PK sampling times relative to dose

- Concomitant therapy allowances, if any

- Key statistical analysis considerations, if any

- Brief description of bioanalytical methodology (e.g. LC-MS-MS) lower limit of quantification

- Tables and graphs should identify the dose properly

- PK curves showing plasma concentration over time

- Mean and standard deviation should be included

- Statistical difference (p<0.05) should be identified

- Spaghetti plots by treatment

- PK parameters (90% confidence intervals, means, standard deviation, median, min, max, or individual subject values by treatment)

- Cmax

- Tmax

- Apparent elimination rate constant ($\lambda$)

- Terminal half life

- AUC (t)

- AUC (inf)

*Id.* at 7.

Once the 2015 CDA was in place, Jazz acquired additional Avadel information that was confidential at the time regarding the success of Avadel's clinical study of FT218 and information critical to the success of Avadel's once-nightly program.  Avadel sent Jazz a summary report of its pilot clinical study in humans ("2015 Study Report").  AVDL_01111376 at AVDL_01111380-

137

98.  The report disclosed information that covered **_all categories of confidential information_** as defined in the 2015 CDA, including information critical to the development of Avadel's FT218 product that was not previously disclosed to the public.  This information included the health and medical history of the subjects, the demographics of the subjects, the exact time of day that dosing occurred, the timestamp for pK sampling, the statistical tests performed, the pK curve for each formulation tested in linear and semi-log plot, mean pK parameters for each dosage tested, and a comparison of the pK curves between the two clinical studies.  *Id.*  Jazz distributed Avadel's confidential information disclosed in the 2015 Study Report internally at Jazz.  Jazz once again decided not to partner with Avadel.

In 2018, Jazz again approached Avadel to purportedly discuss a potential collaboration regarding Avadel's once-nightly oxybate formulation.  The parties again entered into a confidential disclosure agreement on May 3, 2018 to protect "all information" provided to the other party in connection with this potential collaboration ("2018 CDA").  *Avadel*, C.A. No. 1-22-00487, ECF 2-14.  In Paragraph 2(a), the 2018 CDA states:

> Except as otherwise expressly permitted herein, without the prior written consent of the Disclosing Party, the Receiving Party will not use Confidential Information of the Disclosing Party for any purpose other than the Purpose or disclose Confidential Information of the Disclosing Party to any third party; provided that the Receiving Party may disclose Confidential Information of the Disclosing Party to its Affiliates and their respective officers, directors, employees, consultants, attorneys, financial or other advisors/providers, accountants, agents or representatives (the "Representatives") who are required to use such Confidential Information for the Purpose and who are bound by obligations of confidentiality at least as stringent as those set forth herein. Upon disclosing Confidential Information to any such Representatives, the Receiving Party will advise them of the confidential nature of the information. Without limiting the generality of the foregoing, the Receiving Party will take all reasonable precautions to prevent the disclosure of Confidential Information of the Disclosing Party to any unauthorized third parties (and in any event consistent with the

138

> precautions it ordinarily takes to safeguard its own confidential documents) and will be liable for any breach of the confidentiality and non-use obligations under this Agreement by any of the Representatives of the Receiving Party.

*Id.*, ¶ 2(a).  The 2018 CDA defines confidential information to include, *inter alia*:

> (i) all information (whether in written, electronic, or graphic form or disclosed orally) that is provided by or on behalf of one Party (the "Disclosing Party") to the other Party (the "Receiving Party"), directly or indirectly, in connection with the Purpose and relating to the Disclosing Party and its Affiliates (as defined below) and their respective products, product candidates, technologies and businesses, and those of any third party from whom the Disclosing Party or its Affiliates has received information on a confidential basis,

> (ii) any memorandum, analysis, compilation, summary, interpretation, study, report or other document, record or material that is or has been prepared by, for or on behalf of the Receiving Party or any of its Representatives (as defined below) and that contains, reflects, interprets or is based directly or indirectly upon any information of the type referred to in clause (i) of this sentence.

*Id.*, ¶ 1.  The 2018 CDA also recognizes that a breach of these obligations could cause irreparable harm to the other Party that could not be adequately compensated with damages.  Paragraph 5 of the 2018 CDA allows the parties to "seek preliminary and permanent injunctive and other equitable relief without having to prove the inadequacy of any other remedy it may have at law or in equity and without being required to post bond or other security."  *Id.*, ¶ 5.

Under the 2018 CDA, Jazz obtained access to information regarding Avadel's clinical trials as well as the key confidential features of Avadel's once-nightly formulation, including its ability to achieve the desired once-nightly sodium oxybate dosing.  By July 2018, Avadel provided Jazz with at least the following confidential information:

> - a summary table and completed Clinical Study Reports (CSRs) providing key data on clinical absorption, distribution, metabolism, and excretion, pharmacokinetics and pharmacodynamics, and efficacy and safety study protocols and reports;

139

- an Investigator Brochure for the REST-ON Phase III clinical trial;

- a summary document providing key information about the REST-ON Phase III clinical trial and significant safety signals relative to public information about Xyrem®;

- a summary document answering questions about the status of the major Chemistry, Manufacturing and Controls activities; and

- a slide deck providing key information on supply chain activities and estimated costs of goods sold.

As part of the diligence process, Jazz received a confidential summary table of all pK studies Avadel had completed and one pK study Avadel planned to complete in 2018.  The summary table disclosed that Avadel tested FT218 in four doses: 4.5 g, 6 g, 7.5 g, and 9 g.  *Avadel*, C.A. No. 1-22-00487, ECF 2-19. Jazz also received the Clinical Study Reports for the PKFT218-1301, PKFT218-1602, PKFT218-1603, and PKFT218-1701 clinical studies that included descriptions of the drug formulation tested by Avadel.  AVDL_00113347, AVDL_00114819, AVDL_00034188, AVDL_00113582.  Jazz further received materials, including a copy of the Investigator Brochure for the REST-ON phase III clinical trial under the 2018 NDA, which included detailed descriptions of FT218's composition as well as the results of Avadel's *in vivo* drug release testing for FT218.  *See, e.g.*, AVDL_00121402 at AVDL_00121424, 427, 446.



”).

The materials disclosed during the 2018 diligence process contained Avadel's trade secret information regarding various clinical trials as well as the unique attributes and profile of a sachet, liquid-suspension system for sodium oxybate once-nightly dosing.  In particular, the materials

140

disclosed during the 2018 diligence process contained what was at the time confidential, trade secret data indicating that such a sachet, liquid-suspension system would be effective to achieve ████████████████████████████████ once-nightly dosing of a sodium oxybate product.   *See e.g.*,   AVDL_00121402   at   AVDL_00121424;   AVDL_00034188   at AVDL_00034194. Jazz also learned from the diligence process that Avadel's FT218 consists of immediate release pellets, controlled release coated pellets, and excipients including malic acid as the acidifying agent, hydroxyethylcellulose and xanthan gum as suspending/viscosifying agents, and magnesium stearate as the lubricant.  Jazz further learned from the diligence process that the controlled release coated pellets' coating consists of hydrogenated vegetable oil, methacrylic acid-methyl methacrylate co-polymers, and methacrylic acid-ethyl methacrylate co-polymers. AVDL_00121402 at AVDL_00121424-26, 428.  Jazz was additionally aware that Avadel was testing FT218 in doses ranging from 4.5 g to 9 g per day.  AVDL_00121402 at AVDL_00121424. After Avadel's disclosure of the foregoing confidential information pursuant to a written confidentiality agreement, Jazz once again declined to partner with Avadel.

Instead of keeping Avadel's confidential information secret, Jazz replaced its existing claims in the pending applications of Sustained Release Patent family with new claims designed to cover Avadel's product using the confidential information disclosed by Avadel, including the information that Avadel's FT218 contained an immediate release component and a controlled release component with methacrylic acid-methyl methacrylate co-polymers as part of its functional coating, despite not having invented the once-nightly formulation as claimed.  As set forth *supra*, Jazz concealed its misuse from Avadel as long as possible.

Based on the above evidence, Jazz's issued claims in the Sustained Release Patents are invalid for derivation and lack of inventorship.

2.      **Response to Jazz on Invalidity of the Sustained Release Patents Due to Anticipation by Patent Publications Ultimately Assigned to Avadel**

Jazz's Final Validity Contentions do not dispute that the published application for the '062 patent, which was ultimately assigned to Avadel, would anticipate the claims of the Resinate Patent as prior art to Jazz's patents. *See* Jazz Final Validity Contentions at 93 n. 19. Jazz asserts only that because Avadel's "written description argument fails, their anticipation argument is also misplaced." *Id.* For the reasons set forth above, the claims of the Sustained Release Patents lack written description support and are not entitled to claim priority to the filing date of the March 24, 2010 provisional application. Thus, Jazz should be entitled to a priority date no earlier than July 2, 2018 for the '488 Patent, no earlier than June 30, 2020 for the '885 Patent, and no earlier than December 24, 2020 for the '956 and '931 Patents. *See supra* Section III.C. Because the published application for the '062 patent, which was ultimately assigned to Avadel, was publicly available more than a year prior to any such potential priority date for the Sustained Release Patents, it is prior art to Jazz's patents. The Sustained Release Patents are therefore invalid as anticipated by the prior patent publication ultimately assigned to Avadel.

## IV.    RESINATE PATENTS

### A.    Background

On December 7, 2021, Jazz provided Avadel with its initial infringement chart pursuant to Paragraph 4(c) of the Delaware Default Standard. In its initial infringement chart, Jazz asserted that the product described in Avadel's NDA infringes claims 1-3, 5-12, and 14-18 of the '079 patent, and claims 1-24 of the '782 patent.

On January 14, 2022, Avadel provided Jazz with its Initial Invalidity Contentions for the Resinate Patents.

### E.  The Asserted Claims of the '079 and '782 Patents are Invalid Under 35 U.S.C. § 112

For the reasons set forth below, the asserted claims of the '079 and the '782 patent are invalid for failure to comply with the written description and enablement requirements of 35 U.S.C. § 112.

Pursuant to 35 U.S.C. § 112, ¶ 1, a patent specification "shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same[.]"  *Id.*  The Federal Circuit has held that this language creates two closely related, yet separate requirements for a specification: (i) a written description of the invention ("written description"), and (ii) a written description of the manner and process of making and using the invention ("enablement").  *See Ariad Pharm., Inc. v. Eli Lilly Co.*, 598 F.3d 1336, 1344 (Fed. Cir. 2010) (en banc).

The test for sufficiency of a patent's written description "requires an objective inquiry into the four corners of the specification from the person of ordinary skill in the art.  Based on that inquiry, the specification must describe an invention understandable to that skilled artisan to show that the inventor actually invented the invention claimed."  *Id.* at 1351.  A patent is invalid for inadequate written description unless "the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Id.*

The requirement of enablement mandates that the disclosure in the specification describe "the manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the [invention]."  35 U.S.C. § 112, ¶ 1.  For a patent's specification to

be enabling, it "must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *ALZA Corp. v. Andrx Pharm., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010).   In determining whether undue experimentation is required to practice the claimed invention, a court may assess some or all of the so-called *Wands* factors, which include: (1) the quantity of experimentation necessary; (2) the amount of direction or guidance disclosed in the patent; (3) the presence of absence of working examples in the patent; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability of the art; and (8) the breadth of the claims.   *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).   A patent specification must enable the full scope of the claimed invention.   *See ALZA Corp.*, 603 F.3d at 939 (affirming invalidity of the claims based on lack of enabling disclosure because "developing non-osmotic oral dosage forms, such as tablets and capsules" requires undue experimentation).

### 1.     The '079 Patent Is Invalid for Lack of Written Description

#### a.     "controlled release component"

Each of asserted claims 1-3, 5-11, and 14-18 of the '079 patent contain the limitation "controlled release component."   To the extent that "controlled release component" is construed to cover non-resinate components, the claims are invalid for failing to satisfy the written description requirement of 35 U.S.C. § 112.

Jazz has broadly interpreted this claim limitation to capture non-resinate GHB formulations, such as Avadel's FT218 product.   *See, e.g.*, Jazz's 12/7/2021 Initial Infringement Contentions at 5.   Under Jaz's interpretation, the asserted claims would broadly cover any solid or liquid formulation with a "controlled release component" containing GHB, regardless of the composition of the "controlled release component."   Thus, the claims broadly recite and claim a

component with a desired functionality—controlled release of GHB—regardless of the means by which the claimed functionality is achieved.

In contrast to the breadth of the claims as interpreted by Jazz, the disclosures of the '079 patent are limited to resinate forms of GHB. The specification states that "the term 'controlled release' refers to compositions, for example GHB resinate compositions as described herein…" *Id.* col. 6:55-57. But the specification does not describe any GHB composition other than a resinate composition. Likewise, all of the embodiments disclosed in the specification are limited to resinate forms of GHB. *See, e.g.*, *id.* at Examples 1-7. While the specification contains a general disclosure of a "controlled release formulation of GHB" in combination with "an immediate release GHB formulation," such a generic disclosure, without any description of the corresponding formulation or method for achieving such controlled release, would not lead a POSA to believe the inventors were in possession of a formulation containing a "controlled release component" other than resinate forms. *Id.* col. 4:14-20.

In addition, the specification repeatedly describes the invention being directed to resinate-containing compositions:

- "Any anion exchange suitable for pharmaceutical use can be employed ***in the compositions of the present invention***, particularly strong anion exchange resins." *Id.* col. 8:33-35.

- "For the ***oxybate resinate compositions of the present invention***, the amount of oxybate present in the resinate should be high to minimize the amount of resin required." *Id.* col. 9:6-8.

- "Formulation of such drugs ***as resinates according to the present invention*** permits particle sizes that make such release characteristics (e.g., sigmoidal) feasible at reasonable coating weights."[38] *Id.* col. 15:13-16.

---

[38] The inventor has defined "oxybate resinate compositions" as "i.e., oxybate ionically bound to an ion exchange matrix." '782 Patent File History, February 18, 2016, Allphin Declaration at ¶ 5.

- "In the dried state, the **sustained release resinate beads of the present invention** can hydrate more slowly if release-retarding agents are used." *Id.* col. 19:7-9.

- "If the Stomach has about 5 mEq chloride, then **about 30 mEq of additional exchangeable anion must be provided with the *resinate formulation of the present invention* to ensure complete release of the oxybate.**" *Id.* col. 20:18-21.

- "These supplemental anions can be coadministered with the oxybate compositions of the present invention, for example within about an hour (before or after of *administering the drug resinate (e.g. oxybate resinate) compositions of the present invention*, or simultaneously therewith." *Id.* col. 20:62-66.

Indeed, the specification of the '782 patent specifically denigrates other non-resinate forms of "controlled release" components containing GHB. *Id.* col. 5:57 ("…the high solubility and mobility of GHB would tend to significantly reduce the number of viable approaches using such conventional solubility and diffusivity control technologies").

In light of the specification's disclosures, a POSA would not have understood the inventors to be in possession of formulations containing a GHB controlled release component other than resinate forms of GHB. To the extent Jazz contends the claims of the '079 patent cover formulations containing non-resinate forms of GHB, they are invalid for lack of written description support.

        **b.**    **"opening a sachet containing a gamma-hydroxybutyrate formulation"**

Each of asserted claims 1-3, 5-11, and 14-18 of the '079 patent lack adequate description of "opening a sachet containing a gamma-hydroxybutyrate formulation." The lone description with regard to a sachet occurs at column 6 and recites that "some embodiments can be supplied as a sachet which can be suspended in e.g., tap water by the end user." '079 Patent at col. 6:8-10. There is no disclosure of opening a sachet or mixing its contents in water, as claimed, let alone to obtain the biological results recited in various dependent claims.

237

c.      **"wherein the administering promotes the patients to sleep for 6 to 8 hours"**

Claims 5 and 14 lack adequate written description for "wherein the administering promotes the patient to sleep for 6 to 8 hours" because the specification does not disclose any data that would lead a POSA to believe that the inventors were in possession of a formulation that "promotes the patient to sleep for 6 to 8 hours." The specification only recites a desired functionality—a once nightly GHB formulation that promotes sleep for 6 to 8 hours—with no indication the inventors actually achieved it. *See e.g., id*. at col 4:4-6 ("One object of the invention is to maintain the concentration of GHB in the blood at levels sufficient to promote sleep for up to 8, 7, 6, or 5 hours."). The specification contains no dissolution testing showing GHB levels over time, no animal model data, no clinical pharmacokinetic data, and clinical sleep studies or other tests in humans demonstrating efficacy in providing sleep for 6 to 8 hours. *See e.g., id.* at Examples 1-7. Such data would be necessary to provide written description support, particularly where, as here, Jazz has broadly interpreted its claimed formulation to cover any mechanism of controlled release, including those for which specification provides no examples or information. Thus, a POSA would not believe that the inventors were in possession of an invention that "promotes the patient to sleep for 6 to 8 hours."

## 2.      The '079 Patent Is Invalid for Lack of Enablement

A POSA would not be able to enable the full scope of the asserted claims of the '079 patent to encompass a non-resinate formulation of GHB. To satisfy the enablement requirement, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation. As detailed above, the specification's disclosure of a controlled release component is limited to GHB-resinate forms. *See supra* Sections IV. E.1.a and IV.E.3.a. It would require undue experimentation to make and use controlled release

238

components that are not GHB-resinate forms, ████████████████████████████

████████████████████   The patent therefore fails to enable the full scope of possible

"controlled release component," including controlled release particles that do not contain GHB

resinates.

        **3.**      **Response to Jazz on Invalidity of the '079 Patent Under 35 U.S.C. § 112**

            **a.**      **Written description support for a "controlled release component" is inadequte**

Avadel's initial contentions demonstrate that the asserted claims are invalid for failure to

satisfy the requirements of 35 U.S.C. § 112.  In response to Avadel's argument that the '079 patent

disclosure is limited to resinate formulations of GHB, Jazz first argues that the specification

generally describes controlled release dosage forms that are not limited to ion-exchange resins

(also referred to as "reinates").  Jazz's Final Validity Contentions at 204.  But the only language

in the '079 patent specification identified by Jazz in its Final Validity Contentions is a single

reference to "controlled release dosage forms."  '079 patent at col. 13:3-12.  But a POSA would

understand that passage—per its plain language—to refer to resinates.  Thus, the passage begins:

"In one embodiment, the controlled release dosage form includes drug loaded onto beads (e.g.,

***ion-exchange beads***) in combination with one or more optional excipients . . . ."  '079 patent at

col. 13:2-5.  In any event, this language does not support Jazz's argument or disclose non-resinate

formulations, because there is no description of any particular controlled release dosage forms in

that reference or anywhere else in the specification other than to the ion-exchange resins.

Jazz does not identify any other language in the '079 patent specification to support its

argument in its Final Validity Contentions that the specification's description of controlled release

dosage forms are beyond ion-exchange resins.  Instead, Jazz only points to the patent's alleged

incorporation by reference of U.S. Publication No. 2012/0076865 ("Allphin 2012") as allegedly

disclosing non-resinate GHB dosage forms.  But the specification of the '079 patent does not properly incorporate Allphin 2012 by reference, because it fails to "identify with detailed particularity what specific material it incorporates."  *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) (citations omitted).  Allphin 2012 is one of 41 patents or patent publications and 13 other publications that the '079 patent purports to incorporate by reference.  The specification does not describe what is particularly disclosed in those 41 patents or patent publications and 13 other publications, nor does it describe how those 41 patents or patent publications and 13 other publications relate to the subject matter of the '079 patent claims.  *See* '079 patent at col. 2:61-3:58.  Therefore, Allphin 2012 is not properly incorporated by reference, and Jazz cannot rely on it to supplement the insufficient written disclosure of the '079 patent's specification.

Even if Allphin 2012 had been properly incorporated, "incorporation by reference does not convert the invention of the incorporated patent into the invention of the host patent."  *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1553 (Fed. Cir. 1996), *abrogated on other grounds by Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558 (Fed. Cir. 2000). Jazz implicitly concedes in its Final Validity Contentions that the '079 patent does not describe any controlled release dosage forms other than ion-exchange resin dosage forms by relying solely on the supposed incorporation of Allphin 2012 to support its contention that other dosage forms are disclosed.  Jazz's Final Validity Contentions at 204.

A POSA also would not have understood that Jazz's incorporation by reference extends to the subject matter at issue because the teachings that Jazz points to involve conventional approaches to controlled release, which the specification criticizes.  For example, the specification of the '079 patent explains that:

> The solubility of sodium oxybate is unusually high. For example, a Xyrem solution is provided as 500 mg/mL concentration in water, or 42 wt %, and its solubility limit is considerably higher. Furthermore, due to the small size and ionic nature of GHB at physiological pH, the drug is unusually mobile in solution. Those skilled in the art will appreciate that these factors complicate and, in many cases, **limit conventional approaches** for modified release, such as core/shell or matrix formulations, as the high solubility and mobility of GHB would tend to significantly reduce the number of viable approaches using such conventional solubility and diffusivity control technologies.

'079 patent at col. 5:49-60.  The prior art incorporated by reference and relied upon by Jazz is thus the prior art disclosing "conventional" techniques that the specification criticizes.  In these circumstances, the allegedly incorporated dislcosures do not provide written description support for the claimed subject matter.  *See Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed. Cir. 1998) (finding that the incorporated prior art references did not provide written description support for claims that are directed to generic cup shapes, because the specification "specifically distinguishes the prior art as inferior and touts the advantages of the conical shape" which made clear that it "discloses only conical shaped cups and nothing broader").  Jazz specifically cites to Allphin 2012, Jazz's Final Validity Contentions at 204, 207, but Allphin 2012 only teaches non-resinate solid dosage forms, and the '079 patent teaches that:

> Furthermore, while extended release oxybate dosage forms are known, such extended release dosage forms are provided as solids, e.g. as tablets.  Because the required dose of oxybate is high, such tablets can be quite large, and/or require the administration of multiple tablets.  This can be problematic because some patient populations have difficulty swallowing solid dosage forms, or the need to swallow multiple tablets may reduce patient compliance.  In addition, the sustained release matrix or coating compositions used to provide extended release are complex and expensive to produce.
>
> * * * *
>
> A drug-resin complex may address some of these limitations, as the drug is essentially insoluble as long as it remains bound to the resin. Instead, the drug release is regulated by exchange with other anions present in the gut, the most prevalent being chloride.

'079 patent at col. 5:61–6:16.  Thus, a POSA would not understand the '079 patent's incorporation by reference to provide written description support for a non-resinate controlled release component for this additional reason.

Even if it were proper to rely on Allphin 2012 to provide written description support for controlled release formulations outside of an ion-exchange resin, Jazz concedes that Allphin 2012 itself fails to describe administering GHB containing drug particulates in a sachet dosage form and suspending them in water prior to administration.  *See* Jazz's Final Validity Contentions at 204 n.30 ("[I]nventor Allphin built upon the work of Allphin 2012 and discovered **new methods** of administering GHB-containing drug particulates by storing them in a sachet and suspending them in water prior to administration . . . ").  For the reasons discussed in *supra* Section IV.E.1.b and discussed *infra* in Section IV.E.3.b, the specification of the '079 patent also does not adequately describe a sachet dosage form, even for a resinate formulation.  And even if the '079 patent contained such disclosures, Jazz cannot mix and match different and unrelated sections of the specification to satisfy written description.  *See Flash-Control, LLC v. Intel Corp.*, No. 2020-2141, 2021 WL 2944592, at *3 (Fed. Cir. July 14, 2021) ("[T]he specification must present each claim as an 'integrated whole.'") (internal citations omitted).

**Second,** Jazz argues that the law only requires that a patentee describe the invention as claimed.  Jazz's Final Validity Contentions at 204.  Jazz misses the mark and turns the written description requirement on its head.  To satisfy the written description requirement, the patent specification must demonstrate that "the inventors possessed the full scope of the claimed invention."  *Juno Therapeutics*, 10 F.4th at 1336.  Here, Jazz argues that the "controlled release component" encompasses formulations other than those including an ion exchange resin.  As discussed above, however, the specification discloses only ion-exchange formulations, and

repeatedly characterizes the invention as limited to resinate formulations.  *See supra* Section IV.E.1.  Thus, a POSA would not have understood the inventors to have been in possession of the full scope of the "controlled release component" that Jazz contends fall within the scope of the claims.  To the extent that Jazz contends that the "controlled release component" encompasses more than using an ion-exchange formulation, such as FT218's formulation, the claims are invalid for lack of written description support.

> ***Finally***, the claims recite a controlled release component that permits "administering a single daily dose to the patient."[39]  The specification only recites a desired functionality—a GHB formulation that can be administered as a single daily dose—with no indication the inventors actually achieved it.  *See e.g.*, '079 patent at col. 6:42- 49 ("In one embodiment, the present invention provides a GHB formulation which delivers a controlled release profile, for example a controlled release profile suitable for once-a-day dosing as described herein. . . . . compositions of the present invention are useful because the once-a-day dose provides a more consistent supply (release) of GHB to patients who otherwise may have to take multiple doses a day.").  It contains no dissolution testing showing GHB levels over time, no animal model data, no clinical pharmacokinetic data, or clinical sleep studies or other tests in humans demonstrating that the formulation can be dffectively administered as a single daily dose.  Stating a desired result, or a mere plan for achieving that result, without showing how to accomplish it, is not adequate written description support.  *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1351 (Fed. Cir. 2011).  The lack of any *in vitro* or *in vivo* data, or even methods of evaluating the claimed invention

---

[39] To the extent that the claim term "a single daily dose" requires claim construction, Avadel contends that the ordinary meaning in light of the intrinsic evidence is "a single dose that would replace a patient's need to take multiple doses a day."  *See* '079 patent at col. 6: 45-49.  To the extent that Jazz contends otherwise, Avadel reserves the right to request construction of this claim term.

for its ability to function therapeutically as a single daily dose, is thus evidence that the specification lacks written description support for a controlled release component that permits administering only a single daily dose of sodium oxybate.

Moreover, the specification notes that as of the filing date, the only available sodium oxybate drug composition was "given at night in divided doses approximately 2-4 hours apart"; thus, "GHB is typically given twice nightly due to a short *in vivo* half life." '079 patent at col. 3:62-66. The only purported solution to the problem of twice-nightly dosing proposed by the specification is using an ion exchange resin. In light of the fact that achieving improved nightly sleep using a single dose of GHB would be a material deviation from its known "short *in vivo* half life," a POSA would not have believed that the inventors were in possession of any controlled release component that could be administered as a single daily dose absent some disclosure of a means of achieving once-nightly dosing or data demonstrating the inventors had achieved once-daily dosing with a particular controlled release component.

In addition, the specification explains that "[t]he solubility of sodium oxybate is unusually high" and "the drug is unusually mobile in solution," such that "[t]hose skilled in the art will appreciate that these factors complicate and, in many cases, limit conventional approaches for modified release." '079 patent at col. 5:49-56. The specification explicitly notes that such factors "tend to significantly reduce the number of viable approaches using such conventional solubility and diffusivity control techniques." *Id*. at col. 5:58-60. Given the foregoing, a POSA would need data to believe that the inventors were in possession of a controlled release portion that would permit single daily dosing. The need for data would be further underscored by the fact that Jazz now contends that the claims encompass "conventional" controlled release techniques as opposed to being confined to ion exchange resins. '079 patent at col. 5:49-60.

Furthermore, to the extent that the '079 Patent incorporates the Allphin 2012 reference, that Allphin 2012 publication emphasizes that "[i]n man, the plasma half-life of sodium oxybate given orally is about 45 minutes" and results in "about 2 to 3 hours of sleep." Allphin 2012 at ¶ 9. A POSA would have generally been aware of that teaching independently of Allphin 2012. And Allphin 2012 also teaches that "[t]he hygroscopic nature of sodium oxybate presents significant challenges to the formulation, production, and storage of dosage forms capable of delivering sodium oxybate over a sustained period of time." *Id.* at ¶ 30. Those teachings (and background knowledge) also would have led a POSA to need to see data substantiating the possession of a controlled release portion resulting in single daily dosing, as claimed.

Jazz effectively maintains that the claims at issue recite a genus of sodium oxybate formulations containing an immediate release portion and a controlled release portion that achieve single daily dosing. In such circumstances, "the written description 'must demonstrate that the applicant has made a generic invention that achieves the claimed result and do so by showing that the applicant has invented species sufficient to support a claim to the functionally-defined genus.'" *Juno*, 10 F.4th at 1335. But the '079 specification contains not even a single example of achieving that result and fails to provide written description support for such a genus.

      **b.**      **Written description support for "opening a sachet containing a gamma-hydroxybutyrate formulation" is inadequate**

Jazz's argument in its Final Validity Contentions that the specification discloses "opening a sachet containing a gamma hydroxybutyrate formulation" is meritless. Jazz's Final Validity Contentions at 205-06. Jazz cites multiple sections of the '079 patent in an attempt to muster written description support for this claim term. Jazz's Final Validity Contentions at 205 (citing '079 patent at col. 6:4-10, 18:62-19:3, 19:14-27). As an initial matter, all of these citations miss the mark because they are exclusively directed to a resinate formulation. Further, according to

Jazz, "sachet formulations were not suitable for all drug formulations" (Jazz's Final Validity Contentions at 141); therefore, any ostensible disclosures directed to a sachet dosage form for resinate formulations would not have led a POSA to believe that the inventors were in possession of a sachet dosage form for non-resinate formulations.  Jazz's Final Validity Contentions at 141.

Jazz's cited passages fail to disclose a sachet dosage form with respect to non-resinate formulations.  *First*, the specification's discussion at col. 6:4-10 does not provide support for "opening a sachet containing a gamma hydroxybutyrate formulation."  As discussed, the specification at col. 6:4-10 is limited to resinate formulations: "A drug-resin complex may address some of these limitations, as the drug is essentially insoluable as long as it remains bound to the resin." '079 patent at col. 6:12-14.  Further, the cited portion of the specification merely describes a problem in the field that the claimed invention wishes to solve.  '079 patent at col. 6:4-10 ("Accordingly, it would be desirable to provide oxybate (or analogous drugs which require administration in high doses) in an extended release, oral liquid dosage form (including suspensions of oxybate-containing particles as described herein, which in some embodiments can be supplied as a sachet which can be suspended in e.g., tap water by the end user)…").  This stated desire to develop a sachet dosage form cannot satisfy the written description requirement, particularly in light of Jazz's own assertions that a POSA would not have reasonably expected a sachet dosage form of GHB to work.  *See, e.g.*, Jazz's Final Validity Contentions at 140 (alleging that a POSA would not have "reasonably expected a hygroscopic drug product like GHB to be stable or fail to degrade if stored in a sachet.").  Where, as here, when Jazz contends that the claimed features would have been unexpected, the specification must provide more than a mere statement of a desired outcome.  *Nuvo Pharms. (Ir.) Designated Activity Co. v. Dr. Reddy's Lab'ys Inc.*, 923 F.3d 1368, 1381 (Fed. Cir. 2019).

***Second***, the specification at col. 18:62-19:3 of the '079 patent does not provide support for "opening a sachet containing a gamma hydroxybutyrate formulation."  As an initial matter, the cited portion of the specification does not mention sachets at all.  "For example, GHB resinate beads may be presented in hydrated form as part of an aqueous suspension, or may be provided as dried beads for mixing with water immediately prior to ingestion or to be taken without water (***e.g. as a powder, tablet, capsule, etc***.)."  And further, the specification at col. 18:62-19:3 is limited to resinate formulations.  *See* '079 patent at col. 18:67 (referencing "the GHB resinate beads").  A POSA would not have understood based on this disclosure that the inventors were in possession of a ***non-resinate*** formulation to be suspended in water.  Indeed, Jazz argues in its Final Validity Contentions that "a POSA would not have simply assumed just because certain other drug products have been successfully resuspended in water. . . all drug products . . . could successfully be resuspended in water after storage in a sachet."  Jazz's Final Validity Contentions at 147.  Indeed, the section immediately following the disclosure cited by Jazz explains that the reason for using water can be attributed to the unique property of the ion-exchange resinate beads, and not any non-resinate formulation.  *See id.* at col. 19:7-13 (discussing the relationship between the rate of release and the state of hydration of the beads).  A POSA would therefore not have understood this passage to support a non-resinate sachet dosage form of GHB that would be suspended in water.

***Third***, the specification at col. 19:14-27 does not provide support for "opening a sachet containing a gamma hydroxybutyrate formulation" as Jazz contends.  The full and unmodified passage at col. 19:14-27 of the '079 specification makes clear that the disclosure is directed only to resinate beads, and not to any other controlled release formulation:  "In another embodiment, a water permeable but relatively insoluble coating is employed over the ***dry resinate beads*** such that, when the dry beads are suspended in water, water diffuses through the coating to hydrate and swell

247

the ***resinate beads***." '079 patent at col. 19:14-18.  Jazz grossly mischaracterizes this disclosure in its Final Validity Contentions by replacing the phrase "***resinate*** beads," as is found in the specification, with "***[drug]*** beads."  *Id.*; Jazz's Final Validity Contentions at 205.  Because the specification only discusses a resinate formulation, a POSA would not understand that these disclosures apply to a non-resinate GHB formulation in general.  Further, nowhere in the cited passage is there any mention of a sachet.

