**REDACTED PUBLIC VERSION**
**FILED MARCH 4, 2024**

# EXHIBIT 1

| | |
|---|---|
| **From:** | Jones, Andrew T. |
| **To:** | Frank Calvosa; Sawyer, Audra (DC); JazzAvadel |
| **Cc:** | #C-M JAZZ PATENT LITIGATION - LW TEAM; MoFo-Avadel-Jazz; DSilver@McCarter.com; ajoyce@mccarter.com; JTigan@morrisnichols.com; Jack Blumenfeld |
| **Subject:** | RE: Jazz v. Avadel - Limiting Claims and Defenses |
| **Date:** | Monday, February 5, 2024 4:59:46 PM |

Counsel,

Pursuant to the agreement between the parties, Avadel discloses the following four defenses (excluding non-infringement) that it intends to present at trial:

- **'488 Patent, Claim 7**
  - Lack of Written Description
  - Lack of Enablement
  - Improper Inventorship
  - Derivation

- **'488 Patent, Claim 11**
  - Lack of Written Description
  - Lack of Enablement
  - Improper Inventorship
  - Derivation

- **'782 Patent, Claim 24**
  - Lack of Written Description
  - Lack of Enablement
  - Improper Inventorship
  - Obviousness in view of Liang in combination with Lebon and the knowledge of a person of ordinary skill in the art

Avadel further discloses the witnesses that it intends to call for its case-in-chief:

Expert witnesses Avadel will call:, William Charman, Alexander Klibanov, Christine Meyer

Fact witnesses Avadel will call (live and/or by deposition): Clark Allphin, Scott Bura, Greg Divis, Philip McGarrigle, Jason Valentine, Jason Vaughn

Expert witnesses Avadel may call: Bruce Corser, Vivian Gray, Joseph Matal*, Gio Traverso

Fact witnesses Avadel may call (live and/or by deposition): Herve Guillard, Claire Megret, Edwin Walsh


*subject to MIL

**Andrew Jones**
andrewjones@mofo.com
T +1 (202) 887-8780
M +1 (202) 498-8850

---

**From:** Frank Calvosa <frankcalvosa@quinnemanuel.com>
**Sent:** Wednesday, January 31, 2024 12:11 PM
**To:** Audra.Sawyer@lw.com; JazzAvadel <jazzavadel@quinnemanuel.com>

**Cc:** jazzpatentlitigation.lwteam@lw.com; MoFo-Avadel-Jazz <MoFo-Avadel-Jazz@mofo.com>; DSilver@McCarter.com; ajoyce@mccarter.com; JTigan@morrisnichols.com; Jack Blumenfeld <jblumenfeld@morrisnichols.com>
**Subject:** Jazz v. Avadel - Limiting Claims and Defenses

<mark>**External Email**</mark>

---

Counsel,

Pursuant to the agreement reached between the parties, and solely for purposes of streamlining the issues for trial, Jazz discloses that it intends to assert claims 7 and 11 of the '488 patent and claim 24 of the '782 patent at trial.  Further pursuant to parties' agreement, Jazz discloses that it intends to call the witnesses listed below for its case-in-chief:

Expert witnesses Jazz will call:  Steven Little and Mark Rainey
Fact witnesses Jazz will call:  John Miller, Clark Allphin, PJ Honerkamp, Herve Guillard, Jason Vaughn, David Monteith, Patricia Pound, Greg Divis, David O'Brien, and Scott Macke
Fact witnesses Jazz may call:  Jennifer Gudeman, Thorsteinn Thorsteinsson, and Shawn Mindus

Best,

**Frank Calvosa**
*Partner*
**Quinn Emanuel Urquhart & Sullivan, LLP**

51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7569 Direct
212-849-7000 Main Office Number
212-849-7100 FAX
frankcalvosa@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

# EXHIBIT 2

Relativity ID :      JPION00031909

Custodian :          Clark Allphin

Master Date :        8/25/2014 12:00:00 AM

File Name :          Flamel Market
                     Intelligence_SGAK_21Aug201
                     4v4.pptx

Original File Path :  Personal Folders\Archive\



**DTX-0250**

**Jazz Pharms., Inc. v.
Avadel CNS Pharms., LLC**

C.A. Nos. 21-691, 21-1138, 21-1594 (GBW)

**Document Provided in Native Format**

HIGHLY CONFIDENTIAL

JPION00031909

# Flamel Market Intelligence:
## *Once-nightly SXB Micropump formulation*

Sleep PTL Support
Prepared: August 2014



DTX-0250.0003

# Background
## Flamel April Press Release and Quarterly Conference Call

## April 2014 Press Release

***Flamel provides top-line summary for FIH Phase I study***

- **Study Description**
    - Proof-of-concept study of sodium oxybate (SXB) using Micropump technology (MP)
    - N=16 health volunteers
    - 4-way cross-over evaluating 3 different formulations of MP and Xyrem (two 2.25g doses)
    - Extension phase consists of 6g MP formulations
        - 2 formulations moved forward at 6g. 13 patients were evaluable. Profiles for both formulates at 4.5 and 6g were consistent with expectations.
- **Data Released**
    - Topline data announcement from 14 evaluable subjects at 4.5g
    - Onset of action similar to Xyrem
    - $C_{max}$ lower than Xyrem
        - (NOTE: PK success criteria for JZP-386 "… $AUC_{4-8}$ comprising 25-50% of its total $AUC_{0-8}$ with similar Cmax and Tmax compared to Xyrem".  Flamel did not comment on AUC)
    - Mean blood concentration (mcg/ml) at hours 7 and 8 similar to Xyrem
        - (NOTE: blood concentration at 7 and 8 hours is zero – so these data are not meaningful)

## July 29, 2014 Quarterly Update

- Once-nightly SXB clinical development plan and corresponding timelines outlined
    - *See following slides for further details*
- Flamel cash position
    - Flamel anticipates generating cash-flow and self-funding pipeline development

2



DTX-0250.0004

# Market Intelligence
*Flamel's once-nightly SXB Micropump formulation*

**Reason for Update** → *Provide comprehensive overview and understanding of Flamel's once-nightly SXB Micropump formulation*

**Market Intelligence Focus Areas:**

— Characterize Flamel's anticipated clinical development pathway

— Generate corresponding timeline estimates (e.g., study start/stop, regulatory filings)

— Gain further understanding of underlying Micropump technology

— Collect available clinical data/information to gain insight into molecule's pharmacologic properties and clinical performance

— Provide recommendations relevant to Jazz stakeholder needs



# Market Intelligence is proactively providing updates to several [internal] Jazz stakeholders

| Jazz Stakeholders | Stakeholder Needs |
| --- | --- |
| **JZP-386 Development Team** | • Awareness and in-depth understanding of development programs for other once-nightly sodium oxybate formulations<br>• Understand potential relevance to JZP-386 development |
| **Sleep PTL** | • Awareness and understanding of sleep pipeline activity, especially in the narcolepsy and cataplexy space |
| **Corporate** | • Insights into external market events that have the potential to impact Jazz's core business units<br>• Provide awareness into other programs for future decision-making and communication<br>• Objective insights to help IR and Corp Comm determine how to respond |



# Summary of findings - Technology

## *Micropump Technology*

- **Current assumption: *Historically, drug formulation issues have challenged the development of multiparticulate (bead) formulations.*** CA1

  - <u>*What we know*</u>: Other drug developers (e.g., Shire) have pursued development of a sodium oxybate delayed release beads but discontinued efforts

  - <u>*What we know*</u>: Shire published (in IP) regional absorption of beads in dogs (funded by Orphan Medical).

  - <u>*Working assumptions*</u>: SXB poses unusual challenges for bead formulations[2]
    - High solubility of SXB requires more polymer coating and may limit polymer choices
    - Huge doses 6-9g of SXB require lots of beads
    - SXB is better absorbed in upper GI and loses absorption in lower GI
    - Critical for any SR SXB to avoid dose dumping (particularly in alcohol)

  - <u>*Unknowns:*</u> Has Flamel fully considered safety concerns (dose dumping, risks if not fully bioavailable, patient variability, food effect)?

  - <u>*Unknowns:*</u> Are Flamel beads retained in the upper GI? If they are, this might be a successful approach to sustained release.  If they are not, since absorption decreases later in the GI, the full dose might not be absorbed.

  - <u>*Unknowns*</u>: Does Flamel have a unique and differentiated technology platform? What is the difference between Flamel's bead technology and Shires bead technology?  Would Flamel have to license the Shire patent?

  - <u>*Unknowns*</u>: How established is Flamel's Micropump technology? Note: Flamel Micropump technology is used in Flamel's Coreg CR that has been on the US market since 2007 in partnership with GSK

  - See slides 13-16

[1] Flamel corporate presentations   [2] Jazz internal discussions



DTX-0250.0007

**Slide 5**

**CA1**   I might revise the headline to something like "Sodium oxybate multiparticulate (bead) formulations pose challenges which Flamel may not fully appreciate"

Clark Allphin, 8/25/2014

# Summary of findings – Once Nightly Formulation

### *Once-nightly formulation*

- **Current assumption:** ***Historically, drug absorption issues have challenged the development of once nightly SXB.***

  - *What we know:* Jazz has been attempting to develop once nightly SXB for many years and has not been successful
  - *What we know:* Sustained release SXB runs a sensitive balance of duration of effect vs. morning sleepiness.  Food effect and patient variability further complicate this delicate balance
  - *What we know:* Two once nightly SXB programs (e.g., Shire, Jazz) discontinued at early stages
  - *What we know:* At present, Flamel has not publically disclosed/released any meaningful clinical data

  - *Working assumptions*: SXB absorption in lower GI is facilitated by active transporters which also absorb byproducts of food digestion (short-chain fatty acids), so food competes for the transporters and delays SXB effect. Flamel study was 2 hours after eating, so Flamel probably has no awareness of the food effect issues of SXB.

  - *Unknowns:* Can Flamel overcome patient variability and food effect?
  - *Unknowns:* Would once nightly dosing of Xyrem achieve clinical efficacy? The tests have never been performed
  - *Unknowns:* Could bead dosing introduce new safety risks?  If blood levels stay too high too long, patients will have difficulty driving or working the next day.
  - *Unknowns*: Does Flamel's technology achieve adequate sustained release (PK/PD data is unknown)
  - See slides 13-16

[1] Flamel corporate presentations     [2] Jazz internal discussions     

DTX-0250.0009

# Summary of findings – Clinical and Regulatory

### Clinical Development  / Regulatory Pathway

- **Current assumption:** ***505(b)(2) regulatory pathway seems to be a reasonable approval pathway for Flamel to pursue***

  - _What we know_: Flamel has publically stated that they intend to pursue a 505(b)(2) approval pathway[1]
  - _What we know:_ No opportunity to claim bioequivalence (by default 1x nightly will have different PK profile)[2]
  - _What we know:_ Flamel has yet to meet with the FDA; they have not fully fleshed out their development program
  - _Working assumptions_:  Flamel KOL says they plan to perform one phase III trial to obtain indications for EDS and cataplexy. A single Phase III may be sufficient for orphan disease but is getting both indications feasible?
  - _Working assumptions_: Outcomes and study duration likely be similar to Xyrem and what is planned for JXP-386 _Unknowns_: Would an open-label safety study be required? [Working assumption is yes].  Flamel is not planning one.
  - _Unknowns_: Is priority review possible?
  - *See slide 2, 8 and 9*

### Timeline Estimates

- **Current assumption:** ***Flamel's publicly stated timelines appear to be optimistic. Current estimate for the 'best-case scenario' NDA filing is 2H/2017***

  - _Working assumptions_: Flamel's timeline estimates[1,2] are being benchmarked against Jazz's [narcolepsy] expertise and insights gained from JZP-386 development plans
  - _Working assumptions:_ Flamel has not performed trials in narcolepsy in the US.  Flamel study was in France in healthy normals, so Flamel may be underestimating enrollment time and may be unfamiliar with the need for DEA licenses for all sites (since considered schedule 1 drug).  Flamel timelines are likely optimistic considering the logistical and operational challenges for conducting clinical studies in this space[2]
  - _Working assumptions:_ It is common for smaller Biotech's to state aggressive timelines (few execute)
  - *See slide 8-9*

[1] Flamel corporate presentations    [2] Jazz internal discussions



DTX-0250.00010

# Current [incomplete] understanding of Flamel's once-nightly SXB development program



**Advisory Board Meeting** (Aug 2014)

**2nd Phase I Study** (Data end-2014)

**Plans to Meet EMA/FDA** (early 2015)

**NDA filing date** (End 2016)

**Anticipated Approval** (End 2017)

| 2014 | | | | 2015 | | | | 2016 | | | | 2017 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |

**Phase 1**

**Phase 1**

- **2 trials** – N = 14 and N = ??
- **Patients**: Healthy volunteers
- **Primary endpoint**: PK endpoints including $C_{max}$, AUC, and others
- **Study design**: 4-way cross-over
  - 3 different doses of MP sodium oxybate (4.5g, 6g, and 7.5g)
  - Compared against two nightly Xyrem doses
- **Criteria for success**: PK/PD comparable to Xyrem (guesstimate)

**Phase 2**

**Phase 3**

- **Single** Phase II RCT
- **Patients**: Narcolepsy patients
- **Primary endpoint**: PK and PD endpoints
- **Study design**: Unknown
- **Criteria for success**: TBD

- **Single** Phase III RCT – pivotal efficacy study
- **Patients**: Narcolepsy patients
- **Primary endpoint**: Unknown
- **Study design**: Unknown
- **Criteria for success**: Unknown

*Okava and Jazz analysis based on:*
Flamel corporate presentations, SEC filings, and SAI intelligence



DTX-0250.00011

# Comparison of **JZP-386** and **Flamel** Development Timelines



DTX-0250.00012

# Market Intelligence Conclusions & Recommendations

- Flamel appears to be naïve about the technical challenges of SXB
- Technological, clinical and regulatory challenges remain for Flamel

Next Steps:

- Maintain high awareness of Flamel's activities/development
- Wait until more substantial data is available to determine future actions
- Consider when/if corporate development discussions are desirable

**Market Intelligence will continue to monitor Flamel closely and inform**



DTX-0250.00013

# Appendix



DTX-0250.00014

# Flamel – Company Overview / Profile



Flamel offices:

    Based in Lyon, France

    Operations in St Louis, Missouri

    Manufacturing in Pessac, France

| Leerlink Estimates | FLML Revenue ($M) | FLML GAAP EPS |
|---|---|---|
| 2014E | $59 | ($1.28) |
| 2015E | $179 | $0.96 |
| 2016E | $252 | $1.80 |
| 2017E | $230 | $1.71 |

- Have 1 product launched (Bloxiverz neostigmine), 1 approved and 2 in pivotal trials.  Strategy is markets where significant share held by unapproved products while drug delivery is long term
- Recent change of Senior management (no sleep experience; considered 'unimpressive' by sleep KOL advisor)
- Only 1 sleep KOL currently advising them
- <span style="color:red">As of Aug 2014, Prof. Dauvillier (lead narcolepsy KOL in France) was not familiar with Flamel</span> AK12
- Ad Board for July 2014 was delayed to Aug-Sep
- Flamel has not had discussions with the FDA and according to their US KOL consultant 'is not asking the right questions' (effect of 2 blood level spikes vs. 1 on sleep)
- Outperform rating initiated by Leerink Partners 8/1/14 stating expect Flamel to be cash flow positive in near term.  SXB considered long term

12



**Slide 12**

**AK12**        we need to confirm this with Jed.
            Windows User, 8/21/2014

# Recent Information Included in Corporate Presentation

## Ongoing Clinical Development
### Sodium Oxybate Micropump® Microparticles

- Sodium oxybate, a Micropump®-based formulation for one single dose before bedtime for patients suffering from narcolepsy, eliminating the need for a second dose.
  - The current dosing regimen for the standard of care, Xyrem® (sodium oxybate), in the U.S. is two equal, divided doses: the first dose at bedtime and the second dose 2.5 to 4 hours later

- Flamel's results of its FIM ("First in Man") clinical study in human subjects, published in April 2014, demonstrated the elimination of the second nighttime dose.  The key data for 14 evaluable subjects at a nightly dose of 4.5g (two doses of 2.25g for Xyrem) are:
  - Onset of action similar to Xyrem®;
  - $C_{max}$ lower than Xyrem®; and,
  - Mean blood concentration (μg/ml) at hours 7 and 8 similar to Xyrem®.

- The profiles of two selected formulations at 6g in 13 evaluable subjects were consistent with expectations. The current study will continue to treat subjects at higher doses.

- The elimination of the second dose for narcolepsy patients not only provides more convenience, but may improve the benefit sodium oxybate provides as there will be no disruption to nighttime sleep.  The potential for additional benefits, including improved safety, will be studied.

➢ **Given these results, Flamel plans: 1) a second PK study dosing patients up to 7.5g with results expected before year end 2014; 2) a new clinical study in narcoleptics to evaluate certain pharmacodynamic endpoints with results expected around mid-year 2015**

**FLAMEL**
technologies

Flamel's Drug Delivery Platforms                                   July 2014          10

13

Jazz Pharmaceuticals

DTX-0250.00017

# Details on Flamel's Micropump Technology

— Sustained-release sodium oxybate utilizes Flamel's proprietary Micropump technology

— Micropump technology allows for the delivery of thousands of microparticles ranging in size from 200 and 400 µM in one dose

- Each particle contains a drug crystal or granule enclosed in a polymer coating that acts as a shell through which the drug can be released under the effect of osmotic pressure
- Bioadhesive surface – ensures small particles become "lodged" in the intestinal villi of the small intestine, prolonging retention
- Allows for the tailoring of the exact desirable kinetics required to optimize delivery
  - Can mix microparticles with different release kinetics in different ratios
  - Release kinetics can be modulated by altering the thickness and composition of the polymer coating which will control the rate and duration of drug delivery

- Delayed-release formulations contain coated microparticles at one thickness whereas sustained/slow-release formulations include a mixture of microparticles with variations in polymer thickness and composition to ensure controlled delivery



*Note: Image adapted from the Flamel company website*



14

DTX-0250.00018

# The Micropump platform can deliver drugs via tablets, capsules, sachet and liquids





DTX-0250.00019

# How valid are Flamel's Micropump claims?

## Key Benefits

- Micropump® microparticles allows an extended transit time in the small intestine with a mean plasma residence time extended up to 24 hours, which is especially suitable for short-lived drugs known to be absorbed only in the small intestine;
- Microparticles' design can be potentially adapted to each drug's specific characteristics by modifying the coating thickness and composition (including "Generally Regarded as Safe" (GRAS) excipients encapsulated with the drug) for improved efficacy (i.e., extending therapeutic coverage), reduced toxicity and/or side effects (i.e., reduced $C_{max}$ or peak drug concentration in the plasma; with also reduced intra- and inter-patient variability) and improved patient compliance (once-a-day regimen);
- It is applicable to poorly soluble (< 0.01mg/L) as well as highly soluble (> 500g/L) and to low dose (4 mg) or high dose (1,000 mg) of drugs, while providing good mouth feel and taste masking;
- Micropump® allows the development of extremely precise pharmacokinetic profiles [extended (and/or delayed) release] of single or combination of drugs, in a variety of formats (tablet, capsule, sachet, or liquid), while preserving the targeted release rate over the shelf-life of the product; and,
- Broad and strong IP protection (several patents granted e.g. in the US, EU and Japan)



| Flamel's Drug Delivery Platforms | July 2014 | 11 |



DTX-0250.00020

# Publications on Formulation Absorption

**Review published in DDT • Volume 10, Number 4 • February 2005 Issue – Professor Davis' commentary on Flamel**

— Flamel Technologies have described the design of a proprietary drug delivery system (Micropump® microparticles) that is claimed to be bioadhesive and which allows an extended transit time in the small intestine with mean residence time in the plasma extended up to 24 h (http://www.flamel.com/micropump.htm). **This system is stated to be particularly suitable for short-lived drugs known to be absorbed only in the small intestine.** However, as far as can be ascertained, the extended intestinal transit has yet to be demonstrated in humans. Indeed, it is hard to find any published evidence to demonstrate that strategies of bioadhesion will change transit through the small intestine of humans (an effect on gastric emptying has been found, as described below). As aforementioned, the transit of food and pharmaceuticals through the small intestine is reasonably constant in humans with a mean value of around three hours. It is little affected by fed state, age, particle size, shape, density or disease condition [9]. This is not too surprising because the small intestine has a role of moving material to the colon by a process of peristalsis. The mucus that lines the intestine has a protective role and a quick turnover. Moreover, the surface of administered particles can be rapidly conditioned by the adsorption of endogenous components such as non-adherent mucus. Notwithstanding, it has been has been postulated that, because of their size, very small particles could perhaps become trapped between the villae of the small intestine (and also in the folds of the stomach). To test this proposal, Brown et al. followed the transit of very small particles (in the ranges of 70–80 μm, 1–10 μm and 500 nm) in the human gut [ 30] using gamma scintigraphy. The results showed that the particles all had similar transit behaviors and that the measured transit times were in broad agreement with those reported previously for conventional multiparticulate systems such as pellets.



Davis Publication



# Sources

- Flamel communications
    - Press releases
    - Corporate investor decks
    - Quarterly and annual reports
    - Earnings calls

- Internal Jazz discussions
    - Market intelligence
    - Regulatory
    - Product development
    - PTL leadership

- External support
    - SAI intelligence (including KOL interviews)
    - Okava, LLC



DTX-0250.00022

# Flamel Timeline – based on Apr '14 Announcement, Jul'14 Earnings Call, Aug '14 Corporate Presentation

### 3Q 2014

- Advisory Board Meeting planned – KOL bringing in experts in with clinical and pre-clinical expertise to give Flamel insights into the development --- Working with 1 Advisor, Ad Board intended for early Sept.
- Release data from 1st PK (first product) study (??) – direct comparison to Xyrem; head-to-head comparison
- Enter 2nd PK study (dose ranging) – will test at 4.5g, 6g, and 7.5g with 2 MP formulations (includes higher dose)

### 4Q 2014

- 2nd PK study results expected (before end of 2014)
- Enter new Phase II study (larger # of subjects, further evaluate formulations & certain PD endpoints) – not a registration study

### 1Q 2015

- Meet with regulatory authorities (both EMA and FDA?)

### 2Q 2015

- Phase II results (PD data to be released)

### 4Q 2015

- Enter Phase III pivotal efficacy study – required b/c "don't have bioequivalence"
- File first product end of 2015 (with second product being 6-9 months after)

### 4Q 2016

- NDA filing late 2016 - intent to file as 505(b)(2)

19



DTX-0250.00023

# Flamel Market Intelligence:
## *Once-nightly SXB Micropump formulation*

Sleep PTL Support
Prepared: August 2014



# Background
## Flamel April Press Release and Quarterly Conference Call

### April 2014 Press Release

*Flamel provides top-line summary for FIH Phase I study*

- **Study Description**
  - Proof-of-concept study of sodium oxybate (SXB) using Micropump technology (MP)
  - N=16 health volunteers
  - 4-way cross-over evaluating 3 different formulations of MP and Xyrem (two 2.25g doses)
  - Extension phase consists of 6g MP formulations
    - 2 formulations moved forward at 6g. 13 patients were evaluable. Profiles for both formulates at 4.5 and 6g were consistent with expectations.
- **Data Released**
  - Topline data announcement from 14 evaluable subjects at 4.5g
  - Onset of action similar to Xyrem
  - $C_{max}$ lower than Xyrem
    - (NOTE: PK success criteria for JZP-386 "… $AUC_{4-8}$ comprising 25-50% of its total $AUC_{0-8}$ with similar Cmax and Tmax compared to Xyrem".  Flamel did not comment on AUC)
  - Mean blood concentration (mcg/ml) at hours 7 and 8 similar to Xyrem
    - (NOTE: blood concentration at 7 and 8 hours is zero – so these data are not meaningful)

### July 29, 2014 Quarterly Update

- Once-nightly SXB clinical development plan and corresponding timelines outlined
  - *See following slides for further details*
- Flamel cash position
  - Flamel anticipates generating cash-flow and self-funding pipeline development

2



DTX-0250.00025

# Market Intelligence
## *Flamel's once-nightly SXB Micropump formulation*

**Reason for Update**   *Provide comprehensive overview and understanding of Flamel's once-nightly SXB Micropump formulation*

### Market Intelligence Focus Areas:

— Characterize Flamel's anticipated clinical development pathway

— Generate corresponding timeline estimates (e.g., study start/stop, regulatory filings)

— Gain further understanding of underlying Micropump technology

— Collect available clinical data/information to gain insight into molecule's pharmacologic properties and clinical performance

— Provide recommendations relevant to Jazz stakeholder needs



# Market Intelligence is proactively providing updates to several [internal] Jazz stakeholders

| Jazz Stakeholders | Stakeholder Needs |
|---|---|
| **JZP-386 Development Team** | • Awareness and in-depth understanding of development programs for other once-nightly sodium oxybate formulations<br>• Understand potential relevance to JZP-386 development |
| **Sleep PTL** | • Awareness and understanding of sleep pipeline activity, especially in the narcolepsy and cataplexy space |
| **Corporate** | • Insights into external market events that have the potential to impact Jazz's core business units<br>• Provide awareness into other programs for future decision-making and communication<br>• Objective insights to help IR and Corp Comm determine how to respond |



# Summary of findings - Technology

## *Micropump Technology*

- **Current assumption: *Historically, drug formulation issues have challenged the development of multiparticulate (bead) formulations.*** CA1

    - *What we know*: Other drug developers (e.g., Shire) have pursued development of a sodium oxybate delayed release beads but discontinued efforts
    - *What we know*: Shire published (in IP) regional absorption of beads in dogs (funded by Orphan Medical).
    - *Working assumptions*: SXB poses unusual challenges for bead formulations[2]
        - High solubility of SXB requires more polymer coating and may limit polymer choices
        - Huge doses 6-9g of SXB require lots of beads
        - SXB is better absorbed in upper GI and loses absorption in lower GI
        - Critical for any SR SXB to avoid dose dumping (particularly in alcohol)

    - *Unknowns:* Has Flamel fully considered safety concerns (dose dumping, risks if not fully bioavailable, patient variability, food effect)?
    - *Unknowns:* Are Flamel beads retained in the upper GI? If they are, this might be a successful approach to sustained release.  If they are not, since absorption decreases later in the GI, the full dose might not be absorbed.
    - *Unknowns*: Does Flamel have a unique and differentiated technology platform? What is the difference between Flamel's bead technology and Shires bead technology?  Would Flamel have to license the Shire patent?
    - *Unknowns*: How established is Flamel's Micropump technology? Note: Flamel Micropump technology is used in Flamel's Coreg CR that has been on the US market since 2007 in partnership with GSK
    - See slides 13-16

[1] Flamel corporate presentations    [2] Jazz internal discussions



DTX-0250.00028

**Slide 5**

---

**CA1**     I might revise the headline to something like "Sodium oxybate multiparticulate (bead) formulations pose challenges which Flamel may not fully appreciate"

Clark Allphin, 8/25/2014

# Summary of findings – Once Nightly Formulation

***Once-nightly formulation***

- **Current assumption:** ***Historically, drug absorption issues have challenged the development of once nightly SXB.***

  - <u>*What we know:*</u> Jazz has been attempting to develop once nightly SXB for many years and has not been successful
  - <u>*What we know:*</u> Sustained release SXB runs a sensitive balance of duration of effect vs. morning sleepiness.  Food effect and patient variability further complicate this delicate balance
  - <u>*What we know:*</u> Two once nightly SXB programs (e.g., Shire, Jazz) discontinued at early stages
  - <u>*What we know:*</u> At present, Flamel has not publically disclosed/released any meaningful clinical data

  - <u>*Working assumptions*</u>: SXB absorption in lower GI is facilitated by active transporters which also absorb byproducts of food digestion (short-chain fatty acids), so food competes for the transporters and delays SXB effect. Flamel study was 2 hours after eating, so Flamel probably has no awareness of the food effect issues of SXB.

  - <u>*Unknowns:*</u>  <u>Can Flamel overcome patient variability and food effect?</u>
  - <u>*Unknowns:*</u>  Would once nightly dosing of Xyrem achieve clinical efficacy? The tests have never been performed
  - <u>*Unknowns:*</u> Could bead dosing introduce new safety risks?  If blood levels stay too high too long, patients will have difficulty driving or working the next day.
  - <u>*Unknowns*</u>: Does Flamel's technology achieve adequate sustained release (PK/PD data is unknown)
  - See slides 13-16

[1] Flamel corporate presentations    [2] Jazz internal discussions



DTX-0250.00030

# Summary of findings – Clinical and Regulatory

### Clinical Development  / Regulatory Pathway

- **Current assumption: *505(b)(2) regulatory pathway seems to be a reasonable approval pathway for Flamel to pursue***

    - <u>*What we know*</u>: Flamel has publically stated that they intend to pursue a 505(b)(2) approval pathway[1]
    - <u>*What we know:*</u> No opportunity to claim bioequivalence (by default 1x nightly will have different PK profile)[2]
    - <u>*What we know:*</u> Flamel has yet to meet with the FDA; they have not fully fleshed out their development program
    - <u>*Working assumptions*</u>:  Flamel KOL says they plan to perform one phase III trial to obtain indications for EDS and cataplexy. A single Phase III may be sufficient for orphan disease but is getting both indications feasible?
    - <u>*Working assumptions*</u>: Outcomes and study duration likely be similar to Xyrem and what is planned for JXP-386 <u>*Unknowns*</u>: Would an open-label safety study be required? [Working assumption is yes].  Flamel is not planning one.
    - <u>*Unknowns*</u>: Is priority review possible?
    - *See slide 2, 8 and 9*

### Timeline Estimates

- **Current assumption: *Flamel's publicly stated timelines appear to be optimistic. Current estimate for the 'best-case scenario' NDA filing is 2H/2017***

    - <u>*Working assumptions*</u>: Flamel's timeline estimates[1,2] are being benchmarked against Jazz's [narcolepsy] expertise and insights gained from JZP-386 development plans
    - <u>*Working assumptions:*</u> Flamel has not performed trials in narcolepsy in the US.  Flamel study was in France in healthy normals, so Flamel may be underestimating enrollment time and may be unfamiliar with the need for DEA licenses for all sites (since considered schedule 1 drug).  Flamel timelines are likely optimistic considering the logistical and operational challenges for conducting clinical studies in this space[2]
    - <u>*Working assumptions:*</u> It is common for smaller Biotech's to state aggressive timelines (few execute)
    - *See slide 8-9*

[1] Flamel corporate presentations      [2] Jazz internal discussions



DTX-0250.00031

# Current [incomplete] understanding of Flamel's once-nightly SXB development program



**Advisory Board Meeting** (Aug 2014)

**2ⁿᵈ Phase I Study** (Data end-2014)

**Plans to Meet EMA/FDA** (early 2015)

**NDA filing date** (End 2016)

**Anticipated Approval** (End 2017)

| 2014 | | | | 2015 | | | | 2016 | | | | 2017 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |

**Phase 1**

**Phase 1**

- **2 trials** – N = 14 and N = ??
- **Patients**: Healthy volunteers
- **Primary endpoint**: PK endpoints including $C_{max}$, AUC, and others
- **Study design**: 4-way cross-over
  - 3 different doses of MP sodium oxybate (4.5g, 6g, and 7.5g)
  - Compared against two nightly Xyrem doses
- **Criteria for success**: PK/PD comparable to Xyrem (guesstimate)

**Phase 2**   **Phase 3**

- **Single** Phase II RCT
- **Patients**: Narcolepsy patients
- **Primary endpoint**: PK and PD endpoints
- **Study design**: Unknown
- **Criteria for success**: TBD

- **Single** Phase III RCT – pivotal efficacy study
- **Patients**: Narcolepsy patients
- **Primary endpoint**: Unknown
- **Study design**: Unknown
- **Criteria for success**: Unknown

*Okava and Jazz analysis based on:*
Flamel corporate presentations, SEC filings, and SAI intelligence



DTX-0250.00032

# Comparison of **JZP-386** and **Flamel** Development Timelines

Jazz Pharmaceuticals

# Market Intelligence Conclusions & Recommendations

- Flamel appears to be naïve about the technical challenges of SXB
- Technological, clinical and regulatory challenges remain for Flamel

Next Steps:

- Maintain high awareness of Flamel's activities/development
- Wait until more substantial data is available to determine future actions
- Consider when/if corporate development discussions are desirable

**Market Intelligence will continue to monitor Flamel closely and inform**

10



# Appendix



# Flamel – Company Overview / Profile



Flamel offices:

    Based in Lyon, France
    Operations in St Louis, Missouri
    Manufacturing in Pessac, France

| Leerlink Estimates | FLML Revenue ($M) | FLML GAAP EPS |
|---|---|---|
| 2014E | $59 | ($1.28) |
| 2015E | $179 | $0.96 |
| 2016E | $252 | $1.80 |
| 2017E | $230 | $1.71 |

- Have 1 product launched (Bloxiverz neostigmine), 1 approved and 2 in pivotal trials.  Strategy is markets where significant share held by unapproved products while drug delivery is long term
- Recent change of Senior management (no sleep experience; considered 'unimpressive' by sleep KOL advisor)
- Only 1 sleep KOL currently advising them
- As of Aug 2014, Prof. Dauvillier (lead narcolepsy KOL in France) was not familiar with Flamel AK12
- Ad Board for July 2014 was delayed to Aug-Sep
- Flamel has not had discussions with the FDA and according to their US KOL consultant 'is not asking the right questions' (effect of 2 blood level spikes vs. 1 on sleep)
- Outperform rating initiated by Leerink Partners 8/1/14 stating expect Flamel to be cash flow positive in near term.  SXB considered long term

12



**Slide 12**

**AK12**    we need to confirm this with Jed.
Windows User, 8/21/2014

# Recent Information Included in Corporate Presentation

## Ongoing Clinical Development
### Sodium Oxybate Micropump® Microparticles

- Sodium oxybate, a Micropump®-based formulation for one single dose before bedtime for patients suffering from narcolepsy, eliminating the need for a second dose.
  - The current dosing regimen for the standard of care, Xyrem® (sodium oxybate), in the U.S. is two equal, divided doses: the first dose at bedtime and the second dose 2.5 to 4 hours later

- Flamel's results of its FIM ("First in Man") clinical study in human subjects, published in April 2014, demonstrated the elimination of the second nighttime dose.  The key data for 14 evaluable subjects at a nightly dose of 4.5g (two doses of 2.25g for Xyrem) are:
  - Onset of action similar to Xyrem®;
  - $C_{max}$ lower than Xyrem®; and,
  - Mean blood concentration (µg/ml) at hours 7 and 8 similar to Xyrem®.

- The profiles of two selected formulations at 6g in 13 evaluable subjects were consistent with expectations. The current study will continue to treat subjects at higher doses.

- The elimination of the second dose for narcolepsy patients not only provides more convenience, but may improve the benefit sodium oxybate provides as there will be no disruption to nighttime sleep.  The potential for additional benefits, including improved safety, will be studied.

➢ **Given these results, Flamel plans: 1) a second PK study dosing patients up to 7.5g with results expected before year end 2014; 2) a new clinical study in narcoleptics to evaluate certain pharmacodynamic endpoints with results expected around mid-year 2015**

**FLAMEL** technologies

Flamel's Drug Delivery Platforms                                    July 2014          10

13

Jazz Pharmaceuticals

DTX-0250.00038

# Details on Flamel's Micropump Technology

— Sustained-release sodium oxybate utilizes Flamel's proprietary Micropump technology

— Micropump technology allows for the delivery of thousands of microparticles ranging in size from 200 and 400 µM in one dose

- Each particle contains a drug crystal or granule enclosed in a polymer coating that acts as a shell through which the drug can be released under the effect of osmotic pressure

- Bioadhesive surface – ensures small particles become "lodged" in the intestinal villi of the small intestine, prolonging retention

- Allows for the tailoring of the exact desirable kinetics required to optimize delivery

  - Can mix microparticles with different release kinetics in different ratios

  - Release kinetics can be modulated by altering the thickness and composition of the polymer coating which will control the rate and duration of drug delivery

- Delayed-release formulations contain coated microparticles at one thickness whereas sustained/slow-release formulations include a mixture of microparticles with variations in polymer thickness and composition to ensure controlled delivery



*Note: Image adapted from the Flamel company website*



DTX-0250.00039

# The Micropump platform can deliver drugs via tablets, capsules, sachet and liquids



## Micropump® Platform at a Glance

- Extended/delayed release of drugs best absorbed in the small intestine (75% of all small molecules)
- Precise pharmacokinetics of single or combination of drugs in various formats
- Numerous Micropump®-based products successfully tested in human clinical trials

Commercial Stage Platform approved in the USA and EU

Various dosage forms (pills, tablet, capsule, sachet, liquid)

GRAS components, all listed in CDER inactive ingredient database

Combination of multiple release profiles and/or multiple active ingredients

Rapid development time

Taste-masking properties

Strong IP position

Cost effective and easy to scale-up

FLAMEL technologies

June 2014     18



DTX-0250.00040

# How valid are Flamel's Micropump claims?

## Key Benefits

- Micropump® microparticles allows an extended transit time in the small intestine with a mean plasma residence time extended up to 24 hours, which is especially suitable for short-lived drugs known to be absorbed only in the small intestine;
- Microparticles' design can be potentially adapted to each drug's specific characteristics by modifying the coating thickness and composition (including "Generally Regarded as Safe" (GRAS) excipients encapsulated with the drug) for improved efficacy (i.e., extending therapeutic coverage), reduced toxicity and/or side effects (i.e., reduced $C_{max}$ or peak drug concentration in the plasma; with also reduced intra- and inter-patient variability) and improved patient compliance (once-a-day regimen);
- It is applicable to poorly soluble (< 0.01mg/L) as well as highly soluble (> 500g/L) and to low dose (4 mg) or high dose (1,000 mg) of drugs, while providing good mouth feel and taste masking;
- Micropump® allows the development of extremely precise pharmacokinetic profiles [extended (and/or delayed) release] of single or combination of drugs, in a variety of formats (tablet, capsule, sachet, or liquid), while preserving the targeted release rate over the shelf-life of the product; and,
- Broad and strong IP protection (several patents granted e.g. in the US, EU and Japan)



| Flamel's Drug Delivery Platforms | July 2014 | 11 |

16



DTX-0250.00041

# Publications on Formulation Absorption

**Review published in DDT • Volume 10, Number 4 • February 2005 Issue – Professor Davis' commentary on Flamel**

— Flamel Technologies have described the design of a proprietary drug delivery system (Micropump® microparticles) that is claimed to be bioadhesive and which allows an extended transit time in the small intestine with mean residence time in the plasma extended up to 24 h (http://www.flamel.com/micropump.htm). **This system is stated to be particularly suitable for short-lived drugs known to be absorbed only in the small intestine.** However, as far as can be ascertained, the extended intestinal transit has yet to be demonstrated in humans. Indeed, it is hard to find any published evidence to demonstrate that strategies of bioadhesion will change transit through the small intestine of humans (an effect on gastric emptying has been found, as described below). As aforementioned, the transit of food and pharmaceuticals through the small intestine is reasonably constant in humans with a mean value of around three hours. It is little affected by fed state, age, particle size, shape, density or disease condition [9]. This is not too surprising because the small intestine has a role of moving material to the colon by a process of peristalsis. The mucus that lines the intestine has a protective role and a quick turnover. Moreover, the surface of administered particles can be rapidly conditioned by the adsorption of endogenous components such as non-adherent mucus. Notwithstanding, it has been has been postulated that, because of their size, very small particles could perhaps become trapped between the villae of the small intestine (and also in the folds of the stomach). To test this proposal, Brown et al. followed the transit of very small particles (in the ranges of 70–80 μm, 1–10 μm and 500 nm) in the human gut [30] using gamma scintigraphy. The results showed that the particles all had similar transit behaviors and that the measured transit times were in broad agreement with those reported previously for conventional multiparticulate systems such as pellets.



Davis Publication



# Sources

- ## Flamel communications
  - Press releases
  - Corporate investor decks
  - Quarterly and annual reports
  - Earnings calls

- ## Internal Jazz discussions
  - Market intelligence
  - Regulatory
  - Product development
  - PTL leadership

- ## External support
  - SAI intelligence (including KOL interviews)
  - Okava, LLC



DTX-0250.00043

# Flamel Timeline – based on Apr '14 Announcement, Jul'14 Earnings Call, Aug '14 Corporate Presentation

**3Q 2014**

- Advisory Board Meeting planned – KOL bringing in experts in with clinical and pre-clinical expertise to give Flamel insights into the development --- Working with 1 Advisor, Ad Board intended for early Sept.
- Release data from 1st PK (first product) study (??) – direct comparison to Xyrem; head-to-head comparison
- Enter 2nd PK study (dose ranging) – will test at 4.5g, 6g, and 7.5g with 2 MP formulations (includes higher dose)

**4Q 2014**

- 2nd PK study results expected (before end of 2014)
- Enter new Phase II study (larger # of subjects, further evaluate formulations & certain PD endpoints) – not a registration study

**1Q 2015**

- Meet with regulatory authorities (both EMA and FDA?)

**2Q 2015**

- Phase II results (PD data to be released)

**4Q 2015**

- Enter Phase III pivotal efficacy study – required b/c "don't have bioequivalence"
- File first product end of 2015 (with second product being 6-9 months after)

**4Q 2016**

- NDA filing late 2016 - intent to file as 505(b)(2)

19



DTX-0250.00044

# EXHIBIT 3

US 20040234601A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2004/0234601 A1
Legrand et al. (43) Pub. Date: **Nov. 25, 2004**

(54) **MICROPARTICULATE ORAL GALENICAL FORM FOR THE DELAYED AND CONTROLLED RELEASE OF PHARMACEUTICAL ACTIVE PRINCIPLES**

(76) Inventors: **Valerie Legrand**, Lyon (FR); **Catherine Castan**, Orlienas (FR); **Remi Meyrueix**, Lyon (FR); **Gerard Soula**, Meyzieu (FR)

Correspondence Address:
**Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P.**
**1300 I Street, N.W.**
**Washington, DC 20005-3315 (US)**

(21) Appl. No.: **10/826,690**

(22) Filed: **Apr. 19, 2004**

Related U.S. Application Data

(63) Continuation-in-part of application No. PCT/FR02/03443, filed on Oct. 9, 2002.

(30) **Foreign Application Priority Data**

Oct. 9, 2001 (FR) ............................................ 01/12999

Publication Classification

(51) **Int. Cl.**$^7$ ............................... **A61K 9/26**; A61K 9/14

(52) **U.S. Cl.** ............................................................ **424/469**

(57) **ABSTRACT**

The invention relates to a microparticulate system for the delayed and controlled release of active principles (AP) whose absorption window in vivo is essentially limited to the upper parts of the gastrointestinal tract, this system being intended for oral administration. The object of the invention is to provide a system ensuring that the AP is released with certainty by means of a dual mechanism of "time-dependent" and "pH-dependent" release. To achieve this object, the invention proposes a multimicrocapsular oral galenical form which is designed so as to guarantee therapeutic efficacy, and in which the release of the AP is governed by a dual release triggering mechanism that is "time-triggering" and "pH-triggering". This system comprises of microcapsules (200 to 600 $\mu$m) comprising a core of AP coated with a film (maximum 40% by weight) comprising a hydrophilic polymer A (Eudragit® L) and a hydrophobic compound B (vegetable wax, melting point=40-90° C.), B/A being between 0.2 and 1.5. These microcapsules have a dissolution behavior in vitro such that, at a constant pH of 1.4, a latency phase of between 1 and 5 hours is observed, followed by a release of the AP, and such that the change from pH 1.4 to pH 6.8 results in a release of the AP without a latency period in vitro.

DTX-1694

Jazz Pharms., Inc. v.
Avadel CNS Pharms., LLC
C.A. Nos. 21-691, 21-1138, 21-1594 (GBW)



FIG 1



FIG 2

DTX-1694.0002



FIG 3

US 2004/0234601 A1

Nov. 25, 2004

1

# MICROPARTICULATE ORAL GALENICAL FORM FOR THE DELAYED AND CONTROLLED RELEASE OF PHARMACEUTICAL ACTIVE PRINCIPLES

[0001]  This application is a continuation-in-part of Application No. _____, which is the National Stage of International Application No. PCT/FR02/03443, filed Oct. 9, 2002, and claims the benefit of FR01/12999, filed Oct. 9, 2001, each of which is incorporated herein by reference.

[0002]  The present invention relates to the field of microparticulate systems for the delayed and controlled release of one or more active principles, AP, intended for oral administration.

[0003]  The AP envisaged in the present invention are those whose absorption is essentially limited to the upper parts of the gastrointestinal tract located upstream from the colon (upstream from the ileocecal junction), and which represent a large majority of pharmaceutical active principles.

[0004]  More precisely, the invention relates to a microparticulate galenical form for delayed and controlled release where the controlled release phase is triggered with certainty by means of a dual mechanism: "time-dependent" release triggered after a certain residence time in the stomach, and "pH-dependent" release triggered by a change in pH when the particles enter the small intestine, which starts without a latency period. The microparticles of the present invention are microcapsules containing at least one active principle (AP)—excluding perindopril—having a particle size of between 100 and 1200 microns and individually coated with a film allowing the delayed and controlled release of the AP.

[0005]  Systems for the delayed and controlled release of AP are particularly useful in cases where it is desirable, for reasons of chronobiology, that the AP be "bioabsorbed" at a precise time of day so as to be in phase with the circadian cycle. This approach is appropriate to the treatment of cancer or hypertension, the administration of anti-inflammatory drugs or the regulation of glycemia in the treatment of diabetes. It may be advantageous, for example, for the AP to be bioabsorbed very early in the morning so as to assure therapeutic cover when the patient wakes up, without compelling him to wake up prematurely. To do this, the galenical system ingested by the patient, for example after the evening meal, must allow a delayed release of the AP.

[0006]  However, the first rule imposed on the pharmacist is to guarantee that the prescribed drug will be absorbed by the patient. In the case of a delayed release form, it is therefore crucial to have a total guarantee of release of the active principle at a given moment in order to obtain the therapeutic effect. Now, one is obliged to note that delayed release forms cannot ensure with certainty that the AP will be released after a prescribed time. This problem becomes particularly acute in the case where it is vital for the patient that this release does indeed take place, for example in the treatment of cardiovascular diseases or diabetes.

[0007]  In fact, delayed release forms are conventionally obtained by coating the AP with a layer of enteric polymer, for example the methacrylic acid/methyl methacrylate copolymer EUDRAGIT® L. This type of enteric coating is known to have a reduced permeability under the acidic pH conditions of the stomach, and to dissolve when the pH increases to a value close to that prevailing in the small intestine, thereby releasing the AP. However, the intraindividual and interindividual variability of the gastric pH conditions and the gastric emptying time do not make it possible to ensure with certainty that the AP will be released after a given time.

[0008]  Purely "time-dependent" delayed release systems, i.e. those for which the release of the AP is triggered after a given residence time in the gastrointestinal tract, are not satisfactory either. In fact, because of the intraindividual and interindividual variability of the gastric residence time, the AP may be released after it has passed its absorption window, which, for the majority of AP, is located in the upper part of the gastrointestinal tract. The bioabsorption may thus be very low or even zero.

[0009]  In this context it would be particularly advantageous to have a galenical form for the delayed and controlled release of the AP which made it possible to assure with certainty the release of the AP by means of a dual AP release triggering mechanism: "time-dependent" release triggered after a controlled time in the stomach, without a change in pH, and "pH-dependent" release triggered by an increase in the pH when the galenical form enters the intestine. These two AP release triggering factors, in succession, would give the galenical system a high degree of reliability in use. The release of the AP would thus be guaranteed after a preset latency period, even if the variation in pH did not intervene as a trigger, i.e. even if the galenical form did not pass from the stomach into the intestine.

[0010]  To minimize the interindividual variability of AP absorption, it is necessary to adjust the latency period preceding the release of the AP into the stomach by considering the physiological conditions of the gastrointestinal tract in man. According to the well-known results of Davis et al., J. of Controlled Release, 2, 27-38 (1985), the gastric residence time of a preparation is very variable, being in the order of 0.5 to 10 hours. It would therefore be particularly advantageous to have a galenical form which released the active principle into the stomach after a given constant latency period within this interval of 0.5-10 hours, so that the action time of the drug would be the same from one individual to another or even from one day to the next for the same individual.

[0011]  Moreover, to optimize the bioavailability of AP whose absorption is mainly limited to the upper parts of the gastrointestinal tract, it would be advantageous if the "pH-dependent" release into the intestine were to take place without a latency period, since otherwise the AP would not be released in its absorption window and, consequently, the patient would not be treated.

[0012]  Another unique advantage of such a system would be that, by mixing it with a galenical form for immediate release of the AP, or by mixing it with another galenical form for delayed and controlled release of the AP, it would afford release profiles which exhibited several AP release waves (one AP or several identical or different AP) or which, by appropriate adjustment of the different fractions, assured a constant plasma AP concentration level.

[0013]  It would also be advantageous for the delayed and controlled release form to consist of a plurality of microcapsules with a diameter below 2000 microns. In fact, for such a form, the dose of AP to be administered is spread over

a large number of microcapsules (typically 10,000 for a dose of 500 mg) and thus has the following intrinsic advantages:

[0014]   The residence time of the microcapsules in the upper parts of the gastrointestinal tract can be prolonged, thereby increasing the duration of passage of the AP through the absorption windows and thus maximizing the bioavailability of the AP.

[0015]   The use of a mixture of microcapsules with different delayed and controlled release profiles makes it possible to create release profiles which exhibit several release waves or which, by appropriate adjustment of the different fractions, assure a constant plasma AP concentration level.

[0016]   The sensitivity to the variability of gastric emptying is reduced because the emptying, which in this case takes place over a large number of particles, is statistically more reproducible.

[0017]   Bringing the tissues into contact with a high dose of AP—dose dumping—is avoided. Each microcapsule actually contains only a very small dose of AP. This eliminates the risk of tissue damage due to a local excess concentration of aggressive AP.

[0018]   It is possible to combine several galenical forms (immediate and/or delayed and/or prolonged release), containing one or more active principles, in these "multimicrocapsular" systems.

[0019]   It is possible to present these microcapsules in the form of sachets, gelatin capsules or tablets. In cases where the dose of AP is high (500 mg or more), the monolithic forms are too large to be swallowed easily. It is then of particular value to have a microparticulate form for delayed and controlled release of the AP, which those skilled in the art can formulate as disintegrating tablets or sachets.

[0020]   Finally, it would also be desirable for the coating film around the microcapsules to be thin. In fact, a thick coating would have several adverse consequences:

[0021]   (a) the mass fraction of excipient in the galenical form would be too high, making the mass of the drug too large to be swallowed easily and hence, in fine, creating compliance problems that jeopardize the success of the treatment; and

[0022]   (b) the microcapsules would take a very long time to manufacture.

[0023]   In summary, it would therefore be of particular value to have a microparticulate oral galenical form for the delayed and controlled release of AP which simultaneously possessed the following properties:

[0024]   the release of the AP can be triggered in two ways:

[0025]   by release dependent on time, also called "time-dependent" release, when the residence time of the particles in the stomach exceeds 5 hours;

[0026]   by release dependent on a variation in pH, also called "pH-dependent" release, which starts without a latency period when the system enters the intestine and the pH increases; these two AP release triggering factors, in succession, guarantee that the

AP is released after a preset latency period, even if the variation in pH has not intervened as a trigger;

[0027]   it consists of a plurality of small microcapsules of coated AP; and

[0028]   the mass fraction of coating excipients is limited.

[0029]   The delayed or controlled release of AP has formed the subject of numerous studies.

[0030]   Thus PCT patent application WO-A-96/11675 describes microcapsules for the oral administration of medicinal and/or nutritional active principles (AP) whose size is less than or equal to 1000 $\mu$m. These microcapsules consist of particles coated with a coating material consisting of a mixture of a film-forming polymeric derivative (ethyl cellulose), a hydrophobic plasticizer (castor oil), a surfactant and/or lubricant (magnesium stearate) and a nitrogen-containing polymer (polyvinylpyrrolidone: PVP). These microcapsules are also characterized by their ability to reside for a long time (at least 5 hours) in the small intestine and, during this residence time, to allow absorption of the AP over a period greater than the natural transit time in the small intestine.

[0031]   The microcapsules according to said patent application do not provide a solution to the particular problem of the delayed and controlled release of AP with a "time-dependent" and "pH-dependent" triggering of the AP.

[0032]   Patent application FR-A-00 14876 describes a drug for the treatment of type II diabetes which comprises several thousand antihyperglycemic microcapsules (metformin) each consisting of a core containing at least one antihyperglycemic, and of a coating film (e.g. stearic acid and ethyl cellulose) applied to the core, which allows prolonged release of the antihyperglycemic in vivo. These microcapsules have a particle size of between 50 and 1000 $\mu$m.

[0033]   Said patent application FR-A-00 14876 does not indicate how to obtain the delayed and controlled release of AP with a "time-dependent" and "pH-dependent" triggering of the AP.

[0034]   European patent application EP-A-0 609 961 discloses oral morphine granules for which the controlled release of the AP accelerates with the increase in pH.

[0035]   These granules consist of:

[0036]   a sugar core ($\phi$=100 to 1700 $\mu$m)

[0037]   coated with a layer of active ingredient associated with a binder (PVP or hydroxypropyl methyl cellulose: HPMC),

[0038]   and an outer envelope based on:

[0039]   a polymer that is insoluble independently of the pH (ethyl cellulose or methacrylic acid ester/ammonium methacrylate copolymer: EUDRAGIT® RS or RL),

[0040]   an enteric polymer that is insoluble at acidic pH (methacrylic acid/methyl methacrylate copolymer: EUDRAGIT® L),

[0041]   a component that is partially soluble at acidic pH (polyethylene glycol, PVP, HPMC, polyvinyl alcohol: PVA),

US 2004/0234601 A1

Nov. 25, 2004

3

[0042]   optionally a plasticizer (diethyl phthalate)

[0043]   and optionally a filler (talcum).

[0044]   The mass fractions of AP are e.g. 41%, 38% and 29% and the mass fractions of outer envelope are e.g. 14.1%, 21.5% and 12.3% (by weight).

[0045]   Release of the AP takes place at any pH and increases as the pH changes from 1.2 to 7.5. This is therefore a form for prolonged and non-delayed release.

[0046]   The article by H. YOSHINO entitled "*Design and evaluation of time-controlled release systems for site-specific oral drug delivery to the GI tract*", published in *Current status on targeted drug delivery to the GI tract*, Capsugel library, Symp. Ser., Short Hills 22/04, London 6/05, Tokyo 14/05, pp 185-190, (1993), describes multiparticulate oral galenical systems for delayed and controlled release induced by an organic acid and by the residence time in the GIT. These systems are made up of 1000 $\mu$m microcapsules consisting of a neutral sugar core coated with a layer of active ingredient mixed with an organic acid (succinic acid), and of an outer layer of methacrylic acid ester/ammonium methacrylate copolymer (EUDRAGIT® RS). The organic acid is described as allowing a rapid release of the AP after the latency phase. This organic acid is transported by the water which has entered the microcapsules through the enteric outer layer. It then works towards modifying the permeability of the coating to allow rapid diffusion of the AP out of the microcapsules. The presence of this acid in intimate contact with the AP can be detrimental to the latter.

[0047]   Patent U.S. Pat. No. 6,033,687 describes a formulation consisting of a mixture of two types of granules ($\phi$=1.4 mm) based on diltiazem, namely granules with a short latency period and granules with a long latency period. The release profiles are measured at pH 1. These granules comprise:

[0048]   a neutral sugar core ($\phi$=0.5-1.5 mm),

[0049]   a layer of diltiazem associated with a binder (hydroxypropyl cellulose, carboxymethyl cellulose, ethyl cellulose, polyvinylpyrrolidone, alginate, EUDRAGIT),

[0050]   and a single outer coating based on a lubricant (talcum), two methacrylic acid ester/ammonium methacrylate copolymers (EUDRAGIT® RS and EUDRAGIT® RL), a surfactant (sodium laurylsulfate) and a plasticizer (triethyl citrate).

[0051]   In the granules with a short latency period, the mass fraction of the coating represents 12.3%, compared with 30.3% in the granules with a long latency period. However, this technique does not afford long latency periods for film coating rates below 30%. Furthermore, in view of the intraindividual and interindividual variability of the gastric residence time, this "time-dependent" delayed release system may release the AP after it has passed its absorption window. This results in a substantial loss of bioavailability.

[0052]   Patent EP-B-0 263 083 describes a microcapsule coating composition that affords a zero-order and reproducible AP release profile. This coating composition is composed of a mixture of:

[0053]   a hardening polymer to assure the mechanical strength of the coating, possible examples being ethyl cellulose or methacrylic acid copolymer(s) (EUDRAGIT® E, L, S or RS),

[0054]   a lipophilic compound, e.g. stearic acid or paraffin,

[0055]   and talcum.

[0056]   This coating composition is present in the microcapsules in an amount of e.g. 15 to 35% by weight. The hardening polymer/lipophilic compound ratios are e.g. 44 and 42% respectively in Examples 4 and 5.

[0057]   The profiles obtained are profiles without a latency period of variable duration. Said patent neither teaches nor mentions how to obtain a profile with a delayed and controlled release that is triggered at the end of the latency period and/or by a variation in pH.

[0058]   Patent application WO-A-01/58424 A1 discloses "floating" microcapsules coated with an enteric coating based e.g. on EUDRAGIT® L, magnesium stearate, talcum and a plasticizer such as dibutyl sebacate. This coating can be enveloped in a "bioadhesive" film based on chitosan. Like every enteric coating, the aim of the enteric coating according to patent document WO-A-01/58424 is a "pH-dependent" release rather than the conjunction of a "time-dependent" release and a "pH-dependent" release. Furthermore, FIGS. 1 to 3 of said patent application show that the simple objective of "pH-dependent" release is very imperfectly achieved since up to 20% of the AP is released in two hours only at constant acidic pH. As the particles described in said patent application float in the stomach, their gastric residence time is described as increased, so much so that one may even fear the absence of any "pH-triggered" release. Finally, the release would take place in an uncontrolled manner due to the rogue leaks of AP into the stomach.

[0059]   European patent application EP-A-1 101 490 relates to a pharmaceutical preparation that is capable of releasing an active principle into the large intestine and more particularly the colon. This preparation can consist of tablets or granules comprising a core and a coating.

[0060]   The technical problem underlying said invention is to propose a pharmaceutical form that is capable of allowing the release of a medicinal substance at a target site in the lower part of the small intestine, the ascending colon, the transverse colon or the lower part of the large intestine. Given the fact that the mean residence time in the stomach is 5 hours and that, on average, a further 2 hours are required to reach the lower part of the small intestine, the preparation according to EP-A-1 101 490 is designed so that the medicinal substance is not released for 5 hours under acidic conditions simulating the stomach, and is only released after a latency period of at least 2 hours in a fluid simulating the pH conditions of the intestine (cf. especially claim 7 of EP-A-1 101 490).

[0061]   It is therefore apparent that this system aimed at medicinal substances absorbed in the lower parts of the intestine (colon) is not suitable for medicinal substances mainly absorbed in the upper parts of the gastrointestinal tract. Moreover, the system according to European patent application EP-A-1 101 490 does not make provision for release of the AP by means of a dual release triggering mechanism:

US 2004/0234601 A1

Nov. 25, 2004

4

[0062] release into the stomach after a constant given latency period within an interval of 0.5-10 hours ("time-dependent" mechanism),

[0063] and release without a latency period after entering the intestine ("pH-dependent" mechanism).

[0064] Finally, the problem of the interindividual or intraindividual variability of the gastric residence time is not solved by the preparation according to EP-A-1 101 490.

[0065] Thus the prior art does not comprise a galenical system that makes it possible to delay and to guarantee with certainty the release of AP preferentially absorbed in the upper parts of the gastrointestinal tract, by means of a dual release mechanism:

[0066] "time-dependent" release after a latency period in the stomach which has the characteristic of being a constant given latency period within an interval of 0.5-10 hours,

[0067] and "pH-dependent" release without a latency period.

[0068] In view of this state of the art, one of the essential objectives of the present invention is to provide a novel multimicroparticulate galenical system for the oral administration of active principles essentially absorbed in the upper parts of the gastrointestinal tract, this system being of the delayed and controlled release type that assures the release of the AP with certainty and hence guarantees the therapeutic efficacy of said system, by means of a dual "time-dependent" and "pH-dependent" release mechanism. These two AP release triggering factors, in succession, guarantee the release of the AP after a preset latency period, even if the variation in pH has not intervened as a trigger.

[0069] One essential objective of the present invention is to propose a galenical form made up of a plurality of microcapsules that makes it possible to escape from the interindividual and intraindividual variability of the gastric emptying time by releasing the AP at pH 1.4 according to a delayed release profile which has a latency period with an adjustable given duration of between 0.5 and 10 hours, followed by a release phase that starts without a latency period.

[0070] One essential objective of the present invention is to propose a galenical form made up of a plurality of microcapsules that makes it possible on the one hand to release the AP according to a delayed release profile at pH 1.4 with a constant given latency period of between 0.5 and 10 hours, and according to a release half-life $t_{1/2}$ of between 0.25 and 35 hours, and on the other hand to release the AP when the pH changes from 1.4 to 6.8, without a latency period and with a $t_{1/2}$ of between 0.25 and 20 hours.

[0071] One essential objective of the present invention is controlled when the pH changes from 1.4 to 6.8.

[0072] One objective of the present invention is to propose a galenical form consisting of a large number of microcapsules, for example in the order of several thousand, this multiplicity statistically assuring a good reproducibility of the AP transit kinetics throughout the gastrointestinal tract, the result being a better control of the bioavailability and hence a better efficacy.

[0073] One essential objective of the present invention is to propose a galenical form made up of a plurality of coated microcapsules that avoids the use of large amounts of coating agent, the mass fraction of coating agent being comparable to that of monolithic forms.

[0074] One essential objective of the present invention is to propose a pharmaceutical form made up of a plurality of coated microcapsules that makes it possible to present the AP in a form that is easy to swallow, namely a sachet or a disintegrating tablet.

[0075] One essential objective of the present invention is to propose a pharmaceutical form made up of a plurality of coated microcapsules that makes it possible to mix several different active principles.

[0076] Another objective of the present invention is to propose a pharmaceutical form made up of a plurality of coated microcapsules each containing a neutral core.

[0077] Having set themselves the above objectives, among others, it was to the inventors' credit to have developed, in order to assure a certain release of AP mainly absorbed in the upper parts of the gastrointestinal tract and a good bioabsorption of pharmaceutical active principles, a multimicrocapsular galenical system which:

[0078] guarantees the absorption of the AP in its absorption window, which is mainly limited to the upper parts of the gastrointestinal tract;

[0079] thereby assures a certain therapeutic efficacy of this system or of this galenical form;

[0080] and has the essential characteristic of a dual triggering of the AP release.

[0081] This represents a major advance compared with the AP controlled release systems known hitherto, in which the release of the AP is triggered by a single factor, namely the residence time in the gastrointestinal tract for some systems and a variation in pH for other systems.

[0082] Thus the invention, which satisfies the objectives laid out above, among others, relates to a microparticulate oral galenical form for the delayed and control release of at least one AP—excluding perindopril—this AP having an absorption window in vivo that is essentially limited to the upper parts of the gastrointestinal tract, said form being designed so as to guarantee its therapeutic efficacy by guaranteeing its absorption in vivo, and being characterized in that:

[0083] the release of the AP is governed by two different triggering mechanisms, one being based on a variation in pH and the other allowing the release of the AP after a predetermined residence time in the stomach,

[0084] and its dissolution behavior in vitro (determined as indicated in the European Pharmacopeia, 3rd edition, under the title: "Dissolution test for solid oral forms": type II dissolutest performed under SINK conditions, maintained at 37° C. and agitated at 100 rpm) is such that:

[0085] at a constant pH of 1.4, the dissolution profile includes a latency phase with a duration less than or equal to 5 hours, preferably of between 1 and 5 hours,

US 2004/0234601 A1

Nov. 25, 2004

5

[0086] and the change from pH 1.4 to pH 6.8, during the latency phase, results in a release phase that starts without a latency period.

[0087] In one preferred embodiment of the invention, the microparticulate oral galenical form consists of a plurality of microcapsules containing at least one active principle (AP) mainly absorbed in the upper parts of the gastrointestinal tract—excluding perindopril—these microcapsules being of the type that:

[0088] consist of particles of AP each coated with at least one film, this coating film consisting of a composite material which:

[0089] comprises:

[0090] at least one hydrophilic polymer A carrying groups that are ionized at neutral pH,

[0091] and at least one hydrophobic compound B;

[0092] and represents a mass fraction (% by weight, based on the total mass of the microcapsules) of $\leq 40$;

[0093] and have a diameter below 2000 microns, preferably of between 200 and 800 microns and particularly preferably of between 200 and 600 microns,

[0094] characterized in that their coating film consists of a composite based on A and B in which:

[0095] the weight ratio B/A is between 0.45 and 1.0, preferably between 0.5 and 1,

[0096] and the hydrophobic compound B is selected from products that are crystalline in the solid state and have a melting point $T_{fB}$ such that $T_{fB} \geq 40°$ C., preferably $T_{fB} \geq 50°$ C.

[0097] Advantageously, the microcapsules have a diameter of between 200 and 800 microns, B/A is between 0.5 and 1.0 and the hydrophobic compound B is selected from products that one cristalline in the solid state and have a melting point $T_{FB}$ such that $40°$ C. $\leq T_{FB} \leq 90°$ C.

[0098] According to one preferred characteristic of the invention, the hydrophilic polymer A is selected from:

[0099] (meth)acrylic acid/alkyl (e.g. methyl) (meth-)acrylate copolymers (EUDRAGIT® S or L) and mixtures thereof;

[0100] cellulose derivatives, preferably cellulose acetate and/or phthalate, hydroxypropyl methyl cellulose phthalate and hydroxypropyl methyl cellulose acetate and/or succinate;

[0101] and mixtures thereof.

[0102] More preferably, the compound B is selected from the following group of products:

[0103] vegetable waxes, taken on their own or in mixtures with one another;

[0104] hydrogenated vegetable oils, taken on their own or in a mixture with one another;

[0105] mixtures of at least one monoester and of at least one diester and/or of at least one triester of glycerol with at least one fatty acid;

[0106] and mixtures thereof.

[0107] According to the most preferred embodiment of the instant invention, the compound B of the microcapsules' coating film is selected from the groups comprising:

[0108] the products which tradenames (trademarks) are the followings: Dynasan (Hydrogenated palm oil), Cutina (Hydrogenated castor oil), Hydrobase (Hydrogenated soybean oil), Dub (Hydrogenated soybean oil), Castorwax (Hydrogenated castor oil), Croduret (Hydrogenated castor oil), Carbowax, Compritol (Glyceryl behenate), Sterotex (Hydrogenated cottonseed oil), Lubritab (Hydrogenated cottonseed oil), Apifil (Wax yellow), Akofine (Hydrogenated cottonseed oil), Softtisan (Hydrogenated palm oil), Hydrocote (Hydrogenated soybean oil), Livopol (Hydrogenated soybean oil), Super Hartolan (Lanolin), MGLA (Anhydrous milk fat), Corona (Lanolin), Protalan (Lanolin), Akosoft (Suppository bases, Hard fat), Akosol (Suppository bases, Hard fat), Cremao (Suppository bases, Hard fat), Massupol (Suppository bases, Hard fat), Novata (Suppository bases, Hard fat), Suppocire (Suppository bases, Hard fat), Wecobee (Suppository bases, Hard fat), Witepsol (Suppository bases, Hard fat), Coronet, Lanol, Lanolin, Incromega (Omega 3), Estaram (Suppository bases, Hard fat), Estol, Suppoweiss (Suppository bases, Hard fat), Gelucire (Macrogolglycerides Lauriques), Precirol (Glyceryl Palmitostearate), Emulcire (Cetyl alcohol), Plurol diisostearique (Polyglyceryl Diisostearate), Geleol (Glyceryl Stearate), Hydrine et Monthyle;

[0109] as well the additives which codes are the followings: E 901, E 907, E 903 and mixtures thereof;

[0110] and mixtures thereof.

[0111] In practice, the compound can be selected from the group comprising the products which tradenames (trademarks) are the followings : Dynasan P60, Dynasan 116, Dynasan 118, Cutina HR, Hydrobase 66-68, Dub, Compritol 888, Sterotex NF, Lubritab and mixtures thereof.

[0112] According to an interesting embodiment of the invention, the coating film of the microcapsules is free from talc.

[0113] The preferred polymers A are (meth)acrylic acid/ alkyl (e.g. methyl) (meth)acrylate copolymers. These copolymers, which are e.g. of the type marketed by RÖHM PHARMA POLYMERS under the registered trade marks EUDRAGIT® L and S series (for example EUDRAGIT® L100, S100, L30D-55 and L100-55), are anionic enteric (co)polymers soluble in aqueous media at pH values above those encountered in the stomach.

[0114] According to another preferred characteristic of the invention, the compound B is selected from the following group of products:

[0115] vegetable waxes, taken on their own or in mixtures with one another, such as those marketed under the marks DYNASAN® P60 and DYNASAN® 116, inter alia;

[0116] hydrogenated vegetable oils, taken on their own or in a mixture with one another, preferably selected from the group comprising hydrogenated cottonseed oil, hydrogenated soybean oil, hydrogenated palm oil and mixtures thereof;

[0117] monoesters and/or diesters and/or triesters of glycerol with at least one fatty acid, preferably behenic acid, taken by themselves or in a mixture with one another;

[0118] and mixtures thereof.

[0119] The AP release triggering mechanism without a variation in pH, after a predetermined residence time in the stomach, results especially from control of the hydration rate of the microcapsules and/or the dissolution rate of one or more components of the microcapsules. For example, and without implying a limitation, the hydration of the microcapsule can be controlled by:

[0120] the presence, in the microcapsules, of hydrophilic products that make it possible to adjust the osmotic pressure or to cause a swelling of the microcapsules;

[0121] regulation of the water permeability of the coating film;

[0122] the creation of a microporosity in the coating film;

[0123] or even the hydration or dissolution of a compound in the coating film.

[0124] One of the decisive advantages of the multimicrocapsular galenical system according to the invention for the delayed and controlled release of AP is that it involves, in vivo, two factors that trigger the release of the AP into the gastrointestinal tract, namely:

[0125] the residence time in the stomach: "time-triggered" release;

[0126] and the variation in pH: "pH-triggered" release.

[0127] These two AP release triggering factors are successive, so they give the galenical system a high degree of reliability in use. The release of the AP is thus guaranteed after a preset latency period, even if the variation in pH has not intervened as a trigger. The problems of interindividual variability are thus overcome. The therapeutic efficacy of the drug comprising such a galenical system is assured by observing a predetermined chronobiology adapted to the intended therapeutic performance.

[0128] In addition, in the case of the AP considered in the present invention whose absorption window is limited to the upper parts of the gastrointestinal tract, it is particularly advantageous if the form for delayed and then controlled release consists of a plurality of microcapsules. In fact, for such a form, the dose of AP to be administered is spread over a large number of microcapsules (typically 10,000 for a dose of 500 mg) and thus has the following intrinsic advantages:

[0129] The residence time of the microcapsules in the upper parts of the gastrointestinal tract can be prolonged, thereby increasing the duration of passage of the AP through the absorption windows and thus maximizing the bioavailability of the AP.

[0130] The use of a mixture of microcapsules with different delayed and controlled release profiles makes it possible to create release profiles which exhibit several release waves or which, by appropriate adjustment of the different fractions, assure a constant plasma AP concentration level.

[0131] The variability of the gastric emptying is reduced because the emptying, which in this case takes place over a large number of particles, is statistically more reproducible.

[0132] Bringing the tissues into contact with a high dose of AP—dose dumping—is avoided. Each microcapsule actually contains only a very small dose of AP. This eliminates the risk of tissue damage due to a local excess concentration of aggressive AP.

[0133] It is possible to present these microcapsules in the form of sachets, gelatin capsules or tablets. In cases where the dose of AP is high (500 mg or more), the monolithic forms are too large to be swallowed easily. It is then of particular value to have a microparticulate form for delayed and controlled release of the AP, which those skilled in the art can formulate as disintegrating tablets or sachets.

[0134] The multimicrocapsular galenical system according to the invention makes it possible to assure with certainty a delayed and controlled release of the AP into the GIT by means of two triggers, and thus to escape the interindividual and intraindividual variability of the gastric emptying conditions, while at the same time being economically viable and easy to ingest (optimized compliance).

[0135] According to one particularly advantageous characteristic of the preferred embodiment, at a constant pH of 1.4, the controlled release phase following the latency phase is such that the release time for 50% by weight of the AP ($t_{1/2}$) is defined as follows (in hours):

|  | |
|---|---|
|  | $0.25 \leq t_{1/2} \leq 35$ |
| preferably | $0.5 \leq t_{1/2} \leq 20$ |

[0136] In practice, the release phase of the in vitro AP release profile at a constant pH of 1.4 has an adjustable release half-life.

[0137] According to another valuable characteristic of the preferred embodiment, the release phase following the change from pH 1.4 to pH 6.8, which takes place without a latency period, is such that the release time for 50% of the AP ($t_{1/2}$) is defined as follows (in hours):

|  | |
|---|---|
|  | $0.25 \leq t_{1/2} \leq 20$ |
| preferably | $0.5 \leq t_{1/2} \leq 15$ |

[0138] Preferably, the microcapsules according to the invention comprise a single composite coating film AB. This simplifies their preparation and limits the coating rate.

[0139] Preferably, the AP is deposited on a neutral core with a diameter of between 200 and 800 microns, preferably of between 200 and 600 microns.

US 2004/0234601 A1                                                      Nov. 25, 2004

7

[0140]   Without implying a limitation, the hydrophilic neutral core can contain sucrose and/or dextrose and/or lactose, or it can consist of a cellulose microsphere.

[0141]   Advantageously, the microcapsule coating can comprise, in addition to the essential constituents A and B, other conventional ingredients known to those skilled in the art, such as especially:

   [0142]   colorants;

   [0143]   plasticizers, for example dibutyl sebacate;

   [0144]   hydrophilic compounds, for example cellulose and derivatives thereof or polyvinylpyrrolidone and derivatives thereof;

   [0145]   and mixtures thereof.

[0146]   Advantageously, the AP is deposited by the techniques known to those skilled in the art, for example the technique of spray coating in a fluidized air bed onto neutral cores with a diameter of between 200 and 800 microns, preferably of between 200 and 600 microns.

[0147]   From the quantitative point of view, the monolayer of coating agent represents at most 40% and preferably at most 30% by weight of the microcapsules. Such a limited coating rate makes it possible to produce galenical units each containing a high dose of active principle without exceeding a prohibitive size as regards swallowing. This can only improve compliance with the treatment and hence its success.

[0148]   In qualitative terms, the AP of the microcapsules according to the invention is essentially absorbable in the upper parts of the gastrointestinal tract and is advantageously selected from one of the following families of active substances: antiulcer agents, antidiabetics, anticoagulants, antithrombics, hypolipidemics, antiarrhythmics, vasodilators, antiangina agents, antihypertensives, vasoprotectors, fertility promoters, labor inducers and inhibitors, contraceptives, antibiotics, antifungals, antivirals, anticancer agents, anti-inflammatories, analgesics, antiepileptics, antiparkinsonian agents, neuroleptics, hypnotics, anxiolytics, psychostimulants, antimigraine agents, antidepressants, antitussives, antihistamines and antiallergics.

[0149]   Reference may also be made to the list of active principles given on pages 4 to 8 of patent application EP-A-0 609 961.

[0150]   Preferably, the AP is selected from the following compounds: metformin, acetylsalicylic acid, amoxicillin, pentoxifyllin, prazosin, acyclovir, nifedipine, diltiazem, naproxen, ibuprofen, flurbiprofen, ketoprofen, fenoprofen, indomethacin, diclofenac, fentiazac, estradiol valerate, metoprolol, sulpiride, captopril, cimetidine, zidovudine, nicardipine, terfenadine, atenolol, salbutamol, carbamazepine, ranitidine, enalapril, simvastatin, fluoxetine, alprazolam, famotidine, ganciclovir, famciclovir, spironolactone, 5-asa, quinidine, morphine, pentazocine, paracetamol, omeprazole, metoclopramide and mixtures thereof.

[0151]   The microparticulate oral galenical form according to the invention can be a form selected in the groups comprising a tablet (advantageously a tablet that disperses in the mouth), a powder or a gelatin capsule.

[0152]   The microcapsules described above can be used for the manufacture of novel pharmaceutical or dietetic preparations of various AP which have optimized therapeutic or dietetic performance characteristics and are preferably presented in the form of tablets, advantageously disintegrating tablets and even more preferably tablets that disperse in the mouth, powders or gelatin capsules.

[0153]   These microcapsules are all the more valuable because they are also perfectly tolerated by the organism, especially by the stomach, and furthermore can be obtained easily and economically.

[0154]   The present invention further relates to these novel pharmaceutical or dietetic preparations as such, which are original in their structure, to their presentation and to their composition. Such pharmaceutical or dietetic preparations are administered orally, preferably as single daily doses.

[0155]   It is pointed out that it may be of value to mix, in one and the same gelatin capsule, tablet or powder, at least two types of microcapsule whose release kinetics are different but within the framework characteristic of the invention.

[0156]   It is also possible to mix the microcapsules according to the invention with a certain amount of AP that is immediately available in the organism.

[0157]   It can also be envisaged to associate microcapsules containing different AP.

[0158]   In addition, a further subject of the invention is a galenical (pharmaceutical or dietetic) system, preferably in the form of a tablet, advantageously a disintegrating tablet and even more preferably a tablet that disperses in the mouth, a powder or a gelatin capsule, characterized in that it comprises microcapsules such as described above.

[0159]   Furthermore, the invention relates to the use of microparticles such as defined above for the preparation of microparticulate oral galenical (pharmaceutical or dietetic) forms, preferably as tablets, advantageously tablets that disperse in the mouth, powders or gelatin capsules.

[0160]   Finally, the invention further relates to a method of therapeutic treatment, characterized in that it consists in ingesting, according to a given dosage, a drug comprising microcapsules such as defined above.

[0161]   The invention will be explained more clearly by the Examples below, given solely by way of illustration, which afford a good understanding of the invention and show its variants and/or modes of implementation, as well as its different advantages.

EXAMPLES

[0162]   Description of the Figures:

[0163]   FIG. 1 shows the in vitro release profiles of the microcapsules of Example 1 at pH 1.4:  ━━●━━  and at pH 1.4 for 3 hours and then at pH 6.8 as from T=3 hours:  ━━□━━  in % by weight (% D) of dissolved metformin as a function of the time T in hours;

[0164]   FIG. 2 shows the in vitro release profiles of the microcapsules of Example 2 at pH 1.4:  ━━●━━  and at pH

US 2004/0234601 A1
Nov. 25, 2004

8

1.4 for 2 hours and then at pH 6.8 as from 2 hours: —□—| in % by weight (% D) of acyclovir as a function of the time T in hours;

[0165] **FIG. 3** shows the in vitro release profiles of the microcapsules of Example 3 at pH 1.4: —■— and at pH 6.8: —□— in % by weight (% D) of metformin as a function of the time T in hours.

EXAMPLES

Example 1

Preparation of Microcapsules Allowing a
Dual-Mechanism Delayed and Prolonged Release
of Metformin.HCl

[0166] 75 g of metformin.HCl (Chemsource) and 75 g of PVP are dissolved in 1350 g of isopropanol. The solution is sprayed onto 850 g of neutral microspheres (NP Pharm) in a Glatt® GPCG3 spray coater.

[0167] 93.3 g of hydrogenated palm oil (Hüls) (B) and 140 g of Eudragit® L100 (Röhm) (A) are dissolved in hot isopropanol. B/A=0.66. The solution is sprayed onto 700 g of previously prepared microparticles. The film coating conditions are: inlet temperature: 45° C., spraying rate: 8-12 g/min, atomization pressure: 1.5 bar.

[0168] The microcapsules were tested in a type II dissolutest according to the Pharmacopeia, at 37° C. and with agitation at 100 rpm, in the following media:

[0169] a) HCl at pH 1.4

[0170] b) HCl at pH 1.4 for 3 hours, then KH$_2$PO$_4$/NaOH buffer medium at pH 6.8

[0171] The release profiles are shown in **FIG. 1**.

[0172] These profiles are characteristic of a delayed and then prolonged release by means of a dual mechanism: absence of release for 2 hours, followed by a prolonged release without a change in pH, and finally followed by a release accelerated by the change in pH.

Example 2

Preparation of Microcapsules Allowing a
Dual-Mechanism Delayed and Prolonged Release
of Acyclovir

[0173] 75 g of acyclovir and 75 g of the polyvinylpyrrolidone PLASDONE® K29/32 are dissolved in 833 g of isopropanol. The solution is sprayed onto 850 g of neutral microspheres (NP Pharm) in a Glatt® GPCG3 spray coater.

[0174] 93.3 g of hydrogenated palm oil (Hüls) (B) and 140 g of EUDRAGIT® L100 (Röhm) (A) are dissolved in hot isopropanol. B/A=0.66. The solution is sprayed onto 700 g of previously prepared microparticles. The film coating conditions are: inlet temperature: 45° C., spraying rate: 8-12 g/min, atomization pressure: 1.5 bar.

[0175] The microcapsules were tested in a type II dissolutest according to the Pharmacopeia, at 37° C. and with agitation at 100 rpm, in the following media:

[0176] c) HCl at pH 1.4

[0177] d) HCl at pH 1.4 for 3 hours, then KH$_2$PO$_4$/NaOH buffer medium at pH 6.8

[0178] The release profiles are shown in **FIG. 2**.

[0179] The acyclovir release profile obtained at pH 1.4 is characteristic of a delayed and prolonged release by means of a dual release triggering mechanism.

Example 3

Preparation of Microcapsules Allowing a
Dual-Mechanism Delayed and Prolonged Release
of Metformin.HCl

[0180] 105 g of hydrogenated palm oil (Hüls) (B), 30 g of dibutyl sebacate and 165 g of Eudragit® L100 (Röhm) (A) are dissolved in hot isopropanol. B/A=0.64. The solution is sprayed onto 700 g of metformin granules (95.5% metformin/4.5% PVP). The film coating conditions are: inlet temperature: 45° C., spraying rate: 8-12 g/min, atomization pressure: 1.5 bar.

[0181] The microcapsules were tested in a type II dissolutest according to the Pharmacopeia, at 37° C. and with agitation at 100 rpm, in the following media:

[0182] e) HCl at pH 1.4

[0183] f) KH$_2$PO$_4$/NaOH buffer medium at pH 6.8

[0184] The release profiles are shown in **FIG. 3**.

[0185] These profiles are characteristic of a delayed and then prolonged release by means of a dual mechanism: absence of release for 2 hours at acidic pH and rapid release at neutral pH.

**1**. Microparticulate oral galenical form for the delayed and controlled release of at least one active principle—excluding perindopril—this active principle having an absorption window in vivo that is essentially limited to the upper parts of the gastrointestinal tract,

said form being designed so as to guarantee its therapeutic efficacy by guaranteeing its absorption in vivo,

wherein:

in that the release of the active principle is governed by two different triggering mechanisms, one being based on a variation in pH and the other allowing the release of the AP after a predetermined residence time in the stomach,

in that its dissolution behavior in vitro (determined as indicated in the European Pharmacopeia, 3rd edition, under the title: "Dissolution test for solid oral forms": type II dissolutest performed under SINK conditions, maintained at 37° C. and agitated at 100 rpm) is such that:

at a constant pH of 1.4, the dissolution profile includes a latency phase with a duration less than or equal to 5 hours,

and the change from pH 1.4 to pH 6.8, during the latency phase, results in a release phase that starts without a latency period.

**2**. Galenical form according to claim 1, wherein the dissolution profile includes a latency phase with a duration of between 1 and 5 hours.

US 2004/0234601 A1

Nov. 25, 2004

9

**3**. Galenical form according to claim 1, wherein

it comprises "reservoir" microcapsules containing at least one active principle-excluding perindopril—these microcapsules being of the type that:

consist of particles of active principle each coated with at least one film, this coating film consisting of a composite material which:

comprises:

at least one hydrophilic polymer A carrying groups that are ionized at neutral pH,

and at least one hydrophobic compound B;

and represents a mass fraction (% by weight, based on the total mass of the microcapsules) of $\leq 40$;

and have a diameter below 2000 microns,

the coating film of these microcapsules consists of a composite based on A and B in which: the weight ratio B/A is between 0.45 and 1.0,

and the hydrophobic compound B is selected from products that are crystalline in the solid state and have a melting point $T_{fB}$ such that $T_{fB} \geq 40°$ C.

**4**. Galenical form according to claim 3, wherein the microcapsules have a diameter of between 200 and 800 microns, wherein the weight ratio B/A is between 0.5 and 1.0 and wherein the hydrophobic compound B is selected from products that are crystalline in the solid state and have a melting point $T_{fB}$ such that $40°$ C.$\leq T_{fB} \leq 90°$ C.

**5**. Galenical form according to claim 3, wherein the hydrophilic polymer A is selected from:

(meth)acrylic acid/alkyl (e.g. methyl) (meth)acrylate copolymers and mixtures thereof;

cellulose derivatives, preferably cellulose acetate and/or phthalate, hydroxypropyl methyl cellulose phthalate and hydroxypropyl methyl cellulose acetate and/or succinate;

and mixtures thereof.

**6**. Galenical form according to claim 3, wherein the hydrophilic polymer A is selected from:

(meth)acrylic acid/ methyl(meth)acrylate copolymers and mixtures thereof;

cellulose acetate and/or phthalate, hydroxypropyl methyl cellulose phthalate and hydroxypropyl methyl cellulose acetate and/or succinate;

and mixtures thereof.

**7**. Galenical form according to claim 3, wherein the compound B is selected from the following group of products:

vegetable waxes, taken on their own or in mixtures with one another;

hydrogenated vegetable oils, taken on their own or in a mixture with one another;

monoesters and/or diesters and/or triesters of glycerol with at least one fatty acid, taken by themselves or in a mixture with one another;

and mixtures thereof.

**8**. Galenical form according to claim 3, wherein the compound B is selected from the following group of products:

vegetable waxes, taken on their own or in mixtures with one another;

hydrogenated vegetable oils, taken on their own or in a mixture with one another;

mixtures of at least one monoester and of at least one diester and/or at least one triester of glycerol with at least one fatty acid;

and mixtures thereof.

**9**. Galenical form according to claim 7 or **8** wherein the compound B is selected from the group comprising hydrogenated cottonseed oil, hydrogenated soybean oil, hydrogenated palm oil, glyceryl behenate, hydrogenated castor oil, tristearin, tripalmitin, trimyristin , wax yellow, suppository bases or hard fat, anhydrous milk fat, lanolin, glyceryl palmitostearate, glycerylstearate, lauryl macrogolglycerides, cetyl alcohol, polyglycryl diisostearate, diethylene glycol monostearate, ethylene glycol monostearate, Omega 3 and any mixtures thereof.

**10**. Galenical form according to claim 7 or **8** wherein the compound B is selected from the group of hydrogenated cottonseed oil, hydrogenated soybean oil, hydrogenated palm oil, glyceryl behenate, hydrogenated castor oil, tristearin, tripalmitin, trimyristin and any mixtures thereof.

**11**. Galenical form according to claim 3 wherein the compound B is selected from the group comprising

the products which tradenames (trademarks) are the followings: Dynasan, Cutina, Hydrobase, Dub, Castorwax, Croduret, Compritol, Sterotex, Lubritab, Apifil, Akofine, Softtisan, Hydrocote, Livopol, Super Hartolan, MGLA, Corona, Protalan, Akosoft, Akosol, Cremao, Massupol, Novata, Suppocire, Wecobee, Witepsol, Lanolin, Incromega, Estaram, Suppoweiss, Gelucire, Precirol, Emulcire, Plurol diisostearique, Geleol, Hydrine et Monthyle;

as well the additives which codes are the followings: E 901, E 907, E 903 and mixtures thereof;

and mixtures thereof.

**12**. Galenical form according to claim 3 wherein the compound B is selected from the group comprising the products which tradenames (trademarks) are the followings: Dynasan P60, Dynasan 114, Dynasan 116, Dynasan 118, Cutina HR, Hydrobase 66-68, Dub HPH, Compritol 888, Sterotex NF, Sterotex K, Lubritab and mixtures thereof.

**13**. Galenical form according to claim 3 wherein the coating film of the microcapsules is free from talc.

**14**. Galenical form according to claim 1, wherein, at a constant pH of 1.4, the controlled release phase following the latency phase is such that the release time for 50% of the active principle ($t_{1/2}$) is defined as follows (in hours):

$$0.25 \leq t_{1/2} \leq 35$$

**15**. Galenical form according to claim 1, characterized in that the release phase following the change from pH 1.4 to pH 6.8, which takes place without a latency period, is such that the release time for 50% of the active principle ($t_{1/2}$) is defined as follows (in hours):

$$0.25 \leq t_{1/2} \leq 20$$

10

**16**. Galenical form according to claim 3, wherein the microcapsules comprise a single composite coating film AB.

**17**. Galenical form according to claim 3, wherein the active principle is deposited on a neutral core with a diameter of between 200 and 800 microns.

**18**. Galenical form according to claim 3, wherein the neutral core contains sucrose and/or dextrose and/or lactose.

**19**. Galenical form according to claim 18, wherein the neutral core is a cellulose microsphere.

**20**. Galenical form according to claim 1, wherein the active principle used belongs to at least one of the following families of active substances: antiulcer agents, antidiabetics, anticoagulants, antithrombics, hypolipidemics, antiarrhythmics, vasodilators, antiangina agents, antihypertensives, vasoprotectors, fertility promoters, labor inducers and inhibitors, contraceptives, antibiotics, antifungals, antivirals, anticancer agents, anti-inflammatories, analgesics, antiepileptics, antiparkinsonian agents, neuroleptics, hypnotics, anxiolytics, psychostimulants, antimigraine agents, antidepressants, antitussives, antihistamines and antiallergics.

**21**. Galenical form according to claim 20, wherein the active principle is selected from the following compounds: amoxicillin, metformin, acetylsalicylic acid, pentoxifyllin, prazosin, acyclovir, nifedipine, diltiazem, naproxen, ibuprofen, flurbiprofen, ketoprofen, fenoprofen, indomethacin, diclofenac, fentiazac, estradiol valerate, metoprolol, sulpiride, captopril, cimetidine, zidovudine, nicardipine, terfenadine, atenolol, salbutamol, carbamazepine, ranitidine, enalapril, simvastatin, fluoxetine, alprazolam, famotidine, ganciclovir, famciclovir, spironolactone, 5-asa, quinidine, morphine, pentazocine, paracetamol, omeprazole, metoclopramide and mixtures thereof.

**22**. Galenical form according to claim 1, which is a form selected in the group comprising: a tablet, a powder and a gelatin capsule.

**23**. Use of the microcapsules as defined in claim 1 for the preparation of microparticulate oral galenical forms as tablets.

**24**. Galenical form according to claim 1 or **23**, which is a tablet that disperses in the mouth.

*   *   *   *   *

# EXHIBIT 4

Relativity ID :        JPION00466128

Custodian :            No Custodian

Master Date :          7/2/2017 12:00:00 AM

File Name :
                       US8101209_Flamel_Micropump
                       .pdf

Original File Path :   Public Docs\



US008101209B2

(12) **United States Patent**
Legrand et al.

(10) Patent No.: **US 8,101,209 B2**
(45) Date of Patent: *****Jan. 24, 2012**

(54) **MICROPARTICULATE ORAL GALENICAL FORM FOR THE DELAYED AND CONTROLLED RELEASE OF PHARMACEUTICAL ACTIVE PRINCIPLES**

(75) Inventors: **Valérie Legrand**, Lyons (FR); **Catherine Castan**, Orlienas (FR); **Rémi Meyrueix**, Lyons (FR); **Gérard Soula**, Meyzieu (FR)

(73) Assignee: **Flamel Technologies** (FR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1068 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/826,690**

(22) Filed: **Apr. 19, 2004**

(65) **Prior Publication Data**

US 2004/0234601 A1    Nov. 25, 2004

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/492,129, filed as application No. PCT/FR02/03443 on Oct. 9, 2002.

(30) **Foreign Application Priority Data**

Oct. 9, 2001    (FR) ...................................... 01 12999

(51) **Int. Cl.**
*A61K 9/16*    (2006.01)
*A61K 9/50*    (2006.01)
(52) **U.S. Cl.** ........ **424/498**; 424/489; 424/490; 424/494; 424/497; 514/951; 514/963; 514/965
(58) **Field of Classification Search** .............. 424/469, 424/458, 459, 461, 462, 489, 490, 497, 498, 424/501, 494; 514/951, 963, 965
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,845,770 | A | 11/1974 | Theeuwes et al. |
| 3,864,483 | A | 2/1975 | Stein et al. |
| 3,892,769 | A | 7/1975 | Shen et al. |
| 3,914,414 | A | 10/1975 | Stein et al. |
| 3,914,415 | A | 10/1975 | Stein et al. |
| 3,927,216 | A | 12/1975 | Witkowski et al. |
| 3,966,917 | A | 6/1976 | Prasad et al. |
| 3,980,766 | A | 9/1976 | Shaw et al. |
| 4,029,884 | A | 6/1977 | Stein et al. |
| 4,036,227 | A | 7/1977 | Zaffaroni et al. |
| 4,070,494 | A | 1/1978 | Hoffmeister et al. |
| 4,077,407 | A | 3/1978 | Theeuwes et al. |
| 4,111,203 | A | 9/1978 | Theeuwes |

| | | | |
|---|---|---|---|
| 4,218,433 | A | 8/1980 | Kooichi et al. |
| 4,308,251 | A | 12/1981 | Dunn et al. |
| 4,321,253 | A | 3/1982 | Beatty |
| 4,434,153 | A | 2/1984 | Urquhart et al. |
| 4,454,309 | A | 6/1984 | Gould et al. |
| 4,461,759 | A | 7/1984 | Dunn |
| 4,486,471 | A | 12/1984 | Samejima et al. |
| 4,503,067 | A | 3/1985 | Wiedemann et al. |
| 4,519,801 | A | 5/1985 | Edgren |
| 4,553,973 | A | 11/1985 | Edgren |
| 4,572,912 | A | 2/1986 | Yoshioka et al. |
| 4,609,374 | A | 9/1986 | Ayer |
| 4,610,686 | A | 9/1986 | Ayer et al. |
| 4,612,008 | A | 9/1986 | Wong et al. |
| 4,624,847 | A | 11/1986 | Ayer et al. |
| 4,639,436 | A | 1/1987 | Junge et al. |
| 4,687,660 | A | 8/1987 | Baker et al. |
| 4,693,896 | A | 9/1987 | Wheatley et al. |
| 4,717,569 | A | 1/1988 | Harrison et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2068366 | 11/1992 |

(Continued)

OTHER PUBLICATIONS

Sigma-Aldrich Particle Size Conversion, 2010, http://www. sigmaaldrich.com/chemistry/stockroom-reagents/learning-center/ technical-library/particle-size-conversion.html.*

(Continued)

*Primary Examiner* — Michael G Hartley
*Assistant Examiner* — Leah Schlientz
(74) *Attorney, Agent, or Firm* — Patton Boggs LLP

(57) **ABSTRACT**

The invention relates to a microparticulate system for the delayed and controlled release of active principles (AP) whose absorption window in vivo is essentially limited to the upper parts of the gastrointestinal tract, this system being intended for oral administration. The object of the invention is to provide a system ensuring that the AP is released with certainty by means of a dual mechanism of "time-dependent" and "pH-dependent" release. To achieve this object, the invention proposes a multimicrocapsular oral galenical form which is designed so as to guarantee therapeutic efficacy, and in which the release of the AP is governed by a dual release triggering mechanism that is "time-triggering" and "pH-triggering". This system comprises of microcapsules (200 to 600 μm) comprising a core of AP coated with a film (maximum 40% by weight) comprising a hydrophilic polymer A (Eudragit® L) and a hydrophobic compound B (vegetable wax, melting point=40-90° C.), B/A being between 0.2 and 1.5. These microcapsules have a dissolution behavior in vitro such that, at a constant pH of 1.4, a latency phase of between 1 and 5 hours is observed, followed by a release of the AP, and such that the change from pH 1.4 to pH 6.8 results in a release of the AP without a latency period in vitro.

**17 Claims, 2 Drawing Sheets**

**US 8,101,209 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,728,512 | A | 3/1988 | Mehta et al. |
| 4,748,023 | A | 5/1988 | Tamas et al. |
| 4,758,579 | A | 7/1988 | Kohl et al. |
| 4,777,049 | A | 10/1988 | Magruder et al. |
| 4,782,043 | A | 11/1988 | Boger et al. |
| 4,792,448 | A | 12/1988 | Ranade |
| 4,814,182 | A | 3/1989 | Graham et al. |
| 4,814,183 | A | 3/1989 | Zentner |
| 4,816,262 | A | 3/1989 | McMullen |
| 4,832,958 | A | 5/1989 | Baudier et al. |
| 4,833,905 | A | 5/1989 | Hill |
| 4,844,905 | A | 7/1989 | Ichikawa et al. |
| 4,861,599 | A | 8/1989 | Springolo et al. |
| 4,892,738 | A | 1/1990 | Takagishi et al. |
| 4,894,240 | A | 1/1990 | Geoghegan et al. |
| 4,902,513 | A | 2/1990 | Carvais |
| 4,904,769 | A | 2/1990 | Rauenbusch |
| 4,952,402 | A | 8/1990 | Sparks et al. |
| 4,985,454 | A | 1/1991 | Leinert |
| 4,999,189 | A | 3/1991 | Kogan et al. |
| 5,004,614 | A | 4/1991 | Staniforth |
| 5,028,434 | A | 7/1991 | Barclay et al. |
| 5,043,167 | A | 8/1991 | Rotini et al. |
| 5,045,321 | A | 9/1991 | Makino et al. |
| 5,051,262 | A | 9/1991 | Panoz et al. |
| 5,071,868 | A | 12/1991 | Leinert |
| 5,084,278 | A | 1/1992 | Mehta |
| 5,091,485 | A | 2/1992 | Noireaux et al. |
| 5,158,636 | A | 10/1992 | Groitzsch et al. |
| 5,186,930 | A | 2/1993 | Kogan et al. |
| 5,206,030 | A | 4/1993 | Wheatley et al. |
| 5,248,516 | A | 9/1993 | Wheatley et al. |
| 5,268,182 | A | 12/1993 | Brinker et al. |
| 5,286,497 | A | 2/1994 | Hendrickson et al. |
| 5,308,862 | A | 5/1994 | Ohlstein |
| 5,393,772 | A | 2/1995 | Yue et al. |
| 5,405,619 | A | * 4/1995 | Santus et al. .................. 424/490 |
| 5,405,863 | A | 4/1995 | Barone et al. |
| 5,409,709 | A | 4/1995 | Ozawa et al. |
| 5,409,711 | A | 4/1995 | Mapelli et al. |
| 5,431,922 | A | 7/1995 | Nicklasson |
| 5,445,829 | A | 8/1995 | Paradissis et al. |
| 5,453,436 | A | 9/1995 | Ohlstein |
| 5,464,632 | A | 11/1995 | Cousin et al. |
| 5,472,704 | A | 12/1995 | Santus et al. |
| 5,571,533 | A | 11/1996 | Santus et al. |
| 5,594,016 | A | 1/1997 | Ueno et al. |
| 5,603,957 | A | 2/1997 | Burguiere et al. |
| 5,643,915 | A | 7/1997 | Andrulis, Jr. et al. |
| 5,643,939 | A | 7/1997 | Ohlstein |
| 5,651,990 | A | 7/1997 | Takada et al. |
| 5,656,295 | A | 8/1997 | Oshlack et al. |
| 5,674,529 | A | 10/1997 | Marder et al. |
| 5,760,069 | A | 6/1998 | Lukas-Laskey et al. |
| 5,780,055 | A | 7/1998 | Habib et al. |
| 5,783,215 | A | 7/1998 | Arwidsson et al. |
| 5,804,573 | A | 9/1998 | Silver |
| 5,846,566 | A | 12/1998 | Burguiere et al. |
| 5,858,398 | A | 1/1999 | Cho |
| 5,902,821 | A | 5/1999 | Lukas-Laskey et al. |
| 5,922,769 | A | 7/1999 | Barelli et al. |
| 5,945,123 | A | 8/1999 | Hermelin |
| 5,955,106 | A | 9/1999 | Moeckel et al. |
| 6,019,735 | A | 2/2000 | Kensey et al. |
| 6,022,562 | A | 2/2000 | Autant et al. |
| 6,024,982 | A | 2/2000 | Oshlack et al. |
| 6,033,687 | A | 3/2000 | Heinicke et al. |
| 6,034,091 | A | * 3/2000 | Dante ............................ 514/282 |
| 6,043,252 | A | 3/2000 | Bombrun |
| 6,056,968 | A | 5/2000 | Gilbert et al. |
| 6,068,859 | A | 5/2000 | Curatolo et al. |
| 6,077,544 | A | 6/2000 | Debregeas et al. |
| 6,096,341 | A | * 8/2000 | Seth ............................ 424/482 |
| 6,096,777 | A | 8/2000 | Feuerstein et al. |
| 6,099,862 | A | 8/2000 | Chen et al. |
| 6,184,220 | B1 | 2/2001 | Turck et al. |
| 6,214,854 | B1 | 4/2001 | Wang et al. |
| 6,221,377 | B1 | 4/2001 | Meyer |
| 6,224,909 | B1 | 5/2001 | Opitz et al. |
| 6,228,398 | B1 | 5/2001 | Devane et al. |
| 6,248,359 | B1 | 6/2001 | Faour |
| 6,264,983 | B1 | 7/2001 | Upadhyay |
| 6,274,173 | B1 | 8/2001 | Sachs et al. |
| 6,303,146 | B1 | 10/2001 | Bonhomme et al. |
| 6,309,663 | B1 | 10/2001 | Patel et al. |
| 6,309,668 | B1 | 10/2001 | Bastin et al. |
| 6,322,525 | B1 | 11/2001 | Kensey et al. |
| 6,358,990 | B1 | 3/2002 | Howlett et al. |
| 6,379,706 | B2 | 4/2002 | Opitz et al. |
| 6,395,300 | B1 | 5/2002 | Straub et al. |
| 6,403,579 | B1 | 6/2002 | Heller |
| 6,419,960 | B1 | 7/2002 | Krishnamurthy et al. |
| 6,428,488 | B1 | 8/2002 | Kensey et al. |
| 6,428,809 | B1 | 8/2002 | Abrams et al. |
| 6,432,989 | B1 | 8/2002 | Chen |
| 6,462,047 | B1 | 10/2002 | Bombrun et al. |
| 6,472,373 | B1 | 10/2002 | Albrecht |
| 6,475,521 | B1 | 11/2002 | Timminis et al. |
| 6,484,565 | B2 | 11/2002 | Shin et al. |
| 6,491,949 | B2 | 12/2002 | Faour et al. |
| 6,495,154 | B1 | 12/2002 | Tam et al. |
| 6,515,010 | B1 | 2/2003 | Franchini et al. |
| 6,558,669 | B1 | 5/2003 | Venkatesh |
| 6,627,635 | B2 | 9/2003 | Palermo et al. |
| 6,671,904 | B2 | 1/2004 | Easterling |
| 6,692,768 | B1 | 2/2004 | Ishibashi et al. |
| 6,696,088 | B2 | 2/2004 | Oshlack et al. |
| 6,699,506 | B1 | 3/2004 | Paillard et al. |
| 6,699,997 | B2 | 3/2004 | Hildesheim et al. |
| 6,761,904 | B2 | 7/2004 | Bertelsen et al. |
| 6,815,542 | B2 | 11/2004 | Hong et al. |
| 6,846,810 | B2 | 1/2005 | Martin et al. |
| 6,852,337 | B2 | 2/2005 | Gabel et al. |
| 6,903,079 | B2 | 6/2005 | Jagtap et al. |
| 6,946,146 | B2 | 9/2005 | Mulye |
| 7,022,345 | B2 | 4/2006 | Valducci et al. |
| 7,056,942 | B2 | 6/2006 | Hildesheim et al. |
| 7,126,008 | B2 | 10/2006 | Hildesheim et al. |
| 7,268,156 | B2 | 9/2007 | Brook et al. |
| 7,626,041 | B2 | 12/2009 | Brook et al. |
| 7,750,036 | B2 | 7/2010 | Brook et al. |
| 7,759,384 | B2 | 7/2010 | Brook et al. |
| 7,893,100 | B2 | 2/2011 | Brook et al. |
| 2001/0004458 | A1 | 6/2001 | Opitz et al. |
| 2001/0006650 | A1 | 7/2001 | Burnside et al. |
| 2001/0036959 | A1 | 11/2001 | Gabel et al. |
| 2001/0036960 | A1 | 11/2001 | Decker et al. |
| 2002/0052367 | A1 | 5/2002 | Heller |
| 2002/0068085 | A1 | 6/2002 | Rudnic et al. |
| 2002/0068740 | A1 | 6/2002 | Mylari |
| 2002/0099013 | A1 | 7/2002 | Piccariello et al. |
| 2002/0099046 | A1 | 7/2002 | Scott |
| 2002/0107279 | A1 | 8/2002 | Barone et al. |
| 2002/0115655 | A1 | 8/2002 | Mehanna et al. |
| 2002/0143045 | A1 | 10/2002 | Hildesheim et al. |
| 2002/0169199 | A1 | 11/2002 | Gruber et al. |
| 2002/0176888 | A1 * | 11/2002 | Bartholomaeus et al. .... 424/469 |
| 2002/0197327 | A1 | 12/2002 | Ulrich et al. |
| 2003/0004205 | A1 | 1/2003 | Gabel et al. |
| 2003/0004206 | A1 | 1/2003 | Decker et al. |
| 2003/0030878 | A1 | 2/2003 | Jong et al. |
| 2003/0035836 | A1 | 2/2003 | Shanghvi et al. |
| 2003/0035840 | A1 * | 2/2003 | Li et al. ........................ 424/471 |
| 2003/0036559 | A1 | 2/2003 | Beyer et al. |
| 2003/0050301 | A1 | 3/2003 | Mylari |
| 2003/0050620 | A1 | 3/2003 | Odidi et al. |
| 2003/0054041 | A1 | 3/2003 | Lemmens et al. |
| 2003/0059474 | A1 | 3/2003 | Scott et al. |
| 2003/0064108 | A1 | 4/2003 | Lukas et al. |
| 2003/0068371 | A1 | 4/2003 | Oshlack et al. |
| 2003/0068392 | A1 | 4/2003 | Sackler |
| 2003/0077297 | A1 | 4/2003 | Chen et al. |
| 2003/0083286 | A1 | 5/2003 | Teng et al. |
| 2003/0099711 | A1 | 5/2003 | Meadows et al. |
| 2003/0104052 | A1 | 6/2003 | Berner et al. |
| 2003/0104056 | A1 | 6/2003 | Rudnic et al. |
| 2003/0118641 | A1 | 6/2003 | Maloney et al. |

## US 8,101,209 B2

Page 3

| | | |
|---|---|---|
| 2003/0166702 A1 | 9/2003 | Kor et al. |
| 2003/0220399 A1 | 11/2003 | Luskey et al. |
| 2003/0224051 A1 | 12/2003 | Fink et al. |
| 2004/0010983 A1 | 1/2004 | Eshpar |
| 2004/0019096 A1 | 1/2004 | Andronis et al. |
| 2004/0022848 A1 | 2/2004 | Kikuchi et al. |
| 2004/0022849 A1 | 2/2004 | Castan et al. |
| 2004/0121015 A1 | 6/2004 | Chidlaw et al. |
| 2004/0121676 A1 | 6/2004 | Seko et al. |
| 2004/0126428 A1 | 7/2004 | Hughes et al. |
| 2004/0152756 A1 | 8/2004 | Chen et al. |
| 2004/0171584 A1 | 9/2004 | Millan et al. |
| 2004/0175424 A1 | 9/2004 | Castan et al. |
| 2004/0186158 A1 | 9/2004 | Oh |
| 2004/0219208 A1 | 11/2004 | Kawamura et al. |
| 2004/0219212 A1 | 11/2004 | Castan et al. |
| 2004/0220250 A1 | 11/2004 | OhBarth |
| 2004/0223939 A1 | 11/2004 | Clausen et al. |
| 2004/0228924 A1 | 11/2004 | Oshlack et al. |
| 2004/0234601 A1 | 11/2004 | Legrand et al. |
| 2004/0241235 A1 | 12/2004 | Lebon et al. |
| 2005/0009897 A1 | 1/2005 | Anderson et al. |
| 2005/0019406 A1 | 1/2005 | Kerrish et al. |
| 2005/0031546 A1 | 2/2005 | olomaus et al. |
| 2005/0059667 A1 | 3/2005 | Wolff |
| 2005/0089572 A1 | 4/2005 | Kumar et al. |
| 2005/0106249 A1 | 5/2005 | Hwang et al. |
| 2005/0148779 A1 | 7/2005 | Chen et al. |
| 2005/0163856 A1 | 7/2005 | Maloney et al. |
| 2005/0169994 A1 | 8/2005 | Burke et al. |
| 2005/0175695 A1 | 8/2005 | Castan et al. |
| 2005/0196459 A1 | 9/2005 | Castan et al. |
| 2005/0214223 A1 | 9/2005 | Bartholomaeus et al. |
| 2005/0266078 A1 | 12/2005 | Jorda et al. |
| 2005/0281748 A1 | 12/2005 | Hirsh et al. |
| 2006/0013868 A1 | 1/2006 | Akiyama et al. |
| 2006/0110463 A1 | 5/2006 | Castan et al. |
| 2006/0165807 A1 | 7/2006 | Castan et al. |
| 2006/0165809 A1 | 7/2006 | Guimberteau et al. |
| 2006/0182804 A1 | 8/2006 | Burke et al. |
| 2006/0275376 A1 | 12/2006 | Guimberteau et al. |
| 2007/0173464 A1 | 7/2007 | Guimberteau et al. |
| 2007/0183980 A1 | 8/2007 | Arkenau-Maric et al. |
| 2007/0207214 A1 | 9/2007 | Castan et al. |
| 2007/0238774 A1 | 10/2007 | Brook et al. |
| 2007/0244182 A1 | 10/2007 | Brook et al. |
| 2007/0259940 A1 | 11/2007 | Brook et al. |
| 2007/0264326 A1 | 11/2007 | Guimberteau et al. |
| 2008/0020018 A1 | 1/2008 | Moodley et al. |
| 2008/0096951 A1 | 4/2008 | Chen et al. |
| 2008/0193540 A1 | 8/2008 | Soula et al. |
| 2008/0247959 A1 | 10/2008 | Bartholomaeus et al. |
| 2008/0260844 A1 | 10/2008 | Soula et al. |
| 2008/0262069 A1 | 10/2008 | Brook et al. |
| 2009/0041838 A1 | 2/2009 | Guimberteau et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2391832 | 3/2001 |
| CN | 1187121 A | 7/1998 |
| DE | 2 213 180 | 9/1972 |
| DE | 2 417 465 | 10/1975 |
| DE | 3 943 242 | 6/1990 |
| EP | 0 005 129 | 10/1979 |
| EP | 0 015 381 | 9/1980 |
| EP | 0 103 991 | 3/1984 |
| EP | 0 166 287 | 1/1986 |
| EP | 0 174 726 | 3/1986 |
| EP | 0 198 769 | 10/1986 |
| EP | 0 202 051 | 11/1986 |
| EP | 0 207 041 | 12/1986 |
| EP | 0 239 361 | 9/1987 |
| EP | 0 249 587 | 12/1987 |
| EP | 0263083 | 4/1988 |
| EP | 0 273 890 | 7/1988 |
| EP | 0 281 200 | 9/1988 |
| EP | 0 383 967 | 8/1990 |
| EP | 0 383 967 A1 | 8/1990 |
| EP | 0 391 518 | 10/1990 |
| EP | 0 411 590 | 2/1991 |
| EP | 0 413 120 | 2/1991 |
| EP | 0 475 536 | 3/1992 |
| EP | 0 477 135 | 3/1992 |
| EP | 0 502 642 | 9/1992 |
| EP | 0 548 356 | 6/1993 |
| EP | 0 601 508 | 6/1994 |
| EP | 0609961 | 8/1994 |
| EP | 0 624 371 | 11/1994 |
| EP | 0 647 448 | 4/1995 |
| EP | 0 709 087 | 5/1996 |
| EP | 0 793 959 | 9/1997 |
| EP | 0 953 350 | 11/1999 |
| EP | 0 953 359 | 11/1999 |
| EP | 0 968 714 | 1/2000 |
| EP | 0 974 356 | 1/2000 |
| EP | 1 062 955 | 12/2000 |
| EP | 1 069 896 | 1/2001 |
| EP | 1 086 694 | 3/2001 |
| EP | 1 101 490 A1 | 5/2001 |
| EP | 1 123 700 | 8/2001 |
| EP | 1 293 209 | 3/2003 |
| FR | 2 313 915 | 1/1977 |
| FR | 2 634 377 | 1/1990 |
| FR | 2 670 112 | 6/1992 |
| FR | 2 725 623 | 4/1996 |
| FR | 2 759 083 | 8/1998 |
| FR | 2 811 571 | 1/2002 |
| FR | 2 816 840 | 5/2002 |
| FR | 2816840 | 5/2002 |
| FR | 2 830 447 | 4/2003 |
| FR | 2830447 * | 4/2003 |
| FR | 2 837 100 | 9/2003 |
| FR | 2 842 736 | 1/2004 |
| GB | 1 598 458 | 9/1981 |
| GB | 2 163 747 | 3/1986 |
| GB | 2 202 143 | 9/1988 |
| JP | 5 807 3359 A | 5/1983 |
| JP | 61-001613 A | 1/1986 |
| JP | 61-109711 A | 5/1986 |
| JP | 6 303 9811 A | 2/1988 |
| JP | 63-301816 A | 12/1988 |
| JP | 02 053 721 | 2/1990 |
| JP | 7252140 A | 10/1995 |
| JP | 08 073 345 | 3/1996 |
| JP | 10 509 427 | 9/1998 |
| JP | 10 324 643 | 12/1998 |
| JP | 11 269 064 | 10/1999 |
| JP | 11 322 588 | 11/1999 |
| JP | 00 256 182 | 9/2000 |
| WO | WO-87/07833 | 12/1987 |
| WO | WO-91/16885 | 11/1991 |
| WO | WO-91/19711 | 12/1991 |
| WO | WO-91/19712 | 12/1991 |
| WO | WO-92/01446 | 2/1992 |
| WO | WO-93/01805 | 2/1993 |
| WO | WO-94/09762 | 5/1994 |
| WO | WO-94/27557 | 12/1994 |
| WO | WO-94/27988 | 12/1994 |
| WO | WO-95/20946 | 8/1995 |
| WO | WO-95/28148 | 10/1995 |
| WO | WO-96/01628 | 1/1996 |
| WO | WO-96/04908 | 2/1996 |
| WO | WO-96/08243 | 3/1996 |
| WO | WO 96/11675 | 4/1996 |
| WO | WO-96/39127 | 12/1996 |
| WO | WO-97/06798 | 2/1997 |
| WO | WO-97/21436 | 6/1997 |
| WO | WO-97/25066 | 7/1997 |
| WO | WO-97/40680 | 11/1997 |
| WO | WO-98/02157 | 1/1998 |
| WO | WO-98/10754 | 3/1998 |
| WO | WO-98/24411 | 6/1998 |
| WO | WO-98/35672 | 8/1998 |
| WO | WO-98/40053 | 9/1998 |
| WO | WO-98/42311 | 10/1998 |
| WO | WO-98/55107 | 12/1998 |
| WO | WO-99/05105 | 2/1999 |
| WO | WO-99/11260 | 3/1999 |
| WO | WO-99/26608 | 6/1999 |

## US 8,101,209 B2

Page 4

| | | |
|---|---|---|
| WO | WO-99/32091 | 7/1999 |
| WO | WO-99/47125 | 9/1999 |
| WO | WO-99/47128 | 9/1999 |
| WO | WO-99/49846 | 10/1999 |
| WO | WO-99/52526 | 10/1999 |
| WO | WO-00/00179 | 1/2000 |
| WO | WO-00/03695 | 1/2000 |
| WO | WO-00/04902 | 2/2000 |
| WO | WO-00/15639 | 3/2000 |
| WO | WO-00/18374 | 4/2000 |
| WO | WO-00/24379 | 5/2000 |
| WO | WO-00/28989 | 5/2000 |
| WO | WO-00/32174 | 6/2000 |
| WO | WO-00/40233 | 7/2000 |
| WO | WO 00/50015 | 8/2000 |
| WO | WO-00/50036 | 8/2000 |
| WO | WO-00/61115 | 10/2000 |
| WO | WO-00/78293 | 12/2000 |
| WO | WO-01/08661 | 2/2001 |
| WO | WO-01/10419 | 2/2001 |
| WO | WO-01/21159 | 3/2001 |
| WO | WO-01/32157 | 5/2001 |
| WO | WO-01/32158 | 5/2001 |
| WO | WO-01/47499 | 7/2001 |
| WO | WO-01/51035 | 7/2001 |
| WO | WO-01/51036 | 7/2001 |
| WO | WO 01/58424 | 8/2001 |
| WO | WO-01/74356 | 10/2001 |
| WO | WO-01/78725 | 10/2001 |
| WO | WO-01/87837 | 11/2001 |
| WO | WO-02/00216 | 1/2002 |
| WO | WO-02/22108 | 3/2002 |
| WO | WO-02/24167 | 3/2002 |
| WO | WO-02/30392 | 4/2002 |
| WO | WO-02/34237 | 5/2002 |
| WO | WO-02/39984 | 5/2002 |
| WO | WO-02/053097 | 7/2002 |
| WO | WO-02/056861 | 7/2002 |
| WO | WO-02/066002 | 8/2002 |
| WO | WO-02/072072 | 9/2002 |
| WO | WO-02/080887 | 10/2002 |
| WO | WO-02/092078 | 11/2002 |
| WO | WO-02/094285 | 11/2002 |
| WO | WO-03/007962 | 1/2003 |
| WO | WO-03/013467 | 2/2003 |
| WO | WO-03/013479 | 2/2003 |
| WO | WO-03/013609 | 2/2003 |
| WO | WO-03/015745 | 2/2003 |
| WO | WO-03/020243 | 3/2003 |
| WO | WO-03/024426 | 3/2003 |
| WO | WO-03/024429 | 3/2003 |
| WO | WO-03/028645 | 4/2003 |
| WO | WO-03/028718 | 4/2003 |
| WO | WO-03/030920 | 4/2003 |
| WO | WO-03/033001 | 4/2003 |
| WO | WO-03/035029 | 5/2003 |
| WO | WO-03/035039 | 5/2003 |
| WO | WO-03/077888 | 9/2003 |
| WO | WO-03/082204 | 10/2003 |
| WO | WO-03/084517 | 10/2003 |
| WO | WO-03/084518 | 10/2003 |
| WO | WO-03/092622 | 11/2003 |
| WO | WO-03/092626 | 11/2003 |
| WO | WO-03/094899 | 11/2003 |
| WO | WO-03/094924 | 11/2003 |
| WO | WO-03/097018 | 11/2003 |
| WO | WO-03/103538 | 12/2003 |
| WO | WO-2004/002419 | 1/2004 |
| WO | WO-2004/002472 | 1/2004 |
| WO | WO-2004/004693 | 1/2004 |
| WO | WO-2004/009120 | 1/2004 |
| WO | WO-2004/010983 | 2/2004 |
| WO | WO-2004/010984 | 2/2004 |
| WO | WO-2004/016249 | 2/2004 |
| WO | WO-2004/024126 | 3/2004 |
| WO | WO-2004/026262 | 4/2004 |
| WO | WO-2004/035020 | 4/2004 |
| WO | WO-2004/035090 | 4/2004 |
| WO | WO-2004/037259 | 5/2004 |

| | | |
|---|---|---|
| WO | WO-2004/041252 | 5/2004 |
| WO | WO-2004/052346 | 6/2004 |
| WO | WO-2004/054542 | 7/2004 |
| WO | WO-2004/056336 | 7/2004 |
| WO | WO-2004/056337 | 7/2004 |
| WO | WO-2004/064834 | 8/2004 |
| WO | WO-2004/087175 | 10/2004 |
| WO | WO-2005/016313 | 2/2005 |
| WO | WO-2005/016314 | 2/2005 |
| WO | WO-2005/016370 | 2/2005 |
| WO | WO-2005-051322 | 6/2005 |
| WO | WO-2005/051325 | 6/2005 |
| WO | WO-2005/051383 | 6/2005 |
| WO | WO-2005/079760 | 9/2005 |
| WO | WO-2006/056712 | 6/2006 |
| WO | WO-2006/056713 | 6/2006 |
| WO | WO-2006/089843 | 8/2006 |
| WO | WO-2006/125819 | 11/2006 |
| WO | WO-2006/133733 | 12/2006 |
| WO | WO-2006/134018 | 12/2006 |
| WO | WO-2007/054378 | 5/2007 |
| WO | WO-2007/093642 | 8/2007 |

### OTHER PUBLICATIONS

Yoshino, H., "Design and Evaluation of Time-Controlled Release Systems for Site-Specific Oral Drug Delivery to the GI Tract," (1993) *Current Status on Targeted Drug Delivery to the GI Tract*, Capsugel Library, Symp. Ser., Short Hills 22/04, London 6/05, Tokyo 14/05, pp. 185-190.

In the U.S. Patent and Trademark Office U.S. Appl. No. 08/544,208 Non-Final Office Action dated Feb. 11, 1999, 7 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 08/753,013 Non-Final Office Action dated Apr. 14, 1997, 4 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/332,463 Final Office Action dated Sep. 21, 2006, 10 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/332,463 Non-Final Office Action dated Dec. 23, 2005, 6 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/415,850 Advisory Action dated Dec. 10, 2009, 3 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/415,850 Final Office Action dated Aug. 18, 2009, 8 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/415,850 Final Office Action dated Nov. 23, 2010, 12 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/415,850 Final Office Action dated Sep. 10, 2007, 16 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/415,850 Non-Final Office Action dated Aug. 31, 2010, 4 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/415,850 Non-Final Office Action dated Feb. 18, 2009, 7 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/415,850 Non-Final Office Action dated Jan. 21, 2010, 11 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/415,850 Non-Final Office Action dated Mar. 28, 2006, 14 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/478,420 Final Office Action dated Jul. 1, 2009, 27 pages.

In the U.S. Patent and Trademark Office U.S. Patent and Trademark Office U.S. Appl. No. 10/478,420 Final Office Action dated Aug. 10, 2010, 24 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/478,420 Non-Final Office Action dated Jan. 11, 2010, 29 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/478,420 Non-Final Office Action dated Sep. 30, 2008, 18 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/478,420 Non-Final Office Action dated Jan. 4, 2011, 6 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/492,129 Non-Final Office Action dated Apr. 29, 2009, 12 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/492,129 Non-Final Office Action dated Jul. 26, 2007, 9 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/492,129 Non-Final Office Action dated Mar. 30, 2010, 2 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/492,129 Non-Final Office Action dated Mar. 30, 2010, 9 pages.

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/492,129 Non-Final Office Action dated Sep. 8, 2008, 10 pages.

## US 8,101,209 B2

Page 5

In the U.S. Patent and Trademark Office U.S. Appl. No. 10/507,886 Final Office Action dated Jun. 23, 2010, 15 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/507,886 Non-Final Office Action dated Jul. 21, 2009, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/510,621 Final Office Action dated Aug. 25, 2010, 17 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/510,621 Final Office Action dated Mar. 30, 2009, 17 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/510,621 Non-Final Office Action dated Dec. 8, 2009, 16 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/510,621 Non-Final Office Action dated Feb. 5, 2008, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/510,643 Final Office Action dated Mar. 25, 2009, 19 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/510,643 Non-Final Office Action dated Dec. 7, 2009, 16 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/510,643 Non-Final Office Action dated Feb. 5, 2008, 14 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/522,234 Non-Final Office Action dated Jan. 14, 2008, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/522,252 Final Office Action dated Aug. 19, 2008, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/522,252 Final Office Action dated Mar. 2, 2010, 9 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/522,252 Non-Final Office Action dated Jan. 14, 2008, 10 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/522,252 Non-Final Office Action dated Jul. 6, 2009, 12 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/826,690 Final Office Action dated Jan. 7, 2009, 9 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/826,690 Final Office Action dated Jul. 18, 2011, 5 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/826,690 Non-Final Office Action dated Apr. 30, 2010, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/826,690 Non-Final Office Action dated Jul. 27, 2007, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/826,690 Non-Final Office Action dated Oct. 26, 2010, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/826,690 Non-Final Office Action dated Sep. 15, 2009, 16 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/996,780 Final Office Action dated Oct. 8, 2009, 18 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/996,780 Non-Final Office Action dated Dec. 12, 2008, 18 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/997,836 Non-Final Office Action dated Aug. 19, 2010, 19 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/997,836 Non-Final Office Action dated Aug. 7, 2009, 17 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 10/997,836 Non-Final Office Action dated Oct. 29, 2008, 14 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/137,261 Final Office Action dated Jan. 15, 2009, 23 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/137,261 Non-Final Office Action dated Apr. 2, 2008, 17 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/439,432 Final Office Action dated Decmeber 22, 2009, 12 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/439,432 Non-Final Office Action dated Jan. 30, 2009, 22 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/439,432 Non-Final Office Action dated Jul. 13, 2011, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/583,940 Final Office Action dated Feb. 4, 2009, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/583,940 Final Office Action dated May 25, 2010, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/583,940 Non-Final Office Action dated Mar. 3, 2008, 9 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/583,940 Non-Final Office Action dated Sep. 2, 2009, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/648,605 Non-Final Office Action dated Apr. 15, 2009, 15 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/651,577 Final Office Action dated Apr. 29, 2011, 10 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/651,577 Final Office Action dated Jul. 31, 2009, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/651,577 Final Office Action dated Jul. 9, 2010, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/651,577 Non-Final Office Action dated Dec. 26, 2008, 23 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/651,577 Non-Final Office Action dated Jan. 6, 2010, 7 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/651,577 Non-Final Office Action dated Nov. 23, 2010, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/723,553 Final Office Action dated Aug. 26, 2008, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/723,553 Final Office Action dated Jun. 8, 2010, 20 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/723,553 Non-Final Office Action dated Nov. 18, 2009, 16 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/723,553 Non-Final Office Action dated Oct. 4, 2007, 7 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,566 Final Office Action dated Dec. 18, 2008, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,566 Final Office Action dated Mar. 16, 2010, 7 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,566 Non-Final Office Action dated Apr. 4, 2008, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,566 Non-Final Office Action dated Jul. 20, 2010, 6 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,566 Non-Final Office Action dated Jul. 24, 2009, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,573 Final Office Action dated Dec. 10, 2008, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,573 Non-Final Office Action dated Mar. 31, 2008, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,581 Final Office Action dated Dec. 10, 2008, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,581 Final Office Action dated Nov. 26, 2008, 7 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,581 Non-Final Office Action dated Apr. 10, 2008, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,581 Non-Final Office Action dated Jul. 29, 2009, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,581 Non-Final Office Action dated Mar. 31, 2008, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,586 Final Office Action dated Dec. 1, 2008, 7 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,586 Non-Final Office Action dated Jul. 29, 2009, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/767,586 Non-Final Office Action dated Mar. 31, 2008, 13 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/791,466 Final Office Action dated May 9, 2011, 8 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/791,466 Non-Final Office Action dated Aug. 18, 2010, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/802,610 Final Office Action dated May 18, 2010, 11 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/802,610 Non-Final Office Action dated Apr. 16, 2009, 9 pages.
In the U.S. Patent and Trademark Office U.S. Appl. No. 11/802,610 Non-Final Office Action dated Nov. 16, 2009, 16 pages.
In the U.S. Patent and Trademark Office, Restriction Requirement in re: U.S. Appl. No. 10/415,850, dated May 15, 2008, 6 pages.
"Product Information, Losartan (potassium salt)," *Cayman Chemical*, 2005; p. 1.
Amidon et al., "A Theoretical Basis for a Biopharmaceutic Drug Classification: The Correlation of in vitro Drug Product Dissolution and in vivo Bioavailability," *Pharmaceutical Research*, 1995; 12(3):413-420.
BASF Fine Chemicals Brochure Technical Information Cremorphor® RH 40, Aug. 1997.
Becker et al., "Current Approaches to Prevent NSAID-Induced Gastropathy—COX Selectivity and Beyond," *British Journal of Clinical Pharmacology*, 2004; 58(6):587-600.
Buri et al., "IV, Voie Orale," *Formes Pharmaceutiques Nouvelles Aspects Technologique, Biopharmaceutique et al.*, 1985; 175-227.

## US 8,101,209 B2

Page 6

Catella-Lawson et al., "Cyclooxygenase Inhibitors and the Antiplatelet Effects of Aspirin," *New England Journal of Medicine*, 2001; 345(25):1809-1817.

Chou et al., "Conformational studies on copolymers of hydroxypropyl-L-glutamine and L-leucine. Circular dichroism studies," *Biochemistry*, 1972; 11(16):3028-3043.

Coloron Surelease® Aqueous Ethylcellulose Dispersions, 2007.

Corel Pharma Chem—Acrycoat Data Sheet.

Cremophor RH40 Technical Information Data Sheet.

Davis et al., "The Design and Evolution of Controlled Release Systems for the Gastrointestinal tract," *J. Controlled Release*, 1985; 2:27-38.

Evonik Industries: Eudragit® Versatile Polymers of Oral Solid Dosage Formulations. No date on document; last accessed online Aug. 11, 2011.

Evonik Industries: "Guidelines for Formulation Development and Process Technology for Protective Coatings," *Pharma Polymers*, 2009; 1-4.

Flamel Technologies, Press Release, Lyon, France, Oct. 20, 2003.

Gavrilin et al., "A Comparative Study of the Pharmacokinetics and Bioaccessibility of Potassium Losartan in Various Medicinal Forms," *Pharmaceutical Chemistry Journal*, 2002; 36(5):227-228.

Glipizide, Web search for extended release dosage information, Accessed Sep. 23, 2008, Retrieved from the Internet Archive dated Apr. 17, 2001: http://web.archive.org/web20010417064637/http://www.rxlist.com/cgi/generic/glip_ids.htm.

Hayashi, "Preparation and Properties of A-B-A Tri-Block Copolymer Membranes Consisting of *N*-Hydroxyalkyl L-Glutamine as the A Component and L-Alanine as the B Component," *Polymer Journal* (Tokyo, JP), 1985; 17(12):1273-1280.

Beckert et al., "Compression of enteric-coated pellets to disintegrating tablets," *International Journal of Pharmeceutics*, 1996; 143:13-23.

International Search Report from PCT/FR02/01745 dated May 23, 2002.

Jen et al., "Ribavirin dosing in chronic hepatitis C: Application of population pharmacokinetic-pharmacodynamic models," *Clin. Pharmacol. Ther.*, 2002; 72(4):349-361.

JRS Pharma: Lubritab® Brochure.

KSR v. Teleflex, Wikipedia, The Free Encyclopedia, pp. 1-3. (see Footnote 6 at p. 3, lines 14-17).

Kario et al., "Nocturnal Fall of Blood Pressure and Silent Cerebrovascular Damage in Elderly Hypertensive Patients," Advanced Silent Cerebrovascular Damage in Extreme Dippers, *Hypertension*, 1996; 27(1):130-135.

Metformin dosage information. Accessed Sep. 23, 2008, via the internet Archive dated Dec. 17, 2000, at http://web.archive.org/web/*/http://www.odist.com/cgi/generic/metformi_ids.htm.

Nicklasson et al., "Modulation of the tabletting behavior of micorcrystalline cellulose pellets by the incorporation of polyethylene glycol," *European Journal of Pharmaceutical Sciences*, 1999; 9:57-65.

Qingshseng, "Release—Sustained Pellet of Ribavirin," XP002395861, 2004 *Chemical Abstracts*, Data Accession No. 2005:353828, Abstract only.

Specifications and Test Methods of Eudragit® L100-55, 2007.

Tao et al., "Preparation of Ribavirin Sustained—Release Pellets by Centrifugal Granulation Technology," XP002395860, 2005; *Chemical Abstracts*, Database accession No. 2005:500395, Abstract only.

Torriani et al., "Peginterferon Alfa-2a plus Ribavirin for Chronic Hepatitis C Virus Infection in HIV-Infected Patients," *The New England Journal of Medicine*, 2004; 351(5):438-450.

Uchida et al., "Preparation and Evaluation of Sustained Release of Ethyl Cellulose Microcapsules Containing Ampicillin or Amoxicillin Using Rabbits, Beagle Dogs and Humans," *J. Pharmacobio-Dyn.*, 1986; 9(5):13.

Wojcik, "Helix-Coil Transition in Multicomponent Random Copolypeptides in Water. 3. Inclusion of Nearest-Neighbor Interactions and Application to Random Copolymers of (Hydroxybutyl)-*L*-glutamine, *L*-Alanine, *L*-Phenylalanine, *L*-Lysine, and Glycine," *Macromolecules*, 1990; 23(15):3655-3662.

* cited by examiner

U.S. Patent          Jan. 24, 2012          Sheet 1 of 2          US 8,101,209 B2



FIG 1



FIG 2

JPION00466134



FIG 3

JPION00466135

US 8,101,209 B2

**1**

## MICROPARTICULATE ORAL GALENICAL FORM FOR THE DELAYED AND CONTROLLED RELEASE OF PHARMACEUTICAL ACTIVE PRINCIPLES

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of application Ser. No. 10/492,129, filed Jul. 19, 2004, currently pending, which is a National Stage of International Application No. PCT/FR02/03443, filed Oct. 9, 2002, which claims the benefit of FR01/12999, filed Oct. 9, 2001. International Application No. PCT/FR02/03443 and FR01/12999 are incorporated herein by reference.

The present invention relates to the field of microparticulate systems for the delayed and controlled release of one or more active principles, AP, intended for oral administration.

The AP envisaged in the present invention are those whose absorption is essentially limited to the upper parts of the gastrointestinal tract located upstream from the colon (upstream from the ileocecal junction), and which represent a large majority of pharmaceutical active principles.

More precisely, the invention relates to a microparticulate galenical form for delayed and controlled release where the controlled release phase is triggered with certainty by means of a dual mechanism: "time-dependent" release triggered after a certain residence time in the stomach, and "pH-dependent" release triggered by a change in pH when the particles enter the small intestine, which starts without a latency period. The microparticles of the present invention are microcapsules containing at least one active principle (AP)-excluding perindopril-having a particle size of between 100 and 1200 microns and individually coated with a film allowing the delayed and controlled release of the AP.

Systems for the delayed and controlled release of AP are particularly useful in cases where it is desirable, for reasons of chronobiology, that the AP be "bioabsorbed" at a precise time of day so as to be in phase with the circadian cycle. This approach is appropriate to the treatment of cancer or hypertension, the administration of anti-inflammatory drugs or the regulation of glycemia in the treatment of diabetes. It may be advantageous, for example, for the AP to be bioabsorbed very early in the morning so as to assure therapeutic cover when the patient wakes up, without compelling him to wake up prematurely. To do this, the galenical system ingested by the patient, for example after the evening meal, must allow a delayed release of the AP.

However, the first rule imposed on the pharmacist is to guarantee that the prescribed drug will be absorbed by the patient. In the case of a delayed release form, it is therefore crucial to have a total guarantee of release of the active principle at a given moment in order to obtain the therapeutic effect. Now, one is obliged to note that delayed release forms cannot ensure with certainty that the AP will be released after a prescribed time. This problem becomes particularly acute in the case where it is vital for the patient that this release does indeed take place, for example in the treatment of cardiovascular diseases or diabetes.

In fact, delayed release forms are conventionally obtained by coating the AP with a layer of enteric polymer, for example the methacrylic acid/methyl methacrylate copolymer EUDRAGIT® L. This type of enteric coating is known to have a reduced permeability under the acidic pH conditions of the stomach, and to dissolve when the pH increases to a value close to that prevailing in the small intestine, thereby releasing the AP. However, the intraindividual and interindividual

**2**

variability of the gastric pH conditions and the gastric emptying time do not make it possible to ensure with certainty that the AP will be released after a given time.

Purely "time-dependent" delayed release systems, i.e. those for which the release of the AP is triggered after a given residence time in the gastrointestinal tract, are not satisfactory either. In fact, because of the intraindividual and interindividual variability of the gastric residence time, the AP may be released after it has passed its absorption window, which, for the majority of AP, is located in the upper part of the gastrointestinal tract. The bioabsorption may thus be very low or even zero.

In this context it would be particularly advantageous to have a galenical form for the delayed and controlled release of the AP which made it possible to assure with certainty the release of the AP by means of a dual AP release triggering mechanism: "time-dependent" release triggered after a controlled time m the stomach, without a change m pH, and "pH-dependent" release triggered by an increase in the pH when the galenical form enters the intestine. These two AP release triggering factors, in succession, would give the galenical system a high degree of reliability in use. The release of the AP would thus be guaranteed after a preset latency period, even if the variation in pH did not intervene as a trigger, i.e. even if the galenical form did not pass from the stomach into the intestine.

To minimize the interindividual variability of AP absorption, it is necessary to adjust the latency period preceding the release of the AP into the stomach by considering the physiological conditions of the gastrointestinal tract in man. According to the well-known results of Davis et al., J. of Controlled Release, 2, 27-38 (1985), the gastric residence time of a preparation is very variable, being in the order of 0.5 to 10 hours. It would therefore be particularly advantageous to have a galenical form which released the active principle into the stomach after a given constant latency period within this interval of 0.5-10 hours, so that the action time of the drug would be the same from one individual to another or even from one day to the next for the same individual.

Moreover, to optimize the bioavailability of AP whose absorption is mainly limited to the upper parts of the gastrointestinal tract, it would be advantageous if the "pH-dependent" release into the intestine were to take place without a latency period, since otherwise the AP would not be released in its absorption window and, consequently, the patient would not be treated.

Another unique advantage of such a system would be that, by mixing it with a galenical form for immediate release of the AP, or by mixing it with another galenical form for delayed and controlled release of the AP, it would afford release profiles which exhibited several AP release waves (one AP or several identical or different AP) or which, by appropriate adjustment of the different fractions, assured a constant plasma AP concentration level.

It would also be advantageous for the delayed and controlled release form to consist of a plurality of microcapsules with a diameter below 2000 microns. In fact, for such a form, the dose of AP to be administered is spread over a large number of microcapsules (typically 10,000 for a dose of 500 mg) and thus has the following intrinsic advantages:

    The residence time of the microcapsules in the upper parts of the gastrointestinal tract can be prolonged, thereby increasing the duration of passage of the AP through the absorption windows and thus maximizing the bioavailability of the AP.

    The use of a mixture of microcapsules with different delayed and controlled release profiles makes it possible

JPION00466136

US 8,101,209 B2

3

to create release profiles which exhibit several release waves or which, by appropriate adjustment of the different fractions, assure a constant plasma AP concentration level.

The sensitivity to the variability of gastric emptying is reduced because the emptying, which in this case takes place over a large number of particles, is statistically more reproducible.

Bringing the tissues into contact with a high dose of AP-dose dumping-is avoided. Each microcapsule actually contains only a very small dose of AP. This eliminates the risk of tissue damage due to a local excess concentration of aggressive AP.

It is possible to combine several galenical forms (immediate and/or delayed and/or prolonged release), containing one or more active principles, in these "multimicrocapsular" systems.

It is possible to present these microcapsules in the form of sachets, gelatin capsules or tablets. In cases where the dose of AP is high (500 mg or more), the monolithic forms are too large to be swallowed easily. It is then of particular value to have a microparticulate form for delayed and controlled release of the AP, which those skilled in the art can formulate as disintegrating tablets or sachets.

Finally, it would also be desirable for the coating film around the microcapsules to be thin. In fact, a thick coating would have several adverse consequences:

(a) the mass fraction of excipient in the galenical form would be too high, making the mass of the drug too large to be swallowed easily and hence, in fine, creating compliance problems that jeopardize the success of the treatment; and

(b) the microcapsules would take a very long time to manufacture.

In summary, it would therefore be of particular value to have a microparticulate oral galenical form for the delayed and controlled release of AP which simultaneously possessed the following properties:

the release of the AP can be triggered in two ways:

by release dependent on time, also called "time-dependent" release, when the residence time of the particles in the stomach exceeds 5 hours;

by release dependent on a variation in pH, also called "pH-dependent" release, which starts without a latency period when the system enters the intestine and the pH increases; these two AP release triggering factors, in succession, guarantee that the AP is released after a preset latency period, even if the variation in pH has not intervened as a trigger;

it consists of a plurality of small microcapsules of coated AP; and

the mass fraction of coating excipients is limited.

The delayed or controlled release of AP has formed the subject of numerous studies.

Thus PCT patent application WO-A-96/11675 describes microcapsules for the oral administration of medicinal and/or nutritional active principles (AP) whose size is less than or equal to 1000 μm. These microcapsules consist of particles coated with a coating material consisting of a mixture of a film-forming polymeric derivative (ethyl cellulose), a hydrophobic plasticizer (castor oil), a surfactant and/or lubricant (magnesium stearate) and a nitrogen-containing polymer (polyvinylpyrrolidone: PVP). These microcapsules are also characterized by their ability to reside for a long time (at least 5 hours) in the small intestine and, during this residence time,

4

to allow absorption of the AP over a period greater than the natural transit time in the small intestine.

The microcapsules according to said patent application do not provide a solution to the particular problem of the delayed and controlled release of AP with a "time-dependent" and "pH-dependent" triggering of the AP.

Patent application FR-A-00 14876 describes a drug for the treatment of type II diabetes which comprises several thousand antihyperglycemic microcapsules (metformin) each consisting of a core containing at least one antihyperglycemic, and of a coating film (e.g. stearic acid and ethyl cellulose) applied to the core, which allows prolonged release of the antihyperglycemic in vivo. These microcapsules have a particle size of between 50 and 1000 μm.

Said patent application FR-A-00 14876 does not indicate how to obtain the delayed 420 and controlled release of AP with a "time-dependent" and "pH-dependent" triggering of the AP.

European patent application EP-A-0 609 961 discloses oral morphine granules for which the controlled release of the AP accelerates with the increase in pH.

These granules consist of:

sugar core (φ=100 to 1700 μm)

coated with a layer of active ingredient associated with a binder (PVP or hydroxypropyl methyl cellulose: HPMC),

and an outer envelope based on:

a polymer that is insoluble independently of the pH (ethyl cellulose or methacrylic acid ester/ammonium methacrylate copolymer: EUDRAGIT® RS or RL),

an enteric polymer that is insoluble at acidic pH (methacrylic acid/methyl methacrylate copolymer: EUDRAGIT® L),

a component that is partially soluble at acidic pH (polyethylene glycol, PVP, HPMC, polyvinyl alcohol: PVA),

optionally a plasticizer (diethyl phthalate)

and optionally a filler (talcum).

The mass fractions of AP are e.g. 41%, 38% and 29% and the mass fractions of outer envelope are e.g. 14.1%, 21.5% and 12.3% (by weight).

Release of the AP takes place at any pH and increases as the pH changes from 1.2 to 7.5. This is therefore a form for prolonged and pH-dependent release.

The article by H. YOSHINO entitled "*Design and evaluation of time-controlled release systems for site-specific oral drug delivery to the GI tract*", published in *Current status on targeted drug delivery to the GI tract, Capsugel library, Symp. Ser.*, Short Hills 22/04, London 6/05, Tokyo 14/05, pp 185-190, (1993), describes multiparticulate oral galenical systems for delayed and controlled release induced by an organic acid and by the residence time in the GIT. These systems are made up of 1000 μm microcapsules consisting of a neutral sugar core coated with a layer of active ingredient mixed with an organic acid (succinic acid), and of an outer layer of methacrylic acid ester/ammonium methacrylate copolymer (EUDRAGIT®RS). The organic acid is described as allowing a rapid release of the AP after the latency phase. This organic acid is transported by the water which has entered the microcapsules through the enteric outer layer. It then works towards modifying the permeability of the coating to allow rapid diffusion of the AP out of the microcapsules. The presence of this acid in intimate contact with the AP can be detrimental to the latter.

U.S. Pat. No. 6,033,687 describes a formulation consisting of a mixture of two types of granules (φ=1.4 mm) based on diltiazem, namely granules with a short latency period and

US 8,101,209 B2

5

granules with a long latency period. The release profiles are measured at pH 1. These granules comprise:

a neutral sugar core (φ=0.5-1.5 mm),

a layer of diltiazem associated with a binder (hydroxypropyl cellulose, carboxymethyl cellulose, ethyl cellulose, polyvinylpyrrolidone, alginate, EUDRAGIT),

and a single outer coating based on a lubricant (talcum), two methacrylic acid ester/ammonium methacrylate copolymers (EUDRAGIT®RS and EUDRAGIT®RL), a surfactant (sodium laurylsulfate) and a plasticizer (triethyl citrate).

In the granules with a short latency period, the mass fraction of the coating represents 12.3%, compared with 30.3% in the granules with a long latency period. However, this technique does not afford long latency periods for film coating rates below 30%. Furthermore, in view of the intraindividual and interindividual variability of the gastric residence time, this "time-dependent" delayed release system may release the AP after it has passed its absorption window. This results in a substantial loss of bioavailability.

Patent EP-B-0 263 083 describes a microcapsule coating composition that affords a zero-order and reproducible AP release profile. This coating composition is composed of a mixture of:

a hardening polymer to assure the mechanical strength of the coating, possible examples being ethyl cellulose or methacrylic acid copolymer(s) (EUDRAGIT®E, L, S or RS),

a lipophilic compound, e.g. stearic acid or paraffin, and talcum.

This coating composition is present in the microcapsules in an amount of e.g. 15 to 35% by weight. The hardening polymer/lipophilic compound ratios are e.g. 44 and 42% respectively in Examples 4 and 5.

The profiles obtained are profiles without a latency period of variable duration. Said patent neither teaches nor mentions how to obtain a profile with a delayed and controlled release that is triggered at the end of the latency period and/or by a variation in pH.

Patent application WO-A-01/58424 A1 discloses "floating" microcapsules coated with an enteric coating based e.g. on EUDRAGIT®L, magnesium stearate, talcum and a plasticizer such as dibutyl sebacate. This coating can be enveloped in a "bioadhesive" film based on chitosan. Like every enteric coating, the aim of the enteric coating according to patent document WO-A-01/58424 is a "pH-dependent" release rather than the conjunction of a "time-dependent" release and a "pH-dependent" release. Furthermore, FIGS. 1 to 3 of said patent application show that the simple objective of "pH-dependent" release is very imperfectly achieved since up to 20% of the AP is released in two hours only at constant acidic pH. As the particles described in said patent application float in the stomach, their gastric residence time is described as increased, so much so that one may even fear the absence of any "pH-triggered" release. Finally, the release would take place in an uncontrolled manner due to the rogue leaks of AP into the stomach.

European patent application EP-A-1 101 490 relates to a pharmaceutical preparation that is capable of releasing an active principle into the large intestine and more particularly the colon. This preparation can consist of tablets or granules comprising a core and a coating.

The technical problem underlying said invention is to propose a pharmaceutical form that is capable of allowing the release of a medicinal substance at a target site in the lower part of the small intestine, the ascending colon, the transverse colon or the lower part of the large intestine. Given the fact

6

that the mean residence time in the stomach is 5 hours and that, on average, a further 2 hours are required to reach the lower part of the small intestine, the preparation according to EP-A-1 101 490 is designed so that the medicinal substance is not released for 5 hours under acidic conditions simulating the stomach, and is only released after a latency period of at least 2 hours in a fluid simulating the pH conditions of the intestine (cf. especially claim 7 of EP-A-1 101 490).

It is therefore apparent that this system aimed at medicinal substances absorbed in the lower part of the intestine (colon) is not suitable for medicinal substances mainly absorbed in the upper parts of the gastrointestinal tract. Moreover, the system according to European patent application EP-A-1 101 490 does not make provision for release of the AP by means of a dual release triggering mechanism:

release on the stomach after a constant given latency period within an interval of 0.5-10 hours ("time-dependent" mechanism),

and release without a latency period after entering the intestine ("pH-dependent" mechanism).

Finally, the problem of the interindividual or intraindividual variability of the gastric residence time is not solved by the preparation according to EP-A-1 101 490.

Thus the prior art does not comprise a galenical system that makes it possible to delay and to guarantee with certainty the release of AP preferentially absorbed in the upper parts of the gastrointestinal tract, by means of a dual release mechanism:

"time-dependent" release after a latency period in the stomach which has the characteristic of being a constant given latency period within an interval of 0.5-10 hours, and "pH-dependent" release without a latency period.

In view of this state of the art, one of the essential objectives of the present invention is to provide a novel multimicroparticulate galenical system for the oral administration of active principles essentially absorbed in the upper parts of the gastrointestinal tract, this system being of the delayed and controlled release type that assures the release of the AP with certainty and hence guarantees the therapeutic efficacy of said system, by means of a dual "time-dependent" and "pH-dependent" release mechanism. These two AP release triggering factors, in succession, guarantee the release of the AP after a preset latency period, even if the variation in pH has not intervened as a trigger.

One essential objective of the present invention is to propose a galenical form made up of a plurality of microcapsules that makes it possible to escape from the interindividual and intraindividual variability of the gastric emptying time by releasing the AP at pH 1.4 according to a delayed release profile which has a latency period with an adjustable given duration of between 0.5 and 10 hours, followed by a release phase that starts without a latency period.

One essential objective of the present invention is to propose a galenical form made up of a plurality of microcapsules that makes it possible on the one hand to release the AP according to a delayed release profile at pH 1.4 with a constant given latency period of between 0.5 and 10 hours, and according to a release half-life $t_{1/2}$ of between 0.25 and 35 hours, and on the other hand to release the AP when the pH changes from 1.4 to 6.8, without a latency period and with a $t_{1/2}$ of between 0.25 and 20 hours.

One essential objective of the present invention is controlled when the pH changes from 1.4 to 6.8.

One objective of the present invention is to propose a galenical form consisting of a large number of microcapsules, for example in the order of several thousand, this multiplicity statistically assuring a good reproducibility of the AP transit

US 8,101,209 B2

7

kinetics throughout the gastrointestinal tract, the result being a better control of the bioavailability and hence a better efficacy.

One essential objective of the present invention is to propose a galenical form made up of a plurality of coated microcapsules that avoids the use of large amounts of coating agent, the mass fraction of coating agent being comparable to that of monolithic forms.

One essential objective of the present invention is to propose a pharmaceutical form made up of a plurality of coated microcapsules that makes it possible to present the AP in a form that is easy to swallow, namely a sachet or a disintegrating tablet.

One essential objective of the present invention is to propose a pharmaceutical form made up of a plurality of coated microcapsules that makes it possible to mix several different active principles.

Another objective of the present invention is to propose a pharmaceutical form made up of a plurality of coated microcapsules each containing a neutral core.

Having set themselves the above objectives, among others, it was to the inventors' credit to have developed, in order to assure a certain release of AP mainly absorbed in the upper parts of the gastrointestinal tract and a good bioabsorption of pharmaceutical active principles, a multimicrocapsular galenical system which:

   guarantees the absorption of the AP in its absorption window, which is mainly limited to the upper parts of the gastrointestinal tract;

   thereby assures a certain therapeutic efficacy of this system or of this galenical form;

   and has the essential characteristic of a dual triggering of the AP release.

This represents a major advance compared with the AP controlled release systems known hitherto, in which the release of the AP is triggered by a single factor, namely the residence time in the gastrointestinal tract for some systems and a variation in pH for other systems.

Thus the invention, which satisfies the objectives laid out above, among others, relates to a microparticulate oral galenical form for the delayed and control release of at least one AP-excluding perindopril-this AP having an absorption window in vivo that is essentially limited to the upper parts of the gastrointestinal tract, said form being designed so as to guarantee its therapeutic efficacy by guaranteeing its absorption in vivo, and being characterized in that:

   the release of the AP is governed by two different triggering mechanisms, one being based on a variation in pH and the other allowing the release of the AP after a predetermined residence time in the stomach,

   and its dissolution behavior in vitro (determined as indicated in the European Pharmacopeia, 3rd edition, under the title: "Dissolution test for solid oral forms": type II dissolutest performed under SINK conditions, maintained at 37° C. and agitated at 100 rpm) is such that:

      at a constant pH of 1.4, the dissolution profile includes a latency phase with a duration less than or equal to 5 hours, preferably of between 1 and 5 hours,

      and the change from pH 1.4 to pH 6.8, during the latency phase, results in a release phase that starts without a latency period.

In one preferred embodiment of the invention, the microparticulate oral galenical form consists of a plurality of microcapsules containing at least one active principle (AP) mainly absorbed in the upper parts of the gastrointestinal tract-excluding perindopril-these microcapsules being of the type that:

8

consist of particles of AP each coated with at least one film, this coating film consisting of a composite material which:

   comprises:

      at least one hydrophilic polymer A carrying groups that are ionized at neutral pH,

      and at least one hydrophobic compound B;

   and represents a mass fraction (% by weight, based on the total mass of the microcapsules) of $\leqq 40$;

and have a diameter below 2000 microns, preferably of between 200 and 800 microns and particularly preferably of between 200 and 600 microns,

characterized in that their coating film consists of a composite based on A and B in which:

   the weight ratio B/A is between 0.45 and 1.0, preferably between 0.5 and 1,

   and the hydrophobic compound B is selected from products that are crystalline in the solid state and have a melting point $T_{fB}$ such that, $T_{fB} \geqq 40°$ C., preferably $T_{fB} \geqq 50°$ C.

Advantageously, the microcapsules have a diameter of between 200 and 800 microns, B/A is between 0.5 and 1.0 and the hydrophobic compound B is selected from products that one cristalline in the solid state and have a melting point $T_{FB}$ such that $40°$ C. $\leqq T_{FB} \leqq 90°$ C.

According to one preferred characteristic of the invention, the hydrophilic polymer A is selected from:

   (meth)acrylic acid/alkyl (e.g. methyl) (meth)acrylate copolymers (EUDRAGIT®S or L) and mixtures thereof;

   cellulose derivatives, preferably cellulose acetate and/or phthalate, hydroxypropyl methyl cellulose phthalate and hydroxypropyl methyl cellulose acetate and/or succinate;

   and mixtures thereof.

More preferably, the compound B is selected from the following group of products:

   vegetable waxes, taken on their own or in mixtures with one another;

   hydrogenated vegetable oils, taken on their own or in a mixture with one another;

   mixtures of at least one monoester and of at least one diester and/or of at least one triester of glycerol with at least one fatty acid;

   and mixtures thereof.

According to the most preferred embodiment of the instant invention, the compound B of the microcapsules' coating film is selected from the groups comprising: the products which tradenames (trademarks) are the followings: Dynasan (Hydrogenated palm oil), Cutina (Hydrogenated castor oil), Hydrobase (Hydrogenated soybean oil), Dub (Hydrogenated soybean oil), Castorwax (Hydrogenated castor oil), Croduret (Hydrogenated castor oil), Carbowax, Compritol (Glyceryl behenate), Sterotex (Hydrogenated cottonseed oil), Lubritab (Hydrogenated cottonseed oil), Apifil (Wax yellow), Akofine (Hydrogenated cottonseed oil), Softtisan (Hydrogenated palm oil), Hydrocote (Hydrogenated soybean oil), Livopol (Hydrogenated soybean oil), Super Hartolan (Lanolin), MGLA (Anhydrous milk fat), Corona (Lanolin), Protalan (Lanolin), Akosoft (Suppository bases, Hard fat), Akosol (Suppository bases, Hard fat), Cremao (Suppository bases, Hard fat), Massupol (Suppository bases, Hard fat), Novata (Suppository bases, Hard fat), Suppocire (Suppository bases, Hard fat), Wecobee (Suppository bases, Hard fat), Witepsol (Suppository bases, Hard fat), Coronet, Lanol, Lanolin, Incromega (Omega 3), Estaram (Suppository bases, Hard fat), Estol, Suppoweiss (Suppository bases, Hard fat), Gelu-

US 8,101,209 B2

9

cire (Macrogolglycérides Lauriques), Precirol (Glyceryl Palmitostearate), Emulcire (Cetyl alcohol), Plurol diisostearique (Polyglyceryl Diisostearate), Geleol (Glyceryl Stearate), Hydrine et Monthyle; as well the additives which codes are the followings: E 901, E 907, E 903 and mixtures thereof; and mixtures thereof.

In practice, the compound can be selected from the group comprising the products which tradenames (trademarks) are the followings: Dynasan P60, Dynasan 116, Dynasan 118, Cutina HR, Hydrobase 66-68, Dub, Compritol 888, Sterotex NF, Lubritab and mixtures thereof.

According to an interesting embodiment of the invention, the coating film of the 120 microcapsules is free from talc.

The preferred polymers A are (meth)acrylic acid/alkyl (e.g. methyl) (meth)acrylate copolymers. These copolymers, which are e.g. of the type marketed by RÖHM PHARMA POLYMERS under the registered trade marks EUDRAGIT®L and S series (for example EUDRAGIT® L100, S100, L30D-55 and L100-55), are anionic enteric (co) polymers soluble in aqueous media at pH values above those encountered in the stomach.

According to another preferred characteristic of the invention, the compound B is selected from the following group of products:

vegetable waxes, taken on their own or in mixtures with one another, such as those marketed under the marks DYNASAN® P60 and DYNASAN® 116, inter alia;

hydrogenated vegetable oils, taken on their own or in a mixture with one another, preferably selected from the group comprising hydrogenated cottonseed oil, hydrogenated soybean oil, hydrogenated palm oil and mixtures thereof;

monoesters and/or diesters and/or triesters of glycerol with at least one fatty acid, preferably behenic acid, taken by themselves or in a mixture with one another;

and mixtures thereof.

The AP release triggering mechanism without a variation in pH, after a predetermined residence time in the stomach, results especially from control of the hydration rate of the microcapsules and/or the dissolution rate of one or more components of the microcapsules. For example, and without implying a limitation, the hydration of the microcapsule can be controlled by:

the presence, in the microcapsules, of hydrophilic products that make it possible to adjust the osmotic pressure or to cause a swelling of the microcapsules;

regulation of the water permeability of the coating film;

the creation of a microporosity in the coating film;

or even the hydration or dissolution of a compound in the coating film.

One of the decisive advantages of the multimicrocapsular galenical system according to the invention for the delayed and controlled release of AP is that it involves, in vivo, two factors that trigger the release of the AP into the gastrointestinal tract, namely:

the residence time in the stomach: "time-triggered" release,

and the variation in pH: "pH-triggered" release.

These two AP release triggering factors are successive, so they give the galenical system a high degree of reliability in use. The release of the AP is thus guaranteed after a preset latency period, even if the variation in pH has not intervened as a trigger. The problems of interindividual variability are thus overcome. The therapeutic efficacy of the drug comprising such a galenical system is assured by observing a predetermined chronobiology adapted to the intended therapeutic performance.

10

In addition, in the case of the AP considered in the present invention whose absorption window is limited to the upper parts of the gastrointestinal tract, it is particularly advantageous if the form for delayed and then controlled release consists of a plurality of microcapsules. In fact, for such a form, the dose of AP to be administered is spread over a large number of microcapsules (typically 10,000 for a dose of 500 mg) and thus has the following intrinsic advantages:

The residence time of the microcapsules in the upper parts of the gastrointestinal tract can be prolonged, thereby increasing the duration of passage of the AP through the absorption windows and thus maximizing the bioavailability of the AP.

The use of a mixture of microcapsules with different delayed and controlled release profiles makes it possible to create release profiles which exhibit several release waves or which, by appropriate adjustment of the different fractions, assure a constant plasma AP concentration level.

The variability of the gastric emptying is reduced because the emptying, which in this case takes place over a large number of particles, is statistically more reproducible.

Bringing the tissues into contact with a high dose of AP-dose dumping-is avoided. Each microcapsule actually contains only a very small dose of AP. This eliminates the risk of tissue damage due to a local excess concentration of aggressive AP.

It is possible to present these microcapsules in the form of sachets, gelatin capsules or tablets. In cases where the dose of AP is high (500 mg or more), the monolithic forms are too large to be swallowed easily. It is then of particular value to have a microparticulate form for delayed and controlled release of the AP, which those skilled in the art can formulate as disintegrating tablets or sachets.

The multimicrocapsular galenical system according to the invention makes it possible to assure with certainty a delayed and controlled release of the AP into the GIT by means of two triggers, and thus to escape the interindividual and interindividual variability of the gastric emptying conditions, while at the same time being economically viable and easy to ingest (optimized compliance).

According to one particularly advantageous characteristic of the preferred embodiment, at a constant pH of 1.4, the controlled release phase following the latency phase is such that the release time for 50% by weight of the AP ($t_{1/2}$) is defined as follows (in hours):

|            |                                    |
| ---------- | ---------------------------------- |
|            | $0.25 \leq t_{1/2} \leq 35$        |
| preferably | $0.5 \leq t_{1/2} \leq 20$         |

In practice, the release phase of the in vitro AP release profile at a constant pH of 1.4 has an adjustable release half-life.

According to another valuable characteristic of the preferred embodiment, the release phase following the change from pH 1.4 to pH 6.8, which takes place without a latency period, is such that the release time for 50% of the AP ($t_{1/2}$) is defined as follows (in hours):

|            |                                    |
| ---------- | ---------------------------------- |
|            | $0.25 \leq t_{1/2} \leq 20$        |
| preferably | $0.5 \leq t_{1/2} \leq 15$         |

US 8,101,209 B2

11

12

Preferably, the microcapsules according to the invention comprise a single composite coating film AB. This simplifies their preparation and limits the coating rate.

Preferably, the AP is deposited on a neutral core with a diameter of between 200 and 800 microns, preferably of between 200 and 600 microns.

Without implying a limitation, the hydrophilic neutral core can contain sucrose and/or dextrose and/or lactose, or it can consist of a cellulose microsphere.

Advantageously, the microcapsule coating can comprise, in addition to the essential constituents A and B, other conventional ingredients known to those skilled in the art, such as especially:

colorants;

plasticizers, for example dibutyl sebacate;

hydrophilic compounds, for example cellulose and derivatives thereof or polyvinylpyrrolidone and derivatives thereof;

and mixtures thereof.

Advantageously, the AP is deposited by the techniques known to those skilled in the art, for example the technique of spray coating in a fluidized air bed onto neutral cores with a diameter of between 200 and 800 microns, preferably of between 200 and 600 microns.

From the quantitative point of view, the monolayer of coating agent represents at most 40% and preferably at most 30% by weight of the microcapsules. Such a limited coating rate makes it possible to produce galenical units each containing a high dose of active principle without exceeding a prohibitive size as regards swallowing. This can only improve compliance with the treatment and hence its success.

In qualitative terms, the AP of the microcapsules according to the invention is essentially absorbable in the upper parts of the gastrointestinal tract and is advantageously selected from one of the following families of active substances: antiulcer agents, antidiabetics, anticoagulants, antithrombics, hypolipidemics, antiarrhythmics, vasodilators, antiangina agents, antihypertensives, vasoprotectors, fertility promoters, labor inducers and inhibitors, contraceptives, antibiotics, antifungals, antivirals, anticancer agents, anti-inflammatories, analgesics, antiepileptics, antiparkinsonian agents, neuroleptics, hypnotics, anxiolytics, psychostimulants, antimigraine agents, antidepressants, antitussives, antihistamines and anti-allergics.

Reference may also be made to the list of active principles given on pages 4 to 8 of patent application EP-A-0 609 961.

Preferably, the AP is selected from the following compounds: metformin, acetylsalicylic acid, amoxicillin, pentoxifyllin, prazosin, acyclovir, nifedipine, diltiazem, naproxen, ibuprofen, flurbiprofen, ketoprofen, fenoprofen, indomethacin, diclofenac, fentiazac, estradiol valerate, metoprolol, sulpiride, captopril, cimetidine, zidovudine, nicardipine, terfenadine, atenolol, salbutamol, carbamazepine, ranitidine, enalapril, simvastatin, fluoxetine, alprazolam, famotidine, ganciclovir, famciclovir, spironolactone, 5-asa, quinidine, morphine, pentazocine, paracetamol, omeprazole, metoclopramide and mixtures thereof.

The microparticulate oral galenical form according to the invention can be a form selected in the groups comprising a tablet (advantageously a tablet that disperses in the mouth), a powder or a gelatin capsule.

The microcapsules described above can be used for the manufacture of novel pharmaceutical or dietetic preparations of various AP which have optimized therapeutic or dietetic performance characteristics and are preferably presented in the form of tablets, advantageously disintegrating tablets and even more preferably tablets that disperse in the mouth, powders or gelatin capsules.

These microcapsules are all the more valuable because they are also perfectly tolerated by the organism, especially by the stomach, and furthermore can be obtained easily and economically.

The present invention further relates to these novel pharmaceutical or dietetic preparations as such, which are original in their structure, to their presentation and to their composition. Such pharmaceutical or dietetic preparations are administered orally, preferably as single daily doses.

It is pointed out that it may be of value to mix, in one and the same gelatin capsule, tablet or powder, at least two types of microcapsule whose release kinetics are different but within the framework characteristic of the invention.

It is also possible to mix the microcapsules according to the invention with a certain amount of AP that is immediately available in the organism.

It can also be envisaged to associate microcapsules containing different AP.

In addition, a further subject of the invention is a galenical (pharmaceutical or dietetic) system, preferably in the form of a tablet, advantageously a disintegrating tablet and even more preferably a tablet that disperses in the mouth, a powder or a gelatin capsule, characterized in that it comprises microcapsules such as described above.

Furthermore, the invention relates to the use of microparticles such as defined above for the preparation of microparticulate oral galenical (pharmaceutical or dietetic) forms, preferably as tablets, advantageously tablets that disperse in the mouth, powders or gelatin capsules.

Finally, the invention further relates to a method of therapeutic treatment, characterized in that it consists in ingesting, according to a given dosage, a drug comprising microcapsules such as defined above.

The invention will be explained more clearly by the Examples below, given solely by way of illustration, which afford a good understanding of the invention and show its variants and/or modes of implementation, as well as its different advantages.

EXAMPLES

Description of the Figures:

FIG. **1** shows the in vitro release profiles of the microcapsules of Example 1 at pH 1.4 —•—, and at pH 1.4 for 3 hours and then at pH 6.8 as from T=3 hours: —□—, in % by weight (% D) of dissolved metformin as a function of the time T in hours;

FIG. **2** shows the in vitro release profiles of the microcapsules of Example 2 at pH 1.4: —•—, and at pH 1.4 for 2 hours and then at pH 6.8 as from 2 hours: —□—, in % by weight (% D) of acyclovir as a function of the time T in hours;

FIG. **3** shows the in vitro release profiles of the microcapsules of Example 3 at pH 1.4: —■— and at pH 6.8: —□—, in % by weight (% D) of metformin as a function of the time T in hours.

EXAMPLES

Example 1

Preparation of microcapsules allowing a dual-mechanism delayed and prolonged release of metformin.HCl

75 g of metformin.HCl (Chemsource) and 75 g of PVP are dissolved in 1350 g of isopropanol. The solution is sprayed onto 850 g of neutral microspheres (NP Pharm) in a Glatt® GPCG3 spray coater.

US 8,101,209 B2

13

93.3 g of hydrogenated palm oil (Hills) (B) and 140 g of Eudragit® L100 (Röhm) (A) are dissolved in hot isopropanol. B/A=0.66. The solution is sprayed onto 700 g of previously prepared microparticles. The film coating conditions are: inlet temperature: 45° C., spraying rate: 8-12 g/min, atomization pressure: 1.5 bar.

The microcapsules were tested in a type II dissoutest according to the Pharmacopeia, at 37° C. and with agitation at 100 rpm, in the following media:

a) HCl at pH 1.4

b) HCl at pH 1.4 for 3 hours, then KH$_2$PO$_4$/NaOH buffer medium at pH 6.8

The release profiles are shown in FIG. 1.

These profiles are characteristic of a delayed and then prolonged release by means of a dual mechanism: absence of release for 2 hours, followed by a prolonged release without a change in pH, and finally followed by a release accelerated by the change in pH.

Example 2

Preparation of microcapsules allowing a dual-mechanism delayed and prolonged release of acyclovir

75 g of acyclovir and 75 g of the polyvinylpyrrolidone PLASDONE® K29/32 are dissolved in 833 g of isopropanol. The solution is sprayed onto 850 g of neutral microspheres (NP Pharm) in a Glatt® GPCG3 spray coater.

93.3 g of hydrogenated palm oil (Hüls) (B) and 140 g of EUDRAGIT®L100 (Röhm) (A) are dissolved in hot isopropanol. B/A=0.66. The solution is sprayed onto 700 g of previously prepared microparticles. The film coating conditions are: inlet temperature: 45° C., spraying rate: 8-12 g/min, atomization pressure: 1.5 bar.

The microcapsules were tested in a type II dissoutest according to the Pharmacopeia, at 37° C. and with agitation at 100 rpm, in the following media:

c) HCl at pH 1.4

d) HCl at pH 1.4 for 3 hours, then KH$_2$PO$_4$/NaOH buffer medium at pH 6.8

The release profiles are shown in FIG. 2.

The acyclovir release profile obtained at pH 1.4 is characteristic of a delayed and prolonged release by means of a dual release triggering mechanism.

Example 3

Preparation of microcapsules allowing a dual-mechanism delayed and prolonged release of metformin.HCl

105 g of hydrogenated palm oil (Hüls) (B), 30 g of dibutyl sebacate and 165 g of Eudragit®L100 (Röhm) (A) are dissolved in hot isopropanol. B/A=64. The solution is sprayed onto 700 g of metformin granules (95.5% metformin/4.5% PVP). The film coating conditions are: inlet temperature: 45° C., spraying rate: 8-12 g/min, atomization pressure: 1.5 bar.

The microcapsules were tested in a type II dissoutest according to the Pharmacopeia, at 37° C. and with agitation at 100 rpm, in the following media:

e) HCl at pH 1.4

f) KH$_2$PO$_4$/NaOH buffer medium at pH 6.8

The release profiles are shown in FIG. 3.

These profiles are characteristic of a delayed and then prolonged release by means of a dual mechanism: absence of release for 2 hours at acidic pH and rapid release at neutral pH.

14

The invention claimed is:

1. Microparticulate oral pharmaceutical dosage form for the delayed and controlled release of at least one active principle (AP)—excluding perindopril—this active principle having an absorption window in vivo that is essentially limited to the upper parts of the gastrointestinal tract,

wherein the dosage form comprises "reservoir" microcapsules of active principle, each coated with one single, composite coating film,

wherein the single, composite coating film comprises at least one hydrophilic polymer A carrying groups that are ionized at neutral pH, and at least one hydrophobic compound B;

wherein the at least one hydrophobic compound B is selected from the group consisting of hydrogenated vegetable oils, vegetable waxes, wax yellow, wax white, wax microcrystalline, lanolin, anhydrous milk fat, hard fat suppository base, lauroyl macrogolglycerides, cetyl alcohol, polyglyceryl diisostearate, diester or triester of glycerol with at least one fatty acid and mixtures thereof;

wherein the microcapsules have a diameter of between 200 and 800 microns;

wherein the weight ratio B/A is between 0.5 and 1.5;

wherein the release of the active principle is governed by two different triggering mechanisms,

wherein the first triggering mechanism releases the at least one active principle based on a variation in pH,

wherein the second triggering mechanism releases the at least one active principle after a predetermined residence time in the stomach,

wherein the dissolution behavior of the pharmaceutical dosage in vitro is such that:

at a constant pH of 1.4, the dissolution profile includes a latency phase with a duration less than or equal to 5 hours, and a controlled release phase following the latency phase such that the release time for 50% of the active principle (t$_{1/2}$) is between 0.5 hour and 35 hours, and

the change from pH 1.4 to pH 6.8 results in a release phase that starts without a latency period.

2. The pharmaceutical dosage form according to claim 1, wherein the dissolution profile includes a latency phase with a duration of between 1 and 5 hours.

3. The pharmaceutical dosage form according to claim 1, wherein the mass fraction of the coating film (% by weight, based on the total mass of the microcapsules) is less than or equal to 40.

4. The pharmaceutical dosage form according to claim 1, wherein the weight ratio B/A is between 0.5 and 1.0.

5. The pharmaceutical dosage form according to claim 1, wherein the at least one hydrophilic polymer A is selected from the group consisting of: (meth)acrylic acid polymers, alkyl (meth)acrylate polymers, (meth)acrylic acid/alkyl (meth)acrylate copolymers, cellulose derivatives, cellulose acetate phthalate, hydroxypropyl methyl cellulose phthalate, hydroxypropyl methyl cellulose acetate succinate; and mixtures thereof

6. The pharmaceutical dosage form according to claim 1, wherein the at least one hydrophilic polymer A is selected from the group consisting of: (meth)acrylic acid/ methyl (meth)acrylate copolymers, cellulose acetate phthalate, hydroxypropyl methyl cellulose phthalate, hydroxypropyl methyl cellulose acetate succinate; and mixtures thereof

7. The pharmaceutical dosage form according to claim 1, wherein said hydrophobic compound B is selected from the group consisting of: hydrogenated cottonseed oil, hydrogenated soybean oil, hydrogenated palm oil, glyceryl behenate,

US 8,101,209 B2

15

hydrogenated castor oil, Carnauba wax, tristearin, tripalmitin, trimyristin, glyceryl palmitostearate, and any mixtures thereof.

**8**. The pharmaceutical dosage form according to claim **7**, wherein said hydrophobic compound B is selected from the group consisting of: hydrogenated cottonseed oil, hydrogenated soybean oil, hydrogenated palm oil, glyceryl behenate, hydrogenated castor oil, tristearin, tripalmitin, trimyristin and any mixtures thereof.

**9**. The pharmaceutical dosage form according to claim **1** wherein the coating film of the microcapsules is free from talc.

**10**. The pharmaceutical dosage form according to claim **1**, characterized in that the release phase following the change from pH 1.4 to pH 6.8, which takes place without a latency period, is such that the release time for 50% of the active principle ($t_{1/2}$) is defined as follows (in hours): $0.5 \leqq t_{1/2} \leqq 20$.

**11**. The pharmaceutical dosage form according to claim **1**, wherein the active principle is deposited on a neutral core with a diameter of between 200 and 600 microns.

**12**. The pharmaceutical dosage form according to claim **11**, wherein the neutral core contains sucrose or dextrose or lactose.

**13**. The pharmaceutical dosage form according to claim **11**, wherein the neutral core is a cellulose microsphere.

**14**. The pharmaceutical dosage form according to claim **1**, wherein the at least one active principle is selected from the group consisting of: antiulcer agents, antidiabetics, anticoagulants, antithrombics, hypolipidemics, antiarrhythmics, vasodilators, antiangina agents, antihypertensives, vasoprotectors, fertility promoters, labor inducers and inhibitors, contraceptives, antibiotics, antifungals, antivirals, anticancer agents, anti-inflammatories, analgesics, antiepileptics, antiparkinsonian agents, neuroleptics, hypnotics, anxiolytics, psychostimulants, antimigraine agents, antidepressants, antitussives, antihistamines and antiallergics.

**15**. The pharmaceutical dosage form according to claim **14**, wherein the active principle is selected from the group consisting of amoxicillin, metformin, acetylsalicylic acid, pentoxifyllin, prazosin, acyclovir, nifedipine, diltiazem, naproxen, ibuprofen, flurbiprofen, ketoprofen, fenoprofen, indomethacin, diclofenac, fentiazac, estradiol valerate, metoprolol, sulpiride, captopril, cimetidine, zidovudine, nicardipine, terfenadine, atenolol, salbutamol, carbamazepine, ranitidine, enalapril, simvastatin, fluoxetine, alprazolam, famotidine, ganciclovir, famciclovir, spironolactone, 5-asa, quinidine, morphine, pentazocine, paracetamol, omeprazole, metoclopramide and mixtures thereof

**16**. The pharmaceutical dosage form according to claim **1**, wherein said pharmaceutical dosage form is selected from the group consisting of: a tablet, a powder and a capsule.

**17**. The pharmaceutical dosage form according to claim **1** which is a tablet that disperses in the mouth.

*   *   *   *   *

# EXHIBIT 5

Jazz Pharmaceuticals, Inc. v.
Avadel CNS Pharmaceuticals LLC

**JTX-0230**

C.A. No. 21-691 (GBW), 21-1138(GBW), 21-1594 (GBS)



| R&D REPORT | Page 1 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

| R&D REPORT | | |
|---|---|---|
| **Department:** | **FORMULATION** | **Date: June 11, 2014** |

Sodium Oxybate CR, granules for oral suspension

Formulation Development Report
2013

| **Author: H. GUILLARD – M. BLAS** | **Topic: Dodo**<br>**Project code: FT-218** |
|---|---|

**Distribution: J.F. Dubuisson, G. Stetsko, C. Mégret, C. Castan, C. Vialas, P. Caisse, F. Nicolas, A. Constancis**

ABSTRACT

Sodium Oxybate is indicated for the treatment of excessive daytime sleepiness and cataplexy in patients suffering from narcolepsy.
It is currently marketed as an oral solution under the brand name Xyrem®.
Xyrem® should be dosed once prior to bedtime and then requires the patient to wake 2.5 to 4 hours later to take a second dose, which is a huge inconvenience and may jeopardize sleep structure and sleep quality.
Flamel Technologies is developing a new formulation of Sodium Oxybate with the objective to provide a product that is to be taken once at bedtime and allows the patient to sleep continuously for 6 to 8 hours.
The product developed is a powder formulation to be suspended extemporaneously in water just before administration to obtain an oral suspension. It comprises microparticles based on Flamel's Micropump technology which are able to deliver Sodium Oxybate with a controlled release.
For the purpose of a first PK study, three different prototypes have been developed in order to test different kinds of modified release formulations. The three prototypes contain an immediate release fraction and a controlled release fraction but are designed to lead to different in-vivo release profiles.

**Keywords:** Sodium Oxybate, Micropump, Modified Release

Jane Rose Reporting

**Guillard Ex. 35**

10/08/22

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002707

JTX-0230.1



| R&D REPORT | Page 2 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

APPROVAL PAGE

Reference:  R&D

**Title:**   **Sodium Oxybate CR, granules for oral suspension-Formulation Development Report 2013**

**Author:**
Dr. Hervé GUILLARD
Research Scientist
Formulation Department

Date   June 11, 2014

**Author:**
Dr. Maximilien BLAS
Research Scientist
Analytical Research Department

Date   June 12, 2014

**Approved by:**
Dr. Alain CONSTANCIS
Head of Formulation Department

Date   June 13, 2014

**Approved by:**
Dr. Corinne VIALAS
Head of Analytical Research Department

Date   June 12th, 2014

CONFIDENTIAL INFORMATION



| **R&D REPORT** | Page 3 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

## CONTENT

APPROVAL PAGE .................................................................................................................................................. 2

1.   OBJECTIVES ...................................................................................................................................... 5

2.   TARGETED RELEASE PROFILES ................................................................................................. 6

3.   GENERALITIES ABOUT SODIUM OXYBATE ........................................................................... 7

  3.1   API SOURCING ................................................................................................................................. 7
  3.2   API PHYSICAL PROPERTIES .............................................................................................................. 7
  3.3   API SOLUBILITY ............................................................................................................................... 9
    3.3.1    Solubility in water and organic solvents ............................................................................. 9
    3.3.2    Solubility in dissolution buffers at 37°C ........................................................................... 10
  3.4   API STABILITY ............................................................................................................................... 11
  3.5   API SENSITIVITY TO AIR HUMIDITY ............................................................................................... 13

4.   ANALYTICAL DEVELOPMENT .................................................................................................14

  4.1   HPLC ASSAY OF THE API AND ITS DEGRADATION PRODUCTS IN SODIUM OXYBATE FORMULATIONS ... 14
  4.2   WATER CONTENT ........................................................................................................................... 19
  4.3   RESIDUAL SOLVENTS ASSAY ......................................................................................................... 20
  4.4   IN VITRO DISSOLUTION METHOD ..................................................................................................... 21
    4.4.1    Development of a HPLC method .......................................................................................... 21
    4.4.2    Dissolution testing at fixed pHs ......................................................................................... 23
    4.4.3    Dissolution test mimicking in-vivo conditions .................................................................. 23
  4.5   PARTICLE SIZE DETERMINATION ..................................................................................................... 26

5.   FORMULATION DEVELOPMENT .............................................................................................27

  5.1   INTRODUCTION ............................................................................................................................... 27
  5.2   MICROGRANULES OBTAINED BY DRUG-LAYERING ON NEUTRAL CORES (STEP 1) ............................ 28
    5.2.1    Microgranules design ......................................................................................................... 28
    5.2.2    Drug-layering step .............................................................................................................. 28
  5.3   CR MICROPARTICLES ...................................................................................................................... 31
    5.3.1    CR microparticles for Target 1 .......................................................................................... 31
      5.3.1.1   General considerations .........................................................................................................31
      5.3.1.2   Development of CR microparticles with a pH* equal to 7 ......................................................31
      5.3.1.3   Development of CR microparticles with a pH* equal to 6.9 ...................................................35
      5.3.1.4   Development of CR microparticles with a pH* equal to 6.5 ...................................................37
    5.3.2    CR microparticles for Target 2 .......................................................................................... 41
      5.3.2.1   General considerations .........................................................................................................41
      5.3.2.2   Development of microparticles with a bi-layer coating ..........................................................41
        5.3.2.2.1. First step: coating of the API granules with a non-pH dependent layer ("SR microparticles") ...................... 41
        5.3.2.2.2. Second step: coating of SR microparticles with a pH-dependent coating .............................................. 46
    5.3.3    Microparticles stability ....................................................................................................... 49
      5.3.3.1   CR pH*7 microparticles (PSFT1312) ..................................................................................50
      5.3.3.2   CR pH*6.9 microparticles ...................................................................................................51
      5.3.3.3   CR pH*6.5 microparticles (PSFT1314) ..............................................................................52
      5.3.3.4   Bi-layer coated SR/MR pH*6.5microparticles (PSFT1321) ...................................................53
  5.4   DEVELOPMENT OF THE FULL COMPOSITION (MIXTURE OF IR AND CR PARTS) .............................. 55
    5.4.1    General considerations ....................................................................................................... 55
    5.4.2    Suspending agent: xanthan gum ........................................................................................ 55
    5.4.3    Acidic excipient – development of the reconstitution protocol .......................................... 55

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002709

**JTX-0230.3**



| R&D REPORT | Page 4 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

5.4.4   Development of the IR component ........................................................................................ 58
5.5   FULL COMPOSITIONS: .................................................................................................................. 61
5.5.1   Description of the 3 prototypes selected for the PK study ..................................................... 61
5.5.2   Full compositions: packaging and stability conditions ........................................................ 61
5.5.3   Full compositions: manufacturing and characterization ..................................................... 62
5.5.3.1   Protocol for full compositions manufacturing .................................................................. 62
5.5.3.2   Sodium Oxybate CR, granules for oral suspension Type 1 (with CR pH*6,9 microparticles) ............. 62
5.5.3.3   Sodium Oxybate CR, granules for oral suspension Type 2 (with CR pH*6,5 microparticles) ............. 64
5.5.3.4   Sodium Oxybate CR, granules for oral suspension Type 3 (with SR/MR pH*6,5 microparticles) .......... 67
5.5.4   Full compositions: stability data .......................................................................................... 69
5.5.4.1   Stability conditions .......................................................................................................... 69
5.5.4.2   Sodium Oxybate CR, granules for oral suspension Type 1 (with CR pH*6,9 microparticles) - PSFT1325 ........... 70
5.5.4.3   Sodium Oxybate CR, granules for oral suspension Type 2 (with CR pH*6,5 microparticles) - PSFT1323 ........... 73
5.5.4.4   Sodium Oxybate CR, granules for oral suspension Type 3 (with SR/MR pH*6,5 microparticles) - PSFT1322 ..... 75
5.5.5   Considerations on the content of residual solvents in the full compositions ......................... 78

CONCLUSIONS ............................................................................................................................... 79

FIGURES ......................................................................................................................................... 81

TABLES ........................................................................................................................................... 84

APPENDICES .................................................................................................................................. 86

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002710

JTX-0230.4


FLAMEL
technologies

| R&D REPORT | Page 5 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

## 1. OBJECTIVES

Sodium Oxybate is indicated for the treatment of excessive daytime sleepiness and cataplexy in patients suffering from narcolepsy.

It is currently marketed as an oral solution under the brand name Xyrem®.

The recommended starting dose is 4.5 g/day Sodium Oxybate divided into two equal doses of 2.25 g/dose. After a titration period to assess efficacy and tolerability, the dose can be increased up to a maximum of 9 g/day divided into two equal doses of 4.5 g/dose.

Xyrem® should be dosed once prior to bedtime and then requires the patient to wake 2.5 to 4 hours later to take a second dose, which is a huge inconvenience and may jeopardize sleep structure and sleep quality.

Flamel Technologies is developing a new formulation of Sodium Oxybate with the objective to provide a product that is to be taken once at bedtime and allows the patient to sleep continuously for 6 to 8 hours.

The product developed is a powder formulation to be suspended extemporaneously in water just before administration to obtain an oral suspension. It comprises microparticles based on Flamel's Micropump technology which are able to deliver Sodium Oxybate with a controlled release.

Micropump® is an innovative patented technology which allows to obtain small size drug-containing microcapsules coated with a diffusion layer and designed to increase the absorption time of drugs. The microparticles are dispersed in the stomach and pass into the small intestine, where each microparticle, operating as a miniature delivery system, releases the drug at an adjustable rate and over an extended period of time (up to 24 hours). Depending of the diffusion coating used, it is possible to obtain a sustained release over time and/or a delayed release to target specific area of the gastro-intestinal tractus where absorption could be optimised.

For the purpose of a first PK study, three different prototypes have been developed in order to test different kinds of modified release formulations. The three prototypes contain an immediate release fraction and a controlled release fraction but are designed to lead to different in-vivo release profiles.

*This report presents the results obtained during the development work and includes API technical properties characterization, analytical methods set up, formulation design and development on laboratory batches.*

*Data supporting the different process and formulation choices are presented with a focus on the description of the formulations chosen for the clinical pilot study PKFT218-1301.*

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002711

JTX-0230.5


FLAMEL
technologies

| R&D REPORT | Page 6 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

## 2. **TARGETED RELEASE PROFILES**

The PK of sodium oxybate is complex. In particular the molecule shows a capacity-limited absorption trough transporters and undergoes a saturable first-pass effect. In order to optimize this non-linear absorption of Sodium Oxybate, two targets for the in-vivo release profiles (Figure 1)[1] have been defined by Claire Mégret from the Pharmacokinetics and Biostatistics group.

For the first target, half of the dose is immediately released by the formulation whereas the other half is released three hours after intake.

For the second target, the immediate-release fraction represents 40% of the dose. After 1-hour in vivo lag-time (without release of the API), the remaining 60% of the dose are released over a short duration (with 80% of the API released over around two additional hours).



Figure 1: Targets for in-vivo release profiles

---

[1] 10/24/2012 and 01/17/2013 Technical Meetings

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002712

**JTX-0230.6**


FLAMEL
technologies

| R&D REPORT | Page 7 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

## 3. GENERALITIES ABOUT SODIUM OXYBATE

Sodium Oxybate is a controlled substance Schedule I.

### 3.1 API Sourcing

Sodium Oxybate raw material has been purchased from two suppliers:
- Euticals Inc. (USA)
- Centaur Pharmaceuticals PVT, LTD (India).

Table 1 summarizes the information concerning the drug sourcing (supplier, batches and quantity purchased).

| Manufacturer | API batch (quantity supplied in g) |
|---|---|
| Euticals | KL Na Oxybate-02 (650g) |
| | KL Na Oxybate-03 (540g) |
| Centaur Pharmaceuticals | 250609 (10000g + 1691g) |

Table 1: Sodium Oxybate – manufacturers and quantities

### 3.2 API physical properties

The preparation of Sodium Oxybate formulations implies knowing its physical and thermal properties, its stability and solubility in water and organic solvents used in Micropump process. Furthermore in order to set up the dissolution testing conditions, the solubility at 37°C in pH media from 1.1 to 7 at 37°C is also needed

**General information from literature:**

- *Chemical name:* sodium gamma hydroxy butyrate (Na-GHB), gamma hydroxybutyric acid sodium salt, Sodium Oxybate
- *Formula:* C4H7NaO3 - HO-CH₂-CH₂-COONa
- *Molecular weight:* 126.09
- *Chemical structure:* Figure 2
- *CAS number:* 502-85-2



Figure 2: Sodium Oxybate = sodium salt of gamma hydroxy butyric acid (GHB)

- *pH of a 0,5% GHB solution in water* = 7.8 [2]
- *pKa*=4.7
- *Partition Coefficient*: Logᵥ= 2.58 (Octanol/ Water) [pH: 7.4].
- *Polymorphism:* There is no chiral center in the molecule and polymorphism is not reported in the literature and not observed.

---

[2]*Ciolino et al. J. Forensic Sci, 2001, vol 46, n°6, p1315-1323*

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002713

JTX-0230.7



| R&D REPORT | Page 8 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

**API characterization at Flamel:**

- *Crystals size / particle size distribution*: the API is an extremely fine powder very prone to agglomeration. Both the size and the particle size distribution have not been determined due to the very low crystals size and their strong tendency to aggregation.

- *Thermal characterizations:*

Thermo-Gravimetric Analysis (TGA) (Figure 3) and Differential Scanning Calorimetry (DSC) analysis (Figure 4) have been performed to characterize the thermal properties of the raw powder: Sodium Oxybate crystals exhibit an excellent thermal stability up to 200°C and a melting point (148°C) consistent with the data found in the literature (between 146 – 148°C).



Figure 3: Sodium Oxybate analysis by thermogravimetry, with a heat rate of 10°C/min and under air flow



Figure 4: Sodium Oxybate analysis by Differential Scanning Calorimetry, between 40 and 250°C at a heat rate of 10°C/min and under nitrogen flow

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002714



FLAMEL
technologies

| R&D REPORT | Page 9 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

### 3.3 API solubility

#### 3.3.1 Solubility in water and organic solvents

The objective of solubility measurements is to identify an appropriate solvent to dissolve or disperse the API for the drug-layering step.

**Solubility in water at room temperature - effect of pH:**

At room temperature, literature data show that Sodium Oxybate is highly soluble in aqueous solutions whatever the pH in the range [4-7] with a solubility increasing with pH (Figure 5). Below pH4, Sodium Oxybate degradation prevents the determination of its solubility.

**Solubility in organic solvents:**

The API solubility in pure organic solvents has been measured by HPLC or estimated in water/organic solvent mixtures (Table 2).

Sodium Oxybate solubility remains low (<20g/l) in pure organic solvent at 25°C with no solubility increase at 40°C.

Ethanol/water mixtures have been considered as potential solubilizing media since ethanol is the organic solvent having the highest solubilizing power towards Sodium Oxybate. At room temperature, mixtures with water contents higher than 40% allow to obtain Sodium Oxybate solutions with a dry content of at least 35%. At 60°C, Sodium Oxybate is fully solubilized at concentrations of 350mg/g in all the mixtures investigated.



Figure 5: Sodium Oxybate solubility at room temperature in water vs pH (pH adjustment with HCl) - US6780889 patent from Orphan Medicals (Jazz)

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002715

JTX-0230.9



| R&D REPORT | Page 10 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

| T | Medium | Solubility (mg/g) |
|---|---|---|
| | Solvent | |
| 25°C | Acetone | <0.1 |
| | Ethanol | 10.7 |
| | Isopropyl alcohol | 0.3 |
| 40°C | Acetone | <0.1 |
| | Ethanol | 11.5 |
| | Isopropyl alcohol | 0.5 |
| | Ethanol/water mixtures (% w/w) | |
| 25°C | Ethanol / water (80/20) | < 350 |
| | Ethanol / water (60/40) | >350 |
| | Ethanol / water (40/60) | >350 |
| | Ethanol / water (20/80) | >350 |
| 60°C | Ethanol / water (80/20) | > 350 |
| | Ethanol / water (60/40) | >350 |
| | Ethanol / water (40/60) | >350 |
| | Ethanol / water (20/80) | >350 |

Table 2: Sodium Oxybate solubility in different organic solvents at room temperature and 40°C or 60°C

### Process considerations (see paragraph 5.2.2.):

From a process point of view, spraying a drug solution is a preferred option compared to a spraying step with a drug suspension: no requirement is necessary for the API particle size distribution and yields are generally higher. Aqueous solutions are preferred as well as room temperature preparations (involving no heating of the spraying solution).

In pure organic solvents, Sodium Oxybate solubility is too low to have a drug-layering process in solution.

Pure water (preferred option) or ethanol/water mixtures (back-up option) can be considered to manufacture the drug-layered microparticles.

### 3.3.2 Solubility in dissolution buffers at 37°C

In order to define the dissolution conditions, the solubility has also been investigated in buffered solutions at 37°C.

The solubility in buffered solutions (0.1N HCl and 50mM phosphate buffers) has been measured and proves to be higher than 400mg/g in all the media.

The solubility measurements are not relevant because the API solubilization leads to a dramatic increase of the pH of the dissolution medium. For instance:
- the pH of a 0.1N HCl medium at saturation is increased up to 8.4
- the pH of a 50mM pH 6 phosphate buffer at saturation is increased to 8.7.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002716



FLAMEL
technologies

| R&D REPORT | Page 11 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

### 3.4 API stability

### Sodium Oxybate stability in solution (data from literature[3]):

From the literature, it appears that the main degradation pathway of Sodium Oxybate in aqueous solution is due to an intramolecular esterification occurring in acidic medium leading to lactone formation (Figure 6):



Figure 6: Sodium Oxybate and corresponding lactone

Ciolino et al [3] have studied the effect of pH on the degradation of a Sodium Oxybate solution (0.5% w GHB in water) at room temperature over long durations (Table 3).

| GHB solution pH | Beginning of esterification | Remaining GHB after 220 days at RT (%) |
|---|---|---|
| 2 | Cf Figure 7 | 32 |
| 4 | No esterification during the first 10 days | 72 |
| 5.2 | No esterification during the first 17 days | 85 |
| 6.4 | No esterification during the first 17 days | 95 |
| 7 | | |
| 7.8 (in water) | stable | |
| 12 | | |

Table 3: Stability of Sodium Oxybate solutions (0.5% w in water) at room temperature

No esterification happens at room temperature after 220 days at pH above 7. The speed of degradation increases when pH decreases, with more than 30% of lactone formed after one day at pH 2.

Figure 7: Esterification of GHB (filled circles) in pH 2 buffer (for information, open circles represent the hydrolysis of GBL in pH 2 buffer)

Regarding the API stability in organic solvents, 10mg/ml API solutions in ethanol and methanol prove to be stable over 30 days at room temperature [4].

---

[3] Ciolino et al. J. Forensic Sci, 2001, vol 46, n°6, p1315-1323
[4] Hennessy et al. J. Forensic Sci, Nov 2004, vol 49, n°6

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707


FLAMEL
technologies

| R&D REPORT | Page 12 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

**Sodium Oxybate stability in solution (experimental data obtained at Flamel):**

As discussed in paragraph 3.3., pure water (preferred option) or ethanol/water mixtures (back-up option) can be considered as solubilizing medium for the drug-layering step. Sodium Oxybate solutions can be sprayed at room temperature or at higher temperatures to improve drying efficiency.

Sodium Oxybate has to be stable for at least 24h in the solubilizing medium for an industrial process.

The stability of Sodium Oxybate in aqueous solutions or water/ethanol mixtures was therefore investigated at room temperature and 60°C. A concentration of 300mg/g was considered (classical API concentration for a drug-layering process in solution).

The effect of pH on API stability in aqueous solutions was also investigated.

At room temperature, no lactone is formed after one day except in the pH5 aqueous solution.

At 60°C, the kinetics for lactone formation is strongly increased with 2% lactone formed in the pH6 solution after 24 hours.

In water/ethanol mixtures, no lactone is formed in both conditions after 24 hours.

| T condition | 300mg/g Sodium Oxybate solution characteristics | Lactone (%) |
|---|---|---|
| RT | Aqueous solution without pH adjustment (pH=9.5) | < 0,1 |
| 60°C | | < 0,1 |
| RT | Aqueous solution containing 0.7mg/g malic acid - pH 7,3 | < 0,1 |
| 60°C | | < 0,1 |
| RT | Aqueous solution containing 13mg/g malic acid - pH 6.0 | < 0,1 |
| 60°C | | 2,0 |
| RT | Aqueous solution containing 58mg/g malic acid - pH 5.0 | 0,7 |
| 60°C | | 12.7 |
| RT | H2O/ethanol 20/80 (% w/w) – API not fully solubilized | < 0,1 |
| 60°C | | < 0,1 |
| RT | H2O/ethanol 40/60 | < 0,1 |
| 60°C | | < 0,1 |
| RT | H2O/ethanol 60/40 | < 0,1 |
| 60°C | | < 0,1 |
| RT | H2O/ethanol 80/20 | < 0,1 |
| 60°C | | < 0,1 |

Table 4: Sodium Oxybate stability at 300mg/g in water and water/ethanol mixture – % of lactone formed after 24h

CONFIDENTIAL INFORMATION



| **R&D REPORT** | Page 13 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

### 3.5  API sensitivity to air humidity

Sodium Oxybate sensitivity to water uptake has been evaluated by Dynamic Vapor Sorption (DVS Advantage automated vapor sorption analyser from Surface Measurement Systems) at 25°C (Figure 8).

During the relative humidity increase phase, no water uptake is observed below 40% RH. A dramatic uptake is observed for higher relative humidities with more than 50% weight gain at 45%RH.

During the subsequent desorption phase, the pattern is similar except for relative humidities below 45% with some water remaining bound to the crystals.

At 20°C, the sorption pattern is identical.



Figure 8: Sodium Oxybate analysis by DVS – sorption and desorption isotherm at 25°C

From these data, it has been decided in a first approach to perform API handling and manufacturing of the microparticles in relatively dry conditions (RH<40%).

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002719

JTX-0230.13


FLAMEL
technologies

| **R&D REPORT** | Page 14 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

## 4. ANALYTICAL DEVELOPMENT

### 4.1 HPLC assay of the API and its degradation products in Sodium Oxybate formulations

A single HPLC method has been developed for the quantification of Sodium Oxybate and its degradation products in the formulations.

This section of the report gives a description of this method and the main results from its limited qualification. For more information, see the two reports, respectively related to the method development [DR218-001][5] and the limited qualification [RT13-033v2][6].

The HPLC method has been adapted from one method provided by Centaur for related substances analysis in the raw material.

The main degradation product of Sodium Oxybate, depicted Figure 6, is gamma-butyrolactone (Lactone) coming from the intramolecular esterification of Sodium Oxybate. This reaction is catalyzed under acidic conditions. The method developed to characterize the formulations has to be sensitive enough to quantify at least 0.05% of lactone and other degradation products in pellets, microparticles (SR/MR) and in the final product (full composition).

#### Chromatographic parameters

The chromatographic parameters are described in Table 5. Every sample preparation is injected at 80μL for the degradation products assay.

For Sodium Oxybate assay a premix of 6 μL of the sample preparation and 9 μL of a phosphate buffer solution 0.05 M pH=2.0 is performed by the injection module. The 15 μL mixture is then injected.

As specified in the analytical development report, the dilution of the sample preparation in an acidic buffer is required to ensure a good repeatability of the chromatographic profile for Sodium Oxybate assay.

| Column | Synergi Hydro RP 80A Packed with Octadecylsilyl silica gel 4.6mm x 250mm 4μm |
|---|---|
| Temperature | 25°C |
| Flow rate | 1.0 mL/min |
| Detection | UV 210 nm |
| Injection volume | Degradation products: 80 μL<br>Sodium Oxybate assay: 15 μL of a premix solution of 6μL of the sample preparation and 9 μL of a phosphate buffer solution 0.05 M pH=2.0.<br>The mixing is performed in the needle seat just before the sample injection. |
| Run time | Degradation products: 30 min<br>Sodium Oxybate assay: 15 min |
| Elution mode | Isocratic |
| Mobile phase | Phosphate buffer solution 0.05 M pH=2.6/Acetonitrile: 99/1 % |

Table 5: HPLC parameters.

---

[5] DR218-001 – DEVELOPMENT OF THE HPLC ASSAY OF API AND DEGRADATION PRODUCTS IN SODIUM OXYBATE FORMULATIONS (Author: M. BLAS)

[6] RT13-033v2 – LIMITED QUALIFICATION OF THE HPLC ASSAY OF API AND DEGRADATION PRODUCTS IN SODIUM OXYBATE FORMULATIONS ACCORDING TO MTH833 (Author: M. BLAS)

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002720



| **R&D REPORT** | Page 15 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

### Quantification of Sodium Oxybate and its related substances:

For Sodium Oxybate assay, the quantification is performed by external calibration with 3 standards prepared at 5; 7 and 9 g/l in the diluent (mobile phase/methanol 90/10).

The related substances are quantified using the response factor of a dilute standard of lactone (7 mg/L) for the lactone quantification and of Sodium Oxybate (at 7 mg/L) for the other related substances.

#### Sample preparation

To ensure a complete extraction of API and its degradation products, an extraction protocol has been developed for Sodium Oxybate formulations. The procedure is described in Table 6 hereafter for microparticles analysis or for a full composition containing 4.5 g of Sodium Oxybate (in red in the table).

| Extraction protocol for microparticles analysis (full composition containing 4.5 g of API) |
|---|
| In a 50 mL (500mL) volumetric flask: transfer and weight 700 mg of microparticles for 50% API microparticles (). |
| Add 5 mL of mobile phase (**50 mL**) |
| Magnetic stirring for 5 min |
| Add 5 mL of methanol (**50 mL**) |
| Magnetic stirring for 15 min |
| Ultrasonic bath for 1 hour |
| Add about 30mL of the mobile phase (**300 mL**) |
| Magnetic stirring for 15 min |
| Ultrasonic bath for 1 hour |
| Dilute to 50 mL with the mobile phase (**500 mL and dilute to 7 g/L of API in the mobile phase**) |
| Magnetic stirring for 5 min |
| Filtrate on 1 μm and 0.45 μm porosity filters |

Table 6: Extraction protocol for formulation analysis (microparticles and full compositions)

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002721

JTX-0230.15



| **R&D REPORT** | Page 16 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

## Examples of HPLC profiles

Examples of HPLC chromatograms of a reconstituted formulation for Sodium Oxybate and degradation products assay are presented in Figure 9 and Figure 10.



Figure 9: Chromatogram of a reconstituted formulation for Sodium Oxybate assay (Volume of injection: 15 µL)



Figure 10: Chromatograms of a reconstituted formulation and a reconstituted formulation with 7 mg/L    (e.g. 0.1%) of Lactone for the degradation products assay. (Volume of injection: 80 µL)

The retention times of the compounds are listed hereafter (Table 7).

| Compound | Retention time (min) |
|---|---|
| Sodium Oxybate | 7.0 |
| Fumaric acid (Malic acid dehydration) | 8.1 |
| Lactone | 10.0 |
| PVP | 11.0 |
| Unknown from the blank | 11.6 |

Table 7: Retention time of the HPLC peaks observed.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002722



| R&D REPORT | Page 17 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

## Limited qualification:

For the assay Sodium Oxybate and degradation products, a limited qualification has been carried out for specificity, response function, linearity of results, trueness, precision (repeatability), limit of detection (LOD), and limit of quantification (LOQ) according to ICH Guidelines Q2(R1). Stress test studies have also been performed.

The main conclusions of the study are described in Table 8 and Table 9 below.

| Criterion | Results |
|---|---|
| Specificity | A Forced degradation study: has been performed on the raw material and on a reconstituted formulation using with different conditions (acidic, oxidative, alkali and heat treatment))<br>For all the stressed conditions studied, purity factors of the drug substance peaks, in chromatograms of stressed samples, were in the range of 999.9 -1000.0 indicating homogenous peaks.<br>This peak homogeneity confirms the non-interference of degradation peaks with Sodium Oxybate thus establishing the selectivity of the method.<br>Based on the experimental chromatograms, there were no significant interactions between the drug substance, degradation products and excipients. |
| Linearity (of response) | The response function is linear ($r^2 > 0.999$).<br>No significant difference between the calibration curves with reconstituted formulations and Sodium Oxybate was observed within the range studied (60-140%).<br>There is no matrix effect induced by the presence of the excipients in the formulations. |
| Linearity (of results) | The linearity of results was assessed for 6 concentration points between 60 and 140% of the theoretical drug substance contents in test solution.<br>Equation: $y = -0.2148 + 0.9637 \, X$<br>$r^2 = 0.9989$<br>The slope is close to 1, underlining no significant matrix effect. Besides the origin is close to 0 which indicate no significant systematic bias. |
| Trueness | Recovery from 98.2% to 101.3% (Confidence interval)<br>Mean: 99.7% |
| Precision | The precision of the method in the reconstituted formulation (full composition of 4.5 g).<br>The relative standard deviation is 0.7% for the quantification of Sodium Oxybate. |

Table 8: Limited qualification results for the Sodium Oxybate assay.

CONFIDENTIAL INFORMATION



| R&D REPORT | Page 18 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

| Criterion | Results |
|---|---|
| Specificity | Based on the experimental chromatograms, there were no significant interactions between the Lactone and excipients. |
| Linearity (of response) | *For Lactone assay:* The response functions is linear (r2 > 0.999) over the calibration range tested, e.g. (3.6-35 mg/L or 0.05-0.25% of Sodium Oxybate).and the y-intercept is not significantly different than 0 for the calibration performed with the lactone alone and the reconstituted formulation.<br><br>No significant difference between the calibration curves with reconstituted formulations and Sodium Oxybate was observed within the range studied (0.05-0.25%) at a risk level of 2%.<br><br>There is no significant matrix effect induced by the presence of the excipients in the formulations.<br><br>*For others degradation products:* the calibration curve of Sodium Oxybate is linear over the range tested (0.05 to 0.50% of the Sodium Oxybate). The y-intercept is not significantly different than 0 for the calibration performed with the lactone alone and the reconstituted formulation.<br><br>As a result, the degradation products can be assays using the response factor of one dilute Sodium Oxybate standards. |
| Linearity (of results) | *For Lactone assay:* The linearity of results was assessed for 5 concentration points between 0.05 and 0.25% of the theoretical drug substance contents in test solution.<br><br>Equation: y = -0.00005 + 0.9498 X<br>$r^2 = 0.9992$<br>The slope is close to 1, underlining no significant matrix effect. Besides the origin is close to 0 which indicate no significant systematic bias. |
| Trueness | *For Lactone assay:*<br>. Recovery from 92.2% to 96.4% (Confidence interval)<br>. Mean: 94.5% |
| Precision | *For Lactone assay:* 6 independent reconstituted samples containing 0.17% (12 mg/L) of lactone have been analyzed.<br>The relative standard deviation was 1.1% for the quantification of the Lactone. |
| Limit of detection (LOD) | *For Lactone assay:* 0.7 (e.g. **0.01%** of Sodium Oxybate content) |
| | *For others degradation products:* 0.7 (e.g. **0.01%** of Sodium Oxybate content) |
| Limit of quantification (LOQ) | *For Lactone assay:* 2.0 (e.g. **0.03%** of Sodium Oxybate content) |
| | *For others degradation products:* 2.1 (e.g. **0.03%** of Sodium Oxybate content) |

Table 9: Limited qualification results for the degradation products.

After the limited qualification research team Venissieux, this method has been implemented at the Analytical Development Team (GMP site, Pessac) where it has been validated for a Phase I study (see Protocol VA CL065[7] and Report VA CL067[8]).

---

[7] VA CL065 – PROTOCOLE DE VALIDATION DE LA METHODE DE DOSAGE CLHP DU PRINCIPE ACTIF ET DES PRODUITS DE DEGRADATION DANS LES FORMULATIONS FT218 SELON MTH833 (Auteur : S. CLAUSTRE)
[8] VA CL067 – VALIDATION REPORT OF THE API AND DEGRADATION PRODUCTS HPLC ASSAY IN FT218 FORMULATIONS ACCORDING TO MTH833 (Author: S. CLAUSTRE)

CONFIDENTIAL INFORMATION


FLAMEL
technologies

| R&D REPORT | Page 19 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

### 4.2  Water content

The water content is measured by coulometric Karl Fischer (KF) titration. This method is based on the standard reaction between iodine, sulfur dioxide and water. The iodine is generated electrochemically by anodic oxidation of iodide.

The water is extracted from sample by heating and transferred in the titration cell thanks to the air flow. Once all of the water available has reacted, the reaction is complete. The amount of water in the sample is calculated by measuring the current needed for the electrochemical generation of iodine (I2) from iodide (I–) according to the following reaction: $2I^- \rightarrow I_2 + 2e^-$.

#### Effect of Malic acid excipient on water content determination

The final drug product (full composition) encloses Malic acid as acidic excipient. The impact of the presence of Malic acid on water content measurement has been assessed on the Sodium Oxybate raw material.

The presence of Malic acid induces a moderate bias (+0.4% for 5% w/w of malic acid) on the water content determination due to a dehydration of Malic acid or Sodium Oxybate during the assay performed at high temperature (120°C). Decreasing the oven temperature from 120°C to 100°C did not reduce this phenomenon.

However, thanks to the seal coat used on the immediate release microparticules, there is no intimate Malic acid/Sodium Oxybate in the final drug product and no bias has been observed for the water content determination in the full composition.

#### Sample preparation

The amount of sample analyzed depends on the expected water content and the desired accuracy. A minimum of 0.5 mg water per sample should be measured to have a good accuracy. As the water content of samples is about least 0.5 weight% of water, the sample amount was set at 100 mg. To prepare the sample vial, sample should be precisely weighed directly into the vial and the aluminum seal should be quickly put in place to protect the sample against absorbing or losing water. The cap is then placed securely on the vial to seal it in the oven and prevent the purge gas from leaking.

#### Extraction conditions

A temperature around 120°C has been used in order to extract quantitatively the water contained in Sodium Oxybate microparticles and in the full compositions.

A stirring time of 120 seconds and a gas (air) flow of 100 ccm were chosen for the water evaporation. These parameters enable the extraction of nearly all of the water contained in the sample during the mixing time. They were optimized for a sample weight of 100 mg.

#### Suitability test

For accurate determination of water the initial drift value should be as low as possible and stable before the start of a titration. If the drift is higher than 15 μg/min, precautions should be taken: desiccants should be replaced or regenerated and/or Karl Fischer reagent should be changed.

To check the measurement accuracy of the Karl Fischer coulometer at each sequence two vials which contain 10 μl of water are analyzed: one prior to and one at the end of the sequence.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002725



| **R&D REPORT** | Page 20 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

**Operating conditions**

The Karl Fischer coulometer used is a DL 39 from Mettler Toledo (Table 10).

| Sample amount | 100 mg |
|---|---|
| Oven temperature | 120°C |
| Mixing time | 120 s |
| Polarization current | 5µA |
| End point | 80 mV |
| Maximum titration time | 600s |
| Stop parameter | Relative – drift 15 µg/min |

Table 10: Operating conditions of the Karl Fisher titration.

Three vials are tested. The result is the average of the three of them and is expressed in weight percentage.

After its development at Vénissieux, this method has been implemented at the Analytical Development Team (GM site, Pessac).

### 4.3  Residual solvents assay

The assay of residual solvents (ethanol, acetone and isopropyl alcohol) is performed by using a gas chromatography (GC) analytical method with a headspace injection, and an internal calibration (methanol). This kind of method is recommended by the European Pharmacopoeia (EP) and the United States Pharmacopoeia (USP) for the assay of solvents from class 1 and 2. Concerning the class 3 solvents, only loss on drying methods are advocated by EP and USP. In spite of the fact that ethanol, acetone and IPA are from class 3, a more specific and accurate GC method was chosen.

A gas chromatograph 6890 Hewlet Packard equipped with a FID detection is used. For the separation, a capillary column HP-Innowax (60 m) was chosen. This column contains a polyethylene glycol phase (PEG). The chromatographic parameters are summarized in Table 11. This method has been written as a Standard Operating Procedure (MTH571v02) and approved internally.

The residual solvents are evaluated by a cumulated determination of results obtained for the intermediate products (IR and CR microparticles).

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002726



| **R&D REPORT** | Page 21 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

| Chromatograph | GC 6890 Hewlett Packard |
|---|---|
| Column | L=60 m; Stationary phase: Innowax (0.53mm internal diameter) from Agilent |
| Vector gas | Helium |
| Flow rate | 7 ml/min |
| Split ratio | 10/1 |
| Temperature injector | 230°C |
| Oven temperature | 50°C during 8 min – 50°C/min up to 210°C – 210°C during 7 min |
| Detector | FID |
| Detector temperature | 250°C |
| Injector | Headspace |

Table 11: Operating conditions of the residual solvents assay

**Sample preparation:**

500 mg of samples (IR or CR microparticles) are added to a vial containing N-methyl pyrrolidone (NMP) and the internal standard (methanol). The vial is then stirred, sonicated about 15 minutes, stirred, heated in the Headspace oven and the gas fraction is injected. NMP enables the extraction of the residual solvents and does not interfere with the chromatography due to his high boiling point.

### 4.4  In vitro dissolution method

#### 4.4.1  Development of a HPLC method

**Generalities:**

The UV spectrum of Sodium Oxybate dissolved at 2-5 and 10g/l in a pH 6.8 50mM phosphate buffer has been measured at 37°C (cf Figure 11).

Sodium Oxybate has a very low absorption in the UV spectrum and absorbs mainly at wavelengths below 240nm. Due to a strong interference of UV absorption of Sodium Oxybate with formulation excipients (e.g. PVP) in this wavelength area, following release kinetics by automated UV spectroscopy is not possible.

Dissolution profiles have therefore been determined by RP-HPLC analysis of Sodium Oxybate amount in samples collected automatically by an automatic collector.

For the full formulations (including immediate-release fraction and excipients for reconstitution of the powder in water), a special protocol for the reconstitution step has been developed (cf paragraph 5.4.3.).

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

JTX-0230.21



| R&D REPORT | Page 22 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |



Figure 11: UV spectrum of Sodium Oxybate in pH 6.8 50mM phosphate buffer

## Details about operating conditions:

Dissolution tests of Sodium Oxybate contained in the granules for oral suspension are performed according to USP <711> "Dissolution test for solid dosage forms" (harmonized with EP< 2.9.3). Operating conditions (Table 12):

| Apparatus | Paddle (Apparatus 2) |
|---|---|
| Volume | 500* or 900 mL |
| Speed | 100 rpm |
| Temperature | 37°C ±0.5°C |
| Sampling time points | 0h ; 0.5h ; 1h ; 1.5h ; 2h ; 3h ; 4h ; 6h ; 8h ; 10h ; 12h ; 16h |
| Quantification | RP-HPLC using the method for the assay of Sodium Oxybate and degradation products (see paragraph 4.1) |

Table 12: Operating conditions of the dissolution tests.

*To save some API, dissolution testing of microparticles was performed in 500ml instead of 900ml while keeping the same API concentration. It has been checked that the dissolution profile of the microparticles is similar in 500ml or 900ml.

## Calibration:

External calibrations are performed with a range of 3 standard solutions of Sodium Oxybate and 3 standard solutions of Gamma-butyrolactone.

## Test solution:

Samples collected during dissolution are injected without any treatment.

## Results:

The percentage of dissolved Sodium Oxybate is determined by the assay of Sodium Oxybate and Gamma-butyrolactone from the calibration curves. After its development at Vénissieux, this method has been implemented at the Analytical Development Team (GMP site, Pessac) where it has been validated for a Phase I study (see Protocol VA CL066[9] and Report VA 068[10]).

---

[9] VA CL066 – PROTOCOLE DE VALIDATION DE LA METHODE DE DISSOLUTION SUIVI CLHP DES FORMULATIONS FT218 SELON MTH836 (Auteur : S. CLAUSTRE)

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002728



| R&D REPORT | Page 23 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

**Media for dissolution testing:**

Two kinds of dissolution tests have been developed:
- Dissolution testing at fixed pHs (see paragraph 4.4.2)
- Dissolution testing in a medium mimicking the pH changes occurring along the gastro-intestinal tractus (see paragraph 4.4.3)

### 4.4.2 Dissolution testing at fixed pHs

In-vitro dissolution testings are performed at different pH representative of the different conditions prevailing along the gastro-intestinal tractus (GIT).

Considering the extremely high unit dose (4.5g) and the strong alkalinity of Sodium Oxybate, the pH of the buffers typically used for dissolution testing has been measured after solubilizing a unit dose in 900ml (Table 13).

| buffer | Buffer pH (experimental data) | Buffer pH after API solubilization |
|---|---|---|
| 50mM potassium phosphate adujsted with NaOH (pH 6,8) | 6,79 | 6,78 |
| 50mM potassium phosphate adjusted with NaOH (pH=6) | 5,97 | 6,02 |
| 50mM potassium phosphate (pH=4,5) | 4,48 | 5,67 |
| 0.1N HCl (pH=1,1) | 1,10 | 1,40 |

Table 13: Buffer pH after solubilizing of 4.5g of Sodium Oxybate in 900ml buffer

The 50mM potassium phosphate buffer is therefore not a good buffer below pH 6. For dissolution testings below pH6, another buffer (i.e. USP acetate buffer) should be used.

### 4.4.3 Dissolution test mimicking in-vivo conditions

An in-vitro dissolution test has been developed to mimic the pH changes occurring all along the gastro-intestinal tractus. From an acidic medium simulating gastric conditions in fasted or fed state state, the pH of the dissolution medium is progressively increased to simulate the pH evolution in the intestine[11].

After administration, a formulation will transit from the stomach to the intestine then to the caecum and to the colon. The Figure 12 shows the evolution of the mean pH with the transit time post administration in the fasted state or in the fed state (data provided by Claire Mégret from the Pharmacokinetics and Biostatistics group). By plotting the pH vs the transit time after the stomach and the corresponding area of the intestine, one is aware that the transit time in the small intestine (duodenum/jejunum/ileum) is similar in fasted and fed state but pH differs at the beginning of the small intestine (Figure 13).

---

[10]  VA CL068 – VALIDATION REPORT OF THE FT218 FORMULATIONS DISSOLUTION TEST ACCORDING TO MTH 836 (Author: S. CLAUSTRE)
[11] 01/17/2013 and 03/14/2013 Technical Meetings

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707



| R&D REPORT | Page 24 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |



Figure 12: Evolution of pH with transit time in the GIT post administration in the fasted state or in the fed state



Figure 13: Evolution of pH with transit time after the stomach in the fasted state or in the fed state

Sodium Oxybate formulations will be administered two hours after a meal. pH conditions in the GIT 2 hours post-meal are not documented in the literature, except for the stomach pH which is acidic again (as in the fasted state). The pH conditions prevailing in the intestine will probably be intermediate between the fasted conditions (lowest possible pH) and the fed conditions (highest possible pH conditions). The Figure 14 illustrates both pH vs time patterns.

CONFIDENTIAL INFORMATION



| R&D REPORT | Page 25 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |



Figure 14: Evolution of pH with transit time in the GIT post administration in the fasted state or in the fed state / case of an administration two hours post meal

From PK considerations, the release of the API from the modified release part of the formulation should not happen too soon, in order not to increase the Cmax due to the IR part. To develop the microparticles, we therefore considered the 'worst' case leading to the soonest release (i.e. the pattern with higher pHs corresponding to the fasted state).

Compared to the fasted state, the pH pattern has been slighltly simplified by replacing the 15minutes pH 6 phase by additional 15minutes in the pH 6,2 phase. The corresponding pH pattern described in Table 14 is referred as the 'pseudo' fasted state pattern.

| Dissolution medium - pH | Duration step |
|---|---|
| 0.1N HCl - 1.1 | 15min |
| Phosphate buffer - 6,2 | 1h15 |
| Phosphate buffer - 6,4 | 45min |
| Phosphate buffer - 6,6 | 40min |
| Phosphate buffer - 6,9 | 25min |
| Phosphate buffer - 7,4 | 20min |
| Phosphate buffer - 6,4 | / |

Table 14: Dissolution test to mimic in-vivo conditions – pH pattern corresponding to 'pseudo' fasted state

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002731

JTX-0230.25



| R&D REPORT | Page 26 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

## 4.5  Particle size determination

Particle size measurements are conducted on bulk microparticles using a Malvern Mastersizer 200 analyzer (laser diffraction technique) equipped with a Scirocco 2000 dry powder dispersion unit. Each measurement is carried out at 0.1 bars using 5 g samples.

The volume mean diameter D(4;3) measured is the average of three determinations.
The particle size distribution span is also determined. Span is a common calculation to quantify distribution width and is calculated as follows:

$$\text{Span} = \frac{D90 - D10}{D50}$$

Friability is evaluated using Flamel's in-house measurement method. It is used to predict potential attrition or damaging issues that could happen during the coating process or further handling of the product. It is measured using the Mastersizer 200 at two different air pressures (0.1 and 2 bars). The calculated decrease in particle diameter after measurement at 2 bars is the friability index expressed in %. The Friability Index is calculated as follows:

$$\text{Friability Index (\%)} = \frac{D(4;3)_{0.1\,bars} - D(4;3)_{2\,bars}}{D(4;3)_{0.1\,bars}} \times 100$$

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002732



| **R&D REPORT** | Page 27 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

## 5. FORMULATION DEVELOPMENT

### 5.1 Introduction

As described in paragraph 2 (cf Figure 1), two dissolution targets have been defined.

To meet the first target, the formulation will include an immediate release fraction representing 50% of the Sodium Oxybate dose and a controlled release fraction representing 50% of the Sodium Oxybate dose. The controlled release fraction is designed to fully release the active three hours after intake.

For the second target, the mixture will comprise an immediate release fraction representing 40% of the Sodium Oxybate dose and a controlled release fraction representing 60% of the Sodium Oxybate dose. The controlled release fraction is designed to provide a delayed release (of about one hour after intake) followed by a sustained release over a short duration (with 80% of the API released over around two additional hours).

Considering the high daily dose (4.5 to 9g), the formulations which were developed are powder formulations to be suspended extemporaneously in water just before administration.

They are composed of a first fraction of Immediate-Release microparticles and a second fraction of Controlled-Release microparticles (CR microparticles).

Additional excipients have to be included in the formulations to impart both physical and chemical stability to the aqueous suspension before administration (see paragraph 6.4).

The Micropump microcapsules are manufactured in two main steps (Figure 15):

1.  preparation of the drug-loaded microgranules
2.  preparation of the microcapsules by coating a diffusion film on the drug loaded microgranules



Figure 15 : Micropump microcapsules

Depending on the composition of the coated film, two kinds of microparticles can be distinguished. Sustained release (SR) microparticles have a diffusion coating whose properties are not dependent on pH: they exhibit a sustained release over time.

Modified release (MR) microparticles have a coating with pH dependent characteristics. The microparticles exhibit a delayed release at acidic pH and a rapid release at neutral pH.

Thus, the release of the drug can be triggered by time and/or pH to ensure drug delivery within the absorption window.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002733

JTX-0230.27


FLAMEL
technologies

| **R&D REPORT** | Page 28 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

## 5.2  Microgranules obtained by drug-layering on neutral cores (step 1)

The equipment used to manufacture the microgranules is a MiniGlatt or GPC-G1 spray-coater from Glatt in the Würster bottom-spray configuration (spraying upwards through a high air velocity zone inside a vertical tube).

### 5.2.1  Microgranules design

The drug-loaded microparticles should have the following properties:
- narrow size distribution with a mean diameter as small as possible to have an acceptable mouth feeling since the powder formulation has to be suspended in water prior to administration
- smooth surface and spherical shape
- low friability (see paragraph 4.5)
- and a drug content as high as possible considering the extremely high daily dose (4.5g to 9g).

Small inert cores (Cellets 100 and 127[12]) and high drug-layering levels (up to 85%) have therefore been selected to meet the requirements listed above (low particle size with a drug content as high as possible).

The coating level is expressed as follows:

$$\text{Coating level (\%)} = \frac{\text{Mass of coating excipients}}{\text{Mass of all dry materials}} *100$$

Ex: Drug-layering level = (Mass of API and binder )/Mass of all dry materials (API, binder and neutral cores) *100

### 5.2.2  Drug-layering step

Since Sodium Oxybate is highly soluble in water, water is the preferred medium for the drug-layering step. Considering the high drug-layering level targeted (85%), Sodium Oxybate was dissolved in hot water (60°C) to improve drying efficiency in presence of a low amount (10%) of a binder (PVP) with a solution dry content of 35%.

The aqueous drug-layering process carried out on the Miniglatt equipment proved to be difficult to control with a strong tendency of the microparticles to agglomeration. Water was therefore discarded as spraying medium.

Considering Sodium Oxybate solubility in water/organic solvent mixtures (see paragraph 3.3), a 40% water/ 60% ethanol (w/w) mixture was selected to minimize the water content while keeping a high solubilizing power for Sodium Oxybate.

Two different amounts of PVP were tested (5-10%) to determine the minimum quantity of binder necessary to obtain granules with a sufficient mechanical resistance to withstand the subsequent step of Micropump coating.

---

[12] Cellets 100 : Microcrystalline Cellulose Spheres (min 85% within 100-200µm  - mean diameter around 160µm), Pharmatrans Sanaq AG

Cellets 127: Microcrystalline Cellulose Spheres (min 85% within 100-160µm  - mean diameter around 140µm), Pharmatrans Sanaq AG

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002734

JTX-0230.28



| **R&D REPORT** | Page 29 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

The characteristics of the Sodium Oxybate solution for the drug-layering step are:
- Liquid phase: 40% water / 60% ethanol
- Dry content: 35%
- Binder content : 5-10%
- No heating of the solution before spraying
- Coating level: 85%

At the end of the drug-layering step, granules are sieved on 125µm and 400µm to remove very small particles and agglomerates

A preliminary batch made with 10% PVP led to very robust granules with a low friability. To maximize the API content in the granules, the binder percent was therefore decreased to 5%.

As described in the following paragraphs, two different kinds of neutral cores are used for the granules manufacturing (cellets 127 or cellets 100).

For both kinds of neutral cores, an acceptable manufacturing process has been implemented (Table 15 et Table 16) with an excellent manufacturing yield, granules content close to theory without degradation products and the production of robust granules (low friability).

| Batch | 82274304VRE | 82278606PDR | 82587606 | 82588804 | 82712706PDR |
|---|---|---|---|---|---|
| Batch size (g) | 2000 | | | | |
| Manufacturing yield (%) after sieving (125-400µm fraction) | 99 | 98 | 93 | 98 | 96 |
| Assay (%) (theory = 80.8%) | 81.2 | 81.2 | 81.9 | 81.6 | 81.4 |
| Degradation products (%) LOQ=0.05% | Below LOQ | Below LOQ | Below LOQ | Below LOQ | Below LOQ |
| Water content (%) | 0.5 | 0.7 | 0.7 | 0.6 | 0.7 |
| Ethanol content (ppm) | 4500 | 3000 | 3000 | 4000 | 3000 |
| Mean diameter D[4,3] | 270 | 268 | 285 | 266 | 273 |
| Friability (%) | 2 | 0 | 1 | 0 | 1 |

Table 15: Drug-layering – yield and granules characterizations (neutral cores: cellets 127)

CONFIDENTIAL INFORMATION



| R&D REPORT | Page 30 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

| Batch | 82272104VRE | 82586104FDS |
|---|---|---|
| Batch size (g) | 2000 ||
| Manufacturing yield (%) after sieving (125–400µm fraction) | 99 | 99 |
| Assay (%) (theory = 80.8%) | 81.5 | 81.0 |
| Degradation products (%) LOQ=0.05% | Below LOQ | Below LOQ |
| Water content (%) | 0.5 | 0.7 |
| Ethanol content (ppm) | 4500 | ? |
| Mean diameter D[4,3] | 294 | 293 |
| Friability (%) | 0 | 0 |

Table 16: Drug-layering – yield and granules characterizations (neutral cores: cellets 100)

As shown on picture 1, round-shaped granules are obtained.



Picture 1: Granules

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707



| R&D REPORT | Page 31 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

## 5.3 CR microparticles

### 5.3.1 CR microparticles for Target 1

#### 5.3.1.1 General considerations

As shown on Figure 1, the CR microparticles for Target 1 should release the API in-vivo 3 hours after administration.

Assuming a pH evolution in the gastro-intestinal tractus (GIT) similar to the one described in Table 14 (pseudo-fasted state), the microparticles are expected to release the API at the end of the intestine where the pH is close to 7.

To obtain such a release profile, microparticles with pH-dependent diffusion coatings (based on the Micropump II technology) are developed.

The Micropump coating is composed of:
- a hydrophobic compound, Lubritab [13]
- a hydrophilic polymer carrying groups that are ionized at neutral pH, commonly an Eudragit polymer [14].

The nature of each component controls the release rate as well as the coating level. Typically, the pH triggering the release (pH*) is set by the choice and mixture of appropriate Eudragit polymers. Two Eudragit polymers are typically used:
- Eudragit L100-55, with a pH*of 5.5
- Eudragit S100, with a pH* of 7.

#### 5.3.1.2 Development of CR microparticles with a pH* equal to 7

For the development of these microparticles, only Eudragit S100 is used in the Micropump coating.

A. Preliminary batches with 40% Lubritab:

Preliminary batches were manufactured by coating drug-layered microparticles using Cellets 127 as neutral cores by a Micropump II coating composed of a mixture of 40% Lubritab and 60% Eudragit S100. A drying step of 2 hours is performed post-coating to decrease the residual solvents in the coating. The dissolution profiles of microparticles manufactured with a coating level of 35% (and in-process samplings corresponding to coating levels of 23 and 28%) are represented on Figure 16 and Figure 17.

The effect of the coating level on the dissolution profile in 0.1N HCl is shown on Figure 16: the higher the coating level, the slower the release. Microparticles with coating levels of 23 and 28% start releasing the API after less than 3 hours whereas the release only starts after 4 hours for the 35% microparticles. To meet the in-vivo release target, microparticles should not release the API before three hours post-administration. On this basis, only the microparticles with a coating level of 35% have been further investigated.

---

13 Lubritab, Hydrogenated Vegetable Oil, JRS Pharma

[14] Eudragit, Röhm
Eudragit L100-55, Poly(methacrylic acid, ethyl acrylate) 1:1
Eudragit S100

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002737

JTX-0230.31



| R&D REPORT | Page 32 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

Their dissolution profile was determined in the medium mimicking the in-vivo conditions (pseudo fasted state conditions – see Table 14). As shown on Figure 17, the dissolution profile is close to the target with the microparticles starting to release the API during the pH 7.4 stage.



Figure 16: Dissolution profile in 0.1N HCl medium of CR microparticles 821369 – effect of coating level



Figure 17: Dissolution profile of CR microparticles 82136905 (35% coating level) in medium mimicking in-vivo conditions (pseudo-fasted state conditions)

An acceptable manufacturing process has been implemented with a good manufacturing yield (94%) and microparticles without degradation products. Nevertheless, the residual IPA content in the microparticles (15000ppm for a coating level of 35%) remains high despite the 2-hours drying step. The ICH Q3C (guideline) for class III solvents define an upper limit of 50mg per day which is acceptable without justification: assuming a maximum Sodium Oxybate daily dose of 9g with 4.5g for the modified released fraction, the daily amount of IPA would be around 120mg, i.e. well above the accepted upper limit.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002738

JTX-0230.32


FLAMEL
technologies

| **R&D REPORT** | Page 33 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

B. Optimization work:

Experiments from a previous project have shown that the amount of residual IPA is linked to the quantity of Eudragit present in the coating: microparticles with a lower amount of Eudragit polymers had a lower content of residual solvents.

According to Flamel's Micropump II patents (US8101209), the ratio Lubritab/Eudragit has to be kept in the range [0.5-1.5]. The coating composition with the highest possible amount of Lubritab is therefore 60%Lubritab/40%Eudragit.

Drug-layered microparticles with Cellets 127 as neutral cores have been coated by a Micropump II coating layer composed of a mixture of 60% Lubritab and 40% Eudragit S100 at coating level of 35%. During the coating process, two in-process samples were taken corresponding to coating levels of 24 and 29%.

The characteristics of the microparticles and of their manufacturing process are summarized in Table 17 for the previous coating composition (40%Lubritab/60%EudragitS100) and the new one (60%Lubritab/40%EudragitS100).

| Batch | 82270903PDR<br>**Previous formulation** | 82271105PDR<br>**New formulation** |
|---|---|---|
| Micropump layer<br>(composition) | 40% Lubritab / 60% Eudragit S100 | 60% Lubritab / 40% Eudragit S100 |
| pH* | 7 | 7 |
| Coating level (%) | 35 | 24-29-35 (final product) |
| Manufacturing yield (%) | 97 | 94 |
| Assay (%) | 53,5 | 53,8 |
| Degradation products (%) | <0.1 | <0.1 |
| Water content (%) | 0.4 | 0.3 |
| Residual solvents (ppm)<br>– 2hrs drying at 56°C | IPA: 14500 / Ethanol: 2000 | Final product - IPA: 4500 / Ethanol: 2000<br>Sample 29% - IPA: 3000 / Ethanol: 2500<br>Sample 24%- IPA: 2000 / Ethanol: 3000 |
| Mean diameter D[4,3]<br>(μm) | 331 | 330 (TP35%) |

Table 17: Characteristics of CR microparticles coated with a 40%Lubritab/60%EudragitS100 coating or a 60%Lubritab/40%EudragitS100 coating – manufacturing process comparison

The coating process for the 60%Lubritab/40%EudragitS100 composition has an excellent manufacturing yield and leads to microparticles without degradation products.

For the same coating level (35%), increasing the Lubritab content from 40% to 60% allows to divide the residual IPA content by a factor 3.

The effect of the coating level on the microparticles dissolution profile in the medium mimicking the in-vivo conditions (pseudo fasted state conditions) is shown on Figure 18. The microparticles with a coating level of 24% have a dissolution profile close to the target.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002739

JTX-0230.33



| R&D REPORT | Page 34 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |



Figure 18: Dissolution profile of CR microparticles 822711 in medium mimicking in-vivo conditions (pseudo-fasted state conditions) – effect of coating level

In conclusion, increasing the Lubritab content in the Micropump coating allows to:

- Decrease the coating level from 35% to around 25%
- Dramatically decrease the residual IPA content in the microparticles.

Two other batches have been manufactured to determine if the coating level can be further decreased. Results (not shown) from batch 825803 indicate that the dissolution profile is almost similar for coating levels of 22 and 25%. For lower coating levels (15% and 19% from batch 825847), release happens sooner with a smoother transition between the no-release phase and the full release phase (results not shown).

From a PK point of view, it is preferable to have a sharp transition with a full API release occurring very quickly. In this condition, the optimum coating level has been estimated to be in the range 22-25%.

Nevertheless, increasing the Lubritab content in the Micropump coating had a negative effect on the mechanical strength of the diffusion coating. Due to the crystalline nature of Lubritab, coatings with 60% Lubritab are more brittle than classical coatings with 40% Lubritab. We observed an erratic behavior from batch to batch with some batches exhibiting a burst in the dissolution profile whereas others had no burst. A visual observation of the microparticles highlighted a damage of the microparticles correlated with the burst observed on the dissolution profile. It has been demonstrated that such a damage occurred during the coating step. The problem was solved by reducing the atomizing pressure during the coating step form 2 bars to 1.6 bars.

The dissolution profile of the optimized microparticles has been determined at fixed pHs (Figure 19). At pH7, the dissolution profile exhibit a 4 hour lag-time with less than 20% released after 4 hours. At pH 7.5 (0.5 pH unit above pH*), less than 60% of the API is released after 1h. This beahviour is different from the one typically observed for coatings with a mixture of Eudragit L100-55 and S100: in a dissolution medium at pH equal to pH*, the release is very fast and becomes similar to an IR formulation at pH above pH*.

CONFIDENTIAL INFORMATION



| **R&D REPORT** | Page 35 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |



Figure 19: Dissolution profile of MR microparticles 82580303 (coating level = 25%) at fixed pHs

### 5.3.1.3 Development of CR microparticles with a pH* equal to 6.9

The dissolution profile of the microparticles with a pH*7 is close to the target (see Figure 18) but the API release occurs slightly too late.

The impact of decreasing pH* by adding a small amount of Eudragit L100-55 (pH*5.5) in the coating was studied. By replacing 3% of the 40% Eudragit S100 by Eudragit L100-55, the coating composition (60%Lubritab/37%Eudragit S100/3% Eudragit L100-55) has a pH* of 6.9.

Drug-layered microparticles using Cellets 127 as neutral cores have been coated by a Micropump II coating layer composed of a mixture of 60% Lubritab, 37% Eudragit S100 and 3% Eudragit L100-55 at a coating level of 30%. During the coating process, two in-process samples were taken corresponding to coating levels of 20 and 25%.



Figure 20: Dissolution profile of CR microparticles 825892 in medium mimicking in-vivo conditions (pseudo-fasted state conditions) – effect of coating level

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002741

JTX-0230.35



| R&D REPORT | Page 36 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

The effect of the coating level on the microparticles dissolution profile in the medium mimicking the in-vivo conditions (pseudo fasted state) is shown on Figure 20. The microparticles with a coating level of 25% have a dissolution profile on the target.

A coating level of 25% has therefore been chosen for the final prototype. A schematic view of the selected microparticles is represented on Figure 21.



Figure 21: Composition of CR pH*6.9 microparticles

The dissolution profile of the microparticles has also been determined at fixed pHs (Figure 21). The API release fastens close to pH* with more than 80% of the API released after one hour at pH7.



Figure 22: Dissolution profile of CR microparticles 82713302 (coating level = 25%) at fixed pHs

Two batches were manufactured with a coating level of 25%. The manufacturing process is reproducible with a good manufacturing yield. MR microparticles have similar characteristics with no degradation products, a low water content and low residual solvents content (Table 18).

Microparticles from both batches exhibit similar dissolution profile at fixed pH (Figure 23).

CONFIDENTIAL INFORMATION



| R&D REPORT | Page 37 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

| Batch | 82589204 | 82713303 |
|---|---|---|
| Batch size (g) | 571 | 600 |
| Manufacturing yield (%) | 95.9 | 95.8 |
| Assay (%) | 59,9 | 61,4 |
| Degradation products (%) | <0.05 | <0.05 |
| Water content (%) | 0.5 | 0.5 |
| Residual solvents (ppm) | IPA: 4000 / Ethanol: 3000 | IPA: 3000 / Ethanol: 3000 |
| Mean diameter D[4,3] (μm) | 315 | 314 |

Table 18: Characteristics of CR microparticles 82589204 and 82713303 coated with a 60%Lubritab/37%EudragitS100/3%EudragitL100-55 coating (coating level of 25%) - manufacturing process comparison



Figure 23: Dissolution profile of CR microparticles 82713303 and 82589204 (coating level = 25%) at fixed pHs

### 5.3.1.4 Development of CR microparticles with a pH* equal to 6.5

The choice of the formulations for the PK study is based on their dissolution profile in a medium mimicking the pH changes occurring in the GIT. The relevance of such a test to predict the in-vivo behavior of Micropump microparticles has however never been checked.

Another prototype of microparticles has therefore been developed with a pH* of 6.5 significantly lower than the pH* of 6.9 of the type 1 microparticles. Such microparticles are designed to release the API sooner in the GIT.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002743

JTX-0230.37



| **R&D REPORT** | Page 38 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

Drug-layered microparticles using Cellets 127 as neutral cores have been coated by a Micropump II coating layer composed of a mixture of 60% Lubritab, 26,7% Eudragit S100 and 13,3% Eudragit L100-55 at a coating level of 30%.

A schematic view of the microparticles is represented on Figure 24.



Figure 24: Composition of CR pH*6.5 microparticles

The dissolution profile of the microparticles in the medium mimicking the in-vivo conditions (pseudo fasted state) is shown on Figure 25. The microparticles release the API much faster than the target and therefore should release in-vivo the API sooner compared to the microparticles with a pH* of 6.9.



Figure 25: Dissolution profile of CR microparticles 82279004 in medium mimicking in-vivo conditions (pseudo-fasted state conditions)

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002744

JTX-0230.38



| R&D REPORT | Page 39 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

The dissolution profile of the microparticles has also been determined at fixed pHs (Figure 26). The API release fastens close to pH* and becomes immediate at pHs equal to pH* or higher.



Figure 26: Dissolution profile of CR microparticles 82279004 (coating level = 30%) at fixed pHs

Two batches were manufactured with a coating level of 30%. The manufacturing process is reproducible with a good manufacturing yield. MR microparticles have similar characteristics with no degradation products, a low water content and low residual solvents content (Table 19).

| Batch | 82279004 | 82710904 |
|---|---|---|
| Batch size (g) | 571 | 1000 |
| Manufacturing yield (%) | 96.5 | 96,2 |
| Assay (%) | 56.9 | 59,4 |
| Degradation products (%) | <0.05 | <0.05 |
| Water content (%) | 0.5 | 0.7 |
| Residual solvents (ppm) | IPA: 3500 / Ethanol: 2500 | IPA: 3000 / Ethanol: 2000 |
| Mean diameter D[4,3] (µm) | 316 | 311 |

Table 19: Characteristics of CR microparticles 82279004 and 82710904 coated with a 60%Lubritab/26.7%EudragitS100/13.3%EudragitL100-55 coating (coating level of 30%) - manufacturing process comparison

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002745



| **R&D REPORT** | Page 40 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

Microparticles from both batches exhibit similar dissolution profile at fixed pH (Figure 27) and in the medium mimicking the in-vivo conditions (Figure 28).



Figure 27: Dissolution profile of CR microparticles 82279004 and 82710904 (coating level = 30%) at fixed pHs



Figure 28: Dissolution profile of CR microparticles 82279004 and 82710904 in medium mimicking in-vivo conditions (pseudo-fasted state conditions)

CONFIDENTIAL INFORMATION



| R&D REPORT | Page 41 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

### 5.3.2 CR microparticles for Target 2

#### 5.3.2.1 General considerations

As shown on Figure 1, the CR microparticles for Target 2 should start releasing the API in-vivo after a one-hour lag-time followed by a sustained release with about 80% of the API released after two additional hours.

2 approaches have been considered.

#### - Use of a single layer coating

Some preliminary results on another API (Metformine) have shown that a dissolution profile close to the target could be obtained by coating Metformine granules (90% API coating on Cellets 90) with a single Micropump layer (80% EC20 / 2%PVP / 2%CrRH40 / 2% Castor Oil) at a 40% coating level.

The use of a single coating layer with non-dependent pH properties would lead to a release only driven by time, therefore not subject to inter-individual variability.

The same approach was applied for the Sodium Oxybate microparticles but proves to be unsuccessful: even for a coating of 40%, 80% of the API is released after 1h30 without latency period. This approach was therefore discarded and another approach was followed.

#### - Deposition of a Bi-layer coating

API granules are first coated by a non-pH dependent sustained-release coating to generate the desired sustained release. In a second step, the microparticles are further coated by a pH-dependent coating to generate the intended one-hour lag-time.

This approach leads to a release profile driven by time but also pH, therefore probably more subject to inter-individual variability due to different pH conditions occurring in the GIT.

#### 5.3.2.2 Development of microparticles with a bi-layer coating

5.3.2.2.1. First step: coating of the API granules with a non-pH dependent layer ("SR microparticles")

##### A. Microparticles development on Miniglatt equipment

First trials have been performed on Miniglatt equipment to minimize API consumption. A coating level of 25% has been selected as the maximum coating level to be applied on the drug-layered microparticles since the microparticles have to be further coated by the pH-dependent coating leading to a decrease of the API content in the microparticles.

To further save some API, bigger inert cores (Cellets 100) have been used in the first trials instead of the Cellets 127 selected for the development of the CR microparticles. To have a final particle size similar to drug layered particles obtained by coating Cellets 127 at a drug-layering level of 85%, Cellets 100 have been coated at a drug-layering level of 75%.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002747

JTX-0230.41



| R&D REPORT | Page 42 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

The Micropump diffusion coating used for coating the API granules is composed of:
- one insoluble polymer, Ethylcellulose [15]
- one soluble nitrogen-containing polymer, Polyvinylpyrrolidone [16]
- one surfactant, Polyoxyl 40 hydrogenated castor oil [17]
- one plasticizer, Castor oil [18] or Polyethylene glycol [19].

The release profile can be controlled by the nature and proportions of these components.

As a first approach, drug-layered microparticles have been coated by the Micropump coating with the following composition (weight %): 80 Ethylcellulose 20 Std Premium / 8 PVP K29-32 / 4 CremophorRH40 / 8 Castor Oil (reference batch 82132703).

The dissolution profile of the microparticles is on the target as shown on Figure 29.



Figure 29: Dissolution profile of SR microparticles 82132703 in 50mM pH 6.8 phosphate buffer

**Variation of the composition of the coating layer**

In order to decrease the coating level, the effect of the coating composition on the microparticles dissolution profile has been investigated.

- Ethylcellulose-based coating compositions:

Drug-layered microparticles have been coated by different coating compositions with a higher content of hydrophobic excipients:
- 80EC20 / 2PVP / 2CrRH40 / 16CO (=PVP and CrRH40 levels decreased to low values)
- 80EC20 / 8PVP / 12CO (=composition without Cremophor RH40).

Another composition has been tested by replacing Castor Oil by PEG400.

---

[15] Ethocel Premium 20, Dow Chemical
[16] Plasdone K29-32, ISP
[17] Cremophor RH 40, Degussa
[18] Castor oil, Huileries Garbit
[19] PEG, Uniquema

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002748

JTX-0230.42



| **R&D REPORT** | Page 43 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

All batches exhibit a dissolution profile faster than the reference batch (Figure 30).



Figure 30: Dissolution profile in pH 6.8 50mM phosphate buffers of EC-based SR microparticles batches

- Compositions with Cellulose Acetate Butyrate (CAB):

Drug-layered microparticles have also been coated by a composition based on Cellulose acetate butyrate as insoluble cellulosic derivative polymer (80CAB / 10Klucel EF / 10PEG400). Such a coating has already been implemented by Flamel on other projects.

CAB microparticles exhibit a dissolution profile much faster than the reference batch (Figure 31).



Figure 31: Comparison of dissolution profile in pH 6.8 50mM phosphate buffers of CAB-based microparticles batch vs EC-based reference batch

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002749

JTX-0230.43



| **R&D REPORT** | Page 44 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

**Addition of an acidic component with the API in the drug-layer**

Since the API solubility slightly decreases in acidic media (see Figure 5), an attempt has been made to slowdown the dissolution profile by incorporating an acidic excipient (malic acid) in the drug layer (90% AI / 5%PVP / 5% malic acid).

The dissolution profile of the coated microparticles (batch 82134504) being similar to the coated microparticles without malic acid, the approach of adding malic acid in the drug layer has been rejected.

**Conclusion:** the coating selected for the development of the microparticles on the GPCG1 fluid-bed coater has the following composition (80 Ethylcellulose 20 Std Premium / 8 PVP K29-32 / 4 CremophorRH40 / 8 Castor Oil).

B. Microparticles development on the GPCG1 equipment

In order to minimize the coating level of both subsequent diffusion layers, we chose to continue to use Cellets 100 (with a mean diameter D[4,3] of 160µm) instead of the Cellets 127 (D[4,3]=140µm) used for the microparticles developed for the target 1.

The composition of the SR microparticles is represented on Figure 32.

The release profile of the first microparticles (batch 82273205) manufactured on the GPCG1 fluid bed coater is slightly faster than the target since 80% of the API is released in about 1h30 (see Figure 33). Nevertheless, such a release profile is considered as acceptable.



Figure 32: Composition of SR microparticles

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002750

JTX-0230.44



| **R&D REPORT** | Page 45 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |



Figure 33: Dissolution profile in pH 6.8 50mM phosphate buffer

Three microparticles batches were manufactured to evaluate the process robustness (Table 20):

- The manufacturing process is reproducible with a good manufacturing yield.
- SR microparticles have similar characteristics with no degradation products, low water content and low residual solvents content.

| Batch | 82273205VRE | 82277003VRE | 82586803VRE |
|---|---|---|---|
| Batch size (g) | 507 | 667 | 1000 |
| Manufacturing yield (%) | 96 | 96 | 97,1 |
| Assay (%) | 61,9 | 61,9 | 60,7 |
| Degradation products (%) | <0.1 | <0,05 | <0,05 |
| Water content (%) | 0.5 | 0,5 | 0,77 |
| Residual solvents (ppm) | Acetone : < 500 IPA : < 500 Ethanol: 3000 | Acetone : < 500 IPA : < 500 Ethanol: 2500 | Acetone : NDt IPA : < 500 Ethanol: 2500 |
| Mean diameter D[4,3] (µm) | 337 | 334 | 337 |

Table 20: Characteristics of SR microparticles 82273205, 82277003 and 82586803 - manufacturing process comparison

As shown on Figure 33, SR microparticles from the three batches exhibit similar dissolution profiles.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002751

**JTX-0230.45**



| R&D REPORT | Page 46 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

5.3.2.2.2. Second step: coating of SR microparticles with a pH-dependent coating

A. Obtention of a prototype matching the target profile

The microparticles matching target 2 are expected to start releasing the API after a 1-hour lag-time. Assuming a pH evolution in the gastro-intestinal tractus (GIT) similar to the one described in Table 14 (pseudo-fasted state), the microparticles should release the API in an area of the GIT where the pH is close to 6.2.

To obtain such a release profile, the sustained release microparticles are coated by a pH-dependent diffusion coating with a trigger pH (pH*) of 6.5 (coating composition: 60% Lubritab / 26,7% Eudragit S100 / 13,7% Eudragit L100-55). A coating level of 20% has been implemented with an in-process sampling for a coating level of 18%.

The effect of the coating level on the microparticles dissolution profile in the medium mimicking in-vivo conditions (pseudo fasted state) is shown on Figure 34. After a latency period, the microparticles exhibit a release profile similar to the release profile from the sustained release microparticles alone.



Figure 34: Dissolution profile of SR/MR microparticles 82582703PDR (coating level: 18%) and 82582704PDR (coating level: 20%) in medium mimicking in-vivo conditions (pseudo-fasted state conditions): effect of coating level – comparison with dissolution profile corresponding SR microparticles (before coating) 82277003VRE / pH 6.8 phosphate buffer

CONFIDENTIAL INFORMATION



| **R&D REPORT** | Page 47 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

The 82582704PDR microparticles with a coating level of 20% have a dissolution profile very close to the target with a one hour lag-time followed by a sustained-release of about 80% in 1h30 (Figure 35).



Figure 35: Dissolution profile of SR/MR microparticles 82582704PDR (coating level of 20%) in medium mimicking in-vivo conditions (pseudo-fasted state conditions)

A coating level of 20% has therefore been chosen for the final prototype. A schematic view of the microparticles is represented on Figure 36.



Figure 36: Composition of SR/MR microparticles with a bi-layer coating

CONFIDENTIAL INFORMATION



| **R&D REPORT** | Page 48 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

The dissolution profile of the microparticles has also been determined at fixed pHs (Figure 37). The API release fastens close to pH* with a sustained-release without latency period at pH above pH*.



Figure 37: Dissolution profile of SR/MR microparticles 82582704 (coating level = 20%) at fixed pHs

### B. Reproducibility

Two batches were manufactured with a coating level of 25%. The manufacturing process is reproducible with a good manufacturing yield. SR/MR microparticles have similar characteristics with no degradation products, a low water content and low residual solvents content (Table 21).

| Batch | 82582704 | 82588203 |
|---|---|---|
| Batch size (g) | 625 | 1000 |
| Manufacturing yield (%) | 96 | 98,6 |
| Assay (%) | 49.1 | 48,6 |
| Degradation products (%) | <0.05 | <0.05 |
| Water content (%) | 0,6 | 0,4 |
| Residual solvents (ppm) | Acetone : NDt<br>IPA : 1500<br>Ethanol: 1500 | Acetone : NDt<br>IPA : 3000<br>Ethanol: 2500 |
| Mean diameter D[4,3] (µm) | 365 | 374 |

Table 21: Characteristics of SR/MR microparticles 82582704 and 82588203 - manufacturing process comparison

CONFIDENTIAL INFORMATION



| R&D REPORT | Page 49 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

Microparticles from both batches exhibit similar dissolution profile at fixed pH (Figure 38) and in the medium mimicking the in-vivo conditions (Figure 39).



Figure 38: Dissolution profile of SR/MR microparticles 82582704 and 82588203 (coating level = 30%) at fixed pHs



Figure 39: Dissolution profile of SR/MR microparticles 82582704 and 82588203 in medium mimicking in-vivo conditions (pseudo-fasted state conditions)

### 5.3.3 Microparticles stability

Microparticles stability (both chemical stability and dissolution profile stability) was investigated at Room Temperature (RT)-25°C/60%RH and 40°C/75%RH.

Due to recurrent failure of the 25°C/60%RH climatic chamber, it was not possible to control temperature and relative humidity for the first months of the stability experiment. So during the first

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707



| R&D REPORT | Page 50 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

months of the stability, samples were kept at RT (temperature in the range 20-28°C / RH in the range 40-80%).

The control of the relative humidity of the 40°C/75%RH climatic chamber was also out of order at the end of the stability studies. So during around one month, samples were kept at 40°C in the chamber but without humidity control (RH in the range 15-40%).

Table 22 summarizes the exact temperature/relative humidity conditions prevailing during the stability studies performed on the microparticles batches. Stability conditions will be however referred as 25°C/60%RH and 40°C/75%RH in the results summarized below.

| Stability study | Batch (lubricated microparticles) | Microparticles batch | Study start | ICH condition: 25°C/60%RH / effective T and RH | ICH condition: 40°C/75%RH / effective T and RH |
|---|---|---|---|---|---|
| **PSFT1312** | 82580801 | 82580303 | 19/04/2013 | 3months RT without humidity control - 3months 25°C/60%RH | 5.5months 40°C/75%RH - 0.5month 40°C without humidity control |
| **PSFT1314** | 82582201 | 82279004 | 30/04/2013 | ≈3months RT without humidity control - 3months 25°C/60%RH | 5months 40°C/75%RH - 1month 40°C without humidity control |
| **PSFT1321** | 82585001 | 82582704 | 13/05/2013 | 2.5months RT without humidity control - 3.5months 25°C/60%RH | 4.5months 40°C/75%RH - 1.5month 40°C without humidity control |

Table 22: Conditions for microparticles stability studies

For the stability studies, 15-20g of microparticles were packaged in HDPE bottles (Rexam) without heat-sealing the closures and with 2*1g dessicants (Multisorb) in the bottle to be in packaging conditions close to the intended conditions for the IMPD batches.

### 5.3.3.1 CR pH*7 microparticles (PSFT1312)

- Chemical stability (Table 23):

| Batch | 82580801 (microparticles batch: 82580303) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | T0 | 1month 25°C/60 %RH | 2 months 25°C/60 %RH | 3 months 25°C/60 %RH | 6 months 25°C/60 %RH | 1 month 40°C/75 %RH | 2 months 40°C/75 %RH | 3 months 40°C/75 %RH | 6 months 40°C/75 %RH |
| Assay (%) | 59,7 | 60 | 60,1 | 59,3 | 58,6 | 60,3 | 60,6 | 60 | 59,1 |
| Degradation products: lactone (%) | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 |
| Water content (%) | 0,5 | 0.4 | 0.4 | 0.5 | 0.5 | 0.4 | 0.5 | 0.6 | 0.7 |

Table 23: PSFT1312 stability results

Lactone content remains below the limit of qualification (0.05%) after 6 months in both conditions. There is no significant evolution of the water content after 6 months.

- Dissolution profiles stability:

The dissolution profile of the CR pH*7 microparticles has been determined at 25°C/60%RH and 40°C/75%RH in two media (0.1N HCl and pH6 phosphate buffer). As shown on Figure 40 and Figure 41, there is only a slight and progressive slowdown of the release at 25°C/60%RH. The dissolution

CONFIDENTIAL INFORMATION



| R&D REPORT | Page 51 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

slowdown happens more quickly at 40°C/75%RH with a steady dissolution profile after one month and a slight acceleration after 6 months.



Figure 40: Stability at 25°C/60%RH of CR pH*7 microparticles 82580303: dissolution profile in 0.1N HCl and pH6 50mM phosphate buffer



Figure 41: Stability at 40°C/75%RH of CR pH*7 microparticles 82580303: dissolution profile in 0.1N HCl and pH6 50mM phosphate buffer

### 5.3.3.2  CR pH*6.9 microparticles

Microparticles alone have not been followed in stability.

*A full composition with CR pH*6,9 microparticles (batch 82713901) has been manufactured to generate stability data for the IMPD. See paragraph 5.3.3.2 for the full composition characterization and stability data (PSFT1325).*

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002757

JTX-0230.51



| R&D REPORT | Page 52 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

### 5.3.3.3 *CR pH\*6,5 microparticles (PSFT1314)*

- Chemical stability (Table 24):

| Batch | 82582201 (microparticles batch: 82279004) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | T0 | 1month 25°C/60 %RH | 2 months 25°C/60 %RH | 3 months 25°C/60 %RH | 6 months 25°C/60 %RH | 1 month 40°C/75 %RH | 2 months 40°C/75 %RH | 3 months 40°C/75 %RH | 6 months 40°C/75 %RH |
| Assay (%) | 55,9 | 56,7 | 56,1 | 56,1 | 56,5 | 57,5 | 57 | 55,9 | 56,3 |
| Degradation products: lactone (%) | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 |
| Water content (%) | 0,5 | 0.5 | 0.5 | 0.6 | 0.5 | 0.5 | 0.6 | 0.6 | 0.7 |

Table 24: PSFT1314 stability results

Lactone content remains below the limit of qualification (0.05%) after 6 months in both conditions. There is no significant evolution of the water content after 6 months.

- Dissolution profiles stability:

The dissolution profile of the CR pH\*6.5 microparticles has been determined at 25°C/60%RH and 40°C/75%RH in two media (0.1N HCl and pH6 phosphate buffer).

As shown on Figure 42, there is a slight and progressive slowdown of the release at 25°C in 0.1N HCl but the dissolution profile remains unchanged at pH6.
The release slowdown in 0.1N HCl happens more quickly at 40°C/75%RH (Figure 43) with a steady dissolution profile after one month. At pH6, the dissolution profile is unchanged.
The dissolution profile was also determined at pH 6.8 for the 3/6 months stability points (results not shown): in both conditions, the API release is immediate.



Figure 42: Stability at 25°C/60%RH of CR pH\*6,5 microparticles 82277904: dissolution profile in 0.1N HCl, pH6 and pH 6.8 50mM phosphate buffer

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002758

JTX-0230.52



| R&D REPORT | Page 53 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |



Figure 43: Stability at 40°C/75%RH of CR pH*6,5 microparticles 82277904: dissolution profile in 0.1N HCl and pH6 and pH 6.8 50mM phosphate buffer

*A full composition with MR pH*6,5 microparticles (batch 82712901) has been manufactured to generate stability data for the IMPD. See paragraph 5.5.3.3 for the full composition characterization and stability data (PSFT1323).*

### 5.3.3.4 Bi-layer coated SR/MR pH*6,5microparticles (PSFT1321)

- Chemical stability (Table 24):

| Batch | 82585001 (microparticles batch: 82582704) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | T0 | 1month 25°C/60 %RH | 2 months 25°C/60 %RH | 3 months 25°C/60 %RH | 6 months 25°C/60 %RH | 1 month 40°C/75 %RH | 2 months 40°C/75 %RH | 3 months 40°C/75 %RH | 6 months 40°C/75 %RH |
| Assay (%) | 47,7 | 49,1 | 48,4 | 48,9 | 48,5 | 48,2 | 48,9 | 48,4 | 49,1 |
| Degradation products: lactone (%) | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 |
| Water content (%) | 0,3 | 0.5 | 0.5 | 0.7 | 0.5 | 0.5 | 0.7 | 0.6 | 0.7 |

Table 25 : PSFT1321 stability results

Lactone content remains below the limit of qualification (0.05%) after 6 months in both conditions. There is no significant evolution of the water content after 6 months.

- Dissolution profiles stability:

The dissolution profile of SR/MR pH*6.5 microparticles has been determined at 25°C/60%RH and 40°C/75%RH in two media (0.1N HCl and pH6.8 phosphate buffer).
As shown on Figure 44 and Figure 45, a rather steady dissolution profile is obtained between one month and 6months at 25°C/60%RH, and between one month and 3months at 40°C/75%RH. At 40°C/75%RH, the dissolution profile fastens between 3 and 6months.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002759



| R&D REPORT | Page 54 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |



Figure 44: Stability at RT of SR/MR pH*6,5 microparticles 82582704: dissolution profile in 0.1N HCl and pH6.8 50mM phosphate buffer



Figure 45: Stability at 40°C/75%RH of SR/MR pH*6,5 microparticles 82582704: dissolution profile in 0.1N HCl and pH6.8 50mM phosphate buffer

At pH 6.8, the dissolution profile is unchanged and is similar to the dissolution of the SR microparticles.

*A full composition with SR/MR pH*6,5 microparticles (batch 82712501) has been manufactured to generate stability data for the IMPD. See paragraph 5.3.3.4 for the full composition characterization and stability data (PSFT1322).*

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002760

JTX-0230.54



| R&D REPORT | Page 55 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

## 5.4  Development of the full composition (mixture of IR and CR parts)

### 5.4.1  General considerations

The formulations are to be reconstituted in water just before administration.

For a 4,5g unit dose, a volume of water for reconstitution of 40ml has been chosen in order to have in the suspension to be swallowed a percentage of insoluble matters of around 10%, which might be considered as acceptable for the mouth-feeling sensation.

The following additional excipients are present in the formulations:
-   a suspending agent to limit microparticles sedimentation after reconstitution
-   an acidic excipient to impart chemical and physical stability to the microparticules during the reconstitution step in water prior to administration
-   and lubricant/gliding agent to impart flowability to the mixture

### 5.4.2  Suspending agent: xanthan gum

For the administration phase, microparticles have to remain in suspension without settling too quickly. Xanthan gum is selected as a suspending aid agent. At a concentration of 0.5% (relatively to the dry formulation), xanthan gum proves to be efficient to maintain the microparticles in suspension for a few minutes.

### 5.4.3  Acidic excipient – development of the reconstitution protocol

-   Choice of the acidic excipient:

Each full formulation contains an IR fraction and a CR fraction.

For a 4,5g unit dose, assuming a 50/50 mixture, each fraction contains 2.25g of API.
By solubilizing 2.25g of Sodium Oxybate in 40ml of water, the pH of the solution increases up to 8 due to the strong alkaline character of the API (Sodium Oxybate is a sodium salt of a weak base).
At such a high pH above the theoretical pH* of the MR microparticles, MR microparticles are not stable due to a solubilization of the Eudragit from the Micropump coating.

To lower the pH of the suspension and therefore ensure the stability of the MR microparticles during the reconstitution step, an acidic excipient has to be included in the formulation.
Malic acid, tartaric acid and citric acid have been tested. To decrease the pH of a Sodium Oxybate solution in water (2.25g in 40ml of water) from 8 to 4, the quantity of excipient to be added is respectively equal to 75% of the API amount, 53% and 71% for malic acid, tartaric acid and citric acid. Tartaric acid proves to be more efficient than malic acid and citric acid to decrease the suspension pH.
However, considering that malic acid is currently used in the Xyrem solution, malic acid is chosen for the development of the full formulation.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002761


FLAMEL
technologies

| R&D REPORT | Page 56 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

- <u>Determination of the quantity of malic acid:</u>

As a first step, the effect of malic acid quantity on the pH of a Sodium Oxybate solution has been studied.

From a pH8 Sodium Oxybate solution in water (corresponding to the solubilization of 2.25g API in 40ml), malic acid has to be added in a quantity equal to:
- 0.25% of the API amount to decrease the solution pH to 7.3
- 4.3% of the API amount to decrease the solution pH to 6
- 20.7% of the API amount to decrease the solution pH to 5
- and 75% of the API amount to decrease the solution pH to 4.

Considering that the pH of the reconstituted formulation has to be below 6.5 (6.5= pH* of the Micropump coating for SR/MR microparticles and MR pH*6,5), a quantity of malic acid of 5 and 10% is selected.

Full compositions are composed of a lubricated mixture comprising:
- IR microparticles corresponding to 2.25g API,
- CR microparticles corresponding to 2.25g API,
- xanthan gum
- malic acid in a quantity equal to 5 or 10% of the API amount in the IR fraction
- 1% Magnesium stearate and 0.5% Silicon dioxide (Aerosil 200) as lubricant and gliding agent.

The following reconstitution protocol is followed to determine the release profile of the compositions:
- a 4.5g unit dose formulation is poured in a 100ml glass bottle
- 40ml of tap water is added
- after closing the bottle, it is shaken vigorously during around one minute
- after a 15 minutes rest, the reconstituted formulation is poured in the dissolution vessel
- 10ml of tap water is added to rinse the bottle and is poured in the dissolution vessel.

After the 15minutes reconstitution step, the pH of the suspension with 5% malic acid is equal to 5.7, whereas the pH of the suspension with 10% malic acid is equal to 5.35.

As a reference, the dry mixture is directly poured in the dissolution vessel.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002762

JTX-0230.56



| R&D REPORT | Page 57 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

*Case 1: composition with MR pH\*6.5 microparticles (82279004 batch)*
As shown on Figure 46, the dissolution profile of the 2 formulations with 5 and 10% malic acid is very similar to the dissolution profile of the dry mixture.
Based on this result, it has been decided to incorporate malic acid in a quantity equal to 10% of the API amount in the IR fraction in order to have a safety margin.



Figure 46: Dissolution profile of a full sachert composition composed of 2.25g of the dose as IR microparticules and 2.25g of the dose as MR microparticles MR pH\*6,5

*Case 2: composition with SR/MR pH\*6.5 microparticles (82582704 batch)*
The same experiment was made with formulations incorporating SR/MR pH\* 6.5 microparticles. The dissolution profile of a full composition with 10% malic acid is compared to a dry mixture of lubricated microparticles and to the same composition without malic acid.

As shown on Figure 47, the dissolution profile of the reconstituted suspension with 10% malic acid is similar to the dissolution profile of the dry mixture.



Figure 47: Dissolution profile of a full composition composed of 2.25g of the dose as IR microparticules and 2.25g of the dose as SR/MR microparticles pH\*6,5 with or without malic acid

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002763

JTX-0230.57



| **R&D REPORT** | Page 58 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

Without malic acid, the API release starts without latency period. This can be explained by the pH of the suspension after the 15 minutes reconstitution step (6.4). The pH of the suspension without malic acid was expected to be close to 8 (see above). During the reconstitution step, the IR fraction is supposed to solubilize first leading to a strong increase of the pH, a partial solubilization of the Eudragit could occur with a subsequent decrease of the suspension pH.

Additionaly, it has been checked that the reconstituted formulation is chemically stable (with no lactone formed) during the 15 minutes reconstitution step.

Remark: for the formulation development, we have considered a 15 minutes reconstitution step prior to dissolution testing. We checked that this 15minutes step has no impact on the formulations dissolution profile.

For the PK study, a 5 min interval is chosen for the reconstitution protocol. Making sure that the formulation is stable for 15minutes gives a safety margin for the administration phase of the PK study.

Additionally, from the patient point of view, people are not expected to wait for 15 minutes before taking their medicine. A 5 minutes interval seems more reasonable.

### 5.4.4 Development of the IR component

- Physical form :

Due to the low density and flowability of the raw API powder it was chosen for the early development (first pilot PK) to manufacture drug-layered IR microparticles by spray-coating. This approach will be revisited in the future development.

- Interactions between malic acid and Sodium Oxybate

Interactions between the drug-layered microparticles and malic acid in the full composition could lead to stability issues, through the formation of lactone as a degradation product.

The stability of drug-layered microparticles has therefore been evaluated at 40°C/75%RH in presence of a huge amount of malic acid (malic acid quantity equal to 75% of the API amount).
As shown in Table 26, lactone formation happens very quickly in presence of malic acid. Adding desiccants allows to slowdown the API degradation.

| FSFT | Desiccant | Bottle | % malic acid | Lactone content - 1month stability (%) | Lactone content - 2months stability (%) |
|---|---|---|---|---|---|
| 1303 | Without desiccant | Heat sealed | 75 | 0,9 | 45 |
| 1304 | With dessicant (2*1g) | Rexam 60ml bottles | | 0,4 | 7 |

Table 26: Stability of IR microparticle in presence of malic acid with or without dessiccant

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002764



| **R&D REPORT** | Page 59 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

- <u>Deposit of a seal-coat on drug-layered microparticles:</u>

To avoid lactone formation in presence of malic acid, a seal-coat could be deposited on the drug-layered microparticles.

Klucel (HPC) was selected as the seal-coat component because:

- the seal-coat layer should not slowdown the solubilization of the API from the IR component. From PK considerations, it is critical that the IR fraction is fully solubilized prior to administration to have a first PK peak similar to the peak occurring after administration of a Xyrem dose
  - As previously discussed, the duration between the reconstitution step and the administration of the suspension should be short enough to be accepted by the patient. The solubilization of the IR part should therefore be as fast as possible.
- Klucel is soluble in organic solvents, such as acetone which is a very poor solvent for Sodium Oxybate.

The solubilization rate from the drug-layered microparticles with Klucel seal-coat (coating level: 10%) was studied after dispersion of a full composition in tap water. After the shaking step, suspension was let to stand without agitation. Samples were taken up to 15 minutes to determine the solubilization profile. As shown on Figure 48, all the API is solubilized after the first minute. The seal-coat layer does not hinder the release of the IR microparticles.

Stability experiments were conducted with the 'optimized' amount of malic acid (10%) and drug-layered microparticles without seal-coat or with seal-coat at two coating levels (5/10%) - (Table 27).

Without desiccant, the seal-coat layer has a positive effect to prevent lactone formation during the first three months. After 6months, the lactone content is similar for all microparticles.
With desiccant, the lactone content is only slightly above the LOQ after 6months even without seal-coat.

For the stability of the IR fraction in presence of 10% malic acid, depositing a seal-coat on the drug-layered microparticles might not be necessary for future development if desiccants are included in the formulation packaging.



Figure 48: Dissolution rate of Sodium Oxybate from IR microparticles with a 10% Klucel seal-coat in a full formulation

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002765

JTX-0230.59



| R&D REPORT | Page 60 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

| IR microparticles | Desiccant | PSFT | Lactone content (%) | | | | |
|---|---|---|---|---|---|---|---|
| | | | T0 | 1month | 2months | 3months | 6months |
| Without seal-coat | Without desiccant | 1315 | <0.05 | 1,4 | 3,8 | 4,8 | 3,6 |
| | With desiccant (2*1g) | 1316 | | < 0.05 | < 0.05 | < 0,05 | 0,06 |
| With seal-coat (5% Klucel EF) | Without desiccant | 1317 | | 0,4 | 1,1 | 2,6 | 4,4 |
| | With desiccant (2*1g) | 1318 | | <0.05 | <0.05 | < 0,05 | 0,08 |
| With seal-coat (10% Klucel EF) | Without desiccant | 1319 | | 0,1 | 0,7 | 1,5 | 4,7 |
| | With desiccant (2*1g) | 1320 | | <0.05 | <0.05 | 0,06 | 0,08 |

Table 27: Stability of IR microparticles and seal coated IR microparticles in presence of malic acid (with or without desiccant)

*N.B.: only partial stability data were available when final formulations for the first pilot PK had to be selected. On the basis of these available results, it was chosen to deposit a HPC seal-coat on the drug-layered microparticles with a 10% coating level.*

- Reproducibility of seal-coating process:

The robustness of the seal-coating process was evaluated on two batches at two different scales. The manufacturing process is reproducible with a good manufacturing yield. Seal-coated microparticles have similar characteristics with no degradation products, a low water content and low residual solvents content (Table 28).

| Batch | 82583004 | 82711703 |
|---|---|---|
| Batch size (g) | 450 | 1700 |
| Manufacturing yield (%) after sieving (125-400µm fraction) | 96 | 98 |
| Assay (%) | 72,9 | 74,7 |
| Degradation products (%) LOQ=0.05% | Below LOQ | Below LOQ |
| Water content (%) | 0.5 | 0.7 |
| Ethanol content (ppm) | 2000 | 3000 |
| Acetone ppm) | Ndt | Ndt |
| Mean diameter D[4,3] | 280 | 298 |

Table 28: Characteristics of Klucel sela-coated microparticles 82583004 and 82711703 - manufacturing process comparison

CONFIDENTIAL INFORMATION



| **R&D REPORT** | Page 61 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

## 5.5 Full compositions:

### 5.5.1 Description of the 3 prototypes selected for the PK study

The denomination of the full compositions selected for the PK study is indicated in Table 29.

| **Full composition** | **Corresponding CR microparticles** |
|---|---|
| Sodium Oxybate CR, Granules for oral suspension Type 1 | Type 1 (=CR pH*6,9) |
| Sodium Oxybate CR, Granules for oral suspension Type 2 | Type 2 (=CR pH*6,5) |
| Sodium Oxybate CR, Granules for oral suspension Type 3 | Type 3 (=SR/MR pH*6,5) |

Table 29: Denomination of full compositions prototypes

A schematic description of the microparticles used for each prototype is represented in annex 1. For all prototypes, a dose of 4.5g API per unit has been selected. The composition of a single unit dose of 4.5g is detailed in annex 2 for each prototype.

### 5.5.2 Full compositions: packaging and stability conditions

Full formulations have been manufactured to generate stability data for the IMPD of the human PK study. Unit doses were therefore packaged in the packaging selected for the PK study:
- CAPE DUMA TWIST-OFF028277 with integrated 2g silica dessiccant
- DUMA TWIST-OFF 035050 HDPE Bottles White 30mL

Due to the high unit dose (4.5g), it has been decided to have a single unit dosing packaging for the formulations analysis (t0) and for the 1 month stability point. For the other stability points, a quantity corresponding to a little more than 2 unit doses per bottle has been packaged in 50ml bottles (DUMA TWIST-OFF 035050 HDPE Bottles White 50mL) to limit the total number of stability bottles.

The following analysis plan has been decided to characterize the full formulations (dissolution testing, assay and degradation products, water content) - Table 30.

| Stability time point | Dissolution testing (pH medium) - Number of vessels | | | | Other analyses (assay, content, water content) | Total units |
|---|---|---|---|---|---|---|
| | 0.1N HCl | 6.8 | Other pH | Pseudo-fasted state | | |
| T0 | 6 | 2 | 2 | 2 | 2 units for the assay and degradation products content<br>1 for the water content | 15 single units |
| T1mois | 6 | 2 | NA | 2 | 2 units for the assay and degradation content<br>1 for the water content | 13 single units |
| Other stability points (bottle units - vessels) | 3 | 1 | NA | 2 | 1 uniform for all analysis | 4 units |
| | 2 units – 4 vessels | | NA | 1 unit – 2 vessels | | |

Table 30: Analysis of the full composition formulations

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002767

JTX-0230.61



| R&D REPORT | Page 62 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

### 5.5.3 Full compositions: manufacturing and characterization

#### 5.5.3.1 Protocol for full compositions manufacturing

The full composition contains an immediate release fraction representing 40 to 50% of the Sodium Oxybate dose (depending on the prototype) and a controlled release fraction.

Aerosil 200 is first added to the components (microparticles, malic acid, xanthan gum) and the mixture is homogenized during 15minutes using a Roue Rhön mixer. In a second step, the mixture is lubricated with magnesium stearate during 15minutes in the Roue Rhön mixer.
The homogenized mixture is then distributed manually in the packaging bottles.

#### 5.5.3.2 Sodium Oxybate CR, granules for oral suspension Type 1 (with CR pH*6,9 microparticles)

Full composition:

The full formulation contains an immediate release fraction representing 50% of the Sodium Oxybate dose and a controlled release fraction representing 50% of the Sodium Oxybate dose.

The composition of the full mixture (82713901) is indicated in Table 31. Each single unit dose contains 7.18g of mixture.

| Component | batch | 82713901VRE | |
|---|---|---|---|
| | | Quantity (g) | Theoritical unit composition (g) |
| IR microparticles | 82711703FDS | 424,99 | 3,096 |
| Microparticule MR pH*6.9 | 82713303VRE | 509,98 | 3,715 |
| Malic acid | 10/12 | 30,89 | 0,225 |
| Xantural 180 | 9C4345K | 4,93 | 0,036 |
| Aerosil 200 | MPE00004373 | 4,93 | 0,036 |
| MgSt | MPE00005406 | 9,86 | 0,072 |
| | Quantity | 985,56 | 7,180 |

Table 31: Mixture composition and single dose unit composition for Type 1 formulation

Full composition analysis:

For the full analysis of the seal-coated IR microparticles and the CR microparticles Type 1, see respectively Table 28 and Table 18.

The dose per unit is close to the theory (4.5g). The water content is low and the degradation product content is below the LOQ (Table 31).

| Batch | 82713901 |
|---|---|
| Assay (%) | 64,1 |
| Dose per unit (g) | 4,59 |
| Degradation products (%) | <0.05 |
| Water content (%) | 0.68 |

Table 32: Type 1 formulation analysis at t0

Dissolution profile of full composition after reconstitution step:
The dissolution profiles of the 6 vessels in 0.1N HCl are very similar showing that there is no inter-unit variability (Figure 49).

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002768

JTX-0230.62



| R&D REPORT | Page 63 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |



Figure 49: Dissolution profile of Type 1 formulation 82713901 in 0.1N HCl

A shorter lag-time is observed when the pH of the dissolution medium is increased (Figure 50). Let's notice that the dissolution profile is not immediate at pH 7 though pH 7 is above pH*.



Figure 50: Dissolution profile of Type 1 formulation 82713901 at fixed pHs

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002769

JTX-0230.63



| R&D REPORT | Page 64 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

In the medium mimicking the in-vivo conditions (Figure 51), the formulations exhibit a dissolution profile similar to the target.



Figure 51: Dissolution profile of Type 1 formulation 82713901 in medium mimicking in-vivo conditions (pseudo-fasted state conditions)

*5.5.3.3* Sodium Oxybate CR, granules for oral suspension Type 2 (with CR pH*6,5 *microparticles*)

Full composition

The full composition contains an immediate release fraction representing 50% of the Sodium Oxybate dose and a controlled release fraction representing 50% of the Sodium Oxybate dose.

The composition of the full mixture (82712901) is indicated in Table 33. Each single unit dose contains 7.45g of mixture.

|  |  | 82712901VRE | |
|---|---|---|---|
| Component | batch | Quantity (g) | Theoritical unit composition (g) |
| IR microparticles | 82711703FDS | 412,22 | 3,096 |
| Microparticule MR pH*6,5 | 82710904PDR | 530,00 | 3,981 |
| Malic acid | 10/12 | 29,96 | 0,225 |
| Xantural 180 | 9C4345K | 4,96 | 0,037 |
| Aerosil 200 | MPE00004373 | 4,96 | 0,037 |
| MgSt | MPE00005406 | 9,92 | 0,075 |
|  | Quantity (g) | 992,02 | 7,451 |

Table 33: Mixture composition and single dose unit composition for Type 2 formulation

Full composition analysis:

For the full analysis of the seal-coated IR microparticles and the CR microparticles Type 2, see respectively Table 28 and Table 19.

The dose per unit is close to the theory (4.5g). The water content is low and the degradation product content is below the LOQ (Table 34).

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002770



| R&D REPORT | Page 65 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

| Batch | 82712901 |
|---|---|
| Assay (%) | 60,8 |
| Dose per unit (g) | 4,57 |
| Degradation products (%) | <0.05 |
| Water content (%) | 0.4 |

Table 34: Type 2 formulation analysis at t0

<u>Dissolution profile of full composition after reconstitution step:</u>

The dissolution profiles of the 6 vessels in 0.1N HCl are very similar showing that there is no inter-unit variability (Figure 52).



Figure 52 : dissolution profile of Type 2 formulation 82712901 in 0.1N HCl

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002771

JTX-0230.65



| R&D REPORT | Page 66 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

A shorter lag-time is observed when the pH of the dissolution medium is close to the theoretical pH* (Figure 53). At pH above pH*, the release is immediate.



Figure 53: Dissolution profile of Type 2 formulation 82712901 at fixed pHs

In the medium mimicking the in-vivo conditions (Figure 54), the formulations exhibit a short latency period followed by a fast release.



Figure 54: Dissolution profile of Type 2 formulation 82712901 in medium mimicking in-vivo conditions (pseudo-fasted state conditions)

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002772



| R&D REPORT | Page 67 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

*5.5.3.4 Sodium Oxybate CR, granules for oral suspension Type 3 (with SR/MR pH\*6,5 microparticles)*

Full composition

The full formulation contains an immediate release fraction representing 40% of the Sodium Oxybate dose and a controlled release fraction representing 60% of the Sodium Oxybate dose.

The composition of the full mixture (82712501) is indicated in Table 35. Each single unit dose for contains 8.40g of mixture.

| Component | batch | 82712501PDR | |
| | | Quantity (g) | Theoritical unit composition (g) |
|---|---|---|---|
| IR microparticles | 82711703FDS | 326,6855 | 2,477 |
| Microparticule MR pH\* 6.9 | 82588203VRE | 735,0425 | 5,573 |
| Malic acid | 10/12 | 23,7419 | 0,180 |
| Xantural 180 | 9C4345K | 5,5381 | 0,042 |
| Aerosil 200 | MPE00004373 | 5,5381 | 0,042 |
| MgSt | MPE00005406 | 11,0762 | 0,084 |
| | **Quantity (g)** | 1107,622 | 8,397 |

Table 35: Mixture composition and single dose unit composition for Type 3 formulation

Full composition analysis:

The dose per unit is close to the theory (4.5g). The water content is low and the degradation product content is below the LOQ (Table 36).

| Batch | 82712501 |
|---|---|
| Assay (%) | 52,8 |
| Dose per unit (g) | 4,42 |
| Degradation products (%) | <0.05 |
| Water content (%) | 0.4 |

Table 36: Type 3 formulation analysis at t0

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002773

JTX-0230.67



| R&D REPORT | Page 68 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

Dissolution profile of full composition after reconstitution step:

The dissolution profiles of the 6 vessels in 0.1N HCl are very similar showing that there is no inter-unit variability (Figure 55).



Figure 55: Dissolution profile of Type 3 formulation 82712501 in 0.1N HCl

A shorter lag-time is observed when the pH of the dissolution medium is close to the theoretical pH* (Figure 56). At pH above pH*, the dissolution profile is similar to the dissolution profile of the SR microparticles.



Figure 56: Dissolution profile of Type 3 formulation 82712501 at fixed pHs

CONFIDENTIAL INFORMATION



| **R&D REPORT** | Page 69 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

In the medium mimicking the in-vivo conditions (Figure 57), the dissolution profile is very close to the target with a 1hour latency period followed by a sustained release.



Figure 57: Dissolution profile of Type 3 formulation 82712501 in medium mimicking in-vivo conditions (pseudo-fasted state conditions)

### 5.5.4 Full compositions: stability data

The 6 months stability results at 25°C/60%RH and 40°C/75%RH are presented below.

#### 5.5.4.1 Stability conditions

The 25°C/60%RH climatic chamber being out of order at the time of the experiment, stability has been launched in dessicators with a saturated NaBr aqueous solution to generate the desired relative humidity. Dessicators have been placed in an oven at 25°C. A temperature/relative humidity probe has been placed in each dessicator to register the parameters.

The average temperature and the average relative humidity monitored during one month are reported in Table 37.

| **Full composition type** | **Stability plan** | **T/HR probe** | **Stability start** | **Average temperature °C (SD)** | **Average relative humidity % (SD)** |
|---|---|---|---|---|---|
| 1 | PSFT1325 | VTE81 | 17/07 | 24,9 (<0.1) | 58,7 (0.4) |
| 2 | PSFT1323 | VTE149 | 16/07 | 25,3 (<0.1) | 59,1 (0,3) |
| 3 | PSFT1322 | VTE133 | 16/07 | 25,4 (<0.1) | 60,4 (0,4) |

Table 37: 1 month stability data

Average temperature and relative humidities ate within specifications.

Stability bottles have then been transferred to the climatic chamber once repaired. So all the data presented below are related to formulations stored at 25°C/60%RH during 6months.

The control of the relative humidity of the 40°C/75%RH climatic chamber was out of order at the end of the stability studies. So during 2.5months, samples were kept at 40°C in the chamber but

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002775



| **R&D REPORT** | Page 70 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

without humidity control (RH in the range 15-40%). The exact conditions for the stability study at 40°C are therefore 3,5months at 75% RH followed by 2,5months without humidity control.

### 5.5.4.2  Sodium Oxybate CR, granules for oral suspension Type 1 (with CR pH*6,9 microparticles) - PSFT1325

Sachet analysis:

| Batch | 82713901 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | T0 | 25°C/60%RH | | | | 40°C/75%RH | | | |
| | | 1month | 2 months | 3 months | 6 months | 1 month | 2 months | 3 months | 6 months |
| Assay (%) | 64,1 | 61,4 | 63,3 | 63,6 | 63,2 | 61,4 | 63,1 | 63,4 | 62,5 |
| Ded. products (%) | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | 0.07 | 0.08 | 0.12 |
| Water content (%) | 0,5 | 0.6 | 0.5 | 0.5 | 0.6 | 0.5 | 0.7 | 0.8 | 0.9 |

Table 38: Type 1 full composition stability analysis

There is no significant evolution of the water content after 3 months (Table 38). A very slight increase of the lactone content occurs after 6 months at 40°C/75%RH.

Dissolution profiles at fixed pHs:

There is a slight slowdown of the dissolution occurring after 1 month at 25°C/60%RH with no further evolution (Figure 58).



Figure 58: Dissolution profile stability for type 1 full composition 82713901 in 0.1N HCl at 25°C/60%RH

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002776



| R&D REPORT | Page 71 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

The same phenomenon happens at 40°C/75%RH with an increase of the lag-time duration after one month and no further evolution (Figure 59).



Figure 59: Dissolution profile stability for type 1 full composition 82713901 in 0.1N HCl at 40°C/75%RH

For the 2, 3 and 6months stability points, formulations have been packaged with 2 doses per unit (see paragraph 5.5.1).

A remaining single dose unit kept for 6months at 40°C/75%RH has been analyzed: the dissolution profile of the single dose unit is similar to the dissolution profile of the two doses unit (Figure 60).



Figure 60: Dissolution profile stability for type 1 full composition 82713901 in 0.1N HCl at 40°C/75%RH: comparison of single dose unit and two doses unit

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002777



| R&D REPORT | Page 72 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

Dissolution profiles in medium mimicking in-vivo conditions (pseudo-fasted state):

The dissolution profile of the formulation remains unchanged after 6 months at 25°C/60%RH (Figure 61) and 40°C/75%RH (Figure 62).



Figure 61: Dissolution profile stability for type 1 full composition 82713901 in medium mimicking in-vivo conditions (pseudo-fasted state) at 25°C/60%RH



Figure 62: Dissolution profile stability for type 1 full composition 82713901 in medium mimicking in-vivo conditions (pseudo-fasted state) at 40°C/75%RH

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002778

JTX-0230.72



| **R&D REPORT** | Page 73 / 91 |
| --- | --- |
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

*5.5.4.3  Sodium Oxybate CR, granules for oral suspension Type 2 (with CR pH\*6,5 microparticles) - PSFT1323*

Full composition analysis:

| Batch | | 82712901 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | T0 | 25°C/60%RH | | | | 40°C/75%RH | | | |
| | | 1month | 2 months | 3 months | 6 months | 1 month | 2 months | 3 months | 6 months |
| Assay (%) | 60,8 | 60,7 | 60,9 | 59,2 | 60,7 | 61,0 | 60,3 | 60,3 | 59,8 |
| Ded. products (%) | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | 0.06 | 0.08 | 0.08 | 0.12 |
| Water content (%) | 0.4 | 0,4 | 1,1 | 1,0 | 0,9 | 0,5 | 1,6 | 0.9 | 1,0 |

Table 39: Type 2 full composition stability analysis

There is no significant evolution of the water content after 3 months (Table 39). A very slight increase of the lactone content occurs after 6 months at 40°C/75%RH.

Dissolution profiles at fixed pHs:

There is a slight slowdown of the dissolution profile after 1 month at 25°C/60%RH with no further evolution after 6 months (Figure 63).



Figure 63: Dissolution profile stability for type 2 full composition 82712901 in 0.1N HCl at 25°C/60%RH

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002779

JTX-0230.73



| R&D REPORT | Page 74 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

At 40°C/75%RH, a slowdown of the dissolution profile is observed after one month with an increase of the lag-time duration with no further evolution after 6 months (Figure 64).



Figure 64: Dissolution profile stability for type 2 full composition 82712901 in 0.1N HCl at 40°C/75%RH

<u>Dissolution profiles in medium mimicking in-vivo conditions (pseudo-fasted state):</u>

The dissolution profile of the formulation remains unchanged after 6 months at 25°C/60%RH (Figure 65) and 40°C/75%RH (Figure 66).



Figure 65: Dissolution profile stability for type 2 full composition 82712901 in medium mimicking in-vivo conditions (pseudo-fasted state) at 25°C/60%RH

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002780



| **R&D REPORT** | Page 75 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |



Figure 66: Dissolution profile stability for type 2 full composition 82712901 in medium mimicking in-vivo conditions (pseudo-fasted state) at 40°C/75%RH

*5.5.4.4 Sodium Oxybate CR, granules for oral suspension Type 3 (with SR/MR pH\*6,5 microparticles) - PSFT1322*

Full composition analysis:

| Batch | 82712501 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | T0 | 25°C/60%RH | | | | 40°C/75%RH | | | |
| | | 1month | 2 months | 3 months | 6 months | 1 month | 2 months | 3 months | 6 months |
| Assay (%) | 52,8 | 53,1 | 54,1 | 52,8 | 53,7 | 53,5 | 53,6 | 52,7 | 53,1 |
| Deg.Products (%) | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | <0.05 | 0.06 | 0.07 | 0.11 |
| Water content (%) | 0.4 | 0.3 | 0.4 | 0.8 | 0.5 | 0.4 | 0.6 | 0.6 | 0.7 |

Table 40: Type 3 full composition stability analysis

There is no significant evolution of the water content after 6 months (Table 40). A very slight increase of the lactone content occurs after 6 months at 40°C/75%RH.

CONFIDENTIAL INFORMATION



| R&D REPORT | Page 76 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

<u>Dissolution profiles at fixed pHs</u>:

There is a progressive slowdown of the dissolution profile at 25°C/60%RH up to 3months with a slight acceleration after 6months (Figure 67).



Figure 67: Dissolution profile stability for type 3 full composition 82712501 in 0.1N HCl at 25°C/60%RH

At 40°C/75%RH, a slowdown of the dissolution profile is observed after one month followed by an acceleration which becomes very sharp after 6months (Figure 68).



Figure 68: Dissolution profile stability for type 3 full composition 82712501 in 0.1N HCl at 40°C/75%RH

Let's notice that the content of one two-doses unit was agglomerated, probably due to a water uptake, showing that the control of the humidity inside the packaging is crucial.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002782

JTX-0230.76



| R&D REPORT | Page 77 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

<u>Dissolution profiles in medium mimicking in-vivo conditions (pseudo-fasted state):</u>

The dissolution profile of the formulation remains unchanged after 6 months at 25°C/60%RH (Figure 69) and 40°C/75%RH (Figure 70).



Figure 69: Dissolution profile stability for type 3 full composition 82712501 in medium mimicking in-vivo conditions (pseudo-fasted state) at 25°C/60%RH



Figure 70 : Dissolution profile stability for type 3 full composition 82712501 in medium mimicking in-vivo conditions (pseudo-fasted state) at 40°C/75%RH

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002783

JTX-0230.77


FLAMEL
technologies

| R&D REPORT | Page 78 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

### 5.5.5 Considerations on the content of residual solvents in the full compositions

Considering the maximum amount of residual solvents present in Sodium Oxybate microparticles (Table 41), the total amount of class III solvents (Acetone/Ethanol/Isopropyl alcohol PA) has been estimated for a 4.5g daily dose: for the three compositions, this quantity is close to 35mg (Table 42).

| Microparticles | Residual solvent content (ppm) | | |
|---|---|---|---|
| | Ethanol | Acetone | IPA |
| IR sc | 3000 | NDt | Ndt |
| MR pH*6,9 | 3000 | NDt | 4000 |
| MR pH*6,5 | 2500 | NDt | 3500 |
| SR/MR pH*6,5 | 2500 | NDt | 3000 |

Table 41: Residual class III solvents in IR sc microparticles and MR microparticles

| Full composition | Microparticles (g) for a 4.5g daily dose | | Solvents daily quantity for 4.5g (mg) | | | |
|---|---|---|---|---|---|---|
| | Irsc | MR | Ethanol | Acetone | IPA | Total |
| Type 1 | 3,10 | 3,72 | 20 | 0 | 15 | 35 |
| Type 2 | 3,10 | 3,98 | 19 | 0 | 14 | 33 |
| Type 2 | 2,48 | 5,57 | 21 | 0 | 17 | 38 |

Table 42: Daily amount of class III solvents in a full composition composition corresponding to a 4.5g daily dose

The ICH Q3C guideline defines a maximum daily amount of residual class III solvents equal to 50mg. This quantity is considered as acceptable without justification.

In our case, the solvents amount per day is below the limit for a 4.5g daily dose, but the quantity would be slightly above the limit for a 9g daily dose (corresponding to the current daily dose with the Xyrem treatment). This point will have to be assessed in the future development work.

CONFIDENTIAL INFORMATION


FLAMEL
technologies

| R&D REPORT | Page 79 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

## CONCLUSIONS

Based on its Micropump® technology, Flamel Technologies is developing a new oral formulation of Sodium Oxybate with the objective to provide a product that is to be taken once at bedtime and allows the patient to sleep continuously for 6 to 8 hours.

The technical results obtained during the development work are the following:

The first part of the prototype development was dedicated to the selection of the manufacturing process of Sodium Oxybate granules with no degradation and allowing the further coating step being successfully carried out. Taking into account the API characteristics, the API layering onto small neutral cores was performed from a water/ethanol API solution. High drug-layering levels (85%) have been selected to obtain granules as concentrated as possible.

The second part of the formulation development was focused on the coating of the diffusion film on the drug-layered microparticles. PH-dependent coatings have been developed to match the targets.
For the first target, the microparticles should release the API three hours after intake. A single-layer coating composed of Lubritab and a mixture of Eudragit polymers has been developed with a pH* (trigger pH) equal to 6.9. A second prototype with the same coating excipients but a different ratio of Eudragit polymers (pH*=6.5) has been selected to have a formulation that is expected to release the API sooner in the GIT.
For the second target, the API should release the API in a sustained manner (with 80% of the API released over around two hours) after a one-hour lag-time. A bi-layer coating comprising an inner layer designed to provide the sustained release and a pH-dependent outer layer to generate the intended one-hour lag-time has been developed (third prototype).

During the third part, we investigated the full composition preparation: the full composition is a powder formulation to be suspended extemporaneously in water just before administration. It comprises controlled release microparticles, immediate-release microparticles and additional excipients. Malic acid is used in the composition to lower the pH of the 'liquid' preparation and ensure the stability of the controlled-release microparticles during the reconstitution step. The amount of Xanthan gum is selected to slowdown micrparticles settlement in the liquid medium after reconstitution.
To avoid any undesirable interaction between malic acid and the API contained in the IR microparticles, a seal-coat is deposited onto the IR microparticles.

Full compositions are chemically stable with a very low amount of degradation products formed after 6months at 40°C/75%RH. A slowdown of the dissolution profile in 0.1N HCl occurs at 25°C/60%RH and 40°C/75%RH during the first month with no further evolution up to 6months for prototypes 1 and 2. For the third prototype, a slight acceleration of the dissolution profile occurs after one month at 40°C/75%RH.
A dissolution test has been developed to mimic the pH changes occurring along the GIT. In this test, all three prototypes prove to have a stable dissolution profile after 6months at 25°C/60%RH and 40°C/75%RH

A technical transfer has been implemented with the formulation team from Pessac for the manufacturing of the clinical batches. Full compositions identical to the prototypes described in the report have been manufactured at Pessac and tested in a phase 1 PK study (PKFT218-1301).

A work plan has been designed to improve the prototypes tested in the PK study.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002785


FLAMEL
technologies

| R&D REPORT | Page 80 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

The program is mainly related to:

- the evaluation of other manufacturing techniques for the IR fraction that could allow to decrease formulations cost

- the simplification of the current formulations:
  - o evaluation of the necessity of the seal-coat layer on the IR microparticles
  - o optimization of the amount of malic acid

- the improvement of the stability of the formulations dissolution profile in 0.1N HCl.

Additionally, it has been asked to the volunteers, during the PK study, to fill a questionnaire in order to evaluate the organoleptic properties of the formulations. Depending on the results of the evaluation, formulation changes might also be implemented if necessary.

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002786

JTX-0230.80


FLAMEL
technologies

| R&D REPORT | Page 81 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

## FIGURES

Figure 1: targets for in-vivo release profiles ........................................................................................ 6
Figure 2 : Sodium Oxybate = sodium salt of gamma hydroxy butyric acid (GHB) ............................ 7
Figure 3: Sodium Oxybate analysis by thermogravimetry, with a heat rate of 10°C/min and under air flow ............................................................................................................................................. 8
Figure 4 : Sodium Oxybate analysis by Differential Scanning Calorimetry, between 40 and 250°C at a heat rate of 10°C/min and under nitrogen flow ........................................................................... 8
Figure 5 : Sodium Oxybate solubility at room temperature in water vs pH (pH adjustment with HCl) - US6780889 patent from Orphan Medicals (Jazz) ......................................................................... 9
Figure 6 : Sodium Oxybate and corresponding lactone ....................................................................... 11
Figure 7 : esterification of GHB (filled circles) in pH 2 buffer (for information, open circles represent the hydrolysis of GBL in pH 2 buffer) ........................................................................... 11
Figure 8 : Sodium Oxybate analysis by DVS – sorption and desorption isotherm at 25°C .............. 13
Figure 9 : Chromatogram of a reconstituted formulation for Sodium Oxybate assay (Volume of injection: 15 µL) ............................................................................................................................. 16
Figure 10: Chromatograms of a reconstituted formulation and a reconstituted formulation with 7 mg/L    (e.g. 0.1%) of Lactone for the degradation products assay. (Volume of injection: 80 µL) ............................................................................................................................................... 16
Figure 11: UV spectrum of Sodium Oxybate in pH 6.8 50mM phosphate buffer ............................. 22
Figure 12 : evolution of pH with transit time in the GIT post administration in the fasted state or in the fed state ...................................................................................................................................... 24
Figure 13 : evolution of pH with transit time after the stomach in the fasted state or in the fed state .......................................................................................................................................................... 24
Figure 14 : evolution of pH with transit time in the GIT post administration in the fasted state or in the fed state / case of an administration two hours post meal .......................................................... 25
Figure 15 : Micropump microcapsules ................................................................................................ 27
Figure 16 : dissolution profile in 0.1N HCl medium of CR microparticles 821369 – effect of coating level ................................................................................................................................................. 32
Figure 17 : dissolution profile of CR microparticles 82136905 (35% coating level) in medium mimicking in-vivo conditions (pseudo-fasted state conditions) ...................................................... 32
Figure 18 : dissolution profile of CR microparticles 822711 in medium mimicking in-vivo conditions (pseudo-fasted state conditions) – effect of coating level ........................................... 34
Figure 19 : dissolution profile of MR microparticles 82580303 (coating level = 25%) at fixed pHs 35
Figure 20 : dissolution profile of CR microparticles 825892 in medium mimicking in-vivo conditions (pseudo-fasted state conditions) – effect of coating level ........................................... 35
Figure 21 : composition of CR pH*6.9 microparticles ........................................................................ 36
Figure 22: dissolution profile of CR microparticles 82713302 (coating level = 25%) at fixed pHs . 36
Figure 23 : dissolution profile of CR microparticles 82713303 and 82589204 (coating level = 25%) at fixed pHs ...................................................................................................................................... 37
Figure 24 : composition of CR pH*6.5 microparticles ........................................................................ 38
Figure 25 : dissolution profile of CR microparticles 82279004 in medium mimicking in-vivo conditions (pseudo-fasted state conditions) .................................................................................... 38
Figure 26 : dissolution profile of CR microparticles 82279004 (coating level = 30%) at fixed pHs 39

CONFIDENTIAL INFORMATION



Figure 27 : dissolution profile of CR microparticles 82279004 and 82710904 (coating level = 30%) at fixed pHs...................................................................................................................................40

Figure 28 : dissolution profile of CR microparticles 82279004 and 82710904 in medium mimicking in-vivo conditions (pseudo-fasted state conditions)............................................................................40

Figure 29 : dissolution profile of SR microparticles 82132703 in 50mM pH 6.8 phosphate buffer.42

Figure 30 : dissolution profile in pH 6.8 50mM phosphate buffers of EC-based SR microparticles batches.......................................................................................................................................43

Figure 31 : comparison of dissolution profile in pH 6.8 50mM phosphate buffers of CAB-based microparticles batch vs EC-based reference batch ....................................................................43

Figure 32 : composition of SR microparticles ...........................................................................44

Figure 33 : dissolution profile in pH 6.8 50mM phosphate buffer ...............................................45

Figure 34 : dissolution profile of SR/MR microparticles 82582703PDR (coating level: 18%) and 82582704PDR (coating level: 20%) in medium mimicking in-vivo conditions (pseudo-fasted state conditions): effect of coating level – comparison with dissolution profile corresponding SR microparticles (before coating) 82277003VRE / pH 6.8 phosphate buffer .........................46

Figure 35 : dissolution profile of SR/MR microparticles 82582704PDR (coating level of 20%) in medium mimicking in-vivo conditions (pseudo-fasted state conditions) .................................47

Figure 36 : composition of SR/MR microparticles with a bi-layer coating...................................47

Figure 37 : dissolution profile of SR/MR microparticles 82582704 (coating level = 20%) at fixed pHs ...................................................................................................................................48

Figure 38 : dissolution profile of SR/MR microparticles 82582704 and 82588203 (coating level = 30%) at fixed pHs ..............................................................................................................49

Figure 39 : dissolution profile of SR/MR microparticles 82582704 and 82588203 in medium mimicking in-vivo conditions (pseudo-fasted state conditions) .................................................49

Figure 40 : stability at 25°C/60%RH of CR pH*7 microparticles 82580303: dissolution profile in 0.1N HCl and pH6 50mM phosphate buffer....................................................................................51

Figure 41 : stability at 40°C/75%RH of CR pH*7 microparticles 82580303: dissolution profile in 0.1N HCl and pH6 50mM phosphate buffer....................................................................................51

Figure 42 : stability at 25°C/60%RH of CR pH*6,5 microparticles 82277904: dissolution profile in 0.1N HCl, pH6 and pH 6.8 50mM phosphate buffer.......................................................................52

Figure 43: stability at 40°C/75%RH of CR pH*6,5 microparticles 82277904: dissolution profile in 0.1N HCl and pH6 and pH 6.8 50mM phosphate buffer ................................................................53

Figure 44 : stability at RT of SR/MR pH*6,5 microparticles 82582704: dissolution profile in 0.1N HCl and pH6.8 50mM phosphate buffer...........................................................................................54

Figure 45 : stability at 40°C/75%RH of SR/MR pH*6,5 microparticles 82582704: dissolution profile in 0.1N HCl and pH6.8 50mM phosphate buffer............................................................................54

Figure 46 : dissolution profile of a full sachert composition composed of 2.25g of the dose as IR microparticules and 2.25g of the dose as MR microparticles MR pH*6,5................................57

Figure 47 : dissolution profile of a full composition composed of 2.25g of the dose as IR microparticules and 2.25g of the dose as SR/MR microparticles pH*6,5 with or without malic acid...................................................................................................................................57

Figure 48 : dissolution rate of Sodium Oxybate from IR microparticles with a 10% Klucel seal-coat in a full formulation ...........................................................................................................59

Figure 49 : dissolution profile of Type 1 formulation 82713901 in 0.1N HCl...............................63

Figure 50 : dissolution profile of Type 1 formulation 82713901 at fixed pHs...............................63

Figure 51 : dissolution profile of Type 1 formulation 82713901 in medium mimicking in-vivo conditions (pseudo-fasted state conditions) .............................................................................64

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002788

**JTX-0230.82**


FLAMEL
technologies

| **R&D REPORT** | Page 83 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

Figure 52 : dissolution profile of Type 2 formulation 82712901 in 0.1N HCl....................................65
Figure 53 : dissolution profile of Type 2 formulation 82712901 at fixed pHs....................................66
Figure 54 : dissolution profile of Type 2 formulation 82712901 in medium mimicking in-vivo
conditions (pseudo-fasted state conditions)..........................................................................................66
Figure 55 : dissolution profile of Type 3 formulation 82712501 in 0.1N HCl....................................68
Figure 56 : dissolution profile of Type 3 formulation 82712501 at fixed pHs....................................68
Figure 57 : dissolution profile of Type 3 formulation 82712501 in medium mimicking in-vivo
conditions (pseudo-fasted state conditions)..........................................................................................69
Figure 58 : Dissolution profile stability for type 1 full composition 82713901 in 0.1N HCl at
25°C/60%RH ........................................................................................................................................70
Figure 59 : Dissolution profile stability for type 1 full composition 82713901 in 0.1N HCl at
40°C/75%RH ........................................................................................................................................71
Figure 60 : Dissolution profile stability for type 1 full composition 82713901 in 0.1N HCl at
40°C/75%RH: comparison of single dose unit and two doses unit .......................................................71
Figure 61 : Dissolution profile stability for type 1 full composition 82713901 in medium mimicking
in-vivo conditions (pseudo-fasted state) at 25°C/60%RH ..................................................................72
Figure 62 : Dissolution profile stability for type 1 full composition 82713901 in medium mimicking
in-vivo conditions (pseudo-fasted state) at 40°C/75%RH ..................................................................72
Figure 63 : Dissolution profile stability for type 2 full composition 82712901 in 0.1N HCl at
25°C/60%RH ........................................................................................................................................73
Figure 64 : Dissolution profile stability for type 2 full composition 82712901 in 0.1N HCl at
40°C/75%RH ........................................................................................................................................74
Figure 65 : Dissolution profile stability for type 2 full composition 82712901 in medium mimicking
in-vivo conditions (pseudo-fasted state) at 25°C/60%RH ..................................................................74
Figure 66 : Dissolution profile stability for type 2 full composition 82712901 in medium mimicking
in-vivo conditions (pseudo-fasted state) at 40°C/75%RH ..................................................................75
Figure 67 : Dissolution profile stability for type 3 full composition 82712501 in 0.1N HCl at
25°C/60%RH ........................................................................................................................................76
Figure 68 : Dissolution profile stability for type 3 full composition 82712501 in 0.1N HCl at
40°C/75%RH ........................................................................................................................................76
Figure 69 : Dissolution profile stability for type 3 full composition 82712501 in medium mimicking
in-vivo conditions (pseudo-fasted state) at 25°C/60%RH ..................................................................77
Figure 70 : Dissolution profile stability for type 3 full composition 82712501 in medium mimicking
in-vivo conditions (pseudo-fasted state) at 40°C/75%RH ..................................................................77

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002789

**JTX-0230.83**



## **TABLES**

Table 1 : Sodium Oxybate – manufacturers and quantities ............................................................... 7

Table 2 : Sodium Oxybate solubility in different organic solvents at room temperature and 40°C or 60°C ............................................................................................................................................... 10

Table 3 : stability of Sodium Oxybate solutions (0.5% w in water) at room temperature ................ 11

Table 4 : Sodium Oxybate stability at 300mg/g in water and water/ethanol mixture – % of lactone formed after 24h ............................................................................................................................... 12

Table 5: HPLC parameters ............................................................................................................... 14

Table 6 : Extraction protocol for formulation analysis (microparticles and full compositions) ........ 15

Table 7 : Retention time of the HPLC peaks observed ..................................................................... 16

Table 8 : Limited qualification results for the Sodium Oxybate assay .............................................. 17

Table 9 : Limited qualification results for the degradation products ................................................. 18

Table 10 : Operating conditions of the Karl Fisher titration ............................................................. 20

Table 11 : Operating conditions of the residual solvents assay ......................................................... 21

Table 12 : Operating conditions of the dissolution tests ................................................................... 22

Table 13 : buffer pH after solubilizing of 4.5g of Sodium Oxybate in 900ml buffer ....................... 23

Table 14 : dissolution test to mimic in-vivo conditions – pH pattern corresponding to 'pseudo' fasted state ....................................................................................................................................... 25

Table 15 : Drug-layering – yield and granules characterizations (neutral cores: cellets 127) ........... 29

Table 16 : Drug-layering – yield and granules characterizations (neutral cores: cellets 100) ........... 30

Table 17 : characteristics of CR microparticles coated with a 40%Lubritab/60%EudragitS100 coating or a 60%Lubritab/40%EudragitS100 coating – manufacturing process comparison ... 33

Table 18 : characteristics of CR microparticles 82589204 and 82713303 coated with a 60%Lubritab/37%EudragitS100/3%EudragitL100-55 coating (coating level of 25%) - manufacturing process comparison ............................................................................................. 37

Table 19 : characteristics of CR microparticles 82279004 and 82710904 coated with a 60%Lubritab/26.7%EudragitS100/13.3%EudragitL100-55 coating (coating level of 30%) - manufacturing process comparison ............................................................................................. 39

Table 20 : characteristics of SR microparticles 82273205, 82277003 et 82586803 - manufacturing process comparison ......................................................................................................................... 45

Table 21 : characteristics of SR/MR microparticles 82582704 and 82588203 - manufacturing process comparison ......................................................................................................................... 48

Table 22 : conditions for microparticles stability studies .................................................................. 50

Table 23 : PSFT1312 stability results ............................................................................................... 50

Table 24 : PSFT1314 stability results ............................................................................................... 52

Table 25 : PSFT1321 stability results ............................................................................................... 53

Table 26 : stability of IR microparticle in presence of malic acid with or without dessiccant .......... 58

Table 27 : stability of IR microparticles and seal coated IR microparticles in presence of malic acid (with or without desiccant) .............................................................................................................. 60

Table 28 : characteristics of Klucel sela-coated microparticles 82583004 and 82711703 - manufacturing process comparison ................................................................................................. 60

Table 29 : Denomination of full compositions prototypes ................................................................ 61

Table 30 : analysis of the full composition formulations ................................................................... 61

Table 31 : mixture composition and single dose unit composition for Type 1 formulation .............. 62

Table 32 : Type 1 formulation analysis at t0 ..................................................................................... 62

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002790

JTX-0230.84



| R&D REPORT | Page 85 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

Table 33 : mixture composition and single dose unit composition for Type 2 formulation ............. 64

Table 34 : Type 2 formulation analysis at t0 ................................................................................... 65

Table 35 :  mixture composition and single dose unit composition for Type 3 formulation ............. 67

Table 36 : Type 3 formulation analysis at t0 ................................................................................... 67

Table 37 : 1 month stability data ..................................................................................................... 69

Table 38 : type 1 full composition stability analysis ........................................................................ 70

Table 39 : type 2 full composition stability analysis ........................................................................ 73

Table 40 : type 3 full composition stability analysis ........................................................................ 75

Table 41 : residual class III solvents in IR sc microparticles and MR microparticles ...................... 78

Table 42 : daily amount of class III solvents in a full composition composition corresponding to a

4.5g daily dose ........................................................................................................................ 78

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL                                                              AVDL_01002791
AVDL_01002707

JTX-0230.85



| **R&D REPORT** | Page 86 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

## APPENDICES

**Appendix 1:**



CONFIDENTIAL INFORMATION



| **R&D REPORT** | Page 87 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |



CONFIDENTIAL INFORMATION



| R&D REPORT | Page 88 / 91 |
|---|---|
| RD218-001v01-1406/HG-sl | June 11, 2014 |

**Appendix 2:**

| Table P.1. Composition of Sodium Oxybate CR, granules for oral suspension Type 1 | | | |
|---|---|---|---|
| Component | Function | Reference to standard | Quantity (g) per bottle - dose = 4.5g |
| **Sodium Oxybate microparticles** | | | |
| Gamma-hydroxybutyric acid, sodium salt | Drug substance | NA | 4.5 |
| Microcrystalline cellulose spheres | Neutral core | Current USPNF | 0.836 |
| Povidone | Binder and excipient in diffusion coating | Current USP | 0.237 |
| Hydrogenated cottonseed oil | Excipient in diffusion coating | Current USPNF | 0.557 |
| Methacrylic acid copolymer: Methacrylic acid - Ethyl acrylate copolymer (1:1) | Excipient in diffusion coating | Current USPNF | 0.028 |
| Methacrulic acid copolymer: Methacrylic acid - Methyl methacrylate copolymer (1:2) | Excipient in diffusion coating | Current USPNF | 0.344 |
| Hydroxypropyl cellulose | Film coating | Current USPNF | 0.310 |
| **Other excipients** | | | |
| Malic acid | Acidifying agent | Current USPNF | 0.225 |
| Xanthan gum | Suspending agent | Current USPNF | 0.036 |
| Colloidal silicon dioxide | Lubricant | Current USPNF | 0.036 |
| Magnesium stearate (1) | Lubricant | Current USPNF | 0.072 |
| Purified water | Solvent | Current USP | Removed during processing |
| Dehydrated alcohol (2) | Solvent | Current USPNF | Removed during processing |
| Acetone | Solvent | Current USPNF | Removed during processing |
| Isopropyl alcohol | Solvent | Current USP | Removed during processing |
| **Total weight** | **NA** | **NA** | **7.180** |

(1) vegetal origin
(2) European pharmacopeia : anhydrous ethanol

CONFIDENTIAL INFORMATION



| Table P.1. Composition of Sodium Oxybate CR, granules for oral suspension Type 2 | | | |
|---|---|---|---|
| Component | Function | Reference to standard | Quantity (g) per bottle - dose = 4.5g |
| **Sodium Oxybate microparticles** | | | |
| Gamma-hydroxybutyric acid, sodium salt | Drug substance | NA | 4.5 |
| Microcrystalline cellulose spheres | Neutral core | Current USPNF | 0.836 |
| Povidone | Binder and excipient in diffusion coating | Current USP | 0.237 |
| Hydrogenated cottonseed oil | Excipient in diffusion coating | Current USPNF | 0.716 |
| Methacrylic acid copolymer: Methacrylic acid - Ethyl acrylate copolymer (1:1) | Excipient in diffusion coating | Current USPNF | 0.159 |
| Methacrulic acid copolymer: Methacrylic acid - Methyl methacrylate copolymer (1:2) | Excipient in diffusion coating | Current USPNF | 0.318 |
| Hydroxypropyl cellulose | Film coating | Current USPNF | 0.310 |
| **Other excipients** | | | |
| Malic acid | Acidifying agent | Current USPNF | 0.225 |
| Xanthan gum | Suspending agent | Current USPNF | 0.037 |
| Colloidal silicon dioxide | Lubricant | Current USPNF | 0.037 |
| Magnesium stearate (1) | Lubricant | Current USPNF | 0.075 |
| Purified water | Solvent | Current USP | Removed during processing |
| Dehydrated alcohol (2) | Solvent | Current USPNF | Removed during processing |
| Acetone | Solvent | Current USPNF | Removed during processing |
| Isopropyl alcohol | Solvent | Current USP | Removed during processing |
| **Total weight** | **NA** | **NA** | **7.451** |

(1) vegetal origin
(2) European pharmacopeia : anhydrous ethanol

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002795

**JTX-0230.89**


FLAMEL
technologies

| **R&D REPORT** | Page 90 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

**Table P.1. Composition of Sodium Oxybate CR, granules for oral suspension Type 3**

| Component | Function | Reference to standard | Quantity (g) per bottle - dose = 4.5g |
|---|---|---|---|
| Sodium Oxybate microparticles | | | |
| Gamma-hydroxybutyric acid, sodium salt | Drug substance | NA | 4.5 |
| Microcrystalline cellulose spheres | Neutral core | Current USPNF | 0.836 |
| Povidone | Binder and excipient in diffusion coating | Current USP | 0.326 |
| Hydrogenated cottonseed oil | Excipient in diffusion coating | Current USPNF | 0.669 |
| Methacrylic acid copolymer: Methacrylic acid - Ethyl acrylate copolymer (1:1) | Excipient in diffusion coating | Current USPNF | 0.149 |
| Methacrulic acid copolymer: Methacrylic acid - Methyl methacrylate copolymer (1:2) | Excipient in diffusion coating | Current USPNF | 0.297 |
| Hydroxypropyl cellulose | Film coating | Current USPNF | 0.248 |
| Ethycellulose | Excipient in diffusion coating | Current USPNF | 0.892 |
| Polyoxyl 40 Hydrogenated Castor Oil | Excipient in diffusion coating | Current USPNF | 0.045 |
| Castor oil | Excipient in diffusion coating | Current USP | 0.089 |
| **Other excipients** | | | |
| Malic acid | Acidifying agent | Current USPNF | 0.180 |
| Xanthan gum | Suspending agent | Current USPNF | 0.042 |
| Colloidal silicon dioxide | Lubricant | Current USPNF | 0.042 |
| Magnesium stearate (1) | Lubricant | Current USPNF | 0.084 |
| Purified water | Solvent | Current USP | Removed during processing |
| Dehydrated alcohol (2) | Solvent | Current USPNF | Removed during processing |
| Acetone | Solvent | Current USPNF | Removed during processing |
| Isopropyl alcohol | Solvent | Current USP | Removed during processing |
| **Total weight** | **NA** | **NA** | **8.397** |

(1) vegetal origin
(2) European pharmacopeia : anhydrous ethanol

CONFIDENTIAL INFORMATION

HIGHLY CONFIDENTIAL
AVDL_01002707

AVDL_01002796

JTX-0230.90



| R&D REPORT | Page 91 / 91 |
|---|---|
| **RD218-001v01-1406/HG-sl** | June 11, 2014 |

**MODIFICATIONS HISTORY**

| Version 01: | Year/Month/Day |
|---|---|
| Creation | |

---

CONFIDENTIAL INFORMATION

EXHIBIT 6



# FT218 – DoDo Project

## *Sodium Oxybate - "Dose for a Doze"*



Jane Rose Reporting

**Guillard Ex. 34**

10/08/22

Flamel Technologies | Confidential | FT218 DoDo - Technical Meeting | 01-17-2013 | 1

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547180

PTX-0052.1

# Contents

- **Summary Reminder & Key assumptions**

- **Clinical development**

- **PK analysis**

- **Formulation**

- **Patents analysis (FTO)**

- **Timeline**

Flamel Technologies | Confidential | FT218 DoDo - Technical  Meeting | 01-17-2013 | 2

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547181

**PTX-0052.2**

# Summary reminder

- **Objective**:

  **Development of an extended release powder for oral suspension of sodium oxybate using Micropump®.**

- **Xyrem®** (*Jazz Pharmaceuticals*): only product approved by FDA (2005).
  **Net sales** in 2012: **M$ 380** (was M$233 in 2011,  M$142 in 2010 and M$96 in 2009)
  **Dosage:** Two equal doses: 1st dose taken at bedtime and 2nd dose **2.5 to 4 hours later !!**

- **Target Product Profile:**
  - **Dosage form**: Powder for reconstitution
  - **Presentation:** Sachet  - 4.5g, 6g, 7.5g and 9g strength
  - **PK:** ER product  to provide patients with 7 to 8 hours of continuous sleep, with only one administration at bedtime.
  - **Other:** Easy to use correctly and safely - Reduce the risk of overdose due to dosage

- **Major risk of deviation or issue:**
  - **Schedule I** of Sodium oxybate: -> Long and difficult import/export process.
  - **Narrow safety margin** and **criminal use** : Agencies will be very sensitive.
  - **Food effect** on the PK of sodium oxybate. What impact on our formulations ?

Flamel Technologies | Confidential | FT218 DoDo - Technical  Meeting | 01-17-2013 | 3

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547182

PTX-0052.3

# Key assumptions

**1. Manufacturing of pilot batches in Pessac**



**2. Perform the pivotal studies in the US**



**3. Manufacturing of pivotal and commercial batches in US with US API**

**4. Prefer the use of the US API for the whole development.**



Flamel Technologies    Confidential    FT218 DoDo - Technical Meeting    01-17-2013    4

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547183

**PTX-0052.4**



Clinical development

Flamel Technologies   Confidential   FT218 DoDo - Technical Meeting   01-17-2013   5

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547184

**PTX-0052.5**



HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547185

**PTX-0052.6**



HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547186

**PTX-0052.7**

# Reminder: Pharmacokinetics of GHB
## negative food-effect

- **Significant decrease of AUC and Cmax is observed when taken with food, concomitant with a delay of Tmax**

**Table III**   Effect of Food on the Pharmacokinetics of Sodium Oxybate

| Parameter | Fasted State (n = 34) | | Fed State (n = 34) | |
|---|---|---|---|---|
| $AUC_{0-\infty}$ (µg•h/mL) | 289 | (109) | 188* | (80.0) |
| $C_{max}$ (ng/mL) | 142 | (34.2) | 60.1* | (20.1) |
| $t_{max}^a$ (h) | 0.75 | | 2.00** | |
| $t_{1/2}$ (h) | 0.57 | (0.30) | 0.68 | (0.22) |
| CL/F (mL/min/kg) | 3.7 | (1.4) | 6.2 | (3.2) |
| $V_z/F$ (mL/kg) | 192 | (193) | 384 | (324) |
| Urinary recovery (%) | 3.8 | (2.0) | 3.5 | (1.8) |
| $CL_R$ (mL/h) | 490 | (251) | 826 | (462) |

Data presented as mean ± standard deviation.
a. Median.
$*p < 0.05.$ $**p = 0.001.$



*Figure 2.   Mean (± SEM) plasma oxybate (GHB) concentration-time profiles in healthy adult females (n = 34) following a single oral dose of 4.5 g sodium oxybate oral solution under fasted and fed conditions.*

*(L.A. Borgen et al. 2003)*

- **After an high-fat meal, the absorption is significantly delayed**

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547187

PTX-0052.8

# Reminder: Pharmacokinetics of GHB
## negative food-effect

- **Xyrem® is supposed to be administered at least 2h after meal even if a decrease of AUC is still observed 2h post-fed**

 Because food significantly reduces the bioavailability of sodium oxybate, the patient should allow at least 2 hours after eating before taking the first dose of sodium oxybate. Patients should try to minimize variability in the timing of dosing in relation to meals.

PRESCRIBING INFORMATION



2 x 4.5 g, 2h post-fed
2 x 2.25 g, 2h post-fed

*Clinical Pharmacology and Biopharmaceuticals review (OCPB), NDA 21-196*

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547188

PTX-0052.9

# Negative Food-Effect

- Depending the fat of the meal, the food effect shows different intensity: we **suppose a competition with fat of food on the transporters**



☐ 2h after a standard meal
△ 2h after a light breakfast

*Xyrem,* <u>*2 x 2.25g*</u>

*FDA 21-196 Biopharm P1 & P2*

- **Absorption of GHB takes place through transporters:** MCT (-1, -2, -4) monocarboxylates transporters *(Lam & al., 2010)*

- **These transporters are dedicated to the absorption of short-chain fatty acids** *(Ritzhaupt &al. 1998)*

- ➔ **Negative food effect could be due to competition between GHB and SCFA on the MCT**

Flamel Technologies | Confidential | FT218 DoDo - Technical Meeting | 01-17-2013 | 10

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547189

**PTX-0052.10**

# Negative Food-Effect

- 2h post fed, a food effect is observed: **How long does it last?**





*Xyrem, 1/2 x 4.5g*
- *FDA 21-196 Biopharm P1 & P2*
- *L.A. Borgen et al. J. Clin. Pharmacology, 2003*

- **2h after the meal, the food-effect is still observed**, at least during 1h (time of absorption for the 4.5 g dose)

- **6h after the meal, the food effect is not observed in the upper part of the GIT** (place of absorption of the 4.5 g dose)

Flamel Technologies     Confidential     FT218 DoDo - Technical  Meeting     01-17-2013     11

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547190

PTX-0052.11

# Negative Food-Effect

- 2h post fed, a food effect is observed: **How long does it last?**

  - The micropump microparticles will be administered 2h after meal and will transit at the same rate than the food: they will be in 2h-post fed conditions during their all transit

  - These "2h-post-fed conditions" will evolved with time

  - Sources of the SCFA:

    - In the fat of the meals (mainly from milk products), absorbed in the small intestine: can directly influence the absorption of GHB

    - Production by anaerobic fermentation of the undigested carbohydrate by enteric bacteria in the large intestine (Gill & al. 2005): can influence the absorption of GHB in the caecum

➔ We assume that the duration of food-effect is mainly related to the duration of the digestion of SCFA in the small intestine

  - o **Good case:** rapid digestion (4h after ingestion, 2h post-dose): no food effect for the second part of the profile

  - o **Bad case:** slow digestion: food effect expected for all the profile

➔ **We can't answer witch hypothesis is the right one**

➔ **There is a risk to observed a low concentration of GHB 4h after administration**

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547191

PTX-0052.12

# Targeted PK profiles

- **Requirements for the clinical study:**

  - Dose= 4.5 g (vs Xyrem® 2 x 2.25 g)

  - To be compared to Xyrem®:
    - Cmax ≤ Cmax(Xyrem): in order to avoid toxicity
    - Cmin ≥ Cmin(Xyrem): we assume efficacy related to threshold of concentration

  - Performed under therapeutic condition: Post-fed, at bed time.

- Simulations done in the fasted state

  - **Target 1 : Pulsatile profile**
    2 waves 50%/50% of the dose, Tlag= 2,5 - 4h between the waves
  - **Target 2 : Mix IR/SR**
    IR part close to 50%, SR profile with short Tlag and rapid T80%

  - **(Jazz-SR-like):**
    SR profile combined with a part of IR – **NOT Preferred**

Flamel Technologies   Confidential   FT218 DoDo - Technical  Meeting   01-17-2013   13

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547192

**PTX-0052.13**

# Target 1- Pulsatile Profile

- Simulated profile: dose= 4.5 g, **fasted state**
- Xyrem profile: dose = 2 x 2.25 g, 2h-post light breakfast




➔ As expected, the second peak is smaller than the first one due to the smaller absorptivity in the distal part of the GIT and null absorption in colon

➔ A short Tlag leads to higher profile but has higher probability to be impacted by the food-effect (not taken in account in the simulations)

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547193

PTX-0052.14

# Target 2- Mix IR/SR Profile

- Simulated profile: dose= 4.5 g, **fasted state**
- Xyrem profile: dose = 2 x 2.25 g, 2h-post light breakfast




### ➔ Our strategy is different from Jazz:

- mix IR/SR with part of IR close to 50% (i.e 40% IR/60% SR)
- SR with Tlag at least 1h and rapid release (T80% 2h)

Flamel Technologies      Confidential        FT218 DoDo - Technical Meeting        01-17-2013        15

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547194

**PTX-0052.15**

# Conclusions

- **Negative food effect** is assumed to be due to a competition between SCFA and GHB on transporters

  **How long does it last ?** We cannot precisely determine the duration of the negative food effect: there is a risk to observe a low concentration of GHB 4h after administration

- **Proposal of prototypes:**

  - **Target 1 : Pulsatile profile**
    - 2 waves 50%/50% of the dose, Tlag= 2,5 - 4h between the waves depending of what is technically possible
  - **Target 2 : Mix IR/SR**

    - IR close to 50% to ensure high first peak
    - SR with Tlag between 1h and 2h, T80% 2h or 3h

Flamel Technologies | Confidential | FT218 DoDo - Technical  Meeting | 01-17-2013 | 16

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547195

PTX-0052.16

# Formulation development

- API properties

- Preliminary considerations & design

Flamel Technologies | Confidential | FT218 DoDo - Technical  Meeting | 01-17-2013 | 17

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547196

**PTX-0052.17**

# API Properties : Chemistry

- **Name :**

  Sodium oxybate , GHB, $\gamma$-hydroxybutyric acid sodium salt, sodium 4-hydroxybutyrate

- **Chemical structure :**

  Molecular formula : C4H7NaO3
  Molecular weight : 126.09 g/mol

- **pKa :** 4,7 (acid form)

- **Alcaline API :**

  pH of a 0,5% GHB solution in water = 7.8

  *(Ciolino et al. J. Forensic Sci, 2001, vol 46, n°6, p1315-1323)*

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547197

PTX-0052.18

# API Properties : Solubility

- **In aqueous media - effect of pH :**
- ➢ Sodium oxybate is highly soluble whatever the pH in the range [3-7]

- ➢ API solubility increases with pH

*Note: pH of a 500mg/ml solution in water = 9.8*



*US6780889 – Orphan Medicals (Jazz)*

- **In organic solvents :**
- ➢ Solubility in ethanol not known : at least 10g/l – *Hennessy et al. J. Forensic Sci, Nov 2004, vol 49, n°6*

- ➢ Practically insoluble in methylene chloride

Flamel Technologies    Confidential        FT218 DoDo - Technical  Meeting                    01-17-2013        19

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547198

PTX-0052.19

# API Properties : Stability

- **In Aqueous media pH - effect of pH :**

**Main degradation pathway :** intramolecular esterification
in acidic medium leading to lactone formation



A : γ-hydroxybutyric acid
B : γ-butyrolactone

Stability of a 0.5% GHB solution in 0,5M potassium phosphate
monobasic buffer – pH adjustment with phosphoric acid or sodium
hydroxide :

| GHB solution pH | Beginning of esterification | Remaining GHB after 220 days at RT (%) |
|---|---|---|
| 2 | Cf figure | 32 |
| 4 | > 10 days | 72 |
| 5.2 | > 17 days | 85 |
| 6.1 | > 17 days | 95 |
| 7 | | |
| 7.8 (in water) | | stable |
| 9 | | |



FIG. 4—*Hydrolysis of GBL (open circles) and esterification of GHB (filled circles) in pH 2.0 buffer. See text for discussion.*

➢ **Good stability at pH ≥7 and Fast degradation at pH 2**

- **In organic solvents : stability over 30 days** of a 10mg/ml API solution in ethanol and
  methanol *(Hennessy et al. J. Forensic Sci, Nov 2004, vol 49, n°6)*

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547199

**PTX-0052.20**

# Targeted PK profiles - Reminder

- **Maximum requirements for the commercial product:**

  - Dose= 9 g (vs Xyrem® 2 x 4.5 g)

- **Two types of profiles proposed**

  - **Target 1**
    **Pulsatile profile: with Immediate Release (IR) and Delayed Release particles**
    - 50% IR
    - 50% Delayed-Release, Tlag=3h

  - **Target 2**
    **Mix IR/SR:**
    - IR part around 50%
    - Tlag= 1h and 80% release over two hours

Flamel Technologies    Confidential        FT218 DoDo - Technical  Meeting                01-17-2013        21

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547200

**PTX-0052.21**

# Micropump coatings for MR microparticles

- ## Release Target 1 : API release 3 hours after intake

Diffusion coating will be based on the **Micropump II technology**.
*The pH\* (triggering API release) will have to be chosen to release the API after the desired in-vivo lag-time.*


- ## Release Target 2 : fast release (80% in 2 hours) after a 1h lag-time

**1st case** : **Bi-layer** diffusion coating to match the target :

- An external **Micropump II** layer will generate the 1h lag-time
- An internal **Micropump I** layer will allow a sustained release of 80% during two hours after the 1h lag-time

*The pH\* (triggering API release) will have to be carefully chosen to allow the sustained release after the desired 1h in-vivo lag-time.*


**2nd case** : single layer coating based on the **Micropump I** technology.
Back-up option (**not preferred** – possible hinderance by the Jazz patent application #US 2012/0076865 if granted)

Flamel Technologies     Confidential          FT218 DoDo - Technical  Meeting                01-17-2013        22

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547201

PTX-0052.22

# GI Tractus : considerations on API release from MP

- Oxybate Formulation intake 2-3 hours after a meal
  → **GIT conditions intermediate between the fasted state and the fed state**

  ⇒ **Target 1 : API release 3 hours after formulation intake**
  Conditions in the GIT area where API should be released (ileum) ~ fasted conditions (pH ~7)

  ⇒ **Target 2 : API release starts 1 hour after formulation intake**
  Conditions in the GIT area where API release should start (duodenum or beginning or the jejunum) ~ between fasted and fed state conditions (pH ~ 5.5 to 6)



**GIT conditions :** pH vs transit time in **fasted** and **fed** state

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547202

PTX-0052.23

# Microparticles design

- **Calculations to determine the minimum drug content of microparticles**

  <u>Assumptions :</u>

  - **Volume of water for reconstitution :** ………………………………………………**80ml**
  - **Weight of total API (IR+SR)** :………………………………………………….**9g**
  - **Amount of API (IR microparticles)** : …………………………………… 4.5g
  - **Amount of API (MR microparticles)** :…………………………………….4.5g

  *(same IR microparticles used for IR and MR components)*

  - **Binder content in drug-layered microparticles** :…………………………**10%**
  - **Additional sachet excipients** (% of sachet content):…………………… **25%**
  - **Maximum dry content to have an acceptable mouth feeling : …………..** **10%**

  *(MR microparticles + neutral cores of microparticles from IR component are considered as the dry matter in the suspension)*

⇒ ***15g of microparticles (IR component + MR component) with 5 g of additional sachet excipients to be dispersed in 80ml of water***

Flamel Technologies     Confidential          FT218 DoDo - Technical  Meeting                    01-17-2013     24

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547203

PTX-0052.24

# Microparticles design

- **Calculations to determine the minimum drug content of microparticles**

Considering :

1. the high solubility of sodium oxybate ,
2. the fact that microparticles will have to be small for an acceptable mouth feeling,

**High levels of Micropump coatings will probably have to be deposited on the drug-layered IR microparticles to match the dissolution targets.**

| Micropump Coating level for the MR microparticles (%) | Minimum API content in IR microparticles* (%) |
|---|---|
| 30 | 73 |
| 40 | 80 |
| 50 | 90 |

\* To fulfill the requirements listed in the previous slide

➤ **Drug-layered microparticles should have an API content as high as possible.**

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547204

**PTX-0052.25**

# MP design : drug-layered microparticles

- **Requirements for microparticles design :**

- Drug-content in drug-layered microparticles will have to be **as high as possible**

- Particles size should be small to have an acceptable mouth feeling for the MR microparticles

→ **Small inert cores vill be used with high-drug-layering levels.**

<u>Possible options for microparticles design :</u>




- **Drug-layering process :** aqueous process as a first approach (due to the very high API solubility in water)

- **Drug-layered microparticles will be used :**
  - for the IR component of the formulation
  - as starting material before Micropump coating (for the MR component of the formulation)

Flamel Technologies    Confidential    FT218 DoDo - Technical  Meeting    01-17-2013    26

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547205

**PTX-0052.26**

# MP design : drug-layered microparticles for IR

- **Parameters to consider :**

- API highly hygroscopic and strongly alkaline:
$\rightarrow$ Possible interaction with enteric polymers from the Micropump coating of MR microparticles (could lead to stability issue)

- Possible interaction with some sachet excipients
(ex : Xylitol – cf Jazz Patent US6780889)

$\Rightarrow$ If necessary, a seal coat will have to be deposited onto the drug layer to avoid undesired interactions with sachet excipients and MR microparticles.

Flamel Technologies | Confidential | FT218 DoDo - Technical  Meeting | 01-17-2013 | 27

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547206

**PTX-0052.27**

# MP design : MR microparticles for Target 1

- **Release Target 1 : API release 3 hours after intake**

➢ Diffusion coating will be based on the **Micropump II technology**.

➢ But , due to the strong alcalinity of API, interactions with the enteric polymers from the Micropump coating are possible (possibly leading to stability issues)

**Solution 1 :** Barrier layer between the drug-layer and the Micropump II coating (option followed by Supernus)





The pH* (triggering API release) will have to be carefully chosen to release the API after the desired in-vivo lag-time.

**Solution 2 :** use of an acidic excipient (i.e. malic acid) in the drug layer

Flamel Technologies      Confidential      FT218 DoDo - Technical  Meeting      01-17-2013      28

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547207

**PTX-0052.28**

# MP design : MR microparticles for Target 2

- **Release Target 2 : fast release (80% in 2 hours) after a 1h lag-time**

  **Bi-layer** diffusion coating to match the target :
  - An external **Micropump II** layer will generate the 1h lag-time
  - An internal **Micropump I** layer will allow a sustained release of 80% during two hours after the 1h lag-time



The pH* (triggering API release) will have to be carefully chosen to allow the sustained release after the desired 1h in-vivo lag-time.

- ➢ Back-up option : single layer coating based on the **Micropump I** technology.
  (**not preferred** – possible hinderance by the Jazz patent application #US 2012/0076865)



Flamel Technologies    Confidential    FT218 DoDo - Technical Meeting    01-17-2013    29

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547208

PTX-0052.29



# Freedom To Operate

*Patents and Applications evaluation*

Flamel Technologies | Confidential | FT218 DoDo - Technical Meeting | 01-17-2013 | 30

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547209

**PTX-0052.30**

# Patent

- **Patent #US 8,193,211** (delivered on June, 5th 2012)

   **Controlled release compositions of Gamma-Hydroxybutyrate**
   **Assignee : Supernus Pharmaceuticals, Inc.** – Rockville – MD (US)
   **Expires on :** Sept 13th 2028



| US 8,193,211 claim 1 | No patent infringement |
|---|---|
| 1. A once-daily oral pharmaceutical dosage form, comprising: (a) a liquid immediate release component comprising a gamma-hydroxybutyric acid (GHB) salt, (b) a first delayed release component comprising the GHB salt; and (c) a second delayed release component comprising the GHB salt, wherein the first delayed release component releases GHB in the duodenum and comprises a GHB containing core surrounded by a barrier coat, which in turn is surrounded by an enteric coating comprising a pH sensitive material that dissolves in the duodenum, and wherein the second delayed release component releases GHB in the colon and comprises a GHB containing core surrounded by a barrier coat, which in turn is surrounded by a coating comprising a pH sensitive material that dissolves in the colon. | Remark : our dosage form is not liquid (but the IR component of our formulation will be solubilized after reconstitution)<br><br>1) *If only one delayed release component*<br><br>2) *If no barrier coat* |

**Conclusion**
**No Patent infringement if no barrier layer and/or one single delayed component**

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547210

**PTX-0052.31**

# Patent applications

- ## Application #US 2012/0231085 (division of US8,193,211)

  **Controlled release compositions of Gamma-Hydroxybutyrate**

  **Assignee : Supernus Pharmaceuticals, Inc.** – Rockville – MD (US)

  **Pub. Date :** Sept 13th 2012

  *Claim1 :  An oral pharmaceutical dosage form, comprising (a) an immediate release component comprising gamma-hydroxybutyric acid (GHB), and (b) a delayed release component comprising GHB.*

  *Claim 2:  An oral pharmaceutical composition, comprising a delayed release component comprising gamma-hydroxybutyric acid (GHB).*

  > ➤ **To be checked regularly to see if new claims granted**

- ## Application #US 2011/0293729

  **Novel compositions based on Gamma-Hydroxybutyric acid**

  **Assignee : D&A Pharma** – Paris – (France)
  **Pub. Date :** Dec. 1st, 2011

  *Claim1 :  The present invention relates to a granule of gamma-hydroxybutyric acid or of one of its pharmaceutically acceptable salts, characterized in that it comprises a solid core on which the gamma-hydroxybutyric acid or one of its salts is supported.*

  > ➤ **To be checked regularly but probably not hindering (too general)**

Flamel Technologies  Confidential   FT218 DoDo - Technical  Meeting         01-17-2013   32

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547211

**PTX-0052.32**

# Patent applications

- ## Application #US 2012/0076865

  **Controlled release dosage forms for high dose, water soluble and hydroscopic drug substances**

  **Assignee : Jazz Pharmaceuticals, Inc.** – Palo Alto – CA (US)

  **Pub. Date :** March 29th 2012

  ***Claim1 :*** *1. A controlled release dosage form for oral administration, the controlled release dosage form comprising: a controlled release formulation comprising at least one drug selected from GHB and pharmaceutically acceptable salts, hydrates, tautomers, solvates and complexes of GHB; and wherein less than 30% of the at least one drug included in the controlled release formulation is released from the controlled release formulation during the first hour after administration.*

  > ➤ **To be checked regularly to see if claims are granted**
  >
  > **Confirm our preference to focus development on delayed release formulations rather than on sustained release formulations, so we won't infringe a possible Jazz patent if application granted**



Flamel Technologies    Confidential    FT218 DoDo - Technical Meeting    01-17-2013    33

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547212

**PTX-0052.33**



Timeline

Flamel Technologies | Confidential | FT218 DoDo - Technical Meeting | 01-17-2013 | 34

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547213

**PTX-0052.34**



HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547214

**PTX-0052.35**



Back-up

Flamel Technologies   Confidential   FT218 DoDo - Technical  Meeting   01-17-2013   36

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547215

**PTX-0052.36**

# Project Team

**PROJECT MANAGER:** Jean-François (Jeff) DUBUISSON

**DIRECTOR of PROJECTS :** You-Ping CHAN

## FLAMEL (Directors)

**Formulation:** You-Ping CHAN

**Intellectual Property :** Catherine CASTAN

**Formulation & Analytical Development:** Philippe GORRIA

**Chief Pharmaceutical Officer, Director of Quality & Regulatory Affairs:** Christian KALITA

## FLAMEL Venissieux

**Formulation development:** Hervé GUILLARD, (Alain CONSTANCIS)

**Analytical research:** Maximilien BLAS, (Corinne VIALAS)

**PK:** Claire MEGRET, (Florence NICOLAS)

**Clinical trials :** Maryline GUEST

**Tox :** Odile BOUTHERIN FALSON

**Purchasing:** Christelle MANIPOUD

## ECLAT

**Operations, VP:** Scott MACKE

**Sales & Marketing, EVP:** Chris KEITH

## FLAMEL Pessac

**Quality and Regulatory Affair, Microbiology & validation:** Christophe JUDAS, Philippe RODRIGUES, Frédéric MIRGUET

**Analytical Development:** *Samantha CLAUSTRE*

**Formulation:** *David CHOGNOT*

**Financial Affairs:** Vanessa GASSIOT

Flamel Technologies | Confidential | FT218 DoDo - Technical Meeting | 01-17-2013 | 37

HIGHLY CONFIDENTIAL
AVDL_00547180

AVDL_00547216

PTX-0052.37

# EXHIBIT 7

**Jazz Pharmaceuticals, Inc.**

**v.**

**Avadel CNS Pharmaceuticals, LLC**

*Civil Action Nos. 21-691, 21-1138, 21-1594*

# Plaintiff Jazz's Opening Statement



PDX-1.1

# Chapter 1 – Jazz Becomes an Industry Leader in Sleep Medicine





# Chapter 2 – Avadel Infringes





**Dr. Herve Guillard**





## Dr. Herve Guillard

- Part of his job at Flamel was **monitoring Jazz's patent portfolio**

- The published application of the '488 patent is one of the Jazz patents **he monitored during the development of FT218**

- Only tested FT218 in DI water because he saw that **Jazz did it first** in Jazz's published patent application

- Had **never** done deionized water testing before

# EXHIBIT 8

| | |
|---|---|
| **From:** | Clark Allphin <Clark.Allphin@jazzpharma.com> |
| **Sent:** | Wednesday, January 16, 2019 2:01 PM |
| **To:** | Christopher Dougherty |
| **Subject:** | RE: From Sandman: Post Meeting Timelines |
| **Attachments:** | image001.png |

Thanks, Chris.  On CMC call, would prefer to wait for at least one internal team call before going there.  Has David Chapman weighed in on this?

As you probably know, we got into once nightly only because Flamel went there first so we had to follow.  I still expect it to be a dog in terms of commercial opportunity.  Would be good for David to validate the worthiness of another shot on goal.

Clark

**From:** Christopher Dougherty
**Sent:** Wednesday, January 16, 2019 1:55 PM
**To:** Clark Allphin
**Cc:** Sean Haggerty
**Subject:** RE: From Sandman: Post Meeting Timelines

Clark,

The change between October 30th and now is interest in their once nightly prodrug formulation, the concept of which they shared at the December meeting (hadn't previously) and is included in the deck I sent you. Additionally, the focus Bill J. previously had on the project was solely on narcolepsy and short-term, not thinking about long-term uses of oxybate outside of narcolepsy. There is also not a lot of optimism about our internal once nightly program.

None of the cons Cuiping highlighted (below) from the meeting on October 30th are applicable:
 – Increase in dose, but same amount of liquid so no difference (and they are using flavoring agents as well to mask flavor in their Phase) so not an issue
 – Potential for approval via 505(b)2 pathway
 – They are working on four formulations for once nightly, our team following the December meeting thinks they have a good shot at achieving their PK

We were catching up on this project in October and still are, but have a plan going forward and you will see comms on that soon.

██████████████████████████████████████████████████████████They today mentioned they would be happy to set up a call with their CMC consultant – would you like to do that?

Thanks

**DTX-0675**

**Jazz Pharms., Inc. v.
Avadel CNS Pharms., LLC**
C.A. Nos. 21-691, 21-1138, 21-1594 (GBW)

1

HIGHLY CONFIDENTIAL

JPION00070062

## Initial Assessment Summary

- Pros:
  - GHB ester prodrug with 0 Na
  - ███████████████████████
  - PK profile ~ JZP-258, impact on oxybate market
- Cons:
  - 1.6x increase in MW thus mass for same molar GHB dose, impact on final dosage form
  - Full NDA package required for an NCE
  - *Unlikely suitable for once nightly regimen but may threat JZP-258 or Xyrem generic*

---

**From:** Clark Allphin
**Sent:** Wednesday, January 16, 2019 4:13 PM
**To:** Christopher Dougherty
**Cc:** Sean Haggerty
**Subject:** RE: From Sandman: Post Meeting Timelines

Hi, Chris. Thanks for some of the context. What's missing is your follow-up from the meeting we had October 30th, where the consensus of the group was we're not interested and your job was to figure out exactly what they wanted from us. At least that's how I recall it. Anyway, seems our interest has increased since then.

Anyway, some questions based on the answers you attached:

1. Can you explain the rationale for selecting delayed release vs. sustained release approach for the formulation?
2. What size particles are you targeting for the formulation?
3. Can you share the simulations of the expected profile with delayed release? What simulation software was used?
4. Can you comment on your approach to meet alcohol ruggedness requirement, which we expect will be imposed, for the delayed release formulation?
5. Although the prodrug may be novel, do you expect it to meet the regulatory definition of NCE for purposes of exclusivity? Can you explain your thinking on basis for that, in light of the fact it is an ester of GHB.

I will for sure have more questions after the team discussion, as I've not gone into their detailed plans yet.

Regards,
Clark

---

**From:** Christopher Dougherty
**Sent:** Wednesday, January 16, 2019 11:49 AM
**To:** Clark Allphin
**Cc:** Sean Haggerty
**Subject:** FW: From Sandman: Post Meeting Timelines

2

JPION00070063

DTX-0675.0002

Hey Clark,

Hope you are doing well. Sean and I took this project back over from Bill J. when he left in November. To put it politely, no work had been done from a Corp Dev side in over a year (Bill didn't reply to any of their e-mails following a meeting at JPM last January), so when we took the reins back over, we set up to drive this to a conclusion one way or another.

Devin & Andrew Friedberg stayed in touch with XW during that time, and hosted them back in October for an update. We then just had them in Palo Alto in December, where they presented some new ideas, mainly their concept for a once nightly, which got the team excited (Jeff S., Trudy, Cuiping, Devin, etc. & Jed is also excited). If successful, this would be a once nightly no-low sodium (vs. other assets in development which don't offer both). This formulation would have patent exclusivity into the mid 2030s so would potentially allow for development in indications outside of narcolepsy. They finished their SDE study in Australia and are in the middle of the MDE study and are going to talk to the FDA in April. In talking to our regulatory team, the thinking is they might only need to run a small single safety study and be on the market in the 2022/2023 timeframe (if not with the once nightly, they could potentially with a twice nightly (current formulation) no sodium formulation).

We will keep you in the loop as we move forward. We are going to get a group wide call to discuss next steps.

In the mean, can you send us a list of any questions you have? On the prodrug and or development? I've attached one set of responses from XW that they provided to us ahead of the December meeting which might answer some questions.

Thanks,
Chris

---

**From:** Clark Allphin
**Sent:** Monday, January 07, 2019 12:43 PM
**To:** Sean Haggerty
**Cc:** Christopher Dougherty; Bill Bennett
**Subject:** RE: From Sandman: Post Meeting Timelines

Hey, Sean – haven't heard back from you or Chris re: deal context. Assume you're all pretty busy with JPM, so will revert later in the week. I also need to confer with a colleague in Tech Ops who is running our current once nightly CMC program, just to see how his experience aligns with the aspirations of XW.

Clark

---

**From:** Sean Haggerty
**Sent:** Friday, January 04, 2019 5:56 AM
**To:** Bill Bennett; Clark Allphin
**Cc:** Christopher Dougherty
**Subject:** RE: From Sandman: Post Meeting Timelines

Ok great, thanks for the prompt reply Bill!

@Clark, page 4 of Dec deck attached is where we're looking for some of your CMC insight. Product is a Xyrem pro-drug based off valine. October deck has the structure and some physical chemical properties that might be helpful.

3

Happy to touch base by phone if that would be helpful for you. Just let us know.

Thanks in advance,
Sean

**From:** Bill Bennett
**Sent:** Friday, January 04, 2019 8:40 AM
**To:** Sean Haggerty; Clark Allphin
**Cc:** Christopher Dougherty
**Subject:** RE: From Sandman: Post Meeting Timelines

Hi Sean

This would fall to Clark.

Bill

**From:** Sean Haggerty
**Sent:** Friday, January 04, 2019 5:34 AM
**To:** Bill Bennett
**Cc:** Christopher Dougherty
**Subject:** FW: From Sandman: Post Meeting Timelines

Hi Bill —

Touching base about Project Sandman, a Xyrem pro-drug we're evaluating. Looking to get some CMC thoughts on Sandman's scale up plan (discussed in attached) and wasn't sure who best from your team could assist in providing us some perspective and could be involved/help moving forward.

Happy to jump on the phone to discuss if easier for you.

Thanks!
Sean

**From:** Sean Haggerty
**Sent:** Friday, January 04, 2019 5:30 AM
**To:** Trudy Vanhove; Devin Noblin; Jeffrey Silverman; Lynne Robertson (Jazz Contingent Worker); Philip Jochelson; Cuiping Chen; Andrew Friedberg; Jed Black
**Cc:** Christopher Dougherty
**Subject:** From Sandman: Post Meeting Timelines

Sandman Team —

Happy new year! Passing along a presentation we received from Willie after our mid-December in person meeting that provides more detail on their development plan timing expectations and thinking. To help our thinking on how best to proceed forward working with them, it would be helpful to get your views on this document and if the timelines/regulatory path they present is realistic.

Thanks for the help and don't hesitate to reach out with any questions!

Sean

4

JPION00070065

DTX-0675.0004

**Sean B. Haggerty**
Corporate Development
Jazz Pharmaceuticals
2005 Market St | Suite 2100 | Philadelphia, PA 19103
215-832-3732 (w) | 518-225-7740 (m)

** ATTENTION: CONFIDENTIAL **

This email message is for the sole use of the intended recipient(s) and may contain confidential and/or privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact me by reply email and destroy all copies of the original message. Thank you.

HIGHLY CONFIDENTIAL                                                            JPION00070066

DTX-0675.0005

# EXHIBIT 9

Relativity ID :          JPION00070094

Custodian :              Clark Allphin

Master Date :            6/30/2016 12:00:00 AM

File Name :              R665-review oxybate once
                         nightly approaches.docx

Original File Path :
                         \\us1lssnas04v\LSS\ePS\QSR
                         C\17486\P00019\callphin\On
                         eDrive -
                         Jazzpharma.com\Documents\P
                         rojects\JZP...



EXHIBIT
3
10/21/22

DTX-0236

Jazz Pharms., Inc. v.
Avadel CNS Pharms., LLC
C.A. Nos. 21-691, 21-1138, 21-1594 (GBW)



| | R665.00 |
|---|---|
| **Technical Memo** | |
| **Review of Oxybate Once Nightly Approaches** | |

Background ........................................................................................................................ 1

   Orphan Medical ............................................................................................................ 1

   Jazz early efforts .......................................................................................................... 2

   PLE-2 program and follow-on work ............................................................................ 4

   Oligomers and deuteration ........................................................................................ 4

   Interim work during JZP-386 ...................................................................................... 5

   Re-starting and re-assessing ...................................................................................... 6

Oxybate once nightly approach .................................................................................... 8

   Calcium-only, leading to mixed salt .......................................................................... 8

   Buffering backup program .......................................................................................... 8

   GHB Resinate evaluation........................................................................................... 11

   Other approaches considered ................................................................................... 12

Alternatives to Oxybate ............................................................................................... 13

   Gamma butyrolactone (GBL)..................................................................................... 13

   Deuterated oxybate or GBL ...................................................................................... 15

   New prodrug ............................................................................................................. 16

   Other approaches considered ................................................................................... 16

Recommendation.......................................................................................................... 17

**Disclaimer** – This technical memo was drafted in July 2015 and has undergone little modification since, except for addition of references. As of June 2016 when this memo will be finalized, a once nightly program (JZP-324) has been initiated and a backup program (resinate) remains under consideration. This memo reflects the state of understanding before development work commenced and has not been updated with learnings from either experience.

## Background

Jazz and Orphan have conducted several programs aimed at achieving once nightly administration of sodium oxybate. Briefly, the programs and key learnings are summarized in Table 1.

### Orphan Medical

Prior to Jazz acquisition of Orphan Medical, Orphan engaged Shire PLC in development of delayed release beads using Shire's Microtrol technology (dual pulses derived from different pH-triggered enteric

HIGHLY CONFIDENTIAL        JPION00070094

DTX-0236.0002



| | R665.00 |
|---|---|
| **Technical Memo** | |

### Review of Oxybate Once Nightly Approaches

coatings on beads). The project was initiated in 2002[1], and prototype formulations were tested in dog in April 2004.[2] The results of dog PK study indicated progressively poorer absorption and higher variability down the GI tract. However, duodenum-targeted beads achieved 53% BA with acceptable variability but poor loading efficiency. A once nightly dose of the best identified formulation would have required 34g of drug product.[3]

Orphan also took the program to SRI International, presumably to explore options beyond Shire's technology. The main approach involved a matrix bead having 50% drug loading, which was then coated with either a rate-controlling or enteric film. High coating weights were required with little improvement on overall drug product mass requirement. The work was incomplete, with no sound conclusions or animal PK study conducted.[4]

**Jazz early efforts**
When Jazz took over Xyrem, a regional absorption study in humans was commissioned. Using a bolus 900mg dose of solid sodium oxybate delivered by Enterion capsule, precise targeting could be achieved. A human 4-way crossover design confirmed the results of the dog study, that absorption is poorer down the GI tract.[5] However, with relative BA of 74% in jejunum and 56% in ileum the absorption is good enough to consider a once-nightly sustained-release formulation of SXB.

Jazz also engaged in limited evaluation of metabolic inhibitors as a means of extending the half-life of GHB. Based on PK simulations and mouse PD assessments, there were no strong leads that could be developed readily.[6] As a result, the once nightly efforts focused on formulation approaches. During the period of 2006-2009, besides developing a pipeline of several 505b(2) and an NCE program, Jazz focused oxybate franchise LCM on expanding into fibromyalgia using an oral solution as the initial dosage form. The once nightly formulation was viewed as LCM for the new indication, so was not vigorously pursued until clinical development using oral solution was almost complete.

---

[1] File: Shire Project Update 21-oct-02 in-silico modeling.pdf
[2] File: Feasibility study – April 7, 2004.pdf
[3] File: Xyrem XR Calculations for Orphan 062804.ppt
[4] SRI International, Formulation of Xyrem: pulsatile drug release interim development report, SRI project P13851, January 2015. No final report could be located. File: SRI report pulsatile release formulation GHB.pdf
[5] Four way crossover human drug absorption study, investigating the regional absorption of sodium oxybate, compared to an immediate release oral administration, Pharmaceutical Profiles Ltd Study PPL-1035 / 06-004, 2006
[6] Liu, Jamieson and Foreman, GHB metabolic inhibitors, GHB prodrugs and GHB receptor agonists – presentation to experimental medicines committee November, 2006.

HIGHLY CONFIDENTIAL                                        JPION00070095

DTX-0236.0003



| | Jazz Pharmaceuticals | | R665.00 |
| --- | --- | --- | --- |
| | Innovation that performs | | |
| | **Technical Memo** | | |

**Review of Oxybate Once Nightly Approaches**

Table 1. Chronology of Oxybate Once Nightly Efforts

| Initiated | Program | Form or aspect | Learnings or outcome |
| --- | --- | --- | --- |
| 2002 | Shire collaboration | DR beads, enteric | Low BA in dog study, but potentially viable but with high DP mass (~34g); not tested with IR component |
| 2004 | SRI followup | DR matrix beads, enteric | DP mass still a concern, more films are optional; no PK study conducted |
| 2006 | Regional absorption study | Bolus, Enterion capsule | 4-way crossover human PK, 74% BA jejunum, 56% BA ileum, 31% asc colon relative to IR Xyrem |
| 2006 | Metabolic inhibitors | Endogenous, drug-like or approvable | Mouse PD model, no strong leads but some effects |
| 2009 | PLE-2 (SR tablet) | SR tablet | Human PK: High variability, BA in line or slightly lower than expected, pronounced food effect; mean fasted PK matched prediction |
| 2011 | GBL SR | SR softgel (GBL) | Limited absorption window in dog PK study, not viable for duration needed |
| 2011 | GBL oligomers | IR liquid | Activation in GI tract unlikely, systemic exposure deemed likely based on in-vitro evaluation; not attractive |
| 2011 | D-GBL (Concert, later became JZP386) | IR liquid | Human PK: Modest extension in half-life, insufficient alone for QD but possible with formulation |
| 2012 | Prodrug for metabolic extension | IR liquid | (Paper exercise): Mamelak prodrugs unlikely to be absorbed or provide extension of half-life |
| 2013 | Sipper device | Drug/device combo | Design evaluation; viable, but patient market research not favorable |
| 2014 | Inhibition with GHB lookalikes | IR liquid | Rat PK: Potential lead with 1,5-pentanediol / 5-OH valeric acid; no compendial candidates identified |
| 2014 | SR Prodrug for absorption | SR softgel | Paper exercise identified BDO-based prodrugs likely to have good absorption; 2 candidates synthesized |
| 2015 | Initiation of formal Oxybate LCM | N/A | PLE-2 likely failed due to gastric retention, causing high variability; may work well with SR beads |

Note: Between 2006 and 2009, oxybate LCM focused more on expanding into fibromyalgia using oral solution as initial dosage form



| | R665.00 |
|---|---|
| Technical Memo | |
| Review of Oxybate Once Nightly Approaches | |

**PLE-2 program and follow-on work**

The PLE-2 program took advantage of Shire learnings, human regional absorption data, and PK modeling to arrive at a sustained release tablet as the most preferred formulation. Very high mass efficiency (about 92% drug loading overall) was achieved in the SR tablet. However, a well-powered PK study revealed substantial variability even in the fasted state.[7] Importantly, individual subject data did not track the mean, and certain subjects in the fed state experienced delayed and sometimes biphasic profiles. The mean data, however, was in-line with predictions of the PK model based on in-vitro dissolution data. At the time, the variability was thought to be an inherent property of oxybate. Since recent literature[8] then confirmed that oxybate has carrier-mediated transport and probably paracellular as well, attention was focused on circumventing regional absorption limitations.

GBL was studied as a potential workaround, as an extension of the PLE-2 program. GBL is a prodrug of GHB and, in fact, is absorbed more rapidly than GHB with roughly equimolar bioavailability. A small polar molecule with no charge, GBL might have higher permeability than oxybate anion. SR GBL softgels meeting in-vitro dissolution specifications were site-filled and used in a dog PK evaluation. The results indicated a much more limited region of absorption than oxybate, thus much lower relative BA and shorter duration in-vivo.[9]

**Oligomers and deuteration**

Around the same time, a patent was issued to Metabolix/Tepha based on oligomers of GBL that were shown to produce a sustained GHB profile in mice.[10] Jazz engaged Metabolix with synthesis of oligomers and in-vitro evaluation. The requirement at the time was that there should be no systemic exposure to NCE (ie, oligomers or fragments), which would trigger a tox program more like a systemic-activated prodrug. Instead, the prodrug should cleave in the intestine and release GHB slowly. The in-vitro assessment showed this requirement couldn't be met.[11] In the mouse study, the molecular weight of the oligomer would have been far too high for absorption. Lacking enzymes capable of degrading it in the small intestine, the most plausible explanation for the mouse result was activation by bacteria in large intestine.

In 2011, Concert approached Jazz with deuterated GHB. Rat data were initially promising, but dog PK study funded by Jazz was less so.[12] Nevertheless, Jazz in-licensed the opportunity and this became JZP-386. Human PK results in 2015 showed some extension of half-life, but a degree insufficient to promote

---

[7] CSR Study 08-009
[8] Lam W, et al, Monocarboxylate transporter-mediated transport of gamma-hydroxybutyric acid in human intestinal caco-2 cells, drug metabolism and disposition 38(3): 2010.
[9] Pfeiffer J, PK Summary, MPI Study 1301-004, Technical memo R276, 2011.
[10] Willams SF and Martin DP, Therapeutic uses of polymers and oligomers comprising gamma-hydroxybutyrate, US Patent 6,623,730 B1, 2003.
[11] Allphin C, Evaluation of GBL oligomers for extended release of GHB, Report R295, 2012.
[12] Pfeiffer J, Pharmacokinetics of deuterated GHB in dogs, Technical memo R288, 2011.

HIGHLY CONFIDENTIAL                                        JPION00070097

DTX-0236.0005



| | R665.00 |
|---|---|
| Jazz Pharmaceuticals<br>*Innovation that performs*  Technical Memo | |
| Review of Oxybate Once Nightly Approaches | |

once-nightly therapy on its own.  Instead, a formulation vehicle would be required.  The program is still an option for LCM, and an initial PK estimate indicates that a roughly 70% immediate release and 30% sustained release (3h duration) would meet requirements.[13]  During the conduct of JZP-386, four other once-nightly approaches were evaluated with less vigor, as a hedge given the relatively low probability of success of deuteration.  These are described next.

**Interim work during JZP-386**
In collaboration with Orphan, a family of prodrugs was patented by Mamelak and ultimately assigned to Jazz.[14]  In 2012, an analysis of the structures and "deliverability" was undertaken.  Based on in-silico models, the relatively complex prodrugs were predicted to have poor or incomplete intestinal absorption without some activation (ie, breakdown by gut flora).  Effecting GHB sustained release through gradual prodrug metabolism in small intestine is deemed an unreliable approach prone to food effects and inter-patient variability.  It also doesn't circumvent the poor lower GI absorption of the GHB which is released from the prodrug. Therefore, the Mamelak prodrugs were not progressed to animal studies.

Inspired by patients' willingness to use CPAP devices for sleep, a drug-device combination for Xyrem was conceived.  The "sipper" was an in-mouth appliance that delivered SXB solution to saliva, which would be swallowed passively and conceivably exhibit high BA similar to immediate-release.  Charged with a dosing syringe to inflate small bladders, the mouthguard-like device would then release Xyrem in the mouth over 4-5 hours while patient slept.  While initial engineering assessment indicated feasibility[15], patient market research (conducted in February 2014) did not.

In 2014, the idea of metabolic inhibition was revisited with 1,4-butanediol and the inhibitor fomepizole as well as other diols.[16]  Although fomepizole failed to show higher GHB AUC (likely due to enhanced renal clearance of BDO), a solid hit was observed in rat PK studies with 1,5-pentanediol.  It is speculated that the metabolic product 5-hydroxyvaleric acid is the GHB lookalike responsible for competition for GHB metabolizing enzymes.  Because neither 1,5-pentanediol, 5-hydroxyvaleric acid, nor any other omega-hydroxyacid are approvable without extensive tox, the research is on hold until more short-term options are evaluated.

Along the same lines, a sustained release prodrug could offer better lower GI absorption with less variability than oxybate. Rather than target systemic extension of half-life, the approach looks for better absorption from formulation vehicle.  Based on in-silico screening[17], two BDO-based structures were

---

[13] Eller M, "Deuterium session – working session of oxybate LCM", August 28, 2015. Informal communication.
[14] Mamelak M, et al, Gamma-hydroxybutyrate compositions containing carbohydrate, lipid or amino acid carriers, US Patent 7,015,200 B2, 2006.
[15] File: Jazz_Phase1 design_09 05 13.pdf  --  Phase 1 design concepts from Speck Design, 2013.
[16] Absorption Systems Study 14JAZZP1
[17] Allphin C, Prodrug evaluation for GHB delivery, technical memo R391, 2014.

HIGHLY CONFIDENTIAL                                                                                JPION00070098

DTX-0236.0006



| | **R665.00** |
|---|---|
| Jazz Pharmaceuticals *Innovation that performs* **Technical Memo** | |
| **Review of Oxybate Once Nightly Approaches** | |

identified and synthesized for characterization in 2014. Those could be delivered in sustained-release softgel form, but would be prone to variability in gastric transit, due to the number of softgels required. Furthermore, prodrugs would be NCE and require more tox, though probably less than would be required of potential competitive substrates for metabolism. This approach is suspended as well.

**Re-starting and re-assessing**

In 2014 Flamel announced acceptable PK results with a multiparticulate approach. This triggered a re-assessment of conventional SXB delivery options and, in particular, reconsideration of the cause of PLE-2 failure. A review of external experience with SXB, as divulged in patent applications, indicated mixed results with beads as well as tablets.

Shire, as previously mentioned, tested formulations in a dog PK study[18] which indicated that the shortest duration enteric coat (jejunum-targeted) can provide acceptable BA (53%) and variability, albeit with a heavy drug product mass. On the other hand, ileum-targeted beads had much higher (and unacceptable) variability, and considerably lower bioavailability (27%). Neither beads were dosed with an immediate-release component. The result of late-targeted beads may reflect transit and absorption in large intestine.

D&A developed SR beads of 3-4h duration for alcohol dependence. Limited information disclosed in patent application suggests the beads afforded extension of PK when dosed alone.[19] The duration was effectively extended about 1h and BA relative to oral SXB was 83%. However, the SR beads dumped in presence of a 50% IR dose.

Laboratorio Farmaceutico ("Lab Farm") developed a SR tablet for alcohol treatment, using a combination of matrix tablet coated with a SR film.[20] In single tablet (1000mg SXB) dosing, good extension of PK was achieved with low variability. This example suggests that high variability of PLE-2 may be associated more with the number of tablets administered, rather than the tablet size. Tablets in this example were considerably larger than PLE-2 SR tablets.

The PLE-2 formulation failed more due to individual variability than mean behavior. Although individual profiles did not track the mean, the mean fasted profile was consistent with that expected from the original PK modeling. Furthermore, more detailed modeling suggests remarkably good agreement with both kinds of SR tablets.[21] Below is a fit to the PK model based on (a) setting constant regional BA based

---

[18] Liang L, et al, Controlled release compositions of gamma-hydroxybutyrate, US Patent 8,193,211 B2, 2012

[19] Suplie P and Lecoustey S, Gamma-hydroxybutyric acid granules, US patent application 13/984,922, 2014.

[20] Conte U, et al, Controlled release pharmaceutical compositions based on one or more pharmaceutically acceptable salts of gamma hdyroxybutyric acid, US Patent 5,594,030, 1997.

[21] Allphin C (for Sathyan G), 09-002 (PLE-2) study modeling and simulation, Technical Memo R616, 2015. Group B refers to the EC/HPC SR film, and Group C refers to the EC/P188 film both administered 6g dose in fasted state with no IR component.

HIGHLY CONFIDENTIAL                                              JPION00070099

DTX-0236.0007



| | R665.00 |
|---|---|
| **Technical Memo** | |
| **Review of Oxybate Once Nightly Approaches** | |

on overall BA of dosage form, and (b) relative input time adjustment of 16%. The latter reflects that in-vivo behavior is somewhat slower than in-vitro; hence, a 6h system would behave in-vivo as a 7h one.



The most likely root cause of PLE-2 failure appears to be variable gastric retention of tablets in the fasted state. Single large tablets are passed relatively quickly when administered in fasted state, as evidenced by Lab Farm's results as well as literature studies with large non-disintegrating tablets and capsules.[22] Although single-tablets in fasted state are generally not retained, few studies with multiple (large) tablets have been undertaken. In the fed state, it is well known that even modest-sized tablets are retained for surprisingly long and variable periods. Thus, the unusual fed-state behavior of PLE-2 can easily be explained by gastric retention and should be substantially reduced or eliminated with a multiparticulate dosage form.

If the root cause of PLE-2 variability is gastric retention of the tablets, then a multiparticulate approach may be viable for once nightly.

---

[22] Davis, Hardy and Fara, Transit of pharmaceutical dosage forms through the small intestine, Gut, 1986, 27, 886-892. Capsules larger than the PLE-2 tablets (25x9mm vs about 18x8mm for PLE-2) were studied in several of the trials and found to exhibit relatively low gastric residence and variability between subjects.



| | | R665.00 |
|---|---|---|
| Jazz Pharmaceuticals — Innovation that performs | Technical Memo | |
| Review of Oxybate Once Nightly Approaches | | |

## Oxybate once nightly approach

### Calcium-only, leading to mixed salt

The preferred product is a sustained release mixed oxybate salt.  In a marketplace of two oxybate once-nightly products, it would differentiate from sodium-oxybate and make for an easier transition from OMSOS.  Further differentiation may be expressed in the final dosage form.

The mixed salt, however, involves development of two new API processes and the complexity of integrating these into a sustained release formulation.  To speed development time, a staged approach is proposed which ultimately may result in the mixed salt but also affords the possibility of a slightly faster once-nightly single-salt (calcium or sodium).

Calcium oxybate is chosen as the single-salt option, because it may circumvent problems associated with the hygroscopicity of sodium oxybate.  These problems may have complicated Shire's development of pellets, resulting in excessive coating requirements, and may have also limited Flamel's progress in their own development.  By switching to a non-hygroscopic salt amenable to both compression and extrusion/spheronization, we may gain back some time.  Calcium is also the majority salt in the mixed option, and a requirement for the first-line mitigation approach (buffering) should PK results demand it.

1. Develop calcium oxybate API process
2. Develop immediate-release beads using extrusion/spheronization (primary approach) while concurrently developing a process for magnesium oxybate.  Place calcium oxybate IR beads on stability and begin screening SR coatings with calcium only.  Select a coating and place on stability.  Depending on the status of magnesium oxybate process, step 3 may be skipped in the interest of timing.
3. When magnesium oxybate is available, evaluate IR and SR beads containing a 2:1 blend of calcium and magnesium oxybates, using formulation and parameters derived from calcium-only studies.  Place those on stability.  If difficulty in encountered, there is always the option of moving forward with calcium-only.
4. Scale-up and manufacture an engineering lot of IR beads coated to two film weights corresponding to "fast" and "slow".
5. Manufacture CTM.

Off critical path, the sodium oxybate IR beads could be evaluated.  However, PK arms requiring immediate release could be done with either SXB powder or liquid form.

### Buffering backup program

The "main path" development is for a sustained release pellet.  This puts more absorption in the ileum than a delayed release bead that Flamel may be developing.  In the event that PK variability is still too high or overall BA is too low, then buffering has a better chance of overcoming it.

HIGHLY CONFIDENTIAL                                                                        JPION00070101

DTX-0236.0009



| | R665.00 |
|---|---|
| Technical Memo | |
| Review of Oxybate Once Nightly Approaches | |

Oxybate conventionally is delivered as the fully ionized salt form. Due to the magnitude of the dose, the oxybate itself has substantial buffering capacity relative to the buffering capacity of the total small intestinal fluid. The estimate below, based on literature values, indicates a reasonable estimate of 0.83 mEQ/pH for the overall buffer capacity of small intestine. This stands in contrast to an expected SR dose of about 48 mEQ delivered to small intestine over 5h. Even a worst-case estimate of overall buffer capacity is several-fold less than the oxybate dose. Therefore, if oxybate is delivered as a buffered mixture, it is very likely that this will largely set the pH of its own absorption.

| | Median (range) | Reference/result |
|---|---|---|
| Intestinal volume, ml | 83 (45-319) | Schiller[23] |
| Buffer capacity | 4-13 mEq/L/pH | CMM Perez[24] |
| | 10 mEq/L/pH | Jantratid and |
| Total capacity | 10 * 0.083 = | 0.83 mEq/pH |
| Worst case | 13 * 0.319 = | 4.2 mEq/pH |

The intestine isn't static, though, so bicarbonate diffusion will partially compensate for the lower pH. To overcome that, a nominal pH target of 4.5 (50% ionization) is sought, with the expectation that the actual pH achieved may be 5.5 or so. Based on Caco-2 permeability studies by Lam et al, reducing the pH by 1 unit in the small intestine should double the permeability.[26] The directional influence of pH is expected to be the same for both active (MCT) and passive (paracellular) transport.

Self-buffering of oxybate is achieved by in-situ chelation of a solid acid with calcium oxybate, releasing GHB and retaining the calcium acid salt as precipitated solid. Shown below is the displacement that would occur with tartaric acid and calcium oxybate.

(1)  $Ca^{++} (GHB^-)_2$ + Tartaric acid  $\rightarrow$  2 GHB + $Ca^{++}$ (Tartrate) (s)

Because the calcium tartrate is not available to buffer the intestinal fluid, this is substantially more efficient than simply co-releasing an acid along with an oxybate salt. As a result, 50% ionization can be achieved with a 30% increase in drug product. Another advantage is the actual calcium available for absorption is reduced by 50%. Assuming buffering achieves bioavailability comparable to Xyrem, it becomes mass-efficient when the unbuffered bioavailability is less than about 75%. Since the targeted

---

[23] Schiller et al, Aliment Pharmacol Ther 2005; 22: 971-979
[24] CMM Perez, J Pharm Pharmacol 2006 Aug 58(8): 1079-89
[25] Jantratid and Dressman, Dissolution technologies August 2009 (FaSSIF-V2 justification)
[26] Lam, Felmlee and Morris, Monocarboxylate transporter-mediated transport of γ-hydroxybutyric acid in human intestinal Caco-2 cells, Drug Metabolism & Disposition 38(3), 2010. See Figure 2.

HIGHLY CONFIDENTIAL
JPION00070102

DTX-0236.0010



| | R665.00 |
|---|---|
| Jazz Pharmaceuticals *Innovation that performs* Technical Memo | |
| Review of Oxybate Once Nightly Approaches | |

profile, based on PLE-2 results, is expected to get about 70% bioavailability overall, buffering is considered as a mitigation in case actual BA is much lower or variability is still too high.

Feasibility evaluations have established very good pH control throughout the delivery profile, and have also identified challenges and possible solutions with regard to solid state stability. Premature activation by water is problematic, because the GHB formed is liquid and readily forms GBL which evaporates. Further CMC work is proposed in parallel with "main path" activities so that, if needed, buffering can be implemented with reduced risk and time. These activities include:

- Process feasibility for making buffered IR beads. We anticipate this will require a water-free "mini-tab" approach, but may also evaluate extrusion/spheronization using organic solvents.
- SR coating studies, using same film selected for "main path" SR beads.
- Stability studies to establish packaging and process requirements, particularly with regard to salt form (monohydrate vs hydrates) and hygroscopicity of excipients. For planning purposes, we assume that only anhydrous calcium oxybate will be acceptable.
- In-vitro intestinal permeation studies to establish the effect of pH on permeability, as well as effects of bicarbonate counter-transport.

HIGHLY CONFIDENTIAL                                                                JPION00070103

DTX-0236.0011



| | R665.00 |
|---|---|
| Jazz Pharmaceuticals *Innovation that performs* Technical Memo | |
| **Review of Oxybate Once Nightly Approaches** | |

**GHB Resinate evaluation**

Resinates very small diameter coated beads which can feel like a liquid when given in suspension. They are very patient-friendly, particularly for small-dose drugs given to children.  For oxybate, however, a GHB-resinate approach pushes the boundaries of the technology in several ways:

1. The amount of resin needed, theoretically, is at the limit of what has been approved for daily administration (cholestyramine).  In that case, the anion-exchange resin is given four times per day, and our product would require patient exposure all at once.
2. Close to 100% theoretical loading is difficult if not impossible to achieve with existing chloride-bearing resins.  To achieve a reasonable amount of drug product mass, this would be required and may restrict us to a non-compendial resin (such as hydroxide-bearing resins).
3. Resins work by exchanging anions in the GI tract, liberating the anionic drug originally bound to the resin.  The dose of oxybate is far higher than any other drug-resinate, and exceeds the anion capacity of the gut.  Therefore, the approach may fail to work in-vivo as expected.  There is a possibility that an SR coating may not be required due to this limitation.
4. Resins are normally presented as non-viscous liquids, because the amount of drug-resinate relative to liquid is small.  In the case of oxybate SR, the required amount of drug-resinate is such that a large volume of water would be required – about 12 ounces minimum.  This is much more than would be required of conventional SR beads, due to the tremendous swelling of resins.

It is difficult to envision how a resinate approach would mitigate PK failure of conventional SR beads, since most literature indicates gastric emptying and small intestinal transit of beads is relatively size-independent.  Since oxybate is liberated in anionic form, the regional absorption with a resinate would be expected to be similar to that of a conventional bead.  The main advantage of a GHB-resinate might be its intrinsic brake on absorption that's the result of the high molar dose of oxybate and reliance on gut anion exchange.  If this effect can be demonstrated, then there is a possibility that a GHB-resinate may be more intrinsically safe toward overdose or potential abuse.



HIGHLY CONFIDENTIAL                                                            JPION00070104

DTX-0236.0012



| Jazz Pharmaceuticals | R665.00 |
|---|---|
| **Technical Memo** | |
| **Review of Oxybate Once Nightly Approaches** | |

**Other approaches considered**

SR Tablets.  If the underlying reason for the tablet variability is due to size and shape rather than number of tablets, then sustained release tablets may be an acceptable alternative to beads.  Studies with smaller tablets (5mm diameter rounds) indicate they travel through stomach and small intestine in unison.[27]  Nevertheless it is difficult to see the advantage over beads, and would still have more pronounced food effect.

Gastro-retentive tablets require at least a light meal for safe activation.  Otherwise, safety risks preclude fasted administration.  (In other words, in order to allow rapid enough swelling to avoid premature passage, there's a risk of premature swelling in esophagus.)  GR tablets haven't been successfully developed for fasted state, and even in fed state are limited to about 2-3 large tablets.  At least 9 large tablets would be required to deliver the expected therapeutic dose of oxybate.

Floating or mucoadhesive beads would prolong release in stomach and possibly in small intestine.  However, there is little clinical evidence of successful application of this approach.  Many such approaches shown to work in animal studies failed in human experience.[28]  Resins, such as cholestyramine, have been shown to prolong gastric residence but with very small doses (25mg).[29]  Mucoadhesion for gastric retention may not apply for a large dose of beads required for oxybate.  Here a rough calculation may be illustrative.  Assuming 50% of stomach surface ($800cm^2$) is occupied with beads of 100-micron diameter ($400cm^2/g$), the total amount of beads eligible for adhesion is only 1g.  Depending on whether this is a resin or conventional small-diameter coated bead, this is somewhere between 3% and 7% of the dose.  There simply isn't enough stomach surface area to handle an appreciable amount of the oxybate dose!

Ileal braking is an approach for slowing small intestinal transit by co-administering fats or fatty acid in the ileum, triggering a feedback process intended to optimize digestion of dietary components.  If it worked, this might be a good fit for oxybate – a modest amount of fat wouldn't add much to the comparatively large oxybate dose.  Unfortunately, results are mixed and it doesn't seem a reliable mechanism – what time is extended seems to be due to holdup at ileal-cecal junction (Davis 2005).

Administration of non-caloric gel meal may be an effective means of obtaining the modest amount of gastric retention sought.  For meaningful retention, though, the gel would need to be fairly stiff, not

---

[27] Khosla R, Davis S, Gastric emptying and small and large bowel tansit of non-disintegrating tablets fasted subjects, Int J Pharm, 52 (1) 1989, 1-10.
[28] Davis S, Formulation strategies for absorption windows, Drug Del Technology 10 (4) 2005.
[29] Jackson SJ, et al, Effect of resin surface charge on gastric mucoadhesion and residence of cholestyramine, Int J Pharm 205 (1-2), 2000, 173-181.

HIGHLY CONFIDENTIAL                                                      JPION00070105

DTX-0236.0013



| | R665.00 |
|---|---|
| **Technical Memo** | |
| **Review of Oxybate Once Nightly Approaches** | |

prone to syneresis (wringing of water), yet digest completely.  Although some success has been seen with rat studies[30], lack of any precedence in humans elevates the risk of failure or adverse effects.

## Alternatives to Oxybate

By introducing a once-nightly product that is not GHB, we may be able to compete with another oxybate once nightly product.  Several options exist, and selection among them depends on timing and anticipated benefits.

### Gamma butyrolactone (GBL)

GBL is a prodrug of GHB, has undergone NTP tox assessment and is known to convert to GHB within about 2 minutes once absorbed.  It has faster absorption than GHB, so much so that – as a prodrug- its Cmax is higher and Tmax is lower than SXB.[31]  There have been no reported efficacy trials with GBL, and very limited human PK are available.[32]

███████████████████████████████████████████  We may credibly introduce GBL in a fashion that competitors couldn't conceive without a GMP method of manufacture that doesn't involve industrial-sourced GBL.

Because GBL has no INN or USAN, we may use naming to further distance the new product from its past and to differentiate it from conventional oxybate.  Even within accepted non-INN, GBL has numerous options – 4-butanolide, gamma butyric acid lactone, etc.

Features that potentially distinguish GBL from oxybate include:

- It's a hydrophilic liquid, somewhat unusual for pharmaceutical products
- Much faster absorption in small intestine, about five-fold higher intestinal permeability.[33]
- No cations and likely less incidence of enuresis, because there are no cations
- Maybe less desirable for surreptitious administration in beverages, as the taste of GBL may be more difficult to mask than that of sodium oxybate
- It may have much reduced variability in PK vs. oxybate, because it isn't ionizable, doesn't rely on transporters for absorption and has higher permeability.  Dog PK data for IR GBL vs SXB bear this out, although sample size was only 8.

---

[30] Foster KA, et al, Utility of in-situ sodium alginate/karaya gum gels to facilitate gastric retention in rodents, Int J Pharm 434 (2012) 406-412.
[31] Observed in dog PK.  See report R276, Figure 1.
[32] Gamma-butyrolactone: Critical Review Report, Expert Committee on Drug Dependence, 36th, 2014. http://www.who.int/medicines/areas/quality_safety/4_3_Review.pdf
[33] Arena C and Fung HL, Absorption of sodium gamma-hydroxybutyrate and its prodrug gamma-butyrolactone: relationship between invitro transport and in-vivo absorption, J Pharm Sci. 1980 Mar;69(3):356-8.  Measurements with everted rat intestine clearly demonstrate lack of capacity-limited absorption in regime where GHB has such, and about five-fold higher permeability at 0.4M concentration.

HIGHLY CONFIDENTIAL                                                                    JPION00070106

DTX-0236.0014



| | R665.00 |
|---|---|
| **Jazz Pharmaceuticals** *Innovation that performs* **Technical Memo** | |
| **Review of Oxybate Once Nightly Approaches** | |

- Because it doesn't rely on transporters, it doesn't have capacity-limited absorption as oxybate does.  As it's rapidly converted to oxybate after absorption, its elimination has same limitations as oxybate, of course.
- It may be expected to have a smaller food effect vs. Xyrem as immediate-release, but uncertain if this would be true in once-nightly formulation.
- No first-pass metabolism is expected from GBL.  Although first-pass metabolism of GHB is relatively modest in humans (~12%), it may contribute to inter-patient variability.  In animal models, particularly rat, GBL has substantially higher bioavailability vs. GHB due to first-pass metabolism.

A substantial amount of formulation effort was undertaken as the follow-on to PLE-2.  A candidate was tested in a dog PK study, and found to have low bioavailability and somewhat higher than expected variability.  However, careful analysis suggested that GBL was well absorbed in the small intestine and that the variability was associated with variable gastric emptying of the coated softgels.[34]  Neither of these aspects may apply as much to humans, where small intestinal transit is longer and the gastric retention of solid dosages forms is of less duration and prevalence for similar sizes.[35]  The softgels used were roughly half the size of PLE-2 tablets, and had no tendency to stick together in the finished form.

The desired duration of absorption is around 4h for once nightly, which is within range of oral-cecal transit time in humans.  A modest gastric retention would be favorable, as would modest slowing of transit due to "braking" action of GHB itself, if that bears out.[36]

GBL formulation options include:

- SR coated softgels (similar to what was used in dog study)
- SR coated matrix softgels – limit risk of liquid dose-dumping – probably preferred approach
- Matrix softgels – simpler overall, if non-zero order profile acceptable; possibility it may float and exhibit modest retention

---

[34] Pfeiffer J, Simulation of pharmacokinetic profiles after administration of GBL dosage forms, R278, 2011.  Three GBL softgels were administered to dogs.  In the analysis, Pfeiffer simulated the combined effects of variable retention and the reduced absorption window, and explains very well three starkly different individual PK results.  The analysis and data are consistent with complete absorption in small intestine for 2h and no absorption in colon, consistent with the expected transit time in dogs (111 minutes).

[35] Lallo AK, et al, Decoupling the role of image size and calorie intake on gastric retention of swelling-based gastric retentive formulations: pre-screening in the dog model, Int J Pharm 43(1) 2012, 90-100.

[36] Carai 2001 – demonstrated GHB effect on small intestinal motility in mice, which was confirmed by Jazz work with Absorption Systems.  Carai determined the effect was Gaba-b mediated.  In JPI study with relevant therapeutic dose to mice (200mg/kg), GI transit rate was 60% of normal (saline) vs. 28% of normal for a morphine control.  Such an effect, if pertinent to humans, would extend the absorption window in small intestine from about 3.5h to about 5.8h.  The effect, though, was not evident in the dog PK study of GBL SR.

HIGHLY CONFIDENTIAL

JPION00070107

DTX-0236.0015



| | R665.00 |
|---|---|
| Technical Memo | |
| Review of Oxybate Once Nightly Approaches | |

- SR beads; however, drug product mass may be higher than otherwise with oxybate beads, still within feasible range.   Requires absorption onto solid carrier, results in doubling of product mass.  Alternative is microencapsulation, but difficult to do with GBL.
- Core/shell matrix.  GBL matrix is overencapsulated with retarding matrix (not containing GBL) – should give zero order behavior after slight startup lag.  Similar to Skye's Geomatrix or Geoclock technologies.  This can look like a tablet or a capsule-in-capsule.

Because GBL may have no absorption in the large intestine, a combination with oxybate may be sensible.  If release of GBL is followed by oxybate, then extention of absorption into the colon may be effective.  Such a pattern may be achieved with a few interesting approaches:

- Calcium oxybate suspended in neat GBL, encapsulated in softgel and coated.  The calcium oxybate would exhibit poor solubility initially, but solubility will gradually increase as GBL is released and water is taken into the capsule.  Thus, calcium oxybate would dominate at the end of the profile, and GBL at the beginning as desired.
- Magnesium hydroxide or a combination of calcium and magnesium hydroxides suspended in neat GBL, also encapsulated and coated.  The drug product nominally is GBL-only, but generates oxybate as it is activated during release.  The bases have virtually no solubility initially, so no in-situ formation of oxybate occurs until enough GBL has been replaced by water.  Takes advantage of knowledge gained from SOI-2.  The base mixture is adjusted so that oxybate generation is sufficient for delivery at the end of release.
- GBL/resinate combination.  Hydroxide-bearing anion exchange resin is suspended in GBL during manufacture, forming a GHB-resinate suspended in GBL as the core of the dosage form.  SR coating outside the whole dosage form meters release.  Initially, release is predominantly GBL because gut anion diffusion through GBL is severely reduced until anion (bicarbonate or chloride) solubility in GBL/water is sufficient within the core.  Only then will oxybate release from the resin.  Because only a fraction of the dose is presented as GHB-resinate, limitations of anion content in intestinal fluid may be less important vs. a resinate-only approach.

**Deuterated oxybate or GBL**

The results of JZP-386 human PK evaluation indicate that a formulation will be required to enable D-SXB to achieve the minimum acceptable target.  PK simulation suggests that, because some extension of effect was achieved, the ratio of IR/SR in a deuterated product would be closer to 70/30 rather than the reverse for regular oxybate SR.  Development of the deuterated option may proceed on two fronts before a ~mid 2016 decision point anticipating more clarity:

1. Improving and then scaling the process for manufacturing deuterated GBL.  This involves a feasibility evaluation of heavy-water chemistry that offers more scalability and reduced cost vs the high-pressure deuterium gas process.  Concurrently, the conventional high-pressure

HIGHLY CONFIDENTIAL

DTX-0236.0016



| | R665.00 |
|---|---|
| Jazz Pharmaceuticals — Innovation that performs  Technical Memo | |

### Review of Oxybate Once Nightly Approaches

hydrogenation custom synthesis of GBL is undergoing scaleup and validation, which will inform future scaleup of the similar deuterium process if the heavy-water chemistry is not feasible.

2. Exploring feasibility of dosage forms that are unique to the deuterated option and, in particular, take advantage of the IR/SR split. These are options that wouldn't necessarily be evaluated otherwise for regular oxybate. These options include:

    a. Matrix formulations, since zero order is less important if most of the dosage form is immediate-release. PK modeling may reveal that a first- or half-order profile is sufficient.

    b. Resinate formulations, since the SR portion is much lower and within the range of viability for a resin approach.

There is also a possibility of making deuterated-GBL as the API rather than oxybate, or having a combination whereby D-GBL is the immediate-release portion and D-Oxybate is the SR portion.

**New prodrug**

For different reasons, regular GBL and deuterated oxybate offer nonclinical advantages over a novel prodrug. However, a new prodrug can be designed for enhanced properties, such as better absorption potential in the small and large intestine. A new prodrug may not qualify for NCE exclusivity status, as ester-based prodrugs are generally excluded. ████████████████████████

████████████████████████████████████████████████████████████████

Two candidate prodrugs are based on 1,4-butanediol – the biscarbonate and acetate ester. These were selected based on higher likelihood of lower-GI absorption and also better stability vs. GHB-based prodrugs. Presumably, a prodrug would make sense if conventional oxybate SR formulations show high variability or low bioavailability. Therefore, limited work with new prodrugs would focus on describing absorption relative to oxybate. Caco-2 permeation and rat intestinal permeability would be evaluated.

**Other approaches considered**

<u>BDO SR</u> – Although there are two metabolic steps before GHB is made from 1,4-butanediol, the extension of effect is relatively modest. Furthermore, the properties of BDO are similar to GHB and GBL in terms of likely intestinal absorption, so may offer little advantage over GBL in that regard. Finally, Jazz has no "ultra clean" BDO process that might be required if we treat BDO as API.

<u>Competitive substrate (metabolic)</u> – A promising lead was identified in rat PK work, but the compound and others like it are not compendial and would likely require a full tox package. The dose of the substrate is high enough such that tox probably can't be avoided in advance of Ph3 trial. Therefore, the option – even if feasible – likely cannot be implemented in a timing required.

<u>P4HB polymer</u> – rectal installation of P4HB polymer, provided by Metabolix perhaps, would likely result in sustained GHB delivery by action of colonic flora. Bacteria break down P4HB to GHB, and the colon

HIGHLY CONFIDENTIAL                                                                       JPION00070109

DTX-0236.0017



| | R665.00 |
|---|---|
| Jazz Pharmaceuticals — Innovation that performs   Technical Memo | |
| **Review of Oxybate Once Nightly Approaches** | |

has higher expression of MCTs to facilitate its absorption.  Such an appropriate would be unattractive to patient, needless to say, and likely quite variable.  As a possibility for LCM outside of sleep where sustained delivery during the day would be useful, a solid (oral) dosage form of P4HB could be useful.

Other longer-term options, such as combination products with gaba-b agonist, GHB analogues, or combination of true gaba-b and selective GHB-agonist – these are out of scope of this review, as cannot be implemented in required timing.

## Recommendation

A "main path" development of the simplest oxybate sustained-release bead which can be done with competitive timing should be fast-tracked.  Development is planned in such a way that a calcium-only option can be implemented in the shortest time if absolutely needed, but a mixed option is ultimately developed with slightly longer but still acceptable timing.  The mixed option would consist, most likely, of IR sodium oxbate, and sustained release of a 2:1 blend of calcium and magnesium oxybates.

A parallel alternative program is recommended in the event that orphan exclusivity may preclude launching our own oxybate once-nightly.  The fastest implementation may be achieved with GBL in sustained release beads or softgels, which is recommended with the expectation of similar or slighty longer timing than the main path.  Meanwhile, continued development of deuteration API process and specific formulation options would be undertaken and evaluated as competitive picture emerges.

Both main programs have backup approaches.  The extent of CMC work on backups is limited to rationally reduce implementation time or de-risk introduction, should the backup be required to advance the program.  However, backups cannot be developed with equal vigor as main approaches.

| Activity/Program | Role | Key activities proposed now through mid-2016 |
|---|---|---|
| Main path oxybate | Primary oxybate | Develop calcium oxybate API, magnesium oxybate API, calcium oxybate SR beads, and ultimately Ca/Mg SR beads.  Deliver CTM for Ph1 trials |
| Buffering evaluation | Backup – implemented if PK variability is still too high or BA is too low | Process feasibility, mini-tab evaluation or water-free processing of extrusion/spheronization; coating studies on buffered beads; stability studies to establish requirements for moisture ingress in packaging; in-vitro intestinal permeation to verify approach. |
| GHB Resinate | Backup and defensive – assess possibility of superior product/█ – unlikely to cure failure of PK from other bead approaches | Coating of resinate beads (flexible and non-flexible films); resin sourcing discussions; animal study or relevant in-vitro modeling to determine whether gut anion limitation is an intrinsic control providing limited Cmax and extended release. |

HIGHLY CONFIDENTIAL                                    JPION00070110

DTX-0236.0018



| | | R665.00 |
|---|---|---|
| Jazz Pharmaceuticals Innovation that performs | Technical Memo | |
| Review of Oxybate Once Nightly Approaches | | |

| Activity/Program | Role | Key activities proposed now through mid-2016 |
|---|---|---|
| GBL SR | Primary non-oxybate | Evaluate options for IR bead; if not feasible, progress softgel encapsulation; evaluate matrix core vs non-matrix, evaluate combination approaches GBL/SXB; remainder dependent on outcome and TPP, leading to Ph1 CTM. |
| Deuteration | Parallel or backup non-oxybate, longer timing | Evaluate heavy-water chemistry, formulation options specific to deuteration; scale-up deuteration process after de-risking by running regular GBL custom synthesis scale-up and validation first.  If required, pilot PK supplies may be made with available D-GBL if promising formulations are identified. |
| Prodrug | Backup – invoked if GBL SR fails | Characterize stability, permeability (caco-2 and intestinal segment), and formulation options of two candidate prodrugs.  Select one prodrug for scale-up. |

Confidential                    Page 18 of 18                    Printed on:

HIGHLY CONFIDENTIAL                                                      JPION00070111

DTX-0236.0019

# EXHIBIT 10

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              -  -  -

 4    ATELIERS DE LA HAUTE-GARONNE (French  :   CIVIL ACTION
      Corporation) and F2C2 SYSTEMS S.A.S.  :
 5    (French Corporation),                 :
                                            :
 6                 Plaintiffs,              :
                                            :
 7              v.                           :
                                            :
 8    BROETJE AUTOMATION-USA INC. (Delaware :
      Corporation), BROETJE AUTOMATION GMBH :
 9    (German Corporation),                 :
                                            :   NO. 09-598-LPS
10              Defendants.
                              -  -  -
11
                          Wilmington, Delaware
12                        Friday, March 21, 2014
                           Pretrial Conference
13
                              -  -  -
14
      BEFORE:         HONORABLE LEONARD P. STARK, U.S.D.C.J.
15
      APPEARANCES:                    -  -  -
16

17               YOUNG CONAWAY STARGATT & TAYLOR, LLP
                 BY:  JAMES L. HIGGINS, ESQ.
18
                      and
19
                 KAYE SCHOLER, LLP
20               BY:  SCOTT G. LINDVALL, ESQ., and
                      JEFFREY H. HOROWITZ, ESQ.
21                    (New York, New York)

22                    and

23

24
                                 Brian P. Gaffigan
25                               Registered Merit Reporter
```

```
1    APPEARANCES:   (Continued)

2

3              KAYE SCHOLER, LLP
               BY:  PAUL I. MARGUILIES, ESQ.
4                   (Washington, District of Columbia)

5                   and

6              KAYE SCHOLER, LLP
               BY:  MICHELLE MAREK, ESQ.
7                   (Chicago, Illinois)

8                        Counsel for Plaintiffs Ateliers De La
                         Haute-Garonne and F2C2 Systems S.A.S.
9

10             DRINKER BIDDLE & REATH, LLP
               BY:  JOSEPH C. SCHOELL, ESQ.
11
                    and
12
               DRINKER BIDDLE & REATH, LLP
13             BY:  PATRICK J. KELLEHER, ESQ.,
                    DARREN S. CAHR, ESQ., and
14                  CARRIE A. BEYER, ESQ.
                    (Chicago, Illinois)
15
                         Counsel for Broetje Automation-USA Inc.
16                       and Broetje Automation GmbH

17

18

19

20

21

22

23

24

25
```

```
 1                          - oOo -

 2                  P R O C E E D I N G S

 3              (REPORTER'S NOTE:  Pretrial conference was held

 4      in open court, beginning at 10:01 a.m.)

 5              THE COURT:  Good morning, everyone.

 6              (The attorneys respond, "Good morning, Your

 7      Honor.")

 8              THE COURT:  I'll have you put your appearances

 9      on the record for me pleas.

10              MR. HIGGINS:  Good morning, your Honor.  Jim

11      Higgins from Young Conaway on behalf of the plaintiffs.

12      With me today from Kaye Scholar are Scott Lindvall, Jeffrey

13      Horwitz --

14              MR. LINDVALL:  Good morning, Your Honor.

15              MR. HOROWITZ:  Good morning, Judge.

16              MR. HIGGINS:  -- Paul Marguilies and Michelle

17      Marek.

18              MS. MAREK:  Good morning, Your Honor.

19              THE COURT:  Welcome to all of you.

20              Good morning.

21              MR. SCHOELL:  Good morning, Your Honor.  Joseph

22      Schoell of Drinker Biddle & Reath on behalf of the

23      defendants.  I'm joined this morning by my colleagues,

24      Patrick Kelleher, Carrie Beyer, and Darren Cahr.

25              THE COURT:  Okay.  Welcome.
```

4

1          MR. SCHOELL:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          All right.  So we're here for our pretrial

4    conference for a trial scheduled in April.  Happily, you all

5    have filed for me very focused filings and there did not

6    appear to be all that much in dispute so I'm hopeful we can

7    move through things fairly quickly this are morning.

8          The way I intend to proceed is I pulled out what

9    appeared to be at most five disputed issues that have come

10   up and a number of places that I want to start with.  Then

11   after that, we'll go through the rest of the pretrial order,

12   and there are a few issues that are kind of it seems in

13   dispute and I may need a little bit of input from you, and

14   then I will give you all a chance to raise any other issues

15   once we have gone through all that in case I haven't touched

16   on whatever you wish to touch on.

17         So the first issue that I have pulled out is it

18   was unclear to me if the parties agree that discovery is

19   completed or not.  I couldn't quite tell what the dispute,

20   if any, was there.  I think that comes up at page 15 of your

21   proposed pretrial order so I'll turn first to AHG to address

22   that for me.

23         MR. LINDVALL:  I believe, Your Honor, that

24   discovery is completed now.  The supplemental reports and

25   the additional deposition that Your Honor had ordered, that

1  has taken place, and I believe discovery is complete as a

2  result.

3           THE COURT:  Mr. Kelleher.

4           MR. KELLEHER:  Your Honor, the only thing left

5  is we had one final supplemental damages expert report to

6  serve in response to the one we received within a few weeks

7  ago.  We intend to serve it on Sunday.

8           THE COURT:  You intend to serve it this coming

9  Sunday?

10           MR. KELLEHER:  That's right.

11           THE COURT:  Are you aware of that?

12           MR. LINDVALL:  Yes.  I forgot about that, Your

13  Honor.  There is no problem with that.

14           THE COURT:  So there is no issue; correct?

15           MR. LINDVALL:  No issue.

16           MR. KELLEHER:  (Nodding yes.)

17           THE COURT:  How about with respect to the

18  question of the prior art to be used at trial?  I think

19  maybe we got a letter from Broetje on this.  If Broetje

20  believes there is a dispute I need to address, then I will

21  hear that now.

22           MR. KELLEHER:  Your Honor, it was their opening

23  letter back in 2011 that we responded to.

24           THE COURT:  Right.  Well, then fine.  We'll hear

25  from AHG first if you think I need to decide something on

1   this.

2          MR. LINDVALL:  Your Honor, this was in, it's

3   D.I. 322.  Let me give you a brief history of this.  What

4   had happened, Broetje had given us additional prior art and

5   arguments and after the close of discovery, after the close

6   of expert discovery and including some additional prior art,

7   we asked the Court that they narrow down the amount of art

8   that they have.  We asked at the pretrial conference which

9   we have as an exhibit to this letter brief.  Your Honor

10  recognized that and asked them to narrow it down.

11         They sent us an e-mail after the pretrial

12  conference, narrowed it down somewhat, but they added some

13  additional arguments on scope of the content of the prior

14  art and they added some different combinations which had

15  never yet been disclosed.  It's not in anybody's expert

16  report or anything like that.

17         So as a result of that, we sent Your Honor this

18  letter, this D.I. 322, and I believe they said they had

19  responded.  Somehow we missed that response.  I'm not --

20         THE COURT:  There was a response very recently

21  to it, I believe.  You don't think you have seen that?

22         MR. LINDVALL:  Yes.  I'm not saying they

23  purposely did, but I don't think I have seen that.  But we

24  still maintain our position they're untimely.

25         THE COURT:  I can tell you my recollection at

1    least is their response argued first that this issue came

2    up in January, this January when we had our time together,

3    and that essentially my rulings were that since you didn't

4    renew the issues in D.I. 322 or whatever is the letter you

5    have in front of you that it was untimely and, therefore, it

6    would still be untimely now.  Furthermore, that they are now

7    asserting I think maybe six pieces of prior art and that

8    that is narrow enough.  Further, that their expert talked

9    about the scope of the prior art by saying state of the art

10   in his expert report.  And so all things considered, you

11   have adequate notice and that I should continue to deny

12   whatever relief it is you are asking for.

13              Do you have any response?

14              MR. LINDVALL:  Well I think this comes down to

15   prejudice probably, Your Honor.  And to the extent their

16   expert doesn't get up on the stand and give opinions on

17   what we believe is clearly not in his expert report, well,

18   we're fine with that.  I know, Your Honor, we have what is

19   called the Judge Farnan rule, but I think I had mentioned

20   this at the last hearing that we are concerned the

21   defendants' expert report is very sparse, and I'm concerned

22   we're going to be hearing some new opinions.  We obviously

23   will have to object, but I hope to avoid any surprises.

24              I think from that standpoint if they stick with

25   what their expert has in the expert report, we're not going

1    to have any problem.

2              THE COURT:  All right.  Thank you.  Mr. Kelleher,

3    do you want to address this?

4              MR. KELLEHER:  Yes, Your Honor.  For the record

5    our reply letter was filed as D.I. 382 on March 14.

6              Your Honor, you pretty much encapsulated the

7    arguments that we made.  The phrase "state of the art" is in

8    the expert's report.  That is a synonym for scope of the

9    content of the prior art.  There is no nondisclosure here.

10   We have no intent to go beyond what our expert opined to

11   in his report or if they ask expert questions at his

12   deposition, but I think we're planning to sticking to his

13   report.

14             THE COURT:  Okay.  Fine.  Thank you.  To the

15   extent there is a request for me to do something from AHG,

16   I'm denying the request.  I do think that among other

17   things, the defendant is correct that we found in January

18   the issue was note renewed at that time; and I don't think

19   it's been adequately renewed at this time.

20             But beyond that, six references is adequately

21   narrowed in the case in which there is two patents and five

22   asserted claims, as I understand it.  And the plaintiffs

23   will be free, as will the defendants, to object to any

24   testimony from an expert as being beyond the scope of what

25   was previously disclosed.

1           I will do the Judge Farnan rule and reserve

2     judgment on that objection; and you will be able to move,

3     renew that objection post-trial; and if you prevail, as we

4     discussed, and a new trial is necessitated, the other side

5     will be charged all the costs associated with the new trial.

6           So given everything, including the

7     representations we've heard again today from the defendants,

8     I think that adequately takes care of any unfair prejudice

9     or other concerns raised by AHG.

10          The third issue that I was able to identify is

11    this dispute over sequestering witnesses.  First, actually

12    what did not appear to be in dispute is it seems the parties

13    have agreed with respect to AHG's witness Michael Lawrence,

14    the parties seem to agree he will be sequestered but only

15    when Broetje witnesses are testifying regarding fault at

16    Long Beach.  Is that agreed to from the Plaintiff?

17              MR. LINDVALL:  Yes, Your Honor.

18              THE COURT:  Is that agreed to from the

19    defendants?

20              MR. KELLEHER:  Yes, Your Honor, as to Long

21    Beach.  He is our witness actually.  He is our expert

22    witness but he's also a fact witness because he actually

23    works in this field.

24              THE COURT:  Okay.  But other than me

25    mischaracterizing whose witness it is, you agree with what I

1    have said?

2              MR. KELLEHER:  Yes.  Fault issues at Long Beach,

3    California, yes.

4              THE COURT:  Okay.  Any --

5              MR. LINDVALL:  Yes.  I was concerned, fault

6    issues at Long Beach, California.  I mean fault issues in

7    general, I think he should be sequestered.

8              THE COURT:  Not just at Long Beach.

9              MR. LINDVALL:  Yes.  That was the first time I

10   heard that.  I don't think the pretrial order says that.

11             THE COURT:  What is the defendants' view?

12             MR. KELLEHER:  I think the pretrial order

13   actually, Your Honor, did spell out this dispute.  They

14   wanted Mr. Lawrence to be sequestered when any witness, at

15   least of any Broetje witness is talking about any fault

16   issues anywhere in the United States or maybe even

17   elsewhere.

18             We said it should only be with regard to fault

19   issues at Long Beach because that is the only thing he would

20   have personal eyewitness knowledge of, thus, that would be

21   the need to exclude him from the fact witness so his

22   testimony would not be colored by anyone else's.  By anyone

23   else in the world.  He didn't see it personally.

24             THE COURT:  Do you intend to elicit testimony

25   from Mr. Lawrence about fault issues at some location other

1    than Long Beach?

2              MR. KELLEHER:  I don't -- no, Your Honor.  I

3    don't think so.

4              THE COURT:  Okay.  So is there really a ripe

5    dispute on when he would need to be sequestered?

6              MR. KELLEHER:  It does, Your Honor.  Because

7    that means when I would have other witnesses on the trial

8    talking about problems all over the world that we had with

9    their product, I wouldn't be able to have my expert here in

10   the courtroom.

11             THE COURT:  Okay.  Is that what you were seeking?

12             MR. LINDVALL:  Your Honor, first of all, their

13   expert, there is not going to be opinions about faults or

14   not.  This is a patent case and trade dress case, so fault

15   is really a peripheral issue, which I think Your Honor said

16   that you hoped this doesn't turn into a products liability

17   type case.

18             What we anticipate they will do is Mr. Lawrence,

19   when I examined him during his deposition, since he works

20   at Long Beach, he gave testimony he had only seen one or

21   two faults in ten years of using these cassettes.  We plan

22   on using that, obviously, to rebut their story about their

23   being all kinds of faults with our cassettes.  And what

24   they would seek to do is have Mr. Lawrence sit through this

25   testimony about all the faults that the cassettes have had

1    somehow which I think could possibly influence his testimony

2    when I cross-examine him on this because I will be getting

3    his testimony for cross-examination.  It may influence his

4    testimony when he hears this testimony from other Broetje

5    witnesses.

6                    THE COURT:  I want to make sure I understand

7    that.  You think he could somehow inflate his fact testimony

8    about how many faults he saw at Long Beach now that he has

9    heard maybe there is faults at these other facilities?

10                   MR. LINDVALL:  I don't know, but it's the same

11   factual issue, and it is not an issue he is giving opinions

12   about, so it is outside his expertise in his expert report.

13   This is purely him acting as an fact witness.  As far as I'm

14   concerned, Mr. Lawrence, you have to treat him just as any

15   other fact witness for this particular issue.  So anything

16   relating to the faults, which is what he is going to be

17   important to us for, he shouldn't be sitting through the

18   testimony of other Broetje witnesses who talk about any

19   faults or alleged faults with the AHG cassettes.  That is

20   my concern.

21                   THE COURT:  I understand the concern.  Is there

22   anything else you want to add?

23                   MR. KELLEHER:  Yes, Your Honor.  If they believe

24   they have deposition testimony that they could impeach my

25   expert with if he said that there were now more faults, they

1    can impeach him regardless of whether or not he is sitting

2    here for other witnesses.

3              THE COURT:  I agree with that.  I agree with

4    Broetje on this point.  He is a fact witness on whether he

5    has seen faults at the Long Beach facility.  He is not a

6    fact witness on whether he has seen faults elsewhere.  As I

7    understand it, he has no knowledge about that.  And if he

8    were to start testifying about that based on what he saw

9    here at trial, that wouldn't be very probative of anything,

10   and it might very well itself be objectionable.  We'll have

11   to see how it comes up on his expert opinion.

12             He is going to be limited to what he has

13   disclosed in his report.  I'm confident that if suddenly he

14   is testifying as a fact witness to more faults at Long Beach

15   than he could recall previously, there is the deposition he

16   could be cross-examined with, and the jury will assess his

17   credibility on that point.

18             So I will only require Mr. Lawrence to be

19   sequestered to the extent that defendant has agreed to him

20   being sequestered, which is with respect to fact testimony

21   from other witnesses regarding faults, alleged faults at the

22   Long Beach facility.

23             Now, I do think there is also a dispute about

24   Broetje's proposed corporate representatives.  This was an

25   issue that came up years ago, and I guess there is still a

1    dispute.  Let me hear from defendant on that first.

2              MR. KELLEHER:  Yes, Your Honor.  We would like

3    to have two of our corporate representatives here in the

4    courtroom:  Ken Benczkowski who is the President of Broetje

5    USA and Axel Peters who is the Chief Operating Officer of

6    Broetje Germany.

7              We think that under Rule 615, because we have

8    designated them as our corporate representatives, they

9    actually cannot be excluded even though they also happen to

10   be witnesses in the case.  We cited case law as well as the

11   rule for that proposition.  The response we received from

12   the other side does not cite any case law in support of

13   their proposition.

14             THE COURT:  So is it your view that you have

15   unfettered discretion to designate anyone you wish as your

16   corporate representative and then the Court is powerless to

17   exclude them?

18             MR. KELLEHER:  We think, Your Honor, that is the

19   way the Supreme Court and Congress wrote Rule 615, to limit

20   your discretion on this one particular issue.

21             THE COURT:  If I disagree with that

22   interpretation and view it as a discretionary decision,

23   give me a sense of what, if any, prejudice it would cause

24   to your client to have to come up with some other corporate

25   representative.

1          MR. KELLEHER:  Well, Your Honor, the list that

2    we received the other day from AHG as to people they really,

3    really expect to call at trial includes the CEO of the

4    company called Gemcor who is our chief competitor and as

5    well as now AHG's business partner in essence.  And my U.S.

6    president from Broetje USA, Ken Benczkowski, used to work at

7    Gemcor for 20 years.

8          Now, this man Mr. Mangus, he was not deposed in

9    the case.  Whatever he might be testifying to was only

10   alluded to in the most skimpy way in interrogatory answers

11   so my corporate representative Mr. Benczkowski will be very

12   helpful in cross-examining Mr. Mangus.

13         THE COURT:  Okay.  But what about my question?

14   There are other people who could be the corporate

15   representative, are there not?

16         MR. KELLEHER:  There is no one else who is going

17   to be here from Germany or Broetje USA other than people who

18   are also going to be witnesses.

19         THE COURT:  Are there --

20         MR. KELLEHER:  You're asking if we could.

21         THE COURT:  Right.

22         MR. KELLEHER:  There is a possibility we could,

23   Your Honor, yes.

24         THE COURT:  There are other employees.  Are

25   there other officers even?

```
 1              MR. KELLEHER:  Sure, Your Honor.

 2              THE COURT:  So what would be the prejudice if I

 3    require you to call, to bring one of those folks who is not

 4    scheduled to be a fact witness to serve as the corporate

 5    representative?

 6              MR. KELLEHER:  It would be the extra expense of

 7    having that person here and that person being away from the

 8    business for a week.

 9              THE COURT:  Okay.  Thank you.  Let me give AHG a

10    chance to speak to this.

11              MR. LINDVALL:  Your Honor, I think Mr. Kelleher

12    actually highlighted the issue that we have.  To have

13    Mr. Benczkowski through the testimony of Mr. Mangus is

14    exactly why you sequester witnesses like that.  Because

15    whatever Mr. Mangus says, then Mr. Benczkowski can flavor

16    his testimony to be able to effectively try to rebut

17    whatever he says.

18              The idea is we want witnesses to get up there

19    and testify to the truth and not be somehow tainted or cause

20    them to alter their type of testimony because of what they

21    have heard in the courtroom earlier.  This is exactly the

22    situation that we're dealing with here.  We have two

23    witnesses that that is what is going to happen with.  And

24    they are going to be sitting through our whole case-in-chief

25    and listening to all of our fact witnesses and as a result,
```

1   when they get up on the stand, they'll know exactly what the

2   best type of testimony they can give based on what they just

3   heard.  Because they're both witnesses on their will call

4   list.

5          THE COURT:  What about the at least policy,

6   though, that a corporate client, of course, he can only be

7   represented through a human being, and they're entitled to

8   have somebody here.  Why are they not entitled or why

9   shouldn't I left them at least bring as the corporate

10   representative the person who can best help them prepare

11   their defense and on the fly respond to what happens at

12   trial?

13          MR. LINDVALL:  Well, Your Honor, I think, first

14   of all, I think that there, the Court does have a fair

15   amount of discretion on this.  The rule says what it says,

16   but I think just like with a lot of the rules, the Court has

17   a lot of discretion on how they're used.

18          In this particular situation, Broetje is a

19   fairly large corporation.  It has got, I don't know, 1,200,

20   2,000 employees, something like that.  And it would be no

21   problem to bring in another corporate representative.  And

22   it would eliminate the possibility of somehow these

23   witnesses' testimony, if they have a problem.

24          THE COURT:  There are two proposed corporate

25   representatives or at least two that we're talking about.

1    We've mostly talked about the one who I guess used to work

2    with the person on your witness list.  What about the other

3    person?  Why could he or she not serve as the corporate

4    representative?

5              MR. LINDVALL:  Well, Dr. Peters is also on their

6    will call list.  We anticipate that he will be giving

7    testimony on factual issues which will overlap with factual

8    issues that our witnesses will be giving.  We're not exactly

9    sure what he is going to be testifying about because he is a

10   fairly new employee.  I believe he started with the company

11   in September of 2008.  But he still will have testimony that

12   overlaps with what testimony he is going to hear in our

13   case-in-chief.  It is the same situation.

14             THE COURT:  Okay.  Thank you.

15             MR. LINDVALL:  Thank you.

16             THE COURT:  Mr. Kelleher, is there anything else

17   you want to add on that?

18             MR. KELLEHER:  Nothing to add, Your Honor.

19             THE COURT:  Bear with me for a second.

20             (The Court and law clerk confer.)

21             THE COURT:  All right.  I'm going to give this

22   one a little bit more thought, though I recognize I did come

23   close to ruling on this three years ago in favor of AHG, so

24   I'm not completely objective on this.  AHG starts out ahead

25   in my mind, but I am going to give it another look.  And I

1    will let you know certainly before trial and enough in

2    advance of trial that you can make arrangements to bring

3    somebody else, if that is what my ruling is.

4                MR. KELLEHER:  Your Honor?

5                THE COURT:  Yes.

6                MR. KELLEHER:  Can I ask one question about

7    sequestration in general?

8                THE COURT:  Sure.

9                MR. KELLEHER:  I understand witnesses in general

10   will be sequestered when other witnesses are testifying, but

11   what about opening statement and closing argument?

12               THE COURT:  Right.  Initially, I leave it to the

13   parties to see if they can work that out.  And if you have a

14   dispute, you would obviously have to let me know no later

15   than that morning before opening statements, and I will make

16   a decision.

17               I don't have a firm practice on that, and I am

18   happy to go with whatever you agree on if you do reach

19   agreement on.  I take it that it is not a matter you discussed?

20               MR. KELLEHER:  We hadn't discussed that precise

21   issue.

22               THE COURT:  Well, I will leave it to you all to

23   discuss.  Again, if there is a dispute, let me know by the

24   morning of jury selection and I will let you know then.

25               All right.  I'm not sure if these were disputes,

1    but a couple other issues on my list.

2              It seems like the parties were in agreement that

3    there are some nonjury issues to be tried?  I believe they

4    are the affirmative defenses of laches, waiver, equitable

5    estoppel, as well as any standing issues and the objectively

6    high likelihood prong of willful infringement.

7              It seemed that the parties are in agreement that

8    those are issues for the Court.  It seemed as if you all

9    think you might want to present some evidence on that, and I

10   infer that if there is evidence to be presented, it's from

11   the same witnesses who are testifying in front of the jury

12   and you would elicit it during your time in front of the

13   jury.  But if I'm wrong about any of that, now would be the

14   time to talk about it.

15             MR. LINDVALL:  I believe what you just said is

16   accurate, Your Honor.

17             THE COURT:  All right.

18             MR. KELLEHER:  It would be the same witnesses,

19   Your Honor.  I would add there is also the statute of

20   limitations issue which we think ultimately is for you.  And

21   you may have seen in the most recent papers in the last

22   couple of days that equitable tolling has suddenly come up

23   and I think as a matter of equity, that probably ultimately

24   is for you.

25             THE COURT:  But you intend to elicit whatever

1    evidence you think is needed for me to make those decisions

2    as a matter of law as part of the ten hours you requested

3    with the jury here; correct?

4              MR. KELLEHER:  Yes, Your Honor.

5              THE COURT:  Okay.  And does any of that change

6    your answer?

7              MR. LINDVALL:  No, Your Honor.  In fact, what he

8    just brought up probably is correct.  It's something we

9    think you should probably decide:  the equitable tolling.

10             THE COURT:  You are not asking for any separate

11   proceeding or time beyond the ten hours you requested?

12             MR. LINDVALL:  No, Your Honor.

13             THE COURT:  That will be fine then.

14             Then Broetje has requested there be no written

15   filings of any kind during trial.  I take it to mean except

16   for pursuant to the deposition designation process.  Is AHG

17   agreeable to that or did you want to reserve the right to

18   file other written filings?

19             MR. LINDVALL:  No, I have no problem not

20   preparing briefs in the middle of trial.

21             THE COURT:  All right.  Then here is what I will

22   say.  Obviously, the depositions, if there are disputes

23   about that, and we'll talk about that a little bit in a

24   minute, that requires you to file a letter with me.

25             Other than that, if anybody wants to file

1    anything in writing during trial, you need to have expressed

2    leave from me to do it, or, of course, if I actually

3    affirmatively order you to do something in writing, then, of

4    course, you will have to comply with that.

5              Any questions about that?

6              MR. KELLEHER:  50(a) motions, Your Honor, would

7    you want those oral or in writing?

8              THE COURT:  I'll come to that in just a second.

9    But other than that, is there any question about what I

10   said?

11             MR. KELLEHER:  Only, I know there is a procedure

12   for objecting to various exhibits.  I think probably you

13   want to handle those orally rather than getting ...

14             THE COURT:  Right.  We'll do that orally in the

15   morning.  I'll talk about that in just a minute as well.

16             Okay.  Are there any questions about that?

17             MR. LINDVALL:  No, Your Honor.

18             THE COURT:  So on 50(a), I'm glad you raised

19   that.  What I want the parties to do is to meet and confer.

20   And by next Thursday, I want to have a submission from you,

21   a joint submission that lays out either your joint proposal

22   or your competing proposals for how I should deal with 50(a)

23   motion, motions for judgment as a matter of law.  And among

24   the things I want you to address in your proposal or

25   proposals are whether it will be just oral or oral and in

1    writing.  If it's going to be in writing, the timing for

2    when you are going to get the written submission in.

3    Address also whether the motion, however made, needs to be

4    made precisely when the other side rests or if it could

5    alternatively be made at the next break or at the beginning

6    of the next day or at the end of that day.

7           Also, to the extent you propose that it be done

8    orally, do you propose that it has to be done or should be

9    done orally with the jury still sitting there and we're at

10   sidebar or if it can be done during a time after the jury

11   had left for the day?

12          And I also want your views on just how specific

13   you think the motions need to be in order to preserve your

14   rights going forward.

15          These are all matters that I have handled

16   differently from different trials, and different parties

17   have very different views on it.  And I will benefit from

18   having you all talk about that and giving me your specific

19   proposal or proposals by next Thursday.

20          Are there any questions about that?  First,

21   Mr. Lindvall.

22          MR. LINDVALL:  No, Your Honor.

23          THE COURT:  Okay.  Mr. Kelleher?

24          MR. KELLEHER:  No, Your Honor.

25          THE COURT:  All right.  Thank you.  Let me go

1     through some other portions of the pretrial order.  As a

2     general matter, if the parties did not in the pretrial order

3     identify a dispute and I don't talk about it, then what you

4     have agreed on is fine and, of course, will govern as we go

5     forward.

6              With respect to the uncontested facts, the way

7     I'm going to treat those is any party is free to read some

8     or all of the uncontested facts to the jury but you have to

9     give notice to the other side that you intend to do that and

10    roughly when you intend to do it.  And, of course, you will

11    be charged the time it takes to read those to the jury, but

12    you are free to do it if you wish.

13             In terms of the factual issues to be tried, I

14    think we're in agreement, it's patent infringement, direct

15    and induced infringement.  There is five asserted claims of

16    the two patents.  There is willful infringement.  There is

17    invalidity of anticipation, obviousness, and written

18    description.  There is patent damages.

19             MR. KELLEHER:  I'm sorry, Your Honor.

20             THE COURT:  Yes.

21             MR. KELLEHER:  It's indefiniteness rather than

22    written description.

23             THE COURT:  Thank you.  Patent damages, the

24    unfair competition, trade dress, infringement, and

25    intentional interference with respect to economic advantage

1    claims, and any damages from the nonpatent claims.  And it

2    is unclear to me whether contributory infringement is part

3    of the trial.

4            So tell me if I got all of that correct and

5    address whether contributory infringement is part of the

6    trial.

7            MR. LINDVALL:  Your Honor, I believe

8    contributory infringement is part of the trial.  And with

9    respect to trade dress, I understand that it encompasses

10   the state unfair competition and also has the intentional

11   interference with economic or prospective economic.  That is

12   a state law claim which is really not related to the trade

13   dress.  And I believe that's it.

14           There is also the various damages ones, and

15   there is also punitive damages related to the state law

16   claims.

17           THE COURT:  Is there anything in dispute about

18   what are going to be the factual and legal issues from your

19   perspective?  Anything you need me to decide at this time?

20           MR. LINDVALL:  No, I don't believe so, Your

21   Honor.  We spent the last week with each other on the jury

22   instructions and I think we really filtered out a lot of the

23   issues.

24           THE COURT:  Okay.

25           MR. LINDVALL:  So I think we're pretty much in

1    agreement.  Mr. Kelleher can speak to it, though.

2              THE COURT:  Okay.  And I will give him that

3    opportunity right now.  My main focus is whether there is a

4    dispute about what is the dispute that I need to resolve at

5    this time.

6              MR. KELLEHER:  Your Honor, I think contributory

7    infringement, I think that is an issue, but I think it's

8    only for the '339, the apparatus claims rather than the

9    method claims on the other patent.

10             THE COURT:  Can you --

11             MR. LINDVALL:  Right, I believe the contributory

12   infringement is with the -- let me see the verdict form.

13             MR. KELLEHER:  I flipped that.  That is the

14   method claims rather.

15             THE COURT:  You believe it only goes to some of

16   the claims of one of the patents, I think.

17             MR. KELLEHER:  I think that is where we ended

18   up, Your Honor.

19             MR. LINDVALL:  Yes.  Contributory is with the

20   '339 patent, which is the method claim.

21             THE COURT:  Okay.  Then you are in agreement

22   that contributory infringement is part of the trial but only

23   with respect to the method patent; correct, Mr. Lindvall?

24             MR. LINDVALL:  Yes, Your Honor.

25             THE COURT:  Mr. Kelleher.

```
 1              MR. KELLEHER:  Yes, Your Honor.

 2              THE COURT:  All right.  In terms of your

 3    disputes over the legal issues, those are all covered in the

 4    jury instructions, and there will be an opportunity during

 5    trial to have argument on those legal issues, and that is

 6    when I will plan to resolve it.

 7              MR. CAHR:  Your Honor, I think there is actually

 8    one additional issue that relates to legal issues which is a

 9    brand new issue that is not dealt with in the papers that

10    probably we should deal with now.

11              THE COURT:  Okay.  Fine.

12              MR. CAHR:  Two days ago, on Wednesday night, for

13    the first time, we were presented with an alternative

14    instruction and a corresponding special interrogatory on the

15    verdict form on equitable tolling.  This is an issue that

16    we have never really dealt with before.  It never came up

17    before.  It's not in the issues of law in the pretrial.

18    It's not disclosed in any of the earlier pleadings, in any

19    of the earlier disclosures.

20              Because of that, you know, obviously we're

21    somewhat of a loss of how best to deal with this.  It's not

22    something -- there are fact findings that underlie this,

23    even though it sounds in equity, that we never have taken

24    any discovery on or anything like that.

25              We actually just sent a letter last night which
```

1   we haven't even had an opportunity to present to the Court.

2   We actually have an extra copy, if you would like us to do

3   that now, but we'll be happy to file it with the Court this

4   morning noting our specific objections.

5          Ut, one, this is something which we think is far

6   too late because it's highly prejudicial to have this new

7   issue come up this late into the case.

8          Second of all, we think that it is problematic

9   because it's wrong as a matter of law, you see, because it

10  seeks equitable tolling based on issues that were litigated

11  in courts in France and in Germany which are not identical

12  to the ones here.

13         Then, third, even if it wasn't too late, and

14  even if it didn't actually apply the wrong law to the wrong

15  facts, the instruction as proposed itself and the verdict

16  interrogatory itself are we think improperly constructed

17  and, in fact, quite probably should be not in front of the

18  jury at all and it should be something that you handle

19  entirely your own.

20         So that is sort of a legal issue, which I think

21  you are right, I think we largely are in agreement on what

22  legal issues are in play here, and I think you have all of

23  our positions on that.  But this is one little twist that

24  just happened a day and-a-half ago that I think you probably

25  should deal with.

```
 1                    THE COURT:  The letter you are referring to
 2      is a letter that you have or will be sending back to the
 3      plaintiffs?
 4                    MR. CAHR:  We already send it to the plaintiff
 5      last night, so that it literally is fresh off the presses,
 6      as they say.
 7                    THE COURT:  Okay.
 8                    MR. CAHR:  But we would be happy to present it
 9      as an objection to the Court, if you would like.
10                    THE COURT:  Right.  Okay.  Well, let me see what
11      the plaintiffs' response is at this point.
12                    MR. LINDVALL:  Your Honor, this is just, it's an
13      additional instruction we got in two days ago.  It was a day
14      after we put in the jury instructions.  Let me give you just
15      a quick little bit of history.
16                    About a week ago, when the Court had said we can
17      go back and revisit the jury instructions as needed, when we
18      got their proposed new jury instructions which we thought
19      would be some minor changes, they basically had rewritten
20      all the invalidity instructions and a lot of others,
21      bringing in, incorporating some of your earlier instructions.
22                    What ensued was basically a marathon between
23      the two parties where we basically went through all of the
24      instructions, met and conferred multiple times.  We both
25      added new things.  We both took away new instructions.  They
```

1    added brand new instructions which weren't in their original

2    instructions.  It was very much of an intense activity.

3              This is one instruction that we missed in the

4    last, I guess we got it to them within 24 hours after we

5    filed it.  All it is, is an additional instruction.  What it

6    does it relates to their statute of limitations defense.

7              In our instructions that we have we filed with

8    the Court, there is also, there is a delayed discovery

9    instruction in there which is in there, and we also have

10   the reoccurring cause of action type thing where the statute

11   of limitations tolls every time there is a new cause of

12   action.

13             This is just the third one that California

14   allows which is called equitable tolling which basically

15   says if you have a similar action, which we had in France,

16   which we had trade dress and patent infringement in France

17   and Germany, that has already given them proper notice to

18   maintain any evidence or what have you, statute of limitations.

19             THE COURT:  Is there any evidence with respect

20   to this equitable tolling point that you intend to elicit in

21   front of the jury that you wouldn't otherwise be eliciting

22   with respect to the other issues?

23             MR. LINDVALL:  Your Honor, I think that the

24   evidence, the total evidence is really -- if you look at

25   the decisions, I agree with Broetje on this case.  I think

1    actually it is a better decision for you because it's not

2    really something that the jury should decide whether the

3    case in France is similar to this case.  To have the jury be

4    able to make that decision from a factual standpoint is

5    difficult.

6              THE COURT:  I will confess I have not read through

7    all of the jury instructions, but I thought I understood that

8    you have now proposed a jury instruction on this equitable

9    tolling point.

10             MR. LINDVALL:  The only reason we did, Your

11   Honor, is because California has model jury instructions

12   which are extensive.  I didn't realize it, but when we saw

13   the case law, I thought, well, this is an equitable relief.

14   We can try it in a JMOL.  We don't need to put an instruction

15   in there.  When we went back and looked at the instruction,

16   sure enough, they actually have a jury instruction and they

17   said to put it in the verdict form.

18             So to be safe, we filed this additional

19   instruction and a question in the verdict form which asks

20   the jury how many years or how long so should it be tolled.

21             THE COURT:  But you would also be comfortable

22   with me not instructing the jury and not asking them in an

23   interrogatory about it and deciding it myself.

24             MR. LINDVALL:  Yes, Your Honor.  I think that is

25   probably the most appropriate situation because I can't -- I

1    agree with them it is not something the jury should be

2    deciding.  California thinks otherwise, but that is what I

3    think.

4                THE COURT:  Would that take carry of the problem

5    from Broetje's perspective or not?

6                MR. CAHR:  It does take care of the immediate

7    problem.  And I think that I would agree with Mr. Lindvall

8    that if it is proper to have this, it is something that

9    shouldn't be in front of the jury, it should be something

10   for you.

11               We can reserve the debate over whether it is

12   proper for.  Since it is something that is going to be

13   decided in equity, we can save the debate over whether or

14   not it is proper until after the trial.

15               THE COURT:  That's what we will do.

16               MR. CAHR:  We reserve that objection.

17               THE COURT:  Fair enough.  So to the extent you

18   have other objections, including that it is untimely or

19   otherwise improper, we'll deal with that however we deal

20   with the equitable issues.  But when we get to jury

21   instructions, I will expect that there is no debate as to

22   whether or not I should be instructing the jury on equitable

23   tolling.  And to the extent we argue about the verdict

24   sheet, I will expect there is no debate over whether I

25   should ask the jury to make a finding with respect to

1  equitable tolling.  It seems the parties are in agreement

2  that the jury will not be asked to do that.

3             Is there anything further on that point?

4             MR. CAHR:  No, Your Honor.  That's fine.

5             THE COURT:  Is there anything further on that

6  point?

7             MR. LINDVALL:  No, Your Honor.

8             THE COURT:  All right.  Going back to the

9  pretrial order.  On issues regarding witnesses, there was a

10  dispute I think about witnesses testifying with translators.

11             My thoughts on that are that any witness who

12  feels he or she needs a translator should be permitted to

13  use a translator but the time that it takes to testify with

14  or without a translator is time that will be charged and the

15  time will be charged to the party who is on the clock at

16  that time.

17             So to try to be concrete about it, if you use a

18  translator during direct examination, then whoever called

19  the witness will be charged for all the time from the time

20  you called them until the direct is over, including whatever

21  time it takes for translation.

22             If you are cross-examining the other side's

23  witness and that witness needs a translator, then you, the

24  party who is cross-examining the witness, will be charged

25  for all that time, including whatever translation time is

1    embedded in your examination.

2            If I find that there is some sort of abuse or

3    appears to be abuse or unfairness going on, I reserve the

4    right in this context and in all contexts to either penalize

5    a side for time or to shift time from one side to the other.

6    But the default would be, as I have indicated, if you feel

7    you need a translator in whole or in part for a certain

8    question or just for cross-examination or for the whole

9    thing, that is a matter that is left up to the discretion of

10   that witness and the time, again, will be charged according

11   to whoever is on their feet asking questions during the

12   examination.

13           Are there any concerns about that or anything

14   further we should discuss about that?

15           MR. LINDVALL:  No, Your Honor.

16           THE COURT:  Broetje?

17           MR. KELLEHER:  No, Your Honor.

18           THE COURT:  We already talked about objections

19   to expert testimony under the Judge Farnan rule.  Are there

20   any questions about that, Mr. Lindvall?

21           MR. LINDVALL:  No, Your Honor.

22           THE COURT:  Mr. Kelleher?

23           MR. KELLEHER:  No, Your Honor.

24           THE COURT:  All right.  Another recurring issue

25   is impeachment with prior testimony, depositions typically.

1    This is another matter I want the parties to meet and confer

2    and next Thursday give me your specific proposals as to how

3    you would like to see how that done during this trial.

4         So among the things I am asking you to talk

5    about and give me your proposal or proposals on are whether

6    the Court should hear objections that the proposed excerpt

7    of prior testimony doesn't actually show an inconsistency

8    with what the witness just said here in court.

9         Should I hear objections that the proposed excerpt

10   is insufficiently complete and should be complemented at that

11   time on cross-examination with additional portions of the

12   deposition or, alternatively, should that be left for redirect

13   examination?

14        Should the Court require there to be some amount

15   of pause, and if so, how much, from the time you identify

16   we're now going to play pages 10 to 11?  Should we give

17   enough time for the witness to look at that and review it,

18   proposing counsel to look at it, for the Court to look at it

19   and review it?

20        And should impeachment by video deposition, if

21   you have them, be used or must it be limited to only

22   impeachment with reading the written transcripts?

23        So again, this is an issue that I handled in

24   different ways.  Often, the parties are able to agree on how

25   to do it.  Sometimes they don't.  Sometimes this fight comes

1    out at a very inconvenient time at trial.  So in this case,

2    I want you to put your heads together and next Thursday give

3    me your either joint proposal or competing proposals for

4    specifically how to handle that in this trial.

5                    Any questions about that, Mr. Lindvall?

6                    MR. LINDVALL:  No, Your Honor.

7                    THE COURT:  Mr. Kelleher?

8                    MR. KELLEHER:  No, Your Honor.

9                    THE COURT:  Okay.  A further quick point about

10   witnesses.  Examinations are limited to direct, cross, and

11   redirect.  We don't allow recross examination.

12                    You need to ask for leave to approach the

13   witness once per witness, and then leave is freely granted.

14                    I encourage transition statements, brief

15   non-argumentative statements to the jury as to who this

16   witness is or what he or she is testifying to.  That tends

17   to be very helpful for the jury.

18                    Are there any questions about that or anything

19   else about witnesses?  Mr. Lindvall.

20                    MR. LINDVALL:  Your Honor, with respect to a

21   witness who we would want to leave the chair and maybe give

22   a demonstration or what you have, would you allow that?

23                    THE COURT:  Have them come down from the witness

24   stand?

25                    MR. LINDVALL:  Yes.

1           THE COURT:  Yes, you just need to ask for leave,

2       and typically I would grant that.

3           And if I don't say it, opposing counsel is free

4       to move about the courtroom as necessary.  Don't walk right

5       into the jury box, but if you need to move to be able to see

6       a demonstrative or something that's fine.

7           Are there any questions about that or anything

8       else about witnesses?

9           MR. KELLEHER:  No, Your Honor.

10          THE COURT:  Okay.  On deposition designations, I

11      think there was maybe a dispute about depositions that were

12      in foreign language.  I continue to believe I think this is

13      the plaintiffs' position, that we will only play or read the

14      question and answer in English.  So I guess that would be

15      the translated question and answer.

16          I don't think the jury needs to see the original

17      French or German or whatever it was.  I don't think that the

18      jury is likely to discern anything meaningful from hearing

19      or seeing the foreign language question and answer, and so

20      I'm limiting it just to the English.

21          Are there any questions about that?

22          MR. LINDVALL:  No, Your Honor.

23          THE COURT:  Are there any questions?

24          MR. KELLEHER:  I understand the ruling, Your

25      Honor.  I would just say that sometimes the witnesses, when

1    they're speaking in the native language, would be gesturing

2    or pointing to things and that might be helpful to the jury.

3    And in the discretion of the party who is playing the clip,

4    when the time counts against us, that we would be, in a good

5    circumstance, able to decide whether or not we should show

6    the native language.

7                    THE COURT:  Right.  I think that that was

8    opposed by plaintiffs; correct?

9                    MR. LINDVALL:  Yes, Your Honor.

10                   THE COURT:  All right.  So my ruling is with the

11   plaintiffs.  Certainly, your objection is noted and is on

12   the record.

13                   In terms of deposition designations, what you

14   all have listed in the pretrial order is the maximum

15   universe of deposition designations, counterdesignations and

16   objections.

17                   MR. LINDVALL:  I believe, Your Honor, there is

18   one witness who we had a deposition just recently, Dr.

19   Peters.  We have designated.  We are still waiting for their

20   counterdesignations and the parties would object.  At that

21   point in time, we will give you a replacement.

22                   THE COURT:  You would agree to that

23   supplementation to what I have just said; correct?

24                   MR. LINDVALL:  Yes, Your Honor.

25                   THE COURT:  And you would want that; right?

1          MR. KELLEHER:  We would, Your Honor.

2          THE COURT:  So with that one exception, what

3    is in the pretrial order is the most, the maximum of

4    depositions that will be read or played in terms of

5    designations, counterdesignations.

6          Also, the objections to any of that, there will

7    be no more objections -- other than Dr. Peters that you all

8    agreed on, there will be no objections beyond what are the

9    objections that you have listed in the pretrial order.  And

10   I would expect you will narrow all of that as we get closer

11   to trial, and you will do it according to the process you

12   have set out in the pretrial order which culminates in a

13   letter to me by two days before the time you anticipate

14   playing that witness's testimony or reading that witness's

15   testimony.

16         You need to make sure to clearly identify for me

17   in the letter, with the attached excerpts, exactly where the

18   remaining objections are.  And then I will do my best to get

19   you a ruling by the day before you plan to call that witness

20   by deposition so that you will know what you are going to be

21   able to play or to read.

22         Regardless of what the rulings are, the amount

23   of time it takes to call that witness by deposition, to get

24   the video up and running, however long it plays, until the

25   next witness is called, all that time will count towards

1    somebody and we'll look to you all to tell us how to break

2    down that time based on whatever has been designated and

3    counterdesignated.

4              Are there any questions about depositions?

5              MR. LINDVALL:  No, Your Honor.

6              MR. KELLEHER:  No, Your Honor.

7              THE COURT:  Okay.  In terms of exhibits, I view

8    what you have in the pretrial order as the maximum universe

9    of exhibits and objections to exhibits.  Exhibits that are

10   on the exhibit list and not objected to on the exhibit list

11   will be received into evidence by operation of the pretrial

12   order once the exhibit is shown to a witness and offered

13   into evidence and the Court says that that it is admitted.

14             You don't need to formally lay a foundation for

15   those exhibits.  And I know there won't by any objection,

16   but we do need to take the time to show the exhibit to a

17   witness, and we do need to go through that formality of

18   offering it into evidence and me saying that it is admitted.

19             Are there any questions about that?

20             MR. LINDVALL:  Your Honor, first, there is one

21   caveat.  I believe that they provided new, some new exhibits

22   just recently.  We're going to want to object to those.

23   We'll give you a new sheet on that.

24             The second one is with respect to opening

25   statements, what I would anticipate, for example, the U.S.

1    patents that are at issue here, we could use those during

2    opening statement, but I would understand anything not

3    admitted could not be used during opening statement?

4            THE COURT:  Well, if you know it's going to be

5    admitted, either because there are no objections and so you

6    know it is coming in or you have met and conferred, and even

7    though there may be an objection on the pretrial order, you

8    know they will not going to press the objection during the

9    trial, then you are free to use it during opening statement.

10           MR. LINDVALL:  Thank you, Your Honor.

11           THE COURT:  Is there anything else?

12           MR. KELLEHER:  Also, Your Honor, there is some

13   evidence that Your Honor has already ruled on motions in

14   limine that will come in.

15           THE COURT:  Okay.  If I have already ruled that

16   evidence is going to be admitted, then that would be fair

17   game in an opening statement as well.

18           MR. KELLEHER:  Thank you.

19           THE COURT:  Any question about that?

20           MR. HOROWITZ:  Not about that, Your Honor, but

21   about your ruling with respect to exhibits.

22           The one question I still have is even if there is

23   no objection to the exhibit itself, what about if you have an

24   objection to use of that exhibit with that particular witness

25   because of lack of competency, lack of personal knowledge

1    which is really a substantive objection, doesn't necessarily

2    go to the exhibit itself?

3              THE COURT:  Right.  Well, I think the way, if

4    I'm following you, that that would come out is that you are

5    obligated under the pretrial order, and what I was just going

6    to say, to disclose to the other side whatever exhibits you

7    intend to show to a witness as part of the direct examination.

8    And so, for instance, if the defendant sends you the night

9    before, here is all the exhibits we intend to use with Witness

10   X tomorrow, you may have a concern about how they're going to

11   use it.  You would need to meet and confer on that that

12   evening.  And then if you haven't resolved the issue, you

13   would bring it to my attention that morning before you call

14   the witness.  Meaning, the bottom line is it will be rare that

15   an objection like that will come up on the fly during the

16   testimony because through those processes, we should have seen

17   it coming and we should have talked about it.

18              Does that answer the question?

19              MR. HOROWITZ:  It does entirely.  Thank you.

20              THE COURT:  Okay.  Thank you.  Are there any

21   questions about any of that?

22              MR. KELLEHER:  Nothing else from us.

23              THE COURT:  So I pretty much already said this,

24   but basically through that process of exchanging the proposed

25   exhibits to be used with the witness, and your meeting and

1   conferring on objections, if you don't -- I'll be available at

2   8:30 every morning.  The jury comes in at 9:00.  That is your

3   time to raise with me any objections you have to the admission

4   of any of the exhibits or questions about those exhibits that

5   you anticipate may happen that day with the witnesses for that

6   day.

7            If you don't try to get my attention on that,

8   then I will say that those objections are waived if you

9   first bring them up later in the day when the witness is on

10  the stand.

11           We will be charging time for those morning

12  meetings.  That will come out of your ten hour allocation.

13  And the way we do that is we charge the time to the party

14  that raises the objection.  We don't try to keep track as to

15  who is winning or losing the objection.

16           If we do happen to notice that one side seems to

17  be abusive of this process, then, of course, we can always

18  reallocate the time.

19           Before you rest your case, I would advise you

20  that you consult with my deputies to make sure that whatever

21  evidence you believe has been admitted also is evidence that

22  we believe has been admitted.

23           Are there any questions about any of that, Mr.

24  Lindvall?

25           MR. LINDVALL:  No, Your Honor.

1           THE COURT:  Mr. Kelleher?

2           MR. KELLEHER:  No, Your Honor.

3           THE COURT:  Trial.  The order of proof.  I

4    couldn't tell if there was an agreement or disagreement on

5    this.  Where are we on that?

6           MR. LINDVALL:  Your Honor, there is a disagreement.

7           THE COURT:  All right.  Let me hear it then.

8           MR. LINDVALL:  What AHG proposes, in a typical

9    situation, AHG would present what its burden of proof on,

10   for example, infringement and trade dress.  And then Broetje

11   would come up and respond to the infringement and trade

12   dress contentions.  And then they would give their burden of

13   proof presentation, which would be invalidity and statute of

14   limitations, whatever else the Judge or whatever else they

15   present with their burden of proof.  And then AHG gets a

16   chance to rebut their burden of proof items and then that is

17   the end.

18           Now, what Broetje wants to do, they want to have

19   a fourth session where they get a chance to then come up and

20   say, well, no, what Dr. Kytomaa said about invalidity is

21   wrong for the following reasons.  So they really want a

22   second bite at the apple that we wouldn't get.  So what we

23   would ask the Court is to really offer the additional

24   situation where there is a burden of proof and the rebuttal

25   to the burden of proof for both parties and that's it.

1          THE COURT:  And what if we were to give you the

2     opportunity at I guess Phase III to present rebuttal on the

3     issues that you do have the burden of proof on?  Those

4     things that you started at page 1 on?  Would you then

5     oppose, in that instance, the fourth step that Broetje is

6     seeking?

7          MR. LINDVALL:  I guess I wouldn't, Your Honor.

8     It's one of these trials and people are up and down and up

9     and down, but I would not oppose is as long as we have a

10    chance to.

11         THE COURT:  You would not oppose as long as both

12    sides had that same type of opportunity.

13         MR. LINDVALL:  Yes, Your Honor.

14         THE COURT:  Okay.  Thank you.

15         What is defendants' view?

16         MR. KELLEHER:  Your Honor, we would like to do

17    it this way where there is four phases, which I think was in

18    the Google trial that you just finished.  We think it is

19    probably the easiest way for the jury to understand the

20    progression of the back and forth, hearing the responses to

21    the assertions being made by each side.

22         THE COURT:  I take it, but to be absolutely

23    clear, you are in agreement then that at let's call it Phase

24    III, not only would AHG have the opportunity to rebut those

25    issues on which you, the defendants, have the burden of

1    proof, but they would also have a chance to have the last

2    word on the issues that they affirmatively have the burden

3    of proof on at Phase I.

4            MR. KELLEHER:  That's right, Your Honor.

5            THE COURT:  So I think we have an agreement on

6    that fourth phase approach.  In fact, that is what I just

7    did in a trial I just finished this week.  It seemed to work

8    well and was fair to both sides.  So that is how we will

9    proceed, with the four phases.

10           Mind you, in case you are thinking ahead to

11   closing arguments though, I only allow the three closing

12   arguments.  So we'll only hear from the defendant once.  The

13   plaintiff will go first and last.  I'm not going to allow a

14   fourth closing argument.

15           All right.  Other issues regarding the trial

16   itself.  The parties jointly requested ten hours per side.

17   That is granted.  And we will keep track of time according

18   to the way that I already described.

19           In terms of the trial schedule, we're going to

20   begin on Monday, April 7th.  I'll be available to meet with

21   the parties at 8:30.  The jury is available to us at around

22   9:30.  I only keep the jury here until 4:30 each day other

23   than when they're deliberating.  If they unanimously agree

24   to stay beyond 4:30, we let them stay late as they care to.

25           Our goal is to take only about one hour of

1    breaks over the course of the day other than the first day.

2    After the first day, we're able to provide lunch to the

3    jurors so we try to keep the lunch break to about a half

4    hour.  We try to keep the morning and afternoon breaks each

5    to about 15 minutes.

6              For lunch, depending on how things are going, we

7    aim for about 12:30.  The morning and afternoon breaks could

8    be at any time.  It really depends on how things are going.

9              That's all I had to say about trial, per se.

10   Are there any questions about what I have just said there,

11   Mr. Lindvall?

12             MR. LINDVALL:  No, Your Honor.

13             THE COURT:  Mr. Kelleher?

14             MR. KELLEHER:  I don't think so, Your Honor.

15             THE COURT:  Okay.  In terms of jury selection,

16   we'll use the silent struck juror method.

17             I reviewed your voir dire.  I'm happy to see

18   there were very few disputes.  I can resolve those.  I'll

19   docket the voir dire no later than the morning of jury

20   selection.

21             The way we do it -- and we may have talked about

22   this three years ago, I don't recall.  We bring the jury

23   pool in.  They will be seated on the benches in the back of

24   the courtroom.  I will read aloud all of those questions.  I

25   may have taken some out from what you proposed, but all of

1    the questions in the final voir dire.  I will read all of

2    them.  I will tell the jurors to do their best to keep track

3    just in their own minds.  No raising hands, no standing up.

4    Just keep track whether they have a "yes" answer to any of

5    my questions.  And then I will tell them if they had a "yes"

6    answer to any question, we'll meet with them individually

7    back in my juryroom.

8           Each side can send back I think probably three

9    people.  And I'll make a record with the juror through my

10   questions as to what it is their concerns were.  I'll ask a

11   few questions.  Then I'll give a chance for a brief

12   follow-up from both sides.

13          When the juror leaves the juryroom, I'll then

14   turn to both sides and ask if you have a motion to strike

15   for cause.

16          And then we'll go through the next juror.  And

17   we'll do all of that.

18          Then we'll come back in the courtroom, and we'll

19   continue with the process whereby we'll randomly draw out of

20   those still in the pool 14 potential jurors.  We're able to

21   seat them all here in our jury box.  And then each side will

22   have three peremptory strikes which we exercise silently

23   through the passing of a clipboard.

24          And that will leave us with eight jurors, all of

25   them who are considered jurors.  None of them are considered

 1    alternatives.  If they are all still here, they all get to

 2    deliberate.

 3              That is how we do jury selection.  Are there any

 4    questions about that, Mr. Lindvall?

 5              MR. LINDVALL:  No, Your Honor.

 6              THE COURT:  Mr. Kelleher?

 7              MR. KELLEHER:  Your Honor, on the sequestration

 8    of witnesses, are witnesses and/or parties permitted to be

 9    here during voir dire?

10              THE COURT:  During voir dire.  Well, I would say

11    the same thing I said earlier.  Meet and confer on that.  If

12    you have an agreement, I'll be fine with it.  If you have a

13    dispute, then obviously we will have to talk about it by the

14    morning of jury selection.  I don't think I have had the

15    question come up before.

16              MR. KELLEHER:  I'm not sure how big it is, Your

17    Honor.  I assume witnesses can still fit.

18              THE COURT:  There will be room.  I mean unless

19    you have 100 witnesses.

20              MR. KELLEHER:  We do not.

21              THE COURT:  But the pool will be somewhere

22    between 35 and 65 people, so there will be certainly plenty

23    of room.

24              MR. KELLEHER:  Thank you.

25              THE COURT:  Okay.  On the preliminary

1    instructions, I was happy to see I think there was only one

2    dispute.  Did the parties wish to address that one dispute?

3    I think it's at page 3.

4                 MR. LINDVALL:  Just one moment, Your Honor.

5                 (Pause.)

6                 MR. LINDVALL:  I'm sorry, Your Honor.  This is

7    not something that kind of came up highlighted.

8                 So I believe what we're saying, it says when

9    they are in fact purchasing the Broetje party's accused

10   products.  Is that what you are looking at?

11                THE COURT:  Yes.  Right.  There is your proposal

12   in bold.

13                MR. LINDVALL:  And we propose "and/or Broetje is

14   infringing the asserted patents."  We just think what we

15   have is a little more clear and lays it out.  I'm not quite

16   sure what their issue is with it.  We think it's a clarity

17   issue.

18                THE COURT:  We'll hear from Broetje on the AHG

19   proposal there.

20                MR. KELLEHER:  Yes, Your Honor.  This relates to

21   the legal issue of whether or not there is preemption of the

22   state tort, tortious interference with respect to business

23   advantage with regard to the Patent Act.  California, like

24   many states, requires the act that constitutes interference

25   be independently wrongful.  They would like to say that our

1   acts could be independently wrongful either because they

2   infringe the trade dress, et cetera, or the other theories

3   or they infringe patents.

4           Our position here, Your Honor, is that that is

5   preempted.  Congress has created the cause of action for

6   patent infringement.  They set forth what the remedies are in

7   the act.  They, for example, do not just permit willy-nilly

8   punitive damages to be awarded which would be available under

9   California state law if they could use patent infringement

10  as the independent wrong whereas with regard to the patent

11  statute, for example, you have to go through exceptional case

12  analysis before you can get punitive damages there.

13          So we think Congress has framed the entire

14  universe for what kind of remedies are available for patent

15  infringement, and it cannot be the independent wrong in

16  tortious interference.

17          THE COURT:  I think this issue comes up in the

18  jury instructions as well.

19          MR. KELLEHER:  Yes, Your Honor.

20          THE COURT:  So it's not a clarity problem from

21  your perspective.  Your objection is to the underlying legal

22  question.

23          MR. KELLEHER:  That is right.

24          THE COURT:  All right.  Thank you.

25          Mr. Lindvall, is there anything you want to say

1    about that at this time?

2              MR. LINDVALL:  No.  I see Mr. Kelleher's

3    position on that.  And if you would like to wait until we

4    get to the final jury instructions, we can make our argument

5    then.

6              THE COURT:  Right.  You don't think it's

7    imperative that I resolve this question in the context of

8    the preliminary instructions, do you?

9              MR. LINDVALL:  No, Your Honor.  Because whatever

10   decisions you make on the final jury instructions will carry

11   over on to this.

12             THE COURT:  Okay.  Thank you.  So I don't have a

13   decision on that right now.  If we resolve the legal question

14   before the preliminary instructions, you will see it reflected

15   here.  If we don't, then we'll find some way to avoid the

16   question in the context of a preliminary instructions.

17             Either way, unless I ask you for something

18   further, I don't need anything further on the preliminary

19   instructions, and we will get it docketed by some time no

20   later than the morning of jury selection.

21             On the verdict form, it's most likely that we'll

22   just hear argument on any disputed issues at the same time

23   we hear argument on the jury instructions which will be some

24   time during trial, probably in the early part of the trial,

25   but I will endeavor to give you some advanced notice as to

1    when it is that we're ready to hear argument on the verdict

2    form and on the jury instructions.

3                    Are there any questions about that from the

4    plaintiff?

5                    MR. LINDVALL:  No, Your Honor.  Just to be

6    clear, so the jury charge and the argument is going to be

7    done during trial with both the verdict and the final

8    instructions; is that correct, Your Honor?

9                    THE COURT:  The argument about any of the

10   disputes will happen during trial.

11                   MR. LINDVALL:  I see, Your Honor.  Okay.  Thank

12   you, Your Honor.

13                   THE COURT:  Probably after we're done with the

14   jury on a particular day, and it most likely will not be on

15   a Monday.  It would be a Tuesday, and I will let you know

16   with as much advance notice as I am able to give you.  Got

17   it?

18                   MR. LINDVALL:  Yes, thank you.

19                   THE COURT:  Any questions?

20                   MR. KELLEHER:  Yes, Your Honor.  No questions.

21                   THE COURT:  Okay.  Just a couple more things

22   from me.  In terms of post-trial, after we're done with the

23   jury, I will offer you the opportunity if you wish to meet

24   with any jurors who wish to remain behind to talk but I will

25   only do that if both sides agree that they want to do that,

1    and if both sides agree on the record that they won't use

2    anything that they hear from the jurors as part of their

3    post-trial filings or on any appeal.  You don't need to

4    decide any of that now but be prepared for me to ask you

5    those questions after we get the verdict.

6             And I will also, at that time, direct you all

7    to meet and confer and, with a fairly short turnaround, let

8    me know what, if any, order you believe I can enter on the

9    verdict and what your proposals are for briefing or renewing

10   any motions so that we can try to resolve those without too

11   much delay for you.

12            So this is just in the nature of advising you to

13   be ready to begin to address those questions soon after we

14   get a verdict from the jury.  Are there any questions about

15   what I have just said?

16            MR. LINDVALL:  Your Honor, I just realized there

17   is one issue.  On the statute of limitations, we've agreed,

18   for example, equitable tolling is something to be decided by

19   you.

20            The only issue I can see happen is the statute of

21   limitations is a question on the verdict form.  And if the

22   jury finds that, for example, the statute of limitations, we

23   have failed because the statute of limitations, they refused

24   to answer the rest of the questions and Your Honor turns

25   around post-trial and says you know what?  The equitable

55

1    tolling applied there, so the jury is wrong.  It then puts us

2    in a situation we would have to need a completely new trial.

3    I am not sure how we could address this.  The only way I can

4    imagine we would address is if Your Honor would rule on that

5    before trial.  I hate to bring that up.

6           THE COURT:  Well, another way to address it,

7    which I would ask you all to meet and confer and consider,

8    would be to require the jury to go on and answer the

9    remaining questions regardless of what their view is on the

10    statute of limitations.

11           MR. LINDVALL:  That sounds like a good idea.

12    Thank you.

13           THE COURT:  If there is an agreement on that,

14    then that would take care of it.  If there is not, then we

15    can take care of that when we argue the verdict sheet.

16           MR. CAHR:  Just for clarity.  Is the proposal

17    then that the jurors be instructed that regardless what they

18    find on that one question, that they continue on?  I mean I

19    think that the questions that are on the verdict form are

20    just phrased in terms of dates.  So it means --

21           THE COURT:  So I don't have a specific proposal.

22    I just have a conceptual proposal which I'm not making into

23    an order now.

24           MR. CAHR:  Okay.

25           THE COURT:  I can tell you in the trial that

1    ended yesterday, I guess it was, there was a similar issue

2    on the statute of limitations, and what I did was I made the

3    jury go on to make findings on that substantive claim even

4    though as it turned out they found I think the statute of

5    limitations had expired.

6           So conceptually what I have in mind is getting

7    the benefit of the jury's views, since they're going to hear

8    the evidence, and then even though logically you and I

9    wouldn't go on to that substantive issue if we found the

10   statute of limitations part of the claim, that we would have

11   benefit of their views on the succeeding questions anyway,

12   which would also be helpful because there is a chance it

13   would change things up due to equitable tolling or for other

14   reasons.

15          MR. CAHR:  Okay.

16          THE COURT:  But, concretely, I leave it to you

17   all.  And when we get to talk about the verdict sheet, you

18   will let me know how to implement that if you have an

19   agreement on it.

20          MR. CAHR:  Thank you, Your Honor.

21          THE COURT:  Here is my list of petty things that

22   I don't want any of you to do, and I want you to advise

23   folks on your side not to do.  They include don't chew gum,

24   don't suck candy, don't eat.  This is all while you are here

25   in my courtroom.  You do whatever you want when you are

 1    outside the courtroom.

 2              This applies to you, your clients, your

 3    witnesses.  If there happens to be a medical or other

 4    necessity for an exception to any of that, just approach my

 5    staff and I'm sure we will grant leave for exceptions, but

 6    if there is no necessity for it, then these things shouldn't

 7    happen.

 8              You can drink water.  That is fine.  Your

 9    electronic devices, if you have them in the courtroom,

10    they're only for purposes of aiding what is happening here

11    at trial.  You should, in all events, turn off any ringers

12    or noises or buzzers and all that stuff.

13              Don't wear hats.  Don't read a newspaper that

14    everyone can see the newspaper being opened, very

15    ostentatiously, and don't wear sunglasses.

16              And, yes, all these things have happened at

17    trial.  Hopefully, there won't be anything new to add to my

18    list that I'm not thinking of that happens at this trial.

19              If you make any submissions, though there aren't

20    going to be any written submissions unless I ask for them,

21    but nonetheless if there were for some reason to be a

22    written submission after the trial day or on a weekend,

23    please make sure that you serve a courtesy copy by e-mail

24    either to Mr. Looby or to Mr. Golden so they'll make sure

25    that we see it.

1          That's it from my list.  Are there any

2   additional issues from the plaintiff?

3          MR. LINDVALL:  There is, Your Honor.  There is one

4   thing I have experienced in trials is counsel or witnesses

5   making facial expressions.  I'm sure you are aware of the

6   issue.  If I could get your guidance?  But I imagine I know

7   what your guidance is.

8          THE COURT:  What would you imagine my guidance is?

9          MR. LINDVALL:  That the witnesses and attorneys

10  keep a straight face when opposing witnesses.  There is no

11  facial expressions to show disbelief or anything like that.

12         THE COURT:  Is there a dispute on that?

13         MR. KELLEHER:  No, Your Honor.  I wouldn't want

14  someone chided for doing something that is truly involuntary.

15         THE COURT:  I would say to the extent humanly

16  possible, do your best to keep a straight face regardless of

17  what happens at trial.  I will do my best as well.  So

18  beyond that, I'm not sure what more I can say on that.

19         MR. LINDVALL:  No, I understand, Your Honor.  I

20  just want to bring the issue because in two trials it has

21  happened to me with.

22         THE COURT:  All right.  Well, I think it's not

23  going to happen at least as an intentional bad faith effort

24  here.

25             Is there anything else from plaintiffs?

1                    (Counsel confer.)

2                    MR. LINDVALL:  No, Your Honor.  I think we're done.

3                    THE COURT:  Okay.  Anything from defendants?

4                    MR. KELLEHER:  A few things Your Honor.

5                    THE COURT:  Okay.

6                    MR. KELLEHER:  One is logistical.  I see the

7      screen that is here.

8                    THE COURT:  And let me ask Mr. Looby.  I don't

9      believe this is the Court's screen.  It may be left over

10     from the last trial.

11                   (Court and deputy clerk confer.)

12                   THE COURT:  All right.  You will have to talk

13     off-line with my staff.  I was under the impression this

14     screen was imported for our last trial.  I had not seen it

15     before, I don't think.  And it is much smaller than the

16     screen we've used before; and the jury in fact had some

17     trouble seeing it.  So I believe we still have access to a

18     bigger screen.

19                   MR. KELLEHER:  That is exactly what I was going

20     to be asking about.  We'll work it out.

21                   THE COURT:  Yes.

22                   MR. KELLEHER:  Next question, Your Honor.

23     Concerning the exhibits.  You have seen the exhibit list.

24     Both sides I think out of an abundance of caution have an

25     incredible number of exhibits on their list.  Some of the

1    documents themselves are quite big.  For example, we have

2    bills of materials from our machine installations that take

3    place at places like Boeing.  Those are like 800 pages long.

4           I don't know, Your Honor, if you actually need

5    and want a printed set of everything that is on both exhibit

6    lists or would be satisfied with getting witness binders and

7    the copies of whatever was used in cross.

8           THE COURT:  Bear with me a second.

9           (Court and deputy clerk confer.)

10           THE COURT:  As long as both sides are in

11    agreement, because we don't want any unintended disputes

12    as to what the exhibits actually are.  As long as you have

13    worked that out and can show each other what the exhibits

14    are, we don't need a set of them at the beginning of the

15    trial.

16           We'll turn to you once the case is submitted to

17    the jury to give us a complete set for the jury of what has

18    been admitted; and it is helpful as you call each witness to

19    give us two sets of binders so that I and my law clerk can

20    follow along.  Just those exhibits.

21           MR. KELLEHER:  Yes.  And then, Your Honor, the

22    last issue I have.  As you will remember from the last time

23    we were here, after the result in the French case, my client

24    has gone ahead and they're in the process of designing a new

25    cassette that is largely red.  As we pointed out to you in

1    the letter that we submitted a couple weeks ago, their minds

2    have changed about whether they will ever be selling that

3    anywhere other than France.  And, in fact, the current

4    thought is assuming the redesign works, they will be selling

5    it worldwide, including in the U.S.

6            I gather that my opponents want to talk about

7    the red cassette at the trial, even though it hasn't been

8    sold in the United States yet.  What I would like to know is

9    if you could please require them in some fairly short period

10   of time to tell me whether they believe this newly designed

11   cassette still infringes any of their rights.  I still have

12   not heard that answer.

13           THE COURT:  Okay.  What is the plaintiffs' view

14   procedurally on whether I should require you to do that?

15           MR. LINDVALL:  Your Honor, we can do that, but

16   we haven't had a chance to actually inspect the physical

17   cassette.  And we would like to wait until we get that

18   opportunity to inspect the cassette.

19           It was marked.  The deposition was taken by

20   telephone.  The witness was in Germany.  We marked the

21   cassette there in Germany.  I don't know if they are

22   received the cassette, but we can send someone from our

23   Chicago office because they're in Chicago, and we can

24   inspect it.

25           I don't think that is going to be a new product

1   in dispute but I wouldn't want to commit to that right now,

2   but my feeling is it will not be.

3            THE COURT:  Mr. Kelleher, is there going to be

4   any problem arranging for them to inspect that?

5            MR. KELLEHER:  Your Honor, not as long as we're

6   not charged with committing any act of infringement of we

7   import this new red cassette.

8            THE COURT:  Is that what is going on here?  Are

9   you trying to trap them?

10            MR. LINDVALL:  No, no.  Absolutely not, Your

11   Honor.  I told you I doubt it's going to be a -- we would

12   just like to look at it, the actual physical cassette.

13            THE COURT:  And you would rather have the

14   product imported into the United States so you can look and

15   it rather than sending someone from your side to France, I

16   guess it would be.

17            MR. LINDVALL:  Germany.  It would be Germany.

18            THE COURT:  Germany.  That would be your

19   preference?

20            MR. LINDVALL:  Well, it's a deposition exhibit

21   so they would have to bring it anyway.

22            THE COURT:  I think you can work this out.

23            MR. LINDVALL:  Yes.

24            THE COURT:  If you can't, get me a letter

25   outlining the dispute by a week from today and I will

1   resolve it, but it seems to me you should be able to work

2   this out.

3                   MR. LINDVALL:  Yes, Your Honor.  I believe we

4   will.

5                   THE COURT:  Is there anything else?

6                   MR. KELLEHER:  Nothing else from me.

7                   THE COURT:  All right.  Well, I think that takes

8   care of everything for today.  We'll look forward to

9   receiving your submissions next week and seeing you at trial

10  in April.  We will be in recess.

11                  (Pretrial conference ends at 11:14 a.m.)

12

13          I hereby certify the foregoing is a true and accurate
    transcript from my stenographic notes in the proceeding.

14

15                              /s/ Brian P. Gaffigan
                              Official Court Reporter
16                               U.S. District Court

17

18

19

20

21

22

23

24

25

**'**

**'339** [2] - 26:8, 26:20

**/**

**/s** [1] - 63:15

**0**

**09-598-LPS** [1] - 1:9

**1**

**1** [1] - 45:4
**1,200** [1] - 17:19
**10** [1] - 35:16
**100** [1] - 49:19
**10:00** [1] - 3:4
**11** [1] - 35:16
**11:14** [1] - 63:11
**12:30** [1] - 47:7
**14** [2] - 8:5, 48:20
**15** [2] - 4:20, 47:5

**2**

**2,000** [1] - 17:20
**20** [1] - 15:7
**2008** [1] - 18:11
**2011** [1] - 5:23
**2014** [1] - 1:12
**21** [1] - 1:12
**24** [1] - 30:4

**3**

**3** [1] - 50:3
**322** [3] - 6:3, 6:18, 7:4
**35** [1] - 49:22
**382** [1] - 8:5

**4**

**4:30** [2] - 46:22, 46:24

**5**

**50(a** [3] - 22:6, 22:18, 22:22

**6**

**615** [2] - 14:7, 14:19
**65** [1] - 49:22

**7**

**7th** [1] - 46:20

**8**

**800** [1] - 60:3
**8:30** [2] - 43:2, 46:21

**9**

**9:00** [1] - 43:2
**9:30** [1] - 46:22

**A**

**a.m** [2] - 3:4, 63:11
**able** [13] - 9:2, 9:10, 11:9, 16:16, 31:4, 35:24, 37:5, 38:5, 39:21, 47:2, 48:20, 53:16, 63:1
**absolutely** [2] - 45:22, 62:10
**abundance** [1] - 59:24
**abuse** [2] - 34:2, 34:3
**abusive** [1] - 43:17
**access** [1] - 59:17
**according** [3] - 34:10, 39:11, 46:17
**accurate** [2] - 20:16, 63:13
**accused** [1] - 50:9
**Act** [1] - 50:23
**act** [3] - 50:24, 51:7, 62:6
**acting** [1] - 12:13
**action** [4] - 30:10, 30:12, 30:15, 51:5
**ACTION** [1] - 1:4
**activity** [1] - 30:2
**acts** [1] - 51:1
**actual** [1] - 62:12
**add** [5] - 12:22, 18:17, 18:18, 20:19, 57:17
**added** [4] - 6:12, 6:14, 29:25, 30:1
**additional** [11] - 4:25, 6:4, 6:6, 6:13, 27:8, 29:13, 30:5, 31:18, 35:11, 44:23, 58:2
**address** [11] - 4:21, 5:20, 8:3, 22:24, 23:3, 25:5, 50:2, 54:13, 55:3, 55:4, 55:6
**adequate** [1] - 7:11
**adequately** [3] - 8:19,

8:20, 9:8
**admission** [1] - 43:3
**admitted** [8] - 40:13, 40:18, 41:3, 41:5, 41:16, 43:21, 43:22, 60:18
**advance** [2] - 19:2, 53:16
**advanced** [1] - 52:25
**advantage** [2] - 24:25, 50:23
**advise** [2] - 43:19, 56:22
**advising** [1] - 54:12
**affirmatively** [2] - 22:3, 46:2
**afternoon** [2] - 47:4, 47:7
**ago** [9] - 5:7, 13:25, 18:23, 27:12, 28:24, 29:13, 29:16, 47:22, 61:1
**agree** [14] - 4:18, 9:14, 9:25, 13:3, 19:18, 30:25, 32:1, 32:7, 35:24, 38:22, 46:23, 53:25, 54:1
**agreeable** [1] - 21:17
**agreed** [7] - 9:13, 9:16, 9:18, 13:19, 24:4, 39:8, 54:17
**agreement** [15] - 19:19, 20:2, 20:7, 24:14, 26:1, 26:21, 28:21, 33:1, 44:4, 45:23, 46:5, 49:12, 55:13, 56:19, 60:11
**ahead** [3] - 18:24, 46:10, 60:24
**AHG** [15] - 4:21, 5:25, 8:15, 9:9, 12:19, 15:2, 16:9, 18:23, 18:24, 21:16, 44:8, 44:9, 44:15, 45:24, 50:18
**AHG's** [2] - 9:13, 15:5
**aiding** [1] - 57:10
**aim** [1] - 47:7
**alleged** [2] - 12:19, 13:21
**allocation** [1] - 43:12
**allow** [4] - 36:11, 36:22, 46:11, 46:13
**allows** [1] - 30:14
**alluded** [1] - 15:10
**aloud** [1] - 47:24
**alter** [1] - 16:20
**alternative** [1] - 27:13
**alternatively** [2] - 23:5, 35:12
**alternatives** [1] - 49:1

**amount** [4] - 6:7, 17:15, 35:14, 39:22
**analysis** [1] - 51:12
**AND** [1] - 1:2
**and-a-half** [1] - 28:24
**answer** [10] - 21:6, 37:14, 37:15, 37:19, 42:18, 48:4, 48:6, 54:24, 55:8, 61:12
**answers** [1] - 15:10
**anticipate** [5] - 11:18, 18:6, 39:13, 40:25, 43:5
**anticipation** [1] - 24:17
**anyway** [2] - 56:11, 62:21
**apparatus** [1] - 26:8
**appeal** [1] - 54:3
**appear** [2] - 4:6, 9:12
**appearances** [1] - 3:8
**APPEARANCES** [2] - 1:15, 2:1
**appeared** [1] - 4:9
**apple** [1] - 44:22
**applied** [1] - 55:1
**applies** [1] - 57:2
**apply** [1] - 28:14
**approach** [3] - 36:12, 46:6, 57:4
**appropriate** [1] - 31:25
**April** [3] - 4:4, 46:20, 63:10
**argue** [2] - 32:23, 55:15
**argued** [1] - 7:1
**argument** [9] - 19:11, 27:5, 46:14, 52:4, 52:22, 52:23, 53:1, 53:6, 53:9
**argumentative** [1] - 36:15
**arguments** [5] - 6:5, 6:13, 8:7, 46:11, 46:12
**arrangements** [1] - 19:2
**arranging** [1] - 62:4
**art** [10] - 5:18, 6:4, 6:6, 6:7, 6:14, 7:7, 7:9, 8:7, 8:9
**asserted** [3] - 8:22, 24:15, 50:14
**asserting** [1] - 7:7
**assertions** [1] - 45:21
**assess** [1] - 13:16
**associated** [1] - 9:5
**assume** [1] - 49:17
**assuming** [1] - 61:4
**Ateliers** [1] - 2:8

**ATELIERS** [1] - 1:4
**attached** [1] - 39:17
**attention** [2] - 42:13, 43:7
**attorneys** [2] - 3:6, 58:9
**AUTOMATION** [2] - 1:8, 1:8
**Automation** [2] - 2:15, 2:16
**AUTOMATION-USA** [1] - 1:8
**Automation-USA** [1] - 2:15
**available** [5] - 43:1, 46:20, 46:21, 51:8, 51:14
**avoid** [2] - 7:23, 52:15
**awarded** [1] - 51:8
**aware** [2] - 5:11, 58:5
**Axel** [1] - 14:5

**B**

**bad** [1] - 58:23
**based** [4] - 13:8, 17:2, 28:10, 40:2
**Beach** [12] - 9:16, 9:21, 10:2, 10:6, 10:8, 10:19, 11:1, 11:20, 12:8, 13:5, 13:14, 13:22
**bear** [2] - 18:19, 60:8
**BEFORE** [1] - 1:14
**begin** [2] - 46:20, 54:13
**beginning** [3] - 3:4, 23:5, 60:14
**behalf** [2] - 3:11, 3:22
**behind** [1] - 53:24
**believes** [1] - 5:20
**benches** [1] - 47:23
**Benczkowski** [5] - 14:4, 15:6, 15:11, 16:13, 16:15
**benefit** [3] - 23:17, 56:7, 56:11
**best** [7] - 17:2, 17:10, 27:21, 39:18, 48:2, 58:16, 58:17
**better** [1] - 31:1
**between** [2] - 29:22, 49:22
**BEYER** [1] - 2:14
**Beyer** [1] - 3:24
**beyond** [7] - 8:10, 8:20, 8:24, 21:11, 39:8, 46:24, 58:18
**Biddle** [1] - 3:22
**BIDDLE** [2] - 2:10,

**2:12**

**big** [2] - 49:16, 60:1
**bigger** [1] - 59:18
**bills** [1] - 60:2
**binders** [2] - 60:6, 60:19
**bit** [4] - 4:13, 18:22, 21:23, 29:15
**bite** [1] - 44:22
**Boeing** [1] - 60:3
**bold** [1] - 50:12
**bottom** [1] - 42:14
**box** [2] - 37:5, 48:21
**brand** [2] - 27:9, 30:1
**break** [3] - 23:5, 40:1, 47:3
**breaks** [3] - 47:1, 47:4, 47:7
**Brian** [2] - 1:24, 63:15
**brief** [4] - 6:3, 6:9, 36:14, 48:11
**briefing** [1] - 54:9
**briefs** [1] - 21:20
**bring** [10] - 16:3, 17:9, 17:21, 19:2, 42:13, 43:9, 47:22, 55:5, 58:20, 62:21
**bringing** [1] - 29:21
**BROETJE** [2] - 1:8, 1:8
**Broetje** [24] - 2:15, 2:16, 5:19, 6:4, 9:15, 10:15, 12:4, 12:18, 13:4, 14:4, 14:6, 15:6, 15:17, 17:18, 21:14, 30:25, 34:16, 44:10, 44:18, 45:5, 50:9, 50:13, 50:18
**Broetje's** [2] - 13:24, 32:5
**brought** [1] - 21:8
**burden** [9] - 44:9, 44:12, 44:15, 44:16, 44:24, 44:25, 45:3, 45:25, 46:2
**business** [3] - 15:5, 16:8, 50:22
**buzzers** [1] - 57:12
**BY** [6] - 1:17, 1:20, 2:3, 2:6, 2:10, 2:13

**C**

**Cahr** [1] - 3:24
**CAHR** [12] - 2:13, 27:7, 27:12, 29:4, 29:8, 32:6, 32:16, 33:4, 55:16, 55:24, 56:15, 56:20
**California** [7] - 10:3, 10:6, 30:13, 31:11,

**32:2, 50:23, 51:9**

**candy** [1] - 56:24
**cannot** [2] - 14:9, 51:15
**care** [6] - 9:8, 32:6, 46:24, 55:14, 55:15, 63:8
**CARRIE** [1] - 2:14
**Carrie** [1] - 3:24
**carry** [2] - 32:4, 52:10
**case** [22] - 4:15, 8:21, 11:14, 11:17, 14:10, 14:12, 15:9, 16:24, 18:13, 28:7, 30:25, 31:3, 31:13, 36:1, 43:19, 46:10, 51:11, 60:16, 60:23
**case-in-chief** [2] - 16:24, 18:13
**cassette** [7] - 60:25, 61:7, 61:11, 61:17, 61:18, 61:21, 61:22, 62:7, 62:12
**cassettes** [4] - 11:21, 11:23, 11:25, 12:19
**caution** [1] - 59:24
**caveat** [1] - 40:21
**CEO** [1] - 15:3
**certain** [1] - 34:7
**certainly** [3] - 19:1, 38:11, 49:22
**certify** [1] - 63:13
**cetera** [1] - 51:2
**chair** [1] - 36:21
**chance** [9] - 4:14, 16:10, 44:16, 44:19, 45:10, 46:1, 48:11, 56:12, 61:16
**change** [2] - 21:5, 56:13
**changed** [1] - 61:2
**changes** [1] - 29:19
**charge** [2] - 43:13, 53:6
**charged** [8] - 9:5, 24:11, 33:14, 33:15, 33:19, 33:24, 34:10, 62:6
**charging** [1] - 43:11
**chew** [1] - 56:23
**chicago** [1] - 2:7
**Chicago** [3] - 2:14, 61:23
**chided** [1] - 58:14
**Chief** [1] - 14:5
**chief** [3] - 15:4, 16:24, 18:13
**circumstance** [1] - 38:5
**cite** [1] - 14:12
**cited** [1] - 14:10

**cIVIL** [1] - 1:4
**claim** [4] - 25:12, 26:20, 56:3, 56:10
**claims** [9] - 8:22, 24:15, 25:1, 25:16, 26:8, 26:9, 26:14, 26:16
**clarity** [3] - 50:16, 51:20, 55:16
**clear** [3] - 45:23, 50:15, 53:6
**clearly** [2] - 7:17, 39:16
**clerk** [4] - 18:20, 59:11, 60:9, 60:19
**client** [3] - 14:24, 17:6, 60:23
**clients** [1] - 57:2
**clip** [1] - 38:3
**clipboard** [1] - 48:23
**clock** [1] - 33:15
**close** [3] - 6:5, 18:23
**closer** [1] - 39:10
**closing** [4] - 19:11, 46:11, 46:14
**colleagues** [1] - 3:23
**colored** [1] - 10:22
**Columbia** [1] - 2:4
**combinations** [1] - 6:14
**comfortable** [1] - 31:21
**coming** [3] - 5:8, 41:6, 42:17
**commit** [1] - 62:1
**committing** [1] - 62:6
**company** [2] - 15:4, 18:10
**competency** [1] - 41:25
**competing** [2] - 22:22, 36:3
**competition** [2] - 24:24, 25:10
**competitor** [1] - 15:4
**complemented** [1] - 35:10
**complete** [3] - 5:1, 35:10, 60:17
**completed** [2] - 4:19, 4:24
**completely** [2] - 18:24, 55:2
**comply** [1] - 22:4
**Conaway** [1] - 3:11
**CONAWAY** [1] - 1:17
**conceptual** [1] - 55:22
**conceptually** [1] - 56:6
**concern** [3] - 12:20, 12:21, 42:10

**concerned** [4] - 7:20, 7:21, 10:5, 12:14
**concerning** [1] - 59:23
**concerns** [3] - 9:9, 34:13, 48:10
**concrete** [1] - 33:17
**concretely** [1] - 56:16
**confer** [10] - 18:20, 22:19, 35:1, 42:11, 49:11, 54:7, 55:7, 59:1, 59:11, 60:9
**Conference** [1] - 3:3
**conference** [5] - 3:3, 4:4, 6:8, 6:12, 63:11
**conferred** [2] - 29:24, 41:6
**conferring** [1] - 43:1
**confess** [1] - 31:6
**confident** [1] - 13:13
**Congress** [3] - 14:19, 51:5, 51:13
**consider** [1] - 55:7
**considered** [2] - 7:10, 48:25
**constitutes** [1] - 50:24
**constructed** [1] - 28:16
**consult** [1] - 43:20
**content** [2] - 6:13, 8:9
**contentions** [1] - 44:12
**context** [3] - 34:4, 52:7, 52:16
**contexts** [1] - 34:4
**continue** [4] - 7:11, 37:12, 48:19, 55:18
**Continued** [1] - 2:1
**contributory** [7] - 25:2, 25:5, 25:8, 26:6, 26:11, 26:19, 26:22
**copies** [1] - 60:7
**copy** [2] - 28:2, 57:23
**corporate** [13] - 13:24, 14:3, 14:8, 14:16, 14:24, 15:11, 15:14, 16:4, 17:6, 17:9, 17:21, 17:24, 18:3
**corporation** [1] - 17:19
**Corporation** [4] - 1:4, 1:5, 1:8, 1:9
**correct** [9] - 5:14, 8:17, 21:3, 21:8, 25:4, 26:23, 38:8, 38:23, 53:8
**corresponding** [1] - 27:14
**costs** [1] - 9:5
**Counsel** [2] - 2:8, 2:15
**counsel** [4] - 35:18,

37:3, 58:4, 59:1
**count** [1] - 39:25
**counterdesignated** [1] - 40:3
**counterdesignations** [3] - 38:15, 38:20, 39:5
**counts** [1] - 38:4
**couple** [4] - 20:1, 20:22, 53:21, 61:1
**course** [9] - 17:6, 22:2, 22:4, 24:4, 24:10, 43:17, 47:1
**Court** [19] - 6:7, 14:16, 14:19, 17:14, 17:16, 18:20, 20:8, 28:1, 28:3, 29:9, 29:16, 30:8, 35:6, 35:14, 35:18, 40:13, 44:23, 63:15, 63:16
**court** [4] - 3:4, 35:8, 59:11, 60:9
**COURT** [153] - 1:1, 3:5, 3:8, 3:19, 3:25, 4:2, 5:3, 5:8, 5:11, 5:14, 5:17, 5:24, 6:20, 6:25, 8:2, 8:14, 9:18, 9:24, 10:4, 10:8, 10:11, 10:24, 11:4, 11:11, 12:6, 12:21, 13:3, 14:14, 14:21, 15:13, 15:19, 15:21, 15:24, 16:2, 16:9, 17:5, 17:24, 18:14, 18:16, 18:19, 18:21, 19:5, 19:8, 19:12, 19:22, 20:17, 20:25, 21:5, 21:10, 21:13, 21:21, 22:8, 22:14, 22:18, 23:23, 23:25, 24:20, 24:23, 25:17, 25:24, 26:2, 26:10, 26:15, 26:21, 26:25, 27:2, 27:11, 29:1, 29:7, 29:10, 30:19, 31:6, 31:21, 32:4, 32:15, 32:17, 33:5, 33:8, 34:16, 34:18, 34:22, 34:24, 36:7, 36:9, 36:23, 37:1, 37:10, 37:23, 38:7, 38:10, 38:22, 38:25, 39:2, 40:7, 41:4, 41:11, 41:15, 41:19, 42:3, 42:20, 42:23, 44:1, 44:3, 44:7, 45:1, 45:11, 45:14, 45:22, 46:5, 47:13, 47:15, 49:6, 49:10, 49:18, 49:21, 49:25, 50:11, 50:18, 51:17, 51:20, 51:24,

52:6, 52:12, 53:9, 53:13, 53:19, 53:21, 55:6, 55:13, 55:21, 55:25, 56:16, 56:21, 58:8, 58:12, 58:15, 58:22, 59:3, 59:5, 59:8, 59:12, 59:21, 60:8, 60:10, 61:13, 62:3, 62:8, 62:13, 62:18, 62:22, 62:24, 63:5, 63:7
**Court's** [1] - 59:9
**courtesy** [1] - 57:23
**courtroom** [9] - 11:10, 14:4, 16:21, 37:4, 47:24, 48:18, 56:25, 57:1, 57:9
**courts** [1] - 28:11
**covered** [1] - 27:3
**created** [1] - 51:5
**credibility** [1] - 13:17
**cross** [10] - 12:2, 12:3, 13:16, 15:12, 33:22, 33:24, 34:8, 35:11, 36:10, 60:7
**cross-examination** [3] - 12:3, 34:8, 35:11
**cross-examine** [1] - 12:2
**cross-examined** [1] - 13:16
**cross-examining** [3] - 15:12, 33:22, 33:24
**culminates** [1] - 39:12
**current** [1] - 61:3

**D**

**D.I** [4] - 6:3, 6:18, 7:4, 8:5
**damages** [8] - 5:5, 24:18, 24:23, 25:1, 25:14, 25:15, 51:8, 51:12
**Darren** [1] - 3:24
**DARREN** [1] - 2:13
**dates** [1] - 55:20
**days** [4] - 20:22, 27:12, 29:13, 39:13
**DE** [1] - 1:4
**De** [1] - 2:8
**deal** [6] - 22:22, 27:10, 27:21, 28:25, 32:19
**dealing** [1] - 16:22
**dealt** [2] - 27:9, 27:16
**debate** [4] - 32:11, 32:13, 32:21, 32:24
**decide** [6] - 5:25, 21:9, 25:19, 31:2, 38:5, 54:4
**decided** [2] - 32:13,

54:18
**deciding** [2] - 31:23, 32:2
**decision** [5] - 14:22, 19:16, 31:1, 31:4, 52:13
**decisions** [2] - 21:1, 30:25, 52:10
**default** [1] - 34:6
**defendant** [5] - 8:17, 13:19, 14:1, 42:8, 46:12
**defendants** [6] - 3:23, 8:23, 9:7, 9:19, 45:25, 59:3
**Defendants** [1] - 1:10
**defendants'** [3] - 7:21, 10:11, 45:15
**defense** [2] - 17:11, 30:6
**defenses** [1] - 20:4
**DELAWARE** [1] - 1:2
**Delaware** [3] - 1:8, 1:11
**delay** [1] - 54:11
**delayed** [1] - 30:8
**deliberate** [1] - 49:2
**deliberating** [1] - 46:23
**demonstration** [1] - 36:22
**demonstrative** [1] - 37:6
**deny** [1] - 7:11
**denying** [1] - 8:16
**deposed** [1] - 15:8
**deposition** [16] - 4:25, 8:12, 11:19, 12:24, 13:15, 21:16, 35:12, 35:20, 37:10, 38:13, 38:15, 38:18, 39:20, 39:23, 61:19, 62:20
**depositions** [5] - 21:22, 34:25, 37:11, 39:4, 40:4
**deputies** [1] - 43:20
**deputy** [2] - 59:11, 60:9
**described** [1] - 46:18
**description** [2] - 24:18, 24:22
**designate** [1] - 14:15
**designated** [3] - 14:8, 38:19, 40:2
**designation** [1] - 21:16
**designations** [4] - 37:10, 38:13, 38:15, 39:5
**designed** [1] - 61:10
**designing** [1] - 60:24

**devices** [1] - 57:9
**different** [5] - 6:14, 23:16, 23:17, 35:24
**differently** [1] - 23:16
**difficult** [1] - 31:5
**dire** [5] - 47:17, 47:19, 48:1, 49:9, 49:10
**direct** [6] - 24:14, 33:18, 33:20, 36:10, 42:7, 54:6
**disagree** [1] - 14:21
**disagreement** [2] - 44:4, 44:6
**disbelief** [1] - 58:11
**discern** [1] - 37:18
**disclose** [1] - 42:6
**disclosed** [4] - 6:15, 8:25, 13:13, 27:18
**disclosures** [1] - 27:19
**discovery** [7] - 4:18, 4:24, 5:1, 6:5, 6:6, 27:24, 30:8
**discretion** [6] - 14:15, 14:20, 17:15, 17:17, 34:9, 38:3
**discretionary** [1] - 14:22
**discuss** [2] - 19:23, 34:14
**discussed** [3] - 9:4, 19:19, 19:20
**dispute** [24] - 4:6, 4:13, 4:19, 5:20, 9:11, 9:12, 10:13, 11:5, 13:23, 14:1, 19:14, 19:23, 24:3, 25:17, 26:4, 33:10, 37:11, 49:13, 50:2, 58:12, 62:1, 62:25
**disputed** [2] - 4:9, 52:22
**disputes** [6] - 19:25, 21:22, 27:3, 47:18, 53:10, 60:11
**DISTRICT** [2] - 1:1, 1:2
**District** [2] - 2:4, 63:16
**docket** [1] - 47:19
**docketed** [1] - 52:19
**documents** [1] - 60:1
**done** [9] - 23:7, 23:8, 23:9, 23:10, 35:3, 53:7, 53:13, 53:22, 59:2
**doubt** [1] - 62:11
**down** [8] - 6:7, 6:10, 6:12, 7:14, 36:23, 40:2, 45:8, 45:9
**Dr** [4] - 18:5, 38:18, 39:7, 44:20
**draw** [1] - 48:19

**dress** [8] - 11:14, 24:24, 25:9, 25:13, 30:16, 44:10, 44:12, 51:2
**drink** [1] - 57:8
**Drinker** [1] - 3:22
**DRINKER** [2] - 2:10, 2:12
**due** [1] - 56:13
**during** [19] - 11:19, 20:12, 21:15, 22:1, 23:10, 27:4, 33:18, 34:11, 35:3, 41:1, 41:3, 41:8, 41:9, 42:15, 49:9, 49:10, 52:24, 53:7, 53:10

**E**

**e-mail** [2] - 6:11, 57:23
**early** [1] - 52:24
**easiest** [1] - 45:19
**eat** [1] - 56:24
**economic** [3] - 24:25, 25:11
**effectively** [1] - 16:16
**effort** [1] - 58:23
**eight** [1] - 48:24
**either** [7] - 22:21, 34:4, 36:3, 41:5, 51:1, 52:17, 57:24
**electronic** [1] - 57:9
**elicit** [4] - 10:24, 20:12, 20:25, 30:20
**eliciting** [1] - 30:21
**eliminate** [1] - 17:22
**elsewhere** [2] - 10:17, 13:6
**embedded** [1] - 34:1
**employee** [1] - 18:10
**employees** [2] - 15:24, 17:20
**encapsulated** [1] - 8:6
**encompasses** [1] - 25:9
**encourage** [1] - 36:14
**end** [2] - 23:6, 44:17
**endeavor** [1] - 52:25
**ended** [2] - 26:17, 56:1
**ends** [1] - 63:11
**English** [2] - 37:14, 37:20
**ensued** [1] - 29:22
**enter** [1] - 54:8
**entire** [1] - 51:13
**entirely** [2] - 28:19, 42:19
**entitled** [2] - 17:7, 17:8

**equitable** [15] - 20:4, 20:22, 21:9, 27:15, 28:10, 30:14, 30:20, 31:8, 31:13, 32:20, 32:22, 33:1, 54:18, 54:25, 56:13
**equity** [3] - 20:23, 27:23, 32:13
**ESQ** [9] - 1:17, 1:20, 1:20, 2:3, 2:6, 2:10, 2:13, 2:13, 2:14
**essence** [1] - 15:5
**essentially** [1] - 7:3
**estoppel** [1] - 20:5
**et** [1] - 51:2
**evening** [1] - 42:12
**events** [1] - 57:11
**evidence** [15] - 20:9, 20:10, 21:1, 30:18, 30:19, 30:24, 40:11, 40:13, 40:18, 41:13, 41:16, 43:21, 56:8
**exactly** [6] - 16:14, 16:21, 17:1, 18:8, 39:17, 59:19
**examination** [9] - 12:3, 33:18, 34:1, 34:8, 34:12, 35:11, 35:13, 36:11, 42:7
**examinations** [1] - 36:10
**examine** [1] - 12:2
**examined** [2] - 11:19, 13:16
**examining** [3] - 15:12, 33:22, 33:24
**example** [7] - 40:25, 44:10, 51:7, 51:11, 54:18, 54:22, 60:1
**except** [1] - 21:15
**exception** [2] - 39:2, 57:4
**exceptional** [1] - 51:11
**exceptions** [1] - 57:5
**excerpt** [2] - 35:6, 35:9
**excerpts** [1] - 39:17
**exchanging** [1] - 42:24
**exclude** [2] - 10:21, 14:17
**excluded** [1] - 14:9
**exercise** [1] - 48:22
**exhibit** [11] - 6:9, 40:10, 40:12, 40:16, 41:23, 41:24, 42:2, 59:23, 60:5, 62:20
**exhibits** [18] - 22:12, 40:7, 40:9, 40:15, 40:21, 41:21, 42:6,

42:9, 42:25, 43:4, 59:23, 59:25, 60:12, 60:13, 60:20
**expect** [4] - 15:3, 32:21, 32:24, 39:10
**expense** [1] - 16:6
**experienced** [1] - 58:4
**expert** [20] - 5:5, 6:6, 6:15, 7:8, 7:10, 7:16, 7:17, 7:21, 7:25, 8:10, 8:11, 8:24, 9:21, 11:9, 11:13, 12:12, 12:25, 13:11, 34:19
**expert's** [1] - 8:8
**expertise** [1] - 12:12
**expired** [1] - 56:5
**expressed** [1] - 22:1
**expressions** [2] - 58:5, 58:11
**extensive** [1] - 31:12
**extent** [7] - 7:15, 8:15, 13:19, 23:7, 32:17, 32:23, 58:15
**extra** [2] - 16:6, 28:2
**eyewitness** [1] - 10:20

## F

**F2C2** [2] - 1:4, 2:8
**face** [2] - 58:10, 58:16
**facial** [2] - 58:5, 58:11
**facilities** [1] - 12:9
**facility** [2] - 13:5, 13:22
**fact** [18] - 9:22, 10:21, 12:7, 12:13, 12:15, 13:4, 13:6, 13:14, 13:20, 16:4, 16:25, 21:7, 27:22, 28:17, 46:6, 50:9, 59:16, 61:3
**facts** [3] - 24:6, 24:8, 28:15
**factual** [6] - 12:11, 18:7, 24:13, 25:18, 31:4
**failed** [1] - 54:23
**fair** [4] - 17:14, 32:17, 41:16, 46:8
**fairly** [5] - 4:7, 17:19, 18:10, 54:7, 61:9
**faith** [1] - 58:23
**far** [2] - 12:13, 28:5
**Farnan** [3] - 7:19, 9:1, 34:19
**fault** [8] - 9:15, 10:2, 10:5, 10:6, 10:15, 10:18, 10:25, 11:14
**faults** [15] - 11:13, 11:21, 11:23, 11:25,

12:8, 12:9, 12:16, 12:19, 12:25, 13:5, 13:6, 13:14, 13:21
**favor** [1] - 18:23
**feet** [1] - 34:11
**few** [5] - 4:12, 5:6, 47:18, 48:11, 59:4
**field** [1] - 9:23
**fight** [1] - 35:25
**file** [2] - 21:18, 21:24, 21:25, 28:3
**filed** [5] - 4:5, 8:5, 30:5, 30:7, 31:18
**filings** [4] - 4:5, 21:15, 21:18, 54:3
**filtered** [1] - 25:22
**final** [5] - 5:5, 48:1, 52:4, 52:10, 53:7
**findings** [2] - 27:22, 56:3
**fine** [10] - 5:24, 7:18, 8:14, 21:13, 24:4, 27:11, 33:4, 37:6, 49:12, 57:8
**finished** [2] - 45:18, 46:7
**firm** [1] - 19:17
**first** [16] - 4:17, 4:21, 5:25, 7:1, 9:11, 10:9, 11:12, 14:1, 17:13, 23:20, 27:13, 40:20, 43:9, 46:13, 47:1, 47:2
**fit** [1] - 49:17
**five** [3] - 4:9, 8:21, 24:15
**flavor** [1] - 16:15
**flipped** [1] - 26:13
**fly** [2] - 17:11, 42:15
**focus** [1] - 26:3
**focused** [1] - 4:5
**folks** [2] - 16:3, 56:23
**follow** [2] - 48:12, 60:20
**follow-up** [1] - 48:12
**following** [2] - 42:4, 44:21
**FOR** [1] - 1:2
**foregoing** [1] - 63:13
**foreign** [2] - 37:12, 37:19
**forgot** [1] - 5:12
**form** [8] - 26:12, 27:15, 31:17, 31:19, 52:21, 53:2, 54:21, 55:19
**formality** [1] - 40:17
**formally** [1] - 40:14
**forth** [2] - 45:20, 51:6
**forward** [3] - 23:14, 24:5, 63:8

**foundation** [1] - 40:14
**four** [2] - 45:17, 46:9
**fourth** [4] - 44:19, 45:5, 46:6, 46:14
**framed** [1] - 51:13
**France** [6] - 28:11, 30:15, 30:16, 31:3, 61:3, 62:15
**free** [5] - 8:23, 24:7, 24:12, 37:3, 41:9
**freely** [1] - 36:13
**French** [4] - 1:4, 1:5, 37:17, 60:23
**fresh** [1] - 29:5
**Friday** [1] - 1:12
**front** [6] - 7:5, 20:11, 20:12, 28:17, 30:21, 32:9
**furthermore** [1] - 7:6

## G

**Gaffigan** [2] - 1:24, 63:15
**game** [1] - 41:17
**GARONNE** [1] - 1:4
**Garonne** [1] - 2:8
**gather** [1] - 61:6
**Gemcor** [2] - 15:4, 15:7
**general** [4] - 10:7, 19:7, 19:9, 24:2
**German** [1] - 37:17
**german** [1] - 1:9
**Germany** [9] - 14:6, 15:17, 28:11, 30:17, 61:20, 61:21, 62:17, 62:18
**gesturing** [1] - 38:1
**given** [3] - 6:4, 9:6, 30:17
**glad** [1] - 22:18
**GmbH** [2] - 2:16
**GMBH** [1] - 1:8
**goal** [1] - 46:25
**golden** [1] - 57:24
**Google** [1] - 45:18
**govern** [1] - 24:4
**grant** [2] - 37:2, 57:5
**granted** [2] - 36:13, 46:17
**guess** [8] - 13:25, 18:1, 30:4, 37:14, 45:2, 45:7, 56:1, 62:16
**guidance** [2] - 58:6, 58:7, 58:8
**gum** [1] - 56:23

## H

**half** [2] - 28:24, 47:3
**handle** [3] - 22:13, 28:18, 36:4
**handled** [2] - 23:15, 35:23
**hands** [1] - 48:3
**happily** [1] - 4:4
**happy** [5] - 19:18, 28:3, 29:8, 47:17, 50:1
**hate** [1] - 55:5
**hats** [1] - 57:13
**Haute** [1] - 2:8
**HAUTE** [1] - 1:4
**Haute-Garonne** [1] - 2:8
**HAUTE-GARONNE** [1] - 1:4
**heads** [1] - 36:2
**hear** [14] - 5:21, 5:24, 14:1, 18:12, 35:6, 35:9, 44:7, 46:12, 50:18, 52:22, 52:23, 53:1, 54:2, 56:7
**heard** [6] - 9:7, 10:10, 12:9, 16:21, 17:3, 61:12
**hearing** [4] - 7:20, 7:22, 37:18, 45:20
**hears** [1] - 12:4
**held** [1] - 3:3
**help** [1] - 17:10
**helpful** [5] - 15:12, 36:17, 38:2, 56:12, 60:18
**hereby** [1] - 63:13
**HIGGINS** [3] - 1:17, 3:10, 3:16
**Higgins** [3] - 3:11
**high** [1] - 20:6
**highlighted** [2] - 16:12, 50:7
**highly** [1] - 28:6
**history** [2] - 6:3, 29:15
**Honor** [118] - 3:7, 3:10, 3:14, 3:18, 3:21, 4:1, 4:23, 4:25, 5:4, 5:13, 5:22, 6:2, 6:9, 6:17, 7:19, 7:18, 8:4, 8:6, 9:17, 9:20, 10:13, 11:2, 11:6, 11:12, 11:15, 12:23, 14:2, 14:18, 15:1, 15:23, 16:1, 16:11, 17:13, 18:18, 19:4, 20:16, 20:19, 21:4, 21:7, 21:12, 22:6, 22:17, 23:22, 23:24,

24:19, 25:7, 25:21, 26:6, 26:18, 26:24, 27:1, 27:7, 29:12, 30:23, 31:11, 31:24, 33:4, 33:7, 34:15, 34:17, 34:21, 34:23, 36:6, 36:8, 36:20, 37:9, 37:22, 37:25, 38:9, 38:17, 38:24, 39:1, 40:5, 40:6, 40:20, 41:10, 41:12, 41:13, 41:20, 43:25, 44:2, 44:6, 45:7, 45:13, 45:16, 46:4, 47:12, 47:14, 49:5, 49:7, 49:17, 50:4, 50:6, 50:20, 51:4, 51:19, 52:9, 53:5, 53:8, 53:11, 53:12, 53:20, 54:16, 54:24, 55:4, 56:20, 58:3, 58:13, 58:19, 59:2, 59:4, 59:22, 60:4, 60:21, 61:15, 62:5, 62:11, 63:3
**HONORABLE** [1] - 1:14
**hope** [1] - 7:23
**hoped** [1] - 11:16
**hopeful** [1] - 4:6
**hopefully** [1] - 57:17
**HOROWITZ** [1] - 1:20, 3:15, 41:20, 42:19
**Horwitz** [1] - 3:13
**hour** [3] - 43:12, 46:25, 47:4
**hours** [4] - 21:2, 21:11, 30:4, 46:16
**human** [1] - 17:7
**humanly** [1] - 58:15

## I

**idea** [2] - 16:18, 55:11
**identical** [1] - 28:11
**identify** [4] - 9:10, 24:3, 35:15, 39:16
**Ill** [2] - 45:2, 45:24
**Illinois** [2] - 2:7, 2:14
**imagine** [3] - 55:4, 58:6, 58:8
**immediate** [1] - 32:6
**impeach** [2] - 12:24, 13:1
**impeachment** [3] - 34:25, 35:20, 35:22
**imperative** [1] - 52:7
**implement** [1] - 56:18
**import** [1] - 62:7
**important** [1] - 12:17
**imported** [2] - 59:14,

62:14
**impression** [1] - 59:13
**improper** [1] - 32:19
**improperly** [1] - 28:16
**IN** [2] - 1:1, 1:2
**Inc** [1] - 2:15
**INC** [1] - 1:8
**include** [1] - 56:23
**includes** [1] - 15:3
**including** [6] - 6:6, 9:6, 32:18, 33:20, 33:25, 61:5
**inconsistency** [1] - 35:7
**inconvenient** [1] - 36:1
**incorporating** [1] - 29:21
**incredible** [1] - 59:25
**indefiniteness** [1] - 24:21
**independent** [2] - 51:10, 51:15
**independently** [2] - 50:25, 51:1
**indicated** [1] - 34:6
**individually** [1] - 48:6
**induced** [1] - 24:15
**infer** [1] - 20:10
**inflate** [1] - 12:7
**influence** [2] - 12:1, 12:3
**infringe** [2] - 51:2, 51:3
**infringement** [18] - 20:6, 24:14, 24:15, 24:16, 24:24, 25:2, 25:5, 25:8, 26:7, 26:12, 26:22, 30:16, 44:10, 44:11, 51:6, 51:9, 51:15, 62:6
**infringes** [1] - 61:11
**infringing** [1] - 50:14
**input** [1] - 4:13
**inspect** [4] - 61:16, 61:18, 61:24, 62:4
**installations** [1] - 60:2
**instance** [2] - 42:8, 45:5
**instructed** [1] - 55:17
**instructing** [2] - 31:22, 32:22
**instruction** [11] - 27:14, 28:15, 29:13, 30:3, 30:5, 30:9, 31:8, 31:14, 31:15, 31:16, 31:19
**instructions** [26] - 25:22, 27:4, 29:14, 29:17, 29:18, 29:20, 29:21, 29:24, 29:25,

30:1, 30:2, 30:7, 31:7, 31:11, 32:21, 50:1, 51:18, 52:4, 52:8, 52:10, 52:14, 52:16, 52:19, 52:23, 53:2, 53:8
**insufficiently** [1] - 35:10
**intend** [10] - 4:8, 5:7, 5:8, 10:24, 20:25, 24:9, 24:10, 30:20, 42:7, 42:9
**intense** [1] - 30:2
**intent** [1] - 8:10
**intentional** [3] - 24:25, 25:10, 58:23
**interference** [5] - 24:25, 25:11, 50:22, 50:24, 51:16
**interpretation** [1] - 14:22
**interrogatory** [4] - 15:10, 27:14, 28:16, 31:23
**invalidity** [4] - 24:17, 29:20, 44:13, 44:20
**involuntary** [1] - 58:14
**issue** [36] - 4:17, 5:14, 5:15, 7:1, 8:18, 9:10, 11:15, 12:11, 12:15, 13:25, 14:20, 16:12, 19:21, 20:20, 26:7, 27:8, 27:9, 27:15, 28:7, 28:20, 34:24, 35:23, 41:1, 42:12, 50:16, 50:17, 50:21, 51:17, 54:17, 54:20, 56:1, 56:9, 58:6, 58:20, 60:22
**issues** [34] - 4:9, 4:12, 4:14, 7:4, 10:2, 10:6, 10:16, 10:19, 10:25, 18:7, 18:8, 20:1, 20:3, 20:5, 20:8, 24:13, 25:18, 25:23, 27:3, 27:5, 27:8, 27:17, 28:10, 28:22, 30:22, 32:20, 33:9, 45:3, 45:25, 46:2, 46:15, 52:22, 58:2
**itself** [6] - 13:10, 28:15, 28:16, 41:23, 42:2, 46:16

**J**

**JAMES** [1] - 1:17
**January** [3] - 7:2, 8:17
**Jeffrey** [1] - 3:12
**JEFFREY** [1] - 1:20

**Jim** [1] - 3:10
**JMOL** [1] - 31:14
**joined** [1] - 3:23
**joint** [3] - 22:21, 36:3
**jointly** [1] - 46:16
**JOSEPH** [1] - 2:10
**Joseph** [1] - 3:21
**Judge** [5] - 3:15, 7:19, 9:1, 34:19, 44:14
**judgment** [2] - 9:2, 22:23
**juror** [4] - 47:16, 48:9, 48:13, 48:16
**jurors** [8] - 47:3, 48:2, 48:20, 48:24, 48:25, 53:24, 54:2, 55:17
**jury** [63] - 13:16, 19:24, 20:11, 20:13, 21:3, 23:9, 23:10, 24:8, 24:11, 25:21, 27:4, 28:18, 29:14, 29:17, 29:18, 30:21, 31:2, 31:3, 31:7, 31:8, 31:11, 31:16, 31:20, 31:22, 32:1, 32:9, 32:20, 32:22, 32:25, 33:2, 36:15, 36:17, 37:5, 37:16, 37:18, 38:2, 43:2, 45:19, 46:21, 46:22, 47:15, 47:19, 47:22, 48:21, 49:3, 49:14, 51:18, 52:4, 52:10, 52:20, 52:23, 53:2, 53:6, 53:14, 53:23, 54:14, 54:22, 55:1, 55:8, 56:3, 59:16, 60:17
**jury's** [1] - 56:7
**juryroom** [2] - 48:7, 48:13

**K**

**KAYE** [3] - 1:19, 2:3, 2:6
**Kaye** [1] - 3:12
**keep** [9] - 43:14, 46:17, 46:22, 47:3, 47:4, 48:2, 48:4, 58:10, 58:16
**items** [1] - 44:16
**Kelleher** [14] - 3:24, 5:3, 8:2, 16:11, 18:16, 23:23, 26:1, 26:25, 34:22, 36:7, 44:1, 47:13, 49:6, 62:3
**KELLEHER** [66] - 2:13, 5:4, 5:10, 5:16, 5:22, 8:4, 9:20, 10:2, 10:12, 11:2, 11:6,

12:23, 14:2, 14:18, 15:1, 15:16, 15:20, 15:22, 16:1, 16:6, 18:18, 19:4, 19:6, 19:9, 19:20, 20:18, 21:4, 22:6, 22:11, 23:24, 24:19, 24:21, 26:6, 26:13, 26:17, 27:1, 34:17, 34:23, 36:8, 37:9, 37:24, 39:1, 40:6, 41:12, 41:18, 42:22, 44:2, 45:16, 46:4, 47:14, 49:7, 49:16, 49:20, 49:24, 50:20, 51:19, 51:23, 53:20, 58:13, 59:4, 59:6, 59:19, 59:22, 60:21, 62:5, 63:6
**Kelleher's** [1] - 52:2
**Ken** [4] - 14:4, 15:6
**kind** [4] - 4:12, 21:15, 50:7, 51:14
**kinds** [1] - 11:23
**knowledge** [3] - 10:20, 13:7, 41:25
**Kytomaa** [1] - 44:20

**L**

**LA** [1] - 1:4
**laches** [1] - 20:4
**lack** [2] - 41:25
**language** [4] - 37:12, 37:19, 38:1, 38:6
**large** [1] - 17:19
**largely** [2] - 28:21, 60:25
**last** [12] - 7:20, 20:21, 25:21, 27:25, 29:5, 30:4, 46:1, 46:13, 59:10, 59:14, 60:22
**late** [4] - 28:6, 28:7, 28:13, 46:24
**law** [13] - 14:10, 14:12, 18:20, 21:2, 22:23, 25:12, 25:15, 27:17, 28:9, 28:14, 31:13, 51:9, 60:19
**Lawrence** [7] - 9:13, 10:14, 10:25, 11:18, 11:24, 12:14, 13:18
**lay** [1] - 40:14
**lays** [2] - 22:21, 50:15
**least** [6] - 7:1, 10:15, 17:5, 17:9, 17:25, 58:23
**leave** [10] - 19:12, 19:22, 22:2, 36:12, 36:13, 36:21, 37:1, 48:24, 56:16, 57:5

**leaves** [1] - 48:13
**left** [6] - 5:4, 17:9, 23:11, 34:9, 35:12, 59:9
**legal** [9] - 25:18, 27:3, 27:5, 27:8, 28:20, 28:22, 50:21, 51:21, 52:13
**LEONARD** [1] - 1:14
**letter** [14] - 5:19, 5:23, 6:9, 6:18, 7:4, 8:5, 21:24, 27:25, 29:1, 29:2, 39:13, 39:17, 61:1, 62:24
**liability** [1] - 11:16
**likelihood** [1] - 20:6
**likely** [3] - 37:18, 52:21, 53:14
**limine** [1] - 41:14
**limit** [1] - 14:19
**limitations** [13] - 20:20, 30:6, 30:11, 30:18, 44:14, 54:17, 54:21, 54:22, 54:23, 55:10, 56:2, 56:5, 56:10
**limited** [3] - 13:12, 35:21, 36:10
**limiting** [1] - 37:20
**Lindvall** [11] - 3:12, 23:21, 26:23, 32:7, 34:20, 36:5, 36:19, 43:24, 47:11, 49:4, 51:25
**LINDVALL** [73] - 1:20, 3:14, 4:23, 5:12, 5:15, 6:2, 6:22, 7:14, 9:17, 10:5, 10:9, 11:12, 12:10, 16:11, 17:13, 18:5, 18:15, 20:15, 21:7, 21:12, 21:19, 22:17, 23:22, 25:7, 25:20, 25:25, 26:11, 26:19, 26:24, 29:12, 30:23, 31:10, 31:24, 33:7, 34:15, 34:21, 36:6, 36:20, 36:25, 37:22, 38:9, 38:17, 38:24, 40:5, 40:20, 41:10, 43:25, 44:6, 44:8, 45:7, 45:13, 47:12, 49:5, 50:4, 50:6, 50:13, 52:2, 52:9, 53:5, 53:11, 53:18, 54:16, 55:11, 58:3, 58:9, 58:19, 59:2, 61:15, 62:10, 62:17, 62:20, 62:23, 63:3
**line** [2] - 42:14, 59:13
**list** [12] - 15:1, 17:4, 18:2, 18:6, 20:1,

40:10, 56:21, 57:18, 58:1, 59:23, 59:25
**listed** [2] - 38:14, 39:9
**listening** [1] - 16:25
**lists** [1] - 60:6
**literally** [1] - 29:5
**litigated** [1] - 28:10
**LLP** [6] - 1:17, 1:19, 2:3, 2:6, 2:10, 2:12
**location** [1] - 10:25
**logically** [1] - 56:8
**logistical** [1] - 59:6
**Looby** [2] - 57:24, 59:8
**look** [9] - 18:25, 30:24, 35:17, 35:18, 40:1, 62:12, 62:14, 63:8
**looked** [1] - 31:15
**looking** [1] - 50:10
**losing** [1] - 43:15
**loss** [1] - 27:21
**lunch** [3] - 47:2, 47:3, 47:6

## M

**machine** [1] - 60:2
**mail** [2] - 6:11, 57:23
**main** [1] - 26:3
**maintain** [2] - 6:24, 30:18
**man** [1] - 15:8
**Mangus** [4] - 15:8, 15:12, 16:13, 16:15
**marathon** [1] - 29:22
**March** [2] - 1:12, 8:5
**MAREK** [2] - 2:6, 3:18
**Marek** [1] - 3:17
**MARGUILIES** [1] - 2:3
**Marguilies** [1] - 3:16
**marked** [2] - 61:19, 61:20
**materials** [1] - 60:2
**matter** [8] - 19:19, 20:23, 21:2, 22:23, 24:2, 28:9, 34:9, 35:1
**matters** [1] - 23:15
**maximum** [3] - 38:14, 39:3, 40:8
**mean** [4] - 10:6, 21:15, 49:18, 55:18
**meaning** [1] - 42:14
**meaningful** [1] - 37:18
**means** [2] - 11:7, 55:20
**medical** [1] - 57:3
**meet** [9] - 22:19, 35:1, 42:11, 46:20, 48:6, 49:11, 53:23, 54:7,

55:7
**meeting** [1] - 42:25
**meetings** [1] - 43:12
**mentioned** [1] - 7:19
**Merit** [1] - 1:25
**met** [2] - 29:24, 41:6
**method** [5] - 26:9, 26:14, 26:20, 26:23, 47:16
**Michael** [1] - 9:13
**Michelle** [1] - 3:16
**MICHELLE** [1] - 2:6
**middle** [1] - 21:20
**might** [4] - 13:10, 15:9, 20:9, 38:2
**mind** [3] - 18:25, 46:10, 56:6
**minds** [2] - 48:3, 61:1
**minor** [1] - 29:19
**minute** [2] - 21:24, 22:15
**minutes** [1] - 47:5
**mischaracterizing** [1] - 9:25
**missed** [2] - 6:19, 30:3
**model** [1] - 31:11
**moment** [1] - 50:4
**Monday** [2] - 46:20, 53:15
**morning** [22] - 3:5, 3:6, 3:10, 3:14, 3:15, 3:18, 3:20, 3:21, 3:23, 4:7, 19:15, 19:24, 22:15, 28:4, 42:13, 43:2, 43:11, 47:4, 47:7, 47:19, 49:14, 52:20
**most** [7] - 4:9, 15:10, 20:21, 31:25, 39:3, 52:21, 53:14
**mostly** [1] - 18:1
**motion** [3] - 22:23, 23:3, 48:14
**motions** [5] - 22:6, 22:23, 23:13, 41:13, 54:10
**move** [4] - 4:7, 9:2, 37:4, 37:5
**MR** [155] - 3:10, 3:14, 3:15, 3:16, 3:21, 4:1, 4:23, 5:4, 5:10, 5:12, 5:15, 5:16, 5:22, 6:2, 6:22, 7:14, 8:4, 9:17, 9:20, 10:2, 10:5, 10:9, 10:12, 11:2, 11:6, 11:12, 12:10, 12:23, 14:2, 14:18, 15:1, 15:16, 15:20, 15:22, 16:1, 16:6, 16:11, 17:13, 18:5, 18:15, 18:18, 19:4,

19:6, 19:9, 19:20, 20:15, 20:18, 21:4, 21:7, 21:12, 21:19, 22:6, 22:11, 22:17, 23:22, 23:24, 24:19, 24:21, 25:7, 25:20, 25:25, 26:6, 26:11, 26:13, 26:17, 26:19, 26:24, 27:1, 27:7, 27:12, 29:4, 29:8, 29:12, 30:23, 31:10, 31:24, 32:6, 32:16, 33:4, 33:7, 34:15, 34:17, 34:21, 34:23, 36:6, 36:8, 36:20, 36:25, 37:9, 37:22, 37:24, 38:9, 38:17, 38:24, 39:1, 40:5, 40:6, 40:20, 41:10, 41:12, 41:18, 41:20, 42:19, 42:22, 43:25, 44:2, 44:6, 44:8, 45:7, 45:13, 45:16, 46:4, 47:12, 47:14, 49:5, 49:7, 49:16, 49:20, 49:24, 50:4, 50:6, 50:13, 50:20, 51:19, 51:23, 52:2, 52:9, 53:5, 53:11, 53:18, 53:20, 54:16, 55:11, 55:16, 55:24, 56:15, 56:20, 58:3, 58:9, 58:13, 58:19, 59:2, 59:4, 59:6, 59:19, 59:22, 60:21, 61:15, 62:5, 62:10, 62:17, 62:20, 62:23, 63:3, 63:6
**multiple** [1] - 29:24
**must** [1] - 35:21

## N

**narrow** [4] - 6:7, 6:10, 7:8, 39:10
**narrowed** [2] - 6:12, 8:21
**native** [2] - 38:1, 38:6
**nature** [1] - 54:12
**necessarily** [1] - 42:1
**necessary** [1] - 37:4
**necessitated** [1] - 9:4
**necessity** [2] - 57:4, 57:6
**need** [24] - 4:13, 5:20, 5:25, 10:21, 11:5, 22:1, 23:13, 25:19, 26:4, 31:14, 34:7, 36:12, 37:1, 37:5, 39:16, 40:14, 40:16, 40:17, 42:11, 52:18,

54:3, 55:2, 60:4, 60:14
**needed** [2] - 21:1, 29:17
**needs** [4] - 23:3, 33:12, 33:23, 37:16
**never** [4] - 6:15, 27:16, 27:23
**New** [2] - 1:21
**new** [7] - 7:22, 9:4, 9:5, 18:10, 27:9, 28:6, 29:18, 29:25, 30:1, 30:11, 40:21, 40:23, 55:2, 57:17, 60:24, 61:25, 62:7
**newly** [1] - 61:10
**newspaper** [2] - 57:13, 57:14
**next** [10] - 22:20, 23:5, 23:6, 23:19, 35:2, 36:2, 39:25, 48:16, 59:22, 63:9
**night** [4] - 27:12, 27:25, 29:5, 42:8
**nilly** [1] - 51:7
**NO** [1] - 1:9
**noises** [1] - 57:12
**non** [1] - 36:15
**non-argumentative** [1] - 36:15
**nondisclosure** [1] - 8:9
**none** [1] - 48:25
**nonetheless** [1] - 57:21
**nonjury** [1] - 20:3
**nonpatent** [1] - 25:1
**note** [1] - 8:18
**NOTE** [1] - 3:3
**noted** [1] - 38:11
**notes** [1] - 63:13
**nothing** [3] - 18:18, 42:22, 63:6
**notice** [6] - 7:11, 24:9, 30:17, 43:16, 52:25, 53:16
**noting** [1] - 28:4
**number** [2] - 4:10, 59:25

## O

**object** [4] - 7:23, 8:23, 38:20, 40:22
**objected** [1] - 40:10
**objecting** [1] - 22:12
**objection** [15] - 9:2, 9:3, 29:9, 32:16, 38:11, 40:15, 41:7, 41:8, 41:23, 41:24, 42:1, 42:15, 43:14,

43:15, 51:21
**objectionable** [1] - 13:10
**objections** [16] - 28:4, 32:18, 34:18, 35:6, 35:9, 38:16, 39:6, 39:7, 39:8, 39:9, 39:18, 40:9, 41:5, 43:1, 43:3, 43:8
**objective** [1] - 18:24
**objectively** [1] - 20:5
**obligated** [1] - 42:5
**obviously** [6] - 7:22, 11:22, 19:14, 21:22, 27:20, 49:13
**obviousness** [1] - 24:17
**OF** [1] - 1:2
**off-line** [1] - 59:13
**offer** [2] - 44:23, 53:23
**offered** [1] - 40:12
**offering** [1] - 40:18
**office** [1] - 61:23
**Officer** [1] - 14:5
**officers** [1] - 15:25
**Official** [1] - 63:15
**often** [1] - 35:24
**once** [5] - 4:15, 36:13, 40:12, 46:12, 60:16
**one** [31] - 5:5, 5:6, 11:20, 14:20, 15:16, 16:3, 18:1, 18:22, 19:6, 26:16, 27:8, 28:5, 28:23, 30:3, 30:13, 34:5, 38:18, 39:2, 40:20, 40:24, 41:22, 43:16, 45:8, 46:25, 50:1, 50:2, 50:4, 54:17, 55:18, 58:3, 59:6
**ones** [2] - 25:14, 28:12
**oOo** [1] - 3:1
**open** [1] - 3:4
**opened** [1] - 57:14
**opening** [8] - 5:22, 19:11, 19:15, 40:24, 41:2, 41:3, 41:9, 41:17
**Operating** [1] - 14:5
**operation** [1] - 40:11
**opined** [1] - 8:10
**opinion** [1] - 13:11
**opinions** [4] - 7:16, 7:22, 11:13, 12:11
**opponents** [1] - 61:6
**opportunity** [8] - 26:3, 27:4, 28:11, 45:2, 45:12, 45:24, 53:23, 61:18
**oppose** [3] - 45:5, 45:9, 45:11

**opposed** [1] - 38:8
**opposing** [2] - 37:3, 58:10
**oral** [3] - 22:7, 22:25
**orally** [4] - 22:13, 22:14, 23:8, 23:9
**order** [20] - 4:11, 4:21, 10:10, 10:12, 22:3, 23:13, 24:1, 24:2, 33:9, 38:14, 39:3, 39:9, 39:12, 40:8, 40:12, 41:7, 42:5, 44:3, 54:8, 55:23
**ordered** [1] - 4:25
**original** [2] - 30:1, 37:16
**ostentatiously** [1] - 57:15
**otherwise** [3] - 30:21, 32:2, 32:19
**outlining** [1] - 62:25
**outside** [2] - 12:12, 57:1
**overlap** [1] - 18:7
**overlaps** [1] - 18:12
**own** [2] - 28:19, 48:3

## P

**page** [3] - 4:20, 45:4, 50:3
**pages** [2] - 35:16, 60:3
**papers** [2] - 20:21, 27:9
**part** [10] - 21:2, 25:2, 25:5, 25:8, 26:22, 34:7, 42:7, 52:24, 54:2, 56:10
**particular** [5] - 12:15, 14:20, 17:18, 41:24, 53:14
**parties** [19] - 4:18, 9:12, 9:14, 19:13, 20:2, 20:7, 22:19, 23:16, 24:2, 29:23, 33:1, 35:1, 35:24, 38:20, 44:25, 46:16, 46:21, 49:8, 50:2
**partner** [1] - 15:5
**party** [5] - 24:7, 33:15, 33:24, 38:3, 43:13
**party's** [1] - 50:9
**passing** [1] - 48:23
**Patent** [1] - 50:23
**patent** [12] - 11:14, 24:14, 24:18, 24:23, 26:9, 26:20, 26:23, 30:16, 51:6, 51:9, 51:10, 51:14
**patents** [6] - 8:21, 24:16, 26:16, 41:1,

50:14, 51:3
**Patrick** [1] - 3:24
**PATRICK** [2] - 2:13
**Paul** [1] - 3:16
**PAUL** [1] - 2:3
**pause** [2] - 35:15, 50:5
**penalize** [1] - 34:4
**people** [6] - 15:2, 15:14, 15:17, 45:8, 48:9, 49:22
**per** [3] - 36:13, 46:16, 47:9
**peremptory** [1] - 48:22
**period** [1] - 61:9
**peripheral** [1] - 11:15
**permit** [1] - 51:7
**permitted** [2] - 33:12, 49:8
**person** [5] - 16:7, 17:10, 18:2, 18:3
**personal** [2] - 10:20, 41:25
**personally** [1] - 10:23
**perspective** [3] - 25:19, 32:5, 51:21
**Peters** [4] - 14:5, 18:5, 38:19, 39:7
**petty** [1] - 56:21
**Phase** [3] - 45:2, 45:23, 46:3
**phase** [1] - 46:6
**phases** [2] - 45:17, 46:9
**phrase** [1] - 8:7
**phrased** [1] - 55:20
**physical** [2] - 61:16, 62:12
**pieces** [1] - 7:7
**place** [2] - 5:1, 60:3
**places** [2] - 4:10, 60:3
**Plaintiff** [1] - 9:16
**plaintiff** [4] - 29:4, 46:13, 53:4, 58:2
**Plaintiffs** [2] - 1:6, 2:8
**plaintiffs** [6] - 3:11, 8:22, 29:3, 38:8, 38:11, 58:25
**plaintiffs'** [3] - 29:11, 37:13, 61:13
**plan** [3] - 11:21, 27:6, 39:19
**planning** [1] - 8:12
**play** [4] - 28:22, 35:16, 37:13, 39:21
**played** [1] - 39:4
**playing** [2] - 38:3, 39:14
**plays** [1] - 39:24
**pleadings** [1] - 27:18
**pleas** [1] - 3:9

**plenty** [1] - 49:22
**point** [9] - 13:4, 13:17, 29:11, 30:20, 31:9, 33:3, 33:6, 36:9, 38:21
**pointed** [1] - 60:25
**pointing** [1] - 38:2
**policy** [1] - 17:5
**pool** [3] - 47:23, 48:20, 49:21
**portions** [2] - 24:1, 35:11
**position** [4] - 6:24, 37:13, 51:4, 52:3
**positions** [1] - 28:23
**possibility** [2] - 15:22, 17:22
**possible** [1] - 58:16
**possibly** [1] - 12:1
**post** [4] - 9:3, 53:22, 54:3, 54:25
**post-trial** [4] - 9:3, 53:22, 54:3, 54:25
**potential** [1] - 48:20
**powerless** [1] - 14:16
**practice** [1] - 19:17
**precise** [1] - 19:20
**precisely** [1] - 23:4
**preempted** [1] - 51:5
**preemption** [1] - 50:21
**preference** [1] - 62:19
**prejudice** [4] - 7:15, 9:8, 14:23, 16:2
**prejudicial** [1] - 28:6
**preliminary** [5] - 49:25, 52:8, 52:14, 52:16, 52:18
**prepare** [1] - 17:10
**prepared** [1] - 54:4
**preparing** [1] - 21:20
**present** [6] - 20:9, 28:1, 29:8, 44:9, 44:15, 45:2
**presentation** [1] - 44:13
**presented** [2] - 20:10, 27:13
**preserve** [1] - 23:13
**President** [1] - 14:4
**president** [1] - 15:6
**press** [1] - 41:8
**presses** [1] - 29:5
**Pretrial** [2] - 1:12, 3:3
**pretrial** [20] - 4:3, 4:11, 4:21, 6:8, 6:11, 10:10, 10:12, 24:1, 24:2, 27:17, 33:9, 38:14, 39:3, 39:9, 39:12, 40:8, 40:11, 41:7, 42:5, 63:11

**pretty** [3] - 8:6, 25:25, 42:23
**prevail** [1] - 9:3
**previously** [2] - 8:25, 13:15
**printed** [1] - 60:5
**probative** [1] - 13:9
**problem** [5] - 5:13, 8:1, 17:21, 17:23, 21:19, 32:4, 32:7, 51:20, 62:4
**problematic** [1] - 28:8
**problems** [1] - 11:8
**procedurally** [1] - 61:14
**procedure** [1] - 22:11
**proceed** [2] - 4:8, 46:9
**proceeding** [2] - 21:11, 63:13
**process** [8] - 21:16, 39:11, 42:24, 43:17, 48:19, 60:24
**processes** [1] - 42:16
**product** [3] - 11:9, 61:25, 62:14
**products** [2] - 11:16, 50:10
**progression** [1] - 45:20
**prong** [1] - 20:6
**proof** [10] - 44:3, 44:9, 44:13, 44:15, 44:16, 44:24, 44:25, 45:3, 46:1, 46:3
**proper** [4] - 30:17, 32:8, 32:12, 32:14
**proposal** [12] - 22:21, 22:24, 23:19, 35:5, 36:3, 50:11, 50:19, 55:16, 55:21, 55:22
**proposals** [7] - 22:22, 22:25, 23:19, 35:2, 35:5, 36:3, 54:9
**propose** [3] - 23:7, 23:8, 50:13
**proposed** [10] - 4:21, 13:24, 17:24, 28:15, 29:18, 31:8, 35:6, 35:9, 42:24, 47:25
**proposes** [1] - 44:8
**proposing** [1] - 35:18
**proposition** [2] - 14:11, 14:13
**prospective** [1] - 25:11
**provide** [1] - 47:2
**provided** [1] - 40:21
**pulled** [2] - 4:8, 4:17
**punitive** [3] - 25:15, 51:8, 51:12
**purchasing** [1] - 50:9

**purely** [1] - 12:13
**purposely** [1] - 6:23
**purposes** [1] - 57:10
**pursuant** [1] - 21:16
**put** [3] - 3:8, 29:14, 31:14, 31:17, 36:2
**puts** [1] - 55:1

## Q

**questions** [33] - 8:11, 22:5, 22:16, 23:20, 34:11, 34:20, 36:5, 36:18, 37:7, 37:21, 37:23, 40:4, 40:19, 42:21, 43:4, 43:23, 47:10, 47:24, 48:1, 48:5, 48:10, 48:11, 49:4, 53:3, 53:19, 53:20, 54:5, 54:13, 54:24, 55:4, 55:9, 55:19, 56:11
**quick** [2] - 29:15, 36:9
**quickly** [1] - 4:7
**quite** [4] - 4:19, 28:17, 50:15, 60:1

## R

**raise** [2] - 4:14, 43:3
**raised** [2] - 9:9, 22:18
**raises** [1] - 43:14
**raising** [1] - 48:3
**randomly** [1] - 48:19
**rare** [1] - 42:14
**rather** [6] - 22:13, 24:21, 26:8, 26:14, 62:13, 62:15
**reach** [1] - 19:18
**read** [9] - 24:7, 24:11, 31:6, 37:13, 39:4, 39:21, 47:24, 48:1, 57:13
**reading** [1] - 35:22, 39:14
**ready** [2] - 53:1, 54:13
**realize** [1] - 31:12
**realized** [1] - 54:16
**reallocate** [1] - 43:18
**really** [13] - 11:4, 11:15, 15:2, 15:3, 25:12, 25:22, 27:16, 30:24, 31:2, 42:1, 44:21, 44:23, 47:8
**reason** [2] - 31:10, 57:21
**reasons** [2] - 44:21, 56:14
**REATH** [2] - 2:10, 2:12
**Reath** [1] - 3:22

**rebut** [4] - 11:22, 16:16, 44:16, 45:24
**rebuttal** [2] - 44:24, 45:2
**received** [5] - 5:6, 14:11, 15:2, 40:11, 61:22
**receiving** [1] - 63:9
**recent** [1] - 20:21
**recently** [3] - 6:20, 38:18, 40:22
**recess** [1] - 63:10
**recognize** [1] - 18:22
**recognized** [1] - 6:10
**recollection** [1] - 6:25
**record** [5] - 3:9, 8:4, 38:12, 48:9, 54:1
**recross** [1] - 36:11
**recurring** [1] - 34:24
**red** [3] - 60:25, 61:7, 62:7
**redesign** [1] - 61:4
**redirect** [2] - 35:12, 36:11
**references** [1] - 8:20
**referring** [1] - 29:1
**reflected** [1] - 52:14
**refused** [1] - 54:23
**regard** [3] - 10:18, 50:23, 51:10
**regarding** [4] - 9:15, 13:21, 33:9, 46:15
**regardless** [5] - 13:1, 39:22, 55:9, 55:17, 58:16
**Registered** [1] - 1:25
**related** [2] - 25:12, 25:15
**relates** [3] - 27:8, 30:6, 50:20
**relating** [1] - 12:16
**relief** [2] - 7:12, 31:13
**remain** [1] - 53:24
**remaining** [2] - 39:18, 55:9
**remedies** [2] - 51:6, 51:14
**remember** [1] - 60:22
**renew** [2] - 7:4, 9:3
**renewed** [2] - 8:18, 8:19
**renewing** [1] - 54:9
**reoccurring** [1] - 30:10
**replacement** [1] - 38:21
**reply** [1] - 8:5
**report** [11] - 5:5, 6:16, 7:10, 7:17, 7:21, 7:25, 8:8, 8:11, 8:13, 12:12, 13:13

**Reporter** [2] - 1:25, 63:15
**REPORTER'S** [1] - 3:3
**reports** [1] - 4:24
**representations** [1] - 9:7
**representative** [8] - 14:16, 14:25, 15:11, 15:15, 16:5, 17:10, 17:21, 18:4
**representatives** [4] - 13:24, 14:3, 14:8, 17:25
**represented** [1] - 17:7
**request** [2] - 8:15, 8:16
**requested** [4] - 21:2, 21:11, 21:14, 46:16
**require** [6] - 13:18, 16:3, 35:14, 55:8, 61:9, 61:14
**requires** [2] - 21:24, 50:24
**reserve** [5] - 9:1, 21:17, 32:11, 32:16, 34:3
**resolve** [7] - 26:4, 27:6, 47:18, 52:7, 52:13, 54:10, 63:1
**resolved** [1] - 42:12
**respect** [14] - 5:17, 9:13, 13:20, 24:6, 24:25, 25:9, 26:23, 30:19, 30:22, 32:25, 36:20, 40:24, 41:21, 50:22
**respond** [3] - 3:6, 17:11, 44:11
**responded** [2] - 5:23, 6:19
**response** [7] - 5:6, 6:19, 6:20, 7:1, 7:13, 14:11, 29:11
**responses** [1] - 45:20
**rest** [3] - 4:11, 43:19, 54:24
**rests** [1] - 23:4
**result** [4] - 5:2, 6:17, 16:25, 60:23
**review** [2] - 35:17, 35:19
**reviewed** [1] - 47:17
**revisit** [1] - 29:17
**rewritten** [1] - 29:19
**rights** [2] - 23:14, 61:11
**ringers** [1] - 57:11
**ripe** [1] - 11:4
**room** [2] - 49:18, 49:23
**roughly** [1] - 24:10

**Rule** [2] - 14:7, 14:19
**rule** [6] - 7:19, 9:1, 14:11, 17:15, 34:19, 55:4
**ruled** [2] - 41:13, 41:15
**rules** [1] - 17:16
**ruling** [6] - 18:23, 19:3, 37:24, 38:10, 39:19, 41:21
**rulings** [2] - 7:3, 39:22
**running** [1] - 39:24

**S**

**S.A.S** [2] - 1:4, 2:8
**safe** [1] - 31:18
**satisfied** [1] - 60:6
**save** [1] - 32:13
**saw** [3] - 12:8, 13:8, 31:12
**schedule** [1] - 46:19
**scheduled** [2] - 4:4, 16:4
**SCHOELL** [3] - 2:10, 3:21, 4:1
**Schoell** [1] - 3:22
**Scholar** [1] - 3:12
**SCHOLER** [3] - 1:19, 2:3, 2:6
**scope** [4] - 6:13, 7:9, 8:8, 8:24
**SCOTT** [1] - 1:20
**Scott** [1] - 3:12
**screen** [5] - 59:7, 59:9, 59:14, 59:16, 59:18
**se** [1] - 47:9
**seat** [1] - 48:21
**seated** [1] - 47:23
**second** [6] - 18:19, 22:8, 28:8, 40:24, 44:22, 60:8
**see** [18] - 10:23, 13:11, 19:13, 26:12, 28:9, 29:10, 35:3, 37:5, 37:16, 47:17, 50:1, 52:2, 52:14, 53:11, 54:20, 57:14, 57:25, 59:6
**seeing** [3] - 37:19, 59:17, 63:9
**seek** [1] - 11:24
**seeking** [2] - 11:11, 45:6
**seeks** [1] - 28:10
**seem** [1] - 9:14
**selection** [6] - 19:24, 47:15, 47:20, 49:3, 49:14, 52:20

**selling** [2] - 61:2, 61:4
**send** [3] - 29:4, 48:8, 61:22
**sending** [1] - 29:2, 62:15
**sends** [1] - 42:8
**sense** [1] - 14:23
**sent** [3] - 6:11, 6:17, 27:25
**separate** [1] - 21:10
**September** [1] - 18:11
**sequester** [1] - 16:14
**sequestered** [7] - 9:14, 10:7, 10:14, 11:5, 13:19, 13:20, 19:10
**sequestering** [1] - 9:11
**sequestration** [2] - 19:7, 49:7
**serve** [6] - 5:6, 5:7, 5:8, 16:4, 18:3, 57:23
**session** [1] - 44:19
**set** [5] - 39:12, 51:6, 60:5, 60:14, 60:17
**sets** [1] - 60:19
**sheet** [4] - 32:24, 40:23, 55:15, 56:17
**shift** [1] - 34:5
**short** [2] - 54:7, 61:9
**show** [6] - 35:7, 38:5, 40:16, 42:7, 58:11, 60:13
**shown** [1] - 40:12
**side** [14] - 9:4, 14:12, 23:4, 24:9, 34:5, 42:6, 43:16, 45:21, 46:16, 48:8, 48:21, 56:23, 62:15
**side's** [1] - 33:22
**sidebar** [1] - 23:10
**sides** [8] - 45:12, 46:8, 48:12, 48:14, 53:25, 54:1, 59:24, 60:10
**silent** [1] - 47:16
**silently** [1] - 48:22
**similar** [3] - 30:15, 31:3, 56:1
**sit** [1] - 11:24
**sitting** [4] - 12:17, 13:1, 16:24, 23:9
**situation** [7] - 16:22, 17:18, 18:13, 31:25, 44:9, 44:24, 55:2
**six** [2] - 7:7, 8:20
**skimpy** [1] - 15:10
**smaller** [1] - 59:15
**sold** [1] - 61:8
**someone** [3] - 58:14, 61:22, 62:15

**sometimes** [3] - 35:25, 37:25
**somewhat** [2] - 6:12, 27:21
**somewhere** [1] - 49:21
**soon** [1] - 54:13
**sorry** [2] - 24:19, 50:6
**sort** [2] - 28:20, 34:2
**sounds** [2] - 27:23, 55:11
**sparse** [1] - 7:21
**speaking** [1] - 38:1
**special** [1] - 27:14
**specific** [5] - 23:12, 23:18, 28:4, 35:2, 55:21
**specifically** [1] - 36:4
**spell** [1] - 10:13
**spent** [1] - 25:21
**staff** [2] - 57:5, 59:13
**stand** [4] - 7:16, 17:1, 36:24, 43:10
**standing** [2] - 20:5, 48:3
**standpoint** [2] - 7:24, 31:4
**STARGATT** [1] - 1:17
**STARK** [1] - 1:14
**start** [2] - 4:10, 13:8
**started** [2] - 18:10, 45:4
**starts** [1] - 18:24
**state** [7] - 7:9, 8:7, 25:10, 25:12, 25:15, 50:22, 51:9
**statement** [5] - 19:11, 41:2, 41:3, 41:9, 41:17
**statements** [4] - 19:15, 36:14, 36:15, 40:25
**states** [1] - 50:24
**STATES** [1] - 1:1
**States** [3] - 10:16, 61:8, 62:14
**statute** [12] - 20:19, 30:6, 30:10, 30:18, 44:13, 51:11, 54:17, 54:20, 54:22, 54:23, 55:10, 56:2, 56:4, 56:10
**stay** [2] - 46:24
**stenographic** [1] - 63:13
**step** [1] - 45:5
**stick** [1] - 7:24
**sticking** [1] - 8:12
**still** [13] - 6:24, 7:6, 13:25, 18:11, 23:9, 38:19, 41:22, 48:20,

49:1, 49:17, 59:17, 61:11
**story** [1] - 11:22
**straight** [2] - 58:10, 58:16
**strike** [1] - 48:14
**strikes** [1] - 48:22
**struck** [1] - 47:16
**stuff** [1] - 57:12
**submission** [4] - 22:20, 22:21, 23:2, 57:22
**submissions** [3] - 57:19, 57:20, 63:9
**submitted** [2] - 60:16, 61:1
**substantive** [3] - 42:1, 56:3, 56:9
**succeeding** [1] - 56:11
**suck** [1] - 56:24
**suddenly** [2] - 13:13, 10:22
**Sunday** [2] - 5:7, 5:9
**sunglasses** [1] - 57:15
**supplemental** [2] - 4:24, 5:5
**supplementation** [1] - 38:23
**support** [1] - 14:12
**Supreme** [1] - 14:19
**surprises** [1] - 7:23
**synonym** [1] - 8:8
**SYSTEMS** [1] - 1:4
**Systems** [1] - 2:8

## T

**tainted** [1] - 16:19
**TAYLOR** [1] - 1:17
**telephone** [1] - 61:20
**ten** [5] - 11:21, 21:2, 21:11, 43:12, 46:16
**tends** [1] - 36:16
**terms** [9] - 24:13, 27:2, 38:13, 39:4, 40:7, 46:19, 47:15, 53:22, 55:20
**testify** [2] - 16:19, 33:13
**testifying** [9] - 9:15, 13:8, 13:14, 15:9, 18:9, 19:10, 20:11, 33:10, 36:16
**testimony** [27] - 8:24, 10:22, 10:24, 11:20, 11:25, 12:1, 12:3, 12:4, 12:7, 12:18, 12:24, 13:20, 16:13,

16:16, 16:20, 17:2, 17:23, 18:7, 18:11, 18:12, 34:19, 34:25, 35:7, 39:14, 39:15, 42:16
**THE** [154] - 1:1, 1:2, 3:5, 3:8, 3:19, 3:25, 4:2, 5:3, 5:8, 5:11, 5:14, 5:17, 5:24, 6:20, 6:25, 8:2, 8:14, 9:18, 9:24, 10:4, 10:8, 10:11, 10:24, 11:4, 11:11, 12:6, 12:21, 13:3, 14:14, 14:21, 15:13, 15:19, 15:21, 15:24, 16:2, 16:9, 17:5, 17:24, 18:14, 18:16, 18:19, 18:21, 19:5, 19:8, 19:12, 19:22, 20:17, 20:25, 21:5, 21:10, 21:13, 21:21, 22:8, 22:14, 22:18, 23:23, 23:25, 24:20, 24:23, 25:17, 25:24, 26:2, 26:10, 26:15, 26:21, 26:25, 27:2, 27:11, 29:1, 29:7, 29:10, 30:19, 31:6, 31:21, 32:4, 32:15, 32:17, 33:5, 33:8, 34:16, 34:18, 34:22, 34:24, 36:7, 36:9, 36:23, 37:1, 37:10, 37:23, 38:7, 38:10, 38:22, 38:25, 39:2, 40:7, 41:4, 41:11, 41:15, 41:19, 42:3, 42:20, 42:23, 44:1, 44:3, 44:7, 45:1, 45:11, 45:14, 45:22, 46:5, 47:13, 47:15, 49:6, 49:10, 49:18, 49:21, 49:25, 50:11, 50:18, 51:17, 51:20, 51:24, 52:6, 52:12, 53:9, 53:13, 53:19, 53:21, 55:6, 55:13, 55:21, 55:25, 56:16, 56:21, 58:8, 58:12, 58:15, 58:22, 59:3, 59:5, 59:8, 59:12, 59:21, 60:8, 60:10, 61:13, 62:3, 62:8, 62:13, 62:18, 62:22, 62:24, 63:5, 63:7
**themselves** [1] - 60:1
**theories** [1] - 51:2
**therefore** [1] - 7:5
**thinking** [2] - 46:10, 57:18
**thinks** [1] - 32:2

**third** [3] - 9:10, 28:13, 30:13
**thoughts** [1] - 33:11
**three** [5] - 18:23, 46:11, 47:22, 48:8, 48:22
**Thursday** [4] - 22:20, 23:19, 35:2, 36:2
**timing** [1] - 23:1
**today** [4] - 3:12, 9:7, 62:25, 63:8
**together** [2] - 7:2, 36:2
**tolled** [1] - 31:20
**tolling** [12] - 20:22, 21:9, 27:15, 28:10, 30:14, 30:20, 31:9, 32:23, 33:1, 54:18, 55:1, 56:13
**tolls** [1] - 30:11
**tomorrow** [1] - 42:10
**took** [1] - 29:25
**tort** [1] - 50:22
**tortious** [2] - 50:22, 51:16
**total** [1] - 30:24
**touch** [1] - 4:16
**touched** [1] - 4:15
**towards** [1] - 39:25
**track** [4] - 43:14, 46:17, 48:2, 48:4
**trade** [8] - 11:14, 24:24, 25:9, 25:12, 30:16, 44:10, 44:11, 51:2
**transcript** [1] - 63:13
**transcripts** [1] - 35:22
**transition** [1] - 36:14
**translated** [1] - 37:15
**translation** [2] - 33:21, 33:25
**translator** [6] - 33:12, 33:13, 33:14, 33:18, 33:23, 34:7
**translators** [1] - 33:10
**trap** [1] - 62:9
**treat** [2] - 12:14, 24:7
**trial** [51] - 4:4, 5:18, 9:3, 9:4, 9:5, 11:7, 13:9, 15:3, 17:12, 19:1, 19:2, 21:15, 21:20, 22:1, 25:3, 25:6, 25:8, 26:22, 27:5, 32:14, 35:3, 36:1, 36:4, 39:11, 41:9, 44:3, 45:18, 46:7, 46:15, 46:19, 47:9, 52:24, 53:7, 53:10, 53:22, 54:3, 54:25, 55:2, 55:5, 55:25, 57:11, 57:17, 57:18, 57:22, 58:17,

59:10, 59:14, 60:15, 61:7, 63:9
**trials** [4] - 23:16, 45:8, 58:4, 58:20
**tried** [2] - 20:3, 24:13
**trouble** [1] - 59:17
**true** [1] - 63:13
**truly** [1] - 58:14
**truth** [1] - 16:19
**try** [8] - 16:16, 31:14, 33:17, 43:7, 43:14, 47:3, 47:4, 54:10
**trying** [1] - 62:9
**Tuesday** [1] - 53:15
**turn** [5] - 4:21, 11:16, 48:14, 57:11, 60:16
**turnaround** [1] - 54:7
**turned** [1] - 56:4
**turns** [1] - 54:24
**twist** [1] - 28:23
**two** [13] - 8:21, 11:21, 14:3, 16:22, 17:24, 17:25, 24:16, 27:12, 29:13, 29:23, 39:13, 58:20, 60:19
**type** [5] - 11:17, 16:20, 17:2, 30:10, 45:12
**typical** [1] - 44:8
**typically** [2] - 34:25, 37:2

## U

**U.S** [4] - 15:5, 40:25, 61:5, 63:16
**U.S.D.C.J** [1] - 1:14
**ultimately** [2] - 20:20, 20:23
**unanimously** [1] - 46:23
**unclear** [2] - 4:18, 25:2
**uncontested** [2] - 24:6, 24:8
**under** [5] - 14:7, 34:19, 42:5, 51:8, 59:13
**underlie** [1] - 27:22
**underlying** [1] - 51:21
**understood** [1] - 31:7
**unfair** [2] - 9:8, 24:24, 25:10
**unfairness** [1] - 34:3
**unfettered** [1] - 14:15
**unintended** [1] - 60:11
**UNITED** [1] - 1:1
**United** [3] - 10:16, 61:8, 62:14
**universe** [3] - 38:15, 40:8, 51:14

**unless** [3] - 49:18, 52:17, 57:20
**untimely** [4] - 6:24, 7:5, 7:6, 32:18
**up** [29] - 4:10, 4:20, 7:2, 7:16, 13:11, 13:25, 14:24, 16:18, 17:1, 20:22, 21:8, 26:18, 27:16, 28:7, 34:9, 39:24, 42:15, 43:9, 44:11, 44:19, 45:8, 48:3, 48:12, 49:15, 50:7, 51:17, 55:5, 56:13
**USA** [5] - 1:8, 2:15, 14:5, 15:6, 15:17
**ut** [1] - 28:5

## V

**various** [2] - 22:12, 25:14
**verdict** [16] - 26:12, 27:15, 28:15, 31:17, 31:19, 32:23, 52:21, 53:1, 53:7, 54:5, 54:9, 54:14, 54:21, 55:15, 55:19, 56:17
**video** [2] - 35:20, 39:24
**view** [7] - 10:11, 14:14, 14:22, 40:7, 45:15, 55:9, 61:13
**views** [4] - 23:12, 23:17, 56:7, 56:11
**voir** [5] - 47:17, 47:19, 48:1, 49:9, 49:10

## W

**wait** [2] - 52:3, 61:17
**waiting** [1] - 38:19
**waived** [1] - 43:8
**waiver** [1] - 20:4
**walk** [1] - 37:4
**wants** [2] - 21:25, 44:18
**Washington** [1] - 2:4
**water** [1] - 57:8
**ways** [1] - 35:24
**wear** [2] - 57:13, 57:15
**Wednesday** [1] - 27:12
**week** [6] - 16:8, 25:21, 29:16, 46:7, 62:25, 63:9
**weekend** [1] - 57:22
**weeks** [2] - 5:6, 61:1
**welcome** [2] - 3:19, 3:25

**whereas** [1] - 51:10
**whereby** [1] - 48:19
**whole** [3] - 16:24, 34:7, 34:8
**willful** [2] - 20:6, 24:16
**willy** [1] - 51:7
**willy-nilly** [1] - 51:7
**Wilmington** [1] - 1:11
**winning** [1] - 43:15
**wish** [6] - 4:16, 14:15, 24:12, 50:2, 53:23, 53:24
**witness** [42] - 9:13, 9:21, 9:22, 9:25, 10:14, 10:15, 10:21, 12:13, 12:15, 13:4, 13:6, 13:14, 16:4, 18:2, 33:11, 33:19, 33:23, 33:24, 34:10, 35:8, 35:17, 36:13, 36:16, 36:21, 36:23, 38:18, 39:19, 39:23, 39:25, 40:12, 40:17, 41:24, 42:7, 42:14, 42:25, 43:9, 60:6, 60:18, 61:20
**Witness** [1] - 42:9
**witness's** [2] - 39:14
**witnesses** [34] - 9:11, 9:15, 11:7, 12:5, 12:18, 13:2, 13:21, 14:10, 15:18, 16:14, 16:18, 16:23, 16:25, 17:3, 18:8, 19:9, 19:10, 20:11, 20:18, 33:9, 33:10, 36:10, 36:19, 37:8, 37:25, 43:5, 49:8, 49:17, 49:19, 57:3, 58:4, 58:9, 58:10
**witnesses'** [1] - 17:23
**word** [1] - 46:2
**works** [3] - 9:23, 11:19, 61:4
**world** [2] - 10:23, 11:8
**worldwide** [1] - 61:5
**writing** [5] - 22:1, 22:3, 22:7, 23:1
**written** [8] - 21:14, 21:18, 23:2, 24:17, 24:22, 35:22, 57:20, 57:22
**wrongful** [2] - 50:25, 51:1
**wrote** [1] - 14:19

## Y

**years** [6] - 11:21, 13:25, 15:7, 18:23, 31:20, 47:22

**yesterday** [1] - 56:1
**York** [2] - 1:21
**YOUNG** [1] - 1:17
**Young** [1] - 3:11

EXHIBIT 11

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                               - - -

 4   ATELIERS DE LA HAUTE-GARONNE (French  : CIVIL ACTION
     Corporation) and F2C2 SYSTEMS S.A.S.  :
 5   (French Corporation),                 :
                                           :
 6              Plaintiffs,                 :
                                           :
 7         v.                               :
                                           :
 8   BROETJE AUTOMATION-USA INC. (Delaware  :
     Corporation), BROETJE AUTOMATION GMBH  :
 9   (German Corporation),                 :
                                           : NO. 09-598-LPS
10              Defendants.
                               - - -
11
                        Wilmington, Delaware
12                  Monday, September 19, 2011
                        Pretrial Conference
13
                               - - -
14
     BEFORE:         HONORABLE LEONARD P. STARK, U.S.D.C.J.
15
                               - - -
16   APPEARANCES:

17
                 YOUNG CONAWAY STARGATT & TAYLOR, LLP
18               BY:  MELANIE K. SHARP, ESQ., and
                      MONTE T. SQUIRE, ESQ.
19
                      and
20
                 KAYE SCHOLER, LLP
21               BY:  SCOTT G. LINDVALL, ESQ., and
                      SARAH WELBORNE SAUNDERS, ESQ.
22               (New York, New York)

23                        Counsel for Plaintiffs Ateliers De La
                          Haute-Garonne and F2C2 Systems S.A.S.
24

25                                Brian P. Gaffigan
                                  Registered Merit Reporter
```

```
1    APPEARANCES:   (Continued)

2

3                   DRINKER BIDDLE & REATH,, LLP
                    BY:  TODD C. SCHILTZ, ESQ., and
4                        KAREN V. SULLIVAN, ESQ.

5                        and

6                   DRINKER BIDDLE & REATH,, LLP
                    BY:  PATRICK J. KELLEHER, ESQ.,
7                        DARREN S. CAHR, ESQ., and
                         CARRIE A. BEYER, ESQ.
8                        (Chicago, Illinois)

9                             Counsel for Broetje Automation-USA Inc.
                              and Broetje Automation GmbH

10

11

12

13

14                            - oOo -

15                      P R O C E E D I N G S

16              (REPORTER'S NOTE:  Pretrial conference was held

17   in open court, beginning at 1:31 p.m.)

18              THE COURT:  Good afternoon, everyone.

19              (The attorneys respond, "Good afternoon.)

20              THE COURT:  Let's start by having you note your

21   appearances on the record, please.

22              MR. LINDVALL:  Your Honor, my name is Scott

23   Lindvall.  I'm counsel for the plaintiffs, AHG and F2C2.

24   With me is Sarah Saunders, Melanie Sharp and Monte Squire.

25              THE COURT:  Okay.  Thank you very much.
```

```
 1              MR. SCHILTZ:  Your Honor, Todd Schiltz of

 2    Drinker, Biddle & Reath.  With me is Patrick Kelleher,

 3    Darren Cahr, and Carrie Beyer.

 4              THE COURT:  Okay.

 5              MR. SCHILTZ:  Thank you, your Honor.

 6              THE COURT:  Thank you very much.  Welcome to all

 7    of you.

 8              So we're here for the pretrial conference for

 9    the trial that will begin next Monday.  Let me tell you how

10    we'll proceed today.

11              First, I will want to hear brief argument on the

12    pending motions in limine.  I will give each side 15 minutes

13    to address whatever motions they wish in whatever order they

14    wish.  After that, I'm going to hear argument on the other

15    pending motions.  I believe there are ten of them.  And I'll

16    give each side up to a half hour, again, to address any of

17    those ten in with whichever order they choose.

18              After we get through all of that, we'll go

19    through the proposed pretrial order and I'll tell you some

20    things about what the trial is going to look like.  And,

21              Finally, I will give an opportunity for each

22    side to raise any additional issues that they wish to raise.

23    So that's our agenda for today.

24              Let's begin with the motions in limine.  We'll

25    hear from the plaintiffs first to address whichever of the
```

1    motions in limine they wish.  I'll give you a total of

2    15 minutes, as I said.

3                MR. LINDVALL:  Good afternoon, your Honor.

4                THE COURT:  Good afternoon.

5                MR. LINDVALL:  I'm going to address the Motion

6    in Limine No. 1 for the plaintiffs which is shown in their

7    pretrial order as Exhibit 15.  In this one, this motion in

8    limine addresses an issue which I think actually overrides

9    or touches on some other issues in other briefing, and this

10   has to do with foreign law.

11               What Broetje would like to do is to introduce in

12   front of the jury the German decision that was done in this

13   case; which is on appeal, by the way; a French decision on

14   this case; which, again, is on appeal; and also Dr. Budach's

15   opinion on a European patent.

16               In each one of these situations, these

17   decisions, the German decision, the French decision and

18   Dr. Budach's opinion, rely on foreign law; and they want to

19   rely on this foreign law to show that they have, at least on

20   a subjective basis, a good faith basis to continue to

21   manufacture this product, which we believe is infringing our

22   patents.

23               The problem we have here is the jury is going to

24   have to get some understanding about what the differences

25   are between German law, French law and, with respect to

1    Dr. Budach's opinion, also German law or whatever law he did

2    apply.  We're not quite sure.  Otherwise, they're not going

3    to have a firm grasp of what the significance of these

4    opinions are.  All they're going to hear is that -- and you

5    can be guaranteed they'll get Broetje to say we have one in

6    Germany, we have one in France, and we have this opinion

7    from Dr. Budach.  And it's on these European patents which

8    are going to say they are the same patents.

9          The problem we have here is we have a different

10   patent that all of these cases rely on, different claim

11   language.  It's not even the same claim language.  There are

12   differences in the claim language; but, most importantly, we

13   have different law.

14         THE COURT:  It seems to me that not withstanding

15   all of that, which you will be free to argue to the jury,

16   that it's minimally relevant, and that the risk of confusion

17   can be addressed through proper instruction.  It's minimally

18   relevant at least to willfulness, which leads me to the

19   question which I have about a number of these motions.

20         I'm afraid with the willfulness allegation

21   that that is going to allow a lot of things to get in that

22   perhaps both sides don't really want this case to become

23   about.  Have you considered whether you wish instead to have

24   a separate trial on willfulness?

25         MR. LINDVALL:  Your Honor, we would rather have

1   one trial.  Our client is one of limited means and to have a

2   second trial is expensive.

3              THE COURT:  Okay.  Then I think this foreign law

4   is going to come in.  You can continue to argue if you want,

5   but I'm pretty sure I'm going to deny the motion.

6              MR. LINDVALL:  Your Honor, if you were to deny

7   the motion, we would request that we have an opportunity to

8   present some type of jury instruction so that the jury would

9   understand just because a German court has found in their

10  favor doesn't necessarily mean that that is binding on there

11  or somehow is estopped.

12             THE COURT:  No, I think it will be proper to

13  give such an instruction, so you certainly should feel free

14  to propose one.

15             MR. LINDVALL:  I don't have anything else to

16  say.

17             There will be one difficulty.  It will require

18  attorney argument.  Neither party has presented any type of

19  witness who is going to discuss the differences between

20  German and French and U.S. law.

21             THE COURT:  Certainly, you can't argue anything

22  that is not in evidence.

23             MR. LINDVALL:  Okay.  Thank you, your Honor.

24             THE COURT:  All right.

25             MS. SHARP:  Good afternoon, your Honor.  Just a

1    few more comments in our motions in limine and a request for

2    clarification.

3                In the 15 minutes that we were allocated, did

4    your Honor intend we would also be responding?

5                THE COURT:  Yes.  You have a total of

6    15 minutes.  You can address all seven; you can go first on

7    theirs, if you want; or you can reserve your time.

8                MS. SHARP:  Okay.  Then my preference would be

9    to reserve a bit of time and address very briefly our Motion

10   in Limine 2 on fault documents and motion in limine 3 on

11   round tubes.

12               On the fault documents, the issue is pretty

13   straightforward, but perhaps this is another thing that your

14   Honor had in mind in your earlier comments.  There are

15   certain documents that deal with a very limited number, one

16   to two percentage rate of failure of AHG products, and the

17   defense wishes to go into those.  We wish to preclude them.

18               The argument and issues are very similar to an

19   issue that was raised in Braun in connection with FDA needle

20   sticks.  If the Court has any questions on those issues, I

21   am be happy to answer those.

22               THE COURT:  I do.  I do think it is similar.  My

23   concern is this trial becoming about you all have a history.

24   There is a relationship.  There were good days, there were

25   bad days.  You think it ended because they copied.  They

1    think it ended or at least say they think it ended because

2    your product wasn't any good.

3             It seems to me all of that is just a big

4    distraction from what this case really should be about, but

5    if I'm going to let one side get into their area of the past

6    relationship and the breakup, I don't know how I can keep

7    the other side from getting into it.

8             One way I thought of solving that was putting

9    all those issues aside for a separate trial.  But if that

10   is not what the plaintiff wants, I'm not going to force you

11   into a separate trial.  So I'm open to any suggestions you

12   have other than let you tell your side of the story and

13   don't let them tell theirs.

14            MS. SHARP:  Understood, your Honor.  If I may

15   then, I'd like to move on to our Motion in Limine 3

16   regarding round tubes.

17            This is at Exhibit 17 to the pretrial order.

18   The papers I think fully set forth our position.  The

19   difficulty here is their 30(b)(6) witness on June 24th

20   claimed he did not investigate and had no knowledge to talk

21   about round tubes.  Now, we're charged with not having

22   followed up on that, but there was nothing to follow-up on

23   because the witness said he didn't look into the issue of

24   round tubes.

25            The first time then that the round tube issue

1    arises is in exhibits to Dr. Langenfeld's report on the

2    19th.  His corrected report.

3              The only support for the round tube argument,

4    which is a new argument, is two demonstratives.  One is a

5    sheet that was prepared only for the German litigation.  It

6    has HC Technologies noted on the cover of it.  It's not

7    authenticated.  We don't know the author, the date, or the

8    origin.

9              The second piece of evidence that they claim

10   to use in support of the round tubes is the summary sheet

11   that your Honor may be familiar with from the motions to

12   compel.  There was a summary sheet that we characterized as

13   essentially demonstrative where Broetje did certain kinds of

14   searches, and they kept changing that sheet, changing that

15   sheet through the time essentially from January to the final

16   rulings to compel in June.

17             They, after the close of discovery, and only in

18   connection with Langenfeld, added to that sheet in August

19   round tubes and purported to back out a third of the damages

20   on a certain element related to round tubes.

21             So for those reasons, we think the round tube

22   evidence is incompetent and late and should be excluded.

23             THE COURT:  Is it undisputed that some of

24   Broetje's accused products or some of Broetje's products

25   have round tubes?

1          MS. SHARP:  I don't think that that undisputed

2     at all.  Langenfeld says -- and, again, this is another

3     prong of the evidence that they rely on.  Langenfeld claims

4     alone to have gone to a facility, and even though he is not

5     competent to make any kind of expert opinion about what the

6     tubes were, he said he saw them.  And on that visit, he was

7     unaccompanied.  But there is no evidence anywhere that there

8     are round tubes produced and put into sale by Broetje.

9          THE COURT:  Is it undisputed that if they do

10    manufacture round tubes that those round tubes would not be

11    infringing?

12         MS. SHARP:  Yes, and I think that arises in the

13    expert discovery.  But the problem is that the round tube

14    evidence was never disclosed.

15         THE COURT:  All right.  And you have a separate

16    argument on the substantially equal argument?

17         MS. SHARP:  The substantially equal argument I

18    think is subsumed in what I have already said.  The only

19    evidence that they provided is also in demonstratives.

20         THE COURT:  And the relief you seek is that they

21    should not be able to argue in any way the substantially

22    equal point?

23         MS. SHARP:  Yes.

24         THE COURT:  Did you want to reserve your time on

25    the other motion in limines in limine or did you wish to add

1   anything else before we hear from Broetje?

2                MS. SHARP:  We wish to reserve to respond to

3   what they say in their motions.

4                THE COURT:  That's fine.  You will have six

5   minutes left.

6                We'll hear from Broetje.

7                MR. KELLEHER:  Hello, your Honor.  I may as well

8   go in reverse order, since we're talking about round tubes a

9   moment ago.

10               The assertion was made that we never told them

11   that we have cassettes with round tubes.  I have here in my

12   hand -- May I hand this up, your Honor?

13               THE COURT:  You may.

14               (Documents passed forward.)

15               MR. KELLEHER:  These are technical drawings for

16   the tubes that exist in our cassettes that we sell in the

17   United States.  We produced this a year ago.  You can see

18   the very low Bates number.

19               The very last two pages of this is a grid

20   identifying what the documents in front of it are, that they

21   relate to the technical drawings for these tubes.  About the

22   first half of the tubes, you can see by looking at them, are

23   pentagons.

24               Where the tab is, your Honor, at page 3747, that

25   is where you start seeing round tube after round tube after

1   round tube.  We told them about this more than a year ago,

2   and they just didn't follow-up on it.

3             THE COURT:  And the last two pages you say are

4   what?  You say sales data?

5             MR. KELLEHER:  No, your Honor.  They're codes

6   where the identical drawings numbers are.

7             THE COURT:  Did you tell them that you

8   manufactured and sold round tubes?

9             MR. KELLEHER:  At the deposition of Dr. Peters,

10  our 30(b)(6) representative, the question was asked:

11            "Question:  Broetje has on sold one cassettes

12  that have a pentagon-shaped tube?

13            "Answer:  No.

14            "Question:  What else?  What other?

15            "Answer:  Rectangular or just a round shape.

16            "Question:  By round shape, do you mean a

17  cylindrical shape?

18            "Answer:  Yes.

19            "Question:  Does it sell those for rivets -- for

20  rivets?

21            "Answer:  For rivets, yes.  It may also be

22  collars."

23            So that is the testimony for the 30(b)(6)

24  deposition.  I simply didn't follow up.

25            THE COURT:  What page?

1              MR. KELLEHER:  I'm sorry.  172.

2              THE COURT:  And that is Mr. Peters?

3              MR. KELLEHER:  Yes.

4              THE COURT:  Is there a different argument on the

5    substantially equal point?

6              MR. KELLEHER:  Yes, your Honor.  As we pointed

7    out in our briefing, in response to their motion in limine,

8    the page that they're complaining about supposedly not being

9    produced had been produced three times by us in discovery in

10   different forms; and those copies are attached to our motion

11   in limine opposition.  It's authenticated.  It's referred to

12   in Dr. Peters declaration in support of our -- I believe our

13   motion for summary judgment papers.

14             THE COURT:  You pick where to go next.

15             MR. KELLEHER:  Yes, your Honor.  Concerning the

16   fault returns, it's not similar to the B. Braun case where

17   you are dealing with the issue of needle sticks.  The

18   cassettes are not unsafe.  People don't get hurt because

19   they shut down and they stop the line.  Customers get angry.

20   That's the problem.  We're not talking about a safety issue.

21             It was not just two percent of the cassettes.

22   You saw in their papers, they said there were fewer than

23   ten fault reports over 11 years.  And we have shown you

24   there were actually more than 50 over the span of just three

25   years.

1          THE COURT:  What kind of percentage is that?

2          MR. KELLEHER:  I would have to run the number.

3          THE COURT:  Fifty in three years?

4          MR. KELLEHER:  But, for example, you can look at

5     it this way.  We're having a problem with them on average

6     every three to four weeks with the machines they're supplying

7     to us, and the customers are yelling at us.

8          THE COURT:  What can you do to allay my

9     concerns that, I guess it's not as inflammatory as the

10    safety involved in sticking a needle in somebody, but that

11    this is going to devolve into a trial where you say bad

12    things about them and they say bad things about you, and

13    it's just a big distraction?

14         MR. KELLEHER:  It's not to say bad things about

15    them.  It's merely to explain why, in 2003, my client made a

16    decision to design their own system.

17         THE COURT:  And why is that relevant?

18         MR. KELLEHER:  Because they're accusing us of

19    willful infringement and copying, and they want punitive

20    damages under their competition theories.

21         And I would point out, your Honor, in their

22    opposition to our Motion in Limine No. 1, they're saying

23    the foregoing history between parties is relevant to

24    infringement, willful infringement and copying.  If it's

25    relevant for them, it's relevant for us.

1          THE COURT:  Okay.

2          MR. KELLEHER:  Last, your Honor, on the issue

3    of foreign law, Dr. Budach's opinion looked at the United

4    States patents and the Canadian patent as well as the

5    European patent.  It's not confined merely to German law as

6    they represented.

7          Concerning the difference in law, I asked them

8    at interrogatory.  Interrogatory No. 4:  Please identify in

9    full what differences, if any, exist between the scope of

10   the claims of the U.S. patents, '339, '216 on the one hand

11   and the claims of the European patent '685 on the other

12   hand?

13         And their answer was:  Neither AHG, nor its

14   counsel, are versed in European law of claim construction

15   and cannot offer information regarding the scope of the

16   claims of the European patent.  As such, AHG cannot offer

17   any information regarding the differences in the scope.

18         So we heard a lot of statements that the law is

19   different, but in interrogatory answer they told me that

20   they can't say how the law is different.

21         I have no problem with the jury instruction

22   that this Court, of course, is not bound by something that

23   happened in Germany, but I don't think we're going to get

24   into a complex discussion of what German law is, what

25   European law is versus what American law is because they

1    have already said they don't know anything about it.

2              THE COURT:  But the law is different, isn't it?

3              MR. KELLEHER:  I'm not aware, your Honor, on

4    this issue of infringement whether there is any material

5    difference between European law and United States law.

6    There are differences among the countries, for example, on

7    examples of prior art.  What is prior art in one country may

8    not be in another.  That is different.

9              THE COURT:  So if I permit you to do this, tell

10   me what you are going to do with the foreign law.  What will

11   the jury see and learn about foreign law?

12             MR. KELLEHER:  I don't think that they are going

13   to learn anything about foreign law.

14             THE COURT:  Well, they're going to hear about

15   these three pieces of evidence that you want to put in;

16   correct?

17             MR. KELLEHER:  They're going to hear that they

18   sued us for infringement in Germany and the Court determined

19   that several claim limitations were not present in our

20   product.  We're going to say those same claim limitations,

21   you can look at the plain English of the United States claims

22   and they're there.  Therefore, a company could reasonably

23   believe that it's not infringing the patent and there is not a

24   subjectively high likelihood that they are infringing the

25   patent if the words are right there in the claims.  We don't

1  need to understand German law to point that out to the jury.

2          THE COURT:  Are you trying to use that evidence

3  to defend against infringement or just willful infringement?

4          MR. KELLEHER:  Only wilfulness, your Honor.

5          THE COURT:  And the nonpatent claims as well, I

6  gather, or not?

7          MR. KELLEHER:  The nonpatent ... I have to think

8  about that, your Honor.  As to state of mind, I suppose

9  perhaps it is relevant as to punitives.

10          THE COURT:  Okay.  Thank you.  Is there anything

11  else on their motions?

12          MR. KELLEHER:  No, your Honor.

13          THE COURT:  Okay.  You can address your motions,

14  if you wish.

15          MR. KELLEHER:  To turning to ours.  There are

16  three of the motions that they actually said were moot;

17  and I think actually that is not exactly right.  I think

18  an order granting the unopposed motions would be the

19  appropriate way to go.

20          First, they say that they will not say the

21  phrase "Chinese copy" in the courtroom, which we appreciate,

22  but we would like it memorialized in an order so their

23  clients understand the gravity of it.

24          The lawyers have never said this, your Honor.

25  This is not an attack on the lawyers.  The witnesses appear

1    to be going through this on purpose in a studied fashion and

2    trying to get this into the transcripts.

3              Next, your Honor, on the issue of the supposed

4    breach of the supposed '94 contract.  They said they won't

5    say the word "breach," which is all fine and well.  But then

6    in the same paper they filed with the Court, they accuse us

7    of ceasing to honor our obligations and nonperformance.

8              Well, that is what breach is.  And they already

9    sued us in France on the supposed 1994 exclusive distributor

10   contract and Broetje won.  The Court held that we did not

11   breach any contract.  We didn't breach any confidentiality

12   obligation, we didn't improperly terminate any contract, and

13   there is no reason for us to have to relitigate that in this

14   court with them saying we breached some contract.  Then we

15   will get into satellite litigation about what a French court

16   said.

17             THE COURT:  If I'm going to let you put in your

18   German and French judgments on infringement, and I'm going

19   to let you put in fault reports, I understand they're saying

20   they're not going to argue breach.  Why don't I tell them

21   they can argue breach and let's just have it all out?

22             MR. KELLEHER:  Because that has been resolved.

23   They can't sue us for breach on the French contract here

24   because they have already lost on it.  There was a judgment

25   that we didn't infringe the contract.

 1              It obviously really is not relevant, your Honor,

 2    to anything I can think of.  It's not relevant really to our

 3    state of mind.  I don't know why their state of mind is

 4    especially relevant.

 5              THE COURT:  All right.  So you want an order

 6    that says they can't refer to breach or any implication of

 7    breach.

 8              MR. KELLEHER:  Correct, your Honor.

 9              THE COURT:  Can they say that there was a

10    contract?

11              MR. KELLEHER:  They can assert there is, your

12    Honor, and we'll dispute that.  The parties do dispute that.

13    We say it wasn't properly signed.

14              Concerning, your Honor, whether or not they

15    should be allowed to air discovery disputes in front of the

16    jury.  They say at one point in their briefing that is moot

17    because they say they won't do so for any improper purpose,

18    but then they go on to say they think there are improper

19    purposes for which they should be allowed to raise those

20    issues.

21              I point out first, telling the jury that the

22    defendant has not complied with the discovery obligation is

23    one of the sanctions that is listed in Rule 37; and we have

24    never been sanctioned in this case, and there is no motion

25    to do so.

1          Then the two examples they give, what they want

2     to tell the jury, are that we never told them in discovery

3     about round tubes, which I have shown isn't correct, and

4     that Dr. Langenfeld, our damages expert, supposedly only

5     worked for us for 12 days.

6          In the briefing, your Honor, I have given you

7     the confidentiality undertaking he signed last January.  And

8     I have given you the e-mail where I sent that, disclosing

9     him on April 1st to my opponents.  So neither of the things

10    they want to point out is accurate, and I don't see why we

11    should waste trial time with us having to defend against

12    charges that we violated our discovery obligations when we

13    didn't.

14          THE COURT:  Even if I disagree with that, what

15    about they are evidently concerned that their expert may

16    be at some disadvantage because he or she only saw some of

17    your stuff very recently and a number of experts have put in

18    several reports and modified their opinions over time.  Are

19    you trying to preclude the jury finding out that there were

20    multiple reports or recent changes in opinion and that sort

21    of thing?

22          MR. KELLEHER:  No, your Honor.  I think that

23    probably always comes in as to credibility as to us.

24          THE COURT:  Okay.  So that is not part of at

25    what is at issue in your motion?

1        MR. KELLEHER:  Right.  In other words, we don't

2   want to be accused of violating our obligation on discovery

3   obligations.

4        Next, your Honor, we ask that they not be

5   permitted to use your claim construction and Markman opinion

6   to attack our witnesses with regard to their belief that

7   they didn't infringe because this goes to willfulness.  And

8   the reason here, your Honor, is that the patents expired

9   seven months after this case was filed and your claim

10  construction opinion didn't come to exist until February of

11  this year, long after the patents had expired.  There was

12  never a point in time where that document could be relevant

13  to whether or not there was an objectively high likelihood

14  of infringement or whether or not there was subjective

15  recklessness in not going back and redoing the opinion.

16       They also pointed out we are not able to cite a

17  case with these exact facts.  That is true but neither can

18  they.  We think this is a matter of first impression after

19  the Seagate decision has changed the law on this.

20       And my colleague Mr. Cahr will be arguing the

21  last motion.

22       THE COURT:  Okay.  That's fine.  Thank you.

23       Mr. Cahr, you have four minutes, if you want.

24       MR. CAHR:  I'll be very brief.

25       Your Honor, I'm here to talk about the motion in

1    limine on foreign confusion or on priority.  There really

2    are three different issues here:

3              One is the issue of whether or not use in

4    another country can be used to establish priority.

5              The second is whether or not confusion in

6    another country can be used to establish likelihood of

7    confusion.  And,

8              The third is whether or not the actual incident

9    at issue here is actually confusion.

10             But the first issue is very simple.  Priority of

11   use can never be established through use in another country.

12             They intend to use a single installation back

13   in 1991 in Britain to indicate that they have established

14   priority.

15             I can assure that I have personal experience

16   with this.  I'm on the U.S. Legislation Subcommittee of the

17   International Trademark Association.  We've been struggling

18   for the past several years, working on rewrites for the

19   Lanham Act, because even the famous marks that were first

20   used abroad and have not used here have no protection, let

21   alone a common trademark that has no fame.  There is not a

22   single case that holds otherwise, and that, quite frankly,

23   is black letter law at this point.

24             The other issue has to do with confusion.  The

25   confusion in another country really is not relevant to

1    confusion here.  They cite two District Court cases in

2    another Circuit which are really cases that are dealing

3    with, in many respects, the opposite situation.  That's a

4    situation where a defendant was seeking to use lack of

5    confusion outside of the country as a way of actually

6    establishing that there was no likelihood of confusion.

7         Even those two cases, in those very limited

8    circumstances, have not been followed.  It is not a case, in

9    this or any other Circuit, where any appellate court has

10   actually ruled that confusion in another country actually

11   can be used as part of a likelihood of confusion test.  And,

12        Then, finally, just as a matter of evidence, the

13   specific incident that they seek to use is a single hearsay

14   missed return.  Somebody purportedly returned to AHG for

15   repair a Broetje cassette.

16        We do not have any evidence from the people who

17   apparently did this.  We don't know whether or not it was

18   an accident.  We have no idea whether or not it had any

19   relevant whatsoever to source designation.  In fact, it was

20   a post-sale issue.  It wasn't even something which was a

21   pre-sale confusion as to designation or source of origin as

22   contemplated by the Lanham Act or any of the state law

23   claims.

24        So just as a matter of evidence, this is

25   hearsay.  It's unsupported, undocumented.  And even if it

1   were documented, and even if it were hearsay, Third Circuit

2   law is I think pretty clear that this is not actually enough

3   to constitute confusion.

4               THE COURT:  Okay.  Thank you very much.

5               Six minutes left for the plaintiffs.

6               MR. LINDVALL:  Just a couple comments.  Ms.

7   Sharp is going to have some comments, too, in rebuttal.

8               THE COURT:  Okay.

9               MR. LINDVALL:  With respect to the breach

10  argument, their initial argument that we do not use the word

11  "breach," if you look at it, it's very clear.

12              And then we said we won't use the word "breach,"

13  but we said it is part of the story we have to talk about.

14  We are going to talk about faults or whatever.  The story is

15  as follows:

16              There is a 1994 agreement.  There is a

17  signature, a German signature to it.  And then we went

18  forward, and it went for almost ten years these products

19  were sold to Broetje, and Broetje sold them to their

20  customers.

21              In 2003, Broetje decided to sell their own.  We

22  think the evidence will establish they just copied our

23  product.  All along this period of time, we were giving them

24  technical information at their request.  We believe that

25  technical information should have been held confidential.

1          I agree this is not going to be a dispute about

2     whether they breached the contract or not.  In fact, I can

3     almost guarantee our witnesses are not going to say there

4     was a breach of contract, but our witnesses will say that

5     they believed that Broetje was under certain obligations.

6          To tell you the truth, your Honor, they don't

7     know exactly what Broetje did because these documents are

8     confidential, and our witnesses have not seen them, so they

9     won't be able to say I have seen what Broetje's documents

10    are so they're in breach.  They are just going to say what

11    their relationship was between the two parties.  It's a part

12    of the story that has to be told.

13         And this contractual relationship, what is the

14    jury going to think when we are selling them -- we sold them

15    over 2,000 cassettes during this time frame.  What is the

16    jury going to think?  There was no contractual relationship?

17    We were just selling them.  There was no binding obligation

18    there?  Of course, there was a contractual relationship.

19    And this was a contractual relationship the parties were

20    entering under.

21         And it's very highly relevant.  Copying is a

22    very important aspect in this case for two reasons.  One is

23    secondary considerations on obviousness and second is with

24    respect to the unfair competition claims.  That is one of

25    the factors that a jury can look at.

1        With respect, Chinese copying, we are not going

2  to say anything about Chinese copying.  We'll make sure the

3  witnesses are instructed.  We have nothing to do with that.

4  That's the witnesses.

5        The French court, they made a comment about the

6  French court made a ruling on the contract.  That is the

7  whole issue.  They want to be able to use that decision in

8  the French court.  That is on appeal.

9        If you look at that decision, it's a little bit

10 uncertain to see what the Court held.  And to say you are

11 now estopped by that decision I think is improper.  So to

12 the extent they want to use it and try to bring in French

13 law, I guess they can do that, but otherwise we don't think

14 it's relevant.

15       The claim construction opinion.  To be honest

16 with you, it's very doubtful we would use that, but there is

17 no reason we can't attack the opinion, the reasonableness of

18 the opinion by showing what the Court's claim construction

19 is.  Whether it will get in front of the jury and try to

20 convince them or try to get them to understand what a claim

21 construction is and how that is an opinion is another story,

22 but I think that should be left open.

23       Your Honor, I'll let Ms. Sharp address the

24 remaining issue.

25       THE COURT:  That's fine.  Thank you.

1              MS. SHARP:  I apologize for the delay, your

2      Honor.

3              THE COURT:  That's okay.

4              MS. SHARP:  One thing they read to you was from

5      the Peters transcript.  That they stopped short of what we

6      rely on which is at Exhibit C to DI 180.  Mr. Lindvall asks,

7      and this is at page 172, line 23:

8              "Question:  How often do you -- do you -- does

9      Broetje used a round shaped tube?"

10             The answer given by this 30(b)(6) witness was:

11             "Answer:  I haven't looked it up.

12             "Question:  You haven't looked at that?

13             "Answer:  No.

14             "Question:  Is it very often?

15             "Answer:  No.

16             "Question:  The shape that is typically used in

17     a cassette sold by Broetje is the pentagon shape?

18             "Answer:  For rivets, yes."

19             So their own 30(b)(6) witness, in the end of

20     June, had virtually nothing to say and was not prepared by

21     them to say anything about round tubes.

22             THE COURT:  But I don't have a discovery

23     dispute right now.  I have your effort to get me to stop

24     them from putting on any evidence of round tubes when you

25     just confirmed they told you they had some round tubes, just

1    not often, and then you did nothing further.

2              MS. SHARP:  Well, they also didn't say that

3    those round tubes were used with rivets, and this is a rivet

4    case.  They say that --

5              THE COURT:  Did you ask them that?

6              MS. SHARP:  There weren't further questions on

7    that, but this witness said that he had not looked into the

8    round tube issue.

9              THE COURT:  We certainly had enough discovery

10   disputes in this case but I don't recall one where you came

11   and said they had an unprepared 30(b)(6) witness on this

12   point.

13             MS. SHARP:  We did not do that, your Honor.  But

14   we believed at that time that had round tubes been any kind

15   of issue, the witness would have been prepared and would

16   have testified about it.  The round tube issue did not come

17   up in any other context.  It wasn't even in their expert

18   report.

19             The first time this round tube issue is

20   mentioned and pushed is only after discovery closes and into

21   the month of August.  The documents that they talked about

22   today that show drawings of round tubes, they're a series

23   that were produced.  Drawings that are alleged to be round

24   tubes, those were never referred to, relied on, referred to

25   by their expert.  They were never explained by any witness.

1          The documents themselves don't say who authored

2     them, when they were authored, what they purport to show.

3          THE COURT:  They were produced, though.

4          MS. SHARP:  They were produced.  Or that they

5     purport to show everything that is in the cross-section.

6     That is, any detail that would show any details in the

7     cross-section, they were never addressed or relied on.

8          On the issue of substantially equal, DI 209 has

9     Exhibit 36, which is the exhibit that is at issue.  And that

10    is the exhibit that shows HT Technologies.  At least, HT

11    Technologies is mentioned.

12         That exhibit is an untranslated German document.

13    That was not produced, contrary to what they say.  We

14    addressed this in a footnote at the second page of our

15    opposition.  They produced random pages of that document, I

16    believe 1, 2 and 7.  But whatever we said in the motion is

17    what is correct.  Not the entire document.

18         And we don't know the date, the origin.  It is,

19    as I said, in German.  And it wasn't relied on by anybody

20    previously.  It was prepared, according to their witness,

21    for use in the German litigation.  It's not a corporate

22    document.  Mr. Budach made that clear.

23         THE COURT:  Okay.  Thank you.  Your time is up.

24    Thank you very much.

25         We will come back to motion in limines before we

1    break for the day.

2              But at this point, I do want to hear argument on

3    the pending motions.  There are at least a handful filed by

4    each side.  We could do this either as we just did and let

5    plaintiffs address whichever ones they want first and then

6    defendants.  In fact, let's do that.

7              So, plaintiffs, you can use any portion of your

8    half hour that you want.  On the table, on the agenda right

9    now is not only your motions but also Broetje's motions.  If

10   you only want to address some and save the rest of your time

11   to address and respond, that's fine, but you have a total of

12   a half hour.

13             MS. SAUNDERS:  Your Honor, good morning.  Good

14   afternoon.

15             THE COURT:  Good afternoon.  Right.

16             MS. SAUNDERS:  I'm going to address AHG's motion

17   for summary judgment and invalidity.  And this is a pretty

18   straightforward motion.

19             Broetje has to prove by clear and convincing

20   evidence that patents in suit are invalid as anticipated.

21   AHG's motion is based on the fact that their expert admitted

22   during deposition that four of the anticipatory references

23   do not disclose the requisite element of the claims of the

24   patents in suit, of the asserted claims.  They can't meet

25   the standard.  Our expert testimony is unrebutted.  One of

1    the references was considered before -- was before the

2    Patent Office and considered by two patent examiners, and

3    the patents in suit were allowed to issue in view of that

4    patent reference.

5              For those reasons, they can't meet their clear

6    and convincing evidence standard and summary judgment of no

7    invalidity with respect to anticipation should be granted.

8              THE COURT:  Now, anticipation, is that one of

9    the defenses that you all assert came too late anyway?

10             MS. SAUNDERS:  In part.

11             THE COURT:  In part.

12             MS. SAUNDERS:  The references that are the

13   subject of the summary judgment motion are not part of that.

14             THE COURT:  The motion you are addressing now is

15   the motion for partial summary judgment on invalidity

16   defenses.  You are not challenging those particular defenses

17   as untimely.

18             MS. SAUNDERS:  Exactly.

19             THE COURT:  Okay.  Thank you.

20             MS. SAUNDERS:  And just one more comment on

21   indefiniteness.

22             With respect to indefiniteness, the only

23   evidence in the record is the testimony of the inventor.

24   The case law is both from this Court and from the Federal

25   Circuit that an inventor's subjective belief with respect to

1    what a claim term means cannot form the basis of an

2    indefiniteness defense.  For that reason, summary judgment

3    on indefiniteness, no indefinite, should win.

4              THE COURT:  And help me.  There is a lot to keep

5    track of you put in front of us.

6              MS. SAUNDERS:  Sure.

7              THE COURT:  Indefiniteness, at least in part, is

8    one you assert is late, but is also there also a portion of

9    the indefiniteness that you accept is not late?

10             MS. SAUNDERS:  No, your Honor.  Indefiniteness

11   was a late asserted invalidity defense.

12             THE COURT:  Thank you.

13             MR. LINDVALL:  Your Honor, the first one I would

14   like to address is the one outstanding Daubert motion, and

15   that is Mr. Lawrence, Broetje's technical expert.

16             We seek the Daubert opinions.  And I can tell

17   you right to the heart of it.  I took his deposition, and I

18   asked him -- for example, he admitted he gave opinions on

19   invalidity, both anticipation and obviousness.

20             I asked him, okay, what burden of proof did you

21   rely on, did you use in coming up with your conclusion, your

22   opinion?  Did you use clear and convincing evidence?

23   Preponderance of the evidence?  What?

24             He didn't even know what I was talking about.

25   He didn't even know what the burden of proof was or how he

1    was to apply it.

2              That begs the question how could an expert give

3    an opinion on whether or not certain prior art is sufficient

4    or not to invalidate opinion when he doesn't understand what

5    burden of proof he is to apply at a particular point in time.

6              THE COURT:  Well, as long as I limit him from

7    opining on that final issue as to whether it's invalid based

8    on the applicable standard of proof, why can't he not at

9    least be limited to the opinions that he did express?

10             MR. LINDVALL:  Because, your Honor, even the

11   opinions, for example, on anticipation, his opinion that a

12   particular prior art reference discloses an element of the

13   patent claim, that is his opinion.  And there will be

14   disagreement on whether that prior art discloses that element.

15             Whether that element is disclosed or not, it's a

16   burden of proof issue.  Is it shown by clear and convincing

17   evidence that reference A shows element C of claim 1 of the

18   patent?  Whether or not it shows or discloses that element,

19   they have to show -- they have a burden of proof to show by

20   clear and convincing evidence that that element is shown in

21   that reference by clear and convincing evidence.

22             THE COURT:  But the party has the burden and as

23   part of establishing the burden, they bring in someone who

24   they say has the requisite expertise, and he says I think

25   it's there.  The element is there.  Therefore, that's part

1    of the evidence that the party will point to for the jury,

2    which will then decide if that amounts to clear and

3    convincing evidence, isn't it?

4              MR. LINDVALL:  Yes, your Honor.  Maybe I will

5    move on a little bit on this whole issue because it's really

6    a totality with them.  Not only did he not understand the

7    burden of proof, but when I asked him, for example, if he

8    understood what anticipation was or what inherency was,

9    anticipation, which he gives an opinion on, he didn't under-

10   stand what it was.  He didn't understand what anticipation

11   was.

12             He said that certain elements were inherent in

13   prior art.  In other words, it means it's not expressly

14   disclosed in the art, but he believes it is inherent.  And

15   inherency is a pretty difficult area, but an expert has to

16   understand what the law is to give a proper opinion, a

17   reliable opinion to the jury.

18             He didn't understand what secondary

19   considerations were.  He never gave a definition of who one

20   skilled in the art was.  Today, we still don't know what

21   his definition of what one skilled in the art is.  He has

22   to have given that definition under the Graham factors for

23   obviousness.  The first starting point for an obviousness

24   determination is how would one in skill in the art define

25   combining these particular pieces of art.

1        He never once gave the opinion what one skilled

2   in the art was, so how can his opinion be reliable in combining

3   art.

4        He never gave an opinion on the scope and

5   context of the prior art, which today is a very important

6   issue.  We're going to assert that some of the art is not

7   analysis art.  It shouldn't even be in the scope of the

8   prior art.  He never gave an opinion on it.  How can he

9   again give an opinion on obviousness?

10       Probably one of the most important things he

11  didn't do in the obviousness, he never gave a reason why you

12  combine two references.  KSR eliminated the requirement for

13  a motivation that the Federal Circuit had, but it made it

14  very clear that the expert or the opinion has to give some

15  reason why you combine art, because it recognized that any

16  patent, it's usually a combination of old things.

17       So any expert can get up there and say here is

18  reference A, and here is reference B.  I combine the two.

19  Aha.  The patent claim is invalid.

20       It is very dangerous for the jury in that

21  situation because the jury is going to say, okay, we looked

22  at those two references.  They have all the references.

23  Therefore, the patent is invalid.

24       The jury has got to understand there has to be

25  testimony from him that there was a reason to combine the

1       references, and he never gave a reason.  He never did that.

2                   So if you put this totality in perspective, it

3       really draws into question the reliability of Mr. Lawrence's

4       opinions.

5                   THE COURT:  In a way that you're not adequately

6       protected by cross-examining him on all those things you

7       just listed?

8                   MR. LINDVALL:  To tell the truth, your Honor,

9       what I am concerned about, and we may be addressing this

10      later on, is when Mr. Lawrence guess up there and, all of a

11      sudden, he starts, for example, giving a reason why he would

12      combine two pieces of prior art.  And I look at his expert

13      report, there is nothing there, and I have to make an

14      objection.

15                  And I'm concerned.  I don't know if you had a

16      chance to look at Mr. Lawrence's report, but they're very,

17      very scant.  I'm concerned that we're going to be fighting

18      this disclosure issue throughout the courtroom.  I am sure

19      you would agree it's maybe a better technique to deal with

20      this beforehand so we don't have to fight about what was

21      disclosed in the expert report.

22                  THE COURT:  Well, I plan on expert reports to

23      comply with the practice I used in the past, which would be

24      that you would note that objection that an expert is going

25      to go beyond the scope of the expert report, not actually

1      rule on it at trial, save it for post-trial motions.  Then

2      if you prevail on a post-trial motion, the fact he went

3      outside his expert report, there would need to be a new

4      trial, and then Broetje would get to pay for all of that,

5      including your costs.

6                  Does that in any way give you any greater

7      comfort on this issue?

8                  MR. LINDVALL:  Yes.  It's a Judge Farnan rule.

9                  THE COURT:  Yes, it's a Judge Farnan rule.  I

10     don't claim ownership or authorship of it.

11                 MR. LINDVALL:  Yes.  No, no.  That would give me

12     comfort.  It's causing me some headache because we would not

13     rather have to go through that twice.  Our client is a small

14     client, and I would prefer that not to happen, but we really

15     think Mr. Lawrence's expert report are totally deficient

16     from that standpoint.

17                 Now, let me move to a completely different subject.

18     This has to do with Broetje's motion for summary judgment

19     relating to standing.  And I want to draw your Honor's

20     attention to a couple aspects of that.

21                 This focus, in particular, which I think is most

22     important, is this:  They say F2C2 lacks standing on the

23     patent claims because they are not an exclusive licensee

24     between AHG and F2C2.

25                 And as you probably saw from the declarations of

1   the parties who were the signatures to the written agreement

2   that we're looking at today, their clear intent was always

3   for it to be an exclusive license.

4           Remember, AHG and F2C2 are a closely held,

5   family run business.  They're not publicly held.  They have

6   a limited amount of employees.  F2C2 I think only has three

7   employees.  AHG has maybe 100 employees.  So this is a

8   family run, closely held company.  They formed F2C2 to

9   basically -- well, not basically.  They formed F2C2 to take

10  advantage of the patents and to make and sell the products

11  which are in dispute today.  That was the reason for that.

12  And we submitted declarations to the Court to show that.

13          Now, what I would like to do, which I'm not sure

14  if it was clear in the papers, if we looked at, in DI 164,

15  which is Broetje's appendix for all their motions for summary

16  judgment, it's DI 164, there is the English translation of the

17  written agreement that is in dispute.

18          It seems to be their principal argument that, on

19  the second page of that agreement, this is Exhibit 23 to DI

20  164, second page, there is four percentages of ownership.

21  They say those four percentages of ownership mean that the

22  exclusive license agreement was only directed to the

23  European patent, not the U.S. patents.

24          The agreement on itself just says patents.  So

25  they are looking at that and saying, ah, you just mean

1    European patents.  If you look at that language, though,

2    carefully, it says, for example, Mr. Jean-Marc Auriol up to

3    a maximum of 45 percent.  In each one of those instances,

4    they went up to a maximum.

5            This takes care of the situation where maybe

6    one of the individuals would not have any interest, for

7    example, in U.S. patents.  So to make an assertion that this

8    automatically would come to a conclusion that this only --

9    this agreement only applied to European patents is wrong.

10           The other indication that this is an exclusive

11   license agreement -- and it's clear.  The case law is clear

12   you don't have to use the word exclusive to be an exclusive

13   license agreement.

14           They say, for example:  Beginning on May 1st,

15   2001, F2C2 system, the undersigned, on the other hand, was

16   entrusted by the parties on the firsthand with the direct

17   business use and development of the patents.

18           Entrusted basically means like a trust.  We're

19   giving you the right to now exploit these patents.

20           The subsequent conduct of the parties as

21   reflected in the declarations was that they always treated

22   them as an exclusive license.  They were the only people who

23   were able to make or use anything of these licenses.  So

24   they told to Broetje, Germany, F2C2, and that is the way it

25   was done the whole period of time.

1           AHG never went out to license anybody else.

2     F2C2 is a closely held subsidiary of AHG.  Again, a family

3     run business.  In fact, the person who ran F2C2 was the

4     son-in-law of the person who owned AHG, so there was always

5     an intent to keep this as an exclusive arrangement.

6           One thing that has been interjected into this

7     is that we cited law where you can look at the parties'

8     conduct, you can get implied license and what have you.

9     They interjected the French law does not allow that, and

10    they say there is no written agreement.

11          Well, there is a written agreement.  We just

12    showed you.  And that written agreement to construe whether

13    it's an exclusive license agreement, if we do consider

14    French law, French law is one of the few countries in the

15    world which, unlike the U.S., allows subjective intent to

16    almost -- to supersede expressed terms of agreement.  We're

17    not saying that we're contrary to the expressed terms of the

18    agreement, but we cited French law in there.  I don't know

19    if this Court wants to go in and make that interpretation.

20          We moved to strike their reference to French

21    law because if we get French law, they had notice under

22    Federal Rule of Civil Procedure 44.1.  They had to give

23    this Court notice.  This Court has to have adequate time and

24    resources to decide on what the French law is, to make that

25    determination.  If they didn't give adequate notice, they

1    don't get the right to bring in French law.

2          We say even if this Court decides to bring in

3    French law, the French law supports our position with

4    respect to that position.

5          THE COURT:  On the whole issue of standing, if

6    I'm not in a position to resolve it before trial, would you

7    anticipate presenting any evidence as to assignments and

8    French law and issues like that?

9          MR. LINDVALL:  Yes, your Honor.  We would

10   present all of that.  It's obviously our burden of proof to

11   show that F2C2 had a right to recover lost profits.  So as

12   part of our burden, we will present evidence about what the

13   parties' intent were and the assignments and the license and

14   the subsequent conduct.  All of that would be brought into

15   evidence.  And we anticipate doing that because, again, it's

16   our burden.

17         THE COURT:  Thank you.

18         MR. LINDVALL:  The whole reason they're coming

19   after F2C2.  Now, there is a whole question mark here.

20   There is case law out there that says if we want to go ahead

21   and come up with a new agreement now, we can do a new

22   agreement now and make it clear it's an exclusive license

23   agreement, and they have the opportunity to cover lost

24   profits because this isn't a constitutional standing issue.

25   And we could do that, if we wanted to.

1          We didn't think it was necessary.  We didn't

2   even go that route.  And we say in both of our declarations,

3   both of our witnesses offered to do that if that is

4   necessary, but we didn't believe it was necessary because we

5   think the agreements are sufficient on their face.

6          We would like to reserve the rest of the time,

7   your Honor.

8          THE COURT:  Okay.  Thank you.  Then we'll hear

9   from --

10         MR. LINDVALL:  Just a second.  I don't want to

11  shortchange myself.

12         THE COURT:  Yes.

13         (Pause.)

14         MR. LINDVALL:  That's it, your Honor.  Thank

15  you.

16         THE COURT:  That's fine.  You all have 15

17  minutes left.

18         We'll hear from Broetje then.

19         MR. KELLEHER:  Yes, your Honor.  I may as well

20  start where Mr. Lindvall ended, on this issue of whether or

21  not F2C2 is an exclusive licensee.

22         The document that they point to, the only

23  document they're saying is the exclusive license, it has

24  percentages, and it says the ownership, whatever patents

25  that aren't named, whatever they are, from Mr. Phillippe

1    Bornes, up to a maximum up to five percent ownership.  For

2    AHG, the company, up to a maximum of 2.5 percent ownership.

3             The United States patents were owned one-third

4    each by Phillippe Bornes, Jean-Marc Auriol, and AHG.  So

5    those patents are not covered by these because this tops out

6    at five percent possible ownership.  It can't apply to a

7    patent that Mr. Bornes owned 33 percent of.  It's the only

8    document they pointed to as being exclusive license and it

9    clearly doesn't cover United States patents.

10             THE COURT:  And what about, do you agree that

11   they could go ahead and execute something before trial next

12   week?

13             MR. KELLEHER:  No, the patents are expired so

14   they can't be an exclusive licensees of expired patents, and

15   you can't retroactively make them a licensee, because they

16   have to have the right to exclude other people, when the

17   sales are going on.  You can't go back and punish us and

18   give them profits for lost sales that were not being made

19   when there was no exclusive licensee.

20             I think no reasonable juror could find that this

21   piece of paper covers the United States patents.  I really

22   believe there is no genuine dispute on that, and it is their

23   burden of proof.

24             THE COURT:  And if I don't rule on it, you agree

25   the burden is on them, and they will have to put this in

1    front of the jury?

2         MR. KELLEHER:  The burden is on them, but I

3    think the question is for you, your Honor, as a matter of

4    standing to decide, not really the jury.

5         THE COURT:  And what about their effort to

6    strike the reference to French law?

7         MR. KELLEHER:  Your Honor, we looked at their

8    documents, and we filed our motions saying look at all the

9    papers.  It doesn't appear they're an exclusive licensee.

10   They came in and for the very first time said, oh, no.  We

11   have an oral or an implied license.

12        We had to reply to that.  Whatever contracts

13   they have amongst themselves are going to be governed by

14   French law, and it happens that licenses have to be in

15   writing in France.  So we thought that was a very fair reply

16   to them for the first time raising this issue, whether they

17   could have an oral or implied license.

18        THE COURT:  How does the Federal Rule of Civil

19   Procedure requiring a notice fit into that?

20        MR. KELLEHER:  They should have given us notice

21   they were raising an issue of French law.

22        So, your Honor, I'll just run through a few of

23   the motions.  And if you have any questions, if you have

24   them, obviously, this is for you, not for us.

25        THE COURT:  Sure.

1          MR. KELLEHER:  Our 12(b)(1) motion to dismiss

2    claim, the first claim for relief related to the so-called

3    '339 patent, obviously, it's all been briefed for you.

4          I would just say that the questions that are

5    overriding are where is the check?  Where is the check that

6    they actually paid the issued fee to the United States

7    Government?  And where is the check showing they paid the

8    late fee?  Because the late fee also had to be paid.  And

9    where is the granted petition to rely that they filed after

10   the Patent Office said it was being withdrawn from issue?

11         THE COURT:  And so your position is the burden

12   is on them, ultimately, but this is a motion to dismiss;

13   right?

14         MR. KELLEHER:  It's a 12(b)(1).

15         THE COURT:  So they can't meet their burden

16   without producing those three documents.

17         MR. KELLEHER:  The law says that all business of

18   the Patent Office has to be done in writing.  There is no

19   way there was some phone call saying, oh, no, I'm sorry.  I

20   missed the check.  I'll send it to you.  This would have had

21   to have been recorded.

22         THE COURT:  It's undisputed that the Patent

23   Office believes that the patent existed; correct?

24         MR. KELLEHER:  I don't know about that, your

25   Honor.  We know they accepted maintenance fees.  That

1    doesn't necessarily mean that when the check came in, they

2    went and checked to see what the file history said.

3         THE COURT:  In the time period when the patent

4    was arguably valid, you could find it on the PTO records,

5    could you not?

6         MR. KELLEHER:  You could find every patent,

7    you know, ever, your Honor.  You could find every single

8    application, you know, they prepare publicly.  So that

9    doesn't say this is really a patent.  That there is a

10   statute saying that it became abandoned.

11        THE COURT:  If I were to agree with you on the

12   lack of subject matter jurisdiction, could I nonetheless

13   invalidate the patent which you asked for?

14        MR. KELLEHER:  No, you would not have subject

15   matter jurisdiction to rule on whether or not the claims

16   that appear on the page are invalid or not.

17        Concerning our Motion No. 6 on best mode, your

18   Honor, we moved on two grounds.  One, we said that Mr.

19   Bornes had a best mode in his mind of using five groups.  We

20   also said that Mr. Auriol had a best mode in his mind, which

21   is that you cannot -- you have to use an odd number of

22   groups.  You can't use an even number of groups.

23        They responded with some evidence concerning the

24   five groove best mode of Mr. Bornes.  They gave no response

25   whatsoever to what we said about Mr. Auriol's best mode.  We

1    think that has been conceded by their silence, your Honor,

2    and summary judgment ought to be granted of invalidity.

3             THE COURT:  I think you called this a motion for

4    partial summary judgment, but what is partial about it?

5             MR. KELLEHER:  It doesn't end the whole case.

6    It would end two claims.

7             THE COURT:  Meaning it ends the patent case

8    completely; correct?

9             MR. KELLEHER:  It does, your Honor.

10            THE COURT:  But it doesn't end the nonpatent

11   case.

12            MR. KELLEHER:  Right.  This could very well be

13   the last case ever where a patent is invalidated under the

14   best mode requirement, since the statute that was passed

15   last week eliminates that as a litigation issue for cases

16   going forward.

17            THE COURT:  Was it well known in the art that an

18   odd number of grooves would prevent jamming?

19            MR. KELLEHER:  I don't think so.  Mr. Auriol

20   testified from the very beginning he appreciated that he saw

21   a problem with rivets tilting in some way or another if only

22   an even number of grooves were used.  I'm not exactly sure I

23   can say why he felt that, but since it is a subjective

24   requirement, he has to disclose that.

25            THE COURT:  Now, your best mode defense is not

1    in anybody's expert report; correct?

2              MR. KELLEHER:  No, your Honor.  It's based

3    purely on testimony from the other side.  I'm not sure that

4    an expert would have been competent to say about what is in

5    someone else's mind.

6              THE COURT:  If the best mode defense goes

7    forward at trial, you have no expert that you would offer.

8              MR. KELLEHER:  No, your Honor.

9              THE COURT:  And what is your view as to, or if

10   your expert had testified to this, as to how many embodiments

11   were disclosed or are disclosed in the patents?

12             MR. KELLEHER:  There are a number of embodiments

13   disclosed, your Honor.

14             THE COURT:  Are they all an odd number of

15   grooves?

16             MR. KELLEHER:  No, your Honor.  There are even

17   numbers in there, your Honor, even though Mr. Auriol said he

18   doesn't believe that works.

19             THE COURT:  Some of them are odd numbered.

20             MR. KELLEHER:  Some of them are.  The law

21   requires adequate disclosure of the best mode, so you can't

22   hide that the inventor thinks that if you use this actual

23   thing I'm telling you can use, you are actually going to

24   get jamming.

25             THE COURT:  Don't you need to show some sort of

1    concealment, though?

2               MR. KELLEHER:  It's merely that it's not on a

3    printed page.  That's the concealment.

4               THE COURT:  If it's not on a printed page,

5    it follows as a matter of law, in your view, that it's

6    concealed.

7               MR. KELLEHER:  Right.  You don't need that

8    intent, if that is the question.  It's not like an

9    inequitable conduct case where you have to prove intent to

10   mislead.

11              Concerning the statute of limitations motion,

12   your Honor -- I am sorry.  I believe you ruled on that on

13   Friday.  I will pass over that one.

14              THE COURT:  Okay.  Thank you.

15              MR. KELLEHER:  Also with regard to the standing

16   issue, we say F2C2 has no standing to sue us for patent

17   infringement because they're not an exclusive licensee.

18              We also say there is a defect in jurisdiction

19   with regard to AHG because it wasn't until just before this

20   lawsuit that Mr. Bornes and Mr. Auriol signed over, assigned

21   all their remaining rights in the two U.S. patents to AHG.

22              The problem is there is a hundred plus year old

23   U.S. Supreme Court case law, there are some magic words that

24   have to be in there.  We have to assign the right to past

25   damages.  Otherwise, that right remains with the assignee,

1    the party that are signing away their rights.

2                In other words -- and every one of them has the

3    right to sue.  So we could resolve this case with AHG, and

4    as soon as it's done, Mr. Auriol and Mr. Bornes can sue us

5    for the same lost sales.  The Federal Circuit says that's a

6    matter of prudential standing, and it hasn't been corrected

7    in any way, and I don't know that it can be.

8                What it means is that there are damages.  Their

9    damage recovery could only begin as of the date of the

10   assignment.  There is no prudential jurisdiction with regard

11   to everything before that because there are three owners.

12               THE COURT:  And this last issue that you just

13   mentioned of prudential standing, that comes up in your motion

14   for partial summary judgment regarding lack of standing, that

15   you were addressing the French aspect of it earlier; correct?

16               MR. KELLEHER:  Yes, your Honor.  So turning to

17   the prior art motions, your Honor.

18               So with regard to anticipation, we basically

19   made the argument that the claim construction that they

20   asked you for with regard to what "longitudinal passageway

21   and groove" means.  And they got the claim construction of

22   "any hollow shape that goes down the wall of the tube that

23   air flows through."

24               Grammatically, that covers any open space even

25   in a round tube.  Every one of those is still any hollow

1    shape.  I can drawn any number of any hollow shapes.

2          As you know, your Honor, we respectfully asked

3    you to adopt a different claim construction.  We think under

4    that formulation, all kinds of prior art is covered by those

5    claim terms, and you are not allowed to have a patent claim

6    that reads on the prior art.

7          With regard to obviousness, your Honor, KSR did

8    away with the strict teaching motivation test.  It does say

9    that identifying a reason to combine can be important but

10   there are other ways with KSR where things have been found

11   to be invalid.

12         First, I have to say my expert Mr. Lawrence does

13   identify a reason to combine his expert reports.  Referring

14   to the Minbiole prior art which shows cut grooves in the

15   wall of the conduit, the Minbiole patent says that one of

16   the advantage of those grooves is that it enhances direct

17   examinational control of what is passing through the

18   conduit.  And my expert opined that that enhancement of

19   directional control would be a reason to put the grooves of

20   the Minbiole conduit into a rivet feeding tube.

21         THE COURT:  Do you have offhand the paragraphs

22   in which he discusses that?

23         MR. KELLEHER:  I confess I do not, your Honor.

24   I'm very sorry.

25         THE COURT:  It's in your briefing.

1          MR. KELLEHER:  Yes.  It would be in his opening

2    report.

3          THE COURT:  Okay.

4          MR. KELLEHER:  So it's very clear, your Honor,

5    that fasteners have been fed through tubes for decades.

6    There have been cassettes out there.  The Brosene patent

7    that we showed you was a cassette from 1965.

8          The Komaki/Shinjo British patent application

9    which, yes, was looked at by the examiners, it shows a

10   coiled tube filled with fasteners and the shape of the tube

11   is square.

12         They say, your Honor, that the claims cover a

13   pentagon.  I don't -- because each of the five points is a

14   groove for longitudinal passageway.  I don't see how Shinjo

15   would mean a square, wouldn't have at least four grooves and

16   longitudinal passageways under their construction and be an

17   anticipating reference.

18         Respectfully, your Honor, I think the examiners

19   had a different view of what groove and longitudinal

20   passageway meant and, therefore, didn't look at Shinjo in

21   that way.  But if that is the construction that is going to

22   be given to those terms, they read on the prior art and

23   render the claims invalid.

24         With regard to indefiniteness, your Honor, we

25   cite testimony of three people in opposition to their motion

1    for summary judgment:  both the inventors, plus their

2    expert, Dr. Kytomaa.  The three of them are all over the

3    place with regard to how "peripheral guiding" as you have

4    construed it could be given a concrete meaning such that

5    people out there in the real world can know that they're not

6    infringing.

7              THE COURT:  The Federal Circuit has suggested,

8    hasn't it, that inventor testimony at least, which you say

9    is a big part of this, is not really that strong.

10             MR. KELLEHER:  Right.  And I didn't ask them

11   their subjective understanding of that term.  I said can you

12   please tell me.  I've got a tube, and inside of it I've got

13   a rivet.  I say the rivet is pretty close to the wall.

14   Okay.  We'll say that is peripherally guiding.

15             Let's say I keep making the rivet smaller and

16   smaller and smaller.  How will I know when I no longer have

17   peripheral guiding such that I'm not infringing the patent?

18   And they all give answers all over the place.  So that is

19   not asking for their subjective understanding.  It's helping

20   them give us guidance so we can understand how not to

21   infringe their patent.

22             THE COURT:  Did Broetje argue in claim

23   construction that the term was indefinite?

24             MR. KELLEHER:  We think if you had adopted what

25   we had proposed, it would be definite.

```
 1              THE COURT:  But then I thought indefiniteness

 2    was something akin to insolubly ambiguousness cannot be

 3    construed.

 4              MR. KELLEHER:  I would say 99 percent of the

 5    time it is, your Honor.  We cited a case, the Haliburton

 6    case and another case from Judge Farnan specifically dealing

 7    with even if a judge can be defining with words and, from

 8    those words as defined, the construction, someone out there

 9    in the industry would still not be able to get a concrete

10    understanding of what would or wouldn't infringe, then it is

11    indefinite even though the Court was able to reduce it to

12    words.

13              Concerning our expert, Mr. Lawrence.  He has

14    been in the rivet-feeding field for about 20 years.  He is a

15    former employee of Boeing.  He went out on his own as a

16    consultant about 10 years ago.  Boeing continues to hire him

17    even though they have to pay him more.  He is involved in

18    the repair and upkeep of the Broetje machines at the Boeing

19    Long Beach facility, some of which have our systems, some of

20    which have F2C2 systems.  He is intimately familiar with the

21    machines.  He has taken them both apart, I can't count the

22    number of times.

23              He is not a Ph.D. in mechanical engineering from

24    MIT like their expert is.  He is a guys who gets his hands

25    dirty, but he knows this technology, and that is how he is
```

1   able to testify about what a person of ordinary skill in the

2   art, which, of course, is just a hypothetical construct, he

3   is able to testify what he believes a person of ordinary

4   skill in this art would be able to do.

5          Would we be faulted for not having a definition

6   of what Mr. PHOSITA is in terms of credentials?  We looked.

7   We're looking instead, your Honor, at what skills would have

8   to have been in the tool bag of this person of ordinary

9   skills.  The only skills that would have had to have been in

10  tool bag would have been the ability to take a bunch of

11  rivets and drop them into a square Shinjo tube or be able to

12  carve grooves into a wall of something like Brosene.

13         I think it is undeniable that back in 1988,

14  those two incredibly easy skills were within the level of

15  skill of the art, regardless of whether or not we're able to

16  define by prudentials who such a person was.

17         THE COURT:  And what about all of the criticism

18  that he doesn't understand the law?

19         MR. KELLEHER:  He doesn't -- he doesn't have to

20  understand the law, your Honor.  First of all, on inherency,

21  he does.

22         On the question on inherency, your Honor, is

23  whether on the Brosene patent, which shows a cassette filled

24  with coiled tube that is filled with rivets, and the patent

25  says it's supposed to be, it's a storage means and it's

1    supposed to be sold as an article of commerce, per se.

2            He says even though stock members are not

3    illustrated at the ends of the tubes, he says they have to

4    be there.  In order to sell this thing, if you didn't want

5    your customer to open it up, have a box with an empty tube

6    and a bunch of loose rivets, you, of course, have to have

7    stop members at the end.  So he understands that inherency

8    means it has to be there.

9            I think in his deposition, his statement was how

10   else could they do it?  That really is what inherency is.

11   Whether or not he can recite it the way all of us who went

12   to law school, he can't, but he understands the concept of

13   inherency.

14           I agree your Honor about the burden of proof

15   issue.  It's really not his issue to testify about the

16   burden of proof.  He can say I'm looking at it in black and

17   white on the piece of paper, and the jury can determine

18   whether that is clear and convincing evidence.

19           Concerning the motion to strike, your Honor.

20   That is still out there, the cross motion to strike.  It's

21   a late dispositive motion.  It's asking you to dispose of a

22   number of our defenses, and it was filed I believe 10 days

23   after the deadline for dispositive motions.  If it is looked

24   at as a discovery motion, they didn't follow the procedure

25   you ordered in this case for discovery motions.

1          Both parties have continued to supplement, your

2    Honor, over the last couple of months.  We gave them a

3    supplemental interrogatory answer four business days after

4    we took the depositions of their two inventors, and we

5    disclosed the defenses that we had learned through taking

6    their depositions.

7          The same day they serve a supplemental

8    interrogatory answer, too, a few hours after us, changing,

9    adding to their definition of what their trade dress is.

10   But they want our interrogatory to be untimely where

11   apparently theirs is timely.  I think it's a motion for a

12   double standard.

13         We have supplemented.  Both parties produced new

14   documents when their damages experts gave the reports.  Both

15   parties have handed over a few documents here and there.

16         This apparent letter from the dead lawyer,

17   Mr. Dutton was never produced in discovery until they used

18   it to try to find against our 12(b)(1) motion.

19         Last week, as we were finalizing the exhibit

20   list, they were still producing new translations to us that

21   they did last July.

22         THE COURT:  Isn't what you did an order of

23   magnitude different?  I mean you brought in three wholly

24   brand new invalidity defenses and all you point to is that

25   you broadly cited the statute in your answer.

1          MR. KELLEHER:  Your Honor, discovery is still

2    open.  You extended discovery for us.  We took the

3    depositions.  We had noticed them a full month earlier, but

4    they said they weren't available, and it's based only on

5    their testimony.  So I think that is fair.

6          Also, I wouldn't say that's true, your Honor.

7    By that, they're including the 12(b)(1) grounds.  That is

8    not a simple defense.  To the extent it's subject matter

9    jurisdiction, it can't be waived.

10          THE COURT:  I'm talking about indefiniteness.

11          MR. KELLEHER:  Yes, indefinite and best mode.

12    Best mode or the other two.

13          THE COURT:  And then you have anticipation

14    defenses I think that are new, or at least that is my

15    understanding of their argument.

16          MR. KELLEHER:  I think what they said, your

17    Honor, was that there were maybe obviousness combinations

18    that they felt --

19          THE COURT:  Certainly, they didn't say that

20    also.

21          MR. KELLEHER:  Yes.  And they said there was

22    some art that we produced late.  But as we pointed out, the

23    Mauer (phonetic) reference, for example, we actually

24    produced all the way last year in the form of the European

25    counterpart.

1            THE COURT:  Well, that means you didn't produce

2    it.

3            MR. KELLEHER:  It's the same content, your

4    Honor.  We went and found the United States patent.  It

5    really is the same content.

6            THE COURT:  But you concede that you never

7    produced the U.S. Mauer patent; correct?

8            MR. KELLEHER:  We did.  No, your Honor.  We do

9    not concede it.  We did produce it during the discovery

10   period.

11           THE COURT:  In its European form?

12           MR. KELLEHER:  Both -- when we produced the

13   United States patent, discovery was still open.  There has

14   never been a deadline set in this case for disclosing prior

15   art or disposing invalidity contentions and the statute said

16   we didn't have to disclose prior art until 30 days before

17   trial.  We did it well before that.

18           That's it for my, your Honor, unless you have

19   any questions.

20           THE COURT:  Bear with me one second.

21           No, no further questions.

22           MR. KELLEHER:  Thank you.

23           THE COURT:  Thank you.

24           MR. LINDVALL:  I'll try to respond to those even

25   though all these weren't my assignments.

1          With respect to late disclosed prior art.  They

2     produced over 75 patents and what have you in discovery.

3     And they did produce 75.  I don't know if the patent they're

4     talking about was disclosed or not.  The fact is their

5     expert came out with the expert report and used certain

6     references and disclosed those, and that gave us notice, and

7     our expert could rebut that.

8          After all of that was done, all the expert

9     discovery was done, after fact discovery was done, then

10     they disclose that they're going to rely on these.  And that

11     is our issue.  Our expert, if they get any testimony, for

12     example, on these pieces of prior art, does that mean our

13     expert can't rebut it because there is no opinion relating

14     to it in his expert report, in his rebuttal expert report?

15     I don't know but it puts us in an awkward situation.

16          The first time we saw any notice of that prior

17     art was when they used that in the deposition of our

18     inventors, which was technically at the close of discovery.

19          THE COURT:  Well, assume that they can't elicit

20     expert testimony on it because they haven't produced an

21     expert report on it, but that their view is they don't need

22     an expert.  I take it, your view is you may need an expert

23     to rebut it; is that correct?

24          MR. LINDVALL:  That's correct, your Honor.  For

25     example, if they were to call one of the inventors to the

1    stand as a hostile witness and try to elicit testimony to

2    show that the patent is invalid, even though the inventor

3    doesn't speak English and the inventor doesn't know anything

4    about the claim construction decision, then we may want to

5    use our expert in rebuttal to say that, no, that is not true

6    for the following reasons.

7              THE COURT:  So if we get to that point, what

8    would be your request that I do?  Should I give you the

9    chance to file an expert report this week before trial or

10   should we just see what happens at trial?

11             MR. LINDVALL:  Actually, your Honor, I try to

12   anticipate that, and I know that our expert this week is

13   busy on another matter, so he wouldn't be able to do that in

14   some time between the two separations of the trials, if he

15   could do it at all.

16             Obviously, he wouldn't know what to rebut until

17   he hears the testimony of the inventors; and I don't know if

18   they plan on calling the inventors as hostile witnesses or

19   not because they're not on the will call list.  They're on

20   the may call list.  So I don't know what they're planning on

21   doing.

22             This all goes to the Rule 26 disclosures on

23   something like this.  We're supposed to get fair notice

24   about how to respond to something like this.  And fair

25   notice is not when you hear for the first time the inventor

1    is going to be put up as a hostile witness and they're going

2    to use reference A for the first time as an anticipatory

3    witness, and our expert on the same day may have to get up

4    there and disagree with what the inventor said.  This is the

5    whole idea around fair notice of prior art.

6             They gave us 75 pieces of prior art.  I think

7    they have 30 some odd different combinations and anticipatory

8    arguments even in the disclosed arguments.  And we obviously

9    are going to refer to that, your Honor, when we're talking

10   about the pretrial order about limiting them to what they're

11   going to come to trial with rather than let us guess which one

12   of the 30 arguments they're going to use and give us something

13   definite.

14            So that is my response on the late disclosed.

15            THE COURT:  What about the argument that I never

16   set a discovery deadline or at least in terms of disclosing

17   prior art, they had up until the statutory limit to do it.

18            MR. LINDVALL:  I think the scheduling order is

19   clear.  The end of discovery is the end of Rule 26 expert

20   disclosures.  That is when you have to disclose it.

21            And if you say that you can now present other

22   prior art after the close of discovery and then use it at

23   trial, it's a way of circumventing the whole Rule 26 expert

24   disclosures rules.  Because obviously anybody who is going

25   to give any testimony on this prior art is going to be

1    necessarily opinion testimony.  Even the inventor, if

2    they call the inventor as a hostile witness, you can be

3    guaranteed we are going to be doing objections.  They're

4    going to be doing lay opinions or opinion lay testimony.

5    It's improper.

6             Now, let me touch on other areas.  The Shinju

7    reference that Mr. Kelleher was referring to.  Keep in mind,

8    two separate patent examiners both reviewed the Shinju

9    reference and allowed the patent over it.  It's specifically

10   discussed in the U.S. patent, expressly talked about in

11   there and distinguished from our invention.  So we think

12   from that standpoint, it shouldn't be looked at --

13            Mr. Kelleher made a reference, saying, well,

14   the examiners may have used a different claim construction.

15   The patent examiners by the patent rules have to use the

16   broadest possible construction that they can come up in

17   determining whether or not the patent claims should be

18   issued or not.  That's the rules in the Patent Office.  They

19   have to use the broadest possible construction, which is

20   usually broader than any Court's construction.

21            THE COURT:  But maybe in this case it isn't.  I

22   mean how do we know?

23            MR. LINDVALL:  No, we wouldn't know because we

24   are not allowed to call them.  We have to assume they

25   followed the rules, and the rules are they have to follow

1    the broadest possible construction.

2              With respect to the standing issue -- switch

3    gears again -- Mr. Auriol and Bornes, again, in their

4    declaration, made a specific comment in both of their

5    declarations that they would be willing to -- this is with

6    respect to AHG having standing on past damages -- would be

7    willing, if necessary, to execute an agreement to allow AHG

8    to collect for past damages s.  It's express.  It's signed.

9    It's a declaration.  That would alleviate any type of

10   worries that they would have.

11             In any event, we could still put together and

12   agreement today and give it to them, and that would give

13   them the right to past damages.  And we will contemplate

14   doing that.  We didn't think it was necessary.  We thought

15   the agreements are clear on its face.

16             THE COURT:  Their position is it wouldn't make a

17   difference at all because the patent is expired.  How can

18   you assign something that doesn't exist?

19             MR. LINDVALL:  No.  It's just -- for example,

20   you can enforce a patent that has expired.  That is exactly

21   what we have done.  You can still get damages six years back

22   by the statute.  You have lost some damages.  For example,

23   if a patent is expired and you sue a year later, you lost a

24   year of damages.  You can only go five years behind the

25   issuance, but you still enforce it for the period of time it

1    was enforceable.

2              With respect to the motion to dismiss on the

3    '339 patent.  And this has to do with whether the Patent

4    Office abandoned the patent or not.  What we did actually

5    today, we got on the Patent Office website and we found a

6    patent that had been abandoned or withdrawn.  They say

7    withdrawn.

8              If I may, your Honor.  May I approach?

9              THE COURT:  You may.

10             (Documents passed forward.)

11             MR. LINDVALL:  This is what the Patent Office

12   does if the patent has been abandoned or withdrawn.  It

13   doesn't even show the patent anymore.  It just uses the word

14   "withdrawn."  You can't even access it anymore.

15             The idea is it's clear that this patent has been

16   in the patent database the whole time.  We have been paying

17   maintenance fees.  They haven't been returned.  There is no

18   indication at all that this patent has been abandoned.

19             THE COURT:  So where is the check?

20             MR. LINDVALL:  The check, unfortunately, the

21   U.S. Attorney who prosecuted this patent died about six or

22   seven years ago.  His files are gone.  The only evidence we

23   can find was a letter that was sent by that attorney to our

24   client and our client still has that.  He actually had a

25   copy.  His files are gone, the entire file.  We tried to

1    find them.  Again, he is passed away and nobody knows what

2    happened to his files, so we don't have this file anymore.

3            THE COURT:  I should find that you therefore

4    have satisfied your burden?

5            MR. LINDVALL:  You can satisfy the burden by

6    showing that the Patent Office basis still has it an

7    enforceable patent on its website.  And if the Patent Office

8    believes the patent is abandoned or withdrawn, they will put

9    notice on the website by doing this.  That is an official

10   record of the U.S. government, and there is no reason to

11   question why the U.S. government is wrong in this situation.

12           One other aspect of this is that a party -- we

13   cite a federal case in there.  I can't recall the name.

14   What was it?

15           MS. SAUNDERS:  Aristocrat.

16           MR. LINDVALL:  Aristocat -- Aristocrat.

17   Aristocrat said it is improper to attack the validity of the

18   patent by talking about technicalities of the Patent Office.

19   What they're doing is an end-around with Aristocrat.  What

20   they're trying to do is find the Patent Office did something

21   wrong or something is improper.  Then instead of finding the

22   patent is invalid, saying I don't have jurisdiction.  Well,

23   you do have jurisdiction over this no matter what.  It's a

24   patent action.  And they're asking you to decide this issue

25   whether the Patent Office is correct or whether this patent

1    is abandoned or not.

2             Whether it's abandoned or not, it doesn't go to

3    the Court's subject matter jurisdiction.  _Aristocrat_

4    specifically said the Court should not be hearing these type

5    of defenses because there is no statutes that allow for the

6    Court to hear these type of defenses.  What they have done

7    is cleverly turn this into a subject matter jurisdiction

8    when, in fact, it is their way of trying to defend against

9    the patent infringement litigation.

10            The last thing is, you know, best mode.  I'm

11   going to let Ms. Sharp finish up the last conversation.  How

12   much time do we have?

13            THE COURT:  You still have six minutes.

14            MS. SHARP:  Your Honor, first, just one thing to

15   add to what Mr. Lindvall said in response to one of your

16   Honor's questions.  You asked if there was any information

17   about deadlines that the Court imposed.  In addition to

18   the scheduling order, in late July, when we had another

19   conference about production of the defense damages exhibits,

20   your Honor directed us to confer and submit a scheduling

21   order.

22            And one of the issues we discussed at that time

23   was that defendants had not asked for depositions until

24   right towards -- right at the end of what would have been

25   the discovery cutoff; and as a result, they were asking for

1    a time period when our witnesses were unavailable.

2              Concerning about the prospect of having things

3    thrown in late, we asked your Honor if your Honor was

4    reopening discovery for all purposes.  Your Honor ruled

5    towards the end of the transcript in the last couple of

6    pages -- and I'm sorry I don't have that cite -- that you

7    were not reopening discovery.  That the only thing we would

8    be doing is finishing up what had not yet been completed.

9    And that is really what leads to the concern that we have

10   that gave rise to the motion, the original motion to strike

11   which was done as a cross motion, and then the motions to

12   strike that relate to issues that were raised for the first

13   time in the replies.

14             But turning then to the issue of best mode.

15   Broetje has the burden of proof to prove best mode by clear

16   and convincing evidence both that the inventors possessed

17   the knowledge about best mode and concealed it.  The

18   deposition testimony on which they relied is inadequate to

19   prove any of that and certainly far inadequate to prove it

20   to this clear and convincing standard.

21             The questioning taken individually and then the

22   testimony taken as a whole, the questioning doesn't address

23   time frames with any sufficient specificity to understand

24   the time frames that the witnesses were talking about.

25             What their declarations make clear is they

1     did not know the best mode, which is five grooves, until

2     the invention was commercialized, and that was years and

3     years after the patent applications.  At the time of the

4     applications, they were using three and two and four

5     grooves, I believe.

6              THE COURT:  I have some questions for you on

7     best mode.

8              MS. SHARP:  Oh.  I think, if I may, your Honor.

9     I think your Honor already noted that there was such a

10    disclosure in the patent, but figure 2 in the patent shows

11    three grooves, if your Honor wishes that I hand it up.

12             THE COURT:  That's fine.  It's not necessary.

13             On best mode, do you agree that a single

14    inventor's subjective personal view regarding best mode, if

15    concealed, would be a sufficient basis for invalidity?

16             MS. SHARP:  No, not a single inventors.

17             THE COURT:  How about two inventors?

18             MS. SHARP:  If two inventors had a subjective

19    belief regarding the best mode as opposed to preferred

20    modes, yes.

21             THE COURT:  And why not one single inventor of

22    a double inventor invention?

23             MS. SHARP:  Because the inventors have to

24    believe that and reach a meeting of the minds on it.  They

25    could have had a difference, and here may well have had a

1   difference of opinion, but what the record really shows is

2   that they were using all different numbers of grooves at the

3   time to try to determine what the correct number was, and

4   that they had not finally determined the correct number.

5          THE COURT:  And your contention is that a

6   careful reading of the deposition transcript would show

7   ambiguity as to when the two inventors determined that the

8   best mode was five or an odd number.

9          MS. SHARP:  Correct.  Because the questioning

10  doesn't deal, and the answers don't deal with time frames.

11  What the inventors say is that over a very long period of

12  time, they were doing various things to try to figure out

13  how many grooves to use and the follow-up questioning, even

14  the initial questioning wasn't about specific time frames.

15         THE COURT:  And how about, there is the motion

16  to strike.  I guess it's not necessarily what you are up to

17  address, but it seems to me that the best mode defense is

18  procedurally somewhat different than some of the others and

19  that they couldn't have had a basis for it until after they

20  deposed the inventors.  Is that a fair way to distinguish

21  some of these late asserted defenses?

22         MS. SHARP:  Well, if that distinction obtained

23  all the way through, it would be a fair distinction, I think,

24  your Honor, but the reality is that the case has been

25  pending a long time.  Had they been serious about a best

1    mode defense, they could have noticed and taken those

2    depositions long ago, long before, well after the close of

3    discovery.

4              THE COURT:  And what about -- and if you want to

5    kick this to one of your colleagues, feel free.  The motion

6    to strike itself seems like it was fairly untimely, coming

7    in well after the deadline the Court did set for dispositive

8    motions and coming several weeks after they updated their

9    contention interrogatories to tell you they did want to add

10   at least the best mode defense.

11             MS. SHARP:  First, on the issue of whether or

12   not it was a case dispositive motion.  Because the issues

13   weren't timely in the case, we did not regard it as a case

14   dispositive motion, and, optimally, we wish we filed it

15   earlier, but, your Honor, we were trying to get the pretrial

16   order ready and other things ready at the same time and

17   thought that the place that that fit most properly was in

18   response to the motion to dismiss which wasn't brought until

19   August.

20             THE COURT:  Okay.  Fine.  The plaintiffs' time

21   is up.  Thank you very much.

22             Defense do have a few more minutes, if you wish.

23             MR. KELLEHER:  Your Honor, on page 44 of Mr.

24   Auriol's deposition, I asked him:

25             "Question:  Do you remember when you learned

1   that you needed an odd number of grooves?

2           "Answer:  We realized that from the very

3   beginning," was the answer.

4           So I did ask about timing.  That's the answer

5   that he gave.

6           THE COURT:  And your contention is that the only

7   reasonable reading of that is at the very beginning, at

8   least predates the application?

9           MR. KELLEHER:  Yes, your Honor.  He testified

10  that they spent a few months before they had a patent

11  application ready, and that is how I would read that.

12          THE COURT:  Okay.

13          MR. KELLEHER:  With regard to Dr. Kytomaa and

14  the Mauer reference or the indefiniteness issue, I think,

15  your Honor, they don't even need to do a new expert report.

16  As we all know, if you open in the door at an expert's

17  deposition and he gives you opinions, they are allowed to

18  testify about that at trial.  I did ask Dr. Kytomaa about

19  the Mauer reference and he said it is covered by the claims.

20  I asked about peripheral guiding, and he gave his view on

21  it.  So he is able to testify about that at trial because I

22  already opened the door.

23          THE COURT:  They're concerned that they don't

24  know which defenses you are going to assert, assuming I

25  allow you to, particularly which references you are citing

1    as anticipatory, which combinations are obvious.  Are you

2    prepared to tell us all today which ones?

3              MR. KELLEHER:  Your Honor, I'm not sure I

4    am prepared to give any up, but I can tell you if they

5    want some guidance as to what I'm going to argue as to

6    invalidity, all they have to do is look at the summary

7    judgment papers.  I put in there what we felt was the

8    strongest case.

9              THE COURT:  And help me understand why some of

10   what you put in in August, it seems, or thereabouts isn't in

11   violation of the scheduling order and my ruling that you

12   were not to treat discovery as completely open-ended in

13   July.

14             MR. KELLEHER:  I think June is actually

15   when they were produced, your Honor, perhaps I'm incorrect

16   about that, but expert discovery and invalidity discovery

17   was still open.  I didn't take Dr. Kytomaa's deposition

18   until August 19th.

19             THE COURT:  Is there anything else?

20             MR. KELLEHER:  Concerning the Aristocrat case,

21   your Honor.  It doesn't apply here.  Aristocrat holds when

22   the Patent Office revives an application, you can't then

23   say that the revival is improper, therefore, the patent is

24   invalid.

25             Here, the application was abandoned as a matter

1    of statute, section 151, and it was never revived, so we're

2    not arguing invalidity based on improper revival, which was

3    the actual holding of Aristocrat.

4            The case to look at is the Chinsammy case that

5    we cite in our papers.  That was a Federal Circuit case

6    decided this year where someone sued someone for "patent

7    infringement" and what they said was the patent was actually

8    an abandoned application.  The Federal Circuit said there

9    was no subject matter jurisdiction, and a 12(b)(1) motion is

10   properly granted.  We think that is very similar to our

11   case, your Honor.

12           And with regard to best mode, your Honor, each

13   individual inventor has to disclose what he or she thinks is

14   the best mode.  You don't only have to disclose what there

15   is a meeting of the minds on.  There is an individual

16   requirement for every single inventor.

17           THE COURT:  Okay.  Thank you very much.

18           We're going to take a recess.  And when we come

19   back, we'll go through a number of other issues.

20           (Brief recess taken.)

21           THE COURT:  All right.  Let me --

22           MR. LINDVALL:  Your Honor?

23           THE COURT:  Yes.

24           MR. LINDVALL:  Your suggestion, about severing

25   willfulness that you made earlier in the hearing, I've had a

1    chance now to discuss it and think about it.

2              There is one suggestion I could make without our

3    client incurring a lot of costs.  We could sever willfulness

4    but do it so if the jury finds there is infringement, then

5    we have like an extra day after that.  So it's a continuum

6    rather than have to be a separate trial a month later, two

7    months later or three months later.

8              THE COURT:  Thank you.  I had considered that

9    prior to you saying no to separate trials, but in this case,

10   I have decided not to do that.  I'm going to have a single

11   trial of all of the claims that remain as of the time of the

12   trial which will be next Monday.

13             One problem with the latest suggestion is I

14   still would have to decide whether to sever off your

15   nonpatent claims because some of the same concerns I have

16   with willfulness, I also have with the nonpatent claims.

17   And if I did sever those, I'm not sure that we could get it

18   all done in one day, and I don't want to put the jury in a

19   position where they think they're done and then they're not

20   done.  So we will have a single trial, to the extent there

21   is anything left to try, after the Court rules on all of the

22   motions, if indeed I do rule on all of the motions before

23   trial.

24             But what I can give you now is my rulings on the

25   motions in limine, at least all but one of the motions in

1    limine, and I will go through them in order, first with

2    AHG's motion.

3           AHG's Motion No. 1 to preclude reference to

4    foreign law or foreign limitations.

5           That motion is denied.  The Court does believe,

6    as was indicated in the argument, that the foreign law that

7    defendant wishes to cite does have at least some limited

8    relevance.  The jury will decide how much weight to give to

9    that evidence, and the Court will, if asked, instruct the

10   jury on the non-binding nature of the foreign law.

11          The relevance, though minimal, relates to the

12   willfulness claim, and defendant has represented it does not

13   intend to assert, and nor will it be allowed to argue, that

14   there is any relevance to the infringement claim, any

15   relevance of the foreign law to the infringement claim.

16          Next is AHG's Motion in Limine No. 2 to preclude

17   reference to the fault reports.

18          This motion is denied.  While in the Court's

19   view the fault reports do not appear to be very relevant,

20   the Court is not prepared to say that they are entirely

21   irrelevant.  What they are relevant to is the whole under-

22   lying relationship between the parties, which included

23   the time in which AHG was a supplier to Broetje, and then

24   Broetje's development of its own product and the termination

25   of that relationship.  So both parties are going to be

1    permitted to tell that story, and the fault reports are part

2    of the story from the perspective of the defendants.

3            So while not highly relevant in the Court's view,

4    the Court, again, does not find them wholly irrelevant; and

5    under 403, the Court believes it can manage this trial in a

6    manner such that the risk of confusion and prejudice that may

7    result from the fault reports coming into evidence will not

8    substantially outweigh the probative value.  So, again, that

9    motion is denied.

10           AHG Motion No. 3 is one that the Court is

11   reserving ruling on.

12           That takes us to Broetje's motions.  First,

13   Motion No. 1 to preclude reference to breach of the 1994

14   contract between the parties.

15           This motion is granted in that there will be no

16   reference to "a breach of an agreement."  Nor will there be

17   any implication of a breach.  Nonetheless, plaintiff will,

18   consistent with what I already said, be permitted to tell its

19   side of the story, which will include, if plaintiff wishes,

20   its witnesses saying what they thought the defendant's

21   obligations were and what the defendant, in their view, did.

22   The Court understands the parties will dispute whether or not

23   there was a contractual agreement.

24           All of this, again, is minimally relevant in the

25   Court's view, but the Court believes it can manage the trial

1    in a way such that relevance is not substantially outweighed

2    by the unfair prejudice and on confusion.

3            Next is Broetje's Motion No. 2 to preclude

4    references to Broetje's product as Chinese copy.

5            This motion is granted.  There would be no

6    legitimate purpose to using that phrase.  The parties are

7    instructed not to use it, and counsel is instructed to

8    direct their witnesses not to use that phrase either.

9            Broetje Motion No. 3, to preclude reference to

10   extraterritorial confusion or use of trade dress outside the

11   U.S.

12           This motion is granted.  What may have occurred

13   in another country or countries has, at best, minimal

14   relevance to what folks here would think under our own laws,

15   with potentially different culture and different responses

16   to the same type of trade address.  Whatever minimal

17   relevance there may be is far outweighed by the risk of

18   confusion and the potential for wasting a great deal of time

19   at trial.  There may also be a hearsay problem, so the Court

20   is granted that motion and precluding that evidence.

21           Next is Broetje Motion No. 4 to preclude the use

22   of the Court's claim construction opinion as the basis to

23   question or undermine Broetje's reliance on its advice of

24   counsel.

25           This is granted as well.  The Court's Markman

1    opinion, of course, postdates the time that the patents were

2    in effect.  Obviously, it is impossible therefore for the

3    Court's Markman opinion to have factored into the decision of

4    the defendant whether or not to proceed with developing and

5    marketing its product.  And it would be unfairly prejudicial

6    to Broetje and confusing to the jury to question Broetje's

7    witnesses on whether they considered certain arguments that

8    the Court, on a particular day in a particular case, found

9    persuasive.  Therefore, that motion is granted.  And,

10             Finally, Broetje Motion No. 5 to preclude

11   reference to discovery disputes and purported discovery

12   failings.

13             This motion too is granted.  The Court agrees

14   with Broetje that trial is not the time to resolve discovery

15   disputes.  There is no relevance whatsoever to the issues at

16   trial as to whether Broetje was slow or deficient in some

17   way in regards to discovery.

18             The Court notes that what Broetje is attempting

19   to exclude here is any accusation in front of the jury that

20   it did not comply with its discovery obligations.  Broetje

21   is not trying to preclude the plaintiff from getting into

22   the facts of here is what was produced, here is when it was

23   produced, here is what your expert said on such-and-such a

24   date, and here is what they said in a subsequent report or a

25   subsequent date.  Therefore, that is the limited relief that

1    Broetje is seeking, and that is the relief that the Court is

2    granting by granting Motion No. 5.

3             The Court will take under advisement the other

4    motions that have been argued here today as well as the one

5    motion in limine that I noted that I was not ruling on.

6             Let's turn now to the proposed pretrial order.

7    I'm going to go through many of the sections with you and

8    say some things about where you have certain disputes.  If I

9    don't comment on something that is in the proposed order and

10   there is no dispute on it, then it is acceptable to the

11   Court and it is binding on the parties going forward.

12            First, the uncontested facts.  The Court will

13   read those to the jury after opening statements before the

14   first witness testifies.

15            And I should say on some of these, I will need

16   some input from you all.  For instance, on the factual

17   issues to be tried, putting aside that there are motions

18   that might affect that, other than what is pending in the

19   motions, it did not seem that there is a dispute as to what

20   is in dispute.

21            Is that correct from the plaintiffs' perspective?

22            MR. LINDVALL:  I believe so, your Honor.  But in

23   most cases, I think that is true.  It's because the

24   different motions gave us different perspectives.

25            THE COURT:  From the defendant's perspective, is

1    that correct?

2         MR. KELLEHER:  The only one difference I can

3    think of, your Honor, I think they say the issue of marking

4    under the patent marking statute is not at issue in the

5    case.  We believe it is because they never marked a patent

6    number on their cassettes.  It is our position that they

7    never actually accused us of infringing United States

8    patents before this lawsuit was filed, so they could only

9    begin to get damages as of the date they sued us.

10        THE COURT:  Mr. Lindvall, is marking an issue?

11        MR. LINDVALL:  Your Honor, I think this is the

12   first time they brought it up, but I guess if they believe

13   it's an issue, it's an issue.  But I don't believe it's an

14   issue for a number of reasons.  One is we gave them a letter

15   in 2005 which said they're infringing the patents, and we're

16   going to seek relief in the court in every one of those

17   instances.

18        Second, it's a French corporation, located in

19   France, providing these to Germany.  There is no obligation

20   for them to mark.  If Broetje happens to send those to the

21   U.S., everything is still fine.  So it's really a nonissue.

22   But it is -- it was the first time they brought it to light.

23   It's not in any of their responses to interrogatories or

24   what you have.

25        THE COURT:  Okay.  Mr. Kelleher, do you want to

1    respond to that?

2            MR. KELLEHER:  I don't think so, your Honor.

3    It's an issue.

4            THE COURT:  Okay.  If you all think you need to

5    present evidence on it, you may do so.

6            There is a notice that there are some

7    affirmative defenses, laches waiver and equitable estoppel.

8    Do the parties anticipate presenting evidence on those at

9    trial?

10           MR. KELLEHER:  We do, your Honor.  We believe

11   they sat on their hands ever since 2005, before suing us in

12   2009, when they knew these products were being sold in the

13   United States.

14           THE COURT:  So those are matters that won't be

15   argued to the jury, but you will present the evidence.

16           MR. KELLEHER:  They are viewed as that, yes.

17           THE COURT:  And, Mr. Lindvall, you understand

18   that that is what the defendant is going to do at trial?

19           MR. LINDVALL:  Yes.  Yes, your Honor.  I

20   understand that.  Although I would say that they're evidence

21   within the six-year presumption, so they would have a very

22   difficult time during the proof, but I understand the Court

23   would have to decide that separately from the jury.

24           There is one issue.  There are a number of

25   pieces of evidence which has no relevancy separate for

1    laches and equitable estoppel.  Does your Honor still want

2    to hear, have the jury hear that evidence?  It has to do

3    with trade dress.  Laches and equitable estoppel are part of

4    our patent.

5                THE COURT:  It's all going to go in front of the

6    jury.  The jury will be instructed obviously on what it

7    needs to decide and not on things it doesn't need to decide.

8                Next, turning to legal issues.

9                Again, put aside that there is a lot of motions

10   still pending, but it looked as if you are all in agreement

11   as to what legal issues are going to be in this trial.  Of

12   course, we'll discuss those further when we get to jury

13   instructions.

14               Is there anything either of you wish to say on

15   legal issues at this point?  Mr. Lindvall?

16               MR. LINDVALL:  No, your Honor.

17               THE COURT:  Mr. Kelleher?

18               MR. KELLEHER:  No, your Honor.

19               THE COURT:  On expert reports, we'll follow the

20   Judge Farnan rule which was described earlier.  Do either of

21   you have any questions about that?  Mr. Lindvall?

22               MR. LINDVALL:  No, your Honor.

23               THE COURT:  Mr. Kelleher?

24               MR. KELLEHER:  No, your Honor.

25               THE COURT:  Okay.  I'm now up to other

1    witnesses.  I think, let's see, within your witnesses

2    section, at page 6.  We're within VIII, at page 6.  The

3    Court adopts Broetje's proposal that notice of the witnesses

4    to be called will be due by 3:00 p.m. one calender day

5    before.

6              And then witnesses called by deposition, in

7    section 9, pages 7 to 8, the proposal here for the timing of

8    letters to the Court identifying the testimony that's in

9    dispute, that is acceptable to the Court.  You can certainly

10   follow that procedure.

11             The Court also adopts Broetje's additional

12   proposal in paragraph 5 that you will delete additional and

13   redundant portions from the deposition.

14             The Court allows direct, cross and redirect.  No

15   recross examination is permitted.

16             I require there to be only one attorney

17   questioning each witness, and only one attorney at the

18   podium at a time.

19             If you are going to be using equipment, then

20   either the equipment need to be directed by somebody not

21   at the podium or it has to be directed by somebody at the

22   podium who is the one asking questions.  I don't want to

23   see multiple people at the podium.

24             You need to ask for leave to approach a witness

25   once per witness.  Once you ask one time per witness, it

1    will be granted and you can freely approach that witness

2    thereafter.

3              Turning then to exhibits, your section XI.  Your

4    timing of disclosure of exhibits that you intend to use is

5    acceptable.

6              Further, at paragraph 2, the Court adopts

7    Broetje's proposal, I'm on page 9, that if there is no

8    objection, you do not need to elicit additional foundation

9    testimony in order to admit the evidence.  However, the

10   document must be shown to a witness and you must move for

11   its admission.

12             At paragraph 5, the Court adopts Broetje's

13   proposal that physical exhibits will be exchanged by

14   September 24th unless the parties agree otherwise.

15             At paragraph 8, the Court adopts AHG's proposal

16   that demonstratives will be exchanged by 7:00 p.m. the night

17   before they are used unless otherwise agreed.

18             At paragraph 8, the Court adopts Broetje's

19   proposal that demonstratives to be used in the closing

20   arguments will be exchanged by 7:00 a.m. unless alternative

21   arrangements are made.

22             The Court adopts the additional proposal by

23   Broetje in paragraph 10 regarding printed publications, and

24   paragraph 13 regarding certified translations, and the

25   Court also adopts AHG's proposal in paragraph 11 regarding

 1    photocopies.

 2              At section 11, paragraph 3, at page 9, there

 3    is a dispute which I think boils down to whether or not

 4    exhibits to be used only on cross-examination need to be

 5    listed.  I want to hear from the parties whether that

 6    remains in dispute and what your positions are.  There are

 7    two competing proposals.

 8              Mr. Lindvall.

 9              MR. LINDVALL:  My understanding was your Honor's

10    practice was that all exhibits to be used at the trial had

11    to be on the exhibit list, whether it's going to be used for

12    impeachment purposes or for any other purpose.

13              THE COURT:  I certainly have done that on

14    occasion.  I don't always do that.  Is it your request that

15    I would do that at this point?

16              MR. LINDVALL:  Yes, your Honor.

17              THE COURT:  And the defendant?

18              MR. KELLEHER:  We don't object to that, your

19    Honor.

20              THE COURT:  Do not?

21              MR. KELLEHER:  We do not.

22              THE COURT:  Okay.  Well, then that proposal is

23    adopted.

24              Some miscellaneous issues.

25              MR. KELLEHER:  Your Honor?

```
 1                    THE COURT:  Yes.

 2                    MR. KELLEHER:  I apologize.  We weren't sure

 3       exactly which paragraph.

 4                    THE COURT:  I'm sorry.  It's paragraph 3 of XI

 5       at page 9.

 6                    MR. KELLEHER:  Thank you.

 7                    THE COURT:  All right.  A few miscellaneous

 8       things at my end.

 9                    The trial, of course, is timed.  We'll talk in a

10       moment about how much time.

11                    At the end of each trial day, at least one trial

12       member -- I'm sorry.  Do you have an issue?

13                    MR. SCHILTZ:  Your Honor, I apologize.

14                    In paragraph 3, section 11, on page 9, there are

15       two proposals, one by AHG and one by Broetje.  We weren't

16       clear if your Honor had ruled on which of those two were to

17       be accepted or neither.

18                    THE COURT:  I meant to adopt what Mr. Lindvall

19       proposed here on-the-fly on his feet.  And I understood that

20       not to be objected to.  Correct?

21                    MR. SCHILTZ:  Thank you, your Honor, for the

22       clarification.

23                    THE COURT:  Whether these words do it or not,

24       I'll have to leave to you all.

25                    All right.  I was talking about the timing of the
```

1    trial.  At the end of each trial day, at least one member of

2    each side should meet with my deputy to cross-check and get a

3    rough calculation as to what the time used has been and also

4    to cross-check what has been admitted in evidence.

5         In the morning, we will give you the official

6    amount of time used by each side.  And if you find at any

7    point that you have failed to move the admission of something

8    and it's a clerical error, we will give you an opportunity.

9    As long as you raise it with me before the close of

10   evidence, we'll give you an opportunity to correct that.

11        I encourage transition statements, particularly

12   in a patent case, particularly when the burden is going to

13   be shifting throughout the trial.  The jury tends to find

14   it helpful if before you, or even as you are introducing the

15   witness, if you give one or two sentences, non-argumentive,

16   just to tell the jury who the person is and how they fit

17   into the case.

18        I think you probably all know how we keep track

19   of time.  Basically, if you are on your feet, the time is

20   counting against you.  And we'll look to you to give us,

21   with respect to depositions, what the breakdown is for how

22   much time is allocated to each side.

23        Are there any questions about how we time the

24   trial?  Mr. Lindvall?

25        MR. LINDVALL:  No, your Honor.

```
 1                    THE COURT:  And Mr. Kelleher?

 2                    MR. KELLEHER:  What about sidebars, your Honor?

 3                    THE COURT:  Right.  Initially, the sidebars are

 4      charged to the party who is examining the witness at that

 5      time, but if we find that it's being abused, then we reserve

 6      the right to reallocate that time.

 7                    That takes me next to the miscellaneous issues

 8      raised by the parties.

 9                    Evidently, there is a dispute as to whether to

10      play the Intro to the Patent System video produced by the

11      FJC.  As I understand it, AHG does not want it played and

12      Broetje does.  Is that correct, Mr. Lindvall?

13                    MR. LINDVALL:  Yes, your Honor.

14                    THE COURT:  And why don't you want it played?

15                    MR. LINDVALL:  Yes, your Honor.  Actually, I

16      haven't looked at it in the last year or so, I haven't

17      watched it, but my understanding is the Patent Office

18      procedures have slowly changed, and we're not certain about

19      the accuracy of the video anymore.  It was made about

20      nine-ten years ago.

21                    Second, it's our belief that it's slanted

22      towards the defendant's type view that the Patent Office is

23      overworked and, as a result, may not do their job quite as

24      adequately as should be doing.

25                    THE COURT:  Okay.  Does the defense want to
```

1    respond?

2              MR. KELLEHER:  Your Honor, I'm not aware of any

3    errors that have crept into it over time.  I think it's a

4    pretty fair video.  I have played them on the plaintiff's

5    side and the defense side.

6              THE COURT:  Okay.  We're going to play the

7    video.  I have played it at each of my of other patent

8    trials and jurors invariably say they find it useful.

9              I will also be instructing in the preliminary

10   instructions some background about the patent system.  And

11   while there is some redundancy between that and the video,

12   the jurors generally say that they like that because they

13   come in knowing nothing about patent law, and it's complex,

14   and they appreciate seeing it in video form and hearing it

15   in the instructions.

16             In terms of some other miscellaneous issues that

17   you all raised in your papers, the Court finds acceptable

18   and adopts AHG's proposals regarding translated depositions.

19   Mr. Neugebauer's time for testifying.  The point about the

20   substitution of expert.  That witnesses will generally be

21   sequestered.

22             We'll talk about Mr. Lawrence in a second.

23             And with respect to translated exhibits, I do

24   want to hear from the parties on whether Mr. Lawrence should

25   be sequestered.  And also on the remaining issues raised by

1    AHG with respect to whether Mr. Peters should have a

2    translator, whether those 214 exhibits on Broetje's exhibit

3    list should be deleted, and Proposal No. 9 about additional

4    facts.

5            So let me hear first from AHG on each of those

6    issues, please.

7            MR. LINDVALL:  Your Honor, with respect to

8    Mr. Lawrence, as you heard Mr. Kelleher say, Mr. Lawrence

9    has been in this industry for a long time, and Mr. Lawrence

10   is in a unique situation when I took his deposition.  He

11   works at the Long Beach facility of Boeing which makes

12   airplanes, and at that facility, there are three Broetje

13   riveting machines.  Two of these machines use AHG riveting

14   feeding systems and one uses the Broetje feeding system,

15   which we say is an infringement.

16           Mr. Lawrence testified at his deposition about

17   the faults that he had experienced with AHG's rivet feeding

18   system.  He had been using those systems for over 10 years.

19   They're the original systems that had been there for

20   10 years, and I elicited testimony from him about how few

21   faults had come from those riveting machines.

22           As a result, he turned into a fact witness on

23   that particular standpoint for us.  A very important fact

24   witness, in fact, because we anticipate, especially after

25   your Honor's ruling on the MIL, that they're going to elicit

1   testimony from, for example, Mr. Neugebauer about all the

2   faults that they experienced in our riveting machines.

3           This will be used as rebuttal testimony.  We

4   anticipate calling Mr. Lawrence not in our case-in-chief but

5   as a rebuttal witness, if they do decide to present the

6   evidence on faults, because he really is a very key witness

7   here, very important testimony for us.  That's why we would

8   ask for him to be sequestered.

9           There is an alternative, I think that we can do

10  this, because he is an expert.  I understand there may be

11  the need to hear expert testimony.  To the extent one of

12  their witnesses is going to talk about faults, we ask him to

13  be sequestered at that particular time.  And if the witness

14  is talking about something else other than faults, we would

15  have no problem with Mr. Lawrence attending that testimony.

16  To the extent a witness is discussing faults they had with

17  AHG systems, in that situation Mr. Lawrence should be

18  sequestered.

19          THE COURT:  Are you going to present any

20  testimony about faults in your case-in-chief?

21          MR. LINDVALL:  Your Honor, we may have some

22  because we may talk about, the witnesses, what faults they

23  had experienced and why they experienced them.  In that

24  case, I would have no problem with Mr. Lawrence not being

25  sequestered, in that situation.  It would only be when the

1    Broetje witnesses are testifying.

2            THE COURT:  So your request boils down to only

3    requesting that he be sequestered when Broetje witnesses are

4    testifying about faults?

5            MR. LINDVALL:  Yes, your Honor.

6            THE COURT:  Okay.

7            MR. LINDVALL:  I think that would -- that helps

8    limit any prejudice to Broetje, if at all, so it follows

9    the reasons for the rule and would not cause Mr. Lawrence

10   to somehow tilt his testimony because of what he hears a

11   Broetje witness saying.

12           The other thing that is important here, your

13   Honor.  Mr. Lawrence does business with Broetje.  In fact,

14   right after he was retained as an expert witness, he signed

15   a contract, a $10,000 contract with Broetje to do work for

16   them.  So he not only is an expert, he also is a customer

17   and does business with Broetje, so we wouldn't want him to

18   do anything to tilt his views on that.

19           Your Honor, the other was Mr. Peters or

20   Dr. Peters is a Broetje witness.  I took his deposition and

21   it was all in English.  I think he did refer once or twice

22   to an interpreter, but it is our request that Dr. Peters

23   could testify in English.  I think he is very comfortable.

24   He said he was comfortable, and he testified throughout

25   virtually the whole two days of deposition in English.

1          THE COURT:  But evidently he is more comfortable

2     with a translator, so what is the reason to force him to do

3     it in a second language?

4          MR. LINDVALL:  Well, I have no problem if they

5     want to have a translator onboard, if he wants to have a

6     translator.  I think what will end up happening is like what

7     happened.  They had a translator ready and he just decided

8     not to use the translator.

9          THE COURT:  Meaning you wouldn't object to

10    having a translator available for him, but you want him to

11    try to testify in English?

12         MR. LINDVALL:  Yes, your Honor.

13         One issue on Mr. Neugebauer.  I know you did

14    ask about him.  We want to make sure it's clear that on

15    Wednesday, September 28th, when his testimony is going to

16    come out, that it's us selecting when he is going to be

17    pegged in and not him.  We wouldn't want to have him thrown

18    in between two of our witnesses in our case in chief.

19         THE COURT:  That is, it's definitely going to be

20    some time Wednesday afternoon, but you will figure out when

21    on Wednesday afternoon.

22         MR. LINDVALL:  Yes, your Honor.

23         I think the last issue, your Honor, was the late

24    exhibits presented by Broetje.

25         THE COURT:  Right.

1          MR. LINDVALL:  What happened there was, I think

2     it was about -- it was 2:20 a.m., I see it right there, the

3     day before the exhibit lists were due, we received in excess

4     of 200 new exhibits from Broetje.  And, again, this is the

5     day we needed to finalize things to get it to your Honor.

6          These were never listed before.  And the problem

7     we really had with them, many of them were just -- they were,

8     for example, the summary judgment motion of AHG relating to

9     infringement and all the exhibits.  That would be an exhibit.

10    So they would have the briefings, the declarations of all the

11    exhibits and everything piled in this one trial exhibit, and

12    they went through the whole, all six summary judgment motions,

13    and then the other two summary judgment motions that AHG

14    brought, and then even some of the motions to strike and other

15    things like that.  All of that was put on to their exhibit

16    list plus additional items.

17         We called up instantly and said we can't -- you

18    can't do this.  First of all, we don't have any opportunity

19    to put together objections on this in this short period of

20    time, and this is way too late to add this many exhibits.

21         I can understand that both parties would want to

22    add some exhibits near the end.  It always happens at the

23    last minute.  There is a couple you forget about.  They want

24    four or five, we want ten or something like that, but to

25    dump 200 on us at the last minute was something that really

1    created a situation for us that we couldn't handle.

2         Even today, there is still briefs.  They did

3    eliminate it down to about 100, a little over 100 now at our

4    request, and even now we're still seeing briefs and things

5    like that on the trial exhibit list.  We still haven't had

6    an opportunity to object to them yet.  Depending on your

7    Honor's ruling on that, we will set forth any objections we

8    need to on those.  But the point is to do this last minute

9    dump is unfair to us on all these exhibits.

10        THE COURT:  On some of these, though, they

11   didn't exist any earlier, I assume.  Like the briefs, for

12   instance.

13        MR. LINDVALL:  Well, no.  When they filed the

14   summary judgment brief, they could have filed it then.  They

15   waited until everything was briefed and even a time period

16   after everything was fully briefed and waited until the

17   night -- well, not the night but early morning when everything

18   was dune.  Not a couple days before but hours before we wanted

19   to get everything finished up.

20        THE COURT:  The other thing I raised was you had

21   a proposal for additional facts.  I don't know if that is a

22   ripe dispute yet given I haven't ruled on the motions.

23        MR. LINDVALL:  Yes, I think that is correct,

24   your Honor.  That is somewhat motion specific, and depending

25   on how you rule on the motions, we can revisit that.

1                    THE COURT:  Okay.  Thank you.

2                    Let me hear from Broetje on these issues, please.

3                    MR. KELLEHER:  Thank you, your Honor.

4                    Concerning Mr. Lawrence, the particular

5      suggestion that was just made isn't exactly what was in the

6      miscellaneous issues.  I'm thinking through it for the very

7      first time.

8                    It relates only to asking that Michael Lawrence

9      be sequestered when we have a Broetje witness on the stand

10     talking about fault issues.  And the idea was because he has

11     factual experience with working some of the cassettes, his

12     testimony might be tainted.

13                   I don't think, your Honor, we would be offering

14     much testimony about things that happened at Boeing Long

15     Beach.  That seems to be an area where their argument might

16     have some merit.

17                   THE COURT:  Well, do you want some time to

18     consider their proposal?

19                   MR. KELLEHER:  If I could have that, your Honor,

20     please.

21                   THE COURT:  That's fine.  This is one that we

22     can defer ruling on until the morning of trial begins since

23     obviously there won't be any testimony until then.  So if

24     this remains in dispute as of the start of trial, raise it

25     with me that morning, please.

1            MR. KELLEHER:  Thank you, your Honor.

2            Dr. Peters.  He did testify almost exclusively

3    in English.  He is almost fluent in English.  He used to

4    live in the United States.  I have every reason and every

5    intent to put him on with as much English as possible.  I

6    just hate the idea of an order that he has to testify in

7    English.  He will definitely have to have an interpreter

8    standing nearby because even at the deposition, he had to

9    occasionally do so, and he did make a couple of errors in

10   using words that sound the same in English and German but

11   mean different things, so he will need to have an

12   interpreter to turn to.  I expect he will only do so only

13   once every 20 questions or so.

14           THE COURT:  Well, as I understand, there is no

15   objection to him having a translator nearby, so I'm not

16   ordering him to testify in English.  Certain, it's

17   preferable from everyone's perspective if he does.  And the

18   time of his direct testimony and redirect will be charged

19   obviously to Broetje.

20           MR. KELLEHER:  For Mr. Neugebauer, we don't have

21   a problem with them being able to elect when it is we put

22   him on, if we put him on out of order.

23           Then the last issue, your Honor, is the exhibit

24   list.

25           Now, one thing I suppose I should tell you

 1    first, the document that is attached as Exhibit No. 14 to

 2    the pretrial order, it does not include the final exhibit

 3    list that we sent to the plaintiffs.  They instead chopped

 4    that document up, put part it in, and then put parts of an

 5    earlier exhibit list that we sent them that did not include

 6    many of our objections.  So the document that is in your

 7    hands right now does not have all the objections that we

 8    served on the other side the afternoon of the day before

 9    these things were filed.  And I contacted counsel for the

10    plaintiffs last Thursday to try to get this resolved, and as

11    of yet, it has not been.

12             The exhibits that were added -- so this was a

13    little bit after midnight, I believe, maybe 1:00 o'clock the

14    night before, we served a new exhibit list and there were

15    200 new exhibits.  They basically fell into two categories.

16    One, the documents that came from recent depositions and

17    basically their court filings which we consider to be

18    statements of a party opponent, because if things are not

19    on the exhibit list, we can't even use them for impeachment.

20             Out of an abundance of caution, if a witness on

21    the stand says something contrary to what the lawyers said

22    in the court papers, we would like to consider whether we

23    would like to impeach them with that.  That is why those

24    things are on the list.

25             With regard to the deposition exhibits, at 6:00

1    o'clock at night, so 18 hours after we gave them the new

2    exhibits, they served a new exhibit list on us that had

3    about 50 new exhibits.  I sat down and went through in two

4    hours, we got them the objections back, and those were many

5    of the same exhibits that we added on.  They were things that

6    had been put in, in the new depositions that had been taken.

7            So, your Honor, we have basically, both sides,

8    just had a supplemental addition to the exhibit list.  We

9    don't object to theirs.  We don't think ours is objectionable.

10           THE COURT:  Okay.  Thank you.  Did you want to

11   say anything further on that last issue?

12           MR. LINDVALL:  Sure.  Just briefly, your Honor.

13           There are about 35 exhibits we added which were

14   from the late depositions.  We had Dr. Budach's deposition

15   was very late so we had to add.  We both added some on

16   those.  Those are individual exhibits that are easily, you

17   can decide with objections.

18           What is difficult is when you have a brief with

19   all the exhibits as one trial exhibit, it makes it very

20   difficult to think what kind of objection you want except you

21   just list every objection you can possibly think of.  You

22   don't have an idea which part of the brief they're going to

23   use or the exhibits to the brief.  So it's really an unfair

24   situation to have this brief with all of the attachments and

25   exhibits support labeled as one exhibit, and we just think

1    it's an improper characterization.  And there is many of

2    these.  There are over 100 of these.  Thank you.

3            THE COURT:  Thank you.  I'm certainly troubled

4    that a lot of things are happening late in this case, and a

5    lot of that is subject to motions that I have taken under

6    advisement and haven't ruled on.

7            But on the specific issue I have in front of me

8    right now, I'm going to allow the exhibits to stay on the

9    exhibit list.  That is not to say this was done in an ideal

10   manner, but at this point, there is still yet another week

11   until trial, and I'm confident that the plaintiffs have time

12   to understand what the defendant has put into the exhibit

13   list.  So I'm not going to order them to be stricken from

14   the exhibit list at this point.

15           Let me go through a few more things before I turn

16   it to you to see if there is anything else you want to raise.

17           Well, first, let me confirm, I believe I

18   dealt with everything on Broetje's miscellaneous list.  Mr.

19   Kelleher, is there anything else you had listed as a

20   miscellaneous issue?

21           MR. KELLEHER:  I guess, your Honor, we should

22   work out getting into the final pretrial order our actual

23   exhibit list with all of our objections.

24           THE COURT:  Yes, and we'll talk in a moment

25   about what I'm going to need in terms of further submission

1    of a proposed pretrial order from you.

2               In terms of trial, so we're beginning trial on

3    Monday, I'll meet with counsel at 8:30 Monday morning, and

4    we'll have the jury pool come up around 9:30.  In your

5    proposed pretrial order, both sides were requesting 10 hours

6    of trial time.  I understand that to be the maximum you are

7    seeking if the case continues to look just as it looks at

8    the moment; is that correct?  And is that still your request

9    as an adequate amount of time, Mr. Lindvall?

10              MR. LINDVALL:  Yes, your Honor.

11              THE COURT:  Okay.  Mr. Kelleher?

12              MR. KELLEHER:  Yes, your Honor.

13              THE COURT:  Well, the Court agrees that 10 hours

14   per side would be adequate given the scope of the case as it

15   is now.

16              If the case is narrowed due to any rulings

17   between now and Monday, the Court may reduce the amount of

18   time and would certainly let you know that.

19              I will be letting the jury go at 4:30 each day.

20   After at first day, we will begin at 9:00 instead of 9:30.

21   I'll be giving them a 15-minute morning break and a 15-minute

22   afternoon break.

23              We are able to provide lunch to the jury every

24   day after the first day, so the first day we would probably

25   give them 45 minutes to an hour for lunch.  After that,

1    we'll probably try to keep them to more like a half hour for

2    lunch since we will be providing lunch for them.

3              The proposed voir dire, the Court has reviewed

4    it.  I will file the final voir dire some time before the

5    jury comes in, so you will have a chance to see it.  I

6    expect it will be shorter than what the parties had proposed.

7              Broetje had proposed a number of proposals that

8    AHG did not agree to.  I'll give you a couple of minutes if

9    you wish to make the case for some or all of them.

10             MR. CAHR:  Thank you, your Honor.  There were a

11   few of these that we think are important to add.

12             In particular, we think that having a question

13   specifically directed to whether or not they or a close

14   relative has ever worked with any of the relevant companies.

15   Dassault has, for example, a facility within the District,

16   and especially given some of the allegations that are likely

17   to be involved in this action.

18             The kind of prejudice that might exist if

19   someone actually worked for a Gemco or an Electro-Impact or

20   a Kuka, it would be substantial.  It's one question.  I

21   don't think it's something which would be --

22             THE COURT:  And which number would that be?

23             MR. CAHR:  That would be Question No. 26.

24             THE COURT:  Okay.

25             MR. CAHR:  The questions about degrees are

1    relevant here.  Obviously, these are -- this is a

2    sophisticated issue whenever you are dealing with patent

3    cases, whenever you are dealing with issues that involve

4    technology; and I think it's useful for both parties, quite

5    frankly, to know what the educational experience of the

6    parties involved.  If I turns out there are people who are

7    mechanical engineers, that would be useful for both sides,

8    quite frankly.

9            The question about whether or not anyone has

10   ever invented anything.  Obviously, this is a patent case.

11           Whether or not someone is an inventor or feels

12   like they were, for example, a thwarted inventor, those are

13   things that would be quite relevant in determining whether

14   someone might be an objectionable juror.  And,

15           Then, finally, just a question about relevant

16   experience with the actual technology.  This is a case

17   involving the aerospace industry.  It involves making sure

18   airplanes are put together properly so they don't fall out

19   of the sky.  It's an important issue.  If people have

20   experience in this industry and have experience dealing with

21   these issues, both sides, quite frankly, should know that.

22           THE COURT:  Do you want to respond, Mr. Lindvall?

23           MR. LINDVALL:  Your Honor, I don't have any

24   problem with No. 26.

25           Twenty-seven and 28, one is where do you live

1    and do you own a residence?  I think that is a bit -- there

2    is a problem with relevancy, plus it could be very

3    embarrassing for a potential juror, so I think it's an

4    inappropriate question to ask a juror.

5              Are you a member of any support organization or

6    club?  It's the same thing.  It could put a potential juror

7    in an awkward situation, and I really think the relevancy of

8    this case, to put any kind of organizations they belong to

9    is not very important.

10             I think with respect to college degrees, I think

11   that would be embarrassing the way it's worded.  How many

12   members of the panel have college degrees, that causes

13   people to raise their hand and make them feel improper.

14             I think the better way of doing it, your Honor

15   could ask is there anyone who has a degree in engineering or

16   a degree in maybe science.  A degree in engineering may be

17   the better way to do it.  That way, the jurors won't feel

18   uncomfortable with that type of question.

19             Just if you have a college degree or not, if

20   someone has a college degree, something like the history of

21   art -- I'm not downgrading the history of art, but it really

22   doesn't -- it's not really relating to rivets or anything,

23   but mechanical engineering I agree has some relevancy and we

24   would all want to know that.

25             The same thing goes with No. 30, the master's

1   degree and the doctoral degree.  Again, it goes to -- you

2   can ask it in a way that it is relevant.  Does anybody have

3   an engineering degree or advanced degree in engineering?

4           No. 31.  Has any member of the panel, relative

5   or close friend ever started their own business?  I don't

6   understand why that is relevant, and I don't know why you

7   want to ask jurors that.

8           Thirty-second is the one that asked for, does

9   any member of the panel or relative or close friend have

10  experience with or knowledge of rivets in airplanes or

11  manufacturing?

12          I don't have a strong objection to that.  I'm

13  just not quite sure where that is going to go.

14          Have you or a relative, close friend, worked for

15  a government agency or served in the military?

16          I don't know what the relevance of that is.  If

17  they worked for the government or not, it doesn't make any

18  difference to me.  It's an invasion into the jurors' privacy.

19          Thirty-four and five are somewhat redundant.

20  It's a bit argumentative, too, where they said they felt they

21  invented something new, connotating that just because you

22  felt that way doesn't necessarily mean it's new.  I think if

23  the instruction or the question was asked, it should be

24  very, very objective.

25          We have I think a fairly similar question in

1    ours, so I think they can be combined.  That's all.

2                THE COURT:  Okay.  Thank you very much.  That's

3    all I need to here on the voir dire.

4                Next, moving to the preliminary jury instructions.

5    I would have wished that the parties had agreed on more of

6    this.  It was surprising that you have disputes over so many

7    of the preliminary instructions.

8                I will file, before trial begins, what I intend

9    to read to the jury.  It will look more like the plaintiffs'

10   proposal than the defendant's, as the plaintiffs have been

11   more consistent with what I have done in prior patent trials.

12               Let me ask this:  If the Court were to not rule

13   on the standing related motion prior to trial, one difference

14   we noticed in the proposals was how the plaintiff is

15   referred to or plaintiffs.  Do you have a modified proposal

16   if the case, if that motion is still pending a week from

17   now?

18               MR. KELLEHER:  One is not occurring to me right

19   now, your Honor.  We can give it some thought.

20               THE COURT:  Okay.

21               MR. KELLEHER:  One is not occurring to me.

22               THE COURT:  Let's give it some thought.  And if

23   that remains an issue, we'll address it next Monday morning

24   before I instruct the jury.

25               The verdict form, I will get that finalized and

1     filed before trial begins as well.  I give the verdict form

2     to the jury at the beginning of the trial, and I read it to

3     them as part of my preliminary instructions so they know

4     what they're going to be asked to decide at the trial.

5           In that regard, I guess I should ask you, your

6     verdict forms look very different.  If you would like to be

7     heard on why yours is better than theirs, I'm willing to

8     listen.  Plaintiffs.

9           MR. LINDVALL:  Your Honor, a couple comments.

10          We try to be simple and keep the question simple

11    and consistent.  We do have one change we will have to make

12    because we do agree that with respect to the unfair

13    competition and trade dress claims, nonpatent claims, there

14    can only be one recovery under any of those particular

15    claims, so we have to make sure in the jury verdict form

16    that the jury realizes if they find for the plaintiffs under

17    any of the nonpatent claims or damages, the jury has to

18    understand that if they find one, they just write one damages

19    for any.  They can find all but still just one number.  So

20    ours will have to be modified slightly.

21          THE COURT:  I will talk to you about making a

22    submission.

23          MR. LINDVALL:  Okay, your Honor.

24          The specific objection we have with Broetje is

25    two, I think.  One is they separated out damages for Broetje

1    Automation USA and then Broetje Automation, GmbH, Germany

2    and U.S., and we don't think there is any need for that.

3    The U.S. arm is basically an arm of Germany.  It's a small

4    arm.  They act together.  They do things together.  To try

5    to separate them out creates confusion for the jury.

6            In general, in all the depositions, in fact, in

7    all the briefings, I think, there has never been a distinction

8    made between Broetje USA and Broetje Germany for any

9    substantive reason, and I don't think that is necessary.  It

10   makes it a lengthier forum, and it causes the jury to try to

11   figure out what the difference is between Broetje USA and

12   Broetje Automation.

13           The other thing I would like to draw your

14   Honor's attention to.  If you look at their proposed jury

15   verdict form, from 7 through 16, these are all the ones --

16   I'm sorry, not 16.  Seven through, I think it's 17.  They're

17   very long questions.

18           And, for example, let me give you, No. 7 says:

19   Has AHG proven by a preponderance of the evidence that a

20   third party infringed the claims of the '339 patent listed

21   below, that Broetje Automation USA took action that actually

22   induced that infringement of the third party, that Broetje

23   Automation USA was aware of the '339 patent, and that

24   Broetje Automation USA knew or should have known that taking

25   such action would induce direct infringement.

1          Your Honor's jury instructions will tell the

2     jury what they need to show for inducement.  It doesn't need

3     to be this lengthy with all the different elements in there

4     to go yes or no.

5          It's interesting, because if you go to their

6     invalidity questions, for example, obviousness, all they

7     say, rather than go through all the factors of obviousness,

8     they say have the Broetje parties proven by clear and

9     convincing evidence that the following claims of the '339

10    patent are invalid as obvious based on the prior art?

11         So when it's on their side, their very, very

12    simple and to the point, but when it's talking about

13    infringement, they make it -- they go through all the

14    different points.  And I think, your Honor, the thing to do

15    is to do it consistent throughout, and we've provided a

16    consistent, simple way of doing, and it's consistent with

17    Your Honor's and other courts verdict forms.

18              THE COURT:  Okay.  Thank you.

19              Defendants.

20              MR. CAHR:  Thank you, your Honor.  Just to go

21    backwards a little bit.

22         Actually, Mr. Lindvall's point about the length

23    of 7, 8 and 9, and things like that, that is actually maybe

24    more in accord with the obviousness and invalidity ones.

25    That is actually not a problem we would have.  We would be --

```
 1                    THE COURT:  You would be willing to simplify
 2      that.
 3                    MR. CAHR:  We would be willing to simplify that.
 4                    In terms of objections to our verdict form, AHG
 5      fails to identify all of Broetje's grounds for invalidity.
 6      That is obviously something that we think is absolutely
 7      necessary in the verdict form.
 8                    We disagree with Mr. Lindvall's statement that
 9      Broetje USA and Broetje GmbH should probably be mushed
10      together because, quite frankly, it is conceivable they
11      could be liable for different things.  They're doing
12      different things.  They're engaging in different actions.
13      Broetje USA is, for example, selling spare cassettes.
14      They're not selling the entire system.  And so it's just, it
15      is easy to imagine a scenario where they are liable for for
16      different counts and different amounts of money.
17                    AHG fails to require the -- if fails to identify
18      the trade dress at issue.  It is I think really important
19      in a case like this that the jury understand what exactly is
20      being asked to rule on, and being explicit about it,
21      identifying what the trade dress is; and then going through
22      and saying, well, is that infringed?  I think that is
23      important, and I think it is valuable.  It serves a valuable
24      purpose for the jury because otherwise it's enormously
25      confusing.
```

1           The patent and trade dress instructions are

2     obviously -- you know, we have issues that you already made

3     reference to, your Honor, in terms of standing issues about

4     which plaintiff is actually proper for which kind of count.

5           I suspect that will be resolved before trial,

6     but if it's not, obviously, it does present an issue for us,

7     because from our perspective, F2C2 is the only organization

8     that has developed any rights in the trade dress, for

9     example, because you can only develop rights in unregistered

10    trade dress through use, and AHG has not used the trademark

11    in the United States -- trade dress in the United States.

12    And so it seems basic to us that the correct plaintiff be

13    identified for the correct count.

14          We also think that to a certain extent the

15    verdict form is inconsistent with the relief that they're

16    sieging as described in their motions for summary judgment.

17    We think that in the end, this should be an accurate

18    reflection of the specific relief that they're entitled to.

19          We think that the statute of limitations is

20    absolutely something that needs to be in the verdict form.

21    We understand your Honor's ruling on that.  It has ruled it

22    is something for the jury to determine.  The jury needs to

23    determine the discovery rule, and that's fine.  That is the

24    position the Court has taken, and so the jury should

25    actually be in a position to make those decisions.

1          There is also the inclusion of actual damages as

2     a separate claim in the trade dress interrogatory, and AHG

3     has specifically said that it's only seeking lost profits on

4     that claim, so it's just inconsistent.

5          Oh.  And then, finally, AHG fails to, on the

6     trade dress claims, which are obviously the central part of

7     the nonpatent claims, they fail to show -- they fail to go

8     through the fact you first have to show that the patents

9     are nonfunctional.  I mean, I'm sorry, that the trade dress

10    is nonfunctional.  That's an acquired secondary meaning and

11    it's likely to confuse consumers.

12         You need to have an independent finding on this

13    things because if you don't, on appeal, it will be hard to

14    parse out because, obviously, each of those independent

15    ground, this is unregistered trade dress, so each of those

16    independent grounds are necessary to actually reach the

17    point of being able to make an infringement determination.

18         I think that's it.

19         THE COURT:  Thank you.  Let me tell you what I'm

20    looking for.

21         I'm ordering that the parties meet and confer

22    and submit to me by Thursday the revised proposal of a

23    proposed verdict form, to do so through ECF, and to submit

24    by WordPerfect.

25         I'm hoping that -- and I'm going to give you

1    some comments in a moment.  I'm hoping, from what you said

2    today and what I'm about to say, that you can, if not agree

3    entirely on a single form, at least narrow your disputes in

4    a way that you can get me a single document so that I can go

5    through and easily turn it into the document that the jury

6    will see.  So I'm looking for a single submission on behalf

7    of both of you.

8            Starting with, the defendant, as I understand

9    it, is pretty much conceding that they're willing to reduce

10   the verbiage in their proposal.  And one of my reactions

11   to the defense proposal was that it did seem to overly

12   incorporate jury instructions into the verdict form.  So

13   the verdict form that I ultimately come up with should be

14   one that is not attempting to instruct the jury but is just

15   attempting to get the answers from the jury knowing that

16   they will use the jury instructions in conjunction with the

17   verdict form to figure out what they need to figure out.

18           My hope is that you all can figure out a way

19   in terms of who the plaintiffs are and who the defendants

20   are, figure out a way that you can agree that we use some

21   simple terminology on the verdict sheet so as not to confuse

22   the jury but make it clear on the record here that nobody

23   is waiving their rights to argue that perhaps some of the

24   recovery against the defendants might only be against one

25   defendant as opposed to the other, and if I haven't ruled on

1    the standing, that the defendant isn't waiving its right to

2    continue to press its challenge to standing, even if we see

3    a particular plaintiff's name on the verdict form or on the

4    instructions.  So I'm looking to you all to figure out a way

5    to make this simple for the jury, and I'm not asking you to

6    waive any substantive rights in order to do that.

7            All of the invalidity defenses that are on the

8    table as of now should be accounted for in the verdict

9    sheet; and I'm hopeful you will do it in a way that if I do

10   rule some of those invalidity defenses out before Monday, it

11   will be easy and obvious to me as to how to delete certain

12   portions of the verdict form.

13           And with respect to trade dress and breaking

14   out the various elements, I'm inclined to agree with the

15   defendants but that's not a ruling.  I'm just hopeful that

16   you will be able to agree on how to handle that.

17           The only other thing for me to say is, in terms

18   of the pretrial order, get me, let's say by Thursday as

19   well, a revised form of the pretrial order that encompasses

20   specific rulings I have made today and also attaches the

21   updated exhibits, including the exhibit list, which is an

22   exhibit.  And the Court will sign the proposed pretrial

23   order that you submit later this week to indicate that it

24   is adopted, and that pretrial order is the one that will

25   control the subsequent course of these actions unless

1    modified by the Court to prevent manifest injustice.

2              With that, I will turn it back to you to see if

3    there are any issues that you wish to raise that we haven't

4    gotten to.  Mr. Lindvall.

5              MR. LINDVALL:  There is an issue, your Honor,

6    that we talked about earlier.  And this is we believe we

7    have some right to have proper notice of what their

8    invalidity defenses are going to be walking into trial.

9    Right now, the best we have is that they think that the best

10   defenses are in the summary judgment motions, but there is

11   no committal.  Right now, we're lost to what they're going

12   to come in to court with.  And if you could somehow give

13   them some type of guidance order or whatever.

14             THE COURT:  I'm going to give them a deadline.

15   It won't be today, but what do you propose?

16             MR. LINDVALL:  Your Honor, I don't mean to

17   squeeze them, but maybe we can -- Wednesday?

18             THE COURT:  Okay.  Mr. Kelleher?

19             MR. KELLEHER:  I can do Wednesday, your Honor.

20             THE COURT:  Okay.  So by 5:00 p.m. Wednesday,

21   Eastern time, defense will advise plaintiff as to which

22   invalidity defenses, including the specific combinations of

23   prior art references for the obviousness defense, which ones

24   are going to be the subject of this trial, subject to

25   further ruling of the Court.

1          Does that satisfy the concern, Mr. Lindvall?

2          MR. LINDVALL:  Yes, your Honor.  As long as the

3    list we get isn't exactly the 30 different -- I mean the

4    ones they're actually going to try at trial.

5          THE COURT:  The Wednesday list cannot be any

6    larger than what they have given you to date.  And if you

7    feel on Wednesday the list you get is still too long, then

8    you will need to reach out to us and we will take up the

9    issue after we hear from you.

10         MR. LINDVALL:  Because today we have 30

11   different arguments.

12         THE COURT:  I'd understand that.  Thirty seems

13   like too much to me, but I'm hopeful that Mr. Kelleher will

14   be reasonable.  But if he isn't, he is going to have to be

15   unreasonable by Wednesday at 5:00, and you will have to let

16   me know.

17         MR. LINDVALL:  Thank you, your Honor.

18         THE COURT:  Is there anything else from you

19   Mr. Lindvall?

20         MR. LINDVALL:  No, your Honor.

21         THE COURT:  Okay.  Mr. Kelleher.

22         MR. KELLEHER:  Just a few curiosities, your

23   Honor.

24         On sequestering witnesses.  I would ask what

25   about our corporate representatives who will be here in the

1    courtroom?  There is one for Broetje Germany, one for

2    Broetje USA that will probably both be witnesses at some

3    point.

4                 THE COURT:  Are you requesting that the

5    corporate representatives be sequestered?

6                 MR. LINDVALL:  Well, if they're not testifying,

7    no, your Honor.

8                 THE COURT:  Well, evidently, they may be

9    testifying; right?

10                MR. KELLEHER:  Correct.  Most likely, they will

11   be Dr. Peters for Broetje Germany and Mr. Benczkowski for

12   Broetje USA.  He is the CEO of the company.

13                THE COURT:  And you expect to call both of them

14   to testify?

15                MR. KELLEHER:  I do, your Honor.  They were our

16   30(b)(6) witnesses.

17                THE COURT:  Does Broetje USA and Germany not

18   have other people that can be the representative?

19                MR. KELLEHER:  I think Broetje USA does not.

20   It's a very small operation, your Honor.  Broetje Germany,

21   the problem there, everyone who is coming over is going to

22   be a witness.  There is no nontestifying.

23                THE COURT:  Both of the entities do have other

24   employees; correct?

25                MR. KELLEHER:  Broetje USA does have other

1   employees, known as managerial.

2           THE COURT:  Let me see if there is an objection.

3           MR. LINDVALL:  Your Honor, both of these

4   witnesses are very key witnesses.  In fact, they'll probably

5   be -- they're two of the witnesses on the will call list out

6   of four witnesses, five witnesses.  These are key witnesses.

7   If they get to sit through all the testimony, it obviously

8   gives them a huge advantage over -- with respect to the

9   hearing the testimony.

10          It's the whole reason for the rule is for major

11  witnesses like this.  If they get to sit through the

12  testimony, for example, hear the testimony from AHG, which a

13  lot of it is going to be confidential information, by the

14  way, which we're going to have some concern with.  The jury,

15  we're not going to be concerned with.  Having the principals

16  who make, the business decision makers to be sitting through

17  this testimony, listening to this, they are going to know

18  exactly how they're going to testify when they get up there

19  to rebut what they heard.  It's the absolute reason for this

20  rule.

21          THE COURT:  Okay.  Mr. Kelleher.

22          MR. KELLEHER:  Let's say, the rule is Rule 615,

23  and it says this rule does not authorize exclusion of ... an

24  officer or employee of a party which is not a natural person

25  designated as representative by its attorney.  They would be

1    our representatives.

2              We don't object to the idea of, for example, Mr.

3    Auriol sitting in the courtroom for the entire time.  After

4    all, it may be he is the first witness in their case, but we

5    may call him later on.  If he has been sitting there

6    listening to all the other witnesses, then the same argument

7    applies to him that have been argued to Mr. Peters and Mr.

8    Benczkowski.  We don't object to that, but we also would

9    like to have our corporate representatives here.

10             MR. LINDVALL:  I agree with the rule.  But the

11   rule doesn't say -- it says an officer.  They can bring an

12   officer here or they can bring somebody here, but these are

13   keep witnesses they plan using at trial.  They're going to

14   sit through the AHG testimony and know what the witnesses

15   say and know exactly how to respond when they get up here.

16             THE COURT:  Here is what we're going to do.

17   Since I'm hearing from you all on Thursday anyway, you're

18   going to let me know if this remains a dispute as of

19   Thursday, in which case I will make a ruling.

20             I'll tell you my inclination, which I think is

21   what I have done in the past, is I am inclined to make

22   Broetje bring somebody else if they wish to have a corporate

23   representative sit through the entirety of trial.  And they

24   do, as I understand it, have other at least employees who

25   could be a representative.

1          I'm inclined to order them to sequester anybody

2     who is a testifying witness at trial, even if that means you

3     need to bring somebody else as a representative, but I'm

4     not making that a final ruling now.  You will let me know

5     Thursday if I need to make an actual determination on that

6     issue.

7          MR. KELLEHER:  Clarification, your Honor.  If

8     you were to do that; after they have testified, Dr. Peters

9     and Mr. Benczkowski, could they remain in the courtroom or

10    would they have to leave and not be able to watch the rest

11    of the trial?

12         THE COURT:  I think it would depend upon if they

13    were subject to being called again.

14         MR. LINDVALL:  Yes.  I think the rule is,

15    automatically, if they finish testifying and we're not going

16    to call them back, then, yes, they can sit in the courtroom.

17         THE COURT:  So, basically, if they remain after

18    they testified, that means they're effectively disqualified

19    from testifying further.  So depending on where we were in

20    the trial and who it was, you might have to confer with

21    counsel on the other side to make sure they have no

22    intention of calling the person.

23         MR. KELLEHER:  Okay.  I have seen in some of

24    your other pretrial conference transcripts, your Honor, that

25    you sequence the order of proof at trial.  The plaintiff

1    goes first, then the defendant, then plaintiff again to

2    respond to what we have put in, for example, our invalidity

3    case, and then the defendant gets the last word.  Is that

4    the way you do it here?

5              THE COURT:  I appreciate you raising it.  I

6    think you all addressed that in your proposed order.  I

7    don't remember what you put in, but it seemed you were in

8    agreement and it was fine to me.

9              Is there any difference as to how you want to

10   sequence this case?

11             MR. KELLEHER:  I actually don't recall.  May I

12   confer for a moment?

13             MR. LINDVALL:  Ms. Sharp is going to look for

14   that.  I think generally in trials, it just naturally comes

15   out.  I don't think it will end up being a big dispute.

16   Let's see if there is some kind of --

17             THE COURT:  Basically, what I can tell you is if

18   you all agree on how you want to do it, that will be fine by

19   me.  And I know we're going to be interrupted by testimony

20   of one witness on Wednesday in any respect.  So if you all

21   agree on the order of presentation, I'll be fine with it.

22   If it turns out you don't agree and there is a dispute, and

23   I didn't see one in the proposed pretrial order, then let me

24   know in your submission on Thursday.

25             Is there anything else, Mr. Kelleher?

1          MR. KELLEHER:  I know sometimes you have said no

2    written motions without asking permission first.  Would that

3    be the rule for here, too?

4          THE COURT:  Did you want that rule?

5          MR. CAHR:  I think I would want that rule.

6          THE COURT:  Any objection to that rule, no

7    written motions during the course of the trial without

8    asking for leave first?

9          MR. LINDVALL:  Your Honor, I think that maybe

10   with the JMOL, or something like that, you may.

11         We can still ask for leave.  We have no problem

12   with that.

13         THE COURT:  Okay.  So there will be no written

14   motions from the beginning to the end of the trial unless

15   you ask for leave to file a written motion.

16         MR. KELLEHER:  Your Honor, how many peremptories

17   do you give the parties?

18         THE COURT:  We're going to end up with a jury of

19   eight.

20         (Court and deputy clerk confer.)

21         We'll give you five per side, so we'll have 18

22   in the jury box and end up with a jury of eight.

23         MR. KELLEHER:  I know, your Honor, you will use

24   a method where people go back to chambers with an individual

25   member of the voir dire.  Do you have a limit on the number

 1    of people from the team that go back to chambers with you?

 2                THE COURT:  We have room for two per team.  I

 3    don't know if we can accommodate more than that.  We'll have

 4    to let you know that Monday.

 5                MR. KELLEHER:  I think that is everything I

 6    have, your Honor.

 7                THE COURT:  Okay.  Great.

 8                MR. SCHILTZ:  Your Honor, I apologize.  How

 9    would you like the exhibits submitted and when?

10                THE COURT:  I'm sorry?

11                MR. SCHILTZ:  When would you like the exhibits

12    submitted?

13                THE COURT:  Talk to Mr. Looby with that after

14    the hearing.  Okay?

15                And that's it?

16                All right.  Well, thank you all very much.

17    We'll see you next Monday.

18                (Pretrial conference ends at 4:27 p.m.)

19

20         I hereby certify the foregoing is a true and accurate
      transcript from my stenographic notes in the proceeding.

21

22                          /s Brian P. Gaffigan
                            Official Court Reporter
23                           U.S. District Court

24

25

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that true and correct copies of the foregoing document were caused to be served on February 25, 2024 on the following counsel in the manner indicated below.

### VIA EMAIL:

Jack B. Blumenfeld
Jeremy Tigan
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

F. Dominic Cerrito
Eric C. Stops
Evangeline Shih
Andrew S. Chalson
Gabriel P. Brier
Frank C. Calvosa
Catherine T. Mattes
Abigail DeMasi
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
nickcerrito@quinnemanuel.com
ericstops@quinnemanuel.com
evangelineshih@quinnemanuel.com
andrewchalson@quinnemanuel.com
gabrielbrier@quinnemanuel.com
frankcalvosa@quinnemanuel.com
catherinemattes@quinnemanuel.com
Abigaildemasi@quinnemanuel.com

*Attorneys for Plaintiffs*

Dated:  February 25, 2024

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)

ME1 47719473v.1