**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., | |
| Plaintiff, | |
| v. | C.A. No. 21-691-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | ███████████████████ |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., et al., | PUBLIC VERSION FILED: March 5, 2024 |
| Plaintiffs, | |
| v. | C.A. No. 21-1138-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | ███████████████████ |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| Plaintiffs, | |
| v. | C.A. No. 21-1594-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | ███████████████████ |
| Defendant. | |

**<u>LETTER TO THE HONORABLE GREGORY B. WILLIAMS FROM DANIEL M.
SILVER REGARDING EVIDENTIARY DISPUTE ON INVENTORSHIP</u>**

Dear Judge Williams,

The Court should reject Jazz's latest, belated attempt to seek what is effectively summary judgment on Avadel's inventorship defense. Avadel properly disclosed its inventorship defense in its contentions and expert reports, and its defense is consistent with Federal Circuit precedent.

## 1. Federal Circuit Precedent Confirms That Claims Jazz is not Currently Asserting Are Relevant to Avadel's Inventorship Defense

The Federal Circuit has made clear that "[w]hile inventorship is evaluated on a claim-by-claim basis, *the failure to join an inventor of any claim invalidates the entire patent*." *Plastipak Packaging, Inc. v. Premium Waters, Inc.*, 55 F.4th 1332, 1340 (Fed. Cir. 2022).[1] Indeed, "the naming of the inventor or inventors" is a "condition of *patentability*," and "failure to name them renders the *patent* void." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed. Cir. 1998). The Federal Circuit has repeatedly made these statements without qualification regarding—or limitation to— asserted claims, instead framing this as an issue of "patentability" rendering the *entire patent* "void" if not satisfied. *See id.* That is, if any claim of a patent is invalid for improper inventorship, the entire patent is void, regardless of whether the patentee has asserted the claim establishing improper inventorship.

The Federal Circuit's decision in *Fox* supports Avadel's position, even though it addressed very different circumstances. In *Fox*, defendants argued for invalidity of both *asserted and unasserted* claims, which the district court granted. *Fox Grp., Inc. v. Cree, Inc.*, 700 F.3d 1300, 1308 (Fed. Cir. 2012). In *Fox*, the Federal Circuit held that the district court lacked the jurisdiction to invalidate *unasserted* claims, but upheld the finding that the *asserted* claims were invalid. *Id.* Here, unlike the defendants in *Fox*, Avadel seeks invalidity of only the *asserted* claim (24), for which this court indisputably has jurisdiction. And as in *Fox*, Avadel should be able to introduce evidence of improper inventorship as to *any* claim to invalidate the asserted claim. That is, under Federal Circuit law, Avadel should be permitted to offer evidence that its inventors are the true inventors of any claim to invalidate the asserted claim for improper inventorship.

That improper inventorship of any one patent claim invalidates the entire patent makes abundant sense, given the designation of inventorship as to patents as a whole, rather than by claim. This is also consistent with inventors' duties of disclosure, candor, and good faith imposed upon each named inventor, each attorney or agent who prosecutes the application, and others substantively involved in such prosecution. *See* MEP 2001. As to the named inventors, "[i]n applying for a patent, the inventor must ordinarily submit an oath—a statement attesting that he is 'the original inventor' of the 'claimed invention.'" *Minerva Surgical, Inc. v. Hologic, Inc.*, 141 S. Ct. 2298, n.3 (2021) (internal citations omitted). Furthermore, "the inventor must comply with 'a duty of candor and good faith' in the patent process, including 'a duty to disclose' to the PTO all information he knows 'to be material to patentability.'" *Id.* To permit a purported inventor to obtain a valid patent containing claims that are not attributable to that inventor, *i.e.*, where a claim is invalid for improper inventorship, would render these duties superfluous, and directly contravene the public interest. "A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all

---

[1] All emphases added unless otherwise noted.

information material to patentability," which requires the correct inventors be named on the patent to disclose that information.  37 C.F.R. § 1.56.

Particularly relevant here, unasserted claims are not just relevant to inventorship, but also to establish Jazz's copying of Avadel's claims, which Jazz's witnesses to date have refused to acknowledge despite documentary evidence directly on point.  Ex. A, Allphin Dep. at 270:18-271:4 (Q.  Do you know whether [claim 1 of the 079 patent] was copied from a claim that Jazz had obtained . . . A. It would not have been copied by me. Q. Do you know whether it was copied? A. I don't know if it was an exact copy of an Avadel claim for certain").  On the subject of claim copying in particular, the MPEP requires that "[w]here claims are copied or substantially copied form a patent, 37 CFR 41.202(a) requires the applicant, at the time he or she presents the claim(s), to identify the patent and the numbers of the patent claims.  Clearly, the information required by 37 CFR 41.202(a) as to the source of copied claims is material information under 37 CFR 1.56 and failure to inform the USPTO of such information may violate the duty of disclosure."  MPEP 2001.06(d).

## 2.  Avadel Properly Disclosed its Inventorship Contentions for All Claims of the '782 Patent

Contrary to Jazz's assertions, Avadel properly disclosed its inventorship theories, and Jazz has no excuse for only now raising this issue during trial.  Indeed, Jazz filed no MIL or summary judgment motion addressing the issue it now raises.  Avadel disclosed in its inventorship defense to Jazz for the resinate patents in its May 6, 2022, invalidity contentions. Ex. B,  Avadel's Final Invalidity Contentions pp. 280–90.  Further, Avadel expressly set forth in its May 6, 2022 Final Invalidity Contentions ("FIC") that all claims of the '782 patent – one of the "Resinate Patents," are invalid for improper inventorship.  Ex. B, FIC at 280 ("The claims of the Jazz Resinate Patents are further invalid for improper inventorship."), 286 ("The new claims filed by Jazz in the prosecution of the '064 Application copied the claims from Avadel's application that led to the issuance of the '866 patent."); 287 ("The claims of the Jazz Resinate Patents are therefore invalid for lack of inventorship"); 289 ("Further evidence that the Resinate Patents are invalid for improper inventorship stems from …"), 290 ("For the reasons set forth above, Jazz's issued claims in the Resinate Patents are invalid for improper inventorship.").

Further, and contrary to Jazz's assertion at the hearing, Avadel's invalidity expert Dr. Charman clearly disclosed his opinions that all of the '782 patent claims (including claim 19) are invalid for lack of proper inventorship.  Dr. Charman explicitly discussed in his report how the "Asserted Claims" included "claims 1-24 of the '782 patent" – those are all of the claims of the '782 patent.  Ex. C, (Charman Second Supp. Report) ¶ 3.  The "Asserted Claims" thus specifically includes the claims at issue in this motion, including claim 16 and claim 19.  Dr. Charman explained that "I have been asked by counsel for Avadel to consider the validity of the Asserted Claims. In particular, I have been asked to consider who is properly considered to have invented and publicly disclosed the subject matter of the Asserted Claims." *Id.* ¶ 4.  Dr. Charman's report is clear and unequivocal that **all** of the claims of the '782 patent (including Claim 19) were invalid for lack of proper inventorship. *See, e.g., id.* ¶ 978 ("My opinion that the named inventors of the '782 patent did not have possession of the **claimed subject matter** is further supported by the deposition testimony of one of the named inventors …"); ¶ 982 ("at least due to the substantial similarity in the claim language, the testimony of Mr. McGarrigle and Mr. Valentine, the lack of written description for the claims as filed in the '064 application and as issued in the '782 patent, and the timing of Avadel's publication and the filing of the '064 patent claims, and fact the claims

2

of the '064 publication are substantively identical to the claims of the '866 Patent**, it is my opinion that Jazz did not possess the subject matter claimed in the '782 patent**."); ¶ 988 ("As a result of [Avadel's] disclosures, the specification of the [Avadel] '866 Patent would reasonably convey to a POSA that the inventors of Avadel's '866 Patent were in possession of the **subject matter recited in the claims of Jazz's '782 patent** prior to the filing of the applications leading to the '782 patent.").  Indeed, in addition to discussing his opinions that <u>all</u> of the claims of the '782 patent were invalid for improper inventorship, Dr. Charman explicitly discussed Claim 19 (one of the unasserted claims at issue) and its scope.  *Id.* ¶ 4 (The Asserted Claims of the '782 patent require … specific blood concentration ranges of gamma-hydroxybutyrate eight hours after the administration of the claimed formulation.  *See* '782 patent at … claim 19 ('15 mg/L to about 30 mg/mL').").  He likewise went through each claim and identified where the subject matter of each said claim was disclosed in Avadel's patent – including specifically the subject matter of claim 19, as well as 24.  *See id.* at ¶¶ 1238-39; 1248-49.

