EXHIBIT 7

FULLY REDACTED

# EXHIBIT 8

# FULLY REDACTED

EXHIBIT 9

FULLY REDACTED

# EXHIBIT 10

# FULLY REDACTED

# EXHIBIT 11

Jazz Pharmaceuticals, Inc. v.
Avadel CNS Pharmaceuticals LLC

**PTX-0378**

C.A. No. 21-691 (GBW), 21-1138(GBW),
21-1594 (GBS)

Sleep Medicine 75 (2020) 497–501

Contents lists available at ScienceDirect

# Sleep Medicine

journal homepage: www.elsevier.com/locate/sleep





Review Article

# The sodium in sodium oxybate: is there cause for concern?



Alon Y. Avidan [a], Clete A. Kushida [b, *]

[a] David Geffen School of Medicine at UCLA, 710 Westwood Boulevard, RNRC C153, Los Angeles, 17691, CA, USA
[b] Stanford University Medical Center, 450 Broadway Street, MC 5704, Pavilion C, 2nd Floor, Redwood City, CA, USA

ARTICLE INFO

Article history:
Received 10 August 2020
Accepted 17 September 2020
Available online 21 September 2020

Keywords:
Sodium oxybate
Narcolepsy
Cardiovascular risk
Dietary sodium

ABSTRACT

Sodium oxybate (SO), the sodium salt of γ-hydroxybutyric acid, is one of the primary pharmacologic agents used to treat excessive sleepiness, disturbed nighttime sleep, and cataplexy in narcolepsy. The sodium content of SO ranges from 550 to 1640 mg at 3–9 g, given in two equal nightly doses. Clinicians are advised to consider daily sodium intake in patients with narcolepsy who are treated with SO and have comorbid disorders associated with increased cardiovascular (CV) risk, in whom sodium intake may be a concern. It remains unclear whether all patients with narcolepsy treated with SO should modify or restrict their sodium intake. No data are currently available specific to the sodium content or threshold of SO at which patients might experience increased CV risk. To appraise attributable risk, critical evaluation of the literature was conducted to examine the relationship between CV risk and sodium intake, narcolepsy, and SO exposure. The findings suggest that increased CV risk is associated with extremes of daily sodium intake, and that narcolepsy is associated with comorbidities that may increase CV risk in some patients. However, data from studies regarding SO use in patients with narcolepsy have shown a very low frequency of CV side effects (eg, hypertension) and no overall association with CV risk. In the absence of data that specifically address CV risk with SO based on its sodium content, the clinical evidence to date suggests that SO treatment does not confer additional CV risk in patients with narcolepsy.

© 2020 Elsevier B.V. All rights reserved.

## 1. Introduction

There are substantial data confirming the clinical efficacy and favorable safety profile of sodium oxybate (SO) in patients with narcolepsy [1–14]. "Practice Parameters for the Treatment of Narcolepsy and other Hypersomnias of Central Origin," an American Academy of Sleep Medicine report, designate SO as a standard of care for the treatment of cataplexy and disturbed nighttime sleep based on level 1 evidence [15].

The sodium content of SO at approved nightly doses of 3, 4.5, 6, 7.5, and 9 g is 550, 820, 1100, 1400, and 1640 mg, respectively [16]. The US Food and Drug Administration–recommended SO dose is 6–9 g/d, and approximately one third of patients are treated at the highest dose of 9 g nightly [4,6,16].

Current data do not support a causal relationship between dietary sodium intake and cardiovascular (CV) risk in those with normal blood pressure [17,18]. Many authoritative agencies recommend nearly universal reduction in daily sodium intake to

levels <2300 mg/d [19]. However, substantive evidence to support the health benefit rationale behind this universal reduction is lacking [17,20–22]. Moreover, less than 5% of the population consumes sodium at or below this threshold—the average daily sodium intake in the US population is 3600 mg/d—and CV risk has been associated with much higher sodium levels than these recommended guidelines (>6000 mg/d) [23,24].

The clinical implications of sodium intake among patients with narcolepsy treated with SO have not been established. Prescribers of SO are advised to consider daily sodium intake in patients with narcolepsy who have disorders associated with increased CV risk, including heart failure, hypertension, or impaired renal function [16,25]. Questions remain about the need for calibration of sodium intake in narcolepsy management with SO and whether patients receiving SO and their physicians should be mindful of its sodium content [26]. This review examines relevant literature for evidence on CV risk in relation to daily sodium intake and narcolepsy, as well as CV risk in the setting of SO treatment in patients with narcolepsy.

* Corresponding author. Stanford Sleep Medicine Center 50 Broadway Street Pavilion B, 2nd Floor, Redwood City, CA 94063 USA.
E-mail addresses: avidan@mednet.ucla.edu (A.Y. Avidan), clete@stanford.edu (C.A. Kushida).

https://doi.org/10.1016/j.sleep.2020.09.017
1389-9457/© 2020 Elsevier B.V. All rights reserved.



EXHIBIT CA
Corser 13
9/28/23

A.Y. Avidan and C.A. Kushida

Sleep Medicine 75 (2020) 497—501

**Abbreviations**

| | |
|---|---|
| AE | adverse event |
| BP | blood pressure |
| CPAP | continuous positive airway pressure |
| CV | cardiovascular |
| DC | discontinuation |
| EKG | electrocardiogram |
| MSNA | muscle sympathetic nerve activity |
| NR | not reported |
| NT1 | narcolepsy type 1 |
| NT2 | narcolepsy type 2 |
| OR | odds ratio |
| OSA | obstructive sleep apnea |
| RCT | randomized, placebo-controlled trial |
| SO | sodium oxybate |
| US XMSG | US Xyrem Multicenter Study Group |
| XISG | Xyrem International Study Group |

## 2. Methods

A literature search was performed in the National Institutes of Health/National Library of Medicine PubMed database (https://www.ncbi.nlm.nih.gov/pubmed) using the following search strings: relationship between dietary sodium intake and CV morbidity and mortality ([sodium OR salt] AND [cardiovascular disease OR cardiovascular mortality OR cardiovascular risk]); CV risk factors in patients with narcolepsy ([narcolepsy] AND [comorbidities]) and ([narcolepsy] AND [cardiovascular risk]); CV risks associated with sodium oxybate ([sodium oxybate] AND [cardiovascular]) and ([sodium oxybate] AND [safety] AND [adverse events]). The search was limited to studies published in English and in human subjects. Bibliographies of review articles and meta-analyses identified through these searches were also examined for further pertinent sources. Data were included regardless of publication date up until June 2020. A total of 557 articles were identified, 102 of which were deemed relevant for consideration of inclusion. After careful review of the information included in each of these articles, data from 64 were identified to be of specific relevance for the topic and are included.

## 3. Results

### 3.1. Sodium, blood pressure, and cardiovascular risk

Sodium intake is associated with risk of hypertension and cardiovascular outcomes, particularly stroke and myocardial infarction, independent of blood pressure (BP) [27,28]. A number of organizations have recommended that all adults limit sodium intake to <2300 mg/d [19,26,29,30]. The rationale is that this could hopefully reduce these CV risks, and not only for older individuals or those with comorbidities, but for apparently healthy persons as well [19,26,29,30]. However, there is no empiric evidence that reducing sodium intake will reduce CV disease or otherwise improve health outcomes. The Institute of Medicine and the US Agency for Healthcare Research and Quality acknowledge that there is a lack of evidence to support the theory that reducing daily sodium intake to guideline levels reduces CV-related negative health outcomes [31,32]. Sodium, like most dietary nutrients, does not follow a linear but rather a J-shaped relationship to worsening health outcomes [33,34]. Risk of CV disease is increased when sodium intake is <3000 or >6000 mg/d [18,35]. In sum, available

evidence suggests that optimal health outcomes are achieved when sodium intake is maintained between 3000 and 6000 mg/d, which is the range consumed by roughly 80% of Americans [24,36].

### 3.2. Narcolepsy and cardiovascular risk

Heterogeneous data reported across various geographic regions have identified an increased prevalence of CV and cardiometabolic comorbidities in patients with narcolepsy [37—40]. Compared with matched controls, patients with narcolepsy have been found to have an increased risk for "heart diseases" (odds ratio [OR], 2.1, 95% CI, 1.2—3.5; mean age, 46 years) and "diseases of the circulatory system" (OR, 2.6, 95% CI, 2.5—2.8; mean age, 40 years) [37,39]. Specific CV diagnoses that have been reported to be more prevalent in patients with narcolepsy include stroke, myocardial infarction, cardiac arrest, heart failure, hypertension, and hyperlipidemia [37,39]. Obesity and diabetes have been found to be twice as prevalent in patients with narcolepsy (OR, 2.3, 95% CI, 2.1—2.5; OR, 1.8, 95% CI, 1.7—1.8, respectively; mean age, 46 years) [37]. In addition, obstructive sleep apnea (OSA) has been observed to be much more common in patients with narcolepsy, with an OR of 18.7 (95% CI, 17.5—20.0; mean age, 46 years) compared with matched controls [37]. Only one study has looked at the evolution of comorbidities over time in patients with narcolepsy [38]. It was found that over a 14-month observation period, endocrine/metabolic comorbidities remained more prevalent, whereas prevalence of CV comorbid conditions, such as hypertension and hyperlipidemia, decreased to that of matched controls [38]. No study has directly looked at how treatment with SO affects comorbidity prevalence.

Interactions between the orexin/hypocretin system, appetite, energy expenditure, CV autonomic function, and sleep are complex [41]. Increased prevalence of CV and cardiometabolic comorbidities in narcolepsy may be linked to the neuropathophysiology of orexin/hypocretin deficiency [42—48]. Metabolic dysfunction in patients with narcolepsy appears to be independent of body mass index, and CV autonomic dysfunction has been documented in patients with narcolepsy type 1 (NT1), including blunted nocturnal dipping in BP, reduced cardiac vagal modulation, reduced cardiac baroreflex sensitivity, blunted negative heart period trough, decreased sympathetic activation during sleep, and decreased muscle sympathetic nerve activity (MSNA) [39,42,45,46,49]. Although much emphasis has been placed on the nocturnal "non-dipping" phenotype (defined by a BP decrease of <10% during nighttime sleep) in patients with narcolepsy as a predictor of mortality in the general population, the clinical significance of these findings and/or their contribution to CV risk in this population of patients is unclear and conflicting [42,50]. Additionally, ambulatory BP has been observed to be lower in patients with narcolepsy during wakefulness than in control subjects [51].

### 3.3. Sodium oxybate and cardiovascular risk in patients with narcolepsy

In more than two decades of SO use, neither the sodium content nor any CV risk associated with the sodium content of SO has been established or identified as a therapeutic concern. In clinical trials to date, there were no noted differences in BP between SO treatment and placebo [1,10,12,13,16]. There is only one published record of small increases in BP and MSNA 6 months after initiation of SO (6 g) in a case series of two subjects [52]. In the absence of any noted BP changes from SO studies, adverse event (AE) data from clinical trials can be used to assess CV risk. Randomized, controlled, open-label, and long-term observational studies in the real world and clinical settings, as well as in postmarketing surveillance

**PTX-0378.2**

A.Y. Avidan and C.A. Kushida

Sleep Medicine 75 (2020) 497–501

**Table 1**
Cardiovascular system adverse events reported in patients treated with sodium oxybate for narcolepsy: Published safety data.

| Study | Type of Study (N) | CV System Event | Patients with Event, n (%) | Related to Study Drug, Y/N | Serious, Y/N | Led to DC, Y/N |
|---|---|---|---|---|---|---|
| US XMSG, 2002 [1] | RCT (n = 136 adults) | None reported | — | — | — | — |
| US XMSG, 2004 [10] | RCT withdrawal (n = 55 adults) | None reported | — | — | — | — |
| XISG, 2005 [12] | RCT (n = 228 adults) | None reported | — | — | — | — |
| XISG, 2005 [13] | RCT (n = 228 adults) | None reported | — | — | — | — |
| US XMSG, 2003 [3] | Open-label, 12-week extension (n = 118 adults) | Recurrent chest pain with normal EKG | 1 (0.9) | N | Y | Y |
| Mamelak et al., 2015 [6] | Open-label, 12-week (n = 202) | None reported | — | — | — | — |
| Drakatos et al., 2017 [4] | Observational, 6-year retrospective single-center (n = 90) | Hypertension | 1 (1.1) | NR | NR | Y |
| | | "Palpitations" | 1 (1.1) | NR | NR | Y |
| Mayer et al., 2018 [7] | Post-authorization, 10-year surveillance (n = 730)[a] | Hypertension | 3 (0.4) | NR | N | Y |
| | | Angina pectoris | 2 (0.3) | NR | Y | N |
| | | Cerebrovascular disorder | 1 (0.1)[b] | NR | N | N |
| | | Circulatory collapse | 1 (0.1) | NR | N | N |
| Wang et al., 2011 [11,14] | Worldwide surveillance, 2002–2011[c] | Cardiac events | 17 | NR | NR | NR |
| | | Cerebrovascular accident | 6 | NR | NR | NR |
| Plazzi et al., 2018 [8] | RCT withdrawal and open-label titration (n = 106 children; 104 took study drug) | None reported | — | — | — | — |

CV, cardiovascular; DC, discontinuation; EKG, electrocardiogram; NR, not reported; RCT, randomized placebo-controlled trial; SO, sodium oxybate; US XMSG, US Xyrem Multicenter Study Group; XISG, Xyrem International Study Group.
   [a] 670 patients had narcolepsy type 1, 60 had other diagnoses.
   [b] Occurred in a patient with a diagnosis other than narcolepsy type 1.
   [c] Includes all patients who received SO via prescription; total n not reported.

studies (Table 1), have been conducted and demonstrated no increased association between SO and CV risk [1,3–7,9–14].

In the pivotal short-term randomized controlled studies conducted in 611 patients with narcolepsy (398 treated with SO and 213 with placebo; age range, 36–48 years), SO was well tolerated with no CV concerns [1,10,12,16,53]. Serious AEs were infrequent, and treatment discontinuations due to AEs related to SO treatment over all studies of varying duration occurred in 10.3% of patients [16,54]. The most frequent AEs associated with SO treatment in studies of adult and pediatric patients were nausea, dizziness, vomiting, somnolence, enuresis, tremor, headache, decreased weight, and decreased appetite [8,54,55]. Most AEs occurred at the start of treatment and decreased with continued treatment [1]. Overall, there were no clinically meaningful changes in vital signs, including BP, which were similar in control and treatment groups [1,10,12,53]. Hypertension was noted on vital sign monitoring in one patient randomized to SO plus modafinil combination therapy; modafinil is known to cause AEs of hypertension [53,56]. Similarly, in a longer 12-week study of open-label SO in 202 patients with narcolepsy, only one patient (0.5%) experienced hypertension, but this was not recorded as an AE [6].

The reporting of CV AEs in observational studies using SO in clinical practice was similar to controlled interventional trials. In a retrospective study constituting 3116 patient treatment-months (most common dose of SO was 9 g in 33% of patients; mean age, 43 years), there was only one patient with an AE of hypertension [4]. In a prospective observational study constituting 800 patient-years of exposure to SO (median dose, 6 g; mean age, 39 years), no specific CV AEs related to SO treatment were reported [7]. Similarly, in SO postmarketing observational surveillance in the United States and European Union from 2002 to 2008 in 26,000 patients (including patients with narcolepsy, insomnia, and fibromyalgia), hypertension was reported in 0.4% of patients [11]. There was one fatality attributed to heart attack in a patient with narcolepsy who had concomitant OSA and was noncompliant with continuous positive airway pressure (CPAP) use [11]. Only one study has looked at older patient subpopulations and patients with OSA, and it found the safety profile for patients treated with SO to be similar to that of the patient population as a whole, suggesting no conferred increased risk with age or comorbidity [7].

## 4. Discussion

We conducted this literature review to determine whether the sodium content of SO, particularly at higher doses, increases CV risk in patients with narcolepsy. Narcolepsy is associated with CV risk factors [37–39]. Obesity, diabetes, OSA, hypertension, and hyperlipidemia have all been shown to be more common in patients with narcolepsy than in the general population, based on uncontrolled data [37–39]. Because dietary sodium has been associated with increased CV risk at extremes of intake (ie, <3000 or >6000 mg/d), it is possible that sodium intake could be of greatest concern in patients with narcolepsy who have comorbidities that predispose individuals for increased CV risk [23,34]. No studies have specifically reported safety profiles for SO-treated patient subgroups with baseline comorbidities that may predispose them to increased CV risk. However, clinical trials examining the use of SO in narcolepsy have not reported specific exclusion criteria for baseline hypertension or other stable medical comorbidities, apart from sleep apnea, which suggests that patients with these underlying conditions may have been included in randomized controlled trials with SO. Examination of clinical trial data from controlled, observational, and post-marketing surveillance studies showed that the incidence of CV AEs, particularly hypertension, is extremely low in patients treated with SO, regardless of age [1,3,4,6–8,10–12,14,53]. SO has been approved in the United States for the treatment of excessive sleepiness and cataplexy in patients with narcolepsy for almost 20 years, and at no time has increased CV risk been identified as a therapeutic issue in the vast majority of patients [16].