**Fourth**, Jazz argues in its Final Validity Contentions that "[a] POSA would readily understand that the end user would necessarily have to open the sachet before its contents could be 'suspended.'"  *Id.* at 205-06.  Jazz's argument again misses the mark.  The claim limitation requires the sachet to be opened as a part of administering a dose to the patient.  '079 patent, claim 1.  Even if one were to believe there to be sufficient disclosure for a non-resinate GHB formulation "supplied as a sachet," there is no disclosure that the drug would be presented in a sachet that the end user opened as part of "administering a single daily dose."  The sachet could be opened by an end user as a step as required by the limitation, or it could be opened by the end user to be transferred into another storage device for future use rather than as part of a single daily dose, or the sachet could itself be suspended in water.  Because the specification does not disclose any motivation for using a sachet as opposed to any other method of storage or administration, a POSA would not have understood that the sachet must be opened as part of "administrating a single daily dose" to the patient as required by the claim.

**Finally**, the claims recite a "opening a sachet containing a gamma-hydroxybutyrate formulation" that is a part of "administering a single daily dose to the patient."  For the same reason as discussed above, a POSA would not have believed that opening a sachet that contained a gamma-hydroxybutyrate would allow the administration to be a "single daily dose" absent some

248

disclosure of a means of achieving once-daily dosing or data demonstrating the inventors had achieved once-daily dosing.

### c.     Written description support for "wherein the administering promotes the patients to sleep for 6 to 8 hours" is inadequate

In response to Avadel's contentions that the '079 patent lacks written description support for the "sleep for 6 to 8 hours" limitation, Jazz contends in its Final Validity Contentions that the law does not require the specification of a method of treatment patent to contain data "demonstrating efficacy." Jazz's Final Validity Contentions at 206. Jazz's argument is unavailing. The lack of any *in vitro* or *in vivo* data, or even methods of evaluating the claimed invention for its claimed sleep-promoting ability, is evidence that the claimed limitation lacks written description support, regardless of whether such a disclosure is required. The claims at issue merely recite a desired result, without written description for attempting to achieve it or any substantiation for having achieved it. Stating a desired result, or a mere plan for achieving that result, without showing how to accomplish it, is not adequate written description support. *Centocor*, 636 F.3d at 1351. Jazz also argues that the method of treatment as described "allow[s] a POSA to . . . analyze for the promotion of sleep for 6 to 8 hours," but fails to point to any section in the specification that discloses how a POSA would analyze or evaluate the drug for the claimed functionality. Jazz's Final Validity Contentions at 206. Thus, a POSA would not have understood that the inventors were in possession of a method of administrating a GHB formulation that can promote "sleep for 6 to 8 hours."

Moreover, the specification notes that as of the filing date, the only available sodium oxybate drug composition was "given at night in divided doses approximately 2-4 hours apart"; thus, "GHB is typically given twice nightly due to short in vivo half life." '079 patent at col. 3:62-66. Thus, a POSA would not have believed that the inventors were in possession of the "sleep for

6 to 8 hours" limitation absent some data substantiating such a period of sleep and given that such a period of sleep would be a material deviation from the known sleep period for sodium oxybate given its "short in vivo half life."

In addition, the specification explains that "[t]he solubility of sodium oxybate is unusually high" and "the drug is unusually mobile in solution," such that "[t]hose skilled in the art will appreciate that these factors complicate and, in many cases, limit conventional approaches for modified release." '079 patent at col. 5:49-56. The specification explicitly notes that such factors "tend to significantly reduce the number of viable approaches using such conventional solubility and diffusivity control techniques." *Id*. at col. 5:58-60. Given the foregoing, a POSA would need data to believe that the inventors were in possession of the "sleep for 6 to 8 hours" limitation. The need for data would be further underscored by the fact that Jazz now contends that the claims encompass "conventional" techniques as opposed to being confined to ion exchange resins.

Moreover, to the extent that the '079 patent incorporates the Allphin 2012 reference, that publication emphasizes that "[i]n man, the plasma half-life of sodium oxybate given orally is about 45 minutes" and results in "about 2 to 3 hours of sleep." Allphin 2012 at ¶ 9. A POSA would have also generally been aware of that teaching independently of Allphin 2012. And Allphin 2012 further teaches that "[t]he hygroscopic nature of sodium oxybate presents significant challenges to the formulation, production, and storage of dosage forms capable of delivering sodium oxybate over a sustained period of time." *Id.* at ¶ 30. Those teachings (and background knowledge) also would have led a POSA to need to see data substantiating the "6 to 8 hours" limitation to believe the inventors were in possession of a formulation capable of achieving this sleep result.

<strong>d.      The '079 Patent is Invalid for Lack of Enablement</strong>

With respect to Avadel's lack of enablement contention, Jazz relies on the same argument that the '079 patent is not limited to GHB-resinate forms.  For the same reasons as set forth in *supra* Sections IV.E.1., IV.E.2, and IV.E.3, Jazz's arguments lack merit.

**4.      Response to Jazz on the '889 and '586 Applications Failing to Provide Written Description Support for the '079 Patent**

**a.      The '889 Application and the '586 Application Fail to Provide Written Description Support for "opening a sachet containing a solid oxybate formulation"**

Jazz argues in its Final Validity Contentions that there is written description support for the '079 patent in the '889 and '586 Applications.  Jazz's Final Validity Contentions at 95.  For the "opening a sachet containing a solid oxybate formulation" limitation, Jazz cites Paragraphs [017], [024], and [053] of the '889 Application and Paragraph [023] of the '586 Application as allegedly providing sufficient written description support.  *Id.*  As discussed below, however, none of these disclosures describe any non-resinate modified release GHB particles, none describes a sachet formulation enabling a method of administering a single daily dose, and none includes any data showing that such a method would successfully treat narcolepsy with such a single daily dose:

- Paragraph [017] of the '889 Application states "[t]herefore, an immediate release component may be provided, for example, as a dry powder formulation, an immediate release tablet, an encapsulated formulation, or a liquid solution or suspension.  However, an immediate release component may also be formulated as part of a single dosage form that integrates both the above components."  '889 Application, at [017].  This citation does not mention the term sachet and provides no support for a sachet formulation.  Moreover, it is limited to "an immediate release component" in any event.

- Paragraph [024] of the '889 Application provides "a particularly convenient means of administering resinates is as a suspension of individual resinate beads." *Id.* at [024]. This is the same disclosure in the '079 patent at col. 19:14-27 that Jazz contends provides written description support for the claims of the patent. *Compare* '889 Application at Paragraph [024], *with* '079 patent at col. 19:14-17. Jazz's citation to paragraph [024] of the '889 Application fails to provide written description support for the same reasons described above. *See supra* Section IV.E.3.b.

- Paragraph [053] of the '889 Application provides "[d]epending on the means used to retard or delay release, the beads may be presented in hydrated form as part of an aqueous suspension, or may be provided as dried beads for mixing with water immediately prior to ingestion or to be taken without water." '889 Application at [053]. Again, no sachet is disclosed, nor any proposed action of opening a sachet into water (and there are other ways of utilizing a sachet, as discussed *supra*). This citation does not provide adequate written description support for the limitation.

- Paragraph [023] of the '586 Application provides the same disclosure as the '079 patent at col. 6:4-10. *Compare* '586 Application at Paragraph [023], *with* '079 patent at col. 6:4-10. For the reasons described above, this disclosure fails to provide sufficient written description support for "opening a sachet containing a gamma hydroxybutyrate formulation." *See supra* Section IV.E.3.b.

None of the disclosures identified by Jazz provides written description support for the entirety of what Jazz ultimately attempted to claim – a "single daily dose" with the requisite amount of sodium oxybate that is administered by "opening a sachet containing a solid oxybate

formulation" and "wherein the oxybate formulation comprises an immediate release component and a controlled release component." '079 Patent at claim 1.[40] *See Juno Therapeutics*, 10 F.4th at 1336 (requiring "the inventors [to] possess[] the full scope of the claimed invention" for written description). And none of the disclosures cited by Jazz contains any data indicating that a sachet formulation with both an immediate release component and a controlled release component would enable a method of administering only a single daily dose of sodium oxybate. Given the statements in the '079 specification and prior art on the subject, *see supra* Section IV.E.3.b., a POSA would need to see such information or data to deem that the inventors were in possession of the claimed subject matter. To the extent that Jazz relies on the purportedly incorporated Allphin 2012 for providing written description support for administering a single daily dose by opening a sachet containing a solid oxybate formulation, Jazz only cites to ¶ 0042, which also fails to provide any information or data to show that the inventors were in possession of the claimed subject matter. *See* Jazz's Final Validity Contentions at 95; Allphin 2012, ¶ 0042. Further, as discussed in *supra* Section IV.E.3.a-b, a POSA would not have understood that any disclosure therein would apply to a "single daily dose" with the requisite amount of sodium oxybate that is administered by "opening a sachet containing a solid oxybate formulation" and "wherein the oxybate formulation comprises an immediate release component and a controlled release component" as claimed in the '079 patent.

Thus, the disclosures cited by Jazz in its Final Invalidity Contentions would not have led a POSA to understand, based on the disclosures in the '889 and '586 Applications, that the inventors

---

[40] To the extent that the claim term "a single daily dose" requires claim construction, Avadel contends that a single daily dose must be construed to mean "a single dose that would replace patients' need to take multiple doses a day," '079 patent at col. 6:45-49. To the extent that Jazz contends otherwise, Avadel reserves the right to request construction of this claim term.

were in possession of a formulation that involves opening a sachet containing a single daily dose

of a gamma hydroxybutyrate formulation and mixing its contents in water, let alone one that leads

to the biological results recited in various dependent claims as of the filing date of the '889 and

'586 Applications.  Jazz is therefore not entitled to claim priority for the '079 patent back to the

filing date of the '889 Application or the '586 Application.

>    **b.    The '889 Application and the '586 Application Fail to Provide Written Description Support for "controlled release component"**

For the "controlled release component" limitation, Jazz cites Paragraphs [014], [017], and

[018] of the '889 Application, and [014] of the '586 Application as purportedly providing written

description support for this limitation.  Jazz's Final Validity Contentions at 95.  As discussed

below, however, none of these disclosures describe any non-resinate controlled release component

that would enable a method of administering only a single daily dose of GHB:

- Paragraph [014] of both the '889 and the '586 Applications recite: "In addition to the controlled or extended release properties of one embodiment, there can be an immediate release GHB formulation that is present in or accompanies the controlled release formulation."  This disclosure only contains a passing reference to a "controlled release formulation" that does not describe any non-resinate controlled release formulations of GHB, and would not persuade a POSA that the inventors possessed such a non-resinate sachet formulation with both an immediate release component and a controlled release component that would enable a method of administering only a single daily dose of GHB, particularly in light of the specification's statement that various factors "limit conventional approaches for modified release."  '889 Application, ¶ [0022],'586 Application, ¶ [0022]. .  Based on this passing reference to a "controlled release formulation," a POSA would not

understand the inventors to have been in possession of non-resinate controlled release formulations of GHB.

- Paragraph [017] of the '889 Application recites: "The formulations and dosage forms of the present invention can also include an immediate release component. The immediate release component can form part of a controlled release unit or liquid dosage form or may be a separate immediate release composition."  This disclosure likewise only contains a passing reference to a "controlled release formulation," does not describe any non-resinate controlled release formulations of GHB, and would not persuade a POSA that the inventors possessed such a non-resinate sachet formulation with both an immediate release component and a controlled release component that would enable a method of administering only a single daily dose of sodium oxybate, particularly in light of the specification's statement that various factors "limit conventional approaches for modified release." '889 Application, ¶ [0022],'586 Application, ¶ [0022].

- Paragraph [018] of the '889 Application recites: "In specific embodiments, controlled release and immediate release formulations can be dosed together to a subject to provide quick onset of action, followed by maintenance of therapeutic levels of the drug substance over a sustained period of time."  This disclosure likewise only contains a passing reference to a "controlled release formulation," does not describe any non-resinate controlled release formulations of GHB, and would not persuade a POSA that the inventors possessed such a non-resinate sachet formulation with both an immediate release component and a controlled release component that would enable a method of administering only a single daily dose of

255

sodium oxybate, particularly in light of the specification's statement that various factors "limit conventional approaches for modified release." '889 Application, ¶ [0022],'586 Application, ¶ [0022].

None of the disclosures identified by Jazz provide written description support for the entirety of what Jazz ultimately attempted to claim – a "single daily dose" with the requisite amount of sodium oxybate "wherein the oxybate formulation comprises an immediate release component and a controlled release component." '079 patent at claim 1.  And none of the disclosures cited by Jazz contains any data indicating that a non-resinate GHB formulation with both an immediate release component and a controlled release component would enable a method of administering only a single daily dose of sodium oxybate.  Given the statements in the '079 specification and prior art on the subject, *see* disc. IV.D.3.a, a POSA would need to see such information or data to deem that the inventors were in possession of the claimed subject matter. To the extent that Jazz relies on the purportedly incorporated Allphin 2012 for providing written description support for administering a single daily dose of a solid oxybate formulation comprising an immediate release component and a controlled release component, Jazz only cites to ¶ 0042, which also fails to provide any information or data to show that the inventors were in possession of the claimed subject matter.  *See* Jazz's Final Validity Contentions at 95; Allphin 2012, ¶ 0042. Further, as discussed in *supra* Section IV.E.3.a-b, a POSA would not have understood that any disclosure therein would apply to a "single daily dose" with the requisite amount of sodium oxybate that is administered by "opening a sachet containing a solid oxybate formulation" and "wherein the oxybate formulation comprises an immediate release component and a controlled release component" as claimed in the '079 patent.

Thus, the disclosures cited by Jazz in its Final Invalidity Contentions would not have led a POSA to understand, based on the disclosures in the '889 and '586 Applications, that the inventors were in possession of a formulation that includes a non-resinate controlled release component of gamma-hydroxybutyrate, let alone one that can be administered as a "single daily dose," or one that leads to the biological results recited in various dependent claims as of the filing date of the '889 and '586 Applications. *See supra* Section IV.E.3.b. Jazz is therefore not entitled to claim priority for the '079 patent back to the filing date of the '889 Application or the '586 Application.

c.    **The '889 Application and the '586 Application Fail to Provide Written Description Support for "sleep for 6 to 8 hours" limitation**

For the "sleep for 6 to 8 hours" limitation, Jazz only cites Paragraph [014] of the '889 Application and Paragraph [014] of the '586 Application as allegedly providing written description support. Jazz's Final Validity Contentions at 96. Paragraph [014] of both applications recites: "One object of the invention is to maintain the concentration of GHB in the blood at levels sufficient to promote sleep for up to 8,7,6, or 5 hours. . . " Paragraph [014] of the '889 Application further recites "Additionally, it is an object [of the invention] to ensure that the sleep inducing effects of GHB do not remain for longer than the above periods as it would compromise a patent's ability to perform normal day to day activities." These paragraphs are identical to disclosures in the '079 patent. *Compare* '586 Application at Paragraph [014] with '079 at col. 4:4-6; *compare* '889 Application at Paragraph [014] with '079 at col. 4:10-13. Jazz merely states a result, without even a passing showing of having achieved "sleep for 6 to 8 hours." For the same reasons as stated in Section IV.E.3.c., a POSA would not have understood based on the disclosures of the '889 and '586 Applications that the inventors were in possession of a method of administrating a GHB formulation that can promote "sleep for 6 to 8 hours," Jazz is therefore not entitled to claim priority for the '782 patent back to the filing date of the '889 Application or the '586 Application.

257

These paragraphs cited by Jazz further failed to disclose a GHB formulation that can cause patients to sleep for 6 to 8 hours.  *See* also Section IV.E.3.c. .  In addition, Jazz fails to cite to any data showing that such a claimed method would successfully treat narcolepsy by promoting the patient to sleep for 6 to 8.  As stated in Section IV.E.3.a, stating a desired result, or a mere plan for achieving that result, without showing how to accomplish it, is not adequate written description support.  Given the statements in the '079 specification and prior art on the subject, *see supra* Section IV.E.3.c., a POSA would need to see such information or data to deem that the inventors were in possession of the claimed subject matter.

Therefore, a POSA would not have understood based on the disclosures of the '889 and '586 Applications that the inventors were in possession of a method of administrating a GHB formulation that can promote "sleep for 6 to 8 hours," Jazz is therefore not entitled to claim priority for the '782 patent back to the filing date of the '889 Application or the '586 Application.

### 5.      The '782 Patent Is Invalid for Lack of Written Description

#### a.      "modified release particles"

Each of asserted claims 1-24 of the '782 patent contain the limitation "modified release particles."  To the extent that "modified release particles" is construed to cover non-resinate particles, the claims are invalid for failing to satisfy the written description requirement of 35 U.S.C. § 112.

Jazz has broadly interpreted this claim limitation to capture non-resinate GHB formulations, such as Avadel's FT218 product.  *See, e.g.*, Jazz's 12/7/2021 Initial Infringement Contentions at 18.  Under Jazz's interpretation, the asserted claims would broadly cover any solid or liquid formulation with "modified release particles" containing GHB, regardless of the composition of the "modified release particles."  Thus, under Jazz's interpretation, the claims

broadly recite and claim particles with a desired functionality—modified release of GHB—regardless of the means by which the claimed functionality is achieved.

In contrast to Jazz's broad interpretation of the claims, the disclosures of the '782 patent are limited to resinate forms of GHB.  A POSA would not believe the inventors were in possession of any "modified release particles" of GHB other than resinate forms. While the specification does contain a general disclosure of a GHB formulation with polymeric beads, *see* '782 patent col. 2:51-53 ("GHB formulation comprising polymeric beads and pharmaceuticals [sic] acceptable excipients"), there is no description of any form of polymeric beads or how such a GHB-containing bead would be made, other than using GHB resinate.  There are also no embodiments disclosed in the specification other than to GHB resinate forms.  *See, e.g.*, *id.* at Examples 1-7.  Rather, the specification repeatedly describes the invention being directed to resinate-containing compositions.

- "Any anion exchange suitable for pharmaceutical use can be employed *in the compositions of the present invention*, particularly strong anion exchange resins."  *Id.* col. 8:34-36.

- "For the *oxybate resinate compositions of the present invention*, the amount of oxybate present in the resinate should be high to minimize the amount of resin required."  *Id.* col. 9:7-9.

- "Formulation of such drugs *as resinates according to the present invention* permits particle sizes that make such release characteristics (e.g., sigmoidal) feasible at reasonable coating weights."[41]  *Id.* col. 15:38-41.

- "In the dried state, the *sustained release resinate beads of the present invention* can hydrate more slowly if release-retarding agents are used."  *Id.* col. 19:33-35.

- "If the Stomach has about 5 mEq chloride, then **about 30 mEq of additional exchangeable anion must be provided with the** *resinate formulation of the present invention* to ensure complete release of the oxybate."  *Id.* col. 20:44-47.

---

[41] The inventor has defined "oxybate resinate compositions" as "i.e., oxybate ionically bound to an ion exchange matrix."  '782 Patent File History, February 18, 2016, Allphin Declaration at ¶ 5.

- "These supplemental anions can be coadministered with the oxybate compositions of the present invention, for example within about an hour (before or after or ***administering the drug resinate (e.g. oxybate resinate) compositions of the present invention***, or simultaneously therewith." *Id.* col. 21:21-25.

Indeed, the specification of the '782 patent specifically denigrates other non-resinate forms of "modified release particles" containing GHB. *Id.* col. 5:58 ("…the high solubility and mobility of GHB would tend to significantly reduce the number of viable approaches using such conventional solubility and diffusivity control technologies").

The specification also fails to adequately describe "modified release particles" because it does not define the term "modified release particle" or otherwise explain the composition or characteristics of the recited "modified release particle."  Indeed, the claimed term "modified release particle" is not found anywhere in the specification.  The only discussion of "modified release" are in two passages discussing the general unsuitability of conventional approaches to modified release formulations of GHB, including traditional resinate GHB formulations:

- "Those skilled in the art will appreciate that these factors complicate and, in many cases, limit conventional approaches for **modified release**, such as core/shell or matrix formulations, as the high solubility and mobility of GHB would tend to significantly reduce the number of viable approaches using such conventional solubility and diffusivity control technologies." *Id.* col. 5:55-61.

- "Drug-resin complexes including **modified release** drug-resin complexes are known. However, such complexes would typically be considered unsuitable for very high dose, low molecular weight drugs such as oxybate, because the molar amount of drug required is quite high, which would therefore necessitate correspondingly large amounts of ion exchange resin, particularly if the efficiency of binding is significantly less than 100%.  Accordingly, for drugs such as oxybate that are dosed at much higher molar levels, e.g., approximately 100-fold higher compared to typical drug dosing, drug-resin complexes would not be considered acceptable." *Id.* col. 6:21-32.

Thus, a POSA would understand the term "modified release particle" as used in the claims of the '782 patent to include any particle possessing modified release of GHB (as compared to an immediate release GHB formulation).  This could include, but is not limited to, enteric coatings, ion exchanges, physical modifications, osmotic devices, and resins.  As the specification is limited

to embodiments and disclosures of resinate formulations, the specification does not support the full scope of the claims.

In light of the specification's disclosures, a POSA would not have understood the inventors to be in possession of formulations containing "modified release particles" containing GHB other than resinate forms of GHB. To the extent Jazz contends the claims of the '782 patent cover formulations containing non-resinate forms of GHB, they are invalid for lack of written description support.

> **b.** **"a viscosity enhancing agent…wherein the viscosity enhancing agent … [is] separate from the immediate release particles and the modified release particles"**

Claims 1-24 lack adequate written description of "a viscosity enhancing agent… wherein the viscosity enhancing agent… [is] separate from the immediate release particles and the modified release particles." To the extent Jazz alleges claims 1-24 of the '782 patent cover any formulations containing "modified release particles" of GHB in combination with "a viscosity enhancing agent" that is separate from the particles, a POSA would not believe the inventors were in possession of the claimed formulation.

The specification is silent as to the arrangement of the viscosity enhancing agent vis-à-vis the "immediate release" and "modified release" particles. While the specification contains a general disclosure of possible viscosity enhancing agents, *see id*. at col. 14:56-61, the specification contains no description corresponding to the incorporation of a viscosity enhancing agent into a final formulation containing particles but "separate from" the particles. Nor does the specification describe what amount of a viscosity enhancing agent would be needed to achieve a desired effect, or how to determine if the formulation was successful. Thus, a POSA would not understand, by the disclosures of the specification, that a viscosity enhancing agent added to the disclosed

261

embodiments would be separate from the "immediate release particles" and "modified release particles."

### c.      "an acid wherein the . . . acid [is] separate from the immediate release particles and the modified release particles"

Claims 1-24 lack adequate written description of "an acid wherein the . . . acid [is] separate from the immediate release particles and the modified release particles." To the extent Jazz alleges claims 1-24 of the '782 patent cover any formulations containing "modified release particles" of GHB in combination with "an acid" that is separate from the particles, a POSA would not believe the inventors were in possession of the claimed formulation.

The specification is silent as to the arrangement of the acid vis-à-vis the "immediate release" and "modified release" particles. The specification contains no description corresponding to the incorporation of an acid into a final formulation containing particles but "separate from" the particles. Nor does the specification describe what amount of acid would be needed to achieve a desired effect, or how to determine if the formulation was successful. *See, e.g., id.* col. 2:22-32 (describing coating a resin bead with a coating comprising an acid to "provide further controlled release characteristics); *id.* col. 2:54-56 (describing stearic acid could be added to "control the release of GHB from within the polymeric bead"). Thus, a POSA would not understand, by the disclosures of the specification, that an acid added to the disclosed embodiments would be separate from the "immediate release particles" and "modified release particles."

### d.      Blood concentration ranges

Claims 11, 12, and 19 all claim blood concentration ranges of GHB eight hours after administration of the claimed formulation. Claim 11 claims a blood concentration range from "10 mg/L to about 40 mg/mL," and claims 12 and 19 claim a blood concentration range from "15 mg/L

to about 30 mg/mL." A POSA would not believe the inventors were in possession of any GHB formulation or unit dose that could provide such blood concentration ranges.

The specification only mentions blood concentration in two places. In each disclosure the ranges are merely conclusory, with no examples of accompanying disclosures for how to achieve such a concentration or any testing data showing such a concentration had been achieved by the inventors.

- "One object of the invention is to maintain the blood level of GHB from about 10 mg/L to about 20 mg/L for up to 8, 7, 6, or 5 hours." *Id.* col. 4:5-7.

- "Suitable blood levels of oxybate are at least about 10 mg/L, ranging up to about 70 m/L [sic], maintained over a period of about 5-8 hours as described herein. For example, blood levels of oxybate can be about 10, about 15, about 20, about 25, about 30, about 35, about 40, about 45, about 50, about 55, about 60, about 65, or about 70 mg/L, inclusive of all ranges therebetween [sic]." *Id.* col. 22:26-32.

Example 3 reports that "resinate beads" were administered to beagles, but that does not describe any blood level results and Jazz erroneously construes the claims to apply to non-resinate dosage forms, such that any such results would fail to demonstrate possession in any event. *Id.* at col. 23:54-58. A POSA would not believe that the inventors possessed any formulation or unit dose with the claimed blood concentration ranges because the specification discloses only "a mere wish or plan" for the stated blood concentration ranges. *Centocor*, 636 F.3d at 1350-51.

Even if the two conclusory disclosures were enough to provide support for the disclosed ranges, the claimed blood concentration ranges do not match those mentioned in the specification, and thus there is not adequate written description for the ranges. *See Indivior UK Limited v. Dr. Reddy's Laboratories S.A.*, 18 F.4th 1323, 1328 (Fed. Cir. 2021) (noting that the "specification must indicate with some clarity what the claim recites" and finding no written description support for claimed ranges that did not appear in the application). Normalizing the units of the claimed concentrations, claim 11 claims a concentration range of 10 mg/L to about 400,000 mg/L.

Likewise, claims 12 and 19 claim a concentration range of 15 mg/L to about 30,000 mg/L. Nowhere are these ranges disclosed in the specification.  Thus, claims 11, 12, and 19 are invalid for lack of written description.

### 6.   The '782 Patent Is Invalid for Lack of Enablement

A POSA would not be able to enable the full scope of the claims to encompass a non-resinate formulation of GHB.  To satisfy the enablement requirement, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation.  As detailed above, the specification's disclosure of modified release particles is limited to GHB-resinate forms.  *See supra* at Section IV.E.5.  It would require undue experimentation to make and use controlled release components that are not GHB-resinate forms, as confirmed by, ████████████████████████████████  The patent therefore fails to enable the full scope of possible "modified release particles," including modified release particles that do not contain GHB resinates.

Additionally, the specification does not enable a POSA to achieve the full range of possible blood concentrations achieved via the use of "modified release particles," as required by dependent claims 11, 12, and 19.  Nowhere does the specification disclose examples or studies of how the claimed concentrations can be achieved.  The only reference to a dosage amount that is administered and then tested for blood concentration is Example 3, which discloses that dried GHB resinate beads were administered to beagle dogs, the dogs' blood were sampled for determination of plasma GHB content, but no results were disclosed.  '782 Patent col. 23:54-58.

7. **Response to Jazz on Invalidity Under 35 U.S.C. § 112 for the '782 Patent**

a. **Written description support for "modified release particles" is inadequate**

Avadel's initial contentions demonstrate that the asserted claims are invalid for failure to satisfy the requirements of 35 U.S.C. § 112. In response to Avadel's argument that the '782 patent disclosure is limited to resinate forms of GHB, Jazz contends that the specification generally describes modified release dosage forms that are not limited to ion-exchange resins. Jazz's Final Validity Contentions at 207. But the only language in the '782 patent specification identified by Jazz in its Final Validity Contentions is limited to "controlled release dosage form includ[ing] drug loaded onto beads (e.g., ion-exchange beads) in combination with one or more optional excipients . . . ." '782 patent at col. 13:5-33. But a POSA would understand that passage—per its plain language—to refer to resinates. This language does not support Jazz's argument or disclose non-resinate formulations, because there is no description of any particular modified release particles in that reference or anywhere else in the specification other than ion-exchange resin particles.

Jazz does not identify any other language in the '782 patent specification to support its argument in its Final Validity Contentions that the specification's description of modified release particles other than ion-exchange resins. Instead, Jazz only points to the patent's alleged incorporation by reference of U.S. publication No. 2012/0076865 ("Allphin 2012") as allegedly disclosing non-resinate GHB dosage forms. But the specification of the '782 patent does not properly incorporate Allphin 2012 by reference, because the specification fails to "identify with detailed particularity what specific material it incorporates." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). Allphin 2012 is one of the 41 patents or patent publications Jazz purports to incorporate by reference. The specification does not describe what

is particularly disclosed in those 41 patents or patent publications and 13 other publications, nor

does it describe how those 41 patents or patent publications and 13 other publications relate to the

subject matter of the '782 patent claims.  *See* '782 patent at col. 2:64-3:59.  Therefore, Allphin

2012 is not properly incorporated by reference, and Jazz cannot rely on it to supplement the

insufficient written disclosure of the '782 patent's specification.

Jazz implicitly concedes that the '782 patent does not describe any modified release

particles other than ion-exchange resins by relying solely on the incorporation of Allphin 2012 to

support its contention that other dosage forms are disclosed.  Jazz's Final Validity Contentions at

207.

A POSA also would not have understood that Jazz's incorporation by reference extends to

the subject matter at issue because the teachings that Jazz points to involve conventional

approaches to modified release, which the specification criticizes.  For example, the specification

of the '782 patent explains that:

> The solubility of sodium oxybate is unusually high. For example, a
> Xyrem solution is provided as 500 mg/mL concentration in water,
> or 42 wt %, and its solubility limit is considerably higher.
> Furthermore, due to the small size and ionic nature of GHB at
> physiological pH, the drug is unusually mobile in solution. Those
> skilled in the art will appreciate that these factors complicate and, in
> many cases, ***limit conventional approaches*** for modified release,
> such as core/shell or matrix formulations, as the high solubility and
> mobility of GHB would tend to significantly reduce the number of
> viable approaches using such conventional solubility and diffusivity
> control technologies.

'782 patent at col. 5:50-61.  The prior art incorporated by reference and relied upon by Jazz is thus

the prior art disclosing "conventional" techniques that the specification criticizes.  In these

circumstances, the allegedly incorporated disclosures do not provide written description support

for the claimed subject matter.  *See Tronzo*, 156 F.3d at 1159 (finding that the incorporated prior

art references did not provide written description support for claims that were directed to generic

cup shapes, because the specification "specifically distinguishes the prior art as inferior and touts

the advantages of the conical shape" which made clear that it "discloses only conical shaped cups

and nothing broader"). Jazz specifically cites to Allphin 2012, Jazz's Final Validity Contentions

at 204, 207, but Allphin 2012 only teaches non-resinate solid dosage forms, and the '782 patent

teaches that:

> Furthermore, while extended release oxybate dosage forms are known, such extended release dosage forms are provided as solids, e.g. as tablets. Because the required dose of oxybate is high, such tablets can be quite large, and/or require the administration of multiple tablets. This can be problematic because some patient populations have difficulty swallowing solid dosage forms, or the need to swallow multiple tablets may reduce patient compliance. In addition, the sustained release matrix or coating compositions used to provide extended release are complex and expensive to produce.
>
> * * * *
>
> A drug-resin complex may address some of these limitations, as the drug is essentially insoluble as long as it remains bound to the resin. Instead, the drug release is regulated by exchange with other anions present in the gut, the most prevalent being chloride.

'782 patent at col. 5:62–6:17. Thus, a POSA would not understand the '782 patent's incorporation

by reference to provide written description support for non-resinate modified release particles for

this additional reason.

Even if it were proper to rely on Allphin 2012 to provide written description support for

modified release particles outside of an ion-exchange resin, Allphin 2012 itself fails to describe

any formulations containing acids or viscosity enhancing agents separate from the drug-containing

particles, as Jazz concedes. Jazz's Final Validity Contentions at 207 n.32. For the reasons

discussed *supra* Section IV.E.5.b-c and discussed *infra* Sections IV.E.7.b-c, the specification of

the '782 patent also does not adequately describe any viscosity enhancing agents or acids separate

from the drug-containing particles even for a resinate formulation. And even if the '782 patent

contained such disclosures, Jazz cannot mix and match different and unrelated sections of the specification to satisfy written description. *See Flash-Control, LLC v. Intel Corp.*, No. 2020-2141, 2021 WL 2944592, at *3 (Fed. Cir. July 14, 2021) ("[T]he specification must present each claim as an 'integrated whole.'") (internal citations omitted). Thus, a POSA would not have understood Jazz to be in possession of the claimed invention, even if it was proper to rely on Allphin 2012 to provide written description support for modified release particles outside of an ion-exchange resin.