### 3.  Conclusion

At base, Jazz seeks yet another belated summary judgment ruling disguised as an evidentiary objection. This is particularly troubling where Jazz is well aware that Avadel's inventorship defense and copying evidence involves all claims of the '782 patent (including currently unasserted claims), yet Jazz has made no objection on these grounds thus far. Trial is not the appropriate time or place for Jazz's requests for summary disposition of defenses that Jazz did not pursue at the appropriate time via appropriate procedural vehicles. Jazz's request should be denied.


Respectfully submitted,

/s/ *Daniel M. Silver*

Daniel M. Silver (#4758)

cc:      All counsel of record (via CM/ECF and E-Mail)

# EXHIBIT A



Planet Depos
We Make It *Happen*™

<span style="color:darkred">**CONFIDENTIAL**</span>

# Transcript of Clark Allphin, Corporate Designee

**Date:** October 21, 2022

**Case:** Jazz Pharmaceuticals, Inc., et al. -v- Avadel CNS Pharmaceuticals, LLC., et al.

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3    -----------------------------------x

4    JAZZ PHARMACEUTICALS, INC.,         :

                         Plaintiff,

5              v.                        :  C.A. No. 21-691-MN

     AVADEL CNS PHARMACEUTICALS, LLC,

6                         Defendant.     :

7    -----------------------------------x

8    JAZZ PHARMACEUTICALS, INC., et al., :

                         Plaintiffs,

9              v.                        :  C.A. No. 21-1138-MN

     AVADEL CNS PHARMACEUTICALS, LLC,

10                        Defendant.     :

11   -----------------------------------x

12   JAZZ PHARMACEUTICALS, INC., et al., :

                         Plaintiffs,

13             v.                        :  C.A. No. 21-1594-MN

     AVADEL CNS PHARMACEUTICALS, LLC,

14                        Defendant.     :

15   -----------------------------------x

16                    CONFIDENTIAL

17

18      Videotaped Deposition of JAZZ PHARMACEUTICALS

19      By and through its Designated Representative

20                   CLARK ALLPHIN

21               New York, New York

22            Friday, October 21, 2022

23                    9:00 a.m.

24   Reported by: MARY F. BOWMAN, RPR, CRR

25   JOB NO. 468512

| | | |
|---|---|---|
| 1 | patent. | 17:46:25 |
| 2 | MS. DURIE:  Let me have marked as the | 17:46:29 |
| 3 | next exhibit a copy of U.S. Patent | 17:46:30 |
| 4 | 11,077,079. | 17:46:32 |
| 5 | (Exhibit 41, U.S. Patent | 17:46:48 |
| 6 | 11,077,079, marked for identification, | 17:46:48 |
| 7 | as of this date.) | 17:46:48 |
| 8 | Q.  In your '079 patent, turning on the column | 17:46:49 |
| 9 | 24 to claim 1 -- I apologize for the highlighting. | 17:46:52 |
| 10 | I note for the record it is not part of the original | 17:46:55 |
| 11 | document. | 17:46:59 |
| 12 | A.  I'm sorry, which page did you say? | 17:46:59 |
| 13 | Q.  Second-to-last page, column 24. | 17:47:01 |
| 14 | And you see claim 1 claims a method of | 17:47:07 |
| 15 | treating narcolepsy in patients comprising | 17:47:12 |
| 16 | administering a single daily dose to the patient | 17:47:16 |
| 17 | with additional requirements. | 17:47:19 |
| 18 | Do you know whether that claim was | 17:47:23 |
| 19 | copied from a claim that Jazz had obtained? | 17:47:25 |
| 20 | MR. CERRITO:  Objection, lacks | 17:47:31 |
| 21 | foundation, assumes facts not in evidence, | 17:47:32 |
| 22 | asks for a legal conclusion. | 17:47:33 |
| 23 | THE WITNESS:  Can I answer. | 17:47:43 |
| 24 | Q.  You can answer. | 17:47:43 |
| 25 | MR. CERRITO:  You may answer, yes. | 17:47:44 |

| | | |
|---|---|---|
| 1 | A.  It would not have been copied by me. | 17:47:46 |
| 2 | Q.  Do you know whether it was copied? | 17:47:50 |
| 3 | A.  I don't know if it was an exact copy of an | 17:47:55 |
| 4 | Avadel claim for certain. | 17:47:57 |
| 5 | Q.  Do you know who at Jazz first had the idea | 17:47:59 |
| 6 | for a method of treating narcolepsy in a patient in | 17:48:04 |
| 7 | need thereof comprising administering a single daily | 17:48:09 |
| 8 | dose equivalent to 4 grams to 12 grams of sodium | 17:48:14 |
| 9 | oxybate that includes opening a sachet where the | 17:48:18 |
| 10 | oxybate formulation has both an immediate-release | 17:48:23 |
| 11 | component and a controlled-release component? | 17:48:27 |
| 12 | MR. CERRITO:  Objection, vague, calls | 17:48:30 |
| 13 | for a legal conclusion. | 17:48:31 |
| 14 | You may answer. | 17:48:32 |
| 15 | A.  I forgot the question. | 17:48:42 |
| 16 | Q.  Sure. | 17:48:43 |
| 17 | Do you remember who first -- who at Jazz | 17:48:43 |
| 18 | first had that idea? | 17:48:46 |
| 19 | MR. CERRITO:  Same objections. | 17:48:47 |
| 20 | A.  I recall that we would have considered the | 17:48:51 |
| 21 | sachet in general when we were developing -- | 17:48:59 |
| 22 | Q.  Not my question. | 17:49:06 |
| 23 | My question is:  Who at Jazz first had | 17:49:07 |
| 24 | the idea for a method of treating narcolepsy where | 17:49:09 |
| 25 | the method involved administering a single daily | 17:49:14 |

CONFIDENTIAL
Transcript of Clark Allphin, Corporate Designee
October 21, 2022

300

```
 1                    CERTIFICATE

 2       STATE OF NEW JERSEY )
                            )ss:
 3       COUNTY OF UNION     )

 4          I, MARY F. BOWMAN, a Registered

 5     Professional Reporter, Certified

 6     Realtime Reporter, and Notary Public

 7     within and for the State of New Jersey,

 8     do hereby certify:

 9          That CLARK ALLPHIN, the witness

10     whose deposition is hereinbefore set

11     forth, was duly sworn by me and that

12     such deposition is a true record of the

13     testimony given by such witness.

14          I further certify that I am not

15     related to any of the parties to this

16     action by blood or marriage and that I

17     am in no way interested in the outcome

18     of this matter.

19          In witness whereof, I have hereunto

20     set my hand this 2nd day of November,

21     2022.

22

23          _____
            MARY F. BOWMAN, RPR, CRR
24

25
```