Evidence suggests that extremes of sodium intake are associated with increased CV morbidity and mortality in individuals who have clinically significant preexisting risk factors for CV disease as well as for individuals without those risk factors [23,57]. Any sodium-containing drug is an additional contribution to total daily sodium intake [57]. Therefore, sodium intake and SO treatment in patients with narcolepsy who have comorbidities associated with CV risk could theoretically be a cause for concern.

The relationship between sodium intake, BP, and CV risk is complex. Accurate measurement of an individual's sodium intake is difficult because intake varies day to day, and although urinary sodium excretion reflects dietary sodium intake, it does not reflect

PTX-0378.3

plasma sodium levels [35,58]. However, it is possible to determine average intakes for large groups of individuals and therefore it has been possible to compare CV outcomes in groups with different average intakes [36]. When renal function is normal, sodium economy is under neural control [36]. This neural system modulates sodium retention and/or excretion to maintain total body sodium and water balance, upon which human life depends [35,36,58]. Normal total body and plasma sodium levels are maintained over a wide range of daily sodium intake levels [59]. Thus, urinary excretion increases when intake is too high, and decreases when total body stores are deficient [18,35]. Under normal physiologic conditions with intact homeostatic mechanisms, BP is also maintained over a wide range of dietary sodium intake levels [58,60,61]. It is only at extremes of sodium intake that these homeostatic mechanisms become challenged.

The upper limit of sodium intake beyond which increased CV risk is conferred (6000 mg/d) is far higher than guideline levels (<2300 mg/d) [23,26]. The majority of the US population consumes 3600 mg/d, the midpoint of the range associated with optimal health outcomes [24,36]. Currently, there is no supportive evidence that the sodium content of SO, even at the 9-g dose, is a cause for concern for most patients with narcolepsy; no associated CV risk has been found [1,3,4,6–8,10–12,14,53]. Thus, there is no current evidence that treatment with SO increases CV risk or that reducing SO-related sodium intake would alleviate CV risk in patients with narcolepsy. However, there have been no studies that directly examined the effect of dietary sodium intake or urinary sodium levels on CV safety in patients with narcolepsy treated with SO.

Narcolepsy is associated with predisposing CV risk factors of obesity; diabetes; OSA; hypertension; hyperlipidemia; and, to some degree, cardiovascular autonomic dysregulation [37–39]. Although evidence exists to support the notion that narcolepsy is associated with CV and cardiometabolic comorbidities, these studies were largely based on claims data, which inherently lack control for disease severity. Furthermore, the observed high prevalence of OSA, in particular, may be due in part to misdiagnosis of sleep disorders as sleep apnea [37–40]. Increased CV risk associated with any of these comorbidities is attenuated with adequate treatment, including maintaining BP within normal limits, stabilizing blood glucose levels, instituting effective CPAP ventilation, and weight loss [62]. No studies specifically following the evolution of these comorbidities after initiation of SO treatment were identified. In addition, no conclusion can be drawn about the clinical relevance of CV autonomic dysregulation in patients with narcolepsy until further studies are conducted to evaluate effects of narcolepsy medications, obesity, sleep-disordered breathing, periodic limb movements, smoking, and potential differences between NT1 and NT2 on CV autonomic control [51].

It is worth noting that SO treatment has been observed to decrease body weight in both adults and children with narcolepsy [63,64]. It is unclear whether this observed weight loss is because patients may become more active with SO treatment or because of the direct metabolic effect of SO on lipolysis [63,64]. Further research is warranted in this area to determine whether the weight loss observed with SO treatment could potentially contribute to a reduction in overall CV risk [62].

Upon critical evaluation of the existing literature on the topics of sodium intake levels and SO treatment and the hypothetical association with CV risk, we identified several limitations of these data that should be noted. Most notably, no studies have prospectively examined SO treatment on CV outcomes or in subgroups of patients with baseline comorbidities that predispose them to elevated CV risk to evaluate the possible effects of increased sodium load on CV outcomes. Furthermore, the short study period of some pivotal studies (12 weeks) may be insufficient to conclude absence of CV events. Although the multiyear retrospective and surveillance data are more robust and corroborate the lack of evidence of CV AEs with SO treatment, such analyses may introduce recall bias.

## 5. Conclusions

The use of SO for the treatment of narcolepsy is supported by robust clinical evidence demonstrating its efficacy and safety. Existing evidence does not support a model whereby exposure to SO leads to increased CV risk. Patients with narcolepsy and comorbidities that place them at elevated risk for CV disease should receive appropriate treatment for such comorbidities, as appropriate for any patient without narcolepsy. There is no evidence that, in general, patients receiving SO treatment for narcolepsy should alter or discontinue their therapy because of the sodium content of SO.

**Funding source**

This work was supported by Avadel Pharmaceuticals.

**Acknowledgments**

The authors thank Dr. Michael H. Alderman, Professor Emeritus, Albert Einstein College of Medicine, Bronx, NY, for his contributions and critical review of this manuscript. The authors thank Kirsty Nahm, MD, of The Curry Rockefeller Group (Tarrytown, NY) for medical writing assistance, which was funded by Avadel Pharmaceuticals.

**Conflict of interest**

AA: Consultant: Avadel Pharmaceuticals; Balance Therapeutics [Idiopathic hypersomnia]; Harmony Biosciences [Narcolepsy]; Eisai Pharma [Insomnia]; Merck Pharmaceuticals [Insomnia].

CK: Consultant: Avadel Pharmaceuticals, Merck & Co., Inc., XWPharma.

The ICMJE Uniform Disclosure Form for Potential Conflicts of Interest associated with this article can be viewed by clicking on the following link: https://doi.org/10.1016/j.sleep.2020.09.017.

## References

[1] A randomized, double blind, placebo-controlled multicenter trial comparing the effects of three doses of orally administered sodium oxybate with placebo for the treatment of narcolepsy. Sleep 2002;25(1):42–9.

[2] Barateau L, Dauvilliers Y. Recent advances in treatment for narcolepsy. Ther Adv Neurol Disord 2019;12. 1756286419875622.

[3] A 12-month, open-label, multicenter extension trial of orally administered sodium oxybate for the treatment of narcolepsy. Sleep 2003;26(1):31–5.

[4] Drakatos P, Lykouras D, D'Ancona G, et al. Safety and efficacy of long-term use of sodium oxybate for narcolepsy with cataplexy in routine clinical practice. Sleep Med 2017;35:80–4.

[5] Lammers GJ, Arends J, Declerck AC, et al. Gammahydroxybutyrate and narcolepsy: a double-blind placebo-controlled study. Sleep 1993;16(3):216–20.

[6] Mamelak M, Swick T, Emsellem H, et al. A 12-week open-label, multicenter study evaluating the safety and patient-reported efficacy of sodium oxybate in patients with narcolepsy and cataplexy. Sleep Med 2015;16(1):52–8.

[7] Mayer G, Plazzi G, Iranzo A, et al. Long-term compliance, safety, and tolerability of sodium oxybate treatment in patients with narcolepsy type 1: a postauthorization, noninterventional surveillance study. Sleep 2018;41(9) [Epub].

[8] Plazzi G, Ruoff C, Lecendreux M, et al. Treatment of paediatric narcolepsy with sodium oxybate: a double-blind, placebo-controlled, randomised-withdrawal multicentre study and open-label investigation. Lancet Child Adolesc Health 2018;2(7):483–94.

[9] Scrima L, Hartman PG, Johnson Jr FH, et al. The effects of gamma-hydroxybutyrate on the sleep of narcolepsy patients: a double-blind study. Sleep 1990;13(6):479–90.

A.Y. Avidan and C.A. Kushida

Sleep Medicine 75 (2020) 497–501

[10] U. S. Xyrem Multicentre Study Group. Sodium oxybate demonstrates long-term efficacy for the treatment of cataplexy in patients with narcolepsy. Sleep Med 2004;5(2):119–23.

[11] Wang YG, Swick TJ, Carter LP, et al. Safety overview of postmarketing and clinical experience of sodium oxybate (Xyrem): abuse, misuse, dependence, and diversion. J Clin Sleep Med 2009;5(4):365–71.

[12] Xyrem International Study Group. Further evidence supporting the use of sodium oxybate for the treatment of cataplexy: a double-blind, placebo-controlled study in 228 patients. Sleep Med 2005;6(5):415–21.

[13] Xyrem International Study Group. A double-blind, placebo-controlled study demonstrates sodium oxybate is effective for the treatment of excessive daytime sleepiness in narcolepsy. J Clin Sleep Med 2005;1(4):391–7.

[14] Wang YG, Swick TJ, Carter LP, et al. Sodium oxybate: updates and correction to previously published safety data. J Clin Sleep Med 2011;7(4):415–6.

[15] Morgenthaler TI, Kapur VK, Brown T, et al. Practice parameters for the treatment of narcolepsy and other hypersomnias of central origin. Sleep 2007;30(12):1705–11.

[16] Jazz Pharmaceuticals. XYREM (sodium oxybate oral solution, CIII). Full Prescribing Information. Palo Alto, CA: Jazz Pharmaceuticals; 2018.

[17] Graudal N, Hubeck-Graudal T, Jurgens G, et al. Dose-response relation between dietary sodium and blood pressure: a meta-regression analysis of 133 randomized controlled trials. Am J Clin Nutr 2019;109(5):1273–8.

[18] Graudal HA, Hubeck-Graudal T, Jurgens G. Effects of low sodium diet versus high sodium diet on blood pressure, renin, aldosterone, catecholamines, cholesterol, and triglyceride. Cochrane Database Syst Rev 2017;4(4):CD004022.

[19] US Department of Agriculture, US Department of Health and Human Services. Dietary guidelines for Americans 2010. Washington, DC: US Government Printing Office; 2010.

[20] Aburto NJ, Ziolkovska A, Hooper L, et al. Effect of lower sodium intake on health: systematic review and meta-analyses. BMJ 2013;346:f1326.

[21] He FJ, MacGregor GA. Effect of modest salt reduction on blood pressure: a meta-analysis of randomized trials. Implications for public health. J Hum Hypertens 2002;16(11):761–70.

[22] Strazzullo P, D'Elia L, Kandala NB, et al. Salt intake, stroke, and cardiovascular disease: meta-analysis of prospective studies. BMJ 2009;339:b4567.

[23] Alderman MH. Dietary sodium: where science and policy diverge. Am J Hypertens 2016;29(4):424–7.

[24] Jackson SL, King SM, Zhao L, et al. Prevalence of excess sodium intake in the United States - NHANES, 2009-2012. MMWR Morb Mortal Wkly Rep 2016;64(52);1393–7.

[25] UCB Pharma. XYREM (sodium oxybate). Summary of Product Characteristics. Brussels, Belgium: UCB Pharma; 2020.

[26] American Heart Association. Why should I limit sodium?. Available from: https://www.heart.org/-/media/data-import/downloadables/8/2/0/pe-abh-why-should-i-limit-sodium-ucm_300625.pdf?la=en&hash=FC0B16B18A81B3CC8371FAA4CC48D526471DC2CD. [Accessed 7 July 2020].

[27] Gardener H, Rundek T, Wright CB, et al. Dietary sodium and risk of stroke in the Northern Manhattan study. Stroke 2012;43(5):1200–5.

[28] George J, Majeed W, Mackenzie IS, et al. Association between cardiovascular events and sodium-containing effervescent, dispersible, and soluble drugs: nested case-control study. BMJ 2013;347:f6954.

[29] National Academies of Sciences, Engineering, and Medicine. Dietary reference intakes for sodium and potassium. Washington, DC: The National Academies Press; 2019.

[30] Whelton PK, Carey RM, Aronow WS, et al. ACC/AHA/AAPA/ABC/ACPM/AGS/APhA/ASH/ASPC/NMA/PCNA guideline for the prevention, detection, evaluation, and management of high blood pressure in adults: a report of the American College of Cardiology/American Heart Association task force on clinical practice guidelines. Hypertension 2018 2017;71(6):e13–115.

[31] McGuire S, Institute of Medicine. 2013. Sodium intake in populations: assessment of evidence. Washington, DC: The National Academies Press. 2013 Adv Nutr 2014;5(1):19–20.

[32] Newberry SJ, Chung M, Anderson CAM, et al. Effects of dietary sodium and potassium intake on chronic disease outcomes and related risk factors: Agency for Healthcare Research and Quality (AHRQ). 2018 March 6.

[33] Chokshi DA, El-Sayed AM, Stine NW. J-shaped curves and public health. J Am Med Assoc 2015;314(13):1339–40.

[34] O'Donnell MJ, Yusuf S, Mente A, et al. Urinary sodium and potassium excretion and risk of cardiovascular events. J Am Med Assoc 2011;306(20):2229–38.

[35] Kong YW, Baqar S, Jerums G, et al. Sodium and its role in cardiovascular disease - the debate continues. Front Endocrinol 2016;7:164.

[36] McCarron DA, Alderman MH. Reducing sodium intake in the population. J Am Med Assoc 2016;316(23):2550.

[37] Black J, Reaven NL, Funk SE, et al. Medical comorbidity in narcolepsy: findings from the Burden of Narcolepsy Disease (BOND) study. Sleep Med 2017;33:13–8.

[38] Cohen A, Mandrekar J, St Louis EK, et al. Comorbidities in a community sample of narcolepsy. Sleep Med 2018;43:14–8.

[39] Ohayon MM. Narcolepsy is complicated by high medical and psychiatric comorbidities: a comparison with the general population. Sleep Med 2013;14(6):488–92.

[40] Panossian LA, Avidan AY. Narcolepsy and other comorbid medical illnesses. In: Goswami M, Pandi-Perumal SR, Thorpy MJ, editors. Narcolepsy: a clinical guide. Humana Press, a part of Springer Science + Business Media, LLC; 2010. p. 150–4.

[41] Sieminski M, Szypenbejl J, Partinen E. Orexins, sleep, and blood pressure. Curr Hypertens Rep 2018;20(9):79.

[42] Dauvilliers Y, Jaussent I, Krams B, et al. Non-dipping blood pressure profile in narcolepsy with cataplexy. PloS One 2012;7(6). e38977-e.

[43] McAlpine CS, Kiss MG, Rattik S, et al. Sleep modulates haematopoiesis and protects against atherosclerosis. Nature 2019;566(7744):383–7.

[44] Medic G, Wille M, Hemels ME. Short- and long-term health consequences of sleep disruption. Nat Sci Sleep 2017;9:151–61.

[45] Poli F, Plazzi G, Di Dalmazi G, et al. Body mass index-independent metabolic alterations in narcolepsy with cataplexy. Sleep 2009;32(11):1491–7.

[46] Grimaldi D, Calandra-Buonaura G, Provini F, et al. Abnormal sleep-cardiovascular system interaction in narcolepsy with cataplexy: effects of hypocretin deficiency in humans. Sleep 2012;35(4):519–28.

[47] Dominguez F, Fuster V, Fernandez-Alvira JM, et al. Association of sleep duration and quality with subclinical atherosclerosis. J Am Coll Cardiol 2019;73(2):134–44.

[48] Thurston RC, Chang Y, von Kanel R, et al. Sleep characteristics and carotid atherosclerosis among midlife women. Sleep 2017;40(2):zsw052.

[49] Honda Y, Doi Y, Ninomiya R, et al. Increased frequency of non-insulin-dependent diabetes mellitus among narcoleptic patients. Sleep 1986;9(1 Pt 2):254–9.

[50] Ben-Dov IZ, Kark JD, Ben-Ishay D, et al. Predictors of all-cause mortality in clinical ambulatory monitoring: unique aspects of blood pressure during sleep. Hypertension 2007;49(6):1235–41.

[51] Bertoetti C, Silvani A. The link between narcolepsy and autonomic cardiovascular dysfunction: a translational perspective. Clin Auton Res 2018;28(6):545–55.

[52] Giannoccaro MP, Donadio V, Plazzi G, et al. 132. Sympathetic and cardiovascular changes induced by sodium oxybate treatment in patients with narcolepsy and cataplexy. Clin Neurophysiol 2013;124(11):e218.

[53] Black J, Houghton WC. Sodium oxybate improves excessive daytime sleepiness in narcolepsy. Sleep 2006;29(7):939–46.

[54] Alshaikh MK, Tricco AC, Tashkandi M, et al. Sodium oxybate for narcolepsy with cataplexy: systematic review and meta-analysis. J Clin Sleep Med 2012;8(4):451–8.