**Second**, Jazz argues that the law only requires that a patentee describe the invention as claimed. Jazz's Final Validity Contentions at 208. Jazz misses the mark and turns the written description requirement on its head. To satisfy the written description requirement, the patent specification must demonstrate that "the inventors possessed the full scope of the claimed invention." *Juno*, 10 F.4th at 1336. Here, Jazz argues that the "modified release particles" encompasses formulations other than those including an ion exchange resin. As discussed above, however, the specification discloses only ion-exchange formulations, and repeatedly characterizes the invention as limited to resinate formulations. Thus, a POSA would not have understood the inventors to have been in possession of the full scope of the "modified release particles" that Jazz contends fall within the scope of the claims. To the extent that Jazz contends that the "modified release particles" encompasses more than ion-exchange formulations, such as FT218's formulation, the claims are invalid for lack of written description support.

In addition, the specification explains that "[t]he solubility of sodium oxybate is unusually high" and "the drug is unusually mobile in solution," such that "[t]hose skilled in the art will appreciate that these factors complicate and, in many cases, limit conventional approaches for modified release." '782 Patent at 5:50-57. The specification explicitly notes that such factors "tend to significantly reduce the number of viable approaches using such conventional solubility

268

and diffusivity control techniques." *Id*. at 5:58-60.  Given the foregoing, a POSA would need data or examples to believe that the inventors were in possession of modified release particles as claimed.

Jazz effectively maintains that the claims at issue recite a genus of sodium oxybate formulations containing immediate release particles and modified release particles where certain excipients are separate from each.   In such circumstances, "the written description 'must demonstrate that the applicant has made a generic invention that achieves the claimed result and do so by showing that the applicant has invented species sufficient to support a claim to the functionally-defined genus.'" *Juno*, 10 F.4th at 1335.  But the '782 specification contains not even a single example of achieving that result and fails to provide written description support for such a genus.

> **b.** **Written description support for "a viscosity enhancing agent…wherein the viscosity enhancing agent … [is] separate from the immediate release particles and the modified release particles" is inadequate**

In response to Avadel's argument that the '782 patent does not have written description support for a viscosity enhancing agent "separate" from the drug-containing particles, Jazz cites several sections of the specification, none of which provide the require disclosures.  Jazz's Final Validity Contentions at 208 (citing '782 patent at col. 2:40-46, 14:56-61, 19:61-65).  As an initial matter, the disclosures cited by Jazz are dispersed across different sections of the specification in the context of different topics.  *Compare* '782 patent at col. 2:40-46 *with id.* at 19:61-65.  Jazz thus seeks to improperly mix and match different and unrelated sections of the specification in an effort to cobble together the necessary disclosure.  *See Flash-Control,* 2021 WL 2944592, at *3 ("[T]he specification must present each claim as an 'integrated whole.'") (internal citations omitted).

Further, none of these citations support Jazz's argument. *First*, the specification at col. 2:40-46 of the '782 patent does not provide support for a viscosity enhancing agent that is "separate" from the drug releasing components. Instead, the specification at col. 2:40-46 discusses "slippants to reduce viscosity." '782 patent at col. 2:40-46. A POSA would not have considered a "slippant" to be the equivalent of a "viscosity enhancing agent." Further, the disclosure does not discuss where in the formulation the slippants would be added relative to the drug-containing particles.

Second, the specification's discussion at col. 14:56-61 does not provide support for a viscosity enhancing agent that is "separate." Rather, the specification states that "[i]n some embodiments of the formulations of the present invention, the viscosity enhancing agent is selected from the group consisting of . . . ." The cited portion of the specification fails to discuss the arrangement of the viscosity enhancing agents relative to the drug-containing particles. *Id.* at col. 14:56-61. Jazz thus has failed to identify any support in the specification that discloses the incorporation of a viscosity enhancing agent into a final formulation containing viscosity-enhancing agents but that is "separate from" the particles. A POSA therefore would have not understood that Jazz was in possession of a GHB formulation containing a viscosity enhancing agent separate from the drug-containing particles.

Third, the specification's discussion at col. 19:61-65 does not provide support for a viscosity enhancing agent that is "separate." Instead, the specification teaches that "if administered as an aqueous suspension, the highest practical solids loading is desired. The factors which affect the solids loading (volume fraction) of the suspension include the medium used for dilution (water vs. alcohol) and its viscosity." This cited portion of the specification merely states that the viscosity of the suspension affects solid loading, but does not discuss any viscosity enhancing

agents, let alone viscosity enhancing agents separate from the drug-containing particles. '782 patent at col. 19:61-65. As adding viscosity enhancing agents is not the only way to affect the viscosity of a suspension, a POSA would not have understood this disclosure to have provided sufficient support for a viscosity enhancing agent, let alone a viscosity enhancing agent separate from drug containing particles.

Further, even if one were to assume that the scant disclosure identified by Jazz was sufficient to satisfy the written description requirement for a resinate formulation of GHB comprising of a viscosity enhancing agent separate from the drug-containing particles, it fails to provide adequate support for the full range of the claims, because a POSA would not have understood that the disclosure applies to non-resinate formulations. The '782 specification only discloses a list of viscosity enhancing agents suitable for the "present invention," which as discussed, only includes resinate formulations of GHB. *Id.* at col. 14:56-61. Further, a POSA would have understood that different mechanisms of release may require different viscosity enhancing agents. Viscosity enhancing agents suitable for a resinate formulation may not be suitable for other formulations. Thus, a POSA would not have understood that the inventors of the '782 patent were in possession of a non-resinate formulation of GHB containing a viscosity enhancing agent as separate from the drug-containing particles.

### c.    Written description support for "an acid wherein the . . . acid [is] separate from the immediate release particles and the modified release particles" is inadequate

In response to Avadel's argument that the '782 patent does not have written description support for an acid "separate" from the drug-containing particles, Jazz cites several sections of the specification in its Final Validity Contentions, none of which provide the necessary written description support. Jazz's Final Validity Contentions at 209 (citing '782 patent at col. 14:1-6, 14:30-32, 14:33-48).

271

The first two passages cited by Jazz fail to provide any disclosure of the arrangement of the acid relative to the drug-containing particles. *See* '782 patent at col. 14:1-6 (explaining that "the pharmaceutical composition may comprise a pH adjusting or buffering agent" including acids); *id.* at col. 14:30-32 (explaining that the pH adjusting agent may be a mixture of acid and/or base). The third passage Jazz cites also fails to disclose a formulation containing an acid that is separate from the drug-containing particles. Rather, it describes having the listed additives and ingredients either "packaged with GHB" or "packaged separately from GHB prior to consumption." The specification, however, explains that when GHB compositions are "packaged separately from GHB prior to consumption," "useful compositions of GHB may be obtained by mixing GHB with the other components with an aqueous medium prior to consumption." '782 patent at col. 14:46-48. Thus, a POSA would understand that the specification's description of GHB "packaged separately" from the other components listed in the specification refers to arrangements where the components are not part of the same formulation as GHB, as required by the asserted claims. Further, the specification lists acid as as one of the 17 additives or ingredients that can be "packaged separately" from GHB prior to consumption. *Id.* at col. 14:33-48. A POSA would therefore not have believed based on such a laundry list of disclosures that the inventors were in possession of a formulation containing an acid separate from the drug-containing particles.

Further, even if one were to assume that the scant disclosures identified by Jazz were adequate to describe a formulation in which the acid is separate from the drug in a GHB formulation, the specification still fails to provide sufficient written description support for the full scope of the claims, because a POSA would not have recognized that the disclosure applies to non-resinate formulations. The specification discloses that the purpose of adding an acid was to "stabilize the composition's pH." *Id.* at col. 14:31-32. A POSA would have understood that

different mechanisms of release may require different pH values.  For example, the patent specification discloses that an acid and/or a base can be used to adjust the pH of the formulation. *Id.* at col. 14:1-4.  Thus, a POSA would not have understood that the inventors of the '782 patent were in possession of a non-resinate formulation of GHB containing acid as separate from the drug-containing particles.

### d.   Written description support for the claimed blood concentration ranges is inadequate

To respond to Avadel's argument that the '782 patent does not have written description support for the claimed blood concentration ranges, Jazz cites to multiple sections of the specification in its Final Validity Contentions that fail to provide the requisite support.  '782 patent at col. 4:5-10, 22:26-32, Example 3.

As an initial matter, the disclosures relied on by Jazz merely state a result, without a passing showing of having achieved it.  The first disclosure relied on by Jazz discusses only that "[o]ne object of the invention is to maintain the blood level of GHB from about 10 mg/L to about 20 mg/L for up to 8 . . . hours."  *Id.* at col. 4:5-10.  The second disclosure relied on by Jazz merely recites a "suitable blood level of oxybate," *id.* at col. 22:26-32, without indicating that the invention has achieved this range.  Jazz's reliance on these disclosures is misguided, because stating a desired result, or a mere plan for achieving that result, without showing how to accomplish it, is not adequate written description support.  *Centocor*, 636 F.3d at 1351.

Jazz's citation to Example 3 is similarly misguided.  *See* '782 patent at Example 3.  As Jazz acknowledges, Example 3 is directed to obtaining plasma GHB content in ***beagle dogs***, not in humans.  A POSA would not have understood that a disclosure of blood concentration of GHB achieved in beagles would apply to human.  Further, even for dogs, the specification fails to describe any data that supports the claimed blood concentration at 8 hours.  Therefore, a POSA

would not have believed that the inventors were in possession of a GHB formulation arriving at a claimed blood concentration range for dogs, let alone for humans.

Jazz also ignores Avadel's argument in its Initial Invalidity Contentions that "the claimed blood concentration ranges do not match those mentioned in the specification, and thus there is not adequate written description for the ranges."  Avadel's Initial Invalidity Contentions at 126. In its Final Validity Contentions, Jazz merely points to disclosures of blood concentration ranges from about 10 mg/L to at most about 70 m/L up to about 5 to 8 hours.  *See* Jazz's Final Validity Contentions at 210; '782 patent at col. 4:5-10, 22:26-32.  But as discussed in Avadel's Initial Invalidity Contentions, the upper limit of the blood concentration ranges disclosed in the specification are three orders of magnitude lower than the upper limit of the blood concentration ranges that are claimed.  A POSA thus would not have understood from the disclosures in the specification that the inventors were in possession of formulations achieving the full range of claimed GHB blood concentrations for this additional reason.

**e.      The '782 Patent Is Invalid for Lack of Enablement**

With respect to Avadel's lack of enablement contention, Jazz relies on the same argument it put forth in the written description section.  For the same reasons as set forth in *supra* Sections IV.E.4.a, IV.E.5, and IV.E.6.a, Jazz's arguments that the '782 patent enables the full scope of the claimed invention lack merit.

**8.      Response to Jazz on the '889 and '586 Applications Failing to Provide Written Description Support for the '782 Patent**

**a.      The '889 Application and the '586 Application Fail to Provide Written Description Support for the "modified release particles" limitation**

Jazz also argues that there is written description support for the '782 patent in the '889 and '586 Applications.  Jazz's Final Validity Contentions at 99.  For the "modified release particles,"

274

Jazz cites to Paragraphs [014], [017] and [018] of the '889 Application, and Paragraphs [014] and [018] of the '586 Application as purportedly providing written description support.  *Id.*  As discussed below, however, none of these disclosures describe any non-resinate modified release GHB particles:

- Paragraph [014] of both the Applications recites: "In addition to the controlled or extended release properties of one embodiment, there can be an immediate release GHB formulation that is present in or accompanies the controlled release formulation." This disclosure only contains a passing reference to a "controlled release formulation," does not describe any non-resinate modified release particles of GHB, and would not persuade a POSA that the inventors possessed such a non-resinate GHB formulation with immediate release particles, modified release particles, and a viscosity enhancing agent and an acid separate from the drug-containing particles, particularly in light of the specification's statement that various factors "limit conventional approaches for modified release."  '889 Application, ¶ [0022],'586 Application, ¶ [0022].  Based on this passing reference to a "controlled release formulation," a POSA would not understand the inventors to have been in possession of a formulation of GHB with non-resinate modified release particles.

- Paragraph [018] of both Applications recites: "In specific embodiments, controlled release and immediate release formulations can be dosed together to a subject to provide quick onset of action, followed by maintenance of therapeutic levels of the drug substance over a sustained period of time."  This disclosure likewise only contains a passing reference to a "controlled release formulation," does not describe

any non-resinate modified release particles of GHB, and would not persuade a POSA that the inventors possessed such a non-resinate GHB formulation with immediate release particles, modified release particles, and a viscosity enhancing agent and an acid separate from the drug-containing particles, particularly in light of the specification's statement that various factors "limit conventional approaches for modified release." '889 Application, ¶ [0022],'586 Application, ¶ [0022]. Based on this passing reference to a "controlled release formulation," a POSA would not understand the inventors to have been in possession of a formulation of GHB with non-resinate modified release particles.

- Paragraph [017] of the '889 Application recites: "The formulations and dosage forms of the present invention can also include an immediate release component. The immediate release component can form part of a controlled release unit or liquid dosage form or may be a separate immediate release composition." This disclosure likewise only contains a passing reference to a "controlled release formulation," does not describe any non-resinate modified release particles of GHB, and would not persuade a POSA that the inventors possessed such a non-resinate GHB formulation with immediate release particles, modified release particles, and a viscosity enhancing agent and an acid separate from the drug-containing particles, particularly in light of the specification's statement that various factors "limit conventional approaches for modified release." '889 Application, ¶ [0022],'586 Application, ¶ [0022]. Based on this passing reference to a "controlled release formulation," a POSA would not understand the inventors

276

to have been in possession of a formulation of GHB with non-resinate modified release particles.

- Paragraph [0053] of the '889 Application recites: "In the dried state, the sustained release beads may be expected to hydrate more slowly if release-retarding agents are used. As it hydrates, the diffusion of gut anion (chloride) into the bead may accelerate, thus producing a delayed or gradually increasing release of oxybate." This disclosure likewise only contains a passing reference to a "controlled release formulation," does not describe any non-resinate modified release particles of GHB, and would not persuade a POSA that the inventors possessed such a non-resinate GHB formulation with immediate release particles, modified release particles, and a viscosity enhancing agent and an acid separate from the drug-containing particles, particularly in light of the specification's statement that various factors "limit conventional approaches for modified release." '889 Application, ¶ [0022],'586 Application, ¶ [0022]. Based on this passing reference to a "controlled release formulation," a POSA would not understand the inventors to have been in possession of a formulation of GHB with non-resinate modified release particles.

Thus, the disclosures cited by Jazz in its Final Invalidity Contentions would not have led a POSA to understand, based on the disclosures in the '889 and '586 Applications, that the inventors were in possession of GHB formulations that included non-resinate modified release particles, let alone one that included the additional features recited in the various dependent claims as of the filing date of the '889 and '586 Applications. Jazz is therefore not entitled to claim priority for the '782 patent back to the filing date of the '889 Application or the '586 Application.

> **b.    The '889 Application and the '586 Application Fail to Provide Written Description Support for "a viscosity enhancing agent . . . wherein the viscosity enhancing agent . . . [is] separate from the immediate release particles and the modified release particles."**

For this limitation, Jazz only cites to Paragraphs [009] and [0053] of the '889 Application and Paragraphs [009] of the '586 Applications as purportedly providing written description support.[42]  Jazz's Final Validity Contentions at 99.  These paragraphs are identical to the disclosure Jazz cites in the '782 patent as allegedly providing written description support for the claims of the '782 patent, *see* Jazz's Final Validity Contentions at 208.  *Compare* '889 Application and '586 Application at Paragraph [009], *with* '782 patent at col. 2:40-46; *compare* '889 Application at Paragraph [0053] with '782 patent at col. 19:61-65.  Therefore, for the same reason as stated in Section IV.E.7.b.

Thus, the disclosures cited by Jazz in its Final Invalidity Contentions would not have led a POSA to understand, based on the disclosures in the '889 and '586 Applications, that the inventors were in possession of a GHB formulation containing a viscosity enhancing agent separate from the drug-containing particles as of the filing date of the '889 and '586 Applications.  Jazz is therefore not entitled to claim priority for the '782 patent back to the filing date of the '889 Application or the '586 Application.

> **c.    The '889 Application and the '586 Application Fail to Provide Written Description Support for "an acid wherein the . . . acid**

---

[42] Jazz also cites to Paragraphs [0053] and [044] of the '586 Application for either the viscosity enhancing agent limitation or the acid limitation.  These paragraphs do not discuss either a viscosity enhancing agent or an acid.

**[is] separate from the immediate release particles and the modified release particles"**

For this limitation, Jazz only cites to Paragraph [044] of the '889 Application and Paragraph [0056] of the '586 Applications as purportedly providing written description support. Jazz's Final Validity Contentions at 99. Both of these Paragraphs state that "[i]n one embodiment, the oral liquid compositions of the present invention may also comprise one or more surfactants . . . which aid in the stabilization and dispersion of the ingredients in aqueous systems . . . [including] alkoxylated fatty acids." A POSA would not have understood that a singular disclosure of "alkoxylated fatty acids" to provide adequate written description support for all acids, let alone an acid that is separate from the immediate release particles and the modified release particles. Further, the acids recited in claim 3 include only inorganic acids and does not include "alkoxylated fatty acids." *See* '782 patent claim 3 ("wherein the acid is selected from the group consisting of malic acid, citric acid, tartaric acid, boric acid, maleic acid, phosphoric acid, and benzoic acid."). Thus, the disclosures cited by Jazz in its Final Invalidity Contentions would not have led a POSA to understand, based on the disclosures in the '889 and '586 Applications, that the inventors were in possession of a GHB formulation containing an acid that is separate from its drug-containing particles as of the filing date of the '889 and '586 Applications. Jazz is therefore not entitled to claim priority for the '782 patent back to the filing date of the '889 Application or the '586 Application.

d. **The '889 Application and the '586 Application Fail to Provide Written Description Support for the Blood Concentration Range**

For this set of limitations, Jazz only cites Paragraph [014] of the '889 Application and Paragraph [0085] of the '586 Application. Jazz's Final Validity Contentions at 102. These paragraphs are identical to the disclosure Jazz cites in the '782 patent as allegedly providing written

description support for the claims of the '782 patent, *see* Jazz's Final Validity Contentions at 210. *Compare* '889 Application at Paragraph [014], *with* '782 patent at col. 4:5-10; *compare* '586 Application at Paragraph [0085] with '782 patent at col. 22:26-32.  Therefore, for the same reason as stated in Section IV.E.7.d, the disclosures cited by Jazz in its Final Invalidity Contentions would not have led a POSA to understand, based on the disclosures in the '889 and '586 Applications, that the inventors were in possession of a GHB formulation that achieved the claimed blood concentration range as of the filing date of the '889 and '586 Applications.  Jazz is therefore not entitled to claim priority for the '782 patent back to the filing date of the '889 Application or the '586 Application.

### F.    The '079 and '782 Patents Are Invalid For Improper Inventorship And/Or As Anticipated By Avadel Patent Publications

The claims of the Jazz Resinate Patents are further invalid for improper inventorship under 35 U.S.C. § 101 and 115(a) because they were derived from the inventive work of Avadel.  The inventive work by Avadel alternatively renders the claims of the Jazz Resinate Patents invalid as anticipated under post-AIA § 102.

Section 101 requires proper inventorship, as it requires that:  "Whoever invents or discovers [an invention] may obtain a patent."  35 U.S.C. § 101.  Section 115(a) similarly states that:  "An application for patent . . . shall include . . . the name of the inventor."  *See Belcher Pharms., LLC v. Hospira, Inc.*, No. 17-775-LPS, 2019 WL 2503159, at *1 (D. Del. June 5, 2019); *see also* MPEP § 2157 ("[W]here it is clear that the application does not name the correct inventorship . . . Office personnel should reject the claims under 35 U.S.C. [§] 101 and 35 U.S.C. [§] 115.").

Avadel's conception and reduction to practice of its once-nightly formulation and the publication of its associated patents prior to the filing of the claims in the Jazz Resinate Patents

establishes that the claims of the Jazz Resinate Patents are invalid for improper inventorship. The Jazz named inventors did not conceive of or reduce to practice the claims in the Jazz Resinate Patents. Rather, Jazz, through its prosecution counsel, copied the claimed invention from the true inventors—Claire Megret, Herve Guillard, and Jean-Francois Dubuisson, who are the named inventors on patents that ultimately were assigned to Avadel, relating to Avadel's once-nightly formulation.

The Jazz Resinate Patents claim priority to U.S. provisional 62/117,889, filed February 18, 2015. However, as of September 2019, all of Jazz's issued and pending claims in that family were directed to ion exchange resins, commensurate with the only disclosures of the provisional and other applications of that family. At the time, Jazz was engaged in the prosecution of U.S. Application No. 16/448,598 ("the '598 Application"), a parent application to the applications that would eventually issue as the Jazz Resinate Patents. Unlike the claims of the Jazz Resinate Patents, the pending claims of the '598 Application were directed to a composition of oxybate that was ionically bound to an ion exchange matrix, such as an anion-exchange resin, as well as a method of preparing an oxybate resinate. *See* '598 Application File History at Claims, p. 38-42 (June 21, 2019).

On January 25, 2018, the application that ultimately issued as U.S. Patent No. 10,272,062 ("the '062 patent"), and which was ultimately assigned to Avadel, was first published. This application demonstrates Avadel's conception—and reduction to practice—of modified release formulations of oxybate and methods of using those formulations therapeutically.

### 1.     The '079 Patent

On September 12, 2019, the application that ultimately issued as U.S. Patent No. 10,952,986 ("the '986 patent"), and which was ultimately issued to Avadel, was first published. The final version of the claims found in the '986 patent became publicly available on October 1,

2020, and the '986 patent issued on March 23, 2021.  Unlike Jazz's then-pending '598 Application, Avadel's application of the '986 patent describes a method of treatment with GHB by opening a sachet containing a GHB formulation, mixing the formulation with water, and orally administering the mixture.  '321 Application File History at Claims, at 159-162 (May 23, 2019).

A few months after the final version of the claims in the '986 patent which was ultimately assigned to Avadel became public, on December 10, 2020, Jazz filed U.S. Application 17/118,041 (the "'041 Application") (which would eventually issue as the '079 patent) as a continuation of its pending '598 Application.  Jazz filed a Nonpublication Request for the '041 Application, through which Jazz sought to ensure that the '041 Application would not be made public.  *See* '041 Application File History, Nonpublication Request from Applicant (Dec. 10, 2020).  However, by December 10, 2020, the specification of the '041 Application had already been made public, since the '662 patent—whose application the '041 Application claims priority to—had already issued on September 3, 2019.  Furthermore, although Jazz added two new paragraphs to the '041 Application specification, but Jazz represented to the Examiner that the paragraphs being inserted were "material previously incorporated by reference" and so were also previously publicly available.  *See* Applicant Arguments/Remarks Made in an Amendment (Dec. 21, 2020).  In other words, the only truly "nonpublished" material in the '041 Application were the claims.  Thus, the only reasonable inference that can be drawn from filing the Nonpublication Request and the Applicant Remarks is that Jazz was seeking to prevent others from learning what claims Jazz was pursuing in the '041 application.  The following chart depicts the first seven claims in the '321 Application and the '041 Application, showing a striking similarity between the two:

| Claims from Patent Application No. 16/420,321, Amendment and Response to Non Final Office Action, filed October 1, 2020 | Claims from Jazz's Patent Application No. 17/118,041, filed December 10, 2020 |
|---|---|
| 1.  A method of treating a disorder treatable with gamma-hydroxybutyrate in a human in need thereof, the method comprising:<br>administering a single daily dose to said human, the single daily dose comprising an amount of gamma-hydroxybutyrate equivalent to from 3.0 to 12.0 g of sodium oxybate, wherein the administering comprises<br>opening a sachet containing a gamma-hydroxybutyrate formulation,<br>mixing the formulation with water, and<br>orally administering the mixture. | 1.  A method of treating a disease or condition treatable with oxybate in a patient in need thereof, the method comprising:<br>administering a single daily dose to the patient, the single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate, wherein the administering comprises:<br>opening a sachet containing an oxybate formulation,<br>mixing the formulation with water, and<br>orally administering the mixture to the patient. |
| 2.  The method of claim 1, wherein the orally administering occurs at bedtime. | 2.  The method of claim 1, wherein the orally administering occurs at night. |
| 3.  The method of claim 1, wherein the mixing occurs shortly before the orally administering. | 3.  The method of claim 1, wherein the oxybate formulation is mixed with water immediately prior to administration. |
| 4.  The method of claim 1, wherein the orally administering occurs approximately 2 hours after said human has eaten a meal. | 4.  The method of claim 1, wherein the oxybate is administered with food. |
| 5.   The method of claim 1, wherein said administering results in inducing said human to sleep for 6 to 8 hours. | 5.   The method of claim 1, wherein the administering promotes the patient to sleep for 6 to 8 hours. |
| 6.  The method of claim 1, wherein the amount of gamma-hydroxybutyrate administered to the human is equivalent to 4.5 g, 6.0 g, 7.5 g or 9.0 g of sodium oxybate. | 6.  The method of claim 1, wherein the amount of oxybate administered to the human is 35 mEq, 45 mEq, 60 mEq, or 70 mEq of oxybate. |
| 7. The method of claim 1, wherein the mixture is a suspension. | 7. The method of claim 1, wherein the mixture is a suspension. |

The new claims filed by Jazz in the prosecution of the '041 Application copied the claims from Avadel's application that led to the issuance of the '986 patent.  Given the slavish copying, the reasonable inference is that Jazz's new claims were the result of Avadel's communication of its controlled release formulations to Jazz via its published application for the '986 patent.

Further, evidence of Jazz's reliance on Avadel's disclosure in its application for the '986 patent is reflected by the fact that in contrast to the original claims filed with the '598 Application, the new claims are not described or supported by the application's specification. In particular, the specification of the '041 Application does not disclose a method of treatment using a single daily dose of oxybate by opening a sachet containing a solid oxybate formulation, mixing that formulation with water, and orally administering the mixture to the patient. *See supra* Section IV.E.5-8. Furthermore, the only oxybate compositions disclosed in the specification of the '041 Application as being within the scope of the invention are ion exchange resins. *See e.g.*, '041 Application File History at Specification, p. 9-10 (Dec. 10, 2020).

### 2. The '782 Patent

On June 20, 2019, the application that ultimately issued as U.S. Patent No. 10,736,866 ("the '866 patent") and was ultimately assigned to Avadel was first published. The final version of the claims found in the '866 patent became publicly available when the '866 patent issued on August 11, 2020. This application demonstrates Avadel's conception—and reduction to practice—of its novel formulations. Unlike Jazz's pending '598 Application, Avadel's application of the '866 patent described detailed information regarding modified release formulations of oxybate and methods of using those formulations therapeutically.

A few months later, on March 23, 2021, Jazz filed U.S. Application 17/210,064 (the "'064 Application") (which would eventually issue as the '782 patent) as a continuation of Jazz's '041 Application. As it did with the '041 Application, Jazz filed a Nonpublication Request for the '064 Application, even though the only "nonpublished" information in the application was the claims. *See* '064 Application File History, Nonpublication Request from Applicant (Mar. 23, 2021). The only reasonable inference that can be drawn from this is that Jazz wanted to ensure that no one

284

was aware of the claims in the application.  Once again, when comparing the first four claims in

the '064 Application with those in the '866 patent, there is a striking similarity:

| Jazz '782 Claims (as first filed in '064 app) | Avadel '866 Patent |
| --- | --- |
| 1.  A formulation of gamma-hydroxybutyrate comprising:<br>an immediate release portion comprising gamma-hydroxybutyrate;<br>A modified release portion comprising gamma-hydroxybutyrate;<br>a viscosity enhancing agent; and<br>an acid;<br>Wherein the viscosity enhancing agent and the acid are separate from the immediate release portion and the modified release portion. | 1.  A formulation of gamma-hydroxybutyrate comprising:<br>an immediate release portion comprising gamma-hydroxybutyrate;<br>A modified release portion comprising gamma-hydroxybutyrate;<br>A suspending or viscosifying agent selected from…;<br>An acidifying agent selected from…;<br>Wherein the suspending or viscosifying agent and the acidifying agent are separate and distinct from the immediate release portion and the modified release portion; and<br>Wherein the ratio of gamma-hydroxybutyrate in the immediate release portion and the modified release portion is from 10/90 to 65/35. |
| 2. The formulation of claim 1, wherein the viscosity enhancing agent is selected from the group consisting of xanthan gum, microcrystalline cellulose, hydroxyethyl cellulose, hydroxypropymethyl cellulose carboxymethyl cellulose sodium, hydroxypropyl cellulose and mixtures thereof. | *See Claim 1:* a suspending or viscosifying agent selected from the group consisting of xanthan gum, carrageenan gum, gellan gum, guar gum, sodium alginate, calcium alginate, agar, sodium carboxymethyl cellulose, microcrystalline cellulose, hydroxyethyl cellulose, hydroxypropylmethyl cellulose, and mixtures thereof… |
| 3. The formulation of claim 1, wherein the acid is selected from the group consisting of malic acid, citric acid, tartaric acid, boric acid, maleic acid, phosphoric acid, and benzoic acid. | *See Claim 1:* an acidifying agent selected from the group consisting of malic acid, citric acid, tartaric acid, adipic acid, boric acid, maleic acid, phosphoric acid, ascorbic acid, oleic acid, capric acid, caprlic acid, and benzoic acid… |
| 4. The formulation of claim 1, wherein the formulation further comprises a lubricant selected from the group consisting of magnesium stearate, stearic acid, calcium stearate, hydrogenated castor oil, hydrogenated vegetable oil, light mineral oil, mineral oil, polyethylene glycol, | 4. The formulation of claim 1, wherein the formulation further comprises a lubricant or glidant selected from the group consisting of magnesium stearate, calcium stearate, zinc stearate, glyceryl monostearate, glyceryl palmitostearate, |

| Jazz '782 Claims (as first filed in '064 app) | Avadel '866 Patent |
|---|---|
| sodium benzoate, sodium stearyl fumarate, and zinc stearate. | glycerol benzoate, sodium stearyl fumarate, talc, or colloidal silicon dioxide. |

The new claims filed by Jazz in the prosecution of the '064 Application copied the claims from Avadel's application that led to the issuance of the '866 patent.  Given the slavish copying, the reasonable inference is that Jazz's new claims were the result of Avadel's communication of its controlled release formulations to Jazz via its published application for the '866 patent.

Further, evidence of Jazz's reliance on Avadel's disclosure in its application for the '866 patent is reflected by the fact that in contrast to the original claims filed with the '598 Application, the new claims are not described or supported by the application's specification.  In particular, the specification of the '064 Application does not disclose the use of a viscosity-enhancing agent or an acid that is separate from the immediate release portion and modified release portion of the formulation.  *See supra* a Section IV.E.5-8.

*\*\*\**

Because the issued claims of the Jazz Resinate Patents lack written description support, they are not entitled to the priority date of February 18, 2015.  Indeed, they are invalid for lack of written description.  *See supra* Section IV.E.5-8.  Even were one to credit the '079 patent with the date of the earliest recitation a method of treatment using a single daily dose of oxybate by opening a sachet containing a solid oxybate formulation, mixing that formulation with water, and orally administering the mixture to the patient, that would only get to Jazz's December 10, 2020 filing of the claims in the '041 Application.

Similarly, even if one were to credit the '782 patent with the date of the earliest recitation of the use of a viscosity enhancing agent or a viscosity enhancing agent and acid that are separate

from the immediate release portion and modified release portion, that would only get to Jazz's March 23, 2021 filing of the claims in the '064 Application.[43]

Because Avadel's application for the '062 patent published on January 25, 2018, it is prior art to the claims of the Jazz Resinate Patents, and those claims are therefore anticipated.  Further, as demonstrated by the disclosures in the '062 patent, the inventors of the Avadel application had fully conceived of (and reduced to practice) the subject matter claimed in the Jazz Resinate Patents prior to communicating their invention to Jazz by way of the published application for the '062 patent.  The claims of the Jazz Resinate Patents are therefore invalid for lack of inventorship.

### 3. Response to Jazz on Invalidity of the Resinate Patents Due to Derivation and/or Improper Inventorship

As set forth in Avadel's pleadings and Initial Invalidity Contentions, the asserted claims of the Resinate Patents are invalid for improper inventorship.

Jazz contends in its Final Validity Contentions that "the inventors of the '079 and '782 Patents had invented the subject matter of the claims before Defendants had filed any patent application to which their alleged 'inventions' claim priority."  Jazz Final Validity Contentions at 211.  According to Jazz, the asserted claims of the Resinate Patents are therefore not invalid for improper inventorship.  But for the reasons set forth in Avadel's contentions, the specification disclosures of the Jazz Resinate Patents fail to provide written description support for the claims.