# EXHIBIT B

!IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JAZZ PHARMACEUTICALS, INC., )
)
                Plaintiff, )
)
v. )    C.A. No. 21-691-MN
)
AVADEL   CNS   PHARMACEUTICALS, )
LLC, )    **HIGHLY CONFIDENTIAL**
)
                Defendant. )
)
)
)
JAZZ PHARMACEUTICALS, INC. and )
JAZZ PHARMACEUTICALS IRELAND )
LIMITED, )
)
)    C.A. No. 21-1138-MN
                Plaintiffs, )
)
v. )
)    **HIGHLY CONFIDENTIAL**
AVADEL   CNS   PHARMACEUTICALS, )
LLC, )
)
                Defendant. )
)
)
)
JAZZ PHARMACEUTICALS, INC. and )
JAZZ PHARMACEUTICALS IRELAND )
LIMITED, )
)
)    C.A. No. 21-1594-MN
                Plaintiffs, )
)
v. )
)    **HIGHLY CONFIDENTIAL**
AVADEL   CNS   PHARMACEUTICALS, )
LLC, )
)
                Defendant. )
)
)
)

## AVADEL'S FINAL INVALIDITY CONTENTIONS

1

description support for the claims of the '782 patent, *see* Jazz's Final Validity Contentions at 210.

*Compare* '889 Application at Paragraph [014], *with* '782 patent at col. 4:5-10; *compare* '586 Application at Paragraph [0085] with '782 patent at col. 22:26-32.  Therefore, for the same reason as stated in Section IV.E.7.d, the disclosures cited by Jazz in its Final Invalidity Contentions would not have led a POSA to understand, based on the disclosures in the '889 and '586 Applications, that the inventors were in possession of a GHB formulation that achieved the claimed blood concentration range as of the filing date of the '889 and '586 Applications.  Jazz is therefore not entitled to claim priority for the '782 patent back to the filing date of the '889 Application or the '586 Application.

### F.    The '079 and '782 Patents Are Invalid For Improper Inventorship And/Or As Anticipated By Avadel Patent Publications

The claims of the Jazz Resinate Patents are further invalid for improper inventorship under 35 U.S.C. § 101 and 115(a) because they were derived from the inventive work of Avadel.  The inventive work by Avadel alternatively renders the claims of the Jazz Resinate Patents invalid as anticipated under post-AIA § 102.

Section 101 requires proper inventorship, as it requires that:  "Whoever invents or discovers [an invention] may obtain a patent."  35 U.S.C. § 101.  Section 115(a) similarly states that:  "An application for patent . . . shall include . . . the name of the inventor."  *See Belcher Pharms., LLC v. Hospira, Inc.*, No. 17-775-LPS, 2019 WL 2503159, at *1 (D. Del. June 5, 2019); *see also* MPEP § 2157 ("[W]here it is clear that the application does not name the correct inventorship . . . Office personnel should reject the claims under 35 U.S.C. [§] 101 and 35 U.S.C. [§] 115.").

Avadel's conception and reduction to practice of its once-nightly formulation and the publication of its associated patents prior to the filing of the claims in the Jazz Resinate Patents

establishes that the claims of the Jazz Resinate Patents are invalid for improper inventorship. The Jazz named inventors did not conceive of or reduce to practice the claims in the Jazz Resinate Patents. Rather, Jazz, through its prosecution counsel, copied the claimed invention from the true inventors—Claire Megret, Herve Guillard, and Jean-Francois Dubuisson, who are the named inventors on patents that ultimately were assigned to Avadel, relating to Avadel's once-nightly formulation.

The Jazz Resinate Patents claim priority to U.S. provisional 62/117,889, filed February 18, 2015. However, as of September 2019, all of Jazz's issued and pending claims in that family were directed to ion exchange resins, commensurate with the only disclosures of the provisional and other applications of that family. At the time, Jazz was engaged in the prosecution of U.S. Application No. 16/448,598 ("the '598 Application"), a parent application to the applications that would eventually issue as the Jazz Resinate Patents. Unlike the claims of the Jazz Resinate Patents, the pending claims of the '598 Application were directed to a composition of oxybate that was ionically bound to an ion exchange matrix, such as an anion-exchange resin, as well as a method of preparing an oxybate resinate. *See* '598 Application File History at Claims, p. 38-42 (June 21, 2019).

On January 25, 2018, the application that ultimately issued as U.S. Patent No. 10,272,062 ("the '062 patent"), and which was ultimately assigned to Avadel, was first published. This application demonstrates Avadel's conception—and reduction to practice—of modified release formulations of oxybate and methods of using those formulations therapeutically.

### 1.     The '079 Patent

On September 12, 2019, the application that ultimately issued as U.S. Patent No. 10,952,986 ("the '986 patent"), and which was ultimately issued to Avadel, was first published. The final version of the claims found in the '986 patent became publicly available on October 1,

2020, and the '986 patent issued on March 23, 2021.  Unlike Jazz's then-pending '598 Application, Avadel's application of the '986 patent describes a method of treatment with GHB by opening a sachet containing a GHB formulation, mixing the formulation with water, and orally administering the mixture.  '321 Application File History at Claims, at 159-162 (May 23, 2019).

A few months after the final version of the claims in the '986 patent which was ultimately assigned to Avadel became public, on December 10, 2020, Jazz filed U.S. Application 17/118,041 (the "'041 Application") (which would eventually issue as the '079 patent) as a continuation of its pending '598 Application.  Jazz filed a Nonpublication Request for the '041 Application, through which Jazz sought to ensure that the '041 Application would not be made public.  *See* '041 Application File History, Nonpublication Request from Applicant (Dec. 10, 2020).  However, by December 10, 2020, the specification of the '041 Application had already been made public, since the '662 patent—whose application the '041 Application claims priority to—had already issued on September 3, 2019.  Furthermore, although Jazz added two new paragraphs to the '041 Application specification, but Jazz represented to the Examiner that the paragraphs being inserted were "material previously incorporated by reference" and so were also previously publicly available.  *See* Applicant Arguments/Remarks Made in an Amendment (Dec. 21, 2020).  In other words, the only truly "nonpublished" material in the '041 Application were the claims.  Thus, the only reasonable inference that can be drawn from filing the Nonpublication Request and the Applicant Remarks is that Jazz was seeking to prevent others from learning what claims Jazz was pursuing in the '041 application.  The following chart depicts the first seven claims in the '321 Application and the '041 Application, showing a striking similarity between the two:

| Claims from Patent Application No. 16/420,321, Amendment and Response to Non Final Office Action, filed October 1, 2020 | Claims from Jazz's Patent Application No. 17/118,041, filed December 10, 2020 |
|---|---|
| 1.   A method of treating a disorder treatable with gamma-hydroxybutyrate in a human in need thereof, the method comprising:<br>    administering a single daily dose to said human, the single daily dose comprising an amount of gamma-hydroxybutyrate equivalent to from 3.0 to 12.0 g of sodium oxybate, wherein the administering comprises<br>    opening a sachet containing a gamma-hydroxybutyrate formulation,<br>    mixing the formulation with water, and<br>orally administering the mixture. | 1.   A method of treating a disease or condition treatable with oxybate in a patient in need thereof, the method comprising:<br>    administering a single daily dose to the patient, the single daily dose comprising an amount of oxybate equivalent to from 4.0 g to 12.0 g of sodium oxybate, wherein the administering comprises:<br>    opening a sachet containing an oxybate formulation,<br>    mixing the formulation with water, and<br>    orally administering the mixture to the patient. |
| 2.  The method of claim 1, wherein the orally administering occurs at bedtime. | 2.  The method of claim 1, wherein the orally administering occurs at night. |
| 3.  The method of claim 1, wherein the mixing occurs shortly before the orally administering. | 3.  The method of claim 1, wherein the oxybate formulation is mixed with water immediately prior to administration. |
| 4.  The method of claim 1, wherein the orally administering occurs approximately 2 hours after said human has eaten a meal. | 4.  The method of claim 1, wherein the oxybate is administered with food. |
| 5.   The method of claim 1, wherein said administering results in inducing said human to sleep for 6 to 8 hours. | 5.   The method of claim 1, wherein the administering promotes the patient to sleep for 6 to 8 hours. |
| 6.  The method of claim 1, wherein the amount of gamma-hydroxybutyrate administered to the human is equivalent to 4.5 g, 6.0 g, 7.5 g or 9.0 g of sodium oxybate. | 6.  The method of claim 1, wherein the amount of oxybate administered to the human is 35 mEq, 45 mEq, 60 mEq, or 70 mEq of oxybate. |
| 7. The method of claim 1, wherein the mixture is a suspension. | 7. The method of claim 1, wherein the mixture is a suspension. |