[55] Abad VC. An evaluation of sodium oxybate as a treatment option for narcolepsy. Expet Opin Pharmacother 2019;20(10):1189–99.

[56] Bosco A, Lopez R, Barateau L, et al. Effect of psychostimulants on blood pressure profile and endothelial function in narcolepsy. Neurology 2018;90(6):e479–91.

[57] Perrin G, Korb-Savoldelli V, Karras A, et al. Cardiovascular risk associated with high sodium-containing drugs: a systematic review. PLoS One 2017;12(7):e0180634.

[58] O'Donnell M, Mente A, Yusuf S. Sodium intake and cardiovascular health. Circ Res 2015;116(6):1046–57.

[59] Lowell BB. New neuroscience of homeostasis and drives for food, water, and salt. N Engl J Med 2019;380(5):459–71.

[60] Franco V, Oparil S. Salt sensitivity, a determinant of blood pressure, cardiovascular disease and survival. J Am Coll Nutr 2006;25(3 Suppl). 247S-55S.

[61] He FJ, MacGregor GA. Role of salt intake in prevention of cardiovascular disease: controversies and challenges. Nat Rev Cardiol 2018;15(6):371–7.

[62] Cohen JB. Hypertension in obesity and the impact of weight loss. Curr Cardiol Rep 2017;19(10):98.

[63] Husain AM, Ristanovic RK, Bogan RK. Weight loss in narcolepsy patients treated with sodium oxybate. Sleep Med 2009;10(6):661–3.

[64] Ponziani V, Gennari M, Pizza F, et al. Growing up with type 1 narcolepsy: its anthropometric and endocrine features. J Clin Sleep Med 2016;12(12):1649–57.

PTX-0378.5

# EXHIBIT 12
# FULLY REDACTED

# EXHIBIT 13

```
 1                  IN THE UNITED STATES DISTRICT COURT
 2                  IN AND FOR THE DISTRICT OF DELAWARE
 3

 4   JAZZ PHARMACEUTICALS, INC.,        )
              Plaintiffs,               )   C.A. No.
 5   v.                                 )   21-691-GBW
                                        )
 6   AVADEL CNS PHARMACEUTICALS, LLC,   )
              Defendant                 )
 7   -------------------------------    )
                                        )   C.A. No.
 8   JAZZ PHARMACEUTICALS, INC., et al.,)   21-1138-GBW
              Plaintiffs,               )
 9   v.                                 )
                                        )
10   AVADEL CNS PHARMACEUTICALS, LLC,   )
     Defendant.                         )
11   -------------------------------    )
                                        )
12   JAZZ PHARMACEUTICALS, INC., et al.,)
              Plaintiffs,               )   C.A. No.
13   v.                                 )   21-1594-GBW
                                        )
14   AVADEL CNS PHARMACEUTICALS, LLC,   )
              Defendant.                )
15

16                              - - - -

17                      Wilmington, Delaware
18                      Thursday, October 20, 2022
                        Teleconference Transcript
19
                                - - - -
20
        BEFORE:  HONORABLE GREGORY B. WILLIAMS
21               UNITED STATES DISTRICT COURT JUDGE

22
                                - - - -
23

24

25
                            Michele L. Rolfe, RPR, CRR
```

**2**

1

2 APPEARANCES:

3     MORRIS, NICHOLS, ARSHT & TUNNELL LLP
    BY: JEREMY A. TIGAN, ESQ.

4

5     -and-

6     QUINN EMANUEL URQUHART & SULLIVAN, LLP
    BY:  F. DOMINIC CERRITO, ESQ.

7         FRANK C. CALVOSA, ESQ.
        KRISTA M. RYCROFT, ESQ.

8       For the Plaintiff

9

10     MCCARTER & ENGLISH, LLP
    BY:  DANIEL M. SILVER, ESQ.

11     -and-

12     LATHAM & WATKINS LLP
    BY: HERMAN H. YUE, ESQ.

13         AUDRA M. SAWYER, ESQ.

14       For the Defendant

15

16

17

18

19

20

21

22

23

24

25

---

**3**

1         - - - - -

2      P R O C E E D I N G S

3    (REPORTER'S NOTE:  The following teleconference was

4 held beginning at 3:00 p.m.)

5       THE COURT:  Good afternoon.

6       All right.  We are here this afternoon for a

7 discovery dispute teleconference in Jazz Pharmaceuticals,

8 Inc. v. Avadel CNS Pharmaceuticals, LLC.  Civil Action No.

9 21-691.

10       Let's start by having counsel put appearances on

11 the record.

12       MR. TIGAN:  Yes, Your Honor.  This is Jeremy

13 Tigan with Morris Nichols on behalf of Jazz.  I'm joined by

14 Nick Cerrito, Frank Calvosa and Krista Rycroft all with

15 Quinn Emanuel.

16       And with your permission, Mr. Cerrito will

17 present our arguments today.

18       THE COURT:  Okay.  Good afternoon.

19       MR. SILVER:  Good afternoon, Your Honor.  Dan

20 Silver from McCarter & English on behalf of Avadel.  I'm

21 joined by Herman Yue and Audra Sawyer from Latham & Watkins.

22 And with Your Honor's permission, Mr. Yue will be making the

23 argument for Avadel today.

24       THE COURT:  Okay.  Good afternoon.

25       All right.  It's Jazz's motion, so we'll go

---

**4**

1 ahead and turn it over to Mr. Sorry.

2       MR. CERRITO:  Thank you, Your Honor.  This case,

3 as Your Honor may or may not be aware at this point didn't

4 start off as a normal Hatch-Waxman case, that was in part

5 because of defendant's choice not to certify against certain

6 patents.  And as a result it started as a mixed case with

7 271(e) counts and 271(a) counts involved.  Therefore, as a

8 result -- or, subsequently, Avadel did file a certification

9 and we are now currently under the 30-month stay.  That stay

10 is due to expire mid next year prior to the scheduled trial

11 in this matter.

12       It's a normal Hatch-Waxman case if you get to a

13 point where the 31 stay is expired and the parties -- the

14 defendant wants to launch.  The typical situation is the

15 plaintiff amends its pleadings to add eight counts in, if it

16 didn't already have one, and then proceed with damages

17 discovery.  Here, as I said, this started a little

18 differently.

19       At this point, there is discovery that has been

20 provided to us, a certain amount, not all of it.  Certainly,

21 Avadel believes -- or I think Avadel is not contesting that

22 there's more discovery to be had, but that for some reason

23 we shouldn't get it.  I'm not sure -- other than the fact

24 that -- and to be fair that there has been no actual launch.

25       The complicating factor here, Your Honor, as I

---

**5**

1 said, their approval, potential approval short of a 31 stay

2 could go final earlier than a trial in this matter.

3       And as a result, it's obviously likely we'll be

4 moving for a preliminary injunction.  If we were successful,

5 then perhaps no damages discovery would be needed,

6 obviously.  But if we're not, we would then have to pick up

7 the ball and finish up whatever damage discovery existed.

8       So at this point, you know, we're left with the

9 fact that we should proceed with discovery, we should get

10 whatever discovery available to them now.  Should there be a

11 situation where additional discovery becomes available

12 because of an actual launch, then they could certainly

13 supplement and we can take it from there.

14       To avoid this motion, we offered up the idea of

15 maybe staying discovery until it became more relevant and

16 the case was in actual launch, if that ever turns out to be

17 the case, or to bifurcate it.  I'm not sure if it would make

18 a material difference whether it is a stay or a bifurcation.

19 But at some point should this case proceed to trial and we

20 win, you know, and they've lunched already, short of a PI ,

21 then we're going to need that discovery.

22       The only alternative we've heard from defendant

23 is somehow consolidate this with another case that isn't

24 exactly overlapping: that, quite frankly, has not had a Rule

25 16 conference, that got filed more than a year after the

6

1    present case: and for which a motion -- 12(c) motion to
2    dismiss is pending.  We think that any consolidation would
3    severely prejudice plaintiff's rights to get to trial in
4    this matter and get our rights adjudicated with regard to
5    the patent case and proceed in that matter.
6          Consolidation would do nothing more than slow
7    this down perhaps years, which, obviously, not in Jazz's
8    interest and to their prejudice.  So we're not wed to making
9    this difficult for anyone, it's simple, take the discovery
10   they have now and supplement if and when it becomes
11   necessary, or amendable to having it stayed until that time.
12         Again, I'm not sure the process is really the
13   point here, but rather the discovery in some kind of fashion
14   that doesn't burden the Court nor the parties more than it
15   has to.
16         THE COURT:  All right.  Mr. Cerrito, let me ask
17   you a couple of follow-up questions.  You mentioned that
18   Jazz has already received some discovery, and I want to
19   clarify whether any of that discovery -- whether Avadel has
20   produced any damages-related discovery to date.
21         MR. CERRITO:  Yeah, Your Honor, I guess I would
22   answer that by saying yes, to the extent it overlaps with
23   information that we would otherwise request for a
24   preliminary injunction hearing.  So in that sense they have,
25   but I believe and I don't think they have contested

7

1    otherwise, there's additional discovery -- and, again, I can
2    try to itemize it for you, but there may be additional
3    discovery that they currently have.
4         THE COURT:  Okay.  And how do you respond to
5    Avadel's position that 35 U.S.C. 271(e)(4)(c) provides that
6    damages or other monetary relief be awarded against an
7    infringer only if there's been a commercial manufacture,
8    use, offer to sale or sell within United States or
9    importation into the United States of an approved drug.  And
10   because Avadel has not engaged in the commercial sale of
11   Lumryz, there's no damages claim presently at issue, thus
12   the damages-related discovery is not relevant to any parties
13   claim or defense?
14         MR. CERRITO:  Yeah, certainly, Your Honor, I
15   understand their position.
16         As I said, this case started without a
17   Hatch-Waxman stay because Avadel made the choice not to
18   certify.  They subsequently changed that position and put
19   the stay motion in.  As we indicated -- and, again, I think
20   -- look, I don't think anybody says if this case went to an
21   actual launch with marketplace sales as a trial, which we
22   want, we wouldn't be entitled to damages, so at some point
23   we're entitled to discovery.
24         What we're trying to do is just minimize the
25   pain here for everybody.  As I agree, now we're in the

8

1    current stay, but that stay will be lifted in June of 2023
2    before scheduled trial in this case.
3         If Your Honor says to us:  Mr. Cerrito, sit
4    down, shut up, you can get your discovery in June, okay,
5    I'll accept that, Your Honor.  I'm trying to do it in a
6    process that doesn't burden any of the parties any more than
7    it has to.  They have plenty of time to do it now.  We would
8    need supplementation, obviously, if in fact they were able
9    to enter to the market.
10         I don't think the burden right now is great, I
11   don't think they have a ton of stuff that they would
12   otherwise say is relevant and produceable, so I don't think
13   it is that big of a deal.  I think this is much more of just
14   figure out how the process goes.  If Your Honor says, again,
15   sit down and we'll talk about this in June if they were able
16   to launch into the marketplace, I'm happy to sit down, Your
17   Honor.  We just need to know how this is going to go.
18         THE COURT:  I understand.  I understand that
19   you're trying to minimize the burden for all involved in
20   trying to reach some reasonable compromise, but when you
21   have a defendant who is abiding by what appears to be the
22   legal standard and contesting that damages-related discovery
23   is not relevant to any claim or defense at this time, it's
24   difficult for the Court to order something, compel something
25   that may not be at issue at this time.

9

1         But, let me hear from counsel from Avadel as to
2    its position and its response to Jazz's offer to compromise.
3         MR. YUE:  Thank you, Your Honor.  This is Herman
4    Yue from Latham & Watkins for Avadel.
5         I think, Your Honor, sort of hit the nail on the
6    head in terms of the statutory provision for damages here,
7    which requires expressly the commercial manufacture, use,
8    offer for sale or sale within the United States, and that
9    hasn't happened.
10         And if you look at Jazz's own prayer for relief,
11   it is expressly conditioned on Avadel engaging in such
12   commercial manufacture and use.  That hasn't happened yet;
13   that may never happen.
14         Jazz has, as we noted, work assiduously to
15   prevent that from happening.  But certainly as things stand
16   now with the certification against the '963 patent, that
17   patent and the 30-month stay won't expire until June of
18   2023.
19         Now, Your Honor, a few things to note.  Your
20   Honor, I think it may have been represented in the papers
21   that damages discovery is common in patent infringement
22   cases.  And while that may be true for infringement actions
23   brought under other contexts where there is a commercial
24   sale, that's not the case here in the Hatch-Waxman Act
25   context.  Because these Hatch-Waxman actions are intended to

10

1  prevent the commercial launch, and so the notion that
2  damages discovery is somehow routine is not quite right.
3         I'd also like to sort of touch on something that
4  Mr. Cerrito referenced, which is this trade secret case,
5  because I think it's important, Your Honor, to take a step
6  back.  Our goal ultimately is to try to reach resolution of
7  both this case as well as the trade secret case that Avadel
8  has brought against Jazz in a way that's going to be most
9  efficient for the Court.  That trade secret case -- I guess
10 I would disagree with Mr. Cerrito in a sense that I'd
11 actually would argue that it has considerable factual
12 overlaps, probably 90 percent of the facts in that case are
13 going to be overlapping with issues in this case.
14        And just for a little bit of context, Your
15 Honor, that trade secret case, Avadel alleges that during
16 the course of various discussions between Avadel and Jazz
17 where Avadel provided Jazz, under the auspices of a
18 nondisclosure agreement, confidential information about
19 Avadel's formulation technology, that Jazz then turned
20 around and used that information improperly.
21        And so the issues, the facts both in this case
22 where we are challenging whether or not Jazz in fact
23 developed the technology that it claims in its patents, as
24 well as their trade secret case, they all really center
25 around, to great extents, the activities that Jazz was

11

1  engaged in in its drug development work over the last decade
2  or so.
3         So I would say that there is substantial overlap
4  between those cases, and as a result we think it makes sense
5  to try this case as well as the trade secret case in
6  one case so that the same set of facts are heard once,
7  they're heard by one jury that's empanelled by Your Honor,
8  and it will only take up Your Honor's time for one trial as
9  opposed to having two separate trials on what we think are
10 largely overlapping facts.
11        And because there is overlaps between the trade
12 secret case and this case, we are, to be clear, not seeking
13 to slow down the case, this case by years, that's simply not
14 the case.
15        What we're seeking to do is if there is a
16 launch, as Avadel is -- let me rephrase, if the '963 patent
17 expires in mid-June, as it's currently scheduled to do, and
18 Avadel is then free to launch, as a practical matter, Your
19 Honor, it's going to take Avadel at least six months, if not
20 more, to actually come on to the market and actually
21 generate any type of infringing, potentially, or accused
22 sales.
23        At that point, we're looking at then engaging in
24 fact discovery relating to a damages claim then expert
25 reports and expert discovery on the damages issue in the

12

1  space of about two months trial is scheduled.  And that kind
2  of compression just doesn't make sense to us, Your Honor.
3         Our suggestion is pushing the case schedule back
4  and rescheduling trial for some time in the first half of
5  2024.  So we're looking at maybe something like a 5, 9-month
6  delay in the case schedule.
7         Given the overlap with the trade secret case, we
8  think that the trade secret case can also be prepared and
9  tried on that same schedule.  So we would be looking at
10 complete resolution of both of these cases, Your Honor, in
11 the latter part of the first half of 2024.
12        And so we suggest that as a proposal to allow
13 the damages discovery that Jazz is seeking, to allow the
14 orderly unfolding of facts and expert discovery relating to
15 damages case, and, frankly, to conserve Your Honor's
16 resources and time by consolidating those two cases into a
17 single case.
18        THE COURT:  Okay.
19        MR. CERRITO:  May I address that, Your Honor.
20        THE COURT:  Yes, I wanted to hear Jazz's
21 response on that and also -- well, within that, its response
22 on the proposal for consolidation.
23        MR. CERRITO:  Well, I'll start there, Your
24 Honor.  The statement that there's 90 percent overlap,
25 that's a bold statement, and I don't think they could

13

1  support that.  I think there's very little overlap, if any.
2  Yes, there's the same party, but that case has nothing to do
3  with patent infringement or the validity of our patent, so
4  that statement, I think is exaggerated.  We're happy to
5  explain why more.
6         Also, they don't have a jury demand in that
7  case.  So it's a case that, what, again, more than a year
8  after our case against them, we have a 12(c) motion because
9  we believe, quite honestly, Your Honor, it's nothing but
10 mudslinging.  Their whole endeavor here is to consolidate
11 these cases so they can try to get arguments about Jazz
12 being bad players in front of the jury while we're doing our
13 patent case against them.  That's what this is really about,
14 this has nothing to do with the discovery issue.
15        The reality is this would push us back more than
16 a year to go forward with that and that prejudices my
17 client.  We should have the right to get to trial on our
18 case immediately.  If they're willing not to launch their
19 product until resolution of all the three cases together or
20 the two cases together, we could certainly talk about that.
21 I suspect --
22        THE COURT:  Let me stop you there for a second.
23        Mr. Yue, is your client willing to stay the
24 launch of the product until both cases are resolved?
25        MR. YUE:  We're not, Your Honor.  This product