_____

[43] To the extent that the Court finds that the '782 patent is entitled to an earlier priority date than the March 23, 2021 filing of the claims in the '064 Application, the "modified" limitation in the claims is not entitled to a date earlier than February 18, 2016.  During prosecution, in the Non-Final Rejection of June 18, 2021 of the '782 patent, the Examiner noted the word "modified" in the claims of the '782 patent did not have support in the '889 application.  Thus, the Examiner found the earliest potential priority date for the claimed subject matter in of "a formulation of gamma-hydroxybutyrate comprising: an immediate release portion comprising gamma-hydroxybutyrate; a modified release portion comprising gamma-hydroxybutyrate," is February 18, 2016, the effective filing date of the '586 application.

*See supra* Section IV.E.3, 7.  As a result, Jazz's Resinate Patents are not entitled to their claimed priority date, and there is no basis for Jazz's assertion that the inventors of Jazz's Resinate Patents invented the claimed subject matter prior to the conception and reduction to practice of Avadel's once-nightly oxybate formulation.  "[W]here it is clear that the application does not name the correct inventorship," the claims should be rejected under 35 U.S.C. § 101 and 35 U.S.C. § 115. *Belcher Pharms.*, 2019 WL 2503159, at *1.

Jazz also contends that the "law expressly permitted claims that more accurately cover its competitor's product."  Jazz's Final Validity Contentions at 212.  But as Jazz's Final Validity Contentions acknowledge, this is only true if the Resinate Patents' claims "are supported by the specifications of the patent applications Jazz Pharmaceuticals had already filed."  *Id.*  Because the claims lack such support, *see* disc. *supra* Section IV.E.3, 7, Jazz's assertion that the law permits a patentee to file claims that cover its competitor's product is misplaced.

As set forth in Avadel's pleadings and its Initial Invalidity Contentions, the claims of Jazz's Resinate Patents were copied from the published application for the '986 and '866 patents that were ultimately assigned to Avadel and directed to once-nightly oxybate formulations developed by Avadel.  Jazz's Final Validity Contentions does not dispute any of the evidence Avadel presented in its Initial Invalidity Contentions demonstrating that Jazz copied Avadel's claims.  Further, during discovery, Avadel propounded an interrogatory asking Jazz to identify all facts surrounding its decision during prosecution of the Resinate Patents to replace the original claims with claims matching the claims from the published patent applications that were ultimately assigned to Avadel.  Jazz responded that it was " █████████████████████████████████████ █████████████████████████ " ████████████████████████████████████████

The only reasonable inference based on the circumstances is that the claims of Jazz's '079 and

'782 patents were the result of Avadel's communication of its controlled release formulations to Jazz via its published application for the '986 and '866 patents, which claims Jazz then copied for its pending Resinate Patents.

Further evidence that the Resinate Patents are invalid for improper inventorship stems from Jazz's unique access to Avadel's trade secret and other confidential information regarding Avadel's proprietary technology used in its development of its controlled release oxybate formulations (including FT218) and its clinical studies demonstrating the success of those formulations. Thus, Jazz improperly used Avadel's trade secret and other confidential information to draft its claims for Jazz's '079 and '782 patents. To secure such access to Avadel's trade secret and other confidential information, Jazz repeatedly engaged in discussions with Avadel—in 2010, 2015, and 2018—ostensibly for purposes of assessing a possible collaboration between the companies. *See supra* Section III.F. As part of these discussions, Jazz entered into Confidential Disclosure Agreements (CDAs) that restricted Jazz's access and use of Avadel's confidential information disclosed during these discussions. The confidential information disclosed included Avadel's clinical data that showed the success of Avadel's FT218, including clinical trial protocols and critical pK data, FT218's success with a sachet, liquid-suspension formulation for once-nightly oxybate, and that FT218's composition consisted of immediate release pellets, controlled release coated pellets, and excipients including malic acid as the acidifying agent, hydroxyethylcellulose and xanthan gum as suspending/viscosifying agents, and magnesium stearate as the lubricant. *See supra* Section III.F. But instead of honoring its obligations not to misuse Avadel's confidential information, Jazz distributed that information internally at Jazz, hid its misuse from Avadel as long as possible, and used said confidential information to obtain the claims of the Resinate Patents (utilizing non-publication requests to hide its misconduct), despite not having the support in the

specification for these claims, in an effort to cover Avadel's FT218 product.  Indeed, Jazz did not

file the application that ultimately led to the issuance of the '079 patent until December 10, 2020,

and did not file the application that lead to the issuance of the '782 Patent until March 23, 2021,

more than two years after the most recent round of diligence between Jazz and Avadel has

concluded.

For the reasons set forth above, Jazz's issued claims in the Resinate Patents are invalid for

improper inventorship.

### 4.    Response to Jazz on Invalidity of the Resinate Patents Due to Anticipation by the Avadel Patent Publications

Jazz's Final Validity Contentions do not dispute that the published application for the '062

patent (which was ultimately assigned to Avadel) would anticipate the claims of the Resinate

Patent as prior art to Jazz's patents.  *See* Jazz Final Validity Contentions at 212.  Jazz asserts only

that the Resinate Patents are entitled to at least a 2016 priority date for the reasons set forth in its

Final Validity Contentions.  For the reasons set forth above in these contentions, however, Jazz's

priority claim is wrong.  The claims of the Resinate Patents lack written description support, are

therefore entitled to priority date no earlier than December 10, 2020 (for the '079 patent) and

March 23, 2021 (for the '782 patent).  *See supra* Section III. F.2.  Because the published application

for the '062 patent was publicly available more than a year prior to any potential priority date for

the Resinate Patents, it is prior art to Jazz's patents.  The Resinate Patents are therefore invalid as

anticipated by the patent publication ultimately assigned to Avadel.

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., | |
| Plaintiff, | |
| v. | C.A. No. 21-691-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| Plaintiffs, | |
| v. | C.A. No. 21-1138-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| Plaintiffs, | |
| v. | C.A. No. 21-1594-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |

**SECOND SUPPLEMENTED OPENING EXPERT REPORT OF WILLIAM CHARMAN**

███████████████

# CHARMAN OPENING REPORT

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ....................................................................................1

II.    BACKGROUND AND QUALIFICATIONS ........................................2

III.   COMPENSATION ..................................................................................4

IV.   SUMMARY OF OPINIONS ..................................................................4

     A.     Sustained Release Patents ............................................................4
     B.     Resinate Patents ...........................................................................5

V.     LEGAL PRINCIPLES ............................................................................6

     A.     Validity ........................................................................................6
     B.     35 U.S.C. § 112: Written Description ........................................7
     C.     35 U.S.C. § 112: Enablement .....................................................8
     D.     Inventorship ................................................................................9
     E.     Inequitable Conduct ..................................................................10
     F.     Anticipation ...............................................................................11
     G.     Claim of Patent Priority ............................................................12
     H.     Person of Ordinary Skill in the Art ..........................................12

VI.   GENERAL SCIENTIFIC AND TECHNOLOGY BACKGROUND ..............................13

     A.     The Gastrointestinal Tract ........................................................13
         1.     The Stomach ..................................................................14
         2.     The Small Intestine ........................................................14
         3.     The Large Intestine ........................................................15
     B.     pH-Dependent Drug Release Formulations ..............................15
         1.     Barrier Coatings ............................................................16
         2.     Enteric Coatings ............................................................16
     C.     Resinate Formulations ..............................................................17
     D.     Pharmacokinetics, Bioequivalence, and Pharmacodynamics of Oral Formulations ............................................................................19
     E.     Food Effects ..............................................................................21
     F.     Gamma-hydroxybutyrate ..........................................................23
         1.     Background ....................................................................23
         2.     Formulation and Dosing Challenges .............................24
             a.     Sustained Release Formulations of GHB .........................25
             b.     Controlled/Modified Release Formulations of GHB .........27
     G.     LUMRYZ® .................................................................................31
     H.     ██████████████████████████████████ .......33

VII.    PATENTS-IN-SUIT ...........................................................................................34

        A.    Sustained Release Patents .............................................................................35
              1.    Asserted Claims of the Sustained Release Patents ...................35
              2.    Specification of the Sustained Release Patents.........................37
              3.    Examples of the Sustained Release Patents ..............................41
              4.    Priority Date of the Sustained Release Patents .......................44
              5.    Prosecution History of the Sustained Release Patents ............44
                    a.    September 27, 2018 Non-Final Rejection...................46
                    b.    Jazz's Response to Non-Final Rejection....................47
                    c.    May 2, 2019 Final Rejection.......................................47
                    d.    Jazz's Response to the Final Rejection .......................48
                    e.    Allphin March Declaration .........................................50
                    f.    Jazz-Initiated Interviews with Examiner ...................52
                    g.    Allphin April Declaration ..........................................52
        B.    '079 and '782 Patents....................................................................................54
              1.    Prosecution History of the Resinate Patents ...........................55
                    a.    '079 Patent .................................................................55
                    b.    '782 Patent .................................................................57

VIII.   CLAIM CONSTRUCTION...........................................................................58

IX.     INVALIDITY OF THE SUSTAINED RELEASE PATENTS FOR LACK OF
        WRITTEN DESCRIPTION...........................................................................60

        A.    Summary of Opinion......................................................................................60
        B.    The Specification of the Sustained Release Patents Fails to Describe
              Dosage Forms Other than Tablets and Capsules .........................................64
              1.    The Specification of the Sustained Release Patents Fails to
                    Describe Dosage Forms Other Than Tablets and Capsules.....65
              2.    Teachings Related to Tablets and Capsules Would Not Be
                    Expected to Be Relevant to Other Dosage Forms ....................68
              3.    Challenges of Working with GHB Would Have Led a POSA to
                    Further Doubt the Inventors Were in Possession of Formulations
                    Other than Tablets or Capsules................................................70
              4.    The Specification Lacks Any Mention of Other Dosage Forms for
                    the Sustained Release Component ............................................73
        C.    The Specification of the Sustained Release Patents Fails To Disclose A
              Functional Coating With A Non-Polymeric Base .........................................75
        D.    The Specification of the Sustained Release Patents Fails To Disclose A
              Sustained Release Component With A Functional Coating Comprising
              About 20% to About 50% (or About 30% to About 45%) Methacrylic
              Acid-Methyl Methacrylate Co-Polymers With the Recited Drug Release
              Profile............................................................................................................82
              1.    The Specification Fails to Adequately Describe the Use of
                    Methacrylic Acid-Methyl Methacrylate Copolymer In The
                    Functional Coating...................................................................82

ii

|   | 2. | The Sustained Release Patents' Specification Fails to Disclose the Use of Pore Formers without a Polymeric Base | 85 |
|   | 3. | The Specification Fails to Disclose Any Formulation Containing Methacrylic Acid-Methyl Methacrylate Having the Recited Drug Release Profile When Tested in a USP 2 Dissolution Apparatus in Deionized Water, 37 ºC, and a Paddle Speed of 50 RPM | 88 |
| E. | | Measurement Of Drug Released From Sustained Release Component | 96 |
| F. | | The Allphin Declarations Do Not Provide Written Description Support | 100 |
|   | 1. | The information in the Allphin declarations should not be part of the written description analysis | 100 |
|   | 2. | Allphin declarations do not provide written description support for the Sustained Release patent claims | 101 |
|   |   | a. Allphin March Declaration | 101 |
|   |   | b. Allphin April  Declaration | 105 |
| G. | | The Specification Fails to Disclose Once-Nightly Treatment of Narcolepsy | 114 |

| X. | | INVALIDITY OF THE SUSTAINED RELEASE PATENTS FOR LACK OF ENABLEMENT | 119 |
| A. | | Summary of Opinion | 119 |
| B. | | Experimentation Would be Required to Practice the Claimed Invention | 121 |
| C. | | Wands Factors Establish the Need for Undue Experimentation | 122 |
|   | 1. | The Breadth of the Claims | 122 |
|   | 2. | The Nature of the Invention and Predictability of the Art | 124 |
|   |   | a. Creation of controlled release formulation for oral administration | 124 |
|   |   | b. Properties of GHB contribute to the unpredictability of the claims | 125 |
|   |   | c. Treatment of narcolepsy | 127 |
|   |   | d. Oral administration of the formulation | 128 |
|   | 3. | State of the prior art and relative skill of those in the art | 128 |
|   |   | a. Sustained release formulations of other drugs would not guide development of sustained formulations of GHB | 129 |
|   |   | b. Prior art did not teach how to develop sustained release GHB formulations | 131 |
|   |   | c. Use of GHB for other indications would not be informative | 131 |
|   | 4. | The Amount of Direction or Guidance Disclosed in the Patent, Including the Presence or Absence of Working Examples in the Patent | 132 |
|   |   | a. Specification lacks any guidance for development a once-nightly narcolepsy treatment | 133 |
|   |   | b. Specification's teachings are restricted to tablet and capsule formulations | 134 |
|   |   | c. Specification does not provide guidance for how to make the full range of the recited formulations | 135 |

          d.      Specification provides no guidance for how to make a GHB formulation with a sustained release component possessing a functional coating with a non-polymeric base ........................137

          e.      Specification does not teach formulations with a sustained release component containing methacrylic acid-methyl methacrylate copolymer and have the recited dissolution profile .......................................................................................138

     5.      Quantity of Experimentation....................................................141

XI.   INVALIDITY OF THE SUSTAINED RELEASE PATENTS FOR IMPROPER INVENTORSHIP AND DERRIVATION .....................................................142

   A.     Prosecution History of the Sustained Release Patents..........................145
   B.     The Claims of the '488 Patent Lack Written Description Support.....................150
   C.     ████████████████████████████████████ ...........................................153
   D.     Avadel Publicly Disclosed The Subject Matter of the Claimed Invention..........155

     1.      Overview of the '284 Publication ..............................................156
     2.      The '284 Publication Discloses A Formulation Comprising Immediate Release and Sustained Release Portions................................159
     3.      The '284 Publication Describes A Sustained Release Portion With the Functional Coating Recited in the Claims of Jazz's Sustained Release Patents.....................................................................160
     4.      The '284 Publication Describes an Immediate Release and Sustained Release Portion with The Dissolution Profiles Recited in the Claims of Jazz's Sustained Release Patents To The Extent Jazz's Infringement Allegations Are Correct .........................................162
     5.      The '284 Publication Provides Support For A Once-Nightly Oxybate Formulation .............................................................164

XII.  THE SUSTAINED RELEASE PATENTS ARE ANTICIPATED BY THE AVADEL '284 PATENT PUBLICATION.................................................168

   A.     The '284 Publication...............................................................169
   B.     The Asserted Claims of the '488 Patent Are Anticipated by the '284 Publication.......................................................................170
     1.      Preamble .......................................................................170
     2.      Claim 1(a) .....................................................................171
          a.      "[T]he sustained release portion comprises a functional coating and a core, wherein the functional coating is deposited over the core, wherein the core comprises at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate"................................171

        b.      "wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating;" ......................................................................................173

        c.      "the sustained release portion comprises about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate;" ........................................................................174

        d.      "and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm" ............................................................175

3.      Claim 1(b) ...........................................................................................176

        a.      "[T]he immediate release portion comprises about 75% and about 98% by weight of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, and" ...............................................................176

        b.      "and the amount of gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the immediate release portion is about 10% to 50% by weight of the gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyate in the formulation" ............................................177

4.      Claims 1(c) and 1(d) .........................................................................179

5.      Claim 2 ................................................................................................180

        a.      "The formulation of claim 1 wherein the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 7 hours when tested in a dissolution apparatus 2 when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." ........................................................180

6.      Claim 3 ................................................................................................180

        a.      "The formulation of claim 1 wherein the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 6 hours when tested in a dissolution apparatus 2 when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." ........................................................180

7.      Claim 4 ................................................................................................181

a. "The formulation of claim 1 wherein the sustained release portion releases about 60% to about 90% of its gamma-hydroxybutyrate by about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." ...................................181

8.  Claim 5 ...................................................................................182
a. "The formulation of claim 1 wherein the sustained release portion comprises hydrogenated vegetable oil, hydrogenated castor oil, or mixtures thereof." ...........................182

9.  Claim 6 ...................................................................................183
a. "The formulation of claim 1 comprising a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof." .........................183

10. Claim 7 ...................................................................................183
a. "The formulation of claim 6 comprising a sodium salt of gamma-hydroxybutyrate." .........................................184

11. Claim 8 ...................................................................................184
a. "The formulation of claim 1 wherein the immediate release portion comprises 50% by weight of the total gamma-hydroxybutyrate." ...................................................184

12. Claim 9 ...................................................................................185
a. "The formulation of claim 1, wherein the one or more methacrylic acid-methyl methacrylate co-polymers comprise from about 30% to about 45% by weight of the functional coating." ................................................185

13. Claim 10 .................................................................................186
a. "An oral dosage form comprising the formulation of claim 1." ...............................................................186

14. Claim 11 .................................................................................186
a. "The formulation of claim 1 wherein the sustained release portion releases about 10% or less of its gamma-hydroxybutyrate by about 1 hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." ...................................187

15. Preamble of Claim 12 ..............................................................187
a. "A formulation of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, comprising immediate release and a solid sustained release portions:" .........................................187

16. Claim 12(a) ..............................................................................187
a. "a. wherein the immediate release portion comprises about 55 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate;" ...................................................188

17.    Claim 12(b) ...................................................................188
    a.    "b. wherein the sustained release portion comprises from about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate and a functional coating deposited over a core comprising the at least one pharmaceutically active ingredient, wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm;" ....................................188

18.    Claim 12(c) ...................................................................189
    a.    "c. the formulation releases at least about 30% of its gamma-hydroxybutyrate or salt thereof by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; and" .........189

19.    Claim 12(d) ...................................................................189
    a.    "d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." ....................................189

C.    The Asserted Claims of the '885 Patent Are Anticipated by the '284 Publication ...................................................................189
1.    Claim 1 Preamble ...........................................................189
2.    Claim 1 .........................................................................190
3.    Claim 2 .........................................................................191
    a.    "The formulation of claim 1, wherein the sustained release portion releases about 60% to about 90% of its gamma-hydroxybutyrate by about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." ....................................191

4.    Claim 3 .........................................................................191
    a.    "The formulation of claim 1, wherein the sustained release portion releases about 10% or less of its gamma-hydroxybutyrate by about 1 hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." ....................................191

5.    Claim 4 .........................................................................192
    a.    "The formulation of claim 1, wherein the sustained release portion comprises hydrogenated vegetable oil, hydrogenated castor oil, or mixtures thereof." ...........................192

6.    Claim 5 .........................................................................192

       a.     "The formulation of claim 1, comprising a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof." ........................................192

7.    Claim 6 ........................................................................................192
       a.     "The formulation of claim 5, comprising a sodium salt of gamma-hydroxybutyrate." ........................................192

8.    Claim 7 ........................................................................................193
       a.     "The formulation of claim 1, wherein the one or more methacrylic acid-methyl methacrylate co-polymers comprise from about 30% to about 45% by weight of the functional coating." ........................................193

9.    Claim 8 ........................................................................................193
       a.     "The formulation of claim 1, further comprising an immediate release portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate." ........................................193

10.    Claim 9 ........................................................................................194
       a.     "The formulation of claim 8, wherein the immediate release portion comprises a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof." ........................................194

11.    Claim 10 ........................................................................................194
       a.     "The formulation of claim 9, wherein the immediate release portion comprises a sodium salt of gamma-hydroxybutyrate." ........................................194

12.    Claim 11 ........................................................................................194
       a.     "The formulation of claim 8, wherein the immediate release portion is a dry powder formulation, an immediate release tablet, an encapsulated formulation, a liquid solution, or liquid suspension." ........................................194

13.    Claim 12 ........................................................................................195
       a.     "The formulation of claim 8, wherein the immediate release portion comprises about 55 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate." ........................................195

14.    Claim 13 ........................................................................................196
       a.     "The formulation of claim 8, wherein the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; and greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." ........................................196

15. Claim 14................................................................................196
    a. "The formulation of claim 13, wherein the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 7 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm."................................196

16. Claim 15................................................................................197
    a. "The formulation of claim 13, wherein the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm."................................197

D. The Asserted Claims of the '956 Patent Are Anticipated by the '284 Publication................................................................................197
1. Claim 1 Preamble................................................................197
2. Claim 1(a)................................................................................198
3. Claim 1(b)................................................................................199
4. Claims 1(c) and 1(d)..........................................................199
5. Claim 2................................................................................200
    a. "The method of claim 1 wherein the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 7 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm."................................200

6. Claim 3................................................................................200
    a. "The method of claim 1 wherein the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm."................................200

7. Claim 4................................................................................201
    a. "The method of claim 1 wherein the sustained release portion releases about 60% to about 90% of its gamma-hydroxybutyrate by about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm."................................201

8. Claim 5................................................................................201
    a. "The method of claim 1 wherein the sustained release portion comprises hydrogenated vegetable oil, hydrogenated castor oil, or mixtures thereof."................................201

9. Claim 6................................................................................201
    a. "The method of claim 1 comprising a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof."................................202

10. Claim 7................................................................................202

      a.     "The method of claim 6 wherein the formulation comprises a sodium salt of gamma-hydroxybutyrate.".................202

11.    Claim 8.................................................................................202

      a.     "The method of claim 1 wherein the immediate release portion comprises 50% by weight of the total gamma-hydroxybutyrate." .................................................202

12.    Claim 9.................................................................................203

      a.     "The method of claim 1, wherein the one or more methacrylic acid-methyl methacrylate co-polymers comprise from about 30% to about 45% by weight of the functional coating." .................................................203

13.    Claim 10...............................................................................203

      a.     "The method of claim 1 wherein the sustained release portion releases about 10% or less of its gamma-hydroxybutyrate by about 1 hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." .................................203

14.    Preamble of Claim 11 ........................................................203

      a.     "A method for treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof comprising delivering to the patient a formulation of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, comprising immediate release and a solid sustained release portions:" .........203

15.    Claim 11(a) ..........................................................................204

      a.     "a. wherein the immediate release portion comprises about 55 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate;" .................................................204

16.    Claim 11(b)...........................................................................204

      a.     "b. wherein the sustained release portion comprises from about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate and a functional coating deposited over a core comprising the at least one pharmaceutically active ingredient, wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm;".................................204

17.   Claim 11(c) ......................................................................205
      a.   "c. the formulation releases at least about 30% of its
           gamma-hydroxybutyrate or salt thereof by one hour when
           tested in a dissolution apparatus 2 in deionized water at a
           temperature of 37° C. and a paddle speed of 50 rpm; and" .........205
18.   Claim 11(d) ......................................................................205
      a.   "d. the formulation releases greater than about 90% of its
           gamma-hydroxybutyrate by 8 hours when tested in a
           dissolution apparatus 2 in deionized water at a temperature
           of 37° C. and a paddle speed of 50 rpm." ...................................205
19.   Preamble of Claim 12 .......................................................205
      a.   "A method for treating cataplexy or excessive daytime
           sleepiness associated with narcolepsy in a patient in need
           thereof comprising delivering to the patient a formulation
           comprising immediate release and sustained release
           portions, each portion comprising at least one
           pharmaceutically active ingredient selected from gamma-
           hydroxybutyrate and pharmaceutically acceptable salts of
           gamma-hydroxybutyrate, wherein:" .............................................205
20.   Claim 12(a) ......................................................................206
      a.   "a. the sustained release portion comprises a functional
           coating and a core, wherein the functional coating is
           deposited over the core, wherein the core comprises at least
           one pharmaceutically active ingredient selected from
           gamma-hydroxybutyrate and pharmaceutically acceptable
           salts of gamma-hydroxybutyrate wherein the functional
           coating comprises one or more methacrylic acid-methyl
           methacrylate co-polymers that are from about 20% to about
           50% by weight of the functional coating; the sustained
           release portion comprises about 500 mg to 12 g of at least
           one pharmaceutically active ingredient selected from
           gamma-hydroxybutyrate and pharmaceutically acceptable
           salts of gamma-hydroxybutyrate; and the sustained release
           portion releases greater than about 40% of its gamma-
           hydroxybutyrate by about 4 to about 6 hours when tested in
           a dissolution apparatus 2 in deionized water at a
           temperature of 37° C. and a paddle speed of 50 rpm;" ...............206
21.   Claim 12(b) ......................................................................206
      a.   "b. the immediate release portion further comprises one or
           more pharmaceutically acceptable excipients selected from
           the group consisting of copovidone, plasacryl,
           hydroxypropyl cellulose, hydroxypropyl methylcellulose
           and hydroxymethyl cellulose, and" .............................................207

|  | b. | "the amount of gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the immediate release portion is about 10% to 50% by weight of total [] gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate in the formulation;" | 208 |

22. Claim 12(c) ............................................................................208
   a. "c. the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; and" ............................208

23. Claim 12(d) ............................................................................208
   a. "d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." ....................................208

24. Claim 13 ...............................................................................208
   a. "The method of claim 12, wherein the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 7 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." .....................................................................................209

25. Claim 14 ...............................................................................209
   a. "The method of claim 12, wherein the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." .....................................................................................209

26. Claim 15 ...............................................................................209
   a. "The method of claim 12, wherein the sustained release portion releases about 60% to about 90% of its gamma-hydroxybutyrate by about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." ....................................209

27. Claim 16 ...............................................................................210
   a. "The method of claim 12, wherein the sustained release portion comprises hydrogenated vegetable oil, hydrogenated castor oil, or mixtures thereof." ............................210

28. Claim 17 ...............................................................................210
   a. "The method of claim 12, wherein the formulation comprises calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof." ...............................................................................210

29. Claim 18 ...............................................................................210
   a. "The method of claim 17, wherein the formulation comprises a sodium salt of gamma-hydroxybutyrate." ...............210

30.    Claim 19..................................................................................211
    a.    "The method of claim 12, wherein the immediate release portion comprises 50% by weight of the total gamma-hydroxybutyrate." ...................................................211

31.    Claim 20..................................................................................211
    a.    "The method of claim 12, wherein the one or more methacrylic acid-methyl methacrylate co-polymers comprise from about 30% to about 45% by weight of the functional coating."...................................................211

32.    Claim 23..................................................................................211
    a.    "The method of claim 12, wherein the one or more pharmaceutically acceptable excipients are about 10% by weight of the immediate release portion."...................................211

33.    Claim 24..................................................................................212
    a.    "The method of claim 12, wherein the sustained release portion releases about 10% or less of its gamma-hydroxybutyrate by about 1 hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm."....................................212

34.    Preamble of Claim 25 .............................................................212
    a.    "A method for treating cataplexy or excessive daytime sleepiness associated with narcolepsy in a patient in need thereof comprising delivering to the patient a formulation of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate, comprising immediate release and a solid sustained release portions:" .........213

35.    Claim 25(a) ............................................................................213
    a.    "a. wherein the immediate release portion comprises about 55 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate and"..................................................................213
    b.    "about 10% by weight of one or more pharmaceutically acceptable excipients selected from the group consisting of copovidone, plasacryl, hydroxypropyl cellulose, hydroxypropyl methylcellulose and hydroxymethyl cellulose;" .................................................................213

36.    Claim 25(b) ............................................................................214

  a.  "b. wherein the sustained release portion comprises from about 500 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate and a functional coating deposited over a core comprising the at least one pharmaceutically active ingredient, wherein the functional coating comprises one or more methacrylic acid-methyl methacrylate co-polymers that are from about 20% to about 50% by weight of the functional coating; and the sustained release portion releases greater than about 40% of its gamma-hydroxybutyrate by about 4 to 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm;" ....................................214

 37. Claim 25(c) ...................................................................214

  a.  "c. the formulation releases at least about 30% of its gamma-hydroxybutyrate or salt thereof by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; and" .........214

 38. Claim 25(d) ...................................................................215

  a.  "d. the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." ...................................215

E. The Asserted Claims of the '931 Patent Are Anticipated by the '284 Publication ...................................................................215

 1. Claim 1 Preamble.............................................................215

 2. Claim 1 ........................................................................216

 3. Claim 2 ........................................................................217

  a.  "The method of claim 1, wherein the sustained release portion releases about 60% to about 90% of its gamma-hydroxybutyrate by about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." ...................................217

 4. Claim 3 ........................................................................217

  a.  "The method of claim 1, wherein the sustained release portion releases about 10% or less of its gamma-hydroxybutyrate by about 1 hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." ...................................217

 5. Claim 4 ........................................................................218

  a.  "The method of claim 1, wherein the sustained release portion comprises hydrogenated vegetable oil, hydrogenated castor oil, or mixtures thereof." ............................218

 6. Claim 5 ........................................................................218

  a. "The method of claim 1, wherein the sustained release portion comprises a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof." ...................................................................218

7. Claim 6 ...................................................................................218

  a. "The method of claim 5, wherein the sustained release portion comprises a sodium salt of gamma-hydroxybutyrate." .........................................................218

8. Claim 7 ...................................................................................219

  a. "The method of claim 1, wherein the one or more methacrylic acid-methyl methacrylate co-polymers comprise from about 30% to about 45% by weight of the functional coating." .......................................................219

9. Claim 8 ...................................................................................219

  a. "The method claim of 1, wherein the formulation further comprises an immediate release portion comprising at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate." ..............................219

10. Claim 9 ...................................................................................220

  a. "The method of claim 8, wherein the immediate release portion comprises a calcium, lithium, potassium, sodium or magnesium salt of gamma-hydroxybutyrate or mixtures thereof." ...................................................................220

11. Claim 10 .................................................................................220

  a. "The method of claim 9, wherein the immediate release portion comprises a sodium salt of gamma-hydroxybutyrate." .........................................................220

12. Claim 11 .................................................................................220

  a. "The method of claim 8, wherein the immediate release portion is a dry powder formulation, an immediate release tablet, an encapsulated formulation, a liquid solution, or liquid suspension." .....................................220

13. Claim 12 .................................................................................221

  a. "The method of claim 8, wherein the immediate release portion comprises about 55 mg to 12 g of at least one pharmaceutically active ingredient selected from gamma-hydroxybutyrate and pharmaceutically acceptable salts of gamma-hydroxybutyrate." ..........................................221

14. Claim 13 .................................................................................221

         a.    "The method of claim 8, wherein the formulation releases at least about 30% of its gamma-hydroxybutyrate by one hour when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm; and greater than about 90% of its gamma-hydroxybutyrate by 8 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." .................................................. 221

15.    Claim 14 ............................................................................................ 222

         a.    "The method of claim 13, wherein the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 7 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." ................................................................................. 222

16.    Claim 15 ............................................................................................ 222

         a.    "The method of claim 13, wherein the formulation releases greater than about 90% of its gamma-hydroxybutyrate by 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C. and a paddle speed of 50 rpm." ................................................................................. 222

XIII.   INVALIDITY OF THE '079 PATENT FOR LACK OF WRITTEN DESCRIPTION ........................................................................................... 223

    A.    The Claimed "Controlled Release Component" Lacks Written Description Support ........................................................................... 223

        1.    The Specification Fails To Describe Non-Resinate Forms of A "Controlled Release Component" ......................................... 224

        2.    The Specification Fails To Adequately Describe Resinate Forms Of The Claimed "Controlled Release Component" ................................. 235

    B.    "Administering A Single Daily Dose To The Patient" Lacks Written Description Support ........................................................................... 237

    C.    "Opening A Sachet Containing A Solid Oxybate Formulation" Lacks Written Description Support ........................................................ 240

    D.    Dependent Claims 5 and 14 Lack Written Description Support .......................... 245

    E.    Allphin 2012 Does Not Remedy The Deficiencies In the Written Description Support Of The '079 Patent ......................................... 247

XIV.   THE ASSERTED CLAIMS OF THE '079 PATENT ARE INVALID FOR LACK OF ENABLEMENT ....................................................................... 250

    A.    The Claimed Invention Is Not Enabled Because It Encompasses An Inoperable Embodiment .......................................................... 251

    B.    The Specification Fails to Enable the Full Scope of the Claims .......................... 254

        1.    The Specification Lacks An Enabling Disclosure of Non-Resinate Controlled Release Components ......................................... 255

2.    The Specification Lacks An Enabling Disclosure of Resinate
Controlled Release Components ..........................................................259

C.    ████████████████████ A "Method Of Treating Narcolepsy In A
Patient" Comprising "Administering A Single Daily Dose" Of Oxybate To
A Patient Not Enabled ...................................................................260

D.    The Specification Does Not Enable "Opening A Sachet Containing A
Gamma-Hydroxybutyrate Formulation"................................................262

E.    The Limitations Recited In Claims 5 and 14 Are Not Enabled ...........265

F.    The *Wands* Factors Indicate Lack Of Enablement ..............................266
1.    The Breadth Of The Claims .....................................................266
2.    Amount Of Direction Or Guidance In The Specification.....................268
3.    Presence Or Absence Of Working Examples .............................270
4.    The State Of The Prior Art; And The Relative Skill Of Those In
The Art ....................................................................................271
5.    Nature Of The Invention and The Predictability Of The Art................272
6.    Quantity of Experimentation.....................................................275

G.    The Purported Incorporation by Reference of Allphin 2012 Does Not
Remedy The Deficiencies In the Enablement Of The '079 Patent .....................278