The new claims filed by Jazz in the prosecution of the '041 Application copied the claims from Avadel's application that led to the issuance of the '986 patent.  Given the slavish copying, the reasonable inference is that Jazz's new claims were the result of Avadel's communication of its controlled release formulations to Jazz via its published application for the '986 patent.

Further, evidence of Jazz's reliance on Avadel's disclosure in its application for the '986 patent is reflected by the fact that in contrast to the original claims filed with the '598 Application, the new claims are not described or supported by the application's specification. In particular, the specification of the '041 Application does not disclose a method of treatment using a single daily dose of oxybate by opening a sachet containing a solid oxybate formulation, mixing that formulation with water, and orally administering the mixture to the patient. *See supra* Section IV.E.5-8. Furthermore, the only oxybate compositions disclosed in the specification of the '041 Application as being within the scope of the invention are ion exchange resins. *See e.g.*, '041 Application File History at Specification, p. 9-10 (Dec. 10, 2020).

## 2. The '782 Patent

On June 20, 2019, the application that ultimately issued as U.S. Patent No. 10,736,866 ("the '866 patent") and was ultimately assigned to Avadel was first published. The final version of the claims found in the '866 patent became publicly available when the '866 patent issued on August 11, 2020. This application demonstrates Avadel's conception—and reduction to practice—of its novel formulations. Unlike Jazz's pending '598 Application, Avadel's application of the '866 patent described detailed information regarding modified release formulations of oxybate and methods of using those formulations therapeutically.

A few months later, on March 23, 2021, Jazz filed U.S. Application 17/210,064 (the "'064 Application") (which would eventually issue as the '782 patent) as a continuation of Jazz's '041 Application. As it did with the '041 Application, Jazz filed a Nonpublication Request for the '064 Application, even though the only "nonpublished" information in the application was the claims. *See* '064 Application File History, Nonpublication Request from Applicant (Mar. 23, 2021). The only reasonable inference that can be drawn from this is that Jazz wanted to ensure that no one

was aware of the claims in the application.  Once again, when comparing the first four claims in

the '064 Application with those in the '866 patent, there is a striking similarity:

| Jazz '782 Claims (as first filed in '064 app) | Avadel '866 Patent |
|---|---|
| 1. A formulation of gamma-hydroxybutyrate comprising:<br>an immediate release portion comprising gamma-hydroxybutyrate;<br>A modified release portion comprising gamma-hydroxybutyrate;<br>a viscosity enhancing agent; and<br>an acid;<br>Wherein the viscosity enhancing agent and the acid are separate from the immediate release portion and the modified release portion. | 1. A formulation of gamma-hydroxybutyrate comprising:<br>an immediate release portion comprising gamma-hydroxybutyrate;<br>A modified release portion comprising gamma-hydroxybutyrate;<br>A suspending or viscosifying agent selected from…;<br>An acidifying agent selected from…;<br>Wherein the suspending or viscosifying agent and the acidifying agent are separate and distinct from the immediate release portion and the modified release portion; and<br>Wherein the ratio of gamma-hydroxybutyrate in the immediate release portion and the modified release portion is from 10/90 to 65/35. |
| 2. The formulation of claim 1, wherein the viscosity enhancing agent is selected from the group consisting of xanthan gum, microcrystalline cellulose, hydroxyethyl cellulose, hydroxypropymethyl cellulose carboxymethyl cellulose sodium, hydroxypropyl cellulose and mixtures thereof. | *See Claim 1:* a suspending or viscosifying agent selected from the group consisting of xanthan gum, carrageenan gum, gellan gum, guar gum, sodium alginate, calcium alginate, agar, sodium carboxymethyl cellulose, microcrystalline cellulose, hydroxyethyl cellulose, hydroxypropylmethyl cellulose, and mixtures thereof… |
| 3. The formulation of claim 1, wherein the acid is selected from the group consisting of malic acid, citric acid, tartaric acid, boric acid, maleic acid, phosphoric acid, and benzoic acid. | *See Claim 1:* an acidifying agent selected from the group consisting of malic acid, citric acid, tartaric acid, adipic acid, boric acid, maleic acid, phosphoric acid, ascorbic acid, oleic acid, capric acid, caprlic acid, and benzoic acid… |
| 4. The formulation of claim 1, wherein the formulation further comprises a lubricant selected from the group consisting of magnesium stearate, stearic acid, calcium stearate, hydrogenated castor oil, hydrogenated vegetable oil, light mineral oil, mineral oil, polyethylene glycol, | 4. The formulation of claim 1, wherein the formulation further comprises a lubricant or glidant selected from the group consisting of magnesium stearate, calcium stearate, zinc stearate, glyceryl monostearate, glyceryl palmitostearate, |

| Jazz '782 Claims (as first filed in '064 app) | Avadel '866 Patent |
|---|---|
| sodium benzoate, sodium stearyl fumarate, and zinc stearate. | glycerol benzoate, sodium stearyl fumarate, talc, or colloidal silicon dioxide. |

The new claims filed by Jazz in the prosecution of the '064 Application copied the claims from Avadel's application that led to the issuance of the '866 patent.  Given the slavish copying, the reasonable inference is that Jazz's new claims were the result of Avadel's communication of its controlled release formulations to Jazz via its published application for the '866 patent.

Further, evidence of Jazz's reliance on Avadel's disclosure in its application for the '866 patent is reflected by the fact that in contrast to the original claims filed with the '598 Application, the new claims are not described or supported by the application's specification.  In particular, the specification of the '064 Application does not disclose the use of a viscosity-enhancing agent or an acid that is separate from the immediate release portion and modified release portion of the formulation.  *See supra* a Section IV.E.5-8.

***

Because the issued claims of the Jazz Resinate Patents lack written description support, they are not entitled to the priority date of February 18, 2015.  Indeed, they are invalid for lack of written description.  *See supra* Section IV.E.5-8.  Even were one to credit the '079 patent with the date of the earliest recitation a method of treatment using a single daily dose of oxybate by opening a sachet containing a solid oxybate formulation, mixing that formulation with water, and orally administering the mixture to the patient, that would only get to Jazz's December 10, 2020 filing of the claims in the '041 Application.

Similarly, even if one were to credit the '782 patent with the date of the earliest recitation of the use of a viscosity enhancing agent or a viscosity enhancing agent and acid that are separate

from the immediate release portion and modified release portion, that would only get to Jazz's March 23, 2021 filing of the claims in the '064 Application.[43]

Because Avadel's application for the '062 patent published on January 25, 2018, it is prior art to the claims of the Jazz Resinate Patents, and those claims are therefore anticipated. Further, as demonstrated by the disclosures in the '062 patent, the inventors of the Avadel application had fully conceived of (and reduced to practice) the subject matter claimed in the Jazz Resinate Patents prior to communicating their invention to Jazz by way of the published application for the '062 patent. The claims of the Jazz Resinate Patents are therefore invalid for lack of inventorship.