14

1  is important to our client.  We think it's important to
2  narcolepsy patients who, in our view, are in need for a
3  once-nightly sodium oxybate product.
4           But on the flip side, Your Honor, we don't see
5  the prejudice or any type of irreparable harm that would be
6  visited upon Jazz for delaying the trial for a few months.
7  You know, they're seeking damages, they can be compensated
8  monetarily.  And so we think that it's not a problem really
9  for Jazz to simply -- they will get their day in court, but
10 let's do it in an orderly way and in a consolidated way that
11 conserves judicial resources, and it's just going to be a
12 more efficient process.
13          MR. CERRITO:  I --
14          THE COURT:  I didn't mean to cut you off,
15 Mr. Cerrito, you can continue.
16          MR. CERRITO:  No worries, Your Honor.  They're
17 not willing to stop what they're going to do, but they're
18 going to put our case on hold and, obviously, that's
19 extremely prejudicial.
20          There is all kinds of damage harm that could be
21 done.  Like I'm entering in a 2-plus million dollar market
22 for potentially years before we can get to trial on this
23 matter, the prejudice speaks for itself.
24          The reality, going back to the issue at hand, is
25 if Your Honor -- the reason we had to raise this motion with

15

1  Your Honor as quickly as we did is that discovery is closing
2  in a week in this case.  As opposed to the discovery in the
3  other case that they want to consolidate hasn't even begun
4  let alone is there a schedule for it.  But be that as it
5  may, if Your Honor rules that we're not prejudiced to go
6  back if and when there's a damages actual sales of their
7  product launch happens, we're happy to wait.  We have no
8  problem.
9           We had a schedule that was put into this case in
10 which discovery closed and we were forced without an
11 accommodation by the defendants with regard to their various
12 suggestions, we had no choice but to move.
13          THE COURT:  Okay.  Understood.
14          Question for Avadel, Mr. Yue, is Avadel willing
15 to agree to the stay of the deadlines in the scheduling
16 order as they pertain to damages discovery until the time
17 that Avadel launches Lumryz and then under that scenario, we
18 would keep the dates and have the stipulation with a
19 provision that provides for expedited discovery upon -- if
20 and upon the launch that would be completed by the time
21 the -- in enough time sufficient for damages to be part of
22 the trial that's currently scheduled to begin on
23 October 30th, 2023.
24          MR. YUE:  So, Your Honor, I would say that if --
25 of course, if the Court ordered late discovery on damages,

16

1  we would find a way.  But, again, I think it's worth
2  returning back to sort of the practical, like the actual
3  timeline of what would happen here.  The earliest launch,
4  commercial launch that is feasible for Avadel would put the
5  product hitting the market for the first time some time in
6  early August.
7           So we're looking at -- you know, assuming that
8  there's, you know, a month, say, of commercial sales and
9  then discovery into the actual sales, cost, market share,
10 etc., after that time, we're looking, then, at fact
11 discovery for those -- on those issues some time in
12 September with an October 30th trial date.
13          In our view, it would be extremely -- well, it
14 would be a scramble, Your Honor, to put it bluntly, in order
15 to complete the necessary fact discovery as well as expert
16 reports and expert discovery.  So that's -- just purely on a
17 practical level, Your Honor, that's why we thought it would
18 be more appropriate to push the trial date out to allow for
19 -- if Your Honor feels it is appropriate to have damages
20 discovery, to allow that process and allow the expert report
21 process on damages issue to proceed a pace without a
22 scramble or an artificially compressed schedule that would
23 be required for an October 30th trial date.
24          Your Honor, not to belabor the point, it's also
25 worth remembering that when we set this case schedule

17

1  initially, Jazz knew full well that it was working to keep
2  Avadel off the market, and that the '963 patent, which is --
3  it has always maintained that we had to certify against it,
4  that it would keep us off the market.  It knew from the
5  outset that this situation was likely to happen where we
6  would be blocked from entering the market until at least
7  June 17th, 2023.
8           So in many respects, Your Honor, this situation
9  is a situation of Jazz's own creation.  And it seems
10 somewhat unfair to us that they are now complaining about
11 their -- the discovery schedule for damages when they knew
12 full well that this was going to be the outcome given an
13 October 30, 2023 trial date.  They never mentioned it to
14 Judge Noreika, they never raised this, they never said hey,
15 we need to make some special accommodations or some other
16 consideration for this situation.  And so to us it rings a
17 little false for Jazz to now complain about this situation.
18          MR. CERRITO:  Your Honor, I think I just heard
19 that it's Jazz's fault that they failed to certify a year
20 ago when the FDA has made that ruling that they should.
21 That's our fault?  They could have done it a year ago, they
22 chose not to.  That was their choice.
23          And as far as getting this done, this is what
24 happened at every Hatch-Waxman case where there's a launch
25 before trial, every Hatch-Waxman case.  It gets amended, you

18

1  put in eight counts, you do damage damages discovery, all

2  can be done relatively quickly.

3         While they told Your Honor that they are not

4  going to launch, in they think August, they have been

5  telling Wall Street earlier, maybe they should amend that

6  disclosures.  We're talking about a couple of months of

7  sales, I don't think it would be that much discovery.  I

8  think it will be fine.  I think we can get it done fairly

9  quickly.  But to somehow point the finger at us saying it's

10 our fault they didn't certify and we should have known, Your

11 Honor, that just makes no sense.

12        THE COURT:  All right.  I've heard from both

13 sides.  I understand your respective positions.  I was

14 hoping that we could reach some amicable resolution, but it

15 doesn't sound like it.  So I'm going to go ahead and rule on

16 the motion.

17        Given the law in the area, I'm going to deny

18 Jazz's motion to compel without prejudice to renew at the

19 time that there's been a commercial manufacturer, use or

20 sale or offer to sale Lumryz.

21        MR. CERRITO:  Thank you, Your Honor.

22        MR. YUE:  Thank you, Your Honor.

23        THE COURT:  All right.  Thank you both.  Have a

24 good afternoon.

25        (Whereupon, the following proceeding concluded

19

1  at 3:27 p.m.)

2         I hereby certify the foregoing is a true

3  and accurate transcript from my stenographic notes in the

4  proceeding.

5         /s/ Michele L. Rolfe, RPR, CRR

           U.S. District Court

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'963** [3] - 9:16, 11:16, 17:2

**/**

**/s** [1] - 19:5

**1**

**12(c** [2] - 6:1, 13:8
**16** [1] - 5:25
**17th** [1] - 17:7

**2**

**2-plus** [1] - 14:21
**20** [1] - 1:18
**2022** [1] - 1:18
**2023** [5] - 8:1, 9:18, 15:23, 17:7, 17:13
**2024** [2] - 12:5, 12:11
**21-1138-GBW** [1] - 1:8
**21-1594-GBW** [1] - 1:13
**21-691** [1] - 3:9
**21-691-GBW** [1] - 1:5
**271(a** [1] - 4:7
**271(e** [1] - 4:7
**271(e)(4)(c** [1] - 7:5

**3**

**30** [1] - 17:13
**30-month** [2] - 4:9, 9:17
**30th** [3] - 15:23, 16:12, 16:23
**31** [2] - 4:13, 5:1
**35** [1] - 7:5
**3:00** [1] - 3:4
**3:27** [1] - 19:1

**5**

**5** [1] - 12:5

**9**

**9-month** [1] - 12:5
**90** [2] - 10:12, 12:24

**A**

**abiding** [1] - 8:21
**able** [2] - 8:8, 8:15
**accept** [1] - 8:5
**accommodation** [1] - 15:11

**accommodations** [1] - 17:15
**accurate** [1] - 19:3
**accused** [1] - 11:21
**Act** [1] - 9:24
**Action** [1] - 3:8
**actions** [2] - 9:22, 9:25
**activities** [1] - 10:25
**actual** [7] - 4:24, 5:12, 5:16, 7:21, 15:6, 16:2, 16:9
**add** [1] - 4:15
**additional** [3] - 5:11, 7:1, 7:2
**address** [1] - 12:19
**adjudicated** [1] - 6:4
**afternoon** [6] - 3:5, 3:6, 3:18, 3:19, 3:24, 18:24
**ago** [2] - 17:20, 17:21
**agree** [2] - 7:25, 15:15
**agreement** [1] - 10:18
**ahead** [2] - 4:1, 18:15
**al** [2] - 1:8, 1:12
**alleges** [1] - 10:15
**allow** [5] - 12:12, 12:13, 16:18, 16:20
**alone** [1] - 15:4
**alternative** [1] - 5:22
**amend** [1] - 18:5
**amendable** [1] - 6:11
**amended** [1] - 17:25
**amends** [1] - 4:15
**amicable** [1] - 18:14
**amount** [1] - 4:20
**AND** [1] - 1:2
**answer** [1] - 6:22
**APPEARANCES** [1] - 2:1
**appearances** [1] - 3:10
**appropriate** [2] - 16:18, 16:19
**approval** [2] - 5:1
**approved** [1] - 7:9
**area** [1] - 18:17
**argue** [1] - 10:11
**argument** [1] - 3:23
**arguments** [2] - 3:17, 13:11
**ARSHT** [1] - 2:3
**artificially** [1] - 16:22
**assiduously** [1] - 9:14
**assuming** [1] - 16:7
**AUDRA** [1] - 2:13
**Audra** [1] - 3:21
**August** [2] - 16:6, 18:4
**auspices** [1] - 10:17

**AVADEL** [3] - 1:6, 1:10, 1:14
**Avadel** [24] - 3:8, 3:20, 3:23, 4:8, 4:19, 6:19, 7:10, 7:17, 9:1, 9:4, 9:11, 10:7, 10:15, 10:16, 10:17, 11:16, 11:18, 11:19, 15:14, 15:17, 16:4, 17:2
**Avadel's** [2] - 7:5, 10:19
**available** [2] - 5:10, 5:11
**avoid** [1] - 5:14
**awarded** [1] - 7:6
**aware** [1] - 4:3

**B**

**bad** [1] - 13:12
**ball** [1] - 5:7
**became** [1] - 5:15
**becomes** [2] - 5:11, 6:10
**BEFORE** [1] - 1:20
**begin** [1] - 15:22
**beginning** [1] - 3:4
**begun** [1] - 15:3
**behalf** [2] - 3:13, 3:20
**belabor** [1] - 16:24
**believes** [1] - 4:21
**between** [3] - 10:16, 11:4, 11:11
**bifurcate** [1] - 5:17
**bifurcation** [1] - 5:18
**big** [1] - 8:13
**bit** [1] - 10:14
**blocked** [1] - 17:6
**bluntly** [1] - 16:14
**bold** [1] - 12:25
**brought** [2] - 9:23, 10:8
**burden** [4] - 6:14, 8:6, 8:10, 8:19
**BY** [4] - 2:3, 2:6, 2:10, 2:12

**C**

**C.A** [3] - 1:4, 1:7, 1:12
**Calvosa** [1] - 3:14
**CALVOSA** [1] - 2:6
**case** [50] - 4:2, 4:4, 4:6, 4:12, 5:16, 5:17, 5:19, 5:23, 6:1, 6:5, 7:16, 7:20, 8:2, 9:24, 10:4, 10:7, 10:9, 10:12, 10:13, 10:15, 10:21, 10:24, 11:5, 11:6, 11:12, 11:13,

**11:14**, 12:3, 12:6, 12:7, 12:8, 12:15, 12:17, 13:2, 13:7, 13:8, 13:13, 13:18, 14:18, 15:2, 15:3, 15:9, 16:25, 17:24, 17:25
**cases** [8] - 9:22, 11:4, 12:10, 12:16, 13:11, 13:19, 13:20, 13:24
**center** [1] - 10:24
**CERRITO** [10] - 2:6, 4:2, 6:21, 7:14, 12:19, 12:23, 14:13, 14:16, 17:18, 18:21
**Cerrito** [7] - 3:14, 3:16, 6:16, 8:3, 10:4, 10:10, 14:15
**certain** [2] - 4:5, 4:20
**certainly** [5] - 4:20, 5:12, 7:14, 9:15, 13:20
**certification** [2] - 4:8, 9:16
**certify** [6] - 4:5, 7:18, 17:3, 17:19, 18:10, 19:2
**challenging** [1] - 10:22
**changed** [1] - 7:18
**choice** [4] - 4:5, 7:17, 15:12, 17:22
**chose** [1] - 17:22
**Civil** [1] - 3:8
**claim** [4] - 7:11, 7:13, 8:23, 11:24
**claims** [1] - 10:23
**clarify** [1] - 6:19
**clear** [1] - 11:12
**client** [3] - 13:17, 13:23, 14:1
**closed** [1] - 15:10
**closing** [1] - 15:1
**CNS** [4] - 1:6, 1:10, 1:14, 3:8
**commercial** [9] - 7:7, 7:10, 9:7, 9:12, 9:23, 10:1, 16:4, 16:8, 18:19
**common** [1] - 9:21
**compel** [2] - 8:24, 18:18
**compensated** [1] - 14:7
**complain** [1] - 17:17
**complaining** [1] - 17:10
**complete** [2] - 12:10, 16:15
**completed** [1] - 15:20

**complicating** [1] - 4:25
**compressed** [1] - 16:22
**compression** [1] - 12:2
**compromise** [2] - 8:20, 9:2
**concluded** [1] - 18:25
**conditioned** [1] - 9:11
**conference** [1] - 5:25
**confidential** [1] - 10:18
**conserve** [1] - 12:15
**conserves** [1] - 14:11
**considerable** [1] - 10:11
**consideration** [1] - 17:16
**consolidate** [3] - 5:23, 13:10, 15:3
**consolidated** [1] - 14:10
**consolidating** [1] - 12:16
**consolidation** [3] - 6:2, 6:6, 12:22
**contested** [1] - 6:25
**contesting** [2] - 4:21, 8:22
**context** [2] - 9:25, 10:14
**contexts** [1] - 9:23
**continue** [1] - 14:15
**cost** [1] - 16:9
**counsel** [2] - 3:10, 9:1
**counts** [4] - 4:7, 4:15, 18:1
**couple** [2] - 6:17, 18:6
**course** [2] - 10:16, 15:25
**court** [1] - 14:9
**Court** [5] - 6:14, 8:24, 10:9, 15:25, 19:5
**COURT** [15] - 1:1, 1:21, 3:5, 3:18, 3:24, 6:16, 7:4, 8:18, 12:18, 12:20, 13:22, 14:14, 15:13, 18:12, 18:23
**creation** [1] - 17:9
**CRR** [1] - 1:25, 19:5
**current** [1] - 8:1
**cut** [1] - 14:14

**D**

**damage** [3] - 5:7, 14:20, 18:1
**damages** [24] - 4:16,

5:5, 6:20, 7:6, 7:11, 7:12, 7:22, 8:22, 9:6, 9:21, 10:2, 11:24, 11:25, 12:13, 12:15, 14:7, 15:6, 15:16, 15:21, 15:25, 16:19, 16:21, 17:11, 18:1

**damages-related** [3] - 6:20, 7:12, 8:22

**Dan** [1] - 3:19

**DANIEL** [1] - 2:10

**date** [5] - 6:20, 16:12, 16:18, 16:23, 17:13

**dates** [1] - 15:18

**deadlines** [1] - 15:15

**deal** [1] - 8:13

**decade** [1] - 11:1

**defendant** [3] - 4:14, 5:22, 8:21

**Defendant** [4] - 1:6, 1:10, 1:14, 2:14

**defendant's** [1] - 4:5

**defendants** [1] - 15:11

**defense** [2] - 7:13, 8:23

**DELAWARE** [1] - 1:2

**Delaware** [1] - 1:17

**delay** [1] - 12:6

**delaying** [1] - 14:6

**demand** [1] - 13:6

**deny** [1] - 18:17

**developed** [1] - 10:23

**development** [1] - 11:1

**difference** [1] - 5:18

**differently** [1] - 4:18

**difficult** [2] - 6:9, 8:24

**disagree** [1] - 10:10

**disclosures** [1] - 18:6

**discovery** [43] - 3:7, 4:17, 4:19, 4:22, 5:5, 5:7, 5:9, 5:10, 5:11, 5:15, 5:21, 6:9, 6:13, 6:18, 6:19, 6:20, 7:7, 7:3, 7:12, 7:23, 8:4, 8:22, 9:21, 10:2, 11:24, 11:25, 12:13, 12:14, 13:14, 15:1, 15:2, 15:10, 15:16, 15:19, 15:25, 16:9, 16:11, 16:15, 16:16, 16:20, 17:11, 18:1, 18:7