XV.    INVALIDITY OF THE '079 PATENT FOR IMPROPER INVENTORSHIP.............279

A.    The '079 patent Cannot Claim Priority to the '889 or '586 Applications ..........280
1.    There Is No Support For a "Controlled Release Component".................281
2.    There Is No Support For "Opening a Sachet Containing a Solid
Oxybate  Formulation" .................................................................283
3.    There Is No Support For "Wherein The Administering Promotes
the Patients to Sleep for 6 to 8 Hours".............................................285

B.    Avadel Conceived, Reduced to Practice, and Published its Controlled
Release Formulation Before Jazz.......................................................286

C.    ██████████████████████████████████ .........................................291

D.    Avadel Publically Disclosed the Subject Matter of the Claims of the '079
Patent.......................................................................................293
1.    The '990 Publication Discloses A Formulation Containing
Immediate and Controlled Release Component ..................................294
2.    The '990 Publication Discloses Administering A Single Daily
Dose To a Patient.......................................................................295
3.    The '990 Publication Discloses Opening a Sachet Containing
Gamma-hydroxybutyrate Formulation ............................................297
4.    The '990 Publication Discloses Promoting a Patient to Sleep for 6
to 8 Hours ...............................................................................298

XVI.    '079 INEQUITABLE CONDUCT ANALYSIS ..............................................301

XVII.    INVALIDITY OF THE '782 PATENT FOR LACK OF WRITTEN
DESCRIPTION.......................................................................................302

A.   The '782 Patent Is Invalid For Lack of Written Description ................................302
    1.   The Claimed "Modified Release Particles" Lack Written
       Description Support ..........................................................................303
       a.   The Specification Fails to Describe Non-Resinate Modified
          Release Particles ......................................................................304
       b.   The '782 Patent Criticizes Non-Resinate "Modified Release
          Particles" ...................................................................................305
       c.   The '782 Patent's Disclosure is Limited to Resinate
          Particles .....................................................................................306
       d.   The Specification Fails To Adequately Describe Resinate
          Forms Of The Claimed "Modified Release Particles"................316
       e.   The Specification Fails to Describe Modified Release
          Particles That Can Help A Patient Stay Asleep Throughout
          The Night ...................................................................................317
    2.   The Specification Lacks Adequate Written Description Support
       For the Claimed Viscosity Enhancing Agent Separate From the
       Immediate Release Particles and the Modified Release Particles ..........320
    3.   The Specification Lacks Adequate Written Description Support
       For the Claimed Acid Separate from the Immediate Release
       Particles and the Modified Release Particles .............................................321
    4.   The Specification Lacks Adequate Written Description Support
       For the Blood Concentrations in Claims 11, 12, and 19 ..........................323
B.   Allphin 2012 Does Not Remedy The Deficiencies In Written Description
    Support Or The '782 Patent ..................................................................................324

XVIII.  THE '782 PATENT IS INVALID FOR LACK OF ENABLEMENT ............................326

A.   The Claimed Invention Is Not Enabled Because It Encompasses An
    Inoperable Embodiment........................................................................................327
B.   The Claimed "Modified Release Particles" Are Not Enabled .............................328
    1.   The Specification Does Not Allow A POSA to Make and Use
       Non-Resinate Modified Release Particles Without Undue
       Experimentation ......................................................................................328
    2.   The Specification Does Not Allow A POSA to Make and Use
       Resinate Modified Release Particles Without Undue
       Experimentation ......................................................................................329
    3.   The Specification Does Not Allow a POSA To Make and Use A
       Formulation That Helps A Patient Stay Asleep Throughout The
       Night ........................................................................................................330
C.   The Blood Concentrations of Claims 11, 12, and 19 are Not Enabled................331
D.   The *Wands* Factors Indicate Lack of Enablement ...............................................332
E.   The Purported Incorporation by Reference of Allphin 2012 Does Not
    Remedy The Deficiencies In the Enablement Of The '782 Patent.......................334

XIX.   INVALIDITY OF THE '782 PATENT FOR IMPROPER INVENTORSHIP...............335

A.   The '782 Patent Cannot Claim Priority to the '889 or '586 Applications. ..........335

1.     There is No Support for "Modified Release Particles"............................336
2.     There is No Support For "A Viscosity Enhancing Agent . . . Wherein The Viscosity Enhancing Agent . . . [Is] Separate From the Immediate Release Particles and the Modified Release Particles"............................338
3.     There is No Support For "An Acid Wherein the . . . Acid [Is] Separate From The Immediate Release Particles and the Modified Release Particles"............................341
4.     There Is No Support For the Claimed Blood Concentration Ranges.......343

B.     Avadel Conceived, Reduced to Practice, and Published its Controlled Release Formulation Before Jazz............................344

C.     ████████████████████████████████████ ████████████████████████ ............................346

D.     Avadel Publically Disclosed the Subject Matter of the Claims of the '782 Patent............................348

1.     The '866 Patent Has Support For Modified Release Particles ................348
2.     The '866 Patent Has Support For a Viscosity Enhancing Agent . . . Wherein the Viscosity Enhancing Agent . . . [is] Separate From the Immediate Release Particles and the Modified Release Particles......349
3.     The '866 Patent Support For "An Acid Wherein the . . . Acid [Is] Separate From The Immediate Release Particles and the Modified Release Particles"............................350
4.     The '866 Patent has support for the Claimed Blood Concentration Ranges............................351

XX.     '782 PATENT INEQUITABLE CONDUCT ANALYSIS ............................353

XXI.     THE '079 PATENT IS ANTICIPATED BY LIANG 2006 AND LEBON 2013 ...........354

A.     '079 Patent Claims............................355
B.     Liang 2006............................356
C.     Lebon 2013............................357
D.     The Asserted Claims of the '079 Patent Are Anticipated by Liang 2006............................358

1.     Claim 1............................358
    a.     "A method of treating narcolepsy in a patient in need thereof, the method comprising:"............................358
    b.     "administering a single daily dose to the patient"............................359
    c.     "the single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate,"............................360
    d.     "wherein the administering comprises: opening a sachet containing a solid oxybate formulation,"............................360
    e.     "mixing the formulation with water and orally administering the mixture to the patient,"............................362
    f.     "wherein the oxybate formulation comprises an immediate release component and a controlled release component."............363

2.     Claim 2............................364

    a.    "The method of claim 1, wherein the orally administering occurs at night." ................................................................364

3.    Claim 3 ................................................................................365
    a.    "The method of claim 1, wherein the oxybate formulation is mixed with water immediately prior to administration." .........365

4.    Claim 5 ................................................................................366
    a.    "The method of claim 1, wherein the administering promotes the patient to sleep for 6 to 8 hours." ..........................366

5.    Claim 6 ................................................................................366
    a.    "The method of claim 1, wherein the amount of oxybate administered to the patient is 35 mEq, 45 mEq, 60 mEq, or 70 mEq of oxybate." ................................................................366

6.    Claim 7 ................................................................................368
    a.    "The method of claim 1, wherein the mixture is a suspension." ................................................................368

7.    Claim 8 ................................................................................369
    a.    "The method of claim 1, wherein the oxybate formulation further comprises an acid." ........................................369

8.    Claim 9 ................................................................................369
    a.    "The method of claim 8, wherein the acid is selected from the group consisting of malic acid, citric acid, tartaric acid, boric acid, maleic acid, phosphoric acid, and benzoic acid." ......369

9.    Claim 10 ..............................................................................370

10.    Claim 11 ..............................................................................371
    a.    "The method of claim 10, wherein the orally administering occurs at night." ................................................................371

11.    Claim 12 ..............................................................................371
    a.    "The method of claim 10, wherein the oxybate formulation is mixed with water immediately prior to administration." .........371

12.    Claim 14 ..............................................................................371
    a.    "The method of claim 10, wherein the administering promotes the patient to sleep for 6 to 8 hours." ..........................371

13.    Claim 15 ..............................................................................372
    a.    "The method of claim 10, wherein the amount of oxybate administered to the patient is 35 mEq, 45 mEq, 60 mEq, or 70 mEq of oxybate." ................................................................372

14.    Claim 16 ..............................................................................372
    a.    "The method of claim 10, wherein the mixture is a suspension." ................................................................372

15.    Claim 17 ..............................................................................372
    a.    "The method of claim 16, wherein the oxybate formulation further comprises an acid." ........................................372

16.    Claim 18 ..............................................................................373
    a.    "The method of claim 17, wherein the acid is selected from the group consisting of malic acid, citric acid, tartaric acid, boric acid, maleic acid, phosphoric acid, and benzoic acid." ......373

E.     The Asserted Claims of the '079 Patent Are Anticipated by Lebon 2013...........373
       1.     Claim 1............................................................................................373
              a.     "A method of treating narcolepsy in a patient in need
                     thereof, the method comprising:" .................................373
              b.     "administering a single daily dose to the patient" ......................374
              c.     "the single daily dose comprising an amount of oxybate
                     equivalent to from 4.0 g to 12.0 g of sodium oxybate," ..............375
              d.     "wherein the administering comprises: opening a sachet
                     containing a solid oxybate formulation,"....................................375
              e.     "mixing the formulation with water and orally
                     administering the mixture to the patient,"...................................376
              f.     "wherein the oxybate formulation comprises an immediate
                     release component and a controlled release component." ..........377
       2.     Claim 2............................................................................................378
              a.     "The method of claim 1, wherein the orally administering
                     occurs at night." ........................................................................378
       3.     Claim 3............................................................................................379
              a.     "The method of claim 1, wherein the oxybate formulation
                     is mixed with water immediately prior to administration." .........379
       4.     Claim 5............................................................................................379
              a.     "The method of claim 1, wherein the administering
                     promotes the patient to sleep for 6 to 8 hours." ..........................379
       5.     Claim 6............................................................................................380
              a.     "The method of claim 1, wherein the amount of oxybate
                     administered to the patient is 35 mEq, 45 mEq, 60 mEq, or
                     70 mEq of oxybate." ..................................................................380
       6.     Claim 7............................................................................................381
              a.     "The method of claim 1, wherein the mixture is a
                     suspension." ..............................................................................381
       7.     Claim 10..........................................................................................382
       8.     Claim 11..........................................................................................382
              a.     "The method of claim 10, wherein the orally administering
                     occurs at night." ........................................................................382
       9.     Claim 12..........................................................................................383
              a.     "The method of claim 10, wherein the oxybate formulation
                     is mixed with water immediately prior to administration." .........383
       10.    Claim 14..........................................................................................383
              a.     "The method of claim 10, wherein the administering
                     promotes the patient to sleep for 6 to 8 hours." ..........................383
       11.    Claim 15..........................................................................................383
              a.     "The method of claim 10, wherein the amount of oxybate
                     administered to the patient is 35 mEq, 45 mEq, 60 mEq, or
                     70 mEq of oxybate." ..................................................................383
       12.    Claim 16..........................................................................................384
              a.     "The method of claim 10, wherein the mixture is a
                     suspension." ..............................................................................384

XXII. THE RESINATE PATENTS ARE ANTICIPATED BY AVADEL PATENT
PUBLICATION AND PATENT ..................................................................384

A.      The Asserted Claims of the '079 Patent As Applied By Jazz Are
        Anticipated by the '990 Publication ..................................................385
        1.      Claim 1 ........................................................................................385
                a.      "A method of treating narcolepsy in a patient in need
                        thereof, the method comprising:" ................................385
                b.      "administering a single daily dose to the patient" ......386
                c.      "the single daily dose comprising an amount of oxybate
                        equivalent to from 4.0 g to 12.0 g of sodium oxybate," ..............386
                d.      "wherein the administering comprises: opening a sachet
                        containing a solid oxybate formulation,"....................387
                e.      "mixing the formulation with water and orally
                        administering the mixture to the patient,"....................388
                f.      "wherein the oxybate formulation comprises an immediate
                        release component and a controlled release component." ..........389
        2.      Claim 2 ........................................................................................390
                a.      "The method of claim 1, wherein the orally administering
                        occurs at night." ..........................................................390
        3.      Claim 3 ........................................................................................390
                a.      "The method of claim 1, wherein the oxybate formulation
                        is mixed with water immediately prior to administration." .........390
        4.      Claim 5 ........................................................................................391
                a.      "The method of claim 1, wherein the administering
                        promotes the patient to sleep for 6 to 8 hours." .........................391
        5.      Claim 6 ........................................................................................391
                a.      "The method of claim 1, wherein the amount of oxybate
                        administered to the patient is 35 mEq, 45 mEq, 60 mEq, or
                        70 mEq of oxybate." ..................................................................391
        6.      Claim 7 ........................................................................................393
                a.      "The method of claim 1, wherein the mixture is a
                        suspension." ..................................................................393
        7.      Claim 8 ........................................................................................393
                a.      "The method of claim 1, wherein the oxybate formulation
                        further comprises an acid." .........................................................393
        8.      Claim 9 ........................................................................................394
                a.      "The method of claim 8, wherein the acid is selected from
                        the group consisting of malic acid, citric acid, tartaric acid,
                        boric acid, maleic acid, phosphoric acid, and benzoic acid." ......394
        9.      Claim 10 ......................................................................................394
        10.     Claim 11 ......................................................................................395
                a.      "The method of claim 10, wherein the orally administering
                        occurs at night." ..........................................................395
        11.     Claim 12 ......................................................................................396
                a.      "The method of claim 10, wherein the oxybate formulation
                        is mixed with water immediately prior to administration." .........396

12. Claim 14.................................................................................396
    a. "The method of claim 10, wherein the administering
       promotes the patient to sleep for 6 to 8 hours." ...........396
13. Claim 15.................................................................................396
    a. "The method of claim 10, wherein the amount of oxybate
       administered to the patient is 35 mEq, 45 mEq, 60 mEq, or
       70 mEq of oxybate." ................................................396
14. Claim 16.................................................................................397
    a. "The method of claim 10, wherein the mixture is a
       suspension." ...........................................................397
15. Claim 17.................................................................................397
    a. "The method of claim 16, wherein the oxybate formulation
       further comprises an acid." ......................................397
16. Claim 18.................................................................................397
    a. "The method of claim 17, wherein the acid is selected from
       the group consisting of malic acid, citric acid, tartaric acid,
       boric acid, maleic acid, phosphoric acid, and benzoic acid." ......397
B. The '782 Patent As Applied By Jazz is Anticipated by the '866 Patent.............397
   1. Claim 1.................................................................................397
      a. "A formulation of gamma-hydroxybutyrate comprising:" ..........398
      b. "a plurality of immediate release particles comprising
         gamma-hydroxybutyrate;" ......................................398
      c. "a plurality of modified release particles comprising
         gamma-hydroxybutyrate;" ......................................399
      d. "a viscosity enhancing agent; and" ...........................400
      e. "an acid" ..............................................................400
      f. "wherein the viscosity enhancing agent and the acid are
         separate from the immediate release particles and the
         modified release particles." ....................................401
   2. Claim 2.................................................................................402
      a. "The formulation of claim 1, wherein the viscosity
         enhancing agent is selected from the group consisting of
         xanthan gum, microcrystalline cellulose, hydroxyethyl
         cellulose, hydroxypropylmethyl cellulose,
         carboxymethylcellulose sodium, hydroxypropyl cellulose
         and mixtures thereof." ............................................402
   3. Claim 3.................................................................................403
      a. "The formulation of claim 1, wherein the acid is selected
         from the group consisting of malic acid, citric acid, tartaric
         acid, boric acid, maleic acid, phosphoric acid, and benzoic
         acid." ...................................................................403
   4. Claim 4.................................................................................403

a. "The formulation of claim 1, wherein the formulation further comprises a lubricant selected from the group consisting of magnesium stearate, stearic acid, calcium stearate, hydrogenated castor oil, hydrogenated vegetable oil, light mineral oil, mineral oil, polyethylene glycol, sodium benzoate, sodium stearyl fumarate, and zinc stearate." .................................................................403

5. Claim 5 ...........................................................................404
    a. "The formulation of claim 4, wherein the lubricant is magnesium stearate." ...............................................404

6. Claim 6 ...........................................................................404
    a. "The formulation of claim 1, wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to from 4.0 g to 12.0 g of sodium gamma-hydroxybutyrate." ......................................404

7. Claim 7 ...........................................................................405
    a. "The formulation of claim 1, wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to about 4.0 g, about 6 g, about 7.5 g or about 9 g of sodium gamma-hydroxybutyrate." ........................405

8. Claim 8 ...........................................................................405
    a. "The formulation of claim 1, wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to about 6 g of sodium gamma-hydroxybutyrate." ......................................405

9. Claim 9 ...........................................................................406
    a. "The formulation of claim 1, wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to about 7.5 g of sodium gamma-hydroxybutyrate." ......................................406

10. Claim 10 .........................................................................406
    a. "The formulation of claim 1, wherein the formulation comprises an amount of gamma-hydroxybutyrate equivalent to about 9 g of sodium gamma-hydroxybutyrate." ......................................406

11. Claim 11 .........................................................................407
    a. "The formulation of claim 1, wherein 8 h after administration of the formulation provides a blood concentration ranging from 10 mg/L to about 40 mg/mL." .........407

12. Claim 12 .........................................................................408
    a. "The formulation of claim 1, wherein 8 h after administration of the formulation provides a blood concentration ranging from 15 mg/L to about 30 mg/mL." .........408

13. Claim 13 .........................................................................409
    a. "The formulation of claim 1, wherein the formulation is a multiparticulate composition." ....................................409

14.    Claim 14.................................................................................................409
15.    Claim 15.................................................................................................410
       a.    "The unit dose of claim 14, wherein the viscosity
             enhancing agent is selected from the group consisting of
             xanthan gum, microcrystalline cellulose, hydroxyethyl
             cellulose, hydroxypropylmethyl cellulose,
             carboxymethylcellulose sodium, hydroxypropyl cellulose
             and mixtures thereof.".................................................................410
16.    Claim 16.................................................................................................411
       a.    "The unit dose of claim 14, wherein the acid is selected
             from the group consisting of malic acid, citric acid, tartaric
             acid, boric acid, maleic acid, phosphoric acid, and benzoic
             acid.".............................................................................................411
17.    Claim 17.................................................................................................411
       a.    "The unit dose of claim 14, wherein the formulation further
             comprises a lubricant selected from the group consisting of
             magnesium stearate, stearic acid, calcium stearate,
             hydrogenated castor oil, hydrogenated vegetable oil, light
             mineral oil, mineral oil, polyethylene glycol, sodium
             benzoate, sodium stearyl fumarate, and zinc stearate." ..............411
18.    Claim 18.................................................................................................411
       a.    "The unit dose of claim 17, wherein the lubricant is
             magnesium stearate."....................................................................411
19.    Claim 19.................................................................................................412
       a.    "The unit dose of claim 14, wherein 8 h after
             administration of the formulation provides a blood
             concentration ranging from 15 mg/L to about 30 mg/mL.".........412
20.    Claim 20.................................................................................................412
       a.    "The unit dose of claim 14, wherein the unit dose
             comprises an amount of gamma-hydroxybutyrate
             equivalent to from 4.0 g to 12.0 g of sodium gamma-
             hydroxybutyrate.".......................................................................412
21.    Claim 21.................................................................................................412
       a.    "The unit dose of claim 14, wherein unit dose contains an
             amount of gamma-hydroxybutyrate equivalent to about 6 g
             of sodium gamma-hydroxybutyrate.".........................................412
22.    Claim 22.................................................................................................413
       a.    "The unit dose of claim 14, wherein unit dose contains an
             amount of gamma-hydroxybutyrate equivalent to about 7.5
             g of sodium gamma-hydroxybutyrate.".....................................413
23.    Claim 23.................................................................................................413
       a.    "The unit dose of claim 14, wherein unit dose contains an
             amount of gamma-hydroxybutyrate equivalent to about 9 g
             of sodium gamma-hydroxybutyrate.".........................................413
24.    Claim 24.................................................................................................413

a. "The unit dose of claim 14, wherein the unit dose is a sachet." .................................................................................413

390.     In addition, making an oxybate formulation suitable for once-nightly treatment of narcolepsy would require additional experimentation.  As discussed above, no approved once-nightly formulation of GHB for the treatment of narcolepsy was known in the art.  And the Sustained Release patents provide very little to no guidance that would allow a POSA to make the full array of claimed GHB formulations capable of providing once-nightly treatment of narcolepsy. These additional considerations also support my opinion that the quantity of experimentation required to achieve the claimed GHB formulations is high.

391.     Taken together, these considerations lead me to conclude that the quantity of experimentation required to make the full scope of GHB formulations covered by the claims of the Sustained Release patents would be high.  This further supports the lack of enablement of the Asserted Claims under the *Wands* analysis.

* * *

392.     For the reason set forth above, it is my opinion that experimentation would have been required to practice the claimed invention.  Further, based on my analysis of the *Wands* factors, it is my opinion that undue experimentation would be required in order to make the full scope of formulations covered by the Sustained Release patents.  As a result, based on the legal standard for enablement provided to me by counsel, it is my opinion that the claims of the Sustained Release patent are not enabled.

## XI.     INVALIDITY OF THE SUSTAINED RELEASE PATENTS FOR IMPROPER INVENTORSHIP AND DERRIVATION

393.     Avadel has alleged that Jazz derived the subject matter claimed (or at least a portion of the subject matter claimed) in the Sustained Release patents from Avadel, and that the Sustained Release patents are invalid for improper inventorship.  Def. 5/6/2022 Invalidity Contentions  at 126. Specifically, Avadel has asserted that it was Avadel, not Jazz, that invented the subject matter

142

claimed in Jazz's Sustained Release patents, and that Jazz copied material from Avadel's publicly-available U.S. Patent Publication 2018/0021284A1 (the "'284 Publication"), which published January 25, 2018 and later gave rise to Avadel's U.S. Patent No. 10,272,062 (the "'062 Patent") when drafting the claims of the Sustained Release patents. *Id.* at 134; *see also* Appendix D.

394.   While I do not draw any conclusions as to whether Jazz did in fact *copy* the claimed invention from Avadel, or whether Avadel employees should be listed as inventors on the Sustained Release patents (either in addition to, or in the place of the currently listed inventors), I provide opinions regarding what the respective Sustained Release patents and Avadel publication teach, and whether and to what extent those publications show possession of the claims.

395.   I understand from counsel that Jazz has asserted that the claimed "sustained release component" can cover modified release particles—such as those included in Avadel's LUMRYZ product and described in Avadel's '284 Publication—that exhibit immediate release of sodium oxybate upon exposure to certain conditions.  I understand that Avadel disagrees that the claimed "sustained release portion" covers such modified release particles.  However, to the extent the "sustained release portion" claimed by Jazz's Sustained Release patent can cover the modified release particles disclosed in Avadel's '284 Publication, in my opinion, the disclosures of Jazz's Sustained Release patents, and that of Avadel's '284 Publication demonstrate that Avadel, not Jazz, was in possession of the subject matter of the claims of Jazz's Sustained Release patents. My opinions offered herein are contingent on Jazz's assertion that Avadel's LUMRYZ product meets the limitations of the asserted claims.

396.   Unlike Jazz's Sustained Release patents, Avadel's '284 Publication provides a detailed description of a formulation (*e.g.*, that disclosed in Examples 1 and 2 of Avadel's '284 Publication) that meets the requirements set out in the claims of Jazz's Sustained Release patents

as interpreted by Jazz and explains the testing of those formulations using the parameters claimed by Jazz's patents.  Furthermore, if Jazz's assertion of infringement over Avadel's LUMRYZ product is taken as correct (*i.e.*, the relative release of sodium oxybate from the immediate release and modified release portions can be measured), I also believe that the '284 Publication to discloses testing results that meet the limitations of the dissolution profiles claimed by Jazz's patents.  The specification of Jazz's Sustained Release patents discloses no testing whatsoever of any sustained release GHB formulation that uses the type of functional coating specified in its own claims.  Further, the earliest publication of the specification of Avadel's '062 Patent was before the filing date of the earliest application that led to Jazz's Sustained Release patents, and it was therefore accessible to Jazz.  ████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████  Indeed, Jazz completely re-drafted the claims it was pursuing in the Sustained Release patent family mere months after Avadel's patent application was published.

397.    Further, Jazz has asserted that its Sustained Release patents are directed to a once-nightly oxybate formulation, and that the claims of its Sustained Release Patents cover Avadel's once-nightly LUMRYZ oxybate product.  Complaint (D.I. 1).  However, Jazz's Sustained Release patents ████████████████████████████████████████████████████ contain no indication that Jazz was ever in possession of a once-nightly oxybate formulation.  By contrast, Avadel's '284 Publication demonstrates that Avadel possessed an oxybate formulation that could be administered once-nightly, and it contains data to support that assertion.

398.    Below, I explain the basis for my opinion that (a) Jazz did not have possession of and did not invent the claimed invention; and (b) Avadel's '062 patent—which Jazz had access to—demonstrates that Avadel it did have possession of the claimed invention.

A.    **Prosecution History of the Sustained Release Patents**

399.    I have reviewed the prosecution history of Jazz's Sustained Release patents, including the prosecution history of the abandoned application to which the '488 patent claims priority, the '369 application. *See supra* VII.A.5; Appendix B (SR Patent chart). In my opinion, the difference between the claims of the abandoned '369 application[19] and the claims of U.S. Application No. 16/025,487 (the "'487 application") that led directly to the '488 patent, when combined with the lack of written description support for the claims of Jazz's Sustained Release patents, is entirely consistent with and supports that Clark Allphin and Scott Bura did not invent the subject matter claimed in the Sustained Release patents.

400.    Jazz's '369 application was filed on March 24, 2011. *See* Appendix B SR Patent Chart); '488 patent at cover:

> ## Related U.S. Application Data
>
> (63)  Continuation of application No. 13/071,369, filed on Mar. 24, 2011, now abandoned.
>
> (60)  Provisional application No. 61/317,212, filed on Mar. 24, 2010.

---

[19] The '369 application is the earliest application filed in the Sustained Release patent family. Each of the Sustained Release patents that Jazz has asserted in this case claims priority to the '369 application. It is my understanding from counsel that when an application is first filed, the inventors submit a set of claims to the patent office. However, throughout the course of prosecution, those claims can be amended, including in subsequent applications in the same family. In the case of the Sustained Release patents, the originally filed claims of the '369 patent are distinct and different from the claims that Jazz pursued for each of the asserted Sustained Release patents. *See* Appendix B (SR Chart).

401.   After approximately seven years of prosecution, Jazz abandoned the '369 application on November 2, 2018.  Ex. F ('369 Application File History, Notice of Abandonment (November 2, 2018)); Appendix B.  At the time the '369 application was abandoned, the pending claims were directed to a "compressed tablet" controlled release dosage form.  Ex. G ('369 Application File History, Claims at 2 (October 4, 2017)).  I have reproduced independent claim 1 of the '369 application, which was pending prior to its abandonment, below.

> 1.   (Previously Presented)  A controlled release dosage form for oral administration of a gamma-hydroxy butyrate (GHB) drug, the controlled release dosage form comprising:
>
> a controlled release formulation providing a time dependent release of the GHB drug, wherein the controlled release formulation includes a compressed tablet controlled release core, the compressed tablet controlled release core comprising at least one drug selected from GHB and pharmaceutically acceptable salts, hydrates, tautomers, solvates and complexes of GHB, wherein the at least one drug comprises of about 90% to about 98% by weight of the compressed tablet controlled release core; at least one binder in an amount of about 1% to about 10% by weight of the compressed tablet controlled released core; and at least one lubricant in an amount of about 0.5% to about 5% by weight of the compressed tablet controlled release core;
>
> wherein the compressed tablet controlled release core is coated with at least one time dependent release coating composition that is formulated to control the release rate of the at least one drug after administration, wherein the time dependent release coating composition comprises of about 50% to about 80% by weight of at least one polymer comprising ethylcellulose and of about 20% to about 50% by weight of at least one polymeric pore former and less than 30% of the at least one drug included in the controlled release formulation is released from the controlled release formulation during the first hour after administration.

*Id.*

402.   As illustrated by exemplary claim 1, above, the pending claims of the '369 application prior to abandonment were directed to a controlled release formulation providing "time dependent release" of "the GHB drug" that included a "compressed tablet controlled release core comprising at least one drug selected from GHB or its pharmaceutically acceptable salts, hydrates, tautomers, solvates and complexes of GHB."  *Id.*  The claims describe the "time dependent release

coating" composition used to control release of the selected drug as comprising ethylcellulose and a polymeric pore former.

403.     The pending claims of Jazz's '369 application did not contain anything resembling the release profile recited in the claims of Jazz's issued sustained release patents, nor did they reference any dissolution testing apparatus.  Ex. G ('369 Application File History, Claims at 2 (October 4, 2017)).  Further, at no point during prosecution of the '369 application were there any claims directed to once-nightly dosing, or any mention of the dissolution testing parameters found in the issued claims of the Sustained Release patents, or functional coatings containing methacrylic acid-methyl methacrylate co-polymer. Ex. G ('369 Application File History, Claims at 2 (October 4, 2017)).  Indeed, rather than reciting use of an enteric coating like methacrylic acid methyl-methacrylate, as the issued claims of the asserted Sustained Release patents now do, the claims of the '369 application recited the use of a "polymeric pore former" in a "time dependent release coating."  Ex. G ('369 Application File History, Claims at 2 (October 4, 2017)).

404.     Avadel's '284 Publication published on January 25, 2018.  '284 Publication at cover.  Avadel's '284 Publication discloses information about a modified release oxybate formation that can be used for once-nightly administration for treatment of narcolepsy.  As noted, that application states that the terms "gamma-hydroxybutyrate", "GHB" and "oxybate" encompass the free base of gamma-hydroxybutyrate, pharmaceutically acceptable salts of gamma-hydroxybutyric acid, and combinations thereof, their hydrates, solvates, complexes or tautomer forms, consistent with the definition in Avadel's '062 patent.  *See* '284 Publication at ¶ [0152].  As I described in detail below, one embodiment (described in Examples 1 and 2) of the modified release oxybate formulations described in Avadel's '284 Publication includes a functional coating comprised of a one or more methacrylic acid-methyl methacrylate co-polymers.  Avadel performed

147

dissolution testing of this formulation in a USP Apparatus 2, in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm and reported the dissolution profile of the described formulation pursuant to these parameters.   *See e.g.*, Example 1, Example 2, Figure 5.

405.   Approximately five months after the publication of Avadel's '284 Publication, Jazz filed the '487 application on July 2, 2018.  The '487 application gave rise to the '488 patent asserted in this litigation.  *Compare* '488 patent at cover *with* '284 Publication at cover.   The prosecution history demonstrates that concurrent with filing the '487 application, Jazz cancelled all of the originally filed claims, and filed new claims directed to a controlled release formulation comprising methacrylic acid-methyl methacrylate co-polymers, with specific dissolution requirements when tested in a USP apparatus 2 in deionized water at a temperature of 37 °C and a paddle speed of 50 rpm.  JPION0000261 at -265-267.

406.   These new claims of Jazz's '487 application went through several rounds of rejection by the Examiner and amendment by Jazz.  The first rejection occurred on September 27, 2018, when the examiner rejected all of the pending claims "as failing to comply with the written description requirement"; as obvious over Liang; and for double patenting.  JPION00000261 at -431-442 (September 27, 2018 Non-Final Office Action).  In response, on December 27, 2018, Jazz amended the claims of the '487 application to specify that the claims were to a "solid dosage formulation," and to add claim elements specifying weights of specific components of the functional coating and certain excipients.  *See* JPION00000261 at -486-88. (Response to Non-Final Office Action).

407.   The examiner then issued a final rejection of pending claims 109-116 and 118-119, again for failing to comply with the written description requirement and for obviousness over Liang.  *See* JPION00000505 (May 2, 2019 Final Rejection).  The examiner explained how "[t]he

claims are very broadly drawn to encompass ANY dosage form for oral administration of GHB comprising GHB in ANY amount, and further comprising ANY immediate release portion and ANY controlled release portion so long as it has a methacrylic/methacrylate coating, wherein the formulation comprises ANY film former, and releases drug within the amounts and times recited by claims 109-112." *Id.* The examiner also found that Example 13 (referencing PK data) did not satisfy the written description requirement, because it did not prove Jazz had "**actual possession** of the claimed invention at the time of the invention" in light of the examiner's finding that the specification does not appear to disclose any correlation between the structure of the materials that are used to form the compressed table dosage forms and the amounts of said materials, with the ability of the dosage forms to achieve the functional properties recited by the instant claims, including the release rates recited by claims 109-112" and that "NONE of the compositions disclosed by Examples 1-12 are even within the scope of the claims." JPION00000261 at -508-512 (emphasis in original) (further explaining how "an assertion that the disclosure provides testing and evaluation methods that would allow the skilled artisan to perform additional research so as to discover what the invention is . . . does not show **actual possession** of the invention at the time of the invention"). *Id.* at -511-512 (emphasis in original).