### 3. Response to Jazz on Invalidity of the Resinate Patents Due to Derivation and/or Improper Inventorship

As set forth in Avadel's pleadings and Initial Invalidity Contentions, the asserted claims of the Resinate Patents are invalid for improper inventorship.

Jazz contends in its Final Validity Contentions that "the inventors of the '079 and '782 Patents had invented the subject matter of the claims before Defendants had filed any patent application to which their alleged 'inventions' claim priority." Jazz Final Validity Contentions at 211. According to Jazz, the asserted claims of the Resinate Patents are therefore not invalid for improper inventorship. But for the reasons set forth in Avadel's contentions, the specification disclosures of the Jazz Resinate Patents fail to provide written description support for the claims.

---

[43] To the extent that the Court finds that the '782 patent is entitled to an earlier priority date than the March 23, 2021 filing of the claims in the '064 Application, the "modified" limitation in the claims is not entitled to a date earlier than February 18, 2016. During prosecution, in the Non-Final Rejection of June 18, 2021 of the '782 patent, the Examiner noted the word "modified" in the claims of the '782 patent did not have support in the '889 application. Thus, the Examiner found the earliest potential priority date for the claimed subject matter in of "a formulation of gamma-hydroxybutyrate comprising: an immediate release portion comprising gamma-hydroxybutyrate; a modified release portion comprising gamma-hydroxybutyrate," is February 18, 2016, the effective filing date of the '586 application.

*See supra* Section IV.E.3, 7.  As a result, Jazz's Resinate Patents are not entitled to their claimed priority date, and there is no basis for Jazz's assertion that the inventors of Jazz's Resinate Patents invented the claimed subject matter prior to the conception and reduction to practice of Avadel's once-nightly oxybate formulation.  "[W]here it is clear that the application does not name the correct inventorship," the claims should be rejected under 35 U.S.C. § 101 and 35 U.S.C. § 115. *Belcher Pharms.*, 2019 WL 2503159, at *1.

Jazz also contends that the "law expressly permitted claims that more accurately cover its competitor's product."  Jazz's Final Validity Contentions at 212.  But as Jazz's Final Validity Contentions acknowledge, this is only true if the Resinate Patents' claims "are supported by the specifications of the patent applications Jazz Pharmaceuticals had already filed."  *Id.*  Because the claims lack such support, *see* disc. *supra* Section IV.E.3, 7, Jazz's assertion that the law permits a patentee to file claims that cover its competitor's product is misplaced.

As set forth in Avadel's pleadings and its Initial Invalidity Contentions, the claims of Jazz's Resinate Patents were copied from the published application for the '986 and '866 patents that were ultimately assigned to Avadel and directed to once-nightly oxybate formulations developed by Avadel.  Jazz's Final Validity Contentions does not dispute any of the evidence Avadel presented in its Initial Invalidity Contentions demonstrating that Jazz copied Avadel's claims. Further, during discovery, Avadel propounded an interrogatory asking Jazz to identify all facts surrounding its decision during prosecution of the Resinate Patents to replace the original claims with claims matching the claims from the published patent applications that were ultimately assigned to Avadel.  Jazz responded that it was "not aware of any nonprivileged information responsive to this interrogatory."  2/28/2022 Jazz's Response to Avadel's Interrogatory No. 14. The only reasonable inference based on the circumstances is that the claims of Jazz's '079 and

'782 patents were the result of Avadel's communication of its controlled release formulations to Jazz via its published application for the '986 and '866 patents, which claims Jazz then copied for its pending Resinate Patents.

Further evidence that the Resinate Patents are invalid for improper inventorship stems from Jazz's unique access to Avadel's trade secret and other confidential information regarding Avadel's proprietary technology used in its development of its controlled release oxybate formulations (including FT218) and its clinical studies demonstrating the success of those formulations. Thus, Jazz improperly used Avadel's trade secret and other confidential information to draft its claims for Jazz's '079 and '782 patents. To secure such access to Avadel's trade secret and other confidential information, Jazz repeatedly engaged in discussions with Avadel—in 2010, 2015, and 2018—ostensibly for purposes of assessing a possible collaboration between the companies. *See supra* Section III.F. As part of these discussions, Jazz entered into Confidential Disclosure Agreements (CDAs) that restricted Jazz's access and use of Avadel's confidential information disclosed during these discussions. The confidential information disclosed included Avadel's clinical data that showed the success of Avadel's FT218, including clinical trial protocols and critical pK data, FT218's success with a sachet, liquid-suspension formulation for once-nightly oxybate, and that FT218's composition consisted of immediate release pellets, controlled release coated pellets, and excipients including malic acid as the acidifying agent, hydroxyethylcellulose and xanthan gum as suspending/viscosifying agents, and magnesium stearate as the lubricant. *See supra* Section III.F. But instead of honoring its obligations not to misuse Avadel's confidential information, Jazz distributed that information internally at Jazz, hid its misuse from Avadel as long as possible, and used said confidential information to obtain the claims of the Resinate Patents (utilizing non-publication requests to hide its misconduct), despite not having the support in the

specification for these claims, in an effort to cover Avadel's FT218 product.  Indeed, Jazz did not

file the application that ultimately led to the issuance of the '079 patent until December 10, 2020,

and did not file the application that lead to the issuance of the '782 Patent until March 23, 2021,

more than two years after the most recent round of diligence between Jazz and Avadel has

concluded.

For the reasons set forth above, Jazz's issued claims in the Resinate Patents are invalid for

improper inventorship.

### 4.   Response to Jazz on Invalidity of the Resinate Patents Due to Anticipation by the Avadel Patent Publications

Jazz's Final Validity Contentions do not dispute that the published application for the '062

patent (which was ultimately assigned to Avadel) would anticipate the claims of the Resinate

Patent as prior art to Jazz's patents.  *See* Jazz Final Validity Contentions at 212.  Jazz asserts only

that the Resinate Patents are entitled to at least a 2016 priority date for the reasons set forth in its

Final Validity Contentions.  For the reasons set forth above in these contentions, however, Jazz's

priority claim is wrong.  The claims of the Resinate Patents lack written description support, are

therefore entitled to priority date no earlier than December 10, 2020 (for the '079 patent) and

March 23, 2021 (for the '782 patent).  *See supra* Section III. F.2.  Because the published application

for the '062 patent was publicly available more than a year prior to any potential priority date for

the Resinate Patents, it is prior art to Jazz's patents.  The Resinate Patents are therefore invalid as

anticipated by the patent publication ultimately assigned to Avadel.

Application No. 17/118,041, Notice of Allowance and Fees at 4 (June 18, 2021).  Jazz provides no explanation of how this act by the examiner is relevant to Jazz's intent to deceive.

Finally, Jazz argues that Avadel's citation to Manual of Patent Examining Procedure § 2001.06(d) in connection with the applicant's duty of disclosure is inapplicable to the '079 and '782 patents because the cited section relates to information suggesting an interference and interference proceedings had been eliminated before the effective filing date of the '079 and '782 patents.  Jazz's Final Validity Contentions at 213.  But this argument misses the point.  Jazz owed a duty of candor requiring Jazz to disclose to the examiner all information material to patentability, which Jazz does not dispute.  Jazz failed to comply with this duty, as described in Avadel's Answer & Counterclaims.  *See* Counterclaims Counts III-IV, C.A. No. 21-1138-MN (Dkt. 12) at ¶¶ 18-62; Counterclaims Counts III-IV, C.A. No. 21-1594-MN (Dkt. 25) at ¶¶ 41-89.