**discussions** [1] - 10:16

**dismiss** [1] - 6:2

**dispute** [1] - 3:7

**DISTRICT** [3] - 1:1, 1:2, 1:21

**District** [1] - 19:5

**dollar** [1] - 14:21

**DOMINIC** [1] - 2:6

**done** [5] - 14:21, 17:21, 17:23, 18:2, 18:8

**down** [5] - 6:7, 8:4, 8:15, 8:16, 11:13

**drug** [2] - 7:9, 11:1

**due** [1] - 4:10

**during** [1] - 10:15

## E

**earliest** [1] - 16:3

**early** [1] - 16:6

**efficient** [2] - 10:9, 14:12

**eight** [2] - 4:15, 18:1

**Emanuel** [1] - 3:15

**EMANUEL** [1] - 2:5

**empanelled** [1] - 11:7

**endeavor** [1] - 13:10

**engaged** [2] - 7:10, 11:1

**engaging** [2] - 9:11, 11:23

**English** [1] - 3:20

**ENGLISH** [1] - 2:9

**enter** [1] - 8:9

**entering** [2] - 14:21, 17:6

**entitled** [2] - 7:22, 7:23

**ESQ** [7] - 2:3, 2:6, 2:6, 2:7, 2:10, 2:12, 2:13

**et** [2] - 1:8, 1:12

**etc** [1] - 16:10

**exactly** [1] - 5:24

**exaggerated** [1] - 13:4

**existed** [1] - 5:7

**expedited** [1] - 15:19

**expert** [6] - 11:24, 11:25, 12:14, 16:15, 16:16, 16:20

**expire** [2] - 4:10, 9:17

**expired** [1] - 4:13

**expires** [1] - 11:17

**explain** [1] - 13:5

**expressly** [2] - 9:7, 9:11

**extent** [1] - 6:22

**extents** [1] - 10:25

**extremely** [2] - 14:19, 16:13

## F

**fact** [7] - 4:23, 5:9, 8:8, 10:22, 11:24, 16:10, 16:15

**factor** [1] - 4:25

**facts** [5] - 10:12, 10:21, 11:6, 11:10, 12:14

**factual** [1] - 10:11

**failed** [1] - 17:19

**fair** [1] - 4:24

**fairly** [1] - 18:8

**false** [1] - 17:17

**far** [1] - 17:23

**fashion** [1] - 6:13

**fault** [3] - 17:19, 17:21, 18:10

**FDA** [1] - 17:20

**feasible** [1] - 16:4

**few** [2] - 9:19, 14:6

**figure** [1] - 8:14

**file** [1] - 4:8

**filed** [1] - 5:25

**final** [1] - 5:2

**fine** [1] - 18:8

**finger** [1] - 18:9

**finish** [1] - 5:7

**first** [3] - 12:4, 12:11, 16:5

**flip** [1] - 14:4

**follow** [1] - 6:17

**follow-up** [1] - 6:17

**following** [2] - 3:3, 18:25

**FOR** [1] - 1:2

**forced** [1] - 15:10

**foregoing** [1] - 19:2

**formulation** [1] - 10:19

**forward** [1] - 13:16

**Frank** [1] - 3:14

**FRANK** [1] - 2:6

**frankly** [2] - 5:24, 12:15

**free** [1] - 11:18

**front** [1] - 13:12

**full** [2] - 17:1, 17:12

## G

**generate** [1] - 11:21

**given** [3] - 12:7, 17:12, 18:17

**goal** [1] - 10:6

**great** [2] - 8:10, 10:25

**GREGORY** [1] - 1:20

**guess** [2] - 6:21, 10:9

## H

**half** [2] - 12:4, 12:11

**hand** [1] - 14:24

**happy** [3] - 8:16, 13:4, 15:7

**harm** [2] - 14:5, 14:20

**Hatch** [7] - 4:4, 4:12, 7:17, 9:24, 9:25, 17:24, 17:25

**Hatch-Waxman** [7] - 4:4, 4:12, 7:17, 9:24, 9:25, 17:24, 17:25

**head** [1] - 9:6

**hear** [2] - 9:1, 12:20

**heard** [5] - 5:22, 11:6, 11:7, 17:18, 18:12

**hearing** [1] - 6:24

**held** [1] - 3:4

**hereby** [1] - 19:2

**HERMAN** [1] - 2:12

**Herman** [2] - 3:21, 9:3

**hit** [1] - 9:5

**hitting** [1] - 16:5

**hold** [1] - 14:18

**honestly** [1] - 13:9

**Honor** [41] - 3:12, 3:19, 4:2, 4:3, 4:25, 6:21, 7:14, 8:3, 8:5, 8:14, 8:17, 9:3, 9:5, 9:19, 9:20, 10:5, 10:15, 11:7, 11:19, 12:2, 12:10, 12:19, 12:24, 13:9, 13:25, 14:4, 14:16, 14:25, 15:1, 15:5, 15:24, 16:14, 16:17, 16:19, 16:24, 17:8, 17:18, 18:3, 18:11, 18:21, 18:22

**Honor's** [3] - 3:22, 11:8, 12:15

**HONORABLE** [1] - 1:20

**hoping** [1] - 18:14

## I

**idea** [1] - 5:14

**immediately** [1] - 13:18

**important** [3] - 10:5, 14:1

**importation** [1] - 7:9

**improperly** [1] - 10:20

**IN** [2] - 1:1, 1:2

**Inc** [1] - 3:8

**INC** [3] - 1:4, 1:8, 1:12

**indicated** [1] - 7:19

**information** [3] - 6:23, 10:18, 10:20

**infringement** [3] - 9:21, 9:22, 13:3

**infringer** [1] - 7:7

**infringing** [1] - 11:21

**injunction** [2] - 5:4,

6:24

**intended** [1] - 9:25

**interest** [1] - 6:8

**involved** [2] - 4:7, 8:19

**irreparable** [1] - 14:5

**issue** [6] - 7:11, 8:25, 11:25, 13:14, 14:24, 16:21

**issues** [3] - 10:13, 10:21, 16:11

**itemize** [1] - 7:2

**itself** [1] - 14:23

## J

**JAZZ** [1] - 1:4, 1:8, 1:12

**Jazz** [16] - 3:7, 3:13, 6:18, 9:14, 10:8, 10:16, 10:17, 10:19, 10:22, 10:25, 12:13, 13:11, 14:6, 14:9, 17:1, 17:17

**Jazz's** [8] - 3:25, 6:7, 9:2, 9:10, 12:20, 17:9, 17:19, 18:18

**Jeremy** [1] - 3:12

**JEREMY** [1] - 2:3

**joined** [2] - 3:13, 3:21

**Judge** [1] - 17:14

**JUDGE** [1] - 1:21

**judicial** [1] - 14:11

**June** [6] - 8:1, 8:4, 8:15, 9:17, 11:17, 17:7

**jury** [3] - 11:7, 13:6, 13:12

## K

**keep** [3] - 15:18, 17:1, 17:4

**kind** [2] - 6:13, 12:1

**kinds** [1] - 14:20

**known** [1] - 18:10

**KRISTA** [1] - 2:7

**Krista** [1] - 3:14

## L

**largely** [1] - 11:10

**last** [1] - 11:1

**late** [1] - 15:25

**LATHAM** [1] - 2:12

**Latham** [2] - 3:21, 9:4

**latter** [1] - 17:21

**launch** [17] - 4:14, 4:24, 5:12, 5:16, 7:21, 8:16, 10:1,

11:16, 11:18, 13:18, 13:24, 15:7, 15:20, 16:3, 16:4, 17:24, 18:4
**launches** [1] - 15:17
**law** [1] - 18:17
**least** [2] - 11:19, 17:6
**left** [1] - 5:8
**legal** [1] - 8:22
**level** [1] - 16:17
**lifted** [1] - 8:1
**likely** [2] - 5:3, 17:5
**LLC** [4] - 1:6, 1:10, 1:14, 3:8
**LLP** [4] - 2:3, 2:5, 2:9, 2:12
**look** [2] - 7:20, 9:10
**looking** [5] - 11:23, 12:5, 12:9, 16:7, 16:10
**Lumryz** [3] - 7:11, 15:17, 18:20
**lunched** [1] - 5:20

## M

**maintained** [1] - 17:3
**manufacture** [3] - 7:7, 9:7, 9:12
**manufacturer** [1] - 18:19
**market** [8] - 8:9, 11:20, 14:21, 16:5, 16:9, 17:2, 17:4, 17:6
**marketplace** [2] - 7:21, 8:16
**material** [1] - 5:18
**matter** [6] - 4:11, 5:2, 6:4, 6:5, 11:18, 14:23
**McCarter** [1] - 3:20
**MCCARTER** [1] - 2:9
**mean** [1] - 14:14
**mentioned** [2] - 6:17, 17:13
**Michele** [2] - 1:25, 19:5
**mid** [2] - 4:10, 11:17
**mid-June** [1] - 11:17
**million** [1] - 14:21
**minimize** [2] - 7:24, 8:19
**mixed** [1] - 4:6
**monetarily** [1] - 14:8
**monetary** [1] - 7:6
**month** [1] - 16:8
**months** [3] - 12:1, 14:6, 18:6
**MORRIS** [1] - 2:3

**Morris** [1] - 3:13
**most** [1] - 10:8
**motion** [9] - 3:25, 5:14, 6:1, 7:19, 13:8, 14:25, 18:16, 18:18
**move** [1] - 15:12
**moving** [1] - 5:4
**MR** [15] - 3:12, 3:19, 4:2, 6:21, 7:14, 9:3, 12:19, 12:23, 13:25, 14:13, 14:16, 15:24, 17:18, 18:21, 18:22
**mudslinging** [1] - 13:10

## N

**nail** [1] - 9:5
**narcolepsy** [1] - 14:2
**necessary** [2] - 6:11, 16:15
**need** [5] - 5:21, 8:8, 8:17, 14:2, 17:15
**needed** [1] - 5:5
**never** [4] - 9:13, 17:13, 17:14
**next** [1] - 4:10
**Nichols** [1] - 3:13
**NICHOLS** [1] - 2:3
**Nick** [1] - 3:14
**nightly** [1] - 14:3
**nondisclosure** [1] - 10:18
**Noreika** [1] - 17:14
**normal** [2] - 4:4, 4:12
**note** [1] - 9:19
**NOTE** [1] - 3:3
**noted** [1] - 9:14
**notes** [1] - 19:3
**nothing** [4] - 6:6, 13:2, 13:9, 13:14
**notion** [1] - 10:1

## O

**obviously** [5] - 5:3, 5:6, 6:7, 8:8, 14:18
**October** [5] - 1:18, 15:23, 16:12, 16:23, 17:13
**OF** [1] - 1:2
**offer** [4] - 7:8, 9:2, 9:8, 18:20
**offered** [1] - 5:14
**once** [2] - 11:6, 14:3
**once-nightly** [1] - 14:3
**one** [4] - 4:16, 11:6, 11:7, 11:8
**opposed** [2] - 11:9, 15:2

**order** [3] - 8:24, 15:16, 16:14
**ordered** [1] - 15:25
**orderly** [2] - 12:14, 14:10
**otherwise** [3] - 6:23, 7:1, 8:12
**outcome** [1] - 17:12
**outset** [1] - 17:5
**overlap** [4] - 11:3, 12:7, 12:24, 13:1
**overlapping** [3] - 5:24, 10:13, 11:10
**overlaps** [3] - 6:22, 10:12, 11:11
**own** [2] - 9:10, 17:9
**oxybate** [1] - 14:3

## P

**p.m** [2] - 3:4, 19:1
**pace** [1] - 16:21
**pain** [1] - 7:25
**papers** [1] - 9:20
**part** [3] - 4:4, 12:11, 15:21
**parties** [4] - 4:13, 6:14, 7:12, 8:6
**party** [1] - 13:2
**patent** [9] - 6:5, 9:16, 9:17, 9:21, 11:16, 13:3, 13:13, 17:2
**patents** [2] - 4:6, 10:23
**patients** [1] - 14:2
**pending** [1] - 6:2
**percent** [2] - 10:12, 12:24
**perhaps** [2] - 5:5, 6:7
**permission** [2] - 3:16, 3:22
**pertain** [1] - 15:16
**Pharmaceuticals** [2] - 3:7, 3:8
**PHARMACEUTICALS** [6] - 1:4, 1:6, 1:8, 1:10, 1:12, 1:14
**PI** [1] - 5:20
**pick** [1] - 5:6
**plaintiff** [1] - 4:15
**Plaintiff** [1] - 2:7
**plaintiff's** [1] - 6:3
**Plaintiffs** [3] - 1:4, 1:8, 1:12
**players** [1] - 13:12
**pleadings** [1] - 4:15
**plenty** [1] - 8:7
**point** [10] - 4:3, 4:13, 4:19, 5:8, 5:19, 6:13, 7:22, 11:23, 16:24,

18:9
**position** [4] - 7:5, 7:15, 7:18, 9:2
**positions** [1] - 18:13
**potential** [1] - 5:1
**potentially** [2] - 11:21, 14:22
**practical** [3] - 11:18, 16:2, 16:17
**prayer** [1] - 9:10
**prejudice** [5] - 6:3, 6:8, 14:5, 14:23, 18:18
**prejudiced** [1] - 15:5
**prejudices** [1] - 13:16
**prejudicial** [1] - 14:19
**preliminary** [2] - 5:4, 6:24
**prepared** [1] - 12:8
**present** [2] - 3:17, 6:1
**presently** [1] - 7:11
**prevent** [2] - 9:15, 10:1
**problem** [2] - 14:8, 15:8
**proceed** [5] - 4:16, 5:9, 5:19, 6:5, 16:21
**proceeding** [2] - 18:25, 19:4
**process** [6] - 6:12, 8:6, 8:14, 14:12, 16:20, 16:21
**produceable** [1] - 8:12
**produced** [1] - 6:20
**product** [6] - 13:19, 13:24, 13:25, 14:3, 15:7, 16:5
**proposal** [2] - 12:12, 12:22
**provided** [2] - 4:20, 10:17
**provides** [2] - 7:5, 15:19
**provision** [2] - 9:6, 15:19
**purely** [1] - 16:16
**push** [2] - 13:15, 16:18
**pushing** [1] - 12:3
**put** [7] - 3:10, 7:18, 14:18, 15:9, 16:4, 16:14, 18:1

## Q

**questions** [1] - 6:17
**quickly** [3] - 15:1, 18:2, 18:9
**Quinn** [1] - 3:15
**QUINN** [1] - 2:5

**quite** [3] - 5:24, 10:2, 13:9

## R

**raise** [1] - 14:25
**raised** [1] - 17:14
**rather** [1] - 6:13
**reach** [3] - 8:20, 10:6, 18:14
**reality** [2] - 13:15, 14:24
**really** [4] - 6:12, 10:24, 13:13, 14:8
**reason** [2] - 4:22, 14:25
**reasonable** [1] - 8:20
**received** [1] - 6:18
**record** [1] - 3:11
**referenced** [1] - 10:4
**regard** [2] - 6:4, 15:11
**related** [3] - 6:20, 7:12, 8:22
**relating** [2] - 11:24, 12:14
**relatively** [1] - 18:2
**relevant** [4] - 5:15, 7:12, 8:12, 8:23
**relief** [2] - 7:6, 9:10
**remembering** [1] - 16:25
**renew** [1] - 18:18
**rephrase** [1] - 11:16
**report** [1] - 16:20
**REPORTER 'S** [1] - 3:3
**reports** [2] - 11:25, 16:16
**represented** [1] - 9:20
**request** [1] - 6:23
**required** [1] - 16:23
**requires** [1] - 9:7
**rescheduling** [1] - 12:4
**resolution** [4] - 10:6, 12:10, 13:19, 18:14
**resolved** [1] - 13:24
**resources** [2] - 12:16, 14:11
**respective** [1] - 18:13
**respects** [1] - 17:8
**respond** [1] - 7:4
**response** [3] - 9:2, 12:21
**result** [4] - 4:6, 4:8, 5:3, 11:4
**returning** [1] - 16:2
**rights** [2] - 6:3, 6:4
**rings** [1] - 17:16
**Rolfe** [2] - 1:25, 19:5
**routine** [1] - 10:2

**RPR** [2] - 1:25, 19:5
**rule** [1] - 18:15
**Rule** [1] - 5:24
**rules** [1] - 15:5
**ruling** [1] - 17:20
**RYCROFT** [1] - 2:7
**Rycroft** [1] - 3:14