408.    In response to the May 2, 2019 Final Rejection, Jazz amended the pending claims on March 6, 2020 by, among other things, replacing the term "controlled release portion" in the pending claims with "sustained release portion. JPION00000261 at -551-554. Jazz then submitted arguments in its response to the examiner's rejection attempting to distinguish the dissolution profile recited in its pending claims from the GHB dissolution profiles disclosed in Liang 2006. JPION00000261 at -550 (March 6, 2020 Response to Accompany a Request for Continued Examination); *id.* at -551-554 (Amendments to Claims).   In support of its office action response,

Jazz also submitted a declaration from one of the inventors, Clark Allphin, dated March 5, 2020 ("Allphin March Declaration").  JPION00000261 at -536-542.

409.    Jazz also met with the Examiner on April 2, 2020, and April 16, 2020, and submitted a second declaration from Mr. Allphin on April 20, 2020.  *See* JPION00000261 at -564-565 (April 2, 2020 Interview Summary), -567-569 (Allphin April Declaration), -573 (April 16, 2020 Interview Summary).   According to the Applicant-Initiated Interview Summary, Jazz discussed and "presented data showing inventive embodiments having release profiles within the presently claimed ranges, including embodiments not comprising a pore former."  *Id.* at -585.

410.    The Allphin April Declaration submitted on April 20, 2020 discussed "numerous formulations" that were allegedly tested by Mr. Allphin and his co-inventor "to determine what structural features would provide the desired release profile."  *Id.*  at -567.  Mr. Allphin stated that "based on this work, as well as the examples in the application and the studies described in the [March 5, 2020] declaration, we found that a two-component coating with methacrylic acid-methyl methacrylate co-polymer at about 20-50% by weight can provide the claimed dissolution profile."  *Id.* at -568.

411.    A notice of allowance for the '488 patent was issued on July 15, 2020. JPION00000261 at -620.  The '488 patent was issued on September 1, 2020. '488 patent at cover.

## B.    The Claims of the '488 Patent Lack Written Description Support

412.    As discussed above, it is my opinion that the claims of the '488 patent lack written description support. *See supra* IX.  I have also reviewed Jazz's Validity contentions and the chart Jazz provided in support of its arguments that the specification contains adequate written description support, which is reproduced below.   Pl. 4/1/2022 Validity Contentions at 92.

| '488 Patent Disclosure Relied Upon Above for § 112 Support | Corresponding Disclosure in '369 Application |
|---|---|
| 7:64-8:4 | ¶ 0036 |
| 11:29-44 | ¶ 0046 |
| 13:14-47 | ¶¶ 0051-52 |
| 16:3-5 | ¶ 0062 |
| 17:59-66 | ¶ 0069 |
| Example 2 | ¶¶ 0074-75 |
| Example 3 | ¶¶ 0076-77 |

*Id.*

413.    I have reviewed all of the disclosures cited by Jazz in the above table from both the '488 patent and the '369 application and do not agree that they provide support for the claims. *See* '488 patent; '369 application.

414.    First, Jazz contends that the passage at 7:64-8:4 of the '488 patent, and corresponding ¶ [0036] of the '369 application, provides support for formulations containing methacrylic acid-methyl methacrylate co-polymers at the dissolution conditions claimed. Pl. 4/1/2022 Validity Contentions at 88-89. As described above, IX.D.3, this passage would not lead a POSA to believe that the purported inventors of the Sustained Release patents were in possession of the claimed formulation testing using the claimed dissolution method.

415.    Second, Jazz pointed to Examples 2 and 3 of the '488 patent in its contentions as supporting the use of methacrylic acid-methyl methacrylate co-polymers in the claimed formulations at the claimed amounts to achieve the claimed dissolution profiles. Pl. 4/1/2022 Validity Contentions at 90. As described above, IX.D.3, these examples do not include the claimed co-polymer. In fact, there is no description anywhere in the '488 patent specification of dissolution testing conducted on any formulation containing the claimed co-polymer. Thus, for at least these reasons, a POSA would not believe that the purported inventors of the Sustained Release patents

were in possession of the claimed formulation containing methacrylic acid-methyl methacrylate copolymer that had the recited drug release profile when tested using the recited dissolution method.

416.     Third, Jazz contends that the specification contains support for formulations other than tablets and capsules at the '488 patent, 11:29-44 and '369 application ¶ 0046.  Pl. 4/1/2022 Validity Contentions at 92; *id.* at 87-88.  The passage Jazz relies on states that "a CR core may be prepared by blending a drug and other excipients together, and forming the blend into a tablet, caplet, pill, or other dosage according to methods known by those of skill in the art."  *Id.*  A POSA would not believe this bare reference to an open-ended list of possible (yet non-exemplified) formulations to provide sufficient written description support for any dosage forms other than tablets or capsules given that there is no detail provided on any other such formulation(s).  *See supra* at IX.B

417.     Fourth, Jazz cites to the '488 patent at 16:3-5 and 17:59-66 as well as the '369 application at ¶ [0062] and ¶ [0069] to support its contention that the specification would reasonably convey to a POSA that the inventors were in possession of dosage forms other than tablets and capsules.  Pl. 4/1/2022 Validity Contentions at 92; *id.* at 87-88.  However, these passages do not mention any dosage forms, rather, it just states that "[t]he formulation and structure of integrated dosage forms as described herein can be adjusted to provide a combination of immediate release and controlled release performance that suits a particular dosing need."  '488 patent at 17:59-62; '369 application at ¶ [0069].  This disclosure would not reasonably convey to a POSA that the purported inventors were in possession of a controlled release dosage form other than tablets or capsules.  *See supra* at IX.B.

418.     Finally, Jazz also contends that the passage in the '488 patent at 13:14-47 and the '369 application at ¶¶ [0051]-[0052] provides support for formulations containing methacrylic acid-methyl methacrylate copolymers. Pl. 4/1/2022 Validity Contentions at 92; *id.* at 88.   As described above IX.D, these passages only describe using the claimed copolymer as a pore former (within the functional coat), not for any other purpose, and the specification specifically cautions against "incorporating enteric components in the film . . .". '488 patent at 13:32-34; '369 application at ¶ [0051].   These disclosures would not reasonably convey to a POSA that the purported inventors were in possession of a controlled release dosage form other than tablets or capsules. *See supra* at IX.B.



████████████████████████████████████████████████████████

████████████████████████████████. ████████████

421.    I have also reviewed the deposition transcript of Phil McGarrigle, Jazz's in-house counsel in charge of patent prosecution.  ██████████████████████████

███████████████████████  █████████████████████████████

█████████████████████  ██████████████████████████████

422.    Further, as I noted above, the specification of the Sustained Release patents does not contain any description of the use of a USP Apparatus 2 to assess formulations containing methacrylic acid-methyl methacrylate to arrive at the claimed profile. The specification only contains a passing reference to a USP Apparatus 2, and that does not indicate to a POSA that a USP Apparatus 2 should or could be used to assess the claimed formulations.  Indeed, the Sustained Release patents do not contain a single example or piece of data generated using the claimed dissolution conditions.  *See* IX.D████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████

423.    Based on the lack of disclosures in Jazz's applications supporting the issued claims of the Sustained Release patents, ████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████  it is my opinion that Jazz was not in possession of the claimed invention.

424.    Avadel's '284 Publication, however, does demonstrate possession of the claims under Jazz's proposed construction of "gamma-hydroxybutyrate" (as I understand from counsel applied by Jazz in its infringement contentions), as described below.  The extensive disclosures in

Avadel's '284 Publication describing the limitations that were added to Jazz's Sustained Release patent claims stands in stark contrast to the minimal disclosure presented in Jazz's patents, which fail to disclose the elements of the claimed invention.  Further, the claims of the Sustained Release patents are strikingly similar to information publicly disclosed by Avadel in the '284 Publication, which published, prior to when Jazz filed the '487 application that led to the '488 patent (the first patent filed of the Sustained Release patents).  Thus, the evidence shows that Avadel, rather than Jazz, had possession of the purported invention claimed[20] in Jazz's patents and had that possession before Jazz filed the application that led to the Sustained Release patents.

### D.  Avadel Publicly Disclosed The Subject Matter of the Claimed Invention

425.    In contrast to Jazz's Sustained Release patents, the specification of Avadel's '284 Publication discloses the subject matter claimed by Jazz's Sustained Release patents, as construed by Jazz to cover Avadel's LUMRYZ sodium oxybate formulation.  In particular, the '284 Publication describes oxybate formulations containing immediate and sustained release portions, comprised of microparticles.  The '284 Publication describes oxybate formulations with a sustained release portion (pursuant to what Jazz has contended the "sustained release portion" covers) with a functional coating deposited over an oxybate core, wherein the functional coating comprises methacrylic acid-methyl methacrylate copolymers that are from about 20% to 50% by weight of the functional coating.  To the extent Avadel's LUMRYZ product infringes the Sustained Release patents, the '284 Publication also describes formulations that exhibit the dissolution profiles recited in the claims of Jazz's Sustained Release patents when tested in a USP 2 apparatus at 37 °C.  Further, the '284 Publication describes the disclosed formulations as suitable for once-

---

[20] Again, I am referring to the claimed subject matter as construed by Jazz, as I have described above with respect to anticipation of Jazz's Sustained Release patents over Avadel's patent publication.

nightly administration, and provides data in support of this assertion.  Based on these disclosures, which I will describe in greater detail below, it is my opinion that a POSA would understand that the inventors of Avadel's '284 Publication were in possession of and publicly disclosed the formulations claimed by Jazz's Sustained Release patents.  In contrast, as I described above, the specification of Jazz's Sustained Release patents fails to demonstrate that Jazz was in possession of the invention recited in the claims.

### 1.   Overview of the '284 Publication

426.   The '284 Publication discloses "[m]odified release formulations of gamma-hydroxybutyrate having improved dissolution and pharmacokinetic properties" and "therapeutic uses thereof."  *See* '284 Publication at Abstract.  Unlike Jazz's Sustained Release patents, the specification defines "gamma-hydroxybutyrate" to refer to "the free base of gamma hydroxy-butyrate, a pharmaceutically acceptable salt of gamma-hydroxybutyric acid, and combinations thereof, their hydrates, solvates, complexes or tautomers forms."  '284 Publication at ¶ 152.  The '284 Publication recognizes that the requirement of twice-nightly dosing of currently-available oxybate treatments such as Xyrem "is a substantial inconvenience to narcolepsy patients."  '284 Publication at ¶ [0009].  The '284 Publication explains that although several efforts have been made to achieve a once-nightly modified release dosage form of sodium oxybate, none have received FDA approval.  *Id.*  The '284 Publication recognizes that a once-nightly formulation must overcome the "reduction in bioavailability that occurs when sodium oxybate is formulated in a modified release dosage form, as measured by the blood concentration/time area under the curve."  *Id.* at ¶ [0010].  The '284 Publication points out that prior attempts at once-nightly oxybate formulations suffer from disadvantages due to "the low relative bioavailability" of oxybate in these dosage forms which "necessitates an increase in the dose compared to current IR treatments which already provide a large dose" and thus "require a patient must swallow around 4 to 9 pills per dose,

which is a serious inconvenience for the patient and potential drawback for patient compliance." *Id.* at ¶ [0014].

427.    To remedy the problem unsolved by the prior art—finding a modified release formulation of GHB that approximates the bioavailability of an immediate release liquid of GHB administered twice nightly—the inventors of the '284 Publication "discovered a novel relationship between the in vitro release profile of gamma-hydroxybutyrate modified release formulations and in vivo absorption which permits, for the first time, a modified release formulation of gamma-hydroxybutyrate that approximates the bioavailability of a twice-nightly equipotent immediate release liquid solution of sodium oxybate, and that does so across a range of therapeutic doses." *Id.* at ¶ [0027]. "In particular, the inventors have discovered that a modified release formulation of gamma-hydroxybutyrate that rapidly releases half of its gamma-hydroxybutyrate in 0.1N hydrochloric acid dissolution medium, and rapidly releases the other half of its gamma-hydroxybutyrate in phosphate buffer pH 6.8 dissolution medium, approximates or exceeds the in vivo bioavailability of an equipotent immediate release liquid solution of sodium oxybate administered twice nightly." *Id.* Jazz's Sustained Release patents, by contrast, do not describe how to achieve sustained release of oxybate to achieve a once-nightly oxybate formulation ██

███████████████████████████████████████████████████████████████

███████████████████████

428.    As described in detail below and if Jazz is correct that Avadel's LUMRYZ product infringes Jazz's Sustained Release patents, the inventors of the '284 Publication developed an oxybate formulation that achieves the desired dissolution profile described in the '284 Publication (*Id*.), using immediate release and modified release multiparticulate beads. The modified release particles rely on a Eudragit polymer coating to provide delayed release of oxybate (after a lag time)

at a desired pH value.  By contrast, Jazz's Sustained Release patents do not recognize that this type of release profile is desirable, much less disclose a formulation that can achieve it.

429.    The '284 Publication also provides detailed descriptions of the composition of the "modified release formulation" with these desired attributes (*i.e.*, releasing half of its gamma-hydroxybutyrate in 0.1N hydrochloric acid dissolution medium, and rapidly releasing the other half of its gamma-hydroxybutyrate in phosphate buffer pH 6.8 dissolution medium).  Further, the '284 Publication describes multiple forms of testing with various parameters to evaluate the release of the disclosed formulations, including using the parameters that are recited in the claims of Jazz's Sustained Release patents.  '284 Publication at ¶ [0427].

430.    As I will describe in detail below, the '284 Publication teaches a formulation with both immediate release and modified release portions, wherein the modified release portion comprises a functional coating and core particle, and the functional coatings is comprised of methacrylic acid-methly methacrylate co-polymers that are 20 to 50% of the weight of the functional coating, as claimed.

431.    The '284 Publication also describes using a USP 2 apparatus to test the disclosed formulations and describes the dissolution results from various formulations.  If Jazz's assertion that Avadel infringes the Sustained Release patents is correct, the release profile from such formulations meets the limitations of the claims of Jazz's sustained release patents (*e.g.*, releasing "greater than about 40% of its gamma-hydroxybutyrate by about 4 to about 6 hours," "releasing at least about 30% of its gamma-hydroxybutyrate by one hour," and "releasing greater than about 90% of its gamma-hydroxybutryrate by 8 hours").  Examples 1 and 2 of the '284 Publication describe a sodium oxybate formulation that meets the limitations of Jazz's Sustained Release patents (as construed by Jazz) using the testing parameters laid out in all of the claims of Jazz's

Sustained Release patents. The dissolution profile of the formulation created by Avadel (*e.g.*, in Examples 1 and 2 of the '284 Publication) meets the dissolution profiles recited in each claim of Jazz's Sustained Release patents as asserted by Jazz. *See infra* XII.B. Jazz's Sustained Release patents do not describe the claimed formulation, nor do they perform any testing demonstrating that any such formulation meets the requirements recited in the claims. Further, unlike Jazz, Avadel tested a formulation that meets the requirements recited in the claims of Jazz's Sustained Release patents *in vivo*, and demonstrates possession of a once-nightly oxybate formulation.

432.    In short, Avadel recognized the benefit of and disclosed the formulations they developed in a patent publication, the features of which were later claimed in Jazz's Sustained Release patents. Avadel, not Jazz, also tested these formulations, and demonstrated their utility for once-nightly dosing. I will explain the basis for my opinion that Avadel's '284 Publication discloses the limitations of Jazz's Sustained Release Patents in greater detail below. I have also provided a claim by claim analysis in section XII.B of my report which further show the basis for my opinion that the '284 Publication discloses each and every limitation of the claimed invention.

## 2.    The '284 Publication Discloses A Formulation Comprising Immediate Release and Sustained Release Portions

433.    As I stated above, the '284 Publication teaches a formulation with "both immediate release and modified release portions." *See, e.g.*, '284 Publication at ¶ [0030]. The formulation that the inventors found to approximate or exceed the *in vivo* bioavailability compared to an equipotent immediate release liquid solution of sodium oxybate administered twice nightly relies on "a modified release formulation of gamma-hydroxybutyrate[21] that rapidly release half of its

---

[21] Again, unlike Jazz's Sustained Release patents, the specification defines "gamma-hydroxybutyrate" to refer to "the free base of gamma hydroxy-butyrate, a pharmaceutically acceptable salt of gamma-hydroxybutyric acid, and combinations thereof, their hydrates, solvates, complexes or tautomers forms." '284 Publication at ¶ 152. Thus, the release of sodium oxybate

gamma-hydroxybutyrate in 0.1N hydrochloric acid dissolution medium [(i.e., an immediate release portion)], and rapidly releases the other half of its gamma-hydroxybutyrate in phosphate buffer pH 6.8 dissolution medium.  '284 Publication at ¶ [0027]; *see also id.* at ¶ [0029]("The release of gamma-hydroxybutyrate from the immediate release portion is practically uninhibited, and occurs almost immediately in 0.1N [HCL]").  The '284 Publication also demonstrates how a formulation with these characteristics performs in other testing environments, such as deionized water.

> ### 3. The '284 Publication Describes A Sustained Release Portion With the Functional Coating Recited in the Claims of Jazz's Sustained Release Patents

434.    The '284 Publication explains that the modified release portion of the sodium oxybate formulation taught in the specification "is preferably comprised of modified release particles, obtained by coating immediate release particles of gamma-hydroxybutyrate with a coating (or coating film) that inhibits the immediate release of the gamma-hydroxybutyrate."  '284 Publication at ¶ [0339].   The specification described the composition of the polymer coating applied to the particles, describes the use of a suspending agents, viscosifying agents, lubricants and acidifying agents, teaches the weight ratios of the components of the coating and of the particles to the coating, and discloses desirable trigger pH values of the coating on the modified release portion of the formulation.  *See e.g., id.* [0190]-[0195], [0270]-[0305].

435.    In particular, the specification of Avadel's '284 Publication focuses on the use of a coating on the modified release portion comprising methacrylic acid methyl-methacrylate co-polymers with a pH trigger from 5.5 to 6.97.  '284 Publication at ¶ [0189]; Example 1; Example

---

as described in the '284 Publication is a release of "gamma-hydroxybutyrate" as that term is defined in the Publication.  It also qualifies as a release of "gamma-hydroxybutyrate" under Jazz's construction of that term.

2; *see also id.* at ¶ [0275].  Indeed, the specification repeatedly describes "preferred embodiments" that use methacrylic acid methyl methacrylate as a coating for the modified release particles.

436.    One of the many working examples in the '284 Publication patent describes a final composition of a modified release dosage form that aligns with the formulation recited in the claims of Jazz's Sustained Release patents.  Example 1 and Example 1bis, Tables 1d and 1 bis-c teach formulations with a finished composition shown below.

TABLE 1d

Quantitative finished composition

| Component | Function | Quantity per 4.5 g dose (g) |
|---|---|---|
| Sodium oxybate | Drug substance | 4.5 |
| Microcrystalline cellulose spheres | Core | 0.836 |
| Povidone K30 | Binder | 0.237 |
| Hydrogenated Vegetable Oil | Coating excipient | 0.716 |
| Methacrylic acid Copolymer Type C | Coating excipient | 0.159 |
| Methacrylic acid Copolymer Type B | Coating excipient | 0.318 |
| Malic acid | Acidifying agent | 0.113 |
| Xanthan gum | Suspending agent | 0.050 |
| Hydroxyethylcellulose | Suspending agent | 0.075 |
| Carrageenan gum | Suspending agent | 0.075 |
| Magnesium stearate | Lubricant | 0.036 |
| Total | | 7.116 |

TABLE 1bis-c

Quantitative finished composition

| Component | Function | Quantity per 4.5 g dose (g) |
|---|---|---|
| Sodium oxybate | Drug substance | 4.5 |
| Microcrystalline cellulose spheres | Core | 0.836 |
| Povidone K30 | Binder | 0.237 |
| Hydroxypropyl cellulose | Top coat | 0.310 |
| Hydrogenated Vegetable Oil | Coating excipient | 0.716 |
| Methacrylic acid Copolymer Type C | Coating excipient | 0.159 |
| Methacrylic acid Copolymer Type B | Coating excipient | 0.318 |
| Malic acid | Acidifying agent | 0.225 |
| Xanthan gum | Suspending agent | 0.037 |
| Colloidal silicon dioxide | Gliding agent | 0.037 |
| Magnesium stearate | Lubricant | 0.075 |
| Total | | 7.451 |

437.    These formulations have coatings that include methacrylic acid copolymers Type C and Type B.[22]  The total weight of the functional coating is 1.193 g and the methacrylic acid Type B co-polymers weigh 0.318 g.  Thus, the methacrylic acid co-polymers Type B (methacrylic acid methyl methacrylate) weigh approximately 27% of the weight of the functional coating.

438.    The finished formulation of Example 1 and Example 1 bis contained "a 50:50 mixture of MR and IR microparticles based on their sodium oxybate content."  '284 Publication at ¶ [0388];  ¶ [0392].  In other words, half of the sodium oxybate was contained in the immediate release portion, and half was contained in the modified release portion.

**4.    The '284 Publication Describes an Immediate Release and Sustained Release Portion with The Dissolution Profiles Recited in the Claims of Jazz's Sustained Release Patents To The Extent Jazz's Infringement Allegations Are Correct**

439.    Formulations can be characterized by their dissolution profiles in various types of media.  Example 2 of the '284 Publication describes in vitro release over time for the formulations described in Examples 1 and 1 bis in 900 mL DI water tested with USP apparatus 2, at 37 °C ± 0.5 degrees with paddle speed of 50 rpm.  These dissolution testing conditions are the same testing parameters that are recited in the claims of the sustained release patents.

440.    The results of this dissolution testing of the finished composition according to Example 1, tested using a USP apparatus 2, 37 degree C dissolution medium comprising D.I. water, and 50 rpm paddle speed are reported in Table 2d and Figure 5 of Avadel's '284 Publication.  The "IR fraction of sodium oxybate was solubilized in 15 minutes.  The publication reports the release of sodium oxybate from the modified-release fraction started after approximately 4 hours with 90% of the total dose released at 6 hours."  *Id*. at ¶ [0401].  I have reproduced Table 2d and Figure

---

[22] Methacrylic acid Copolymer Types B  is a methacrylic acid methy-methacrylate co-polymer. *See, e.g.*, '866 Patent at 48:14-17; *see also supra* VI.G.

5 below.  Again, however, I note that it is not apparent how to determine where the sodium oxybate

is released from.  However, to the extent Jazz's Sustained Release patents have adequate written

description support for the claimed release profile, which specifies the amount of oxybate release

from the immediate and sustained release components, Avadel's '284 Publication also discloses a

formulation meeting the claimed dissolution profile.

| TABLE 2d | |
|---|---|
| Percent Sodium Oxybate Released in deionized water for finished composition of sodium oxybate prepared according to Example 1 | |
| Time (h) | % released |
| 0 | 0 |
| 0.25 | 53 |
| 1 | 52 |
| 2 | 54 |
| 3 | 55 |
| 4 | 58 |
| 5 | 69 |
| 6 | 92 |
| 7 | 96 |
| 8 | 97 |



Figure 5

441.     As I explain in my discussion of the lack of written description support for Jazz's Sustained Release patent, the disclosures in the Sustained Release patents do not describe how to determine GHB release from only the sustained release portion of a formulation containing both an immediate release and a sustained release portion. *See supra* IX.E.  However, I understand from counsel for Avadel that Jazz has argued that LUMRYZ, as described in Example 1 of the '062 patent, meets the dissolution requirements for the sustained release portion recited in Sustained Release patents. *See* '284 Publication at Example 1, Table 2d, Figure 5.  Example 1 of the '062 Patent, however, is identical to Example 1 of the '284 Publication.  Therefore, to the extent the Court disagrees with my written description opinion concerning the limitations requiring specific GHB release from the sustained release portion, then it is my opinion that the '284 Publication discloses the recited GHB release from the sustained release portion.

442.     Based on my understanding from counsel of Jazz's infringement contentions, the '284 Publication discloses the recited dissolution profile when formulations having the recited quantities of methacrylic acid-methyl methacrylate and GHB are tested in USP Apparatus 2 at 37.0 $\pm$ 0.5 °C and at 50 rpm in deionized water.  '284 Publication at ¶ [0401] (Example 2, Table 2d).

443.     Thus, to the extent there is written description support for this limitation, and based on my understanding from Counsel of Jazz's infringement contentions, it is my opinion that this limitation is disclosed by the '284 Publication.

### 5.     The '284 Publication Provides Support For A Once-Nightly Oxybate Formulation

444.     Unlike Jazz's patents, Avadel's '284 Publication contains data supporting use of the disclosed formulations for once-nightly dosing.  First, Avadel's publication discloses a release profile that the inventors had reason to believe would overcome bioavailability limitations of other attempted once-nightly formulations.  '284 Publication ¶ [0411].  In contrast, as discussed above,

the PK data from the Jazz Sustained Release patents' specification would not lead a POSA to conclude the tested formulations were suitable for once-nightly narcolepsy treatment.  Thus, the dissolution data disclosed by the Sustained Release patents not only fails to provide support for the dissolution profile recited in the claims, but also fails to provide any credible assertion of a once-nightly oxybate treatment.

445.    The '284 Publication also provides *in vivo* data that further demonstrates that the inventors of the '284 Publication were in possession of a once-nightly oxybate formulation. Specifically, the '284 Publication indicates that the study was performed in the fed state.  '284 Publication at ¶ [0572].

446.    For example, Example 3 of the '284 Publication describes an *in vivo* pharmacokinetic study conducted in healthy human volunteers, which assesses three different dosages of Example 1bis of the '284 Publication compared to Xyrem (which was administered as 2 x 2.25 gram sodium oxybate doses administered 4 hours apart).  The study was completed with the formulation described in Example 1bis at 4.5 g, 6.0 g, and 7.5 g doses.  Table 3b reports the mean plasma concentrations over time for these dosage forms.  These results are also provided in Figs 11, 12, 13, 14.

447.    As described by the inventors, "4.5 g nighttime doses of finished composition of the invention equivalent to twice-nightly doses of Xyrem (2 x 2.25 g) provided somewhat less total exposure to sodium oxybate with a later median $T_{max}$ than the initial Xyrem dose." '284 Publication at ¶ [0411].  The inventors also explained that the "relative bioavailability was about 88%" and the composition "according to the invention avoids the high second-dose peak concentration of Xyrem and therefore does not exhibit the substantial between-dose fluctuations in concentration, while achieving a comparable mean $C_{8h}$" (the mean blood concentration after 8 hours).  '284

Publication at ¶ [0411].  The specification also compares the pharmacokinetic parameters AUCinf and C8h for a 7.5g dose of the composition described in Example 1bis to a 9g total dose of Xyrem and concludes that the "data show that a 7.5g dose of a formulation according to the invention given once nightly exhibits a similar PK profile to 9g of Xyrem given in two separate equal doses." *Id.* at ¶ [0413].  A POSA would understand that this data—which the inventors describe as evidencing a "comparable mean C8h" and a "similar PK profile" to Xyrem dosed twice nightly— lends credible support to the assertion in the specification that the claimed formulations can be dosed once nightly for the treatment of narcolepsy.

448.    In contrast, the only data in Jazz's Sustained Release Patents is related to a formulation that does not fall within the scope of the claims because it does not purport to use a functional coating comprising methacrylic acid-methyl methacrylate co-polymers as required by the claims.  *See* '488 Patent, Example 13.  And, as explained in detail by Dr. Scharf, Example 13 only describes fasted-state PK data.  Scharf Rpt. at ¶¶ 46-50.  I understand from Dr. Scharf that a POSA would expect to see fed-state data to demonstrate possession of a once-nightly formulation that may (and likely will) be taken under non-fasted conditions.  ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

*   *   *

449.    For the reasons set forth above, as construed by Jazz, the disclosures in Avadel's '284 Publication, including its working examples, teach the subject matter that was subsequently claimed in Jazz's Sustained Release patents.  As a result of those public disclosures, a POSA would

believe that the inventors of Avadel's '062 patent were in possession of the subject matter ultimately recited in the claims of Jazz's Sustained Release patents prior to the filing of the applications leading to the Sustained Release patents.[23]

450.    In contrast, as I described above, Jazz's Sustained Release patents lack the type of disclosure that would demonstrate possession and invention of the claimed invention.  Jazz's Sustained Release patents do not provide detailed descriptions of modified release formulations of GHB (including involving the use of methacrylic acid-methyl methacrylate copolymers, let alone using the standalone gamma-hydroxybutyrate anion as the active pharmaceutical ingredient), multiparticulate dosage forms, the use of USP apparatus 2 testing for evaluation of in vitro drug release profiles in D.I. water, the specific coatings described in the claims, or the release profile described in the claims.

451.    When comparing the '284 Publication's detailed description of all of the components of a modified release formulation of sodium oxybate along with the claimed release profile and testing of such formulations to Jazz's patents, which fail to describe many of the components of the claimed invention, much less anything resembling the final formulation with the claimed release profile, it would be apparent to a POSA that Jazz did not possess or invent the subject matter recited in the claims of the Sustained Release patents.

---

[23] Again, as I stated above, these statements depend on the assertions Jazz had made in contending that Avadel infringes the Sustained Release patents.

452.     Based on my comparison of the respective disclosures in Avadel's published patent application (which fully disclose the subject matter claimed in Jazz's Sustained Release patents, assuming Jazz is correct that Avadel infringes the Sustained Release Patents) and Jazz's Sustained Release patents (which do not fully disclose the subject matter claimed in Jazz's Sustained Release patents), it is my opinion that a POSA would recognize that Avadel contributed to the invention of at least some, if not all, of the subject matter claimed in the Jazz Sustained Release patents.

## XII.    THE SUSTAINED RELEASE PATENTS ARE ANTICIPATED BY THE AVADEL '284 PATENT PUBLICATION

453.     Jazz has asserted that the Sustained Release patents are entitled to a priority date of March 24, 2010.  As I discussed above, *see supra* VII.A.4, it is my opinion that the Sustained Release patents are not entitled to a priority date earlier than July 2, 2018.

454.     Because it is my opinion that the Sustained Release patents are only entitled to the priority date of July 2, 2018, if the Court construes the claim terms "gamma-hydroxybutyrate" such that the claims encompass gamma-hydroxybutyrate salts and methods of treating with gamma-hydroxybutyrate salts, the Sustained Release patents are anticipated by the '284 Publication, the published application which ultimately issued as U.S. Patent No. 10,272,062 ("'062 patent") and was assigned to Avadel.

455.     Jazz has asserted that the claimed "sustained release portion" can cover modified release particles—such as those included in Avadel's LUMRYZ product and which are described in Avadel's '284 Publication—that exhibit immediate release of oxybate upon exposure to certain conditions.  Avadel disagrees that the claimed "sustained release portion" covers such modified release particles.

456.     I do not offer an opinion on whether the "modified release" particles in LUMRYZ (and described in Example 1 of the '284 Publication) meet the "sustained release portion"

over a period of about 2 to about 8 hours.  Nor does the '079 patent specification contain teachings that instruct a POSA on how to create a drug formulation from the drug-resin complexes described in the specification.   A final formulation of a controlled release component that could be administered to a patient would include additional excipients in addition to the resin complex. However, the '079 patent does not teach a POSA what specific excipients should be included, or how to combine them with a drug-resin complex to formulate a controlled release component.

763.    Further, as I have explained above, resinate forms of a controlled release component are inoperable for controlling the release of oxybate to create a once-nightly oxybate formulation that can be administered to a patient for the treatment of narcolepsy.  *See supra* XIV.A; Appendix E.  This further supports my opinion that the specification does not provide sufficient teachings to enable a POSA to make and use a resinate-based controlled release component that controls release of oxybate for about 2 to about 8 hours.  ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

764.    For at least these reasons, it is my opinion that the specification does not teach a POSA how to make and use the full scope of the claims.

### C.    ████████████████████████████   A "Method Of Treating Narcolepsy In A Patient" Comprising "Administering A Single Daily Dose" Of Oxybate To A Patient Not Enabled

765.    In my opinion, the '079 patent fails to teach a POSA how to achieve a method of treating narcolepsy in a patient comprising administering a single daily dose of oxybate to a patient in need of treatment without undue experimentation.   The '079 patent specification does not provide any teachings regarding how to create a dosage form of GHB that may be administered in

a single daily dose to a patient for the treatment of narcolepsy.  Indeed, the '079 patent specification only provides teachings related to resinate-GHB complexes, which are inoperable for the purpose of providing a single-daily dose of oxybate to a patient, ███████████████████████

███████████████████████████████████████████████

███████████████████████████████

766.     There is a complete lack of information in the specification of the '079 patent that a POSA could use to make and use a non-resinate GHB formulation that could be administered in a single daily dose to a patient for treating narcolepsy.  There is no information about materials, methods, or techniques to create a non-resinate GHB formulation for administration in a single daily dose to a patient for treatment of narcolepsy.  Nor is there any evidence (*e.g.*, PK data and/or clinical data) that shows that the inventors achieved such a result.  ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

767.     ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

768. 

769.    Thus, it is my opinion that the specification of the '079 patent fails to teach a POSA how to make and use an oxybate formulation that can be administered in a single daily dose for treating narcolepsy in a patient, as recited in the claims of the '079 patent.