In sum, none of Jazz's arguments rebut Avadel's invalidity contentions or the arguments laid out in its Answer & Counterclaims that the '079 and '782 patents are unenforceable for inequitable conduct and/or unclean hands.

Dated:  May 6, 2022                          Respectfully submitted,


                                             By: /s/ Daniel M. Silver
                                             Daniel M. Silver (#4758)
                                             Alexandra M. Joyce (#6423)
                                             405 N. King Street, 8th Floor
                                             Wilmington, DE 19801
                                             MCCARTER & ENGLISH, LLP
                                              (302) 984-6331
                                             dsilver@mccarter.com
                                             ajoyce@mccarter.com


                                             Kenneth G. Schuler (*admitted pro hac vice*)
                                             Marc N. Zubick (*admitted pro hac vice*)
                                             Sarah W. Wang (*admitted pro hac vice*)
                                             Alex Grabowski (*admitted pro hac vice*)
                                             LATHAM & WATKINS LLP
                                             330 N. Wabash Avenue, Suite 2800
                                             Chicago, IL 60611
                                             Telephone: (312) 876-7700
                                             Email: kenneth.schuler@lw.com
                                             Email: marc.zubick@lw.com
                                             Email: sarah.wang@lw.com
                                             Email: alex.grabowski@lw.com


                                             Herman Yue (*admitted pro hac vice*)
                                             Bornali Rashmi Borah (*admitted pro hac vice*)
                                             LATHAM & WATKINS LLP
                                             1271 Avenue of the Americas
                                             New York, NY 10020
                                             (212) 906-1200
                                             Email: Herman.Yue@lw.com
                                             Email: Rashmi.Borah@lw.com


                                             Yi Ning (*admitted pro hac vice*)
                                             LATHAM & WATKINS LLP
                                             140 Scott Drive
                                             Menlo Park, CA 94025
                                             (650) 328-4600
                                             Email: sunnie.ning@lw.com


                                             Daralyn J. Durie (*admitted pro hac vice*)
                                             DURIE TANGRI LLP
                                             217 Leidesdorff Street
                                             San Francisco, CA 94111

                                             294

(415) 365-6666
ddurie@durietangri.com

Kira A. Davis (*admitted pro hac vice*)
Katherine E. McNutt (*admitted pro hac vice*)
DURIE TANGRI LLP
953 East 3rd Street
Los Angeles, CA 90013
(213) 992-4499
kdavis@durietangri.com
kmcnutt@durietangri.com

*Attorneys for Avadel*

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., | |
| Plaintiff, | |
| v. | C.A. No. 21-691-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| Plaintiffs, | |
| v. | C.A. No. 21-1138-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| Plaintiffs, | |
| v. | C.A. No. 21-1594-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| Defendant. | |

**SECOND SUPPLEMENTED OPENING EXPERT REPORT OF WILLIAM CHARMAN**

**HIGHLY CONFIDENTIAL**

## CHARMAN OPENING REPORT

## I.       INTRODUCTION

1.       I have been retained by counsel for Defendant Avadel CNS Pharmaceuticals, LLC ("Avadel") as an expert witness in the above captioned action.

2.       I understand that Plaintiff Jazz Pharmaceuticals ("Jazz") has filed a lawsuit against Avadel alleging infringement of U.S. Patent Nos. 10,758,488 ("'488 patent"), 10,813,885 ("'885 patent"), 10,959,956 ("'956 patent"), and 10,966,931 ("'931 patent") (together, the "Sustained Release patents"), as well as U.S. Patent Nos. 11,077,079 ("'079 Patent") and 11,147,782 ("'782 patent") (together, the "Resinate patents") (collectively, the "Patents-in-Suit").

3.       I understand the following claims of the Patents-in-Suit are being asserted by Jazz: claims 1-12 of the '488 patent; claims 1-15 of the '885 patent; claims 1-20, 23-25 of the '956 patent; claims 1-15 of the '931 patent; claims 1-3, 5-12, 14-18 of the '079 patent; and claims 1-24 of the '782 patent (collectively, the "Asserted Claims").

4.       I have been asked by counsel for Avadel to consider the validity of the Asserted Claims.  In particular, I have been asked to consider whether the Asserted Claims meet the written description and enablement requirements of 35 U.S.C. § 112, whether the Asserted Claims are anticipated under 35 U.S.C. § 102, and who is properly considered to have invented and publicly disclosed the subject matter of the Asserted Claims.

5.       My opinions are set forth in this report based on the materials I have reviewed (listed in Exhibit A), my experience and training in the relevant field, including my experience with drug formulation and testing, and the applicable legal principles provided by Avadel's counsel.

- The Resinate patents are invalid for lack of enablement because the specification does not teach a POSA to make and use the full scope the claimed subject matter without undue experimentation

- To the extent the '079 patent has sufficient written description support, the '079 patent is invalid as anticipated by Liang 2006

- To the extent the '079 patent has sufficient written description support, the '079 patent is invalid as anticipated by Lebon 2013

- To the extent Jazz's interpretation of the claimed "controlled release component" is correct, the '079 patent is invalid as anticipated by Avadel's '990 Publication

- To the extent Jazz's interpretation of the claimed "modified release particles" is correct, the '782 patent is invalid as anticipated by Avadel's '866 Patent

- To the extent Jazz's interpretation of the claimed "controlled release component" is correct, Avadel invented the subject matter claimed by the '079 patent and publicly disclosed it prior to the filing date of Jazz's '079 patent

- To the extent Jazz's interpretation of the claimed "modified release particles" is correct, Avadel invented the subject matter claimed by the '782 patent and publicly disclosed it prior to the filing date of Jazz's '782 patent

- Jazz did not convey to the patent office that it was using material from the claims of Avadel's patents in the claims of its own patents

## V.    LEGAL PRINCIPLES

### A.    <u>Validity</u>

22.    I understand from counsel for Avadel that issued patents are presumed to be valid, and that to establish invalidity a challenger must prove invalidity by clear and convincing evidence,

which is an intermediate standard that is higher than a preponderance of the evidence, but does not require proof beyond a reasonable doubt.

**B.      35 U.S.C. § 112: Written Description**

23.      I understand from counsel for Avadel that 35 U.S.C. § 112 requires that a patent specification "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make, and use the same[.]"

24.      I also understand that the test for sufficiency of a patent's written description requires an objective inquiry into the four corners of the specification from the perspective of a POSA, and that, based on that inquiry, the specification must reasonably convey to a POSA that the inventor had possession of the claimed subject matter as of the priority date of the claims, *i.e.*, that the inventor actually invented what is claimed at the pertinent time.   I understand that "possession" does not require actual reduction to practice.

25.      I also understand that where a particular claim limitation (or combination of limitations) is disclosed as part of a list of numerous other alternatives in the specification, courts often require "blaze marks" that would direct a POSA to select the particular feature (or combination of features) from among the numerous disclosures in the specification.   Put differently, a list of features disclosed in the specification from which a POSA would have to pick and choose in order to arrive at the claimed invention does not, without more, provide written description support.  Similarly, where the claim recites a particular functionality, the specification must provide blaze marks that would direct a POSA to the operative species within a broad genus disclosure in the specification that would achieve that functionality.