## S

**sale** [7] - 7:8, 7:10, 9:8, 9:24, 18:20
**sales** [6] - 7:21, 11:22, 15:6, 16:8, 16:9, 18:7
**SAWYER** [1] - 2:13
**Sawyer** [1] - 3:21
**scenario** [1] - 15:17
**schedule** [8] - 12:3, 12:6, 12:9, 15:4, 15:9, 16:22, 16:25, 17:11
**scheduled** [5] - 4:10, 8:2, 11:17, 12:1, 15:22
**scheduling** [1] - 15:15
**scramble** [2] - 16:14, 16:22
**second** [1] - 13:22
**secret** [9] - 10:4, 10:7, 10:9, 10:15, 10:24, 11:5, 11:12, 12:7, 12:8
**see** [1] - 14:4
**seeking** [4] - 11:12, 11:15, 12:13, 14:7
**sell** [1] - 7:8
**sense** [5] - 6:24, 10:10, 11:4, 12:2, 18:11
**separate** [1] - 11:9
**September** [1] - 16:12
**set** [2] - 11:6, 16:25
**severely** [1] - 6:3
**share** [1] - 16:9
**short** [2] - 5:1, 5:20
**shut** [1] - 8:4
**side** [1] - 14:4
**sides** [1] - 18:13
**SILVER** [2] - 2:10, 3:19
**Silver** [1] - 3:20
**simple** [1] - 6:9
**simply** [2] - 11:13, 14:9
**single** [1] - 12:17
**sit** [3] - 8:3, 8:15, 8:16
**situation** [7] - 4:14, 5:11, 17:5, 17:8, 17:9, 17:16, 17:17

**six** [1] - 11:19
**slow** [2] - 6:6, 11:13
**sodium** [1] - 14:3
**somewhat** [1] - 17:10
**sorry** [1] - 4:1
**sort** [3] - 9:5, 10:3, 16:2
**sound** [1] - 18:15
**space** [1] - 12:1
**speaks** [1] - 14:23
**special** [1] - 17:15
**stand** [1] - 9:15
**standard** [1] - 8:22
**start** [3] - 3:10, 4:4, 12:23
**started** [3] - 4:6, 4:17, 7:16
**statement** [3] - 12:24, 12:25, 13:4
**STATES** [2] - 1:1, 1:21
**States** [3] - 7:8, 7:9, 9:8
**statutory** [1] - 9:6
**stay** [12] - 4:9, 4:13, 5:1, 5:18, 7:17, 7:19, 8:1, 9:17, 13:23, 15:15
**stayed** [1] - 6:11
**staying** [1] - 5:15
**stenographic** [1] - 19:3
**step** [1] - 10:5
**stipulation** [1] - 15:18
**stop** [2] - 13:22, 14:17
**Street** [1] - 18:5
**stuff** [1] - 8:11
**subsequently** [2] - 4:8, 7:18
**substantial** [1] - 11:3
**successful** [1] - 5:4
**sufficient** [1] - 15:21
**suggest** [1] - 12:12
**suggestion** [1] - 12:3
**suggestions** [1] - 15:12
**SULLIVAN** [1] - 2:5
**supplement** [2] - 5:13, 6:10
**supplementation** [1] - 8:8
**support** [1] - 13:1
**suspect** [1] - 13:21

## T

**technology** [2] - 10:19, 10:23
**teleconference** [2] - 3:3, 3:7
**Teleconference** [1] -

1:18
**terms** [1] - 9:6
**THE** [15] - 1:1, 1:2, 3:5, 3:18, 3:24, 6:16, 7:4, 8:18, 12:18, 12:20, 13:22, 14:14, 15:13, 18:12, 18:23
**therefore** [1] - 4:7
**they've** [1] - 5:20
**three** [1] - 13:19
**Thursday** [1] - 1:18
**Tigan** [1] - 3:13
**TIGAN** [2] - 2:3, 3:12
**timeline** [1] - 16:3
**today** [2] - 3:17, 3:23
**together** [2] - 13:19, 13:20
**ton** [1] - 8:11
**touch** [1] - 10:3
**trade** [9] - 10:4, 10:7, 10:9, 10:15, 10:24, 11:5, 11:11, 12:7, 12:8
**transcript** [1] - 19:3
**Transcript** [1] - 1:18
**trial** [18] - 4:10, 5:2, 5:19, 6:3, 7:21, 8:2, 11:8, 12:1, 12:4, 13:17, 14:6, 14:22, 15:22, 16:12, 16:18, 16:23, 17:13, 17:25
**trials** [1] - 11:9
**tried** [1] - 12:9
**true** [2] - 9:22, 19:2
**try** [4] - 7:2, 10:6, 11:5, 13:11
**trying** [4] - 7:24, 8:5, 8:19, 8:20
**TUNNELL** [1] - 2:3
**turn** [1] - 4:1
**turned** [1] - 10:19
**turns** [1] - 5:16
**two** [4] - 11:9, 12:1, 12:16, 13:20
**type** [2] - 11:21, 14:5
**typical** [1] - 4:14

## U

**U.S** [1] - 19:5
**U.S.C** [1] - 7:5
**ultimately** [1] - 10:6
**under** [4] - 4:9, 9:23, 10:17, 15:17
**understood** [1] - 15:13
**unfair** [1] - 17:10
**unfolding** [1] - 12:14
**UNITED** [2] - 1:1, 1:21
**United** [3] - 7:8, 7:9,

9:8
**up** [6] - 5:6, 5:7, 5:14, 6:17, 8:4, 11:8
**URQUHART** [1] - 2:5

## V

**validity** [1] - 13:3
**various** [2] - 10:16, 15:11
**view** [2] - 14:2, 16:13
**visited** [1] - 14:6

## W

**wait** [1] - 15:7
**Wall** [1] - 18:5
**wants** [1] - 4:14
**WATKINS** [1] - 2:12
**Watkins** [2] - 3:21, 9:4
**Waxman** [7] - 4:4, 4:12, 7:17, 9:24, 9:25, 17:24, 17:25
**wed** [1] - 6:8
**week** [1] - 15:2
**weeks** [1] - 11:19
**whole** [1] - 13:10
**WILLIAMS** [1] - 1:20
**willing** [4] - 13:18, 13:23, 14:17, 15:14
**Wilmington** [1] - 1:17
**win** [1] - 5:20
**worries** [1] - 14:16
**worth** [2] - 16:1, 16:25

## Y

**year** [6] - 4:10, 5:25, 13:7, 13:16, 17:19, 17:21
**years** [3] - 6:7, 11:13, 14:22
**YUE** [5] - 2:12, 9:3, 13:25, 15:24, 18:22
**Yue** [4] - 3:21, 9:4, 13:23, 15:14
**yue** [1] - 3:22

# EXHIBIT 14

REFINITIV STREETEVENTS

# PRELIMINARY TRANSCRIPT

AVDL.OQ - Q3 2022 Avadel Pharmaceuticals PLC Earnings Call

EVENT DATE/TIME: NOVEMBER 09, 2022 / 1:00PM GMT

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2022 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



PRELIMINARY

NOVEMBER 09, 2022 / 1:00PM, AVDL.OQ - Q3 2022 Avadel Pharmaceuticals PLC Earnings Call

## CORPORATE PARTICIPANTS

**Gregory J. Divis** *Avadel Pharmaceuticals plc - CEO & Director*

**Jennifer Gudeman**

**Richard Kim** *Avadel Pharmaceuticals plc - Chief Commercial Officer*

**Thomas S. McHugh** *Avadel Pharmaceuticals plc - Senior VP & CFO*

## CONFERENCE CALL PARTICIPANTS

**Adam Gerald Evertts** *LifeSci Capital, LLC, Research Division - Senior Research Analyst*

**Ami Fadia** *Needham & Company, LLC, Research Division - Senior Analyst*

**Chase Richard Knickerbocker** *Craig-Hallum Capital Group LLC, Research Division - Senior Research Analyst*

**Christopher Lawrence Howerton** *Jefferies LLC, Research Division - Equity Analyst*

**François Daniel Brisebois** *Oppenheimer & Co. Inc., Research Division - MD & Senior Analyst*

**Marc Harold Goodman** *SVB Securities LLC, Research Division - Senior MD of Neuroscience & Senior Research Analyst*

**Matthew Lee Kaplan** *Ladenburg Thalmann & Co. Inc., Research Division - MD & Head of Healthcare Equity Research*

## PRESENTATION

**Operator**

Good morning. My name is Rob, and I will be your conference operator today. At this time, I would like to welcome everyone to the Avadel Pharmaceuticals Third Quarter 2022 Earnings Conference Call. After the speakers' remarks, there will be a question-and-answer session. (Operator Instructions) Austin Murta from Avadel Investor Relations, you may begin your conference.

**Unidentified Company Representative**

Good morning, and thank you for joining us on our conference call to discuss third quarter 2022 earnings. As a reminder, before we begin, the following presentation includes several matters that constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are subject to risks and uncertainties that could cause the actual results to differ materially from those contemplated in such forward-looking statements. These risks include risks that products in the development stage may not achieve scientific objectives or milestones or meet stringent regulatory requirements, uncertainties regarding market entry and acceptance of products and the impact of competitive products and pricing.

These and other risks are described more fully in Avadel's public filings under the Exchange Act included in the Form 10-K for the year ended December 31, 2021, and which was filed on March 16, 2022 and subsequent SEC filings. Except as required by law, Avadel undertakes no obligation to update or revise any forward-looking statements contained in this presentation to reflect new information, future events or otherwise.

On the call today are Greg Divis, Chief Executive Officer; Jennifer Gudeman, Vice President of Medical and Clinical Affairs; Richard Kim, Chief Commercial Officer; and Tom McHugh, Chief Financial Officer. At this time, I'll turn the call over to Greg.

**Gregory J. Divis** *- Avadel Pharmaceuticals plc - CEO & Director*

Thank you, Austin. Good morning, everyone, and thank you for joining us this morning to discuss Avadel's third quarter 2022 results. Q3 was another important quarter for Avadel and our pursuit to bring LUMRYZ to people with narcolepsy.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2022 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



PRELIMINARY

Most importantly, LUMRYZ are investigational once-in-bedtime oxybate therapy for the treatment of cataplexy or excessive daytime sleepiness in adults with narcolepsy was granted tentative approval by the FDA in July. The FDA's formal decision of granting technical approval results in 3 very important developments for Avadel.

First, it validates LUMRYZ safety profile and clinical efficacy and as such, has confirmed that LUMRYZ is approvable as a once at bedtime therapy. We view this as a major regulatory derisking event for Avadel.

Second, it enables us to complete work on key launch-related activities, including the build-out of the REMS program and the manufacture of commercial launch supply. We made significant progress in these activities in Q3 and are on track to have both completed before the end of the year. Lastly, it confirms that the potential latest date we should receive a final approval decision is after expiry of the REMS patent, which will occur on June 17, 2023, approximately 7 months from now. A final approval will then be followed by a launch that is expected no later than Q3 of 2023 into what we believe is a $3 billion-plus market opportunity. We will continue to take the necessary actions to bring LUMRYZ to final approval and more importantly, to provide access to people with narcolepsy who are desperately seeking new treatment options.

Very recent comprehensive market research that Richard will highlight shortly, continues to confirm the significant interest in LUMRYZ across all patient and physician segments, all of which is supported further by what we see in the real-world data coming from our RESTORE study, where 94% of twice-nightly switch patients prefer the once at bedtime dosing of LUMRYZ.

The combination of the real-world data of RESTORE along with our extensive market research and data analytics confirms our belief that LUMRYZ is well positioned to capture a meaningful share of the projected $3 billion-plus once at bedtime oxybate market. Although our base case assumption is to receive a final approval decision following expiration of the REMS patent in June of 2023, we continue to pursue efforts that could potentially lead to a final approval decision sooner.

More specifically, the Delaware court has granted our expedited request and has scheduled a hearing on our renewed motion to delist the REMS patent from the Orange Book for next week on Tuesday, November 15 at 10 a.m. Eastern Time. We look forward to the Delaware Court's decision and the opportunity to potentially accelerate the time line to a final approval and subsequent launch for LUMRYZ.

With that, I'll turn the call over to Jennifer to provide details on our recent data presentations. Jennifer?

### Jennifer Gudeman

Thanks, Greg, and good morning. As Greg said, this was an important quarter of progress for Avadel. We continue to add to the robust body of evidence supporting LUMRYZ. These extensive and positive data will support the launch following potential final FDA approval.

Let's start with the Test Congress held a few weeks ago, where we had 3 posters presented with updated data from our open-label study RESTORE. First, we provided further confirmation of long-term safety and tolerability with Bloom rise among the 180 participants who received at least 1 dose.

Second, for patients not previously taking an oxybate, most have been efficiently titrated to a stable dose within 1 month. The majority of switch patients, they remain at once nightly dose of LUMRYZ equivalent to their previous total nightly intake of a media release oxybate. These more real-world data will be instructive for clinicians to consider when we launch commercially, Understanding the patient perspective and experience is critical to Avital. After 3 months on therapy of LUMRYZ, which patients are asked which dosing regimen may prefer. As we have seen consistently, there is an overwhelming preference for dosing that only LUMRYZ will offer with 94% stating they preferred the once-nightly dosing regimen over twice nightly. Let's look at some of the reasons for that preference by understanding the challenges with twice-nightly oxybate.

For those switching from either of the twice-nightly oxybate, we asked at baseline about their experience with the second dose, which revealed several key points.

3

©2022 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



PRELIMINARY

First, about 2/3 of participants had accident only missed their second dose in the past 3 months. Of these, 80% reported feeling worse the next day. These data align with what we hear directly from patients as having a negative impact to them, frequently missing a dose and feeling worse the next day.

Next, 61% reported taking their second dose more than 4 hours after the first dose. Of these, 88% confirmed that they experienced next day grogginess. These data also align with what we hear anecdotally from patients. Lastly, approximately 25% of participants reported the need for someone else to wake them for the second dose.

Now turning towards the ANA meeting. We were very pleased to debut data in partnership with the Mayo Clinic that examined more than 2,000 patients with narcolepsy seen at Mayo in the past 20 years. These were compared to an equivalent number of a matched cohort of patients without narcolepsy to identify the top 20 comorbidities increased in the narcolepsy cohort.

Among the top 20 comorbidities increased, 3 were sleep conditions, 3 were psychiatric conditions, both are well recognized to be increased in people with narcolepsy. What generated considerable interest were 2 additional findings.

First, 5 gain-related disorders were significantly increased in the narcolepsy cohort. Second, the top 20 comorbidities did not include hypertension or other types of cardiac disease, such as myocardial infarction or stroke. We have additional real-world data from the collaboration with the Mayo Clinic that we will be submitting for 2023 medical congresses specifically focused on the cohort that has been treated with sodium oxybate.

What we and the narcolepsy community are most excited about is when LUMRYZ is available and real-world evidence can be generated to further validate the transformational impact of LUMRYZ for people with narcolepsy.

I will now turn the call over to Richard to provide details on the commercial opportunity and are advancing preparations for launch. Richard?

---

**Richard Kim** - *Avadel Pharmaceuticals plc - Chief Commercial Officer*

Thanks, Jennifer, and good morning, everyone. I'll provide updates on our growing market insights and our overall launch readiness. But today, I'd like to start with a reminder of why we do what we do.

This fall, our team attended a lot of meetings with seed specialists and people with narcolepsy to continue to demonstrate Avadel's commitment to the narcolepsy community. At each conference, we were asked several times unsolicited, when our product will be approved and made available. These people are well aware of LUMRYZ and have told us they are waiting for it.

Now to take the step further, I want to share a patient family story that is really stuck with me. A couple of weeks ago, 1 father told us that every single night, he wakes up at 3 a.m. to call his son in college so that he does not miss taking the second dose of oxybate and that he just can't wait for the day where both he and his son don't have to wake up at 3:00 a.m. in the middle of the night for his son to attend classes the next day.

As much as we focus on people with narcolepsy, we sometimes overlook the impact on family members and caregivers. This is just 1 of the many personal stories that we often hear and continues to remind us why we cannot relent in our pursuit of bringing once at bedtime limited to people with narcolepsy and their families.

Let me now transition to our continued focus on advancing our deep understanding of the arts market, which continues to inform our launch of planning. We conducted a new quantitative market research project from over 130 narcolepsy treaters that once again validated our key market assumptions and offer some important new insights about current non-oxrate prescribers.

While we ask several questions, 1 key takeaway is that oxybate use will increase once gloominess available across oxybate prescribers and even current non-oxybate prescribers. Here are a few key points from this market research.

4

©2022 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



PRELIMINARY

NOVEMBER 09, 2022 / 1:00PM, AVDL.OQ - Q3 2022 Avadel Pharmaceuticals PLC Earnings Call

First, all prescribers can identify patients who are eligible for oxybate therapy. However, many eligible patients are still not treated. High-volume oxybate prescribers state using oxybate in about 45% of their narcolepsy patients with another 20% eligible, but not being treated with an oxybate. By comparison, low-volume oxybate prescribers stay using oxybate in under 10% of all narcolepsy patients with an additional 20% eligible, but not being treated with an oxybate.