**D.    The Specification Does Not Enable "Opening A Sachet Containing A Gamma-Hydroxybutyrate Formulation"**

770.    The specification fails to teach a POSA to perform the recited method step of "opening a sachet containing a gamma-hydroxybutyrate formulation."

771.    The specification does not teach a POSA to administer a single daily dose of oxybate to a patient by "opening a sachet containing a solid oxybate formulation, mixing the formulation with water, and orally administering the mixture to the patient."  '079 patent at claim 1.

772.    First, the specification of the '079 patent is limited to resinate-GHB complexes. The specification of the '079 patent references a sachet in one instance: "Accordingly, it would be

capable of delivering sodium oxybate over a sustained period of time." *Id*. ¶ 30.   Thus, Allphin 2012 only highlights the challenges associated with developing a controlled release GHB formulation.

818.   ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

819.   For at least these reasons, Allphin 2012 fails to remedy the described deficiencies of the '079 patent.   Allphin 2012 does not enable a POSA to make and use a controlled release dosage of GHB that allows for administration of a single-daily dose of oxybate to a patient for treatment of narcolepsy without undue experimentation.   Accordingly, it is my opinion that Allphin 2012 does not enable the full scope of the claims, either alone or in combination with the disclosures of the '079 patent.

## XV.   INVALIDITY OF THE '079 PATENT FOR IMPROPER INVENTORSHIP

820.   Avadel has alleged that the '079 patent is invalid for "improper inventorship because [it] was derived from the inventive work of Avadel." Def. 5/6/2022 Invalidity Contentions at 280.   Specifically, Avadel has asserted that it, and not Jazz, invented the subject matter claimed in the '079 patent (or at the very least part of the subject matter claimed in the '079 patent), and that Jazz simply copied the pending claims from Avadel's US Patent Publication 2019/0274990 A1 (the "'990 Application") following its publication on September 12, 2019.   *Id*; *see also* Appendix D.   That application later gave rise to Avadel's U.S. Patent No. 10,952,986 (the "'986 patent").

821.    While I do not draw any conclusions as to whether Jazz did in fact copy the claimed invention from Avadel, or whether Avadel employees should be listed as inventors on the '079 patent (either in addition to, or in the place of the currently listed inventors), I provide opinions regarding what the '079 patent and Avadel publication teach, and whether and to what extent those publications show possession of the claims.

A.    **The '079 patent Cannot Claim Priority to the '889 or '586 Applications**

822.    Jazz has contended that "[a]t a minimum, both the '079 and the '782 Patents are entitled to a February 2016 priority date…." Pl. 4/1/2022 Validity Contentions at 94.  App. No. 15/047,586 (the "'586 application"), was filed on February 18, 2016.

823.    During prosecution of the '079 patent, the patent examiner noted "there is no support for the claimed subject matter in prov' 889…. Therefore, the earliest priority for the claimed subject matter is the effective filing date of 02/18/2016."  JPION00444475 at 595-596 (noting "sachet" was not found and mixing the formulation with water as claimed was not found). From my review of the prosecution history of the '079 patent Jazz never disputed the Examiners analysis.  JPION00444475 at -763 ("Additionally, Applicants do not comment on the statement that the effective filing date of the instantly claim subject matter is February 18, 2016.").

824.    As noted in Appendix C (Resinate Chart), the '079 patent is a continuation of the '586 application.  I understand from counsel that for a continuation application to claim priority to its predecessor application, the claims must find written description support in the predecessor application.  I also understand from counsel that a continuation application requires that no new matter be added to the specification in the later application.  Thus, because it is my opinion that the '079 patent's claims do not have written description support, it is also my opinion that the '079 patent cannot claim priority to the '586 application.

825.    Further, Jazz provided citations to "exemplary support"[32] in the '889 and '586 applications for the claims of the '079 patent.  Pl. 4/1/2022 Validity Contentions at 95-98.  It is my opinion that the provided citations (nor any other material) in the '889 or '586 applications do not provide support for the claims of the '079 patent for at least the reasons discussed below.  *See also supra* XIII

### 1.    There Is No Support For a "Controlled Release Component"

826.    All of the Asserted Claims of the '079 patent require a "controlled release component."  *See* '079 patent claims 1 and 10.  Jazz contends that paragraphs [014], [017], and [018] of the '889 Application and Paragraph [014] of the '586 application provide written description support for this limitation.   Pl. 4/1/2022 Validity Contentions at 95, 97.  However, none of these disclosures describe any non-resinate controlled release components that would provide for a method of administering a single daily dose of GHB.  Further, the passages cited do not provide adequate written description support for resinate-based "controlled release components" because they fail to describe how a resinate-GHB complex can be used as part of a final formulation and used to control release of oxybate.  Thus, the citations would not reasonably convey to a POSA that the inventors had possession of the full scope of a "controlled release component" as claimed.  *See supra* XIII.A (explaining my opinion for lack of written description support for the claimed "controlled release component").

827.    Paragraph [014] of both the '889 and the '586 applications recite: "In addition to the controlled or extended release properties of one embodiment, there can be an immediate release GHB formulation that is present in or accompanies the controlled release formulation."  '889

---

[32] It is unclear what "exemplary" means, but I understand from counsel for Avadel that Jazz is bound by its contentions.

application at ¶ [014], '586 application at ¶ [014].  As I have described above, *supra* XIII.A, these disclosures in the '889 and '586 applications only contain a passing reference to a "controlled release formulation" that does not describe any non-resinate controlled release formulations of GHB.  The disclosure would not reasonably convey to a POSA that the inventors possessed such a non-resinate sachet formulation with both an immediate release component and a controlled release component that would enable a method of administering only a single daily dose of GHB, particularly in light of the specification's statement that various factors "limit conventional approaches for modified release."  '889 Application at ¶ [0022]; '586 Application at ¶ [0022]. Based on this passing reference to a "controlled release formulation," a POSA would not understand the inventors to have been in possession of non-resinate controlled release formulations of GHB.

828.    Paragraph [017] of the '889 application also does not provide the required support for a "controlled release component."  The paragraph recites: "The formulations and dosage forms of the present invention can also include an immediate release component.  The immediate release component can form part of a controlled release unit or liquid dosage form or may be a separate immediate release composition."  '889 application at ¶ [017].  As I describe above, *supra* XIII.A of my report, this disclosure likewise only contains a passing reference to a "controlled release formulation."  It does not describe any non-resinate controlled release formulations of GHB.  Thus, the disclosure would not reasonably convey to a POSA that the inventors possessed such a non-resinate sachet formulation with both an immediate release component and a controlled release component that would enable a method of administering only a single daily dose of sodium oxybate, particularly in light of the specification's statement that various factors "limit

conventional approaches for modified release." '889 application at ¶ [0022]; '586 application at ¶ [0022].

829.    Paragraph [0018] also fails to provide written description support for "controlled release component." Paragraph [0018] of the '889 application recites: "In specific embodiments, controlled release and immediate release formulations can be dosed together to a subject to provide quick onset of action, followed by maintenance of therapeutic levels of the drug substance over a sustained period of time." This disclosure likewise only contains a passing reference to a "controlled release formulation." It does not describe any non-resinate controlled release formulations of GHB. Thus, it would not reasonably convey to a POSA that the inventors possessed such a non-resinate sachet formulation with both an immediate release component and a controlled release component that would enable a method of administering only a single daily dose of sodium oxybate, particularly in light of the specification's statement that various factors "limit conventional approaches for modified release." '889 application at ¶ [0022]; '586 application at ¶ [0022].

## 2.    There Is No Support For "Opening a Sachet Containing a Solid Oxybate Formulation"

830.    Both independent claims of the '079 patent require "opening a sachet containing a solid oxybate formulation." '079 patent at claims 1, 10. Jazz contends that paragraphs [0017], [0024], and [0053] of the '889 application and paragraph [0023] of the '586 application provide written description support for this claim limitation. Pl. 4/1/2022 Validity Contentions at 95, 97. I disagree. None of the disclosures in the applications Jazz points to describe any non-resinate modified release GHB particles that can be administered via a sachet, or formulation that can be administered via a sachet as a single daily dose for the treatment of narcolepsy. Thus, the passages

would not reasonably convey to a POSA that the inventors had possession of the full scope of "opening a sachet containing a solid oxybate formulation."

831.    Paragraph [0017] of the '889 application states "[t]herefore, an immediate release component may be provided, for example, as a dry powder formulation, an immediate release tablet, an encapsulated formulation, or a liquid solution or suspension.  However, an immediate release component may also be formulated as part of a single dosage form that integrates both the above components."  '889 Application, at ¶ [0017].  This citation does not mention the term sachet and provides no support for a sachet formulation, nor would it convey to a POSA that the inventors had possession of a non-resinate formulation, let alone in a sachet, meeting the requirements of the claims (including a single daily dose).  Moreover, it is limited to "an immediate release component" and thus does not provide support for a final formulation administered via a sachet.

832.    Paragraph [0024] of the '889 application provides "a particularly convenient means of administering resinates is as a suspension of individual resinate beads."  *Id.* at ¶ [0024]; *see also* '079 patent at 19:14-27.  This citation does not mention a sachet or mixing the formulation with water, and is specific to resinates.  Thus, this paragraph fails to provide support for the full scope of the claimed invention including conveying that the inventors had possession of a non-resinate formulation that can be administered in a single daily dose.

833.    Paragraph [0053] of the '889 application provides "[d]epending on the means used to retard or delay release, the beads may be presented in hydrated form as part of an aqueous suspension, or may be provided as dried beads for mixing with water immediately prior to ingestion or to be taken without water."  '889 application at ¶ [0053].  Again, this portion of the publication does not reference a sachet.  Further, as I described above in section XIII.C the only "beads" described are resinate beads.  Thus, this paragraph fails to provide written description

support for the full scope of the claimed invention including a single daily dose administered to a patient, a non-resinate formulation, and a sachet formulation. This disclosure would not reasonably convey to a POSA that the inventors had possession of the claim limitation.

834. Finally, paragraph [0023] of the '586 application recites: "including suspensions of oxybate-containing particles as described herein, which in some embodiments can be supplied as a sachet which can be suspended in e.g., tap water by the end user…." '586 application at ¶ [0023]; '079 patent at 6:4-10. This disclosure would not convey to a POSA that the inventors were in possession of a non-resinate formulation or formulation that could be administered as a single daily dose. Further, for the reasons described above, *see supra* XIII.C , this disclosure fails to provide sufficient written description support for "opening a sachet containing a solid oxybate formulation."

### 3. There Is No Support For "Wherein The Administering Promotes the Patients to Sleep for 6 to 8 Hours"

835. Claims 5 and 14 of the '079 patent depend from claims 1 and 10, respectively, and add the limitation "wherein the administering promotes the patients to sleep for 6 to 8 hours." '079 patent at claims 5, 14. Jazz contends that paragraph [014] of the '889 and '586 applications provide support for this claim limitation. Pl. 4/1/2022 Validity Contentions at 96, 98. I disagree.

836. Both paragraph [0014] of the '889 and '586 applications recite: "One object of the invention is to maintain the concentration of GHB in the blood at a level sufficient to promote sleep for up to 8, 7, 6, or 5 hours…. Additionally, it is an object to ensure that the sleep inducing effects of GHB do not remain for longer than the above periods as it would compromise a patient's ability to perform normal day to day activities, such as work or driving a car." As discussed above, XIII.D, this passage only describes what the inventors hoped to achieve, without any data or

supporting results.  Thus, this disclosure would not reasonably convey to a POSA that the inventors had possession of the claimed limitation.

837.   Therefore, it is my opinion that there is no support in either the '889 or '586 applications for the claimed limitations of the '079 patent.  I understand from counsel that this means the '079 patent cannot claim priority to either of these applications.  Based upon my review of the file histories for the '079 patent and the applications it is a continuation from, I believe that the earliest priority date for the '079 patent is the date the '041 application was filed, December 10, 2020.[33]  '079 patent at cover.

**B.   Avadel Conceived, Reduced to Practice, and Published its Controlled Release Formulation Before Jazz**

838.   As discussed above, VII.B.1.a; *see also* Appendix C (Resinate Chart), the parent application to the '079 patent is the '598 application.  '079 patent at cover.  Jazz was prosecuting the '598 application until an official notice of abandonment on February 22, 2021.  '598 application at Abandonment, Feb. 22, 2021.  At the time that Jazz was prosecuting the '598 application, the claims were directed towards directed to "oxybate ionically bound to an ion exchange matrix."  '598 Application File History at Claims, February 3, 2020.

839.   During this same time, Avadel was prosecuting Application No. 16/420,321 (the "'321 Application").  The '321 Application published as US 2019/0274990 on September 19, 2019 (the "'990 Publication").

840.   Jazz filed the application that led to the '079 patent, US App. No. 2017/118,041 on December 20, 2020 (the "'041 application").  '079 patent at cover.  The first seven claims of Avadel's '990 Publication, available publicly before Jazz filed the '041 application, are, in my

---

[33] And, as I describe above, the specification of Jazz's '079 patent lacks written description support.

opinion, substantively identical to Jazz's as filed claims in the '041 application from the perspective of a POSA.

| Claims from Jazz's '041 Application, filed December 10, 2020 | Claims from Avadel's "990 Publication, published September 12, 2019 |
|---|---|
| 1. A method of treating a disease or condition treatable with oxybate in a patient in need thereof, the method comprising: <br><br> administering a single daily dose to the patient, the single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate, wherein the administering comprises: <br><br> opening a sachet containing an oxybate formulation, <br><br> mixing the formulation with water, and <br><br> orally administering the mixture to the patient. | 1. A method of treating a disorder treatable with gammahydroxybutyrate in a human in need thereof, the method comprising: <br><br> administering a single daily dose to said human an amount of gamma-hydroxybutyrate equivalent to from 3.0 to 12.0 g of sodium oxybate, wherein the administering comprises <br><br> opening a sachet containing a gamma-hydroxybutyrate formulation, <br><br> mixing the formulation with water, and <br><br> orally administering the mixture. |
| 2. The method of claim 1, wherein the orally administering occurs at night. | 2. The method of claim 1, wherein the orally administering occurs at bedtime. |
| 3. The method of claim 1, wherein the oxybate formulation is mixed with water immediately prior to administration. | 3. The method of claim 1, wherein the mixing occurs shortly before the orally administering. |
| 4. The method of claim 1, wherein the oxybate is administered with food. | 4. The method of claim 1, wherein the orally administering occurs approximately 2 hours after said human has eaten a meal. |
| 5. The method of claim 1, wherein the administering promotes the patient to sleep for 6 to 8 hours. | 5. The method of claim 1, wherein said administering results in inducing said human to sleep for 6 to 8 hours. |
| 6. The method of claim 1, wherein the amount of oxybate administered to the human is 35 mEq, 45 mEq, 60 mEq, or 70 mEq of oxybate. | 6. The method of claim 1, wherein the amount of gammahydroxybutyrate administered to the human is equivalent to 4.5 g, 6.0 g, 7.5 g, or 9.0 g of sodium oxybate. |
| 7. The method of claim 1, wherein the mixture is a suspension. | 7. The method of claim 1, wherein the mixture is a suspension. |

841.    It is my opinion that there is no substantive difference between the claims of the '041 application filed on December 10, 2020 and the claims of the '990 Publication filed on September 12, 2019.

842.    For claim 1, the '041 application replaces "a disorder" with "a disease or condition."   These terms in the context of the '041 application and '990 Publication are synonymous.   In my opinion a POSA would not see these words and claiming different subject matter.   And, the specification of the '041 application does not refer to narcolepsy as either a disease or a disorder and thus does not propose any specific definition of disease or disorder that would contract their normal, synonymous, meaning to a POSA.

843.    The second difference in claim 1, as shown in the chart above, is the '041 applications use of the term "oxybate" instead of "gamma-hydroxybutyrate." The specification of the '041 application equates these two terms.   JPION00444475 at -477 ('041 application at ¶ (0002)) ("[g]amma-hydroxybutyrate (GHB), also known as 'oxybate'…").   Thus, this does not differentiate claim 1 of the '041 application from claim 1 of the '990 Publication.

844.    The third difference is the '041 application claims a range of 4.0 g to 12.0 g of sodium oxybate, whereas the '990 Publication claims 3.0 g to 12.0 g.   The range claimed in the '041 application is within the range claimed in the '990 Publication.   Thus, this does not differentiate claim 1 of the '041 application from claim 1 of the '990 Publication.

845.    Finally, the '041 application uses the word "patient" were the '990 Publication uses the word "human."   It is my opinion that this is a distinction without a difference.   A narcolepsy "patient" is a "human".   The context of the Resinate patents supports that the claimed patients are humans.   For example, the specification of the '041 application discusses the GI tract of a **human** and the difficulties of using resinate formulations in the **human** body.   *See, e.g.*, JPION00444475

288

at -499-501 ('041 application at ¶¶ (0062)-(0067)).  Thus, it is my opinion that claim 1 of the '041 application and claim 1 of the '990 Publication are substantively identical.

846.    Claim 2 of the '041 application and the '990 Publication are identical except that the '041 application uses the word "night" where the '990 Publication uses the word "bedtime." This change does not substantively alter the subject matter claimed.  A POSA would recognize that patients/humans typically go to bed at night.

847.    Claim 3 of the '041 application states that "oxybate formulation is mixed with water immediately prior to administration."  Claim 3 of the '990 Publication states that "mixing occurs shortly before the orally administering."  They both require mixing of the claimed formulation prior to administering.  Claim 3 of the '041 application recites the mixing is "with water," however this limitation is already contained within claim 1 of both the '041 application and '990 Publication.  A POSA would understand that there is no substantive difference in the claims.

848.    Claim 4 of the '041 application states that the "oxybate is administered with food." Claim 4 of the '990 Publication states that "orally administering occurs approximately 2 hours after said human has eaten a meal."  Both of these claims add a limitation regarding the human eating food.  Further, "with food" does not specify a time frame, and thus encompasses administering oxybate 2 hours after eating a meal.

849.    Claim 5 of the '041 application requires the method of claim 1 to "promote the patient" to sleep for 6 to 8 hours.  Claim 5 of the '990 Publication requires the method of claim 1 "results in inducing said human to sleep for 6 to 8 hours."  As discussed for claim 1, a POSA would not recognize a substantive difference between "patient" and "human."  Further, a POSA would not recognize a difference between something that "promotes" and "results in inducing" sleep. Thus, a POSA would not recognize any substantive difference in these two claims.

850.    Claim 6 of the '041 application uses the term "oxybate" whereas claim 6 of the '990 Publication uses the term "gammahydroxybutyrate." As discussed with claim 1, these terms are used synonymously in the '041 application. Claim 6 of the '041 application and claim 6 of the '990 Publication both require the method of claim 1 to be administered to a human. I note that in the issued version of claim 6, in the '079 patent, the word "human" is changed to "patient." Claim 6 of the '041 application requires the amount of oxybate administered to be 35 mEq, 45 mEq, 60 mEq, or 70 mEq. Claim 6 of the '990 Publication requires the amount of gammahydroxybutyrate to be 4.5 g, 6.0 g, 7.5 g, or 9.0 g of sodium oxybate. An equivalent (Eq) is a unit representing the amount of substance that will react with an arbitrary amount of another substance in a given chemical reaction.[34] The equivalent weight can be calculated by dividing the molecular weight of a compound by its valency. Specifically, the relationship between the mEq value of a compound to its actual weight (in mg) is represented by the equation: mEq = (Weight /molecular weight) * valence. For sodium oxybate, the molecular weight is 126.09, [35] and the valence value is 1.[36] According to this conversion, 35 mEq of oxybate is about 4.4 grams of sodium oxybate, 45 mEq is about 5.7 g, 60 mEq is about 7.5 g, and 70 mEq is about 8.8 g.   Claim 6 therefore recites practicing the method of claim 1 where the oxybate dose is about 4.4, 5.7, 7.5, and 8.8 grams, which is nearly identical to the g values recited in the '990 Publication. Especially in light of Claim 6 of the '990 Publication stating that the amount to be administered is "equivalent" to the

---

[34] A milliequivalent (mEq) is one-thousandth of an Eq.

[35]    odium oxybate, PUBCHEM COMPOUND SUMMARY FOR CID 23663870 (2023), https://pubchem.ncbi.nlm.nih.gov/compound/Sodium-oxybate, (showing molecular weight of sodium oxybate is 126.09).

[36]    Hydroxybutyrate/Butyrate    Acid, SWGDRUG.ORG (last    revised    May    16, 2015), https://www.swgdrug.org/Monographs/GAMMA-HYDROXYBUTYRATE.pdf (contains chemical structures showing oxybate as "-1" charge showing that the valence for oxybate is 1.)

recited grams, a POSA would not view these two claims as substantively different.  *See also* Matal

Rpt., at 63; JPION00444475 at -722.

851.    Claim 7 of the '041 application is identical to claim 7 of the '990 Publication.

**C.** 



855.

856.    Additionally, it is my opinion that the claims of the '041 application as filed bear little substantive relation to the content of the '041 application's specification. As noted above, *supra* XIII, XV.A, the claims of the '079 patent lack written description support and the specification contains no indication that the resinate-GHB complexes disclosed could be administered to a patient as part of a formulation for once-nightly dosing. Further, these claims of

the '079 patent are substantively identical to the claims as filed in the '041 specification. *Compare*
'079 patent at claims 1-7 *with* JPION00444475 at -514.

857.    Thus, at least due to the substantial similarity in the claim language, ███████
████████████████████████████ the lack of written description for the claims as filed in the
'041 application and as issued in the '079 patent, and the timing of Avadel's publication and the
filing of the '041 patent claims, it is my opinion that the claims of the '041 application are
substantively identical to the claims of the '990 Publication and Jazz did not possess the invention
of the claims of the '079 patent.

**D.    Avadel Publically Disclosed the Subject Matter of the Claims of the '079
Patent**

858.    In contrast to Jazz's '079 patent, the specification of Avadel's '990 Publication
discloses the subject matter claimed by Jazz's '079 patent, as interpreted by Jazz to include salts
of oxybate within the claims.  The '990 Publication stems from the same family as Avadel's '284
Publication, which I discussed above at *supra* XI.D.1.  The '990 Publication has substantively the
same specification as the '284 Publication.  *Compare* '990 Publication at Cover *with* '284
Publication at Cover.  The '990 Publication discloses "[m]odified release formulations of gamma-
hydroxybutyrate having improved dissolution and pharmacokinetic properties" and "therapeutic
uses thereof."  *See* '990 Publication at Abstract; *see also supra* XI.D.1 .  As I described above,
Avadel invented a novel oxybate formulation that can be administered as a once-nightly dosage.
*Id.*  The '990 Publication discloses that the inventors contemplated a microparticulate formulation
packaged in a sachet as an embodiment of their invention.  *See, e.g.*, '990 Publication at ¶ [0269],
("preferably provided as dry particulate formulations (i.e. granules, powders, coated particles,
microparticles, pellets, microspheres, etc.), in a sachet…."), ¶ [0362] ("The modified release
formulation of gamma-hydroxybutyrate is preferably supplied in sachets or stickpacks comprising

a particulate formulation.  The sachets are preferably available in several different doses…."); *see also id.* at claim 1, 8, 13, 20, 23, 30.  Indeed Avadel not only contemplated such a formulation, but has received tentative FDA approval for LUMRYZ, which is a microparticulate formulation in a stickpack/sachet.  *See, e.g.*, AVDL_01329969; AVDL_00044786 at -787-90.

859.    In particular, the '990 Publication describes a method of treating narcolepsy using a formulation containing immediate release and controlled release microparticles, administering a single daily dose of said formulation to a patient, opening a sachet containing a gamma-hydroxybutyrate formulation, and promoting a patient to sleep for 6 to 8 hours.

### 1.    The '990 Publication Discloses A Formulation Containing Immediate and Controlled Release Component

860.    The Court defined "controlled release component" as "[c]ompositions characterized by having at least one of the active components having a release over a period of at least about 2 to about 8 hours [.]"  *See* D.I. 230.  Jazz has asserted that the claimed "controlled release component" can cover modified release particles—such as those included in Avadel's LUMRYZ product and described in Avadel's '990 Publication—that exhibit immediate release of oxybate upon exposure to certain conditions.  Avadel disagrees that the claimed "controlled release components" which must have "release over a period of at least about 2 to about 8 hours" covers such modified release particles.  However, to the extent the claimed "controlled release component" can cover modified release particles such as those described in Avadel's '990 Publication and included in Avadel's LUMRYZ product, it is my opinion that the '990 Publication discloses a formulation containing both an immediate release component and a controlled release component.

861.    The '990 Publication discloses that "[t]he modified release formulations of gamma-hydroxybutyrate preferably have both immediate release and modified release portions." '990

Publication at ¶ [0029].  The "'modified-release (MR) portion' . . . [is] designed to deliver drugs at a specific time or over a period of time after administration, or at a specific location in the body." *Id*. at ¶ [0160].

862.    Further, the '990 Publication contains several examples of formulations containing both an immediate and controlled release component.  For example, Table 1bis-b in Example 1 of the '990 Publication shows a qualitative finished composition that contains a modified release fraction of sodium oxybate and an immediate release fraction of sodium oxybate.  '990 Publication at Table 1bis-b.  Thus, to the extent the modified release particles described in Example 1 constitute a "controlled release component," as claimed, it is my opinion that this limitation is disclosed in the '990 Publication.

### 2.    The '990 Publication Discloses Administering A Single Daily Dose To a Patient

863.    The '990 Publication discloses administering a single daily dose to a patient of a GHB formulation.  Specifically, the '990 Publication discloses GHB formulations that are "administered only once at bedtime" to a patient suffering from narcolepsy.  *Id*. at ¶ [0017].  The '990 Publication also explains that the object of the current invention is "to provide once-nightly modified release formulations of gamma-hydroxybutyrate that roughly approximate or exceed the bioavailability of an equal dose of an immediate release solution of sodium oxybate administered twice nightly, across the entire therapeutic range of sodium oxybate doses."  *Id.* at ¶ [0019]; *see also id.* at ¶ [0023] ("Yet another object of the present invention is to provide modified release formulations of gamma-hydroxybutyrate that allow once daily administration and reduced dose compared to the commercial treatment Xyrem."), ¶ [0025] ("Yet another object of the present invention is to provide modified release formulations of gamma-hydroxybutyrate that are administered only once at bed-time with improved dissolution and pharmacokinetic profiles and

reduced sodium content compared to an immediate release liquid solution of sodium oxybate administered twice nightly.").  Claim 1 of the '990 Publication discloses "administering a single daily dose to said human."  *Id.* at claim 1.

864.    Unlike Jazz's '079 patent, Avadel's '990 Publication contains data supporting use of the disclosed formulations for administering a single daily dose to a patient.  The '990 Publication contains substantial *in vitro* data demonstrating that the inventors were in possession of formulation that meets the requirements of the release profiles that the inventors believed would achieve once-nightly dosing and require only a single daily dose.  For example, Example 3 of the '990 Publication describes an *in vivo* pharmacokinetic study conducted in healthy human volunteers, which assesses three different dosages of Example 1bis of the '990 Publication compared to Xyrem (which was administered as 2 x 2.25 gram sodium oxybate doses administered 4 hours apart).  The study was completed with the formulation described in Example 1bis at 4.5 g, 6.0 g, and 7.5 g doses.  Table 3b reports the mean plasma concentrations over time for these dosage forms.  These results are also provided in Figs 11, 12, 13, 14.

865.    As described by the inventors, "4.5 g nighttime doses of finished composition of the invention equivalent to twice-nightly doses of Xyrem (2 x 2.25 g) provided somewhat less total exposure to sodium oxybate with a later median Tmax than the initial Xyrem dose." '990 Publication at ¶ [0411].  The inventors also explained that the "relative bioavailability was about 88%" and the composition "according to the invention avoids the high second-dose peak concentration of Xyrem and therefore does not exhibit the substantial between-dose fluctuations in concentration, while achieving a comparable mean C8h (the mean blood concentration after 8 hours)." '990 Publication at ¶ [0411].  The specification also compares the pharmacokinetic parameters AUCinf and C8h for a 7.5g dose of the composition described in Example 1bis to a 9g

total dose of Xyrem and concludes that the "data show that a 7.5g dose of a formulation according to the invention given once nightly exhibits a similar PK profile to 9g of Xyrem given in two separate equal doses." *Id.* at ¶ [0413]. A POSA would understand that this data—which the inventors describe as evidencing a "comparable mean C8h" and a "similar PK profile" to Xyrem dosed twice nightly—lends credible support to the assertion in the specification that the claimed formulations can be dosed once nightly, *i.e.*, in a single daily dose, for the treatment of narcolepsy.

866.    In contrast, the '079 patent does not define a release profile that the alleged inventors believed would result in a formulation that could be administered in a single daily dose, or any PK data whatsoever. Thus, it is my opinion that this limitation is disclosed by the '990 Publication.

### 3.    The '990 Publication Discloses Opening a Sachet Containing Gamma-hydroxybutyrate Formulation

867.    It is my opinion that the '990 Publication discloses opening a sachet containing a solid oxybate formulation. Specifically, the '990 Publication discloses "the modified release formulation of gamma-hydroxybutyrate is preferably supplied in sachets or stick-packs comprising a particulate formulation" and "these sachets can be opened, and its contents mixed with tap water to provide the nightly dose of gamma-hydroxybutyrate." '990 Publication at ¶ [0362]. Further, the '990 Publication discloses that "[t]he modified release formulation of gamma-hydroxybutyrate of the present invention can be provided in any dosage form that is suitable for oral administration . . . but they are preferably provided as dry particulate formulations (i.e. "granules, powders, coated particles, microparticles, pellets, microspheres, etc.), in a sachet or other suitable discreet packaging units." *Id.* at ¶ [0269]. Further, the '990 Publication claims "opening a sachet

containing a gamma-hydroxybutyrate formulation." *Id*. at claim 1.  Thus, it is my opinion that this limitation is disclosed by the '990 Publication.

### 4.     The '990 Publication Discloses Promoting a Patient to Sleep for 6 to 8 Hours

868.    The '990 Publication discloses promoting a patient to sleep for 6 to 8 hours. Specifically, the inventors of the '990 patent explain in the specification that "[t]he idea dose will provide an effective eight hours of sleep…."  '990 Publication at ¶ [0008].   Further, the specification states that "[t]he formulation is also preferably effective to induce sleep for six to eight, most preferably eight consecutive hours."  *Id*. at ¶ [0188]; *see also id.* at claim 5 ("said administering results in inducing said human to sleep for 6 to 8 hours").

869.    Unlike Jazz's '079 patent, Avadel's '990 Publication contains data supporting use of the disclosed formulations for administering a single daily dose to a patient, which would lend credibility to the claim of promoting sleep for 6 to 8 hours.   For example, Example 3 of the '990 Publication describes an *in vivo* pharmacokinetic study conducted in healthy human volunteers, which assesses three different dosages of Example 1bis of the '990 Publication compared to Xyrem (which was administered as 2 x 2.25 gram sodium oxybate doses administered 4 hours apart).  The study was completed with the formulation described in Example 1bis at 4.5 g, 6.0 g, and 7.5 g doses.  Table 3b reports the mean plasma concentrations over time for these dosage forms.  These results are also provided in Figs 11, 12, 13, 14.

870.    As described by the inventors, "4.5 g nighttime doses of finished composition of the invention equivalent to twice-nightly doses of Xyrem (2 x 2.25 g) provided somewhat less total exposure to sodium oxybate with a later median Tmax than the initial Xyrem dose." '990 publication at ¶ [0411].  The inventors also explained that the "relative bioavailability was about 88%" and the composition "according to the invention avoids the high second-dose peak

concentration of Xyrem and therefore does not exhibit the substantial between-dose fluctuations in concentration, while achieving a comparable mean C8h (the mean blood concentration after 8 hours)." '990 Publication at ¶ [0411].   The specification also compares the pharmacokinetic parameters AUCinf and C8h for a 7.5g dose of the composition described in Example 1bis to a 9g total dose of Xyrem and concludes that the "data show that a 7.5g dose of a formulation according to the invention given once nightly exhibits a similar pK profile to 9g of Xyrem given in two separate equal doses."  *Id.* at ¶ [0413].   A POSA would understand that this data—which the inventors describe as evidencing a "comparable mean C8h" and a "similar PK profile" to Xyrem dosed twice nightly—lends credible support to the assertion in the specification that the claimed formulations can be dosed once nightly, i.e. in a single daily dose, for the treatment of narcolepsy.

871.    In contrast, the '079 patent does not define a release profile that the alleged inventors believed would result in a formulation that could promote sleep for 6 to 8 hours, any PK data, or even any final formulation whatsoever.   Thus, it is my opinion that this limitation is disclosed by the '990 Publication.

*   *   *

872.    For the reasons set forth above, the disclosures in Avadel's '990 Publication, including its working examples, teach the subject matter claimed in Jazz's '079 patent.   As a result of those disclosures, the specification of the '990 Publication would reasonably convey to a POSA that the inventors of Avadel's '990 Publication were in possession of the subject matter recited in the claims of Jazz's '079 patent prior to the filing of the applications leading to the '079 patent.   In addition, those disclosures were released to the public, including Jazz, prior to the filing of Jazz's application giving rise to its '079 patent, by virtue of Avadel's published patent application.