169.    Additionally, in the April Allphin Declaration, Mr. Allphin noted that "[t]he effects of application weight enable wide latitude in enteric level and allow a formulator to develop a suitable formulation meeting the structural and functional requirements.  Further, a coating with a water-soluble pore former, as shown in the previous declaration, can meet the target dissolution profile, but as shown in Figures 1 & 2, a water-insoluble pore-former is not required for achieving the target dissolution profile."  *Id.* at -568.  Mr. Allphin also noted that the base component can be a broad range of materials, but only identifies a "water-insoluble polymer or hydrophobic film-forming compound."  *Id.*

170.    The Allphin April Declaration does not describe the dissolution media and the dissolution apparatus used, nor the conditions under which the described experiment is conducted.

171.    Both the Allphin March and April Declarations were submitted to the Patent Office after the publication of Avadel's '062 patent application on January 25, 2018.

**B.    '079 and '782 Patents**

172.    The '079 and '782 patents, the Resinate patents, are members of the same patent family, and share a substantially identical specification.  *See* Appendix C (Resinate patent family history).

173.    I understand that Jazz has asserted claims 1-3, 5-12, 14-18 of the '079 patent and claims 1-24 of the '782 patent.  The Asserted Claims are reproduced in Appendix A of this report.

174.    The Asserted Claims of the '079 patent require administering a single daily dose containing a controlled release component by opening a sachet containing a gamma-hydroxybutyrate formulation that promotes 6 to 8 hours of sleep for narcolepsy patients.

175.    The Asserted Claims of the '782 patent require a formulation of gamma-hydroxybutyrate comprising of modified release particles, a viscosity agent and acid that are separate from the immediate release and modified release particles, and specific blood

concentration ranges of gamma-hydroxybutyrate eight hours after the administration of the claimed formulation.  *See* '782 patent at claim 11 ("10 mg/L to about 40 mg/mL"), claim 12 ("15 mg/L to about 30 mg/mL"), and claim 19 ("15 mg/L to about 30 mg/mL").

176.   Jazz has asserted that both the '079 and '782 patents claim priority to Provisional Application No. 62/117,889, filed February 18, 2015.  Pl. 4/1/2022 Validity Contentions at 93. However, as of September 2019, Jazz was prosecuting U.S. Application No. 16/448,598 (the "'598 application").  All of the issued and pending claims in that family were directed to ion exchange resins, commensurate with the specification.  *See* '598 Application File History at Claims, June 21, 2019.

177.   The patent examiner noted that the provisional application does not contain adequate support for the claims, and thus the earliest date the '079 and '782 patents could claim priority to is U.S. Application No. 15/047,586, filed on February 18, 2016.  JPION00444475 at -596; JPION00452143 at -264-265.  However, for the reasons set forth below, it is my opinion that the '079 patent cannot claim priority to a date before December 10, 2020, and the '782 patent cannot claim priority to a date before March 23, 2021.

### 1.   Prosecution History of the Resinate Patents

178.   I have also reviewed the prosecution history for the Resinate Patents.

#### a.   <u>'079 Patent</u>

179.   On December 10, 2020, Jazz filed U.S. Application 17/118,041 (the "'041 application"), which would eventually issue as the '079 patent as a continuation of its pending '598 application.  On December 21, 2020, Jazz added two new paragraphs to the '041 application specification, '079 patent at 13:66-14:37, and represented to the Examiner that the paragraphs being inserted were "material previously incorporated by reference" and "[n]o new matter [was] introduced."  JPION00444475 at -587-590.

978.     My opinion that the named inventors of the '782 patent did not have possession of the claimed subject matter is further supported by the deposition testimony of one of the named inventors, Mr. Allphin, Jazz's in-house counsel Mr. McGarrigle, and the prosecuting attorney of the '782 patent, Mr. Valentine.

979.     First, Mr. Allphin was not able to describe any meaningful work he performed in order to arrive at the invention as claimed in the now issued '782 patent.  For example, when asked "do you consider yourself to be an inventor of ['a formulation of GHB with immediate-release particles and modified-release particles with certain characteristics as set forth in topic 20']," [45] Mr. Allphin testified "I don't know." Ex. C, C. Allphin Tr. at 56:24-57:7.  He further testified that he didn't recall when he "first contemplated a formulation with the characteristics set forth in topic 20" testified that he did not recall.  *Id.* at 57:8-12.  Mr. Allphin also testified that he did not recall if he "first contemplate[d] the formulation that is described in topic 20 before or after [he] acquired a general understanding that Avadel had filed for patent claims on such a formulation." *Id.* at 58:11-18.  Mr. Allphin also testified that he did not "know with certainty" "what is the purpose of having an acid present in the formulation."  Ex. C, C. Allphin Tr. at 279:23-280:4; *see also id.* at 282:10-16.

980.     The similarity of the claims of Jazz's '064 application and Avadel's '866 Patent is consistent with the testimony of Mr. McGarrigle, that he instructed Mr. Valentine to review Avadel's patents or patent applications during the drafting the claims of the '064 patent application. Ex. H, McGarrigle Tr. at 122:2-10.  Both Mr. McGarrigle and the prosecuting attorney

---

[45] I note topic 20 as provided to Jazz recites "Experiments conducted on a formulation of GHB comprising a plurality of immediate release particles comprising GHB,  a plurality of modified release particles comprising GHB, a viscosity enhancing agent, and an acid, wherein the viscosity enhancing agent and the acid are separate from the immediate release particles and the modified release particles."  Def. 8/30/2022 30(B)(6) notice to Pls. at 9.

also stated in their depositions that they referred to the claims of the '866 Patent during the drafting process for the '064 application.  Ex. H, McGarrigle Tr. at 119:17-120:14; Ex. I, Valentine Tr. at 60:2-6.

981.    Additionally, it is my opinion that the claims as filed of the '064 application as filed, bear little substantive relation to the content of the '064 application's specification.  As noted above, *supra* XVII.A, XIX.A, the claims of the '782 patent, lack written description support from the specification.   These claims are substantively identical to the claims as filed in the '064 specification. *Compare* '782 patent at claims 1-4 *with* JPION00452143 at -195.

982.    Thus, at least due to the substantial similarity in the claim language, the testimony of Mr. McGarrigle and Mr. Valentine, the lack of written description for the claims as filed in the '064 application and as issued in the '782 patent, and the timing of Avadel's publication and the filing of the '064 patent claims, and fact the claims of the '064 publication are substantively identical to the claims of the '866 Patent, it is my opinion that Jazz did not possess the subject matter claimed in the '782 patent,.

### D.    Avadel Publically Disclosed the Subject Matter of the Claims of the '782 Patent

983.    In contrast to Jazz's '782 patent, the specification of Avadel's '866 Patent discloses the subject matter claimed by Jazz's '782 Patent, as interpreted by Jazz to include salts of GHB within the claims.  In particular, the '866 Patent describes "modified release particles," "a viscosity enhancing agent . . . wherein the viscosity enhancing agent . . .  [is] separate from the immediate release particles and the modified release particles," "an acid wherein the . . . acid [is] separate from the immediate release particles and the modified release particles," and the claimed blood concentration ranges.

### 1.    The '866 Patent Has Support For Modified Release Particles

separate from modified and immediate release microparticles). Thus, it is my opinion that this limitation is disclosed by the '866 Patent.

### 4. The '866 Patent has support for the Claimed Blood Concentration Ranges

987. The '866 Patent discloses the claimed blood concentrations of the '782 patent.[46] For example, the '866 Patent discloses "the modified release formulations of gamma-hydroxybutyrate are defined based on the concentration of gamma-hydroxybutyrate in the blood stream 8 hours after administration. Therefore, in other sub-embodiments the formulation can be characterized by ". . . a 7.5 g dose of the modified release formulation of gamma-hydroxybutyrate has been shown to achieve a mean $C_{8h}$ of from 13.0 to 40.3, from 16.0 to 26.0, 15.0 to 25.0, from 17.5 to 22.0, from 21.6 to 40.3, from 24.7 to 37.2, or from 27.8 to 34.1 micrograms/mL, when administered once approximately two hours after a standardized evening meal." '866 Patent at 27:37-55.