Second, when shown the LUMRYZ product profile, current oxybate prescribers predict that oxybate market utilization as measured by market share will grow by at least 50%. Third, for narcolepsy prescribers who do not use oxybates, these HCPs state that 1 in 4 of their narcolepsy patients are oxybate eligible despite not currently prescribing the twice-nightly formulations.

Now the top reasons for not using oxybate are similar with other groups in that the prescribers are concerned with reimbursement challenges and the inability of their patients to comply with twice-only dosing.

However, when shown the LUMRYZ product profile, almost half of these current non-prescribing oxybate HCPs stated they would use LUMRYZ in the future and that they can already identify eligible patients they would treat. We also see awareness about Avadel, LUMRYZ and once-nightly sodium oxybate increasing compared to last year with the greatest awareness increase in high oxybate prescribers.

What this all translates into is that when LUMRYZ is available across all oxybate prescribing segments. These HCPs intend to give LUMRYZ to highest share of scripts in a growing future oxybate market.

Now when we look at the oxybate market from a patient claims perspective, our analytics suggest that the market potential for LUMRYZ could be roughly double that of the current twice-nightly oxybate market, with more than 30,000 potential eligible patients.

Recall, the estimated total patient position consists of 3 key segments. First, approximately 16,000 actively treated 290 patients; second, an estimated 10,000 to 15,000 potential patients previously treated with an oxybate who have discontinued twice therapy within the last 3 years. And third, roughly 3,000 new oxybate patient starts and in this segment, we expect robust yet growth of 25% to 50% per year in the future. All 3 patient segments have expressed high levels of interest in LUMRYZ and along with HCPs are also aligned in the belief that once at bedtime dosing is the most important engine for an oxybate therapy when comparing different formulations, thus demonstrating our preference for aluminide over the current standard of care.

Now turning to our launches efforts. Q3 was a busy quarter for our team. We made significant progress building our commercial launch supply for LUMRYZ and all the programs that will enable the fulfillment of a prescription after approval, mainly the detailed build-out of the REMS, our ongoing patient support services development and finalization of the contracts for our specialty pharmacy network. The progress we have made will enable us to shorten the time from a final approval decision in June to full launch of LUMRYZ in the third quarter of 2023.

As Jennifer mentioned, we had a strong showing at the chest and ANA congresses as well as attending and presenting at some of the first live patient organization meetings in a couple of years. On the payer front, our team had several key meetings with the decision makers at the GPOs and PBM that manage over 85% of the commercially insured lives.

We continue to advance our conversations with them around contracts and coverage for LUMRYZ and the feedback continues to be positive. One more key update on loss readiness. We just began to build out our launch team knowing that we are now only about 7 months away at the latest from a final approval decision.

This first portion of our build-out plan paired with what remains, balances are need to be launched-ready while continuing to be thoughtful about how and when we invest our resources. We look forward to providing more updates on future calls.

With that, I will now turn the call over to Tom for an update on the company's financials. Tom?

5

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2022 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



PRELIMINARY

**NOVEMBER 09, 2022 / 1:00PM, AVDL.OQ - Q3 2022 Avadel Pharmaceuticals PLC Earnings Call**

**Thomas S. McHugh** - *Avadel Pharmaceuticals plc - Senior VP & CFO*

Thank you, Richard. I'll provide a few highlights for the quarter and also note that full financial results are available in the press release and the 10-Q. I'll start with the balance sheet where we reported $106.5 million of cash, cash equivalents and marketable securities as of September 30, 2022.

The company also had $143.8 million convertible notes, which includes $117.4 million maturing in October of 2023. Subsequent to September 30, we completed an open market repurchase at a discount to par of $8.9 million of the $26.4 million of notes that mature in February of 2023. As a result, the amount that matures in February was reduced to $17.5 million. Excluding restructuring charges, Total operating expenses in the quarter ended September 30, 2022, were $17 million compared to $25.7 million in the same period in 2021 and $26.3 million in the quarter ended June 30, 2022.

The decrease in operating expenses in the current quarter resulted primarily from cost optimization actions taken by the company, and we are on track to reduce quarterly cash operating expenses, excluding inventory purchases, to our target range of $12 million to $14 million.

R&D expenses were $2.9 million in the quarter ended September 30, 2022, compared to $4.4 million for the same period in 2021. The $1.5 million decrease is due to lower costs related to the manufacturer of LUMRYZ and lower compensation costs.

SG&A expenses were $14.1 million in the quarter ended September 30, 2022, compared to $21.3 million for the same period in 2021. The decrease is a result of a number of factors, including lower cost of marketing, compensation, medical affairs and consulting fees.

Net loss for the third quarter 2022 was approximately $20.1 million or $0.33 per diluted share compared to net loss of approximately $22 million or $0.38 per diluted share in the same period in 2021. I will now turn the call back to Greg for closing remarks.

---

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Thank you, Tom. To wrap up, being approximately 7 months away from the backstop date on which we expect to receive a final approval decision for LUMRYZ and a potential launch shortly thereafter, we are focused on executing the most important priorities that offer us the opportunities to both accelerate a final approval decision and shorten the time between approval and launch.

Receiving tentative approval for LUMRYZ is a significant derisking element to our mission and our overall value proposition as a company, which is further supported by all of our customer insights and stakeholder feedback, which continue to demonstrate the significant opportunity for LUMRYZ to command a meaningful share of the $3 billion plus 1 at bedtime oxybate market. We will remain relentless in our efforts to fully realize the value of LUMRYZ for all stakeholders, including patients, prescribers and investors.

We thank you for your support, and we look forward to providing future updates on our progress. With that, we will open the call for questions. Operator?

---

# QUESTIONS AND ANSWERS

**Operator**

(Operator Instructions) And your first question comes from the line of Francois Brisebois from Oppenheimer.

---

**François Daniel Brisebois** - *Oppenheimer & Co. Inc., Research Division - MD & Senior Analyst*

Congrats on the progress here. So just a quick couple of ones here. In terms of building out the REMS, can you just maybe help us understand what challenges can come up when you build out REMS? Why it might be straightforward, why it might not be. Just a little more color around that.

6

©2022 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.


REFINITIV

PRELIMINARY

**NOVEMBER 09, 2022 / 1:00PM, AVDL.OQ - Q3 2022 Avadel Pharmaceuticals PLC Earnings Call**

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Yes, Frank, it's Greg. Thanks. I would describe it really in 2 steps. There's a technology component to this and an infrastructure required to actually execute and do the necessary work to ensure safe use, that the REMS program is designed from an IT infrastructure, programming and whatnot.

And then there becomes a second piece of that, which is staffing it as you get -- fully staffing it as you head toward a final approval and a subsequent launch. So again, we partnered with a leading very experienced REMS provider who has great experience with controlled substances. And so from that standpoint, the execution of our build-out to date which again is expected to be completed from an operational standpoint before the end of this calendar year is on track.

We'll clearly, as we head toward a final approval, begin to staff up the necessary resources to operationalize it. But the underlying, if you will, components of it, will be done well in advance.

**François Daniel Brisebois** - *Oppenheimer & Co. Inc., Research Division - MD & Senior Analyst*

Okay. Great. And then in terms of the store data, you guys keep showing some good data on it. Is there -- is that data useful or important for the payers from the payer's perspective in terms of reimbursement?

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Well, maybe I'll let Richard comment on that.

**Richard Kim** - *Avadel Pharmaceuticals plc - Chief Commercial Officer*

Frank, thanks for the question. Yes. The great thing is we're really blessed with a bank of full range of clinical data that Jennifer and her team have actually produced from both -- from Reston and now the posters from the store. So I would say everything has been very useful with the conversations with payers and as we get into more in-depth conversations, the fact that 94% of patients, when previously being on a twice nightly prefer to be on the once nightly formulation, I think, bodes well. So in short, the answer is yes, Frank, we'll absolutely leverage that in the appropriate payer settings going forward as well.

**François Daniel Brisebois** - *Oppenheimer & Co. Inc., Research Division - MD & Senior Analyst*

Okay. Great. And then I just -- sorry, last question. I feel like I have to just ask about it here. The -- in terms of the Delaware hearing on the 15th here, so next week. Can you just kind of maybe walk us through the potential, although it's hard to say, but the potential outcomes in terms of time lines? Or is a decision made do you expect it to be made on the bench? And if not, if the decision is in your favor what does that mean in terms of next steps here? Just to get a better feel for what can happen on the timeline?

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Yes. I think to describe that situation kind of at large and how we view it is we're not going to speak obviously to the specifics of the litigation, just not -- it's not what we do.

But from a process standpoint, we were pleased that after the claim construction hearing that the Delaware Court decided to grant our request for an expedited hearing on this motion to the list, which as we noted, is next Tuesday. And what will be argued by both sides will be -- should this patent be listed in the orange book. That will be a major part of that hearing.

7

©2022 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



PRELIMINARY

**NOVEMBER 09, 2022 / 1:00PM, AVDL.OQ - Q3 2022 Avadel Pharmaceuticals PLC Earnings Call**

And for reference purposes, all of the documentation, all the briefings from both parties work on this specific matter were completed by the end of August. So it's been a brief fully for quite some time. So on Tuesday, will be the chance for both sides to issue their -- argue their size, respectively. The outcome of that, we would expect to be 1 of 2 things.

The court will either agree with us that, that patent is not Orange Book listable because of the nature of that patent or won't agree with us. If he agrees with us, that the court agrees with us, then we would certainly go down the path of -- expect it to go down the path of a request to have that patent delisted, and we would immediately begin our work to transition from a tentative approval to a final approval decision. So in this case, there will be 2 steps.

It will be a delisting required and then subsequent to that will be the FDA's final approval decision in terms of timing and how and when that will occur, will the judge rule from the bench or not? We have no insight from that perspective. We're just pleased that he's granted our expedited request for the hearing and look forward to Tuesday's meeting.

---

**Operator**

Your next question comes from the line of Ami Fadia from Needham.

---

**Ami Fadia** - *Needham & Company, LLC, Research Division - Senior Analyst*

Firstly, I wanted to understand how you're thinking about sort of coverage of FT218 in the context of the possible entry of generic Xyrem early next year as well as how you're thinking about contracting with payers. Can you give us some color around some of that dynamic there? And how are payers thinking about or what feedback have you received from peers with regards to the potential of patients from Xyrem or Xyway switching on to FT218 in the future? And I have more questions later.

---

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Richard, do you want to take that?

---

**Richard Kim** - *Avadel Pharmaceuticals plc - Chief Commercial Officer*

Yes, sure. No, great questions. Thank you. First, it's been just great for the team to be out in front of the payers again, one-on-one meetings also this fall, the PCMA and AMCP meetings.

Overall, our basic strategy, as we've stated several times, has been to really seek parity coverage compared to the branded oxybate as well. And when we think about our conversations with the payers. Well, first and foremost, we've always assumed generics and authorized generic will be in the market by the time we launch. And the general feedback that we sort of hear from the payers is they're really treating the -- at least the authorized generic is really more of a brand extension.

Most people are predicting that it will be priced similar to other authorized generic potentially in about a 15% price discount range. compared to the branded. But also keep in mind that Z Rem is currently priced about 8.5% more expensive than Xywav.

So our overall strategy, once again, is really more parity. So when we think about our sort of contracting sort of philosophy, first and foremost, we're going to be going through what others haven't, which is contracting directly with the 3 GPOs before we launch. So we're well under our way with our conversations across the 3 major GPOs. And what I can sort of say is I think the feedback has been really positive.

They've sort of had -- oxybate have had really no competition for 20 years. So the fact that there's another branded compound coming to marketplace, I think the payers have really enjoyed the conversation. I mean we're not naive. We know that they want to leverage us in their conversations. But

8

©2022 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



PRELIMINARY

the 1 thing I'll say the team has done an excellent job of -- it's also really conveying our clinical value proposition across the board as well. So we feel like we're in the right place where we need to be with the payers right now.

And we're really sort of impressed with the progress that we've made so far with the GPOs and also the PBMs around the downstream coverage decisions is later. So we really think we're sort of right in the right sweet spot right now with where we should be with the payers today.

**Ami Fadia** - *Needham & Company, LLC, Research Division - Senior Analyst*

Great. And my second question is can you help us sort of set expectations for how to think about the ramp next year? Let's just assume for that purpose, but it will be some time after June. So in that context, 2 things I wanted to understand better. How long would it take to really get the rents up and running? -- given that you have to wait until approval to start to seek sort of physicians to sign up and get familiarized with the new processes. And adopt us coming from? Would it be be a be or (inaudible).

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Yes. So I think on the first question, we don't view the actual REMS build out to be a rate limiter in terms of impacting our time line post an approval. We certainly will be actively engaging with physicians post and approve.

We certainly can engage with physicians on REMS to register them, so on and so forth until after a final approval for sure. But we don't view that as a significant rate limiter relative to our timing from an approval to a launch. What at 1 point previously was going to be upwards of 6 months, we've significantly condensed that down given the work that's been done to date and will continue to be done prior to a final approval decision. And Ami, I'm sorry, your second question regarding REMS that you had the question on, could you just restate?

**Ami Fadia** - *Needham & Company, LLC, Research Division - Senior Analyst*

The second part on REMS was how long do you think it would take for physicians to familiarize themselves with the new processes or sort of the form that needs to be filled to send a patient to your sort of patient support hub.

The other question I had was just around where do you see early adopters coming from, whether it would be from Xyrem or (inaudible)?

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Yes. Richard, do you want to take that question?

**Richard Kim** - *Avadel Pharmaceuticals plc - Chief Commercial Officer*

Yes. So maybe first, as far as sort of the timing for the physicians. Obviously, rent certification is really a critical component to make sure that we have the right and appropriate use of our products. But it's not a really laborious process.

People in essence, really familiarize themselves to the PI and some training on board. So it shouldn't take very long. And it's not dissimilar to what has been done in the past, but clearly, we have our own unique label. So we don't see that as really a long process on me. And as far as sort of where do we see the sources business coming from. From our market research that we've just done this latest wave, the candid answer is pretty much all segments of prescribers and types of patients.

Clearly, there's a lot more familiarity with current high oxybate prescribers, but we see from our research that both Xywav and Xyrem patients are very interested in learning more about LUMRYZ as well. And we've also sort of seen a bit of a tapering of Xywav uptake in the marketplace as well. So we see great opportunities as Iowa patients tend to be more motivated for earlier doctors as we've done seen from our market research.

9

©2022 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



PRELIMINARY

**NOVEMBER 09, 2022 / 1:00PM, AVDL.OQ - Q3 2022 Avadel Pharmaceuticals PLC Earnings Call**

And for the Xyrem patients, our value proposition is probably even more -- is very clear for them as well. So we're going to be focusing our initial efforts really on the high users within the marketplace will clearly support all users. But at the end of the day, when our research continues to sort of show is we have great opportunities within the current oxybate prescribers. There are high volume, the low volume ones.

And what was really interesting for us to sort of see in this latest wave of market research is for current narcolepsy prescribers who don't use oxybate, almost half of them said they would want to prescribe Bloom rise when it becomes available as well. So we'll sort of time those out over the first stages of launch. But we're just really delighted to sort of see that the LUMRYZ value proposition comes across very clearly to all of our segments that we're trying to speak to.

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Yes. The only thing I would add to Richard's comment, Ami, is that these 30,000 to 35,000 patients that we've described in these 3 segments, they really predominantly fall within that highly concentrated source of business, the 1,600 physicians that make up 80% of that volume. It's all within that same group from that standpoint. So as Richard referenced is kind of the high oxybate users, it is a very concentrated opportunity for us where the lion's share of our opportunity exists. So thank you.

**Operator**

And your next question comes from the line of Chris Howerton from Jefferies.

**Christopher Lawrence Howerton** - *Jefferies LLC, Research Division - Equity Analyst*

I guess 2 for me would be with respect to the ongoing RESTORE study, could you give us a sense of the durability that you're seeing of patients on LUMRYZ and just how that might translate to persistency on the commercial market. And then I appreciate all the kind of discussion with respect to launch readiness. Could you give us a little more understanding in terms of what specifically you expect your commercial team to look like? And maybe a little bit more about the distribution and timing of hiring for that team.

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Yes. Thanks, Chris. Jen, do you want to start on RESTORE?

**Ami Fadia** - *Needham & Company, LLC, Research Division - Senior Analyst*

Yes, absolutely. Chris, thank you for the question. So just to level set, the RESTORE study began in March of 2020, obviously, coinciding with when the pandemic started.

What we put out this October is that we've had about 27% of participants discontinue in this study. So being open label and the fact that these participants are having to travel to the clinical trial site once a month to pick up their medication because it is a Schedule 1 until the point of approval, we're not surprised by that rate of discontinuation.