299

873.    In contrast, as I described above, Jazz's '079 patent and '041 application lack the type of disclosure that would demonstrate possession and invention of the claimed invention. Jazz's '079 patent does not provide detailed descriptions of a method of treating narcolepsy using a formulation containing immediate release and controlled release microparticles, administering a single daily dose of said formulation to a patient, opening a sachet containing a gamma-hydroxybutyrate formulation, and promoting a patient to sleep for 6 to 8 hours.

874.    When comparing the '990 Publication's detailed description of all of the components of a modified release formulation of GHB to the '079 specification, which fails to describe many of the components of the claimed invention, it would be apparent to a POSA that Jazz did not possess the subject matter recited in the claims of the '079 patent. ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

875.    Based on my comparison of the respective disclosures in Avadel's published patent application (which fully disclose the subject matter claimed in Jazz's '079 patent, *see infra* XXII.A) and Jazz's '079 patent (which do not), it is my opinion that a POSA would conclude that Avadel was in possession of the subject matter (or at least a portion thereof) claimed in the Jazz's '079 patent.

for the once-nightly treatment of narcolepsy, for the same reasons expressed above with respect to the '079 patent, ████████████████████████████████████████████

946.    For at least these reasons, Allphin 2012 fails to remedy the described deficiencies of the '782 patent.  Allphin 2012 does not enable a GHB formulation comprising modified release particles that allows for administration of a single-daily dose of oxybate to a patient for treatment of narcolepsy.  Accordingly, it is my opinion that Allphin 2012 does not provide adequate support for or enablement of the full scope of the claims, either alone or in combination with the disclosures of the '782 patent.

## XIX.   INVALIDITY OF THE '782 PATENT FOR IMPROPER INVENTORSHIP

947.    Avadel has alleged that the '782 patent is invalid for "improper inventorship because [it] was derived from the inventive work of Avadel." Def. 5/6/2022 Invalidity Contentions at 280.  Specifically, Avadel has asserted that it, and not Jazz, invented the subject matter claimed in the '782 patent, and that Jazz simply copied the pending claims from Avadel's US Patent 10,736,866 (the "'866 Patent"), issued on August 11, 2020.  *Id.* at 284-286; *see also* Appendix D.

### A.    <u>The '782 Patent Cannot Claim Priority to the '889 or '586 Applications.</u>

948.    Jazz has contended that "[a]t a minimum, both the '079 and the '782 patents are entitled to a February 2016 priority date…." Pl. 4/1/2022 Validity Contentions at 94.  I understand from counsel that this means that Jazz is claiming priority for the '782 patent to at least App. No. 15/047,586 (the "'586 application"), filed on February 18, 2016, or Provisional App. No. 62/117,889 (the "'889 application"), filed on February 18, 2015.

949.    In the prosecution history of the '782 patent the patent examiner noted "there is no support for the claimed subject matter in prov' 889…. Therefore, the earliest priority for the claimed subject matter is 02/18/2016, the effective filing date of 15/047,586." JPION00452143 at

264-265 (noting lack of support for "modified").  From my review of the prosecution history of the '782 patent Jazz never disputed the Examiner's conclusion or analysis.

950.    As noted in Appendix C (resinate chart), the '782 patent is a continuation of the '586 application.  I understand from counsel for Avadel that for a continuing application to claim priority to its predecessor application, the claims must find written description support in the predecessor application.  I also understand from counsel that a continuation application requires that no new matter be added to the specification in the later application.  Thus, because it is my opinion that the '782 patent's claims do not have written description support, it is also my opinion that the '782 patent cannot claim priority to the '586 application.

951.    Further, Jazz provided citations to "exemplary support"[43] in the '889 and '586 applications for the claims of the '782 patent.  Pl. 4/1/2022 Validity Contentions at 99-104.  It is my opinion that the provided citations (nor any other material) in the '889 or '586 applications, do not provide adequate written description support for the Asserted Claims of the '782 patent.  *See supra* XVII.A.

### 1.    There is No Support for "Modified Release Particles"

952.    Both independent claims of the '782 patent (claims 1 and 14) require "modified release particles."  '782 patent at claims 1, 14.  Jazz contends that paragraphs [017], [018], and [053] of the '889 application and paragraph [018] of the '586 application provides written description support for this limitation.  Pl. 4/1/2022 Validity Contentions at 99, 102.  I disagree because none of these disclosures would reasonably convey to a POSA that the inventors had possession of the full scope of a "modified release particles" as claimed.  *See supra* XVII.A.1.

---

[43] It is unclear what "exemplary" means, but I understand from counsel for Avadel that Jazz is bound by its contentions.

953.    Paragraph [017] of the '889 application recites: "The formulations and dosage forms of the present invention can also include an immediate release component. The immediate release component can form part of a controlled release unit or liquid dosage form or may be a separate immediate release composition." '889 application at ¶ [017]; '782 patent at 4:46-52.  This disclosure only contains a passing reference to a "controlled release formulation."  It does not describe any modified release particles of GHB.   Joint Claim Construction Brief (D.I. 132) at 44. Thus, the disclosure would not reasonably convey to a POSA that the inventors possessed a GHB formulation with immediate release particles, both resinate and non-resinate forms of modified release particles, and a viscosity enhancing agent and an acid separate from the drug-containing particles, particularly in light of the specification's statement that various factors "limit conventional approaches for modified release." '889 application at ¶ [0022]; '586 application at ¶ [0022]; *see also* '782 patent at 5:57.   *See supra* XVII.A.1-4.

954.    Paragraph [018] of both applications recites: "In specific embodiments, controlled release and immediate release formulations can be dosed together to a subject to provide quick onset of action, followed by maintenance of therapeutic levels of the drug substance over a sustained period of time." '889 application at ¶ [018]; '586 application at ¶ [018]; '782 patent at 4:63-67.   This disclosure likewise only contains a passing reference to a "controlled release formulation," and does not describe any modified release particles of GHB.  This description is also specific to "sustained release beads" that rely on diffusion of chloride ions to release oxybate. As I have previously explained, the only "beads" referenced in the specification are resinate beads. Thus, this paragraph is limited to resinate beads and accordingly does not provide support for the full scope of the claimed invention.  Accordingly, this passage would not reasonably convey to a POSA that the inventors possessed such a GHB formulation with immediate release particles,

337

resinate and non-resinate modified release particles, and a viscosity enhancing agent and an acid separate from the drug-containing particles, particularly in light of the specification's statement that various factors "limit conventional approaches for modified release."  '889 application at ¶ [0022],'586 application at ¶ [0022]; *see also* '782 patent at 5:57.

955.    Finally, paragraph [0053] of the '889 application recites: "In the dried state, the sustained release beads may be expected to hydrate more slowly if release-retarding agents are used. As it hydrates, the diffusion of gut anion (chloride) into the bead may accelerate, thus producing a delayed or gradually increasing release of oxybate."  *Id.* at ¶ [0053]; *see* '782 patent at 19:33-39. This disclosure likewise only contains a passing reference to a "controlled release formulation," and does not describe any modified release particles of GHB.  Thus, this disclosure would not reasonably convey to a POSA that the inventors possessed such a GHB formulation with immediate release particles, modified release particles, and a viscosity enhancing agent and an acid separate from the drug-containing particles, particularly in light of the specification's statement that various factors "limit conventional approaches for modified release."  '889 application at ¶ [0022],'586 application at ¶ [0022].

956.    Therefore, it is my opinion that a POSA would not have understood that the inventors were in possession of GHB formulations that included modified release particles based on the disclosures in the '889 and '586 Applications.

> **2.    There is No Support For "A Viscosity Enhancing Agent . . . Wherein The Viscosity Enhancing Agent . . . [Is] Separate From the Immediate Release Particles and the Modified Release Particles"**

957.    All claims of the '782 patent require the limitation "a viscosity enhancing agent…wherein the viscosity enhancing agent . . .  [is] separate from the immediate release particles and the modified release particles…."  '782 patent at claims 1, 14.  Jazz contends that support for this limitation can be found in [009], [044], and [053] of the '889 application, and

paragraphs [009], [0044], [0053], and [0056] of the '586 application.  I disagree because none of these disclosures would reasonably convey to a POSA that the inventors had possession of the full scope of the limitation as claimed.

958.    Paragraph [009] of the '889 application and the '586 application recites: "Oral administration may be achieved while reducing water by using agents that increase flow, such as slippants to reduce viscosity.  Example slippants include polyethylene oxide (PEG) which is made in various molecular sizes."  *Id.* at ¶ [009]; '586 application at ¶ [009]; '782 patent at 2:41-46. This passage does not provide support for a viscosity enhancing agent that is "separate" from the drug releasing components.  Instead, the passage mentions "slippants to reduce viscosity."  '889 application at ¶ [009]; '586 application at ¶ [009]; *see also* '782 patent at 2:40-46.  A POSA would not have considered a "slippant" to be the equivalent of a "viscosity enhancing agent."  Further, the disclosure does not discuss where in the formulation the slippants would be added relative to the drug-containing particles.  Thus, the disclosure would not reasonably convey to a POSA that the inventors were in possession of the claim limitation.

959.    Paragraph [044] of the '889 application is the same as [056] of the '586 application and recites: "In one embodiment, the oral liquid compositions of the present invention may also comprise one or more surfactants in amounts of up to 50% w/v or from about 0.02 to about 3.0% w/v of the total formulation. The surfactants useful in the preparation of the finished compositions of the present invention are generally organic materials which aid in the stabilization and dispersion of the ingredients in aqueous systems for a suitable homogenous compositions."  '889 application at [044]; '782 patent at 15:4-11.  The passage does not mention any "viscosity enhancing agent," let alone one that is "separate" from the immediate and modified release particles of the formulation.  Further, the examples provided are "non-ionic surfactants such as []

poloxamers, polyoxyethylene ethers (BRIJ), alkoxylated fatty acids (MYRJ), polysorbates (TWEENs), macrogel mixtures (Gelucire, Labrasol), and sorbitan esters (SPANs)." *Id.*; *see also* '782 patent at 15:11-16. These examples are different than those of the previously cited passage, paragraph [009], and they are all surfactants, not viscosity agents. Thus a POSA would not link these two passages together as part of any disclosure of viscosity enhancing agents. Thus, this disclosure would not reasonably convey to a POSA that the inventors had possession of the claimed limitation.

960. Paragraph [053] of the '889 application, as with the prior passages, does not describe a viscosity enhancing agent that is separate from the immediate and modified release particles. Instead, the recited paragraph teaches that "[i]f administered as a suspension, the highest practical solids loading is desired. Factors which affect the solids loading (volume fraction) of the suspension include the medium used for dilution (water vs. alcohol) and its viscosity, degree of swelling of the resinate, the sphericity and uniformity of the beads, and surface charge." '889 application at ¶ [053]; '782 patent at 19:61-67. This cited portion of the specification merely states that the viscosity of the suspension affects solid loading, but does not discuss any viscosity enhancing agents, let alone viscosity enhancing agents separate from the drug-containing particles. It does not discuss any particular methods to achieve an appropriate viscosity, merely that viscosity can affect the solids loading, among other factors. A POSA would not have understood this disclosure to have provided sufficient support for a viscosity enhancing agent, let alone a viscosity enhancing agent separate from drug containing particles.

961. Jazz also cites to paragraphs [044] and [053] of the '586 application as support for "a viscosity enhancing agent…wherein the viscosity enhancing agent . . . [is] separate from the immediate release particles and the modified release particles." Pl. 4/1/2022 Validity Contentions

at 99.  These passages do not describe any viscosity enhancing agents.  Paragraph [044] discusses "[r]ecovery of oxybate from a chloride-exchange process."  '586 application at ¶ [044]; '782 patent at 11:6-27.  Nothing about this description would reasonably convey to a POSA that the inventors had possession of the claim limitation.  Paragraph [053] discusses "one or more lubricants to improve desired processing characteristics" and the "use of a 'puffer' system during tableting" to apply "lubricant directly to the punch and die surfaces…."  '586 application at ¶ [053]; '782 patent at 13:34-58.  A POSA would not have understood from either of these disclosures that the inventors had possession of a formulation containing a viscosity enhancing agent, let alone a viscosity enhancing agent separate from drug containing particles.

### 3. There is No Support For "An Acid Wherein the . . . Acid [Is] Separate From The Immediate Release Particles and the Modified Release Particles"

962.    Both independent claims of the '782 patent require the limitation "an acid wherein the . . . acid [is] separate from the immediate release particles and the modified release particles." '782 patent at claim 1, 14.  Jazz does not differentiate the citations provided for the prior limitation from this limitation.  Pl. 4/1/2022 Validity Contentions at 99, 102 (paragraphs [009], [044], and [053] of the '889 application, and paragraphs [009], [0044], [0053], and [0056] of the '586 application).  I disagree that any of these citations support the limitation because none of these disclosures would reasonably convey to a POSA that the inventors had possession of the full scope of the limitation as claimed.

963.    Paragraph [009] of the '889 application and the '586 application recites: "Oral administration may be achieved while reducing water by using agents that increase flow, such as slippants to reduce viscosity. Example slippants include polyethylene oxide (PEG) which is made in various molecular sizes."  '889 application at ¶ [009]; '586 application at ¶ [009]; '782 patent at 2:41-46.  This passage does not provide support for "an acid wherein the . . . acid [is] separate

from the immediate release particles and the modified release particles," and does not even mention an acid.

964.     Paragraph [044] of the '889 application is the same as [056] of the '586 application and recites: "In one embodiment, the oral liquid compositions of the present invention may also comprise one or more surfactants in amounts of up to 50% w/v or from about 0.02 to about 3.0% w/v of the total formulation. The surfactants useful in the preparation of the finished compositions of the present invention are generally organic materials which aid in the stabilization and dispersion of the ingredients in aqueous systems for a suitable homogenous compositions." '889 application at [044]; '782 patent at 15:4-11.  The examples provided are "non-ionic surfactants such as [] poloxamers, polyoxyethylene ethers (BRIJ), alkoxylated fatty acids (MYRJ), polysorbates (TWEENs), macrogel mixtures (Gelucire, Labrasol), and sorbitan esters (SPANs)." *Id.*; *see also* '782 patent at 15:11-16.  These are all surfactants, and a POSA would not recognize them as acids.  This paragraph does not provide support for the claimed limitation.  While it does mention a singular acid, alkoxylated fatty acids, a POSA would not recognize that disclosure, in the list of other materials, to provide the necessary "blaze mark" to support all acids as claimed, let alone an acid separate from the immediate and modified release particles.

965.     Further, dependent claims 3 and 16, which depend from independent claims 1 and 14 respectively, list specific acids.  '782 patent at claim 3, 16.  These water-soluble acids described in claims 3 and 16 are functionally and chemically different to "alkoxylated fatty acids," which are surfactants.  *See* '782 patent at claim 3 ("wherein the acid is selected from the group consisting of malic acid, citric acid, tartaric acid, boric acid, maleic acid, phosphoric acid, and benzoic acid."), claim 16 (same).

342

966.    Thus, a POSA would not have understood that the inventors were in possession of a GHB formulation containing an acid that is separate from its drug-containing particles based on the disclosures in the '889 and '586 Applications.

### 4.    There Is No Support For the Claimed Blood Concentration Ranges

967.    Dependent claims 11, 12, and 19, require the "formulation of claim 1" or the "unit dose of claim 14" to provide a blood concentration range. For all three claims, Jazz identifies paragraph [014] of the '889 application and paragraph [085] of the '586 application as exemplary support. Neither passage provides support such that would reasonably convey to a POSA that the inventors were possession of either a formulation or a unit dose that achieved the desired result.

968.    Paragraph [014] of the '889 application states: "One object of the invention is to maintain the blood level above 5, 7, or 10 mg/L for up to 8, 7, 6, or 5 hours." '889 application at [014]; '782 patent at 4:5-7. Paragraph [085] of the '586 application states: "Suitable blood levels of oxybate are at least about 10 mg/L, ranging up to about 70 m/L, maintained over a period of about 5-8 hours as described herein. For example, suitable blood levels of oxybate can be about 10, about 15, about 20, about 25, about 30, about 35, about 40, about 45, about 50, about 55, about 60, about 65, or about 70 mg/L, inclusive of all ranges there [] between." '586 application at [086]; '782 patent at 22:26-32. Neither recitation even purports to approach the 30 mg/mL upper bound of the range claimed in claims 12 and 19, let alone the 40 mg/mL range claimed in claim 11.[44] Thus, nowhere in the specification do the inventors even purport to possess the claimed subject matter, and a POSA would not understand that they did. Further, to reasonably believe the

---

[44] Jazz appears to treat "40 mg/mL" in the claim limitation as a typographical error as Jazz has contended that [014] of the '889 application and [0085] of the '586 application, each of which only recite mg/L, provide written description support for this limitation. Pl. 4/1/2022 Contentions at 102.

inventors had possession of the claimed blood concentration ranges, a POSA would expect to see PK data demonstrating that the inventors had achieved such a result. *See e.g.*, Scharf Rpt. at ¶ 36; *see also supra* XVII.A.4.

969. Thus, the cited passage would not reasonably convey to a POSA that the inventors were in possession of a GHB formulation or unit dose capable of achieving the claimed blood concentrations.

**B.** **Avadel Conceived, Reduced to Practice, and Published its Controlled Release Formulation Before Jazz**

970. As discussed above, VII.B.1.b(prosecution history), the parent application to the '782 patent is the '041 application, which resulted in the '079 patent. '782 patent at Cover. The parent of the '079 patent, the grandparent of the '782 patent, is the '598 application. Jazz was prosecuting the '598 application until an official notice of abandonment on February 22, 2021. '598 Application at Abandonment, Feb. 22, 2021. At the time that Jazz was prosecuting the '598 application, the claims were directed towards directed to "oxybate ionically bound to an ion exchange matrix." '598 Application File History at Claims, February 3, 2020.

971. On August 11, 2020, Avadel's '866 Patent issued. '866 Patent at cover.

972. Jazz filed the application that led to the '782 patent, App. No. 17/210,064 (the "'064 application) on March 23, 2021. '782 patent at cover. The first four claims of Avadel's issued patent, available publicly before Jazz filed the '064 application, are, in my opinion, substantively identical to Jazz's as filed claims.

| Claims from Jazz's '064 Application, filed March 23, 2021 | Claims from Avadel's '866 Patent, Issued August 11, 2020 |
|---|---|
| 1. A formulation of gamma-hydroxybutyrate comprising:<br><br>an immediate release portion comprising gamma-hydroxybutyrate; | 1. A formulation of gamma-hydroxybutyrate comprising:<br><br>an immediate release portion comprising gamma-hydroxybutyrate; |

| Claims from Jazz's '064 Application, filed March 23, 2021 | Claims from Avadel's '866 Patent, Issued August 11, 2020 |
|---|---|
| a modified release portion comprising gamma-hydroxybutyrate;<br><br>a viscosity enhancing agent; and<br><br>an acid;<br><br>wherein the viscosity enhancing agent and the acid are separate from the immediate release portion and the modified release portion. | a modified release portion comprising gamma-hydroxybutyrate;<br>a suspending or viscosifying agent selected from…; and<br>an acidifying agent selected…;<br>wherein the suspending or viscosifying agent and the acidifying agent are separate and distinct from the immediate release portion and the modified release portion; and<br>wherein the ratio of gamma-hydroxybutyrate in the immediate release portion and the modified release portion is from 10/90 to 65/35. |
| 2. The formulation of claim 1, wherein the viscosity enhancing agent is selected from the group consisting of xanthan gum, microcrystalline cellulose, hydroxyethyl cellulose, hydroxypropylmethyl cellulose, carboxymethylcellulose sodium, hydroxypropyl cellulose and mixtures thereof. | *See* claim 1: a suspending or viscosifying agent selected from the group consisting of xanthan gum, carrageenan gum, gellan gum, guar gum, sodium alginate, calcium alginate, agar, sodium carboxymethyl cellulose, microcrystalline cellulose, hydroxyethyl cellulose, hydroxypropylmethyl cellulose, and mixtures thereof… |
| 3. The formulation of claim 1, wherein the acid is selected from the group consisting of malic acid, citric acid, tartaric acid, boric acid, maleic acid, phosphoric acid, and benzoic acid. | *See* claim 1: an acidifying agent selected from the group consisting of malic acid, citric acid, tartaric acid, adipic acid, boric acid, maleic acid, phosphoric acid, ascorbic acid, oleic acid, capric acid, caprylic acid, and benzoic acid; |
| 4. The formulation of claim 1, wherein the formulation further comprises a lubricant selected from the group consisting of magnesium stearate, stearic acid, calcium stearate, hydrogenated castor oil, hydrogenated vegetable oil, light mineral oil, mineral oil, polyethylene glycol, sodium benzoate, sodium stearyl fumarate, and zinc stearate. | 4. The formulation of claim 1, wherein the formulation further comprises a lubricant or glidant selected from the group consisting of magnesium stearate, calcium stearate, zinc stearate, glyceryl monostearate, glyceryl palmitostearate, glycerol behenate, sodium stearyl fumarate, talc, or colloidal silicon dioxide. |

973.    It is my opinion that there is no substantive difference between the claims of the '064 application and the claims of Avadel's '866 Publication recited above.

974.    For claim 1, everything recited in the '064 application is recited in claim 1 of the '866 Patent, except the '064 application uses the term "viscosity enhancing agent," whereas the '866 Patent uses the term "suspending or viscosifying agent," and "acid" where the '866 Patent used "acidifying agent."   A POSA would not recognize any distinction between these two terms in the context of the claims.  Further, claim 2 of the '064 application lists malic acid, citric acid, tartaric acid, boric acid, maleic acid, phosphoric acid, and benzoic acid as viscosity enhancing agents.  These are all listed as suspending or viscosifying agents in claim 1 of the '866 Patent.  Thus, these claims are substantively identical.

975.    For claim 2, all of the viscosity enhancing agents listed in the '064 application are found in claim 1 of the '866 Patent, in the same order.  The only difference is that the '064 patent claims "carboxymethyl cellulose sodium" whereas the '866 Patent claims "sodium carboxymethyl cellulose."   A POSA would not see any distinction between these two claims, and thus, these claims are substantively identical.

976.    Similarly to 2, claim 3 of the '064 application recites a list of acids, in the same order as are found in a list of "acidifying agents" in claim 1 of the '866 Patent.  A POSA would not see any distinction between these two claims, and thus, these claims are substantively identical.

977.    Claim 4 of the '064 application claims a list of lubricants.  Claim 4 of the '866 Patent claims a list of lubricants.  Four of these are identical. One of the six other lubricants listed in claim 4 of the '064 application is listed in the specification of the '866 Patent.  '866 patent at 34:4-10 (listing stearic acid).  The remaining five lubricants listed in claim 4 of the '064 application would not convey to a POSA that the named inventors of the '064 application invented something substantively different than the claims of the '866 Patent.

C.    ██████████████████████████████████████
██████████████████████████

978. ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████

979. ███████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████ ████████████████████████

███████████████████████████████████████████████████ ▪

███████████████████████ ████████████████████████████████

he ██████████████████████████████ ██████████████████

█████████████████████ ██████████████████████ ██████████

████████████████████████████████████████████████████

███████████████████████████████████████████████ ████

█████████████████████████ █████████████████████████████

█████████████████████████████ ████████████████████████

████████████

███████████████████████████████████████████

██████████████████████████ ███████████████████████████

████████████████████████████████████████████████████

███████ ██████████████████████████████████████████████

<hr />

▪ █████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████

██████████████████   ████████████████████████████████

████████████████   ████████████████████████████████

██████

981.    Additionally, it is my opinion that the claims as filed of the '064 application as filed, bear little substantive relation to the content of the '064 application's specification.  As noted above, *supra* XVII.A, XIX.A, the claims of the '782 patent, lack written description support from the specification.   These claims are substantively identical to the claims as filed in the '064 specification. *Compare* '782 patent at claims 1-4 *with* JPION00452143 at -195.

982.    Thus, at least due to the substantial similarity in the claim language, ██████████ ████████████████████████ the lack of written description for the claims as filed in the '064 application and as issued in the '782 patent, and the timing of Avadel's publication and the filing of the '064 patent claims, and fact the claims of the '064 publication are substantively identical to the claims of the '866 Patent, it is my opinion that Jazz did not possess the subject matter claimed in the '782 patent,.

D.    **Avadel Publically Disclosed the Subject Matter of the Claims of the '782 Patent**

983.    In contrast to Jazz's '782 patent, the specification of Avadel's '866 Patent discloses the subject matter claimed by Jazz's '782 Patent, as interpreted by Jazz to include salts of GHB within the claims.  In particular, the '866 Patent describes "modified release particles," "a viscosity enhancing agent . . . wherein the viscosity enhancing agent . . .  [is] separate from the immediate release particles and the modified release particles," "an acid wherein the . . . acid [is] separate from the immediate release particles and the modified release particles," and the claimed blood concentration ranges.

1.    **The '866 Patent Has Support For Modified Release Particles**

984.     As previously noted, the Court construed the term "modified release particles" to mean "particles containing an active pharmaceutical ingredient with a release profile that is different from that of an immediate release particle."  I understand that Jazz has asserted that the claimed "modified release particles" can cover microparticles—such as those included in Avadel's LUMRYZ product and described in Avadel's '866 Patent—that exhibit immediate release of sodium oxybate upon exposure to certain conditions.  I understand that Avadel disagrees that the claimed "modified release particles" which must have "a release profile that is different from that of an immediate release particle" covers Avadel's product.  However, to the extent the claimed "modified release particles" can cover the microparticles described in Avadel's '866 Patent and included in Avadel LUMRYZ product, it is my opinion that the '866 Patent discloses a formulation containing the claimed modified release particles.  The '866 Patent discloses a plurality of modified release particles comprising gamma-hydroxybutyrate.  For example, the title of the '866 Patent is "Modified release gamma-hydroxybutyrate formulations…."  '866 Patent at cover.  Additionally, the '866 Patent discloses "the formulation is a particulate formulation that includes . . . a plurality of modified release gamma-hydroxybutyrate particles." *Id*. at 34:49-55; *see also id.* at claim 1 ("a modified release portion comprising gamma-hydroxybutyrate").  Thus, it is my opinion that this limitation is disclosed by the '866 Patent.

### 2.   The '866 Patent Has Support For a Viscosity Enhancing Agent . . . Wherein the Viscosity Enhancing Agent . . .  [is] Separate From the Immediate Release Particles and the Modified Release Particles

985.     The '866 Patent discloses a viscosity enhancing agent.  Specifically, the '866 Patent discloses "the particulate formulation comprises, besides the immediate release and modified release particles of gamma-hydroxybutyrate, one or more suspending or viscosifying agents or lubricants."  '866 Patent at 32:66-33:3.  Further, the '866 Patent discloses that the "[p]referred suspending or viscosifying agents are chosen from the group consisting of xanthan gum, medium

viscosity sodium carboxymethyl cellulose, mixtures of microcrystalline cellulose and sodium carboxymethyl cellulose, mixtures of microcrystalline cellulose and guar gum, medium viscosity hydroxyethyl cellulose, agar, sodium alginate, mixtures of sodium alginate and calcium alginate, gellan gum, carrageenan gum grade iota, kappa or lambda, and medium viscosity hydroxypropylmethyl cellulose."  *Id.* at 33:4-12; *see also id.* 33:13-30; *id.* at claim 1 ("a suspending or viscosifying agent selected from the group consisting of xanthan gum, carrageenan gum, gellan gum, guar gum, sodium alginate, calcium alginate, agar, sodium carboxymethyl cellulose, microcrystalline cellulose, hydroxyethyl cellulose, hydroxypropylmethyl cellulose, and mixtures thereof").  The '866 Patent also discloses the viscosity enhancing agent being separate from the immediate release particles and the modified release particles.  *See e.g.*, '866 Patent at Table 1c (finished composition with acidifying agent and suspending agents separate from modified and immediate release microparticles).  Thus, it is my opinion that this limitation is disclosed by the '866 Patent.

### 3. The '866 Patent Support For "An Acid Wherein the . . . Acid [Is] Separate From The Immediate Release Particles and the Modified Release Particles"

986.    It is my opinion that the '866 Patent discloses "an acid."  The '866 Patent discloses "the invention provides a modified release formulation of gamma-hydroxybutyrate comprising immediate release and modified release portions, a suspending or viscosifying agent, and an acidifying agent…."  '866 Patent at 24:1-5.  Further, the '866 Patent discloses "[t]he preferred acidifying agents are chosen from the group consisting of malic acid, citric acid, tartaric acid, adipic acid, boric acid, maleic acid, phosphoric acid, ascorbic acid, oleic acid, capric acid, caprylic acid, and benzoic acid."  *Id.* at 34:30-34; *see also id.* at claim 1.  The '866 Patent also discloses the acid being separate from the immediate release particles and the modified release particles.  *See e.g.*, '866 Patent at Table 1c (finished composition with acidifying agent and suspending agents

separate from modified and immediate release microparticles).  Thus, it is my opinion that this limitation is disclosed by the '866 Patent.

### 4. The '866 Patent has support for the Claimed Blood Concentration Ranges

987.    The '866 Patent discloses the claimed blood concentrations of the '782 patent.[46] For example, the '866 Patent discloses "the modified release formulations of gamma-hydroxybutyrate are defined based on the concentration of gamma-hydroxybutyrate in the blood stream 8 hours after administration. Therefore, in other sub-embodiments the formulation can be characterized by ". . . a 7.5 g dose of the modified release formulation of gamma-hydroxybutyrate has been shown to achieve a mean $C_{8h}$ of from 13.0 to 40.3, from 16.0 to 26.0, 15.0 to 25.0, from 17.5 to 22.0, from 21.6 to 40.3, from 24.7 to 37.2, or from 27.8 to 34.1 micrograms/mL, when administered once approximately two hours after a standardized evening meal."  '866 Patent at 27:37-55.

\* \* \*

988.    For the reasons set forth above, the disclosures in Avadel's '866 Patent, including its working examples, teach the subject matter claimed in the '782 patent as interpreted by Jazz to cover sodium oxybate formulations.  As a result of those disclosures, the specification of the '866 Patent would reasonably convey to a POSA that the inventors of Avadel's '866 Patent were in possession of the subject matter recited in the claims of Jazz's '782 patent prior to the filing of the applications leading to the '782 patent.  In addition, those disclosures were released to the public,

---

[46] Jazz appears to treat "40 mg/mL" in the claim limitation as a typographical error as Jazz has contended that [014] of the '889 application and [0085] of the '586 application, each of which only recite mg/L, provide written description support for this limitation.  Pl. 4/1/2022 Contentions at 102.

including Jazz, prior to the filing of Jazz's application giving rise to its '782 patent, by virtue of Avadel's published patent application.

989.    In contrast, as I described above, Jazz's '782 patent and '064 application lack the type of disclosure that would demonstrate possession of the claims.  Jazz's '782 patent does not provide detailed descriptions of modified release particles, a viscosity enhancing agent and an acid wherein the viscosity enhancing agent and the acid are separate from the immediate and modified release particles, and the claimed blood concentrations.

990.    When comparing the '866 Patent's detailed description of all of the components of a modified release formulation of GHB to the '782 specification, which fails to describe many of the components of the claimed invention, it would be apparent to a POSA that Jazz did not possess the subject matter recited in the claims of the '782 patent. ███████████████████

████████████████████████████████████████████████

██████████████████████████████ ███████████████████

███████████████████████████

991.    Based on my comparison of the respective disclosures in Avadel's issued patent application (which fully disclose the subject matter claimed in Jazz's '782 patent, *see* XXII.B) and Jazz's '782 patent (which do not), it is my opinion that a POSA would conclude that Avadel possessed the subject matter (or at least a portion thereof) claimed in the Jazz's '782 patent.

# EXHIBIT 3

# THIS DOCUMENT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 4

# THIS DOCUMENT HAS

# BEEN REDACTED IN ITS

# ENTIRETY

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that true and correct copies of the foregoing document were caused to be served on August 15, 2023 on the following counsel in the manner indicated below.

### VIA EMAIL:

Jack B. Blumenfeld
Jeremy Tigan
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

F. Dominic Cerrito
Eric C. Stops
Evangeline Shih
Andrew S. Chalson
Gabriel P. Brier
Frank C. Calvosa
Catherine T. Mattes
Abigail DeMasi
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
nickcerrito@quinnemanuel.com
ericstops@quinnemanuel.com
evangelineshih@quinnemanuel.com
andrewchalson@quinnemanuel.com
gabrielbrier@quinnemanuel.com
frankcalvosa@quinnemanuel.com
catherinemattes@quinnemanuel.com
Abigaildemasi@quinnemanuel.com

*Attorneys for Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited*

Dated:  August 15, 2023                              */s/ Daniel M. Silver*
                                                                  Daniel M. Silver (#4758)

ME1 43839597v.1