\* \* \*

988. For the reasons set forth above, the disclosures in Avadel's '866 Patent, including its working examples, teach the subject matter claimed in the '782 patent as interpreted by Jazz to cover sodium oxybate formulations. As a result of those disclosures, the specification of the '866 Patent would reasonably convey to a POSA that the inventors of Avadel's '866 Patent were in possession of the subject matter recited in the claims of Jazz's '782 patent prior to the filing of the applications leading to the '782 patent. In addition, those disclosures were released to the public,

---

[46] Jazz appears to treat "40 mg/mL" in the claim limitation as a typographical error as Jazz has contended that [014] of the '889 application and [0085] of the '586 application, each of which only recite mg/L, provide written description support for this limitation. Pl. 4/1/2022 Contentions at 102.

including Jazz, prior to the filing of Jazz's application giving rise to its '782 patent, by virtue of Avadel's published patent application.

989.    In contrast, as I described above, Jazz's '782 patent and '064 application lack the type of disclosure that would demonstrate possession of the claims. Jazz's '782 patent does not provide detailed descriptions of modified release particles, a viscosity enhancing agent and an acid wherein the viscosity enhancing agent and the acid are separate from the immediate and modified release particles, and the claimed blood concentrations.

990.    When comparing the '866 Patent's detailed description of all of the components of a modified release formulation of GHB to the '782 specification, which fails to describe many of the components of the claimed invention, it would be apparent to a POSA that Jazz did not possess the subject matter recited in the claims of the '782 patent. This is further confirmed by testimony from the inventors of the '782 patent, who could not identify anything inventive that he contributed to the claimed invention, and Phil McGarrigle, who testified that the attorneys who drafted the claims of the '782 patent referred to Avadel's publications.

991.    Based on my comparison of the respective disclosures in Avadel's issued patent application (which fully disclose the subject matter claimed in Jazz's '782 patent, *see* XXII.B) and Jazz's '782 patent (which do not), it is my opinion that a POSA would conclude that Avadel possessed the subject matter (or at least a portion thereof) claimed in the Jazz's '782 patent.

1237.   Thus, for the reasons discussed in connection with claims 5 and 14, it is my opinion that claim 18 is anticipated by the '866 Patent.

### 19.   Claim 19

a.   **"The unit dose of claim 14, wherein 8 h after administration of the formulation provides a blood concentration ranging from 15 mg/L to about 30 mg/mL."**

1238.   Claim 19, which depends on claim 14, further recites "wherein 8 h after administration of the formulation provides a blood concentration ranging from 15 mg/L to about 30 mg/mL." This limitation is also recited in claim 12.  *See supra* XXII.B.12.

1239.   Thus, for the reasons discussed in connection with claims 12 and 14, it is my opinion that claim 19 is anticipated by the '866 Patent.

### 20.   Claim 20

a.   **"The unit dose of claim 14, wherein the unit dose comprises an amount of gamma-hydroxybutyrate equivalent to from 4.0 g to 12.0 g of sodium gamma-hydroxybutyrate."**

1240.   Claim 20, which depends on claim 14, further recites "wherein the unit dose comprises an amount of gamma-hydroxybutyrate equivalent to from 4.0 g to 12.0 g of sodium gamma-hydroxybutyrate." This limitation is also recited in claim 6.  *See supra* XXII.B.6.

1241.   Thus, for the reasons discussed in connection with claims 6 and 14, it is my opinion that claim 20 is anticipated by the '866 Patent.

### 21.   Claim 21

a.   **"The unit dose of claim 14, wherein unit dose contains an amount of gamma-hydroxybutyrate equivalent to about 6 g of sodium gamma-hydroxybutyrate."**

1242.   Claim 21, which depends on claim 14, further recites "wherein unit dose contains an amount of gamma-hydroxybutyrate equivalent to about 6 g of sodium gamma-hydroxybutyrate."  This limitation is also recited in claim 8.  *See supra* XXII.B.8.

1243.   Thus, for the reasons discussed in connection with claims 8 and 14, it is my opinion that claim 21 is anticipated by the '866 Patent.

### 22.   Claim 22

   a.   **"The unit dose of claim 14, wherein unit dose contains an amount of gamma-hydroxybutyrate equivalent to about 7.5 g of sodium gamma-hydroxybutyrate."**

1244.   Claim 22, which depends on claim 14, further recites "wherein unit dose contains an amount of gamma-hydroxybutyrate equivalent to about 7.5 g of sodium gamma-hydroxybutyrate." This limitation is also recited in claim 9. *See supra* XXII.B.9.

1245.   Thus, for the reasons discussed in connection with claims 9 and 14, it is my opinion that claim 22 is anticipated by the '866 Patent.

### 23.   Claim 23

   a.   **"The unit dose of claim 14, wherein unit dose contains an amount of gamma-hydroxybutyrate equivalent to about 9 g of sodium gamma-hydroxybutyrate."**

1246.   Claim 23, which depends on claim 14, further recites "wherein unit dose contains an amount of gamma-hydroxybutyrate equivalent to about 9 g of sodium gamma-hydroxybutyrate." This limitation is also recited in claim 10. *See supra* XXII.B.10.

1247.   Thus, for the reasons discussed in connection with claims 10 and 14, it is my opinion that claim 23 is anticipated by the '866 Patent.

### 24.   Claim 24

   a.   **"The unit dose of claim 14, wherein the unit dose is a sachet."**

1248.   Claim 24, which depends on claim 14, further recites "wherein the unit dose is a sachet." The '866 Patent discloses that "[t]he modified release formulations of gamma-hydroxybutyrate of the present invention can be provided . . in a sachet or other suitable discreet packing units." *Id.* at 31:61-32:1; *see also id.* at 44:16-25 ("The modified release formulation of

gamma-hydroxybutyrate is preferably supplied in sachets or stick-packs comprising a particulate formulation. The sachets are preferably available in several different doses, comprising gamma-hydroxybutyrate in amounts equivalents to 0.5 g, 1.0 g, 1.5 g, 3.0 g, 4.5 g, 6.0 g, 7.5 g, 9.0 g, 10.5 g and/or 12 g of sodium oxybate. Depending on the dose required, one or more of these sachets can be opened, and its contents mixed with tap water to provide the nightly dose of gamma-hydroxybutyrate.").

1249. Thus, for the reasons discussed in connection with claim 14, it is my opinion that claim 24 is anticipated by the '866 Patent.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


28 April 2023
_____
Date

William Charman
_____
William N. Charman

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that true and correct copies of the foregoing document were caused to be served on February 26, 2024 on the following counsel in the manner indicated below.

### <u>VIA EMAIL:</u>

Jack B. Blumenfeld
Jeremy Tigan
Cameron Clark
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
cclark@morrisnichols.com

F. Dominic Cerrito
Eric C. Stops
Evangeline Shih
Andrew S. Chalson
Gabriel P. Brier
Frank C. Calvosa
Catherine T. Mattes
Abigail DeMasi
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
nickcerrito@quinnemanuel.com
ericstops@quinnemanuel.com
evangelineshih@quinnemanuel.com
andrewchalson@quinnemanuel.com
gabrielbrier@quinnemanuel.com
frankcalvosa@quinnemanuel.com
catherinemattes@quinnemanuel.com
Abigaildemasi@quinnemanuel.com

*Attorneys for Plaintiffs*

Dated:  February 26, 2024                    */s/ Daniel M. Silver*
                                             Daniel M. Silver (#4758)