In fact, I could have understood if it were higher with the requirement to travel to those sites on a monthly basis. I think what we're most pleased about is that there's a very low rate of discontinuation due to adverse reactions. In October presentations, we had noted that it's about 5% of participants who have discontinued due to adverse events. And we know that tolerability can be one of the biggest challenges with taking any oxybate formulation.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2022 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



PRELIMINARY

NOVEMBER 09, 2022 / 1:00PM, AVDL.OQ - Q3 2022 Avadel Pharmaceuticals PLC Earnings Call

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Thanks, Jen. Richard, maybe you can just kind of frame up kind of the commercial team we'll be building toward?

---

**Richard Kim** - *Avadel Pharmaceuticals plc - Chief Commercial Officer*

Yes, super. No, thanks for the question, Chris. So first, as we've mentioned previously, we retained some of our key skill sets so that we could obviously keep our momentum going for our launch readiness here.

Overall, what we've sort of stated is our goals to have somewhere around 50 sales representatives out there. As Greg had mentioned, there's 5,000 prescribers, 1,600 make up 80% of the volume. So we know that we can cover all of those prescribers with that sales team.

We also will have other key field members such as our field reimbursement team that we will have out there as well. We have -- as mentioned, we have just begun hiring some folks back into the mix here as well. And what we'll be building backwards from is sort of that backstop of that June approval date. But obviously, we're trying to remain flexible depending on where some of the hearing outcomes become as well.

So the buildup has begun in a very targeted way. but we're going to make sure that we're ready to peak at the latest for a June approval of next year.

---

**Christopher Lawrence Howerton** - *Jefferies LLC, Research Division - Equity Analyst*

Awesome. And Greg, do you mind if I maybe sneak in 1 more follow-up?

---

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Go ahead, Chris.

---

**Christopher Lawrence Howerton** - *Jefferies LLC, Research Division - Equity Analyst*

Okay. Great. And Tom, I'm really happy to see that you purchased some of the notes that were due in February, I guess. Is that still kind of the plan to be potentially opportunistic for those notes that are still outstanding? Or any additional comments you want to make around the strategy there?

---

**Thomas S. McHugh** - *Avadel Pharmaceuticals plc - Senior VP & CFO*

Yes. No, it is opportunistic in nature, Chris, and we had a good opportunity to buy some dose back at a discount. Our commentary in the last couple of months is that our assumption with regards to cash runway is that the notes that come due in February need to be settled in cash anyway. So we were able to just accelerate the purchase a little bit and save some money along the way.

---

**Operator**

Our next question comes from the line of Adam Evertts from LifeSci Capital.

---

**Adam Gerald Evertts** - *LifeSci Capital, LLC, Research Division - Senior Research Analyst*

Great. One sort of clarification for me. On the survey data mentioned by Richard on this call, is that a new survey or additional details from prior surveys? And I guess either way, do you expect to present those data at a medical meeting or other format in 2023?

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2022 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



PRELIMINARY

NOVEMBER 09, 2022 / 1:00PM, AVDL.OQ - Q3 2022 Avadel Pharmaceuticals PLC Earnings Call

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Yes. It's new research. We're constantly updating and refreshing our understanding of the market. So this is some data from a very, very recent large quant study that Richard referenced. And I don't know if we'll present that specific data in a scientific congress, but we'll certainly continue to provide some of these insights and learnings as we go forward. both in these sorts of events and then potentially at a future kind of prelaunch commercial day.

**Operator**

Your next question comes from the line of Marc Goodman from SVP.

**Marc Harold Goodman** - *SVB Securities LLC, Research Division - Senior MD of Neuroscience & Senior Research Analyst*

Greg, first, just on the legal stuff. If the Delaware Court next week gives you a negative outcome, right, the patent should be listed, then is there anything left? I'm trying to remember if there are any other issues that you could do? Or is that it we're waiting until June?

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Yes. I think that's the primary -- depending on the ruling next -- whenever it occurs after next Tuesday, the base case assumption is June 17 expiry in an approval decision post that. .

Otherwise, whatever happens next week will either give us an opportunity to bring that up a little earlier potentially depending upon timing. And otherwise, as Richard described, we're operating toward the base case of June.

**Marc Harold Goodman** - *SVB Securities LLC, Research Division - Senior MD of Neuroscience & Senior Research Analyst*

Right. I'm just saying like the administrative process that got thrown out, this is the result of the Markman hearing. So basically, like this is it, right? I mean if it goes negative, Okay. We'll just go to that scenario where it's June, right? There's nothing else that you're going to do legally.

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Yes. There's no other legal matters, if you will, pending that could react or result in something sooner. Correct.

**Marc Harold Goodman** - *SVB Securities LLC, Research Division - Senior MD of Neuroscience & Senior Research Analyst*

Right. Okay. Good. And then just to be clear, on the positive outcome, it's unclear if we figure out right then and there next week if it's a positive view or if it takes what do you think it could be a couple of weeks. It could take a month? How long do you think this judge is going to take? .

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

It's really too difficult to predict, I would say. It would be inappropriate from that standpoint. We're pleased that after the claim construction hearing on October 25, it was only 3 days later that he decided to grant us our request for this expedited hearing.

So again, we believe the court understands the matter quite well and the urgency that we've expressed accordingly and are glad the hearing is less than 7 days away from now.

12

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2022 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.


REFINITIV

PRELIMINARY

**NOVEMBER 09, 2022 / 1:00PM, AVDL.OQ - Q3 2022 Avadel Pharmaceuticals PLC Earnings Call**

---

**Marc Harold Goodman** - *SVB Securities LLC, Research Division - Senior MD of Neuroscience & Senior Research Analyst*

Got it. Okay. And then, Tom, just on managing through with the finances, I guess, number one, have you tapped the ATM at all? Don't you have that ability?

---

**Thomas S. McHugh** - *Avadel Pharmaceuticals plc - Senior VP & CFO*

Yes, that's right, Marc. And what we -- it's in our 10-Q, we raised about a little over $10 million during the third quarter from sales off the ATM. But if we -- that is a no. That's right.

---

**Marc Harold Goodman** - *SVB Securities LLC, Research Division - Senior MD of Neuroscience & Senior Research Analyst*

Right. And so is that included in the 106.5?

---

**Christopher Lawrence Howerton** - *Jefferies LLC, Research Division - Equity Analyst*

It is, yes. .

---

**Marc Harold Goodman** - *SVB Securities LLC, Research Division - Senior MD of Neuroscience & Senior Research Analyst*

Okay. And then I'm sorry, I just I didn't catch the date. When did you buy the $9 million in the open market for the convert?

---

**Thomas S. McHugh** - *Avadel Pharmaceuticals plc - Senior VP & CFO*

It was over the course of the third quarter. So there was no single purchase was...

---

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

The convert was a recent purchase.

---

**Thomas S. McHugh** - *Avadel Pharmaceuticals plc - Senior VP & CFO*

No, the note. My apologies, Marc. No, we repurchased the notes in the open market just earlier this month actually, it was just about a week ago.

---

**Marc Harold Goodman** - *SVB Securities LLC, Research Division - Senior MD of Neuroscience & Senior Research Analyst*

I see. Okay. And how have discussions been with the convert holders in general? I mean I would -- I guess rates have really backed up pretty darn quickly. So what's been the discussions like?

---

**Thomas S. McHugh** - *Avadel Pharmaceuticals plc - Senior VP & CFO*

Listen, I think I would characterize them as constructive. We haven't done any formal engagement with the convertible note holders. I think they, like us, are being deliberate in our approach. We want to see how this next legal proceeding plays out for the hearing next week before making decisions on what to do. But I would generally characterize our discussions as constructive.

---

13

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2022 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



PRELIMINARY

**NOVEMBER 09, 2022 / 1:00PM, AVDL.OQ - Q3 2022 Avadel Pharmaceuticals PLC Earnings Call**

**Marc Harold Goodman** - *SVB Securities LLC, Research Division - Senior MD of Neuroscience & Senior Research Analyst*

And have you, as management team, also been in discussions potentially with doing some type of royalty deal? Have those discussions started as well? And is everything kind of hinging on waiting to next week before anything moves forward? .

**Thomas S. McHugh** - *Avadel Pharmaceuticals plc - Senior VP & CFO*

Yes, fair question, Marc. And over the last several months, we've been really consistent in our thinking and our communications that we do want to see how these -- the legal things played out. Of course, we know how the DC 1 played out and we have Delaware coming up next week. We're looking at all options. And the time to execute and the form of finance we may pursue. It's -- I wouldn't necessarily say that the legal proceeding is a gating item to us, but we do want to see how it turns out because a favorable outcome, of course, just puts us in a better position.

And as Greg noted earlier, a decision that's not in our favor puts us to a base case and a planning time line of June of next year towards an approval decision.

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Yes. And I would add, Marc, that -- just I would just add, Marc. We've been quite -- I would say a couple of things.

One, we've been very prescriptive in our thinking about financing the company and the launch. And this -- and the notion and the consideration of a form of committed capital that comes upon the approval and upon the launch for us with over $100 million of cash on hand is every bit as valuable as cash in the balance sheet today. So we've had extensive discussions with a number of parties who do think -- could potentially be sources of that sort of committed capital in the future upon the advancement in progress of the NDA to a final approval.

So again, I don't want to send the message that we're just waiting for after the hearing. Like we've done a lot of work to put ourselves in a position to begin to execute coming out of next week or whenever that ruling is and recognizing that the time lines between an approval decision after next week, if it goes in our favor or in June of next year, have become compressed a little bit and have begun to converge on themselves.

So we're actively involved in solving how we fund the company at launch and through the lens of what's in the best interest of our shareholders for sure.

**Operator**

And your next question comes from the line of Matt Kaplan from Ladenburg Thalmann.

**Matthew Lee Kaplan** - *Ladenburg Thalmann & Co. Inc., Research Division - MD & Head of Healthcare Equity Research*

I just wanted to zero in on the kind of the sodium oxybate narcolepsy, cataplexy market dynamics that you're seeing and hearing out there after attending these meetings recently in discussions with payers, PBMs.

What's your sense in terms of the impacts of and what's going on with the low salt, twice-nightly product out in the marketplace? And I guess, secondly, you mentioned kind of the 3 components of the 30,000 patients. What's your sense in terms of being able to expand the sodium oxybate market after full approval and a launch?

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2022 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



PRELIMINARY

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Thanks, Matt. Richard, do you want to take that?

---

**Richard Kim** - *Avadel Pharmaceuticals plc - Chief Commercial Officer*

Yes, sure. Thanks, Matt. So first, as far as the payers are concerned, they're very on top of what's been going on in the marketplace. And as I mentioned before, we've had really great conversations with them.

Maybe 1 sort of thing I can add that I didn't mention before is when payers are thinking about sort of switches, how to look at AGs, one of the benefits that we have coming to this marketplace of that sort of more than 30,000 patients that have been treated, the vast majority have already been exposed to an oxybate.

So we're very confident that payers will acknowledge that they've already experienced an oxybate before, which bodes very well for us even in light of an AG or anything coming to the marketplace.

So overall, as far as the payers are concerned, we think we're very well positioned. And as we think about where the market will expand, what we've learned from this market research that we did most recently is there's still quite a few patients that are viewed to be oxybate eligible who are not receiving oxybate, probably greatest within low oxybate users currently and non oxybate users, clearly.

So we a see opportunities there for them to just prescribe to patients they've already identified and clearing the opportunity longer term is to get more de novo patients into the mix here as well.

What we sort of see from our research is from this latest round is that the market should grow by at least 50% with the introduction of LUMRYZ in the marketplace with once again, the largest percentage growth coming from lower users who probably have really struggled with the proposition of twice-nightly oxybate in the past.

So the good news is we see growth opportunities within the high oxybate users still but maybe even a higher percentage of growth opportunity from lower and clearly getting some nonprescribers into the mix as well.

---

**Operator**

(Operator Instructions) Your next question comes from the line of Chase Knickerbocker from Craig Hallum.

---

**Chase Richard Knickerbocker** - *Craig-Hallum Capital Group LLC, Research Division - Senior Research Analyst*

I just want to put a finer point on some of the questions Chris asked around the ramp of your commercial capabilities, what specifically has been added in this first tranche of hiring, I guess, you mentioned on the call, some key field personnel on the MSL side. Is it some of the management around sales capabilities?

And I guess, assuming base case of June approval, how should we think about the ramp of sales personnel hiring? Richard, what kind of time frame do you want most of the reps on board to be able to really get them trained up in preparation for launch?

---

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Thanks, Chase. Richard, do you want to start?

---

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2022 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



PRELIMINARY

NOVEMBER 09, 2022 / 1:00PM, AVDL.OQ - Q3 2022 Avadel Pharmaceuticals PLC Earnings Call

**Richard Kim** - *Avadel Pharmaceuticals plc - Chief Commercial Officer*

Yes, sure. So yes, we -- just a couple of areas that we have focused in on the initial wave is we have hired a new head of sales so that we can get the framework for the sales force going -- and we've also selectively added some more of our payer resources as well with where we are in our conversations with the GPOs and the PBMs as well.

So we'll be sort of selectively adding to a few places, clearly balancing sort of the financial sort of situation with our need to grow. But once if you think backwards to June, our goal is to really peak at the right time. And with the fact that we've now compressed the time from a final approval potential decision in June, to a 3Q launch, our goal is to bring on a lot of our field force before that approval time line as well because we want to make sure that they are familiar with the territory, with their customers and everything as well. So we continue to sort of balance the need we're sort of in a position to be able to pull that off.

But as Greg and Tom have mentioned, also still balancing sort of where we may wind up with some of the proceedings from both legal in the financial raises as well. So I feel right now we're in a really good spot. The great news is there's been a lot of interest in people wanting to come join Avadel.

So with the folks that we've retained and kept here, and our plans around building out once again, our goal is to really peak at the right time to sort of be ready for that June backstop date.

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Yes. I think, Chase, I would just add to that, that we've got a really kind of disciplined approach and a detailed plan of how we build toward a June decision and then a launch thereafter. And then how do you pull that up if you have any -- in the event there's good news and that decision come sooner, right, from that standpoint.

So again, I think it's all mapped out. We know where kind of things that got -- that are longer kind of poles in the tent that require more work leading up into those days, and those are the roles that Richard noted that we'll bring on board. So I appreciate the question.

**Chase Richard Knickerbocker** - *Craig-Hallum Capital Group LLC, Research Division - Senior Research Analyst*

Yes. Helpful color. And then just 1 last for me, if I could. Around a potential positive outcome if we make that assumption, being at its -- we're sitting in November now. I mean what does it accelerate your kind of thinking on potential approval with those extra regulatory matters and getting the patent deal less that needs to happen in your thoughts, what is it kind of due to accelerate approval now that we're in November.

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Yes. Again, I think there's 2 steps to that process. The first is getting a decision from the court and then that results in the delisting and then the FDA making a final approval decision that we obviously would be working to want to have done as soon as possible from that standpoint.

But any sort of positive momentum that create -- that moves us in that direction earlier than June is just upside from our standpoint, recognizing that we're only 7 months away. So I think that we've noted that the time lines have converged a little bit from that standpoint as the cases in Delaware have slipped a little bit, but we're certainly pleased that this important hearing is taking place next week from that standpoint.

I think ultimately, it really is a function of the difference between launching, as we've said kind of in of Q3, if we go to June and launching before that. If we if a decision and approval comes sooner. And any launch earlier, quite frankly, is better, simply put from that standpoint.

16

©2022 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



PRELIMINARY

NOVEMBER 09, 2022 / 1:00PM, AVDL.OQ - Q3 2022 Avadel Pharmaceuticals PLC Earnings Call

**Operator**

Your next question comes from the line of Paul Matteis from Stifel.

**Unidentified Analyst**

This is James on for Paul. Maybe just a quick clarifying 1 on DEA scheduling. I guess, can you remind us the latest there? And is there anything that needs to happen there post full approval? And would that be kind of gating to any other kind of prelaunch activities that need to recur?

**Gregory J. Divis** - *Avadel Pharmaceuticals plc - CEO & Director*

Yes. Thanks. There's -- first of all, Congress has already determined what the scheduling requirement of sodium oxybate or oxybate product is a Schedule III. So anything that has to happen administratively whether it be from DEA related or whatnot, isn't a rate limiter relative to us coming to market from that standpoint.

It's not -- it's all contemplated in our consideration of timing. If we had an approval after June 17 and an expectation that we would launch therefore in Q3, we'll be -- certainly be ready to launch in Q3, that contemplates any of those sorts of matters.

**Operator**

And there are no further questions at this time. This does conclude today's conference call. We thank you for your participation, and you may now disconnect.

**DISCLAIMER**

Refinitiv reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES REFINITIV OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2022, Refinitiv. All Rights Reserved.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2022 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



# EXHIBIT 15
# FULLY REDACTED