# EXHIBIT A



This site is intended for a global audience    Contact Us

About    Pioneering Pathways    Medicines    Science    Our Purpose    Our Stories    News    Investors    Careers




# Transforming Lives. Redefining Possibilities.

Home    |    About Jazz

At Jazz Pharmaceuticals plc (NASDAQ: JAZZ), our purpose is to innovate to transform the lives of patients and their families.

We are dedicated to developing life-changing medicines for people with serious diseases — often with limited or no therapeutic options — so they can live their lives more fully. By transforming biopharmaceutical discoveries into novel medicines, we are working to give people around the world the opportunity to redefine what's possible – to make the "small wins" big again.

We have a diverse portfolio of marketed medicines including leading therapies for sleep disorders and epilepsy, and a growing portfolio of cancer treatments. Our patient-focused and science-driven approach powers pioneering research and development advancements across our robust pipeline of innovative therapeutics in oncology and neuroscience.

**About Jazz**
Leadership
Board of Directors
Global Footprint
History
Corporate Values
Corporate Development
Partnering
Contact



*Everything we do at Jazz Pharmaceuticals is focused on three things: putting patients first, being a great place to work, and living our shared values.*

About                    Pioneering Pathways        Medicines            Science            Our Purpose
Our Stories              News                        Careers             Investors

    © 2024 Jazz Pharmaceuticals, Inc. All Rights Reserved.

This site is intended for a global audience

Privacy Statement    |    U.S. Consumer Health Data Privacy Policy    |    Terms of Use    |    Social Media Global Guidelines    |    Cookie Policy    |    Sitemap

# EXHIBIT B

# Jazz Pharmaceuticals Pipeline

Our patient-centric approach to R&D begins with difficult-to-treat, unmet patient needs. We harness the collective talents and expertise of our researchers and partners in order to identify scientific breakthroughs with the potential to result in life-changing medicines that redefine possibilities for patients and their families. Stemming from our robust research and development efforts, we have been able to identify and develop durable, differentiated commercial assets across two therapeutic focus areas – neuroscience and oncology – with significant market opportunities.

This document includes information about investigational products, or investigational indications for products that may have marketing authorizations for other indications in the European Union (EU) or other countries throughout the world. Safety and efficacy may not have been established, and there is no guarantee that pipeline products or investigational uses will receive approval from health authorities. Likewise, any forward-looking statements such as our ability to identify scientific breakthroughs with the potential to result in life-changing medicines are subject to risks and uncertainties, which include, without limitation, risks and uncertainties associated with pharmaceutical product development, and other risks and uncertainties affecting Jazz Pharmaceuticals and its development programs, described in Jazz's periodic reports on file with the Securities and Exchange Commission.

# Oncology



| PROGRAM | POTENTIAL INDICATION(S) | PRE-CLINICAL | PHASE 1 | PHASE 2 | PHASE 3 | PHASE 4/ REGULATORY |
|---|---|---|---|---|---|---|
| Zanidatamab + SOC chemo ± tislelizumab (1L) | GEA | | | | | |
| Zanidatamab + SOC chemo ± PD-1/L-1 (1L) | BTC | | | | | |
| Zanidatamab + SOC chemo (1L) | BTC, GEA, CRC | | | | | |
| Zanidatamab + fulvestrant + palbociclib (3L) | Previously treated HER2+/HR+ breast cancer | | | | | |
| Zanidatamab + evorpacept (ALX148 – CD47 blocker) (3L) | HER2-expressing breast cancer | | | | | |
| I-SPY 2 Zanidatamab + SOC | Breast cancer | | | | | |
| Zanidatamab + paclitaxel and ramucirumab | HER2+ advanced GEA | | | | | |
| Zanidatamab | 2L BTC | | | | | |
| | Early-stage HER2/Neu+ breast cancer | | | | | |
| | HER2-expressing solid tumors in Japan | | | | | |
| | Advanced HER2-expressing cancers | | | | | |
| Zanidatamab + chemo (3L) | Advanced HER2-expressing cancers | | | | | |

© 2024 Jazz Pharmaceuticals, Inc. All Rights Reserved. Last updated February 2024

# Oncology

| PROGRAM | POTENTIAL INDICATION(S) | PRE-CLINICAL | PHASE 1 | PHASE 2 | PHASE 3 | PHASE 4/ REGULATORY |
|---------|------------------------|--------------|---------|---------|---------|---------------------|
| **PRE-I-SPY Zanidatamab + tucatinib** | Breast cancer | | | | | |

**Overview:** Zanidatamab is an investigational HER2-targeted bispecific antibody that can simultaneously bind two non-overlapping epitopes of HER2. Zanidatamab has been granted two Fast Track designations by the U.S. Food and Drug Administration (FDA): one as a single agent for refractory biliary tract cancers (BTC) and one in combination with standard-of-care (SOC) chemotherapy for first-line gastroesophageal adenocarcinoma (1L GEA). Zanidatamab has also received Orphan Drug designations from the FDA for the treatment of biliary tract and gastric cancers, as well as Orphan Drug designation from the European Medicines Agency for the treatment of gastric cancer and BTC.

**Clinical Trials:** Currently, the Phase 3 HERIZON-GEA-01 trial evaluates zanidatamab in combination with chemotherapy and with or without the checkpoint inhibitor tislelizumab as a first-line treatment for metastatic HER2-positive (HER2+) GEA. Read more about the pivotal trial (NCT05152147) **here**.

The Phase 3 HERIZON-BTC-302 trial evaluates zanidatamab and CisGem (cisplatin plus gemcitabine) with or without the addition of a programmed death protein 1/ligand 1 (PD-1/L-1) inhibitor versus CisGem with or without a PD-1/L1 inhibitor in adult participants. Read more about the trial (NCT06282575) **here**.

Additionally, Phase 2 trials are investigating zanidatamab both as a monotherapy and in combination with chemotherapy and/or other agents in BTC, GEA, breast cancer, colorectal cancer (CRC) and HER2-expressing cancers:

- Zanidatamab in addition to SOC chemotherapy is being evaluated in a Phase 2 trial for BTC, GEA and CRC. Read more about the trial (NCT03929666) **here**.

- Phase 2a study investigating the safety, tolerability and anti-tumor activity of zanidatamab in combination with fulvestrant and palbociclib in patients with locally advanced and/or metastatic HER2+/hormone receptor-positive breast cancer. Learn more about the study (NCT04224272) **here**.

- Phase 2 trial evaluating the safety and tolerability of zanidatamab with evorpacept (ALX148) in patients with advanced HER2-expressing cancer. Learn more about the trial (NCT05027139) **here**.

- Phase 2 investigation of serial studies to predict the therapeutic response with imaging and moLecular analysis 2 (I-SPY 2) trial assessing the efficacy of novel drugs in sequence with standard chemotherapy to advance approaches to personalized medicine. This trial is conducted in collaboration with QuantumLeap Healthcare Collaborative. Learn more about I-SPY 2 (NCT01042379) **here**.

- In collaboration with the Canadian Cancer Trials Group, the efficacy of zanidatamab in combination with usual care, paclitaxel and ramucirumab, is being evaluated in Phase 2 trial in HER2+ advanced GEA. Read more about the study (NCT06043427) **here**.

- Phase 2b HERIZON-BTC-01 trial evaluating zanidatamab as a second-line (2L) monotherapy for treatment of HER2-amplified BTC. Learn more about the pivotal trial (NCT04466891) **here**.

- Phase 2 single-arm open-label pilot trial evaluating zanidatamab in patients with early-stage, low-risk, HER2-positive breast cancer. This study is being completed as part of the collaboration with the MD Anderson Cancer Center. Learn more about the study (NCT05035836) **here**.

Zanidatamab is also being investigated in Phase 1 studies as a monotherapy as well as in combination with selected chemotherapies:

- Phase 1 of the ZW25-102 study investigates the safety, preliminary antitumor activity and pharmacokinetics of zanidatamab in Japanese patients with HER2-expressing solid tumors.

- Safety, tolerability and effectiveness, as well as how the body absorbs, distributes, and eliminates zanidatamab, are being evaluated in a three-part study on locally advanced and/or metastatic HER2-espressing cancers. Part 1 of the study evaluates dose maintenance and recommended dosing; part 2 further evaluates the safety and tolerability of zanidatamab; and part 3 tests the safety, tolerability and effectiveness of zanidatamab in combination with selected chemotherapy agents. Learn more about the multi-part study (NCT02892123) **here**.

- Phase 1/1b platform trial with multiple ongoing drug regiment arms, evaluating single agents or combinations for breast cancer patients. Promising treatment regiments are to be transferred into the I-SPY 2 SMART Design Trial (NCT01042379). Learn more about Pre-I-SPY/I-SPY-P1 (NCT05868226) **here**.

| | | | | | | |
|---------|------------------------|--------------|---------|---------|---------|---------------------|
| **Lurbinectedin** | 2L SCLC | | | | | |
| | Relapsed SCLC | | | | | |
| **Lurbinectedin + atezolizumab (1L)** | SCLC | | | | | |

**Overview:** Lurbinectedin, or Zepzelca® in the United States and Canada, is an alkylating drug that binds guanine residues within DNA, which triggers a cascade of events that can affect the activity of DNA binding proteins, including some transcription factors, and DNA repair pathways, resulting in disruption of the cell cycle and eventual cell death.

**Clinical Trials:** In addition to being approved for small cell lung cancer (SCLC), the effectiveness of lurbinectedin is being evaluated in adult patients with extensive-stage SCLC (ES-SCLC). The Phase 4 prospective, multi-center observational study aims to collect safety and outcome data of lurbinectedin in adult participants with ES-SCLC previously exposed to at least one line of chemotherapy. Learn more about the study (NCT04894591) **here**.

Currently, lurbinectedin is also being evaluated in combination with other agents for the following:
- Phase 3 trial evaluating and comparing the activity and safety of lurbinectedin as a single agent and in combination with irinotecan in SCLC patients. This trial is being conducted by PharmaMar as part of Jazz Pharmaceuticals' **partnership** with the company. Learn more about the study (NCT05153239) **here**.
- Phase 3 trial evaluating lurbinectedin in combination with the PD-L1 inhibitor, atezolizumab, as a first-line maintenance treatment for patients with ES-SCLC. The trial will measure the progression-free survival and overall survival benefits of lurbinectedin and atezolizumab administered in combination compared to atezolizumab alone. The trial is conducted in collaboration with F. Hoffmann-La Roche Ltd. Learn more about the IMforte Phase 3 trial (NCT05091567) **here**.

● **Jazz** Pharmaceuticals.     © 2024 Jazz Pharmaceuticals, Inc. All Rights Reserved. Last updated February 2024

# Oncology



| PROGRAM | POTENTIAL INDICATION(S) | PRE-CLINICAL | PHASE 1 | PHASE 2 | PHASE 3 | PHASE 4/ REGULATORY |
|---|---|---|---|---|---|---|
| **JZP351** | Newly diagnosed <22 yrs with AML (COG) | | | | | |
| | Newly diagnosed adults with standard- and HR-AML (AMLSG) | | | | | |
| | AML or HR-MDS >60yrs (AML18) | | | | | |
| | Newly diagnosed older adults with HR-AML | | | | | |
| | HR- MDS (EMSCO) | | | | | |
| | Low-intensity dosing for higher risk MDS | | | | | |
| **JZP351 + other approved therapies** | R/R AML or HMA Failure MDS | | | | | |
| | de novo or R/R AML | | | | | |

**Overview:** JZP351, or Vyxeos®/Vyxeos Liposomal in approved markets, is a liposomal combination of daunorubicin, an anthracycline topoisomerase inhibitor, and cytarabine, a nucleoside metabolic inhibitor.

**Clinical Trials:** Jazz Pharmaceuticals is collaborating with the University of Texas MD Anderson Cancer Center on one Phase 1 and two Phase 2 trials investigating JZP351 on its own and in parallel with other approved therapies, respectively, for potential indications in higher-risk myelodysplastic syndromes (MDS), relapsing/refractory acute myeloid leukemia (R/R AML) or hypomethylating agents (HMA) failure MDS.

Additionally, five Phase 2 and Phase 3 trials of JZP351 are evaluating the agent in various age populations, including older adults, adults over 60 as well as newly diagnosed patients younger than 22. These studies are conducted with cooperative groups such as the Children's Oncology Group (COG), AML study group (AMLSG) and the European Myelodysplastic Neoplasms Cooperative Group (EMSCO).

| **JZP815** | Solid tumors and hematologic malignancies | | | | | |
|---|---|---|---|---|---|---|

**Overview:** An investigational pan-RAF inhibitor for the treatment of solid tumors and hematologic malignancies that contain mutations in the mitogen-activated protein kinase (MAPK) pathway. JZP815 targets specific components of the MAPK pathway that, when activated by oncogenic mutations, can be a frequent driver of human cancer. JZP815 potentially inhibits both monomer- and dimer-driven RAF signaling (e.g., RAS-induced), prevents paradoxical pathway activation induced by BRAF selective inhabitation and is active against class 1, class 2 and class 3 BRAF mutants as well as BRAF fusions and CRAF mutants.

**Clinical Trials:** Learn more about the Phase 1, open-label, first-in-human study (NCT05557045) here.

| **JZP898** | Solid tumors | | | | | |
|---|---|---|---|---|---|---|

**Overview:** Investigational JZP898, previously WTX-613, is a conditionally activated IFNα2b cytokine pro-drug.

**Clinical Trials:** The safety, tolerability, pharmacokinetics, immunogenicity and preliminary antitumor activity of JZP898 both as a monotherapy and in combination with pembrolizumab is being investigated in Phase 1, first-in-human study. Read more about the study (NCT06108050) here.

| **JZP341** | Solid tumors | | | | | |
|---|---|---|---|---|---|---|

**Overview:** Long-acting *Erwinia* asparaginase.

**Clinical Trials:** Learn more about the first-in-human study (NCT05631327) here.

| **KRAS Inhibitor** | Solid tumors | | | | | |
|---|---|---|---|---|---|---|

**Overview:** KRAS (Kirsten rat sarcoma virus) inhibitor program, including G12D selective and pan-KRAS molecules, acquired from Redx Pharma.

| **CombiPlex** | N/A | | | | | |
|---|---|---|---|---|---|---|

**Overview:** Evaluating patented CombiPlex® platform in a wide range of tumor types. Evaluating improvement in cancer therapy by using extremely small (nano-scale) carriers to deliver optimal ratios of multiple anticancer agents directly to cancer cells over a prolonged period of time.

| **Undisclosed Targets** | N/A | | | | | |
|---|---|---|---|---|---|---|
| | N/A | | | | | |

**Overview:** Includes a partnered collaboration for undisclosed target exploring Ras/Raf/mitogen-activated protein kinase (MAPK) pathway in oncology.

# Neuroscience

| PROGRAM | POTENTIAL INDICATION(S) | PRE-CLINICAL | PHASE 1 | PHASE 2 | PHASE 3 | PHASE 4/ REGULATORY |
|---------|--------------------------|--------------|---------|---------|---------|---------------------|

**Cannabidiol** — Seizures associated with LGS, DS, TSC in Japan



**Overview:** Epidiolex® (cannabidiol), known as Epydiolex® in the EU, United Kingdom (U.K.), Australia and Israel, is a prescription, plant-derived cannabis-based medicine administered as an oral solution. In the United States, Epidiolex is indicated for the treatment of seizures associated with Lennox-Gastaut syndrome (LGS), Dravet syndrome (DS), or tuberous sclerosis complex (TSC) in patients 1 year of age and older. In the EU and U.K., Epidyolex is indicated for use as adjunctive therapy of seizures associated with LGS or DS, in conjunction with clobazam, for patients 2 years of age and older. Epidyolex is also indicated for use as adjunctive therapy of seizures associated with TSC for patients 2 years of age and older.

**Clinical Trials:** Jazz's GW Pharmaceuticals initiated clinical trials of Epidyolex in Japan in October 2022. The study tests the efficacy and safety of the drug in patients with LGS, DS and TSC.

**Suvecaltamide** — Essential tremor

Parkinson's disease tremor

**Overview:** Suvecaltamide (JZP385) is an orally available, highly selective small molecule and works by selectively blocking T-type calcium channels.

**Clinical Trials:** In people with essential tremor, a previous **proof-of-concept trial** (NCT03101241) found that twice-daily suvecaltamide was safe and improved some aspects of the condition. A follow-up **Phase 2b trial** (NCT05122650) is evaluating a once-daily formulation. For more information, please visit **www.EveresTstudy.com**.

Learn more about the study (NCT05642442) evaluating the efficacy and safety of suvecaltamide for the treatment of moderate-to-severe residual tremor in adult participants with Parkinson's disease **here**.

**JZP441** — Narcolepsy

**Overview:** JZP441, previously referred to as DSP-0187, is a potent and highly selective oral orexin-2 receptor agonist with potential applications for the treatment of narcolepsy, idiopathic hypersomnia and other sleep disorders.

**Clinical Trials:** The safety, tolerability, pharmacokinetics and pharmacodynamics of JZP441 are being investigated in healthy sleep-deprived adults. NCT05651152 **here** and NCT05720494 **here**.

**JZP324** — Narcolepsy

**Overview:** Planned. Extended-release oxybate formulation.

**Undisclosed Cannabinoids** — Other neuroscience

**Undisclosed Targets** — Sleep

Epilepsy

Other neuroscience

**LGS** = Lennox-Gastaut syndrome, **DS** = Dravet syndrome, **TSC** = Tuberous sclerosis complex, **PTSD** = post-traumatic stress disorder, **SOC** = standard-of-care, **1L** = first line, **GEA** = gastroesophageal adenocarcinoma, **2L** = second line, **BTC** = biliary tract cancer, **CRC** = colorectal cancer, **3L** = third line, **SCLC** = small cell lung cancer, **AML** = acute myeloid leukemia, **COG** = Children's Oncology Group, **HR** = high-risk, **MDS** = myelodysplastic syndromes, **AMLSG** = acute myeloid leukemia study group, **EMSCO** = European Myelodysplastic Neoplasms Cooperative Group, **R/R** = relapsing/refractory, **HMA** = hypomethylating agents.

Jazz Pharmaceuticals.   © 2024 Jazz Pharmaceuticals, Inc. All Rights Reserved. Last updated February 2024

# EXHIBIT C

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

## FORM 10-K

(Mark One)

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2023
or

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to

Commission File Number: 001-33500

# JAZZ PHARMACEUTICALS PUBLIC LIMITED COMPANY
(Exact name of registrant as specified in its charter)

| Ireland | 98-1032470 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**Fifth Floor, Waterloo Exchange**
**Waterloo Road, Dublin 4, Ireland D04 E5W7**
011-353-1-634-7800
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, nominal value $0.0001 per share | JAZZ | The Nasdaq Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ | Non-accelerated filer | ☐ | Smaller reporting company | ☐ | Emerging growth company | ☐ |
|---|---|---|---|---|---|---|---|---|---|

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant, as of June 30, 2023, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $7,659,805,500 based upon the last sale price reported for the registrant's ordinary shares on such date on The Nasdaq Global Select Market. The calculation of the aggregate market value of voting and non-voting common equity excludes 1,610,713 ordinary shares of the registrant held by executive officers, directors and shareholders that the registrant concluded were affiliates of the registrant on that date. Exclusion of such shares should not be construed to indicate that any such person possesses the power, direct or indirect, to direct or cause the direction of the management or policies of the registrant or that such person is controlled by or under common control with the registrant.

As of February 21, 2024, a total of 62,345,283 ordinary shares, nominal value $0.0001 per share, of the registrant were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Certain information required by Part III, Items 10-14 of this Form 10-K is incorporated by reference to the registrant's definitive Proxy Statement for the 2024 Annual General Meeting of Shareholders to be filed with the Securities and Exchange Commission pursuant to Regulation 14A. If such Proxy Statement is not filed within 120 days after the end of the fiscal year covered by this Form 10-K, such information will be included in an amendment to this Form 10-K to be filed within such 120-day period.

**JAZZ PHARMACEUTICALS PLC**
**2023 ANNUAL REPORT ON FORM 10-K**
**TABLE OF CONTENTS**

**Page**

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 5 |
| Item 1A. | Risk Factors | 35 |
| Item 1B. | Unresolved Staff Comments | 65 |
| Item 1C. | Cybersecurity | 65 |
| Item 2. | Properties | 67 |
| Item 3. | Legal Proceedings | 67 |
| Item 4. | Mine Safety Disclosures | 67 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 68 |
| Item 6. | Reserved | 71 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 72 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 96 |
| Item 8. | Financial Statements and Supplementary Data | 98 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 98 |
| Item 9A. | Controls and Procedures | 98 |
| Item 9B. | Other Information | 100 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 100 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 100 |
| Item 11. | Executive Compensation | 100 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 101 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 101 |
| Item 14. | Principal Accountant Fees and Services | 101 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 101 |
| Item 16. | Form 10-K Summary | 108 |
| Signatures | | 109 |

We own or have rights to various copyrights, trademarks, and trade names used in our business in the U.S. and/or other countries, including the following: Jazz Pharmaceuticals®, Xywav® (calcium, magnesium, potassium, and sodium oxybates) oral solution, Xyrem® (sodium oxybate) oral solution, Epidiolex® (cannabidiol) oral solution, Epidyolex® (the trade name in Europe and other countries outside the U.S. for Epidiolex), Rylaze® (asparaginase erwinia chrysanthemi (recombinant)-rywn), Enrylaze® (the trade name in Europe and other countries outside the U.S. and Canada for Rylaze), Zepzelca® (lurbinectedin), Defitelio® (defibrotide sodium), Defitelio® (defibrotide), Vyxeos® (daunorubicin and cytarabine) liposome for injection, Vyxeos® liposomal 44 mg/100 mg powder for concentrate for solution for infusion, CombiPlex® and Sativex® (nabiximols) oral solution. This Annual Report on Form 10-K also includes trademarks, service marks and trade names of other companies. Trademarks, service marks and trade names appearing in this Annual Report on Form 10-K are the property of their respective owners.

Table of Contents

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

*This Annual Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, which are subject to the "safe harbor" created by those sections. Forward-looking statements are based on our management's beliefs and assumptions and on information currently available to our management. In some cases, you can identify forward-looking statements by terms such as "may," "will," "should," "could," "would," "expect," "plan," "anticipate," "believe," "estimate," "project," "predict," "propose," "intend," "continue," "potential," "possible," "strive," "seek," "designed," "goal," "foreseeable," "likely," "unforeseen" and similar expressions intended to identify forward-looking statements. These statements involve known and unknown risks, uncertainties and other factors which may cause our actual results, performance, time frames or achievements to be materially different from any future results, performance, time frames or achievements expressed or implied by the forward-looking statements. We discuss many of these risks, uncertainties and other factors in greater detail under Risk Factors in Part I, Item 1A of this Annual Report on Form 10-K. Given these risks, uncertainties and other factors, you should not place undue reliance on these forward-looking statements. In addition, our goals and objectives are aspirational and are not guarantees or promises that such goals and objectives will be met. Also, these forward-looking statements represent our estimates and assumptions only as of the date of this filing. You should read this Annual Report on Form 10-K completely and with the understanding that our actual future results may be materially different from what we expect. We hereby qualify our forward-looking statements by our cautionary statements. Except as required by law, we assume no obligation to update our forward-looking statements publicly, or to update the reasons that actual results could differ materially from those anticipated in these forward-looking statements, even if new information becomes available in the future.*

**SUMMARY RISK FACTORS**

Below is a summary of material factors that make an investment in our ordinary shares speculative or risky. Importantly, this summary does not address all of the risks and uncertainties that we face. Additional discussion of the risks and uncertainties summarized in this risk factor summary, as well as other risks and uncertainties that we face, can be found under "Risk Factors" in Part I, Item 1A of this Annual Report on Form 10-K. The below risk factor summary is qualified in its entirety by that more complete discussion of such risks and uncertainties. You should consider carefully the risks and uncertainties described under "Risk Factors" in Part I, Item 1A of this Annual Report on Form 10-K as part of your evaluation of an investment in our ordinary shares.

- Our inability to maintain or increase sales from our oxybate franchise would have a material adverse effect on our business, financial condition, results of operations and growth prospects.

- The introduction of new products in the U.S. market that compete with, or otherwise disrupt the market for, our oxybate products has adversely affected and may continue to adversely affect sales of our oxybate products.

- The distribution and sale of our oxybate products are subject to significant regulatory restrictions, including the requirements of a risk evaluation and mitigation strategy, or REMS, and safety reporting requirements, and these regulatory and safety requirements subject us to risks and uncertainties, any of which could negatively impact sales of Xywav and Xyrem.

- While we expect our oxybate products and Epidiolex/Epidyolex to remain our largest products, our success also depends on our ability to effectively commercialize our other existing products and potential future products.

- We face substantial competition from other companies, including companies with larger sales organizations and more experience working with large and diverse product portfolios, and competition from generic drugs.

- Adequate coverage and reimbursement from third party payors may not be available for our products and we may be unable to successfully contract for coverage from pharmacy benefit managers and other organizations; conversely, to secure coverage from these organizations, we may be required to pay rebates or other discounts or other restrictions to reimbursement, either of which could diminish our sales or adversely affect our ability to sell our products profitably.

- The pricing of pharmaceutical products has come under increasing scrutiny as part of a global trend toward healthcare cost containment and resulting changes in healthcare law and policy, including recently enacted changes to Medicare, may impact our business in ways that we cannot currently predict, which could have a material adverse effect on our business and financial condition.

- In addition to access, coverage and reimbursement, the commercial success of our products depends upon their market acceptance by physicians, patients, third party payors and the medical community.

Table of Contents

- Delays or problems in the supply of our products for sale or for use in clinical trials, loss of our single source suppliers or failure to comply with manufacturing regulations could materially and adversely affect our business, financial condition, results of operations and growth prospects.

- Our future success depends on our ability to successfully develop and obtain and maintain regulatory approvals for our late-stage product candidates and, if approved, to successfully launch and commercialize those product candidates.

- We may not be able to successfully identify and acquire or in-license additional products or product candidates to grow our business, and, even if we are able to do so, we may otherwise fail to realize the anticipated benefits of these transactions.

- Conducting clinical trials is costly and time-consuming, and the outcomes are uncertain. A failure to prove that our product candidates are safe and effective in clinical trials, or to generate data in clinical trials to support expansion of the therapeutic uses for our existing products, could materially and adversely affect our business, financial condition, results of operations and growth prospects.

- It is difficult and costly to protect our proprietary rights, and we may not be able to ensure their protection.

- We have incurred and may in the future incur substantial costs as a result of litigation or other proceedings relating to patents, other intellectual property rights and related matters, and we may be unable to protect our rights to, or commercialize, our products.

- Significant disruptions of information technology systems or data security breaches could adversely affect our business.

- We are subject to significant ongoing regulatory obligations and oversight, which may subject us to civil or criminal proceedings, investigations, or penalties and may result in significant additional expense and limit our ability to commercialize our products.

- If we fail to comply with our reporting and payment obligations under the Medicaid Drug Rebate program or other governmental pricing programs, we could be subject to additional reimbursement requirements, penalties, sanctions and fines, which could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

- We have incurred substantial debt, which could impair our flexibility and access to capital and adversely affect our financial position, and our business would be adversely affected if we are unable to service our debt obligations.

- To continue to grow our business, we will need to commit substantial resources, which could result in future losses or otherwise limit our opportunities or affect our ability to operate and grow our business.

- If we fail to attract, retain and motivate key personnel or to retain the members of our executive management team, our operations and our future growth may be adversely affected.

### NOTE REGARDING COMPANY REFERENCE

*In this report, unless otherwise indicated or the context otherwise requires, all references to "Jazz Pharmaceuticals," "Jazz," "the registrant," "we," "us," and "our" refer to Jazz Pharmaceuticals plc and its consolidated subsidiaries.*

Table of Contents

# PART I

**Item 1.**       **Business**

**Overview**

Jazz Pharmaceuticals plc is a global biopharmaceutical company whose purpose is to innovate to transform the lives of patients and their families. We are dedicated to developing life-changing medicines for people with serious diseases - often with limited or no therapeutic options. We have a diverse portfolio of marketed medicines, including leading therapies for sleep disorders and epilepsy, and a growing portfolio of cancer treatments. Our patient-focused and science-driven approach powers pioneering research and development advancements across our robust pipeline of innovative therapeutics in oncology and neuroscience.

Our strategy for growth is rooted in executing commercial launches and ongoing commercialization initiatives; advancing robust research and development, or R&D, programs and delivering impactful clinical results; effectively deploying capital to strengthen the prospects of achieving our short- and long-term goals through strategic corporate development; and delivering strong financial performance. We focus on patient populations with high unmet needs. We identify and develop differentiated therapies for these patients that we expect will be long-lived assets and that we can support with an efficient commercialization model. In addition, we leverage our efficient, scalable operating model and integrated capabilities across our global infrastructure to effectively reach patients around the world.

In January 2022, we announced our Vision 2025, which aims to deliver sustainable growth and enhanced value, driving our continued transformation to an innovative, high-growth global pharmaceutical leader. The three core components of our Vision 2025 focus on commercial execution, pipeline productivity and operational excellence.

Our lead marketed products, listed below, are approved in countries around the world to improve patient care.

**Neuroscience**

- **Xywav® (calcium, magnesium, potassium, and sodium oxybates) oral solution**, a product approved by the U.S. Food and Drug Administration, or FDA, in July 2020 and launched in the U.S. in November 2020 for the treatment of cataplexy or excessive daytime sleepiness, or EDS, in patients seven years of age and older with narcolepsy, and also approved by FDA in August 2021 for the treatment of idiopathic hypersomnia, or IH, in adults and launched in the U.S. in November 2021. Xywav contains 92% less sodium than Xyrem®;

- **Xyrem (sodium oxybate) oral solution**, a product approved by FDA and distributed in the U.S. for the treatment of cataplexy or EDS in patients seven years of age or older with narcolepsy; Jazz also markets Xyrem in Canada for the treatment of cataplexy in patients with narcolepsy. Xyrem is also approved and distributed in the European Union, or EU (EU market authorizations include Northern Ireland), Great Britain and other markets through a licensing agreement; and

- **Epidiolex® (cannabidiol) oral solution**, a product approved by FDA and launched in the U.S. in 2018 by GW Pharmaceuticals plc, or GW, and currently indicated for the treatment of seizures associated with Lennox-Gastaut syndrome, or LGS, Dravet syndrome, or DS, or tuberous sclerosis complex, or TSC, in patients one year of age or older; in the EU and Great Britain (where it is marketed as Epidyolex®) and other markets listed in the table below, it is approved for adjunctive treatment of seizures associated with LGS or DS, in conjunction with clobazam (EU and Great Britain only), in patients 2 years of age and older and for adjunctive treatment of seizures associated with TSC in patients 2 years of age and older.

**Oncology**

- **Rylaze® (asparaginase erwinia chrysanthemi (recombinant)-rywn)**, a product approved by FDA in June 2021 and launched in the U.S. in July 2021 for use as a component of a multi-agent chemotherapeutic regimen for the treatment of acute lymphoblastic leukemia or lymphoblastic lymphoma in adults and pediatric patients aged one month or older who have developed hypersensitivity to *E. coli*-derived asparaginase. In September 2023, the European Commission, or EC, granted marketing authorization for this therapy under the trade name Enrylaze; and

- **Zepzelca® (lurbinectedin)**, a product approved by FDA in June 2020 under FDA's accelerated approval pathway and launched in the U.S. in July 2020 for the treatment of adult patients with metastatic small cell lung cancer, or SCLC, with disease progression on or after platinum-based chemotherapy; in Canada, Zepzelca received conditional approval in September 2021 for the treatment of adults with Stage III or metastatic SCLC, who have progressed on or after platinum-containing therapy.

Table of Contents

In 2023, consistent with our strategy, we continued to focus on research and development activities within our neuroscience and oncology therapeutic areas. For a summary of our ongoing research and development activities, see "Business—Research and Development" in this Part I, Item 1.

**Our Commercialized Products**

*Neuroscience*

**Our Sleep Products**. We are the global leader in the development and commercialization of oxybate therapy for patients with sleep disorders. Xyrem was approved by FDA in 2002 for treating EDS and cataplexy in narcolepsy. In 2020, we received FDA approval for Xywav for the treatment of cataplexy or EDS, in patients seven years of age and older with narcolepsy. In August 2021, Xywav became the first and only therapy approved by FDA for the treatment of IH in adults. Xywav is an oxybate therapy that contains 92% less sodium than Xyrem. Xywav has become a standard of care for patients with narcolepsy and IH.

**Xywav**. In July 2020, FDA approved Xywav for the treatment of cataplexy and EDS in patients with narcolepsy. Narcolepsy is a chronic, debilitating neurological disorder characterized by EDS and the inability to regulate sleep-wake cycles normally. Since there is no cure for narcolepsy and long-term disease management is needed, we believe that Xywav represents an important therapeutic option for patients with this sleep disorder. Narcolepsy affects an estimated one in 2,000 people in the U.S., with symptoms typically appearing in childhood. There are five primary symptoms of narcolepsy, including EDS, cataplexy, disrupted nighttime sleep, sleep-related hallucinations, and sleep paralysis. While patients with narcolepsy may not experience all five symptoms, EDS, an essential symptom of narcolepsy, is present in all narcolepsy patients and is characterized by chronic, pervasive sleepiness as well as sudden irresistible and overwhelming urges to sleep (inadvertent naps and sleep attacks). Narcolepsy may affect many areas of life, including limiting a patient's education and employment opportunities, and may lead to difficulties at work, school, or in daily life activities like driving, operating machinery or caring for children. Patients with narcolepsy may also suffer from significant medical comorbidities, including cardiac disorders, depression, suicide risk, anxiety, diseases of the digestive system and respiratory diseases.

Cataplexy, the sudden loss of muscle tone with retained consciousness, can be one of the most debilitating symptoms of narcolepsy. Cataplexy is present in approximately 70% of patients with narcolepsy. Cataplexy can range from slight weakness or a drooping of facial muscles to the complete loss of muscle tone resulting in postural collapse. It may also impair a patient's vision or speech. Cataplexy is often triggered by strong emotions such as laughter, anger or surprise. Cataplexy can severely impair a patient's quality of life and ability to function.

Narcolepsy patients, by virtue of their diagnosis, are at increased risk of cardiovascular events and disease, and the impact of sodium on cardiovascular health is well established. There is also extensive scientific evidence that reducing sodium consumption, which is a modifiable risk factor, is associated with clinically meaningful reductions in blood pressure and cardiovascular disease risk. Therefore, we believe that reducing sodium intake compared to currently-marketed high-sodium oxybate products by 92% each day is a significant advancement for these patients. The 92% reduction of sodium translates into a reduction of approximately 1,000 to 1,500 milligrams per day for a patient prescribed Xyrem, depending on the dose. Our commercial efforts are focused on educating patients and physicians about the lifelong impact of high sodium intake, and how the use of Xywav enables them to address what is a modifiable risk factor. When patients transition from Xyrem to Xywav, Xywav treatment is initiated at the same dose and regimen (gram for gram) and titrated as needed based on efficacy and tolerability.

We view the adoption of Xywav in narcolepsy as a positive indication that physicians and patients appreciate the benefits of a low-sodium oxybate option. In June 2021, FDA recognized seven years of Orphan Drug Exclusivity, or ODE, for Xywav in narcolepsy through July 21, 2027. Nevertheless, Lumryz, a fixed-dose, high-sodium oxybate, was approved by FDA on May 1, 2023 for the treatment of cataplexy or EDS in adults with narcolepsy. FDA continues to recognize seven years of ODE for Xywav in narcolepsy. In connection with granting ODE for Xywav, FDA stated that "Xywav is clinically superior to Xyrem by means of greater safety because Xywav provides a greatly reduced chronic sodium burden compared to Xyrem." FDA's summary also stated that "the differences in the sodium content of the two products at the recommended doses will be clinically meaningful in reducing cardiovascular morbidity in a substantial proportion of patients for whom the drug is indicated." FDA has also recognized that the difference in sodium content between Xywav and Lumryz is likely to be clinically meaningful in all patients with narcolepsy and that Xywav is safer than Lumryz in all such patients. Lumryz has the same sodium content as Xyrem. Xywav is the only approved oxybate therapy that does not carry a warning and precaution related to high sodium intake.

On August 12, 2021, FDA approved Xywav for the treatment of IH in adults. Xywav remains the first and only FDA-approved therapy to treat IH. We initiated the U.S. commercial launch of Xywav for the treatment of IH on November 1, 2021. In January 2022, FDA recognized seven years of ODE for Xywav in IH through August 12, 2028. IH is a debilitating neurologic sleep disorder characterized by chronic EDS (the inability to stay awake and alert during the day resulting in the irrepressible need to sleep or unplanned lapses into sleep or drowsiness), severe sleep inertia, and prolonged and

Table of Contents

non-restorative nighttime sleep. Although there are overlapping clinical features with other conditions, including narcolepsy, IH has its own specific diagnostic criteria. IH can significantly affect social, educational and occupational functioning. An estimated 37,000 people in the U.S. have been diagnosed with IH and are actively seeking healthcare.

We have agreements in place for Xywav with all three major pharmacy benefit managers, or PBMs, in the U.S. To date, we have entered into agreements with various entities and have achieved benefit coverage for Xywav in both narcolepsy and IH indications for approximately 90% of commercial lives.

We have seen strong adoption of Xywav in narcolepsy since its launch in November 2020 and increasing adoption in IH since its launch in November 2021. In 2023, net product sales of Xywav were $1,273.0 million, which represented 34% of our total net product sales for the year.

***Xyrem.*** Xyrem was approved in the U.S. for the treatment of cataplexy in adult patients with narcolepsy in 2002 and was approved for treatment of EDS in adult patients with narcolepsy in 2005. In October 2018, Xyrem was also approved in the U.S. for the treatment of cataplexy or EDS in pediatric patients seven years of age and older with narcolepsy.

In 2023, net product sales of Xyrem were $569.7 million, which represented 15% of our total net product sales for the year.

***Xywav and Xyrem REMS.*** Our marketing, sales and distribution of Xywav and Xyrem in the U.S. are subject to a risk evaluation and mitigation strategy, or REMS, which is required by FDA to mitigate the risks of serious adverse outcomes resulting from inappropriate prescribing, abuse, misuse and diversion of Xywav and Xyrem. The Xywav and Xyrem REMS has the same requirements for both products. Under this REMS, all of the Xywav and Xyrem sold in the U.S. must be dispensed and shipped directly to patients or caregivers through a central pharmacy. Xywav and Xyrem may not be stocked in retail pharmacies. Physicians and patients must complete an enrollment process prior to fulfillment of Xywav and Xyrem prescriptions, and each physician and patient must receive materials concerning the serious risks associated with Xywav and Xyrem before the physician can prescribe, or a patient can receive, the product. The central certified pharmacy must monitor and report instances of patient or prescriber behavior giving rise to a reasonable suspicion of abuse, misuse or diversion of Xywav and Xyrem, and maintains enrollment and prescription monitoring information in a central database. The central pharmacy ships the product directly to the patient (or caregiver) by a courier service.

We have had exclusive agreements with Express Scripts Specialty Distribution Services, Inc., or ESSDS, the central pharmacy for Xywav and Xyrem, to distribute Xywav and Xyrem in the U.S. and provide patient support services related to Xyrem since 2002. In December 2022, we entered into new agreements with ESSDS with a two-year term. Our current agreements with ESSDS, which expire on December 1, 2024, may be terminated by either party at any time without cause on 180 days' prior written notice to the other party.

***Epidiolex.*** We acquired Epidiolex (Epidyolex outside the U.S.) in May 2021 as part of our acquisition of GW, which we refer to as the GW acquisition, which expanded our growing neuroscience business with a global, high-growth childhood-onset epilepsy franchise. Epidiolex was approved in the U.S. in June 2018 for the treatment of seizures associated with two rare and severe forms of epilepsy, LGS and DS, in patients two years of age and older, and subsequently approved in July 2020 for the treatment of seizures associated with TSC in patients one year of age and older. FDA also approved the expansion of the other approved indications, LGS and DS, to patients one year of age and older. The rolling European launch of Epidyolex is also underway following EC approval in September 2019 for use as adjunctive therapy of seizures associated with LGS or DS, in conjunction with clobazam, for patients two years of age and older. Epidiolex is now launched in all five key European markets: United Kingdom, Germany, Italy, Spain and France. The clobazam restriction is limited to the EU and Great Britain. Epidyolex was also approved for adjunctive therapy in seizures associated with TSC for patients 2 years of age and older in the EU and Great Britain in April 2021 and Great Britain in August 2021, and is approved for this indication in other markets. Outside the U.S. and Europe, Epidiolex/Epidyolex is approved in Israel, Canada, Australia and New Zealand. See "Research and Development" below for a discussion of clinical development activities for Epidiolex.

LGS and DS are severe childhood-onset, drug-resistant epilepsy syndromes. LGS and DS affect approximately 35,000-50,000 and approximately 10,000 individuals in the U.S., respectively. TSC is a rare genetic disorder that causes non-malignant tumors to form in many different organs and is a leading cause of genetic epilepsy. TSC affects approximately 50,000 individuals in the U.S. Epidiolex has received ODE to treat seizures associated with LGS and DS through 2025 and TSC through 2027.

Net product sales of Epidiolex/Epidyolex in 2023 were $845.5 million, which represented 23% of our total net product sales for the year.

***Oncology***

***Rylaze.*** Rylaze was approved by FDA in June 2021 under the Real-Time Oncology Review, or RTOR, program, and was launched in the U.S. in July 2021, for use as a component of a multi-agent chemotherapeutic regimen for the treatment of acute

7

Table of Contents

lymphoblastic leukemia, or ALL, and lymphoblastic lymphoma, or LBL, in pediatric and adult patients one month and older who have developed hypersensitivity to E. coli-derived asparaginase. Rylaze is the only recombinant Erwinia asparaginase manufactured product that maintains a clinically meaningful level of serum asparaginase activity throughout the entire intended course of treatment. We developed Rylaze to address the needs of patients and health care providers for an innovative, high-quality Erwinia asparaginase with reliable supply. See "Research and Development" below for a discussion of clinical development activities for Rylaze.

The initial approved recommended dosage of Rylaze was for an intramuscular, or IM, administration of 25 mg/m$^2$ every 48 hours. In November 2022, FDA approved a supplemental Biologics License Application, or sBLA, for a Monday/Wednesday/Friday 25/25/50 mg/m$^2$ IM dosing schedule. In April 2022, we submitted a separate sBLA for intravenous, or IV, administration. In February 2023, we received a complete response letter from FDA requesting additional clinical data on the IV administration of Rylaze. There is no impact on the approved product labeling for Rylaze IM administration. In September 2023, the EC granted marketing authorization for JZP458 (Rylaze) under the trade name Enrylaze and we have initiated a rolling launch in Europe.

In 2023, net product sales of Rylaze were $394.2 million, which represented 11% of our total net product sales for the year.

***Zepzelca.*** We acquired U.S. development and commercialization rights to Zepzelca in early 2020, and launched six months thereafter, with an indication for treatment of patients with SCLC with disease progression on or after platinum-based chemotherapy. Zepzelca is an alkylating drug that binds guanine residues within DNA. This triggers a cascade of events that can affect the activity of DNA binding proteins, including some transcription factors, and DNA repair pathways, resulting in disruption of the cell cycle and eventual cell death. Our education and promotional efforts are focused on SCLC-treating physicians. We are continuing to raise awareness of Zepzelca across academic and community cancer centers.

Our exclusive U.S. development and commercialization rights to Zepzelca were acquired through an exclusive license agreement we entered into with Pharma Mar, S.A., or PharmaMar, in December 2019. In October 2020, we entered into an amendment to the license agreement with PharmaMar to expand our exclusive license to include rights to develop and commercialize Zepzelca in Canada. The term of the amended license agreement extends on a licensed product-by-licensed product and country-by-country basis until the latest of: (i) expiration of the last PharmaMar patent covering Zepzelca in that country (subject to certain exclusions), (ii) expiration of regulatory exclusivity for Zepzelca in that country and (iii) 12 years after the first commercial sale of Zepzelca in that country. We have the right to terminate the amended license agreement at will upon a specified notice period, and either party can terminate the amended license agreement for the other party's uncured material breach or bankruptcy.

Zepzelca was granted orphan drug designation for adults with metastatic SCLC with disease progression on or after platinum-based chemotherapy by FDA in August 2018. In December 2019, PharmaMar submitted a New Drug Application, or NDA, to FDA for accelerated approval of Zepzelca for relapsed SCLC based on data from a Phase 2 trial, and in February 2020, FDA accepted the NDA for filing with priority review. In June 2020, FDA granted accelerated approval of Zepzelca for the treatment of adult patients with metastatic SCLC with disease progression on or after platinum-based chemotherapy. Zepzelca is approved based on response rate and duration of response. In collaboration with F. Hoffmann-La Roche Ltd, or Roche, we have an ongoing Phase 3 pivotal clinical trial in first-line extensive stage SCLC of Zepzelca in combination with Tecentriq® (atezolizumab). In addition, our licensor PharmaMar is conducting a confirmatory trial in second-line SCLC. This is a three-arm trial comparing Zepzelca as either monotherapy or in combination with irinotecan to investigator's choice of irinotecan or topotecan. Data from either the first-line trial of Zepzelca in combination with Tecentriq or the PharmaMar trial could serve to confirm clinical benefit of Zepzelca and support full approval in the U.S. See "Research and Development" below for a discussion of clinical development activities for Zepzelca.

In 2023, net product sales of Zepzelca were $289.5 million, which represented 8% of our total net product sales for the year.

***Revenue Diversification***

As part of our objective to build a durable, growing commercial portfolio and reduce business risk by diversifying our revenue sources, we have been actively seeking to expand our commercial portfolio thorough a combination of launching internally developed therapies and commercial assets or investigational therapies acquired through corporate development. In 2018, 74% of total revenue was generated by one product, Xyrem. For the year ended December 31, 2023, 50% of total revenue was generated outside of our Sleep products, Xywav and Xyrem, plus high-sodium oxybate AG royalty revenue.

Table of Contents

Our marketed products, listed below, are approved in countries around the world to improve patient care.

| Product | Indications | Initial Approval Date | Markets |
|---|---|---|---|
| **NEUROSCIENCE** | | | |
| Xywav® (calcium, magnesium, potassium, and sodium oxybates) | Treatment of cataplexy or EDS in patients seven years of age and older with narcolepsy. | July 2020 | U.S. |
| | Treatment of IH in adults. | August 2021 | U.S. |
| | Treatment of cataplexy in patients with narcolepsy. | May 2023 | Canada |
| Xyrem® (sodium oxybate) | Treatment of cataplexy or EDS in patients seven years of age and older with narcolepsy. | July 2002 | U.S. |
| | Treatment of cataplexy in patients with narcolepsy. | August 2005 | Canada |
| | Treatment of narcolepsy with cataplexy in adult patients, adolescents and children from age of 7 years. | October 2005 | EU, Great Britain, other markets (through licensing agreement) |
| Epidiolex® (cannabidiol) | Treatment of seizures associated with LGS, DS, or TSC, in patients 1 year of age and older. | June 2018 | U.S. |
| Epidyolex® (cannabidiol) | For adjunctive therapy of seizures associated with LGS or DS, in conjunction with clobazam, for patients 2 years of age and older.* | September 2019 | EU, Great Britain, EEA**, Israel, Switzerland, Australia and New Zealand |
| | For adjunctive therapy of seizures associated with TSC for patients 2 years of age and older. | April 2021 | EU, Great Britain, Israel and Switzerland |
| Epidiolex® (cannabidiol) | For adjunctive therapy of seizures associated with LGS, DS or TSC for patients 2 years of age and older. | November 2023 | Canada |
| **ONCOLOGY** | | | |
| Rylaze® (asparaginase erwinia chrysanthemi (recombinant)-rywn) | A component of a multi-agent chemotherapy regimen for the treatment of ALL or LBL in adult and pediatric patients 1 month or older who have developed hypersensitivity to E. coli-derived asparaginase. | June 2021 | U.S. |
| Rylaze® (crisantaspase recombinant) | A component of a multi-agent chemotherapeutic regimen for the treatment of ALL and LBL, in adults and pediatric patients 1 year or older who have developed hypersensitivity to E. coli-derived asparaginase. | September 2022 | Canada |
| Enrylaze® (recombinant crisantaspase) | A component of a multi-agent chemotherapeutic regimen for the treatment of ALL and LBL in adult and pediatric patients (1 month and older) who have developed hypersensitivity or silent inactivation to E. coli-derived asparaginase. | September 2023 | EU, Great Britain |

Table of Contents

| | | | |
|---|---|---|---|
| Zepzelca® (lurbinectedin) | Treatment of adult patients with metastatic SCLC with disease progression on or after platinum-based chemotherapy. | June 2020 | U.S. (licensed from PharmaMar)*** |
| | Treatment of adults with Stage III or metastatic SCLC who have progressed on or after platinum-containing therapy. | September 2021 | Canada (licensed from PharmaMar)**** |
| Defitelio® (defibrotide) | Treatment of severe hepatic veno-occlusive disease, or VOD, also known as sinusoidal obstruction syndrome, or SOS, following hematopoietic stem cell transplantation, or HSCT, therapy. | October 2013 | EU, Great Britain, EEA**, Switzerland, Israel, Australia, South Korea, Saudi Arabia |
| Defitelio® (defibrotide sodium) | Treatment of adult and pediatric patients with hepatic VOD, also known as SOS, with renal or pulmonary dysfunction following HSCT. | March 2016 | U.S. |
| Defitelio® (defibrotide sodium) | Treatment of severe hepatic VOD, also known as SOS, following HSCT therapy. | July 2017 | Canada, Brazil |
| Defitelio® (defibrotide) | Treatment of hepatic SOS (hepatic VOD). | June 2019 | Japan |
| Vyxeos® (daunorubicin and cytarabine) liposome for injection | Treatment of newly-diagnosed therapy-related acute myeloid leukemia, or t-AML, or AML with myelodysplasia-related changes, or AML-MRC, in adults and pediatric patients one year and older. | August 2017 | U.S. |
| Vyxeos® liposomal 44 mg/100 mg powder for concentrate for solution for infusion | Treatment of adults with newly-diagnosed t-AML or AML-MRC. | August 2018 | EU, Great Britain, Switzerland, Israel, Australia, South Korea, Saudi Arabia |
| Vyxeos® Daunorubicin and cytarabine liposome for injection Powder, 44 mg daunorubicin and 100 mg cytarabine per vial, IV infusion | Treatment of adults with newly diagnosed therapy-related t-AML or AML with AML-MRC. | April 2021 | Canada |

*The clobazam restriction limited to EU and Great Britain

**European Economic Area

***Accelerated approval received from FDA

****Conditional approval received from Health Canada

**Research and Development Progress**

A key aspect of our strategy is our continued investment in expanding our research and development organization and initiatives. We actively explore new options for patients including novel compounds, small molecule advancements, biologics and innovative delivery technologies. We are focused on research and development activities within our oncology and neuroscience therapeutic areas and exploring and potentially investing in adjacent therapeutic areas.

Our research and development activities encompass all stages of development and currently include clinical testing of new product candidates and activities related to clinical improvements of, or additional indications or new clinical data for, our existing marketed products. We also have active preclinical programs for novel therapies, including neuroscience and precision medicines in oncology. We are increasingly leveraging our growing internal research and development function, and we have

Table of Contents

also entered into collaborations with third parties for the research and development of innovative early-stage product candidates and have supported additional investigator-sponsored trials, or ISTs, that are anticipated to generate additional data related to our products. We also seek out investment opportunities in support of the development of early- and mid-stage technologies in our therapeutic areas and adjacencies. We have a number of licensing and collaboration agreements with third parties, including biotechnology companies, academic institutions and research-based companies and institutions, related to preclinical and clinical research and development activities in hematology and precision oncology, as well as in neuroscience.

### Oncology

*Zanidatamab.* We acquired our exclusive development and commercialization rights to Zanidatamab in 2022 through an exclusive licensing agreement with a subsidiary of Zymeworks Inc., or Zymeworks, providing development and commercialization rights to Zanidatamab across all indications in the U.S., Europe, Japan and all other territories except for those Asia/Pacific territories previously licensed by Zymeworks. The term of the license agreement extends on a licensed product-by-licensed product and country-by-country basis until the expiration of the royalty term for such licensed product in such country. We have the right to terminate the amended license agreement at will upon a specified notice period, and either party can terminate the amended license agreement for the other party's uncured material breach or bankruptcy.

Zanidatamab is an investigational HER2-targeted bispecific antibody that can simultaneously bind two non-overlapping epitopes of HER2, known as biparatopic binding. Zanidatamab is currently being evaluated in multiple clinical trials as a treatment for patients with HER2-expressing cancers. Following positive data from a pivotal Phase 2 clinical trial evaluating zanidatamab monotherapy in patients with previously treated advanced or metastatic HER2-amplified biliary tract cancers, or BTC, we initiated a rolling Biologics License Application, or BLA, submission for accelerated approval in second-line BTC. In addition, we have an ongoing Phase 3 randomized clinical trial evaluating zanidatamab in combination with chemotherapy plus or minus tislelizumab as a first-line treatment for HER2-expressing gastroesophageal adenocarcinoma, or GEA, and an ongoing Phase 2 trial examining zanidatamab in combination with chemotherapy in first-line patients with HER2-expressing metastatic GEA. There are also multiple ongoing clinical trials exploring zanidatamab in breast cancer and other HER2-expressing tumor types.

*Zepzelca.* Our development plan for Zepzelca continues to progress.

In collaboration with Roche, we have an ongoing Phase 3 pivotal clinical trial in first-line extensive stage SCLC of Zepzelca in combination with Tecentriq® (atezolizumab). In addition, our licensor PharmaMar is conducting a confirmatory trial in second-line SCLC. This is a three-arm trial comparing Zepzelca as either monotherapy or in combination with irinotecan to investigator's choice of irinotecan or topotecan. Data from either the first-line trial of Zepzelca in combination with Tecentriq or the PharmaMar trial could serve to confirm clinical benefit of Zepzelca and support full approval in the U.S.

In 2023, we elected to close the Phase 2 basket trial evaluating Zepzelca as monotherapy in patients with select relapsed/refractory solid tumors based on limited response in three solid tumor cohorts. We have an ongoing Phase 4 observational study to collect real world safety and outcome data in adult Zepzelca monotherapy patients with SCLC who progress on or after prior platinum-containing chemotherapy.

*Vyxeos.* Vyxeos® (daunorubicin and cytarabine) liposome for injection is a product approved in the U.S., Canada, EU, Great Britain and other markets (marketed as Vyxeos® liposomal in the EU, Great Britain and other markets) for the treatment of adults newly diagnosed t-AML or AML-MRC. Our Vyxeos clinical development strategy is designed to target potential new patient segments across the AML landscape and to generate clinical data on Vyxeos when used in combination with other therapeutic agents.

*JZP815.* JZP815 is a pan-RAF kinase inhibitor that targets specific components of the mitogen-activated protein kinase, or MAPK, pathway that, when activated by oncogenic mutations, can be a frequent driver of human cancer. In October 2022, we enrolled our first patient in a Phase 1 study to investigate the safety, dosing, and initial antitumor activity of JZP815 in participants with advanced or metastatic solid tumors harboring alterations in the MAPK pathway.

*JZP898.* JZP898 is a differentiated, conditionally-activated interferon alpha, or IFNα, INDUKINE™ molecule. We acquired rights to JZP898 from Werewolf Therapeutics, Inc., or Werewolf, in 2022 under an exclusive, worldwide, royalty-bearing license to develop, manufacture and commercialize Werewolf's investigational WTX-613, now referred to as JZP898. In November 2023, we enrolled our first patient in a Phase 1 study to investigate the safety, tolerability, pharmacokinetics, immunogenicity and preliminary antitumor activity of JZP898 both as a monotherapy and in combination with pembrolizumab in adults with advanced/metastatic solid tumors.

### Neuroscience

*Epidiolex.* We have an ongoing Phase 3 trial of Epidyolex for LGS, DS and TSC in Japan.

Table of Contents

*Suvecaltamide (JZP385)*. Suvecaltamide (JZP385) is a highly selective modulator of T-type calcium channels currently in development for the potential treatment of essential tremor, or ET. ET is the most common pathological movement disorder, and there have been no new approved therapies in more than 50 years. We acquired suvecaltamide in our acquisition of Cavion, Inc., or Cavion, a clinical-stage biotechnology company, in August 2019. We initiated a Phase 2b clinical trial of suvecaltamide in December 2021. In this multicenter, double-blind, randomized, placebo-controlled trial, we are evaluating the safety and efficacy of suvecaltamide in the treatment of adults with moderate to severe ET. The primary efficacy outcome measure is the change from baseline to Week 12 on the Tremor Research Group Essential Tremor Rating Assessment Scale (TETRAS) composite outcome score, which represents items from the TETRAS-Activities of Daily Living and TETRAS-Performance Subscale, and measures the functional impact due to tremor. Additionally, in November 2022, we initiated a Phase 2 trial of suvecaltamide in patients with Parkinson's disease tremor.

*JZP150.* JZP150 is a fatty acid amide hydrolase inhibitor program for the potential treatment of post-traumatic stress disorder, or PTSD, and associated symptoms. We initiated a Phase 2 clinical trial of JZP150 for PTSD in December 2021. In December 2023, we announced that this trial did not meet the primary endpoint in the treatment of adults with PTSD as measured by improvement in the Clinician Administered Post Traumatic Stress Disorder (PTSD) Scale (CAPS-5) Total Symptom Severity Score.

*JZP441.* JZP441 is a potent, highly selective oral orexin-2 receptor agonist with potential application for the treatment of narcolepsy, IH and other sleep disorders. In May 2022, we announced that we had entered into a licensing agreement with Sumitomo Pharma Co., Ltd, or Sumitomo, to acquire exclusive development and commercialization rights in the U.S., Europe and other territories for DSP-0187, now referred to as JZP441. Sumitomo initiated a Phase 1 trial in Japan in November 2021 to evaluate safety, tolerability and pharmacokinetics of JZP441 in healthy volunteers. In November 2022, we initiated a Phase 1 development program to assess the safety, tolerability, pharmacokinetics, and pharmacodynamics of JZP441 in sleep-deprived healthy volunteers. In November 2023, we announced that the study achieved proof of concept in healthy volunteers based on the Maintenance of Wakefulness Test and that the program is being paused as we analyze safety findings related to visual disturbances and cardiovascular effects; no liver toxicity signals were observed.

We are also pursuing early-stage activities related to the development of JZP324, an extended-release low sodium oxybate formulation that we believe could provide a clinically meaningful option for patients with serious sleep disorders.

*Preclinical*

Through third parties, we are also pursuing oncology and neuroscience preclinical and clinical research and development activities under a number of licensing and collaboration agreements, including with:

- XL-protein GmbH, or XLp, for rights to use XLp's PASylation® technology to extend the plasma half-life of selected asparaginase product candidates;

- Redx Pharma plc, or Redx, for preclinical collaboration activities related to the Ras/Raf/MAP kinase pathway program that we purchased from Redx;

- We are also evaluating the use of our CombiPlex delivery technology platform in a number of therapeutic formulations and combinations in oncology as part of our internal oncology research and development activities; and

- Autifony Therapeutics Limited to collaborate on discovering and developing drug candidates targeting two different ion channel targets associated with neurological disorders.

Below is a summary of our key ongoing and planned development projects related to our products and pipeline and their corresponding current stages of development:

| Product Candidates | Description |
| --- | --- |
| **ONCOLOGY** | |
| **Phase 3** | |
| Zanidatamab | HER2-positive GEA (ongoing trial) |
| Zepzelca | First-line extensive stage SCLC in combination with Tecentriq (collaboration with Roche) (ongoing trial) Confirmatory Study (PharmaMar study) (ongoing trial) |
| Vyxeos | AML or high-risk Myelodysplastic Syndrome, or MDS (AML18) (cooperative group studies) (ongoing trial) Newly diagnosed adults with standard- and high-risk AML (AML Study Group cooperative group study) (ongoing trial) Newly diagnosed pediatric patients with AML (Children's Oncology Group cooperative group study) (ongoing trial) |

**Pivotal Phase 2**

| | |
|---|---|
| Zanidatamab | Previously treated, advanced HER2-expressing BTC (ongoing trial) (pivotal trial) |

**Phase 2**

| | |
|---|---|
| Zanidatamab | HER2-expressing GEA, BTC or colorectal cancer in combination with standard first-line chemotherapy (ongoing trial) |
| Vyxeos | High-risk MDS (European Myelodysplastic Syndromes) (cooperative group study) (ongoing trial)<br>Newly diagnosed untreated patients with high-risk AML (cooperative group study) (planned trial) |
| Vyxeos + other approved therapies | Relapsed/refractory, or R/R, AML or hypomethylating agent failure MDS (MD Anderson collaboration study) (ongoing trial)<br>De novo or R/R AML (MD Anderson collaboration study) (ongoing trial) |

**Phase 2a**

| | |
|---|---|
| Zanidatamab | Previously treated HER2+HR+ breast cancer in combination with palbociclib (ongoing trial) |

**Phase 1b/2**

| | |
|---|---|
| Zanidatamab | First-line breast cancer and GEA (BeiGene trial) (ongoing trial) |
| Zanidatamab | HER2-expressing breast cancer in combination with ALX148 (ongoing trial) |

**Phase 1**

| | |
|---|---|
| JZP815 | Raf and Ras mutant tumors (acquired from Redx) (ongoing trial) |
| Zanidatamab | Previously treated metastatic HER2-expressing cancers in combination with select antineoplastic therapies (ongoing trial) |
| JZP341 (long-acting *Erwinia* asparaginase) | Solid tumors (licensed from Ligand Pharmaceuticals Incorporated, or Ligand) (ongoing trial) |
| JZP898 | Conditionally-activated IFNα INDUKINE™ molecule in solid tumors (ongoing trial) |
| Vyxeos | Low intensity dosing for higher risk MDS (MD Anderson collaboration study) (ongoing trial) |

**Preclinical**

| | |
|---|---|
| Undisclosed target | Ras/Raf/MAP kinase pathway (collaboration with Redx) |
| Undisclosed targets | Oncology |
| CombiPlex® | Oncology exploratory activities |

**NEUROSCIENCE**

**Phase 3**

| | |
|---|---|
| Epidyolex | LGS, TSC and DS (ongoing trial in Japan) |

**Phase 2b**

| | |
|---|---|
| Suvecaltamide (JZP385) | ET (ongoing trial) |

**Phase 2**

| | |
|---|---|
| Suvecaltamide (JZP385) | Parkinson's disease tremor (ongoing trial) |

**Phase 1**

| | |
|---|---|
| JZP324 | Oxybate extended-release formulation (planned trial) |
| JZP441* | Potent, highly selective oral orexin-2 receptor agonist (paused) |
| Undisclosed cannabinoids | Other neuroscience (ongoing trials) |

**Preclinical**

| | |
|---|---|
| Undisclosed targets | Sleep<br>Epilepsy<br>Other Neuroscience |

*Also known as DSP-0187 (see discussion above in this section for JZP441)

13

Table of Contents

**Commercialization Activities**

We have direct Jazz commercial operations in the U.S., Europe, Australia and Canada and a network of commercial distributors that represent our commercial interests in other key markets across the globe. In the U.S., our products are commercialized through a number of teams, including a team of experienced, trained sales professionals who provide education and promote Xywav, Xyrem, Epidiolex, Zepzelca, Rylaze, Vyxeos and Defitelio to healthcare providers in the appropriate specialties for each product, a team that interacts with payors and institutions to ensure access and coverage for the products, and a team that distributes the products throughout the U.S. healthcare system (wholesalers, pharmacies, hospitals, and community and academic institutions) and provides patient services.

In Canada and in approved markets in Europe where we commercialize Defitelio and Vyxeos, we have a field force of hematology sales specialists. In markets where these products either are not approved or are unable to be promoted under local regulation, we have medical affairs personnel responsible for responding to medical information requests and for providing information consistent with local treatment protocols with respect to such products. In certain European markets, we have a sales team and a team of medical science liaisons supporting our rolling launch of Epidyolex. In addition, we directly market Xyrem and Zepzelca in Canada.

Other commercial activities include marketing related services, pricing and access, industry analytics and insights, distribution services and commercial support services. We employ third party vendors, such as advertising agencies, market research firms and suppliers of marketing and other sales support-related services, to assist with our commercial activities. We also provide reimbursement and patient assistance support for our U.S. markets.

We intend to scale the size of our sales force as appropriate to effectively reach our target audience in the specialty markets in which we currently operate. We promote Zepzelca, Rylaze, Vyxeos and Defitelio to many hematology and oncology specialists who operate in the same hospitals and outpatient clinical sites, and we believe that we benefit from operational synergies from this overlap. We expect that the launch of Enrylaze in Europe will be executed primarily through our existing team. Continued growth of our current marketed products and the launch of any future products may require a reevaluation of our field force and support organization in and outside the U.S.

**Human Capital Management and Environment, Health and Safety**

We are committed to creating a company where the culture embodies our corporate purpose to innovate to transform the lives of patients and reflects our key goals: (1) be a great place to work and (2) live our core values of *Integrity, Collaboration, Passion, Innovation, and Pursuit of Excellence.*

*Employee Demographics.* As of December 31, 2023, Jazz employed approximately 2,800 people worldwide, of which approximately 50% were employed in the U.S. and approximately 50% were employed outside the U.S. primarily in the U.K., Ireland and across the EU. As an innovative biopharmaceutical company, we have over 750 employees — representing approximately 27% of our global workforce — supporting our research and development activities. We consider our employee relations to be very good.

*Diversity, Equity, Inclusion and Belonging.* We make diversity, equity, inclusion and belonging, or DEIB, a priority because it is a key to driving business performance, unlocking the potential of our people and living our core values.

We strive to create a workplace culture that fosters the ability of our employees to be their authentic selves and contribute boldly. We aspire to have diversity through our entire workforce. We seek to surround underrepresented groups with allies to enable all employees to thrive equitably. Our board of directors and management team are committed to fostering DEIB in all parts of our business.

Our DEIB strategy includes: (1) building a more diverse workforce in terms of gender identity, race, ethnicity and sexual orientation and that represent unique backgrounds, experiences, thoughts and talents; (2) investing in talent development and driving equity; and (3) and creating a culture of inclusion and belonging.

We believe an employee community that fosters diversity and inclusion leads to innovation and improved business performance. We have created three Employee Resource Teams, or ConcERTos, and five Affinity Forums and provided a platform for broader company engagement and education. Our three ConcERTos, "Community Beat," "All Dimensions of Diversity" and "Inclusion for Innovation," were established as broad self-led teams of employee volunteers with diverse backgrounds with the aim of connecting our employees, or Jazzicians, with similar visions and interests in an inclusive, welcoming, and collaborative setting. The five Affinity Forums include, ¡HOLA Jazz! (Hispanic Organization for Leadership Advancement), JazzSoul, JAWS (Jazz Association for Women Supporters), Jazz Pride and Pan-Asian and are places of connection and learning for members of these communities and their allies. As of the end of 2023, 32% of our global workforce were active in at least one of these groups.

14

Table of Contents

We have established aspirational goals related to the diversity of our workforce, including representation of women and people of color, particularly at the leadership level (i.e., employees at executive director and above). In this regard, we have made some meaningful progress, as demonstrated by the following, as of December 31, 2023:

- 50% of our board of directors and 60% of our executive committee is diverse in terms of gender, ethnicity and sexual orientation.

- Women represent 54% of our global workforce and 47% at the leadership level (employees at executive director and above).

- In the U.S., people of color represent 35% of our U.S. workforce and 20% at the leadership level.

While we are proud of what we have accomplished to date, we remain committed to our aspiration of providing a diverse, equitable and inclusive workplace that is supportive of all backgrounds, including among our broader leadership.

*Employee Engagement.* We have a strong employee value proposition anchored in our shared commitment to our purpose to innovate to transform the lives of patients. We are committed to ensuring that we create a rich culture that provides a great place to work for our employees through company-wide efforts to connect employees to our shared purpose and to create an environment where our people feel valued, respected, and able to contribute to their full potential. We believe employee engagement and the power of our employee voices is foundational to strong performance. We have transparent and regular communication channels with our employees consisting of many forms – including all employee meetings, regular communication messages from executive leadership, town halls, top leadership forums, pulse check feedback mechanisms and engagement surveys.

In 2023, to mark our 20-Year Anniversary we provided the opportunity for all employees to come together and reconnect to our Purpose and Values in a series of in-person and virtual events. In advance of the events, a culture diagnostic was completed to help us understand what behaviors will help drive future business success across Jazz and informed a refresh of the behavioral descriptors that underpin the Jazz Values. In total, 31 in-person and 11 virtual sessions across 9 global locations took place in the fourth quarter of 2023, with almost 2,000 employees taking part. The goal of these events, in addition to other 20th anniversary observances throughout the year, was to promote greater feelings of employee belonging and an increase in overall employee engagement, as well as help shift our culture to ensure sustained business success.

Our employee feedback surveys are designed to help us measure overall employee engagement as well as gather insights on other important areas of our employee experience, and we consistently achieve participation rates above 75%. We consistently have high levels of engagement as measured by feelings of connection to our purpose, as well as Jazz being considered a good place to work by our employees. Our surveys also provide important insight into the areas where we have opportunities to focus, such as decision-making, planning and prioritizing work, and creating a greater sense of belonging. Our survey informs programs and activities aligned with achieving our corporate objectives and achieving our goal of evolving our operating culture for agility and scalability.

Our Community Beat ConcERTo is made up of employee volunteers and representatives that promote company culture and create a sense of belonging and camaraderie among our employees. They foster programs and engagement activities on a local level to draw better connections to employees with the company strategy and business milestones, give back through community service, and promote different health and well-being initiatives. They play a pivotal role in fostering community within our working model by engaging remote employees and maximizing connection during times together at our sites and offices.

*Growth, Development and Total Rewards.* Our talent strategy focuses on attracting the best talent, recognizing and rewarding the performance of our employees as defined by both *what* they accomplished and *how* they accomplished it, and continually developing our talent through new experiences and learning opportunities. We believe there is ample opportunity for growth and development at Jazz and there is not a one size fits all approach to growing our talent. We strive to create the best career experience for all of our employees and encourage them to have regular dialogue with their leadership to create meaningful career development plans.

Our performance management process supports our culture of continual feedback and coaching, and ongoing growth and development through new experiences and learning. We encourage all employees to have an individual development plan to outline learning and growth interests and focus areas.

We leverage digital learning platforms to provide on demand, bite-sized learning to all employees that can be accessed 24/7 on a range of topics from leadership, personal effectiveness and well-being. In addition, we provide a number of self-service learning resources via our intranet site on topics such as High-Performance Teamwork, Decision Making, Hybrid Working, and Digital Skills development. We continue to offer tuition reimbursement in our major markets aimed at growth and career development.

Table of Contents

In 2023, we continued to focus on developing the capabilities of our Global Leadership Team (Top 80 leaders) to build leadership excellence, strengthen relationships, and encourage cross functional collaboration in pursuit of our enterprise strategic goals. Our focus in 2023 was on building critical mindsets and behaviors linked to a high-performance culture, e.g., how to create an environment where people feel able to constructively challenge one another.

Our management and leadership teams place significant focus and attention to diversity, capability development, and succession planning for critical roles. We regularly review talent development and succession plans for each of our functions to successfully maintain business operations and develop a pipeline of talent. We have aspirational goals concerning employee retention, diversity, and talent development.

We provide our employees with what we believe to be market competitive and locally relevant compensation and benefits that support our overarching strategy to attract, retain and reward highly talented employees in an extremely competitive and dynamic industry. This includes broad-based participation in our annual incentive plan, which rewards employees based on the company's achievement of pre-established goals (or sales targets in the case of sales incentive plans) as well as performance against their personal objectives and our long-term equity incentive plans, which fosters an ownership culture and provides employees with the opportunity to share in the long-term success they help create.

We strive to create a culture of health and well-being throughout the organization by offering a diverse and customizable set of programs focusing on employee experience, self-care, work-life balance, flexibility and early intervention. In addition to traditional employee benefits, we support employees and their families through access to a suite of innovative programs that are designed to enhance their physical, financial, emotional and social well-being.

- We provide a robust set of offerings centered around mental and emotional health including our employee assistance program, which provides employees and their family counseling support – from everyday matters to more serious ones.

- We offer an enhanced suite of differentiated global leave and time-off polices to address the needs of our diverse employee population through varying stages of life, including minimum standards for new parent leave (irrespective of gender or how a family is created), family caregiver leave and bereavement leave. We also offer a global volunteer day to provide employees time off with full pay to give back to their communities.

- We recently introduced our Wellbeing Reimbursement Account, which reimburses employees for a wide array of expenses that support their overall wellbeing, empowering them to choose what is most important to them.

*Workplace Safety & Employee Care.* Workplace safety is always a top priority for us. To create and sustain a safe and healthy workplace, we have implemented initiatives designed to address risk evaluation, education and training of employees, use of appropriate personal protective equipment, and compliance with relevant national and international health and safety standards.

We leverage an employee support framework focused on Care, Connection, Continuity and Consciousness (our "4Cs") to enable our employees to live into our values and support one another while doing everything we can to deliver on our patient mission. Important to this framework are new leader expectations and tools given the rise and complexity of emerging employee demands and needs – including more flexibility to address personal needs, a greater connection to understand the whole person and their lives, and more active support surrounding social injustice. We provide productivity and collaboration tools and resources for employees working remotely, including training and toolkits to help leaders effectively lead and manage remote teams; increased flexibility within work schedules and leave programs to support employees caring for children and others; expanded employees assistance and mindfulness programs to help employees and their families manage anxiety, stress, and overall wellbeing; and increased investment in resources focused on inclusion and belonging.

Through direct input from employees, external insights and best practices, we developed our flexible working model; expanding the power of intentional collaboration and our ability to more effectively manage our global and highly distributed team workforce. This approach to work, called "Jazz Remix," aims to provide eligible employees with the greatest flexibility and agility to globally connect, collaborate, innovate and perform.

*Environment, Health and Safety.* Our operations are subject to complex and increasingly stringent environmental, health and safety laws and regulations in the countries where we operate and, in particular, in Ireland, the U.K. and Italy where we have manufacturing facilities. Our manufacturing activities involve the controlled storage, use and disposal of chemicals and solvents. Environmental and health and safety authorities in Ireland, the U.K. and Italy administer laws governing, among other matters, the emission of pollutants into the air (including the workplace), the discharge of pollutants into bodies of water, the storage, use, handling and disposal of hazardous substances, the exposure of persons to hazardous substances, and the general health, safety and welfare of employees and members of the public. In certain cases, such laws, directives and regulations may impose strict liability for pollution of the environment and contamination resulting from spills, disposals or other releases of hazardous substances or waste. Costs, damages and/or fines may result from the presence, investigation and remediation of such contamination at properties currently or formerly owned, leased or operated by us or at off-site locations,

including where we have arranged for the disposal of hazardous substances or waste. In addition, we may be subject to third party claims, including for natural resource damages, personal injury and property damage, in connection with such contamination.

We seek to operate our manufacturing facilities in an environmentally responsible way to protect our people, our business, our environment and the local communities in which we operate. In light of the potential impact of our business on the environment, we have adopted a number of internal environmental policies and management systems designed to manage our operations in compliance with applicable laws, directives and regulations on environmental protection and in support of environmental sustainability and local biodiversity. Our environmental policies and management systems include procedures for assessing compliance with applicable environmental laws and regulations and reporting incidents of non-compliance to applicable governmental authorities. For example, we have environmental policies governing our manufacturing facilities in Ireland, the U.K. and Italy, which demonstrate our commitment to environmental sustainability and require us to minimize resource use (e.g., energy and water) and waste generation, optimize the use of raw materials, and undertake continuous improvement in environmental performance, with an emphasis on pollution prevention.

**Competition**

The biopharmaceutical industry is highly competitive. Our products compete, and our product candidates may in the future compete, with currently existing therapies, product candidates currently under development by us and others and/or future product candidates, including new chemical entities that may be safer, more effective or more convenient than our products. Any products that we develop may be commercialized in competitive markets, and our competitors, which include large global pharmaceutical companies and small research-based companies and institutions, may succeed in developing products that render our products obsolete or noncompetitive.

With respect to competition we face from generic drugs, certain U.S. state laws allow for, and in some instances in the absence of specific instructions from the prescribing physician mandate, the dispensing of generic products rather than branded products when a generic version is available. Generic competition often results in decreases in the net prices at which branded products can be sold.

In particular, our products and most advanced product candidates face or may face competition as described below:

- *Xywav and Xyrem.* Xywav and Xyrem are approved by FDA and marketed in the U.S. for the treatment of both cataplexy and EDS in both adult and pediatric patients with narcolepsy. We and others have launched products to treat EDS in narcolepsy and may in the future launch products to treat cataplexy in narcolepsy that are competitive with or disrupt the market. Xywav and Xyrem face competition from Lumryz, a branded product for treatment of cataplexy and EDS in narcolepsy. Avadel's Lumryz, a once-nightly dose, high-sodium oxybate, was launched in the U.S. market in June 2023. On June 22, 2023, we filed a complaint in the United States District Court for the District of Columbia seeking a declaration that FDA's approval of the NDA for Avadel's Lumryz was unlawful. In the complaint, we allege that FDA acted outside its authority under the Orphan Drug Act, when, despite ODE protecting Xywav, FDA approved the Lumryz NDA and granted Lumryz ODE based on FDA's finding that Lumryz makes a major contribution to patient care, and is therefore clinically superior to Xywav and Xyrem. We cannot at this time predict the timing or ultimate outcome of this litigation or the impact of this litigation on our sleep products, Xywav and Xyrem. For additional information on litigation involving this matter, see "*FDA Litigation*" and "*Avadel Patent Litigation*" in Note 14, Commitments and Contingencies-Legal Proceedings of the Notes to Consolidated Financial Statements, included in Part IV of this Annual Report on Form 10-K.

  In addition, since January 2023 our oxybate products have faced competition from an AG version of high-sodium oxybate pursuant to a settlement agreement we entered into with an abbreviated new drug application, or ANDA, filer, and since July 2023, an additional AG version of high-sodium oxybate from a volume-limited ANDA filer. Collectively, these AG version of high-sodium oxybate have negatively impacted and are expected to continue to negatively impact Xyrem and Xywav sales for patients with narcolepsy. Specifically, a wholly owned subsidiary of Hikma Pharmaceuticals PLC, or Hikma, launched its AG version of sodium oxybate in January 2023 and Amneal Pharmaceuticals LLC, or Amneal, launched its AG version of sodium oxybate in July 2023. Hikma has elected to continue to sell the Hikma AG product, with royalties to be paid to us, for a total of up to four years beginning in January 2024, which election may be terminated by Hikma in accordance with the notice provisions in the agreements between the parties. We have the right to receive a meaningful royalty from Hikma on net sales of the Hikma AG product; the royalty rate was fixed for the second half of 2023. There was also a substantial increase in the royalty rate beginning in January 2024, which will remain fixed for the duration of the agreement's term. For a description of generic versions of sodium oxybate and/or new products for the treatment of cataplexy and/or EDS that currently compete or could in the future compete with, or otherwise disrupt the market for, Xywav and Xyrem, as well as a description of our settlement agreements with ANDA filers, see the risk factor under the heading "*The introduction of new products in the U.S. market that compete with, or otherwise disrupt the market for, our oxybate*

17

Table of Contents

*products has adversely affected and may continue to adversely affect sales of our oxybate products"* in Part I, Item 1A of this Annual Report on Form 10-K.

In addition, Xywav and Xyrem may face competition in the future from other new sodium oxybate formulations for treatment of narcolepsy. Also, in the future we expect competition from generic versions of sodium oxybate. For example, we received notices in June 2021 and February 2023, that Lupin and Teva, respectively, filed ANDAs for generic versions of Xywav. On October 13, 2023, Lupin announced that it has received tentative approval for its application to market a generic version of Xywav.

Non-oxybate products intended for the treatment of EDS or cataplexy in narcolepsy or IH (Xywav is the first and only FDA-approved therapy to treat IH), including new market entrants, even if not directly competitive with Xywav or Xyrem, could have the effect of changing treatment regimens and payor or formulary coverage of Xywav or Xyrem in favor of other products, and indirectly materially and adversely affect sales of Xywav and Xyrem. Xywav and Xyrem face competition from Sunosi® (solriamfetol), which we sold to Axsome Therapeutics, Inc. in 2022. Xywav and Xyrem may face increased competition from new branded entrants to treat EDS or cataplexy in narcolepsy such as pitolisant, which has been approved by FDA for the treatment of both cataplexy and EDS in adult patients with narcolepsy. Other companies have announced that they have product candidates in various phases of development to treat the symptoms of narcolepsy, such as Axsome's reboxetine, and various companies are performing research on orexin agonists for the treatment of sleep disorders, including Takeda Pharmaceutical Company Limited, Merck & Co., Inc., Eisai Co., Ltd., Centessa Pharmaceuticals plc and Alkermes plc.

In addition, we are also aware that prescribers often prescribe branded or generic medications for cataplexy before prescribing or instead of prescribing oxybate therapy, and that payors often require patients to try such medications before they will cover Xywav or Xyrem, even if they are not approved for this use. For example, prescribers often treat mild cataplexy with drugs that have not been approved by FDA for this indication, including tricyclic antidepressants and selective serotonin reuptake inhibitors or selective norepinephrine reuptake inhibitors. We are also aware that branded or generic stimulants such as modafinil may be prescribed off-label for treatment of EDS in narcolepsy. Wake-promoting agents modafinil and armodafinil, including both branded and generic equivalents, are approved for the treatment of EDS in narcolepsy and other conditions, and may be used in conjunction with or instead of Xywav or Xyrem.

- • *Epidiolex.* Patients in the U.S. suffering from seizures associated with DS, LGS or TSC are treated with a variety of FDA-approved products, including clobazam, clonazepam, valproate, lamotrigine, levetiracetam, rufinamide, topiramate, ethosuximide, and zonisamide. FDA approved Zogenix, Inc.'s low-dose fenfluramine in DS in June 2020, and for LGS in March 2022. In March 2022, UCB S.A. announced that it had completed its acquisition of Zogenix. FDA approved Marinus Pharmaceuticals, Inc.'s ganaxolone for the treatment of seizures associated with cyclin-dependent kinase-like 5 deficiency disorder in March 2022. Ovid Therapeutics Inc./Takeda Pharmaceutical Company Limited and Eisai Company Limited are developing therapies for treating Developmental and Epileptic Encephalopathies (includes DS and LGS). Stiripentol has been approved in Europe for several years to treat DS and was approved in 2018 by the FDA. Zynerba Pharmaceuticals, Inc. is developing a topical formulation of cannabidiol, or CBD, for which it is working with FDA on a path forward on CONNECT-FX data for Zygel in Fragile X syndrome. There are a number of public and private companies in the early stages of developing genetic therapies for DS, including Stoke Therapeutics, Inc., which has an antisense oligonucleotide, STK-001, in early clinical trials.

In addition, there are non-FDA approved CBD preparations being made available from companies in the medical marijuana industry, which might attempt to compete with Epidiolex. While federal law prohibits the sale and distribution of most marijuana products not approved or authorized by FDA, the vast majority of states and the District of Columbia have legalized either CBD or marijuana for either recreational or medical use, or both. Under the U.S. Farm Bill, enacted in late 2018, certain extracts and other material derived from cannabis are no longer controlled under the Federal Controlled Substances Act, or CSA. However, the marketing of such products as a food, dietary supplement, or for medical purposes remains subject to FDA requirements. With respect to the marketing of CBD as a food or dietary supplement, in January 2023 FDA concluded that the existing regulatory frameworks for foods and supplements were not appropriate for CBD products and denied three citizen petitions that had asked the agency to conduct rulemaking to allow the marketing of CBD products as dietary supplements. In addition, Congressional efforts related to legalization of marijuana continue. Although our business is distinct from that of entities marketing FDA-unapproved marijuana and CBD-containing dietary supplement, future legislation or federal government action authorizing the sale, distribution, use, and insurance reimbursement of non-FDA approved marijuana or CBD products could increase competition for and adversely affect our ability to generate sales of Epidiolex and our cannabinoid product candidates.

We are aware of exploratory research into the effects of tetrahydrocannabinol, often referred to as THC, and CBD drug formulations; discovery research within the pharmaceutical industry into synthetic agonists and antagonists of

Table of Contents

CB1 and CB2 receptors; companies that supply synthetic cannabinoids and cannabis extracts to researchers for pre-clinical and clinical investigation; and various companies that cultivate cannabis plants with a view to supplying herbal cannabis or nonpharmaceutical cannabis-based formulations to patients. These activities have not been approved by the FDA but may in the future compete with our products.

Moreover, we expect that Epidiolex will face competition from generic products in the future. In November and December 2022, we received notices from various ANDA filers that they have each filed with FDA an ANDA for a generic version of Epidiolex (cannabidiol) oral solution. In January 2023, we filed patent infringement suits against these ANDA filers. For a description of this litigation, see "*Epidiolex Patent Litigation*" in Note 14, Commitments and Contingencies-Legal Proceedings of the Notes to Consolidated Financial Statements, included in Part IV of this Annual Report on Form 10-K. As a result of these lawsuits, we expect that a stay of approval of up to 30 months will be imposed by FDA on these ANDA filers.

- *Zepzelca.* Zepzelca faces competition from topotecan, which is also an approved treatment in second line SCLC in the U.S., as well as other regimens for relapsed SCLC currently recommended in compendia guidelines, including rechallenge with first line platinum chemotherapy. There are also a number of products and immunotherapies for the treatment of second line SCLC in various phases of development, including Amgen Inc.'s tarlatamab.

- *Rylaze.* Rylaze may face competition from Erwinaze in the future. Erwinaze was previously approved and commercialized by us as a treatment for ALL patients with hypersensitivity to *E. coli*-derived asparaginase. In April 2020, Porton Biopharma Limited, or PBL, granted Clinigen Group plc, or Clinigen, a global license for Erwinaze. However, in December 2021, Clinigen announced that FDA issued a complete response letter to PBL's BLA for Erwinaze, indicating that the BLA cannot be approved in its current form. Outside of the U.S., Enrylaze faces competition from Erwinase. Rylaze may also face competition from other companies who have developed or are developing new treatments for ALL. In addition, some new asparaginase treatments could reduce the rate of hypersensitivity in patients with ALL, and new treatment protocols are being developed and approved for ALL that may not include asparaginase-containing regimens, including some for the treatment of relapsed or refractory ALL patients.

- *Vyxeos.* With respect to Vyxeos, there are a number of alternative established therapies in AML. A key consideration in the treatment of AML patients is the patient's suitability for chemotherapy. The AML patient population studied in the Vyxeos Phase 3 clinical trial supporting our NDA included 60-75 year old fit patients, or those deemed able to tolerate intensive induction chemotherapy. Prior to Vyxeos, the most widely recognized option for the treatment of newly-diagnosed t-AML and AML-MRC in fit patients was cytarabine in combination with daunorubicin, known as 7+3, which is still used today in this population, along with other intensive chemotherapy regimens, particularly in patients under the age of 60. Also, since Vyxeos was approved, several other products have been approved by FDA or are in development as treatment options for newly diagnosed AML patients eligible for intensive chemotherapy, such as targeted agents (e.g. midostaurin, enasidenib and ivosidenib), immunotherapies (e.g., gemtuzumab ozogamicin and chimeric antigen receptor T-cell therapy), and agents disrupting leukemia cell survival (e.g., glasdegib). We are also aware of the increasing use of venetoclax combined with either a hypomethylating agent or low-dose cytarabine, a treatment approved by FDA in newly diagnosed AML patients who are age 75 years or older, or who have comorbidities that preclude use of intensive induction chemotherapy. With ongoing trends in the U.S. towards lower-intensity treatments and away from intensive chemotherapy regimens for AML, we note increasing competition from other therapeutic options as we continue to educate providers on the clinical benefits of Vyxeos in appropriate patients.

- *Defitelio.* While there is currently no direct competition to Defitelio to treat severe VOD, changes in the types of conditioning regimens used as part of HSCT may affect the incidence of VOD diagnosis and demand for Defitelio. There was a significant decline in the number of patients receiving HSCT due to the effects of the COVID-19 pandemic. Moving forward, while HSCT procedures are gradually returning to pre-pandemic numbers, we expect changes in chemotherapy regimens and the increasing use of cell therapies to potentially lower the incidence of sVOD; additionally, there has been a reduction of prophylactic use of Defitelio in Europe.

An important part of our corporate strategy is to build a diversified product pipeline, including by acquiring or in-licensing and developing, or partnering to license and develop, additional products and product candidates that we believe are highly differentiated and have significant commercial potential. Our ability to continue to grow our product portfolio requires that we compete successfully with other pharmaceutical companies, many of which may have substantially greater financial sales and marketing resources, to acquire or in-license products and product candidates.

## Customers

In the U.S., Xywav and Xyrem are sold to one certified specialty pharmacy, ESSDS, that ships Xywav and Xyrem directly to patients. Also in the U.S., Epidiolex is sold to specialty pharmacies, wholesalers and specialty distributors. Defitelio

Table of Contents

is sold to hospital customers through subsidiary specialty distributors of McKesson Corporation, or McKesson. Zepzelca, Rylaze and Vyxeos are sold to customers through subsidiary specialty distributors of McKesson, Cencora, Inc. (formerly named AmerisourceBergen Corporation), or Cencora, and Cardinal Health, Inc., or Cardinal. We have distribution services agreements made in the ordinary course of business with McKesson, Cencora and Cardinal and a pharmacy services agreement with ESSDS that provides for the distribution of Xywav and Xyrem to patients. For more information regarding our relationship with ESSDS, see "Business—Our Commercialized Products—Xyrem" in this Part I, Item 1. Purchases are made on a purchase order basis.

In certain countries in Europe, Defitelio and Vyxeos are sold pursuant to marketing authorizations. We distribute these products through Durbin PLC, a U.K.-based wholesaler and distributor, and O&M Movianto Nederland BV, our centralized European logistics services provider, to hospitals and local wholesalers in Europe where we market these products directly and, in other markets in Europe and elsewhere where we do not market these products directly, to local distributors and wholesalers. In certain countries in Europe, Epidyolex is sold pursuant to marketing authorizations. We distribute Epidyolex through a variety of wholesalers and distributors. In countries where there is no marketing authorization, Epidyolex is available pursuant to named patient programs, temporary use authorizations or similar authorizations in accordance with local regulations controlling the medical use of unapproved products.

We commercialize and distribute Xyrem in Canada for the treatment of cataplexy in patients with narcolepsy. Xyrem is also sold in 21 countries by UCB (which has rights to market Xyrem in 54 countries).

## Manufacturing

We have a manufacturing and development facility in Athlone, Ireland where we manufacture Xywav and Xyrem, a manufacturing and development facility in Kent Science Park, U.K. where we produce Epidiolex/Epidyolex, and a manufacturing plant in Villa Guardia, Italy where we produce defibrotide drug substance. We currently do not have our own commercial manufacturing or packaging capability for our other products, product candidates or their active pharmaceutical ingredients, or APIs. As a result, our ability to develop and supply products in a timely and competitive manner depends on third party suppliers being able to meet our ongoing commercial and clinical trial needs for API, other raw materials, packaging materials and finished products.

### *Lead Marketed Products*

*Xywav.* Xywav is manufactured at our Athlone facility. Xywav, like Xyrem, is a Schedule III controlled substance in the U.S. The API of Xywav are the calcium, magnesium, potassium and sodium salts of gamma-hydroxybutyric acid (as gamma-hydroxybutyric acid is the API for Xyrem), which are Schedule I controlled substances in the U.S. As a result, Xywav and Xyrem are subject to regulation by the U.S. Drug Enforcement Administration, or DEA, under the CSA, and its manufacturing and distribution are highly restricted. Quotas from the DEA are required in order to manufacture or procure calcium, magnesium, potassium and sodium salts of gamma-hydroxybutyric acid in the U.S. For information related to DEA quota requirements, see "Business—Government Regulation—Other Post-Approval Pharmaceutical Product Regulation—Controlled Substance Regulations" in this Part I, Item 1.

*Xyrem.* Xyrem is manufactured by us in our Athlone facility and by Patheon Pharmaceuticals Inc., which we refer to together with its affiliates as Patheon, under a Master Manufacturing Services Agreement, or the Patheon Agreement, entered into with Patheon in 2015. We manufacture Xyrem in our Athlone facility for most of our U.S. commercial supply and rely on Patheon to supply Xyrem for other markets, though we are not required to purchase Xyrem exclusively from Patheon. The current term of the Patheon Agreement will expire in December 2024, subject to further automatic two-yearly extensions if Patheon is then providing manufacturing services for any product, unless either party provides prior notice of termination. In addition, we may terminate the Patheon Agreement for any reason upon 12 months' prior written notice.

Siegfried USA, LLC and its European affiliates, or Siegfried, supply sodium oxybate, the API of Xyrem, to Patheon and our Athlone facility. Although Siegfried has been our only supplier of sodium oxybate since 2012, we have the right to purchase a portion of our worldwide requirements of sodium oxybate from other suppliers. The agreement with Siegfried expires in April 2024, subject to automatic three-year extensions until either party provides notice of its intent to terminate the agreement. During the term of the agreement and, under certain circumstances for 18 months after the agreement terminates, Siegfried is not permitted to manufacture sodium oxybate for any other company.

*Epidiolex.* Epidiolex/Epidyolex is manufactured by us in our Kent Science Park facility in the U.K. Epidiolex is a pharmaceutical formulation comprising highly purified plant-derived CBD. We cultivate our cannabinoid plants in the U.K. under highly controlled and standardized conditions.

*Zepzelca.* Zepzelca is manufactured by Simtra Biopharma Solutions, or Simtra. The current term of the agreement with Simtra will expire in December 2025 and will then be subject to automatic two-year extensions, unless either party provides advance notice of its intent to terminate the agreement. PharmaMar retains manufacturing rights for the API for U.S. and Canadian commercial supply of Zepzelca.

20

Table of Contents

*Rylaze.* Rylaze is currently manufactured by Patheon, and the API of Rylaze is manufactured by AGC Biologics A/S. The initial term of the agreement with Patheon will expire in December 2025 and will then be subject to automatic two-year extensions, unless either party provides advance notice of its intent to terminate the agreement. The initial term of the agreement with AGC Biologics A/S will expire in October 2026 and will then be subject to automatic three-year extensions, unless either party provides advance notice of its intent to terminate the agreement.

*Vyxeos.* Vyxeos is manufactured by Simtra, which is a sole source supplier from a single site location, using our CombiPlex technology platform. CombiPlex products represent formulations with increased manufacturing complexities associated with producing drug delivery vehicles encapsulating two or more drugs that are maintained at a fixed ratio and, in the case of Vyxeos, two drugs that are co-encapsulated in a freeze-dried liposomal format. Our manufacturing agreement with Simtra expires in August 2025, subject to automatic three-year renewal terms, unless either party provides advance notice of its intent to terminate the agreement. While other contract manufacturers may be able to produce Vyxeos, the proprietary technology that supports the manufacture of Vyxeos is not easily transferable. The marketing authorization in the EU for Vyxeos also requires us to comply with certain manufacturing-related post-approval commitments.

*Defitelio.* We are our own sole supplier of, and we believe that we are currently the sole worldwide producer of, defibrotide API. We manufacture defibrotide API from porcine DNA in a single facility located in Villa Guardia, Italy. Patheon currently processes defibrotide API into its finished vial form under a specific product agreement entered into under a separate agreement with Patheon. Patheon is the sole provider of our commercial and clinical supply of Defitelio; however, we are not required to purchase Defitelio exclusively from Patheon. If Patheon does not or is not able to supply us with Defitelio for any reason, it may take time and resources to implement and execute the necessary technology transfer to another processor, and such delay could negatively impact our anticipated revenues from Defitelio and could potentially cause us to breach contractual obligations with customers or to violate local laws requiring us to deliver the product to those in need.

### Product Candidates

For discussion of the challenges we face with respect to supply of our products and product candidates, see the risk factor under the heading "*Delays or problems in the supply of our products for sale or for use in clinical trials, loss of our single source suppliers or failure to comply with manufacturing regulations could materially and adversely affect our business, financial condition, results of operations and growth prospects*" in Part I, Item 1A of this Annual Report on Form 10-K.

## Patents and Proprietary Rights

We actively seek to patent, or to acquire or obtain licenses to third party patents, to protect our products and product candidates and related inventions and improvements that we consider important to our business. We own a portfolio of U.S. and non-U.S. patents and patent applications and have licensed rights to a number of issued patents and patent applications. Our owned and licensed patents and patent applications cover or relate to our products and product candidates, including certain formulations, used to treat particular conditions, distribution methods and methods of administration, drug delivery technologies and delivery profiles and methods of making and use. Patents extend for varying periods according to the date of the patent filing or grant and the legal term of patents in the various countries where patent protection is obtained. The patent laws of non-U.S. countries differ from those in U.S., and the degree of protection afforded by non-U.S. patents may be different from the protection offered by U.S. patents. In addition to patents, our products and product candidates are in some instances protected by various regulatory exclusivities. For a description of those exclusivities and their regulatory background, see "Business—Government Regulation—Marketing Exclusivity—The Hatch-Waxman Act" in this Part I, Item 1.

The patents, patent applications and regulatory exclusivities that relate to our marketed products include:

- *Xywav.* We have 13 U.S. patents that relate to Xywav. These patents expire from 2033 to 2037. In addition, we have patent applications that relate to Xywav for use in additional indications that would, if issued, expire between 2040 and 2041. Xywav has been granted ODE by FDA to treat narcolepsy through 2027 and to treat IH through 2028. Some of our Xywav patents have been subject to patent litigation with the companies who filed ANDAs seeking to market a generic version of Xywav. For example, we received notices in June 2021 and February 2023, that Lupin and Teva, respectively, filed ANDAs for generic versions of Xywav. For additional information on litigation involving these matters, see Note 14, Commitments and Contingencies-Legal Proceedings of the Notes to Consolidated Financial Statements, included in Part IV of this Annual Report on Form 10-K.

- *Xyrem.* We currently have six issued patents in the U.S. relating to Xyrem listed in FDA's publication "Approved Drug Products with Therapeutic Equivalence Evaluations," or the Orange Book. Our patents relate to Xyrem's restricted distribution system and a drug-drug interaction, or DDI, between Xyrem and divalproex sodium. In October 2018, as a result of FDA's grant of pediatric exclusivity, an additional six months was added to the original expiration dates of all of our Orange Book-listed patents that existed at that time. As a result, our Orange Book-listed patents have periods of exclusivity between December 2022 (with an additional six months for pediatric exclusivity) and September 2033. Some of our Xyrem patents have been subject to patent litigation with the companies who filed

21

Table of Contents

ANDAs seeking to market a generic version of Xyrem, including challenge through the inter partes review, or IPR, procedures of the Patent Trial and Appeal Board, or PTAB, of the U.S. Patent and Trademark Office, or USPTO. Some IPR petitions were dismissed by the PTAB. However, in July 2018, the United States Court of Appeals for the Federal Circuit upheld on appeal PTAB decisions finding that six patents associated with the Xywav and Xyrem REMS and three claims of a seventh REMS patent were unpatentable. As a result, we will not be able to enforce patents or claims that the PTAB found unpatentable. Although we have settled all patent litigation against the ten companies that filed ANDAs, it is possible that additional companies may challenge our U.S. patents for Xyrem in the future. For a description of our Xyrem settlements, see the risk factor under the heading "The introduction of new products in the U.S. market that compete with, or otherwise disrupt the market for, our oxybate products has adversely affected and may continue to adversely affect sales of our oxybate products" in Part I, Item 1A of this Annual Report on Form 10-K. For additional information on litigation involving or Orange Book-listed patents, see "*Avadel Patent Litigation*" in Note 14, Commitments and Contingencies-Legal Proceedings of the Notes to Consolidated Financial Statements, included in Part IV of this Annual Report on Form 10-K.

A Xyrem formulation patent that had issued in multiple non-U.S. countries expired in 2019. The European Patent Office has issued a method of administration patent relating to the DDI between Xyrem and divalproex sodium that will expire in 2034. That patent is licensed to UCB as the marketing authorization holder outside of the U.S. and Canada, and UCB has the right to enforce it. In addition to our issued patents, we have patent applications relating to Xyrem pending in the U.S. and other countries.

- *Epidiolex.* Our patent portfolio relating to the use of CBD in the treatment of epileptic encephalopathies includes 28 issued U.S. patents listed in the Orange Book. These patents claim the use of CBD for the treatment of convulsive, drop and atonic seizures associated with both LGS and DS, an oral composition of CBD, as well as the use of CBD in combination with clobazam, and the teaching that dose adjustment may be needed when concomitantly prescribed. The patents currently listed in the Orange Book will expire between 2035 and 2041. We have filed corresponding patent applications in many jurisdictions worldwide, including Europe, U.K., Canada, Japan, Mexico, Australia and New Zealand. The USPTO has granted a patent based on data that demonstrates that Epidiolex provides a benefit over synthetic CBD in an animal model of epilepsy, which will expire in 2039 and we have listed it in the Orange Book. Epidiolex has received ODE to treat seizures associated with LGS and DS through 2025 and TSC through 2027. Some of our Epidiolex patents have been subject to patent litigation with the companies who filed ANDAs seeking to market a generic version of Epidiolex. In November and December 2022, ten companies sent us notices that they had filed ANDAs seeking approval to market a generic version of Epidiolex. For additional information on litigation involving these matters, see Note 14, Commitments and Contingencies-Legal Proceedings of the Notes to Consolidated Financial Statements, included in Part IV of this Annual Report on Form 10-K.

- *Zepzelca.* In December 2019, we entered into an exclusive license agreement with PharmaMar pursuant to which we obtained exclusive U.S. development and commercialization rights to Zepzelca. In October 2020, we entered into the amended license agreement which expanded our exclusive license to include rights to develop and commercialize Zepzelca in Canada. We have a portfolio of in-licensed U.S. and Canadian patents for lurbinectedin relating to compositions, methods of use, and processes. For example, one Orange Book listed U.S. patent (expiring in 2029, with granted patent term extension) covers a genus of compounds, including lurbinectedin, and use in treating various cancers. A request for extension (CSP) has also been filed in Canada. Zepzelca has also been granted ODE for the treatment of adults with metastatic SCLC with disease progression on or after platinum-based chemotherapy until 2027 and new chemical entity exclusivity until 2025 in the U.S.

- *Rylaze.* In 2016, we obtained worldwide rights from Pfenex, Inc., or Pfenex, including Pfenex's patent rights relating to Rylaze, to develop and commercialize multiple early-stage hematology product candidates, including a license to two U.S. process patents relating to Rylaze, with respective expirations in 2026 and 2038. Pfenex has been acquired by Ligand Pharmaceuticals Incorporated. Rylaze has been granted orphan drug designation for the treatment of patients with ALL or LBL. We have two patent application families relating to dosing regimens. One covers the dosing regimen ($25mg/m^2$ intramuscularly every 48 hours), while the other covers various dosing regimens of interest. If issued, these would expire in 2040 and 2042, respectively. Another patent application relating to formulations of asparaginase would expire in 2042, if issued.

- *Vyxeos.* We have a portfolio of U.S. and non-U.S. patents and patent applications for Vyxeos and the CombiPlex technology platform relating to various compositions and methods of making and use. These include seven U.S. patents covering Vyxeos compositions and methods of use expiring between 2025 and 2032 and two U.S. patents covering CombiPlex (which also cover Vyxeos) expiring in January 2027. These patents are listed in the Orange Book. Vyxeos has been granted ODE by FDA until August 2024, seven years from its FDA approval, for the treatment of adults with newly-diagnosed t-AML or AML-MRC. In March 2021, FDA approved an expanded label for Vyxeos for the treatment of t-AML or AML-MRC in pediatric patients 1 year and older. In addition, Vyxeos has

22

Table of Contents

been granted orphan drug designation by the EC until August 2028, ten years from its EC approval for the treatment of adults with newly-diagnosed t-AML or AML-MRC and was approved by Health Canada for treatment of adults with newly diagnosed t-AML or AML-MRC in April 2021.

- *Defitelio*. The unique process of deriving defibrotide from porcine DNA is extensive and uses both chemical and biological processes that rely on complex characterization methods. We have U.S. and non-U.S. patents and patent applications relating to various compositions, methods of use and methods of characterization, with the issued patents expiring at various times between 2021 and 2035. Three U.S. patents are listed in the Orange Book. Defibrotide has also been granted orphan drug designation by the Korean Ministry of Food and Drug Safety to treat and prevent VOD, by the Commonwealth of Australia-Department of Health for the treatment of VOD and by the EC for the prevention of acute Graft-versus-Host Disease and has also received approvals in Canada, Brazil and Switzerland. We acquired the rights to defibrotide for the treatment and prevention of VOD in North America, Central America and South America from Sigma-Tau Pharmaceuticals, Inc. in 2014.

The patents and/or patent applications that relate to our product candidates include:

- *Zanidatamab*. Through a license agreement with Zymeworks BC Inc. in 2022, we obtained a license to a portfolio of U.S. and non-U.S. patents and patent applications, including rights relating to compositions and methods of using zanidatamab. The portfolio contains a U.S. composition of matter patent relating to zanidatamab, which expires in 2034 (excluding any adjustments or extensions).

- *JZP815*. Through a collaboration agreement and an asset purchase agreement with Redx in 2019, we acquired a portfolio of U.S. and non-U.S. patents and patent applications, including rights relating to compositions and methods of using JZP815. The portfolio contains a U.S. composition of matter patent relating to JZP815, which expires in 2035 (excluding any adjustments or extensions).

- *JZP898*. Through a license agreement with Werewolf in 2022, we obtained a license to a portfolio of U.S. and non-U.S. patents and patent applications, including rights relating to compositions and methods of using JZP898. The portfolio contains a U.S. composition of matter patent relating to JZP898, which, if granted, expires in 2040 (excluding any adjustments or extensions).

- *Suvecaltamide (JZP385)*. Through the acquisition of Cavion in 2019, we obtained a portfolio of U.S. and non-U.S. patents and patent applications, including rights relating to compositions and methods of using suvecaltamide. The portfolio includes a U.S. composition of matter patent relating to suvecaltamide, which expires in 2027, but which may be extended to 2032 depending on regulatory approval. A U.S. patent to the treatment of ET may provide supplemental protection to 2039.

- *JZP441*. Through a license agreement with Sumitomo in 2022, we obtained a license to a portfolio of U.S. and non-U.S. patents and patent applications, including rights relating to compositions and methods of using JZP441. The portfolio contains a U.S. composition of matter patent relating to JZP441, which expires in 2040 (excluding any adjustments or extensions).

In addition, we have rights to a number of trademarks and service marks, and pending trademark and service mark applications, in the U.S. and elsewhere in the world to further protect the proprietary position of our products. For a discussion of the challenges we face in obtaining or maintaining patent and/or trade secret protection, see the risk factors under the heading "Risks Related to Our Intellectual Property" in Part I, Item 1A of this Annual Report on Form 10-K.

## Government Regulation

As a global pharmaceutical company, our activities are subject to extensive regulation in the U.S., Europe and other countries where we do business. Regulatory requirements encompass the entire life cycle of pharmaceutical products, from research and development activities to marketing approval, manufacturing, labeling, packaging, adverse event and safety reporting, storage, advertising, promotion, sale, pricing and reimbursement, recordkeeping, distribution, importing and exporting. Regulations differ from country to country and are constantly evolving.

### *Testing and Approval of Pharmaceutical Products*

We are not permitted to market a product in a country until we receive approval from the relevant regulatory authority, such as FDA in the U.S. and the EC or the competent authorities of the EU member states. An application for marketing approval must contain information generated by the applicant, also called a sponsor, demonstrating the quality, safety and efficacy of the product candidate, including data from preclinical and clinical trials, proposed product packaging and labeling and information pertaining to product formulation and the manufacture and analytical testing of the API and the finished product.

Table of Contents

In the U.S., FDA reviews and, if warranted, approves applications for marketing approval. The process for obtaining marketing approval in the U.S. for a drug or biologic product candidate generally includes:

- conducting preclinical laboratory and animal testing and submitting the results to FDA in an investigational new drug, or IND, application requesting approval to test the product candidate in human clinical trials;

- conducting adequate and well-controlled human clinical trials to establish the safety and efficacy of the product candidate in the desired indication;

- submitting an NDA, supplemental New Drug Application, or sNDA or BLA as appropriate, to FDA seeking approval for a specific indication; and

- completing inspections by FDA of the facilities where the product candidate is manufactured, analyzed and stored to demonstrate compliance with current Good Manufacturing Practices, or cGMP, and any requested FDA audits of the clinical trial sites that generated the data supporting the application.

Human clinical trials conducted before approval of a product generally proceed in three sequential phases, although the phases may overlap. In Phase 1, the initial introduction of the product candidate in humans, the product candidate is typically tested to assess metabolism, pharmacokinetics, pharmacological actions and tolerability, including side effects associated with increasing doses. Phase 2 usually involves clinical trials in a limited patient population to determine the effectiveness of the product candidate for a particular indication or indications, dosage tolerance and optimum dosage and to identify common adverse effects and safety risks. If a product candidate demonstrates evidence of effectiveness and an acceptable safety profile in Phase 2, Phase 3 clinical trials are undertaken to obtain additional information about clinical efficacy and safety in a larger number of patients. Clinical trials must be conducted in accordance with specific protocols, as well as FDA requirements related to conducting the trials and recording and reporting the results, commonly referred to as good clinical practices, to ensure that the resulting data are credible and accurate and that the trial participants are adequately protected. FDA enforces good clinical practices through periodic inspections of trial sponsors, clinical investigators and trial sites.

Once an NDA, sNDA or BLA has been compiled and submitted, FDA performs an initial review before it accepts the application for filing. FDA may refuse to file an application and/or request additional information before acceptance. Once accepted for filing, FDA begins an in-depth review of the application. Under the current goals and policies agreed to by FDA under the Prescription Drug User Fee Act, or PDUFA, for a new molecular entity, FDA has ten months from the filing decision in which to complete its initial review of a standard application and respond to the applicant, and six months from the filing decision for a priority application. FDA does not always meet its PDUFA goal dates, and in certain circumstances, the PDUFA goal date may be extended.

FDA also has various programs, including Fast Track, Priority Review, Breakthrough Therapy and Accelerated Approval (Subpart H and E), RTOR pilot program, that are intended to expedite the process for reviewing certain applications and/or provide for approval on the basis of surrogate endpoints or restricted distribution. Generally, products may be eligible for one or more of these programs if they are intended for serious or life-threatening diseases or conditions, have potential to address unmet medical needs, or may provide meaningful benefit over existing treatments. For example, FDA granted Vyxeos Breakthrough Therapy and Fast Track designations and granted Priority Review with respect to our NDA for Vyxeos for the treatment of t-AML and AML-MRC that was approved in August 2017. In addition, a priority review voucher, or PRV, may be used to obtain priority review by FDA for one of our future regulatory submissions. We used the PRV we acquired in May 2018 to obtain priority review for our Xywav for the treatment of IH sNDA, which was approved by FDA in August 2021. In June 2020, FDA granted Accelerated Approval to Zepzelca for relapsed SCLC. In December 2020, we initiated the submission of a BLA for Rylaze for ALL under the RTOR pilot program, which was approved by FDA in June 2021.

During its review of an application, FDA evaluates whether the product demonstrates the required level of safety and efficacy for the indication for which approval is sought and conducts the inspections and audits described above. FDA may also refer an application to an advisory committee, typically a panel of clinicians, for review, evaluation and a non-binding recommendation as to whether the application should be approved. When FDA completes its evaluation, it issues either an approval letter or a complete response letter. A complete response letter generally outlines what FDA considers to be the deficiencies in the application and may indicate that substantial additional testing or information is required prior to FDA approval of the product. If and when identified deficiencies have been addressed to FDA's satisfaction after a review of the resubmission of the application FDA will issue an approval letter.

Even if a product is approved, the approval may be subject to limitations based on FDA's interpretation of the data submitted in the application. For example, as a condition of approval, FDA may require the sponsor to agree to certain post-marketing requirements, such as conducting Phase 4, or post-approval, clinical trials to gain additional safety data or to document a clinical benefit in the case of products approved under Accelerated Approval regulations. FDA's approval of the NDA for Defitelio included a number of post-marketing commitments and requirements, including the requirement that we conduct a clinical trial to analyze the safety of defibrotide versus best supportive care in the prevention of VOD in adult and

24

Table of Contents

pediatric patients. For its approval of Vyxeos, FDA required that we conduct a safety study to characterize infusion-related reactions in patients treated with Vyxeos and a clinical trial to determine dosing to minimize toxicity in patients with moderate and severe renal impairment. Further, FDA granted Accelerated Approval to Zepzelca for relapsed SCLC based on data from a Phase 2 trial, which approval is contingent upon verification and description of clinical benefit in a post-marketing clinical trial.

In addition, if FDA determines that a REMS is necessary to ensure that the benefits of the product outweigh the risks, a sponsor may be required to include a proposed REMS (either as part of the application or after approval), which may include a patient package insert or a medication guide to provide information to consumers about the product's risks and benefits; a plan for communication to healthcare providers; or conditions on the product's prescribing or distribution referred to as elements to assure safe use. Xywav and Xyrem are required to have a REMS. For more discussion regarding the Xywav and Xyrem REMS, see the risk factors under the headings "*The distribution and sale of our oxybate products are subject to significant regulatory restrictions, including the requirements of a REMS, and these regulatory requirements subject us to risks and uncertainties, any of which could negatively impact sales of Xywav and Xyrem*" and "Risks Related to Our Intellectual Property" in Part I, Item 1A of this Annual Report on Form 10-K.

The EU and many individual countries have regulatory structures similar to the U.S. for conducting preclinical and clinical testing and applying for marketing approval or authorization, although specifics may vary widely from country to country. Clinical trials in the EU must be conducted in accordance with the requirements of the EU Clinical Trials Regulation and applicable good clinical practice standards. In the EU, there are several procedures for requesting marketing authorization which can be more efficient than applying for authorization on a country-by-country basis. There is a "centralized" procedure allowing submission of a single marketing authorization application to the European Medicines Agency, or EMA. If the EMA issues a positive opinion, the EC will grant a centralized marketing authorization that is valid in all EU member states and three of the four European Free Trade Association countries (Iceland, Liechtenstein and Norway). The centralized procedure is mandatory for certain medicinal products, including orphan medicinal products and biotechnology-derived medicinal products, and optional for others. There is also a "decentralized" procedure allowing companies to file identical applications to several EU member states simultaneously for product candidates that have not yet been authorized in any EU member state and a "mutual recognition" procedure allowing companies that have a product already authorized in one EU member state to apply for that authorization to be recognized by the competent authorities in other EU member states. The U.K.'s withdrawal from the EU on January 31, 2020, commonly referred to as Brexit, has created uncertainty concerning the future relationship between the U.K. and the EU. Among the changes that have had a direct impact are that Great Britain (England, Scotland and Wales) is now treated as a third country. To mitigate the immediate impact of this in December 2020, the EU and U.K. reached an agreement in principle on the framework for their future relationship, the EU-U.K. Trade and Cooperation Agreement, or TCA. With regard to EU regulations, Northern Ireland continues to follow the EU regulatory rules. As part of the TCA, the EU and the U.K. recognize Good Manufacturing Practice, or GMP, inspections carried out by the other party and the acceptance of official GMP documents issued by the other party. The TCA also encourages, although it does not oblige, the parties to consult one another on proposals to introduce significant changes to technical regulations or inspection procedures. Among the areas of absence of mutual recognition are batch testing and batch release. The U.K. has unilaterally agreed to accept EU batch testing and batch release; there is a list of approved countries for import into Great Britain, currently including EU and EEA countries, which require no import testing or U.K. "qualified person" release certification. However, the EU continues to apply EU laws that require batch testing and batch release to take place in the EU territory. This means that medicinal products that are tested and released in the U.K. must be retested and re-released when entering the EU market for commercial use. As regards marketing authorizations, Great Britain has introduced a separate regulatory submission process, approval process and a separate national marketing authorization. Northern Ireland, however, continues to be covered by the marketing authorizations granted by the EC.

The maximum timeframe for the evaluation of an application in the EU under the centralized procedure is 210 days, subject to certain exceptions and clock stops. An initial marketing authorization granted in the EU is valid for five years, with renewal subject to re-evaluation of the risk-benefit profile of the product. Once renewed, the authorization is usually valid for an unlimited period unless the national competent authority or the EC decides on justified grounds to proceed with one additional five-year renewal.

In the EU, if an applicant can demonstrate that comprehensive data on the efficacy and safety of the product under normal conditions of use cannot be provided due to certain specified objective and verifiable reasons, products may be granted marketing authorization "under exceptional circumstances." A marketing authorization granted under exceptional circumstances is valid for five years, subject to an annual reassessment of conditions imposed by the EC. The marketing authorization in the EU for Defitelio was granted under exceptional circumstances because it was not possible to obtain complete information about the product due to the rarity of the disease and because ethical considerations prevented conducting a study directly comparing Defitelio with best supportive care or a placebo. As a result, the marketing authorization requires us to comply with a number of post-marketing obligations, including obligations relating to the manufacture of the drug substance and finished product, the submission of data concerning patients treated with the product collected through a third-party patient registry and the establishment of a multi-center, multinational and prospective observational patient registry to investigate the

Table of Contents

long-term safety, health outcomes and patterns of utilization of Defitelio during normal use. We are in the process of conducting the post-authorization study in the EU to provide further data on long-term safety, health outcomes and patterns of utilization of Defitelio in normal use.

Similar to the use of REMS in the U.S. to ensure that the benefits of a product outweigh its risks, in the EU and other countries we are required and may, in the future in relation to new products, be required to agree to post-marketing obligations or conditions in the marketing authorization for our products, to include a patient package insert or a medication guide to provide information to consumers about the product's risks and benefits, to implement a plan for communication to healthcare providers, and to impose restrictions on the product's distribution. For example, the marketing authorization in the EU for Vyxeos requires us to comply with certain manufacturing-related post-approval commitments.

After approval, certain changes to the approved product, such as adding new indications, making certain manufacturing changes, modifying a REMS, or making certain additional labeling claims, are subject to further regulatory review and approval. Obtaining approval for a new indication generally requires that additional clinical studies be conducted to demonstrate that the product is safe and effective for the new intended use. Such regulatory reviews can result in denial or modification of the planned changes, or requirements to conduct additional tests or evaluations that can substantially delay or increase the cost of the planned changes.

### *Manufacture of Pharmaceutical Products*

The manufacturing process for pharmaceutical products is highly regulated, and regulators may shut down manufacturing facilities that they believe do not comply with regulations. We and the third party suppliers of our products are subject to cGMP, which are extensive regulations governing manufacturing processes, stability testing, recordkeeping and quality standards as defined by FDA, the EC, the EMA, competent authorities of EU member states and other regulatory authorities. FDA also periodically inspects manufacturing facilities and the sponsor's and manufacturer's records related to manufacturing, and assesses compliance with cGMP. Following such inspections, FDA may issue notices on Form FDA 483 and warning letters. In addition to Form FDA 483 notices and warning letters, failure to comply with the statutory and regulatory requirements may result in suspension of manufacturing, product seizure, withdrawal of the product from the market, administrative, civil and criminal penalties, among other enforcement remedies both in the U.S. and in non-U.S. countries.

In the EU, a manufacturing authorization is required to manufacture medicinal products, and the manufacturing authorization holder must comply with various requirements set out in applicable EU laws, regulations and guidance. These requirements include compliance with EU cGMP standards when manufacturing products and their APIs, including APIs manufactured outside of the EU with the intention of importing them into the EU. In addition to inspection reports, manufacturers and marketing authorization holders may be subject to civil, criminal or administrative sanctions, including suspension of manufacturing authorization, in cases of non-compliance with the EU or EU member states' requirements applicable to manufacturing.

### *Sales and Marketing of Pharmaceutical Products*

#### *Advertising and Promotional Activities*

FDA regulates advertising and promotional activities for products in the U.S., requiring advertising, promotional materials and labeling to be truthful and not misleading, and products to be marketed only for their approved indications and in accordance with the provisions of the approved label. FDA actively investigates allegations of off-label promotion in order to enforce regulations prohibiting these types of activities. FDA routinely issues informal and more formal communications such as untitled letters or warning letters interpreting its authority over these matters. While such communications may not be considered final agency decisions, many companies may decide not to contest the agency's interpretations so as to avoid disputes with FDA, even if they believe the claims they were making to be truthful, not misleading and otherwise lawful.

In the EU, the advertising and promotion of our products are subject to laws governing promotion of medicinal products, interactions with physicians, misleading and comparative advertising and unfair commercial practices. For example, applicable laws require that promotional materials and advertising in relation to medicinal products comply with the product's Summary of Product Characteristics, or SmPC, as approved by the competent authorities in connection with a marketing authorization approval. The SmPC is the document that provides information to physicians concerning the safe and effective use of the product. Promotional activity that does not comply with the SmPC is considered off-label and is prohibited in the EU. Other applicable laws at the EU level and in the individual EU member states also apply to the advertising and promotion of medicinal products, including laws that prohibit the direct-to-consumer advertising of prescription-only medicinal products and further limit or restrict the advertising and promotion of our products to the general public and to health care professionals. Violations of the rules governing the promotion of medicinal products in the EU could be penalized by administrative measures, fines and imprisonment.

Table of Contents

*Fraud and Abuse*

We are also subject to numerous fraud and abuse laws and regulations globally. In the U.S., there are a variety of federal and state laws restricting certain marketing practices in the pharmaceutical industry pertaining to healthcare fraud and abuse, including anti-kickback laws and false claims laws. Our sales, marketing, patient support and medical activities may be subject to scrutiny under these laws. The U.S. federal healthcare program Anti-Kickback Statute prohibits, among other things, knowingly and willfully offering, paying, soliciting or receiving anything of value to induce (or in return for) the referral of business, including the purchase, recommendation or prescription of a particular drug reimbursable under Medicare, Medicaid or other federally financed healthcare programs. The statute has been interpreted to apply to arrangements between pharmaceutical companies on one hand and patients, prescribers, purchasers and formulary managers on the other. Although there are a number of statutory exemptions and regulatory safe harbors protecting certain common manufacturer business arrangements and activities from prosecution and administrative sanction, the exemptions and safe harbors are drawn narrowly and are subject to regulatory revision or changes in interpretation by the U.S. Department of Justice, or DOJ, and the Office of Inspector General of the U.S. Department of Health and Human Services, or OIG. Practices or arrangements that involve remuneration may be subject to scrutiny if they do not qualify for an exemption or safe harbor. For example, in November 2020, the OIG issued a Special Fraud Alert to highlight certain inherent risks of remuneration related to speaker programs sponsored by drug and device companies, which may not in all circumstances qualify under either safe harbor or statutory exception protection. The Special Fraud Alert sent a clear signal that speaker programs will be subject to potentially heightened enforcement scrutiny, in particular for those programs with certain characteristics identified as risk factors by OIG, including meals exceeding modest value or where alcohol is made available; lack of substantive or new content presented; programs held at venues not conducive to the exchange of educational information; repeat attendees or attendees without a legitimate business interest; sales or marketing influence on speaker selection; and excessive speaker compensation. Violations of the federal Anti-Kickback Statute may be established without providing specific intent to violate the statute, and may be punishable by civil, criminal, and administrative fines and penalties, damages, imprisonment, and/or exclusion from participation in federal healthcare programs.

The federal civil False Claims Act prohibits, among other things, any person from knowingly presenting, or causing to be presented, a false or fraudulent claim for payment of federal funds, or knowingly making, or causing to be made, a false statement to get a false claim paid. A claim resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim. The False Claims Act also permits a private individual acting as a "whistleblower" to bring actions on behalf of themselves and the federal government alleging violations of the statute and to share in any monetary recovery. Violations of the False Claims Act may result in significant financial penalties (including mandatory penalties on a per claim or statement basis), treble damages and exclusion from participation in federal health care programs.

Pharmaceutical companies are subject to other federal false claim and statements laws, some of which extend to non-government health benefit programs. For example, the healthcare fraud provisions under the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations, or HIPAA, impose criminal liability for, among other things, knowingly and willfully executing, or attempting to execute, a scheme to defraud any health care benefit program, including private third party payors, or falsifying or covering up a material fact or making any materially false or fraudulent statement in connection with the delivery of or payment for health care benefits, items or services. Violations of HIPAA fraud provisions may result in criminal, civil and administrative penalties, fines and damages, including exclusion from participation in federal healthcare programs.

The majority of individual states also have statutes or regulations similar to the federal anti-kickback law and the False Claims Act, which apply to items and services reimbursed under Medicaid and other state programs, or, in several states, apply regardless of the payor. Other states restrict whether and when pharmaceutical companies may provide meals to health care professionals or engage in other marketing-related activities, and certain states and cities require identification or licensing of sales representatives.

**Other Post-Approval Pharmaceutical Product Regulation**

*Safety Reporting/Pharmacovigilance*

FDA, the EMA and other governmental authorities track information on side effects and adverse events reported during clinical studies and after marketing approval. We are required to file periodic safety update reports with the authorities concerning adverse events. If, upon review, an authority determines that any events and/or reports indicate a trend or signal, they can require a change in a product label, restrict sales and marketing, require post-approval safety studies, require a labor intensive collection of data regarding the risks and benefits of marketed products and ongoing assessments of those risks and benefits and/or require or conduct other actions, potentially including withdrawal or suspension of the product from the market. For example, if the EMA has concerns that the risk-benefit profile of a product has changed, it can, following an investigation procedure, adopt an opinion advising that the existing marketing authorization for the product be varied or suspended and requiring the marketing authorization holder to conduct post-authorization safety studies. The opinion is then submitted for

27

Table of Contents

approval by the EC. Also, from time to time, FDA issues drug safety communications on its adverse event reporting system based on its review of reported adverse events.

FDA and the competent authorities of the EU member states on behalf of the EMA also periodically inspect our records related to safety reporting. Following such inspections, FDA may issue notices on FDA Form 483 and warning letters that could cause us to modify certain activities. An FDA Form 483 notice, if issued, can list conditions FDA investigators believe may have violated relevant FDA regulations or guidance. Failure to adequately and promptly correct the observation(s) can result in a warning letter or other regulatory enforcement action. Similarly, the EMA's Pharmacovigilance Risk Assessment Committee may propose to the Committee for Medicinal Products for Human Use that the marketing authorization holder be required to take specific steps. Non-compliance can lead to the variation, suspension or withdrawal of marketing authorization or imposition of financial penalties or other enforcement measures.

*Sunshine Act and Transparency Laws*

The Physician Payment Sunshine Act requires tracking of payments and transfers of value to physicians and teaching hospitals and ownership interests held by physicians and their families, and reporting to the federal government and public disclosure of these data. Since 2022, reporting has been required of information regarding payments and transfers of value provided to physician assistants, nurse practitioners, clinical nurse specialists, certified nurse anesthetists, and certified nurse-midwives. A number of states now require pharmaceutical companies to report expenses relating to the marketing and promotion of pharmaceutical products and to report gifts and payments to healthcare providers in the states. Government agencies and private entities may inquire about our marketing practices or pursue other enforcement activities based on the disclosures in those public reports.

Outside the U.S., interactions between pharmaceutical companies and physicians are also governed by strict laws, regulations, industry self-regulation codes of conduct and physicians' codes of professional conduct. The provision of benefits or advantages to physicians to induce or encourage the prescription, recommendation, endorsement, purchase, supply, order or use of medicinal products, which is prohibited in the EU, is governed by the national anti-bribery laws of the EU member states, as described below in "Business—Government Regulation—Anti-Corruption Legislation" in this Part I, Item 1. Violation of these laws could result in substantial fines and imprisonment. Certain EU member states, or industry codes of conduct, require that payments made to physicians be publicly disclosed. Moreover, agreements with physicians must often be the subject of prior notification and approval by the physician's employer, his/her competent professional organization, and/or the competent authorities of the individual EU member states. Failure to comply with these requirements could result in reputational risk, public reprimands, administrative penalties, fines or imprisonment.

*Controlled Substance Regulations*

A drug product approved by FDA may be subject to scheduling as a controlled substance under the CSA depending on the drug's potential for abuse. Controlled substances that are pharmaceutical products are subject to a high degree of regulation under the CSA, which establishes, among other things, certain registration, manufacturing quotas, security, recordkeeping, reporting, import, export and other requirements administered by the DEA. The DEA classifies controlled substances into five schedules. Schedule I substances by definition have a high potential for abuse, have no currently "accepted medical use" in the U.S., lack accepted safety for use under medical supervision, and may not be prescribed, marketed or sold in the U.S. Pharmaceutical products approved for use in the U.S. may be classified as Schedule II, III, IV or V, with Schedule II substances considered to present the highest potential for abuse or dependence and Schedule V substances the lowest relative risk of abuse. The API of Xywav and Xyrem, oxybate salts, are regulated by the DEA as Schedule I controlled substances, and Xywav and Xyrem drug products are regulated as Schedule III controlled substances. Certain product candidates we are developing contain controlled substances as defined in the CSA. Drug products approved by FDA that contain cannabis or cannabis extracts may be controlled substances and will be rescheduled to Schedules II-V after approval, or, like Epidiolex, removed completely from the schedules by operation of other laws.

The DEA limits the quantity of certain Schedule I and II controlled substances that may be manufactured and procured in the U.S. in any given calendar year through a quota system and, as a result, quotas from the DEA are required in order to manufacture and procure oxybate salts in the U.S. Accordingly, we require DEA quotas for Siegfried, our U.S. based sodium oxybate supplier, to manufacture sodium oxybate and for Patheon, our U.S.-based Xyrem supplier, to procure sodium oxybate from Siegfried in order to manufacture and supply us with Xyrem drug product. We also require DEA quotas for Patheon to manufacture and procure the API of Xywav oxybate salt. Xywav and Xyrem manufactured at our plant in Ireland enters the U.S. as a Schedule III drug and thus does not require a DEA manufacturing or procurement quota.

As Schedule III drugs, Xywav and Xyrem are also subject to DEA and state regulations relating to the importation, manufacturing, storage, distribution and physician prescription procedures, including limitations on prescription refills. In addition, the third parties who perform our clinical and commercial manufacturing, distribution, dispensing and clinical studies for Xywav and Xyrem are required to maintain necessary DEA registrations and state licenses. The DEA periodically inspects facilities for compliance with its rules and regulations.

28

Table of Contents

*Other Regulations*

There are many other requirements and restrictions in the U.S. and elsewhere imposed on pharmaceutical companies and their activities, including those related to the posting of information relating to clinical studies and their outcomes, the export and importation of products, required authorizations for distributors, the identification or licensing of sales representatives, restrictions on the ability of manufacturers to offer co-pay support to patients for certain prescription drugs, implementation of required compliance programs or marketing codes of conduct, protection of the environment, taxation and work safety. Non-compliance with such requirements may result in civil, criminal or administrative sanctions.

### Anti-Corruption Legislation

Our business activities outside of the U.S. are subject to the U.S. Foreign Corrupt Practices Act, or FCPA, and similar anti-bribery or anti-corruption laws, regulations, industry self-regulation codes of conduct and physicians' codes of professional conduct or rules of other countries in which we operate, including the U.K. Bribery Act of 2010, or the U.K. Bribery Act. The FCPA and similar anti-corruption laws in other countries generally prohibit the offering, promising, giving, or authorizing others to give anything of value, either directly or indirectly, to U.S. or non-U.S. government officials in order to improperly influence any act or decision, secure an improper advantage, or obtain or retain business. The FCPA also requires public companies to make and keep books and records that accurately and fairly reflect the transactions of the company and to devise and maintain an adequate system of internal accounting controls. The U.K. Bribery Act prohibits giving, offering, or promising bribes to any person, including U.K. and non-U.K. government officials and private persons, as well as requesting, agreeing to receive, or accepting bribes from any person. In addition, under the U.K. Bribery Act, companies that carry on a business or part of a business in the U.K. may be held liable for bribes given, offered or promised to any person, including U.K. and non-U.K. government officials and private persons in any country, by employees and persons associated with the company in order to obtain or retain business or a business advantage for the company. Liability is strict, with no element of a corrupt state of mind, but a defense of having in place adequate procedures designed to prevent bribery is available under the U.K. Bribery Act and certain other laws; under the FCPA, it might be considered as a mitigating factor.

As described above, our business is heavily regulated and therefore involves significant interaction with government officials in many countries. Additionally, in certain countries, the health care providers who prescribe pharmaceuticals are employed by their government, and the purchasers of pharmaceuticals are government entities; therefore, our dealings with these prescribers and purchasers may be subject to the FCPA, the U.K. Bribery Act and similar laws. Recently the Securities and Exchange Commission, or SEC, and the DOJ have increased their FCPA enforcement activities with respect to pharmaceutical companies. In addition, under the Dodd-Frank Wall Street Reform and Consumer Protection Act, private individuals who report to the SEC original information that leads to successful enforcement actions may be eligible for a monetary award. We engage in ongoing efforts designed to ensure our compliance with these laws, including conducting due diligence of our business partners, requiring training of our employees on FCPA requirements, and implementing and maintaining policies, procedures, and internal controls to ensure compliance with the FCPA and similar laws. However, there is no certainty that all employees and third party business partners (including our distributors, wholesalers, agents, contractors, and other partners) will comply with anti-bribery laws. In particular, we do not control the actions of our suppliers and other third party agents, although we may be liable for their actions. Violation of these laws may result in civil or criminal sanctions, which could include monetary fines, criminal penalties, disgorgement of past profits, and could cause disruption to our business, including through procurement bans or similar administrative actions. It is possible that an adverse outcome in an FCPA action could materially affect our consolidated results of operations, liquidity, and financial position and result in parallel civil litigation such as securities class actions and shareholder derivative suits.

### Data Protection and Privacy

We are subject to data protection and privacy laws and regulations globally, which restrict the processing of personal data. The legislative and regulatory landscape for privacy and data security continues to evolve with an increased attention in countries globally that could potentially affect our business. In particular, we are subject to the EU General Data Protection Regulation, which imposes penalties up to 4% of annual global revenue, the California Consumer Privacy Act of 2018 and numerous other federal, state, national and international laws and regulations that govern the privacy and security of the personal data we collect and maintain. These laws and regulations applicable to our business, increase potential enforcement and litigation activity. In order to manage these evolving risks, we have adopted a global privacy program that governs the processing of personal data across our business.

### Marketing Exclusivity

*The Hatch-Waxman Act*

The marketing approval process described above for the U.S. is premised on the applicant being the owner of, or having obtained a right of reference to, all of the data required to prove the safety and effectiveness of a drug product. This type of marketing application, sometimes referred to as a "full" or "stand-alone" NDA, is governed by Section 505(b)(1) of the United

29

Table of Contents

States Federal Food, Drug, and Cosmetic Act, or FDCA. A Section 505(b)(1) NDA contains full reports of investigations of safety and effectiveness, which includes the results of preclinical and clinical trials, together with detailed information on the manufacture and composition of the product, in addition to other information. As an alternative, the Drug Price Competition and Patent Term Restoration Act of 1984, or the Hatch-Waxman Act, provides two abbreviated approval pathways for certain drug products.

The first path, under Section 505(b)(2) of the FDCA, usually is used for the approval of a product that is similar, but not identical, to a previously-approved brand-name product, referred to as the reference listed drug, or RLD. Under this path, the applicant is permitted to rely to some degree on FDA's finding that the RLD is safe and effective and must submit its own product-specific data on safety and effectiveness only to the extent necessary to bridge the differences between the products. The second abbreviated path established under the Hatch-Waxman Act is for the approval of generic drugs. Section 505(j) of the FDCA permits the submission of an ANDA for a generic version of an approved, brand-name drug. Generally, an ANDA must contain data and information showing that the proposed generic product and the RLD (i) have the same active ingredient, in the same strength and dosage form, to be delivered via the same route of administration, (ii) are intended for the same uses, and (iii) are bioequivalent. This data and information are provided instead of data and information independently demonstrating the proposed generic product's safety and effectiveness.

The Hatch-Waxman Act requires an ANDA or a Section 505(b)(2) NDA applicant to certify that there are no patents listed for that product in the Orange Book, or that for each Orange Book-listed patent either the listed patent has expired, the listed patent will expire on a particular date and approval is sought after patent expiration, or the listed patent is invalid or will not be infringed by the manufacture, use or sale of the new product. A certification that approval is sought after patent expiration is called a "Paragraph III Certification." A certification that the new product will not infringe the RLD's Orange Book-listed patents, or that such patents are invalid, is called a "Paragraph IV Certification." If a relevant patent covers an approved method of use, an ANDA or Section 505(b)(2) NDA applicant can also file a statement, called, in the case of an ANDA, a "section viii statement," that the application does not seek approval of the method of use covered by the listed patent. With such a statement, the applicant must "carve out" the protected method of use (typically an indication and related material) from the proposed product's labeling. If the applicant makes a Paragraph III Certification, the ANDA or the Section 505(b)(2) NDA will not be approved until the listed patents claiming the RLD have expired.

If the applicant has provided a Paragraph IV Certification to FDA, the applicant must also send a notice of that certification to the NDA holder and the relevant patent holders once FDA accepts the ANDA or the Section 505(b)(2) NDA for filing. The NDA and patent holders then have 45 days to initiate a patent infringement lawsuit. Filing the lawsuit triggers an automatic stay on FDA's approval of the ANDA or the Section 505(b)(2) NDA until the earliest of 30 months after the NDA holder's receipt of the notice of Paragraph IV Certification, expiration of the patent, certain settlements of the lawsuit, or a decision in the infringement case that is favorable to the applicant. FDA may issue tentative approval of an application if the application meets all conditions for approval but cannot receive effective approval because the 30-month stay or another period of regulatory exclusivity has not expired. If an ANDA or Section 505(b)(2) NDA is approved before conclusion of any relevant patent litigation, the applicant can choose to launch the product, but does so "at risk" of being liable for damages, and potentially treble damages, if the RLD sponsor or patent holder ultimately prevails in patent litigation.

Under the Hatch-Waxman Act, newly approved drugs and indications may benefit from statutory periods of non-patent marketing exclusivity that can potentially delay review or approval of an ANDA or Section 505(b)(2) application. For example, the Hatch-Waxman Act provides five-year marketing exclusivity to the first applicant to gain approval of an NDA for a new chemical entity, meaning a drug containing an active moiety that FDA has not previously approved. During this period, FDA cannot accept for review an ANDA or a Section 505(b)(2) NDA for a product containing the same moiety, except that an application containing a Paragraph IV Certification may be submitted after four years, which may trigger the litigation and stay described above. The Hatch-Waxman Act also provides three years of marketing exclusivity with the approval of an NDA, including a Section 505(b)(2) NDA, for a product containing a previously-approved moiety but that incorporates a change (such as a new indication, dosage form or strength) from an approved product with the same moiety, if the change required clinical data from new investigations that were conducted or sponsored by the applicant. This three-year exclusivity does not preclude submission of the ANDA or Section 505(b)(2) NDA for such a product, but prevents FDA from giving final approval to such product.

The Hatch-Waxman Act also permits a patent term extension of up to five years (but not beyond 14 years from the date of approval) for an NDA, including a Section 505(b)(2) NDA, that is approved for a product that contains an active ingredient that has not previously been approved. The extension, which compensates for patent term lost during product development and FDA regulatory review process, is generally equal to the sum of one-half the time between the effective date of an IND application and the submission date of an NDA, and all of the time between the submission date of an NDA and the approval of that application. It is available for only one patent for a given product, and it must be a patent that claims the product or a method of using or manufacturing the product. The USPTO, in consultation with FDA, reviews and approves applications for patent term extension.

30

Table of Contents

In the EU, innovative medicinal products that are subject to marketing authorization on the basis of a full dossier qualify for eight years' data exclusivity upon marketing authorization and an additional two years' market exclusivity. Data exclusivity prevents regulatory authorities in the EU from referencing the innovator's data to assess a generic application or biosimilar application for eight years from the date of authorization of the innovative product, after which a generic or biosimilar marketing authorization application can be submitted, and the innovator's data may be referenced. However, the generic product or biosimilar products cannot be marketed in the EU for a further two years thereafter. The overall ten-year period may be extended for a further year to a maximum of 11 years if, during the first eight years of those ten years, the marketing authorization holder obtains an authorization for one or more new therapeutic indications which, during the scientific evaluation prior to their authorization, are held to bring a significant clinical benefit in comparison with existing therapies.

*Orphan Drug and Other Exclusivities*

Some jurisdictions, including the U.S., may designate drugs or biologics for relatively small patient populations as orphan drugs. FDA grants orphan drug designation to drugs or biologics intended to treat a rare disease or condition, which is one that affects fewer than 200,000 individuals in the U.S., or more than 200,000 individuals, but for which there is no reasonable expectation that the cost of developing the product and making it available in the U.S. for the disease or condition will be recovered from U.S. sales of the product. Orphan drug designation does not shorten the duration of the regulatory review process or lower the approval standards, but can provide important benefits, including consultation with FDA. If a product is approved for its orphan designated use, it may be entitled to ODE, which blocks FDA from approving in the EU for seven years any other application for a product that is the same drug for the same indication. If there is a previously-approved product that is the same drug for the same indication, orphan drug designation requires the sponsor to provide a plausible hypothesis of clinical superiority over the approved product, whereas ODE requires the sponsor to actually demonstrate clinical superiority. Clinical superiority can be established by way of greater efficacy, greater safety, or making a major contribution to patient care. Additionally, a later product can be approved if the sponsor holding ODE consents, or cannot adequately supply the market. ODE does not prevent approval of another sponsor's application for different indications or uses of the same drug, or for different drugs for the same indication. Defibrotide has been granted ODE by FDA to treat and prevent VOD until March 2023. Vyxeos has been granted ODE by FDA for the treatment of AML until August 2024. Epidiolex has received ODE to treat seizures associated with LGS and DS through 2025 and TSC through 2027. In June 2021, FDA, recognized seven years of ODE for Xywav stating that Xywav is clinically superior to Xyrem by means of greater safety due to reduced chronic sodium burden. Xywav has been granted ODE by FDA to treat narcolepsy through 2027 and to treat IH through 2028. Rylaze has been granted ODE for the treatment of patients with ALL or LBL until 2028.

Biologic products approved under a BLA are subject to the Biologics Price Competition and Innovation Act, or BPCIA, which authorizes an abbreviated approval pathway for a biological product that is "biosimilar" to an already approved biologic, or reference product. The BPCIA provides periods of exclusivity that protect a reference product from competition by biosimilars. FDA may not accept a biosimilar application for review until four years after the date of first licensure of the reference product, and the biosimilar cannot be licensed until 12 years after the reference product was first licensed.

Under certain circumstances, the exclusivity periods applicable to drugs and biologics and the patent-related protections applicable to drugs may be eligible for a six-month extension if the sponsor submits pediatric data that fairly respond to a written request from FDA for such data. This exclusivity may be granted even if the data does not support a pediatric indication. We consider pediatric exclusivity for our products whenever appropriate. For example, in response to a written request from FDA, we conducted a Phase 3 clinical trial to assess the safety and efficacy of Xyrem in children and adolescents aged seven to 17 who have narcolepsy with cataplexy, and submitted study results in a supplement to the Xyrem NDA, seeking approval for this indication. In October 2018, FDA approved the sNDA and notified us that we had been granted pediatric exclusivity, extending by six months the preclusive effect of our Orange Book-listed patents for Xyrem, as well as the three-year regulatory exclusivity period granted to the Xyrem pediatric indication because of the clinical studies that were necessary for approval of the sNDA.

In the EU, orphan drug designation may be granted to products that can be used to treat life-threatening diseases or chronically debilitating conditions with an incidence of no more than five in 10,000 people or that, for economic reasons, would be unlikely to be developed without incentives. Orphan designated medicinal products are entitled to a range of benefits during the development and regulatory review process and ten years of market exclusivity in all EU member states upon approval. As in the U.S., a similar medicinal product with the same orphan indication may be approved, notwithstanding orphan product exclusivity, if the exclusivity holder gives consent or if the manufacturer of the original orphan medicinal product is unable to supply sufficient quantities. Marketing authorization may also be granted to a similar medicinal product with the same orphan indication if the similar product is deemed safer, more effective or otherwise clinically superior to the original orphan medicinal product. The period of market exclusivity granted in relation to the original orphan medicinal product may, in addition, be reduced to six years if it can be demonstrated, on the basis of available evidence, that the original orphan medicinal product is sufficiently profitable not to justify maintenance of market exclusivity. Defibrotide has been granted orphan drug designation by the EC for the treatment of VOD and prevention of GvHD until October 2023, by the Korean Ministry of Food and Drug

31

Table of Contents

Safety to treat and prevent VOD, and by the Commonwealth of Australia-Department of Health for the treatment of VOD. Vyxeos has been granted orphan drug designation by the EC until August 2028. We also received Orphan Designation from EMA's Committee for Orphan Medicinal Products, or COMP, for Epidyolex for DS, LGS and TSC, and the COMP reconfirmed the designation for DS, LGS and TSC upon EC's approval.

**Pharmaceutical Pricing, Reimbursement by Government and Private Payors and Patient Access**

*Pricing and Reimbursement*

Successful commercialization of our products depends in significant part on adequate financial coverage and reimbursement from third party payors, including governmental payors (such as the Medicaid and Medicare programs in the U.S.), managed care organizations and private health insurers. Third party payors decide which drugs will be reimbursed and establish reimbursement and co-pay levels and conditions for reimbursement. Third party payors are increasingly challenging the prices charged for medical products and services by examining their cost effectiveness, as demonstrated in pharmacoeconomic and/or clinical studies, in addition to their safety and efficacy. In some cases, for example, third party payors try to encourage the use of less expensive products, when available, through their prescription benefits coverage and reimbursement, co-pay and prior authorization policies. The process for determining whether a payor will provide coverage for a product may be separate from the process for setting the price or reimbursement rate that the payor will pay for the product once coverage is approved. Third party payors may require prior approval before covering a specific product, or may require patients and health care providers to try other covered products first. Third party payors may also limit coverage to specific products on an approved list, or formulary, which might not include all of the approved products for a particular indication. For certain categories of products, third party payors, principally through contracted PBMs negotiate rebates with drug manufacturers for inclusion of products on their formularies in specific positions or coverage criteria. Beginning in the third quarter of 2019, we have been entering into agreements with certain PBMs or similar organizations to provide rebates for our products where coverage was provided and products were listed in certain formulary positions, among other conditions.

Medicaid is a joint federal and state program that is administered by the states for low-income and disabled beneficiaries. Medicare is a federal program that is administered by the federal government covering individuals age 65 and over as well as those with certain disabilities. Medicare Part B pays physicians who administer our products. Under the Medicaid Drug Rebate Program, as a condition of having federal funds made available to the states for our drugs under Medicare Part B, we are required to pay a rebate to each state Medicaid program for our covered outpatient drugs that are dispensed to Medicaid beneficiaries and paid for by a state Medicaid program. Medicaid rebates are based on pricing data we report on a monthly and quarterly basis to the U.S. Centers for Medicare & Medicaid Services, or CMS, the federal agency that administers the Medicaid Drug Rebate Program and Medicare. These data include the average manufacturer price and, in the case of innovator products, the best price for each drug which, in general, represents the lowest price available from the manufacturer to any entity in the U.S. in any pricing structure, calculated to include all applicable sales and associated rebates, discounts and other price concessions. If we become aware that our reporting for a prior quarter was incorrect, or has changed as a result of recalculation of the pricing data, we are obligated to resubmit the corrected data for up to three years after those data originally were due. We are required to provide average sales price, or ASP, information for certain of our products to CMS on a quarterly basis. The ASP is calculated based on a statutorily defined formula as well as regulations and interpretations of the statute by CMS. This information is used to compute Medicare payment rates, with rates for Medicare Part B drugs outside the hospital outpatient setting and in the hospital outpatient setting consisting of ASP plus a specified percentage.

Federal law requires that any company that participates in the Medicaid Drug Rebate Program also participate in the Public Health Service's 340B program, or the 340B program, in order for federal funds to be available for the manufacturer's drugs under Medicaid and Medicare Part B. The 340B program, which is administered by the Health Resources and Services Administration, or HRSA, requires participating manufacturers to agree to charge statutorily defined covered entities no more than the 340B "ceiling price" for the manufacturer's covered drugs used in an outpatient setting. These 340B covered entities include certain qualifying community health clinics, a variety of entities that receive health services grants from the Public Health Service, and multiple categories of hospitals, including children's hospitals, critical access hospitals, free standing cancer hospitals and hospitals that serve a disproportionate share of low-income patients. The 340B ceiling price is calculated using a statutory formula, which is based on the average manufacturer price and rebate amount for the covered outpatient drug as calculated under the Medicaid Drug Rebate Program, and in general, products subject to Medicaid price reporting and rebate liability are also subject to the 340B ceiling price calculation and discount requirement. A regulation regarding the calculation of the 340B ceiling price and the imposition of civil monetary penalties on manufacturers that knowingly and intentionally overcharge covered entities became effective on January 1, 2019. We also are required to report our 340B ceiling prices to HRSA on a quarterly basis and HRSA then publishes them to 340B covered entities. In addition, legislation may be introduced that, if passed, would further expand the 340B program to additional covered entities or would require participating manufacturers to agree to provide 340B discounted pricing on drugs used in an inpatient setting.

A provision in The American Rescue Plan Act of 2021 eliminated, effective January 2024, the statutory cap on rebates drug manufacturers are required to pay under the Medicaid Drug Rebate Program. The elimination of the cap on rebates means

Table of Contents

that manufacturer discounts to Medicaid may rise beginning in 2024 and, in certain circumstances, rebates could exceed the amount that state Medicaid programs pay for the drug. This policy change will have the greatest impact on drugs whose prices have reached the 100 percent Average Manufacturer Price rebate cap. Further, the Inflation Reduction Act of 2022 among other things, requires the U.S. Department of Health and Human Services Secretary to negotiate, with respect to Medicare units and subject to a specified cap, the price of a set number of certain high Medicare spend drugs and biologicals per year starting in 2026, penalizes manufacturers of certain Medicare Parts B and D drugs for price increases above inflation, and makes several changes to the Medicare Part D benefit, including a limit on annual out-of-pocket costs, and a change in manufacturer liability under the program, which could negatively affect our business and financial condition.

Effective January 2023, a provision of the Infrastructure Investment and Jobs Act requires a manufacturer of single source drugs or biologicals in single-use packages or single dose containers to pay a refund on discarded amounts of drug under Medicare Part B where the discarded amount exceeds an applicable threshold.

In order to be eligible to have our products paid for with federal funds under the Medicaid and Medicare Part B programs and purchased by certain federal agencies and grantees, we also participate in the U.S. Department of Veterans Affairs, or VA, Federal Supply Schedule, or FSS, pricing program. Under this program, we are obligated to make our products available for procurement on an FSS contract under which we must comply with standard government terms and conditions and charge a price to certain federal agencies that is no higher than the statutory Federal Ceiling Price, or FCP. The FCP is based on the non-federal average manufacturer price, or Non-FAMP, which we calculate and report to the VA on a quarterly and annual basis. We also participate in the Tricare Retail Pharmacy program, under which we pay quarterly rebates on utilization of innovator products that are dispensed through the Tricare Retail Pharmacy network to Tricare beneficiaries. The rebates are calculated as the difference between the annual Non-FAMP and FCP. Pricing and rebate calculations vary across products and programs, are complex, and are often subject to interpretation by us, governmental or regulatory agencies and the courts, which can change and evolve over time.

In addition, in the U.S., drug pricing by pharmaceutical companies is currently, and is expected to continue to be, under close scrutiny, including with respect to companies that have increased the price of products after acquiring those products from other companies. There are numerous ongoing efforts at the federal and state level seeking to indirectly or directly regulate drug prices to reduce overall healthcare costs using tools such as price ceilings, value-based pricing and increased transparency and disclosure obligations. Numerous states have passed or are considering legislation that requires or purports to require companies to report pricing information, including proprietary pricing information. For example, in 2017, California adopted a prescription drug price transparency state bill requiring advance notice of and an explanation for price increases of certain drugs that exceed a specified threshold. Similar bills have been previously introduced at the federal level and additional legislation could be introduced this year.

Similar to what is occurring in the U.S., political, economic and regulatory developments outside of the U.S. are also subjecting the healthcare industry to fundamental changes and challenges. Pressure by governments and other stakeholders on prices and reimbursement levels continue to exist. In various EU member states we expect to be subject to continuous cost-cutting measures, such as voluntary and temporary sales rebates, lower maximum prices, lower or lack of reimbursement coverage and incentives to use cheaper, usually generic, products as an alternative. Health technology assessment, or HTA, of medicinal products is becoming an increasingly common part of the pricing and reimbursement procedures in some EU member states, including countries representing major markets. The HTA process, which is governed by the national laws of these countries, is the procedure according to which the assessment of the public health impact, therapeutic impact and the economic and societal impact of use of a given medicinal product in the national healthcare systems of the individual country is conducted. HTA generally compares attributes of individual medicinal products, as compared with other treatment options available on the market. The outcome of HTA regarding specific medicinal products will often influence the pricing and reimbursement status granted to these medicinal products by the competent authorities of individual EU member states. In December 2021, the EC adopted a HTA regulation intended to boost cooperation among EU member states in assessing health technologies, including new medicinal products. The regulation will apply to all EU member states from January 2025 provides that EU member states will be able to use common HTA tools, methodologies, and procedures across the EU. Individual EU member states will continue to be responsible for drawing conclusions on the overall value of a new health technology for their healthcare system, and pricing and reimbursement decisions.

In the EU, our products are marketed through various channels and within different legal frameworks. The making available or placing on the EU market of unauthorized medicinal products is generally prohibited. However, the competent authorities of the EU member states may exceptionally and temporarily allow and reimburse the supply of such unauthorized products, either on a named patient basis or through a compassionate use process, to individual patients or a group of patients with a chronically or seriously debilitating disease or whose disease is considered to be life-threatening, and who cannot be treated satisfactorily by an authorized medicinal product. Such reimbursement may no longer be available if authorization for named patient or compassionate use programs expire or is terminated or if marketing authorization is granted for the product. In some EU member states, authorization and reimbursement policies may also delay commercialization of our products, or

33

may adversely affect our ability to sell our products on a profitable basis. After initial price and reimbursement approvals, reductions in prices and changes in reimbursement levels can be triggered by multiple factors, including reference pricing systems and publication of discounts by third party payors or authorities in other countries. In the EU, prices can be reduced further by parallel distribution and parallel trade, or arbitrage between low-priced and high-priced EU member states.

For more information, including with respect to recent legal developments regarding the Medicaid Drug Rebate Program, Medicare Part B, and the 340B program, see the risk factors under the headings "*Adequate coverage and reimbursement from third party payors may not be available for our products and we may be unable to successfully contract for coverage from pharmacy benefit managers and group purchasing organizations, which could diminish our sales or affect our ability to sell our products profitably; conversely, to secure coverage from these organizations, we may be required to pay rebates or other discounts or other restrictions to reimbursement that could diminish our sales,*" "*The pricing of pharmaceutical products has come under increasing scrutiny as part of a global trend toward healthcare cost containment and resulting changes in healthcare law and policy may impact our business in ways that we cannot currently predict, which could have a material adverse effect on our business and financial condition*" and "*If we fail to comply with our reporting and payment obligations under the Medicaid Drug Rebate Program or other governmental pricing programs, we could be subject to additional reimbursement requirements, penalties, sanctions and fines, which could have a material adverse effect on our business, financial condition, results of operations and growth prospects*" in Part I, Item 1A of this Annual Report on Form 10-K.

### *Patient Copay Assistance and Free Product Programs*

We have various patient programs to help patients access and pay for our products, including co-pay coupons for certain products, services that help patients determine their insurance coverage for our products, and a free product program. We also make grants to independent charitable foundations that help financially needy patients with their premium, and co-pay and co-insurance obligations. There has been enhanced scrutiny of company-sponsored patient assistance programs, including co-pay assistance programs and donations to third-party charities that provide such assistance, as well as reimbursement support offerings.

The OIG has established guidelines for pharmaceutical manufacturers who make donations to charitable organizations providing co-pay assistance to Medicare patients. Such donations are unlikely to run afoul of the anti-kickback laws provided that the organizations receiving donations, among other things, are *bona fide* charities, are entirely independent of and not controlled by the manufacturer, provide aid to applicants on a first-come basis according to consistent financial criteria, and do not link aid to use of a donor's product. In 2016 and 2017, we received subpoenas from the U.S. Attorney's Office for the District of Massachusetts requesting documents related to our support of charitable organizations that provide financial assistance to Medicare patients. In April 2019, we finalized our civil settlement agreement with the DOJ and OIG, and entered into a corporate integrity agreement requiring us to maintain our ongoing corporate compliance program and obligating us to implement or continue, as applicable, a set of defined corporate integrity activities to ensure compliance with OIG's policies around charitable contributions for a period of five years from the effective date of the corporate integrity agreement.

### About Jazz Pharmaceuticals plc

Jazz Pharmaceuticals plc was formed under the laws of Ireland (registered number 399192) as a private limited liability company in March 2005 under the name Azur Pharma Limited and was subsequently re-registered as a public limited company under the name Azur Pharma Public Limited Company, or Azur Pharma, in October 2011. On January 18, 2012, the businesses of Jazz Pharmaceuticals, Inc. and Azur Pharma were combined in a merger transaction, in connection with which Azur Pharma was re-named Jazz Pharmaceuticals plc and we became the parent company of and successor to Jazz Pharmaceuticals, Inc.

Our predecessor, Jazz Pharmaceuticals, Inc., was incorporated in California in March 2003 and was reincorporated in Delaware in January 2004.

### Available Information

The mailing address of our headquarters is Fifth Floor, Waterloo Exchange, Waterloo Road, Dublin 4, Ireland, and our telephone number at that location is 353-1-634-7800. Our website is www.jazzpharmaceuticals.com.

We file or furnish pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, as applicable, our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, amendments to those reports, proxy statements and other information electronically with the SEC. Through a link on our website, we make copies of our periodic and current reports, amendments to those reports, proxy statements and other information available, free of charge, as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC. Information found on, or accessible through, our website is not a part of, and is not incorporated into, this Annual Report on Form 10-K.

**Item 1A.      Risk Factors**

*We have identified the following risks and uncertainties that may have a material adverse effect on our business, financial condition or results of operations. The risks described below are not the only ones we face. Additional risks not presently known to us or that we currently believe are immaterial may also significantly impair our business operations. Our business could be harmed by any of these risks. The trading price of our ordinary shares could decline due to any of these risks, and you may lose all or part of your investment. In assessing these risks, you should also refer to the other information contained in this Annual Report on Form 10-K, including our consolidated financial statements and accompanying notes.*

**Risks Related to Our Lead Products and Product Candidates**

***Our inability to maintain or increase sales from our oxybate franchise would have a material adverse effect on our business, financial condition, results of operations and growth prospects.***

Historically, our business was substantially dependent on Xyrem, and our financial results were significantly influenced by sales of Xyrem. Our operating plan assumes that Xywav, our oxybate product launched in November 2020, will remain the treatment of choice for patients who can benefit from oxybate treatment. While we expect that our business will continue to be meaningfully dependent on oxybate revenues, there is no guarantee that oxybate revenues will remain at current levels, or that oxybate revenues will otherwise grow in future periods. In this regard, our ability to maintain or increase oxybate revenues and realize the anticipated benefits from our investment in Xywav are subject to a number of risks and uncertainties as discussed in greater detail below, including those related to the launch of Xywav for the treatment of idiopathic hypersomnia, or IH, in adults and adoption in that indication; competition from the introduction of authorized generic, or AG, versions of sodium oxybate and new products, such as Avadel's once-nightly dose, high-sodium oxybate branded product Lumryz, for treatment of cataplexy and/or excessive daytime sleepiness, or EDS, in adults with narcolepsy in the U.S. market, as well as potential future competition from additional AG and generic versions of sodium oxybate and from other competitors; increased pricing pressure from, changes in policies by, or restrictions on reimbursement imposed by, third party payors, including our ability to maintain adequate coverage and reimbursement for Xywav and Xyrem; increased rebates required to maintain access to our products; challenges to our intellectual property around Xyrem and/or Xywav, including from pending antitrust and intellectual property litigation; and continued acceptance of Xywav and Xyrem by physicians and patients. For example, Xyrem product sales have decreased since the launch of Xywav due to the continued adoption of Xywav among existing Xyrem patients and new-to-oxybate narcolepsy patients driven by educational initiatives around the benefit of lowering sodium intake. In addition, a wholly owned subsidiary of Hikma Pharmaceuticals PLC, or Hikma, launched its AG version of sodium oxybate in January 2023 and Amneal Pharmaceuticals LLC, or Amneal, launched its AG version of sodium oxybate in July 2023. We have seen a negative impact and expect to see a further negative impact on our oxybate revenues as a result of these AG products and Avadel's Lumryz and any generic products and new branded products. A substantial further decline in oxybate revenues could cause us to reduce our operating expenses or seek to raise additional funds, which would have a material adverse effect on our business, financial condition, results of operations and growth prospects, including on our ability to acquire, in-license or develop new products to grow our business.

***The introduction of new products in the U.S. market that compete with, or otherwise disrupt the market for, our oxybate products has adversely affected and may continue to adversely affect sales of our oxybate products.***

New treatment options for cataplexy and EDS in narcolepsy have been commercially launched, and in the future, other products may be launched that are competitive with or disrupt the market for our oxybate products, Xywav and Xyrem.

Ten companies have sent us notices that they had filed abbreviated new drug applications, or ANDAs, seeking approval to market a generic version of Xyrem. We filed patent lawsuits against all ten companies and have settled with all ten of the companies. To date, the U.S. Food and Drug Administration, or FDA, has approved or tentatively approved four of these ANDAs, and we believe that it is likely that FDA will approve or tentatively approve some or all of the others. Pursuant to our patent litigation settlement with the first filer, Hikma launched its AG version of sodium oxybate, in the U.S. beginning on January 1, 2023. Accordingly, beginning in January 2023, Xywav and Xyrem face competition from an AG version of sodium oxybate. We also granted Hikma a license to launch its own generic sodium oxybate product, but if it elects to launch its own generic product, Hikma will no longer have the right to sell the Hikma AG product. In our settlements with Amneal, Lupin Inc., or Lupin, and Par Pharmaceutical, Inc., or Par, we granted each party the right to sell a limited volume of an AG product in the U.S. beginning on July 1, 2023 and ending on December 31, 2025, with royalties to be paid to us. Amneal launched its AG version of sodium oxybate in July 2023. At this time, Amneal has rights to sell a low-single-digit percentage of historical Xyrem sales over each 6-month sales period. At this time, Lupin and Par have elected not to launch an AG product. AG products are distributed through the same risk evaluation and mitigation strategy, or REMS, as Xywav and Xyrem. We also granted each of Amneal, Lupin and Par a license to launch its own generic sodium oxybate product under its ANDA on or after December 31, 2025, or earlier under certain circumstances, including the circumstance where Hikma elects to launch its own generic product. If Amneal, Lupin or Par elects to launch its own generic product under such circumstance, it will no longer have the right to sell an AG product. In our settlements with each of six other ANDA filers, we granted each a license to launch

Table of Contents

its own generic sodium oxybate product under its ANDA on or after December 31, 2025, or earlier under certain circumstances, including circumstances where Hikma launches its own generic sodium oxybate product. It is possible that additional companies may file ANDAs seeking to market a generic version of Xyrem which could lead to additional patent litigation or challenges with respect to Xyrem.

Any ANDA holder launching an AG product or another generic sodium oxybate product will independently establish the price of the AG product and/or its own generic sodium oxybate product and determine the types of discounts or rebates they will offer parties that purchase or pay for the product. Generic competition often results in decreases in the net prices at which branded products can be sold. A component of drug pricing is the manufacturer's list price for a drug to wholesalers or direct purchasers in the U.S. (without discounts, rebates or other reductions) referred to as the Wholesale Acquisition Cost, or WAC. In this regard, Hikma and Amneal launched their AG products in 2023 at a WAC that was less than 15% lower than the WAC for Xyrem. After any introduction of a generic product, whether or not it is an AG product, a significant percentage of the prescriptions written for Xyrem have been, and will likely be, filled with the generic product. Certain U.S. state laws allow for, and in some instances in the absence of specific instructions from the prescribing physician mandate, the dispensing of generic products rather than branded products when a generic version is available. This has resulted in reduced sales of, and revenue from, Xyrem. We continue to receive royalties and other revenue based on sales of AG products in accordance with the terms of our settlement agreements.

Other companies may develop sodium oxybate products for treatment of narcolepsy, using an alternative formulation or a different delivery technology, and seek approval in the U.S. using a new drug application, or NDA, approval pathway under Section 505(b)(2) and referencing the safety and efficacy data for Xyrem. For example, we face competition from branded products for treatment of cataplexy and/or EDS in narcolepsy, such as Avadel's Lumryz. On May 1, 2023, Avadel announced that it had received FDA approval and orphan drug exclusivity through May 1, 2030 for Lumryz, a fixed-dose, sodium oxybate which uses its proprietary technology for the treatment of EDS and cataplexy in patients with narcolepsy. For additional information on litigation involving this matter, see "FDA Litigation" in Note 14, Commitments and Contingencies-Legal Proceedings of the Notes to Consolidated Financial Statements, included in Part IV of this Annual Report on Form10-K. Xyrem and Xywav also face increased competition from other branded entrants to treat EDS in narcolepsy such as pitolisant and Sunosi. Other companies have announced that they have product candidates in various phases of development to treat the symptoms of narcolepsy, such as Axsome Therapeutics, Inc.'s reboxetine, and various companies are performing research and development on orexin agonists for the treatment of sleep disorders.

We expect that Xywav for the treatment of both cataplexy and EDS in patients with narcolepsy will continue to face competition from generic or AG sodium oxybate products or branded entrants in narcolepsy, such as Avadel's Lumryz notwithstanding FDA recognizing Orphan Drug Exclusivity, or ODE, for Xywav. For example, we received notices in June 2021 and February 2023, that Lupin and Teva, respectively, filed ANDAs for generic versions of Xywav. On October 13, 2023, Lupin announced that it has received tentative approval for its application to market a generic version of Xywav. Additional companies may file ANDAs seeking to market a generic version of Xywav which could lead to additional patent litigation or challenges with respect to Xywav.

Moreover, generic or AG sodium oxybate products or branded sodium oxybate entrants in narcolepsy, such as Avadel's Lumryz, as well as non-oxybate products intended for the treatment of EDS or cataplexy in narcolepsy or IH including new market entrants, even if not directly competitive with Xywav or Xyrem, have had and may continue to have the effect of changing treatment regimens and payor or formulary coverage of Xywav or Xyrem in favor of other products, and indirectly materially and adversely affect sales of Xywav and Xyrem. Examples of such new market entrants of non-oxybate products include pitolisant, a drug that was approved by FDA in 2019 for the treatment of EDS in adult patients with narcolepsy and approved by FDA in 2020 for an adult cataplexy indication in the U.S. Pitolisant has also been approved and marketed in Europe to treat adult patients with narcolepsy, with or without cataplexy, and to treat EDS in obstructive sleep apnea. In addition, we are also aware that prescribers often prescribe branded or generic medications for cataplexy, before or instead of prescribing oxybate therapy in Xywav and Xyrem, and that payors often require patients to try such medications before they will cover Xywav or Xyrem, even if they are not approved for this use. Examples of such products are described in "Business—Competition" in Part 1, Item 1 of this Annual Report on Form 10-K.

We expect that the approval and launch of AG products or other generic versions of Xyrem or Xywav and the approval and launch of any other sodium oxybate product, such as Avadel's Lumryz, or alternative product that treats narcolepsy will continue to have a negative impact and could have a material adverse effect on our sales of Xywav and Xyrem and on our business, financial condition, results of operations and growth prospects.

36

Table of Contents

***The distribution and sale of our oxybate products are subject to significant regulatory restrictions, including the requirements of a REMS and safety reporting requirements, and these regulatory and safety requirements subject us to risks and uncertainties, any of which could negatively impact sales of Xywav and Xyrem.***

The active pharmaceutical ingredient, or API, of Xywav and Xyrem, is a form of gamma-hydroxybutyric acid, or GHB, a central nervous system depressant known to be associated with facilitated sexual assault as well as with respiratory depression and other serious side effects. As a result, FDA requires that we maintain a REMS with elements to assure safe use, or ETASU, for Xywav and Xyrem to help ensure that the benefits of the drug in the treatment of cataplexy and EDS in narcolepsy outweigh the serious risks of the drug. The REMS imposes extensive controls and restrictions on the sales and marketing of Xywav and Xyrem that we are responsible for implementing. Any failure to demonstrate our substantial compliance with our REMS obligations, or a determination by FDA that the REMS is not meeting its goals, could result in enforcement action by FDA, lead to changes in our REMS obligations, negatively affect sales of Xywav or Xyrem, result in additional costs and expenses for us and/or require us to invest a significant amount of resources, any of which could materially and adversely affect our business, financial condition, results of operations and growth prospects.

FDA will evaluate the Xywav and Xyrem REMS on an ongoing basis and will require modifications as may be appropriate. In 2023, FDA requested certain modifications to the Xywav and Xyrem REMS that FDA approved in January 2024 as part of additional modifications to the REMS that we requested. We cannot predict whether FDA will request, seek to require or ultimately require additional modifications to, or impose additional requirements on, the Xywav and Xyrem REMS, including in connection with the submission of new oxybate products or indications, the introduction of AGs, or to accommodate generics, or whether FDA will approve modifications to the Xywav and Xyrem REMS that we consider warranted. Any modifications approved, required or rejected by FDA could change the safety profile of Xywav or Xyrem, and have a significant negative impact in terms of product liability, public acceptance of Xywav or Xyrem as a treatment for cataplexy and EDS in narcolepsy, and prescribers' willingness to prescribe, and patients' willingness to take, Xywav or Xyrem, any of which could have a material adverse effect on our business. Modifications approved, required or rejected by FDA could also make it more difficult or expensive for us to distribute Xywav or Xyrem, make distribution easier for oxybate competitors, disrupt continuity of care for Xywav or Xyrem patients and/or negatively affect sales of Xywav or Xyrem.

We depend on outside vendors, including Express Scripts Specialty Distribution Services, Inc., the central certified pharmacy, to distribute Xywav and Xyrem in the U.S., provide patient support services and implement the requirements of the Xywav and Xyrem REMS. If the central pharmacy fails to meet the requirements of the Xywav and Xyrem REMS applicable to the central pharmacy or otherwise does not fulfill its contractual obligations to us, moves to terminate our agreement, refuses or fails to adequately serve patients, or fails to promptly and adequately address operational challenges or challenges in implementing REMS modifications, the fulfillment of Xywav or Xyrem prescriptions and our sales would be adversely affected. If we change to a new central pharmacy, new contracts might be required with government payors and other insurers who pay for Xywav or Xyrem, and the terms of any new contracts could be less favorable to us than current agreements. In addition, any new central pharmacy would need to be registered with the U.S. Drug Enforcement Administration, or DEA, and certified under the REMS and would also need to implement the particular processes, procedures and activities necessary to distribute under the Xywav and Xyrem REMS. Transitioning to a new pharmacy could result in product shortages, which would negatively affect sales of Xywav and Xyrem, result in additional costs and expenses for us and/or take a significant amount of time, any of which could materially and adversely affect our business, financial condition, results of operations and growth prospects.

In its approval of Hikma's ANDA, FDA waived the requirement of a single shared REMS with the Xywav and Xyrem REMS, approving Hikma's ANDA with a generic sodium oxybate REMS separate from the Xywav and Xyrem REMS, except for the requirement that the sodium oxybate REMS program pharmacies contact the Xywav and Xyrem REMS by phone to verify and report certain information. The generic sodium oxybate REMS was approved with the condition that it be open to all future sponsors of ANDAs or NDAs for sodium oxybate products. In its approval of Avadel's sodium oxybate product, FDA also approved a separate REMS for that product, also with a requirement that the pharmacies in the Avadel-sponsored REMS contact the Xywav and Xyrem REMS to verify and report certain information. Administration of multiple sodium oxybate REMS systems, including sodium oxybate distribution systems that are less restrictive than the Xywav and Xyrem REMS (such as the generic sodium oxybate REMS or Avadel's sodium oxybate REMS), could increase the risks associated with oxybate distribution, could make it more difficult or expensive for us to distribute Xywav and Xyrem and disrupt patient access to Xywav or Xyrem. Because patients, consumers and others may not differentiate sodium oxybate products from Xyrem or differentiate between the different REMS programs, any negative outcomes, including risks to the public, caused by or otherwise related to a separate sodium oxybate REMS, could have a significant negative impact in terms of product liability, our reputation and good will, public acceptance of Xywav or Xyrem as a treatment for cataplexy and EDS in narcolepsy, and prescribers' willingness to prescribe, and patients' willingness to take, Xywav or Xyrem, any of which could have a material adverse effect on our business.

Table of Contents

We may face pressure to further modify the Xywav and Xyrem REMS, including proprietary data required for the safe distribution of sodium oxybate, in connection with FDA's approval of the generic sodium oxybate REMS or another oxybate REMS that has been approved or may be submitted or approved in the future. We cannot predict the outcome or impact on our business of any future action that we may take with respect to FDA's waiver of the single shared system REMS requirement, its approval and tentative approval of generic versions of sodium oxybate or the consequences of distribution of sodium oxybate through the generic sodium oxybate REMS approved by FDA or another separate REMS.

REMS programs have increasingly drawn public scrutiny from the U.S. Congress, the Federal Trade Commission, or FTC, the United States Patent and Trademark Office, or USPTO, and FDA, with allegations that such programs are used as a means of improperly blocking or delaying competition. In December 2019, as part of the Further Consolidated Appropriations Act of 2020, the U.S. Congress passed legislation known as the Creating and Restoring Equal Access To Equivalent Samples Act, or CREATES. CREATES is intended to prevent companies from using REMS and other restricted distribution programs as a means to deny potential competitors access to product samples that are reasonably necessary to conduct testing in support of an application that references a listed drug or biologic, and provides such potential competitors a potential private right of action if the innovator fails to timely provide samples upon request. CREATES also grants FDA additional authority regarding generic products with REMS. A further example of continued interest in REMS oversight came from the USPTO in collaboration with FDA in November 2022, when they published a Request for Comment, or RFC, in the Federal Register that asked, "What policy considerations or concerns should the USPTO and the FDA explore in relation to the patenting of REMS associated with certain FDA-approved products?" The comments for this RFC closed on February 6, 2023.

It is possible that the FTC, FDA or other governmental authorities could claim that, or launch an investigation into whether, we are using our REMS programs in an anticompetitive manner or have engaged in other anticompetitive practices, whether under CREATES or otherwise. The Federal Food, Drug and Cosmetic Act further states that a REMS ETASU shall not be used by an NDA holder to block or delay generic drugs or drugs covered by an application under Section 505(b)(2) from entering the market. In its 2015 letter approving the Xyrem REMS, FDA expressed concern that we were aware that the Xyrem REMS is blocking competition. From June 2020 to May 2022, we were served with a number of lawsuits that included allegations that we had used the Xyrem REMS to delay approval of generic sodium oxybate. In December 2020, these cases were centralized and transferred to the United States District Court for the Northern District of California, where the multidistrict litigation will proceed for the purpose of discovery and pre-trial proceedings. For additional information on these lawsuits, see "Xyrem Antitrust Litigation" (and for other litigation involving our listing of our REMS patent in FDA's publication "Approved Drug Products with Therapeutic Equivalence Evaluations," or Orange Book, see "Avadel Litigation") in Note 14, Commitments and Contingencies-Legal Proceedings of the Notes to Consolidated Financial Statements, included in Part IV of this Annual Report on Form 10-K. It is possible that additional lawsuits will be filed against us making similar or related allegations or that governmental authorities could commence an investigation. We cannot predict the outcome of these or potential additional lawsuits; however, if the plaintiffs were to be successful in their claims, they may be entitled to injunctive relief or we may be required to pay significant monetary damages, which could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

Pharmaceutical companies, including their agents and employees, are required to monitor adverse events occurring during the use of their products and report them to FDA. The patient counseling and monitoring requirements of the Xywav and Xyrem REMS provide more extensive information about adverse events experienced by patients taking Xywav and Xyrem, including deaths, than is generally available for other products that are not subject to similar REMS requirements. As required by FDA and other regulatory agencies, the adverse event information that we collect for Xywav and Xyrem is regularly reported to FDA and could result in FDA requiring changes to Xywav and/or Xyrem labeling, including additional warnings or additional boxed warnings, or requiring us to take other actions that could have an adverse effect on patient and prescriber acceptance of Xywav and Xyrem. As required by FDA, Xywav's and Xyrem's current labeling includes a boxed warning regarding the risk of central nervous system depression and misuse and abuse.

Any failure to demonstrate our substantial compliance with the REMS or any other applicable regulatory requirements to the satisfaction of FDA or another regulatory authority could result in such regulatory authorities taking actions in the future which could have a material adverse effect on oxybate product sales and therefore on our business, financial condition, results of operations and growth prospects.

***Our inability to maintain or increase sales of Epidiolex/Epidyolex would have a material adverse effect on our business, financial condition, results of operations and growth prospects.***

Our ability to maintain or increase sales of Epidiolex/Epidyolex (cannabidiol) is subject to many risks. There are many factors that could cause the commercialization of Epidiolex to be unsuccessful, including a number of factors that are outside our control. The commercial success of Epidiolex depends on the extent to which patients and physicians accept and adopt Epidiolex as a treatment for seizures associated with Lennox-Gastaut syndrome, Dravet syndrome and Tuberous Sclerosis Complex, and we do not know whether our or others' estimates in this regard will be accurate. Physicians may not prescribe

Table of Contents

Epidiolex and patients may be unwilling to use Epidiolex if coverage is not provided or reimbursement is inadequate to cover a significant portion of the cost. Additionally, any negative development for Epidiolex in the market, in clinical development for additional indications, or in regulatory processes in other jurisdictions, may adversely impact the commercial results and potential of Epidiolex. In the future, we expect Epidiolex to face competition from generic cannabinoids. In November and December 2022, we received notices from various ANDA filers that they have each filed with FDA an ANDA for a generic version of Epidiolex (cannabidiol) oral solution. In January 2023, we filed patent infringement suits against these ANDA filers. As a result of these lawsuits, a stay of approval of up to 30 months will be imposed by FDA on these ANDA filers. For additional information see "*Epidiolex Patent Litigation*" in Note 14, Commitments and Contingencies-Legal Proceedings of the Notes to Consolidated Financial Statements, included in Part IV of this Annual Report on Form 10-K.

***While we expect our oxybate products and Epidiolex/Epidyolex to remain our largest products, our success also depends on our ability to effectively commercialize our other existing products and potential future products.***

In addition to Xywav, Xyrem, Epidiolex/Epidyolex and our other neuroscience products and product candidates, we are commercializing a portfolio of products, including our other lead marketed products, Zepzelca, Rylaze, Vyxeos and Defitelio. An inability to effectively commercialize our other lead marketed products and to maximize their potential where possible through successful research and development activities could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

Our ability to realize the anticipated benefits from our investment in Zepzelca is subject to a number of risks and uncertainties, including our ability to successfully commercialize Zepzelca in the U.S. and Canada; adequate supply of Zepzelca to meet demand; availability of favorable treatment pathway designations pricing and adequate coverage and reimbursement; the limited experience of, and need to educate, physicians in the use of Zepzelca for the treatment of metastatic small cell lung cancer, or SCLC; the potential for negative trial data read-outs in ongoing or future Zepzelca clinical trials; our and Pharma Mar, S.A., or PharmaMar's, ability to maintain accelerated approval or successfully complete a confirmatory study of Zepzelca; and our ability to educate health care providers about Zepzelca in the treatment of relapsed, metastatic SCLC in the U.S. and patients' access to lung cancer screening, diagnosis and treatment. Our ability to realize the anticipated benefits from our investments in Rylaze is subject to a number of uncertainties, including our ability to successfully commercialize Rylaze including creating awareness among health care professionals and ensuring that patients with acute lymphoblastic leukemia or lymphoblastic lymphoma will be given the appropriate course of therapy and dosing regimen based on the currently approved label. Our ability to realize the anticipated benefits from our investment in Vyxeos is subject to a number of risks and uncertainties, including our ability to differentiate Vyxeos from other liposomal chemotherapies and generically available chemotherapy combinations with which physicians and treatment centers are more familiar; acceptance by hospital pharmacy and therapeutics committees in the U.S., the European Union, or EU, and other countries; the increasing complexity of the acute myeloid leukemia, or AML, landscape requiring changes in patient identification and treatment selection, including diagnostic tests and monitoring that clinicians may find challenging to incorporate; the use of new and novel compounds in AML that are either used off-label or are only approved for use in combination with other agents and that have not been tested in combination with Vyxeos; the increasing use of venetoclax, which received full FDA approval in October 2020 for AML treatment; the limited size of the population of high-risk AML patients who may potentially be indicated for treatment with Vyxeos; the availability of adequate coverage, pricing and reimbursement approvals; ongoing trends in the U.S. towards lower-intensity treatments and away from intensive chemotherapy regimens, such as Vyxeos; and competition from new and existing products that are used in place of intensive chemotherapy treatments like Vyxeos and potential competition from products in development. Our ability to maintain and grow sales and to realize the anticipated benefits from our investment in Defitelio is subject to a number of risks and uncertainties, including continued acceptance by hospital pharmacy and therapeutics committees in the U.S., the EU and other countries; the continued availability of favorable pricing and adequate coverage and reimbursement; the limited experience of, and need to educate, physicians and other health care providers in recognizing, diagnosing and treating hepatic veno-occlusive disease, or VOD, particularly in adults; the possibility that physicians recognizing VOD symptoms may not initiate or may delay initiation of treatment while waiting for those symptoms to improve, or may terminate treatment before the end of the recommended dosing schedule; changes in chemotherapy regimens and the increasing use of cell therapies to potentially lower the incidence of severe VOD; and the limited size of the population of VOD patients who are indicated for treatment with Defitelio.

***We face substantial competition from other companies, including companies with larger sales organizations and more experience working with large and diverse product portfolios, and competition from generic drugs.***

Our products compete, and our product candidates may in the future compete, with currently existing therapies, including other branded products, AG and other generic products, product candidates currently under development by us and others and/or future product candidates, including new chemical entities that may be safer or more effective or more convenient than our products. Any products that we develop may be commercialized in competitive markets, and our competitors, which include large global pharmaceutical companies and small research-based companies and institutions, may succeed in developing products that render our products obsolete or noncompetitive. Many of our competitors, particularly large pharmaceutical and

Table of Contents

life sciences companies, have substantially greater financial, operational and human resources than we do. Smaller or earlier stage companies may also prove to be significant competitors, particularly through focused development programs and collaborative arrangements with large, established companies. In addition, many of our competitors deploy more personnel to market and sell their products than we do, and we compete with other companies to recruit, hire, train and retain pharmaceutical sales and marketing personnel. If our sales force and sales support organization are not appropriately resourced and sized to adequately promote our products, the commercial potential of our current and any future products may be diminished. In any event, the commercial potential of our current products and any future products may be reduced or eliminated if our competitors develop or acquire and commercialize generic or branded products that are safer or more effective, are more convenient or are less expensive than our products. If we are unable to compete successfully, our commercial opportunities will be reduced and our business, results of operations and financial conditions may be materially harmed.

For a description of the competition that our lead marketed products and most advanced product candidates face or may face, see the discussion in "Business—Competition" in Part I, Item 1 of this Annual Report on Form 10-K and the risk factor under the heading "*The introduction of new products in the U.S. market that compete with, or otherwise disrupt the market for, our oxybate products has adversely affected and may continue to adversely affect sales of our oxybate products*" in this Part I, Item 1A.

***Adequate coverage and reimbursement from third party payors may not be available for our products and we may be unable to successfully contract for coverage from pharmacy benefit managers and other organizations; conversely, to secure coverage from these organizations, we may be required to pay rebates or other discounts or other restrictions to reimbursement, either of which could diminish our sales or adversely affect our ability to sell our products profitably.***

In both U.S. and non-U.S. markets, our ability to successfully commercialize and achieve market acceptance of our products depends in significant part on adequate financial coverage and reimbursement from third party payors, including governmental payors (such as the Medicare and Medicaid programs in the U.S.), managed care organizations and private health insurers. Without third party payor reimbursement, patients may not be able to obtain or afford prescribed medications. In addition, reimbursement guidelines and incentives provided to prescribing physicians by third party payors may have a significant impact on the prescribing physicians' willingness and ability to prescribe our products. The demand for, and the profitability of, our products could be materially harmed if state Medicaid programs, the Medicare program, other healthcare programs in the U.S. or elsewhere, or third party commercial payors in the U.S. or elsewhere deny reimbursement for our products, limit the indications for which our products will be reimbursed, or provide reimbursement only on unfavorable terms.

As part of the overall trend toward cost containment, third party payors often require prior authorization for, and require reauthorization for continuation of, prescription products or impose step edits, which require prior use of another medication, usually a generic or preferred brand, prior to approving coverage for a new or more expensive product. Such restrictive conditions for reimbursement and an increase in reimbursement-related activities can extend the time required to fill prescriptions and may discourage patients from seeking treatment. We cannot predict actions that third party payors may take, or whether they will limit the access and level of reimbursement for our products or refuse to provide any approvals or coverage. From time to time, third party payors have refused to provide reimbursement for our products, and others may do so in the future.

Third party payors increasingly examine the cost-effectiveness of pharmaceutical products, in addition to their safety and efficacy, when making coverage and reimbursement decisions. We may need to conduct expensive pharmacoeconomic and/or clinical studies in order to demonstrate the cost-effectiveness of our products. If our competitors offer their products at prices that provide purportedly lower treatment costs than our products, or otherwise suggest that their products are safer, more effective or more cost-effective than our products, this may result in a greater level of access for their products relative to our products, which would reduce our sales and harm our results of operations. In some cases, for example, third party payors try to encourage the use of less expensive generic products through their prescription benefit coverage and reimbursement and co-pay policies. Because some of our products compete in a market with both branded and generic products, obtaining and maintaining access and reimbursement coverage for our products may be more challenging than for products that are new chemical entities with no therapeutic alternatives exist.

Third party pharmacy benefit managers, or PBMs, other similar organizations and payors can limit coverage to specific products on an approved list, or formulary, which might not include all of the approved products for a particular indication, and to exclude drugs from their formularies in favor of competitor drugs or alternative treatments, or place drugs on formulary tiers with higher patient co-pay obligations, and/or to mandate stricter utilization criteria. Formulary exclusion effectively encourages patients and providers to seek alternative treatments, make a complex and time-intensive request for medical exemptions, or pay 100% of the cost of a drug. In addition, in many instances, certain PBMs, other similar organizations and third party payors may exert negotiating leverage by requiring incremental rebates, discounts or other concessions from manufacturers in order to maintain formulary positions, which could continue to result in higher gross to net deductions for affected products. In this regard, we have entered into agreements with PBMs and payor accounts to provide rebates to those entities related to formulary coverage for our products, but we cannot guarantee that we will be able to agree to coverage terms

40

Table of Contents

with other PBMs and other third party payors. Payors could decide to exclude our products from formulary coverage lists, impose step edits that require patients to try alternative, including generic, treatments before authorizing payment for our products, limit the types of diagnoses for which coverage will be provided or impose a moratorium on coverage for products while the payor makes a coverage decision. An inability to maintain adequate formulary positions could increase patient cost-sharing for our products and cause some patients to determine not to use our products. Any delays or unforeseen difficulties in reimbursement approvals could limit patient access, depress therapy adherence rates, and adversely impact our ability to successfully commercialize our products. If we are unsuccessful in maintaining broad coverage for our products, our anticipated revenue from and growth prospects for our products could be negatively affected.

In many countries outside the U.S., procedures to obtain price approvals, coverage and reimbursement can take considerable time after the receipt of marketing authorization. Many European countries periodically review their reimbursement of medicinal products, which could have an adverse impact on reimbursement status. In addition, we expect that legislators, policymakers and healthcare insurance funds in the EU member states will continue to propose and implement cost-containing measures, such as lower maximum prices, lower or lack of reimbursement coverage and incentives to use cheaper, usually generic, products as an alternative to branded products, and/or branded products available through parallel import to keep healthcare costs down. Moreover, in order to obtain reimbursement for our products in some European countries, including some EU member states, we may be required to compile additional data comparing the cost-effectiveness of our products to other available therapies. Health Technology Assessment, or HTA, of medicinal products is becoming an increasingly common part of the pricing and reimbursement procedures in some EU member states, including those representing the larger markets. The HTA process, which is currently governed by national laws in each EU member state, is the procedure to assess therapeutic, economic and societal impact of a given medicinal product in the national healthcare systems of the individual country. The outcome of an HTA will often influence the pricing and reimbursement status granted to these medicinal products by the competent authorities of individual EU member states. The extent to which pricing and reimbursement decisions are influenced by the HTA of the specific medicinal product currently varies between EU member states, although beginning in January 2025, the EU HTA regulation will apply; this regulation aims to harmonize the clinical benefit assessment of HTA across the EU. If we are unable to maintain favorable pricing and reimbursement status in EU member states that represent significant markets, our anticipated revenue from and growth prospects for our products in the EU could be negatively affected. For example, the European Commission, or EC, granted marketing authorization for Vyxeos in August 2018 and for Epidyolex in September 2019, and, as part of our rolling launches of Vyxeos and Epidyolex in Europe, we are making pricing and reimbursement submissions in European countries. If we experience setbacks or unforeseen difficulties in obtaining favorable pricing and reimbursement decisions, including as a result of regulatory review delays, planned launches in the affected EU member states would be delayed, which could negatively impact anticipated revenue from and growth prospects for Vyxeos and Epidyolex.

***The pricing of pharmaceutical products has come under increasing scrutiny as part of a global trend toward healthcare cost containment and resulting changes in healthcare law and policy, including recently enacted changes to Medicare, may impact our business in ways that we cannot currently predict, which could have a material adverse effect on our business and financial condition.***

Political, economic and regulatory influences are subjecting the healthcare industry in the U.S. to fundamental changes, particularly given the current atmosphere of mounting criticism of prescription drug costs in the U.S. We expect there will continue to be legislative and regulatory proposals to change the healthcare system in ways that could impact our ability to sell our products profitably, as governmental oversight and scrutiny of biopharmaceutical companies is increasing. For example, we anticipate that the U.S. Congress, state legislatures, and federal and state regulators may adopt or accelerate adoption of new healthcare policies and reforms intended to curb healthcare costs, such as federal and state controls on reimbursement for drugs (including under Medicare, Medicaid and commercial health plans), new or increased requirements to pay prescription drug rebates and penalties to government health care programs, and additional pharmaceutical cost transparency policies that aim to require drug companies to justify their prices through required disclosures. Further, the Inflation Reduction Act of 2022, or IRA, among other things, requires the U.S. Department of Health and Human Services Secretary to negotiate, with respect to Medicare units and subject to a specified cap, the price of a set number of certain Medicare spend drugs and biologicals per year starting in 2026, penalizes manufacturers of certain Medicare Parts B and D drugs for price increases above inflation, and makes several changes to the Medicare Part D benefit, including a limit on annual out-of-pocket costs, and a change in manufacturer liability under the program, which could negatively affect our business and financial condition. The Centers for Medicare & Medicaid Services, or CMS, issued final guidance implementing the Drug Price Negotiation Program for the first year of the program in which it finalized certain policies governing the selection of drugs for negotiation for such year. Among other things, CMS finalized definitions of "qualifying single source drug" and "marketed" that, especially if they persist beyond the first year of the program, could further disincentivize innovation. In addition, under the Medicaid Drug Rebate Program, rebates owed by manufacturers are no longer subject to a cap on the rebate amount effective January 1, 2024, which could adversely affect our rebate liability.

41

Table of Contents

Legislative and regulatory proposals that have recently been considered include, among other things, proposals to limit the terms of patent litigation settlements with generic sponsors, to define certain conduct around patenting and new product development as unfair competition, to address the scope of orphan drug exclusivity and to facilitate the importation of drugs into the U.S. from other countries. Legislative and regulatory proposals to reform the regulation of the pharmaceutical industry and reimbursement for pharmaceutical drugs are continually changing, and all such considerations may adversely affect our business and industry in ways that we cannot accurately predict.

There is also ongoing activity related to health care coverage. The Affordable Care Act substantially changed the way healthcare is financed by both governmental and private insurers. These changes impacted previously existing government healthcare programs and have resulted in the development of new programs, including Medicare payment-for-performance initiatives. Further, federal policy makers have taken and are expected to continue to try to take steps towards expanding health care coverage beyond the Affordable Care Act, which could have ramifications for the pharmaceutical industry. Additional legislative changes, regulatory changes, or guidance could be adopted, which may impact the marketing approvals and reimbursement for our products and product candidates. For example, there has been increasing legislative, regulatory, and enforcement interest in the U.S. with respect to drug pricing practices. There have been several Congressional inquiries and proposed and enacted federal and state legislation and regulatory initiatives designed to, among other things, bring more transparency to product pricing, evaluate the relationship between pricing and manufacturer patient programs, and reform government healthcare program reimbursement methodologies for drug products beyond the changes enacted by the IRA.

If new healthcare policies or reforms intended to curb healthcare costs are adopted or if we experience negative publicity with respect to pricing of our products or the pricing of pharmaceutical drugs generally, the prices that we charge for our products may be affected, our commercial opportunity may be limited and/or our revenues from sales of our products may be negatively impacted. We have periodically increased the price of our products, including Xywav and Xyrem most recently in January 2024, and there is no guarantee that we will make similar price adjustments to our products in the future or that price adjustments we have taken or may take in the future will not negatively affect our sales volumes and revenues. There is no guarantee that such price adjustments will not negatively affect our reputation and our ability to secure and maintain reimbursement coverage for our products, which could limit the prices that we charge for our products, limit the commercial opportunities for our products and/or negatively impact revenues from sales of our products.

Government investigations or U.S. Congressional oversight with respect to drug pricing or our other business practices could cause us to incur significant expense and could distract us from the operation of our business and execution of our strategy. Any such investigation or hearing could also result in reduced market acceptance and demand for our products, could harm our reputation and our ability to market our products in the future, and could have a material adverse effect on our business, financial condition, results of operations and growth prospects. For example, in July 2022, we received a subpoena from the U.S. Attorney's Office for the District of Massachusetts requesting documents related to Xyrem and U.S. Patent No. 8,772,306 ("Method of Administration of Gamma Hydroxybutyrate with Monocarboxylate Transporters"), product labeling changes for Xyrem, communications with FDA and the USPTO, pricing of Xyrem, and other related documents. For more information, see the risk factor under the heading "*We are subject to significant ongoing regulatory obligations and oversight, which may subject us to civil or criminal proceedings, investigations, or penalties and may result in significant additional expense and limit our ability to commercialize our products*" in this Part I, Item 1A.

We expect that legislators, policymakers and healthcare insurance funds in Europe and other international markets will continue to propose and implement cost-containing measures to keep healthcare costs down. These measures could include limitations on the prices we will be able to charge for our products or the level of reimbursement available for these products from governmental authorities or third party payors as well as clawbacks and revenue caps. For example, in the U.K., the cap on National Health Service, or NHS, spending on branded medicines agreed between the U.K. government and industry for 2019 to 2023 has remained unaltered despite higher than expected growth in NHS use of branded medicines, resulting in significant increases to the industry level revenue clawback rate payable on sales of branded medicines to the NHS. In the EU, a trend in some EU member states is for medicinal products to be reimbursed based on competitor products and not in relation with the value or the cost of the product. On April 26, 2023, the EC adopted a proposal for a new Directive and a new Regulation, which revise and replace the existing EU general pharmaceutical legislation. This proposal includes increased transparency on research and development costs or public contributions to these costs with a view to strengthen the negotiating position of national competent authorities of the EU member states responsible for pricing and reimbursement, as well as reinforced cooperation with these authorities on pricing and reimbursement matters. Further, an increasing number of European and other foreign countries use prices for medicinal products established in other countries as "reference prices" to help determine the price of the product in their own territory. Consequently, a downward trend in prices of medicinal products in some countries could contribute to similar downward trends elsewhere.

Table of Contents

***In addition to access, coverage and reimbursement, the commercial success of our products depends upon their market acceptance by physicians, patients, third party payors and the medical community.***

If physicians do not prescribe our products, we cannot generate the revenues we anticipate from product sales. Market acceptance of each of our products by physicians, patients, third party payors and the medical community depends on:

- the clinical indications for which a product is approved and any restrictions placed upon the product in connection with its approval, such as a REMS or equivalent obligation imposed in a European or other foreign country, patient registry requirements or labeling restrictions;

- the prevalence of the disease or condition for which the product is approved and its diagnosis;

- the efficacy of the product in regular use;

- the severity of side effects and other risks in relation to the benefits of our products;

- unanticipated serious adverse events;

- acceptance by physicians and patients of each product as a safe and effective treatment;

- availability of sufficient product inventory to meet demand;

- physicians' decisions relating to treatment practices based on availability of product;

- perceived clinical superiority and/or advantages over alternative treatments;

- overcoming negative publicity surrounding illicit use of

  ◦ GHB or

  ◦ cannabidiol, or CBD, and marijuana products

  and the view of patients, law enforcement agencies, physicians and regulators of our products as being the same or similar to illicit products;

- relative convenience and ease of administration;

- with respect to Xywav and Xyrem, physician and patient assessment of the burdens associated with obtaining or maintaining the certifications required under the Xywav and Xyrem REMS;

- the cost of treatment in relation to alternative treatments, including generic products; and

- the availability of financial or other assistance for patients who are uninsured or underinsured.

Because of our dependence upon market acceptance of our products, any adverse publicity associated with harm to patients or other adverse events resulting from the use or misuse of any of our products or any similar products distributed by other companies, including generic versions of our products, could materially and adversely affect our business, financial condition, results of operations and growth prospects.

***Delays or problems in the supply of our products for sale or for use in clinical trials, loss of our single source suppliers or failure to comply with manufacturing regulations could materially and adversely affect our business, financial condition, results of operations and growth prospects.***

The manufacture of pharmaceutical products requires significant expertise and capital investment, including the development of process controls required to consistently produce the API and the finished product in sufficient quantities while meeting detailed product specifications on a repeated basis. We and our suppliers may encounter difficulties in production, including difficulties with the supply of manufacturing materials, production costs and yields, process controls, quality control and quality assurance, including testing of stability, impurities and impurity levels and other product specifications by validated test methods, and compliance with strictly enforced U.S., state and non-U.S. regulations. In addition, we and our suppliers are subject to FDA's current Good Manufacturing Practices, or cGMP, requirements, federal and state controlled substances obligations and equivalent rules and regulations prescribed by non-U.S. regulatory authorities. If we or any of our suppliers encounter manufacturing, quality or compliance difficulties with respect to any of our products, whether due to the ongoing military conflict in Ukraine and related sanctions imposed against Russia (including as a result of disruptions of global shipping, the transport of products, energy supply, cybersecurity incidents and banking systems as well as of our ability to control input costs) or otherwise, we may be unable to obtain or maintain regulatory approval or meet commercial demand for such products, which could adversely affect our business, financial condition, results of operations and growth prospects. In addition, we could be subject to enforcement action by regulatory authorities for our failure to comply with cGMP with respect to the products we manufacture in our facilities as well as for our failure to adequately oversee compliance with cGMP by any of our third party suppliers operating under contract. Moreover, failure to comply with applicable legal and regulatory

43

Table of Contents

requirements subjects us and our suppliers to possible regulatory action, including restrictions on supply or shutdown, which may adversely affect our or a supplier's ability to supply the ingredients or finished products we need.

We have a manufacturing and development facility in Athlone, Ireland where we manufacture Xywav and Xyrem, a manufacturing plant in Villa Guardia, Italy where we produce the defibrotide drug substance and a manufacturing and development facility in the U.K. at Kent Science Park, where we produce Epidiolex/Epidyolex and have capability to develop product candidates. We currently do not have our own commercial manufacturing or packaging capability for our other products, their APIs or product candidates outside of those developed at Kent Science Park. As a result, our ability to develop and supply products in a timely and competitive manner depends primarily on third party suppliers being able to meet our ongoing commercial and clinical trial needs for API, other raw materials, packaging materials and finished products.

In part due to the limited market size for our products and product candidates, we have a single source of supply for most of our marketed products, product candidates and their APIs. Single sourcing puts us at risk of interruption in supply in the event of manufacturing, quality or compliance difficulties. If one of our suppliers fails or refuses to supply us for any reason, it would take a significant amount of time and expense to implement and execute the necessary technology transfer to, and to qualify, a new supplier. FDA and similar international or national regulatory bodies must approve manufacturers of the active and inactive pharmaceutical ingredients and certain packaging materials used in our products. If there are delays in qualifying new suppliers or facilities or a new supplier is unable to meet FDA's or similar international regulatory body's requirements for approval, there could be a shortage of the affected products for the marketplace or for use in clinical studies, or both, which could negatively impact our anticipated revenues and could potentially cause us to breach contractual obligations with customers or to violate local laws requiring us to deliver the product to those in need.

We are responsible for the manufacture and supply of Epidiolex/Epidyolex and other cannabinoid product candidates for commercial use and for use in clinical trials. The manufacturing of Epidiolex/Epidyolex and our product candidates necessitates compliance with Good Manufacturing Practice, or GMP, and other regulatory requirements in jurisdictions internationally. Our ability to successfully manufacture Epidiolex/Epidyolex and other cannabinoid product candidates involves cultivation of botanical raw material from specific cannabinoid plants, extraction and purification processes, manufacture of finished products and labeling and packaging, which includes product information, tamper evidence and anti-counterfeit features, under tightly controlled processes and procedures. In addition, we must ensure chemical consistency among our batches, including clinical batches and, if approved, marketing batches. Demonstrating such consistency may require typical manufacturing controls as well as clinical data. We must also ensure that our batches conform to complex release specifications. We have a second site at which we can grow the specific cannabinoid plants that produce the CBD used in Epidiolex/Epidyolex and a second site at which we can crystallize the purified CBD from the liquid plant extract. A number of our product candidates (excluding Epidiolex/Epidyolex) consist of a complex mixture manufactured from plant materials, and because the release specifications may not be identical in all countries, certain batches may fail release testing and not be able to be commercialized. If we are unable to manufacture Epidiolex/Epidyolex or other product candidates in accordance with regulatory specifications, including GMP or if there are disruptions in our manufacturing process due to damage, loss or otherwise, or failure to pass regulatory inspections of our manufacturing facilities, we may not be able to meet current demand or supply sufficient product for use in clinical trials, and this may also harm our ability to commercialize Epidiolex/Epidyolex and our product candidates on a timely or cost-competitive basis, if at all. Our manufacturing program requires significant time and resources and may not be successful, may lead to delays, interruptions to supply or may prove to be more costly than anticipated.

Vyxeos is manufactured by Simtra Biopharma Solutions, which is a sole source supplier from a single site location. Moreover, the proprietary technology that supports the manufacture of Vyxeos is not easily transferable. Consequently, engaging an alternate manufacturer may be difficult, costly and time-consuming. If we fail to obtain a sufficient supply of Vyxeos in accordance with applicable specifications on a timely basis, our sales of Vyxeos, our future maintenance and potential growth of the market for this product, our ability to conduct ongoing and future clinical trials of Vyxeos, and our business, financial condition, results of operations and growth prospects could be materially adversely affected.

Rylaze drug substance is manufactured by AGC Biologics A/S at its facility in Copenhagen, Denmark and the drug product is manufactured and packaged by Patheon at its facility in Greenville, North Carolina. Both sites have ample capacity to support forecast demand and we have secured supply for more than one year's forecast demand. To successfully manufacture Rylaze, the manufacturer must have an adequate master and working cell bank. If we fail to obtain a sufficient supply of Rylaze in accordance with applicable specifications on a timely basis, our sales of Rylaze, our future maintenance and potential growth of the market for this product, our competitive advantage over competing products that have supply constraints, and our business, financial condition, results of operations and growth prospects could be materially adversely affected.

In addition, in order to conduct our ongoing and any future clinical trials of, complete marketing authorization submissions for, and potentially launch our other product candidates, we also need to have sufficient quantities of product manufactured.

44

Table of Contents

Moreover, to obtain approval from FDA or a similar international or national regulatory body of any product candidate, we or our suppliers for that product must obtain approval by the applicable regulatory body to manufacture and supply product, in some cases based on qualification data provided to the applicable body as part of our regulatory submission. Any delay in generating, or failure to generate, data required in connection with submission of the chemistry, manufacturing and controls portions of any regulatory submission could negatively impact our ability to meet our anticipated submission dates, and therefore our anticipated timing for obtaining FDA or similar international or national regulatory body approval, or our ability to obtain regulatory approval at all. In addition, any failure of us or a supplier to obtain approval by the applicable regulatory body to manufacture and supply product or any delay in receiving, or failure to receive, adequate supplies of a product on a timely basis or in accordance with applicable specifications could negatively impact our ability to successfully launch and commercialize products and generate sales of products at the levels we expect.

**Risks Related to Growth of Our Product Portfolio and Research and Development**

***Our future success depends on our ability to successfully develop and obtain and maintain regulatory approvals for our late-stage product candidates and, if approved, to successfully launch and commercialize those product candidates.***

The testing, manufacturing and marketing of our products require regulatory approvals, including approval from FDA and similar bodies in Europe and other countries. If FDA, the European Medicines Agency, or EMA, the EC or the competent authorities of the EU member states or other European countries determine that our quality, safety or efficacy data do not warrant marketing approval for a product candidate, we could be required to conduct additional clinical trials as a condition to receiving approval, which could be costly and time-consuming and could delay or preclude the approval of our application. Our inability to obtain and maintain regulatory approval for our product candidates in the U.S. and internationally and to successfully commercialize new products that are approved would prevent us from receiving a return on our investments and could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

Even if we receive regulatory approval of a product, regulatory authorities may impose significant labeling restrictions or requirements, including limitations on the dosing of the product, requirements around the naming or strength of a product, restrictions on indicated uses for which we may market the product, the imposition of a boxed warning or other warnings and precautions, and/or the requirement for a REMS or equivalent obligation imposed in a European or other foreign country to ensure that the benefits of the drug outweigh the risks. FDA requires a REMS and a boxed warning for Xywav and Xyrem, and similar restrictions could be imposed on other products in the future. Our receipt of approval for narrower indications than sought, restrictions on marketing through a REMS or equivalent obligation imposed in a European or other foreign country, or significant labeling restrictions or requirements in an approved label such as a boxed warning, could have a negative impact on our ability to recoup our research and development costs and to successfully commercialize that product, any of which could materially and adversely affect our business, financial condition, results of operations and growth prospects.

Regulatory authorities may also impose post-marketing obligations as part of their approval, which may lead to additional costs and burdens associated with commercialization of the product and may pose a risk to maintaining approval of the product. We are subject to certain post-marketing requirements and commitments in connection with the approval of certain of our products, including Epidiolex/Epidyolex, Defitelio, Vyxeos, Rylaze and Zepzelca. These post-marketing requirements and commitments include satisfactorily conducting multiple post-marketing trials and safety studies. Failure to comply with these post-marketing requirements could result in withdrawal of our marketing approvals for the applicable product and/or other civil or criminal penalties. For example, FDA granted accelerated approval to Zepzelca for relapsed SCLC based on data from a Phase 2 trial, which approval is contingent upon verification and description of clinical benefit in a post-marketing clinical trial. While we and our licensor PharmaMar have reached agreement with FDA regarding a confirmatory clinical development program, our inability to confirm its clinical benefit could result in the withdrawal of approval of Zepzelca, which could have a material adverse effect on our business, financial condition, results of operations and growth prospects. In any event, if we are unable to comply with our post-marketing obligations imposed as part of the marketing approvals in the U.S., the EU, or other countries, our approval may be varied, suspended or revoked, product supply may be delayed and our sales of our products could be materially adversely affected.

Any new data relating to Epidiolex/Epidyolex, including from adverse event reports and post-marketing studies in the U.S. and Europe, and from other ongoing clinical trials, may result in changes to the product label and/or imposition of a REMS and may adversely affect sales, or result in withdrawal of Epidiolex/Epidyolex from the market. FDA, EMA and regulatory authorities in other jurisdictions may also consider the new data in reviewing Epidiolex/Epidyolex marketing applications for indications beyond its currently approved uses or impose additional post-approval requirements. If any of these actions were to occur, it could result in significant expense and delay or limit our ability to generate sales of Epidiolex/Epidyolex.

If we are not successful in the clinical development of our product candidates, if we are unable to obtain regulatory approval for our product candidates in a timely manner, or at all, or if sales of an approved product do not reach the levels we

Table of Contents

expect, our anticipated revenue from our product candidates would be negatively affected, which could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

***We may not be able to successfully identify and acquire or in-license additional products or product candidates to grow our business, and, even if we are able to do so, we may otherwise fail to realize the anticipated benefits of these transactions.***

In addition to continued investment in our research and development pipeline, we intend to grow our business by acquiring or in-licensing, and developing, including with collaboration partners, additional products and product candidates that we believe are highly differentiated and have significant commercial potential. However, we may be unable to identify or consummate suitable acquisition or in-licensing opportunities, and this inability could impair our ability to grow our business. Other companies, many of which may have substantially greater financial, sales and marketing resources, compete with us for these opportunities. Even if appropriate opportunities are available, we may not be able to successfully identify them, or we may not have the financial resources necessary to pursue them.

Even if we are able to successfully identify and acquire, in-license or develop additional products or product candidates, we may not be able to successfully manage the risks associated with integrating any products or product candidates into our portfolio or the risks arising from anticipated and unanticipated problems in connection with an acquisition or in-licensing or from financial difficulties of our collaborators. Further, while we seek to mitigate risks and liabilities of potential acquisitions and in-licensing transactions through, among other things, due diligence, there may be risks and liabilities that such due diligence efforts fail to discover, that are not disclosed to us, or that we inadequately assess. Any failure in identifying and managing these risks, liabilities and uncertainties effectively, could have a material adverse effect on our business, results of operations and financial condition. In addition, product and product candidate acquisitions, particularly when the acquisition takes the form of a merger or other business consolidation such as our acquisition of GW Pharmaceuticals plc, or GW, have required, and any similar future transactions also will require, significant efforts and expenditures, including with respect to transition and integration activities. We may encounter unexpected difficulties, or incur substantial costs, in connection with potential acquisitions and similar transactions, which include:

- the need to incur substantial debt and/or engage in dilutive issuances of equity securities to pay for acquisitions;

- the need to comply with regulatory requirements, including in some cases clearance from the FTC;

- the potential need to secure shareholder approval of the transaction;

- the potential disruption of our historical core business;

- the strain on, and need to continue to expand, our existing operational, technical, financial and administrative infrastructure;

- the difficulties in integrating acquired products and product candidates into our portfolio;

- the difficulties in assimilating employees and corporate cultures;

- the failure to retain key managers and other personnel;

- the need to write down assets or recognize impairment charges;

- the diversion of our management's attention to integration of operations and corporate and administrative infrastructures; and

- any unanticipated liabilities for activities of or related to the acquired business or its operations, products or product candidates.

As a result of these or other factors, products or product candidates we acquire, or obtain licenses to, may not produce the revenues, earnings or business synergies that we anticipated, may not result in regulatory approvals, and may not perform as expected. For example, in May 2021, we made a substantial investment in Epidiolex and certain other products and technologies acquired in our acquisition of GW. The total consideration paid by us for the entire issued share capital of GW was $7.2 billion. The success of our acquisition of GW will depend, in part, on our ability to realize the anticipated benefits from the acquisition, which benefits may not be realized at the expected levels within the expected timeframe, or at all, or may take longer to realize or cost more than expected, which could materially and adversely affect our business, financial condition, results of operations and growth prospects. In this regard, in the third quarter of 2022, we recorded a $133.6 million asset impairment charge as a result of the decision to discontinue the nabiximols program that we acquired as part of our acquisition of GW. In any event, failure to manage effectively our growth through acquisitions or in-licensing transactions could adversely affect our growth prospects, business, results of operations and financial condition.

46

Table of Contents

***Conducting clinical trials is costly and time-consuming, and the outcomes are uncertain. A failure to prove that our product candidates are safe and effective in clinical trials, or to generate data in clinical trials to support expansion of the therapeutic uses for our existing products, could materially and adversely affect our business, financial condition, results of operations and growth prospects.***

As a condition to regulatory approval, each product candidate must undergo extensive and expensive preclinical studies and clinical trials to demonstrate that the product candidate is safe and effective. The results at any stage of the development process may lack the desired safety, efficacy or pharmacokinetic characteristics. If FDA or any equivalent non-U.S. regulatory agency determines that the safety or efficacy data included in any marketing application we submit do not warrant marketing approval for the affected product or product candidate, we may be required to conduct additional preclinical studies or clinical trials, which could be challenging to perform, costly and time-consuming. Even if we believe we have successfully completed testing, FDA or any equivalent non-U.S. regulatory agency may determine our data is not sufficiently compelling to warrant marketing approval for the indication(s) sought, if at all, and may require us to engage in additional clinical trials or provide further analysis which may be costly and time-consuming. Any adverse events or other data generated during the course of clinical trials of our product candidates and/or clinical trials related to additional indications for our commercialized products could result in action by FDA or an equivalent non-U.S. regulatory agency, which may restrict our ability to sell, or adversely affect sales of, currently marketed products, or such events or other data could otherwise have a material adverse effect on a related commercial product, including with respect to its safety profile. Any failure or delay in completing such clinical trials could materially and adversely affect the maintenance and growth of the markets for the related marketed products, which could adversely affect our business, financial condition, results of operations and overall growth prospects.

In addition to issues relating to the results generated in clinical trials, clinical trials have been and can be delayed or halted for a variety of reasons, including:

- difficulty identifying, recruiting or enrolling eligible patients, often based on the number of clinical trials, particularly with enrollment criteria targeting the same patient population, and in rare diseases with small patient populations;

- difficulty identifying a clinical development pathway, including viable indications and appropriate clinical trial protocol design, particularly where there is no applicable regulatory precedent;

- delays or failures in obtaining regulatory authorization to commence a trial because of safety concerns of regulators relating to our product candidates or similar product candidates of our competitors or failure to follow regulatory guidelines;

- delays or failures in obtaining clinical materials and manufacturing sufficient quantities of the product candidate for use in trials;

- delays or failures in reaching agreement on acceptable terms with prospective study sites;

- delays or failures in obtaining approval of our clinical trial protocol from an institutional review board, or similar bodies in other jurisdictions, such as an ethics committee in Europe, to conduct a clinical trial at a prospective study site;

- failure of our clinical trials and clinical investigators, including contract research organizations or other third parties assisting us with clinical trials, to satisfactorily perform their contractual duties, meet expected deadlines and comply with FDA and other regulatory agencies' requirements, including good clinical practices;

- unforeseen safety issues;

- inability to monitor patients adequately during or after treatment;

- difficulty monitoring multiple study sites; or

- insufficient funds to complete the trials.

In some jurisdictions such as the EU, initiating phase 3 clinical trials and clinical trials in the pediatric population is subject to a requirement to obtain approval or a waiver from the competent authorities of the EU member states and/or the EMA. If we do not obtain such approval our ability to conduct clinical trials and obtain marketing authorizations or approvals may be severely impaired and our business may be adversely impacted.

**Risks Related to Our Intellectual Property**

***It is difficult and costly to protect our proprietary rights, and we may not be able to ensure their protection.***

Our commercial success depends in part on obtaining, maintaining and defending intellectual property protection for our products and product candidates, including protection of their use and methods of manufacturing and distribution. Our ability

Table of Contents

to protect our products and product candidates from unauthorized making, using, selling, offering to sell or importation by third parties depends on the extent to which we have rights under valid and enforceable patents or have adequately protected trade secrets that cover these activities.

The degree of protection to be afforded by our proprietary rights is difficult to predict because legal means afford only limited protection and may not adequately protect our rights or permit us to gain or keep our competitive advantage. For example:

- our patent applications, or those of our licensors or partners, may not result in issued patents;

- others may independently develop similar or therapeutically equivalent products without infringing our patents, or those of our licensors, such as products that are not covered by the claims of our patents, or for which fall outside the exclusive rights granted under our license agreements;

- our issued patents, or those of our licensors or partners, may be held invalid or unenforceable as a result of legal challenges by third parties or may be vulnerable to legal challenges as a result of changes in applicable law;

- our patents covering certain aspects of our products or the use thereof could be delisted from FDA's Orange Book, as a result of challenges by third parties before FDA or the courts;

- competitors may manufacture products in countries where we have not applied for patent protection or that have a different scope of patent protection or that do not respect our patents; or

- others may be issued patents that prevent the sale of our products or require licensing and the payment of significant fees or royalties.

Patent enforcement generally must be sought on a country-by-country basis, and issues of patent validity and infringement may be judged differently in different countries. The legal systems of certain countries, particularly certain developing countries, may lack maturity or consistency when it comes to the enforcement of patents and other intellectual property rights, particularly those relating to pharmaceuticals, which could make it difficult for us to stop the infringement of our patents or marketing of competing products in violation of our proprietary rights generally. Proceedings to enforce our patent rights in foreign jurisdictions could result in substantial costs and divert our efforts and attention from other aspects of our business.

Changes in either the patent laws or in interpretations of patent laws in the U.S. and other countries may diminish the value of our intellectual property portfolio. Any patent may be challenged, and potentially invalidated or held unenforceable, including through patent litigation or through administrative procedures that permit challenges to patent validity. Patents can also be circumvented by an ANDA or Section 505(b)(2) application that avoids infringement of our intellectual property.

In June 2021, we received notice from Lupin that it has filed with FDA an ANDA for a generic version of Xywav. The notice from Lupin included a "paragraph IV certification" with respect to ten of our patents listed in FDA's Orange Book for Xywav on the date of our receipt of the notice. A paragraph IV certification is a certification by a generic applicant that patents covering the branded product are invalid, unenforceable, and/or will not be infringed by the manufacture, use or sale of the generic product. In April 2022, we received notice from Lupin that it had filed a paragraph IV certification regarding a newly-issued patent listed in the Orange Book for Xywav. In February 2023, we received notice from Teva that it had filed an ANDA seeking approval to market a generic version of Xywav, which notice included a paragraph IV certification with respect to certain of our patents listed in FDA's Orange Book for Xywav. In April 2023, we received notice from Alkem that it had filed an ANDA seeking approval to market a generic version of Xyrem, which notice included a paragraph IV certification with respect to certain of our patents listed in FDA's Orange Book for Xyrem. For additional information on litigation involving these matters, see Note 14, Commitments and Contingencies-Legal Proceedings of the Notes to Consolidated Financial Statements, included in Part IV of this Annual Report on Form 10-K.

We have settled patent litigation with each of the ten companies seeking to introduce generic versions of Xyrem in the U.S. by granting those companies licenses to launch their generic products (and in certain cases, an AG version of Xyrem) in advance of the expiration of the last of our patents. Notwithstanding our Xyrem patents and settlement agreements, additional third parties may also attempt to introduce generic versions of Xyrem, Xywav or other sodium oxybate products for treatment of cataplexy and/or EDS in narcolepsy that design around our patents or assert that our patents are invalid or otherwise unenforceable. Such third parties could launch a generic or 505(b)(2) product referencing Xyrem before the dates provided in our patents or settlement agreements. For example, we have several methods of use patents listed in the Orange Book, that expire in 2033 that cover treatment methods included in the Xyrem label related to a drug-drug interaction, or DDI, with divalproex sodium. Although FDA has stated, in granting a Citizen Petition we submitted in 2016, that it would not approve any sodium oxybate ANDA referencing Xyrem that does not include the portions of the currently approved Xyrem label related to the DDI patents, we cannot predict whether a future ANDA filer, or a company that files a Section 505(b)(2) application for a drug referencing Xyrem, may pursue regulatory strategies to avoid infringing our DDI patents notwithstanding FDA's response

Table of Contents

to the Citizen Petition, or whether any such strategy would be successful. Likewise, we cannot predict whether we will be able to maintain the validity of these patents or will otherwise obtain a judicial determination that a generic or other sodium oxybate product, its package insert or the generic sodium oxybate REMS or another separate REMS will infringe any of our patents or, if we prevail in proving infringement, whether a court will grant an injunction that prevents a future ANDA filer or other company introducing a different sodium oxybate product from marketing its product, or instead require that party to pay damages in the form of lost profits or a reasonable royalty.

Additionally, in November and December 2022, ten companies sent us notices that they had filed ANDAs seeking approval to market a generic version of Epidiolex, which notices each included a paragraph IV certification with respect to certain of our patents listed in FDA's Orange Book for Epidiolex on the date of the receipt of the applicable notice. On January 3, 2023, we filed a patent infringement suit against the ten Epidiolex ANDA filers in the United States District Court for the District of New Jersey. In June and July 2023, we received notice from certain of the Epidiolex ANDA Filers that they had each filed a paragraph IV certification regarding a newly-issued patent listed in the Orange Book for Epidiolex. On July 21, 2023, we filed an additional lawsuit against all of the Epidiolex ANDA Filers in the United States District Court for the District of New Jersey alleging that, by filing its ANDA, each Epidiolex ANDA Filer infringed the newly-issued patent related to a method of treatment using Epidiolex.

On May 13, 2021, we filed a patent infringement suit against Avadel and several of its corporate affiliates in the United States District Court for the District of Delaware. The suit alleges that Avadel's product candidate FT218 will infringe five of our patents related to controlled release formulations of oxybate and the safe and effective distribution of oxybate. The suit seeks an injunction to prevent Avadel from launching a product that would infringe these patents, and an award of monetary damages if Avadel does launch an infringing product. Avadel filed an answer to the complaint and counterclaims asserting that the patents are invalid or not enforceable, and that its product, if approved, will not infringe our patents. For additional information on litigation involving this matter, see "*Avadel Patent Litigation*" in Note 14, Commitments and Contingencies-Legal Proceedings of the Notes to Consolidated Financial Statements, included in Part IV of this Annual Report on Form 10-K.

Since Xyrem's regulatory exclusivity has expired in the EU, we are aware that generic or hybrid generic applications have been approved by various EU regulatory authorities, and additional generic or hybrid generic applications may be submitted and approved.

We also currently rely in part on trade secret protection for several of our products, including Defitelio, and product candidates. Trade secret protection does not protect information or inventions if another party develops that information or invention independently, and establishing that a competitor developed a product through trade secret misappropriation rather than through legitimate means may be difficult to prove. We seek to protect our trade secrets and other unpatented proprietary information in part through confidentiality and invention agreements with our employees, consultants, advisors and partners. Nevertheless, our employees, consultants, advisors and partners may unintentionally or willfully disclose our proprietary information to competitors, and we may not have adequate remedies for such disclosures. Moreover, if a dispute arises with our employees, consultants, advisors or partners over the ownership of rights to inventions, including jointly developed intellectual property, we could lose patent protection or the confidentiality of our proprietary information, and possibly also lose the ability to pursue the development of certain new products or product candidates.

*We have incurred and may in the future incur substantial costs as a result of litigation or other proceedings relating to patents, other intellectual property rights and related matters, and we may be unable to protect our rights to, or commercialize, our products.*

Our ability, and that of our partners, to successfully commercialize any approved products will depend, in part, on our ability to obtain patents, enforce those patents and operate without infringing the proprietary rights of third parties. If we choose to go to court to stop a third party from infringing our patents, our licensed patents or our partners' patents, that third party has the right to ask the court or an administrative agency to rule that these patents are invalid and/or should not be enforced. These lawsuits and administrative proceedings are expensive and consume time and other resources, and we may not be successful in these proceedings or in stopping infringement. In addition, the inter partes review process, or IPR, or a post grant review process under the Leahy-Smith America Invents Act permits any person, whether they are accused of infringing the patent at issue or not, to challenge the validity of certain patents through a proceeding before the Patent Trial and Appeal Board, or PTAB, of the USPTO.

There is a risk that a court could decide that our patents or certain claims in our patents are not valid or infringed, and that we do not have the right to stop a third party from using the inventions covered by those claims. In addition, the PTAB may invalidate a patent, as happened with six of our patents covering the Xywav and Xyrem REMS, which were invalidated through the IPR process. In addition, even if we prevail in establishing that another product infringes a valid claim of one of our patents, a court may determine that we can be compensated for the infringement in damages, and refuse to issue an injunction. As a result, we may not be entitled to stop another party from infringing our patents for their full term.

49

Table of Contents

Litigation involving patent matters is frequently settled between the parties, rather than continuing to a court ruling. The FTC has publicly stated that, in its view, certain types of agreements between branded and generic pharmaceutical companies related to the settlement of patent litigation or the manufacture, marketing and sale of generic versions of branded drugs violate the antitrust laws and has commenced investigations and brought actions against some companies that have entered into such agreements. In particular, the FTC has expressed its intention to take aggressive action to challenge settlements that include an alleged transfer of value from the brand company to the generic company (so-called "pay for delay" patent litigation settlements). The U.S. Congress and state legislatures have also identified pharmaceutical patent litigation settlements as potential impediments to generic competition and have introduced, and in states like California passed, legislation to regulate them. Third party payors have also challenged such settlements on the grounds that they increase drug prices. Because there is currently no precise legal standard with respect to the lawfulness of such settlements, many pharmaceutical companies, including us, have faced extensive litigation over whether patent litigation settlements they have entered into are reasonable and lawful. From June 2020 to May 2022, several lawsuits were filed on behalf of purported direct and indirect Xyrem purchasers, alleging that the patent litigation settlement agreements we entered with Hikma and other ANDA filers violate state and federal antitrust and consumer protection laws. For additional information on these lawsuits, see Note 14, Commitments and Contingencies-Legal Proceedings of the Notes to Consolidated Financial Statements, included in Part IV of this Annual Report on Form 10-K. It is possible that additional lawsuits will be filed against us making similar or related allegations. We cannot predict the outcome of these or potential additional lawsuits; however, if the plaintiffs in the class action complaints were to be successful in their claims, they may be entitled to injunctive relief or we may be required to pay significant monetary damages, which could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

Parties to such settlement agreements in the U.S. are required by law to file the agreements with the FTC and the U.S. Department of Justice, or DOJ, for review. Accordingly, we have submitted our patent litigation settlement agreements to the FTC and the DOJ for review. We may receive formal or informal requests from the FTC regarding our ANDA litigation settlements, and there is a risk that the FTC may commence a formal investigation or action against us, which could divert the attention of management and cause us to incur significant costs, regardless of the outcome. Any claim or finding that we or our business partners have failed to comply with applicable laws and regulations could be costly to us and have a material adverse effect on our business, financial condition, results of operations and growth prospects.

A third party may claim that we or our manufacturing or commercialization partners are using inventions covered by the third party's patent rights, or that we or such partners are infringing, misappropriating or otherwise violating other intellectual property rights, and may go to court to stop us from engaging in our normal operations and activities, including making or selling our products. Such lawsuits are costly and could affect our results of operations and divert the attention of management and development personnel. There is a risk that a court could decide that we or our partners are infringing, misappropriating or otherwise violating third party patent or other intellectual property rights, which could be very costly to us and have a material adverse effect on our business. If we are sued for patent infringement, we would need to demonstrate that our products or methods do not infringe the patent claims of the relevant patent and/or that the patent claims are invalid or unenforceable, which we may not be able to do.

If we were found to infringe upon a patent or other intellectual property right, if we failed to obtain or renew a license under a patent or other intellectual property right from a third party, or if a third party that we were licensing technologies from was found to infringe upon a patent or other intellectual property rights of another third party, we may be required to pay damages, including damages of up to three times the damages found or assessed, if the infringement is found to be willful, suspend the manufacture of certain products or reengineer or rebrand our products, if feasible, or we may be unable to enter certain new product markets. In addition, if we have declined or failed to enter into a valid assignment agreement for any reason, we may not own the invention or our intellectual property, and our products may not be adequately protected.

Litigation, whether filed by us or against us, can be expensive and time consuming to defend and divert management's attention and resources. Our competitive position could suffer as a result. On June 22, 2023, we filed a complaint in the United States District Court for the District of Columbia seeking a declaration that FDA's approval on May 1, 2023 of the New Drug Application for Avadel's drug Lumryz was unlawful. We cannot predict the timing or ultimate outcome of this litigation or the impact of this litigation on our business, including any potential adverse consequences to, among other things, our reputation, relationships with governmental or regulatory authorities, including FDA. For additional information, see "*FDA Litigation*" in Note 14, Commitments and Contingencies-Legal Proceedings of the Notes to Consolidated Financial Statements, included in Part IV of this Annual Report on Form 10-K.

***With respect to our products and product candidates targeting rare indications, relevant regulatory exclusivities such as orphan drug exclusivity or pediatric exclusivity may not be granted or, if granted, may be limited.***

The first NDA applicant with an orphan drug designation for a particular active moiety to treat a specific disease or condition that receives FDA approval is usually entitled to a seven-year exclusive marketing period in the U.S. for that drug, for that indication. We rely in part on this ODE and other regulatory exclusivities to protect Xywav, Epidiolex, Zepzelca, Vyxeos and, potentially, our other products and product candidates from competitors, and we expect to continue relying in part on these

Table of Contents

regulatory exclusivities in the future. The duration of our regulatory exclusivity period could be impacted by a number of factors, including FDA's later determination that our request for orphan designation was materially defective, that the manufacturer is unable to supply sufficient quantities of the drug, that the extension of the exclusivity period established by the Improving Regulatory Transparency for New Medical Therapies Act does not apply, or the possibility that we are unable to successfully obtain pediatric exclusivity. There is no assurance that we will successfully obtain orphan drug designation for other products or product candidates or other rare diseases or that a product candidate for which we receive orphan drug designation will be approved, or that we will be awarded orphan drug exclusivity upon approval as, for example, FDA may reconsider whether the eligibility criteria for such exclusivity have been met and/or maintained. Moreover, a drug product with an active moiety that is different from that in our drug candidate or, under limited circumstances, the same drug product, may be approved by FDA for the same indication during the period of marketing exclusivity. According to FDA, the limited circumstances include a showing that the second drug is clinically superior to the drug with marketing exclusivity through a demonstration of superior safety or efficacy or that it makes a major contribution to patient care. For example, even though FDA granted seven-year ODE to Xywav, FDA also approved Lumryz and granted Lumryz seven-year ODE based on FDA's finding that Lumryz makes a major contribution to patient care and is therefore clinically superior to Xywav and Xyrem. In addition, if a competitor obtains approval and marketing exclusivity for a drug product with an active moiety that is the same as that in a product candidate we are pursuing for the same indication before us, approval of our product candidate would be blocked during the period of marketing exclusivity unless we could demonstrate that our product candidate is clinically superior to the approved product. In addition, if a competitor obtains approval and marketing exclusivity for a drug product with an active moiety that is the same as that in a product candidate we are pursuing for a different orphan indication, this may negatively impact the market opportunity for our product candidate. There have been legal challenges, including from us, to aspects of FDA's regulations and policies concerning the exclusivity provisions of the Orphan Drug Act, including whether two drugs are the same drug product, and our and future challenges could lead to changes that affect the protections potentially afforded our products in ways that are difficult to predict. In this regard, we have filed a complaint in the United States District Court for the District of Columbia seeking a declaration that FDA's approval of Lumryz was unlawful and allege that FDA acted outside its authority under the Orphan Drug Act, when, despite the ODE protecting Xywav, FDA approved Lumryz and granted Lumryz seven-year ODE. However, legal challenges like this are inherently uncertain and there can be no guarantee that the United States District Court for the District of Columbia will agree with our interpretation of applicable laws and regulations or will otherwise agree with any or all of the allegations included in our complaint, or that we will otherwise prevail in this litigation. We also cannot predict what other adverse consequences to, among other things, our reputation, our relationship with FDA or other governmental or regulatory authorities or the protections afforded our products could result from our decision to proceed with this litigation or the ultimate outcome thereof. Moreover, in the future, there is the potential for legislative changes or additional legal challenges to FDA's orphan drug regulations and policies, and it is uncertain how such challenges might affect our business.

In the EU, if a marketing authorization is granted for a medicinal product that is designated an orphan drug, that product is entitled to ten years of marketing exclusivity. We rely in part on this orphan drug exclusivity and other regulatory exclusivities to protect Epidyolex and Vyxeos. During the period of marketing exclusivity, subject to limited exceptions, no similar medicinal product may be granted a marketing authorization for the orphan indication. There is no assurance that we will successfully obtain orphan drug designation for future rare indications or orphan exclusivity upon approval of any of our product candidates that have already obtained designation. Even if we obtain orphan exclusivity for any product candidate, the exclusivity period can be reduced to six years if at the end of the fifth year it is established that the orphan designation criteria are no longer met or if it is demonstrated that the orphan drug is sufficiently profitable that market exclusivity is no longer justified. Further, a similar medicinal product may be granted a marketing authorization for the same indication notwithstanding our marketing exclusivity if we are unable to supply sufficient quantities of our product, or if the second product is safer, more effective or otherwise clinically superior to our orphan drug. In addition, if a competitor obtains marketing authorization and orphan exclusivity for a product that is similar to a product candidate we are pursuing for the same indication, approval of our product candidate would be blocked during the period of orphan marketing exclusivity unless we could demonstrate that our product candidate is safer, more effective or otherwise clinically superior to the approved product.

## Other Risks Related to Our Business and Industry

***We have substantially expanded our international footprint and operations, and we may expand further in the future, which subjects us to a variety of risks and complexities which, if not effectively managed, could negatively affect our business.***

We are headquartered in Dublin, Ireland and have offices in multiple locations, including the U.S., the U.K. and key markets across Europe, Canada, Australia and Japan and clinical trial sites in multiple locations around the world. We may further expand our international operations into other countries in the future, either organically or by acquisition. Conducting

our business in multiple countries subjects us to a variety of risks and complexities that may materially and adversely affect our business, results of operations, financial condition and growth prospects, including:

- the diverse regulatory, financial and legal requirements in the countries where we are located or do business, and any changes to those requirements;

- challenges inherent in efficiently managing employees and commercial partners in diverse geographies, including the need to adapt systems, policies, benefits and compliance programs to differing labor and employment law and other regulations, as well as maintaining positive interactions with our unionized employees;

- costs of, and liabilities for, our international operations, including clinical trials, products or product candidates;

- additional exposure to foreign currency exchange risk from non-U.S. operations;

- political and economic instability, such as the instability caused by Russia's invasion of Ukraine; and

- public health risks, such as the COVID-19 pandemic and potential related effects on supply chain, travel and employee health and availability.

In addition, there can be no guarantee that we will effectively manage the increasing, global complexity of our business without experiencing operating inefficiencies or control deficiencies. Our failure to do so could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

***Significant disruptions of information technology systems or data security breaches could adversely affect our business.***

In the ordinary course of our business, we and the third parties upon which we rely collect, store, process and transmit, or collectively, process large amounts of sensitive, proprietary, and/or confidential information, including intellectual property, business information, personal data, and clinical trial data, or collectively, sensitive data. We outsource some of our operations (including parts of our information technology infrastructure) to a number of third party vendors who may have, or could gain, access to our confidential information. In addition, many of those third parties, in turn, subcontract or outsource some of their responsibilities to third parties.

Our information technology systems, and those of our vendors, are large and complex and store large amounts of sensitive data We and the third parties upon which we rely face a variety of evolving threats that could threaten the availability of our sensitive data and information technology systems and cause security incidents from inadvertent or intentional actions by our employees, third party vendors and/or business partners, or from cyber-attacks and malicious third parties.

Threats of this nature are prevalent, are increasing in frequency, persistence, sophistication and intensity, are being conducted by sophisticated and organized groups and individuals, are increasingly difficult to detect, and come from a variety of sources and with a wide range of motives (including, but not limited to, industrial espionage) and expertise, including organized criminal groups, "hacktivists," traditional computer "hackers," threat actors, personnel (such as through theft or misuse), nation states, nation-state-supported actors, and others.

In addition to the extraction of important information, such threats could include the deployment of harmful malware, ransomware, denial-of-service attacks, social engineering, malicious code, credential harvesting, personnel misconduct or error, supply-chain attacks, software bugs, server malfunctions, software or hardware failures, loss of data or other information technology assets, adware, attacks enhanced or facilitated by AI, and other threats that affect service reliability and threaten the confidentiality, integrity and availability of our information technology systems and sensitive data. In addition, supply-chain attacks have increased in frequency and severity, and we cannot guarantee that third parties' infrastructure in our supply chain or our third-party partners' supply chains have not been compromised.

If we (or a third party upon whom we rely) experience a security incident or are perceived to have experienced a security incident, or otherwise experience significant disruptions of our, our third party vendors' and/or business partners' information technology systems or security breaches, including in our remote work environment, such occurrence could adversely affect our business operations and/or result in the loss, misappropriation, and/or unauthorized access, use or disclosure of, or the prevention of access to, sensitive data, and could result in adverse consequences to us such as government enforcement actions, additional reporting requirements and/or oversight, restrictions on processing sensitive data, litigation, indemnification obligations, negative publicity, reputational harm, monetary fund diversions, diversion of management attention, interruptions in our operations, financial loss, and other similar harms. Any such event that leads to unauthorized access, use or disclosure of personal data, including personal data regarding our patients or employees, could harm our reputation, compel us to comply with federal and/or state breach notification laws and foreign law equivalents, notify relevant stakeholders, subject us to mandatory corrective action, require us to verify the correctness of database contents and otherwise subject us to liability under laws and regulations that protect the privacy and security of personal data. This could disrupt our business, result in increased costs or loss of revenue, and/or result in significant legal and financial exposure. We cannot be sure that our insurance coverage will be adequate or sufficient, that such coverage will continue to be available on commercially reasonable terms or at

Table of Contents

all, or that such coverage will pay future claims. In addition, security breaches and other inappropriate access can be difficult to detect, and any delay in identifying them may further harm us.

While we have implemented security measures to protect our information technology systems and infrastructure and sensitive data, there can be no assurance that such measures will be effective or prevent service interruptions or security breaches that could adversely affect our business. We may expend significant resources to implement and maintain security measures to try to protect against security incidents. In addition, failure to maintain effective internal accounting controls related to security breaches and cybersecurity in general could impact our ability to produce timely and accurate financial statements and subject us to regulatory scrutiny.

In addition to experiencing a security incident, third parties may gather, collect, or infer sensitive data about us from public sources, data brokers, or other means that reveals competitively sensitive details about our organization and could be used to undermine our competitive advantage or market position.

***We are subject to significant ongoing regulatory obligations and oversight, which may subject us to civil or criminal proceedings, investigations, or penalties and may result in significant additional expense and limit our ability to commercialize our products.***

*FDA and Equivalent Non-U.S. Regulatory Authorities*

Our activities are subject to extensive regulation encompassing the entire life cycle of our products, from research and development activities to marketing approval (including specific post-marketing obligations), manufacturing, labeling, packaging, adverse event and safety reporting, storage, advertising, promotion, sale, pricing and reimbursement, recordkeeping, distribution, importing and exporting. The failure by us or any of our third party partners, including our corporate development and collaboration partners, clinical trial sites, suppliers, distributors and our central pharmacy for Xywav and Xyrem, to comply with applicable requirements could subject us to administrative or judicial sanctions or other negative consequences, such as delays in approval or refusal to approve a product candidate, restrictions on our products, our suppliers, our other partners or us, the withdrawal, suspension or variation of product approval or manufacturing authorizations, untitled letters, warning letters, fines and other monetary penalties, unanticipated expenditures, product recall, withdrawal or seizure, total or partial suspension of production or distribution, interruption of manufacturing or clinical trials, operating restrictions, injunctions, suspension of licenses, civil penalties and/or criminal prosecution, any of which could result in a significant drop in our revenues from the affected products and harm to our reputation and could have a significant impact on our sales, business and financial condition.

We monitor adverse events resulting from the use of our products, as do the regulatory authorities, and we file periodic reports with the authorities concerning adverse events. The authorities review these events and reports, and if they determine that any events and/or reports indicate a trend or signal, they can require a change in a product label, restrict sales and marketing and/or require conduct or other actions, potentially including variation, withdrawal or suspension of the marketing authorization, any of which could result in reduced market acceptance and demand for our products, could harm our reputation and our ability to market our products in the future, and could have a material adverse effect on our business, financial condition, results of operations and growth prospects. FDA, the competent authorities of the EU member states on behalf of the EMA, and the competent authorities of other European countries, also periodically inspect our records related to safety reporting. The EMA's Pharmacovigilance Risk Assessment Committee may propose to the Committee for Medicinal Products for Human Use that the marketing authorization holder be required to take specific steps or advise that the existing marketing authorization be varied, suspended or revoked. Failure to adequately and promptly correct the observation(s) can result in further regulatory enforcement action, which could include the variation, suspension or withdrawal of marketing authorization or imposition of financial penalties or other enforcement measures.

Rylaze and Epidyolex are available on a named patient basis or through a compassionate use process in many countries where they are not commercially available. If any such country's regulatory authorities determine that we are promoting such products without proper authorization, we could be found to be in violation of pharmaceutical advertising laws or the regulations permitting sales under named patient programs. In that case, we may be subject to financial or other penalties. Any failure to maintain revenues from sales of products on a named patient basis and/or to generate revenues from commercial sales of these products exceeding historical sales on a named patient basis could have an adverse effect on our business, financial condition, results of operations and growth prospects.

FDA, the competent authorities of the EU member states and other European countries, and other governmental authorities require advertising and promotional materials to be truthful and not misleading, and products to be marketed only for their approved indications and in accordance with the provisions of the approved label. Regulatory authorities actively investigate allegations of off-label promotion in order to enforce regulations prohibiting these types of activities. A determination that we have promoted an approved product for off-label uses could subject us to significant liability, including civil and administrative financial penalties and other remedies as well as criminal financial penalties, other sanctions and imprisonment. Even if we are not determined to have engaged in off-label promotion, an allegation that we have engaged in such activities could have a significant impact on our sales, business and financial condition. The U.S. government has also

53

Table of Contents

required companies to enter into complex corporate integrity agreements and/or non-prosecution agreements that impose significant reporting and other burdens on the affected companies. Failure to maintain a comprehensive and effective compliance program, and to integrate the operations of acquired businesses into a combined comprehensive and effective compliance program on a timely basis, could subject us to a range of regulatory actions and/or civil or criminal penalties that could affect our ability to commercialize our products and could harm or prevent sales of the affected products, or could substantially increase the costs and expenses of commercializing and marketing our products.

*Other Regulatory Authorities*

We are also subject to regulation by other regional, national, state and local agencies, including the DEA, the DOJ, the FTC, the United States Department of Commerce, the Office of Inspector General of the U.S. Department of Health and Human Services, or OIG, and other regulatory bodies, as well as similar governmental authorities in those non-U.S. countries in which we commercialize our products.

We are subject to numerous fraud and abuse laws and regulations globally and our sales, marketing, patient support and medical activities may be subject to scrutiny under these laws and regulations. These laws are described in "Business—Government Regulation" in Part I, Item 1 of our Annual Report on Form 10-K for the year ended December 31, 2023. While we maintain a comprehensive compliance program to try to ensure that our practices and the activities of our third party contractors and employees fall within the scope of available statutory exceptions and regulatory safe harbors whenever possible, and otherwise comply with applicable laws, regulations or guidance, regulators and enforcement agencies may disagree with our assessment or find fault with the conduct of our employees or contractors. In addition, existing regulations are subject to regulatory revision or changes in interpretation by the DOJ or OIG. For example, in November 2020, the OIG issued a Special Fraud Alert to highlight certain inherent fraud and abuse risks associated with speaker fees, honorariums and expenses paid by pharmaceutical and medical device companies to healthcare professionals participating in company-sponsored events. The Special Fraud Alert sent a clear signal that speaker programs will be subject to potentially heightened enforcement scrutiny.

Many companies have faced government investigations or lawsuits by whistleblowers who bring a *qui tam* action under the False Claims Act on behalf of themselves and the government for a variety of alleged improper marketing activities, including providing free product to customers expecting that the customers would bill federal programs for the product, providing consulting fees, grants, free travel and other benefits to physicians to induce them to prescribe the company's products, and inflating prices reported to private price publication services, which are used to set drug reimbursement rates under government healthcare programs. In addition, the government and private whistleblowers have pursued False Claims Act cases against pharmaceutical companies for causing false claims to be submitted as a result of the marketing of their products for unapproved uses or violations of the federal anti-kickback statute. If we become the subject of a government False Claims Act or other investigation or whistleblower suit, we could incur substantial legal costs (including settlement costs) and business disruption responding to such investigation or suit, regardless of the outcome.

On July 11, 2022, we received a subpoena from the U.S. Attorney's Office for the District of Massachusetts requesting documents related to Xyrem and U.S. Patent No. 8,772,306 ("Method of Administration of Gamma Hydroxybutyrate with Monocarboxylate Transporters"), product labeling changes for Xyrem, communications with FDA and the USPTO, pricing of Xyrem, and other related documents. We are cooperating with this investigation. We are unable to predict how long this investigation will continue or its outcome, but it is possible that we will incur significant costs in connection with the investigation, regardless of the outcome. We may also become subject to similar investigations by other state or federal governmental agencies. The investigation by the U.S. Attorney's Office and any additional investigations or litigation related to the subject matter of this investigation may result in damages, fines, penalties or administrative sanctions against us, negative publicity or other negative actions that could harm our reputation, reduce demand for Xyrem and/or reduce coverage of Xyrem, including by federal health care programs and state health care programs. If any or all of these events occur, our business and stock price could be materially and adversely affected.

Public reporting under the Physician Payment Sunshine Act, or Sunshine provisions, and other similar state laws, the requirements of which are discussed in "Business—Government Regulation" in Part I, Item 1 of this Annual Report on Form 10-K for the year ended December 31, 2023, has resulted in increased scrutiny of the financial relationships between industry, teaching hospitals, physicians and other health care providers. Such scrutiny may negatively impact our ability to engage with physicians and other health care providers on matters of importance to us. In addition, government agencies and private entities may inquire about our marketing practices or pursue other enforcement activities based on the disclosures in those public reports. If the data reflected in our reports are found to be in violation of any of the Sunshine provisions or any other U.S. federal, state or local laws or regulations that may apply, or if we otherwise fail to comply with the Sunshine provisions or similar requirements of state or local regulators, we may be subject to significant civil, and administrative penalties, damages or fines.

We have various programs to help patients access our products, including patient assistance programs, which include co-pay coupons for certain of our products, assistance to help patients determine their insurance coverage for our products, and a

Table of Contents

free product program. Co-pay coupon programs for commercially insured patients, including our program for Xyrem, have received negative publicity related to allegations regarding their use to promote branded pharmaceutical products over other less costly alternatives, and some states have imposed restrictions on manufacturer co-pay programs when therapeutic equivalents are available. In September 2014, the OIG issued a Special Advisory Bulletin warning manufacturers that they may be subject to sanctions under the federal Anti-Kickback Statute and other laws if they do not take appropriate steps to exclude Medicare Part D beneficiaries from using co-pay coupons. It is possible that changes in insurer policies regarding co-pay coupons and/or the introduction and enactment of new legislation or regulatory action could restrict or otherwise negatively affect these patient support programs, which could result in fewer patients using affected products, including Xyrem, and therefore could have a material adverse effect on our sales, business and financial condition.

We have established programs to consider grant applications submitted by independent charitable organizations, including organizations that provide co-pay support to patients who suffer from the diseases treated by our drugs. The OIG has issued guidance for how pharmaceutical manufacturers can lawfully make donations to charitable organizations who provide co-pay assistance to Medicare patients, provided that such organizations, among other things, are *bona fide* charities, are entirely independent of and not controlled by the manufacturer, provide aid to applicants on a first-come basis according to consistent financial criteria, and do not link aid to use of a donor's product. In April 2019, we finalized our civil settlement agreement with the DOJ and OIG and entered into a corporate integrity agreement requiring us to maintain our ongoing corporate compliance program and obligating us to implement or continue, as applicable, a set of defined corporate integrity activities for a period of five years from the effective date of the corporate integrity agreement. Although we have structured our programs to follow available guidance and the requirements of our corporate integrity agreement, if we or our donation recipients are deemed to fail to comply with relevant laws, regulations or evolving government guidance in the operation of these programs, such facts could be used as the basis for an enforcement action against us by the federal government or other enforcement agencies or private litigants, or we could become liable for payment of certain stipulated penalties or could be excluded from participation in federal health care programs, which would have a material adverse effect on our sales, business and financial condition.

Our business activities outside of the U.S. are subject to the U.S. Foreign Corrupt Practices Act, or FCPA, and similar anti-bribery or anti-corruption laws, regulations or rules of other countries in which we operate, including the U.K. Bribery Act of 2010, or the U.K. Bribery Act. In certain countries, the health care providers who prescribe pharmaceuticals are employed by their government and the purchasers of pharmaceuticals are government entities; therefore, our dealings with these prescribers and purchasers may be subject to regulation under the FCPA, the U.K. Bribery Act and equivalent national laws in other countries. As an example, recently the U.S. Securities and Exchange Commission and the DOJ have increased their FCPA enforcement activities with respect to pharmaceutical companies. Violation of these laws by us or our suppliers and other third party agents for which we may be liable may result in civil or criminal sanctions, which could include monetary fines, criminal penalties, and disgorgement of past profits, which could have a material adverse impact on our business and financial condition.

Outside the U.S., interactions between pharmaceutical companies and physicians are also governed by strict laws, such as national anti-bribery laws of European countries, national sunshine rules, regulations, industry self-regulation codes of conduct and physicians' codes of professional conduct. Failure to comply with these requirements could result in reputational risk, public reprimands, administrative penalties, fines or imprisonment.

We are also subject to federal, state, national and international laws and regulations governing the privacy and security of health-related and other personal data we collect and maintain, including, but not limited to, Section 5 of the Federal Trade Commission Act, the Health Insurance Portability and Accountability Act of 1996, or HIPAA, the California Privacy Rights Act and the EU's General Data Protection Regulation, or GDPR. The GDPR, for example, imposes restrictions on the processing (e.g., collection, use and disclosure) of personal data in the EU and also imposes strict restrictions on the transfer of personal data out of the EU to the U.S. The GDPR imposes penalties of up to 4% of annual global revenue. HIPAA imposes privacy and security obligations on covered entity health care providers, health plans, and health care clearinghouses, as well as their "business associates" – certain persons or covered entities that create, receive, maintain, or transmit protected health information in connection with providing a specified service or performing a function on behalf of a covered entity. Although we are not directly subject to HIPAA, we could potentially be subject to criminal penalties if we, our affiliates, or our agents knowingly receive individually identifiable health information maintained by a HIPAA-covered entity in a manner that is not authorized or permitted by HIPAA.

In July 2023, the EC adopted its adequacy decision for the EU-US Data Privacy Framework, meaning that personal data can now flow freely from the EU to U.S. companies that participate in the Data Privacy Framework. These laws and regulations continue to develop and are subject to interpretation, and may impose limitations on our activities or otherwise adversely affect our business. Compliance with these laws requires a flexible privacy framework and substantial resources, and compliance efforts will likely be an increasing and substantial cost in the future.

Table of Contents

If we or our third party partners fail to comply or are alleged to have failed to comply with these or other applicable data protection and privacy laws and regulations, or if we were to experience a data breach involving personal data, we could be subject to government enforcement actions or private lawsuits. Any associated claims, inquiries, or investigations or other government actions could lead to unfavorable outcomes that have a material impact on our business including through significant penalties or fines, monetary judgments or settlements including criminal and civil liability for us and our officers and directors, increased compliance costs, delays or impediments in the development of new products, negative publicity, increased operating costs, diversion of management time and attention, or other remedies that harm our business, including orders that we modify or cease existing business practices.

***If we fail to comply with our reporting and payment obligations under the Medicaid Drug Rebate Program or other governmental pricing programs, we could be subject to additional reimbursement requirements, penalties, sanctions and fines, which could have a material adverse effect on our business, financial condition, results of operations and growth prospects.***

We participate in the Medicaid Drug Rebate Program, the 340B program, the U.S. Department of Veterans Affairs, Federal Supply Schedule, or FSS, pricing program, and the Tricare Retail Pharmacy, or Tricare, program, and have obligations to report the average sales price for certain of our drugs to the Medicare program. All of these programs are described in more detail under the heading "Business—Pharmaceutical Pricing, Reimbursement by Government and Private Payors and Patient Access" in Part I, Item 1 of this Annual Report on Form 10-K. Manufacturers are required to report the average sales price for drugs under the Medicare program regardless of whether they are enrolled in the Medicaid Drug Rebate Program. In addition, manufacturers must pay refunds to Medicare for single source drugs or biologicals, or biosimilar biological products, reimbursed under Medicare Part B and packaged in single-dose containers or single-use packages for units of discarded drug reimbursed by Medicare Part B in excess of 10 percent of total allowed charges under Medicare Part B for that drug. Statutory or regulatory changes or guidance from CMS could affect the average sales price calculations for our products and the resulting Medicare payment rate and could negatively impact our results of operations. Further, the IRA established a Medicare Part B inflation rebate scheme, under which, generally speaking, manufacturers will owe rebates if the average sales price of a Part B drug increases faster than the pace of inflation. Failure to timely pay a Part B inflation rebate is subject to a civil monetary penalty.

Pricing and rebate calculations vary across products and programs, are complex, and are often subject to interpretation by us, governmental or regulatory agencies and the courts, which can change and evolve over time. In the case of our Medicaid pricing data, if we become aware that our reporting for a prior quarter was incorrect, or has changed as a result of recalculation of the pricing data, we are generally obligated to resubmit the corrected data for up to three years after those data originally were due. Such restatements and recalculations increase our costs for complying with the laws and regulations governing the Medicaid Drug Rebate Program and could result in an overage or underage in our rebate liability for past quarters. Price recalculations also may affect the ceiling price at which we are required to offer our products under the 340B program and give rise to an obligation to refund entities participating in the 340B program for overcharges during past quarters impacted by a price recalculation.

Civil monetary penalties can be applied if we are found to have knowingly submitted any false price or product information to the government, if we are found to have made a misrepresentation in the reporting of our average sales price, if we fail to submit the required price data on a timely basis, or if we are found to have charged 340B covered entities more than the statutorily mandated ceiling price. CMS could also decide to terminate our Medicaid drug rebate agreement, in which case federal payments may not be available under Medicaid or Medicare Part B for our covered outpatient drugs. We cannot assure you that our submissions will not be found by CMS to be incomplete or incorrect. Moreover, failure to pay refunds for units of discarded drug under the discarded drug refund program could subject us to civil monetary penalties of 125 percent of the refund amount.

Our failure to comply with our reporting and payment obligations under the Medicaid Drug Rebate Program and other governmental programs could negatively impact our financial results. CMS issued a final regulation that modified prior Medicaid Drug Rebate Program regulations to permit reporting multiple best price figures with regard to value-based purchasing arrangements; and to provide definitions for "line extension," "new formulation," and related terms, with the practical effect of expanding the scope of drugs considered to be line extensions that are subject to an alternative rebate formula. While the regulatory provisions that purported to affect the applicability of the best price and average manufacturer price exclusions of manufacturer-sponsored patient benefit programs, in the context of PBM "accumulator" programs were invalidated by a court, such programs may continue to negatively affect us in other ways. Regulatory and legislative changes, and judicial rulings relating to the Medicaid Drug Rebate Program and related policies (including coverage expansion), have increased and will continue to increase our costs and the complexity of compliance, have been and will continue to be time-consuming to implement, and could have a material adverse effect on our results of operations, particularly if CMS or another agency challenges the approach we take in our implementation. Rebates are no longer subject to a cap on the rebate amount.

Table of Contents

The Health Resources and Services Administration, or HRSA, issued a final regulation regarding the calculation of the 340B ceiling price and the imposition of civil monetary penalties on manufacturers that knowingly and intentionally overcharge covered entities. Implementation of this regulation could affect our obligations and potential liability under the 340B program in ways we cannot anticipate. We are also required to report the 340B ceiling prices for our covered outpatient drugs to HRSA, which then publishes them to 340B covered entities. If we are found to have knowingly and intentionally charged 340B covered entities more than the statutorily mandated ceiling price, we could be subject to significant civil monetary penalties and/or such failure also could be grounds for HRSA to terminate our agreement to participate in the 340B program, in which case our covered outpatient drugs would no longer be eligible for federal payment under the Medicaid or Medicare Part B program, which would have a material adverse effect on our business, financial condition, results of operations and growth prospects, including our ability to acquire, in-license or develop new products to grow our business. Moreover, HRSA established an administrative dispute resolution, or ADR, process under a final regulation for claims by covered entities that a manufacturer engaged in overcharging, including claims that a manufacturer limited the ability of a covered entity to purchase the manufacturer's drugs at the 340B ceiling price, and by manufacturers that a covered entity violated the prohibitions against diversion or duplicate discounts. Such claims are to be resolved through an ADR panel of government officials rendering a decision that may be appealed to a federal court. An ADR proceeding could potentially subject us to discovery by covered entities and other onerous procedural requirements and could result in additional liability. This ADR regulation has been challenged in separate litigation instituted by PhRMA and by pharmaceutical manufacturers in multiple federal courts. In November 2022, HRSA issued a notice of proposed rulemaking that proposes changes to the ADR process, which could negatively affect us. In addition, HRSA could decide to terminate a manufacturer's agreement to participate in the 340B program for a violation of that agreement or other good cause shown, in which case the manufacturer's covered outpatient drugs may no longer be eligible for federal payment under the Medicaid or Medicare Part B program.

Further, legislation may be introduced that, if passed, would, among other things, modify the requirements of the 340B program.

Medicare Part D generally provides coverage to enrolled Medicare patients for self-administered drugs (*i.e.*, drugs that are not administered by a physician). Medicare Part D is administered by private prescription drug plans approved by the U.S. government and, subject to detailed program rules and government oversight, each drug plan establishes its own Medicare Part D formulary for prescription drug coverage and pricing, which the drug plan may modify from time to time. The prescription drug plans negotiate pricing with manufacturers and pharmacies and may condition formulary placement on the availability of manufacturer discounts. In addition, manufacturers, including us, are currently required to provide to CMS a 70% discount on brand name prescription drugs utilized by Medicare Part D beneficiaries when those beneficiaries are in the coverage gap phase of the Part D benefit design. Civil monetary penalties could be due if we fail to offer discounts to beneficiaries under the Medicare Part D coverage gap discount program. The IRA sunsets the coverage gap discount program starting in 2025 and replaces it with a new manufacturer discount program. Failure to pay a discount under this new program will be subject to a civil monetary penalty. In addition, the IRA established a Medicare Part D inflation rebate scheme, under which, generally speaking, manufacturers will owe additional rebates if the average manufacturer price of a Part D drug increases faster than the pace of inflation. Failure to comply with obligations under the Part D benefit redesign or to timely pay a Part D inflation rebate is subject to a civil monetary penalty.

The IRA also creates a drug price negotiation program under which the prices for Medicare units of certain high Medicare spend drugs and biologicals without generic or biosimilar competition will be capped by reference to, among other things, a specified non-federal average manufacturer price starting in 2026. Failure to comply with requirements under the drug price negotiation program is subject to an excise tax and/or a civil monetary penalty. This or any other legislative change could impact the market conditions for our products. We further expect continued scrutiny on government price reporting from Congress, agencies, and other bodies.

Pursuant to applicable law, knowing provision of false information in connection with price reporting under the U.S. Department of Veterans Affairs, FSS or Tricare programs can subject a manufacturer to civil monetary penalties. These program obligations also contain extensive disclosure and certification requirements. If we overcharge the government in connection with our arrangements with FSS or Tricare, we are required to refund the difference to the government. Failure to make necessary disclosures and/or to identify contract overcharges can result in allegations against us under the False Claims Act and other laws and regulations. Unexpected refunds to the government, and responding to a government investigation or enforcement action, would be expensive and time-consuming, and could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

***Product liability and product recalls could harm our business.***

The development, manufacture, testing, marketing and sale of pharmaceutical products are associated with significant risks of product liability claims or recalls. Side effects or adverse events known or reported to be associated with, or manufacturing defects in, the products sold by us could exacerbate a patient's condition, or could result in serious injury or impairment or even death. This could result in product liability claims against us and/or recalls of one or more of our products.

57

Table of Contents

In many countries, including in EU member states, national laws provide for strict (no-fault) liability which applies even where damages are caused both by a defect in a product and by the act or omission of a third party.

Product recalls may be issued at our discretion or at the discretion of our suppliers, government agencies and other entities that have regulatory authority for pharmaceutical sales. Any recall of our products could materially adversely affect our business by rendering us unable to sell that product for some time and by adversely affecting our reputation. A recall could also result in product liability claims by individuals and third party payors. In addition, product liability claims could result in an investigation of the safety or efficacy of our products, our manufacturing processes and facilities, or our marketing programs conducted by FDA, the EC or the competent authorities of the EU member states. Such investigations could also potentially lead to a recall of our products or more serious enforcement actions, limitations on the therapeutic indications for which they may be used, or suspension, variation, or withdrawal of approval. Any such regulatory action by FDA, the EC or the competent authorities of the EU member states could lead to product liability lawsuits as well.

Product liability insurance coverage is expensive, can be difficult to obtain and may not be available in the future on acceptable terms, or at all. Our product liability insurance may not cover all of the future liabilities we might incur in connection with the development, manufacture or sale of our products. A successful claim or claims brought against us in excess of available insurance coverage could subject us to significant liabilities and could have a material adverse effect on our business, financial condition, results of operations and growth prospects. Such claims could also harm our reputation and the reputation of our products, adversely affecting our ability to market our products successfully.

***We use hazardous materials in our manufacturing facilities, and any claims relating to the improper handling, storage, release or disposal of these materials could be time-consuming and expensive.***

Our operations are subject to complex and increasingly stringent environmental, health and safety laws and regulations in the countries where we operate and, in particular, in Ireland, the U.K. and Italy where we have manufacturing facilities. If an accident or contamination involving pollutants or hazardous substances occurs, an injured party could seek to hold us liable for any damages that result and any liability could exceed the limits or fall outside the coverage of our insurance. We may not be able to maintain insurance with sufficient coverage on acceptable terms, or at all. Costs, damages and/or fines may result from the presence, investigation and remediation of such contamination at properties currently or formerly owned, leased or operated by us or at off-site locations, including where we have arranged for the disposal of hazardous substances or waste. In addition, we may be subject to third party claims, including for natural resource damages, personal injury and property damage, in connection with such contamination.

## Risks Related to Controlled Substances

***Xyrem and Xywav are controlled substances and certain product candidates we are developing may be subject to U.S. federal and state controlled substance laws and regulations, and our failure to comply with these laws and regulations, or the cost of compliance with these laws and regulations, could materially and adversely affect our business, results of operations, financial condition and growth prospects.***

Xyrem and Xywav and certain product candidates we are developing contain controlled substances as defined by state law and the federal CSA. Controlled substances are subject to a number of requirements and restrictions under the CSA and implementing regulations, including certain registration, security, recordkeeping, reporting, import, export and other requirements administered by the DEA. The DEA classifies controlled substances into five schedules: Schedule I, II, III, IV or V substances. Schedule I substances by definition have a high potential for abuse, no currently "accepted medical use" in the U.S., lack accepted safety for use under medical supervision, and may not be prescribed, marketed or sold in the U.S. Pharmaceutical products approved for use in the U.S. which contain a controlled substance are listed as Schedule II, III, IV or V, with Schedule II substances considered to present the highest potential for abuse or dependence and Schedule V substances the lowest relative risk of abuse among such substances. Schedule I and II drugs are subject to the strictest controls under the CSA, including manufacturing and procurement quotas, heightened security requirements and additional criteria for importation. In addition, dispensing of Schedule II drugs is subject to additional requirements. For example, they may not be refilled without a new prescription.

Drug products approved for medical use by FDA that contain cannabis or cannabis extracts may be controlled substances and will be rescheduled to Schedules II-V after approval, or, like Epidiolex, removed completely from the schedules by operation of other laws.

Individual states have also established controlled substance laws and regulations. Though state-controlled substances laws often mirror federal law, they may separately schedule our products or our product candidates as well. We or our partners may also be required to obtain separate state registrations, permits or licenses in order to be able to manufacture, distribute, administer or prescribe controlled substances for clinical trials or commercial sale, and failure to meet applicable regulatory

Table of Contents

requirements could lead to enforcement and sanctions by the states in addition to those from the DEA or otherwise arising under federal law.

U.S. facilities conducting research, manufacturing, distributing, importing or exporting, or dispensing controlled substances must be registered (licensed) to perform these activities and must comply with the security, control, recordkeeping and reporting obligations under the CSA, DEA regulations and corresponding state requirements. DEA and state regulatory bodies conduct periodic inspections of certain registered establishments that handle controlled substances. Obtaining and maintaining the necessary registrations and complying with the regulatory obligations may result in delay of the importation, manufacturing, distribution or clinical research of our commercial products and product candidates. Furthermore, failure to maintain compliance with the CSA and DEA and state regulations by us or any of our contractors, distributors or pharmacies can result in regulatory action that could have a material adverse effect on our business, financial condition and results of operations. DEA and state regulatory bodies may seek civil penalties, refuse to renew necessary registrations, or initiate proceedings to restrict, suspend or revoke those registrations. In certain circumstances, violations could lead to criminal penalties.

Schedule I and II substances are subject to DEA's annual manufacturing and procurement quota requirements. The annual quota allocated to us or our contract manufacturers for the active ingredients in our products may not be sufficient to complete clinical trials or meet commercial demand. Consequently, any delay or refusal by the DEA in establishing our, or our contract manufacturers', procurement and/or production quota for controlled substances could delay or stop our clinical trials or product launches, which could have a material adverse effect on our business, results of operations, financial condition and growth prospects.

***Some of our cannabinoid product candidates are currently controlled substances, the use of which may generate public controversy.***

Some of our product candidates derived from botanical marijuana contain controlled substances and their regulatory approval may generate public controversy. Political and social pressures and adverse publicity could lead to challenges in the approval of, and increased expenses for, our product candidates. These pressures could also limit or restrict the introduction and marketing of our product candidates. Adverse publicity from cannabis misuse or adverse side effects from cannabis or other cannabinoid products may adversely affect the commercial success or market penetration achievable by our cannabinoid product candidates. The nature of our business attracts a high level of public and media interest, and in the event of any resultant adverse publicity, our reputation may be harmed.

***Our ability to research, develop and commercialize Epidiolex/Epidyolex and certain of our product candidates is dependent on our ability to maintain licenses relating to the cultivation, possession and supply of botanical cannabis, a controlled substance.***

Our cannabinoid research and manufacturing facilities are located predominantly in the U.K. In the U.K., licenses to cultivate, possess and supply cannabis for medical research are granted by the U.K. government on an annual basis. Although our licenses have been renewed each year since 1998, they may not be in the future, in which case we may not be able to carry on our research and development program in the U.K. In addition, we are required to maintain our existing commercial licenses to cultivate, produce and supply cannabis. However, if the U.K. government were not prepared to renew such licenses, we would be unable to manufacture and distribute our products on a commercial basis in the U.K. or beyond. In order to carry out research in countries other than the U.K., similar licenses to those outlined above are required to be issued by the relevant authority in each country. In addition, we will be required to obtain licenses to export from the U.K. and to import into the recipient country. To date, we have obtained necessary import and export licenses to over 30 countries. Although we have an established track record of successfully obtaining such licenses as required, this may change in the future, which could materially and adversely affect our business, results of operations, financial condition and growth prospects.

***Controlled substance legislation differs between countries and legislation in certain countries may restrict or limit our ability to sell Epidyolex and certain of our product candidates.***

Most countries are parties to the Single Convention on Narcotic Drugs 1961, which governs international trade and domestic control of narcotic substances, including cannabis extracts. Countries may interpret and implement their treaty obligations in a way that creates a legal obstacle to our obtaining regulatory approval for Epidyolex and certain of our product candidates in those countries. These countries may not be willing or able to amend or otherwise modify their laws and regulations to permit Epidyolex or certain of our product candidates to be marketed, or achieving such amendments to the laws and regulations may take a prolonged period of time. In the case of countries with similar obstacles, we would be unable to market Epidyolex and certain of our product candidates in countries in the near future or perhaps at all if the laws and regulations in those countries do not change.

Table of Contents

## Risks Related to Our Financial Condition and Results

***We have incurred substantial debt, which could impair our flexibility and access to capital and adversely affect our financial position, and our business would be adversely affected if we are unable to service our debt obligations.***

As of December 31, 2023, we had total indebtedness of approximately $5.8 billion. Our substantial indebtedness may:

- limit our ability to use our cash flow or borrow additional funds for working capital, capital expenditures, acquisitions, investments or other general business purposes;

- require us to use a substantial portion of our cash flow from operations to make debt service payments;

- limit our flexibility to plan for, or react to, changes in our business and industry, or our ability to take specified actions to take advantage of certain business opportunities that may be presented to us;

- expose us to the risk of increased interest rates as certain of our borrowings, including a portion of borrowings under the credit agreement, are at variable rates of interest;

- result in dilution to our existing shareholders in the event exchanges of our 2.00% exchangeable senior notes due 2026 are settled in our ordinary shares;

- place us at a competitive disadvantage compared to our less leveraged competitors; and

- increase our vulnerability to the impact of adverse economic and industry conditions.

If our cash flows and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce or delay investments and capital expenditures, seek additional capital or restructure or refinance our debt. These alternative measures may not be successful and may not permit us to meet our debt service obligations. In the absence of such cash flows and resources, we could face substantial liquidity problems and might be required to dispose of material assets or operations to meet our debt service and other obligations. In addition, if we are unable to repay amounts under our secured credit agreement or senior secured notes, the credit agreement lenders and note holders could proceed against the collateral granted to them to secure that debt, which would seriously harm our business.

***Covenants in our credit agreement and indenture governing our senior secured notes restrict our business and operations in many ways and if we do not effectively manage our covenants, our financial conditions and results of operations could be adversely affected.***

The credit agreement and the indenture governing our senior secured notes contain various covenants that, among other things, limit our ability and/or our restricted subsidiaries' ability to:

- incur or assume liens or additional debt or provide guarantees in respect of obligations of other persons;

- pay dividends or distributions or redeem or repurchase capital stock;

- prepay, redeem or repurchase certain debt;

- make loans, investments, acquisitions (including certain acquisitions of exclusive licenses) and capital expenditures;

- enter into agreements that restrict distributions from our subsidiaries;

- enter into transactions with affiliates;

- enter into sale and lease-back transactions;

- sell, transfer or exclusively license certain assets, including material intellectual property, and capital stock of our subsidiaries; and

- consolidate or merge with or into, or sell substantially all of our assets to, another person.

If we undergo a change of control triggering event, we would be required to make an offer to purchase all of the senior secured notes at a purchase price in cash equal to 101% of their principal amount, plus accrued and unpaid interest, subject to certain exceptions. If we engage in certain asset sales, we will be required under certain circumstances to make an offer to purchase the senior secured notes at 100% of the principal amount, plus accrued and unpaid interest.

The credit agreement also includes certain financial covenants that require us to maintain a maximum secured leverage ratio and a minimum interest coverage ratio as long as we have drawn funds under the revolving credit facility (or letters of credit in excess of $50 million have been issued and remain undrawn).

As a result of these restrictions, we may be:

- limited in how we conduct our business;

Table of Contents

- unable to raise additional debt or equity financing to operate during general economic or business downturns; or

- unable to compete effectively, take advantage of new business opportunities or grow in accordance with our plans.

Our failure to comply with any of the covenants could result in a default under the credit agreement and the indenture governing our senior secured notes, which, if not cured or waived, could result in us having to repay our borrowings before their due dates. Such default may allow the lenders or the note holders to accelerate the related debt and may result in the acceleration of any other debt to which a cross-acceleration or cross-default provision applies. If we are forced to refinance these borrowings on less favorable terms or if we were to experience difficulty in refinancing the debt prior to maturity, our results of operations or financial condition could be materially affected. In addition, an event of default under the credit agreement may permit the lenders to refuse to permit additional borrowings under the revolving credit facility or to terminate all commitments to extend further credit under the revolving credit facility. Furthermore, if we are unable to repay the amounts due and payable under the credit agreement or senior secured notes, the lenders and note holders may be able to proceed against the collateral granted to them to secure that indebtedness. In the event our lenders or note holders accelerate the repayment of such borrowings, we cannot assure you that we will have sufficient assets to repay such indebtedness.

A default under the indentures governing our exchangeable senior notes could also lead to a default under other debt agreements or obligations, including the credit agreement and indenture governing the senior secured notes. Likewise, a default under the credit agreement or senior secured notes could lead to a default under other debt agreements or obligations, including the indentures governing our exchangeable senior notes.

***To continue to grow our business, we will need to commit substantial resources, which could result in future losses or otherwise limit our opportunities or affect our ability to operate and grow our business.***

The scope of our business and operations has grown substantially, including through a series of business combinations and acquisitions. To continue to grow our business over the longer term, we plan to commit substantial resources to product acquisition and in-licensing, product development, clinical trials of product candidates and expansion of our commercial, development, manufacturing and other operations. Acquisition opportunities that we pursue could materially affect our liquidity and capital resources and may require us to incur additional indebtedness, seek equity capital or both. Our ability to raise additional capital may be adversely impacted by worsening global economic conditions and the recent disruptions to, and volatility in, the credit and financial markets in the U.S. and worldwide resulting from the effects of inflationary pressures, potential future bank failures or otherwise. In addition, under Irish law we must have authority from our shareholders to issue any ordinary shares, including ordinary shares that are part of our authorized but unissued share capital, and we currently have such authorization. Moreover, as a matter of Irish law, when an Irish public limited company issues ordinary shares to new shareholders for cash, the company must first offer those shares on the same or more favorable terms to existing shareholders on a pro-rata basis, unless this statutory pre-emption obligation is dis-applied, or opted-out of, by approval of its shareholders. At our annual general meeting of shareholders in August 2023, our shareholders voted to approve our proposal to dis-apply the statutory pre-emption obligation on terms that are substantially more limited than our general pre-emption opt-out authority that had been in effect prior to August 4, 2021. This current pre-emption opt-out authority is due to expire in February 2025. If we are unable to obtain further pre-emption authorities from our shareholders in the future, or otherwise continue to be limited by the terms of new pre-emption authorities approved by our shareholders in the future, our ability to use our unissued share capital to fund in-licensing, acquisition or other business opportunities, or to otherwise raise capital, could be adversely affected. In any event, an inability to borrow or raise additional capital in a timely manner and on attractive terms could prevent us from expanding our business or taking advantage of acquisition opportunities and could otherwise have a material adverse effect on our business and growth prospects. In addition, if we use a substantial amount of our funds to acquire or in-license products or product candidates, we may not have sufficient additional funds to conduct all of our operations in the manner we would otherwise choose.

***We have significant intangible assets and goodwill. Consequently, the future impairment of our intangible assets and goodwill may significantly impact our profitability.***

Our intangible assets and goodwill are significant and are subject to an impairment analysis whenever events or changes in circumstances indicate the carrying amount of the asset may not be recoverable. Additionally, goodwill and indefinite-lived assets are subject to an impairment test at least annually. Events giving rise to impairment are an inherent risk in the pharmaceutical industry and cannot be predicted. For example, in the third quarter of 2022, we recorded a $133.6 million asset impairment charge as a result of the decision to discontinue our nabiximols program. Our results of operations and financial position in future periods could be negatively impacted should future impairments of intangible assets and goodwill occur.

***Our financial results have been and may continue to be adversely affected by foreign currency exchange rate fluctuations.***

Because our financial results are reported in U.S. dollars, we are exposed to foreign currency exchange risk as the functional currency financial statements of non-U.S. subsidiaries are translated to U.S. dollars for reporting purposes. To the extent that revenue and expense transactions are not denominated in the functional currency, we are also subject to the risk of

transaction losses. For example, because our product sales outside of the U.S. are primarily denominated in the euro, our sales of those products have been and may continue to be adversely affected by fluctuations in foreign currency exchange rates. Given the volatility of exchange rates, as well as our expanding operations, there is no guarantee that we will be able to effectively manage currency transaction and/or translation risks, which could adversely affect our operating results. Although we utilize foreign exchange forward contracts to manage currency risk primarily related to certain intercompany balances denominated in non-functional currencies, our efforts to manage currency risk may not be successful.

***Changes in our effective tax rates could adversely affect our business and financial condition, results of operations and growth prospects.***

We are incorporated in Ireland and maintain subsidiaries in North America, the U.K. and a number of other foreign jurisdictions. As a result, our effective tax rate is derived from a combination of applicable tax rates in the various jurisdictions where we operate. Our effective tax rate may fluctuate depending on a number of factors, including, but not limited to, the distribution of our profits or losses between the jurisdictions where we operate and changes to or differences in interpretation of tax laws. For example, our income tax expense for the year ended December 31, 2021 included an expense of $259.9 million arising on the remeasurement of our U.K. net deferred tax liability, which arose primarily in relation to the GW Acquisition, due to a change in the statutory tax rate in the U.K. following enactment of the U.K. Finance Act 2021.

We are subject to reviews and audits by the U.S. Internal Revenue Service, or IRS, and other taxing authorities from time to time, and the IRS or other taxing authority may challenge our structure, transfer pricing arrangements and tax positions through an audit or lawsuit. Responding to or defending against challenges from taxing authorities could be expensive and consume time and other resources. If we are unsuccessful, we may be required to pay additional taxes for prior periods, interest, fines or penalties, and may be obligated to pay increased taxes in the future, any of which could require us to reduce our operating expenses, decrease efforts in support of our products or seek to raise additional funds. Any of these actions could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

***Changes to tax laws relating to multinational corporations could adversely affect us.***

The U.S. Congress, the EU, the Organization for Economic Co-operation and Development, or OECD, and other government agencies in jurisdictions where we and our affiliates do business have had an extended focus on issues related to the taxation of multinational corporations. As a result of the focus on the taxation of multinational corporations, the tax laws in Ireland, the U.S. and other countries in which we and our affiliates do business could change on a prospective or retroactive basis, and any such changes could adversely affect us.

One example is the OECD's initiative in the area of "base erosion and profit shifting." In October 2021, the OECD released a framework proposal reflecting the agreement of over 140 jurisdictions, including Ireland, to implement a two-pillar plan on global tax reform, including a global minimum tax rate of 15% for large multinational corporations on a jurisdiction-by-jurisdiction basis, or Pillar Two. In December 2022, the EU agreed to implement this global minimum tax rate for EU member states by the start of 2024. In accordance with the EU directive, Ireland adopted legislation implementing Pillar Two on December 18, 2023, with effect from the start of 2024. Other jurisdictions in which we do business have also introduced or adopted legislation implementing Pillar Two. We are currently evaluating the effect of the new law on our financial results.

Further, the IRA among other things, introduced new tax provisions, including a 15 percent corporate alternative minimum tax for certain large corporations, and a one percent excise tax on certain share repurchases by publicly traded corporations, including certain repurchases by specified domestic affiliates of publicly traded foreign corporations. These provisions became effective in 2023. The IRS has issued limited guidance on the corporate alternative minimum tax, the excise tax and the other provisions in the IRA, and this guidance has yet to be finalized. We are currently evaluating the effect of the law on our financial results. The U.S. and other jurisdictions in which we operate continue to consider other changes in tax laws and regulations that apply to multinationals, including proposed guidance with respect to research and development expenditures and other guidance under the 2017 Tax Cuts and Jobs Act. These changes, if implemented, could adversely impact our tax provision, cash tax liability and effective tax rate.

***The IRS may not agree with the conclusion that we should be treated as a foreign corporation for U.S. federal tax purposes.***

Although we are incorporated in Ireland, the IRS may assert that we should be treated as a U.S. corporation (and, therefore, a U.S. tax resident) for U.S. federal tax purposes pursuant to Section 7874 of the U.S. Internal Revenue Code, or the Code. For U.S. federal tax purposes, a corporation generally is considered a tax resident in the jurisdiction of its organization or incorporation. Because we are an Irish incorporated entity, we would be classified as a foreign corporation (and, therefore, a non-U.S. tax resident) under these rules. Section 7874 of the Code provides an exception under which a foreign incorporated entity may, in certain circumstances, be treated as a U.S. corporation for U.S. federal tax purposes. Because we indirectly acquired all of Jazz Pharmaceuticals, Inc.'s assets through the acquisition of the shares of Jazz Pharmaceuticals, Inc. common stock when the businesses of Jazz Pharmaceuticals, Inc. and Azur Pharma Public Limited Company were combined in a merger transaction in January 2012, or the Azur Merger, the IRS could assert that we should be treated as a U.S. corporation for U.S.

Table of Contents

federal tax purposes under Section 7874. The IRS continues to scrutinize transactions that are potentially subject to Section 7874, and has issued several sets of final and temporary regulations under Section 7874 since 2012. We do not expect these regulations to affect the U.S. tax consequences of the Azur Merger. Nevertheless, new statutory and/or regulatory provisions under Section 7874 of the Code or otherwise could be enacted that could adversely affect our status as a foreign corporation for U.S. federal tax purposes, and any such provisions could have prospective or retroactive application to us, our shareholders, Jazz Pharmaceuticals, Inc. and/or the Azur Merger.

***Our ability to use net operating losses and carryforward tax losses to offset potential taxable income is limited under applicable law and could be subject to further limitations if we do not generate taxable income in a timely manner or if certain "ownership change" provisions of applicable law result in further limitations.***

Our ability to use net operating losses, or NOLs, to offset potential future taxable income and related income taxes that would otherwise be due also depends on our ability to generate future income that is taxable in the U.S. before the NOLs expire. We cannot predict with certainty when, or whether, our U.S. affiliates will generate sufficient taxable income to use all of the NOLs. In addition, the use of NOLs to offset potential future taxable income and related income taxes that would otherwise be due is subject to limitations under the "ownership change" provisions of Sections 382 and 383 of the Code and similar state provisions. Additionally, U.K. carryforward tax losses may become subject to limitations in the event of certain changes in the ownership interest of significant shareholders where there is also a major change in the nature of conduct of a trade or business within a specified period of time. These limitations may cause us to lose or forfeit additional NOLs or carryforward tax losses before we can use these attributes. Subsequent ownership changes and changes to the U.S. federal or state or U.K. tax rules with respect to the use of NOLs and carryforward tax losses may further affect our ability to use these losses in future years.

**Risks Related to Our Ordinary Shares**

***The market price of our ordinary shares has been volatile and is likely to continue to be volatile in the future, and the value of your investment could decline significantly.***

The stock market in general, including the market for life sciences companies, has experienced extreme price and trading volume fluctuations that have often been unrelated or disproportionate to the operating performance of those companies, which has resulted in decreased market prices, notwithstanding the lack of a fundamental change in the underlying business models of those companies. Worsening economic conditions and other adverse effects or developments may negatively affect the market price of our ordinary shares, regardless of our actual operating performance. The market price for our ordinary shares is likely to continue to be volatile and subject to significant price and volume fluctuations in response to market, industry and other factors, including the risk factors described in this "Risk Factors" section.

Our share price may be dependent upon the valuations and recommendations of the analysts who cover our business. If our results do not meet these analysts' forecasts, the expectations of our investors or the financial guidance we provide to investors in any period, the market price of our ordinary shares could decline. Our ability to meet analysts' forecasts, investors' expectations and our financial guidance is substantially dependent on our ability to maintain or increase sales of our marketed products.

In addition, the market price of our ordinary shares may decline if the effects of our acquisition of GW and other strategic transactions on our financial or operating results are not consistent with the expectations of financial analysts or investors. The market price of our ordinary shares could also be affected by possible sales of our ordinary shares by holders of our exchangeable senior notes who may view our exchangeable senior notes as a more attractive means of equity participation in our company and by hedging or arbitrage trading activity involving our ordinary shares by the holders of our exchangeable senior notes.

***We are subject to Irish law, which differs from the laws in effect in the U.S. and may afford less protection to holders of our securities.***

It may not be possible to enforce court judgments obtained in the U.S. against us in Ireland based on the civil liability provisions of the U.S. federal or state securities laws. In addition, there is some uncertainty as to whether the courts of Ireland would recognize or enforce judgments of U.S. courts obtained against us or our directors or officers based on the civil liability provisions of the U.S. federal or state securities laws or hear actions against us or those persons based on those laws. We have been advised that the U.S. currently does not have a treaty with Ireland providing for the reciprocal recognition and enforcement of judgments in civil and commercial matters. Therefore, a final judgment for the payment of money rendered by any U.S. federal or state court based on civil liability, whether or not based solely on U.S. federal or state securities laws, would not automatically be enforceable in Ireland.

As an Irish company, we are governed by the Irish Companies Act 2014, which differs in some material respects from laws generally applicable to U.S. corporations and shareholders, including, among others, differences relating to interested director and officer transactions, mergers, amalgamations and acquisitions, takeovers and shareholder lawsuits. The duties of

Table of Contents

directors and officers of an Irish company are generally owed to the company only. Shareholders of Irish companies generally do not have a personal right of action against directors or officers of the company and may exercise such rights of action on behalf of the company only in limited circumstances. Accordingly, holders of our securities may have more difficulty protecting their interests than would holders of securities of a corporation incorporated in a U.S. jurisdiction.

***Our articles of association, Irish law, our credit agreement and the indentures governing our senior secured notes and exchangeable senior notes contain provisions that could delay or prevent a takeover of us by a third party.***

Our articles of association could delay, defer or prevent a third party from acquiring us, despite the possible benefit to our shareholders, or otherwise adversely affect the price of our ordinary shares. In addition to our articles of association, several mandatory provisions of Irish law could prevent or delay an acquisition of us. We are also subject to various provisions of Irish law relating to mandatory bids, voluntary bids, requirements to make a cash offer and minimum price requirements, as well as substantial acquisition rules and rules requiring the disclosure of interests in our shares in certain circumstances. Furthermore, our credit agreement limits our ability to enter into certain fundamental changes, and the indentures governing our senior secured notes and exchangeable senior notes require us to offer to repurchase such notes for cash if we undergo certain fundamental changes. Additionally, in certain circumstances, the indentures governing our exchangeable senior notes require us to increase the exchange rate for a holder of our exchangeable senior notes in connection with a fundamental change. A takeover of us may trigger a default under the credit agreement or the requirement that we offer to purchase our senior secured notes or exchangeable senior notes and/or increase the exchange rate applicable to our exchangeable senior notes, which could make it more costly for a potential acquirer to engage in a business combination transaction with us.

These provisions, whether alone or together, may discourage potential takeover attempts, discourage bids for our ordinary shares at a premium over the market price or adversely affect the market price of, and the voting and other rights of the holders of, our ordinary shares. These provisions, whether alone or together, could also discourage proxy contests and make it more difficult for our shareholders to elect directors other than the candidates nominated by our board.

***Future sales and issuances of our ordinary shares, securities convertible into our ordinary shares or rights to purchase ordinary shares or convertible securities could result in additional dilution of the percentage ownership of our shareholders and could cause our share price to decline.***

We expect to continue to opportunistically seek access to additional capital to license or acquire additional products, product candidates or companies to expand our operations or for general corporate purposes. To the extent we raise additional capital by issuing equity securities or securities convertible into or exchangeable for ordinary shares, our shareholders may experience substantial dilution. We may sell ordinary shares, and we may sell convertible or exchangeable securities or other equity securities in one or more transactions at prices and in a manner we determine from time to time. If we sell such ordinary shares, convertible or exchangeable securities or other equity securities in subsequent transactions, existing shareholders may be materially diluted.

***We have never declared or paid dividends on our capital stock and we do not anticipate paying dividends in the foreseeable future.***

We do not currently plan to pay cash dividends in the foreseeable future. Any future determination as to the payment of dividends will, subject to Irish legal requirements, be at the sole discretion of our board of directors and will depend on our financial condition, results of operations, capital requirements, compliance with the terms of the credit agreement and the indenture governing our senior secured notes, and other factors our board of directors deems relevant. Accordingly, holders of our ordinary shares must rely on increases in the trading price of their shares for returns on their investment in the foreseeable future. In addition, in the event that we pay a dividend on our ordinary shares, in certain circumstances, as an Irish tax resident company, some shareholders may be subject to withholding tax, which could adversely affect the price of our ordinary shares.

**General Risk Factors**

***If we fail to attract, retain and motivate key personnel or to retain the members of our executive management team, our operations and our future growth may be adversely affected.***

Our success and our ability to grow depend in part on our continued ability to attract, retain and motivate highly qualified personnel, including our executive management team. In addition, changes we make to our current and future work environments may not meet the needs or expectations of our employees or may be perceived as less favorable compared to other companies' policies, which could negatively impact our ability to hire and retain qualified personnel, whether in a remote or in-office environment. The loss of services and institutional knowledge of one or more additional members of our executive management team or other key personnel could delay or prevent the successful completion of some of our vital activities and may negatively impact our operations and future growth. We do not carry "key person" insurance. In addition, changes in our organization as a result of executive management transition may have a disruptive impact on our ability to implement our strategy. Until we integrate new personnel, and unless they are able to succeed in their positions, we may be unable to successfully manage and grow our business. In any event, if we are unable to attract, retain and motivate quality individuals, or

Table of Contents

if there are delays, or if we do not successfully manage personnel and executive management transitions, our business, financial condition, results of operations and growth prospects could be adversely affected.

***Our business and operations could be negatively affected if we become subject to shareholder activism or hostile bids, which could cause us to incur significant expense, hinder execution of our business strategy and impact our stock price.***

Shareholder activism, which takes many forms and arises in a variety of situations, has been increasingly prevalent. Stock price declines may also increase our vulnerability to unsolicited approaches. If we become the subject of certain forms of shareholder activism, such as proxy contests or hostile bids, the attention of our management and our board of directors may be diverted from execution of our strategy. Such shareholder activism could give rise to perceived uncertainties as to our future strategy, adversely affect our relationships with business partners and make it more difficult to attract and retain qualified personnel. Also, we may incur substantial costs, including significant legal fees and other expenses, related to activist shareholder matters. Our stock price could be subject to significant fluctuation or otherwise be adversely affected by the events, risks and uncertainties of any shareholder activism.

### Item 1B.    Unresolved Staff Comments

There are no material unresolved written comments that were received from the SEC staff 180 days or more before the end of our 2023 fiscal year relating to our periodic or current reports under the Securities Exchange Act of 1934, as amended.

### Item 1C.    Cybersecurity

#### Risk management and strategy

We have implemented and maintain an information security program designed to identify, assess, and manage material risks from cybersecurity threats to our critical computer networks, third party hosted services, communications systems, hardware and software, and our critical data including intellectual property, clinical trial participant and patient-related data, and confidential information that is proprietary, strategic or competitive in nature, or collectively, Information Systems and Data.

Our cybersecurity threat risk management processes include the following, among others:

- Our information security department identifies and assesses risks from cybersecurity threats by monitoring and evaluating our threat environment and risk profile using various methods including, for example, manual methods and automated tools, conducting scans of the threat environment, conducting threat assessments, performing vulnerability assessments, use of external intelligence feeds, and through third-party-conducted red/blue team testing and tabletop incident response exercises.

- Depending on the environment, we implement and maintain various technical, physical and organizational measures, processes, standards and policies designed to manage and mitigate material risks from cybersecurity threats to our Information Systems and Data, including, for example: information security policies and standards governing access control, network and device security, encryption standards, incident response plans, disaster recovery plans, risk management, vulnerability detection and management and security awareness training requirements as well as security tools such as firewalls, malware protection tools, secure authentication tools, centralized logging and monitoring tools, threat intelligence tools, and data protection tools.

- Our overall risk assessment and management processes address cybersecurity threats that may have a material impact on our business. Our information security department maintains a risk register of individual risks from cybersecurity threats. Our Chief Information Security Officer, or CISO, and Chief Information Officer, or CIO, periodically review the area of cybersecurity risk management within our overall enterprise risk management program and work with our executive director of internal audit and enterprise risk management to incorporate the aggregate risks from the cybersecurity threat risk register into the overall enterprise risk management program risk register. In addition, our CISO and CIO report significant increases to our threat profile to the Information Security Governance Committee (described below).

- We use third parties, including professional services, incident response and managed security firms (including some that we have on a pre-paid retainer basis), to assist us from time to time identify, assess, and manage cybersecurity risks, perform threat assessments relating to our Information Systems and Data by reviewing our business and industry vertical threat profiles and applying those to the overall threat landscape, perform penetration tests, conduct cybersecurity readiness exercises, assess program maturity, and to assist in the event of a cyber security incident.

- We have third-party vendor management processes designed to help us identify, assess and manage risks from cybersecurity threats to our Information Systems and Data that may arise out of our use of third-party vendors across

Table of Contents

our business, including, among others, application providers, hosting companies, contract research organizations, contract manufacturing organizations, distributors, and supply chain resources. Depending on the nature of the services and the service provider, our vendor management processes may include assessment of the cybersecurity practices of such vendors and contractually imposing obligations on the provider.

For a description of the risks from cybersecurity threats that may materially affect us and how those risks may affect us see "*Significant disruptions of information technology systems or data security breaches could adversely affect our business*" under Part I, Item 1A. Risk Factors in this Annual Report on Form 10-K.

### Governance

- Our board of directors addresses our cybersecurity risk management as part of its general oversight function. The audit committee of the board of directors, or Audit Committee, helps oversee our cybersecurity risk management processes, including oversight of risks from cybersecurity threats.

- The Information Governance Security Committee and the Audit Committee receive various reports from CISO and CIO. The CISO (or its designee) reports to the Audit Committee on cybersecurity risk on at least a quarterly basis. Written reports and presentation materials regarding cybersecurity risk provided to the Audit Committee are made available to the board of directors and they can discuss the materials and cybersecurity risk with the Audit Committee members. The Internal Audit team oversees internal controls implemented by us under our information security program.

- Our information security program is implemented and maintained by certain of our management, including the CISO, CIO and other members of our Information Security Governance Committee (Chief Legal Officer, Chief Financial Officer, and Chief Privacy Officer). Our CISO has been at the company for over 7 years, and has served in various cybersecurity roles for over 20 years across multiple companies and industry verticals including banking, consulting, ecommerce, and pharmaceuticals. He is a Certified Information Systems Security Professional and has experience responding to major information security incidents at previous companies prior to joining the company. Our CIO has been at the company and had oversight of our cybersecurity for over 7 years. In addition, our CIO has served in various information technology roles in the U.S. and overseas for over 25 years across multiple companies and industry verticals including consulting, healthcare, and pharmaceuticals.

- The Information Security Governance Committee helps assess and manage our cybersecurity risks and monitor the effectiveness of our information security program and risk management. Management, including those serving on our Information Security Governance Committee, is responsible for hiring appropriate cybersecurity personnel, helping to integrate cybersecurity considerations into our overall risk management strategy, providing appropriate resources for cybersecurity risk management, and communicating key priorities to relevant personnel. Our cybersecurity incident response plan includes processes designed to escalate certain cybersecurity incidents that caused a significant impact to us members of the Information Security Governance Committee, and certain members of executive management depending on the circumstances. In addition, our incident response plan includes reporting to the Audit Committee for certain cybersecurity incidents, including those that have potentially had a material impact to us.

**Item 2.       Properties**

Our corporate headquarters are located in Dublin, Ireland, and our U.S. operations are located in Palo Alto, California, Carlsbad, California and Philadelphia, Pennsylvania. In addition to our owned manufacturing and development facilities and our leased administrative, manufacturing and development facilities, we also have dedicated growing facilities operated by contract partners. The following table contains information about our significant properties as of December 31, 2023:

| Type | Location | Approximate Square Feet | Lease / Contract Expiration Date |
|---|---|---:|---:|
| Administrative office | Dublin, Ireland | 45,000 | 2036 |
| Administrative office | Palo Alto, United States | 99,000 | 2029 |
| Administrative office | Philadelphia, United States | 60,000 | 2029 |
| Administrative office | Carlsbad, United States | 43,000 | 2028 |
| Administrative office | Oxford, United Kingdom | 26,000 | 2028 |
| Administrative office | Cambridge, United Kingdom | 22,000 | 2030-2031 |
| Administrative office | Vancouver, Canada | 15,000 | 2029 |
| Administrative office and laboratory | Villa Guardia (Como), Italy | 34,000 | 2029 |
| Manufacturing and development | Athlone, Ireland | 58,000 | Owned |
| Manufacturing and development | Southern United Kingdom | 139,000 | 2024-2033 |
| Manufacturing and development | Villa Guardia (Como), Italy | 45,000 | Owned |
| Growing facility | Eastern United Kingdom | 1,960,000 | 2026 |
| Growing facility | Northern United Kingdom | 915,000 | 2025 |
| Growing facility | Southern United Kingdom | 165,000 | 2028 |
| Growing facility under construction | Southern United Kingdom | 370,000 | 2035 |

In addition, we have offices in Japan, Australia, France and elsewhere in Europe.

We believe that our existing properties are in good condition and suitable for the conduct of our business. As we continue to expand our operations, we may need to lease additional or alternative facilities.

**Item 3.       Legal Proceedings**

The information required to be set forth under this Item 3 is incorporated by reference to Note 14, Commitments and Contingencies—Legal Proceedings of the Notes to Consolidated Financial Statements, included in Part IV of this Annual Report on Form 10-K.

**Item 4.       Mine Safety Disclosures.**

Not applicable.

67

Table of Contents

**PART II**

**Item 5.      Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

Our ordinary shares trade on The Nasdaq Global Select Market under the trading symbol "JAZZ."

**Holders of Ordinary Shares**

As of February 21, 2024, there were 889 holders of record of our ordinary shares. Because almost all of our ordinary shares are held by brokers, nominees and other institutions on behalf of shareholders, we are unable to estimate the total number of shareholders represented by these record holders.

**Dividends**

Under Irish law, dividends may only be paid, and share repurchases and redemptions must generally be funded only out of, "distributable reserves."  In addition, the terms of our credit agreement restrict our ability to make certain restricted payments, including dividends and other distributions by us in respect of our ordinary shares, subject to, among other exceptions, (1) a general exception for dividends and restricted payments up to $30 million in the aggregate and (2) an exception that allows for restricted payments, subject to a cap equal to the sum of (i) $100 million plus (ii) so long as our secured leverage ratio (as defined in our credit agreement) does not exceed 3:1 after giving pro forma effect to the restricted payment, a formula-based amount tied to our consolidated net income; provided that such cap applies only if our total leverage ratio (as defined in our credit agreement) exceeds 2:1 after giving pro forma effect to the restricted payment. Any future determination as to the payment of dividends will, subject to Irish legal requirements, be at the sole discretion of our board of directors and will depend on our consolidated financial condition, results of operations, capital requirements, compliance with the terms of our credit agreement or other future borrowing arrangements, and other factors our board of directors deems relevant.

**Irish Law Matters**

As we are an Irish incorporated company, the following matters of Irish law are relevant to the holders of our ordinary shares.

*Irish Restrictions on Import and Export of Capital*

Except as indicated below, there are no restrictions on non-residents of Ireland dealing in Irish domestic securities, which includes ordinary shares of Irish companies. Dividends and redemption proceeds also continue to be freely transferable to non-resident holders of such securities. The Financial Transfers Act, 1992 gives power to the Minister for Finance of Ireland to restrict financial transfers between Ireland and other countries and persons. Financial transfers are broadly defined and include all transfers that would be movements of capital or payments within the meaning of the treaties governing the member states of the European Union. The acquisition or disposal of interests in shares issued by an Irish incorporated company and associated payments falls within this definition. In addition, dividends or payments on redemption or purchase of shares and payments on a liquidation of an Irish incorporated company would fall within this definition. At present the Financial Transfers Act, 1992 prohibits financial transfers involving Belarus, Al-Qaida, the Taliban of Afghanistan, Democratic Republic of Congo, Democratic People's Republic of Korea (North Korea), Iran, Iraq, Côte d'Ivoire, Lebanon, Liberia, Zimbabwe, Sudan, Somalia, Republic of Guinea, Republic of Guinea-Bissau, Afghanistan, Libya, Syria, Tunisia, certain known terrorists and terrorist groups, countries that harbor certain terrorist groups, Ukraine and persons responsible for human rights violations and the undermining of independence in Ukraine and the misappropriation of Ukrainian State funds without the prior permission of the Central Bank of Ireland.

Any transfer of, or payment in respect of, a share or interest in a share involving the government of any country that is currently the subject of United Nations sanctions, any person or body controlled by any of the foregoing, or by any person acting on behalf of the foregoing, may be subject to restrictions pursuant to such sanctions as implemented into Irish law.

Irish Taxes Applicable to U.S. Holders

Irish Tax on Dividends. While we have no current plans to pay dividends, dividends on our ordinary shares would generally be subject to Irish Dividend Withholding Tax at the standard rate (currently 25%), unless an exemption applies.

Irish Tax on Capital Gains. A shareholder who (i) is neither resident nor ordinarily resident in Ireland for Irish tax purposes and (ii) does not use or hold, and did not acquire, our ordinary shares in connection with a trade or business carried on by such shareholder in Ireland through a branch or agency generally should not be subject to Irish tax on capital gains on a disposal of our ordinary shares.

Table of Contents

A shareholder who is an individual and who is temporarily not resident in Ireland may, under Irish anti-avoidance legislation, still be liable for Irish tax on capital gains on any chargeable gain realized upon the disposal of our ordinary shares during the period in which such individual is a non-resident.

*Capital Acquisitions Tax*. Irish capital acquisitions tax, or CAT, is comprised principally of gift tax and inheritance tax. CAT could apply to a gift or inheritance of our ordinary shares irrespective of the place of residence, ordinary residence or domicile of the parties. This is because our ordinary shares are regarded as property situated in Ireland as our share register must be held in Ireland. The person who receives the gift or inheritance has primary liability for CAT.

CAT is levied at a rate of 33% above certain tax-free thresholds. The appropriate tax-free threshold is dependent upon (i) the relationship between the donor and the donee and (ii) the aggregation of the values of previous gifts and inheritances received by the donee from persons within the same category of relationship for CAT purposes. Gifts and inheritances passing between spouses are exempt from CAT. Our shareholders should consult their own tax advisers as to any tax consequences of holding our ordinary shares, including whether CAT is creditable or deductible in computing any domestic tax liabilities.

*Stamp Duty*. Irish stamp duty (if any) may become payable in respect of ordinary share transfers. However, a transfer of our ordinary shares from a seller who holds shares through Depository Trust Company, or DTC, to a buyer who holds the acquired shares through DTC will not be subject to Irish stamp duty. A transfer of our ordinary shares (i) by a seller who holds ordinary shares outside of DTC to any buyer or (ii) by a seller who holds the ordinary shares through DTC to a buyer who holds the acquired ordinary shares outside of DTC, may be subject to Irish stamp duty (currently at the rate of 1% of the price paid or the market value of the ordinary shares acquired, if greater). The person accountable for payment of stamp duty is the buyer or, in the case of a transfer by way of a gift or for less than market value, all parties to the transfer.

A shareholder who holds ordinary shares outside of DTC may transfer those ordinary shares into DTC without giving rise to Irish stamp duty provided that the shareholder would be the beneficial owner of the related book-entry interest in those ordinary shares recorded in the systems of DTC (and in exactly the same proportions) as a result of the transfer and at the time of the transfer into DTC there is no sale of those book-entry interests to a third party being contemplated by the shareholder. Similarly, a shareholder who holds ordinary shares through DTC may transfer those ordinary shares out of DTC without giving rise to Irish stamp duty provided that the shareholder would be the beneficial owner of the ordinary shares (and in exactly the same proportions) as a result of the transfer, and at the time of the transfer out of DTC there is no sale of those ordinary shares to a third party being contemplated by the shareholder. In order for the share registrar to be satisfied as to the application of this Irish stamp duty treatment where relevant, the shareholder must confirm to us that the shareholder would be the beneficial owner of the related book-entry interest in those ordinary shares recorded in the systems of DTC (and in exactly the same proportions) (or vice-versa) as a result of the transfer and there is no agreement being contemplated for the sale of the related book-entry interest or the ordinary shares or an interest in the ordinary shares, as the case may be, by the shareholder to a third party.

Table of Contents

**Performance Measurement Comparison (1)**

   The following graphs show the total shareholder return on the last day of each year of an investment of $100 in cash as if made on December 31, 2018 and on the last day of each quarter of an investment of $100 in cash as if made on December 31, 2022, respectively, in (i) our ordinary shares; (ii) the Nasdaq Composite Index; and (iii) the Nasdaq Biotechnology Index through December 31, 2023. The shareholder return shown in the graphs below are not necessarily indicative of future performance, and we do not make or endorse any predictions as to future shareholder returns.





_____

(1) This section is not "soliciting material," is not deemed "filed" with the SEC and is not to be incorporated by reference into any of our filings under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, or Exchange Act, whether made before or after the date hereof and irrespective of any general incorporation language in any such filing.

(2) Information used in the graph was obtained from Research Data Group, Inc.

Table of Contents

**Issuer Purchases of Equity Securities**

The following table summarizes purchases of our ordinary shares made by or on behalf of us or any of our "affiliated purchasers" as defined in Rule 10b-18(a)(3) under the Securities Exchange Act of 1934, as amended, during each fiscal month during the three-month period ended December 31, 2023:

| | Total Number of Shares Purchased (1) | Average Price Paid per Share (2) | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs (3) | Maximum Number (or Approximate Dollar Value) of Shares that May Yet Be Purchased Under the Plans or Programs (4) |
|---|---|---|---|---|
| October 1 - October 31, 2023 | — | $ — | — | $ 261,226,226 |
| November 1 - November 30, 2023 | 811,384 | $ 122.99 | 811,384 | $ 161,447,383 |
| December 1 - December 31, 2023 | — | $ — | — | $ 161,447,383 |
| Total | 811,384 | $ 122.99 | 811,384 | |

1. This table does not include ordinary shares that we withheld in order to satisfy tax withholding requirements in connection with the vesting and release of restricted stock units. All the ordinary shares reported in this column were purchased pursuant to our publicly announced share repurchase program.

2. Average price paid per ordinary share includes brokerage commissions.

3. The ordinary shares reported in the table above were purchased pursuant to our publicly announced share repurchase program. On November 8, 2016, we announced that our board of directors had authorized the use of up to $300 million to repurchase our ordinary shares. In November 2018, December 2018, and October 2019, our board of directors increased the existing share repurchase program authorization by $320.0 million, $400.0 million, and $500.0 million respectively thereby increasing the total amount authorized for repurchase of ordinary shares having an aggregate purchase price of up to $1.5 billion, exclusive of any brokerage commissions. Under this program, which has no expiration date, we may repurchase ordinary shares from time to time on the open market. Such repurchases may be pursuant to Rule 10b-18 or Rule 10b5-1 agreements as determined by our management and in accordance with the requirements of the Securities and Exchange Commission. The timing and amount of repurchases will depend on a variety of factors, including the price of our ordinary shares, alternative investment opportunities, restrictions under our credit agreement, corporate and regulatory requirements and market conditions. The share repurchase program may be modified, suspended or discontinued at any time without prior notice.

4. The dollar amount shown represents, as of the end of each period, the approximate dollar value of ordinary shares that may yet be purchased under our publicly announced share repurchase program, exclusive of any brokerage commissions. The timing and amount of repurchases will depend on a variety of factors, including the price of our ordinary shares, alternative investment opportunities, restrictions under our credit agreement, corporate and regulatory requirements and market conditions, and may be modified, suspended or otherwise discontinued at any time without prior notice.

**Item 6.   Reserved**

Table of Contents

**Item 7.      Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The purpose of the Management Discussion and Analysis is to present information that management believes is relevant to promote an understanding of our results of operations and cash flows for the fiscal year ended December 31, 2023 and our financial condition as of December 31, 2023 and should be read in conjunction with the consolidated financial statements and notes to consolidated financial statements included elsewhere in this Annual Report on Form 10-K. This discussion contains forward-looking statements that involve risks and uncertainties. When reviewing the discussion below, you should keep in mind the substantial risks and uncertainties that impact or could impact our business. In particular, we encourage you to review the risks and uncertainties described in "Risk Factors" in Part I, Item 1A in this Annual Report on Form 10-K. These risks and uncertainties could cause actual results to differ materially from those projected in forward-looking statements contained in this report or implied by past results and trends. Forward-looking statements are statements that attempt to forecast or anticipate future developments in our business, financial condition or results of operations. See the "Cautionary Note Regarding Forward-Looking Statements" that appears at the beginning of this Annual Report. These statements, like all statements in this report, speak only as of the date of this Annual Report on Form 10-K (unless another date is indicated), and we undertake no obligation to update or revise these statements in light of future developments. Forward-looking statements are statements that attempt to forecast or anticipate future developments in our business, financial condition or results of operations. See the "Cautionary Note Regarding Forward-Looking Statements" that appears at the beginning of this Annual Report. These statements, like all statements in this report, speak only as of the date of this Annual Report on Form 10-K (unless another date is indicated), and we undertake no obligation to update or revise these statements in light of future developments.*

**Overview**

Jazz Pharmaceuticals plc is a global biopharmaceutical company whose purpose is to innovate to transform the lives of patients and their families. We are dedicated to developing life-changing medicines for people with serious diseases - often with limited or no therapeutic options. We have a diverse portfolio of marketed medicines, including leading therapies for sleep disorders and epilepsy, and a growing portfolio of cancer treatments. Our patient-focused and science-driven approach powers pioneering research and development advancements across our robust pipeline of innovative therapeutics in oncology and neuroscience.

Our strategy for growth is rooted in executing commercial launches and ongoing commercialization initiatives, advancing robust research and development, or R&D, programs and delivering impactful clinical results, effectively deploying capital to strengthen the prospects of achieving our short- and long-term goals through strategic corporate development, and delivering strong financial performance. We focus on patient populations with high unmet needs. We identify and develop differentiated therapies for these patients that we expect will be long-lived assets and that we can support with an efficient commercialization model. In addition, we leverage our efficient, scalable operating model and integrated capabilities across our global infrastructure to effectively reach patients around the world.

In January 2022, we announced our Vision 2025, which aims to deliver sustainable growth and enhanced value, driving our continued transformation to an innovative, high-growth global pharmaceutical leader. The three core components of our Vision 2025 focus on commercial execution, pipeline productivity and operational excellence.

Our strategy to deliver sustainable growth and enhanced value is focused on:

- Strong commercial execution to drive diversified revenue growth and address unmet medical needs of our patients across our product portfolio, which focuses on neuroscience and oncology medicines;

- Expanding and advancing our pipeline to achieve a valuable portfolio of durable, highly differentiated products;

- Continuing to build a flexible, efficient and productive development engine for targeted therapeutic areas to identify and progress early-, mid- and late-stage assets;

- Identifying and acquiring novel product candidates and approved therapies to complement our existing pipeline and commercial portfolio;

- Investing in an efficient, scalable operating model and differentiated capabilities to enable growth; and

- Unlocking further value through indication expansion and entry into global markets.

In 2023, consistent with our strategy, we continued to focus on research and development activities within our neuroscience and oncology therapeutic areas. For a summary of our ongoing research and development activities, see "Business—Research and Development" in Part I, Item 1 of this Annual Report on Form 10-K.

Table of Contents

Our marketed products, listed below, are approved in countries around the world to improve patient care.

| Product | Indications | Initial Approval Date | Markets |
|---|---|---|---|
| **NEUROSCIENCE** | | | |
| Xywav® (calcium, magnesium, potassium, and sodium oxybates) | Treatment of cataplexy or excessive daytime sleepiness, or EDS, in patients seven years of age and older with narcolepsy. | July 2020 | U.S. |
| | Treatment of idiopathic hypersomnia, or IH, in adults. | August 2021 | U.S. |
| | Treatment of cataplexy in patients with narcolepsy. | May 2023 | Canada |
| Xyrem® (sodium oxybate) | Treatment of cataplexy or EDS in patients seven years of age and older with narcolepsy. | July 2002 | U.S. |
| | Treatment of cataplexy in patients with narcolepsy. | August 2005 | Canada |
| | Treatment of narcolepsy with cataplexy in adult patients, adolescents and children from age of 7 years. | October 2005 | European Union, or EU, Great Britain, other markets (through licensing agreement) |
| Epidiolex® (cannabidiol) | Treatment of seizures associated with Lennox-Gastaut syndrome, or LGS, Dravet syndrome, or DS, or tuberous sclerosis complex, or TSC, in patients 1 year of age and older. | June 2018 | U.S. |
| Epidyolex® (cannabidiol) | For adjunctive therapy of seizures associated with LGS or DS, in conjunction with clobazam, for patients 2 years of age and older.* | September 2019 | EU, Great Britain, EEA**, Israel, Switzerland, Australia and New Zealand |
| | For adjunctive therapy of seizures associated with TSC for patients 2 years of age and older. | April 2021 | EU, Great Britain, Israel and Switzerland |
| Epidiolex® (cannabidiol) | For adjunctive therapy of seizures associated with LGS, DS or TSC for patients 2 years of age and older. | November 2023 | Canada |
| **ONCOLOGY** | | | |
| Rylaze® (asparaginase erwinia chrysanthemi (recombinant)-rywn) | A component of a multi-agent chemotherapeutic regimen for the treatment of acute lymphoblastic leukemia, or ALL, and lymphoblastic lymphoma, or LBL, in adult and pediatric patients 1 month or older who have developed hypersensitivity to E. coli-derived asparaginase. | June 2021 | U.S. |
| Rylaze® (crisantaspase recombinant) | A component of a multi-agent chemotherapeutic regimen for the treatment of ALL and LBL, in adults and pediatric patients 1 year or older who have developed hypersensitivity to E. coli-derived asparaginase. | September 2022 | Canada |

Table of Contents

| | | | |
|---|---|---|---|
| Enrylaze® (recombinant crisantaspase) | A component of a multi-agent chemotherapeutic regimen for the treatment of ALL and LBL in adult and pediatric patients (1 month and older) who have developed hypersensitivity or silent inactivation to E. coli-derived asparaginase. | September 2023 | EU, Great Britain |
| Zepzelca® (lurbinectedin) | Treatment of adult patients with metastatic small cell lung cancer, or SCLC, with disease progression on or after platinum-based chemotherapy. | June 2020 | U.S. (licensed from PharmaMar)*** |
| | Treatment of adults with Stage III or metastatic SCLC who have progressed on or after platinum-containing therapy. | September 2021 | Canada (licensed from PharmaMar)**** |
| Defitelio® (defibrotide) | Treatment of severe hepatic veno-occlusive disease, or VOD, also known as sinusoidal obstruction syndrome, or SOS, following hematopoietic stem cell transplantation, or HSCT, therapy. | October 2013 | EU, Great Britain, EEA**, Switzerland, Israel, Australia, South Korea, Saudi Arabia |
| Defitelio® (defibrotide sodium) | Treatment of adult and pediatric patients with hepatic VOD, also known as SOS, with renal or pulmonary dysfunction following HSCT. | March 2016 | U.S. |
| Defitelio® (defibrotide sodium) | Treatment of severe hepatic VOD, also known as SOS, following HSCT therapy. | July 2017 | Canada, Brazil |
| Defitelio® (defibrotide) | Treatment of hepatic SOS (hepatic VOD). | June 2019 | Japan |
| Vyxeos® (daunorubicin and cytarabine) liposome for injection | Treatment of newly-diagnosed therapy-related acute myeloid leukemia, or t-AML, or AML with myelodysplasia-related changes, or AML-MRC, in adults and pediatric patients one year and older. | August 2017 | U.S. |
| Vyxeos® liposomal 44 mg/100 mg powder for concentrate for solution for infusion | Treatment of adults with newly-diagnosed t-AML or AML-MRC. | August 2018 | EU, Great Britain, Switzerland, Israel, Australia, South Korea, Saudi Arabia |
| Vyxeos® Daunorubicin and cytarabine liposome for injection Powder, 44 mg daunorubicin and 100 mg cytarabine per vial, intravenous, or IV, infusion | Treatment of adults with newly diagnosed therapy-related t-AML or AML with AML-MRC. | April 2021 | Canada |

*The clobazam restriction limited to EU and Great Britain

**European Economic Area

***Accelerated approval received from U.S. Food and Drug Administration, or FDA

****Conditional approval received from Health Canada

*Neuroscience*

We are the global leader in the development and commercialization of oxybate therapy for patients with sleep disorders. Xyrem was approved by FDA in 2002 for treatment of cataplexy and in 2005 for treatment of EDS in narcolepsy. In 2020, we received FDA approval for Xywav for the treatment of cataplexy or EDS, in patients seven years of age and older with narcolepsy. In August 2021, Xywav became the first and only therapy approved by FDA for the treatment of IH in adults. Xywav is an oxybate therapy that contains 92% less sodium than Xyrem. Xywav has become a standard of care for patients with narcolepsy and IH.

Since there is no cure for narcolepsy and long-term disease management is needed, we believe that Xywav represents an important therapeutic option for patients with this sleep disorder. Our commercial efforts are focused on educating patients and physicians about the lifelong impact of high sodium intake, and how the use of Xywav enables them to address what is a modifiable risk factor. We view the adoption of Xywav in narcolepsy as a positive indication that physicians and patients appreciate the benefits of a low-sodium oxybate option.

In June 2021, FDA recognized seven years of Orphan Drug Exclusivity, or ODE, for Xywav in narcolepsy. ODE extends through July 2027. Nevertheless, Lumryz, a fixed-dose, high-sodium oxybate, was approved by FDA on May 1, 2023 for the treatment of cataplexy or EDS in adults with narcolepsy. FDA continues to recognize seven years of ODE for Xywav in narcolepsy. In connection with granting ODE, FDA stated that "Xywav is clinically superior to Xyrem by means of greater safety because Xywav provides a greatly reduced chronic sodium burden compared to Xyrem." FDA's summary also stated that "the differences in the sodium content of the two products at the recommended doses will be clinically meaningful in reducing cardiovascular morbidity in a substantial proportion of patients for whom the drug is indicated." FDA has also recognized that the difference in sodium content between Xywav and Lumryz is likely to be clinically meaningful in all patients with narcolepsy and that Xywav is safer than Lumryz in all such patients. Lumryz has the same sodium content as Xyrem. Xywav is the only approved oxybate therapy that does not carry a warning and precaution related to high sodium intake.

On August 12, 2021, FDA approved Xywav for the treatment of IH in adults. Xywav remains the first and only FDA-approved therapy to treat IH. We initiated the U.S. commercial launch of Xywav for the treatment of IH in adults in November 2021. In January 2022, FDA recognized seven years of ODE for Xywav in IH that extends through August 2028. IH is a debilitating neurologic sleep disorder characterized by chronic EDS (the inability to stay awake and alert during the day resulting in the irrepressible need to sleep or unplanned lapses into sleep or drowsiness), severe sleep inertia, and prolonged and non-restorative nighttime sleep. An estimated 37,000 people in the U.S. have been diagnosed with IH and are actively seeking healthcare.

We have agreements in place for Xywav with all three major pharmacy benefit managers, or PBMs, in the U.S. To date, we have entered into agreements with various entities and have achieved benefit coverage for Xywav in both narcolepsy and IH indications for approximately 90% of commercial lives.

We have seen strong adoption of Xywav in narcolepsy since its launch in November 2020, and increasing adoption in IH since its launch in November 2021. Exiting 2023, there were approximately 12,300 patients taking Xywav, including approximately 9,525 patients with narcolepsy and approximately 2,775 patients with IH.

We acquired Epidiolex (Epidyolex outside the U.S.) in May 2021 as part of the acquisition of GW Pharmaceuticals plc, or GW, which we refer to as the GW Acquisition, which expanded our growing neuroscience business with a global, high-growth childhood-onset epilepsy franchise. Epidiolex was approved in the U.S. in June 2018 for the treatment of seizures associated with two rare and severe forms of epilepsy, LGS and DS, in patients two years of age and older, and subsequently approved in July 2020 for the treatment of seizures associated with TSC in patients one year of age and older. FDA also approved the expansion of all existing indications, LGS and DS, to patients one year of age and older. The rolling European launch of Epidiolex is also underway following European Commission, or EC, approval in September 2019 for use as adjunctive therapy of seizures associated with LGS or DS, in conjunction with clobazam, for patients two years of age and older. Epidyolex is now launched in all five key European markets: United Kingdom, Germany, Italy, Spain and France. The clobazam restriction is limited to the EU and Great Britain. Epidyolex was also approved for adjunctive therapy of seizures associated with TSC for patients 2 years of age and older in the EU and Great Britain in April 2021 and Great Britain in August 2021, and is approved or under review for this indication in other markets. Outside the U.S. and Europe, Epidiolex/Epidyolex is approved in Israel, Canada, Australia and New Zealand.

In addition to our currently marketed products, we previously marketed Sunosi® (solriamfetol) in the U.S. and in Europe and Canada. In May 2022, we completed the U.S. divestiture of Sunosi and in November 2022 we completed the ex-U.S. divestiture to Axsome. Under the terms of the sale agreement with Axsome, Axsome received the rights to Sunosi in all of the existing territories available to us. We received an upfront payment of $53.0 million, and have the right to receive a high single-digit royalty on Axsome's U.S. net sales of Sunosi in current indications and a mid-single-digit royalty on Axsome's U.S. net sales of Sunosi in future indications.

75

Table of Contents

*Oncology*

Rylaze was approved by FDA in June 2021 under the Real-Time Oncology Review program, and was launched in the U.S. in July 2021 for use as a component of a multi-agent chemotherapeutic regimen for the treatment of patients with ALL or LBL in pediatric and adult patients one month and older who have developed hypersensitivity to E. coli-derived asparaginase. Rylaze is the only recombinant erwinia asparaginase manufactured product approved in the U.S. that maintains a clinically meaningful level of asparaginase activity throughout the entire course of treatment. We developed Rylaze to address the needs of patients and health care providers for an innovative, high-quality erwinia asparaginase with reliable supply. The initial approved recommended dosage of Rylaze was for an intramuscular, or IM, administration of 25 mg/m$^2$ every 48 hours. In November 2022, FDA approved a supplemental Biologics License Application, or sBLA, for a Monday/Wednesday/Friday 25/25/50 mg/m$^2$ IM dosing schedule. In April 2022, we submitted a separate sBLA for IV administration. In February 2023, we received a complete response letter from FDA requesting additional clinical data on the IV administration of Rylaze. There is no impact on the approved product labeling for Rylaze IM administration. In September 2023, the EC granted marketing authorization for JZP458 under the trade name Enrylaze and we have initiated a rolling launch in Europe.

We acquired U.S. development and commercialization rights to Zepzelca in early 2020, and launched six months thereafter, with an indication for treatment of patients with SCLC with disease progression on or after platinum-based chemotherapy. Our education and promotional efforts are focused on SCLC-treating physicians. We are continuing to raise awareness of Zepzelca across academic and community cancer centers. In collaboration with F. Hoffmann-La Roche Ltd, or Roche, we have an ongoing Phase 3 pivotal clinical trial in first-line extensive stage SCLC of Zepzelca in combination with Tecentriq® (atezolizumab). We are also developing Zepzelca in additional indications.

Defitelio is the first and only approved treatment for patients with VOD, severe VOD, or sVOD, or VOD with renal or pulmonary dysfunction following HSCT by regulatory authorities in the U.S., Europe, Japan and other markets. There was a significant decline in the number of patients receiving HSCT due to the effects of the COVID-19 pandemic. Moving forward, while HSCT procedures are gradually returning to pre-pandemic numbers, we expect changes in chemotherapy regimens and the increasing use of cell therapies to potentially lower the incidence of sVOD; additionally, there has been a reduction of prophylactic use of Defitelio in Europe.

Vyxeos is a treatment for adults with newly-diagnosed t-AML, or AML-MRC. In March 2021, FDA approved a revised label to include a new indication to treat newly-diagnosed t-AML, or AML-MRC, in pediatric patients aged one year and older. We have a number of ongoing development activities and continue to expand into new markets internationally. With ongoing trends in the U.S. towards lower-intensity treatments and away from intensive chemotherapy regimens for AML, we have seen increasing competition from other therapeutic options.

*Research and Development Progress*

Our research and development activities encompass all stages of development and currently include clinical testing of new product candidates and activities related to clinical improvements of, or additional indications or new clinical data for, our existing marketed products. We also have active preclinical programs for novel therapies, including neuroscience and precision medicines in oncology. We are increasingly leveraging our growing internal research and development function, and we have also entered into collaborations with third parties for the research and development of innovative early-stage product candidates and have supported additional investigator-sponsored trials that are anticipated to generate additional data related to our products. We also seek out investment opportunities in support of the development of early- and mid-stage technologies in our therapeutic areas and adjacencies. We have a number of licensing and collaboration agreements with third parties, including biotechnology companies, academic institutions and research-based companies and institutions, related to preclinical and clinical research and development activities in hematology and in precision oncology, as well as in neuroscience.

Within our oncology R&D program, in October 2022, we announced an exclusive licensing and collaboration agreement with Zymeworks Inc., or Zymeworks, providing us the right to acquire development and commercialization rights to Zymeworks' zanidatamab across all indications in the United States, Europe, Japan and all other territories except for those Asia/Pacific territories previously licensed by Zymeworks. In December 2022, we exercised the option to continue with the exclusive development and commercialization rights to zanidatamab. Under the terms of the agreement, Zymeworks received an upfront payment of $50.0 million, and following the exercise of our option to continue the collaboration, a second, one-time payment of $325 million. Zymeworks is also eligible to receive regulatory and commercial milestone payments of up to $1.4 billion, for total potential payments of $1.76 billion. Pending approval, Zymeworks is eligible to receive tiered royalties between 10% and 20% on our net sales. Zanidatamab is a bispecific antibody that can simultaneously bind two non-overlapping epitopes of HER2, known as biparatopic binding. Zanidatamab is currently being evaluated in multiple clinical trials as a treatment for patients with HER2-expressing cancers. Following positive data from a pivotal Phase 2 clinical trial evaluating zanidatamab monotherapy in patients with previously treated advanced or metastatic HER2-amplified biliary tract cancers, or BTC, we initiated a rolling BLA submission for accelerated approval in second-line BTC. In addition, we have an ongoing Phase 3 randomized clinical trial evaluating zanidatamab in combination with chemotherapy plus or minus

76

Table of Contents

tislelizumab as a first-line treatment for HER2-expressing gastroesophageal adenocarcinoma, or GEA, and an ongoing Phase 2 trial examining zanidatamab in combination with chemotherapy in first-line patients with HER2-expressing metastatic GEA. There are also multiple ongoing clinical trials exploring zanidatamab in breast cancer and other HER2-expressing tumor types.

Our development plan for Zepzelca continues to progress. We are collaborating with Roche on a pivotal Phase 3 clinical trial evaluating Zepzelca in combination with Tecentriq in first-line extensive stage SCLC. In December 2021, our licensor PharmaMar initiated a confirmatory trial in second-line SCLC. This ongoing three-arm trial is comparing Zepzelca as either monotherapy or in combination with irinotecan to investigator's choice of irinotecan or topotecan. Data from either the first-line trial of Zepzelca in combination with Tecentriq or the PharmaMar trial could serve to confirm clinical benefit of Zepzelca and secure full approval in the U.S.

In addition, we have an ongoing Phase 4 observational study to collect real world safety and outcome data in adult Zepzelca monotherapy patients with SCLC who progress on or after prior platinum-containing chemotherapy.

In June 2022, we announced the FDA had cleared our Investigational New Drug application for JZP815 and in October 2022, we enrolled the first patient in a Phase 1 trial. JZP815 is an investigational stage pan-RAF kinase inhibitor that targets specific components of the mitogen-activated protein kinase pathway that, when activated by oncogenic mutations, can be a frequent driver of human cancer.

In April 2022, we announced that we had entered into a licensing and collaboration agreement with Werewolf Therapeutics, Inc., or Werewolf, to acquire exclusive global development and commercialization rights to Werewolf's investigational WTX-613, now referred to as JZP898. Under the terms of the agreement, we made an upfront payment of $15.0 million to Werewolf, and Werewolf is eligible to receive development, regulatory and commercial milestone payments of up to $1.26 billion. If approved, Werewolf is eligible to receive a tiered, mid-single-digit percentage royalty on net sales of JZP898. This transaction underscores our commitment to enhancing our pipeline to deliver novel oncology therapies to patients, and also provides us with an opportunity to expand into immuno-oncology. JZP898 is a differentiated, conditionally-activated interferon alpha, or IFNα, INDUKINE™ molecule. We initiated a Phase 1 clinical trial of JZP898 in late 2023.

Our neuroscience R&D efforts include an ongoing Phase 3 trial of Epidyolex for LGS, DS and TSC in Japan initiated in October 2022.

In December 2021 we initiated Phase 2 clinical trials for suvecaltamide (JZP385), for essential tremor, or ET. Additionally, in November 2022, we initiated a Phase 2 trial of suvecaltamide in patients with Parkinson's disease tremor. In December 2023, we announced that our Phase 2 clinical trial for JZP150 for treatment of post-traumatic stress disorder, or PTSD, did not meet the primary endpoint. We plan to fully evaluate these data; however, based on top-line results we do not anticipate moving forward with additional JZP150 development in PTSD. We are also pursuing early-stage activities related to the development of JZP324, an extended-release low sodium, oxybate formulation that we believe could provide a clinically meaningful option for narcolepsy patients.

In May 2022, we announced that we had entered into a licensing agreement with Sumitomo Pharma Co., Ltd, or Sumitomo, to acquire exclusive development and commercialization rights in the United States, Europe and other territories for JZP441, also known as DSP-0187, a potent, highly selective oral orexin-2 receptor agonist with potential application for the treatment of narcolepsy, IH and other sleep disorders. Under the terms of the agreement, we made an upfront payment of $50 million to Sumitomo, and Sumitomo is eligible to receive development, regulatory and commercial milestone payments of up to $1.09 billion. If approved, Sumitomo is eligible to receive a tiered, low double-digit royalty on our net sales of JZP441. In November 2023, we announced that we achieved initial proof-of-concept in our Phase 1 clinical trial program in healthy volunteers as demonstrated by the Maintenance of Wakefulness Test (MWT). At that time, we also noted the program was being paused as we analyze safety findings related to visual disturbances and cardiovascular effects; no liver toxicity signals were observed. We are committed to orexin-2 agonist development and have a backup orexin-2 receptor agonist program.

Below is a summary of our key ongoing and planned development projects related to our products and pipeline and their corresponding current stages of development:

| Product Candidates | Description |
| --- | --- |
| **ONCOLOGY** | |
| **Phase 3** | |
| Zanidatamab | HER2-positive GEA (ongoing trial) |
| Zepzelca | First-line extensive stage SCLC in combination with Tecentriq (collaboration with Roche) (ongoing trial) |
| | Confirmatory Study (PharmaMar study) (ongoing trial) |

Table of Contents

| | |
|---|---|
| Vyxeos | AML or high-risk Myelodysplastic Syndrome, or MDS (AML18) (cooperative group studies) (ongoing trial) |
| | Newly diagnosed adults with standard- and high-risk AML (AML Study Group cooperative group study) (ongoing trial) |
| | Newly diagnosed pediatric patients with AML (Children's Oncology Group cooperative group study) (ongoing trial) |
| **Pivotal Phase 2** | |
| Zanidatamab | Previously treated, advanced HER2-expressing BTC (ongoing trial) (pivotal trial) |
| **Phase 2** | |
| Zanidatamab | HER2-expressing GEA, BTC or colorectal cancer in combination with standard first-line chemotherapy (ongoing trial) |
| Vyxeos | High-risk MDS (European Myelodysplastic Syndromes) (cooperative group study) (ongoing trial) |
| | Newly diagnosed untreated patients with high-risk AML (cooperative group study) (planned trial) |
| Vyxeos + other approved therapies | Relapsed/refractory, or R/R AML or hypomethylating agent failure MDS (MD Anderson collaboration study) (ongoing trial) |
| | De novo or R/R AML (MD Anderson collaboration study) (ongoing trial) |
| **Phase 2a** | |
| Zanidatamab | Previously treated HER2+HR+ breast cancer in combination with palbociclib (ongoing trial) |
| **Phase 1b/2** | |
| Zanidatamab | First-line breast cancer and GEA (BeiGene trial) (ongoing trial) |
| Zanidatamab | HER2-expressing breast cancer in combination with ALX148 (ongoing trial) |
| **Phase 1** | |
| JZP815 | Raf and Ras mutant tumors (acquired from Redx Pharma plc, or Redx) (ongoing trial) |
| Zanidatamab | Previously treated metastatic HER2-expressing cancers in combination with select antineoplastic therapies (ongoing trial) |
| JZP341 (long-acting *Erwinia* asparaginase) | Solid tumors (licensed from Ligand Pharmaceuticals Incorporated, or Ligand) (ongoing trial) |
| JZP898 | Conditionally-activated IFNα INDUKINE™ molecule in solid tumors (ongoing trial) |
| Vyxeos | Low intensity dosing for higher risk MDS (MD Anderson collaboration study) (ongoing trial) |
| **Preclinical** | |
| Undisclosed target | Ras/Raf/MAP kinase pathway (collaboration with Redx) |
| Undisclosed targets | Oncology |
| CombiPlex® | Hematology/oncology exploratory activities |
| **NEUROSCIENCE** | |
| **Phase 3** | |
| Epidyolex | LGS, TSC and DS (ongoing trial in Japan) |
| **Phase 2b** | |
| Suvecaltamide (JZP385) | ET (ongoing trial) |
| **Phase 2** | |
| Suvecaltamide (JZP385) | Parkinson's disease tremor (ongoing trial) |
| **Phase 1** | |
| JZP324 | Oxybate extended-release formulation (planned trial) |
| JZP441* | Potent, highly selective oral orexin-2 receptor agonist (paused) |
| Undisclosed cannabinoids | Other neuroscience (ongoing trials) |
| **Preclinical** | |
| Undisclosed targets | Sleep |
| | Epilepsy |
| | Other Neuroscience |

Table of Contents

*Also known as DSP-0187 (see discussion above in this section for JZP441)

### 2023 Highlights and Recent Developments

Regulatory Submissions, Approvals and Commercial Launches

<u>Xywav</u>

- In May 2023, Xywav was approved for the treatment of cataplexy in patients with narcolepsy in Canada.

<u>Epidiolex/Epidyolex</u>

- In the first half of 2023, launched TSC indication in England and Spain. Also launched LGS indication in Australia.

- In the second half of 2023, secured reimbursement for LGS, DS and TSC indications in Greece, Poland and Luxembourg. Also secured reimbursement for TSC indication in Austria, Finland and Norway.

<u>Rylaze/Enrylaze</u>

- In September 2023, the EC granted marketing authorization for JZP485 under the trade name Enrylaze.

<u>Zanidatamab</u>

- In the fourth quarter for 2023, we initiated a rolling BLA submission for zanidatamab in second-line BTC.

<u>Research and Development</u>

- In the fourth quarter of 2023, we initiated a Phase 1 clinical trial for JPZ898.

### Operational Excellence

We remain focused on continuing to build excellence in areas that we believe will give us a competitive advantage, including maintaining an increasingly agile and adaptable commercialization engine and strengthening our customer-focused market expertise across patients, providers and payors. We are continuously refining our approach to engaging our customers by strengthening alignment and integration across functions and across regions. This includes maintaining a virtual presence at scientific congresses, when appropriate, designed to ensure we can continue to provide promotional and non-promotional interactions and supporting our field-based teams with virtual customer interaction tools, training and content. These initiatives mark a significant operational evolution that is directly linked to our corporate strategy and are designed to better enable our teams to work collaboratively on an aligned and shared agenda through both virtual and in-person interactions. In most geographies, our teams have increased the frequency of in-person interactions as medical congresses and healthcare practices have resumed in-person activities.

### Other Challenges, Risks and Trends Related to Our Business

Historically, our business was substantially dependent on Xyrem and our financial results were significantly influenced by sales of Xyrem. Our operating plan assumes that Xywav, with 92% lower sodium compared to high-sodium oxybates, depending on the dose, absence of a sodium warning and dosing titration option, will remain the treatment of choice for patients who can benefit from oxybate treatment. In June 2021, FDA recognized seven years of ODE for Xywav in narcolepsy through July 21, 2027 stating that Xywav is clinically superior to Xyrem by means of greater safety due to reduced chronic sodium burden. While we expect that our business will continue to meaningfully depend on oxybate revenues, there is no guarantee that oxybate revenues will remain at current levels, or that oxybate revenues will otherwise grow in future periods.

Our ability to successfully commercialize Xywav will depend on, among other things, our ability to maintain adequate payor coverage and reimbursement for Xywav and acceptance of Xywav by physicians and patients, including of Xywav for the treatment of IH in adults. In an effort to support strong adoption of Xywav, we are focused on providing robust patient copay and savings programs and facilitating payor coverage for Xywav.

Xywav and Xyrem face competition from a branded product for treatment of cataplexy and/or EDS in narcolepsy. Avadel's Lumryz was launched in the U.S. market in June 2023. On June 22, 2023, we filed a complaint in the United States District Court for the District of Columbia seeking a declaration that FDA's approval of the New Drug Application, or NDA, for Avadel's Lumryz was unlawful. In the complaint, we allege that FDA acted outside its authority under the Orphan Drug Act, when, despite ODE protecting Xywav, FDA approved the Lumryz NDA and granted Lumryz ODE based on FDA's finding that Lumryz makes a major contribution to patient care and is therefore clinically superior to Xywav and Xyrem. We cannot at this time predict the timing or ultimate outcome of this litigation or the impact of this litigation on our business.

In addition, in January 2023 our oxybate products began to face competition from an AG version of high-sodium oxybate pursuant to a settlement agreement we entered into with an abbreviated new drug application, or ANDA, filer. In July 2023, a volume-limited ANDA filer launched an AG version of high-sodium oxybate. These AG products have negatively impacted and are expected to continue to negatively impact Xyrem and Xywav sales for patients with narcolepsy. Specifically, a wholly

Table of Contents

owned subsidiary of Hikma Pharmaceuticals PLC, or Hikma, launched its AG version of sodium oxybate in January 2023 and Amneal Pharmaceuticals LLC, or Amneal, launched its AG version of sodium oxybate in July 2023. Hikma has elected to continue to sell the Hikma AG product, with royalties to be paid to us, for a total of up to four years beginning in January 2024, which election may be terminated by Hikma in accordance with the notice provisions in the agreements between the parties. We have the right to receive a meaningful royalty from Hikma on net sales of the Hikma AG product; the royalty rate was fixed for the second half of 2023. There was a substantial increase in the royalty rate beginning in January 2024, which will remain fixed for the duration of the agreement's term. We are also paid for supply of the Hikma AG product and reimbursed by Hikma for a portion of the services costs associated with the operation of the Xywav and Xyrem risk evaluation and mitigation strategy, or REMS, and distribution of the Hikma AG product. We also granted Hikma a license to launch its own generic sodium oxybate product, but if it elects to launch its own generic product, Hikma will no longer have the right to sell the Hikma AG product. In addition, Hikma would need to set up its own REMS, which must be open to any other company seeking to commercialize a sodium oxybate product. In our settlements with Amneal, Lupin Inc., or Lupin, and Par Pharmaceutical, Inc., or Par, we granted each party the right to sell a limited volume of an AG product in the U.S. beginning on July 1, 2023 and ending on December 31, 2025, with royalties to be paid to us. Amneal launched its AG version of sodium oxybate in July 2023. At this time, Amneal has rights to sell a low-single-digit percentage of historical Xyrem sales over each 6-month sales period. At this time, Lupin and Par have elected not to launch an AG product. AG products will be distributed through the same REMS, as Xywav and Xyrem. We also granted each of Amneal, Lupin and Par a license to launch its own generic sodium oxybate product under its ANDA on or after December 31, 2025, or earlier under certain circumstances, including the circumstance where Hikma elects to launch its own generic product. If Amneal, Lupin or Par elects to launch its own generic product under such circumstance, it will no longer have the right to sell an AG product. In addition, any company commercializing a generic version of high-sodium oxybate would need to establish its own REMS, or join an existing REMS operated by another company.

In the future, we expect our oxybate products to continue to face competition from generic versions of high-sodium oxybate pursuant to settlement agreements we entered into with multiple ANDA filers. In addition, we received notices in June 2021 and February 2023, that Lupin and Teva, respectively, filed ANDAs for generic versions of Xywav. On October 13, 2023, Lupin announced that it has received tentative approval for its application to market a generic version of Xywav. Generic competition can decrease the net prices at which branded products, such as Xywav and Xyrem are sold. In addition, we have increasingly experienced pressure from third party payors to agree to discounts, rebates or restrictive pricing terms, and we cannot guarantee we will be able to agree to commercially reasonable terms with PBMs, or similar organizations and other third party payors, or that we will be able to ensure patient access and acceptance on formularies. Entering into agreements with PBMs or similar organizations and payors to ensure patient access has and will likely continue to result in higher gross to net deductions. Moreover, generic or AG high-sodium oxybate products or branded high-sodium oxybate entrants in narcolepsy, such as Avadel's Lumryz, have had and may continue to have the effect of changing payor or formulary coverage of Xywav or Xyrem in favor of other products, and indirectly adversely affect sales of Xywav and Xyrem.

Our financial condition, results of operations and growth prospects are also dependent on our ability to maintain or increase sales of Epidiolex/Epidyolex in the U.S. and Europe, which is subject to many risks and there is no guarantee that we will be able to continue to successfully commercialize Epidiolex/Epidyolex for its approved indications. The commercial success of Epidiolex/Epidyolex depends on the extent to which patients and physicians accept and adopt Epidiolex/Epidyolex as a treatment for seizures associated with LGS, DS and TSC, and we do not know whether our or others' estimates in this regard will be accurate. Physicians may not prescribe Epidiolex and patients may be unwilling to use Epidiolex/Epidyolex if coverage is not provided or reimbursement is inadequate to cover a significant portion of the cost. Additionally, any negative development for Epidiolex/Epidyolex in the market, in clinical development for additional indications, or in regulatory processes in other jurisdictions, may adversely impact the commercial results and potential of Epidiolex/Epidyolex. Moreover, we expect that Epidiolex will face competition from generic products in the future. For example, in November and December 2022, we received notices from ten ANDA filers that they have each filed with FDA an ANDA for a generic version of Epidiolex. In addition, there are non-FDA approved cannabidiol preparations being made available from companies through the state-enabled medical marijuana industry, which might attempt to compete with Epidiolex. Thus, significant uncertainty remains regarding the commercial potential of Epidiolex/Epidyolex.

In addition to our neuroscience products and product candidates, we are commercializing a portfolio of oncology products, including Rylaze, Zepzelca, Defitelio and Vyxeos. An inability to effectively commercialize Rylaze, Zepzelca, Defitelio and Vyxeos and to maximize their potential where possible through successful research and development activities could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

A key aspect of our growth strategy is our continued investment in our evolving and expanding R&D activities. If we are not successful in the clinical development of our product candidates, if we are unable to obtain regulatory approval for our product candidates in a timely manner, or at all, or if sales of an approved product do not reach the levels we expect, our anticipated revenue from our product candidates would be negatively affected, which could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

Table of Contents

In addition to continued investment in our R&D pipeline, we intend to continue to grow our business by acquiring or in-licensing, and developing, including with collaboration partners, additional products and product candidates that we believe are highly differentiated and have significant commercial potential. Failure to identify and acquire, in-license or develop additional products or product candidates, successfully manage the risks associated with integrating any products or product candidates into our portfolio or the risks arising from anticipated and unanticipated problems in connection with an acquisition or in-licensing, such as the GW Acquisition, could have a material adverse effect on our business, results of operations and financial condition.

The success of the GW Acquisition will depend, in part, on our ability to realize the anticipated benefits from the combination of our and GW's historical businesses. Nonetheless, Epidiolex and the other products and technologies acquired may not be successful or continue to grow at the same rate as if our companies operated independently or they may require significantly greater resources and investments than originally anticipated. For example, in the third quarter of 2022, we recorded a $133.6 million asset impairment charge as a result of the decision to discontinue the nabiximols program. As a result, the anticipated benefits of the GW Acquisition may not be realized at the expected level, within the expected timeframe or at all or may take longer to realize or cost more than expected, which could materially and adversely affect our business, financial condition, results of operations and growth prospects.

Our industry has been, and is expected to continue to be, subject to healthcare cost containment and drug pricing scrutiny by regulatory agencies in the U.S. and internationally. If new healthcare policies or reforms intended to curb healthcare costs are adopted or if we experience negative publicity with respect to pricing of our products or the pricing of pharmaceutical drugs generally, the prices that we charge for our products may be affected, our commercial opportunity may be limited and/or our revenues from sales of our products may be negatively impacted. For example, the Inflation Reduction Act of 2022 among other things, requires the U.S. Department of Health and Human Services Secretary to negotiate, with respect to Medicare units and subject to a specified cap, the price of a set number of certain high Medicare spend drugs and biologicals per year starting in 2026, penalizes manufacturers of certain Medicare Parts B and D drugs for price increases above inflation, and makes several changes to the Medicare Part D benefit, including a limit on annual out-of-pocket costs, and a change in manufacturer liability under the program, that could negatively affect our business and financial condition. In addition, under the Medicaid Drug Rebate Program, rebates owed by manufacturers are no longer subject to a cap on the rebate amount, which could adversely affect our rebate liability. We are also subject to increasing pricing pressure and restrictions on reimbursement imposed by payors. If we fail to obtain and maintain adequate formulary positions and institutional access for our current products and future approved products, we will not be able to achieve a return on our investment and our business, financial condition, results of operations and growth prospects would be materially adversely affected.

While certain preparations of cannabis remain Schedule I controlled substances, if such products are approved by FDA for medical use in the U.S. they are rescheduled to Schedules II-V, since approval by FDA satisfies the "accepted medical use" requirement; or such products may be removed from control under the Controlled Substances Act entirely. If any of our product candidates receive FDA approval, the Department of Health and Human Services and the U.S. Drug Enforcement Administration will make a scheduling determination. U.S. or foreign regulatory agencies may request additional information regarding the abuse potential of our products which may require us to generate more clinical or other data than we currently anticipate to establish whether or to what extent the substance has an abuse potential, which could increase the cost, delay the approval and/or delay the launch of that product.

Finally, business practices by pharmaceutical companies, including product formulation improvements, patent litigation settlements, and REMS programs, have increasingly drawn public scrutiny from legislators and regulatory agencies, with allegations that such programs are used as a means of improperly blocking or delaying competition. Government investigations with respect to our business practices, including as they relate to the Xywav and Xyrem REMS, the launch of Xywav, our Xyrem patent litigation settlement agreements or otherwise, could cause us to incur significant monetary charges to resolve these matters and could distract us from the operation of our business and execution of our strategy. For example, in July 2022, we received a subpoena from the U.S. Attorney's Office for the District of Massachusetts requesting documents related to Xyrem and U.S. Patent No. 8,772,306 ("Method of Administration of Gamma Hydroxybutyrate with Monocarboxylate Transporters"), product labeling changes for Xyrem, communications with FDA and the U.S. Patent and Trademark Office, pricing of Xyrem, and other related documents. We may also become subject to similar investigations by other state or federal governmental agencies. The investigation by the U.S. Attorney's Office and any additional investigations or litigation related to the subject matter of this investigation may result in damages, fines, penalties, financial charges to resolve the matter or administrative sanctions against us, negative publicity or other negative actions that could harm our reputation, reduce demand for Xyrem and/or reduce coverage of Xyrem, including by federal health care programs and state health care programs. In addition, from June 2020 to May 2022, a number of lawsuits were filed on behalf of purported direct and indirect Xyrem purchasers, alleging that the patent litigation settlement agreements we entered with certain generic companies violate state and federal antitrust and consumer protection laws. For additional information on these lawsuits and other legal matters, see Note 14, Commitments and Contingencies-Legal Proceedings of the Notes to Consolidated Financial Statements, included in Part IV of this Annual Report on Form 10-K. It is possible that additional lawsuits will be filed against us making similar or related

Table of Contents

allegations. We cannot predict the outcome of these or potential additional lawsuits; however, if the plaintiffs were to be successful in their claims against us, they may be entitled to injunctive relief or we may be required to pay significant monetary damages. Moreover, we are, and expect to continue to be, the subject of various claims, legal proceedings, and government investigations apart from those set forth above that have arisen in the ordinary course of business that have not yet been fully resolved and that could adversely affect our business and the execution of our strategy. Any of the foregoing risks and uncertainties could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

**Results of Operations**

The following table presents our revenues and expenses for the years ended December 31, 2023, 2022 and 2021 (in thousands except percentages):

| | 2023 | Change | 2022 | Change | 2021[1] |
|---|---|---|---|---|---|
| Product sales, net | $ 3,736,943 | 3 % | $ 3,641,429 | 18 % | $ 3,079,001 |
| Royalties and contract revenues | 97,261 | 442 % | 17,945 | 18 % | 15,237 |
| Cost of product sales (excluding amortization of acquired developed technologies) | 435,577 | (19 %) | 540,517 | 23 % | 440,760 |
| Selling, general and administrative | 1,343,105 | (5 %) | 1,416,967 | (2)% | 1,451,683 |
| Research and development | 849,658 | 44 % | 590,453 | 17 % | 505,748 |
| Intangible asset amortization | 608,284 | 2 % | 599,169 | 14 % | 525,769 |
| Intangible asset impairment charge | — | N/A(2) | 133,648 | N/A(2) | — |
| Acquired in-process research and development | 19,000 | (96 %) | 444,148 | N/A(2) | — |
| Interest expense, net | 289,438 | — | 288,242 | 3 % | 278,766 |
| Foreign exchange (gain) loss | (8,787) | (146 %) | 19,014 | 337 % | 4,350 |
| Income tax expense (benefit) | (119,912) | (24 %) | (158,645) | (173)% | 216,116 |
| Equity in loss of investees | 3,009 | N/A(2) | 9,921 | N/A(2) | 714 |

_____

(1)  The results of operations of the GW business have been included from the closing of the GW Acquisition on May 5, 2021.

(2)  Comparison to prior period is not meaningful.

82

Table of Contents

*Revenues*

The following table presents product sales, royalties and contract revenues, and total revenues for the years ended December 31, 2023, 2022 and 2021 (in thousands except percentages):

| | 2023 | Change | 2022 | Change | 2021[1] |
|---|---|---|---|---|---|
| Xywav | $ 1,272,977 | 33 % | $ 958,425 | 79 % | $ 535,297 |
| Xyrem | 569,730 | (44)% | 1,020,453 | (19)% | 1,265,830 |
| Epidiolex/Epidyolex | 845,468 | 15 % | 736,398 | 59 % | 463,645 |
| Sativex | 19,668 | 17 % | 16,825 | 32 % | 12,707 |
| Sunosi[3] | — | N/A(2) | 28,844 | (50)% | 57,914 |
| Total Neuroscience | 2,707,843 | (2)% | 2,760,945 | 18 % | 2,335,393 |
| Rylaze | 394,226 | 40 % | 281,659 | 229 % | 85,629 |
| Zepzelca | 289,533 | 7 % | 269,912 | 9 % | 246,808 |
| Defitelio/defibrotide | 184,000 | (5)% | 194,290 | (2)% | 197,931 |
| Vyxeos | 147,495 | 15 % | 127,980 | (5)% | 134,060 |
| Erwinaze/Erwinase | — | — | — | N/A(2) | 69,382 |
| Total Oncology | 1,015,254 | 16 % | 873,841 | 19 % | 733,810 |
| Other | 13,846 | 108 % | 6,643 | (32)% | 9,798 |
| Product sales, net | 3,736,943 | 3 % | 3,641,429 | 18 % | 3,079,001 |
| High-sodium oxybate AG royalty revenue | 75,918 | N/A(2) | — | — | — |
| Other royalty and contract revenues | 21,343 | 19 % | 17,945 | 18 % | 15,237 |
| Total revenues | $ 3,834,204 | 5 % | $ 3,659,374 | 18 % | $ 3,094,238 |

    (1) The results of operations of the GW business have been included from the closing of the acquisition of GW on May 5, 2021.

    (2) Comparison to prior period is not meaningful.

    (3) Net product sales of Sunosi U.S. are included until the date of divestment to Axsome on May 9, 2022.

*Product Sales, Net*

Xywav product sales increased in 2023 compared to 2022, primarily due to increased sales volumes of 28% and, to a lesser extent, a higher selling price. Xywav product sales were positively impacted by Xywav for IH as we see continued growth of new prescribers since its launch in late 2021 and by educational initiatives around the benefit of lowering sodium intake. Exiting 2023, there were 9,525 patients taking Xywav for narcolepsy and 2,775 taking Xywav for IH, an increase of approximately 11% and 59%, respectively, compared to 2022. Xywav product sales increased in 2022 compared to 2021, primarily due to increased sales volumes of 76% due to the positive impact of the launch of Xywav for IH in late 2021 and strong adoption in narcolepsy. Xyrem product sales decreased in 2023 compared to 2022, primarily due to decreased sales volumes of 49%, reflecting the strong adoption of Xywav by existing Xyrem patients and the impact of high-sodium oxybate competition, offset by a higher selling price and lower gross to net deductions. Xyrem product sales decreased in 2022 compared to 2021, primarily due to a decrease in sales volume of 23% reflecting adoption of Xywav by existing Xyrem patients, partially offset by a higher selling price. Epidiolex/Epidyolex product sales increased by 15% in 2023 compared to 2022, primarily due to increased sales volumes of 15% due to increased demand and expansion in European markets and, to a lesser extent, a higher selling price, partially offset by higher gross to net deductions. Epidiolex/Epidyolex product sales increased by 59% in 2022 compared to 2021, which included product sales from the closing of the GW Acquisition on May 5, 2021 to December 31, 2021. On a pro forma basis, Epidiolex/Epidyolex product sales increased by 12% in 2022 compared to 2021, primarily due to an increase in sales volumes of 16% and, to a lesser extent, a higher selling price, partially offset by higher gross to net deductions. Sunosi product sales decreased in 2022 as compared to 2021 as we completed the U.S. divestment of Sunosi in May 2022.

Rylaze product sales increased in 2023 compared to 2022, primarily due to increased sales volumes of 37% and, to a lesser extent, a higher selling price, offset by higher gross to net deductions. The increased sales volumes reflect the significant unmet patient need for a high-quality, reliable supply of Erwinia asparaginase for patients with ALL. Rylaze product sales increased in 2022 compared to 2021, primarily due to increased sales volumes following its launch in the U.S. in July 2021. Zepzelca product sales increased by 7% in 2023 compared to 2022, primarily due to a higher selling price and increased sales volumes, offset by higher gross to net deductions. Zepzelca product sales increased by 9% in 2022 compared to 2021, primarily due to a higher selling price and higher sales volumes. Defitelio/defibrotide product sales decreased by 5% in 2023

Table of Contents

compared to 2022, primarily due to a decrease in sales volumes, partially offset by a higher selling price. Defitelio/defibrotide product sales in 2022 decreased by 2% compared to 2021 as the impact of a higher selling price and increased sales volumes were offset by the negative impact of foreign exchange rates. Vyxeos product sales increased by 15% in 2023 compared to 2022, primarily due to increased sales volumes and to a lesser extent, a higher selling price, partially offset by higher gross to net deductions. Vyxeos product sales decreased by 5% in 2022 compared to 2021, primarily due to higher gross to net deductions, driven by a reduction in the returns provision in 2021, due to lower than estimated actual returns, and the negative impact of foreign exchange rates, partially offset by higher sales volume.

We expect product sales, net will increase in 2024 over 2023, primarily due to our key growth drivers; Xywav, through continued growth in the IH market and in new prescribers, Epidiolex through growth in current markets and meaningful expansion into new markets and in Rylaze through strong demand, offset by a decrease in sales of Xyrem due to the impact of high-sodium oxybate competition.

*Royalties and Contract Revenues*

Royalties and contract revenues increased in 2023 compared to 2022 primarily due to royalty revenue received from Hikma on net sales of their high-sodium oxybate AG. Royalties and contract revenues increased in 2022 compared to 2021, primarily due to higher royalty revenues. We expect royalties and contract revenues to increase significantly in 2024 compared to 2023, primarily due to increased royalty revenues from high-sodium oxybate AG, reflecting the significant increase in the fixed-rate royalty structure of the Hikma AG agreement.

*Cost of Product Sales*

Cost of product sales decreased in 2023 compared to 2022, primarily due to a reduction in the acquisition accounting inventory fair value step-up expense, or fair value step-up expense, of $121.9 million and the impact of an expense for past royalties recorded in 2022 in connection with the Otsuka Pharmaceutical Co., Ltd or Otsuka, settlement agreement, partially offset by changes in product mix. Cost of product sales increased in 2022 compared to 2021, primarily due to an increase in the fair value step-up expense of $50.3 million, driven by the inclusion of a full year expense in 2022 and the Otsuka royalty expense. Gross margin as a percentage of net product sales was 88.3%, 85.2% and 85.7% in 2023, 2022 and 2021, respectively. The increase in our gross margin percentage in 2023 compared to 2022 was primarily due to the decrease in the fair value step-up expense in 2023 and the impact of the Otsuka royalty expense in 2022. The decrease in our gross margin percentage in 2022 compared to 2021 was primarily due to the increase in the fair value step-up expense and the Otsuka royalty expense. We expect our cost of product sales to increase in 2024 compared to 2023, primarily driven by a change in product mix.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses decreased in 2023 compared to 2022, primarily due to the loss on disposal of Sunosi of $40.8 million, restructuring costs of $22.1 million and GW related integration costs of $21.1 million incurred in 2022, together with a reduction in costs related to program terminations of $19.1 million and in compensation related expenses, partially offset by an impairment of facility assets of $61.7 million in 2023. Selling, general and administrative expenses decreased in 2022 compared to 2021, primarily due to lower GW related integration expenses of $207.9 million and lower Sunosi related costs, partially offset by restructuring costs of $22.1 million and costs related to program terminations of $42.6 million, the loss on disposal of Sunosi of $40.8 million, an increase in compensation related expenses driven by the inclusion of GW related headcount costs for the full period in 2022, and increased investment in sales and marketing spend relating to Xywav and Epidiolex. We expect selling, general and administrative expenses in 2024 to increase compared to 2023, primarily due to continued investment in our key growth drivers, such as Xywav in IH, Epidiolex and Rylaze along with increased employee expenses.

*Research and Development Expenses*

Research and development expenses consist primarily of costs related to clinical studies and outside services, personnel expenses, milestone expenses and other research and development costs. Clinical study and outside services costs relate primarily to services performed by clinical research organizations, materials and supplies, and other third party fees. Personnel expenses relate primarily to salaries, benefits and share-based compensation. Other research and development expenses primarily include overhead allocations consisting of various support and facilities-related costs. We do not track fully-burdened research and development expenses on a project-by-project basis. We manage our research and development expenses by identifying the research and development activities that we anticipate will be performed during a given period and then prioritizing efforts based on our assessment of which development activities are important to our business and have a reasonable probability of success, and by dynamically allocating resources accordingly. We also continually review our development pipeline projects and the status of their development and, as necessary, reallocate resources among our development pipeline projects that we believe will best support the future growth of our business.

Table of Contents

The following table provides a breakout of our research and development expenses by major categories of expense (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| Clinical studies and outside services | $ 501,181 | $ 270,008 | $ 234,462 |
| Personnel expenses | 258,303 | 223,603 | 193,716 |
| Milestone expense | 5,500 | 6,250 | 15,000 |
| Restructuring expenses | — | 10,284 | — |
| Other | 84,674 | 80,308 | 62,570 |
| Total | 849,658 | 590,453 | 505,748 |

Research and development expenses increased by $259.2 million in 2023 compared to 2022. Clinical studies and outside services costs increased in 2023 compared to 2022, primarily due to the addition of costs related to clinical programs for zanidatamab, and, to a lesser extent, JZP385 and JZP441, partially offset by a reduction in costs related to JZP458 (Rylaze). Personnel expenses increased by $34.7 million in 2023 compared to 2022, primarily due to increased headcount in support of our development programs. Milestone expenses of $5.5 million in 2023 primarily related to a milestone payment of $5.0 million under our collaboration and license agreement with Werewolf. Research and development expenses increased by $84.7 million in 2022 compared to 2021. Clinical studies and outside services costs increased in 2022 compared to 2021, primarily due to the addition of costs related to clinical programs for zanidatamab, JZP898 and JZP441, and increased costs for JZP150, offset by a reduction in costs related to JZP458 (Rylaze). Personnel expenses increased by $29.9 million in 2022 compared to 2021, primarily due to increased compensation related expenses driven by the inclusion of GW related headcount costs for the full period in 2022. We incurred restructuring costs of $10.3 million in 2022. Milestone expenses of $6.3 million in 2022 primarily related to a milestone expense of $5.0 million made under our asset purchase and collaboration agreements with Redx.

For 2024, we expect that our research and development expenses will continue to increase from previous levels as we prepare for anticipated data read-outs from clinical trials, initiate and undertake additional clinical trials and related development work primarily relating to zanidatamab.

*Intangible Asset Amortization*

Intangible asset amortization for 2023 was in line with 2022. Intangible asset amortization increased by $73.4 million in 2022 compared to 2021, primarily due to the inclusion of the amortization for the full period in 2022, of the intangible assets arising from the acquisition of GW, primarily related to Epidiolex, offset by a decrease relating to the Erwinaze intangible asset that was fully amortized in June 2021. Intangible asset amortization in 2024 is not expected to change materially from 2023.

*Acquired In-Process Research and Development*

Acquired in-process research and development, or IPR&D, expense in 2023 primarily related to the upfront payment made in connection with our licensing and collaboration agreement with Autifony Therapeutics Limited, or Autifony, of $18.0 million. Acquired IPR&D expense in 2022 primarily related to the upfront payments made in connection with our licensing and collaboration agreements with Zymeworks and Werewolf of $375.0 million and $15.0 million, respectively, and our licensing agreement with Sumitomo of $50.0 million.

*Intangible Asset Impairment Charge*

In 2022, we recorded an acquired IPR&D asset impairment charge of $133.6 million as a result of the decision to discontinue our nabiximols program.

*Interest Expense, Net*

Interest expense, net increased by $1.2 million in 2023 compared to 2022, primarily driven by higher interest rates on our outstanding term loan borrowings, partially offset by higher interest income on investments and the inclusion of interest expense on the now repaid seven-year €625.0 million term loan B facility, or the Euro Term Loan, in 2022. Interest expense, net increased by $9.5 million in 2022 compared to 2021, primarily due to the inclusion of interest expense for the full period in 2022, on the $1.5 billion in aggregate principal amount of 4.375% senior secured notes, due 2029, or the Secured Notes, and the seven-year $3.1 billion term loan B facility, or the Dollar Term Loan, which were used, in part, to finance the cash portion of the GW Acquisition, and higher interest rates on the Dollar Term Loan in 2022, offset by a decrease in non-cash interest expense relating to the 1.50% exchangeable senior notes due 2024, or the 2024 Notes, and our 2.00% exchangeable senior notes due 2026, or the 2026 Notes, collectively known as the Exchangeable Senior Notes, following the adoption of ASU No. 2020-06, "Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging— Contracts in

Table of Contents

Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity", or ASU 2020-06, on January 1, 2022.

We expect interest expense, net to increase in 2024 compared to 2023 primarily due to reduced interest income due to lower interest rates partially offset by lower interest expense following the repricing of our Dollar Term Loan, for further information on this please refer to Liquidity and Capital Resources.

*Foreign Exchange (Gain) Loss*

The foreign exchange (gain) loss is primarily related to the translation of sterling and euro-denominated net monetary liabilities, primarily intercompany balances, held by subsidiaries with a U.S. dollar functional currency and related foreign exchange forward contracts not designated as hedging instruments.

*Income Tax Expense (Benefit)*

Our income tax benefit was $119.9 million and $158.6 million in 2023 and 2022, respectively, and our income tax expense was $216.1 million in 2021, relating to tax arising on income or losses in Ireland, the U.K., the U.S. and certain other foreign jurisdictions, offset by deductions on subsidiary equity, foreign derived intangible income benefits, and originating tax credits. Our income tax benefit in 2023 decreased compared to 2022 primarily due to payments for acquired IPR&D made in 2022 and the impact of the 2022 impairment of our acquired IPR&D asset as a result of the decision to discontinue our nabiximols program, partially offset by the change in income mix across jurisdictions. Our income tax expense in 2021 included an expense of $259.9 million arising on the remeasurement of our U.K. net deferred tax liability, which arose primarily in relation to the GW Acquisition, due to a change in the statutory tax rate in the U.K. following enactment of the U.K. Finance Act 2021.

*Equity in Loss of Investees*

Equity in loss of investees relates to our share in the net loss of companies in which we have made investments accounted for under the equity method of accounting.

**Liquidity and Capital Resources**

As of December 31, 2023, we had cash, cash equivalents and investments of $1.6 billion, borrowing available under our five-year $500.0 million revolving credit facility, or the Revolving Credit Facility, of $500.0 million and a long-term debt principal balance of $5.8 billion. Our long-term debt included $2.7 billion aggregate principal amount Dollar Term Loan, $1.5 billion principal amount of the Secured Notes, $1.0 billion principal amount of the 2026 Notes and $575.0 million principal amount of the 2024 Notes. During 2023, 2022 and 2021, we generated cash flows from operations of $1,092.0 million, $1,272.0 million and $778.5 million, respectively, and we expect to continue to generate positive cash flow from operations which we expect will enable us to operate our business and de-lever our balance sheet over time.

Since the closing of the acquisition of GW in May 2021, we have fully repaid our Euro Term Loan €625.0 million, or $753.0 million, and made voluntary and mandatory repayments of $300.0 million and $77.5 million, respectively, relating to the Dollar Term Loan.

We have a significant amount of debt outstanding on a consolidated basis. For a more detailed description of our debt arrangements, including information relating to our scheduled maturities with respect to our long-term debt see Note 12, Debt, of the Notes to Consolidated Financial Statements, included in Part IV of this Annual Report on Form 10-K. This substantial level of debt could have important consequences to our business, including, but not limited to the factors set forth in in Part I, Item 1A "Risk Factors" of this Annual Report on Form 10-K under the heading "We have incurred substantial debt, which could impair our flexibility and access to capital and adversely affect our financial position, and our business would be adversely affected if we are unable to service our debt obligations."

We believe that our existing cash, cash equivalents and investments balances, cash we expect to generate from operations and funds available under our revolving credit facility will be sufficient to fund our operations and to meet our existing obligations for the foreseeable future. The adequacy of our cash resources depends on many assumptions, including primarily our assumptions with respect to product sales and expenses, as well as the other factors set forth in "Risk Factors" in Part I, Item 1A of this Annual Report on Form 10-K under the headings "Risks Related to our Lead Products and Product Candidates" and *"To continue to grow our business, we will need to commit substantial resources, which could result in future losses or otherwise limit our opportunities or affect our ability to operate and grow our business."* Our assumptions may prove to be wrong or other factors may adversely affect our business, and as a result we could exhaust or significantly decrease our available cash resources, and we may not be able to generate sufficient cash to service our debt obligations which could, among other things, force us to raise additional funds and/or force us to reduce our expenses, either of which could have a material adverse effect on our business.

Table of Contents

To continue to grow our business over the longer term, we plan to commit substantial resources to product acquisition and in-licensing, product development, clinical trials of product candidates and expansion of our commercial, development, manufacturing and other operations. In this regard, we have evaluated and expect to continue to evaluate a wide array of strategic transactions as part of our strategy to acquire or in-license and develop additional products and product candidates. Acquisition opportunities that we pursue could materially affect our liquidity and capital resources and may require us to incur additional indebtedness, seek equity capital or both. We regularly evaluate the performance of our products and product candidates to ensure fit within our portfolio and support efficient allocation of capital. In addition, we may pursue new operations or continue the expansion of our existing operations. Accordingly, we expect to continue to opportunistically seek access to additional capital to license or acquire additional products, product candidates or companies to expand our operations or for general corporate purposes. Raising additional capital could be accomplished through one or more public or private debt or equity financings, collaborations or partnering arrangements. However, our ability to raise additional capital may be adversely impacted by worsening global economic conditions and the recent disruptions to, and volatility in, the credit and financial markets in the U.S. and worldwide resulting from the effects of inflationary pressures, potential future bank failures, or otherwise. Accordingly, we could experience an inability to access additional capital or our liquidity could otherwise be impacted, which could in the future negatively affect our capacity for certain corporate development transactions or our ability to make other important, opportunistic investments. In addition, under Irish law we must have authority from our shareholders to issue any ordinary shares, including ordinary shares that are part of our authorized but unissued share capital, and we currently have such authorization. Moreover, as a matter of Irish law, when an Irish public limited company issues ordinary shares to new shareholders for cash, the company must first offer those shares on the same or more favorable terms to existing shareholders on a pro rata basis, unless this statutory pre-emption obligation is dis-applied, or opted-out of, by approval of its shareholders. At our annual general meeting of shareholders in August 2023, our shareholders voted to approve our proposal to dis-apply the statutory pre-emption obligation on terms that are substantially more limited than our general pre-emption opt-out authority that had been in effect prior to August 4, 2021. This current pre-emption opt-out authority is due to expire in February 2025. If we are unable to obtain further pre-emption authorities from our shareholders in the future, or otherwise continue to be limited by the terms of new pre-emption authorities approved by our shareholders in the future, our ability to use our unissued share capital to fund in-licensing, acquisition or other business opportunities, or to otherwise raise capital could be adversely affected. In any event, an inability to borrow or raise additional capital in a timely manner and on attractive terms could prevent us from expanding our business or taking advantage of acquisition opportunities, and could otherwise have a material adverse effect on our business and growth prospects. In addition, if we use a substantial amount of our funds to acquire or in-license products or product candidates, we may not have sufficient additional funds to conduct all of our operations in the manner we would otherwise choose. Furthermore, any equity financing would be dilutive to our shareholders, and could require the consent of the lenders under the Credit Agreement and the indenture for the Secured Notes for certain financings.

In November 2016, our board of directors authorized a share repurchase program and as of December 31, 2023 had authorized the repurchase of up to $1.5 billion, exclusive of any brokerage commissions. Under this program, which has no expiration date, we may repurchase ordinary shares from time to time on the open market. The timing and amount of repurchases will depend on a variety of factors, including the price of our ordinary shares, alternative investment opportunities, restrictions under the amended credit agreement, corporate and regulatory requirements and market conditions. The share repurchase program may be modified, suspended or discontinued at any time without prior notice. In 2023, we spent a total of $269.8 million to purchase 2.1 million of our ordinary shares at a total purchase price, including brokerage commissions, of $126.65 per share. In 2022, we spent a total of $0.1 million to purchase 338 of our ordinary shares at a total purchase price, including brokerage commissions, of $160.70 per share. As of December 31, 2023, the remaining amount authorized under the share repurchase program was $161.4 million.

Table of Contents

The following table shows a summary of our cash flows for the periods indicated (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| Net cash provided by operating activities | $ 1,092,007 | $ 1,271,977 | $ 778,507 |
| Net cash used in investing activities | (163,062) | (446,230) | (5,212,143) |
| Net cash (used in) provided by financing activities | (305,254) | (529,491) | 3,970,522 |
| Effect of exchange rates on cash and cash equivalents | 1,137 | (6,222) | (3,207) |
| Net increase (decrease) in cash and cash equivalents | $ 624,828 | $ 290,034 | $ (466,321) |

*Operating activities*

Net cash provided by operating activities decreased by $180.0 million in 2023 compared to 2022, primarily due to an increase in research and development expenses primarily related to zanidatamab, increased prepaid income taxes and increased interest expense on our outstanding term loan borrowings.

Net cash provided by operating activities increased by $493.5 million in 2022 compared to 2021, primarily due to cash received from increased sales of our products and decreased transaction and integration-related costs associated with the GW Acquisition.

*Investing activities*

Net cash used in investing activities decreased by $283.2 million in 2023 compared to 2022, primarily due to the following:

- $425.1 million decrease in upfront payments for acquired IPR&D primarily driven by the $375.0 million, $50.0 million and $15.0 million payments to Zymeworks, Sumitomo and Werewolf, respectively, in 2022, partially offset by the $18.0 million payment to Autifony in 2023; offset by
- $119.1 million net increase in the acquisition of investments, primarily time deposits; and
- $53.0 million upfront payment from Axsome in 2022 relating to the Sunosi U.S. disposition.

Net cash used in investing activities decreased by $4,765.9 million in 2022 compared to 2021, primarily due to the following:

- $6,234.8 million outflow in 2021 related to the net cash paid for the GW Acquisition; and
- $53.0 million upfront payment from Axsome in 2022 relating to the Sunosi U.S. disposition; offset by
- $1,069.2 million decrease in net proceeds from maturity of investments, primarily time deposits; and
- $444.1 million in upfront payments in 2022 for acquired IPR&D primarily driven by the $375.0 million, $50.0 million and $15.0 million payments to Zymeworks, Sumitomo and Werewolf, respectively.

*Financing activities*

Net cash used in financing activities decreased by $224.2 million in 2023 compared to 2022, primarily due to:

- Repayments of long-term debt of $31.0 million in 2023, compared to $582.0 million in 2022; offset by
- Share repurchases of $269.8 million in 2023; and
- A decrease of $51.6 million in proceeds from employee equity incentive and purchase plans.

Net cash (used in) provided by financing activities decreased by $4,500.0 million in 2022 compared to 2021, primarily due to:

- Net proceeds from issuance of borrowings under the Credit Agreement of $3,719.9 million and the Secured Notes of $1,471.5 million in 2021 that were used to fund, in part, the cash consideration payable in connection with the GW Acquisition; offset by
- Repayments of long-term debt of $582.0 million in 2022, compared to $1,320.6 million in 2021.

Table of Contents

**Credit Agreement**

On May 5, 2021, the Company, Jazz Financing Lux S.à.r.l., or Jazz Lux, and certain of our other subsidiaries, as borrowers, or, collectively with the Company and Jazz Lux, the "Borrowers", entered into the Credit Agreement by and among the Borrowers, the lenders and issuing banks from time to time party thereto, Bank of America, N.A., as administrative agent and U.S. Bank Trust Company, National Association, as collateral trustee, or the Credit Agreement, that provided for (i) the Dollar Term Loan which was drawn by Jazz Lux on the Closing Date in U.S. dollars (ii) the Euro Term Loan which was drawn by Jazz Lux on the Closing Date in Euros and (iii) the Revolving Credit Facility.

We used the proceeds from the Term Loan (i) to repay in full $575.9 million under that certain credit agreement, dated as of June 18, 2015 (as amended) among the Company, and certain of our other subsidiaries as borrowers, the lenders party thereto and Bank of America, N.A., as administrative agent and collateral agent, or the Existing Credit Agreement, (ii) to fund, in part, the cash consideration payable in connection with the GW Acquisition and (iii) to pay related fees and expenses. Upon the repayment in full of loans under the Existing Credit Agreement, it was terminated and all guarantees and liens thereunder were released.

In 2021, we made voluntary prepayments on the Euro Term Loan totaling €416.7 million, or $502.0 million, and in March 2022 we repaid the remaining outstanding principal of €208.3 million, or $251.0 million. The Euro Term Loan bore interest at the Euro Inter-Bank Offered Rate, or EURIBOR, plus an applicable margin. The applicable margin for the Euro Term Loan was 3.50%. During the term of the Euro Term Loan, the interest rate and effective interest rate were 4.43% and 4.93%, respectively.

In January 2024, Jazz Lux entered into an amendment, or Repricing Amendment, to the Credit Agreement. Upon entry into the Repricing Amendment, certain existing lenders converted outstanding Dollar Term Loans into a new tranche of U.S. dollar term loans, or the Tranche B-1 Dollar Term Loans, and Jazz Lux borrowed $201.9 million aggregate principal amount of additional Tranche B-1 Dollar Term Loans, the proceeds of which were used to repay the outstanding Dollar Term Loans that were not converted. The Tranche B-1 Dollar Term Loans are a separate class of term loans under the Credit Agreement with the same material terms (including with respect to maturity, prepayment, security, covenants and events of default) as the previously outstanding Dollar Term Loans, with the interest rate amended as described below. The principal amount of Dollar Term Loans outstanding immediately prior to the Repricing Amendment and the outstanding principal amount of Tranche B-1 Dollar Term Loans immediately following the Repricing Amendment, each totaled $2.723 billion. The Tranche B-1 Dollar Term Loans bear interest at a rate equal to either (a) U.S dollar Secured Overnight Financing Rate, or Term SOFR, or (b) the prime lending rate, in each case, plus an applicable margin. The applicable margin for the Tranche B-1 Dollar Term Loans is 3.00% (in the case of Term SOFR borrowings) and 2.00% (in the case of borrowings at the prime lending rate), a decrease of 50 basis points from the applicable margin on the Initial Dollar Term Loans. The Tranche B-1 Dollar Term Loans are subject to a Term SOFR floor of 0.50%. The applicable margin for the Revolving Credit Facility ranges from 3.25% to 2.75% (in the case of Term SOFR borrowings) and 2.25% to 1.75% (in the case of borrowings at the prime lending rate), depending on our first lien secured net leverage ratio level. The Tranche B-1 Dollar Term Loan is subject to a Term SOFR floor of 0.50% and loans under the Revolving Credit Facility are not subject to a floor. The Revolving Credit Facility has a commitment fee payable on the undrawn amount ranging from 0.50% to 0.40% per annum based upon our first lien secured net leverage ratio. As of December 31, 2023, the interest rate and effective interest rate on the Dollar Term Loan were 8.97% and 4.56%, respectively. Pursuant to the Repricing Amendment the interest rate and effective interest rate on the Tranche B-1 Dollar Term Loans are 8.90% and 9.50%, respectively. As of December 31, 2023, we had an undrawn Revolving Credit Facility totaling $500.0 million.

We may make voluntary prepayments at any time without payment of a premium or penalty, subject to certain exceptions, and are required to make certain mandatory prepayments of outstanding indebtedness under the Credit Agreement in certain circumstances. Principal repayments of the Dollar Term Loan, which were due quarterly, began in September 2021 and were equal to 1.0% per annum of the original principal amount of $3.1 billion with any remaining balance payable on the maturity date. In September 2022, we made a voluntary repayment on the Dollar Term Loan totaling $300.0 million. The Tranche B-1 Dollar Term Loans will amortize in quarterly installments equal to 0.284664830% of the initial principal amount thereof, with the remaining balance payable on May 5, 2028.

The Borrowers' obligations under the Credit Agreement and any hedging or cash management obligations entered into with any lender thereunder are guaranteed by the Company, the other borrowers, and each of the Company's other existing or subsequently acquired or organized direct and indirect subsidiaries (subject to certain exceptions), or the Guarantors. We refer to the Borrowers and the Guarantors collectively as the "Loan Parties".

The Loan Parties' obligations under the Credit Agreement are secured, subject to customary permitted liens and other exceptions, by a security interest in (a) all tangible and intangible assets of the Loan Parties, except for certain excluded assets, and (b) all of the equity interests of the subsidiaries of the Loan Parties held by the Loan Parties.

The Credit Agreement contains customary representations and warranties and customary affirmative and negative covenants applicable to the Company and its restricted subsidiaries, including, among other things, restrictions on indebtedness, liens, investments, mergers, dispositions, prepayment of junior indebtedness and dividends and other distributions. The Credit Agreement contains financial covenants that require the Company and its restricted subsidiaries to (a) not exceed a maximum first lien secured net leverage ratio and (b) not fall below a minimum interest coverage ratio, provided that such covenants apply only to the Revolving Credit Facility and are applicable only if amounts are drawn (or non-cash collateralized letters of credit in excess of $50 million are outstanding) under the Revolving Credit Facility. The Credit Agreement also contains customary events of default relating to, among other things, failure to make payments, breach of covenants and breach of representations.

**2029 Senior Secured Notes**

*2029 Notes*. On April 29, 2021, Jazz Securities Designated Activity Company, or Jazz Securities, our direct wholly owned subsidiary, closed the offering of the Secured Notes in a private placement. We used the proceeds from the Secured Notes to fund, in part, the cash consideration payable in connection with the GW Acquisition.

Interest on the Secured Notes is payable semi-annually in arrears on January 15 and July 15 of each year, beginning on January 15, 2022, at a rate of 4.375% per year. The Secured Notes mature on January 15, 2029.

The Secured Notes are jointly and severally guaranteed by us and each of our restricted subsidiaries, other than Jazz Securities, that is a borrower, or a guarantor, under the Credit Agreement. The Secured Notes and related guarantees are secured by a first priority lien (subject to permitted liens and certain other exceptions), equally and ratably with the Credit Agreement, on the collateral securing the Credit Agreement.

Except as described below, the Secured Notes may not be optionally redeemed before July 15, 2024. Thereafter, some or all of the Secured Notes, may be redeemed at any time and from time to time at a specified redemption prices, plus accrued and unpaid interest, if any, to, but excluding, to the redemption date. Jazz Securities may redeem all but not part of the Secured Notes at its option at any time in connection with certain tax-related events and may redeem some or all of the Secured Notes at any time and from time to time prior to July 15, 2024 at a price equal to 100% of the principal amount of the Secured Notes to be redeemed plus a "make whole" premium, plus accrued and unpaid interest, if any, to, but excluding, the redemption date. In addition, Jazz Securities may redeem up to 40% of the aggregate principal amount of the Secured Notes at any time and from time to time prior to July 15, 2024, with the net proceeds of certain equity offerings at a price of 104.375% of the principal amount of such Secured Notes, plus accrued and unpaid interest, if any, to, but excluding, the redemption date. In addition, during each of the three consecutive twelve-month periods commencing on the issue date of the Secured Notes, Jazz Securities may redeem up to 10% of the original aggregate initial principal amount of the Secured Notes at a redemption price of 103% of the principal amount of such Secured Notes, plus accrued and unpaid interest, if any, to, but excluding, the redemption date.

If we undergo a change of control, Jazz Securities will be required to make an offer to purchase all of the Secured Notes at a purchase price in cash equal to 101% of the principal amount thereof, plus accrued and unpaid interest, if any, to, but excluding, the date of repurchase, subject to certain exceptions.

The indenture governing the Secured Notes contains customary affirmative covenants and negative covenants applicable to us and our restricted subsidiaries, including, among other things, restrictions on indebtedness, liens, investments, mergers, dispositions, prepayment of junior indebtedness and dividends and other distributions. If Jazz Securities or our restricted subsidiaries engage in certain asset sales, Jazz Securities will be required under certain circumstances to make an offer to purchase the Secured Notes at 100% of the principal amount, plus accrued and unpaid interest, if any, to, but excluding, the repurchase date.

As of December 31, 2023, the interest rate and effective interest rate on the Secured Notes were 4.375% and 4.64%, respectively.

**Exchangeable Senior Notes**

*2026 Notes*. In the second quarter of 2020, Jazz Investments I Limited, our wholly owned subsidiary, completed a private placement of $1.0 billion principal amount of the 2026 Notes. We used a portion of the net proceeds from this offering to repurchase for cash $332.9 million aggregate principal amount of the 1.875% exchangeable senior notes due 2021, or the 2021 Notes, through privately-negotiated transactions concurrently with the offering of the 2026 Notes. Interest on the 2026 Notes is payable semi-annually in cash in arrears on June 15 and December 15 of each year, beginning on December 15, 2020, at a rate of 2.00% per year. In certain circumstances, we may be required to pay additional amounts as a result of any applicable tax withholding or deductions required in respect of payments on the 2026 Notes. The 2026 Notes mature on June 15, 2026, unless earlier exchanged, repurchased or redeemed.

The holders of the 2026 Notes have the ability to require us to repurchase all or a portion of their 2026 Notes for cash in the event we undergo certain fundamental changes, such as specified change of control transactions, our liquidation or dissolution or the delisting of our ordinary shares from any of The New York Stock Exchange, The Nasdaq Global Market, The

90

Table of Contents

Nasdaq Global Select Market or The Nasdaq Capital Market (or any of their respective successors). Additionally, the terms and covenants in the indenture related to the 2026 Notes include certain events of default after which the 2026 Notes may be due and payable immediately. Prior to June 15, 2026, we may redeem the 2026 Notes, in whole but not in part, subject to compliance with certain conditions, if we have, or on the next interest payment date would, become obligated to pay to the holder of any 2026 Notes additional amounts as a result of certain tax-related events. We also may redeem the 2026 Notes on or after June 20, 2023 and prior to March 15, 2026, in whole or in part, if the last reported sale price per ordinary share has been at least 130% of the exchange price then in effect for at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period ending on, and including, the trading day immediately preceding the date on which we provide the notice of redemption.

The 2026 Notes are exchangeable at an initial exchange rate of 6.4182 ordinary shares per $1,000 principal amount of 2026 Notes, which is equivalent to an initial exchange price of approximately $155.81 per ordinary share. Upon exchange, the 2026 Notes may be settled in cash, ordinary shares or a combination of cash and ordinary shares, at our election. Our intent and policy is to settle the principal amount of the 2026 Notes in cash upon exchange. The exchange rate will be subject to adjustment in some events but will not be adjusted for any accrued and unpaid interest. In addition, following certain make-whole fundamental changes occurring prior to the maturity date of the 2026 Notes or upon our issuance of a notice of redemption, we will in certain circumstances increase the exchange rate for holders of the 2026 Notes who elect to exchange their 2026 Notes in connection with that make-whole fundamental change or during the related redemption period. Prior to March 15, 2026, the 2026 Notes will be exchangeable only upon satisfaction of certain conditions and during certain periods, and thereafter, at any time until the close of business on the second scheduled trading day immediately preceding the maturity date.

*2024 Notes.* In 2017, our wholly owned subsidiary Jazz Investments I Limited, completed a private placement of $575.0 million principal amount of 2024 Notes. We used the net proceeds from this offering to repay $500.0 million in outstanding loans under the revolving credit facility under the amended credit agreement and to pay related fees and expenses. We used the remainder of the net proceeds for general corporate purposes. The 2024 Notes are senior unsecured obligations of Jazz Investments I Limited and are fully and unconditionally guaranteed on a senior unsecured basis by Jazz Pharmaceuticals plc and will rank pari passu in right of payment with the existing 2021 Notes. Interest on the 2024 Notes is payable semi-annually in cash in arrears on February 15 and August 15 of each year, beginning on February 15, 2018, at a rate of 1.50% per year. In certain circumstances, we may be required to pay additional amounts as a result of any applicable tax withholding or deductions required in respect of payments on the 2024 Notes. The 2024 Notes mature on August 15, 2024, unless earlier exchanged, repurchased or redeemed.

The holders of the 2024 Notes have the ability to require us to repurchase all or a portion of their 2024 Notes for cash in the event we undergo certain fundamental changes, such as specified change of control transactions, our liquidation or dissolution or the delisting of our ordinary shares from The Nasdaq Global Select Market. Prior to August 15, 2024, we may redeem the 2024 Notes, in whole but not in part, subject to compliance with certain conditions, if we have, or on the next interest payment date would, become obligated to pay to the holder of any 2024 Notes additional amounts as a result of certain tax-related events. We also may redeem the 2024 Notes on or after August 20, 2021, in whole or in part, if the last reported sale price per ordinary share has been at least 130% of the exchange price then in effect for at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period ending on, and including, the trading day immediately preceding the date on which we provide the notice of redemption.

The 2024 Notes are exchangeable at an initial exchange rate of 4.5659 ordinary shares per $1,000 principal amount of 2024 Notes, which is equivalent to an initial exchange price of approximately $219.02 per ordinary share. In August 2023, we made an irrevocable election to fix the settlement method for exchanges of the 2024 Notes to a combination of cash and our ordinary shares with a specified cash amount per $1,000 principal amount of the 2024 Notes of $1,000. The exchange rate will be subject to adjustment in some events but will not be adjusted for any accrued and unpaid interest. In addition, following certain make-whole fundamental changes occurring prior to the maturity date of the 2024 Notes or upon our issuance of a notice of redemption, we will in certain circumstances increase the exchange rate for holders of the 2024 Notes who elect to exchange their 2024 Notes in connection with that make-whole fundamental change or during the related redemption period. Prior to May 15, 2024, the 2024 Notes will be exchangeable only upon satisfaction of certain conditions and during certain periods, and thereafter, at any time until the close of business on the second scheduled trading day immediately preceding the maturity date.

**Contractual Obligations**

Our primary contractual obligations relate to our outstanding indebtedness, as described above. We also have obligations under lease agreements and third-party manufacturing agreements. For information relating to our scheduled maturities with respect to our long-term debt and our lease liabilities see Note 12 Debt and Note 13 Leases, respectively, and for information relating to our noncancelable purchase commitments due within one year see Note 14 Commitments and Contingencies, included in the Notes to Consolidated Financial Statements, included in Part IV of this Annual Report on Form 10-K. Our long-term noncancelable purchase commitments were $36.7 million at December 31, 2023, primarily related to agreements with third party manufactures.

We also have potential future milestone payments or royalty obligations to third parties under asset purchase, product development, license and other agreements as the timing and likelihood of such milestone payments are not known, and, in the case of royalty obligations, as the amount of such obligations are not estimable. Our contingent obligations to third parties, in the form of development, regulatory and sales-based milestone payments, as of December 31, 2023 included $1,387.5 million under our license and collaboration agreement with Zymeworks, $1,255.0 million under our global license and collaboration agreement with Werewolf, $1,090.0 million under our license agreement with Sumitomo, $752.5 million under our license and collaboration agreement with Autifony, $681.0 million under our amended license agreement with PharmaMar, $595.0 million under asset purchase and collaboration agreements with Redx, $375.0 million under the asset purchase and exclusive license agreement with SpringWorks Therapeutics, Inc., $260.0 million in connection with our acquisition of Cavion, $155.5 million under our license agreement with Ligand, and $494.9 million related to other agreements.

**Critical Accounting Policies and Significant Estimates**

A critical accounting policy is one that is both important to the portrayal of our financial condition and results of operations and requires management's most difficult, subjective or complex judgments, often as a result of the need to make estimates about the effect of matters that are inherently uncertain. While our significant accounting policies are described in more detail in Note 2, Summary of Significant Accounting Policies, of the Notes to Consolidated Financial Statements included in Part IV of this Annual Report on Form 10-K, we believe the following accounting estimates and policies to be critical.

***Revenue Recognition***

Revenues are recognized when control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration we expect to be entitled to in exchange for those goods or services.

*Product Sales, Net*

Product sales revenue is recognized when control has transferred to the customer, which occurs at a point in time, which is typically on delivery to the customer or, in the case of products that are subject to consignment agreements, when the customer removes product from our consigned inventory location for shipment directly to a patient.

*Items Deducted from Gross Product Sales.* Revenues from sales of products are recorded net of government rebates and rebates under managed care plans and commercial payor contracts, estimated allowances for sales returns, government chargebacks, prompt payment discounts, patient coupon programs, and specialty distributor and wholesaler fees. Calculating certain of these items involves estimates and judgments based on sales or invoice data, contractual terms, historical utilization rates, new information regarding changes in applicable regulations and guidelines that would impact the amount of the actual rebates, our expectations regarding future utilization rates and channel inventory data. We review the adequacy of our provisions for sales deductions on a quarterly basis. Amounts accrued for sales deductions are adjusted when trends or significant events indicate that adjustment is appropriate and to reflect actual experience. The most significant items deducted from gross product sales where we exercise judgment are rebates, sales returns and chargebacks.

The following table presents the activity and ending balances for our sales-related accruals and allowances (in thousands):

| | Rebates Payable | Sales Returns Reserve | Chargebacks | Discounts and Distributor Fees | Total |
|---|---|---|---|---|---|
| Balance at December 31, 2020 | $ 110,885 | $ 18,368 | $ 5,293 | $ 16,793 | $ 151,339 |
| GW Acquisition | 53,872 | 5 | 1,322 | 3,260 | 58,459 |
| Provision, net | 440,776 | (1,765) | 91,425 | 125,859 | 656,295 |
| Payments/credits | (409,818) | (794) | (86,651) | (124,104) | (621,367) |
| Balance at December 31, 2021 | 195,715 | 15,814 | 11,389 | 21,808 | 244,726 |
| Provision, net | 630,295 | 13,222 | 135,854 | 186,609 | 965,980 |
| Payments/credits | (528,209) | (2,872) | (132,622) | (190,062) | (853,765) |
| Balance at December 31, 2022 | 297,801 | 26,164 | 14,621 | 18,355 | 356,941 |
| Provision, net | 651,209 | 2,485 | 185,886 | 179,688 | 1,019,268 |
| Payments/credits | (640,566) | (8,214) | (185,575) | (174,814) | (1,009,169) |
| Balance at December 31, 2023 | $ 308,444 | $ 20,435 | $ 14,932 | $ 23,229 | $ 367,040 |

Total items deducted from gross product sales were $1,019.3 million, $966.0 million and $656.3 million, or 21.4%, 21.0% and 17.6% as a percentage of gross product sales, in 2023, 2022 and 2021, respectively. Included in these amounts are immaterial adjustments related to prior-year sales due to changes in estimates.

*Rebates*

We are subject to rebates on sales made under governmental and managed-care pricing programs and commercial payor contracts in the U.S. The largest of these rebates is associated with sales covered by Medicaid. We participate in state government-managed Medicaid programs as well as certain other qualifying federal and state government programs under the terms of which discounts and rebates are provided to participating government entities. We offer rebates and discounts to managed health care organizations and commercial payors in the U.S. In estimating our provisions for rebates, we consider relevant statutes with respect to governmental pricing programs and contractual sales terms with managed-care providers, commercial payors and group purchasing organizations. We estimate the rebate provision based on historical utilization rates, historical payment experience, new information regarding changes in regulations and guidelines that would impact the amount of the actual rebates, our expectations regarding future utilization rates and channel inventory data obtained from our major distributors in accordance with our inventory management agreements. Estimating these rebates is complex, in part due to the time delay between the date of sale and the actual settlement of the liability. We believe that the methodology we use to estimate rebates on product sales made under governmental and managed-care pricing programs is reasonable and appropriate given current facts and circumstances. However, estimates may vary from actual experience.

Rebates were $651.2 million, $630.3 million and $440.8 million, or 13.7%, 13.7% and 11.8% as a percentage of gross product sales, in 2023, 2022 and 2021, respectively. Rebates as a percentage of gross product sales in 2023 were in line with 2022. Rebates as a percentage of gross product sales increased in 2022 compared to 2021, primarily due to the entry into additional contracts with commercial payors and a full year of Epidiolex in our product portfolio. Rebates as a percentage of gross product sales are expected to increase in 2024 compared to 2023, primarily due to rebate rate increases and new government rebates.

*Sales returns*

For certain products, we allow customers to return product within a specified period before and after the applicable expiration date and issue credits which may be applied against existing or future invoices. We account for sales returns as a reduction in net revenue at the time a sale is recognized by establishing an accrual in an amount equal to the estimated value of products expected to be returned. The sales return accrual is estimated principally based on historical experience, the level and estimated shelf life of inventory in the distribution channel, our return policy and expected market events including generic competition.

Sales returns were $2.5 million, $13.2 million and $(1.8) million, or 0.1%, 0.3% and (0.1)% as a percentage of gross product sales in 2023, 2022 and 2021, respectively. Sales returns as a percentage of gross product sales are not expected to change materially in 2024 compared to 2023.

*Chargebacks*

We participate in chargeback programs with a number of entities, principally Federal Supply Schedule, Group Purchasing Organizations, and other public parties, under which pricing on products below wholesalers' list prices is provided to

Table of Contents

participating entities. These entities purchase product through wholesalers at the contract price and the wholesalers charge back to us the difference between their acquisition cost and the lower negotiated price. We record the difference as allowances against accounts receivable. We determine our estimate of the chargebacks provision primarily based on historical experience on a product and program basis, current contract prices under the chargeback programs and channel inventory data.

Chargebacks were $185.9 million, $135.9 million and $91.4 million, or 3.9%, 2.9% and 2.4% as a percentage of gross product sales in 2023, 2022 and 2021, respectively. Chargebacks as a percentage of gross product sales increased in 2023 compared to 2022 primarily due to higher chargeback utilization. Chargebacks as a percentage of gross product sales increased in 2022 compared to 2021 primarily due to higher chargeback utilization and a full year of Epidiolex in our product portfolio. Chargebacks as a percentage of gross product sales are not expected to change materially in 2024 compared to 2023.

*Discounts and distributor fees*

Discounts and distributor fees comprise prompt payment discounts, patient coupon programs and specialty distributor and wholesaler fees. We offer customers a cash discount on gross product sales as an incentive for prompt payment. We estimate provisions for prompt pay discounts based on contractual sales terms with customers and historical payment experience. To help patients afford our products, we have various programs to assist them, including patient assistance programs, a free product voucher program and co-pay coupon programs for certain products. We estimate provisions for these programs primarily based on expected program utilization, adjusted as necessary to reflect our actual experience on a product and program basis. Specialty distributor and wholesaler fees comprise fees for distribution of our products. We estimate provisions for distributor and wholesaler fees primarily based on sales volumes and contractual terms with our distributors.

Discounts and distributor fees were $179.7 million, $186.6 million and $125.9 million, or 3.8%, 4.1% and 3.4% as a percentage of gross product sales in 2023, 2022 and 2021, respectively. Discounts and distributor fees as a percentage of gross product sales in 2023 were broadly in line with 2022. Discounts and distributor fees as a percentage of gross product sales increased in 2022 compared to 2021, primarily due to a full year of Epidiolex in our product portfolio. Discounts and distributor fees as a percentage of gross product sales are not expected to change materially in 2024 compared to 2023.

***Acquisitions and Valuation of Intangibles***

We make certain judgments to determine whether transactions should be accounted for as acquisitions of assets or as business combinations. If it is determined that substantially all of the fair value of gross assets acquired in a transaction is concentrated in a single asset (or a group of similar assets), the transaction is treated as an acquisition of assets. We evaluate the inputs, processes, and outputs associated with the acquired set of activities. If the assets in a transaction include an input and a substantive process that together significantly contribute to the ability to create outputs, the transaction is treated as an acquisition of a business.

We account for business combinations using the acquisition method of accounting, which requires that assets acquired and liabilities assumed generally be recorded at their fair values as of the acquisition date. Goodwill represents the excess of the acquisition consideration over the fair value of assets acquired and liabilities assumed. We test goodwill for impairment annually in October and when events or changes in circumstances indicate that the carrying value may not be recoverable. We have determined that we operate in a single segment and have a single reporting unit associated with the development and commercialization of pharmaceutical products. In performing the annual impairment test, the fair value of the reporting unit is compared to its corresponding carrying value, including goodwill. If the carrying value exceeds the fair value of the reporting unit an impairment loss will be recognized for the amount by which the reporting unit's carrying amount exceeds its fair value, not to exceed the carrying amount of goodwill. We have determined the fair value of our single reporting unit to be equal to our market capitalization, as determined by our traded share price, plus a control premium. The control premium used was based on a review of such premiums identified in recent acquisitions of companies of similar size and in similar industries. We performed our annual goodwill impairment test in October 2023 and concluded that goodwill was not impaired as the fair value of the reporting unit significantly exceeded its carrying amount, including goodwill. As of December 31, 2023, we had $1.8 billion of goodwill resulting from acquisitions accounted for as business combinations.

In transactions accounted for as acquisitions of assets, no goodwill is recorded and contingent consideration such as payments upon achievement of various developmental, regulatory and commercial milestones generally is not recognized at the acquisition date. In an asset acquisition, upfront payments allocated to IPR&D projects at the acquisition date are expensed unless there is an alternative future use. In addition, product development milestones are expensed upon achievement.

Table of Contents

*Valuation of Intangible Assets*

We have acquired, and expect to continue to acquire, intangible assets through asset acquisitions or business combinations. When significant identifiable intangible assets are acquired, we engage an independent third party valuation firm to assist in determining the fair values of these assets as of the acquisition date. Discounted cash flow models are typically used in these valuations, which require the use of significant estimates and assumptions, including but not limited to:

- estimating the timing of and expected costs to complete the in-process projects;

- projecting regulatory approvals;

- estimating future cash flows including revenues and operating profits resulting from completed products and in-process projects; and

- developing appropriate discount rates and probability rates by project.

We believe the fair values that we assign to the intangible assets acquired are based upon reasonable estimates and assumptions given available facts and circumstances as of the acquisition dates. No assurance can be given, however, that the underlying assumptions used to estimate expected cash flows will transpire as estimated. In addition, we are required to estimate the period of time over which to amortize the intangible assets, which requires significant judgment.

*Impairment of Intangible Assets*

Finite-lived intangible assets consist primarily of purchased developed technology and are amortized on a straight-line basis over their estimated useful lives, which range from seven to sixteen years. The estimated useful lives associated with intangible assets are consistent with the estimated lives of the products and may be modified when circumstances warrant. Intangible assets with finite lives are reviewed for impairment whenever events or circumstances indicate that the carrying value of an asset may not be recoverable. Events giving rise to impairment are an inherent risk in the pharmaceutical industry and cannot be predicted. Factors that we consider in deciding when to perform an impairment review include significant under-performance of a product in relation to expectations, significant negative industry or economic trends, and significant changes or planned changes in our use of the assets. An impairment loss would be recognized when estimated undiscounted future cash flows expected to result from the use of the asset and its eventual disposition are less than its carrying amount. Estimating future cash flows related to an intangible asset involves estimates and assumptions. If our assumptions are not correct, there could be an impairment loss or, in the case of a change in the estimated useful life of the asset, a change in amortization expense.

IPR&D is not amortized but is tested for impairment annually or when events or circumstances indicate that the fair value may be below the carrying value of the asset. If the carrying value of the assets is not expected to be recovered, the assets are written down to their estimated fair values.

As of December 31, 2023, we had $5.4 billion of finite-lived intangible assets, of which $3.8 billion related to the Epidiolex intangible asset which we acquired in the GW Acquisition and $1.1 billion related to the Vyxeos intangible asset which we acquired in the Celator Acquisition. As part of our annual impairment assessment, we reviewed these intangible assets as of December 31, 2023 and determined the carrying value is recoverable. Cash flow models used in our assessment are based on our commercial experience to date and require the use of significant estimates, which include, but are not limited to, patient-related assumptions, including patient population and segmentation, patient growth and treatment rates, and long-range pricing expectations.

We did not recognize an impairment charge related to our intangible assets in 2023 or 2021. In 2022, we recorded an acquired IPR&D asset impairment charge of $133.6 million as a result of the decision to discontinue our nabiximols program.

Please refer to Note 10, Goodwill and Intangible Assets, of the Notes to Consolidated Financial Statements included in Part IV of this Annual Report on Form 10-K, for further information about our intangible assets and the remaining useful lives of our finite-lived intangible assets as of December 31, 2023.

### Income Taxes

We use the asset and liability method of accounting for income taxes. Under this method, deferred tax assets and liabilities are determined based on differences between the financial statement carrying amount and the tax basis of assets and liabilities and are measured using enacted tax rates and laws that will be in effect when the differences are expected to reverse. We provide a valuation allowance when it is more-likely-than-not that deferred tax assets will not be realized.

Our most significant tax jurisdictions are Ireland, the U.K. and the U.S. Certain estimates are required in determining our expense for income taxes. Some of these estimates are based on management's interpretations of jurisdiction-specific tax laws or regulations and the likelihood of settlement related to tax audit issues. Various internal and external factors may have favorable or unfavorable effects on our future effective income tax rate. These factors include, but are not limited to, changes

Table of Contents

in tax laws, regulations and/or rates, changing interpretations of existing tax laws or regulations, changes in estimates of prior years' items, the impact of accounting for share-based compensation, changes in our international organization, likelihood of settlement, and changes in overall levels of income before taxes.

Realization of our deferred tax assets is dependent upon the generation of future taxable income, the amount and timing of which are uncertain. In evaluating our ability to recover our deferred tax assets, we consider all available positive and negative evidence, including cumulative income in recent fiscal years, our forecast of future taxable income exclusive of certain reversing temporary differences and significant risks and uncertainties related to our business. In determining future taxable income, we are responsible for assumptions utilized including the amount of state, federal and international pre-tax operating income, the reversal of certain temporary differences and the implementation of feasible and prudent tax planning strategies. These assumptions require significant judgment about the forecasts of future taxable income in applicable tax jurisdictions, which are based on our commercial experience to date and are consistent with the plans and estimates that we are using to manage our underlying business.

We maintain a valuation allowance against certain other deferred tax assets where realizability is not certain. We periodically evaluate the likelihood of the realization of deferred tax assets and reduce the carrying amount of these deferred tax assets by a valuation allowance to the extent we believe a portion will not be realized. This determination depends on a variety of factors, some of which are subjective, including our recent cumulative earnings experience by taxing jurisdiction, expectations of future taxable income, carryforward periods available to us for tax reporting purposes, various income tax strategies and other relevant factors. If we determine that the deferred tax assets are not realizable in a future period, we would record material changes to income tax expense in that period.

We have also provided for unrecognized tax benefits that we believe are not more-likely-than-not to be sustained upon examination by tax authorities. The evaluation of unrecognized tax benefits is based on factors that include, but are not limited to, changes in tax law, the measurement of tax positions taken or expected to be taken in tax returns, the effective settlement of matters subject to audit, new audit activity and changes in facts or circumstances related to a tax position. We evaluate unrecognized tax benefits on a quarterly basis and adjust the level of the liability to reflect any subsequent changes in the relevant facts surrounding the uncertain positions. Our liabilities for unrecognized tax benefits can be relieved only if the contingency becomes legally extinguished through either payment to the taxing authority or the expiration of the statute of limitations, the recognition of the benefits associated with the position meet the more-likely-than-not threshold or the liability becomes effectively settled through the examination process. We consider matters to be effectively settled once the taxing authority has completed all of its required or expected examination procedures, including all appeals and administrative reviews. We also accrue for potential interest and penalties related to unrecognized tax benefits in income tax expense (benefit).

**Recent Accounting Pronouncements**

For a discussion of recent accounting pronouncements, please see Note 2, Summary of Significant Accounting Policies, of the Notes to Consolidated Financial Statements included in Part IV of this Annual Report on Form 10-K.

**Item 7A.      Quantitative and Qualitative Disclosures About Market Risk**

*Interest Rate Risk*. The primary objectives of our investment policy, in order of priority, are as follows: safety and preservation of principal and diversification of risk; liquidity of investments sufficient to meet cash flow requirements; and competitive yield. Although our investments are subject to market risk, our investment policy specifies credit quality standards for our investments and limits the amount of credit exposure from any single issue, issuer or certain types of investment. Our investment policy allows us to maintain a portfolio of cash equivalents and short-term investments in a variety of securities, including U.S. federal government and federal agency securities, corporate bonds or commercial paper issued by U.S. corporations, money market instruments, certain qualifying money market mutual funds, certain repurchase agreements, and tax-exempt obligations of states, agencies and municipalities in the U.S. Our cash equivalents and investments as of December 31, 2023 consisted of money market funds and time deposits which are not subject to significant interest rate risk.

We are exposed to risks associated with changes in interest rates in connection with our term loan borrowings. In May 2021 we entered into a credit agreement, or the Credit Agreement, that provides for (i) a seven-year $3.1 billion term loan B facility, or the Dollar Term Loan, (ii) a seven-year €625.0 million term loan B facility, or the Euro Term Loan and, together with the Dollar Term Loan, collectively known as the Term Loan and (iii) a five-year $500.0 million revolving credit facility, or the Revolving Credit Facility. There were no borrowings outstanding under the Revolving Credit Facility or the Euro Term Loan as of December 31, 2023. Dollar Term Loan borrowings of $2.7 billion were outstanding as of December 31, 2023 and subject to a U.S. dollar Secured Overnight Financing Rate, or Term SOFR, floor of 0.50%. In January 2024 we completed a repricing of the Dollar Term Loan, at par, which resulted in a 50-basis point margin reduction. The applicable margin for the Dollar Term Loan is now 3.00% (in the case of Term SOFR) and 2.00% (in the case of borrowings at the prime lending rate).

Table of Contents

To achieve a desired mix of floating and fixed interest rates on our Dollar Term Loan, we entered into interest rate swap agreements in April 2023. The interest rate swap agreements have a notional amount of $500.0 million and are effective until April 2026. As a result of these agreements, the interest rate on a portion of our term loan borrowings is fixed at 3.9086%, plus the borrowing spread, until April 30, 2026. The net asset fair value of outstanding interest rate swap contracts was $0.4 million as of December 31, 2023. The impact of a hypothetical increase or decrease in interest rates on the fair value of the interest rate swap contracts would be offset by a change in the value of the underlying liability. If interest rates were to increase or decrease by 1%, interest expense for 2024 would increase or decrease by approximately $22.1 million, based on the unhedged portion of our outstanding variable rate borrowings.

In April 2021, we issued $1.5 billion in aggregate principal amount of 4.375% senior secured notes, due 2029, or the Secured Notes. In 2017, we completed a private placement of $575.0 million aggregate principal amount of 1.50% exchangeable senior notes due 2024, or the 2024 Notes, and in June 2020, we completed a private offering of $1.0 billion aggregate principal amount of 2.00% exchangeable senior notes due 2026, or the 2026 Notes.

The Secured Notes, the 2024 Notes and the 2026 Notes have fixed annual interest rates of 4.375%, 1.50% and 2.00%, respectively, and we therefore do not have economic interest rate exposure on the Secured Notes, the 2024 Notes and the 2026 Notes. However, the fair values of the Secured Notes, the 2024 Notes and the 2026 Notes are exposed to interest rate risk. Generally, the fair values of the Secured Notes, the 2024 Notes and the 2026 Notes will increase as interest rates fall and decrease as interest rates rise. The fair values of the 2024 Notes and the 2026 Notes are also affected by volatility in our ordinary share price. As of December 31, 2023 the fair values of the Secured Notes, the 2024 Notes and the 2026 Notes were estimated to be approximately $1.4 billion, $559.0 million and $1.0 billion, respectively.

*Foreign Currency Exchange Rate Risk.* We have significant operations in Europe as well as in the U.S. The functional currency of each foreign subsidiary is generally the local currency. We are exposed to foreign currency exchange risk as the functional currency financial statements of foreign subsidiaries are translated to U.S. dollars. The assets and liabilities of our foreign subsidiaries having a functional currency other than the U.S. dollar are translated into U.S. dollars at the exchange rate prevailing at the balance sheet date, and at the average exchange rate for the reporting period for revenue and expense accounts. The cumulative foreign currency translation adjustment is recorded as a component of accumulated other comprehensive loss in shareholders' equity. The reported results of our foreign subsidiaries will be influenced by their translation into U.S. dollars by currency movements against the U.S. dollar. Our primary currency translation exposure is related to our subsidiaries that have functional currencies denominated in sterling and euro. A hypothetical 10% strengthening or weakening in the rates used to translate the results of our foreign subsidiaries that have functional currencies denominated in sterling and euro would have increased or decreased net income for the year ended December 31, 2023 by approximately $86.8 million and $4.6 million, respectively.

Transactional exposure arises where transactions occur in currencies other than the functional currency. Transactions in foreign currencies are recorded at the exchange rate prevailing at the date of the transaction. The resulting monetary assets and liabilities are translated into the appropriate functional currency at exchange rates prevailing at the balance sheet date and the resulting gains and losses are reported in foreign exchange gain (loss) in the consolidated statements of income (loss). As of December 31, 2023, our exposure to transaction risk primarily related to sterling and euro denominated net monetary liabilities, including intercompany loans, held by subsidiaries with a U.S. dollar functional currency. We have entered into foreign exchange forward contracts to manage this currency risk. These foreign exchange forward contracts are not designated as hedges; gains and losses on these derivative instruments are designed to offset gains and losses on the underlying balance sheet exposures. As of December 31, 2023, we held foreign exchange forward contracts with notional amounts totaling $511.7 million. The net asset fair value of outstanding foreign exchange forward contracts was $17.4 million as of December 31, 2023. Based on our foreign currency exchange rate exposures as of December 31, 2023, a hypothetical 10% adverse fluctuation in exchange rates would decrease the fair value of our foreign exchange forward contracts by approximately $38.9 million. The resulting loss on these forward contracts would be offset by a positive impact on the underlying monetary assets and liabilities.

**Item 8.**        **Financial Statements and Supplementary Data**

Our consolidated financial statements as listed below are included in this Annual Report on Form 10-K as pages F-1 through F-44.

| | Page |
|---|---|
| **Jazz Pharmaceuticals plc** | |
| Report of Independent Registered Public Accounting Firm (KPMG, Dublin, Ireland, Auditor Firm ID: 1116) | F-1 |
| Consolidated Balance Sheets | F-3 |
| Consolidated Statements of Income (Loss) | F-4 |
| Consolidated Statements of Comprehensive Income (Loss) | F-5 |
| Consolidated Statements of Shareholders' Equity | F-6 |
| Consolidated Statements of Cash Flows | F-8 |
| Notes to Consolidated Financial Statements | F-10 |

**Item 9.**        **Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

Not applicable.

**Item 9A.**        **Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures.* We have carried out an evaluation under the supervision and with the participation of management, including our principal executive officer and interim principal financial officer, of our disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on their evaluation, our principal executive officer and interim principal financial officer concluded that our disclosure controls and procedures were effective as of December 31, 2023.

*Limitations on the Effectiveness of Controls.* A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues, if any, within an organization have been detected. Accordingly, our disclosure controls and procedures are designed to provide reasonable, not absolute, assurance that the objectives of our disclosure control system are met and, as set forth above, our principal executive officer and interim principal financial officer have concluded, based on their evaluation as of the end of the period covered by this report, that our disclosure controls and procedures were effective to provide reasonable assurance that the objectives of our disclosure control system were met.

*Changes in Internal Control over Financial Reporting.* During the quarter ended December 31, 2023, there were no changes to our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

*Management's Report on Internal Control over Financial Reporting.* The following report is provided by management in respect of our internal control over financial reporting (as defined in Rule 13a-15(f) and 15d-15(f) of the Exchange Act):

1.    Our management is responsible for establishing and maintaining adequate internal control over financial reporting.

2.    Our management used the Committee of Sponsoring Organizations of the Treadway Commission Internal Control - Integrated Framework (2013), or the COSO framework, to evaluate the effectiveness of internal control over financial reporting. Management believes that the COSO framework is a suitable framework for its evaluation of financial reporting because it is free from bias, permits reasonably consistent qualitative and quantitative measurements of our internal control over financial reporting, is sufficiently complete so that those relevant factors that would alter a conclusion about the effectiveness of our internal control over financial reporting are not omitted and is relevant to an evaluation of internal control over financial reporting.

3.    Management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2023 and has concluded that such internal control over financial reporting was effective. There were no material weaknesses in internal control over financial reporting identified by management.

4.    KPMG, our independent registered public accounting firm, has audited the consolidated financial statements of Jazz Pharmaceuticals plc as of and for the year ended December 31, 2023, included herein, and has issued an audit report on our internal control over financial reporting, which is included below.

Table of Contents

### Report of Independent Registered Public Accounting Firm

To the Shareholders and Board of Directors
Jazz Pharmaceuticals plc:

*Opinion on Internal Control Over Financial Reporting*

We have audited Jazz Pharmaceuticals plc and subsidiaries' (the Company) internal control over financial reporting as of December 31, 2023, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2023, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2023 and 2022, the related consolidated statements of income (loss), comprehensive income (loss), shareholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2023, and the related notes and financial statement schedules at item 15(a)2 (collectively, 'the consolidated financial statements'), and our report dated February 28, 2024 expressed an unqualified opinion on those consolidated financial statements.

*Basis for Opinion*

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Managements Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

*Definition and Limitations of Internal Control Over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ KPMG

Dublin, Ireland
February 28, 2024

Table of Contents

**Item 9B.      Other Information**

**Insider Trading Arrangements**

During the quarter ended December 31, 2023, no director or Section 16 officer adopted or terminated any Rule 10b5-1 trading arrangements or non-Rule 10b5-1 trading arrangements.

**Item 9C.      Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

Not applicable.

<div align="center">

**PART III**

</div>

Certain information required by Part III is omitted from this Annual Report on Form 10-K and incorporated by reference to our definitive proxy statement for our 2024 annual general meeting of shareholders, or our 2024 Proxy Statement, to be filed pursuant to Regulation 14A of the Securities Exchange Act of 1934, as amended, or Exchange Act. If our 2024 Proxy Statement is not filed within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K, the omitted information will be included in an amendment to this Annual Report on Form 10-K filed not later than the end of such 120-day period.

**Item 10.      Directors, Executive Officers and Corporate Governance**

The information required by this item is to be included in our 2024 Proxy Statement as follows and is incorporated by reference:

- The information relating to our directors and nominees for director is to be included in the section entitled "Proposal 1—Election of Directors;"

- The information relating to our executive officers is to be included in the section entitled "Executive Officers;"

- The information relating to our audit committee, audit committee financial expert and procedures by which shareholders may recommend nominees to our board of directors is to be included in the section entitled "Corporate Governance and Board Matters;" and

- If required, the information regarding compliance with Section 16(a) of the Exchange Act is to be included in the section entitled "Delinquent Section 16(a) Reports."

Such information is incorporated herein by reference to our 2024 Proxy Statement, provided that if the 2024 Proxy Statement is not filed within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K, the omitted information will be included in an amendment to this Annual Report on Form 10-K filed not later than the end of such 120-day period.

Our Code of Conduct applies to all of our employees, directors and officers, including our principal executive officer, interim principal financial officer, principal accounting officer or controller, or persons performing similar functions, and those of our subsidiaries. The Code of Conduct is available on our website at *www.jazzpharmaceuticals.com* under the section entitled "Our Purpose" under "Ethical Standards." We intend to satisfy the disclosure requirements under Item 5.05 of the SEC Form 8-K regarding an amendment to, or waiver from, a provision of our Code of Conduct by posting such information on our website at the website address and location specified above.

**Item 11.      Executive Compensation**

The information required by this item is to be included in our 2024 Proxy Statement under the sections entitled "Executive Compensation," "Director Compensation," "Corporate Governance and Board Matters—Compensation Committee Interlocks and Insider Participation" and "Corporate Governance and Board Matters—Compensation Committee Report" and is incorporated herein by reference, provided that if the 2024 Proxy Statement is not filed within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K, the omitted information will be included in an amendment to this Annual Report on Form 10-K filed not later than the end of such 120-day period.

<div align="center">

100

</div>

**Item 12.**   **Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by this item with respect to equity compensation plans is to be included in our 2024 Proxy Statement under the section entitled "Equity Compensation Plan Information" and the information required by this item with respect to security ownership of certain beneficial owners and management is to be included in our 2024 Proxy Statement under the section entitled "Security Ownership of Certain Beneficial Owners and Management" and in each case is incorporated herein by reference, provided that if the 2024 Proxy Statement is not filed within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K, the omitted information will be included in an amendment to this Annual Report on Form 10-K filed not later than the end of such 120-day period.

**Item 13.**   **Certain Relationships and Related Transactions, and Director Independence**

The information required by this item is to be included in our 2024 Proxy Statement under the sections entitled "Certain Relationships and Related Party Transactions" and "Corporate Governance and Board Matters—Independence of the Board of Directors" and is incorporated herein by reference, provided that if the 2024 Proxy Statement is not filed within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K, the omitted information will be included in an amendment to this Annual Report on Form 10-K filed not later than the end of such 120-day period.

**Item 14.**   **Principal Accountant Fees and Services**

The information required by this item is to be included in our 2024 Proxy Statement under the section entitled "Proposal 2—On a Non-Binding Advisory Basis, Ratify Appointment of Independent Registered Accounting Firm and, On a Binding Basis, Authorize the Board of Directors, Acting Through the Audit Committee, to Determine the Independent Auditors' Remuneration" and is incorporated herein by reference, provided that if the 2024 Proxy Statement is not filed within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K, the omitted information will be included in an amendment to this Annual Report on Form 10-K filed not later than the end of such 120-day period.

<div align="center">

**PART IV**

</div>

**Item 15.**   **Exhibits and Financial Statement Schedules**

*(a) The following documents are filed as part of this Annual Report on Form 10-K:*

*1.*   *Financial Statements:*

See Consolidated Financial Statements in Part II, Item 8 of this Annual Report on Form 10-K.

*2.*   *Financial Statement Schedules:*

The following financial statement schedule of Jazz Pharmaceuticals plc is filed as part of this Annual Report on Form 10-K on page F-51 and should be read in conjunction with the consolidated financial statements of Jazz Pharmaceuticals plc.

Schedule II: Valuation and Qualifying Accounts

All other schedules are omitted because they are not applicable, not required under the instructions, or the requested information is shown in the consolidated financial statements or related notes thereto.

*(b) Exhibits—The following exhibits are included herein or incorporated herein by reference:*

| Exhibit Number | Description of Document |
|---|---|
| 2.1 | Agreement and Plan of Merger and Reorganization, dated as of September 19, 2011, by and among Azur Pharma Limited (now Jazz Pharmaceuticals plc), Jaguar Merger Sub Inc., Jazz Pharmaceuticals, Inc. and Seamus Mulligan, solely in his capacity as the Indemnitors' Representative (incorporated herein by reference to Exhibit 2.1 in Jazz Pharmaceuticals, Inc.'s Current Report on Form 8-K (File No. 001-33500) filed with the SEC on September 19, 2011). |
| 2.2 | Agreement and Plan of Merger, dated as of May 27, 2016, by and among Jazz Pharmaceuticals plc, Plex Merger Sub, Inc., and Celator Pharmaceuticals, Inc. (incorporated herein by reference to Exhibit 2.1 in Jazz Pharmaceuticals plc's Current Report on Form 8-K (File No. 001-33500), as filed with the SEC on May 31, 2016). |

Table of Contents

| | |
|---|---|
| 2.3‡ | Transaction Agreement, dated as of February 3, 2021, by and among Jazz Pharmaceuticals UK Holdings Limited, Jazz Pharmaceuticals Public Limited Company and GW Pharmaceuticals PLC (incorporated herein by reference to Exhibit 2.1 in Jazz Pharmaceuticals plc's Current Report on Form 8-K (File No. 001-33500), as filed with the SEC on February 4, 2021). |
| 2.4# | License and Collaboration Agreement, dated October 18, 2022, between Jazz Pharmaceuticals Ireland Limited and Zymeworks BC Inc. (incorporated herein by reference to Exhibit 2.1 in Jazz Pharmaceuticals plc's Current Report on Form 8-K (File No. 001-033500), as filed with the SEC on December 5, 2022). |
| 3.1 | Amended and Restated Memorandum and Articles of Association of Jazz Pharmaceuticals plc, as amended on August 4, 2016 (incorporated herein by reference to Exhibit 3.1 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2016, as filed with the SEC on August 9, 2016). |
| 4.1 | Reference is made to Exhibit 3.1. |
| 4.2A | Investor Rights Agreement, dated July 7, 2009 by and between Jazz Pharmaceuticals, Inc. and the other parties named therein (incorporated herein by reference to Exhibit 10.88 in Jazz Pharmaceuticals, Inc.'s Current Report on Form 8-K (File No. 001-33500), as filed with the SEC on July 7, 2009). |
| 4.2B | Assignment, Assumption and Amendment Agreement, dated as of January 18, 2012, by and among Jazz Pharmaceuticals, Inc., Jazz Pharmaceuticals plc and the other parties named therein (incorporated herein by reference to Exhibit 4.7B in the Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2011, as filed by Jazz Pharmaceuticals plc on behalf of and as successor to Jazz Pharmaceuticals, Inc. with the SEC on February 28, 2012). |
| 4.3A | Indenture, dated as of August 23, 2017, among Jazz Pharmaceuticals Public Limited Company, Jazz Investments I Limited and U.S. Bank National Association (incorporated herein by reference to Exhibit 4.1 in Jazz Pharmaceuticals plc's Current Report on Form 8-K (File No. 001-33500), as filed with the SEC on August 23, 2017). |
| 4.3B | Form of 1.50% Exchangeable Senior Note due 2024 (incorporated herein by reference to Exhibit 4.1 in Jazz Pharmaceuticals plc's Current Report on Form 8-K (File No. 001-33500), as filed with the SEC on August 23, 2017). |
| 4.4A | Indenture, dated as of June 11, 2020 among Jazz Pharmaceuticals Public Limited Company, Jazz Investments I Limited and U.S. Bank National Association (incorporated herein by reference to Exhibit 4.1 in Jazz Pharmaceuticals plc's Current Report on Form 8-K (File No. 001-033500), as filed with the SEC on June 11, 2020). |
| 4.4B | Form of 2.000% Exchangeable Senior Note due 2026 (incorporated herein by reference to Exhibit 4.2 in Jazz Pharmaceuticals plc's Current Report on Form 8-K (File No. 001-033500), as filed with the SEC on June 11, 2020). |
| 4.5A | Indenture, dated as of April 29, 2021, among Jazz Securities Designated Activity Company, the guarantors party thereto, U.S. Bank National Association, as trustee and acknowledged by U.S. Bank National Association, as collateral trustee. (incorporated herein by reference to Exhibit 4.1 in Jazz Pharmaceuticals plc's Current Report on Form 8-K (File No. 001-033500), as filed with the SEC on April 29, 2021). |
| 4.5B | Form of 4.375% Senior Notes due 2029 (incorporated herein by reference to Exhibit 4.2 in Jazz Pharmaceuticals plc's Current Report on Form 8-K (File No. 001-033500), as filed with the SEC on April 29, 2021). |
| 4.5C | First Supplemental Indenture, dated as of July 21, 2021, among GW Pharmaceuticals Limited, GW Global Services (International) Limited, GW Pharma Limited, GW Research Limited, GW UK Services Limited and Greenwich Biosciences, Inc., Jazz Securities Designated Activity Company, and U.S. Bank National Association, as trustee under the Indenture, dated as of April 29, 2021 (incorporated herein by reference to Exhibit 4.5C in Jazz Pharmaceuticals, plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2021, as filed with the SEC on August 3, 2021). |
| 4.6 | Description of Share Capital. |
| 10.1A | Credit Agreement, dated as of May 5, 2021, by and among Jazz Pharmaceuticals Public Limited Company, the other borrowers from time to time party thereto, the lenders and issuing banks from time to time party thereto, Bank of America, N.A., as administrative agent, and U.S. Bank National Association, as collateral trustee (incorporated herein by reference to Exhibit 10.1 in Jazz Pharmaceuticals plc's Current Report on Form 8-K (File No. 001-033500), as filed with the SEC on May 5, 2021). |

| 10.1B | Conforming Changes Amendment, dated as of June 7, 2023, entered into by Bank of America, N.A. as administrative agent to Credit Agreement, dated as of May 5, 2021, by and among Jazz Pharmaceuticals Public Limited Company, the other borrowers from time to time party thereto, the lenders and issuing banks from time to time party thereto, Bank of America, N.A., as administrative agent, and U.S. Bank National Association, as collateral trustee (incorporated herein by reference to Exhibit 10.1 in Jazz Pharmaceuticals, plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2023, as filed with the SEC on August 9, 2023). |
| 10.1C | Amendment No. 1, dated as of January 19, 2024, by and among Jazz Pharmaceuticals Public Limited Company, the other borrowers from time to time party thereto, the lenders and issuing banks from time to time party thereto, Bank of America, N.A., as administrative agent, and U.S. Bank Trust Company, National Association, as collateral trustee. (incorporated herein by reference to Exhibit 10.1 in Jazz Pharmaceuticals plc's Current Report on Form 8-K (File No. 001-033500), as filed with the SEC on January 25, 2024). |
| 10.2A# | Settlement Agreement, dated as of April 5, 2017, by and between Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited, and Roxane Laboratories, Inc., West-Ward Pharmaceuticals Corp., Eurohealth (USA), Inc., and Hikma Pharmaceuticals PLC (incorporated herein by reference to Exhibit 10.1 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2022, as filed with the SEC on November 9, 2022). |
| 10.2B | Settlement Agreement, dated as of April 4, 2019, by and among United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General of the Department of Health and Human Services, Jazz Pharmaceuticals plc, Jazz Pharmaceuticals, Inc., and Jazz Pharmaceuticals Ireland Ltd. (incorporated herein by reference to Exhibit 10.7 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended March 31, 2019, as filed with the SEC on May 7, 2019). |
| 10.3 | Corporate Integrity Agreement, dated as of April 3, 2019, by and between Jazz Pharmaceuticals plc and the Office of Inspector General of the United States Department of Health and Human Services (incorporated herein by reference to Exhibit 10.6 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended March 31, 2019, as filed with the SEC on May 7, 2019). |
| 10.4† | Supply Agreement, dated as of April 1, 2010, by and between Jazz Pharmaceuticals, Inc. and Siegfried (USA) Inc. (incorporated herein by reference to Exhibit 10.54 in Jazz Pharmaceuticals, Inc.'s Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended March 31, 2010, as filed with the SEC on May 6, 2010). |
| 10.5‡ | Master Manufacturing Services Agreement, dated as of October 1, 2015, by and between Jazz Pharmaceuticals Ireland Limited and Patheon Pharmaceuticals Inc. (incorporated herein by reference to Exhibit 10.8 in Jazz Pharmaceuticals plc's Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2020, as filed with the SEC on February 23, 2021). |
| 10.6‡ | Contract Manufacturing Agreement, dated as of January 20, 2020, by and between Jazz Pharmaceuticals Ireland Limited and Siegfried AG (incorporated herein by reference to Exhibit 10.10 in Jazz Pharmaceuticals plc's Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2019, as filed with the SEC on February 25, 2020). |
| 10.7# | Pharmacy Master Services Agreement, dated as of December 1, 2022, by and between Jazz Pharmaceuticals, Inc. and Express Scripts Specialty Distribution Services, Inc. (incorporated herein by reference to Exhibit 10.8# in Jazz Pharmaceuticals plc's Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2022, as filed with the SEC on March 1, 2023). |
| 10.8A‡ | Amended and Restated License Agreement, dated as of October 14, 2020, between Pharma Mar, S.A., and Jazz Pharmaceuticals Ireland Limited (incorporated herein by reference to Exhibit 10.12 in Jazz Pharmaceuticals plc's Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2020, as filed with the SEC on February 23, 2021). |
| 10.8B‡ | Amendment No. 1, dated as of April 6, 2021, to Amended and Restated License Agreement, dated as of October 14, 2020, between Pharma Mar, S.A. and Jazz Pharmaceuticals Ireland Limited (incorporated herein by reference to Exhibit 10.2 in Jazz Pharmaceuticals, plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2021, as filed with the SEC on August 3, 2021). |
| 10.9 | Lease, dated May 8, 2012, by and between John Ronan and Castle Cove Property Developments Limited and Jazz Pharmaceuticals plc (incorporated herein by reference to Exhibit 10.2 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2012, as filed with the SEC on August 7, 2012). |
| 10.10A | Commercial Lease, dated as of January 7, 2015, by and between The Board of Trustees of the Leland Stanford Junior University and Jazz Pharmaceuticals, Inc. (incorporated herein by reference to Exhibit 10.10 in Jazz Pharmaceuticals plc's Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2014, as filed with the SEC on February 24, 2015). |

Table of Contents

| 10.10B | First Amendment, dated as of January 29, 2018, to Commercial Lease, dated as of January 7, 2015, by and between The Board of Trustees of the Leland Stanford Junior University and Jazz Pharmaceuticals, Inc. (incorporated herein by reference to Exhibit 10.5 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2018, as filed with the SEC on August 7, 2018). |
| --- | --- |
| 10.10C | Second Amendment, dated as of July 26, 2018, to Commercial Lease, dated as of January 7, 2015, by and between The Board of Trustees of the Leland Stanford Junior University and Jazz Pharmaceuticals, Inc., as previously amended by the First Amendment to Lease, dated as of January 29, 2018 (incorporated herein by reference to Exhibit 10.1 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2018, as filed with the SEC on November 6, 2018). |
| 10.11+ | Form of Indemnification Agreement between Jazz Pharmaceuticals plc and its officers and directors (incorporated herein by reference to Exhibit 10.1 in Jazz Pharmaceuticals plc's Current Report on Form 8-K (File No. 001-33500), as filed with the SEC on January 18, 2012). |
| 10.12+ | Offer Letter from Jazz Pharmaceuticals, Inc. to Robert Iannone dated as of April 11, 2019 (incorporated herein by reference to Exhibit 10.4 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2019, as filed with the SEC on August 6, 2019). |
| 10.13A+ | Employment Agreement, dated as of May 16, 2012 by and between Patricia Carr and Jazz Pharmaceuticals plc (incorporated herein by reference to Exhibit 10.1 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2019, as filed with the SEC on November 5, 2019). |
| 10.13B+ | Change in Control Severance Terms, dated as of May 15, 2016, by and between Jazz Pharmaceuticals Ireland Ltd. and Patricia Carr (incorporated herein by reference to Exhibit 10.2 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2019, as filed with the SEC on November 5, 2019). |
| 10.13C+ | Change in Control Stock Award Acceleration Agreement, dated as of May 15, 2016 by and between Jazz Pharmaceuticals plc and Patricia Carr (incorporated herein by reference to Exhibit 10.3 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2019, as filed with the SEC on November 5, 2019). |
| 10.14+ | Offer Letter, dated as of July 5, 2019 by and between Jazz Pharmaceuticals, Inc. and Neena M. Patil (incorporated herein by reference to Exhibit 10.4 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2019, as filed with the SEC on November 5, 2019). |
| 10.15A+ | Employment Contract, dated as of December 14, 2019, by and between Jazz Pharmaceuticals UK Limited and Samantha Pearce (incorporated herein by reference to Exhibit 10.28A in Jazz Pharmaceuticals plc's Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2019, as filed with the SEC on February 25, 2020). |
| 10.15B+ | Amendment to Employment Contract, dated as of April 21, 2020, by and between Jazz Pharmaceuticals UK Limited and Samantha Pearce (incorporated herein by reference to Exhibit 10.4 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended March 31, 2020, as filed with the SEC on May 5, 2020). |
| 10.15C+ | Equity Award Letter, dated as of December 9, 2019, by and between Jazz Pharmaceuticals UK Limited and Samantha Pearce (incorporated herein by reference to Exhibit 10.28B in Jazz Pharmaceuticals plc's Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2019, as filed with the SEC on February 25, 2020). |
| 10.16+ | Offer Letter, dated as of February 23, 2020, by and between Jazz Pharmaceuticals, Inc. and Renée Galá (incorporated herein by reference to Exhibit 10.1 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended March 31, 2020, as filed with the SEC on May 5, 2020). |
| 10.17A+ | Offer Letter, dated as of April 4, 2023, by and between Jazz Pharmaceuticals Ireland and Liz Henderson. |
| 10.17B+ | New Hire Equity Letter, dated as of April 4, 2023, from Jazz Pharmaceuticals to Liz Henderson. |
| 10.18A+ | Jazz Pharmaceuticals plc 2011 Equity Incentive Plan (incorporated herein by reference to Exhibit 99.1 in Jazz Pharmaceuticals plc's registration statement on Form S-8 (File No. 333-179075), as filed with the SEC on January 18, 2012). |
| 10.18B+ | Jazz Pharmaceuticals plc 2011 Equity Incentive Plan Sub-Plan Governing Awards to Participants in the Republic of Ireland (incorporated herein by reference to Exhibit 10.39B in the Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2011, as filed by Jazz Pharmaceuticals plc on behalf of and as successor to Jazz Pharmaceuticals Inc. with the SEC on February 28, 2012). |

Table of Contents

| | |
|---|---|
| 10.18C+ | Jazz Pharmaceuticals plc 2011 Equity Incentive Plan - Form of U.S. Option Grant Notice and Form of U.S. Option Agreement (approved July 31, 2013) (incorporated herein by reference to Exhibit 10.3 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2013, as filed with the SEC on November 5, 2013). |
| 10.18D+ | Jazz Pharmaceuticals plc 2011 Equity Incentive Plan - Form of Non-U.S. Option Grant Notice and Form of Non-U.S. Option Agreement (approved July 31, 2013) (incorporated herein by reference to Exhibit 10.5 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2013, as filed with the SEC on November 5, 2013). |
| 10.18E+ | Jazz Pharmaceuticals plc 2011 Equity Incentive Plan - Form of Non-U.S. Option Grant Notice and Form of Non-U.S. Option Agreement (incorporated herein by reference to Exhibit 10.1 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended March 31, 2016, as filed with the SEC on May 10, 2016). |
| 10.18F+ | Amended and Restated 2011 Equity Incentive Plan (approved August 4, 2016) (incorporated herein by reference to Exhibit 10.8 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period June 30, 2016, as filed with the SEC on August 9, 2016). |
| 10.18G+ | Amended and Restated 2011 Equity Incentive Plan (approved November 3, 2016) (incorporated herein by reference to Exhibit 10.2 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2016, as filed with the SEC on November 8, 2016). |
| 10.18H+ | Amended and Restated 2011 Equity Incentive Plan (approved November 2, 2022)(incorporated herein by reference to Exhibit 10.26Q+ in Jazz Pharmaceuticals plc's Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2022, as filed with the SEC on March 1, 2023). |
| 10.18I+ | Amended and Restated 2011 Equity Incentive Plan (approved November 1, 2023). |
| 10.18J+ | Form of U.S. Option Grant Notice and Form of U.S. Option Agreement under the Jazz Pharmaceuticals plc Amended and Restated 2011 Equity Incentive Plan (incorporated herein by reference to Exhibit 10.7 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2016, as filed with the SEC on November 8, 2016). |
| 10.18K+ | Form of U.S. Restricted Stock Unit Award Grant Notice and Form of U.S. Restricted Stock Unit Award Agreement under the Jazz Pharmaceuticals plc Amended and Restated 2011 Equity Incentive Plan (incorporated herein by reference to Exhibit 10.6 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2016, as filed with the SEC on November 8, 2016). |
| 10.18L+ | Form of Non-U.S. Option Grant Notice and Non-U.S. Option Agreement under the Jazz Pharmaceuticals plc Amended and Restated 2011 Equity Incentive Plan (incorporated herein by reference to Exhibit 10.2 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2018, as filed with the SEC on August 7, 2018). |
| 10.18M+ | Form of Non-U.S. Option Grant Notice and Non-U.S. Option Agreement under the Jazz Pharmaceuticals plc 2011 Equity Incentive Plan (incorporated herein by reference to Exhibit 10.4 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended March 31, 2019, as filed with the SEC on May 7, 2019). |
| 10.18N+ | Form of Non-U.S. Restricted Stock Unit Award Grant Notice and Non-U.S. Restricted Stock Unit Award Agreement under the Jazz Pharmaceuticals plc Amended and Restated 2011 Equity Incentive Plan (incorporated herein by reference to Exhibit 10.5 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended March 31, 2019, as filed with the SEC on May 7, 2019). |
| 10.18O+ | Form of U.S. Restricted Stock Unit Award Grant Notice and Form of U.S. Restricted Stock Unit Award Agreement under the Jazz Pharmaceuticals plc Amended and Restated 2011 Equity Incentive Plan (incorporated herein by reference to Exhibit 10.8 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2021, as filed with the SEC on August 3, 2021). |
| 10.18P+ | Form of Non-U.S. Restricted Stock Unit Award Grant Notice and Form of Non-U.S. Restricted Stock Unit Award Agreement under the Jazz Pharmaceuticals plc Amended and Restated 2011 Equity Incentive Plan (incorporated herein by reference to Exhibit 10.9 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2021, as filed with the SEC on August 3, 2021). |
| 10.18Q+ | Form of Non-U.S. Restricted Stock Unit Award Grant Notice and Form of Non-U.S. Restricted Stock Unit Award Agreement under the Jazz Pharmaceuticals plc Amended and Restated 2011 Equity Incentive Plan (incorporated herein by reference to Exhibit 10.1 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2021, as filed with the SEC on November 9, 2021). |

Table of Contents

| 10.18R+ | Form of U.S. Performance Restricted Stock Unit Award Grant Notice and Form of U.S. Performance Restricted Stock Unit Award Agreement under the Jazz Pharmaceuticals plc Amended and Restated 2011 Equity Incentive Plan (incorporated herein by reference to Exhibit 10.6 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2021, as filed with the SEC on August 3, 2021). |
| 10.18S+ | Form of Non-U.S. Performance Restricted Stock Unit Award Grant Notice and Form of Non-U.S. Performance Restricted Stock Unit Award Agreement under the Jazz Pharmaceuticals plc Amended and Restated 2011 Equity Incentive Plan (incorporated herein by reference to Exhibit 10.7 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2021, as filed with the SEC on August 3, 2021). |
| 10.19A+ | Jazz Pharmaceuticals plc Amended and Restated 2007 Non-Employee Directors Stock Option Plan (incorporated herein by reference to Exhibit 99.4 in Jazz Pharmaceuticals plc's registration statement on Form S-8 (File No. 333-179075), as filed with the SEC on January 18, 2012). |
| 10.19B+ | Form of Non-U.S. Option Grant Notice and Form of Non-U.S. Option Agreement under the Jazz Pharmaceuticals plc Amended and Restated 2007 Non-Employee Directors Stock Option Plan (incorporated herein by reference to Exhibit 10.30B in Jazz Pharmaceuticals plc's Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2012, as filed with the SEC on February 26, 2013). |
| 10.19C+ | Jazz Pharmaceuticals plc Amended and Restated 2007 Non-Employee Directors Stock Option Plan - Form of Non-U.S. Option Grant Notice and Form of Non-U.S. Option Agreement (approved August 1, 2013) (incorporated herein by reference to Exhibit 10.7 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2013, as filed with the SEC on November 5, 2013). |
| 10.19D+ | Amended and Restated 2007 Non-Employee Directors Stock Award Plan (approved August 4, 2016) (incorporated herein by reference to Exhibit 10.9 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2016, as filed with the SEC on August 9, 2016). |
| 10.19E+ | Amended and Restated 2007 Non-Employee Directors Stock Award Plan (approved November 3, 2016) (incorporated herein by reference to Exhibit 10.3 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2016, as filed with the SEC on November 8, 2016). |
| 10.19F+ | Amended and Restated 2007 Non-Employee Directors Stock Award Plan (approved July 30, 2020) (incorporated herein by reference to Exhibit 10.3 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2020, as filed with the SEC on August 4, 2020). |
| 10.19G+ | Form of Non-U.S. Option Grant Notice and Form of Non-U.S. Option Agreement under the Jazz Pharmaceuticals plc Amended and Restated Non-Employee Directors 2007 Stock Award Plan (incorporated herein by reference to Exhibit 10.5 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2016, as filed with the SEC on November 8, 2016). |
| 10.19H+ | Form of Non-U.S. Option Grant Notice and Non-U.S. Option Agreement under the Jazz Pharmaceuticals plc Amended and Restated 2007 Non-Employee Directors Stock Award Plan (incorporated herein by reference to Exhibit 10.2 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2018, as filed with the SEC on November 6, 2018). |
| 10.19I+ | Form of Non-U.S. Option Grant Notice and Non-U.S. Option Agreement under the Jazz Pharmaceuticals plc Amended and Restated 2007 Non-Employee Directors Stock Award Plan (incorporated herein by reference to Exhibit 10.7 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended March 31, 2019, as filed with the SEC on May 7, 2019). |
| 10.19J+ | Form of Non-U.S. Option Grant Notice and Non-U.S. Option Agreement under the Jazz Pharmaceuticals plc Amended and Restated 2007 Non-Employee Directors Stock Award Plan (incorporated herein by reference to Exhibit 10.2 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2020, as filed with the SEC on November 2, 2020). |
| 10.19K+ | Form of Non-U.S. Restricted Stock Unit Award Grant Notice and Non-U.S. Restricted Stock Unit Award Agreement under the Jazz Pharmaceuticals plc Amended and Restated 2007 Non-Employee Directors Stock Award Plan (incorporated herein by reference to Exhibit 10.3 in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended September 30, 2020, as filed with the SEC on November 2, 2020). |
| 10.20A+ | Amended and Restated GW Pharmaceuticals plc 2020 Long-Term Incentive Plan. |

106

| | |
|---|---|
| 10.20B+ | Form of Restricted Stock Unit Award Agreement under the GW Pharmaceuticals plc 2020 Long-Term Incentive Plan (incorporated herein by reference to Exhibit 10.10B in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2021, as filed with the SEC on August 3, 2021). |
| 10.20C+ | Form of Replacement Stock Option Award Agreement under the GW Pharmaceuticals plc 2020 Long-Term Incentive Plan (incorporated herein by reference to Exhibit 10.10C in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2021, as filed with the SEC on August 3, 2021). |
| 10.20D+ | Form of Replacement Restricted Stock Unit Award Agreement under the GW Pharmaceuticals plc 2020 Long-Term Incentive Plan (incorporated herein by reference to Exhibit 10.10D in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2021, as filed with the SEC on August 3, 2021). |
| 10.21A+ | Jazz Pharmaceuticals plc 2007 Employee Stock Purchase Plan, as amended and restated (incorporated herein by reference to Exhibit 10.31A in Jazz Pharmaceuticals plc's Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2012, as filed with the SEC on February 26, 2013). |
| 10.21B+ | Amended and Restated 2007 Employee Stock Purchase Plan (incorporated herein by reference to Exhibit 10.30B+ in Jazz Pharmaceuticals plc's Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2022, as filed with the SEC on March 1, 2023). |
| 10.21C+ | Amended and Restated 2007 Employee Stock Purchase Plan (approved November 1, 2023). |
| 10.21D+ | Jazz Pharmaceuticals plc 2007 Employee Stock Purchase Plan Sub-Plan Governing Purchase Rights to Participants in the Republic of Ireland (incorporated herein by reference to Exhibit 10.14C in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended March 31, 2012, as filed with the SEC on May 8, 2012 ). |
| 10.22A+ | Jazz Pharmaceuticals plc Cash Bonus Plan for U.S. Affiliates (approved October 30, 2019) (incorporated herein by reference to Exhibit 10.34C in Jazz Pharmaceuticals plc's Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2019, as filed with the SEC on February 25, 2020). |
| 10.22B+ | Jazz Pharmaceuticals Cash Bonus Plan (Ireland and Other Specified Affiliates) (Calendar Year 2020) (incorporated herein by reference to Exhibit 10.34D in Jazz Pharmaceuticals plc's Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2019, as filed with the SEC on February 25, 2020). |
| 10.22C+ | Jazz Pharmaceuticals plc Cash Bonus Plan for U.S. Affiliates (approved October 30, 2020) (incorporated herein by reference to Exhibit 10.33C in Jazz Pharmaceuticals plc's Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2020, as filed with the SEC on February 23, 2021). |
| 10.22D+ | Jazz Pharmaceuticals Cash Bonus Plan (Ireland and Other Specified Affiliates) (Calendar Year 2021) (incorporated herein by reference to Exhibit 10.33D in Jazz Pharmaceuticals plc's Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2020, as filed with the SEC on February 23, 2021). |
| 10.22E+ | Jazz Pharmaceuticals plc Global Cash Bonus Plan (approved November, 2021) (incorporated herein by reference to Exhibit 10.34E+ in Jazz Pharmaceuticals plc's Annual Report on Form 10-K (File No. 001-33500) for the period ended December 31, 2021, as filed with the SEC on March 1, 2022). |
| 10.23+ | Amended and Restated Executive Change in Control and Severance Benefit Plan, dated as of May 3, 2023 (incorporated herein by reference to Exhibit 10.2+ in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2023, as filed with the SEC on August 9, 2023). |
| 10.24+ | Amended and Restated Non-Employee Director Compensation Policy (approved May 4, 2023) (incorporated herein by reference to Exhibit 10.3+ in Jazz Pharmaceuticals plc's Quarterly Report on Form 10-Q (File No. 001-33500) for the period ended June 30, 2023, as filed with the SEC on August 9, 2023). |
| 21.1 | Subsidiaries of Jazz Pharmaceuticals plc. |
| 23.1 | Consent of KPMG, Independent Registered Public Accounting Firm. |
| 24.1 | Power of Attorney (included on the signature page hereto). |
| 31.1 | Certification of Principal Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 31.2 | Certification of Interim Principal Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |

Table of Contents

| | |
|---|---|
| 32.1* | Certification of Principal Executive Officer and Interim Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 97.1 | Jazz Pharmaceuticals plc Policy for Recoupment of Incentive Compensation |
| 101.INS | XBRL Instance Document - The instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | Inline XBRL Taxonomy Extension Labels Linkbase Document |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |

\+ Indicates management contract or compensatory plan.

† Confidential treatment has been granted for portions of this exhibit. Omitted portions have been filed separately with the Securities and Exchange Commission.

‡ Certain portions of this exhibit have been omitted pursuant to Item 601(b)(2) of Regulation S-K.

# Portions of this document have been omitted pursuant to Item 601(b)(10) of Regulations S-K because they are both not material and are the type that the Company treats as private and confidential.

* The certifications attached as Exhibit 32.1 accompany this Annual Report on Form 10-K pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, and shall not be deemed "filed" by the Registrant for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

**Item 16. Form 10-K Summary**

None.

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: February 28, 2024

**Jazz Pharmaceuticals public limited company**
(Registrant)

/s/   BRUCE C. COZADD
_____
**Bruce C. Cozadd**
**Chairman and Chief Executive Officer and Director**
**(Principal Executive Officer)**

/s/   PATRICIA CARR
_____
**Patricia Carr**
**Senior Vice President, Chief Accounting Officer**
**(Principal Accounting Officer and Interim Principal Financial Officer)**

109

Table of Contents

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Bruce C. Cozadd, Renée Galá, Neena M. Patil and Patricia Carr, and each of them, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution for him or her, and in his or her name in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done therewith, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, and any of them, his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, the following persons on behalf of the registrant and in the capacities and on the dates indicated have signed this report below:

| Signature | Title | Date |
|---|---|---|
| /s/   BRUCE C. COZADD<br>**Bruce C. Cozadd** | Chairman, Chief Executive Officer and Director<br>*(Principal Executive Officer)* | February 28, 2024 |
| /s/   PATRICIA CARR<br>**Patricia Carr** | Senior Vice President, Chief Accounting Officer<br>*(Principal Accounting Officer and Interim Principal Financial Officer)* | February 28, 2024 |
| /s/   JENNIFER E. COOK<br>**Jennifer E. Cook** | Director | February 28, 2024 |
| /s/   PATRICK G. ENRIGHT<br>**Patrick G. Enright** | Director | February 28, 2024 |
| /s/   PETER GRAY<br>**Peter Gray** | Director | February 28, 2024 |
| /s/   HEATHER ANN MCSHARRY<br>**Heather Ann McSharry** | Director | February 28, 2024 |
| /s/   SEAMUS C. MULLIGAN<br>**Seamus C. Mulligan** | Director | February 28, 2024 |
| /s/   KENNETH W. O'KEEFE<br>**Kenneth W. O'Keefe** | Director | February 28, 2024 |
| /s/   ANNE O'RIORDAN<br>**Anne O'Riordan** | Director | February 28, 2024 |
| /s/   NORBERT G. RIEDEL, PH.D.<br>**Norbert G. Riedel, Ph.D.** | Director | February 28, 2024 |
| /s/   MARK D. SMITH, M.D.<br>**Mark D. Smith, M.D.** | Director | February 28, 2024 |
| /s/   CATHERINE A. SOHN, PHARM.D.<br>**Catherine A. Sohn, Pharm.D.** | Director | February 28, 2024 |
| /s/   RICK E WINNINGHAM<br>**Rick E Winningham** | Director | February 28, 2024 |

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and Board of Directors
Jazz Pharmaceuticals plc:

*Opinion on the Consolidated Financial Statements*

We have audited the accompanying consolidated balance sheets of Jazz Pharmaceuticals plc.. and subsidiaries (the Company) as of December 31, 2023 and 2022, the related consolidated statements of income (loss), comprehensive income (loss), shareholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2023, and the related notes and financial statement schedule at item 15(a)2 (collectively, 'the consolidated financial statements'). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2023 and 2022, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2023, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2023, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated February 28, 2024 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

*Critical Audit Matter*

The critical audit matter communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the consolidated financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Assessment of the carrying value of the Vyxeos intangible asset*

As discussed in Note 10 to the consolidated financial statements, the finite-lived intangible assets balance as of December 31 ,2023 was $5,418,039 thousand, a portion of which related to finite-lived intangible asset in respect of Vyxeos. As discussed in Note 2, the Company reviews finite-lived intangible assets for impairment when events or circumstances indicate that the carrying value of such assets may not be recoverable.

We identified the assessment of the carrying value of the Vyxeos intangible asset as a critical audit matter. There was a high degree of subjectivity in assessing the carrying value of Vyxeos, specifically revenue forecast assumptions for Vyxeos, which are key inputs to the determination of estimated undiscounted future cash flows.

The following are the primary procedures we performed to address this critical audit matter.

–   We evaluated the design and tested the operating effectiveness of certain internal controls related to the Vyxeos intangible asset impairment review process, including the Company's control related to the development of the revenue forecast assumptions for Vyxeos

Table of Contents

&ndash;   We evaluated the reasonableness of the Company's revenue forecast assumptions for Vyxeos by comparing certain underlying assumptions against (1) company-specific operational information and management's communication to the Board of Directors and (2) available industry or other third-party reports

&ndash;   We challenged management's ability to accurately forecast revenue by comparing historical projections to actual results

/s/ KPMG

We have served as the Company's auditor since 2012.

Dublin, Ireland
February 28, 2024

<div align="center">F-2</div>

**JAZZ PHARMACEUTICALS PLC**
**CONSOLIDATED BALANCE SHEETS**
**(In thousands, except per share amounts)**

| | December 31, | |
|---|---|---|
| | **2023** | **2022** |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,506,310 | $ 881,482 |
| Investments | 120,000 | — |
| Accounts receivable, net of allowances of $21,136 and $17,843 at December 31, 2023 and 2022, respectively | 705,794 | 651,493 |
| Inventories | 597,039 | 714,061 |
| Prepaid expenses | 185,476 | 91,912 |
| Other current assets | 320,809 | 267,192 |
| Total current assets | 3,435,428 | 2,606,140 |
| Property, plant and equipment, net | 169,646 | 228,050 |
| Operating lease assets | 65,340 | 73,326 |
| Intangible assets, net | 5,418,039 | 5,794,437 |
| Goodwill | 1,753,130 | 1,692,662 |
| Deferred tax assets, net | 477,834 | 376,247 |
| Deferred financing costs | 6,478 | 9,254 |
| Other non-current assets | 67,464 | 55,139 |
| Total assets | $ 11,393,359 | $ 10,835,255 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 102,750 | $ 90,758 |
| Accrued liabilities | 793,914 | 803,255 |
| Current portion of long-term debt | 604,954 | 31,000 |
| Income taxes payable | 35,074 | 7,717 |
| Deferred revenue | — | 463 |
| Total current liabilities | 1,536,692 | 933,193 |
| Long-term debt, less current portion | 5,107,988 | 5,693,341 |
| Operating lease liabilities, less current portion | 59,225 | 71,838 |
| Deferred tax liabilities, net | 847,706 | 944,337 |
| Other non-current liabilities | 104,751 | 106,812 |
| Commitments and contingencies (Note 14) | | |
| Shareholders' equity: | | |
| Ordinary shares, nominal value $0.0001 per share; 300,000 shares authorized; 62,255 and 63,214 shares issued and outstanding at December 31, 2023 and 2022, respectively | 6 | 6 |
| Non-voting euro deferred shares, €0.01 par value per share; 4,000 shares authorized, issued and outstanding at both December 31, 2023 and 2022 | 55 | 55 |
| Capital redemption reserve | 473 | 472 |
| Additional paid-in capital | 3,699,954 | 3,477,124 |
| Accumulated other comprehensive loss | (842,147) | (1,125,509) |
| Retained earnings | 878,656 | 733,586 |
| Total shareholders' equity | 3,736,997 | 3,085,734 |
| Total liabilities and shareholders' equity | $ 11,393,359 | $ 10,835,255 |

The accompanying notes are an integral part of these consolidated financial statements.

**JAZZ PHARMACEUTICALS PLC**

**CONSOLIDATED STATEMENTS OF INCOME (LOSS)**

**(In thousands, except per share amounts)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| Revenues: | | | |
| Product sales, net | $ 3,736,943 | $ 3,641,429 | $ 3,079,001 |
| Royalties and contract revenues | 97,261 | 17,945 | 15,237 |
| Total revenues | 3,834,204 | 3,659,374 | 3,094,238 |
| Operating expenses: | | | |
| Cost of product sales (excluding amortization of acquired developed technologies) | 435,577 | 540,517 | 440,760 |
| Selling, general and administrative | 1,343,105 | 1,416,967 | 1,451,683 |
| Research and development | 849,658 | 590,453 | 505,748 |
| Intangible asset amortization | 608,284 | 599,169 | 525,769 |
| Acquired in-process research and development | 19,000 | 444,148 | — |
| Intangible asset impairment charge | — | 133,648 | — |
| Total operating expenses | 3,255,624 | 3,724,902 | 2,923,960 |
| Income (loss) from operations | 578,580 | (65,528) | 170,278 |
| Interest expense, net | (289,438) | (288,242) | (278,766) |
| Foreign exchange gain (loss) | 8,787 | (19,014) | (4,350) |
| Income (loss) before income tax expense (benefit) and equity in loss of investees | 297,929 | (372,784) | (112,838) |
| Income tax expense (benefit) | (119,912) | (158,645) | 216,116 |
| Equity in loss of investees | 3,009 | 9,921 | 714 |
| Net income (loss) | $ 414,832 | $ (224,060) | $ (329,668) |
| | | | |
| Net income (loss) per ordinary share: | | | |
| Basic | $ 6.55 | $ (3.58) | $ (5.52) |
| Diluted | $ 6.10 | $ (3.58) | $ (5.52) |
| Weighted-average ordinary shares used in per share calculations - basic | 63,291 | 62,539 | 59,694 |
| Weighted-average ordinary shares used in per share calculations - diluted | 72,066 | 62,539 | 59,694 |

The accompanying notes are an integral part of these consolidated financial statements.

F-4

Table of Contents

**JAZZ PHARMACEUTICALS PLC**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**

**(In thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| Net income (loss) | $ 414,832 | $ (224,060) | $ (329,668) |
| Other comprehensive income (loss): | | | |
| Foreign currency translation adjustments | 283,127 | (725,277) | (268,347) |
| Loss on fair value hedging activities reclassified from accumulated other comprehensive income (loss) to foreign exchange gain (loss), net of income tax benefit of $—, $43, and $—, respectively | — | 128 | — |
| Unrealized gain (loss) on cash flow hedging activities, net of income tax expense (benefit) of $1,215, $— and ($2), respectively | 3,658 | — | (14) |
| (Gain) loss on cash flow hedging activities reclassified from accumulated other comprehensive income (loss) to interest expense, net of income tax expense (benefit) of $1,137, $— and ($355), respectively | (3,423) | — | 2,482 |
| Unrealized loss on fair value hedging activities, net of income tax benefit of $—, $— and $43, respectively | — | — | (129) |
| Other comprehensive income (loss) | 283,362 | (725,149) | (266,008) |
| Total comprehensive income (loss) | $ 698,194 | $ (949,209) | $ (595,676) |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

**JAZZ PHARMACEUTICALS PLC**

**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**

**(In thousands)**

| | Ordinary Shares | | Non-voting Euro Deferred | | Capital Redemption Reserve | Additional Paid-in Capital | Accumulated Other Comprehensive Loss | Retained Earnings | Total Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| **Balance at December 31, 2020** | 56,171 | $ 6 | 4,000 | $ 55 | $ 472 | $ 2,633,670 | $ (134,352) | $ 1,159,894 | $ 3,659,745 |
| Issuance of ordinary shares in connection with the acquisition of GW Pharmaceuticals plc | 3,798 | — | — | — | — | 608,456 | — | — | 608,456 |
| Share-based payment -precombination service in connection with the acquisition of GW Pharmaceuticals plc | — | — | — | — | — | 3,555 | — | — | 3,555 |
| Issuance of ordinary shares in conjunction with exercise of share options | 1,042 | — | — | — | — | 119,058 | — | — | 119,058 |
| Issuance of ordinary shares under employee stock purchase plan | 157 | — | — | — | — | 16,203 | — | — | 16,203 |
| Issuance of ordinary shares in conjunction with vesting of restricted stock units | 465 | — | — | — | — | — | — | — | — |
| Shares withheld for payment of employee's withholding tax liability | — | — | — | — | — | (35,602) | — | — | (35,602) |
| Share-based compensation | — | — | — | — | — | 189,452 | — | — | 189,452 |
| Other comprehensive loss | — | — | — | — | — | — | (266,008) | — | (266,008) |
| Net loss | — | — | — | — | — | — | — | (329,668) | (329,668) |
| **Balance at December 31, 2021** | 61,633 | 6 | 4,000 | 55 | 472 | 3,534,792 | (400,360) | 830,226 | 3,965,191 |
| Cumulative effect adjustment from adoption of ASU 2020-06 | — | — | — | — | — | (333,524) | — | 127,474 | (206,050) |
| Issuance of ordinary shares in conjunction with exercise of share options | 832 | — | — | — | — | 82,897 | — | — | 82,897 |
| Issuance of ordinary shares under employee stock purchase plan | 139 | — | — | — | — | 15,123 | — | — | 15,123 |
| Issuance of ordinary shares in conjunction with vesting of restricted stock units | 610 | — | — | — | — | — | — | — | — |
| Shares withheld for payment of employee's withholding tax liability | — | — | — | — | — | (45,443) | — | — | (45,443) |
| Share-based compensation | — | — | — | — | — | 223,279 | — | — | 223,279 |
| Shares repurchased | — | — | — | — | — | — | — | (54) | (54) |
| Other comprehensive loss | — | — | — | — | — | — | (725,149) | — | (725,149) |
| Net loss | — | — | — | — | — | — | — | (224,060) | (224,060) |
| **Balance at December 31, 2022** | 63,214 | $ 6 | 4,000 | $ 55 | $ 472 | $ 3,477,124 | $ (1,125,509) | $ 733,586 | $ 3,085,734 |

F-6

Table of Contents

**JAZZ PHARMACEUTICALS PLC**

**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY—(Continued)**

**(In thousands)**

| | Ordinary Shares | | Non-voting Euro Deferred | | Capital Redemption Reserve | Additional Paid-in Capital | Accumulated Other Comprehensive Loss | Retained Earnings | Total Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| **Balance at December 31, 2022** | 63,214 | $ 6 | 4,000 | $ 55 | $ 472 | $ 3,477,124 | $ (1,125,509) | $ 733,586 | $ 3,085,734 |
| Issuance of ordinary shares in conjunction with exercise of share options | 280 | — | — | — | — | 30,189 | — | — | 30,189 |
| Issuance of ordinary shares under employee stock purchase plan | 156 | — | — | — | — | 16,270 | — | — | 16,270 |
| Issuance of ordinary shares in conjunction with vesting of restricted stock units | 735 | — | — | — | — | — | — | — | — |
| Shares withheld for payment of employee's withholding tax liability | — | — | — | — | — | (50,952) | — | — | (50,952) |
| Share-based compensation | — | — | — | — | — | 227,323 | — | — | 227,323 |
| Shares repurchased | (2,130) | — | — | — | 1 | — | — | (269,762) | (269,761) |
| Other comprehensive income | — | — | — | — | — | — | 283,362 | — | 283,362 |
| Net income | — | — | — | — | — | — | — | 414,832 | 414,832 |
| **Balance at December 31, 2023** | 62,255 | $ 6 | 4,000 | $ 55 | $ 473 | $ 3,699,954 | $ (842,147) | $ 878,656 | $ 3,736,997 |

The accompanying notes are an integral part of these consolidated financial statements.

F-7

Table of Contents

**JAZZ PHARMACEUTICALS PLC**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

**(In thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| **Operating activities** | | | |
| Net income (loss) | $ 414,832 | $ (224,060) | $ (329,668) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Intangible asset amortization | 608,284 | 599,169 | 525,769 |
| Share-based compensation | 226,841 | 221,996 | 189,006 |
| Acquisition accounting inventory fair value step-up adjustment | 151,446 | 273,392 | 223,085 |
| Impairment of property, plant and equipment | 61,014 | — | — |
| Depreciation | 30,412 | 30,302 | 26,714 |
| Non-cash interest expense | 22,378 | 37,973 | 92,655 |
| Acquired in-process research and development | 19,000 | 444,148 | — |
| Provision for losses on accounts receivable and inventory | 11,113 | 14,537 | 19,668 |
| Deferred tax expense (benefit) | (260,217) | (292,251) | 69,198 |
| Intangible asset impairment charge | — | 133,648 | — |
| Loss on disposal of a business | — | 37,704 | — |
| Other non-cash transactions | 11,343 | (14,486) | 10,032 |
| Changes in assets and liabilities: | | | |
| Accounts receivable | (51,883) | (90,135) | (92,735) |
| Inventories | (13,420) | (49,642) | (48,861) |
| Prepaid expenses and other current assets | (126,179) | 35,788 | (83,320) |
| Operating lease assets | 14,948 | 14,769 | 15,583 |
| Other non-current assets | (15,884) | (24,038) | 817 |
| Accounts payable | 9,603 | (11,225) | 57,021 |
| Accrued liabilities | (23,245) | 165,991 | 142,355 |
| Income taxes payable | 25,220 | (1,692) | (15,524) |
| Deferred revenue | (463) | (2,093) | (2,305) |
| Operating lease liabilities, less current portion | (16,965) | (16,422) | (16,037) |
| Other non-current liabilities | (6,171) | (11,396) | (4,946) |
| Net cash provided by operating activities | 1,092,007 | 1,271,977 | 778,507 |
| **Investing activities** | | | |
| Proceeds from maturity of investments | 270,000 | 60,000 | 1,095,000 |
| Acquired in-process research and development | (19,000) | (444,216) | — |
| Purchases of property, plant and equipment | (23,962) | (29,046) | (27,641) |
| Acquisition of investments | (390,100) | (61,036) | (26,819) |
| Proceeds from sale of a business | — | 53,000 | — |
| Acquisition of intangible assets | — | (25,000) | (17,891) |
| Acquisition of a business, net of cash acquired | — | — | (6,234,792) |
| Net cash used in investing activities | (163,062) | (446,230) | (5,212,143) |
| **Financing activities** | | | |
| Proceeds from employee equity incentive and purchase plans | 46,459 | 98,020 | 135,261 |
| Repayments of long-term debt | (31,000) | (582,014) | (1,101,788) |
| Payment of employee withholding taxes related to share-based awards | (50,952) | (45,443) | (35,602) |
| Share repurchases | (269,761) | (54) | — |
| Net proceeds from issuance of borrowings under credit agreement | — | — | 3,719,930 |
| Net proceeds from issuance of Senior Secured Notes, due 2029 | — | — | 1,471,533 |
| Payments for repurchase of Exchangeable Senior Notes, due 2021 | — | — | (218,812) |
| Net cash (used in) provided by financing activities | (305,254) | (529,491) | 3,970,522 |
| Effect of exchange rates on cash and cash equivalents | 1,137 | (6,222) | (3,207) |
| Net increase (decrease) in cash and cash equivalents | 624,828 | 290,034 | (466,321) |
| Cash and cash equivalents, at beginning of period | 881,482 | 591,448 | 1,057,769 |
| Cash and cash equivalents, at end of period | $ 1,506,310 | $ 881,482 | $ 591,448 |

F-8

Table of Contents

**JAZZ PHARMACEUTICALS PLC**

**CONSOLIDATED STATEMENTS OF CASH FLOWS—(Continued)**

**(In thousands)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2023** | **2022** | **2021** |
| Supplemental disclosure of cash flow information: | | | |
| Cash paid for interest | $ 333,112 | $ 270,671 | $ 138,271 |
| Cash paid for income taxes, net of refunds | 177,880 | 94,681 | 271,217 |

The accompanying notes are an integral part of these consolidated financial statements.

F-9

Table of Contents

<div align="center">

**JAZZ PHARMACEUTICALS PLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

</div>

**1. Organization and Description of Business**

Jazz Pharmaceuticals plc is a global biopharmaceutical company whose purpose is to innovate to transform the lives of patients and their families. We are dedicated to developing life-changing medicines for people with serious diseases - often with limited or no therapeutic options. We have a diverse portfolio of marketed medicines and novel product candidates, from early- to late-stage development, in neuroscience and oncology. Within these therapeutic areas, we strive to identify new options for patients by actively exploring small molecules and biologics, and through innovative delivery technologies and cannabinoid science.

Our lead marketed products, listed below, are approved in countries around the world to improve patient care.

**Neuroscience**

- **Xywav® (calcium, magnesium, potassium, and sodium oxybates) oral solution**, a product approved by the U.S. Food and Drug Administration, or FDA, in July 2020 and launched in the U.S. in November 2020 for the treatment of cataplexy or excessive daytime sleepiness, or EDS, in patients seven years of age and older with narcolepsy, and also approved by FDA in August 2021 for the treatment of idiopathic hypersomnia, or IH, in adults and launched in the U.S. in November 2021. Xywav contains 92% less sodium than Xyrem®;

- **Xyrem (sodium oxybate) oral solution**, a product approved by FDA and distributed in the U.S. for the treatment of cataplexy or EDS in patients seven years of age or older with narcolepsy; Jazz also markets Xyrem in Canada for the treatment of cataplexy in patients with narcolepsy. Xyrem is also approved and distributed in the European Union, or EU (EU market authorizations include Northern Ireland), Great Britain and other markets through a licensing agreement; and

- **Epidiolex® (cannabidiol) oral solution**, a product approved by FDA and launched in the U.S. in 2018 by GW Pharmaceuticals plc, or GW, and currently indicated for the treatment of seizures associated with Lennox-Gastaut syndrome, or LGS, Dravet syndrome, or DS, or tuberous sclerosis complex, or TSC, in patients one year of age or older; in the EU and Great Britain (where it is marketed as Epidyolex®) and other markets, it is approved for adjunctive treatment of seizures associated with LGS or DS, in conjunction with clobazam (EU and Great Britain only), in patients 2 years of age and older and for adjunctive treatment of seizures associated with TSC in patients 2 years of age and older.

**Oncology**

- **Rylaze® (asparaginase erwinia chrysanthemi (recombinant)-rywn)**, a product approved by FDA in June 2021 and launched in the U.S. in July 2021 for use as a component of a multi-agent chemotherapeutic regimen for the treatment of acute lymphoblastic leukemia or lymphoblastic lymphoma in adults and pediatric patients aged one month or older who have developed hypersensitivity to *E. coli*-derived asparaginase. In September 2023, the European Commission granted marketing authorization for this therapy under the trade name Enrylaze; and

- **Zepzelca® (lurbinectedin)**, a product approved by FDA in June 2020 under FDA's accelerated approval pathway and launched in the U.S. in July 2020 for the treatment of adult patients with metastatic small cell lung cancer, or SCLC, with disease progression on or after platinum-based chemotherapy; in Canada, Zepzelca received conditional approval in September 2021 for the treatment of adults with Stage III or metastatic SCLC, who have progressed on or after platinum-containing therapy.

Throughout this report, unless otherwise indicated or the context otherwise requires, all references to "Jazz Pharmaceuticals," "the registrant," "the Company", "we," "us," and "our" refer to Jazz Pharmaceuticals plc and its consolidated subsidiaries. Throughout this report, all references to "ordinary shares" refer to Jazz Pharmaceuticals plc's ordinary shares.

**2. Summary of Significant Accounting Policies**

*Basis of Presentation*

The consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles, or U.S. GAAP, and include the accounts of Jazz Pharmaceuticals plc and our subsidiaries. Intercompany

<div align="center">F-10</div>

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

transactions and balances have been eliminated. Our consolidated financial statements include the results of operations of businesses we have acquired from the date of each acquisition for the applicable reporting periods.

*Use of Estimates*

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosures in the consolidated financial statements and accompanying notes. Management bases its estimates on historical experience and on assumptions believed to be reasonable under the circumstances. Actual results could differ materially from those estimates.

*Adoption of New Accounting Standards*

In October 2021, the Financial Accounting Standards Board issued ASU 2021-08, "Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers", or ASU 2021-08, which requires entities to recognize and measure contract assets and contract liabilities acquired in a business combination in accordance with ASC 2014-09, "Revenue from Contracts with Customers (Topic 606)". The update will generally result in an entity recognizing contract assets and contract liabilities at amounts consistent with those recorded by the acquiree immediately before the acquisition date rather than at fair value. ASU 2021-08 was effective for the Company from January 1, 2023 and adoption did not have a material impact on our consolidated financial statements. We will apply to future business combinations, if any.

**Significant Risks and Uncertainties**

Historically, our business was substantially dependent on Xyrem and while we expect that our business will continue to meaningfully depend on oxybate revenues from both Xywav and Xyrem, there is no guarantee that oxybate revenues will remain at current levels, or that oxybate revenues will otherwise grow in future periods. In this regard, our ability to maintain or increase oxybate revenues and realize the anticipated benefits from our investment in Xywav are subject to a number of risks and uncertainties including, without limitation, those related to the launch of Xywav for the treatment of IH in adults and adoption in that indication; competition from the recent introduction of two authorized generic, or AG, versions of high-sodium oxybate and new products, such as Avadel's Lumryz, for treatment of cataplexy and/or EDS in narcolepsy in the U.S. market, as well as potential future competition from additional AG versions of high-sodium oxybate and from generic versions of high-sodium oxybate and from other competitors; increased pricing pressure from, changes in policies by, or restrictions on reimbursement imposed by, third party payors, including our ability to maintain adequate coverage and reimbursement for Xywav and Xyrem; increased rebates required to maintain access to our products; challenges to our intellectual property around Xywav and/or Xyrem, including from pending antitrust and intellectual property litigation; and continued acceptance of Xywav and Xyrem by physicians and patients. A significant decline in oxybate revenues could cause us to reduce our operating expenses or seek to raise additional funds, which would have a material adverse effect on our business, financial condition, results of operations and growth prospects, including on our ability to acquire, in-license or develop new products to grow our business.

In addition to risks related specifically to Xywav and Xyrem, we are subject to other challenges and risks related to successfully commercializing a portfolio of oncology products and other neuroscience products, and other risks specific to our business and our ability to execute on our strategy, as well as risks and uncertainties common to companies in the pharmaceutical industry with development and commercial operations, including, without limitation, risks and uncertainties associated with: ongoing clinical research activity and related outcomes, obtaining regulatory approval of our late-stage product candidates; effectively commercializing our approved or acquired products such as Epidiolex, Rylaze and Zepzelca; obtaining and maintaining adequate coverage and reimbursement for our products; contracting and rebates to pharmacy benefit managers and similar organizations that reduce our net revenue; increasing scrutiny of pharmaceutical product pricing and resulting changes in healthcare laws and policy; market acceptance; regulatory concerns with controlled substances generally and the potential for abuse; future legislation, action by the U.S. Federal Government authorizing the sale, distribution, use, and insurance reimbursement of non-FDA approved cannabinoid products; delays or problems in the supply of our products, loss of single source suppliers or failure to comply with manufacturing regulations; delays or problems with third parties that are part of our manufacturing and supply chain; identifying, acquiring or in-licensing additional products or product candidates; our ability to realize the anticipated benefits of acquired or in-licensed products or product candidates, such as Epidiolex and Zanidatamab, at the expected levels, with the expected costs and within the expected timeframe; pharmaceutical product development and the inherent uncertainty of clinical success; the challenges of protecting and enhancing our intellectual property rights; complying with applicable regulatory requirements; and possible restrictions on our ability and flexibility to pursue certain future opportunities as a result of our substantial outstanding debt obligations.

F-11

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Concentrations of Risk*

Financial instruments that potentially subject us to concentrations of credit risk consist of cash, cash equivalents, investments and derivative contracts. Our investment policy permits investments in U.S. federal government and federal agency securities, corporate bonds or commercial paper issued by U.S. corporations, money market instruments, certain qualifying money market mutual funds, certain repurchase agreements, and tax-exempt obligations of U.S. states, agencies and municipalities and places restrictions on credit ratings, maturities, and concentration by type and issuer. We are exposed to credit risk in the event of a default by the financial institutions holding our cash, cash equivalents and investments to the extent recorded on the balance sheet.

We manage our foreign currency transaction risk and interest rate risk within specified guidelines through the use of derivatives. All of our derivative instruments are utilized for risk management purposes, and we do not use derivatives for speculative trading purposes. As of December 31, 2023 and 2022, we had foreign exchange forward contracts with notional amounts totaling $511.7 million and $505.0 million, respectively. As of December 31, 2023 and 2022, the outstanding foreign exchange forward contracts had a net asset fair value of $17.4 million. As of December 31, 2023, we had interest rate swap contracts with notional amounts totaling $500.0 million. These outstanding interest rate swap contracts had a net asset fair value of $0.4 million as of December 31, 2023. The counterparties to these contracts are large multinational commercial banks, and we believe the risk of nonperformance is not significant.

We are also subject to credit risk from our accounts receivable related to our product sales. We monitor our exposure within accounts receivable and record a reserve against uncollectible accounts receivable as necessary. We extend credit to pharmaceutical wholesale distributors and specialty pharmaceutical distribution companies, primarily in the U.S., and to other international distributors and hospitals. Customer creditworthiness is monitored and collateral is not required. We monitor economic conditions in certain European countries which may result in variability of the timing of cash receipts and an increase in the average length of time that it takes to collect accounts receivable outstanding. Historically, we have not experienced significant credit losses on our accounts receivable and as of December 31, 2023, allowances on receivables were not material. As of December 31, 2023, five customers accounted for 79% of gross accounts receivable, including Express Scripts Specialty Distribution Services, Inc. and its affiliates, or ESSDS, which accounted for 41% of gross accounts receivable, ASD Specialty Healthcare LLC, which accounted for 13% of gross accounts receivable and McKesson Corporation and affiliates, or McKesson, which accounted for 11% of gross accounts receivable. As of December 31, 2022, five customers accounted for 87% of gross accounts receivable, including ESSDS, which accounted for 55% of gross accounts receivable, Cardinal Health Inc, which accounted for 10% of gross accounts receivable and McKesson, which accounted for 9% of gross accounts receivable.

We depend on single source suppliers for most of our products, product candidates and their active pharmaceutical ingredients, or APIs. With respect to our oxybate products, the API is manufactured for us by a single source supplier and the finished products are manufactured both by us in our facility in Athlone, Ireland and by our U.S.-based supplier.

*Business Acquisitions*

Our consolidated financial statements include the results of operations of an acquired business from the date of acquisition. We account for acquired businesses using the acquisition method of accounting. The acquisition method of accounting for acquired businesses requires, among other things, that assets acquired, liabilities assumed and any noncontrolling interests in the acquired business be recognized at their estimated fair values as of the acquisition date, with limited exceptions, and that the fair value of acquired in-process research and development, or IPR&D, be recorded on the balance sheet. Also, transaction costs are expensed as incurred. Any excess of the acquisition consideration over the assigned values of the net assets acquired is recorded as goodwill. Contingent consideration is included within the acquisition cost and is recognized at its fair value on the acquisition date. A liability resulting from contingent consideration is remeasured to fair value at each reporting date until the contingency is resolved and changes in fair value are recognized in earnings.

*Cash Equivalents and Investments*

We consider all highly liquid investments, readily convertible to cash, that mature within three months or less from date of purchase to be cash equivalents.

Investments consist of time deposits with initial maturities of greater than three months. Collectively, cash equivalents and investments are considered available-for-sale and are recorded at fair value. Unrealized gains and losses, net of tax, are recorded in accumulated other comprehensive loss in shareholders' equity. We use the specific-identification method for calculating realized gains and losses on securities sold. Realized gains and losses and declines in value judged to be other than temporary on investments are included in interest expense, net in the consolidated statements of income (loss).

Table of Contents

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Derivative Instruments and Hedging Activities*

We record the fair value of derivative instruments as either assets or liabilities on the consolidated balance sheets. Changes in the fair value of derivative instruments are recorded each period in current earnings or other comprehensive income (loss), depending on whether a derivative instrument is designated as part of a hedging transaction and, if it is, the type of hedging transaction. For a derivative to qualify as a hedge at inception and throughout the hedged period, we formally document the nature and relationships between the hedging instruments and hedged item.

For derivatives formally designated as hedges, we assess both at inception and quarterly thereafter, whether the hedging derivatives are highly effective in offsetting changes in either the fair value or cash flows of the hedged item.

Gains or losses on cash flow hedges are reclassified from other comprehensive income (loss) to earnings when the hedged transaction occurs. If we determine that a forecasted transaction is no longer probable of occurring, we discontinue hedge accounting and any related unrealized gain or loss on the derivative instrument is recognized in current earnings.

We designate cross-currency interest rate swaps as fair value hedges to hedge foreign currency risks related to our borrowings denominated in currencies other than the U.S. dollar. Fair value hedge amounts included in the assessment of hedge effectiveness are recognized in foreign exchange gain (loss) within the consolidated statements of income (loss), along with the offsetting gains and losses of the related hedged item. We have elected to exclude the total forward points or currency basis from the assessment of hedge effectiveness and account for them as excluded components. The initial fair value of the excluded component is amortized to foreign exchange gain (loss) and the difference between changes in fair value of the excluded component and the amount recorded in earnings is recorded in other comprehensive income (loss).

Derivatives that are not designated and do not qualify as hedges are adjusted to fair value through current earnings.

*Inventories*

Inventories are valued at the lower of cost or net realizable value. Cost is determined using the first-in, first-out method for all inventories. Our policy is to write down inventory that has become obsolete, inventory that has a cost basis in excess of its expected net realizable value and inventory in excess of expected requirements. The estimate of excess quantities is subjective and primarily dependent on our estimates of future demand for a particular product. If our estimate of future demand changes, we consider the impact on the reserve for excess inventory and adjust the reserve as required. Increases in the reserve are recorded as charges in cost of product sales.

We capitalize inventory costs associated with our products prior to regulatory approval when, based on management's judgment, future commercialization is considered probable and the future economic benefit is expected to be realized; otherwise, such costs are expensed as research and development. The determination to capitalize inventory costs is based on various factors, including status and expectations of the regulatory approval process, any known safety or efficacy concerns, potential labeling restrictions, and any other impediments to obtaining regulatory approval. We had no pre-approval inventory on our consolidated balance sheet as of December 31, 2023 or 2022.

Our inventory production process for our cannabinoid products includes the cultivation of botanical raw material. Because of the duration of the cultivation process, a portion of our inventory will not be sold within one year. Consistent with the practice in other industries that cultivate botanical raw materials, all inventory is classified as a current asset.

*Property, Plant and Equipment*

Property, plant and equipment are stated at cost, less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. Estimated useful lives are as follows:

| | |
|---|---|
| Buildings | 40 years |
| Manufacturing equipment and machinery | 4-20 years |
| Computer software and equipment | 3-7 years |
| Furniture and fixtures | 5 years |

Leasehold improvements are amortized over the shorter of the noncancelable term of our leases or their economic useful lives. Maintenance and repairs are expensed as incurred.

*Leases*

We determine if an arrangement is a lease at inception. Leases are classified at lease commencement as either operating leases or finance leases. Operating leases are included in operating lease assets, accrued liabilities, and operating lease liabilities on our consolidated balance sheets. Finance lease assets are included in property, plant and equipment, net, and

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

finance lease liabilities are included in accrued liabilities and other non-current liabilities in our consolidated balance sheets. Lease assets and lease liabilities are recognized based on the present value of the future minimum lease payments over the lease term at commencement date. In determining the net present value of lease payments, we use our incremental borrowing rate based on the information available at the lease commencement date. The lease asset also includes any lease payments made, reduced by lease incentives and increased by initial direct costs incurred. Our lease terms may include options to extend or terminate the lease when it is reasonably certain that we will exercise that option. Operating lease expense for minimum lease payments is recognized on a straight-line basis over the lease term. Finance lease expense is recognized as depreciation expense of property, plant and equipment and interest expense on finance lease liabilities.

We have lease agreements with lease and non-lease components, which are generally accounted for separately. For vehicle leases we account for the lease and non-lease components as a single lease component.

We have elected the short-term lease exemption and, therefore, do not recognize a lease asset or corresponding liability for lease arrangements with an original term of 12 months or less. Rent expense under short-term leases is recognized on a straight-line basis over the lease term.

### Goodwill

Goodwill represents the excess of the acquisition consideration over the fair value of assets acquired and liabilities assumed. We have determined that we operate in a single segment and have a single reporting unit associated with the development and commercialization of pharmaceutical products. In performing the annual impairment test, the fair value of the reporting unit is compared to its corresponding carrying value, including goodwill. If the carrying value exceeds the fair value of the reporting unit an impairment loss will be recognized for the amount by which the reporting unit's carrying amount exceeds its fair value, not to exceed the carrying amount of goodwill. We test goodwill for impairment annually in October and when events or changes in circumstances indicate that the carrying value may not be recoverable.

### Acquired In-Process Research and Development

The initial costs of rights to IPR&D projects acquired in an asset acquisition are expensed as IPR&D unless the project has an alternative future use. The fair value of IPR&D projects acquired in a business combination are capitalized and accounted for as indefinite-lived intangible assets until the underlying project receives regulatory approval, at which point the intangible asset will be accounted for as a finite-lived intangible asset, or discontinued, at which point the intangible asset will be written off. Development costs incurred after an acquisition are expensed as incurred.

### Intangible Assets

Intangible assets with finite useful lives consist primarily of purchased developed technology and are amortized on a straight-line basis over their estimated useful lives, which range from seven to sixteen years. The estimated useful lives associated with finite-lived intangible assets are consistent with the estimated lives of the associated products and may be modified when circumstances warrant. Such assets are reviewed for impairment when events or circumstances indicate that the carrying value of an asset may not be recoverable. An impairment loss would be recognized when estimated undiscounted future cash flows expected to result from the use of an asset and its eventual disposition are less than its carrying amount. The amount of any impairment is measured as the difference between the carrying amount and the fair value of the impaired asset.

### Revenue Recognition

Our revenue comprises product sales, net and royalty and contract revenues. Revenues are recognized when control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration we expect to be entitled to in exchange for those goods or services. Prior to recognizing revenue, we make estimates of the transaction price, including variable consideration that is subject to a constraint. Amounts of variable consideration are included in the transaction price to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved.

*Product Sales, Net*

Product sales revenue is recognized when control has transferred to the customer, which occurs at a point in time, which is typically on delivery to the customer or, in the case of products that are subject to consignment agreements, when the customer removes product from our consigned inventory location for shipment directly to a patient.

*Reserves for Variable Consideration*

Revenues from sales of products are recorded at the net sales price, which includes estimates of variable consideration for which reserves are established and which relate to returns, specialty distributor fees, wholesaler fees, prompt payment discounts, government rebates, government chargebacks, coupon programs and rebates under managed care plans and

F-14

Table of Contents

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

commercial payor contracts. Calculating certain of these reserves involves estimates and judgments and we determine their expected value based on sales or invoice data, contractual terms, historical utilization rates, new information regarding changes in these programs' regulations and guidelines that would impact the amount of the actual rebates, our expectations regarding future utilization rates for these programs and channel inventory data. These reserves reflect our best estimates of the amount of consideration to which we are entitled based on the terms of the contract. The amount of variable consideration that is included in the transaction price may be constrained, and is included in the net sales price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period. We reassess our reserves for variable consideration at each reporting date. Historically, adjustments to estimates for these reserves have not been material.

Reserves for returns, specialty distributor fees, wholesaler fees, government rebates, coupon programs and rebates under managed care plans and commercial payor contracts are included within current liabilities in our consolidated balance sheets. Reserves for government chargebacks and prompt payment discounts are shown as a reduction in accounts receivable.

*Royalties and Contract Revenues*

We enter into out-licensing agreements under which we license certain rights to our products or product candidates to third parties. If a licensing arrangement includes multiple goods or services, we consider whether the license is distinct. If the license to our intellectual property is determined to be distinct from the other performance obligations identified in the arrangement, we recognize revenue from non-refundable, upfront fees allocated to the license when the license is transferred to the licensee and the licensee is able to use and benefit from the license. If the license to our intellectual property is determined not to be distinct, it is combined with other goods or services into a combined performance obligation. We consider whether the combined performance obligation is satisfied over time or at a point in time and, if over time, the appropriate method of measuring progress for purposes of recognizing revenue from non-refundable, upfront fees. We evaluate the measure of progress each reporting date and, if necessary, adjust the measure of performance and related revenue recognition.

At the inception of each arrangement that includes development milestone payments, we evaluate whether the milestones are considered probable of being reached and estimate the amount to be included in the transaction price using the most likely amount method. If it is probable that a significant revenue reversal would not occur, the associated milestone value is included in the transaction price. Milestone payments that are not within our control or that of the licensee, such as regulatory approvals, are not considered probable of being achieved until those approvals are received. The transaction price is allocated to each performance obligation on a relative stand-alone selling price basis, for which we recognize revenue as or when the performance obligations under the contract are satisfied. At the end of each subsequent reporting period, we re-evaluate the probability of achievement of such development milestones and any related constraint, and if necessary, adjust our estimate of the overall transaction price.

For arrangements that include sales-based royalties and milestone payments based on the level of sales, and the license is deemed to be the predominant item to which the royalties and sales-based milestones relate, we recognize revenue at the later of (i) when the related sales occur, or (ii) when the performance obligation to which some or all of the royalty or sales-based milestone has been allocated has been satisfied (or partially satisfied).

*Cost of Product Sales*

Cost of product sales includes manufacturing and distribution costs, the cost of drug substance, royalties due to third parties on product sales, product liability and cargo insurance, FDA user fees, freight, shipping, handling and storage costs and salaries and related costs of employees involved with production. Excluded from cost of product sales shown on the consolidated statements of income (loss) is amortization of acquired developed technology of $608.3 million, $599.2 million and $525.8 million in 2023, 2022 and 2021, respectively.

*Research and Development*

Research and development expenses consist primarily of costs related to clinical studies and outside services, personnel expenses, milestone expenses and other research and development costs, including milestone payments incurred prior to regulatory approval of products. Clinical study and outside services costs relate primarily to services performed by clinical research organizations, clinical studies performed at clinical sites, materials and supplies, and other third party fees. Personnel expenses relate primarily to salaries, benefits and share-based compensation. Other research and development expenses primarily include overhead allocations consisting of various support and facilities-related costs. Research and development costs are expensed as incurred. For product candidates that have not been approved by FDA, inventory used in clinical trials is expensed at the time of production and recorded as research and development expense. For products that have been approved by FDA, inventory used in clinical trials is expensed at the time the inventory is packaged for the trial.

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Advertising Expenses*

We expense the costs of advertising, including promotional expenses, as incurred. Advertising expenses were $92.2 million, $108.8 million and $161.5 million in 2023, 2022 and 2021, respectively.

*Income Taxes*

We use the asset and liability method of accounting for income taxes. Under this method, deferred tax assets and liabilities are determined based on differences between the financial statement carrying amount and the tax basis of assets and liabilities and are measured using enacted tax rates and laws that will be in effect when the differences are expected to reverse. A valuation allowance is provided to reduce deferred tax assets to the amount that is more-likely-than-not to be realized. We recognize the benefits of a tax position if it is more-likely-than-not of being sustained. A recognized tax benefit is then measured as the largest amount of tax benefit that is greater than fifty percent likely of being realized upon settlement. Interest and penalties related to income taxes are included in the income tax expense and classified with the related liability on the consolidated balance sheets.

*Foreign Currency*

Our functional and reporting currency is the U.S. dollar. The assets and liabilities of our subsidiaries that have a functional currency other than the U.S. dollar are translated into U.S. dollars at the exchange rate prevailing at the balance sheet date with the results of operations of subsidiaries translated at the weighted average exchange rate for the reporting period. The cumulative foreign currency translation adjustment is recorded as a component of accumulated other comprehensive income (loss) in shareholders' equity.

Transactions in foreign currencies are translated into the functional currency of the relevant subsidiary at the weighted average exchange rate for the reporting period. Any monetary assets and liabilities arising from these transactions are translated into the relevant functional currency at exchange rates prevailing at the balance sheet date or on settlement. Resulting gains and losses are recorded in foreign exchange gain (loss) in our consolidated statements of income (loss).

*Deferred Financing Costs*

Deferred financing costs are reported at cost, less accumulated amortization and are presented in the consolidated balance sheets as a direct deduction from the carrying value of the associated debt, with the exception of deferred financing costs associated with revolving-debt arrangements which are presented as assets. The related amortization expense is included in interest expense, net in our consolidated statements of income (loss).

*Contingencies*

From time to time, we may become involved in claims and other legal matters arising in the ordinary course of business. We record accruals for loss contingencies to the extent that we conclude that it is probable that a liability has been incurred and the amount of the related loss can be reasonably estimated. Legal fees and other expenses related to litigation are expensed as incurred and included in selling, general and administrative expenses.

*Share-Based Compensation*

We account for compensation cost for all share-based awards at fair value on the date of grant. The fair value is recognized as expense over the service period, net of estimated forfeitures, using the straight-line method. The estimation of share-based awards that will ultimately vest requires judgment, and, to the extent actual results or updated estimates differ from current estimates, such amounts will be recorded as a cumulative adjustment in the period estimates are revised. We primarily consider historical experience when estimating expected forfeitures.

*Performance-Based Restricted Stock Unit Awards*

Performance-based restricted stock units, or PRSUs, awarded to employees vest upon the achievement of certain performance criteria at the end of a specified performance period, subject to a relative total shareholder return, or TSR, modifier. The estimated fair value of these PRSUs is based on a Monte Carlo simulation model. Compensation expense for PRSUs is recognized from the date the Company determines the performance criteria probable of being achieved to the date the award, or relevant portion of the award, is expected to vest. Cumulative adjustments are recorded on a quarterly basis to reflect subsequent changes to the estimated outcome of the performance criteria until the date results are determined.

*Variable Interest Entity*

In the year ended December 31, 2021, we invested in a cell of a protected cell company, or the protected cell, as part of our directors' and officers' liability risk financing strategy. Based on our control and the structure of the protected cell, we concluded that Jazz is the primary beneficiary of the protected cell and is required to consolidate the protected cell. The

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

insurance premium payable to the protected cell for the years ended December 31, 2022 and 2021 and the protected cell's assets and liabilities as of December 31, 2023 and 2022 were immaterial. No premium was payable for the year ended December 31, 2023.

*Recent Accounting Pronouncements*

In November 2023, the FASB issued ASU 2023-07, "Segment Reporting (Topic 280) - Improvements to Reportable Segment Disclosures", which requires enhanced disclosures about significant segment expenses. The amendments are effective retrospectively to all prior periods presented in the financial statements, for fiscal years beginning after December 15, 2023. We are currently evaluating the impact of adopting this new accounting guidance.

In December 2023, the FASB issued ASU 2023-09, "Income Taxes (Topic 740) - Improvements to Income Tax Disclosures", which requires additional enhanced tax disclosures. The amendments are effective on a prospective basis, with the option to apply it retrospectively, for fiscal years beginning after December 15, 2024. We are currently evaluating the impact of adopting this new accounting guidance.

**3. Collaborations, Disposition and Business Combination**

*License Agreements*

In November 2023, we entered into an exclusive licensing and collaboration agreement with Autifony Therapeutics Limited, or Autifony, to discover and develop drug candidates targeting two different ion channel targets associated with neurological disorders. Under the terms of the agreement, we made an upfront payment of $18.0 million to Autifony, which was recorded as acquired IPR&D expense in our consolidated statements of income (loss) for the year ended December 31, 2023. Autifony is eligible to receive development and commercial milestone payments of up to $752.5 million and, if a product is approved, a tiered, mid-single-digit percentage royalty on net sales of that product.

In October 2022, we entered into an exclusive licensing and collaboration agreement with Zymeworks Inc., or Zymeworks, providing us the right to acquire development and commercialization rights to Zymeworks' zanidatamab across all indications in the United States, Europe, Japan and all other territories except for those Asia/Pacific territories previously licensed by Zymeworks. In December 2022, we exercised the option to continue with the exclusive development and commercialization rights to zanidatamab. Zanidatamab is a bispecific antibody that can simultaneously bind two non-overlapping epitopes of HER2, known as biparatopic binding. Under the terms of the agreement, Zymeworks received an upfront payment of $50.0 million, and, following our decision to continue the collaboration after the readout of the top-line clinical data from HERIZON-BTC-01, a second, one-time payment of $325.0 million. We recorded the $375.0 million as acquired IPR&D expense in our consolidated statements of income (loss) for the year ended December 31, 2022. Zymeworks is also eligible to receive regulatory and commercial milestone payments of up to $1.4 billion, for total potential payments of $1.76 billion. Pending approval, Zymeworks is eligible to receive tiered royalties between 10% and 20% on our net sales.

In May 2022, we entered into a licensing agreement with Sumitomo Pharma Co., Ltd, or Sumitomo, to acquire exclusive development and commercialization rights in the U.S., Europe and other territories for DSP-0187, now referred to as JZP441. JZP441 is a potent, highly selective oral orexin-2 receptor agonist with potential application for the treatment of narcolepsy, IH and other sleep disorders. Under the terms of the agreement, we made an upfront payment of $50.0 million to Sumitomo, which was recorded as acquired IPR&D expense in our consolidated statements of income (loss) for the year ended December 31, 2022. Sumitomo is eligible to receive development, regulatory and commercial milestone payments of up to $1.09 billion and, if JZP441 is approved, a tiered, low double-digit royalty on Jazz's net sales of JZP441.

In April 2022, we entered into a licensing and collaboration agreement with Werewolf Therapeutics, Inc., or Werewolf, to acquire exclusive global development and commercialization rights to Werewolf's investigational WTX-613, now referred to as JZP898. JZP898 is a differentiated, conditionally-activated interferon alpha (IFNα) INDUKINE™ molecule. We made an upfront payment of $15.0 million to Werewolf in 2022, which was recorded as acquired IPR&D expense in our consolidated statements of income (loss) for the year ended December 31, 2022, and a milestone payment of $5.0 million in September 2023 which was recorded within research and development expense in our consolidated statements of income (loss) for the year ended December 31, 2023. Werewolf is eligible to receive further development, regulatory and commercial milestone payments of up to $1.26 billion and, if JZP898 is approved, a tiered, mid-single-digit percentage royalty on net sales of JZP898.

*Sunosi Disposition*

In March 2022, we entered into a definitive agreement to divest Sunosi to Axsome Therapeutics, Inc., or Axsome. In May 2022, we completed the U.S. divestiture and in November 2022, the ex-U.S. divestiture was completed. Under the terms of the sale agreement, Axsome received the rights to Sunosi in all of the existing territories available to us. We received an

Table of Contents

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

upfront payment of $53.0 million, and have the right to receive a high single-digit royalty on Axsome's U.S. net sales of Sunosi in current indications and a mid-single-digit royalty on Axsome's U.S. net sales of Sunosi in future indications.

Upon closing, we recognized a loss on disposal of $40.8 million within selling, general and administrative expenses in our consolidated statements of income (loss) in the year ended December 31, 2022. We are accounting for the contingent consideration in the form of the future royalty as it is earned.

We determined that the disposal of Sunosi did not qualify for reporting as a discontinued operation since it did not represent a strategic shift that has or will have a major effect on our operations and financial results.

*GW Acquisition*

On May 5, 2021, or the Closing Date, we acquired the entire issued share capital of GW. As a result, GW became an indirect wholly owned subsidiary of the Company.

We acquired GW with the objective of broadening our neuroscience portfolio, further diversifying our revenue and driving sustainable, long-term value creation opportunities. GW was a global leader in discovering, developing, manufacturing and commercializing novel, regulatory approved therapeutics from its proprietary cannabinoid research to address a broad range of diseases.

The aggregate consideration for the GW Acquisition was $7.2 billion as follows (all amounts in thousands except American Depositary Shares, or ADS, and per GW ADS amounts):

| | | |
|---|---|---:|
| GW ADS outstanding May 5, 2021 | | 31,556,200 |
| Cash consideration per GW ADS | $ | 200 |
| Total cash consideration to GW ADS holders | $ | 6,311,240 |
| Cash consideration to GW share option holders (inclusive of payroll taxes) | | 267,450 |
| Total cash consideration | | 6,578,690 |
| Equity consideration to GW ADS holders (1) | | 608,456 |
| Consideration related to replacement share option pre-combination service | | 3,555 |
| Total equity consideration | | 612,011 |
| Total purchase consideration | $ | 7,190,701 |

_____
(1) 3.8 million ordinary shares were issued to GW ADS holders. The closing price of the ordinary shares on May 4, 2021 ($160.20) was used to determine the fair value of this equity consideration because the closing of the transaction on May 5, 2021 occurred prior to the opening of regular trading.

In April 2021, we closed an offering of $1.5 billion in aggregate principal amount of 4.375% senior secured notes, due 2029, or the Secured Notes. In May 2021, we entered into a credit agreement, or the Credit Agreement, that provides for (i) a seven-year $3.1 billion term loan B facility, or the Dollar Term Loan, (ii) a seven-year €625.0 million term loan B facility, or the Euro Term Loan and, together with the Dollar Term Loan, collectively known as the Term Loan and (iii) a five-year $500.0 million revolving credit facility, or the Revolving Credit Facility. We financed the cash portion of the GW Acquisition consideration through a combination of cash on hand and borrowings under the Term Loan and the Secured Notes. For further information on the Term Loan and the Secured Notes, please see Note 12.

The GW Acquisition was accounted for as a business combination using the acquisition method under which assets and liabilities of GW were recorded at their respective estimated fair values as of the Closing Date and added to the assets and liabilities of the Company, including an amount for goodwill representing the difference between the acquisition consideration and the estimated fair value of the identifiable net assets. The results of operations of GW have been included in our consolidated financial statements since the Closing Date.

In 2021, we incurred $81.9 million in acquisition-related costs related to the GW Acquisition, which primarily consisted of banking, legal, accounting and valuation-related expenses. These expenses were recorded in selling, general and administrative expense in the accompanying consolidated statements of income (loss). In 2021, our consolidated statements of income (loss) included revenues of $476.4 million and a net loss of $704.6 million from the acquired GW business, as measured from the Closing Date.

Table of Contents

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following table summarizes the fair values of assets acquired and liabilities assumed at the Closing Date (in thousands):

| | Fair Values of Assets Acquired and Liabilities Assumed |
|---|---|
| Cash and cash equivalents | $ 343,898 |
| Accounts receivable | 76,355 |
| Inventory | 1,206,290 |
| Prepaid expenses and other current assets | 72,758 |
| Property, plant and equipment | 154,407 |
| Acquired developed technologies | 5,480,000 |
| In-process research and development | 160,000 |
| Total acquired identifiable intangible assets | 5,640,000 |
| Goodwill | 933,234 |
| Deferred tax liabilities, net | (1,069,076) |
| Accrued liabilities | (131,971) |
| Other assets/liabilities | (35,194) |
| Total purchase consideration | $ 7,190,701 |

**Inventory**

Inventories acquired included raw materials, work in progress and finished goods. Inventories were recorded at their estimated fair values. The inventory was valued at estimated selling price less the estimated costs to be incurred to complete (in the case of work in progress) and sell the inventory, the associated margins on these activities and holding costs. A step-up in value of inventory of $1,062.6 million was recorded in connection with the GW Acquisition. The step-up expense will be recorded in cost of product sales on our consolidated statements of income (loss) as the inventory is sold to customers from the Closing Date.

**Intangible assets**

The fair value of acquired intangible assets was $5,640.0 million. The intangible assets included acquired developed technologies, primarily related to Epidiolex, and IPR&D.

The fair value of the Epidiolex acquired developed technology asset was determined by applying the income approach, which recognizes that the fair value of an asset is premised upon the expected receipt of future economic benefits such as earnings and cash inflows based on current sales projections and estimated direct costs, using a discount rate of 9.4% that reflects the return requirements of the market. This intangible asset is being amortized over an estimated useful life of 12 years.

We acquired a nabiximols IPR&D asset in the acquisition. In 2022, we recorded an impairment charge of $133.6 million to write off the value of this asset as a result of our decision to discontinue the program.

Some of the more significant assumptions inherent in the development of intangible asset fair values include: the amount and timing of projected future cash flows (including revenue, cost of sales, research and development cost and sales and marketing expenses); probability of success; the discount rate selected to measure inherent risk of future cash flows; and the assessment of the asset's life cycle and the competitive trends impacting the asset, among other factors.

**Deferred tax liabilities, net**

The net deferred tax liability relates to the difference between the financial statement carrying amount and the tax basis of acquired intangible assets and inventory, partially offset by acquired net operating loss carryforwards and other temporary differences.

**Other tangible assets and liabilities**

Other tangible assets and liabilities were valued at their respective carrying amounts as management believes that these amounts approximated their acquisition-date fair values.

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**Goodwill**

Goodwill represents the excess of the total purchase consideration over the estimated fair value of net assets acquired and was recorded in the consolidated balance sheet as of the Closing Date. The goodwill was primarily attributable to the establishment of the deferred tax liability for the acquired intangible assets and inventory. We do not expect any portion of this goodwill to be deductible for income tax purposes.

**4. Cash and Available-for-Sale Securities**

Cash, cash equivalents and investments consisted of the following (in thousands):

| | | December 31, 2023 | | | | |
|---|---|---|---|---|---|---|
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value | Cash and Cash Equivalents | Investments |
| Cash | $ 437,724 | $ — | $ — | $ 437,724 | $ 437,724 | $ — |
| Time deposits | 420,000 | — | — | 420,000 | 300,000 | 120,000 |
| Money market funds | 768,586 | — | — | 768,586 | 768,586 | — |
| Totals | $ 1,626,310 | $ — | $ — | $ 1,626,310 | $ 1,506,310 | $ 120,000 |

| | | December 31, 2022 | | | | |
|---|---|---|---|---|---|---|
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value | Cash and Cash Equivalents | Investments |
| Cash | $ 334,018 | $ — | $ — | $ 334,018 | $ 334,018 | $ — |
| Time deposits | 30,000 | — | — | 30,000 | 30,000 | — |
| Money market funds | 517,464 | — | — | 517,464 | 517,464 | — |
| Totals | $ 881,482 | $ — | $ — | $ 881,482 | $ 881,482 | $ — |

Cash equivalents and investments are considered available-for-sale securities. We use the specific-identification method for calculating realized gains and losses on securities sold and include them in interest expense, net in the consolidated statements of income (loss). Our investment balances represent time deposits with original maturities of greater than three months and less than one year. Interest income from available-for-sale securities was $65.1 million, $11.5 million and $1.8 million in 2023, 2022 and 2021, respectively.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**5. Fair Value Measurement**

The following table summarizes, by major security type, our available-for-sale securities and derivative contracts that were measured at fair value on a recurring basis and were categorized using the fair value hierarchy (in thousands):

| | December 31, 2023 | | | December 31, 2022 | | |
|---|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Total Estimated Fair Value | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Total Estimated Fair Value |
| **Assets:** | | | | | | |
| Available-for-sale securities: | | | | | | |
| Time deposits | $ — | $ 420,000 | $ 420,000 | $ — | $ 30,000 | $ 30,000 |
| Money market funds | 768,586 | — | 768,586 | 517,464 | — | 517,464 |
| Interest rate contracts | — | 3,784 | 3,784 | — | — | — |
| Foreign exchange forward contracts | — | 18,035 | 18,035 | — | 17,356 | 17,356 |
| Totals | $ 768,586 | $ 441,819 | $ 1,210,405 | $ 517,464 | $ 47,356 | $ 564,820 |
| **Liabilities:** | | | | | | |
| Interest rate contracts | $ — | $ 3,410 | $ 3,410 | $ — | $ — | $ — |
| Foreign exchange forward contracts | — | 681 | 681 | — | — | — |
| Totals | $ — | $ 4,091 | $ 4,091 | $ — | $ — | $ — |

As of December 31, 2023 and 2022, our available-for-sale securities included money market funds and time deposits and their carrying values were approximately equal to their fair values. Money market funds were measured using quoted prices in active markets, which represent Level 1 inputs and time deposits were measured at fair value using Level 2 inputs. Level 2 inputs are obtained from various third party data providers and represent quoted prices for similar assets in active markets, or these inputs were derived from observable market data, or if not directly observable, were derived from or corroborated by other observable market data.

Our derivative assets and liabilities include interest rate and foreign exchange derivatives that are measured at fair value using observable market inputs such as forward rates, interest rates, our own credit risk as well as an evaluation of our counterparties' credit risks. Based on these inputs, the derivative assets and liabilities are classified within Level 2 of the fair value hierarchy.

There were no transfers between the different levels of the fair value hierarchy in 2023 or in 2022.

As of December 31, 2023 and 2022, the carrying amount of investments measured using the measurement alternative for equity investments without a readily determinable fair value was $4.7 million and $5.5 million, respectively. The carrying amount, which is recorded within other non-current assets, is based on the latest observable transaction price.

As of December 31, 2023, the estimated fair values of the 1.50% exchangeable senior notes due 2024, or 2024 Notes and the 2.00% exchangeable senior notes due 2026, or 2026 Notes, which we refer to collectively as the Exchangeable Senior Notes, were approximately $559.0 million and $1.0 billion, respectively. As of December 31, 2023, the estimated fair value of the Secured Notes and the Dollar Term Loan were approximately $1.4 billion and $2.7 billion, respectively. The fair values of each of these debt facilities was estimated using quoted market prices obtained from brokers (Level 2).

**6. Derivative Instruments and Hedging Activities**

We are exposed to certain risks arising from operating internationally, including fluctuations in foreign exchange rates primarily related to the translation of sterling and euro-denominated net monetary liabilities, including intercompany balances, held by subsidiaries with a U.S. dollar functional currency and fluctuations in interest rates on our outstanding term loan borrowings. We manage these exposures within specified guidelines through the use of derivatives. All of our derivative instruments are utilized for risk management purposes, and we do not use derivatives for speculative trading purposes.

We enter into foreign exchange forward contracts, with durations of up to 12 months, designed to limit the exposure to fluctuations in foreign exchange rates related to the translation of certain non-U.S. dollar denominated liabilities, including intercompany balances. Hedge accounting is not applied to these derivative instruments as gains and losses on these hedge

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

transactions are designed to offset gains and losses on underlying balance sheet exposures. As of December 31, 2023 and 2022, the notional amount of foreign exchange contracts where hedge accounting was not applied was $511.7 million and $505.0 million, respectively.

The foreign exchange gain (loss) in our consolidated statements of income (loss) included the following gains and losses associated with foreign exchange contracts not designated as hedging instruments (in thousands):

| Foreign Exchange Forward Contracts: | Year Ended December 31, | | |
| | 2023 | 2022 | 2021 |
|---|---|---|---|
| Gain (loss) recognized in foreign exchange gain (loss) | $ 13,543 | $ (58,755) | $ (19,585) |

To achieve a desired mix of floating and fixed interest rates on our variable rate debt, we entered into interest rate swap agreements in April 2023 which are effective until April 2026. These agreements hedge contractual term loan interest rates. As of December 31, 2023, the interest rate swap agreements had a notional amount of $500.0 million. As a result of these agreements, the interest rate on a portion of our term loan borrowings is fixed at 3.9086%, plus the borrowing spread, until April 30, 2026.

Our previous interest rate swap was entered into in March 2017. In May 2021, we repaid the term loan to which these interest rate swap agreements related, at which point the interest rate swap contracts were de-designated as cash flow hedges. These interest rate swap agreements matured in July 2021.

The impact on accumulated other comprehensive income (loss) and earnings from derivative instruments that qualified as cash flow hedges was as follows (in thousands):

| Interest Rate Contracts: | Year Ended December 31, | | |
| | 2023 | 2022 | 2021 |
|---|---|---|---|
| Gain (loss) recognized in accumulated other comprehensive income (loss), net of tax | $ 3,658 | $ — | $ (14) |
| (Gain) loss reclassified from accumulated other comprehensive income (loss) to interest expense, net of tax | (3,423) | — | 2,482 |

Assuming no change in the U.S dollar Secured Overnight Financing Rate, or Term SOFR based interest rates from market rates as of December 31, 2023, $2.8 million of gains, net of tax, recognized in accumulated other comprehensive income (loss) will be reclassified to earnings over the next 12 months.

In order to hedge our exposure to foreign currency exchange risk associated with our Euro Term Loan, we entered into a cross-currency interest rate swap contract in May 2021, which matured in March 2022, and was de-designated as a fair value hedge. The terms of this contract converted the principal repayments and interest payments on the Euro Term Loan into U.S. dollars. The carrying amount of the Euro Term Loan and the fair value of the cross-currency interest rate swap contract were remeasured on a monthly basis, with changes in the euro to U.S. dollar foreign exchange rates recognized within foreign exchange gain (loss) in the consolidated statements of income (loss).

The impact on accumulated other comprehensive income (loss) and earnings from the cross-currency interest rate swap contract was as follows (in thousands):

| Cross-Currency Interest Rate Contract: | Year Ended December 31, | |
| | 2022 | 2021 |
|---|---|---|
| Loss recognized in accumulated other comprehensive income (loss), net of tax | $ — | $ (375) |
| Loss reclassified from accumulated other comprehensive income (loss) to foreign exchange loss, net of tax | 128 | 246 |
| Loss recognized in foreign exchange loss | 2,646 | 35,885 |

The cash flow effects of our derivative contracts are included within net cash provided by operating activities in the consolidated statements of cash flows, except for the settlement of notional amounts of the cross-currency swap, which were included in net cash used in financing activities.

F-22

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following tables summarize the fair value of outstanding derivatives (in thousands):

| | | December 31, 2023 | | |
| | Asset Derivatives | | Liability Derivatives | |
| | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value |
|---|---|---|---|---|
| Derivatives designated as hedging instruments: | | | | |
| Interest rate contracts | Other current assets | $ 3,784 | Accrued liabilities | $ — |
| | Other non-current assets | — | Other non-current liabilities | 3,410 |
| Derivatives not designated as hedging instruments: | | | | |
| Foreign exchange forward contracts | Other current assets | 18,035 | Accrued liabilities | 681 |
| Total fair value of derivative instruments | | $ 21,819 | | $ 4,091 |

| | | December 31, 2022 | | |
| | Asset Derivatives | | Liability Derivatives | |
| | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value |
|---|---|---|---|---|
| Derivatives not designated as hedging instruments: | | | | |
| Foreign exchange forward contracts | Other current assets | $ 17,356 | Accrued liabilities | $ — |
| Total fair value of derivative instruments | | $ 17,356 | | $ — |

Although we do not offset derivative assets and liabilities within our consolidated balance sheets, our International Swap and Derivatives Association agreements provide for net settlement of transactions that are due to or from the same counterparty upon early termination of the agreement due to an event of default or other termination event. These provisions were not applicable as of December 31, 2022 since all derivatives were in an asset position. The following table summarizes the potential effect on our consolidated balance sheets of offsetting our interest rate contracts and foreign exchange forward contracts subject to such provisions as of December 31, 2023 (in thousands):

| | | | | December 31, 2023 | | | |
| | | | | | Gross Amounts Not Offset in the Consolidated Balance Sheet | | |
| Description | Gross Amounts of Recognized Assets/ Liabilities | Gross Amounts Offset in the Consolidated Balance Sheet | Net Amounts of Assets/ Liabilities Presented in the Consolidated Balance Sheet | Derivative Financial Instruments | Cash Collateral Received (Pledged) | Net Amount |
|---|---|---|---|---|---|---|
| Derivative assets | $ 21,819 | $ — | $ 21,819 | $ (4,091) | $ — | $ 17,728 |
| Derivative liabilities | (4,091) | — | (4,091) | 4,091 | — | — |

**7. Inventories**

Inventories consisted of the following (in thousands):

| | December 31, | |
| | 2023 | 2022 |
|---|---|---|
| Raw materials | $ 25,595 | $ 20,786 |
| Work in process | 431,732 | 517,670 |
| Finished goods | 139,712 | 175,605 |
| Total inventories | $ 597,039 | $ 714,061 |

As of December 31, 2023 and 2022, inventories included $328.0 million and $457.6 million, respectively, related to the purchase accounting inventory fair value step-up on inventory acquired in the GW Acquisition.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**8. Other Current Assets**

Other current assets consisted of the following (in thousands):

| | December 31, | |
|---|---|---|
| | **2023** | **2022** |
| Deferred charge for income taxes on intercompany profit | $ 171,507 | $ 176,057 |
| Other | 149,302 | 91,135 |
| Total other current assets | $ 320,809 | $ 267,192 |

**9. Property, Plant and Equipment**

Property, plant and equipment consisted of the following (in thousands):

| | December 31, | |
|---|---|---|
| | **2023** | **2022** |
| Manufacturing equipment and machinery | $ 82,897 | $ 73,580 |
| Land and buildings | 70,912 | 68,935 |
| Leasehold improvements | 67,722 | 64,776 |
| Computer software | 38,134 | 34,116 |
| Construction-in-progress | 18,661 | 67,385 |
| Computer equipment | 15,398 | 16,424 |
| Furniture and fixtures | 9,273 | 10,481 |
| Subtotal | 302,997 | 335,697 |
| Less accumulated depreciation and amortization | (133,351) | (107,647) |
| Property, plant and equipment, net | $ 169,646 | $ 228,050 |

Depreciation and amortization expense on property, plant and equipment amounted to $30.4 million, $30.3 million and $26.7 million for the years ended December 31, 2023, 2022 and 2021, respectively.

**10. Goodwill and Intangible Assets**

The gross carrying amount of goodwill was as follows (in thousands):

| | |
|---|---|
| Balance at December 31, 2022 | $ 1,692,662 |
| Foreign exchange | 60,468 |
| Balance at December 31, 2023 | $ 1,753,130 |

The gross carrying amounts and net book values of our intangible assets were as follows (in thousands):

| | Remaining Weighted-Average Useful Life (In years) | December 31, 2023 | | | December 31, 2022 | | |
|---|---|---|---|---|---|---|---|
| | | Gross Carrying Amount | Accumulated Amortization | Net Book Value | Gross Carrying Amount | Accumulated Amortization | Net Book Value |
| Acquired developed technologies | 8.8 | $ 7,785,495 | $ (2,367,456) | $ 5,418,039 | $ 7,491,994 | $ (1,697,557) | $ 5,794,437 |
| Manufacturing contracts | — | 11,828 | (11,828) | — | 11,417 | (11,417) | — |
| Trademarks | — | 2,886 | (2,886) | — | 2,876 | (2,876) | — |
| Total finite-lived intangible assets | | $ 7,800,209 | $ (2,382,170) | $ 5,418,039 | $ 7,506,287 | $ (1,711,850) | $ 5,794,437 |

The increase in the gross carrying amount of intangible assets as of December 31, 2023 compared to December 31, 2022 primarily relates to the positive impact of foreign currency translation adjustments due to the strengthening of sterling against the U.S. dollar.

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The assumptions and estimates used to determine future cash flows and remaining useful lives of our intangible and other long-lived assets are complex and subjective. They can be affected by various factors, including external factors, such as industry and economic trends, and internal factors such as changes in our business strategy and our forecasts for specific product lines.

Based on finite-lived intangible assets recorded as of December 31, 2023, and assuming the underlying assets will not be impaired and that we will not change the expected lives of any other assets, future amortization expenses were estimated as follows (in thousands):

| Year Ending December 31, | | Estimated Amortization Expense |
|---|---|---|
| 2024 | $ | 624,651 |
| 2025 | | 624,651 |
| 2026 | | 624,651 |
| 2027 | | 624,651 |
| 2028 | | 623,319 |
| Thereafter | | 2,296,116 |
| Total | $ | 5,418,039 |

**11. Accrued Liabilities**

Accrued liabilities consisted of the following (in thousands):

| | | December 31, | | |
|---|---|---|---|---|
| | | 2023 | | 2022 |
| Rebates and other sales deductions | $ | 325,711 | $ | 313,176 |
| Employee compensation and benefits | | 121,209 | | 143,243 |
| Accrued facilities expenses | | 55,455 | | 25,864 |
| Clinical trial accruals | | 44,757 | | 31,338 |
| Accrued interest | | 36,443 | | 35,614 |
| Accrued royalties | | 30,706 | | 57,347 |
| Sales return reserve | | 20,435 | | 26,164 |
| Consulting and professional services | | 19,538 | | 22,278 |
| Current portion of lease liabilities | | 19,447 | | 15,938 |
| Selling and marketing accruals | | 14,743 | | 18,553 |
| Inventory-related accruals | | 13,977 | | 8,565 |
| Accrued collaboration expenses | | 10,158 | | 33,205 |
| Accrued construction-in-progress | | 5,141 | | 3,298 |
| Derivative instrument liabilities | | 681 | | — |
| Other | | 75,513 | | 68,672 |
| Total accrued liabilities | $ | 793,914 | $ | 803,255 |

F-25

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**12. Debt**

The following table summarizes the carrying amount of our indebtedness (in thousands):

| | December 31, | |
| | 2023 | 2022 |
|---|---|---|
| 2024 Notes | $ 575,000 | $ 575,000 |
| Unamortized - debt issuance costs | (1,046) | (2,738) |
| 2024 Notes, net | 573,954 | 572,262 |
| | | |
| 2026 Notes | 1,000,000 | 1,000,000 |
| Unamortized - debt issuance costs | (6,400) | (8,932) |
| 2026 Notes, net | 993,600 | 991,068 |
| | | |
| Secured Notes | 1,480,214 | 1,476,938 |
| | | |
| Term Loan | 2,665,174 | 2,684,073 |
| Total debt | 5,712,942 | 5,724,341 |
| Less current portion [(1)] | 604,954 | 31,000 |
| Total long-term debt | $ 5,107,988 | $ 5,693,341 |

(1) Balance as of December 31, 2023 includes the 2024 Notes since they mature in August 2024.

*Credit Agreement*

On May 5, 2021, the Company, Jazz Financing Lux S.à.r.l., or Jazz Lux, and certain of our other subsidiaries, as borrowers, or collectively with the Company and Jazz Lux, the "Borrowers", entered into the Credit Agreement by and among the Borrowers, the lenders and issuing banks from time to time party thereto, Bank of America, N.A., as administrative agent and U.S. Bank Trust Company, National Association, as collateral trustee, or the Credit Agreement, that provided for (i) the Dollar Term Loan which was drawn by Jazz Lux on the Closing Date in U.S. dollars (ii) the Euro Term Loan which was drawn by Jazz Lux on the Closing Date in Euros and (iii) the Revolving Credit Facility.

We used the proceeds from the Term Loan (i) to repay in full $575.9 million under that certain credit agreement, dated as of June 18, 2015 (as amended) among the Company, and certain of our other subsidiaries as borrowers, the lenders party thereto and Bank of America, N.A., as administrative agent and collateral agent, or the Existing Credit Agreement, (ii) to fund, in part, the cash consideration payable in connection with the GW Acquisition and (iii) to pay related fees and expenses. Upon the repayment in full of loans under the Existing Credit Agreement, it was terminated and all guarantees and liens thereunder were released.

In 2021, we made voluntary prepayments on the Euro Term Loan totaling €416.7 million, or $502.0 million, and in March 2022 we repaid the remaining outstanding principal of €208.3 million, or $251.0 million. The Euro Term Loan bore interest at the Euro Inter-Bank Offered Rate, or EURIBOR, plus an applicable margin. The applicable margin for the Euro Term Loan was 3.50%. During the term of the Euro Term Loan, the interest rate and effective interest rate were 4.43% and 4.93%, respectively.

In January 2024, Jazz Lux entered into an amendment, or Repricing Amendment, to the Credit Agreement. Upon entry into the Repricing Amendment, certain existing lenders converted outstanding Dollar Term Loans into a new tranche of U.S. dollar term loans, or the Tranche B-1 Dollar Term Loans, and Jazz Lux borrowed $201.9 million aggregate principal amount of additional Tranche B-1 Dollar Term Loans, the proceeds of which were used to repay the outstanding Dollar Term Loans that were not converted. The Tranche B-1 Dollar Term Loans are a separate class of term loans under the Credit Agreement with the same material terms (including with respect to maturity, prepayment, security, covenants and events of default) as the previously outstanding Dollar Term Loans, with the interest rate amended as described below. The principal amount of Dollar Term Loans outstanding immediately prior to the Repricing Amendment and the outstanding principal amount of Tranche B-1 Dollar Term Loans immediately following the Repricing Amendment, each totaled $2.723 billion. The Tranche B-1 Dollar Term Loans bear interest at a rate equal to either (a) Term SOFR or (b) the prime lending rate, in each case, plus an applicable margin. The applicable margin for the Tranche B-1 Dollar Term Loans is 3.00% (in the case of Term SOFR borrowings) and

F-26

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

2.00% (in the case of borrowings at the prime lending rate), a decrease of 50 basis points from the applicable margin on the Initial Dollar Term Loans. The Tranche B-1 Dollar Term Loans are subject to a Term SOFR floor of 0.50%. The applicable margin for the Revolving Credit Facility ranges from 3.25% to 2.75% (in the case of Term SOFR borrowings) and 2.25% to 1.75% (in the case of borrowings at the prime lending rate), depending on our first lien secured net leverage ratio level. The Tranche B-1 Dollar Term Loan is subject to a Term SOFR floor of 0.50% and loans under the Revolving Credit Facility are not subject to a floor. The Revolving Credit Facility has a commitment fee payable on the undrawn amount ranging from 0.50% to 0.40% per annum based upon our first lien secured net leverage ratio. As of December 31, 2023, the interest rate and effective interest rate on the Dollar Term Loan were 8.97% and 4.56%, respectively. Pursuant to the Repricing Amendment, the interest rate and effective interest rate on the Tranche B-1 Dollar Term Loans are 8.90% and 9.50%, respectively. As of December 31 ,2023, we had an undrawn Revolving Credit Facility totaling $500.0 million.

We may make voluntary prepayments at any time without payment of a premium or penalty, subject to certain exceptions, and are required to make certain mandatory prepayments of outstanding indebtedness under the Credit Agreement in certain circumstances. Principal repayments of the Dollar Term Loan, which were due quarterly, began in September 2021 and were equal to 1.0% per annum of the original principal amount of $3.1 billion with any remaining balance payable on the maturity date. In September 2022, we made a voluntary repayment on the Dollar Term Loan totaling $300.0 million. The Tranche B-1 Dollar Term Loans will amortize in quarterly installments equal to 0.284664830% of the initial principal amount thereof, with the remaining balance payable on May 5, 2028.

The Borrowers' obligations under the Credit Agreement and any hedging or cash management obligations entered into with any lender thereunder are guaranteed by the Company, the other borrowers, and each of the Company's other existing or subsequently acquired or organized direct and indirect subsidiaries (subject to certain exceptions), or the Guarantors. We refer to the Borrowers and the Guarantors collectively as the "Loan Parties."

The Loan Parties' obligations under the Credit Agreement are secured, subject to customary permitted liens and other exceptions, by a security interest in (a) all tangible and intangible assets of the Loan Parties, except for certain excluded assets, and (b) all of the equity interests of the subsidiaries of the Loan Parties held by the Loan Parties.

The Credit Agreement contains customary representations and warranties and customary affirmative and negative covenants applicable to the Company and its restricted subsidiaries, including, among other things, restrictions on indebtedness, liens, investments, mergers, dispositions, prepayment of junior indebtedness and dividends and other distributions. The Credit Agreement contains financial covenants that require the Company and its restricted subsidiaries to (a) not exceed a maximum first lien secured net leverage ratio and (b) not fall below a minimum interest coverage ratio, provided that such covenants apply only to the Revolving Credit Facility and are applicable only if amounts are drawn (or non-cash collateralized letters of credit in excess of $50 million are outstanding) under the Revolving Credit Facility. The Credit Agreement also contains customary events of default relating to, among other things, failure to make payments, breach of covenants and breach of representations.

*2029 Senior Secured Notes*

On April 29, 2021, Jazz Securities Designated Activity Company, or Jazz Securities, a direct wholly owned subsidiary of the Company, closed the offering of the Secured Notes in a private placement. We used the proceeds from the Secured Notes to fund, in part, the cash consideration payable in connection with the GW Acquisition.

Interest on the Secured Notes is payable semi-annually in arrears on January 15 and July 15 of each year, beginning on January 15, 2022, at a rate of 4.375% per year. The Secured Notes mature on January 15, 2029.

The Secured Notes are jointly and severally guaranteed by the Company and each of its restricted subsidiaries, other than Jazz Securities, that is a borrower, or a guarantor, under the Credit Agreement. The Secured Notes and related guarantees are secured by a first priority lien (subject to permitted liens and certain other exceptions), equally and ratably with the Credit Agreement, on the collateral securing the Credit Agreement.

Except as described below, the Secured Notes may not be optionally redeemed before July 15, 2024. Thereafter, some or all of the Secured Notes, may be redeemed at any time and from time to time at a specified redemption prices, plus accrued and unpaid interest, if any, to, but excluding, to the redemption date. Jazz Securities may redeem all but not part of the Secured Notes at its option at any time in connection with certain tax-related events and may redeem some or all of the Secured Notes at any time and from time to time prior to July 15, 2024 at a price equal to 100% of the principal amount of the Secured Notes to be redeemed plus a "make whole" premium, plus accrued and unpaid interest, if any, to, but excluding, the redemption date. In addition, Jazz Securities may redeem up to 40% of the aggregate principal amount of the Secured Notes at any time and from time to time prior to July 15, 2024, with the net proceeds of certain equity offerings at a price of 104.375% of the principal amount of such Secured Notes, plus accrued and unpaid interest, if any, to, but excluding, the redemption date. In addition, during each of the three consecutive twelve-month periods commencing on the issue date of the Secured Notes, Jazz Securities

F-27

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

may redeem up to 10% of the original aggregate initial principal amount of the Secured Notes at a redemption price of 103% of the principal amount of such Secured Notes, plus accrued and unpaid interest, if any, to, but excluding, the redemption date.

If Jazz undergoes a change of control, Jazz Securities will be required to make an offer to purchase all of the Secured Notes at a purchase price in cash equal to 101% of the principal amount thereof, plus accrued and unpaid interest, if any, to, but excluding, the date of repurchase, subject to certain exceptions.

The indenture governing the Secured Notes contains customary affirmative covenants and negative covenants applicable to the Company and its restricted subsidiaries, including, among other things, restrictions on indebtedness, liens, investments, mergers, dispositions, prepayment of junior indebtedness and dividends and other distributions. If Jazz Securities or the Company's restricted subsidiaries engage in certain asset sales, Jazz Securities will be required under certain circumstances to make an offer to purchase the Secured Notes at 100% of the principal amount, plus accrued and unpaid interest, if any, to, but excluding, the repurchase date.

As of December 31, 2023, the interest rate and effective interest rate on the Secured Notes were 4.375% and 4.64%, respectively.

*Exchangeable Senior Notes Due 2026*

In 2020 we completed a private placement of $1.0 billion principal amount of the 2026 Notes. We used a portion of the net proceeds from this offering to repurchase for cash $332.9 million aggregate principal amount of the 1.875% exchangeable senior notes due 2021, or 2021 Notes, through privately-negotiated transactions concurrently with the offering of the 2026 Notes. Interest on the 2026 Notes is payable semi-annually in cash in arrears on June 15 and December 15 of each year, beginning on December 15, 2020, at a rate of 2.00% per year. In certain circumstances, we may be required to pay additional amounts as a result of any applicable tax withholding or deductions required in respect of payments on the 2026 Notes. The 2026 Notes mature on June 15, 2026, unless earlier exchanged, repurchased or redeemed.

The holders of the 2026 Notes have the ability to require us to repurchase all or a portion of their 2026 Notes for cash in the event we undergo certain fundamental changes, such as specified change of control transactions, our liquidation or dissolution or the delisting of our ordinary shares from any of The New York Stock Exchange, The Nasdaq Global Market, The Nasdaq Global Select Market or The Nasdaq Capital Market (or any of their respective successors). Additionally, the terms and covenants in the indenture related to the 2026 Notes include certain events of default after which the 2026 Notes may be due and payable immediately. Prior to June 15, 2026, we may redeem the 2026 Notes, in whole but not in part, subject to compliance with certain conditions, if we have, or on the next interest payment date would, become obligated to pay to the holder of any 2026 Notes additional amounts as a result of certain tax-related events. We also may redeem the 2026 Notes on or after June 20, 2023 and prior to March 15, 2026, in whole or in part, if the last reported sale price per ordinary share has been at least 130% of the exchange price then in effect for at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period ending on, and including, the trading day immediately preceding the date on which we provide the notice of redemption.

The 2026 Notes are exchangeable at an initial exchange rate of 6.4182 ordinary shares per $1,000 principal amount of 2026 Notes, which is equivalent to an initial exchange price of approximately $155.81 per ordinary share. Upon exchange, the 2026 Notes may be settled in cash, ordinary shares or a combination of cash and ordinary shares, at our election. Our intent and policy is to settle the principal amount of the 2026 Notes in cash upon exchange. The exchange rate will be subject to adjustment in some events but will not be adjusted for any accrued and unpaid interest. In addition, following certain make-whole fundamental changes occurring prior to the maturity date of the 2026 Notes or upon our issuance of a notice of redemption, we will in certain circumstances increase the exchange rate for holders of the 2026 Notes who elect to exchange their 2026 Notes in connection with that make-whole fundamental change or during the related redemption period. Prior to March 15, 2026, the 2026 Notes will be exchangeable only upon satisfaction of certain conditions and during certain periods, and thereafter, at any time until the close of business on the second scheduled trading day immediately preceding the maturity date.

As of December 31, 2023, the "if converted value" did not exceed the principal amount of the 2026 Notes. As of December 31, 2022, the "if converted value" of the 2026 Notes exceeded the principal amount by $22.5 million.

The total liability is reflected net of issuance costs of $15.3 million which will be amortized over the term of the 2026 Notes. We have determined the expected life of the 2026 Notes to be equal to the original six-year term. The effective interest rate of the 2026 Notes is 2.26%.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Exchangeable Senior Notes Due 2024*

In 2017, we completed a private placement of $575.0 million principal amount of 2024 Notes. We used the net proceeds from this offering to repay $500.0 million in outstanding loans under the revolving credit facility and to pay related fees and expenses. We used the remainder of the net proceeds for general corporate purposes. Interest on the 2024 Notes is payable semi-annually in cash in arrears on February 15 and August 15 of each year, beginning on February 15, 2018, at a rate of 1.50% per year. In certain circumstances, we may be required to pay additional amounts as a result of any applicable tax withholding or deductions required in respect of payments on the 2024 Notes. The 2024 Notes mature on August 15, 2024, unless earlier exchanged, repurchased or redeemed.

The holders of the 2024 Notes have the ability to require us to repurchase all or a portion of their 2024 Notes for cash in the event we undergo certain fundamental changes, such as specified change of control transactions, our liquidation or dissolution or the delisting of our ordinary shares from The Nasdaq Global Select Market. Prior to August 15, 2024, we may redeem the 2024 Notes, in whole but not in part, subject to compliance with certain conditions, if we have, or on the next interest payment date would, become obligated to pay to the holder of any 2024 Notes additional amounts as a result of certain tax-related events. We also may redeem the 2024 Notes on or after August 20, 2021, in whole or in part, if the last reported sale price per ordinary share has been at least 130% of the exchange price then in effect for at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period ending on, and including, the trading day immediately preceding the date on which we provide the notice of redemption.

The 2024 Notes are exchangeable at an initial exchange rate of 4.5659 ordinary shares per $1,000 principal amount of 2024 Notes, which is equivalent to an initial exchange price of approximately $219.02 per ordinary share. In August 2023, we made an irrevocable election to fix the settlement method for exchanges of the 2024 Notes to a combination of cash and ordinary shares of the Company with a specified cash amount per $1,000 principal amount of the 2024 Notes of $1,000. The exchange rate will be subject to adjustment in some events but will not be adjusted for any accrued and unpaid interest. In addition, following certain make-whole fundamental changes occurring prior to the maturity date of the 2024 Notes or upon our issuance of a notice of redemption, we will in certain circumstances increase the exchange rate for holders of the 2024 Notes who elect to exchange their 2024 Notes in connection with that make-whole fundamental change or during the related redemption period. Prior to May 15, 2024, the 2024 Notes will be exchangeable only upon satisfaction of certain conditions and during certain periods, and thereafter, at any time until the close of business on the second scheduled trading day immediately preceding the maturity date.

As of December 31, 2023 and 2022, the "if-converted value" did not exceed the principal amount of the 2024 Notes.

The total liability is reflected net of issuance costs of $11.4 million which will be amortized over the term of the 2024 Notes. We have determined the expected life of the 2024 Notes to be equal to the original seven-year term. The effective interest rate of the 2024 Notes is 1.79%.

The Exchangeable Senior Notes were issued by Jazz Investments I Limited, or the Issuer, a 100%-owned finance subsidiary of Jazz Pharmaceuticals plc. The Exchangeable Senior Notes are senior unsecured obligations of the Issuer and are fully and unconditionally guaranteed on a senior unsecured basis by Jazz Pharmaceuticals plc. No subsidiary of Jazz Pharmaceuticals plc guaranteed the Exchangeable Senior Notes. Subject to certain local law restrictions on payment of dividends, among other things, and potential negative tax consequences, we are not aware of any significant restrictions on the ability of Jazz Pharmaceuticals plc to obtain funds from the Issuer or Jazz Pharmaceuticals plc's other subsidiaries by dividend or loan, or any legal or economic restrictions on the ability of the Issuer or Jazz Pharmaceuticals plc's other subsidiaries to transfer funds to Jazz Pharmaceuticals plc in the form of cash dividends, loans or advances. There is no assurance that in the future such restrictions will not be adopted.

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

For the years ended December 31, 2023 and 2022, we recognized $32.8 million, in interest expense, net, of which, $28.6 million related to the contractual coupon rate and $4.2 million related the amortization of the debt issuance costs on the Exchangeable Senior Notes. For the year ended December 31, 2021, we recognized $89.9 million in interest expense, net, of which, $31.2 million related to the contractual coupon rate, $4.4 million related to the debt issuance costs and $54.3 million related to the amortization of the debt discount costs.

Scheduled maturities with respect to our long-term debt are as follows (in thousands):

| Year Ending December 31, | Scheduled Long-Term Debt Maturities |
|---|---|
| 2024 | $ 606,000 |
| 2025 | 31,000 |
| 2026 | 1,031,000 |
| 2027 | 31,000 |
| 2028 | 2,598,500 |
| Thereafter | 1,500,000 |
| Total | $ 5,797,500 |

**13. Leases**

We have noncancelable leases for our buildings and growing facilities and we are obligated to make payments under noncancelable operating leases for automobiles used by our sales force.

The components of the lease expense for the years ended December 31, 2023, 2022 and 2021 were as follows (in thousands):

| Lease Cost | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Operating lease cost | $ 19,394 | $ 19,670 | $ 23,869 |
| Short-term lease cost | 6,290 | 5,088 | 5,540 |
| Variable lease cost | 81 | 5 | 10 |
| Sublease income | (22) | — | — |
| **Finance Lease Cost** | | | |
| Amortization of leased asset | 481 | 472 | 324 |
| Interest on lease liabilities | 377 | 429 | 295 |
| Net lease cost | $ 26,601 | $ 25,664 | $ 30,038 |

F-30

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Supplemental balance sheet information related to operating and finance leases was as follows (in thousands):

| Leases | Classification | December 31, 2023 | | December 31, 2022 | |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Operating lease assets | Operating lease assets | $ | 65,340 | $ | 73,326 |
| Finance lease assets | Property, plant and equipment | | 4,450 | | 4,671 |
| Total lease assets | | $ | 69,790 | $ | 77,997 |
| | | | | | |
| **Liabilities** | | | | | |
| Current | | | | | |
| Operating lease liabilities | Accrued liabilities | $ | 19,019 | $ | 15,557 |
| Finance lease liabilities | Accrued liabilities | | 428 | | 381 |
| Non-current | | | | | |
| Operating lease liabilities | Operating lease liabilities, less current portion | | 59,225 | | 71,838 |
| Finance lease liabilities | Other non-current liabilities | | 5,039 | | 5,210 |
| Total lease liabilities | | $ | 83,711 | $ | 92,986 |

| Lease Term and Discount Rate | December 31, 2023 | December 31, 2022 |
|---|---|---|
| Weighted-average remaining lease term (years) | | |
| Operating leases | 5.1 | 5.8 |
| Finance leases | 11.2 | 12.0 |
| Weighted-average discount rate | | |
| Operating leases | 5.4 % | 5.3 % |
| Finance leases | 7.5 % | 7.4 % |

Supplemental cash flow information related to operating and finance leases was as follows (in thousands):

| | Year Ended December 31, 2023 | | 2022 | | 2021 | |
|---|---|---|---|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities: | | | | | | |
| Operating cash outflows from operating leases | $ | 20,646 | $ | 20,544 | $ | 24,847 |
| Operating cash outflows from finance leases | | 835 | | 806 | | 625 |
| Financing cash outflows from finance leases | | 377 | | 429 | | 324 |
| Non-cash operating activities: | | | | | | |
| Operating lease assets obtained in exchange for new operating lease liabilities | $ | 9,953 | $ | 4,312 | $ | 8,188 |
| Finance lease assets obtained in exchange for new finance lease liabilities | | — | | — | | 650 |
| De-recognition of operating lease asset on lease assignment / termination | | 4,169 | | — | | 56,968 |
| De-recognition of operating lease liability on lease assignment / termination | | 4,457 | | — | | 68,064 |

F-31

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Maturities of operating and finance lease liabilities were as follows (in thousands):

| Year Ending December 31, | Operating Leases | | Finance Leases | |
|---|---|---|---|---|
| 2024 | $ | 22,841 | $ | 823 |
| 2025 | | 16,891 | | 823 |
| 2026 | | 14,184 | | 823 |
| 2027 | | 12,675 | | 769 |
| 2028 | | 12,008 | | 610 |
| Thereafter | | 11,819 | | 4,382 |
| Total lease payments | | 90,418 | | 8,230 |
| Less imputed interest | | (12,174) | | (2,763) |
| Present value of lease liabilities | $ | 78,244 | $ | 5,467 |

### 14. Commitments and Contingencies

*Indemnification*

In the normal course of business, we enter into agreements that contain a variety of representations and warranties and provide for general indemnification, including indemnification associated with product liability or infringement of intellectual property rights. Our exposure under these agreements is unknown because it involves future claims that may be made but have not yet been made against us. To date, we have not paid any claims or been required to defend any action related to these indemnification obligations.

We have agreed to indemnify our executive officers, directors and certain other employees for losses and costs incurred in connection with certain events or occurrences, including advancing money to cover certain costs, subject to certain limitations. The maximum potential amount of future payments we could be required to make under the indemnification obligations is unlimited; however, we maintain insurance policies that may limit our exposure and may enable us to recover a portion of any future amounts paid. Assuming the applicability of coverage, the willingness of the insurer to assume coverage, and subject to certain retention, loss limits and other policy provisions, we believe the fair value of these indemnification obligations is not significant. Accordingly, we did not recognize any liabilities relating to these obligations as of December 31, 2023 and December 31, 2022. No assurances can be given that the covering insurers will not attempt to dispute the validity, applicability, or amount of coverage without expensive litigation against these insurers, in which case we may incur substantial liabilities as a result of these indemnification obligations.

*Other Commitments*

As of December 31, 2023, we had $56.6 million of noncancelable purchase commitments due within one year, primarily related to agreements with third party manufacturers.

*Legal Proceedings*

We are involved in legal proceedings, including the following matters:

*Xyrem Antitrust Litigation*

From June 2020 to May 2022, a number of lawsuits were filed on behalf of purported direct and indirect Xyrem purchasers, alleging that the patent litigation settlement agreements we entered with generic drug manufacturers who had filed Abbreviated New Drug Applications, or ANDA, violate state and federal antitrust and consumer protection laws, as follows:

On June 17, 2020, a class action lawsuit was filed in the United States District Court for the Northern District of Illinois by Blue Cross and Blue Shield Association, or BCBS, against Jazz Pharmaceuticals plc, Jazz Pharmaceuticals, Inc., and Jazz Pharmaceuticals Ireland Limited, or, collectively, the Company Defendants (hereinafter referred to as the BCBS Lawsuit). The BCBS Lawsuit also names Roxane Laboratories, Inc., Hikma Pharmaceuticals USA Inc., Eurohealth (USA), Inc., Hikma Pharmaceuticals plc, Amneal Pharmaceuticals LLC, Par Pharmaceutical, Inc., Lupin Ltd., Lupin Pharmaceuticals Inc., and Lupin Inc., or, collectively, the BCBS Defendants.

On June 18 and June 23, 2020, respectively, two additional class action lawsuits were filed against the Company Defendants and the BCBS Defendants: one by the New York State Teamsters Council Health and Hospital Fund in the United States District Court for the Northern District of California, and another by the Government Employees Health Association Inc. in the United States District Court for the Northern District of Illinois (hereinafter referred to as the GEHA Lawsuit).

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

On June 18, 2020, a class action lawsuit was filed in the United States District Court for the Northern District of California by the City of Providence, Rhode Island, on behalf of itself and all others similarly situated, against Jazz Pharmaceuticals plc, and Roxane Laboratories, Inc., West-Ward Pharmaceuticals Corp., Hikma Labs Inc., Hikma Pharmaceuticals USA Inc., and Hikma Pharmaceuticals plc, or, collectively, the City of Providence Defendants.

On June 30, 2020, a class action lawsuit was filed in the United States District Court for the Northern District of Illinois by UFCW Local 1500 Welfare Fund on behalf of itself and all others similarly situated, against Jazz Pharmaceuticals Ireland Ltd., Jazz Pharmaceuticals, Inc., Roxane Laboratories, Inc., Hikma Pharmaceuticals plc, Eurohealth (USA), Inc. and West-Ward Pharmaceuticals Corp., or collectively the UFCW Defendants (hereinafter referred to as the UFCW Lawsuit).

On July 13, 2020, the plaintiffs in the BCBS Lawsuit and the GEHA Lawsuit dismissed their complaints in the United States District Court for the Northern District of Illinois and refiled their respective lawsuits in the United States District Court for the Northern District of California. On July 14, 2020, the plaintiffs in the UFCW Lawsuit dismissed their complaint in the United States District Court for the Northern District of Illinois and on July 15, 2020, refiled their lawsuit in the United States District Court for the Northern District of California.

On July 31, 2020, a class action lawsuit was filed in the United States District Court for the Southern District of New York by the A.F. of L.-A.G.C. Building Trades Welfare Plan on behalf of itself and all others similarly situated, against Jazz Pharmaceuticals plc (hereinafter referred to as the AFL Plan Lawsuit). The AFL Plan Lawsuit also names Roxane Laboratories Inc., West-Ward Pharmaceuticals Corp., Hikma Labs Inc., Hikma Pharmaceuticals plc, Amneal Pharmaceuticals LLC, Par Pharmaceutical, Inc., Lupin Ltd., Lupin Pharmaceuticals, Inc., and Lupin Inc.

On August 14, 2020, an additional class action lawsuit was filed in the United States District Court for the Southern District of New York by the Self-Insured Schools of California on behalf of itself and all others similarly situated, against the Company Defendants, as well as Hikma Pharmaceuticals plc, Eurohealth (USA) Inc., Hikma Pharmaceuticals USA, Inc., West-Ward Pharmaceuticals Corp., Roxane Laboratories, Inc., Amneal Pharmaceuticals LLC, Endo International, plc, Endo Pharmaceuticals LLC, Par Pharmaceutical, Inc., Lupin Ltd., Lupin Pharmaceuticals Inc., Lupin Inc., Sun Pharmaceutical Industries Ltd., Sun Pharmaceutical Holdings USA, Inc., Sun Pharmaceutical Industries, Inc., Ranbaxy Laboratories Ltd., Teva Pharmaceutical Industries Ltd., Watson Laboratories, Inc., Wockhardt Ltd., Morton Grove Pharmaceuticals, Inc., Wockhardt USA LLC, Mallinckrodt plc, and Mallinckrodt LLC (hereinafter referred to as the Self-Insured Schools Lawsuit).

On September 16, 2020, an additional class action lawsuit was filed in the United States District Court for the Northern District of California, by Ruth Hollman on behalf of herself and all others similarly situated, against the same defendants named in the Self-Insured Schools Lawsuit.

In December 2020, the above cases were centralized and transferred to the United States District Court for the Northern District of California, where the multidistrict litigation will proceed for the purpose of discovery and pre-trial proceedings.

On March 18, 2021, United Healthcare Services, Inc. filed a lawsuit in the United States District Court for the District of Minnesota against the Company Defendants, Hikma Pharmaceuticals plc, Roxane Laboratories, Inc., Hikma Pharmaceuticals USA Inc., Eurohealth (USA) Inc., Amneal Pharmaceuticals LLC, Par Pharmaceutical, Inc., Lupin Ltd., and Lupin Pharmaceuticals, Inc., raising similar allegations, or the UHS Lawsuit. On March 24, 2021, the U.S. Judicial Panel on Multidistrict Litigation conditionally transferred the UHS Lawsuit to the United States District Court for the Northern District of California, where it was consolidated for discovery and pre-trial proceedings with the other cases.

On August 13, 2021, the United States District Court for the Northern District of California granted in part and denied in part the Company Defendants' motion to dismiss the complaints in the cases referenced above.

On October 8, 2021, Humana Inc. filed a lawsuit in the United States District Court for the Northern District of California against the Company Defendants, Hikma Pharmaceuticals plc, Hikma Pharmaceuticals USA Inc., Hikma Labs, Inc., Eurohealth (USA), Inc., Amneal Pharmaceuticals LLC, Par Pharmaceutical, Inc., Lupin Ltd., Lupin Pharmaceuticals, Inc., and Lupin Inc, raising similar allegations.

On October 8, 2021, Molina Healthcare Inc. filed a lawsuit in the United States District Court for the Northern District of California against the Company Defendants, Hikma Pharmaceuticals plc, Hikma Pharmaceuticals USA Inc., Hikma Labs, Inc., Eurohealth (USA), Inc., Amneal Pharmaceuticals LLC, Par Pharmaceutical, Inc., Lupin Ltd., Lupin Pharmaceuticals, Inc., and Lupin Inc, raising similar allegations.

On February 17, 2022, Health Care Service Corporation filed a lawsuit in the United States District Court for the Northern District of California against the Company Defendants, Hikma Pharmaceuticals plc, Hikma Pharmaceuticals USA Inc., Hikma Labs, Inc., Eurohealth (USA), Inc., Amneal Pharmaceuticals LLC, Par Pharmaceutical, Inc., Lupin Ltd., Lupin Pharmaceuticals, Inc., and Lupin Inc, raising similar allegations.

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

On April 19, 2023, the Court held a hearing on class certification in the consolidated multi-district litigation referenced above. On May 12, 2023, the Court granted the plaintiffs' motion and preliminarily certified classes of Xyrem purchasers seeking monetary and injunctive relief. The Court excluded Xywav purchasers from the classes. Trial in this matter is scheduled for October 28, 2024.

On January 13, 2023, Amneal Pharmaceuticals LLC, Lupin Ltd., Lupin Pharmaceuticals, Inc., and Lupin Inc, notified the Court that they had reached a settlement-in-principle with the class action plaintiffs. On April 19, 2023, the Court held a hearing on a motion for preliminary approval of this proposed settlement. On May 12, 2023, the Court granted the motion for preliminary approval of the proposed settlement. On January 11, 2024, the Court held a hearing on the motion for final approval of the proposed settlement. The Court deferred ruling and scheduled a further hearing for final approval of the proposed settlement on April 17, 2024.

On December 11, 2023, Blue Cross and Blue Shield of Florida, Inc. and Health Options, Inc. filed a lawsuit in the United States District Court for the Middle District of Florida against the Company Defendants, Hikma Pharmaceuticals plc, Hikma Pharmaceuticals USA Inc., Hikma Labs, Inc., and Eurohealth (USA), Inc., raising similar allegations. On January 23, 2024, the Blue Cross Florida case was transferred to the United States District Court for the Northern District of California and consolidated with the above referenced multidistrict litigation for pretrial purposes.

On May 9, 2022, Aetna Inc., or Aetna, filed a lawsuit in the Superior Court of California for the County of Alameda against the Company Defendants, Hikma Pharmaceuticals plc, Hikma Pharmaceuticals USA Inc., Hikma Labs, Inc., Eurohealth (USA), Inc., Amneal Pharmaceuticals LLC, Par Pharmaceutical, Inc., Lupin Ltd., Lupin Pharmaceuticals, Inc., and Lupin Inc, raising similar allegations. On December 27, 2022, the Court granted in part and denied in part our motion to dismiss Aetna's complaint. As a result of that ruling, the generic defendants have been dismissed from the case, and certain of Aetna's claims against Jazz have been dismissed. On January 27, 2023, Aetna filed an amended complaint against Jazz. On March 22, 2023, we filed motions to dismiss and to strike portions of the amended complaint. On June 26, 2023, the Court granted our motions, and granted Aetna leave to further amend its complaint. On November 17, 2023, Aetna filed its second amended complaint. On February 2, 2024, we filed our answer to the second amended complaint and Hikma filed a motion to quash service. That motion remains pending.

The plaintiffs in certain of these lawsuits are seeking to represent a class of direct purchasers of Xyrem, and the plaintiffs in the remaining lawsuits are seeking to represent a class of indirect purchasers of Xyrem. Each of the lawsuits generally alleges violations of U.S. federal and state antitrust, consumer protection, and unfair competition laws in connection with the Company Defendants' conduct related to Xyrem, including actions leading up to, and entering into, patent litigation settlement agreements with each of the other named defendants. Each of the lawsuits seeks monetary damages, exemplary damages, equitable relief against the alleged unlawful conduct, including disgorgement of profits and restitution, and injunctive relief. It is possible that additional lawsuits will be filed against the Company Defendants making similar or related allegations. If the plaintiffs were to be successful in their claims, they may be entitled to injunctive relief or we may be required to pay significant monetary damages, which could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

*GW Acquisition Litigation*

On March 15, 2021, GW filed a definitive proxy statement, or Proxy Statement, with the Securities and Exchange Commission in connection with the GW Acquisition.

Since the filing of the Proxy Statement, Jazz Pharmaceuticals plc has been named in two lawsuits filed in state and federal courts in New York on March 17, 2021 by purported GW shareholders in connection with the GW Acquisition. The first was filed in the United States District Court for the Southern District of New York by James Farrell (hereinafter referred to as the Farrell Lawsuit) and an additional suit was filed in New York state court by Brian Levy (hereinafter referred to as the Levy Lawsuit). In addition to Jazz Pharmaceuticals plc, Jazz Pharmaceuticals U.K. Holdings Ltd., GW Pharmaceuticals plc, and the GW board of directors are named as defendants in the Farrell Lawsuit. In the Levy Lawsuit, GW Pharmaceuticals plc, the GW board of directors, Centerview Partners LLC, and Goldman Sachs & Co. LLC are named as defendants. In addition to the Farrell Lawsuit and the Levy Lawsuit, ten additional suits have been filed in New York, California, and Pennsylvania federal courts by purported GW shareholders against GW Pharmaceuticals plc and its board of directors, but which do not name any Jazz Pharmaceuticals parties (hereinafter referred to as the GW Litigation, and collectively with the Farrell Lawsuit and the Levy Lawsuit, as the Transaction Litigation). In the Transaction Litigation, the plaintiffs allege the Proxy Statement omitted material information and contained misrepresentations, and that the individual members of the GW board of directors breached their fiduciary duties, in violation of state and federal laws, including the Securities Exchange Act of 1934. The plaintiffs in the Transaction Litigation sought various remedies, including injunctive relief to prevent the consummation of the GW Acquisition unless certain allegedly material information was disclosed, or in the alternative, rescission or damages.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

On April 14, 2021, GW filed a Form 8-K containing supplemental disclosures related to the GW Acquisition. Pursuant to a memorandum of understanding between the parties, the Levy Lawsuit was dismissed on April 14, 2021.

On May 27, 2021, a class action lawsuit was filed in the United States District Court for the Southern District of California by plaintiff Kurt Ziegler against GW and its former Directors asserting claims under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934, referred to as the Ziegler Lawsuit. The allegations in the Ziegler Lawsuit are similar to those in the previously dismissed Transaction Litigation.

On June 3, 2022, we filed a motion to dismiss the Ziegler Lawsuit. While the motion to dismiss was pending, in December 2022, the parties participated in a mediation and reached a tentative settlement, which remains subject to court approval. On March 20, 2023, the plaintiffs in the Ziegler Lawsuit filed a motion for preliminary approval of the settlement. On July 28, 2023, the Court granted the motion for preliminary approval, which conditionally certified a class for settlement purposes. On December 11, 2023, the Court held a hearing regarding final approval of the proposed settlement and took the matter under advisement. The Court has yet to issue a final written order approving the settlement.

*Patent Infringement Litigation*

*Avadel Patent Litigation*

On May 13, 2021, we filed a patent infringement suit against Avadel Pharmaceuticals plc, or Avadel, and several of its corporate affiliates in the United States District Court for the District of Delaware. The suit alleges that Avadel's Lumryz will infringe five of our patents related to controlled release formulations of oxybate and the safe and effective distribution of oxybate. The suit seeks an injunction to prevent Avadel from launching a product that would infringe these patents, and an award of monetary damages if Avadel does launch an infringing product. Avadel filed an answer to the complaint and counterclaims asserting that the patents are invalid or not enforceable, and that its product will not infringe our patents. Avadel filed a motion for partial judgment on the pleadings on its counterclaim that one of our patents should be delisted from the Orange Book. On November 18, 2022, the Court issued an order that we delist the patent from the Orange Book. On November 22, 2022, we filed a notice of appeal to the United States Court of Appeals for the Federal Circuit. The Federal Circuit temporarily stayed the District Court's delisting order. On February 24, 2023, the Federal Circuit affirmed the District Court's delisting order, lifted the temporary stay, and gave Jazz 14 days to request that FDA delist the patent from the Orange Book. Jazz complied with the Federal Circuit's order and requested delisting on February 28, 2023. On March 3, 2023, we and Avadel stipulated to the dismissal without prejudice of the claims and counterclaims related to infringement and validity of the delisted patent in both this suit and a later-filed suit described below related to the same patent.

On August 4, 2021, we filed an additional patent infringement suit against Avadel in the United States District Court for the District of Delaware. The second suit alleges that Avadel's Lumryz will infringe a newly-issued patent related to sustained-release formulations of oxybate. The suit seeks an injunction to prevent Avadel from launching a product that would infringe this patent, and an award of monetary damages if Avadel does launch an infringing product. Avadel filed an answer to the complaint and counterclaims asserting that the patents are invalid or not enforceable, and that its product will not infringe our patents.

On November 10, 2021, we filed an additional patent infringement suit against Avadel in the United States District Court for the District of Delaware. The third suit alleges that Avadel's Lumryz will infringe a newly-issued patent related to sustained-release formulations of oxybate. The suit seeks an injunction to prevent Avadel from launching a product that would infringe this patent, and an award of monetary damages if Avadel does launch an infringing product. Avadel filed an answer to the complaint and counterclaims asserting that the patents are invalid or not enforceable, and that its product will not infringe our patents.

On April 14, 2022, Avadel sued us in the United States District Court for the District of Delaware. Avadel's new suit alleges that we misappropriated trade secrets related to Avadel's once-nightly sodium oxybate development program and breached certain contracts between the parties. Avadel seeks monetary damages, an injunction preventing us from using Avadel's confidential information, and an order directing the United States Patent and Trademark Office to modify the inventorship of one of our oxybate patents. On July 8, 2022, we filed a motion for judgment on the pleadings, which the Court denied on July 18, 2023. The denial is not a ruling that Jazz misappropriated Avadel's trade secrets or breached any contract. The case will go forward in discovery and the Court instructed the parties to submit a proposed scheduling order.

On June 7, 2022, we received notice from Avadel that it had filed a "paragraph IV certification" regarding one patent listed in the Orange Book for Xyrem. A paragraph IV certification is a certification by a generic applicant that alleges that patents covering the branded product are invalid, unenforceable, and/or will not be infringed by the manufacture, use or sale of the generic product. On July 15, 2022, we filed an additional lawsuit against Avadel asserting infringement of that patent. The suit alleges that the filing of Avadel's application for approval of FT218 is an act of infringement, and that Avadel's product

F-35

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

would infringe the patent if launched. The suit seeks an injunction to prevent Avadel from launching a product that would infringe the patent, and an award of damages if Avadel does launch an infringing product. Avadel filed an answer to the complaint and counterclaims asserting that the patent is invalid, that its product would not infringe, and that by listing the patent in the Orange Book, we engaged in unlawful monopolization in violation of the Sherman Act. On December 9, 2022, we filed a motion to dismiss Avadel's counterclaims. On June 29, 2023, we filed a motion seeking leave to supplement our motion to dismiss, as well as a motion to stay discovery pending resolution of the motion to dismiss. The Court has not yet ruled on these motions. As noted above, on March 3, 2023, we and Avadel stipulated to the dismissal without prejudice of the claims and counterclaims related to infringement and validity of the delisted patent.

On November 1, 2023, the Court held a claim construction hearing relating to disputed terms in the asserted patents. On December 15, 2023, the Court issued a written opinion and order resolving the parties' remaining claim construction disputes. On November 20, 2023, we and Avadel each filed motions for summary judgment. On February 14, 2024, the Court issued a written opinion and order denying both parties' motions for summary judgment.

Trial regarding our patent infringement claims against Avadel began on February 26, 2024, and the jury has not yet reached a verdict. The Court scheduled a trial regarding Avadel's counterclaims for unlawful monopolization for November 3, 2025, and a trial regarding Avadel's trade secret misappropriation claims for December 15, 2025.

On July 21, 2022, Avadel filed a lawsuit against FDA in the United States District Court for the District of Columbia, challenging FDA's determination that Avadel was required to file a paragraph IV certification regarding one of our Orange Book listed patents. We are seeking relief including a declaration that FDA's decision requiring patent certification was unlawful, an order setting aside that decision, an injunction prohibiting FDA from requiring such certification as a precondition to approval of its application for FT218, and an order requiring FDA to take final action on Avadel's application for approval of FT218 within 14 days of the Court's ruling. On July 27, 2022, we filed a motion to intervene in that case, which the Court granted. The Court held a hearing on the parties' respective motions for summary judgment on October 7, 2022. On November 3, 2022, the Court granted our and FDA's motions for summary judgment and denied Avadel's motion.

*Xywav Patent Litigation*

In June 2021, we received notice from Lupin Inc., or Lupin, that it has filed with FDA an ANDA, for a generic version of Xywav. The notice from Lupin included a paragraph IV certification with respect to ten of our patents listed in FDA's Orange Book for Xywav on the date of our receipt of the notice. The asserted patents relate generally to the composition and method of use of Xywav, and methods of treatment when Xywav is administered concomitantly with certain other medications.

In July 2021, we filed a patent infringement suit against Lupin in the United States District Court for the District of New Jersey. The complaint alleges that by filing its ANDA, Lupin has infringed ten of our Orange Book listed patents. We are seeking a permanent injunction to prevent Lupin from introducing a generic version of Xywav that would infringe our patents. As a result of this lawsuit, we expect that a stay of approval of up to 30 months will be imposed by FDA on Lupin's ANDA. In June 2021, FDA recognized seven years of Orphan Drug Exclusivity for Xywav through July 21, 2027. On October 4, 2021, Lupin filed an answer to the complaint and counterclaims asserting that the patents are invalid or not enforceable, and that its product, if approved, will not infringe our patents.

In April 2022, we received notice from Lupin that it had filed a paragraph IV certification regarding a newly-issued patent listed in the Orange Book for Xywav. On May 11, 2022, we filed an additional lawsuit against Lupin in the United States District Court for the District of New Jersey alleging that by filing its ANDA, Lupin infringed the newly-issued patent related to a method of treatment when Xywav is administered concomitantly with certain other medications. The suit seeks a permanent injunction to prevent Lupin from introducing a generic version of Xywav that would infringe our patent. On June 22, 2022, the Court consolidated the two lawsuits we filed against Lupin.

In November 2022, we received notice from Lupin that it had filed a paragraph IV certification regarding a newly-issued patent listed in the Orange Book for Xywav. On January 19, 2023, we filed an additional lawsuit against Lupin in the United States District Court for the District of New Jersey alleging that by filing its ANDA, Lupin infringed the newly-issued patent referenced in its November 2022 paragraph IV certification, as well as another patent that issued in January 2023. The suit seeks a permanent injunction to prevent Lupin from introducing a generic version of Xywav that would infringe the two patents in suit. On February 15, 2023, the Court consolidated the new lawsuit with the two suits we previously filed against Lupin. No trial date has been set in the consolidated case against Lupin.

In February 2023, we received notice from Teva Pharmaceuticals, Inc., or Teva, that it had filed with FDA an ANDA for a generic version of Xywav. The notice from Teva included a paragraph IV certification with respect to thirteen of our patents listed in FDA's Orange Book for Xywav on the date of the receipt of the notice. The asserted patents relate generally to the

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

composition and method of use of Xywav, and methods of treatment when Xywav is administered concomitantly with certain other medications.

In March 2023, we filed a patent infringement suit against Teva in the United States District Court for the District of New Jersey. The complaint alleges that by filing its ANDA, Teva has infringed thirteen of our Orange Book listed patents. We are seeking a permanent injunction to prevent Teva from introducing a generic version of Xywav that would infringe our patents. As a result of this lawsuit, we expect that a stay of approval of up to 30 months will be imposed by FDA on Teva's ANDA. On May 23, 2023, Teva filed an answer to the complaint and counterclaims asserting that the patents are invalid or not enforceable, and that its product, if approved, will not infringe our patents.

On December 15, 2023, based on a stipulation between all parties, the Court consolidated the Lupin lawsuits and the Teva lawsuit for all purposes. No trial date has been set in the consolidated case.

*Alkem Patent Litigation*

In April 2023, we received notice from Alkem Laboratories Ltd., or Alkem, that it has filed with FDA an ANDA, for a generic version of Xyrem. The notice from Alkem included a paragraph IV certification with respect to six of our patents listed in FDA's Orange Book for Xyrem on the date of our receipt of the notice. The asserted patents relate generally to methods of treatment when Xyrem is administered concomitantly with certain other medications.

In June 2023, we filed a patent infringement suit against Alkem in the United States District Court for the District of New Jersey. The complaint alleges that by filing its ANDA, Alkem has infringed six of our Orange Book listed patents. We are seeking a permanent injunction to prevent Alkem from introducing a generic version of Xyrem that would infringe our patents. As a result of this lawsuit, we expect that a stay of approval of up to 30 months will be imposed by FDA on Alkem's ANDA.

On October 4, 2023, we entered into a settlement agreement with Alkem that resolves our patent litigation. Under the settlement agreement, we granted Alkem a license to manufacture, market, and sell its generic version of Xyrem on or after December 31, 2025, or earlier under certain circumstances, including circumstances where Hikma launches its own generic sodium oxybate product.

*Epidiolex Patent Litigation*

In November and December 2022, we received notices from Teva Pharmaceuticals, Inc.; Padagis US LLC; Apotex Inc.; API Pharma Tech LLC and InvaGen Pharmaceuticals, Inc.; Lupin Limited; Taro Pharmaceutical Industries Ltd.; Zenara Pharma Private Limited and Biophore Pharma, Inc.; MSN Laboratories Pvt. Ltd. and MSN Pharmaceuticals, Inc.; Alkem Laboratories Ltd.; and Ascent Pharmaceuticals, Inc. (hereinafter referred to as the "Epidiolex ANDA Filers"), that they have each filed with FDA an ANDA for a generic version of Epidiolex (cannabidiol) oral solution. As of the date of this filing, we are not aware of other ANDA filers. The notices from the Epidiolex ANDA Filers each included a "paragraph IV certification" with respect to certain of our patents listed in FDA's Orange Book for Epidiolex on the date of the receipt of the notice. The listed patents relate generally to the composition and method of use of Epidiolex, and methods of treatment using Epidiolex. A paragraph IV certification is a certification by a generic applicant that alleges that patents covering the branded product are invalid, unenforceable, and/or will not be infringed by the manufacture, use or sale of the generic product.

On January 3, 2023, we filed a patent infringement suit against the Epidiolex ANDA Filers in the United States District Court for the District of New Jersey. The complaint alleges that by filing their ANDAs, the Epidiolex ANDA Filers have infringed certain of our Orange Book listed patents, and seeks an order that the effective date of FDA approval of the ANDAs shall be a date no earlier than the expiration of the last to expire of the asserted patents. As a result of this lawsuit, we expect that a stay of approval of up to 30 months will be imposed by FDA on the Epidiolex ANDA Filers' ANDAs.

From March 2023 through May 2023, we received the Epidiolex ANDA Filers' answers to the complaint. The answers include defenses and counterclaims asserting that the Epidiolex ANDA Filers' products, if launched would not infringe our patents, that our patents are invalid, and in one instance, counterclaims related to allegations of inequitable conduct and improper listing of patents in the Orange Book. On May 25, 2023, we filed a motion to dismiss certain of the counterclaims. On January 11, 2024, the Court issued an order granting in part and denying in part our motion to dismiss.

The Court in the Epidiolex Patent Litigation scheduled trial for September 2025.

In June and July 2023, we received notice from certain of the Epidiolex ANDA Filers that they had each filed a paragraph IV certification regarding a newly-issued patent listed in the Orange Book for Epidiolex. On July 21, 2023, we filed an additional lawsuit against all of the Epidiolex ANDA Filers in the United States District Court for the District of New Jersey alleging that, by filing its ANDA, each Epidiolex ANDA Filer infringed the newly-issued patent related to a method of treatment using Epidiolex. The suit seeks an order that the effective date of FDA approval of each Epidiolex ANDA Filer's application shall be a date no earlier than the expiration of the newly-issued patent.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

On October 24, 2023, we entered into a settlement agreement with Padagis US LLC, or Padagis, that resolved our patent litigation with Padagis related to Epidiolex. Under the settlement agreement, we granted Padagis a license to manufacture, market, and sell its generic version of Epidiolex on a date that depends on the occurrence of certain other events. The specific terms of the Padagis settlement agreement are confidential.

On November 20, 2023, we entered into a settlement agreement with Teva Pharmaceuticals, Inc., or Teva, that resolved our patent litigation with Teva related to Epidiolex. Under the settlement agreement, we granted Teva a license to manufacture, market and sell its generic version of Epidiolex on a date which remains confidential. The specific terms of the Teva settlement agreement are confidential.

On December 4, 2023, we entered into a settlement agreement with Alkem Laboratories Ltd., or Alkem, that resolved our patent litigation with Alkem related to Epidiolex. Under the settlement agreement, we granted Alkem a license to manufacture, market, and sell its generic version of Epidiolex on a date which remains confidential. The specific terms of the Alkem settlement agreement are confidential.

The settlements with Padagis, Teva and Alkem do not resolve the litigation against the other seven Epidiolex ANDA Filers, which is ongoing. We cannot predict the specific timing or outcome of events in these matters with respect to the remaining defendants or the impact of developments involving any specific parties or patents on other ongoing proceedings with any specific Epidiolex ANDA Filer.

In September and October 2023, we received notice from certain of the Epidiolex ANDA filers that they had each filed a paragraph IV certification regarding one or more newly-issued patents listed in the Orange Book for Epidiolex. On December 15, 2023, we filed an additional lawsuit against seven of the original Epidiolex ANDA Filers with whom we have not previously settled. We filed this lawsuit in the United States District Court for the District of New Jersey alleging that, by filing its ANDA, each Epidiolex ANDA Filer infringed the newly-issued patents related to methods of treatment using Epidiolex. The suit seeks an order that the effective date of FDA approval of each Epidiolex ANDA Filer's application shall be a date no earlier than the expiration of the newly-issued patents.

Epidiolex also has ODE for the treatment of seizures associated with LGS or DS in patients 2 years of age and older through September 28, 2025, and for the treatment of seizures associated with LGS or DS in patients between 1 and 2 years of age and for the treatment of seizures associated with TSC through July 31, 2027.

The Company vigorously enforces its intellectual property rights but cannot predict the outcome of these matters.

*MSP Litigation*

On April 3, 2023, MSP Recovery Claims, Series LLC, or MSP, filed a class action lawsuit on behalf itself and others similarly situated against Jazz Pharmaceuticals plc, Jazz Pharmaceuticals, Inc., and Jazz Pharmaceuticals Ireland Limited, (collectively, the Company Defendants), Express Scripts, Inc., Express Scripts Holding Company, Express Scripts Specialty Distribution Services, Inc., Curascript, Inc. d/b/a Curascript, S.D., Priority Healthcare Distribution, Inc. d/b/a Curascript SD and Curascript Specialty Distribution SD, Caring Voice Coalition, and Adira Foundation (collectively with the Company Defendants, referred to as the Defendants) in the United States District Court for the Northern District of California. The MSP complaint alleges that the Defendants conspired to increase the price and quantity dispensed of Xyrem and Prialt, in violation of the Racketeer Influenced and Corrupt Organizations Act and several state laws. The allegations relate generally to the conduct at issue in the investigation conducted by the United States Department of Justice from 2016-2019, involving the Company's contributions to certain charitable foundations. MSP seeks monetary damages, restitution, disgorgement, and a declaration that the conduct alleged is unlawful.

On July 25, 2023, we and certain other defendants filed motions to dismiss MSP's complaint, which the Court granted on December 12, 2023. On January 5, 2024, the MSP filed an amended complaint. On February 20, 2024, we filed a motion to dismiss MSP's amended complaint. No trial date has been set for this matter.

*FDA Litigation*

On June 22, 2023, we filed a complaint in the United States District Court for the District of Columbia seeking a declaration that FDA's approval on May 1, 2023 of the New Drug Application, or NDA, for Avadel's Lumryz was unlawful. In the complaint, we allege that FDA acted outside its authority under the Orphan Drug Act, when, despite the orphan drug exclusivity, or ODE, protecting Jazz's low-sodium oxybate product Xywav, FDA approved the Lumryz NDA and granted Lumryz ODE based on FDA's finding that Lumryz makes a major contribution to patient care and is therefore clinically superior to Xywav and Xyrem. Jazz further alleges that in doing so, FDA failed to follow its own regulations, failed to follow established agency policy without providing a reasoned explanation for the departure, reversed prior decisions by its own staff and experts without a reasoned explanation, and disregarded the relevant scientific literature and data. The complaint, filed

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

pursuant to the Administrative Procedure Act, seeks to have the Court vacate and set aside FDA's approval of the Lumryz NDA and seeks a declaration that FDA's approval of the Lumryz NDA was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law; and that approval of the Lumryz NDA was in excess of FDA's statutory authority and was made without observance of procedure required by law.

On September 15, 2023, we filed a motion for summary judgment. On October 20, 2023, Avadel and FDA filed cross motions for summary judgment. Oral argument on these motions is currently scheduled for April 9, 2024.

From time to time we are involved in legal proceedings arising in the ordinary course of business. We believe there is no other litigation pending that could have, individually or in the aggregate, a material adverse effect on our results of operations or financial condition.

## 15. Shareholders' Equity

### Share Repurchase Program

In November 2016, our board of directors authorized a share repurchase program and as of December 31, 2023, had authorized the repurchase of up to $1.5 billion, exclusive of any brokerage commissions. Under this program, which has no expiration date, we may repurchase ordinary shares from time to time on the open market. The timing and amount of repurchases will depend on a variety of factors, including the price of our ordinary shares, alternative investment opportunities, restrictions under the May 2021 credit agreement, corporate and regulatory requirements and market conditions. The share repurchase program may be modified, suspended or discontinued at any time without prior notice. In 2023, we spent a total of $269.8 million to purchase 2.1 million of our ordinary shares under the share repurchase program at an average total purchase price, including commissions, of $126.65 per share. In 2022, we spent a total of $0.1 million to repurchase 338 of our ordinary shares at a total purchase price, including brokerage commissions, of $160.70 per share. As of December 31, 2023, the remaining amount authorized under the share repurchase program was $161.4 million, exclusive of any brokerage commissions.

### Authorized But Unissued Ordinary Shares

We had reserved the following shares of authorized but unissued ordinary shares (in thousands):

|  | December 31, | |
| --- | --- | --- |
|  | 2023 | 2022 |
| 2011 Equity Incentive Plan | 22,855 | 23,689 |
| 2007 Employee Stock Purchase Plan | 3,913 | 4,069 |
| GW Incentive Plans | 1,570 | 1,707 |
| Amended and Restated 2007 Non-Employee Directors Stock Award Plan | 714 | 755 |
| Total | 29,052 | 30,220 |

### Dividends

In 2023 and 2022, we did not declare or pay cash dividends on our common equity. Under Irish law, dividends may only be paid, and share repurchases and redemptions must generally be funded only out of, "distributable reserves." In addition, the terms of our credit agreement restrict our ability to make certain restricted payments, including dividends and other distributions by us in respect of our ordinary shares, subject to, among other exceptions, (1) a general exception for dividends and restricted payments up to $30 million in the aggregate and (2) an exception that allows for restricted payments, subject to a cap equal to the sum of (i) $100 million plus (ii) so long as our secured leverage ratio (as defined in our credit agreement) does not exceed 3:1 after giving pro forma effect to the restricted payment, a formula-based amount tied to our consolidated net income; provided that such cap applies only if our total leverage ratio (as defined in our credit agreement) exceeds 2:1 after giving pro forma effect to the restricted payment. Any future determination as to the payment of dividends will, subject to Irish legal requirements, be at the sole discretion of our board of directors and will depend on our consolidated financial condition, results of operations, capital requirements, compliance with the terms of our credit agreement or other future borrowing arrangements, and other factors our board of directors deems relevant.

## 16. Comprehensive Income (Loss)

Comprehensive income (loss) includes net income (loss) and all changes in shareholders' equity during a period, except for those changes resulting from investments by shareholders or distributions to shareholders.

F-39

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Accumulated Other Comprehensive Loss*

The components of accumulated other comprehensive loss as of December 31, 2023 and 2022 were as follows (in thousands):

| | Net Unrealized Gain From Hedging Activities | | Foreign Currency Translation Adjustments | | Total Accumulated Other Comprehensive Loss |
|---|---|---|---|---|---|
| Balance at December 31, 2022 | $ | — | $ | (1,125,509) | $ (1,125,509) |
| Other comprehensive income before reclassifications | | 3,658 | | 283,127 | 286,785 |
| Amounts reclassified from accumulated other comprehensive income (loss) | | (3,423) | | — | (3,423) |
| Other comprehensive income, net | | 235 | | 283,127 | 283,362 |
| Balance at December 31, 2023 | $ | 235 | $ | (842,382) | $ (842,147) |

In 2023, other comprehensive income primarily reflects foreign currency translation adjustments due to the strengthening of the sterling and the euro against the U.S. dollar.

**17. Net Income (Loss) per Ordinary Share**

Basic net income (loss) per ordinary share is based on the weighted-average number of ordinary shares outstanding. Diluted net income (loss) per ordinary share is based on the weighted-average number of ordinary shares outstanding and potentially dilutive ordinary shares outstanding.

Basic and diluted net income (loss) per ordinary share were computed as follows (in thousands, except per share amounts):

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | 2021 | |
| Numerator: | | | | | | |
| Net income (loss) | $ | 414,832 | $ | (224,060) | $ | (329,668) |
| Effect of interest on assumed conversions of Exchangeable Senior Notes, net of tax | | 24,876 | | — | | — |
| Net income (loss) for dilutive net income (loss) per ordinary share | $ | 439,708 | $ | (224,060) | $ | (329,668) |
| Denominator: | | | | | | |
| Weighted-average ordinary shares used in per share calculations - basic | | 63,291 | | 62,539 | | 59,694 |
| Dilutive effect of Exchangeable Senior Notes | | 8,016 | | — | | — |
| Dilutive effect of employee equity incentive and purchase plans | | 759 | | — | | — |
| Weighted-average ordinary shares used in per share calculations - diluted | | 72,066 | | 62,539 | | 59,694 |
| Net income (loss) per ordinary share: | | | | | | |
| Basic | $ | 6.55 | $ | (3.58) | $ | (5.52) |
| Diluted | $ | 6.10 | $ | (3.58) | $ | (5.52) |

Potentially dilutive ordinary shares from our employee equity incentive and purchase plans are determined by applying the treasury stock method to the assumed vesting of outstanding restricted stock units, or RSUs, and PRSUs, the assumed exercise of share options and the assumed issuance of ordinary shares under our employee stock purchase plan, or ESPP.

On January 1, 2022, we adopted ASU No. 2020-06, "Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging— Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity" on a modified retrospective basis, which requires the use of the if-converted method to calculate potentially dilutive ordinary shares for convertible instruments. In August 2023, we made an irrevocable election to

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

fix the settlement method for exchanges of the 2024 Notes to a combination of cash and ordinary shares of the Company with a specified cash amount per $1,000 principal amount of the 2024 Notes of $1,000. As a result, the assumed issuance of ordinary shares upon exchange of the 2024 Notes has only been included in the calculation of diluted net income per ordinary share in 2023 up to the date the irrevocable election was made. The potential issue of ordinary shares upon exchange of the Exchangeable Senior Notes was anti-dilutive and had no impact on diluted net loss per ordinary share for 2022.

In 2021, potentially dilutive ordinary shares from the Exchangeable Senior Notes were determined by applying the treasury stock method to the assumed issuance of ordinary shares upon exchange of the Exchangeable Senior Notes. The average price of our ordinary shares in 2021 exceeded the effective exchange price per ordinary share of the 2026 Notes. However, the potential ordinary shares issuable upon exchange were excluded from the calculation of diluted net loss per ordinary shares because their effect would have been anti-dilutive. The average price of our ordinary shares in 2021 did not exceed the effective exchange price per ordinary share of the 2021 Notes and 2024 Notes.

The following table represents the weighted-average ordinary shares that were excluded from the computation of diluted net income (loss) per ordinary share for the years presented because including them would have an anti-dilutive effect (in thousands):

| | Year Ended December 31, | | |
| | 2023 | 2022 | 2021 |
|---|---|---|---|
| Employee equity incentive and purchase plans | 2,973 | 2,751 | 3,927 |
| Exchangeable Senior Notes | — | 9,044 | 9,725 |

## 18. Segment and Other Information

Our operating segment is reported in a manner consistent with the internal reporting provided to the chief operating decision maker, or CODM. Our CODM has been identified as our chief executive officer. We have determined that we operate in one business segment, which is the identification, development and commercialization of meaningful pharmaceutical products that address unmet medical needs.

The following table presents total long-lived assets by location (in thousands):

| | December 31, | | | |
| | 2023 | | 2022 | |
|---|---|---|---|---|
| Ireland | $ | 68,201 | $ | 71,276 |
| United Kingdom | | 80,293 | | 143,870 |
| United States | | 59,440 | | 63,559 |
| Italy | | 20,942 | | 15,768 |
| Other | | 6,110 | | 6,904 |
| Total long-lived assets (1) | $ | 234,986 | $ | 301,377 |

_____

(1)  Long-lived assets consist of property, plant and equipment and operating lease assets.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**19. Revenues**

The following table presents a summary of total revenues (in thousands):

|  | Year Ended December 31, | | |
|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| Xywav | $ 1,272,977 | $ 958,425 | $ 535,297 |
| Xyrem | 569,730 | 1,020,453 | 1,265,830 |
| Epidiolex/Epidyolex | 845,468 | 736,398 | 463,645 |
| Sativex | 19,668 | 16,825 | 12,707 |
| Sunosi[1] | — | 28,844 | 57,914 |
| Total Neuroscience | 2,707,843 | 2,760,945 | 2,335,393 |
| Rylaze | 394,226 | 281,659 | 85,629 |
| Zepzelca | 289,533 | 269,912 | 246,808 |
| Defitelio/defibrotide | 184,000 | 194,290 | 197,931 |
| Vyxeos | 147,495 | 127,980 | 134,060 |
| Erwinaze/Erwinase | — | — | 69,382 |
| Total Oncology | 1,015,254 | 873,841 | 733,810 |
| Other | 13,846 | 6,643 | 9,798 |
| Product sales, net | 3,736,943 | 3,641,429 | 3,079,001 |
| High-sodium oxybate AG royalty revenue | 75,918 | — | — |
| Other royalty and contract revenues | 21,343 | 17,945 | 15,237 |
| Total revenues | $ 3,834,204 | $ 3,659,374 | $ 3,094,238 |

_____

(1) Divestiture of Sunosi U.S. was completed in May 2022.

The following table presents a summary of total revenues attributed to geographic sources (in thousands):

|  | Year Ended December 31, | | |
|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| United States | $ 3,489,977 | $ 3,370,379 | $ 2,820,242 |
| Europe | 269,243 | 239,638 | 230,158 |
| All other | 74,984 | 49,357 | 43,838 |
| Total revenues | $ 3,834,204 | $ 3,659,374 | $ 3,094,238 |

The following table presents a summary of the percentage of total revenues from customers that represented more than 10% of our total revenues:

|  | Year Ended December 31, | | |
|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| ESSDS | 48 % | 56 % | 60 % |
| McKesson | 11 % | 11 % | 12 % |

*Financing and payment*

Our payment terms vary by the type and location of our customer, but payment is generally required in a term ranging from 30 to 65 days.

**20. Share-Based Compensation**

*GW Incentive Plans*

On May 5, 2021, Jazz Pharmaceuticals plc acquired the entire issued share capital of GW Pharmaceuticals plc. In connection with the GW Acquisition, we assumed the GW Pharmaceuticals plc 2008 Long-Term Incentive Plan, GW Pharmaceuticals plc 2017 Long-Term Incentive Plan and GW Pharmaceuticals plc 2020 Long-Term Incentive Plan, each as

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

amended from time to time, together referred to as the GW Incentive Plans. The terms of the GW Incentive Plans provide for the grant of stock options, stock appreciation rights, RSUs, other stock awards, and performance awards that may be settled in cash, shares, or other property. Ordinary shares granted to employees in exchange for GW ADS in connection with the GW Acquisition vest ratably over service periods of two years, while all post-acquisition grants vest ratably over service periods of four years and expire no more than 10 years after the date of grant. As of December 31, 2023, a total of 1,864,475 of our ordinary shares had been authorized for issuance under the GW Incentive Plans.

*2011 Equity Incentive Plan*

On January 18, 2012, the businesses of Jazz Pharmaceuticals, Inc. and Azur Pharma were combined in a merger transaction, or the Azur Merger. In connection with the Azur Merger, Jazz Pharmaceuticals, Inc.'s board of directors adopted the 2011 Equity Incentive Plan, or the 2011 Plan, in October 2011 and its stockholders approved the 2011 Plan at the special meeting of the stockholders held in December 2011 in connection with the Azur Merger. The 2011 Plan became effective immediately before the consummation of the Azur Merger and was assumed and adopted by us upon the consummation of the Azur Merger. The terms of the 2011 Plan provide for the grant of stock options, stock appreciation rights, RSUs, other stock awards, and performance awards that may be settled in cash, shares, or other property. All outstanding grants under the 2011 Plan were granted to employees and vest ratably over service periods of four years and expire no more than 10 years after the date of grant. As of December 31, 2023, a total of 34,836,988 of our ordinary shares had been authorized for issuance under the 2011 Plan.

*2007 Employee Stock Purchase Plan*

In 2007, Jazz Pharmaceuticals, Inc.'s employees became eligible to participate in the ESPP. The ESPP was amended and restated by Jazz Pharmaceuticals, Inc.'s board of directors in October 2011 and approved by its stockholders in December 2011. The amended and restated ESPP became effective immediately prior to the effective time of the Azur Merger and was assumed by us upon the consummation of the Azur Merger. The amended and restated ESPP allows our eligible employee participants (including employees of any parent or subsidiary company if our board of directors designates such company as eligible to participate) to purchase our ordinary shares at a discount of 15% through payroll deductions. The ESPP consists of a fixed offering period of 24 months with four purchase periods within each offering period. The number of shares available for issuance under our ESPP during any six-month purchase period is 175,000 shares. As of December 31, 2023, a total of 7,029,250 of our ordinary shares had been authorized for issuance under the ESPP.

*Amended and Restated 2007 Non-Employee Directors Stock Award Plan*

The Amended and Restated 2007 Non-Employee Directors Stock Award Plan, or the 2007 Directors Award Plan, which was initially adopted by the Jazz Pharmaceuticals, Inc. board of directors and approved by the Jazz Pharmaceuticals, Inc. stockholders in connection with its initial public offering, was continued and assumed by us upon the consummation of the Azur Merger. Until October 2011, the 2007 Directors Award Plan provided for the automatic grant of stock options to purchase shares of Jazz Pharmaceuticals, Inc.'s common stock to its non-employee directors initially at the time any individual first became a non-employee director, which vest over three years, and then annually over their period of service on its board of directors, which vest over one year. On October 24, 2011, Jazz Pharmaceuticals, Inc.'s board of directors amended the 2007 Directors Award Plan to eliminate all future initial and annual automatic grants so that future automatic grants would not be made that would be subject to the excise tax imposed by Section 4985 of the Internal Revenue Code of 1986, as amended, or the Internal Revenue Code, in connection with the Azur Merger. Accordingly, all future stock option grants under the 2007 Directors Award Plan will be at the discretion of our board of directors. Since the Azur Merger, all of the new grants under the 2007 Directors Award Plan were granted to non-employee directors and vest ratably over service periods of one to three years and expire no more than 10 years after the date of grant. In August 2016, our shareholders approved our proposal to expand the types of stock awards that may be granted to our non-employee directors under the 2007 Directors Award Plan and eliminate the final automatic share reserve increase under the 2007 Directors Award Plan that was scheduled to occur on January 1, 2017. In July 2020, our shareholders approved our proposal to increase the number of ordinary shares authorized for issuance under the 2007 Directors Award Plan by 500,000 shares. As of December 31, 2023, a total of 1,403,938 of our ordinary shares had been authorized for issuance under the 2007 Directors Award Plan.

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Share-Based Compensation*

Share-based compensation expense related to share options, RSUs, PRSUs and grants under our ESPP was as follows (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2023** | **2022** | **2021** |
| Selling, general and administrative | $ 146,942 | $ 151,986 | $ 135,285 |
| Research and development | 64,847 | 57,522 | 43,758 |
| Cost of product sales | 15,052 | 12,488 | 9,963 |
| Total share-based compensation expense, pre-tax | 226,841 | 221,996 | 189,006 |
| Income tax benefit from share-based compensation expense | (40,015) | (41,058) | (33,958) |
| Total share-based compensation expense, net of tax | $ 186,826 | $ 180,938 | $ 155,048 |

We recognized income tax benefits related to share option exercises of $1.9 million, $8.0 million and $9.3 million in 2023, 2022 and 2021, respectively.

*Restricted Stock Units*

In 2023, 2022 and 2021, we granted RSUs covering an equal number of our ordinary shares to employees with a weighted-average grant date fair value of $144.65, $152.08 and $168.10, respectively. The fair value of RSUs is determined on the date of grant based on the market price of our ordinary shares as of that date. The fair value of the RSUs is recognized as an expense ratably over the vesting period of four years. In 2023, 2022 and 2021, 1,094,000, 910,000 and 692,000 RSUs were released, respectively, with 735,000, 610,000 and 465,000 ordinary shares issued, respectively, and 359,000, 300,000 and 227,000 ordinary shares withheld for tax purposes, respectively. The total fair value of shares vested was $155.5 million, $138.1 million and $109.2 million during 2023, 2022 and 2021, respectively.

As of December 31, 2023, total compensation cost not yet recognized related to unvested RSUs was $307.7 million, which is expected to be recognized over a weighted-average period of 2.4 years.

The following table summarizes information as of December 31, 2023 and activity during 2023 related to our RSUs:

| | Number of RSUs (In thousands) | Weighted-Average Grant-Date Fair Value | Weighted-Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value (In thousands) |
| --- | --- | --- | --- | --- |
| Outstanding at January 1, 2023 | 3,209 | $ 151.11 | | |
| RSUs granted | 1,768 | 144.65 | | |
| RSUs released | (1,094) | 148.68 | | |
| RSUs forfeited | (320) | 149.54 | | |
| Outstanding at December 31, 2023 | 3,563 | $ 148.79 | 1.3 | $ 438,224 |

*Performance-Based Restricted Stock Units*

The Compensation & Management Development Committee of our board of directors, and in the case of our Chief Executive Officer, the independent members of our board of directors, approved awards of PRSUs to certain employees of the Company, subject to vesting on the achievement of certain commercial and pipeline performance criteria to be assessed over a performance period from the date of the grant to December 31, 2023, December 31, 2024 and December 31, 2025, respectively. Following the determination of the Company's achievement with respect to the performance criteria, the amount of shares awarded will be subject to adjustment based on the application of a relative TSR modifier. The number of shares that may be earned ranges between 0% and 200% of the target number of PRSUs granted based on the degree of achievement of the applicable performance metric and the application of the relative TSR modifier.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table summarizes information as of December 31, 2023 and activity during 2023 related to our PRSUs:

| | Number of PRSUs (In thousands) | Weighted-Average Grant-Date Fair Value | Weighted-Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value (In thousands) |
|---|---|---|---|---|
| Outstanding at January 1, 2023 | 440 | $ 183.68 | | |
| PRSUs granted | 271 | 156.91 | | |
| PRSUs forfeited | (47) | 176.06 | | |
| Outstanding at December 31, 2023 | 664 | $ 173.30 | 1.5 | $ 81,729 |

As of December 31, 2023, total compensation cost not yet recognized related to unvested PRSUs was $24.6 million, which is expected to be recognized over a weighted-average period of 1.5 years.

As the PRSUs granted in each year are subject to a market condition, the grant date fair value for such PRSUs was based on a Monte Carlo simulation model. In 2023, 2022 and 2021, we granted PRSUs to employees with a weighted-average grant date fair value of $156.91, $178.78 and $190.81, respectively. The Company evaluated the performance targets in the context of its current long-range financial plan and its product candidate development pipeline and recognized compensation expense based on the probable number of awards that will ultimately vest.

*Share Options*

There were no share options granted in 2023 and 2022. The table below shows, for market strike price option grants, the weighted-average assumptions used in the Black-Scholes option pricing model and the resulting weighted-average grant date fair value of market strike price options granted in 2021:

| | Year Ended December 31, 2021 |
|---|---|
| Grant date fair value | $ 51.39 |
| Volatility | 37 % |
| Expected term (years) | 4.5 |
| Range of risk-free rates | 0.4-0.8% |
| Expected dividend yield | — % |

We relied on a blend of the historical and implied volatilities of our own ordinary shares to determine expected volatility for share option grants. In addition, we used a single volatility estimate for each share option grant. The weighted-average volatility was determined by calculating the weighted average of volatilities for all share options granted in a given year.

The expected term of share option grants represented the weighted-average period the awards were expected to remain outstanding and our estimates were based on historical exercise data. The risk-free interest rate assumption was based on zero coupon U.S. Treasury instruments whose term was consistent with the expected term of our share option grants. The expected dividend yield assumption was based on our history and expectation of dividend payouts.

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table summarizes information as of December 31, 2023 and activity during 2023 related to our share option plans:

| | Shares Subject to Outstanding Options (In thousands) | | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (Years) | | Aggregate Intrinsic Value (In thousands) |
|---|---|---|---|---|---|---|
| Outstanding at January 1, 2023 | 3,189 | $ | 140.64 | | | |
| Options exercised | (251) | | 120.29 | | | |
| Options forfeited | (16) | | 133.93 | | | |
| Options expired | (206) | | 153.92 | | | |
| Outstanding at December 31, 2023 | 2,716 | $ | 141.55 | 4.1 | $ | 3,900 |
| Vested and expected to vest at December 31, 2023 | 2,715 | $ | 141.55 | 4.1 | $ | 3,896 |
| Exercisable at December 31, 2023 | 2,669 | $ | 141.69 | 4.1 | $ | 3,669 |

Aggregate intrinsic value shown in the table above is equal to the difference between the exercise price of the underlying share options and the fair value of our ordinary shares for share options that were in the money. The aggregate intrinsic value changes based on the fair market value of our ordinary shares. The aggregate intrinsic value of share options exercised was $6.3 million, $34.8 million and $51.8 million during 2023, 2022 and 2021, respectively. We issued new ordinary shares upon exercise of share options.

As of December 31, 2023, total compensation cost not yet recognized related to unvested share options was $1.5 million, which is expected to be recognized over a weighted-average period of 0.5 years.

As of December 31, 2023, total compensation cost not yet recognized related to grants under the ESPP was $11.3 million, which is expected to be recognized over a weighted-average period of 1.2 years.

*Nominal Strike Price Options*

During the second quarter of 2021, we issued nominal strike price options to replace certain unvested GW awards in connection with the GW Acquisition with a weighted-average grant date fair value of $170.82. The fair value of nominal strike price options was determined on the date of the grant based on the market price of our ordinary shares as of that date.

The following table summarizes information as of December 31, 2023 and activity during 2023 related to our nominal strike price options:

| | Shares Subject to Outstanding Options (In thousands) | | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (Years) | | Aggregate Intrinsic Value (In thousands) |
|---|---|---|---|---|---|---|
| Outstanding at January 1, 2023 | 56 | $ | 0.02 | | | |
| Options exercised | (29) | | 0.02 | | | |
| Outstanding at December 31, 2023 | 27 | $ | 0.02 | 6.4 | $ | 3,357 |
| Vested and expected to vest at December 31, 2023 | 27 | $ | 0.02 | 6.4 | $ | 3,357 |
| Exercisable at December 31, 2023 | 27 | $ | 0.02 | 6.4 | $ | 3,357 |

The aggregate intrinsic value of nominal strike price options exercised was $3.9 million, $8.4 million and $0.2 million during 2023, 2022 and 2021, respectively. We issued new ordinary shares upon exercise of nominal strike price options.

**21. Employee Benefit Plans**

We maintain a qualified 401(k) savings plan, in which all U.S. based employees are eligible to participate, provided they meet the requirements of the plan. We match certain employee contributions under the 401(k) savings plan and for the years ended December 31, 2023, 2022 and 2021 we recorded expense of $13.4 million, $10.6 million and $9.1 million, respectively, related to this plan.

We also operate a number of defined contribution retirement plans for certain non-U.S. based employees. Expenses related to contributions to such plans for the years ended December 31, 2023, 2022 and 2021 were $14.0 million, $14.6 million and $11.4 million, respectively.

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**22. Income Taxes**

The components of income (loss) before income tax expense (benefit) and equity in loss of investees were as follows (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| Ireland | $ 449,214 | $ (50,311) | $ 97,557 |
| United Kingdom | (643,096) | (963,598) | (681,291) |
| United States | (6,056) | 224,453 | 221,185 |
| Other | 497,867 | 416,672 | 249,711 |
| Total | $ 297,929 | $ (372,784) | $ (112,838) |

The following table sets forth the details of income tax expense (benefit) (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| Current | | | |
| Ireland | $ 77,343 | $ 61,550 | $ 25,770 |
| United Kingdom | 7,726 | 1,454 | (924) |
| United States | 20,803 | 37,823 | 88,850 |
| Other | 34,433 | 32,779 | 33,222 |
| Total current tax expense | 140,305 | 133,606 | 146,918 |
| Deferred, exclusive of other components below | | | |
| Ireland | (10,919) | (62,311) | (5,388) |
| United Kingdom | (150,506) | (193,219) | (111,534) |
| United States | (89,246) | (9,086) | (46,531) |
| Other | (8,990) | (11,144) | (28,604) |
| Total deferred, exclusive of other components | (259,661) | (275,460) | (192,057) |
| Deferred, change in tax rates | | | |
| United Kingdom | 268 | (16,990) | 259,873 |
| United States | (824) | 201 | 1,377 |
| Other | — | (2) | 5 |
| Total deferred, change in tax rates | (556) | (16,791) | 261,255 |
| Total deferred tax expense (benefit) | (260,217) | (292,251) | 69,198 |
| Total income tax expense (benefit) | $ (119,912) | $ (158,645) | $ 216,116 |

Our income tax benefit was $119.9 million and $158.6 million in 2023 and 2022, respectively, and our income tax expense was $216.1 million in 2021, relating to tax arising on income or losses in Ireland, the U.K., the U.S. and certain other foreign jurisdictions, offset by deductions on subsidiary equity, foreign derived intangible income benefits and originating tax credits. Our income tax benefit in 2023 decreased compared to 2022 primarily due to pretax losses from payments for acquired IPR&D made in 2022 and the 2022 impairment of our acquired IPR&D asset as a result of the decision to discontinue our nabiximols program partially offset by the change in income mix across jurisdictions. Our income tax expense in 2021 included an expense of $259.9 million arising on the remeasurement of our U.K. net deferred tax liability, which arose primarily in relation to the GW Acquisition, due to a change in the statutory tax rate in the U.K. following enactment of the U.K. Finance Act 2021.

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The reconciliation between income tax expense (benefit) at the Irish statutory trading income tax rate of 12.5 percent, the jurisdiction of tax domicile of Jazz Pharmaceuticals, applied to income before the income tax expense (benefit) and equity in loss of investees and our reported income tax expense (benefit) was as follows (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| Income tax expense (benefit) at the statutory income tax rate | $ 37,241 | $ (46,598) | $ (14,105) |
| Deduction on subsidiary equity | (153,655) | (158,488) | (116,438) |
| Change in valuation allowance | 75,081 | 95,051 | 81,280 |
| Research and other tax credits | (49,900) | (27,976) | (31,069) |
| Foreign derived intangible income benefit | (42,400) | (29,541) | (3,416) |
| Non-deductible facility expense | 16,618 | 8,093 | — |
| Non-deductible financing costs | 15,705 | 4,504 | 14,418 |
| Non-deductible compensation | 14,092 | 13,505 | 19,914 |
| Patent box incentive benefit | (13,862) | (6,203) | — |
| Change in unrecognized tax benefits | (12,612) | 5,029 | (6,436) |
| Foreign income tax rate differential | (7,763) | 5,863 | (4,343) |
| Change in estimates | (5,472) | (14,065) | (2,653) |
| Tax deficiencies/(excess tax benefits) from share-based compensation | 3,959 | (1,690) | (5,555) |
| Change in tax rate | (605) | (16,790) | 261,663 |
| Non-deductible royalty expense | — | 6,274 | — |
| Non-deductible acquisition-related costs | — | — | 20,929 |
| Other | 3,661 | 4,387 | 1,927 |
| Reported income tax expense (benefit) | $ (119,912) | $ (158,645) | $ 216,116 |

F-48

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Significant components of our net deferred tax assets (liabilities) were as follows (in thousands):

|  | | December 31, | | |
|---|---|---|---|---|
|  | | 2023 | | 2022 |
| Deferred tax assets: | | | | |
| Operating loss carryforwards | $ | 296,490 | $ | 263,235 |
| Intangible assets | | 238,062 | | 236,462 |
| Deduction on subsidiary equity carryforwards | | 212,015 | | 157,367 |
| Capitalized research and development | | 201,186 | | 88,009 |
| Tax credit carryforwards | | 142,854 | | 189,792 |
| Accrued liabilities | | 128,948 | | 109,257 |
| Share-based compensation | | 48,403 | | 42,795 |
| Indirect effects of unrecognized tax benefits | | 40,811 | | 47,224 |
| Lease liabilities | | 13,415 | | 14,081 |
| Other | | 5,925 | | 11,595 |
| Total deferred tax assets | | 1,328,109 | | 1,159,817 |
| Valuation allowance | | (312,340) | | (234,732) |
| Deferred tax assets, net of valuation allowance | | 1,015,769 | | 925,085 |
| Deferred tax liabilities: | | | | |
| Intangible assets | | (1,290,425) | | (1,367,146) |
| Inventories | | (81,995) | | (110,927) |
| Operating lease assets | | (10,628) | | (10,978) |
| Other | | (2,593) | | (4,124) |
| Total deferred tax liabilities | | (1,385,641) | | (1,493,175) |
| Net deferred tax liabilities | $ | (369,872) | $ | (568,090) |

The net change in valuation allowance was an increase of $77.6 million, $80.5 million and $76.9 million in 2023, 2022 and 2021, respectively.

The following table summarizes the presentation of deferred tax assets and liabilities (in thousands):

|  | | December 31, | | |
|---|---|---|---|---|
|  | | 2023 | | 2022 |
| Deferred tax assets | $ | 477,834 | $ | 376,247 |
| Deferred tax liabilities | | (847,706) | | (944,337) |
| Net deferred tax liabilities | $ | (369,872) | $ | (568,090) |

As of December 31, 2023, we had net operating losses, or NOL, carryforwards and tax credit carryforwards for U.S. federal income tax purposes of approximately $15.2 million and $47.2 million, respectively, available to reduce future income subject to income taxes. The U.S. federal NOL carryforwards will expire, if not utilized, in the tax years 2024 to 2033 and the U.S. federal tax credits will expire, if not utilized, in the tax years 2024 to 2043. In addition, we had approximately $13.5 million of NOL carryforwards and $6.4 million of tax credit carryforwards as of December 31, 2023 available to reduce future taxable income for U.S. state income tax purposes. The U.S. state NOL carryforwards will expire, if not utilized, in the tax years 2024 to 2034. As of December 31, 2023, there were NOL and other carryforwards for income tax purposes of approximately $1,017.5 million, $605.8 million and $295.5 million available to reduce future income subject to income taxes in the United Kingdom, Malta and Ireland respectively. The NOLs and other carryforwards generated in the United Kingdom, Malta and Ireland have no expiration date. We also had foreign tax credit carryforwards in Ireland, as of December 31, 2023, of $89.0 million, which may only be utilized against certain sources of income.  The foreign tax credit carryforwards have no expiration date.

Utilization of certain of our NOL and tax credit carryforwards in the U.S. is subject to an annual limitation due to the ownership change limitations provided by Sections 382 and 383 of the Internal Revenue Code and similar state provisions. Such an annual limitation may result in the expiration of certain NOLs and tax credits before future utilization. In addition, as a

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

result of the Azur Merger, until 2022 we were subject to certain limitations under the Internal Revenue Code in relation to the utilization of U.S. NOLs to offset U.S. taxable income resulting from certain transactions.

Valuation allowances require an assessment of both positive and negative evidence when determining whether it is more likely than not that deferred tax assets are recoverable. Such assessment is required by tax-paying component. Our valuation allowance was $312.3 million and $234.7 million as of December 31, 2023 and 2022, respectively, for certain Irish, U.S. (federal and state) and foreign deferred tax assets which we maintain until sufficient positive evidence exists to support reversal. As part of the overall change in valuation allowance, we recognized a net income tax expense of $76.2 million, $95.1 million and $81.3 million in 2023, 2022 and 2021, respectively, relating primarily to the creation of a valuation allowance against certain deferred tax assets primarily associated with temporary differences related to carryforwards in foreign subsidiaries and foreign tax credit carryforwards. We periodically evaluate the likelihood of the realization of deferred tax assets and will adjust such amounts in light of changing facts and circumstances including, but not limited to, future projections of taxable income, tax legislation, rulings by relevant taxing authorities, the progress of tax examinations and the regulatory approval of products currently under development. Realization of the deferred tax assets is dependent on future taxable income. The Company believes that it is more likely than not to generate sufficient taxable income to realize the deferred tax assets carried as of December 31, 2023 for which no valuation allowance has been recognized.

No provision has been made for income tax on undistributed earnings of the Company's foreign subsidiaries where such earnings are considered indefinitely reinvested in the foreign operations. Temporary differences related to such earnings totaled approximately $1.6 billion as of December 31, 2023. In the event of the distribution of those earnings in the form of dividends, a sale of the subsidiaries, or certain other transactions, we may be liable for income taxes, subject to an adjustment, if any, for foreign tax credits. The Company estimates that it would incur additional income taxes of up to approximately $79.8 million on repatriation of these unremitted earnings to Ireland.

We only recognize the financial statement effects of a tax position when it is more likely than not, based on the technical merits, that the position will be sustained upon examination. As a result, we have recorded an unrecognized tax benefit for certain tax positions which we judge may not be sustained upon examination.

A reconciliation of our unrecognized tax benefits follows (in thousands):

| | December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2023** | | **2022** | | **2021** | |
| Balance at the beginning of the year | $ | 143,976 | $ | 137,867 | $ | 146,557 |
| Increases related to current year tax positions | | 15,004 | | 25,128 | | 26,675 |
| Increases related to prior year tax positions | | 224 | | 2,794 | | 211 |
| Decreases related to prior year tax positions | | (12,702) | | (164) | | (182) |
| Increases recognized through purchase accounting | | — | | — | | 5,916 |
| Decreases related to settlements with taxing authorities | | — | | (223) | | (14,744) |
| Lapse of the applicable statute of limitations | | (23,808) | | (21,426) | | (26,566) |
| Balance at the end of the year | $ | 122,694 | $ | 143,976 | $ | 137,867 |

The unrecognized tax benefits were included in income taxes payable, other non-current liabilities and deferred tax assets, net, in our consolidated balance sheets. Interest related to income taxes is recorded in the income tax expense (benefit) in our consolidated statements of income (loss). As of December 31, 2023 and 2022, our accrued interest related to income taxes was $8.4 million and $5.8 million, respectively. Interest related to income taxes recognized in the consolidated statements of income (loss) were not significant. Included in the balance of unrecognized tax benefits were potential benefits of $77.1 million and $91.7 million at December 31, 2023 and 2022, respectively, that, if recognized, would affect the effective tax rate on income. The Company believes that it is reasonably possible that approximately $26.5 million of its currently remaining unrecognized tax benefits may be recognized by the end of 2024 as a result of a lapse of the statute of limitations.

We file income tax returns in multiple tax jurisdictions, the most significant of which are Ireland, the U.K. and the U.S. (both at the federal level and in various state jurisdictions). For Ireland we are no longer subject to income tax examinations by taxing authorities for the years prior to 2019. For the U.K. we are no longer subject to income tax examinations by taxing authorities for the years prior to 2016. The U.S. jurisdictions generally have statute of limitations three to four years from the later of the return due date or the date when the return was filed. However, in the U.S. (at the federal level and in most states), carryforwards that were generated in 2019 and earlier may still be adjusted upon examination by the taxing authorities. Certain of our Luxembourg subsidiaries are currently under examination by the Luxembourg taxing authorities for the years ended December 31, 2017, 2018 and 2019. In October 2022 and January 2023, we received tax assessment notices from the Luxembourg taxing authorities for all open tax years relating to certain transfer pricing and other adjustments. The notices

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

propose additional Luxembourg income tax of approximately $24.7 million, translated at the foreign exchange rate as at December 31, 2023. We disagree with the proposed assessments and are contesting them vigorously.

F-51

Table of Contents

**Schedule II**

**Valuation and Qualifying Accounts**

**(In thousands)**

| | | | Balance at beginning of period | Additions charged to costs and expenses | Other Additions | Deductions | Balance at end of period |
|---|---|---|---|---|---|---|---|
| For the year ended December 31, 2023 | | | | | | | |
| Allowance for doubtful accounts | (1) | $ | 242 | $ — | $ — | $ — | $ 242 |
| Allowance for sales discounts | (1) | | 2,980 | 22,334 | — | (19,352) | 5,962 |
| Allowance for chargebacks | (1) | | 14,621 | 185,886 | — | (185,575) | 14,932 |
| Deferred tax asset valuation allowance | (2)(4) | | 234,732 | 76,670 | 1,368 | (430) | 312,340 |
| | | | | | | | |
| For the year ended December 31, 2022 | | | | | | | |
| Allowance for doubtful accounts | (1) | $ | 298 | $ — | $ — | $ (56) | $ 242 |
| Allowance for sales discounts | (1) | | 2,126 | 20,133 | — | (19,279) | 2,980 |
| Allowance for chargebacks | (1) | | 11,389 | 135,854 | — | (132,622) | 14,621 |
| Deferred tax asset valuation allowance | (2)(4) | | 154,255 | 95,947 | — | (15,470) | 234,732 |
| | | | | | | | |
| For the year ended December 31, 2021 | | | | | | | |
| Allowance for doubtful accounts | (1) | $ | 50 | $ 127 | $ 771 | $ (650) | $ 298 |
| Allowance for sales discounts | (1) | | 144 | 13,196 | 1,243 | (12,457) | 2,126 |
| Allowance for chargebacks | (1) | | 5,293 | 91,425 | 1,322 | (86,651) | 11,389 |
| Deferred tax asset valuation allowance | (2)(3)(4) | | 77,342 | 82,820 | 9 | (5,916) | 154,255 |

---

(1)   Shown as a reduction of accounts receivable. Charges related to sales discounts and chargebacks are reflected as a reduction of revenue.

(2)   Additions to the deferred tax asset valuation allowance charged to costs and expenses relate to movements on certain Irish, U.S. (federal and state) and other foreign deferred tax assets where we continue to maintain a valuation allowance until sufficient positive evidence exists to support reversal.

(3)   Other additions to the deferred tax asset valuation allowance in 2021 relate to currency translation adjustments recorded directly in other comprehensive income.

(4)   Deductions from the deferred tax asset valuation allowance include movements relating to utilization of NOLs and tax credit carryforwards, release in valuation allowance and other movements including adjustments following finalization of tax returns and currency translation adjustments.

# EXHIBIT D

```
                         IN THE UNITED STATES DISTRICT COURT

                         IN AND FOR THE DISTRICT OF DELAWARE


JAZZ PHARMACEUTICALS, INC.,          )
         Plaintiffs,                 )    C.A. No.
v.                                   )    21-691-GBW
                                     )
AVADEL CNS PHARMACEUTICALS, LLC,     )
         Defendant                   )
---------------------------------    )
                                     )    C.A. No.
JAZZ PHARMACEUTICALS, INC., et al.,  )    21-1138-GBW
         Plaintiffs,                 )
v.                                   )
                                     )
AVADEL CNS PHARMACEUTICALS, LLC,     )
Defendant.                           )
---------------------------------    )
                                     )
JAZZ PHARMACEUTICALS, INC., et al.,  )
         Plaintiffs,                 )
v.                                   )    C.A. No.
                                     )    21-1594-GBW
AVADEL CNS PHARMACEUTICALS, LLC,     )
         Defendant.                  )



                         - - - -

                    Wilmington, Delaware
                    Tuesday, February 27, 2024
                    Trial Day 2

                       - - - -


   BEFORE:  HONORABLE GREGORY B. WILLIAMS
            UNITED STATES DISTRICT COURT JUDGE


                       - - - -


                         Michele L. Rolfe, RPR, CRR
```

1

**APPEARANCES:**

2

3    MORRIS, NICHOLS, ARSHT & TUNNELL LLP
    BY: JEREMY A. TIGAN, ESQ.

4

      -and-

5

    QUINN EMANUEL URQUHART & SULLIVAN, LLP
6    BY: ADAM J. DICLEMENTE, ESQ.
      NICHOLAS CERRITO, ESQ.
7      FRANK C. CALVOSA, ESQ.
      JOSEPH PAUNOVICH, ESQ.
8        The Plaintiff

9

10    MCCARTER & ENGLISH, LLP
    BY: ALEXANDRA M. JOYCE, ESQ.

11

      -and-

12

    LATHAM & WATKINS LLP
13    BY: KENNETH G. SCHULER, ESQ.
      MARC N. ZUBICK, ESQ.
14      ALEX GRABOWSKI, ESQ.

15        For Defendant

16

17

18

19

20

21

22

23

24

25

1                              - - - - -

2                       P R O C E E D I N G S

3          (REPORTER'S NOTE:  The following jury trial was held

4     in Courtroom 6B beginning at 8:51 a.m.)

5               THE COURT:  Good morning.  You may be seated.

6               All right.  A couple of administrative things

7     before we get started.  I want to remind counsel that joint

8     submission is due each night by midnight, according to your

9     agreement.  It's important that we get it on time, you know,

10    our folks are staying up to work on it.  And so any

11    objection, argument not received by midnight going forward

12    is going to be waived.

13               I want to remind counsel to provide the Court

14    with two courtesy copies of any demonstratives or slides

15    used in your openings or with witnesses or that you use

16    during your closing.  So, you know, when you're going to

17    present the witness or, you know, typically for your

18    openings, you would have gave the Court two copies of the

19    demonstratives, along with the witness binders, but just

20    keep that in mind going forward.

21               I want to remind counsel to remember to -- I

22    hope you are meeting and conferring about the final proposed

23    jury instructions that -- the final joint submission on that

24    is due to the Court by noon tomorrow.  And that we'll be

25    having the charge conference on Thursday afternoon or

1    the stand.

2              GREGORY J. DIVIS, having been called on the part

3    and behalf of the Plaintiff as a witness, having first

4    affirmed to tell the truth, testified as follows:

5                        DIRECT EXAMINATION

6              MR. PORTER:  May it please the Court.  Your

7    Honor, before we get started, I'd like to introduce JTX0085,

8    JTX0086, and PTX1901.  I don't believe there are any

9    objections to those documents.

10             MS. DURIE:  No objection.

11             THE COURT:  All right.  JTX0085, JTX0086, and

12   PTX1901 are admitted.

13             (Exhibits admitted.)

14             MR. PORTER:  Thank you, Your Honor.

15   BY MR. PORTER:

16   Q.    Good afternoon.

17   A.    Good afternoon.

18   Q.    How are you today?

19   A.    Doing well, thank you.

20   Q.    Please tell the jury your name.

21   A.    My name is Greg Divis.

22   Q.    And where do you work, sir?

23   A.    I work at Avadel Pharmaceuticals.

24   Q.    Now, Mr. Divis, during the course of this lawsuit,

25   you were deposed; is that correct?

DIRECT EXAMINATION - GREGORY DIVIS

1    put on a oxybate product in the future, the estimation

2    across those four or five different research projects was

3    they would expect Lumryz to get somewhere between 50 and

4    60 percent, and that the use of oxybates would grow

5    according to the bottom.

6    Q.    Now, Lumryz is currently FDA approved to treat -- I'm

7    sorry.  Again, Lumryz is currently approved for

8    once-nightly, correct -- once at bedtime?

9    A.    Yeah.  Interchangable, but once at bedtime, yes, sir.

10   Q.    Okay.  And it's currently FDA approved for the

11   treatment of cataplexy or excessive daytime sleepiness in

12   adults with narcolepsy, right?

13   A.    Yes, that's correct.

14   Q.    All right.  But currently, Lumryz does not have an

15   indication for treatment of narcolepsy in pediatric

16   patients, true?

17   A.    No, it doesn't, not yet.

18   Q.    Okay.  But Avadel is seeking a pediatric indication

19   now, isn't it?

20   A.    Yeah, we have filed our application with the FDA.

21   Q.    Okay.  And if you go with me to 119.63.

22         Whenever you're ready.

23   A.    Yes.

24   Q.    Okay.  And you see this is -- this slide is titled

25   Lumryz Pediatrics?

DIRECT EXAMINATION - GREGORY DIVIS

1    A.      Yes.

2    Q.      Okay.  You notice that twice-nightly oxybate are both

3    approved for under 7 -- or 7 years or older, weight-based?

4    A.      Yes.

5    Q.      Okay.  And that would be Xyrem and Xywav, correct?

6    A.      Correct.

7    Q.      Okay.  Because Lumryz is not, again, approved for

8    pediatrics, right?

9    A.      No, it's not.

10   Q.      Okay.  And -- but it -- I think, as you may have --

11   you may have alluded to this, Lumryz is -- I'm sorry, Avadel

12   is seeking approval for the pediatric market; is that right?

13   A.      Yeah, that is correct.

14   Q.      Okay.  Okay.

15           But as reported to the board of directors --

16   well, let's look here.  It says, "Response on proposed

17   pediatric study request, clinical studies of Lumryz, FT-218,

18   in pediatric patients with narcolepsy may not be needed,"

19   right?

20   A.      Correct.

21   Q.      "Because Xyrem studies confirm safety/efficacy in

22   pediatrics," right?

23   A.      Yes.

24   Q.      Okay.  And Lumryz's efficacy and safety confirmed

25   efficacy in adults and PK study establish a bridge between

DIRECT EXAMINATION - GREGORY DIVIS

1    Lumryz and Xyrem, right?

2    A.    Yes.

3    Q.    Okay.  So in other words, you're telling the Board

4    that it's possible that Lumryz might not have to do clinical

5    studies in pediatric patients because of the studies that

6    Jazz had already conducted on its Xyrem product, right?

7    A.    Yes, that's correct.

8    Q.    Okay.  So just as Avadel uses -- used Jazz's studies

9    to get Lumryz approved for adults, it's also contemplating

10   using Jazz's studies to get Lumryz approved for pediatrics,

11   right?

12   A.    Yeah, we are.

13   Q.    Yeah, okay.

14         Now, Avadel is also pursuing an indication to

15   treat idiopathic hypersomnia for Lumryz, correct?

16   A.    Yeah, we are.

17   Q.    Okay.  And there are approximately 45,000 patients

18   who have been diagnosed with idiopathic hypersomnia, right?

19   A.    I think the numbers move around a little bit, but,

20   you know, that's a general diagnosis number, from what I can

21   recall, yes.

22   Q.    Okay.  And -- and Avadel's board was told that having

23   an idiopathic hypersomnia indication for Lumryz would expand

24   the patient population that could be prescribed Lumryz,

25   correct?

DIRECT EXAMINATION - GREGORY DIVIS

1    A.      Yeah, that's correct.

2    Q.      Okay.  And you know, sir, that, as we sit here today

3    in this courtroom, there's only one drug currently approved

4    to treat idiopathic hypersomnia, correct?

5    A.      Yeah, that's Xywav.

6    Q.      Jazz's Xywav, true?

7    A.      Yes, that's correct.

8    Q.      Okay.  Now...

9            We're almost done.

10   A.      Okay.

11   Q.      All right.  Now, so we have been discussing the sales

12   Avadel hoped to make, and we're going to discuss the sales

13   that Avadel, in fact, made, but first I'd like to give the

14   jury some foundational information about how Avadel tracks

15   its sales; is that okay?

16   A.      Sure.

17   Q.      Okay.  Now, do you have, in your binder, PTX486?

18           And it's a native, so we're going to have to put

19   it up on the screen.

20   A.      Hold on.  Okay.  It's not in here.

21   Q.      Yeah.  Okay, we're going to put it up.

22           MR. PORTER:  Well, Your Honor, I'd like to move

23   PTX486 into evidence.  I don't believe that there's any

24   objection.

25           MS. DAVIS:  No objection, Your Honor.

DIRECT EXAMINATION - GREGORY DIVIS

1          THE COURT:  PTX486 is admitted.

2               (Exhibit admitted.)

3          MR. PORTER:  And I'd also like to move for

4     admission of JTX259.  And I don't believe there's any

5     objection.

6               (Reporter asks for clarification.)

7          MR. PORTER:  259, please.

8          MS. DAVIS:  No objection.

9          THE COURT:  Okay.  JTX259 is admitted.

10              (Exhibit admitted.)

11    BY MR. PORTER:

12    Q.    So if we could look at 486, I know that may be a

13    little bit difficult to see, but do you recognize this as a

14    weekly sales report, sir?

15    A.    Yes, I do.

16    Q.    Okay.  Now, just to be clear, Avadel doesn't sell

17    Lumryz directly to corner pharmacies like Walgreens, right?

18    A.    No, we don't.

19    Q.    Okay.  It instead sells it to a handful of specialty

20    pharmacies, correct?

21    A.    Yes, that's correct --

22    Q.    Okay.

23    A.    -- three of them.

24    Q.    I'm sorry?

25    A.    Three of them, yes.

# EXHIBIT E

Case 1:21-cv-00691-GBW    Document 592-1    Filed 04/22/24    Page 182 of 338 PageID #: 38988

Search    Menu

Home  /  For Industry  /  Medical products for rare diseases and conditions  /  Designating an Orphan Product: Drugs and Biological Products  /  Clinical Superiority Findings

# Clinical Superiority Findings

Share    Post    LinkedIn    Email    Print

## Designating an Orphan Product: Drugs and Biological Products

Orphan Drug Designation Request Form

Orphan Drug Act - Relevant Excerpts

Frequently Asked Questions (FAQ) About Designating an Orphan Product

Orphan Drug Designation: Disease Considerations

Clinical Superiority Findings

Instructions for Searchable Designation Database

Public Identification of Orphan Drug Designation

Improving the Prevention, Diagnosis, and Treatment of Rare and Neglected Diseases: FDA Report to Congress

Contact Us

Content current as of:
04/01/2024

In accordance with section 527(e)(2) of the FD&C Act (21 U.S.C. 360cc(e)(2)), FDA will publish a summary of the clinical superiority findings when a drug is eligible for orphan-drug exclusivity on the basis of a demonstration of clinical superiority. This page will only include the clinical findings for those drugs approved on or after August 18, 2017, the date that the FDA Reauthorization Act of 2017 added section 527(e)(2) to the FD&C Act. "Clinical superiority," is used here only within the meaning of that term under FDA's orphan drug regulations at 21 CFR Part 316 and section 527(c) of the FD&C Act. For the definition of "clinically superior," for the purposes of determining eligibility for orphan-drug exclusivity when the same drug has been previously approved for the same use or indication, see 21 CFR 316.3(b)(3). For the definition of "same drug," see 21 CFR 316.3(b)(14).

The summary is organized by approval date.

## 2023

Flamel Ireland Limited dba Avadel Ireland for Lumryz (sodium oxybate)

## 2022

Mitsubishi Tanabe Pharma Corporation for Radicava ORS (edaraone) oral suspension

## 2020

Jazz Pharmaceuticals Ireland Limited for Xywav (calcium, magnesium, potassium, and sodium oxybates)

| | |
|---|---|
| Approval Date | 7/21/2020 |
| NDA/BLA | 212690 |
| Sponsor | Jazz Pharmaceuticals Ireland Limited |
| Drug | Xywav (calcium, magnesium, potassium, and sodium oxybates) |
| Orphan Designation | Treatment of narcolepsy |
| Approved Labeled Indication | Indicated for the treatment of cataplexy or excessive daytime sleepiness (EDS) in patients 7 years of age and older with narcolepsy |
| Exclusivity Protected Indication | Indicated for the treatment of cataplexy or excessive daytime sleepiness (EDS) in patients 7 years of age and older with narcolepsy |
| Summary of Clinical Superiority Findings | The active moiety, oxybate was previously approved as Xyrem (sodium oxybate) for the treatment of cataplexy or EDS in patients 7 years of age and older with narcolepsy. Xywav (calcium, magnesium, potassium, and sodium oxybates) is clinically superior to Xyrem by means of greater safety because Xywav provides a greatly reduced chronic sodium burden compared to Xyrem. The differences in the sodium content of the two products at the recommended doses will be clinically meaningful in reducing cardiovascular morbidity in a substantial proportion of patients for whom the drug is indicated. |

## 2019

Neurelis Pharmaceuticals, Inc. for Valtoco (diazepam nasal spray)

## 2018

CSL Behring for Hizentra

Astellas Pharma Global Development, Inc. for Prograf



Novartis Pharmaceuticals Corporation for Signifor LAR

Leadiant Biosciences, Inc. for Revcovi (elapegademase-lvlr)

Alexion Pharmaceuticals, Inc. for Ultomiris (ravulizumab-cwvz)

2017

Wyeth Pharmaceuticals, Inc., a Pfizer Company for Mylotarg

Was this helpful?    Yes    No

FDA Archive                    Visitor Information                    FOIA

About FDA               Website Policies / Privacy                  HHS.gov

Accessibility                No FEAR Act                           USA.gov

                      Vulnerability Disclosure Policy

Contact FDA                                      1-888-INFO-FDA (1-888-463-6332)        Top

# EXHIBIT F

NARCOLEPSY  ⌄ | Prescribing Information | Medication Guide | UNLOCK MORE SUPPORT



## It's time to address the high-sodium elephant in the room

Talk to your doctor about low-sodium XYWAV.*

*XYWAV contains 131 mg of sodium at the maximum recommended nightly dose.

**WHAT IS XYWAV**

XYWAV is for people 7 years of age or older with cataplexy and/or excessive daytime sleepiness (EDS) in narcolepsy

**2.5X**

**increased risk[†]
of stroke[‡]**

**1.6X**

**increased risk[†]
of heart attack[‡]**

### Did you know that people with narcolepsy are at an increased risk of certain cardiovascular conditions?

A study has shown that people with narcolepsy were at a 2.5x higher risk[†] to have a stroke and 1.6x higher risk[†] to have a heart attack than people without narcolepsy.[‡]

Some risk factors for cardiovascular disease are modifiable, such as excessive sodium intake. Fortunately, for most adults, reducing sodium intake by 1000 mg per day can help reduce the risk for high blood pressure, heart disease, and stroke.

[†]Odds ratio.

[‡]A retrospective analysis of US medical claims data for 9312 people with narcolepsy and a control group of 46,559 without narcolepsy.

XYWAV® (calcium, magnesium, potassium, and sodium oxybates) oral solution, 0.5 g/mL total salts (equivalent to 0.413 g/mL of oxybate) is a prescription medicine used to treat the following symptoms in people 7 years of age or older with narcolepsy: sudden onset of weak or paralyzed muscles (cataplexy) and excessive daytime sleepiness (EDS)



## Discover the only oxybate with low sodium

High-sodium oxybates contain ~1640 mg of sodium at the maximum recommended nightly dose, meaning **you would consume more sodium than American Heart Association's 1500 mg ideal sodium limit for most adults—all before eating or drinking anything**.

XYWAV, with 131 mg of sodium at the maximum recommended nightly dose, is the first and only low-sodium oxybate treatment approved by the FDA for treating cataplexy and/or excessive daytime sleepiness (EDS) in people 7 years of age or older with narcolepsy.

Learn more about why choosing XYWAV over high-sodium oxybates can help reduce your sodium intake, a modifiable risk factor for cardiovascular disease.

**XYWAV AND SODIUM**

**XYWAV is thought to work during sleep to help improve symptoms of cataplexy and EDS during the day[§]**

§The exact way XYWAV works for the treatment of cataplexy and EDS in patients with narcolepsy is unknown.



## The XYWAV Coupon Program

Pay as little as $5 for XYWAV through the Coupon Program. Want to find out if you are eligible?‖¶ JazzCares® is here to help.

‖Applies only to commercially insured patients enrolled in the XYWAV and XYREM REMS. Subject to maximum annual benefit.
¶You must be a resident of the US, Puerto Rico, or other US territory.

Jazz Pharmaceuticals reserves the right to terminate or modify this program at any time with or without notice. Other Terms and Conditions apply.

## Financial and insurance support, based on your personal needs

Jazz Pharmaceuticals is here to help you find programs that may help you reduce the cost of XYWAV. Plus, JazzCares can help support your doctor's office in navigating your specific insurance requirements to help get you the treatment you need.

**SHOW ME HOW TO SAVE**



## myWAV: Individualized support at your fingertips

Once your doctor has prescribed XYWAV, you can register for and download the myWAV app. myWAV can help you get started and offers support throughout your treatment journey. Watch this video to find out more.

SIGN UP

 

All third-party product, company names and logos are trademarks™ or registered® trademarks and remain the property of their respective holders.



**STANDUP CHAMPIONS**

## Hear from real patients taking XYWAV

Standup Champions are patients who take XYWAV to treat their cataplexy and/or EDS in narcolepsy, and want to share their experiences to help and inspire others. Watch videos from people living with narcolepsy and learn how they fit XYWAV treatment into their lives.

**WATCH PATIENT STORIES**

XYWAV® (calcium, magnesium, potassium, and sodium oxybates) oral solution, 0.5 g/mL total salts (equivalent to 0.413 g/mL of oxybate) is a prescription medicine used to treat:

- the following symptoms in people 7 years of age or older with narcolepsy:
  - sudden onset of weak or paralyzed muscles (cataplexy)
  - excessive daytime sleepiness (EDS)
- idiopathic hypersomnia (IH) in adults.

### Important Safety Information

WARNING: Taking XYWAV with other central nervous system (CNS) depressants such as medicines used to make you or your child fall asleep, including opioid analgesics, benzodiazepines, sedating antidepressants, antipsychotics, sedating anti-epileptic medicines, general anesthetics, muscle relaxants, alcohol, or street drugs, may cause serious medical problems, including trouble breathing (respiratory depression), low blood pressure (hypotension), changes in alertness (drowsiness), fainting (syncope), and death.

The active ingredient of XYWAV is a form of gamma-hydroxybutyrate (GHB). Abuse or misuse of illegal GHB alone or with other drugs that cause changes in alertness (or consciousness) has caused serious side effects. These effects include seizures, trouble breathing (respiratory depression), changes in alertness (drowsiness), coma, and death. Call your doctor right away if you or your child has any of these serious side effects.

Because of these risks, you have to go through the XYWAV and XYREM REMS to have your or your child's prescription for XYWAV filled.

**Do not take XYWAV if you take or your child takes** other sleep medicines or sedatives (medicines that cause sleepiness), drinks alcohol, or has a rare problem called succinic semialdehyde dehydrogenase deficiency.

Keep XYWAV in a safe place to prevent abuse and misuse. Selling or giving away XYWAV may harm others, and is against the law. Tell your doctor if you have ever abused or been dependent on alcohol, prescription medicines, or street drugs.

Anyone who takes XYWAV should not do anything that requires them to be fully awake or is dangerous, including driving a car, using heavy machinery, or flying an airplane, for at least 6 hours after taking XYWAV. Those activities should not be done until you know how XYWAV affects you or your child.

**XYWAV can cause serious side effects, including the following:**

- **Breathing problems, including** slower breathing, trouble breathing, and/or short periods of not breathing while sleeping (sleep apnea). People who already have breathing or lung problems have a higher chance of having breathing problems when they use XYWAV.
- **Mental health problems, including** confusion, seeing or hearing things that are not real (hallucinations), unusual or disturbing thoughts (abnormal thinking), feeling anxious or upset, depression, thoughts of killing yourself or trying to kill yourself, increased tiredness, feelings of guilt or worthlessness, or difficulty concentrating. Tell your doctor if you or your child have or had depression or have tried to harm yourself or themselves. **Call your doctor right away if you have or your child has symptoms of mental health problems or a change in weight or appetite.**
- **Sleepwalking.** XYWAV can cause sleepwalking, which can cause injuries. Call your doctor if this occurs.

The most common side effects of XYWAV in adults include nausea, headache, dizziness, anxiety, insomnia, decreased appetite, excessive sweating (hyperhidrosis), vomiting, diarrhea, dry mouth, parasomnia (a sleep disorder that can include abnormal dreams, abnormal rapid eye movement (REM) sleep, sleep paralysis, sleep talking, sleep terror, sleep-related eating disorder, sleepwalking, and other abnormal sleep-related events), somnolence, fatigue, and tremor.

The most common side effects of XYREM (which also contains oxybate like XYWAV) in children include nausea, bedwetting, vomiting, headache, weight decrease, decreased appetite, dizziness, and sleepwalking.

XYWAV can cause physical dependence and craving for the medicine when it is not taken as directed. These are not all the possible side effects of XYWAV.

You are encouraged to report negative side effects of prescription drugs to the FDA. Visit www.fda.gov/medwatch, or call 1-800-FDA-1088.

**Please see full Prescribing Information, including BOXED Warning, and Medication Guide.**



**Jazz** Pharmaceuticals.

**Living With Narcolepsy**

About Narcolepsy

Living With Narcolepsy

**Why XYWAV**

What is XYWAV

XYWAV and Sodium

Transitioning From XYREM

FAQ

**Getting XYWAV**

Talking to Your Doctor

Getting XYWAV

Dosing

Side Effects

**Support & Resources**

JazzCares® Savings & Financial Support

JazzCares® Patient Support Programs

Additional Patient Resources

Educational Webinars

Patient Stories

**UNLOCK MORE SUPPORT**

Privacy Statement

Contact Us

Site Map

Terms of Use

Jazz Pharmaceuticals

This site is intended for US residents only.
© 2023 Jazz Pharmaceuticals plc or its subsidiaries US-XYW-2200245 Rev1123

# EXHIBIT G

# LUMRYZ™ REMS

# Certified Pharmacy Training — Pharmacy Staff and Pharmacists

All LUMRYZ REMS authorized representatives, certified pharmacy staff, and pharmacists involved in dispensing LUMRYZ must complete the **Pharmacy Staff Module** and the **Pharmacy Staff Knowledge Assessment**. All authorized representatives and pharmacists must also complete the **Pharmacist Module** and the **Pharmacist Knowledge Assessment**.



(sodium oxybate) for extended-release oral suspension Ⓒ



Reference ID: 5270348



(sodium oxybate) for extended-release
oral suspension ℃

## Dear LUMRYZ REMS Certified Pharmacy Staff,

The LUMRYZ REMS has been approved by the Food and Drug Administration (FDA) as a Risk Evaluation and Mitigation Strategy (REMS).

### The LUMRYZ REMS

The FDA has determined that a REMS is necessary to ensure that the benefits of LUMRYZ (sodium oxybate) for extended-release oral suspension outweigh the risks of serious adverse outcomes resulting from inappropriate prescribing, misuse, abuse, and diversion of LUMRYZ by:

1. **Informing prescribers, pharmacists, and patients of:**
   - The risk of significant central nervous system (CNS) and respiratory depression associated with LUMRYZ
   - The contraindication of use of LUMRYZ with sedative hypnotics or alcohol
   - The potential for abuse, misuse, and overdose associated with LUMRYZ
   - The safe use, handling, and storage of LUMRYZ

2. **Ensuring that pharmacy controls exist prior to filling prescriptions for LUMRYZ that:**
   - Screen for concomitant use of sedative hypnotics and other CNS depressants
   - Monitor for inappropriate prescribing, misuse, abuse, and diversion of LUMRYZ
   - Notify prescribers when patients are receiving concomitant contraindicated medications or when there are signs of potential abuse, misuse, or diversion

This training provides information about the LUMRYZ REMS that includes important information about LUMRYZ and the responsibilities of certified pharmacy staff involved in the dispensing of LUMRYZ.

**LUMRYZ is approved for:**
   - Treatment of cataplexy in adults with narcolepsy
   - Treatment of excessive daytime sleepiness (EDS) in adults with narcolepsy

LUMRYZ may be prescribed only by prescribers certified in the LUMRYZ REMS and dispensed only by pharmacies certified in the LUMRYZ REMS to patients enrolled in the LUMRYZ REMS. Please contact the LUMRYZ REMS with any questions at www.LUMRYZREMS.com or 1-877-453-1029.


Sincerely,

Avadel CNS Pharmaceuticals, LLC

# TABLE OF CONTENTS

**LUMRYZ REMS TRAINING: PHARMACY STAFF MODULE** .................................................. **4**

  **IMPORTANT SAFETY INFORMATION** ................................................................. 5

     INDICATIONS AND USAGE ........................................................ 5

     HOW SUPPLIED .................................................................. 5

     CONTROLLED SUBSTANCE SCHEDULING .......................... 5

     BOXED WARNING ............................................................... 5

     CONTRAINDICATIONS ......................................................... 6

     WARNINGS AND PRECAUTIONS ......................................... 6

  **LUMRYZ REMS REQUIREMENTS** ..................................................................... 7

  **OVERVIEW OF CERTIFIED PHARMACY RESPONSIBILITIES** ................................... 8

     ENROLLMENT VERIFICATION ............................................... 8

     PRESCRIPTION PROCESSING .............................................. 9

     SHIPPING .......................................................................... 10

     MONITORING FOR INAPPROPRIATE PRESCRIBING, ABUSE, MISUSE, AND DIVERSION ....... 10

     ADVERSE EVENT REPORTING ............................................. 11

     ONGOING PATIENT EDUCATION ....................................... 11

     DRUG TAKEBACK PROGRAM .............................................. 11

**LUMRYZ REMS TRAINING: PHARMACIST MODULE** ............................................. **12**

  **LUMRYZ REMS REQUIREMENTS** ..................................................................... 13

  **CERTIFIED PHARMACY RESPONSIBILITIES** ..................................................... 14

     PATIENT COUNSELING AND SCREENING ........................... 15

     CLINICAL USE CLARIFICATIONS .......................................... 15

     PRESCRIPTION REFILLS ...................................................... 16

     MONITORING AND ASSESSING FOR SIGNS OF ABUSE, MISUSE, AND DIVERSION ....... 17

     SHIPPING PROCEDURES ..................................................... 18

     INVENTORY CONTROL ....................................................... 18

Reference ID: 5270348

CERTIFIED PHARMACY TRAINING — PHARMACY STAFF MODULE

## LUMRYZ™ REMS

## Training for the Authorized Representative, Pharmacy Staff, and Pharmacists Involved in the LUMRYZ REMS

All authorized representatives, pharmacy staff, and pharmacists within a LUMRYZ REMS certified pharmacy involved in dispensing LUMRYZ must complete training on the **Pharmacy Staff Module** successfully complete the **Pharmacy Staff Knowledge Assessment**. Training must be completed annually.



Lumryz™
(sodium oxybate) for extended-release oral suspension Ⅽ

# IMPORTANT SAFETY INFORMATION

## INDICATIONS AND USAGE

- LUMRYZ (sodium oxybate) for extended-release oral suspension is a central nervous system (CNS) depressant that is indicated for the following:
  - Treatment of cataplexy in adults with narcolepsy
  - Treatment of excessive daytime sleepiness (EDS) in adults with narcolepsy

## HOW SUPPLIED

- LUMRYZ is shipped from a LUMRYZ REMS certified pharmacy directly to patients. Each shipment to a patient will contain:
  - A carton with the prescribed amount of LUMRYZ packets at the prescribed dose (each child-resistant package contains a packet of LUMRYZ 4.5 g, 6 g, 7.5 g, or 9 g)
  - A mixing cup for preparation of each single dose (LUMRYZ dose mixed with water)
  - For a new patient, the **Patient Brochure**

## CONTROLLED SUBSTANCE SCHEDULING

- The active ingredient in LUMRYZ is sodium oxybate or gamma-hydroxybutyrate (GHB, a known drug of abuse). GHB has been used to facilitate sexual assaults. Because of its rapid sedative effects (particularly when mixed with alcohol) and its colorless and odorless appearance, GHB has been used to "spike" the drinks of unsuspecting victims. Because of its abuse potential, GHB is designated a controlled substance by the Drug Enforcement Administration (DEA) and has been placed in a bifurcated federal schedule.
- GHB products approved by the FDA, such as sodium oxybate, and used as prescribed for therapeutic purposes are Schedule III drugs.
- The active ingredient of LUMRYZ, sodium oxybate, is the sodium salt of GHB, a Schedule I controlled substance.
- Federal law prohibits the transfer of LUMRYZ to any persons other than the patient for whom it was prescribed.

## BOXED WARNING

<div style="border:1px solid black">

### WARNING: CENTRAL NERVOUS SYSTEM (CNS) DEPRESSION AND ABUSE AND MISUSE.

- **Central Nervous System Depression**

  LUMRYZ (sodium oxybate) is a CNS depressant. Clinically significant respiratory depression and obtundation may occur in patients treated with LUMRYZ at recommended doses. Many patients who received sodium oxybate during clinical trials in narcolepsy were receiving central nervous system stimulants.

- **Abuse and Misuse**

  LUMRYZ (sodium oxybate) is the sodium salt of gamma-hydroxybutyrate (GHB). Abuse or misuse of illicit GHB, either alone or in combination with other CNS depressants, is associated with CNS adverse reactions, including seizure, respiratory depression, decreases in the level of consciousness, coma, and death.

Because of the risks of CNS depression and abuse and misuse, LUMRYZ is available only through a restricted program under a Risk Evaluation and Mitigation Strategy (REMS) called the LUMRYZ REMS. For further information go to www.LUMRYZREMS.com or call 1-877-453-1029.

</div>

5

# IMPORTANT SAFETY INFORMATION

## CONTRAINDICATIONS

- LUMRYZ is contraindicated for use in:
  - combination with sedative hypnotics.
  - combination with alcohol.
  - patients with succinic semialdehyde dehydrogenase deficiency, a rare disorder of inborn error of metabolism variably characterized by mental retardation, hypotonia, and ataxia.

## WARNINGS AND PRECAUTIONS

**Central Nervous System Depression**

- LUMRYZ is a CNS depressant.
- Concurrent use of LUMRYZ with other CNS depressants, including but not limited to opioid analgesics, benzodiazepines, sedating antidepressants or antipsychotics, sedating antiepileptic drugs, general anesthetics, muscle relaxants, and/or illicit CNS depressants, may increase the risk of respiratory depression, hypotension, profound sedation, syncope, and death.
  - If use of these CNS depressants in combination with LUMRYZ is required, dose reduction or discontinuation of one or more CNS depressants (including LUMRYZ) should be considered.
  - If short-term use of an opioid (e.g., post- or perioperative) is required, interruption of treatment with LUMRYZ should be considered.
- Patients who have sleep apnea or compromised respiratory function may be at a higher risk of developing respiratory depression, loss of consciousness, coma, and death with LUMRYZ use.
- Healthcare providers should caution patients about operating hazardous machinery, including automobiles or airplanes, until they are reasonably certain that LUMRYZ does not affect them adversely (e.g., impair judgment, thinking, or motor skills). Patients should not engage in hazardous occupations or activities requiring complete mental alertness or motor coordination, such as operating machinery or a motor vehicle or flying an airplane, for at least 6 hours after taking LUMRYZ.

**Abuse, Misuse and Diversion**

- LUMRYZ is a Schedule III controlled substance.
- The active ingredient of LUMRYZ, sodium oxybate, is the sodium salt of GHB, a Schedule I controlled substance. Abuse of illicit GHB, either alone or in combination with other CNS depressants, is associated with CNS adverse reactions, including seizure, respiratory depression, decreases in the level of consciousness, coma, and death.
- The rapid onset of sedation, coupled with the amnestic features of GHB, particularly when combined with alcohol, has proven to be dangerous for the voluntary and involuntary user (e.g., assault victim).
- Patients should be carefully evaluated for a history of drug abuse and follow such patients closely, observing them for signs of misuse or abuse of GHB (e.g., increase in size or frequency of dosing, reports of lost, stolen, or spilled medication, drug-seeking behavior, feigned cataplexy).

**For complete safety information, please see the Prescribing Information for LUMRYZ.**

6

## LUMRYZ REMS REQUIREMENTS

LUMRYZ may be prescribed only by prescribers certified in the LUMRYZ REMS and dispensed only to patients enrolled in the LUMRYZ REMS. Because of the risks of CNS depression, abuse, misuse, and diversion, LUMRYZ is available only through a restricted program called the LUMRYZ REMS.

### Notable requirements of this REMS include:

- Use of a certified pharmacy.

- Healthcare providers who prescribe LUMRYZ must have completed the **Prescriber Enrollment Form** and must comply with the requirements of the LUMRYZ REMS.

- To receive LUMRYZ, patients must be enrolled in the LUMRYZ REMS and be counseled on the serious risks and safe use of LUMRYZ treatment. Patients are enrolled by certified prescribers who must fill out and submit the **Patient Enrollment Form**. Prescribers must also complete and submit the **Prescription Form** to a certified pharmacy for all new LUMRYZ prescriptions and for LUMRYZ prescriptions for patients restarting LUMRYZ treatment after not receiving LUMRYZ for 6 months or more.

- Lumryz must not be stocked in retail pharmacies.

Further information is available at www.LUMRYZREMS.com.

Reference ID: 5270348

## OVERVIEW OF CERTIFIED PHARMACY RESPONSIBILITIES

### PRESCRIPTION PROCESSING

- A certified pharmacy must validate all prescriptions prior to dispensing LUMRYZ. Before a prescription for LUMRYZ can be shipped to a patient, the certified pharmacy must:
  - o Verify that the **Prescription Form** is complete and signed by the prescriber.
  - o Verify that the **Prescription Form** was received from the prescriber's office.
  - o Verify the prescription is dated according to state-controlled substance regulations.
  - o Verify the prescription is for no more than a 1-month (30-day) supply on a patient's first LUMRYZ fill and no more than a 3-month (90-day) supply on subsequent fills.
  - o Verify there are no discrepancies or concerns with the dosing and titration.
    - ◊ If there are discrepancies or concerns, the certified pharmacy must contact the prescriber to revise and resubmit the prescription.
  - o Review the **Prescription Form** for medications and comorbidities
    - ★ Note: A pharmacy processing a refill (e.g., transferred prescription) or a renewal (e.g., prescription sent from a prescriber) for an existing patient with the previous fill at another certified pharmacy must contact the previous pharmacy for the most recent **Prescription Form** for the patient that contains the medication and comorbidities list. A pharmacy may view an existing patient's previous RDA history and REMS activity online at www.LUMRYZREMS.com or by calling the LUMRYZ REMS at 1-877-453-1029.
  - o Complete the **Patient Counseling Checklist** with the patient and review the patient information contained in the LUMRYZ REMS patient database using the secure web viewing portal and the **Prescription Form,** including:
    - ◊ Comorbid conditions and concomitant use of sedative hypnotics, certain other CNS depressants or other potentially interacting agents that either are unknown to the prescriber or pose a high risk of serious interaction with LUMRYZ.
      - – If comorbid conditions or patient use of a contraindicated medication is confirmed and if the prescriber has not indicated prior knowledge, then the pharmacist will notify and consult the prescriber about the comorbid conditions and risks of concomitant medication use and document the call and the prescriber's treatment rationale on the **Patient Counseling Checklist**.
    - ◊ Alerts and **Risk Management Reports (RMRs)** regarding potential abuse, misuse, or diversion.
  - o Contact all other REMS for oxybate products by phone to:
    - ◊ Verify that the patient has no other active, overlapping prescriptions for oxybate products that overlap with the current prescription.
    - ◊ Verify that the patient and prescriber have not been disenrolled from any other REMS for oxybate products for suspected abuse, misuse, or diversion.
  - o Document that the calls to all other REMS for oxybate products were completed by submitting confirmation to the LUMRYZ REMS through the REMS dispense authorization (RDA) process.
  - o Obtain a RDA from the LUMRYZ REMS for each dispense.
  - o The issuance of a RDA informs the pharmacy that all the REMS safe us conditions are met:
    - ◊ The pharmacy is certified
    - ◊ The prescriber is certified
    - ◊ The patient is enrolled
    - ◊ The patient has no other active, overlapping LUMRYZ prescriptions
    - ◊ The **Patient Counseling Checklist** has been completed for the required patients

Reference ID: 5270348

◊ The Pharmacist confirmed that the alerts and **RMR** history for patient and prescriber have been reviewed

◊ The pharmacy confirmed that the call was made to all other REMS for oxybate products to verify:

- The patient has no other active, overlapping prescriptions for oxybate products that overlap with the current prescription for LUMRYZ
- The patient and prescriber have not been disenrolled from any other REMS for oxybate products for suspected abuse, misuse, or diversion

o The certified pharmacy will process all LUMRYZ prescriptions, regardless of payment method, through the pharmacy management system (PMS) and obtain a RDA online on the LUMRYZ REMS website or by calling the REMS to verify the safe use conditions as described above.

◊ To obtain an RDA, provide the following information prior to dispensing LUMRYZ.

- Patient information:
  - Patient First Name
  - Patient Last Name
  - Patient Date of Birth
  - Patient Zip Code
- Prescriber information:
  - Prescriber DEA
- Completed **Patient Counseling Checklist** for required patients
- Confirmation that alerts and **RMR** have been reviewed for patient and prescriber
- Confirmation that a call was made to all other REMS for oxybate products
  - Initial date / time of outreach to all other REMS for oxybate products
  - Number of attempts to contact all other REMS for oxybate products
  - Confirmation that the patient and prescriber are not disenrolled in any other REMS for oxybate products for misuse, abuse, or diversion
  - Confirmation that the patient does not have an overlapping prescription in any other REMS for oxybate products

◊ If all safe use conditions are met;
- A RDA will be generated by the LUMRYZ REMS
- The RDA will be recorded by the pharmacy
- The RDA will be maintained in the LUMRYZ REMS patient database
- Upon receiving the RDA code, the certified pharmacy is authorized to dispense LUMRYZ

- If the safe use conditions are **<u>not met</u>**, a RDA will not be issued, and the pharmacy will be notified of the reason, and the product will not be dispensed.

- If a certified pharmacy receives information regarding active, overlapping prescriptions for an oxybate product for a patient, the certified pharmacy responsible for dispensing the current prescription will notify and consult each prescriber.

o Prescriptions are considered overlapping when more than one prescription for an oxybate product is received for a patient within an overlapping timeframe.

◊ If a certified pharmacy suspects abuse, misuse, or diversion, the prescription should not be filled, the certified pharmacy must complete and submit a **RMR** to the LUMRYZ REMS, and the prescriber will be notified.

◊ There are valid reasons why a patient may have overlapping prescriptions on file or on hold, including if the patient moves or changes prescribers, or if the prescriber sends in a new prescription prior to the completion of all refills.

◊ A certified pharmacy responsible for dispensing LUMRYZ to a patient must ensure that under these situations a patient does not receive multiple overlapping shipments of an oxybate product.

◊ If there are valid reasons why a patient may need an overlapping dispense of an oxybate product, including if the prescriber is changing the patient's treatment, to avoid delivery issues, if there is a valid early refill (e.g., lost or stolen medication), or for titration timing.

9

- Once a RDA is obtained from the LUMRYZ REMS, patient information has been reviewed in the patient database using the secure web viewing portal has been performed, and the other REMS for oxybate products have been contacted, the certified pharmacy will contact the patient to schedule shipment.

  o For a new patient, the certified pharmacy provides the **Patient Brochure**.

  o A pharmacist must counsel the patient by completing the **Patient Counseling Checklist** prior to the initial dispensing of LUMRYZ.

    ◊ The certified pharmacy must submit the **Patient Counseling Checklist** to the LUMRYZ REMS online at www.LUMRYZREMS.com or complete a print version and fax to the LUMRYZ REMS at 1-877-206-3198.

- The certified pharmacy must report each prescription filled for LUMRYZ to all REMS for oxybate products
  - Product information:
    – Date of Fill
    – Days' Supply
    – Quantity
    – Product/NDC

## SHIPPING

All LUMRYZ is shipped to patients (or their adult designee) by an overnight service with receipt signature required. Certified pharmacies must provide confirmation of receipt of each prescription of LUMRYZ to the LUMRYZ REMS electronically.

- The patient may request an alternate shipping address, which is subject to approval by a pharmacist.

- See **How Supplied** for details of the contents of each LUMRYZ shipment.

- Daily tracking reports are generated to confirm the receipt of each order shipped.

- Lost shipments are investigated.

## MONITORING FOR INAPPROPRIATE PRESCRIBING, ABUSE, MISUSE, AND DIVERSION

Certified pharmacies must conduct detailed monitoring on an ongoing basis of patients and prescribers for signs of inappropriate prescribing, abuse, misuse and diversion. Each certified pharmacy will:

- Document early refill requests and instances of patient and prescriber behavior that suggest potential abuse, misuse, or diversion by completing and submitting a **RMR** to the LUMRYZ REMS online at www.LUMRYZREMS.com or complete a print version and fax to the LUMRYZ REMS at 1-877-206-3198. This information is maintained in the prescriber and/or patient databases in the LUMRYZ REMS.

  o Request the LUMRYZ REMS to disenroll a patient or a prescriber who has demonstrated behavior that suggests potential abuse, misuse, or diversion by completing and submitting a **RMR** to the LUMRYZ REMS.

- Review the patient's **RMR** history and alerts in the LUMRYZ REMS using the secure pharmacy web viewing portal for the patient database prior to granting an early refill request or if abuse, misuse, or diversion is suspected.

- Discuss early refill requests or other patient incidents with the prescriber so that the prescriber can make a decision to allow or deny the early refill, or to take some other action based on the patient's behavior and history.

- Report all **RMRs** to the LUMRYZ REMS by completing and submitting the **RMR** online at www.LUMRYZREMS.com or by fax to 1-877-206-3198.

- Determine whether an alert should be placed in the patient's profile in the patient database within the LUMRYZ REMS for repeated reports of lost, stolen, destroyed, or spilled drug for review prior to shipping LUMRYZ.

- Inform a pharmacist immediately if certified pharmacy staff suspects patients or prescribers of abuse, misuse, or diversion.

Reference ID: 5270348

## ADVERSE EVENT REPORTING

- Everyone on staff in each certified pharmacy has an essential role to play in the process of collecting information on potential adverse events for reporting to the LUMRYZ REMS.

  o Document and report all potential adverse events reported by all sources, including any CNS depression, respiratory depression, loss of consciousness, coma, and death by contacting Avadel CNS Pharmaceuticals, LLC at productsafety@avadel.com or 1-888-828-2335.

  o Report all potential adverse events related to suspected abuse, misuse, or diversion, by completing and submitting the **RMR** to the LUMRYZ REMS online at www.LUMRYZREMS.com or by fax to 1-877-206-3198.

## ONGOING PATIENT EDUCATION

Patients in the LUMRYZ REMS have access to ongoing education while taking LUMRYZ through:

- A 24-hour/7 day a week toll-free telephone help line staffed by a pharmacist trained in the LUMRYZ REMS,
- Continued contact with the certified pharmacy for every refill, and
- The LUMRYZ REMS website (www.LUMRYZREMS.com).

## DRUG TAKEBACK PROGRAM

- LUMRYZ patients can return any unused, leftover or expired drug product through a drug takeback program. To obtain information, please contact the LUMRYZ REMS at 1-877-453-1029.



CERTIFIED PHARMACY TRAINING — PHARMACIST MODULE

## LUMRYZ™ REMS

# Training for Authorized Representatives and Pharmacists Involved in the Dispensing of LUMRYZ

All LUMRYZ REMS authorized representatives and certified pharmacy pharmacists involved in dispensing LUMRYZ must complete training on the **Pharmacist Module** (in addition to the **Pharmacy Staff Module**) and successfully complete the **Pharmacist Knowledge Assessment** and **Pharmacy Staff Knowledge Assessment**. Training must be completed annually.



Lumryz™
(sodium oxybate) for extended-release oral suspension ℂℂ

Authorized representatives and all pharmacists involved in dispensing LUMRYZ must complete the following additional training at least annually. The LUMRYZ REMS requires that pharmacists within a certified pharmacy are thoroughly trained on the requirements of the LUMRYZ REMS. Training will be conducted by reviewing the LUMRYZ REMS materials and successfully completing the **Knowledge Assessments** on the requirements of certified pharmacies and pharmacists working within a certified pharmacy.

To complete pharmacy certification, Authorized Representatives must submit the **Pharmacy Enrollment Form** to the LUMRYZ REMS.

Pharmacist duties will include:

- Review of the LUMRYZ Prescribing Information.
- Review of certified pharmacy's internal processes and procedures established to support the LUMRYZ REMS with an experienced pharmacist.
- Execution of the **Patient Counseling Checklist** for new patients, existing patients who restart treatment after not receiving LUMRYZ for 6 months or longer, and patients who report a change in their medication or medical history.
- Detailed monitoring including completion of a **RMR**, as needed.
- Follow-up interactions with patients and prescribers.
- LUMRYZ REMS documentation and processes.

## LUMRYZ REMS REQUIREMENTS

For information on the LUMRYZ REMS requirements see **Pharmacy Staff Module- LUMRYZ REMS Requirements**.

## CERTIFIED PHARMACY RESPONSIBILITIES

Certified pharmacies will:

- Limit the first prescription fill to no more than a 1-month (30-day) supply of LUMRYZ and no more than a 3-month (90-day) supply for subsequent prescription fills.
- Report potential adverse events to Avadel CNS Pharmaceuticals, LLC at productsafety@avadel.com or 1-888-828-2335.
- Notify prescribers when there are signs of potential abuse or misuse or when patients are taking sedative hypnotics, other CNS depressants, or other potentially interacting agents of which the prescriber is not already aware.
- Certified pharmacies must complete and submit a **RMR** to the LUMRYZ REMS for all instances of potential abuse, misuse, or diversion.
- Certified pharmacies must provide confirmation that each Lumryz prescription filled was reported to all REMS for oxybate products by submitting the confirmation electronically to the LUMRYZ REMS.
- Utilize the LUMRYZ REMS, which has access to the secure, validated, separate and distinct LUMRYZ REMS databases (patient database, certified prescriber database, certified pharmacy database, and disenrolled prescriber database) that will only be queried independently through electronic verification, to verify the following:
  - o Complete patient enrollment information
  - o Complete prescriber certification information
  - o Patient information including:
    - Name and two additional identifiers (date of birth, phone number, address, gender)
    - Current and previous prescribers
    - Comorbid conditions and concomitant medications reported by the patient
    - Prescription history

Reference ID: 5270348

- Prescription information including:
  - Date
  - Dose
  - Titration instructions (as applicable)
  - Number of refills
  - Directions
  - Total quantity (dose packets and number of days' supply)
  - Concomitant medications
- **RMRs**
- Shipment information, including:
  - Dates of shipments
  - Dates of shipment receipts
  - Patient addresses
  - Designee information
  - Number of shipments sent daily
  - Quantities of LUMRYZ dispensed daily
- Documentation of interactions with prescribers, patients, and other parties

These data must be available to the LUMRYZ REMS for review on an ongoing basis to ensure that LUMRYZ is dispensed to enrolled patients only after completion and documentation of safe use conditions. In certain cases, a pharmacist must access a patient's or prescriber's historical data in the LUMRYZ REMS using the certified pharmacy secure web viewing portal for the patient database and review it prior to dispensing LUMRYZ.

Reference ID: 5270348

## PATIENT COUNSELING AND SCREENING

- Certified pharmacies must complete the **Patient Counseling Checklist** and submit to the LUMRYZ REMS prior to dispensing LUMRYZ for new patients, existing patients who restart treatment after not receiving LUMRYZ for 6 months or longer, and patients who report a change in their medication or medical history.

- For new patients (first shipment of LUMRYZ), and for patients who are restarting LUMRYZ treatment after not receiving product for 6 months or longer, the **Patient Counseling Checklist** must be completed in its entirety.

- For prescription renewals and refills, if the patient has indicated a change in their medication use or medical history, the patient will be transferred to the pharmacist to determine if further counseling and prescriber outreach is required. Steps 1, 3, 4 and 5 of the **Patient Counseling Checklist** must be completed if the patient indicates that the patient is taking a new medication or has a new comorbid medical condition that is listed in Step 4 of the **Patient Counseling Checklist.**

- Each time a pharmacist completes the **Patient Counseling Checklist**, the pharmacist must:
  - Verify that early refill requests have been thoroughly questioned and approved through the **RMR** procedure (see below).
  - Screen the patient for concomitant use of contraindicated medications (sedative hypnotics), alcohol, other CNS depressants or other potentially interacting agents.
    - ◊ The pharmacist asks the patient if he or she is taking any other medications and can consult external pharmacy databases to identify drug interactions or prescriptions for other drug products that might have been filled at different pharmacies before filling the LUMRYZ prescription.
    - ◊ If patient use of a contraindicated medication is confirmed, and if the prescriber has not indicated prior knowledge, then the pharmacist will notify and consult the prescriber about the risks of concomitant medication use prior to shipping LUMRYZ.
    - ◊ Instruct the patient to alert the pharmacy to any new medication the patient begins as soon as possible.
  - Screen the patient for other medical conditions.
    - ◊ The pharmacist asks the patient what other medical conditions he/she has.
    - ◊ If the patient indicates that he/she has a certain medical condition listed on the **Patient Counseling Checklist**, the pharmacist counsels the patient and notifies the prescriber, if there is no confirmation of prior prescriber knowledge, about the medical condition prior to shipping LUMRYZ.
  - Document the results of the patient screening, all reported concomitant medications and comorbid medical conditions, the action(s) taken, and the date the **Patient Counseling Checklist** is completed in the LUMRYZ REMS.
  - Counsel the patient on proper drug disposal if patient has unused oxybate product from a prior prescription (e.g., receiving an early refill for a dosage increase, alternative dose form of oxybate products, etc.).
  - Submit the **Patient Counseling Checklist** to the LUMRYZ REMS online at www.LUMRYZREMS.com or complete a print version and fax to the LUMRYZ REMS at 1-877-206-3198.

- Certified pharmacies must provide patients with 24/7 access to a LUMRYZ REMS trained pharmacist.

Reference ID: 5270348

## CLINICAL USAGE CLARIFICATIONS

**The pharmacist must:**

- Review the information on each **Prescription Form**.

- Notify and consult the prescriber if there are any clinical usage clarifications required, such as:
  - o Dose over recommended dosage range (6 g to 9 g per night)
  - o Non-standard doses or instructions
  - o Possible errors in dosing or titration amounts or directions

If the issue is not resolved with the prescriber, the pharmacist may consult with the Pharmacist-in-Charge at his/her certified pharmacy and with the LUMRYZ REMS.

## PRESCRIPTION REFILLS

★ Note: A pharmacy processing a refill (e.g., transferred prescription) or a renewal (e.g., prescription sent from a prescriber) for an existing patient with the previous fill at another certified pharmacy must contact the previous pharmacy for the most recent **Prescription Form** for the patient that contains the medication and comorbidities list. A pharmacy may view an existing patient's previous RDA history and REMS activity online at www.LUMRYZREMS.com or by calling the LUMRYZ REMS at 1-877-453-1029.

- Up to 5 refills are allowed on a LUMRYZ prescription (per DEA regulations for Schedule lll controlled substances).

- Refills may be submitted from the prescriber to the certified pharmacy by phone, fax, mail, and online through a prescribing system. When the prescription information is entered into the PMS, the LUMRYZ REMS will verify eligibility and issue a RDA.

- For information on the prescription processing requirements see **Prescription Processing** – in the Pharmacy Staff Module.

- Refill orders should be opened at a patient's certified pharmacy when the patient has approximately 10 days of therapy remaining from the previous shipment.

  - o Certified pharmacy staff will contact the patient and schedule a shipment. The pharmacy staff will ask the patient if there has been any change in his/her medications or medical history.
  - o If the patient reports a change in their medication or medical history, the pharmacy staff will then transfer the patient to a pharmacist who must complete the **Patient Counseling Checklist**. The patient should be counseled on the use or diagnosis of:
    - ◊ Sedative hypnotics (for example, diazepam, phenobarbital, zolpidem, etc.)
    - ◊ CNS depressants, including but not limited to opioid analgesics, benzodiazepines, sedating antidepressants or antipsychotics, sedating antiepileptic drugs, general anesthetics, and muscle relaxants
    - ◊ Alcohol
    - ◊ Sleep apnea
    - ◊ Asthma, COPD, or other conditions affecting his or her breathing
    - ◊ Other current medical conditions
  - o The pharmacist completes refill counseling and confirmation of prescriber consultation or notification by completing and submitting the **Patient Counseling Checklist** as applicable to the LUMRYZ REMS online at www.LUMRYZREMS.com or by fax to 1-877-206-3198.

- All patient requests for early refills are to be questioned and documented by the pharmacist.

  - o An early refill request is a request for LUMRYZ shipment prior to the date of the next shipment.
  - o Requests to accommodate shipment logistics (scheduled delivery date falls on a Sunday, holiday, or vacation) are not considered early refills.
  - o If the early refill is required due to a dosage increase, a pharmacist must:
    - ◊ Confirm the new dosage with the prescriber prior to processing the prescription.
  - o If an early refill is requested for any other reason, a pharmacist must:

16

Reference ID: 5270348

◊ Discuss the request with the patient to evaluate his/her compliance with therapy, assessing for misuse, abuse, and diversion.

◊ Evaluate the patient's record in the LUMRYZ REMS using the certified pharmacy secure web viewing portal for the patient database and review the patient's prior **RMR** history to identify previous reports of early refills or other incidents suggestive of abuse, misuse, and diversion.

◊ Contact the prescriber to discuss the request and any prior early refill requests or incidents suggestive of abuse, misuse, and diversion.

◊ Send new shipments of LUMRYZ to the patient only if approved by the prescriber.

◊ Send new shipments to replace LUMRYZ reported stolen by a patient only after obtaining a copy of the police report filed by the patient.

◊ Document the discussion and outcome by completing and submitting the **RMR** to the LUMRYZ REMS online at www.LUMRYZREMS.com or by fax to 1-877-206-3198.

## MONITORING AND ASSESSING FOR SIGNS OF ABUSE, MISUSE, AND DIVERSION

- Risk management events must be documented in the LUMRYZ REMS.

  o Risk management events are reported or discovered events outside the norm that give rise to a reasonable suspicion of abuse, misuse, or diversion.

  o Examples of events that should generate a **RMR** include but are not limited to:

    ◊ Requests for early refills

    ◊ Patient's misuse or abuse of product

    ◊ Lost, stolen, destroyed, or spilled drug

    ◊ Delivery to incorrect address and not returned

    ◊ Patient claims that product was not delivered while carrier shows receipt of delivery

    ◊ Product tampering

    ◊ Counterfeit product

    ◊ Contaminated product

    ◊ Inquiries and/or arrests by law or regulatory enforcement agencies associated with the misuse, abuse, or diversion of the product

    ◊ Crimes related to the product

  o **RMRs** must document:

    ◊ Patient and/or prescriber identifying information

    ◊ Reason for report

    ◊ Certified Pharmacy actions

    ◊ Prescriber contact

    ◊ Supporting documentation (if applicable, such as a police report, fire report, DEA Form 106, or shipper investigation report)

  o Pharmacies can request that a patient be monitored by the LUMRYZ REMS if serious or repeated events give rise to reasonable suspicion of misuse, abuse or diversion.

  o If abuse, misuse, or diversion is suspected, the pharmacist must review the patient's **RMR** history and discuss the incident with the prescriber prior to shipping LUMRYZ.

  o Repeated reports of lost, stolen, destroyed, or spilled drug will be documented as an alert to the patient record stored in the patient database of the LUMRYZ REMS and will be accessible to the dispensing pharmacist using the secure web viewing portal for the patient database for review prior to shipping drug.

  o Certified pharmacies and/or prescribers may request the LUMRYZ REMS to disenroll a patient after review and discussion of incidents suggestive of abuse, misuse, or diversion by completing and submitting a **RMR** to the LUMRYZ REMS. Avadel CNS Pharmaceuticals, LLC will review the information and determine if the patient should be disenrolled.

Reference ID: 5270348

- o Pharmacies may recommend that a prescriber be disenrolled by submitting a **RMR** to the LUMRYZ REMS. Avadel CNS Pharmaceuticals, LLC will review the information and determine if the prescriber should be disenrolled.
- o All **RMRs** must be reported to the LUMRYZ REMS online at www.LUMRYZREMS.com or by fax to 1-877-206-3198.

## SHIPPING PROCEDURES

- LUMRYZ must be shipped via an overnight service with receipt signature required.

  - o LUMRYZ is shipped directly to the patient or adult designee (18 years, or 21 years if required by carrier) if the patient is not available to receive the order.

- The patient may request an alternate shipping address, which is then subject to approval by a pharmacist.

- If the patient requests Saturday delivery, his/her certified pharmacy will verify with the overnight shipping service that Saturday delivery is available for the shipping address.

- Each LUMRYZ shipment must include:

  - o A carton with the prescribed amount of LUMRYZ packets at the prescribed dose (each child-resistant packet contains a single dose of LUMRYZ 4.5 g, 6 g, 7.5 g, or 9 g).
  - o A mixing cup for preparation of each single dose (LUMRYZ dose mixed with water).
  - o The **Patient Brochure** (new patients only).

- Daily tracking reports must be generated by each certified pharmacy to confirm the receipt of each order shipped during the previous 48 hours. Saturday deliveries are confirmed the following Monday.

  - o A patient will be contacted if there is no proof of patient or designee signature, if the patient or designee on file did not sign for the shipment, or if there is a potential incomplete delivery.
  - o If a shipment is reported lost, an investigation will be launched to find it.
  - o Receipt of each shipment of LUMRYZ by a patient must be reported to the LUMRYZ REMS by the patient's certified pharmacy electronically. This will include confirmation that the LUMRYZ prescription filled was reported to all REMS for oxybate products.

## INVENTORY CONTROL

The LUMRYZ inventory must be reconciled every two weeks and recorded in the pharmacy management system. A physical count must match the count in the pharmacy management system. If the LUMRYZ inventory cannot be reconciled, no other patient orders can be processed until an investigation is completed and approved by the Pharmacist in Charge. Documentation must be made available in the event of an audit.



# EXHIBIT H

## FULLY REDACTED

# EXHIBIT I

## Page 1

TRANSCRIPTION OF AUDIO
----------------------------------------
FINAL COPY


Leerink Global Biopharma Conference
Avadel Presentation
March 11, 2024 at 3:20 PM EDT


JANE ROSE REPORTING
Wendy K. Sawyer, CDLT, Transcriptionist

## Page 2

1    (Beginning of Audio Recording.)
2        MR. GOODMAN:  All right.  Welcome back to
3    another session.  I'm Marc Goodman, one of the biotech
4    analysts at Leerink, and we're very happy to have
5    Avadel Pharmaceuticals here.  And we have, Greg, the
6    CEO, Richard Kim, who's the chief commercial officer,
7    and everybody knows Tom, as well, who's the CFO.
8    Thank you so much for joining us.
9        Obviously, an exciting time.  Product's
10   doing well.  Getting all -- I mean, certainly, totally
11   different from the last, you know, year, two years,
12   whatever we've been talking about this.
13       Maybe we can just start with just the
14   broader oxybate market dynamics and just give us a
15   sense of your sense of the broader market right now
16   and what's happening in the growth dynamics.
17       MR. KIM:  Sure.  Ah, no.  Thanks, Marc, for
18   allowing us to be here.  You know, even if we take a
19   step broader in the narcolepsy market, we see from
20   claims data about 170,000 patients who are prevalent,
21   who are treated in undercare in the US.  Prior to
22   LUMRYZ coming to the marketplace, there's about 16,000
23   patients who are on the twice nightly first generation
24   oxybates.
25       And as we sort of try to now --

## Page 3

1    unfortunately, now, we have to piece together the
2    data.
3        MR. GOODMAN:  Yeah.
4        MR. KIM:  Some data is no longer publicly
5    available.  We have to rely on claims for other
6    sources here.  So we probably can't give an exact
7    numeric number of where the size of the marketplace
8    is, but what we can say from the launch thus far is we
9    have seen segments like the previous discontinued well
10   represented, which have come back into the mix, and
11   we've also seen a really good representation of new to
12   oxybate patients.
13       So our belief is the marketplace is growing.
14   We still have to sort of put together all the
15   data from the different sources to sort of show
16   exactly how much numerically it's grown.
17       MR. GOODMAN:  But is your sense that the
18   market's growing 2 percent or 3 percent, something
19   like that?  I mean, is that is that general --
20       MR. KIM:  Well, I -- it's -- you know, I
21   would -- the overall marketplace for narcolepsy, maybe
22   yes for oxybates because, for example, some of the
23   segments have come back in probably at a rate greater
24   than that early on, but it's hard for us to really put
25   an exact number to it.  But we've definitely sort of

## Page 4

1    seen representation from all three of the patient
2    segments we've talked about in the past.
3        So we definitely sort of feel and also hear
4    from our -- the sleep providers that there's more
5    patients coming to the mix now that LUMRYZ is
6    available.
7        MR. GOODMAN:  That's what it feels like.
8        MR. DIVIS:  I think the two things we know
9    for sure is that patients who have come back in, who
10   have previously been on an oxybate and had
11   discontinued is a market growth, and we are seeing
12   physicians treat patients who haven't prescribed or
13   treated a patient with oxybate.  Those are two very
14   clear examples of market expansion that are occurring
15   right now and early in the launch.
16       MR. GOODMAN:  Right.  Right.  Right.  Right.
17   So that's -- that's specifically for oxybate too.
18       MR. DIVIS:  Specifically for oxybate.
19       MR. GOODMAN:  Yeah.  Yeah.  Interesting.  So
20   what surprised you in the first six or so months of
21   launch, do you think?
22       MR. KIM:  You know, I mean, this is going to
23   sound like one of those cliche answers.
24       MR. GOODMAN:  Come on.  Don't say it.
25       MR. KIM:  Not a lot really has happened.

## Page 5

1  For better or worse, we actually had a little more
2  time to prepare for this launch too.  So we had done a
3  lot of market research.  We've used claims.  We had
4  spoken to providers, patients, and the payers.
5       So, you know, I wouldn't say nothing was
6  surprising.  We would say there was things that were
7  maybe a little more difficult.  Things like the fact
8  that, you know, it's difficult to change people's
9  behavior that's ingrained for 20 years.  The fact that
10  some people, you know, despite sort of seeing and
11  identifying patients, they're just -- they wouldn't
12  want to rock the boat, per se, providers.
13       But we've also started seeing tremendous
14  head, you know, advancement that we've made with this
15  launch sort of eight months into launch now as well.
16  So everything from getting, you know, almost 1900 REM-
17  certified HCPs to, you know, now we're 2200 patients
18  in RYZUP who are showing an interest in using our
19  product, that our fulfillment works, and we have over
20  1200 patients who are initiated by the end of January.
21       And the fact that we have over 80 percent of
22  commercially covered lives with where there's a LUMRYZ
23  policy in place now.  So, we're super proud of what
24  we've done.  We have, as Greg likes to say, we have
25  more wood to chop.

## Page 6

1       But not surprises, but just maybe you can
2  always have a great assumption on when everything will
3  occur in the marketplace and who would opt sooner
4  versus who may adopt later as well.
5       MR. GOODMAN:  Any specific issues that have,
6  you know, anything that you've had to deal with?
7       MR. KIM:  You know --
8       MR. GOODMAN:  Maybe the little things.
9       MR. KIM:  Maybe the biggest one that is
10  probably true for almost any new product launch in a
11  specialty field is product fulfillment.  It's just a
12  pain.  It's just different.  It's new.  You're working
13  through coverage here.
14       So, you know, candidly, I think some of the
15  people who put their first patients through early on
16  in the launch may have had a different experience than
17  the ones who are doing it more recently now as well.
18       But we've also sort of seen as, especially
19  high volume users, once they've gotten their first or
20  second patient through, the velocity seems to be
21  faster for their next patients to come to the system.
22  And we're also clearly getting, you know, better at
23  getting those patients on to LUMRYZ and started as
24  well.
25       MR. DIVIS:  Yeah.  We have a colleague, and

## Page 7

1  Richard quotes this often, which is, you know, in
2  launches, you always see little mini campfires.  You
3  just don't want the forest fire.
4       MR. KIM:  Right.
5       MR. DIVIS:  Right?  We haven't seen the
6  forest fire, and the team has done a great job.  And
7  we feel like we've really built an incredibly strong
8  foundation early on in the launch to continue to build
9  and grow, as Richard noted, with a lot more wood to
10  chop.
11       MR. GOODMAN:  Yeah.  And fulfillment was
12  like, how long did it take at the beginning versus
13  now?
14       MR. KIM:  Well, you know, especially at the
15  beginning, Marc, they were, you know, almost all the
16  scripts growing through medical necessity, which
17  generally, you know, requires a sort of -- sort of
18  medical necessity appeal denial that process.
19       What we can see now is, as our coverage has
20  really increased to now 80 -- over 80 percent of
21  commercially covered lives, if there's a policy that
22  exists and you meet the prior authorization criteria,
23  those patients are going through in well under a
24  month.
25       You know, if there's a criteria, but they

## Page 8

1  don't meet all that sort of PA, the steps that were
2  required before you can go into an oxybate, which are
3  the same steps for any oxybate, there's usually a
4  little bit of back and forth, so there's a probably a
5  little bit over a month.  And those where there is no
6  policy in place, those ones generally take the longest
7  still, but that's our smallest segment that exists
8  today.
9       MR. GOODMAN:  But even in a good scenario,
10  it still takes a few weeks to get through this
11  process.
12       MR. KIM:  That's right.  That's right.
13       MR. GOODMAN:  It's just is.
14       MR. KIM:  That's -- welcome to the United
15  States and specialty products.  Right?
16       MR. GOODMAN:  Right.  Right.  Any anecdotal
17  stories just about patients that you're hearing and --
18       MR. KIM:  Well, many.  And in fact, what's
19  really cool is we're about to launch our LUMRYZ brand
20  ambassadors.  These are real patients on LUMRYZ who
21  are going to start to share their stories online.
22  But, you know, maybe one of the -- I think back to a
23  call I had with a sleep physician in December, give me
24  some great feedback on many things.  Also, some things
25  we can do better on in some areas, but he's like,

Transcription of Leerink          FINAL                    March 11, 2024
Global Biopharma Conference                                Avadel Presentation

---

Page 9

1   Richard, I -- the one area I got to talk to you about is
2   new to oxybate patients.
3          He said, in my -- in the past, it was a
4   battle.  It was like arm wrestling with these patients
5   because they're -- they just couldn't get over the
6   fact that I finally got diagnosed.  I'm going to get
7   on this therapy.  I just told you I'm struggling with
8   the night, and you're going to force me to wake up.
9   He said that battle's gone now with LUMRYZ.  It's
10  gone.  So it's a fundamentally different conversation
11  for getting new patients to oxybates on.
12         So, you know, once again, we think about all
13  of our segments.  You know, we have really good
14  catalysts for all of them, but to me that was
15  represented because we know that from our past market
16  research, 40 to 50 percent of patients, when offered a
17  twice on the oxybate, refused to take it with the
18  biggest reason being because of the dosing regimen.
19  So, we believe that LUMRYZ can take a lot of that off
20  the table now going forward.
21         MR. GOODMAN:  Remind us before the launch,
22  where did you think the patients would come from?  And
23  here we are six months in, and are they coming from
24  where you expected?
25         MR. KIM:  Yeah.  I mean, you know, we sort

Page 10

1   of stated that the majority of patients are switch
2   patients with more coming from the mixed salt
3   versus -- so the twice only sodium oxybates.  And,
4   obviously, we're seeing good representation from
5   previously discontinued and new to oxybates.
6          It doesn't sort of surprise us where we are
7   right now because there were just numerically more
8   patients who are on twice nightly oxybates.
9          But the fact that we're getting really good
10  representation from these previously discontinued, we
11  think is awesome because, you know, that one was,
12  like, are they really going to come back in and -- and
13  re-engage?  And the answer is, heck yeah.  And then --
14         MR. GOODMAN:  Which means they stop for the
15  exact reason that you --
16         MR. KIM:  That's right.
17         MR. GOODMAN:  The benefit.
18         MR. KIM:  That's right.  I mean, Marc, it's
19  funny when you asked before what surprises, like, that
20  we were super thorough in our pre-launch market
21  research, our claims analysis, and our audits that we
22  did.  So, you know, once again, maybe a few smaller
23  things that surprised us, but the fundamentals, not
24  really at all.
25         MR. GOODMAN:  Yeah.  And the patients are

Page 11

1   having good experiences, and you're not hearing any
2   issues.  There's no side effect issue that's popped up
3   that we weren't expecting because we know what oxybate
4   is?
5          MR. KIM:  Yeah.  No.  No.  I think generally
6   in line.  I mean, is it perfect with every patient?
7   The answer, of course, is no, but the vast majority of
8   the feedback we receive has been very positive.
9          And, you know, once again, especially from a
10  patient perspective now to get those patient stories
11  out there, and we sort of see that as a multiplier
12  effect because the patient voice is very small at the
13  beginning.  Now with over 1200 patients who have
14  initiated, more of those voices are out there to share
15  their personal journeys as well.  So, you know, we're
16  just super excited to be in this next phase of our
17  launch.
18         MR. GOODMAN:  And lastly, XYREM versus
19  XYWAV, like, who -- where are you getting more
20  patients from?
21         MR. KIM:  We're getting more from XYWAV, and
22  you're giving me that look that some people give to
23  me, as well, because people with that, I would've
24  maybe thought it would be the other way around.
25         MR. GOODMAN:  Yeah.  Yeah.

Page 12

1          MR. KIM:  There's maybe three fundamental
2   reasons for that.  The first is today there are more
3   patients on the mixed salts than the twice nightly
4   sodium oxybates.
5          But when we, about a year and a half into
6   the XYWAV launch, we did market research with patients
7   to show them their profile of LUMRYZ, and both groups
8   were super excited to learn about LUMRYZ and want to
9   consider switching to LUMRYZ, but the XYWAV patients
10  barely eke out the XYREM patients.
11         And when we dug into the data, what we saw
12  was the XYWAV patients tended to be diagnosed for a
13  shorter period of time.  They switched treatment
14  sooner.  They're the early adopters, and I believe
15  we've seen some of that as well.
16         But, fundamentally, if you think about the
17  impact of the salt, magnesium, calcium, potassium, or
18  sodium, that really doesn't do anything different to
19  the narcolepsy outcome for the GHB.
20         So, you know, we just believe with the
21  unique proposition we have for LUMRYZ, it's attracted
22  patients from every segment and any therapy that
23  they've been on as well.
24         MR. GOODMAN:  What about any commentary on
25  just discontinuation patients who just stop on your

---

Transcription of Leerink FINAL March 11, 2024
Global Biopharma Conference Avadel Presentation

Page 13

1  therapy?
2    MR. KIM:  Sure.  I mean, we will have
3  discontinuations just like every other therapy, but
4  when we look back at claims for the first generation
5  oxybates, what the data will tell you is almost a
6  quarter discontinue at 30 days and almost 50 percent
7  at 12 months.
8    And what we can sort of see as we look at
9  similar milestones, we're meaningfully lower than
10  those rates that the twice nightly oxybates have shown
11  us through claims data as well.
12    MR. GOODMAN:  And the patients that you're
13  losing after 30 days, I mean, these can't be switches.
14  They must just be --
15    MR. KIM:  You know, there --
16    MR. GOODMAN:  It's so bizarre.
17    MR. KIM:  There's a little bit of
18  everything, like, you know, some people, you know,
19  there's little things that we all get used to here as
20  well.  It could be insurance.  It could be other
21  things here, but, you know, let's face it.  Not
22  every -- any product gets 100 percent market share.
23    There will people who may want to go back,
24  and we've heard a couple of those cases.  But what we
25  can sort of say is the vast majority of patients have

Page 14

1  done very well and have stayed persistent on their
2  LUMRYZ journey.
3    MR. GOODMAN:  Yeah.  Yeah.  So what's
4  realistic for us to be thinking about as a, you know,
5  kind of market penetration rate for you into the
6  oxybate market?  I mean, do you think you're going to
7  grab 20, 30, 40 percent?  Like, what do you -- what do
8  you think is realistic?
9    MR. KIM:  Well, thanks for asking me between
10  my boss and our CFO right now, Marc, but, no.  Though,
11  when we -- we did a ton of research before and during
12  our launch, we did six different quant demand market
13  research studies where LUMRYZ was given the highest
14  market share in the OxPay category between 40 and 61
15  percent over six different studies.  And they also
16  told us that the marketplace would grow because of
17  LUMRYZ of new starts somewhere between 25 to 50
18  percent with an average of 38 percent.
19    So that's why we're, you know, we -- and we
20  have seen nothing that deters us now that we've been
21  in the marketplace from the work that we did before
22  launch and the research that we continue to do during
23  launch as well.  So, you know, we definitely sort of
24  see why LUMRYZ should be the market leader in the
25  oxybate field and have a very meaningful share going

Page 15

1  forward.
2    MR. GOODMAN:  So 50 percent is not crazy,
3  not a forecast.
4    MR. KIM:  Well, it's what our market
5  research showed.
6    MR. GOODMAN:  Yeah.
7    MR. KIM:  Consistently, six times.
8    MR. GOODMAN:  Yeah.
9    MR. DIVIS:  And that's why -- I mean, we're
10  really feel -- we feel really great about the
11  foundation we built, but that's why we say we have a
12  lot more wood to chop --
13    MR. GOODMAN:  Yeah.
14    MR. DIVIS:  Because we're not there yet.
15    MR. GOODMAN:  Yeah.  Yeah.  So let's talk
16  about the 2024 sales.  I think you mentioned on the
17  call consensus of 150 or whatever the number is, and
18  then you, you know, you kind of said, yeah, that
19  looks reasonable or whatever.
20    So maybe you can just talk about some of the
21  assumptions that you have, you know, and why that
22  number is comfortable for you.
23    MR. MCHUGH:  Yeah.  Certainly.  Starting
24  call.  Yeah.  Consensus was about 155,000,000 for
25  2024, and our comment was, you know, we're comfortable

Page 16

1  with that.
2    You know, it's across the various sell side,
3  there's different assumptions that, you know, get to
4  that number, of course.  But from a -- from a pure
5  numbers perspective, what we have to achieve is, on
6  average, about 1300 reimbursed patients on therapy
7  during the course of 2024.  So that's the average.
8    And we've been very consistent that we
9  believe that the average net revenue per patient is
10  about $120,000 per year.  So that's the, you know,
11  I'll say two baseline assumptions to achieve that
12  consensus number.
13    MR. GOODMAN:  Right.
14    MR. MCHUGH:  And we think that there's the
15  opportunity to overachieve as well, you know, go above
16  and beyond the 155,000,000.  If the pace of patient
17  demand accelerates beyond, you know, what we're seeing
18  today, if the total number of patients on therapy
19  exceeds those assumptions at various points of time,
20  of course, net pricing could be higher as well.
21    MR. GOODMAN:  Well, the number of patients
22  today are what?  As of the end of January?  I think
23  you said 1200, didn't you?
24    MR. MCHUGH:  Yeah.  So what we had reported
25  was 1200 patients who initiated therapy through --

Transcription of Leerink
Global Biopharma Conference

FINAL

March 11, 2024
Avadel Presentation

Page 17

1     MR. GOODMAN:  Initiated.
2     MR. MCHUGH:  Initiated therapy through --
3     MR. GOODMAN:  So that's not an average on
4   therapy.
5     MR. MCHUGH:  That's right.  Yeah.
6     MR. GOODMAN:  Right.  So you only need to
7   get to 1300 on average for the year.
8     MR. MCHUGH:  Correct.
9     MR. DIVIS:  I think the other point is that,
10  you know, we're obviously really pleased with where we
11  are, but we get asked all the time in one-on-one
12  meetings to -- about our view on consensus.  And we
13  have a similar comment.  You know, we're comfortable
14  with consensus, and we felt it was appropriate just to
15  confirm that as, you know, kind of one time so
16  everybody can hear it.
17    MR. GOODMAN:  Right.
18    MR. DIVIS:  But, you know, I think we're we
19  feel really good where we sit today and with a lot of
20  room to grow.
21    MR. GOODMAN:  Right.  Well, I mean, I was
22  just saying when you look at the math, it would have
23  to be pretty disappointing rest of the year for you
24  not to beat that.  Right?  I mean, you're already 1200
25  patients.

Page 18

1     MR. MCHUGH:  Yeah.  Certainly.  Everything
2   we see is, you know, as we always say, up and to the
3   right in terms of enrollment.
4     MR. GOODMAN:  So that's an initial payment,
5   initial, so it's 1200.  So when does it become fully,
6   like, there's no, scaling up of pricing and dosing and
7   anything like that.  Right?  It's -- so once they
8   start, they're at that average dose, right, right off
9   the bat.
10    MR. MCHUGH:  Yes.  We're assuming, you know,
11  on average, patients will be on a 7 and a half gram
12  dose.  That's the nearest equivalent dose to where we
13  see the twice nightlies, which is 7.6 grams.  You
14  know, not all patients get there right away.  Some
15  will switch immediately to that to that equivalent
16  dose.
17    Others will start at 4 and a half grams, our
18  lowest dose, and titrate up.
19    MR. GOODMAN:  Yeah.  What's the market
20  research say about the orexin, you know, kind of noise
21  and excitement?  And does that impact oxybate, you
22  think, down the line?
23    MR. KIM:  You know, it's a -- it's a great
24  question, Marc.  We'd also sort of rely on a lot of
25  our thought leader feedback that we're receiving as

Page 19

1   well.  There's a lot of excitement.  We're also
2   excited.  It's always great when new mechanisms, you
3   know, potentially can come into marketplace.
4     You know, obviously, some of the companies
5   have shared some of their data.  There's, you know,
6   one of the companies announced that they'll be going
7   to Phase 3 later on this year.
8     I think we're still learning about what the
9   true product profile is going to be.  You know, these,
10  orexin agonists look very exciting, but they've also
11  come with different sorts of tolerability or adverse
12  events as well.  So these are chronic therapies, and I
13  think we're also trying to understand what the impact
14  to sort of the nocturnal view will be on these.
15    So, you know, I remind myself right now that
16  the most used product has an 80 percent share and
17  that's because they're generic with stimulants, in
18  this marketplace.
19    You know, oxybates today are used in less
20  than ten percent of the overall narcolepsy
21  marketplace, so we sort of view LUMRYZ as an ideal
22  product to address EDS and cataplexy without it
23  disrupting the nighttime, and we still believe that
24  we'll be in a unique category even if orexins come in
25  the marketplace as well.

Page 20

1     MR. GOODMAN:  Greg, do you think about
2   bringing an orexin in?
3     MR. DIVIS:  Well, as a company that's
4   focused on rare sleep, it's it behooves us to have a
5   sense of what's going on across all of our fellow
6   companies and what they're working on and sharing with
7   them what we're doing.
8     So, you know, it certainly is something
9   we're monitoring and staying close to in terms of
10  what's happening from that standpoint.  And certainly
11  something we would, you know, as a company in this
12  space would have to evaluate if that opportunity
13  presented itself.
14    MR. GOODMAN:  I mean, I want to talk about
15  what you're working on from a pipeline perspective
16  internally.  But before we get there, just how you're
17  thinking about external versus internal because we're
18  going to break even this year, which means we're going
19  to start to make cash pretty soon, build it up.
20    MR. DIVIS:  Yeah.  I mean, first and
21  foremost is to really execute our core strategy, which
22  is continuing to launch and really realize the promise
23  and potential of LUMRYZ and narcolepsy, execute our
24  life cycle, which we'll talk about in pediatric IH and
25  whatnot.

Transcription of Leerink      FINAL      March 11, 2024
Global Biopharma Conference      Avadel Presentation

---

Page 21

1      And -- but we're we are at a place where
2 we're building capabilities to understand what's out
3 there in the marketplace.  Obviously, rare sleep is a
4 place we want to be deep in and understand all the
5 different things happening in terms of a develop --
6 from the development perspective and be in a position
7 where if opportunities present themselves to add up an
8 asset to our portfolio, you know, we're in a position.
9      But recognizing that the most important
10 thing we can do in the near term is continuing to
11 deliver on the launch and execute our current game
12 plan that creates the greatest optionality for us to,
13 you know, determine where we take the company next.
14      But rare sleep, we want to be deep in.
15 Anything that would come across our desk outside of
16 that would, you know, in the near term, would have to,
17 you know, pass a pretty high bar.
18      MR. GOODMAN:  Yeah.  So if we're bringing in
19 an orexin, it's probably next year, not this year.
20 Let's talk about what you're working on in the
21 pipeline, the pediatric.  Give us just the work that's
22 been done, the pipe -- you know, the timelines and how
23 much you think that will add, and then IH is --
24      MR. DIVIS:  Yeah.  I think the first comment
25 I would make, generally, about our life cycle strategy

---

Page 22

1 is that when we talk to physicians and we talk to them
2 about LUMRYZ and narcolepsy, it's very quick we get
3 asked about pediatrics and IH.
4      So they were obvious, you know, clear next
5 steps for us, you know, to pursue from that standpoint
6 because we heard it directly from, prescribers.
7 Pediatric statuses, we filed our supplemental NDA,
8 back in November.  We'll have an action date.  We have
9 an action date of September 7th of 2024.
10      So we would -- that's a Saturday.  The FDA
11 won't work on a Saturday, but we would expect the
12 decision, you know, either the Friday before or the
13 Monday after from that standpoint.
14      And, you know, right now, today, that
15 represents, depending on which claims database you
16 look at, at 3 to 5 percent of the current treated
17 oxybate patient population.  We think there's more
18 potential out there beyond that.
19      But I will say that as much as we've heard
20 from patients who are eligible for LUMRYZ today, we
21 hear comparable requests and interest from parents who
22 have children who are on an oxybate.
23      So, although, you know, the pediatric
24 patient population isn't the largest subset, it
25 certainly introduces additional patient population,

---

Page 23

1 and it addresses a very significant need in terms of
2 the family, the parents, and the caregivers who, as
3 we've heard numerous times, that when you have a child
4 who takes an oxybate, it just doesn't disrupt the
5 child, it disrupts the family.
6      So, again, we have that well in advance, and
7 we'll look forward to a potential decision and
8 approval later this year.
9      MR. GOODMAN:  Okay.
10      MR. DIVIS:  In terms of IH, we spent quite a
11 bit of time really trying to understand that
12 opportunity even more so as we've, you know, watched
13 the twice nightly advance in their launch over the
14 last couple, two-plus years or whatever it's been now.
15      And, you know, with over 30,000 uniquely
16 diagnosed IH patients, another 12,000 or so who are
17 co-diagnosed with IH and/or narcolepsy, you know,
18 there's a robust patient population that -- with only
19 one currently FDA approved treatment, with, you know,
20 less than 10 percent penetration of that marketplace,
21 we think there's a lot of opportunity.
22      And, you know, the thing we hear about IH is
23 that, you know, these patients, you know, different
24 from narcolepsy in that they really physically
25 struggle at times with waking up with the deep sleep

---

Page 24

1 inertia that they suffer from.
2      So the opportunity to give them a full
3 course of therapy and not force them to wake up that
4 physically is hard for many of these patients is
5 highly attractive from the clinician community.  So
6 we've advanced that study, quite from a planning
7 standpoint, quite far since, over the last couple
8 months in an accelerated fashion.
9      We would expect to be in the clinic with
10 first patient enrolled, and initiated, in the second
11 half and as early as we can in the second half.  So we
12 get asked all the time about how long we think that
13 study will take.  We haven't given specific guidance
14 yet only because we're still doing site feasibility
15 and really assessing enrollment timelines and
16 enrollment, you know, target populations by site.
17      But if you look at the two predecessor
18 trials between the Harmony trial and the Jazz trial,
19 you know, it took between really, you know, little
20 more than 12 months to a little under 18 months to
21 complete.
22      So I think that's a reasonable proxy as we
23 think about it now, recognizing that we haven't
24 completed site feasibility, but we should be
25 initiating that in the second half and be off and

---

Page 25

1  running.
2      MR. GOODMAN:  Okay.  Just for completeness,
3  just remind everybody the -- what's still outstanding
4  from a litigation perspective with Jazz.  What have we
5  learned?  What have -- what have we that's still
6  outstanding?
7      MR. MCHUGH:  Yeah.  So the most -- the most
8  recent event was the patent litigation.  So the trial
9  was held a little over a week ago, and the jury -- it
10  was a jury trial, came back with a verdict, just this
11  past Monday, just a week ago.
12      So the bottom line is, you know, in terms of
13  the verdict, it was a split decision.  It was
14  determined that we didn't infringe one of the patents,
15  and the jury determined that, the other patent that
16  Jazz has is valid.
17      And what the jury awarded was the equivalent
18  of a 0.7 percent royalty to Jazz, and this is only
19  past damages.  What you see in the headlines is a 3 and
20  a half percent royalty, but what the jury determined is
21  that a 3 and a half percent royalty would be applied to
22  approximately 20 percent of our launch to date
23  revenues.
24      So, you know, we refer to it as, the
25  equivalent about a 0.7 percent royalty.  That's

Page 26

1  where we stand, today in terms of that particular
2  piece of litigation.
3      The next steps, you know, to put in the
4  calendar, we don't have the exact date, but the judge
5  will have to make a final ruling, on that jury
6  decision as well as a determination of what, if any,
7  future royalties might apply.
8      MR. GOODMAN:  Okay.  So that's
9  something we're expecting, so in the next few months,
10  though.
11      MR. MCHUGH:  Yeah.  It's probably, you know,
12  I couldn't even give you a time frame, but I'll say,
13  you know, hopefully, this calendar year.
14      MR. GOODMAN:  Oh, it could be later in
15  the --
16      MR. MCHUGH:  Yeah.
17      MR. GOODMAN:  Yeah.  Okay.  So that's  one.
18  And then the other.
19      MR. MCHUGH:  Yes.  And the next, the next,
20  upcoming event is on April 9th.  This is where, Jazz
21  sued FDA, believing that the approval of LUMRYZ should
22  be vacated.  It's a -- it's not a jury trial.  This is
23  strictly an APA hearing, so probably two or three
24  hours' length, then the judge will decide, you know,
25  after that date.  We would -- we're hoping for a

Page 27

1  ruling, probably by the time we exit Q2 on that.
2      MR. GOODMAN:  2Q.  Is that what you said?
3  Yeah.  Interesting.  Okay.  And that'll be it?
4      MR. MCHUGH:  That'll be it as far as -- as
5  far as those two pieces.  Right?  You know, there are
6  two piece -- you know, two instances where we've
7  initiated litigation against Jazz.  You know, those
8  hearings are now scheduled for the fourth quarter of
9  2025.
10      MR. GOODMAN:  And the date?  Okay.  Fourth
11  quarter --
12      MR. MCHUGH:  So pretty far in the future.
13  I'm sure we'll have more questions later on, but we're
14  still in the early phases of those.
15      MR. GOODMAN:  This is for you suing Jazz
16  for?
17      MR. MCHUGH:  We're suing Jazz for
18  misappropriation of trade secrets as well as
19  antitrust.
20      MR. GOODMAN:  Okay.  Never a dull moment.
21  Richard, how do you see the oxybate market right now
22  as far as just what's happening with the generics kind
23  of coming in?  Is it having any impact on the business
24  at all or you know?  And have they taken a lot of
25  market share?  Like, I can't quite figure it out.

Page 28

1      MR. KIM:  Yeah.  It's a great question,
2  Marc.  What we can sort of see is, what the authorized
3  generics have done is predominantly cannibalize
4  branded XYREM --
5      MR. GOODMAN:  Yeah.
6      MR. KIM:  -- and have that switch, you know,
7  clear there, you know, there may be some new starts,
8  but it looks like it's predominantly swapping one for
9  the other, and that's really been the main impact in
10  the marketplace thus far.
11      MR. GOODMAN:  Yeah.  That's what it kind of
12  feels like.  Right?
13      MR. KIM:  That's right.
14      MR. GOODMAN:  Yeah.  So Greg, what's kind
15  of, you know, you talk to people, and you finish a
16  meeting, and you're like, I don't think they
17  appreciate x or y, you know, in our business.  Like,
18  what's still a little bit underappreciated?
19      MR. DIVIS:  Well, I think, you know, we like
20  to call ourselves a show-me story.  Right?  When we
21  share how we view the opportunity, how we view the
22  market, I think we're a bit of a show-me story.  And I
23  think we've started the trend with our first two
24  quarters of launch that we are delivering or exceeding
25  what folks thought we would be able to do.

Page 29

1    But I do think that there's probably two
2  things that, you know, we tend to address when we talk
3  to investors.
4    The first one is the litigation, and we're
5  coming -- at least the litigation initiated by the
6  other company -- we're coming to a point in time over
7  the next couple months when most of that lift will be
8  behind us.
9    MR. GOODMAN:  Yeah.
10    MR. DIVIS:  Right?  And there'll be much
11  more clarity.  And, you know, last month's -- last
12  Monday's decision was a major step forward from that
13  clarity standpoint in a good way for us.
14    And then I would say the second piece is
15  just, you know, what is the true potential of LUMRYZ
16  in the marketplace?  You know, we have a very clear
17  view of what we think multisource generics will --
18  what impact they will or won't have in the future.
19    And so we have those discussions for sure.
20  So I think for us and, you know, working with, you
21  know, folks like yourself is to continue to print
22  really strong quarters and see you, you know, up your
23  future forecast and potential in peak sales, you know,
24  down the road and, you know, as we continue to deliver
25  and execute.

Page 30

1    But I think, ultimately, those are the two
2  biggest things is what's the real potential, which we
3  think from our perspective and all the six quant
4  studies that Richard talked about, that it's a
5  $1,000,000,000 product opportunity if we can execute
6  it on based what physicians are reporting to us in
7  surveys of large numbers.  And, you know, we continue
8  to clear the last couple remaining, you know,
9  litigation matters.
10    MR. GOODMAN:  So $1,000,000,000 was what you
11  think.  The street's still not at a 1,000,000,000.
12  Where's the street now, you think?
13    MR. MCHUGH:  You know, the street has its
14  pretty wide range out there.  But, you know, there's
15  certainly a few people on the south side who have us,
16  you know, north of $500,000,000 up to $700 -- $800,000,000.
17  I think at a minimum, most are moving at least to the
18  $500,000,000 mark at this point.
19    MR. GOODMAN:  So 500 to 800 is the range.
20  So the average is somewhere in there.  Most people,
21  they are closer to 500.
22    MR. MCHUGH:  It's been a consistent, upward
23  movement.  And, you know, to Greg's point, you know,
24  we've always believed we're a show-me story.
25    MR. GOODMAN:  Yeah.

Page 31

1    MR. MCHUGH:  As we continue to put up, you
2  know, good numbers, good quarters, you know, the
3  estimates continue to rise appropriately.
4    MR. GOODMAN:  Right.  And just back in the
5  litigation, I just want to make sure I understand
6  something.  When the judge comes back and talks about
7  this royalty that the jury kind of ruled on, can the
8  judge come back and say this is absolutely crazy that
9  the jury is making you pay x or y?  I mean, like,
10  can -- and up it significantly?  I mean, is that even
11  possible?
12    MR. MCHUGH:  Well, listen.  Anything is
13  possible.  I don't want to get too far off my skis and
14  certainly speak for the judge.
15    MR. GOODMAN:  But you're infringed on --
16  you're infringed on a patent.
17    MR. MCHUGH:  But, you know, the -- you know,
18  I think the jury decision certainly has to weigh into
19  that.  And a 0.7 percent royalty perhaps is a starting
20  point.  Listen, we maintain we don't owe royalty at
21  all.
22    MR. GOODMAN:  Right.
23    MR. MCHUGH:  We'll continue to fight that
24  fight.
25    MR. GOODMAN:  And on appeal.

Page 32

1    MR. MCHUGH:  But, you know, if you, but it
2  was -- you can think about it in terms of brackets the
3  way we think about it right now.  It's 0.7 percent on
4  one end.  Perhaps it's 3 and a half percent on the
5  other end.  And then -- but we have to see what the
6  judge decides at the end of the day.
7    MR. GOODMAN:  Yeah.  I just was wondering if
8  there was any case studies where you, you know,
9  judges, like, just take the jury award and just, you
10  know, double it, triple it, quad -- you know, or --
11    MR. MCHUGH:  Not aware of any.
12    MR. GOODMAN:  Yeah.  Okay.  All right.
13    MR. DIVIS:  If you double 0.7, it's 1.4.
14    MR. MCHUGH:  I hear you.  I mean, even 3
15  percent wouldn't be a -- you know.  I think most
16  people walked away thinking it was 3 and a half
17  percent that day
18    MR. GOODMAN:  Right.
19    MR. GOODMAN:  And said, oh, that's fine.
20    MR. DIVIS:  It's been a very consistent
21  discussion we've had at all of our meetings here
22  with -- at your conference, which is why we wanted to
23  clarify here on the fireside.
24    MR. GOODMAN:  Yeah.  Yeah.
25  //

Transcription of Leerink                      FINAL                        March 11, 2024
Global Biopharma Conference                                              Avadel Presentation

Page 33

1       MR. DIVIS:  It's really a net effect of
2  royalty.
3       MR. GOODMAN:  Well, it was confusing.  I
4  mean, it was in the press release, so you can't blame
5  us for being confused.  Thank you for joining us,
6  guys.
7       MR. DIVIS:  Appreciate it.  Thanks, Marc.
8       MR. GOODMAN:  Appreciate it.
9       (End of Audio Recording.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 34

1       CERTIFICATE OF TRANSCRIPTION
2
3       Jane Rose Reporting does hereby certify that
4  the foregoing transcript is a true and correct record
5  of the recorded proceedings; that said proceedings was
6  transcribed to the best of our ability from the audio
7  receiving; and that Jane Rose Reporting is neither
8  counsel for, nor related to, any of the parties to
9  this case, and have no interest, financial or
10 otherwise, in its outcome.
11
12
13
14       _____
15       Jane Rose Reporting
16       March 12, 2024
17
18
19
20
21
22
23
24
25

Transcription of Leerink
Global Biopharma Conference

FINAL

March 11, 2024
Avadel Presentation

**A**
ability 34:6
able 28:25
absolutely 31:8
accelerated 24:8
accelerates 16:17
achieve 16:5,11
action 22:8,9
add 21:7,23
additional 22:25
address 19:22 29:2
addresses 23:1
adopt 6:4
adopters 12:14
advance 23:6,13
advanced 24:6
advancement 5:14
adverse 19:11
ago 25:9,11
agonists 19:10
Ah 2:17
allowing 2:18
ambassadors 8:20
analysis 10:21
analysts 2:4
and/or 23:17
anecdotal 8:16
announced 19:6
answer 10:13 11:7
answers 4:23
antitrust 27:19
APA 26:23
appeal 7:18 31:25
applied 25:21
apply 26:7
appreciate 28:17 33:7
  33:8
appropriate 17:14
appropriately 31:3
approval 23:8 26:21
approved 23:19
approximately 25:22
April 26:20
area 9:1
areas 8:25
arm 9:4
asked 10:19 17:11
  22:3 24:12
asking 14:9
assessing 24:15
asset 21:8
assuming 18:10
assumption 6:2
assumptions 15:21
  16:3,11,19
attracted 12:21
attractive 24:5

audio 1:1 2:1 33:9
  34:6
audits 10:21
authorization 7:22
authorized 28:2
Avadel 1:7 2:5
available 3:5 4:6
average 14:18 16:6,7
  16:9 17:3,7 18:8,11
  30:20
award 32:9
awarded 25:17
aware 32:11
awesome 10:11

**B**
back 2:2 3:10,23 4:9
  8:4,22 10:12 13:4,23
  22:8 25:10 31:4,6,8
bar 21:17
barely 12:10
based 30:6
baseline 16:11
bat 18:9
battle 9:4
battle's 9:9
beat 17:24
beginning 2:1 7:12,15
  11:13
behavior 5:9
behooves 20:4
belief 3:13
believe 9:19 12:14,20
  16:9 19:23
believed 30:24
believing 26:21
benefit 10:17
best 34:6
better 5:1 6:22 8:25
beyond 16:16,17
  22:18
biggest 6:9 9:18 30:2
Biopharma 1:6
biotech 2:3
bit 8:4,5 13:17 23:11
  28:18,22
bizarre 13:16
blame 33:4
boat 5:12
boss 14:10
bottom 25:12
brackets 32:2
brand 8:19
branded 28:4
break 20:18
bringing 20:2 21:18
broader 2:14,15,19

build 7:8 20:19
building 21:2
built 7:7 15:11
business 27:23 28:17

**C**
calcium 12:17
calendar 26:4,13
call 8:23 15:17,24
  28:20
campfires 7:2
candidly 6:14
cannibalize 28:3
capabilities 21:2
caregivers 23:2
case 32:8 34:9
cases 13:24
cash 20:19
catalysts 9:14
cataplexy 19:22
category 14:14 19:24
CDLT 1:12
CEO 2:6
certainly 2:10 15:23
  18:1 20:8,10 22:25
  30:15 31:14,18
CERTIFICATE 34:1
certified 5:17
certify 34:3
CFO 2:7 14:10
change 5:8
chief 2:6
child 23:3,5
children 22:22
chop 5:25 7:10 15:12
chronic 19:12
claims 2:20 3:5 5:3
  10:21 13:4,11 22:15
clarify 32:23
clarity 29:11,13
clear 4:14 22:4 28:7
  29:16 30:8
clearly 6:22
cliche 4:23
clinic 24:9
clinician 24:5
close 20:9
closer 30:21
colleague 6:25
come 3:10,23 4:9,24
  6:21 9:22 10:12 19:3
  19:11,24 21:15 31:8
comes 31:6
comfortable 15:22,25
  17:13
coming 2:22 4:5 9:23
  10:2 27:23 29:5,6

comment 15:25 17:13
  21:24
commentary 12:24
commercial 2:6
commercially 5:22
  7:21
community 24:5
companies 19:4,6
  20:6
company 20:3,11
  21:13 29:6
comparable 22:21
complete 24:21
completed 24:24
completeness 25:2
conference 1:6 32:22
confirm 17:15
confused 33:5
confusing 33:3
consensus 15:17,24
  16:12 17:12,14
consider 12:9
consistent 16:8 30:22
  32:20
Consistently 15:7
continue 7:8 14:22
  29:21,24 30:7 31:1,3
  31:23
continuing 20:22
  21:10
conversation 9:10
cool 8:19
COPY 1:3
core 20:21
correct 17:8 34:4
counsel 34:8
couple 13:24 23:14
  24:7 29:7 30:8
course 11:7 16:4,7,20
  24:3
coverage 6:13 7:19
covered 5:22 7:21
co-diagnosed 23:17
crazy 15:2 31:8
creates 21:12
criteria 7:22,25
current 21:11 22:16
currently 23:19
cycle 20:24 21:25

**D**
damages 25:19
data 2:20 3:2,4,15
  12:11 13:5,11 19:5
database 22:15
date 22:8,9 25:22 26:4
  26:25 27:10

day 32:6,17
days 13:6,13
deal 6:6
December 8:23
decide 26:24
decides 32:6
decision 22:12 23:7
  25:13 26:6 29:12
  31:18
deep 21:4,14 23:25
definitely 3:25 4:3
  14:23
deliver 21:11 29:24
delivering 28:24
demand 14:12 16:17
denial 7:18
depending 22:15
desk 21:15
despite 5:10
determination 26:6
determine 21:13
determined 25:14,15
  25:20
deters 14:20
develop 21:5
development 21:6
diagnosed 9:6 12:12
  23:16
different 2:11 3:15
  6:12,16 9:10 12:18
  14:12,15 16:3 19:11
  21:5 23:23
difficult 5:7,8
directly 22:6
disappointing 17:23
discontinuation 12:25
discontinuations 13:3
discontinue 13:6
discontinued 3:9 4:11
  10:5,10
discussion 32:21
discussions 29:19
disrupt 23:4
disrupting 19:23
disrupts 23:5
DIVIS 4:8,18 6:25 7:5
  15:9,14 17:9,18 20:3
  20:20 21:24 23:10
  28:19 29:10 32:13
  32:20 33:1,7
doing 2:10 6:17 20:7
  24:14
dose 18:8,12,12,16,18
dosing 9:18 18:6
double 32:10,13
dug 12:11
dull 27:20

Transcription of Leerink
Global Biopharma Conference

FINAL

March 11, 2024
Avadel Presentation

Page 36

---

dynamics 2:14,16

**E**

early 3:24 4:15 6:15
    7:8 12:14 24:11
    27:14
EDS 19:22
EDT 1:8
effect 11:2,12 33:1
eight 5:15
either 22:12
eke 12:10
eligible 22:20
enrolled 24:10
enrollment 18:3 24:15
    24:16
equivalent 18:12,15
    25:17,25
especially 6:18 7:14
    11:9
estimates 31:3
evaluate 20:12
event 25:8 26:20
events 19:12
everybody 2:7 17:16
    25:3
exact 3:6,25 10:15
    26:4
exactly 3:16
example 3:22
examples 4:14
exceeding 28:24
exceeds 16:19
excited 11:16 12:8
    19:2
excitement 18:21 19:1
exciting 2:9 19:10
execute 20:21,23
    21:11 29:25 30:5
exists 7:22 8:7
exit 27:1
expansion 4:14
expect 22:11 24:9
expected 9:24
expecting 11:3 26:9
experience 6:16
experiences 11:1
external 20:17

**F**

face 13:21
fact 5:7,9,21 8:18 9:6
    10:9
family 23:2,5
far 3:8 24:7 27:4,5,12
    27:22 28:10 31:13
fashion 24:8

faster 6:21
FDA 22:10 23:19
    26:21
feasibility 24:14,24
feedback 8:24 11:8
    18:25
feel 4:3 7:7 15:10,10
    17:19
feels 4:7 28:12
fellow 20:5
felt 17:14
field 6:11 14:25
fight 31:23,24
figure 27:25
filed 22:7
final 1:3 26:5
finally 9:6
financial 34:9
fine 32:19
finish 28:15
fire 7:3,6
fireside 32:23
first 2:23 4:20 6:15,19
    12:2 13:4 20:20
    21:24 24:10 28:23
    29:4
focused 20:4
folks 28:25 29:21
force 9:8 24:3
forecast 15:3 29:23
foregoing 34:4
foremost 20:21
forest 7:3,6
forth 8:4
forward 9:20 15:1
    23:7 29:12
foundation 7:8 15:11
fourth 27:8,10
frame 26:12
Friday 22:12
fulfillment 5:19 6:11
    7:11
full 24:2
fully 18:5
fundamental 12:1
fundamentally 9:10
    12:16
fundamentals 10:23
funny 10:19
future 26:7 27:12
    29:18,23

**G**

game 21:11
general 3:19
generally 7:17 8:6
    11:5 21:25

generation 2:23 13:4
generic 19:17
generics 27:22 28:3
    29:17
getting 2:10 5:16 6:22
    6:23 9:11 10:9 11:19
    11:21
GHB 12:19
give 2:14 3:6 8:23
    11:22 21:21 24:2
    26:12
given 14:13 24:13
giving 11:22
Global 1:6
go 8:2 13:23 16:15
going 4:22 7:23 8:21
    9:6,8,20 10:12 14:6
    14:25 19:6,9 20:5,18
    20:18
good 3:11 8:9 9:13
    10:4,9 11:1 17:19
    29:13 31:2,2
Goodman 2:2,3 3:3,17
    4:7,16,19,24 6:5,8
    7:11 8:9,13,16 9:21
    10:14,17,25 11:18
    11:25 12:24 13:12
    13:16 14:3 15:2,6,8
    15:13,15 16:13,21
    17:1,3,6,17,21 18:4
    18:19 20:1,14 21:18
    23:9 25:2 26:8,14,17
    27:2,10,15,20 28:5
    28:11,14 29:9 30:10
    30:19,25 31:4,15,22
    31:25 32:7,12,14,19
    32:24 33:3,8
gotten 6:19
grab 14:7
gram 18:11
grams 18:13,17
great 6:2 7:6 8:24
    15:10 18:23 19:2
    28:1
greater 3:23
greatest 21:12
Greg 2:5 5:24 20:1
    28:14
Greg's 30:23
groups 12:7
grow 7:9 14:16 17:20
growing 3:13,18 7:16
grown 3:16
growth 2:16 4:11
guidance 24:13
guys 33:6

**H**

half 12:5 18:11,17
    24:11,11,25 25:20
    25:21 32:4,16
happened 4:25
happening 2:16 20:10
    21:5 27:22
happy 2:4
hard 3:24 24:4
Harmony 24:18
HCPs 5:17
head 5:14
headlines 25:19
hear 4:3 17:16 22:21
    23:22 32:14
heard 13:24 22:6,19
    23:3
hearing 8:17 11:1
    26:23
hearings 27:8
heck 10:13
held 25:9
high 6:19 21:17
higher 16:20
highest 14:13
highly 24:5
hopefully 26:13
hoping 26:25
hours 26:24

**I**

ideal 19:21
identifying 5:11
IH 20:24 21:23 22:3
    23:10,16,17,22
immediately 18:15
impact 12:17 18:21
    19:13 27:23 28:9
    29:18
important 21:9
increased 7:20
incredibly 7:7
inertia 24:1
infringe 25:14
infringed 31:15,16
ingrained 5:9
initial 18:4,5
initiated 5:20 11:14
    16:25 17:1,2 24:10
    27:7 29:5
initiating 24:25
instances 27:6
insurance 13:20
interest 5:18 22:21
    34:9
Interesting 4:19 27:3
internal 20:17

internally 20:16
introduces 22:25
investors 29:3
issue 11:2
issues 6:5 11:2

**J**

Jane 1:11,25 34:3,7
    34:15
January 5:20 16:22
Jazz 24:18 25:4,16,18
    26:20 27:7,15,17
job 7:6
joining 2:8 33:5
journey 14:2
journeys 11:15
judge 26:4,24 31:6,8
    31:14 32:6
judges 32:9
jury 25:9,10,15,17,20
    26:5,22 31:7,9,18
    32:9

**K**

K 1:12
Kim 2:6,17 3:4,20 4:22
    4:25 6:7,9 7:4,14
    8:12,14,18 9:25
    10:16,18 11:5,21
    12:1 13:2,15,17 14:9
    15:4,7 18:23 28:1,6
    28:13
kind 14:5 15:18 17:15
    18:20 27:22 28:11
    28:14 31:7
know 2:11,18 3:20 4:8
    4:22 5:5,8,10,14,16
    5:17 6:6,7,14,22 7:1
    7:14,15,17,25 8:22
    9:12,13,15,25 10:11
    10:22 11:3,9,15
    12:20 13:15,18,18
    13:21 14:4,19,23
    15:18,21,25 16:2,3
    16:10,15,17 17:10
    17:13,15,18 18:2,10
    18:14,20,23 19:3,4,5
    19:9,15,19 20:8,11
    21:8,13,16,17,22
    22:4,5,12,14,23
    23:12,15,17,19,22
    23:23,23 24:16,19
    24:19 25:12,24 26:3
    26:11,13,24 27:5,6,7
    27:24 28:6,7,15,17
    28:19 29:2,11,15,16
    29:20,21,22,23,24

---

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

Case 1:21-cv-00691-GBW   Document 592-1   Filed 04/22/24   Page 225 of 338 PageID #: 30229

Transcription of Leerink
Global Biopharma Conference

FINAL

March 11, 2024
Avadel Presentation

Page 37

30:7,8,13,14,16,23
30:23 31:2,2,17,17
32:1,8,10,10,15
**knows** 2:7

**L**

**large** 30:7
**largest** 22:24
**lastly** 11:18
**launch** 3:8 4:15,21 5:2
5:15,15 6:10,16 7:8
8:19 9:21 11:17 12:6
14:12,22,23 20:22
21:11 23:13 25:22
28:24
**launches** 7:2
**leader** 14:24 18:25
**learn** 12:8
**learned** 25:5
**learning** 19:8
**Leerink** 1:6 2:4
**length** 26:24
**let's** 13:21 15:15 21:20
**life** 20:24 21:25
**lift** 29:7
**likes** 5:24
**line** 11:6 18:22 25:12
**listen** 31:12,20
**litigation** 25:4,8 26:2
27:7 29:4,5 30:9
31:5
**little** 5:1,7 6:8 7:2 8:4
8:5 13:17,19 24:19
24:20 25:9 28:18
**lives** 5:22 7:21
**long** 7:12 24:12
**longer** 3:4
**longest** 8:6
**look** 11:22 13:4,8
17:22 19:10 22:16
23:7 24:17
**looks** 15:19 28:8
**losing** 13:13
**lot** 4:25 5:3 7:9 9:19
15:12 17:19 18:24
19:1 23:21 27:24
**lower** 13:9
**lowest** 18:18
**LUMRYZ** 2:22 4:5 5:22
6:23 8:19,20 9:9,19
12:7,8,9,21 14:2,13
14:17,24 19:21
20:23 22:2,20 26:21
29:15

**M**

**magnesium** 12:17

**main** 28:9
**maintain** 31:20
**major** 29:12
**majority** 10:1 11:7
13:25
**making** 31:9
**Marc** 2:3,17 7:15
10:18 14:10 18:24
28:2 33:7
**March** 1:8 34:16
**mark** 30:18
**market** 2:14,15,19
4:11,14 5:3 9:15
10:20 12:6 13:22
14:5,6,12,14,24 15:4
18:19 27:21,25
28:22
**marketplace** 2:22 3:7
3:13,21 6:3 14:16,21
19:3,18,21,25 21:3
23:20 28:10 29:16
**market's** 3:18
**math** 17:22
**matters** 30:9
**MCHUGH** 15:23 16:14
16:24 17:2,5,8 18:1
18:10 25:7 26:11,16
26:19 27:4,12,17
30:13,22 31:1,12,17
31:23 32:1,11,18
**mean** 2:10 3:19 4:22
9:25 10:18 11:6 13:2
13:13 14:6 15:9
17:21,24 20:14,20
31:9,10 32:14 33:4
**meaningful** 14:25
**meaningfully** 13:9
**means** 10:14 20:18
**mechanisms** 19:2
**medical** 7:16,18
**meet** 7:22 8:1
**meeting** 28:16
**meetings** 17:12 32:21
**mentioned** 15:16
**milestones** 13:9
**mini** 7:2
**minimum** 30:17
**misappropriation** 27:18
**mix** 3:10 4:5
**mixed** 10:2 12:3
**moment** 27:20
**Monday** 22:13 25:11
**Monday's** 29:12
**monitoring** 20:9
**month** 7:24 8:5
**months** 4:20 5:15 9:23

13:7 24:8,20,20 26:9
29:7
**month's** 29:11
**movement** 30:23
**moving** 30:17
**multiplier** 11:11
**multisource** 29:17

**N**

**narcolepsy** 2:19 3:21
12:19 19:20 20:23
22:2 23:17,24
**NDA** 22:7
**near** 21:10,16
**nearest** 18:12
**necessity** 7:16,18
**need** 17:6 23:1
**neither** 34:7
**net** 16:9,20 33:1
**Never** 27:20
**new** 3:11 6:10,12 9:2
9:11 10:5 14:17 19:2
28:7
**night** 9:8
**nightlies** 18:13
**nightly** 2:23 10:8 12:3
13:10 23:13
**nighttime** 19:23
**nocturnal** 19:14
**noise** 18:20
**north** 30:16
**noted** 7:9
**November** 22:8
**number** 3:7,25 15:17
15:22 16:4,12,18,21
**numbers** 16:5 30:7
31:2
**numeric** 3:7
**numerically** 3:16 10:7
**numerous** 23:3

**O**

**obvious** 22:4
**obviously** 2:9 10:4
17:10 19:4 21:3
**occur** 6:3
**occurring** 4:14
**offered** 9:16
**officer** 2:6
**oh** 26:14 32:19
**Okay** 23:9 25:2 26:8
26:17 27:3,10,20
32:12
**once** 6:19 9:12 10:22
11:9 18:7
**ones** 6:17 8:6
**one-on-one** 17:11

**online** 8:21
**opportunities** 21:7
**opportunity** 16:15
20:12 23:12,21 24:2
28:21 30:5
**opt** 6:3
**optionality** 21:12
**orexin** 18:20 19:10
20:2 21:19
**orexins** 19:24
**outcome** 12:19 34:10
**outside** 21:15
**outstanding** 25:3,6
**overachieve** 16:15
**overall** 3:21 19:20
**owe** 31:20
**OxPay** 14:14
**oxybate** 2:14 3:12
4:10,13,17,18 8:2,3
9:2,17 11:3 14:6,25
18:21 22:17,22 23:4
27:21
**oxybates** 2:24 3:22
9:11 10:3,5,8 12:4
13:5,10 19:19

**P**

**PA** 8:1
**pace** 16:16
**pain** 6:12
**parents** 22:21 23:2
**particular** 26:1
**parties** 34:8
**pass** 21:17
**patent** 25:8,15 31:16
**patents** 25:14
**patient** 4:1,13 6:20
11:6,10,10,12 16:9
16:16 22:17,24,25
23:18 24:10
**patients** 2:20,23 3:12
4:5,9,12 5:4,11,17
5:20 6:15,21,23 7:23
8:17,20 9:2,4,11,16
9:22 10:1,2,8,25
11:13,20 12:3,6,9,10
12:12,22,25 13:12
13:25 16:6,18,21,25
17:25 18:11,14
22:20 23:16,23 24:4
**pay** 31:9
**payers** 5:4
**payment** 18:4
**peak** 29:23
**pediatric** 20:24 21:21
22:7,23
**pediatrics** 22:3

**penetration** 14:5
23:20
**people** 5:10 6:15
11:22,23 13:18,23
28:15 30:15,20
32:16
**people's** 5:8
**percent** 3:18,18 5:21
7:20 9:16 13:6,22
14:7,15,18,18 15:2
19:16,20 22:16
23:20 25:18,20,21
25:22,25 31:19 32:3
32:4,15,17
**perfect** 11:6
**period** 12:13
**persistent** 14:1
**personal** 11:15
**perspective** 11:10
16:5 20:15 21:6 25:4
30:3
**Pharmaceuticals** 2:5
**phase** 11:16 19:7
**phases** 27:14
**physically** 23:24 24:4
**physician** 8:23
**physicians** 4:12 22:1
30:6
**piece** 3:1 26:2 27:6
29:14
**pieces** 27:5
**pipe** 21:22
**pipeline** 20:15 21:21
**place** 5:23 8:6 21:1,4
**plan** 21:12
**planning** 24:6
**pleased** 17:10
**PM** 1:8
**point** 17:9 29:6 30:18
30:23 31:20
**points** 16:19
**policy** 5:23 7:21 8:6
**popped** 11:2
**population** 22:17,24
22:25 23:18
**populations** 24:16
**portfolio** 21:8
**position** 21:6,8
**positive** 11:8
**possible** 31:11,13
**potassium** 12:17
**potential** 20:23 22:18
23:7 29:15,23 30:2
**potentially** 19:3
**predecessor** 24:17
**predominantly** 28:3,8
**prepare** 5:2

Transcription of Leerink
Global Biopharma Conference

FINAL

March 11, 2024
Avadel Presentation

prescribed 4:12
prescribers 22:6
present 21:7
Presentation 1:7
presented 20:13
press 33:4
pretty 17:23 20:19
  21:17 27:12 30:14
prevalent 2:20
previous 3:9
previously 4:10 10:5
  10:10
pre-launch 10:20
pricing 16:20 18:6
print 29:21
prior 2:21 7:22
probably 3:6,23 6:10
  8:4 21:19 26:11,23
  27:1 29:1
proceedings 34:5,5
process 7:18 8:11
product 5:19 6:10,11
  13:22 19:9,16,22
  30:5
products 8:15
Product's 2:9
profile 12:7 19:9
promise 20:22
proposition 12:21
proud 5:23
providers 4:4 5:4,12
proxy 24:22
publicly 3:4
pure 16:4
pursue 22:5
put 3:14,24 6:15 26:3
  31:1

**Q**

quad 32:10
quant 14:12 30:3
quarter 13:6 27:8,11
quarters 28:24 29:22
  31:2
question 18:24 28:1
questions 27:13
quick 22:2
quite 23:10 24:6,7
  27:25
quotes 7:1
Q2 27:1

**R**

range 30:14,19
rare 20:4 21:3,14
rate 3:23 14:5
rates 13:10

real 8:20 30:2
realistic 14:4,8
realize 20:22
really 3:11,24 4:25 7:7
  7:20 8:19 9:13 10:9
  10:12,24 12:18
  15:10,10 17:10,19
  20:21,22 23:11,24
  24:15,19 28:9 29:22
  33:1
reason 9:18 10:15
reasonable 15:19
  24:22
reasons 12:2
receive 11:8
receiving 18:25 34:7
recognizing 21:9
  24:23
record 34:4
recorded 34:5
Recording 2:1 33:9
refer 25:24
refused 9:17
regimen 9:18
reimbursed 16:6
related 34:8
release 33:4
rely 3:5 18:24
REM 5:12
remaining 30:8
remind 9:21 19:15
  25:3
reported 16:24
reporting 1:11,25 30:6
  34:3,7,15
representation 3:11
  4:1 10:4,10
represented 3:10 9:15
represents 22:15
requests 22:21
required 8:2
requires 7:17
research 5:3 9:16
  10:21 12:6 14:11,13
  14:22 15:5 18:20
rest 17:23
revenue 16:9
revenues 25:23
re-engage 10:13
Richard 2:6 7:1,9 9:1
  27:21 30:4
right 2:2,15 4:15,16,16
  4:16,16 7:4,5 8:12
  8:12,15,16,16 10:7
  10:16,18 14:10
  16:13 17:5,6,17,21
  17:24 18:3,7,8,8,14

  19:15 22:14 27:5,21
  28:12,13,20 29:10
  31:4,22 32:3,12,18
rise 31:3
road 29:24
robust 23:18
rock 5:12
room 17:20
Rose 1:11,25 34:3,7
  34:15
royalties 26:7
royalty 25:18,20,21,25
  31:7,19,20 33:2
ruled 31:7
ruling 26:5 27:1
running 25:1
RYZUP 5:18

**S**

sales 15:16 29:23
salt 10:2 12:17
salts 12:3
Saturday 22:10,11
saw 12:11
Sawyer 1:12
saying 17:22
scaling 18:6
scenario 8:9
scheduled 27:8
scripts 7:16
se 5:12
second 6:20 24:10,11
  24:25 29:14
secrets 27:18
see 2:19 7:2,19 11:11
  13:8 14:24 18:2,13
  25:19 27:21 28:2
  29:22 32:5
seeing 4:11 5:10,13
  10:4 16:17
seen 3:9,11 4:1 6:18
  7:5 12:15 14:20
segment 8:7 12:22
segments 3:9,23 4:2
  9:13
sell 16:2
sense 2:15,15 3:17
  20:5
September 22:9
session 2:3
share 8:21 11:14
  13:22 14:14,25
  19:16 27:25 28:21
shared 19:5
sharing 20:6
shorter 12:13
show 3:15 12:7

showed 15:5
showing 5:18
shown 13:10
show-me 28:20,22
  30:24
side 11:2 16:2 30:15
significant 23:1
significantly 31:10
similar 13:9 17:13
sit 17:19
site 24:14,16,24
six 4:20 9:23 14:12,15
  15:7 30:3
size 3:7
skis 31:13
sleep 4:4 8:23 20:4
  21:3,14 23:25
small 11:12
smaller 10:22
smallest 8:7
sodium 10:3 12:4,18
soon 20:19
sooner 6:3 12:14
sort 2:25 3:14,15,25
  4:3 5:10,15 6:18
  7:17,17 8:1 9:25
  10:6 11:11 13:8,25
  14:23 18:24 19:14
  19:21 28:2
sorts 19:11
sound 4:23
sources 3:6,15
south 30:15
space 20:12
speak 31:14
specialty 6:11 8:15
specific 6:5 24:13
specifically 4:17,18
spent 23:10
split 25:13
spoken 5:4
stand 26:1
standpoint 20:10 22:5
  22:13 24:7 29:13
start 2:13 8:21 18:8,17
  20:19
started 5:13 6:23
  28:23
starting 15:23 31:19
starts 14:17 28:7
stated 10:1
States 8:15
statuses 22:7
stayed 14:1
staying 20:9
step 2:19 29:12
steps 8:1,3 22:5 26:3

stimulants 19:17
stop 10:14 12:25
stories 8:17,21 11:10
story 28:20,22 30:24
strategy 20:21 21:25
street 30:12,13
street's 30:11
strictly 26:23
strong 7:7 29:22
struggle 23:25
struggling 9:7
studies 14:13,15 30:4
  32:8
study 24:6,13
subset 22:24
sued 26:21
suffer 24:1
suing 27:15,17
super 5:23 10:20
  11:16 12:8
supplemental 22:7
sure 2:17 4:9 13:2
  27:13 29:19 31:5
surprise 10:6
surprised 4:20 10:23
surprises 6:1 10:19
surprising 5:6
surveys 30:7
swapping 28:6
switch 10:1 18:15
  28:6
switched 12:13
switches 13:13
switching 12:9
system 6:21

**T**

table 9:20
take 2:18 7:12 8:6
  9:17,19 21:13 24:13
  32:9
taken 27:24
takes 8:10 23:4
talk 9:1 15:15,20
  20:14,24 21:20 22:1
  22:1 28:15 29:2
talked 4:2 30:4
talking 2:12
talks 31:6
target 24:16
team 7:6
tell 13:5
ten 19:20
tend 29:2
tended 12:12
term 21:10,16
terms 18:3 20:9 21:5

Transcription of Leerink
Global Biopharma Conference

FINAL

March 11, 2024
Avadel Presentation

| | | | | |
|---|---|---|---|---|
| 23:1,10 25:12 26:1 32:2 | **trial** 24:18,18 25:8,10 26:22 | **week** 25:9,11 | **year** 2:11 12:5 16:10 17:7,23 19:7 20:18 21:19,19 23:8 26:13 | **4** 18:17 |
| **Thank** 2:8 33:5 | **trials** 24:18 | **weeks** 8:10 | **years** 2:11 5:9 23:14 | **40** 9:16 14:7,14 |
| **thanks** 2:17 14:9 33:7 | **triple** 32:10 | **weigh** 31:18 | | **5** |
| **therapies** 19:12 | **true** 6:10 19:9 29:15 34:4 | **welcome** 2:2 8:14 | **$** | **5** 22:16 |
| **therapy** 9:7 12:22 13:1 13:3 16:6,18,25 17:2 17:4 24:3 | **try** 2:25 | **Wendy** 1:12 | **$1,000,000,000** 30:5 30:10 | **50** 9:16 13:6 14:17 15:2 |
| **thing** 21:10 23:22 | **trying** 19:13 23:11 | **weren't** 11:3 | **$120,000** 16:10 | **500** 30:19,21 |
| **things** 4:8 5:6,7 6:8 8:24,24 10:23 13:19 13:21 21:5 29:2 30:2 | **twice** 2:23 9:17 10:3,8 12:3 13:10 18:13 23:13 | **we'll** 19:24 20:24 22:8 23:7 27:13 31:23 | **$500,000,000** 30:16,18 | **6** |
| **think** 4:8,21 6:14 8:22 9:12,22 10:11 11:5 12:16 14:6,8 15:16 16:14,22 17:9,18 18:22 19:8,13 20:1 21:23,24 22:17 23:21 24:12,22,23 28:16,19,22,23 29:1 29:17,20 30:1,3,11 30:12,17 31:18 32:2 32:3,15 | **two** 2:11 4:8,13 16:11 24:17 26:23 27:5,6,6 28:23 29:1 30:1 | **we're** 2:4 5:17,23 6:22 8:19 10:4,9 11:15,21 13:9 14:19 15:9,14 15:25 16:17 17:10 17:13,18 18:10,25 19:1,8,13 20:7,9,17 20:18 21:1,2,8,18 24:14 26:9,25 27:13 27:17 28:22 29:4,6 30:24 | **$700** 30:16 | **61** 14:14 |
| | | | **$800,000,000** 30:16 | **7** |
| | **two-plus** 23:14 | | | **7** 18:11 |
| | | | **0** | **7th** 22:9 |
| | **U** | | **0.7** 25:18,25 31:19 32:3,13 | **7.6** 18:13 |
| | **ultimately** 30:1 | | | **8** |
| | **underappreciated** 28:18 | **we've** 2:12 3:11,25 4:2 5:3,13,14,24 6:18 7:7 12:15 13:24 14:20 16:8 22:19 23:3,12 24:6 27:6 28:23 30:24 32:21 | **1** | **80** 5:21 7:20,20 19:16 |
| | **undercare** 2:21 | | **1,000,000,000** 30:11 | **800** 30:19 |
| **thinking** 14:4 20:17 32:16 | **understand** 19:13 21:2,4 23:11 31:5 | | **1-800-825-3341** 1:25 | **9** |
| **thorough** 10:20 | **unfortunately** 3:1 | | **1.4** 32:13 | **9th** 26:20 |
| **thought** 11:24 18:25 28:25 | **unique** 12:21 19:24 | **whatnot** 20:25 | **10** 23:20 | |
| **three** 4:1 12:1 26:23 | **uniquely** 23:15 | **wide** 30:14 | **100** 13:22 | |
| **time** 2:9 5:2 12:13 16:19 17:11,15 23:11 24:12 26:12 27:1 29:6 | **United** 8:14 | **wondering** 32:7 | **11** 1:8 | |
| | **upcoming** 26:20 | **wood** 5:25 7:9 15:12 | **12** 13:7 24:20 34:16 | |
| | **upward** 30:22 | **work** 14:21 21:21 22:11 | **12,000** 23:16 | |
| | **users** 6:19 | | **1200** 5:20 11:13 16:23 16:25 17:24 18:5 | |
| | **usually** 8:3 | **working** 6:12 20:6,15 21:20 29:20 | **1300** 16:6 17:7 | |
| **timelines** 21:22 24:15 | | **works** 5:19 | **150** 15:17 | |
| **times** 15:7 23:3,25 | **V** | **worse** 5:1 | **155,000,000** 15:24 16:16 | |
| **titrate** 18:18 | **vacated** 26:22 | **wouldn't** 5:5,11 32:15 | **16,000** 2:22 | |
| **today** 8:8 12:2 16:18 16:22 17:19 19:19 22:14,20 26:1 | **valid** 25:16 | **would've** 11:23 | **170,000** 2:20 | |
| | **various** 16:2,19 | **wrestling** 9:4 | **18** 24:20 | |
| | **vast** 11:7 13:25 | | **1900** 5:16 | |
| **told** 9:7 14:16 | **velocity** 6:20 | | | |
| **tolerability** 19:11 | **verdict** 25:10,13 | **X** | **2** | |
| **Tom** 2:7 | **versus** 6:4 7:12 10:3 11:18 20:17 | **x** 28:17 31:9 | **2** 3:18 | |
| **ton** 14:11 | | **XYREM** 11:18 12:10 28:4 | **2Q** 27:2 | |
| **total** 16:18 | **view** 17:12 19:14,21 28:21,21 29:17 | **XYWAV** 11:19,21 12:6 12:9,12 | **20** 5:9 14:7 25:22 | |
| **totally** 2:10 | | | **2024** 1:8 15:16,25 16:7 22:9 34:16 | |
| **trade** 27:18 | **voice** 11:12 | | **2025** 27:9 | |
| **transcribed** 34:6 | **voices** 11:14 | **Y** | **2200** 5:17 | |
| **transcript** 34:4 | **volume** 6:19 | **y** 28:17 31:9 | **25** 14:17 | |
| **TRANSCRIPTION** 1:1 34:1 | | **yeah** 3:3 4:19,19 6:25 7:11 9:25 10:13,25 11:5,25,25 14:3,3 15:6,8,13,15,15,18 15:23,24 16:24 17:5 18:1,19 20:20 21:18 21:24 25:7 26:11,16 26:17 27:3 28:1,5,11 28:14 29:9 30:25 32:7,12,24,24 | **3** | |
| | **W** | | **3** 3:18 19:7 22:16 25:19,21 32:4,14,16 | |
| **Transcriptionist** 1:12 | **wake** 9:8 24:3 | | **3:20** 1:8 | |
| **treat** 4:12 | **waking** 23:25 | | **30** 13:6,13 14:7 | |
| **treated** 2:21 4:13 22:16 | **walked** 32:16 | | **30,000** 23:15 | |
| | **want** 5:12 7:3 12:8 13:23 20:14 21:4,14 31:5,13 | | **38** 14:18 | |
| **treatment** 12:13 23:19 | | | | |
| **tremendous** 5:13 | **wanted** 32:22 | | **4** | |
| **trend** 28:23 | **watched** 23:12 | | | |
| | **way** 11:24 29:13 32:3 | | | |

# EXHIBIT J

Transcription of Audio      FINAL      March 18, 2024
Avadel Pharmaceuticals          UBS Virtual CNS Day

---

**Page 1**

IN THE MATTER OF
-----------------------------

ADAVDEL PHARMACEUTICALS (AVDL)

-----------------------------

TRANSCRIPTION OF
UBS Virtual CNS Day
March 18, 2024
Video Runtime: 0:28:04


JANE ROSE REPORTING
Wendy K. Sawyer, CDLT, Transcriptionist


FINAL COPY
JANE ROSE REPORTING  1-800-825-3341

---

**Page 2**

1      (Beginning of Video Recording.)
2      MR. VERMA:  And our next company here at UBS
3   CNS Day is Avadel.  And with me today we have Greg
4   Divis, CEO; Richard Kim, Chief Commercial Officer; and
5   Tom McHugh, Chief Financial Officer.
6      Guys, how are you doing?
7      MR. DIVIS:  Doing great.  Thanks, Ash.
8   Thanks for having us.
9      MR. VERMA:  Excellent.  Yeah.  Thanks for
10   taking the time.  So this is a fireside chat, and I
11   want to take like 20 minutes of Q&A and open it up for
12   investors to ask some questions at the end.  So that's
13   the format.
14      Maybe, Greg, I think it might be helpful to
15   just give a high level overview of the company,
16   LUMRYZ, just like spend a minute and sort of provide
17   some context, and then we can dive into the questions.
18      MR. DIVIS:  That's great.  Again, we really
19   appreciate the opportunity, Ash, to be here.  It's a
20   fairly open-ended question, so there's a lot we can
21   cover.  So I'll try to be efficient.
22      The company has really been through a quite
23   a bit over the last five years.  You know, previously,
24   a generic injectable company, a pediatric company, but
25   we've really transformed ourselves into a really high

---

**Page 3**

1   growth biopharmaceutical company, really just on the
2   starting line, if you will, with the launch of LUMRYZ.
3      And for those who aren't aware, LUMRYZ is
4   the first and only once-at-bedtime oxybate for the
5   treatment of cataplexy or excessive daytime sleepiness
6   in adults with narcolepsy.  And LUMRYZ really
7   addresses the most important and significant unmet
8   need for people with narcolepsy who are considering
9   going on an oxybate, and that is being -- having to be
10   forcibly awoken in the middle of the night to take a
11   second dose.
12      And I think it's stated very clearly by the
13   FDA in our approval letter and their granting of our
14   orphan exclusivity that it's just an antithetical
15   for patients to be required to be forcibly awakened in
16   the middle of the night to take a second dose for
17   patients who are suffering from a condition, a rare
18   sleep disorder condition, whose therapy or their
19   treatment or their condition is characterized by
20   disturbed or disrupted nocturnal sleep.
21      So we're very proud to be the first and only
22   company to have leveraged our own technology to bring
23   this meaningful improvement, and we believe our value
24   proposition is quite clear, and in that our value
25   proposition really not only addresses this unmet need,

---

**Page 4**

1   Ash, but really, we believe over time, will
2   demonstrate it has a positive impact on patients'
3   treatment experience and the management of their
4   condition.
5      So we're really proud of where we are.  The
6   company's made tremendous progress over the last
7   number of years, and in particular, the last 15
8   months, where we've gone from 30 people to over 160
9   people.  We've got an approval.  We've navigated some
10   legal challenges that I'm sure we'll talk about.  We
11   launch in less than a month, and under Tom's
12   leadership, all of that under, really, Richard's
13   leadership, and under Tom's leadership, we've really
14   cleaned up our balance sheet and strengthen ourselves
15   really well to position ourselves to continue to grow
16   as we embark on this journey of building this --
17   building our company.
18      So again, thanks for the opportunity to be
19   here.
20      MR. VERMA:  Good stuff.  Yeah, thanks for
21   that intro.  So I mean, I want to talk about, like,
22   the -- more like the legal updates for -- because I
23   feel that that is the most important thing that
24   matters to the stock and story at this point.
25      And yeah, I mean, it was interesting to

---

Page 5

1   attend this jury trial in Delaware.  I think like --
2   kind of eye-opening to see how these things play out
3   in real life.  But what I wanted to understand from
4   you is that -- I mean, in the sense of, like, where the
5   royalty for the future LUMRYZ sales shakes out, like,
6   how confident are you that it would be at the
7   historical (inaudible) that will determine by the
8   jury.  Like, it -- I know this is something that is in
9   the hands of the judge.  Like, how often do you see
10  that this kind of, like, you know, giving damages that
11  is in line with the jury determination and anything
12  that you can share on that or like timeline.  When do
13  we get to know what is the process, those kind of
14  things would be helpful.
15      MR. DIVIS:  Yeah, so Ash, maybe just to
16  recap.  You know, two weeks ago, we received a split
17  decision.  This was related to the patent litigation
18  between us and Jazz Pharmaceuticals.
19      And the net result was a royalty that was
20  determined by the jury, effectively of 0.7 percent.  And
21  what that was for was past damages.  So Jazz was
22  awarded a royalty for past damages, and what's left to
23  be determined now is what royalty might be applied on
24  a go-forward basis.  And that's really in the hands of
25  the judge.

Page 6

1       We don't have exact time frame.  I will just
2   say it's going to be months down the road before the
3   judge issues a final ruling on that.  But to your
4   question about, you know, how should you think about
5   or how should we think about a royalty on a go-forward
6   basis, you know, I think you would look at it as
7   bookends at this point, you know.  It's 0.7 percent,
8   perhaps a 3 and a half percent.
9       The 3 and a half percent, you know, to put a
10  little context behind that, that was the royalty rate
11  that the jury came up with.  But it was applied to a
12  percentage of our launch to date revenue.
13      So when you apply that, that's how you get
14  to 0.7 percent.  So I think about the bookends as 0.7
15  to 3.5.  And of course, a judge has to decide and make the
16  final ruling.  But you know, for -- in that docket,
17  the judge at least what we expect is it could be 0.7.
18  it could be 3.5.  Perhaps a little more than either
19  one of those.  But that's the way we're thinking about
20  it right now.
21      MR. VERMA:  Yeah.  Yeah.  And there is a
22  separate legal matter that is playing out in the Jazz
23  versus FDA case, and the orphan drug exclusivity.  If
24  you can talk about that a little bit, like, when -- I
25  know the date has been moved around a little bit.  So

Page 7

1   what's the latest on that and all -- what do you think
2   is the likely outcome of that type of a litigation?
3   It'll be good to know from your perspective how you
4   think about this.
5       MR. DIVIS:  Yeah.  No, certainly.  So
6   originally, that hearing, you know, this is the AP
7   hearing, where Jazz sued FDA.  We've intervened in the
8   case, you know, on behalf of FDA.  Originally, that
9   hearing was February 27th.  It got moved to April 9th
10  is the current date.  You know, the reason for the
11  move was really a decision by the judge, you know, at
12  that -- to move it to that date based on what was on
13  his docket at the time.
14      You know, it's -- I don't want to really
15  give too much of an opinion on potential, you know,
16  how the judge might decide.  It's strictly an
17  Administrative Procedures Act.  The judge will
18  evaluate, you know, the evidence, if you will, but
19  it's all what's in the written record.  So there's
20  really no new evidence to be introduced in that case.
21      In terms of potential outcomes or timing of
22  potential outcomes, you know, we have, you know,
23  developed a view based on this particular judge's
24  track record that he could issue a ruling within 60
25  days of the hearing.  So, you know, listen, quite

Page 8

1   frankly, we'd like to, you know, know what the ruling
2   is before we execute too.  But that's the timing
3   we're looking at.
4       You know, with respect to potential
5   outcomes, I think it's, you know, listen, Jazz
6   prevails, we prevail.  It's a pretty binary event, is
7   the way I'd like to describe it.  You know, we of
8   course, you know, I believe in the merits of our case,
9   but ultimately, the judge is going to make a decision.
10      MR. VERMA:  Yeah.  Yeah.  Okay.  That's
11  great.  I mean, it's good to cover the logistics, I
12  think.  I mean, we've hosted, like expert calls.  I
13  know you can't comment there directly because you're
14  in active litigation.
15      So maybe we can just switch gears and start
16  to talk about a little bit about the launch and the
17  update coming out from the fourth quarter.
18      So I know that you've actually, kind of
19  the -- yeah, not give like a full year guidance.  And
20  the launch metrics have been very strong from our
21  perspective.  And what you've done here is kind of
22  like just come out and bless the sell side consensus,
23  which is around 155 million.
24      Do you think that this is kind of like the
25  base case, that you think pretty comfortable that you

Transcription of Audio    FINAL    March 18, 2024
Avadel Pharmaceuticals        UBS Virtual CNS Day

Page 9

1 can get there?  Or do you think there is more upside
2 to this as you make progress more towards the, you
3 know, the second half of the year.  How confident do
4 you think of the sales ramp for '24?
5   MR. DIVIS:  Yeah.  So we did confirm, or you
6 know, made the comment that we were comfortable with,
7 you know, consensus, sell side consensus of $155
8 million for 2024.  And listen, quite frankly, we see,
9 you know, a lot of upside potential to that number.
10   You know, it's the average number of
11 patients you'd have to have on therapy during the year
12 is about 1300.  You know, Richard will certainly
13 comment on, you know, patient progress.  But given how
14 we exited 2023 with, you know, over 1000 patients who
15 initiated therapy, that number grew to over 1200
16 patients who initiated therapy through January 31st.
17   So, you know, we certainly like the run rate
18 we're on.  And we believe that 155 million is very
19 achievable and with the potential for upside, you
20 know, given what we're seeing for patient demand, you
21 know, other variables that come into play are net
22 pricing.  You know, of course, the total number of
23 patients on therapy.  But, you know, we see -- we see
24 a fair amount of upside potential to that consensus
25 number.

Page 10

1   MR. VERMA:  Yeah.  Maybe if you were like
2 either Tom or Richard, if you can talk a little bit
3 about, like, the source of the patients.  I mean, you
4 talked about, like, three different buckets of where
5 you have been getting patients from, like, how do you
6 see for this 2024, like, that composition changing or
7 if there is any of those buckets, like either the
8 experience or naive patients where you might get more
9 of a traction for 2024.
10   MR. KIM:  Yeah, sure.  Thanks for the
11 question, Ash.  So, yeah, as you know, what we've
12 stated thus far is we've seen the majority of our
13 enrollments and patientship product being switch
14 patients from the first generation oxybate more coming
15 from Xywav than from Xyrem.  And part of that is just
16 math.  There's more of those patients on those
17 therapies right now.
18   But when it comes to the other two segments,
19 you know, the previously discontinued, candidly, we
20 had some people question whether or not that was a
21 real segment.  And what we can say is it's a very
22 meaningful segment to us very early on already that
23 there are a number of patients who have come forward
24 who stopped a twice nightly oxybate, who have
25 reengaged to start on LUMRYZ again.

Page 11

1   And maybe an important other component that
2 we saw, sort of as far as momentum is concerned in Q4,
3 we saw new-to-oxybate patients represent a slightly
4 higher percentage of our overall mix of patients
5 compared to Q3.
6   So I think all three segments are going to
7 be very viable for us.  Probably we're still going to
8 get most from the switch patients just because there's
9 more of those out there currently today.  But I think
10 we're starting to see a little bit of flex as far as
11 some of the representation from the other segments as
12 well.
13   MR. VERMA:  Yeah.  And so, I mean, the
14 patients who had discontinued, you know, these
15 prior -- that were previously in oxybate, they
16 discontinued, and you're trying to kind of like
17 activate that part of the market, right, like what
18 does it take to do that?
19   Because I'm assuming that if these patients
20 were, let's say, on oxybate like first generation
21 oxybate, like, let's say, a couple of years ago, would
22 they still need to be coming and seeing a doctor for
23 you to be able to you know, like, get them to start
24 using LUMRYZ or like there might be some -- or could
25 there be patients that have discontinued or not

Page 12

1 seeking treatment for whatever reason?  Could you tap
2 into that possible pool also?
3   MR. KIM:  That's right.  Yeah, it's a great
4 question.  So what we see from our claims data is from
5 the last four years, there's about 10- to 15,000
6 patients who have discontinued first generation
7 oxybate.  99 percent of them are still under the
8 active care of a sleep provider, from what we can see
9 from claims data right now.  So the good news is
10 they're actually they're being treated and managed for
11 their condition.
12   And, you know, Ash, what we know is the top
13 two reasons why patients discontinue taking a first
14 generation oxybate previously is it didn't work, and I
15 couldn't take the second dose.  And those are very
16 interrelated.  But we sort of think is a lot of them
17 felt the benefit of an oxybate, but they couldn't get
18 the full benefit with that second dose as well.
19   So that's why we've personally not been
20 surprised that we have seen reactivation.  And, you
21 know, the good news is they're all on the call,
22 audience of the oxybate prescribers that we see today
23 as well.
24   MR. VERMA:  Yeah.  And then the new patients
25 that you saw a little bit more mix of that in 4Q,

Transcription of Audio       FINAL       March 18, 2024
Avadel Pharmaceuticals       UBS Virtual CNS Day

Page 13

1  yeah, like is that because like, you are growing the
2  overall pie of the market, like, or what is causing
3  more of a new patient ads right now versus, you know,
4  in the past, like, there hasn't been much of new
5  patients to come by here.
6      MR. KIM:  Yeah.  You know, like, maybe  I'll
7  summarize this in a, in a, story, a conversation I had
8  with a sleep specialist at the end of last year who
9  just sort of said to me, fundamentally, it's a
10  different conversation with new-to-oxybate patients.
11  It's not so much of a battle to convince them to, you
12  know, finally, I'm going to get you on this therapy.
13  It's going to help you sleep, to function during the
14  day.  But I'm going to force you to wake up two and a
15  half to four hours after you take it.
16      So fundamentally, we think for many of these
17  sleep specialists, they're having a different
18  conversation, a more straightforward conversation with
19  their new-to-oxybate patients.  But also at the same
20  time, I think we are -- like, we've -- it's hard to
21  sort of piece together the entire marketplace ever
22  since the data has become a little bit more
23  fragmented.
24      However, one thing we can say is we've added
25  new writers for LUMRYZ who have never, ever written an

Page 14

1  oxybate before in their lives, who have now come in
2  and written for LUMRYZ as well.  So we're seeing some
3  of that movement on the news.  We're getting more
4  engagement of the previously discontinued.
5      So over time, we believe we'll be able to
6  show that the marketplace is growing beyond the 16,000
7  patients who are on first generation oxybates before.
8      MR. VERMA:  Yeah.  And then in terms of,
9  like, the prescribers is most of the use coming from
10  physicians who have primarily you know, prescribed
11  Xyrem/Xywav before, or like, I don't know if you can
12  give the -- give the, you know, metrics around, like,
13  how much of it is like sleep centers versus standalone
14  neurologists or any other physician audience that
15  might be involved in this.
16      MR. KIM:  Yeah.  I mean, right now our
17  basics are there's about 4500 active writers for
18  oxybate 1600 that make up 80 percent of the volume and
19  under 500 that make up 50 percent of the volume.
20  We've clearly got most of our usage from those 500,
21  less than 500 who make up 50 percent of the volume.
22      And, Ash, it's coming from all sorts of
23  places -- the large academic centers, the private
24  sleep centers here across the board, as well, a good
25  mix of people with subspecialties in both neurology

Page 15

1  and pulmonology and psychiatry and even internal
2  medicine.  So I think what's been pleasant -- we've
3  been very pleased to sort of see is it's been a good
4  breadth of usage.  It's not just coming from one sort
5  of segment of prescriber as well.
6      MR. VERMA:  Yeah, yeah.  Just on the
7  discontinuation rate.  I mean, yeah, I think the
8  commentary that we've heard from you is that your
9  discontinuation rate on LUMRYZ is running at a
10  significantly lower than the typical, like, 25 percent
11  at a one-month mark.  Right.
12      And as you get a little bit more
13  longitudinal data on this, like, what is, you know,
14  like, where do you think this might shake out?  What
15  would be the reason for here to have a lower
16  discontinuation rate versus first generation, you
17  know, first generation patients?
18      MR. KIM:  Yeah.  You know, I think that the
19  data that we sort of see thus far from claims is on
20  the first generation oxybates, almost 25 percent
21  discontinued after one month and almost 50 percent at
22  12 months.  And to your point, we have seen -- what
23  we've stated thus far is we've seen a meaningfully
24  lower rate of discontinuation at all the same time
25  points that we have thus far.

Page 16

1      And, Ash, I think it comes back down to the
2  fundamentals of the market research we did pre-launch,
3  which was the fact that patients -- I mean, physicians
4  view oxybates as the most effective product, but
5  patients struggled to always get their full dose.  And
6  when you don't get your full dose, you're not getting,
7  you know, you may not get the full therapeutic benefit
8  that you have.
9      So we do expect our discontinuation rates to
10  be lower.  We're still learning about exactly what
11  they're looking like right now.  But thus far, once
12  again, at the same time points, we've seen
13  meaningfully lower discontinuation rates than the
14  first generation oxybates have had.
15      MR. VERMA:  Yeah.  Yeah.  And, Tom, maybe --
16  I know you briefly mentioned like net pricing dynamics
17  that could impact 2024.  I mean, to the extent that
18  you can, you know, kind of like comment on, like, what
19  are the push and pulls of that?  And is there any
20  phasing consideration as we go through the year on
21  where pricing might shake out to be?
22      MR. MCHUGH:  Yes, Ash.  So what we believe,
23  and, you know, what we're targeting is that on average
24  you know, the net revenue per patient per year is
25  about $120,000.  There's a lot of underlying

Transcription of Audio
Avadel Pharmaceuticals

FINAL

March 18, 2024
UBS Virtual CNS Day

Page 17

1    assumptions that go into that, one of which is that,
2    you know, we expect that the average strength for
3    patients that are using LUMRYZ is 7.5 grams.  And
4    we're, you know, we're sort of at that tipping point
5    right now.  And that's, that's exactly what we're
6    seeing.  So that assumption has certainly played out
7    for us.
8           You know, the dynamics that, you know,
9    impact the net revenue, no different than any other,
10   you know, any other company in our industry.  We have
11   gross to nets.  You know, they're typically higher in,
12   in the first quarter of the year as patient
13   deductibles reset and we're providing more financial
14   assistance to patients to, you know, to utilize
15   LUMRYZ.
16          But, you know, as we're phasing, you know,
17   to use your term, you know, we're very quickly
18   approaching that net revenue per patient per year.
19   And I, you know, kind of started using the term, we're
20   at this tipping point.  And I'd always thought about
21   it more, you know, in terms of we have more patients
22   utilizing LUMRYZ than new patients coming in.  And
23   we've crossed that point.  So I think we'll very
24   quickly, you know, get to that net revenue per patient
25   per year.

Page 18

1           MR. VERMA:  Yeah.  I mean, like if we look
2    at the historical you know, revenue reported by Jazz,
3    I mean, there was always like going from 1Q to 2Q.
4    There was like a big jump always.  And either that's
5    like the delayed benefit of, like, having less volume
6    coming in 1Q that you're seeing like an artificially
7    high 2Q.  Is that something that you -- do you expect
8    that type of a dynamic for LUMRYZ also?
9           MR. MCHUGH:  Yeah, I think that I do believe
10   that net revenue, you know, will increase from, you
11   know, Q1 into Q2.  You know, we're probably too early
12   in our launch to really evaluate any kind of -- any
13   type of seasonal impact in our business.
14          But yeah, we would expect that, you know, in
15   terms of that net revenue, you know, would certainly
16   increase as we progress throughout the year and
17   certainly from Q1 into Q2.
18          MR. VERMA:  Yeah.  Okay.  So maybe just like
19   I think we can -- can we take a pause and just see if
20   there are any questions from investors on the line?
21   If not, then we can come back, and I have a few other
22   follow-ups.
23          MALE VOICE:  We'll now begin the Q&A
24   session.  If you have a question, please click on the
25   Raise Hand button, which can be found on the bottom of

Page 19

1    your Zoom interface.  If you have dialed in via
2    telephone, please press star nine to raise your hand
3    and star six to unmute.  I'll now stand by for any
4    questions.  At this time, there are no raised hands.
5           MR. VERMA:  Got it.  Okay, so I think maybe
6    I want to talk about idiopathic hypersomnia, because I
7    feel like that's kind of the underappreciated part of
8    the story.
9           So one is the -- one is I mean, yeah.  If
10   you can provide any color on are you seeing any?  I
11   know you're not marketing for IH, but are you seeing
12   any off label use in IH patients like that that are
13   taking LUMRYZ right now?
14          MR. KIM:  Yeah.  Ash, you know, yeah.  To
15   your point, we clearly do not market for off label
16   uses, but we have seen claims and requests coming in
17   for off label uses of LUMRYZ thus far.
18          MR. VERMA:  And is it like a substantial
19   portion of patients or do --
20          MR. KIM:  No, no, I think it's -- you know,
21   I think it's really more of a trickle.  And you know,
22   once again, what happens is we -- our IRs refer them
23   to the right specialty pharmacy.  So I think there are
24   always going to be some dabblers in any new product
25   launch.  And we're definitely seeing some of those

Page 20

1    dabblers within the LUMRYZ launch as well.
2           MR. VERMA:  Right.  So one of the things
3    that we've been talking to a lot of like experts and
4    physicians is that to understand, like for IH
5    patients, what is the rate of discontinuation or what
6    are the -- what is the rate of them not taking the
7    second dose versus the narcolepsy patients?  You know,
8    like for, for the first generation oxybate.
9           Do you have any kind of like credible data
10   on that?  I've heard from, like, anecdotal numbers
11   around it, but nothing that's a little bit
12   substantive.
13          MR. KIM:  Yeah, we're trying.  It's a great
14   point.  We hear the exact same anecdotes you do.  And,
15   you know, we're beginning to ramp up more of our more
16   detailed, quantified market research.  So probably
17   nothing that we could sort of put in numbers for you
18   today.
19          But similar to what we've done in the past,
20   we are thinking about some of the patient survey work
21   that we've done through other communities to
22   understand this.  But once again, what we do here
23   quite consistently is in in IH or in narcolepsy, where
24   is a massively inconvenient thing to do.  And IH,
25   there's just a lot of times the physical inability to

Page 21

1  wake up to take that second dose.  So we hear that
2  quite consistently in the marketplace today.
3        MR. VERMA:  Yeah.  So if you can talk a
4  little bit about like your Phase III plan for IH,
5  it'll be helpful.  Just like, you know, how many
6  patients what type of what type of trial design are
7  you thinking?  How long could it take to enroll or,
8  you know, run the study?  I think those would be
9  pretty good data points.
10       MR. DIVIS:  Yeah.  So, as we've said
11 previously, we're in really advanced stages of our
12 planning to launch our and begin enrolling patients in
13 the second half of this year of our Phase III IH
14 trial.  So the team has done a great job of getting
15 ourselves ready.
16       As you can imagine, all the work you have to
17 do with the FDA, all the clinical supply and CRO
18 involvement, you know, site identification and
19 whatnot.  We haven't guided specifically on exactly
20 when first patient in will be other than second half.
21 And we haven't guided explicitly in terms of timing.
22       I would just characterize a couple things
23 for yourself, Ash, and those on the call or on the
24 webcast.  We obviously have studied what has been done
25 in the space pretty extensively to date -- trial

Page 22

1  designs, sites, enrollment times, and whatnot, both
2  for both the pitolisant study as well as the Mixel
3  (phonetic) study.
4        So you know, if you look at timing to
5  complete those trials, it really ran from 12 to 15
6  months.  So, you know, we do think, you know, they're
7  reasonable proxies.  Now, probably upwards of 18
8  months to complete a trial is how we think about it
9  today, recognizing that as we get through site
10 assessment and enrollment projections, we may have a
11 more refined number in the future.  And if we have a
12 different number, we'll certainly speak to it.  Our
13 time frame will certainly share it.
14       In terms of trial design, we haven't said
15 publicly.  That will eventually become available
16 publicly, but I think it's safe to assume that we've
17 looked at what's been done and the clinical
18 community's and the physician community and the
19 research community's interest in that sort of design
20 because of the limited amount of time a patient may
21 have to be on placebo coupled with an opportunity to
22 continue on in an open label extension forum are, I
23 think, are good proxies for us is how we're thinking
24 about what the trial could look like.
25       MR. VERMA:  Yeah.  So like that.  But that

Page 23

1  includes like the enrollment and the trial conduct.
2  Right?  Like the sort of like the roughly 18 months
3  that you alluded to.
4        MR. DIVIS:  Yeah.  I mean.  I think that's,
5  you know, at least if you look at what's occurred to
6  date on previous trials, I think that's a good kind of
7  benchmark, at least currently, in terms of, you know,
8  what's the art of the possible based upon historical
9  enrollment trends to complete the primary part of the
10 trial.  You know, I wouldn't say that includes any
11 sort of open label extension arm, but to get to the
12 primary endpoints.
13       MR. VERMA:  Yeah.  Got it.  Okay.  And then
14 other question that I get on the story just around
15 like your expectations on kind of like going to cash
16 flow positive.  And where do you if there is any sort
17 of like need to access the market at some point of
18 time, like, what are you assuming, what is baked in to
19 your financial projections?
20       MR. MCHUGH:  So, Ash, we ended 2023 in a
21 really good place.  We had 105 million of cash in the
22 balance sheet and really effectively no debt.  And
23 what our belief is, at this point, you know, certainly
24 based on the trends we're seeing, some other
25 assumptions we're making, is that we'll achieve break

Page 24

1  even during 2024.
2        We haven't said specifically, you know, when
3  that would occur.  I'll use my earlier term, the
4  tipping point for us, you know, the point, you know,
5  where we hit cash flow breakeven is when we're about
6  1300 to 1500 patients on therapy.
7        And again, that refers back to, you know,
8  this -- our assumption around average net revenue of
9  120,000 per year per patient.  And we did guide to our
10 expectation for cash operating expenses on our last
11 call for 2024.  And our assumption is and our
12 expectation is that cash operating expenses about 40
13 to 45 million per quarter.
14       So you can apply the math from there.  Call
15 it 160 to 180 million annualized.  And that's where
16 that range of patients of 1300 to 1500 on therapy --
17 reimbursed patients on therapy, you know, that's where
18 you -- that's where we hit the breakeven point.
19       MR. VERMA:  Yeah.  Got it.  I mean, in the
20 last two minutes remaining, I know this is a big
21 topic, but just what are your expectations from
22 Orexin?  I think we are going to get some data from
23 Takeda and Alkermes.  But this is kind of like just a
24 question on the long term impact of the narcolepsy
25 market.  How do you think this could change as we get

Transcription of Audio                    FINAL                    March 18, 2024
Avadel Pharmaceuticals                                             UBS Virtual CNS Day

Page 25

1  clarity on this?
2        MR. KIM:  Yes, Ash.  I mean, you know,
3  obviously probably a better question to ask some of
4  the companies in development there.  But I guess the
5  way we look at it is first, it's always exciting when
6  more therapies and more mechanisms are coming into the
7  class to serve the narcolepsy community.
8        I think as we think about Orexin, I guess
9  our view would be we're very anxious, like a lot of
10  people, to learn more about what the actual profile
11  looks like.  And we believe we'll see more of that at
12  the sleep conference in June in Houston this year.
13        But I think it really is going to come down
14  to like a balance of how much efficacy do you push
15  versus how much -- how many adverse events come into
16  the mix considering this is chronic therapy.  So I
17  think that's what we're sort of looking for.
18        And the lower the dose and potency that
19  people go for, maybe there's a, you know, as there is
20  today, the room for more combination therapy that is
21  used.  Today, almost every patient is a polypharmacy
22  patient in the narcolepsy field today.
23        So and I think overall understanding if
24  things stick in NT 1 versus NT 2, all we know today is
25  the oxybate marketplace is less than 10 percent

Page 26

1  penetrated in the market today.  And we see a lot of
2  room for that growth to come with or without Orexin in
3  the marketplace in the future as well.
4        MR. VERMA:  Yeah.  Yeah.  Great.  All right.
5  We are out of time.  Thank you so much for this.  And
6  look forward to maintaining the dialogue.  So good
7  luck with everything.
8        MR. DIVIS:  Thanks, Ash.
9        MR. MCHUGH:  Thanks, Ash.
10        MR. VERMA:  Thanks, everybody.  Bye.
11        (End of Video Recording.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 27

1        CERTIFICATE OF TRANSCRIPTION
2
3        Jane Rose Reporting does hereby certify that
4  the foregoing transcript is a true and correct record
5  of the recorded proceedings; that said proceedings was
6  transcribed to the best of our ability from the audio
7  receiving; and that Jane Rose Reporting is neither
8  counsel for, nor related to, any of the parties to
9  this case, and have no interest, financial or
10  otherwise, in its outcome.
11
12
13        _____
14        Jane Rose Reporting
15        March 19, 2024
16
17
18
19
20
21
22
23
24
25

JANE ROSE REPORTING                    National Court-Reporting Coverage
1-800-825-3341                         janerose@janerosereporting.com

Transcription of Audio
Avadel Pharmaceuticals

FINAL

March 18, 2024
UBS Virtual CNS Day

**A**

**ability** 27:6
**able** 11:23 14:5
**academic** 14:23
**access** 23:17
**achievable** 9:19
**achieve** 23:25
**Act** 7:17
**activate** 11:17
**active** 8:14 12:8 14:17
**actual** 25:10
**ADAVDEL** 1:4
**added** 13:24
**addresses** 3:7,25
**Administrative** 7:17
**ads** 13:3
**adults** 3:6
**advanced** 21:11
**adverse** 25:15
**ago** 5:16 11:21
**Alkermes** 24:23
**alluded** 23:3
**amount** 9:24 22:20
**anecdotal** 20:10
**anecdotes** 20:14
**annualized** 24:15
**antithetical** 3:14
**anxious** 25:9
**AP** 7:6
**applied** 5:23 6:11
**apply** 6:13 24:14
**appreciate** 2:19
**approaching** 17:18
**approval** 3:13 4:9
**April** 7:9
**arm** 23:11
**art** 23:8
**artificially** 18:6
**Ash** 2:7,19 4:1 5:15
  10:11 12:12 14:22
  16:1,22 19:14 21:23
  23:20 25:2 26:8,9
**assessment** 22:10
**assistance** 17:14
**assume** 22:16
**assuming** 11:19 23:18
**assumption** 17:6 24:8
  24:11
**assumptions** 17:1
  23:25
**attend** 5:1
**audience** 12:22 14:14
**audio** 27:6
**Avadel** 2:3
**available** 22:15
**AVDL** 1:4
**average** 9:10 16:23

17:2 24:8
**awakened** 3:15
**awarded** 5:22
**aware** 3:3
**awoken** 3:10

**B**

**back** 16:1 18:21 24:7
**baked** 23:18
**balance** 4:14 23:22
  25:14
**base** 8:25
**based** 7:12,23 23:8,24
**basics** 14:17
**basis** 5:24 6:6
**battle** 13:11
**beginning** 2:1 20:15
**behalf** 7:8
**belief** 23:23
**believe** 3:23 4:1 8:8
  9:18 14:5 16:22 18:9
  25:11
**benchmark** 23:7
**benefit** 12:17,18 16:7
  18:5
**best** 27:6
**better** 25:3
**beyond** 14:6
**big** 18:4 24:20
**binary** 8:6
**biopharmaceutical**
  3:1
**bit** 2:23 6:24,25 8:16
  10:2 11:10 12:25
  13:22 15:12 20:11
  21:4
**bless** 8:22
**board** 14:24
**bookends** 6:7,14
**bottom** 18:25
**breadth** 15:4
**break** 23:25
**breakeven** 24:5,18
**briefly** 16:16
**bring** 3:22
**buckets** 10:4,7
**building** 4:16,17
**business** 18:13
**button** 18:25
**Bye** 26:10

**C**

**call** 12:21 21:23 24:11
  24:14
**calls** 8:12
**candidly** 10:19
**care** 12:8

**case** 6:23 7:8,20 8:8
  8:25 27:9
**cash** 23:15,21 24:5,10
  24:12
**cataplexy** 3:5
**causing** 13:2
**CDLT** 1:15
**centers** 14:13,23,24
**CEO** 2:4
**certainly** 7:5 9:12,17
  17:6 18:15,17 22:12
  22:13 23:23
**CERTIFICATE** 27:1
**certify** 27:3
**challenges** 4:10
**change** 24:25
**changing** 10:6
**characterize** 21:22
**characterized** 3:19
**chat** 2:10
**Chief** 2:4,5
**chronic** 25:16
**claims** 12:4,9 15:19
  19:16
**clarity** 25:1
**class** 25:7
**cleaned** 4:14
**clear** 3:24
**clearly** 3:12 14:20
  19:15
**click** 18:24
**clinical** 21:17 22:17
**CNS** 1:9 2:3
**color** 19:10
**combination** 25:20
**come** 8:22 9:21 10:23
  13:5 14:1 18:21
  25:13,15 26:2
**comes** 10:18 16:1
**comfortable** 8:25 9:6
**coming** 8:17 10:14
  11:22 14:9,22 15:4
  17:22 18:6 19:16
  25:6
**comment** 8:13 9:6,13
  16:18
**commentary** 15:8
**Commercial** 2:4
**communities** 20:21
**community** 22:18 25:7
**community's** 22:18,19
**companies** 25:4
**company** 2:2,15,22,24
  2:24 3:1,22 4:17
  17:10
**company's** 4:6
**compared** 11:5

**complete** 22:5,8 23:9
**component** 11:1
**composition** 10:6
**concerned** 11:2
**condition** 3:17,18,19
  4:4 12:11
**conduct** 23:1
**conference** 25:12
**confident** 5:6 9:3
**confirm** 9:5
**consensus** 8:22 9:7,7
  9:24
**consideration** 16:20
**considering** 3:8 25:16
**consistently** 20:23
  21:2
**context** 2:17 6:10
**continue** 4:15 22:22
**conversation** 13:7,10
  13:18,18
**convince** 13:11
**COPY** 1:24
**correct** 27:4
**counsel** 27:8
**couple** 11:21 21:22
**coupled** 22:21
**course** 6:15 8:8 9:22
**cover** 2:21 8:11
**credible** 20:9
**CRO** 21:17
**crossed** 17:23
**current** 7:10
**currently** 11:9 23:7

**D**

**dabblers** 19:24 20:1
**damages** 5:10,21,22
**data** 12:4,9 13:22
  15:13,19 20:9 21:9
  21:25 23:6
**date** 6:12,25 7:10,12
  21:25 23:6
**day** 1:9 2:3 13:14
**days** 7:25
**daytime** 3:5
**debt** 23:22
**decide** 6:15 7:16
**decision** 5:17 7:11 8:9
**deductibles** 17:13
**definitely** 19:25
**Delaware** 5:1
**delayed** 18:5
**demand** 9:20
**demonstrate** 4:2
**describe** 8:7
**design** 21:6 22:14,19
**designs** 22:1

**detailed** 20:16
**determination** 5:11
**determine** 5:7
**determined** 5:20,23
**developed** 7:23
**development** 25:4
**dialed** 19:1
**dialogue** 26:6
**different** 10:4 13:10
  13:17 17:9 22:12
**directly** 8:13
**discontinuation** 15:7
  15:9,16,24 16:9,13
  20:5
**discontinue** 12:13
**discontinued** 10:19
  11:14,16,25 12:6
  14:4 15:21
**disorder** 3:18
**disrupted** 3:20
**disturbed** 3:20
**dive** 2:17
**Divis** 2:4,7,18 5:15 7:5
  9:5 21:10 23:4 26:8
**docket** 6:16 7:13
**doctor** 11:22
**doing** 2:6,7
**dose** 3:11,16 12:15,18
  16:5,6 20:7 21:1
  25:18
**drug** 6:23
**dynamic** 18:8
**dynamics** 16:16 17:8

**E**

**earlier** 24:3
**early** 10:22 18:11
**effective** 16:4
**effectively** 5:20 23:22
**efficacy** 25:14
**efficient** 2:21
**either** 6:18 10:2,7 18:4
**embark** 4:16
**ended** 23:20
**endpoints** 23:12
**engagement** 14:4
**enroll** 21:7
**enrolling** 21:12
**enrollment** 22:1,10
  23:1,9
**enrollments** 10:13
**entire** 13:21
**evaluate** 7:18 18:12
**event** 8:6
**events** 25:15
**eventually** 22:15
**everybody** 26:10

JANE ROSE REPORTING
1-800-825-3341

National Court-Reporting Coverage
janerose@janerosereporting.com

Transcription of Audio
Avadel Pharmaceuticals

FINAL

March 18, 2024
UBS Virtual CNS Day

evidence 7:18,20
exact 6:1 20:14
exactly 16:10 17:5
  21:19
Excellent 2:9
excessive 3:5
exciting 25:5
exclusivity 3:14 6:23
execute 8:2
exited 9:14
expect 6:17 16:9 17:2
  18:7,14
expectation 24:10,12
expectations 23:15
  24:21
expenses 24:10,12
experience 4:3 10:8
expert 8:12
experts 20:3
explicitly 21:21
extension 22:22 23:11
extensively 21:25
extent 16:17
eye-opening 5:2

**F**
fact 16:3
fair 9:24
fairly 2:20
far 10:12 11:2,10
  15:19,23,25 16:11
  19:17
FDA 3:13 6:23 7:7,8
  21:17
February 7:9
feel 4:23 19:7
felt 12:17
field 25:22
final 1:24 6:3,16
finally 13:12
financial 2:5 17:13
  23:19 27:9
fireside 2:10
first 3:4,21 10:14
  11:20 12:6,13 14:7
  15:16,17,20 16:14
  17:12 20:8 21:20
  25:5
five 2:23
flex 11:10
flow 23:16 24:5
follow-ups 18:22
force 13:14
forcibly 3:10,15
foregoing 27:4
format 2:13
forum 22:22

forward 10:23 26:6
found 18:25
four 12:5 13:15
fourth 8:17
fragmented 13:23
frame 6:1 22:13
frankly 8:1 9:8
full 8:19 12:18 16:5,6
  16:7
function 13:13
fundamentally 13:9,16
fundamentals 16:2
future 5:5 22:11 26:3

**G**
gears 8:15
generation 10:14
  11:20 12:6,14 14:7
  15:16,17,20 16:14
  20:8
generic 2:24
getting 10:5 14:3 16:6
  21:14
give 2:15 7:15 8:19
  14:12,12
given 9:13,20
giving 5:10
go 16:20 17:1 25:19
going 3:9 6:2 8:9 11:6
  11:7 13:12,13,14
  18:3 19:24 23:15
  24:22 25:13
good 4:20 7:3 8:11
  12:9,21 14:24 15:3
  21:9 22:23 23:6,21
  26:6
go-forward 5:24 6:5
grams 17:3
granting 3:13
great 2:7,18 8:11 12:3
  20:13 21:14 26:4
Greg 2:3,14
grew 9:15
gross 17:11
grow 4:15
growing 13:1 14:6
growth 3:1 26:2
guess 25:4,8
guidance 8:19
guide 24:9
guided 21:19,21
Guys 2:6

**H**
half 6:8,9 9:3 13:15
  21:13,20
hand 18:25 19:2

hands 5:9,24 19:4
happens 19:22
hard 13:20
hear 20:14 21:1
heard 15:8 20:10
hearing 7:6,7,9,25
help 13:13
helpful 2:14 5:14 21:5
high 2:15,25 18:7
higher 11:4 17:11
historical 5:7 18:2
  23:8
hit 24:5,18
hosted 8:12
hours 13:15
Houston 25:12
hypersomnia 19:6

**I**
identification 21:18
idiopathic 19:6
IH 19:11,12 20:4,23,24
  21:4,13
III 21:4,13
imagine 21:16
impact 4:2 16:17 17:9
  18:13 24:24
important 3:7 4:23
  11:1
improvement 3:23
inability 20:25
inaudible 5:7
includes 23:1,10
inconvenient 20:24
increase 18:10,16
industry 17:10
initiated 9:15,16
injectable 2:24
interest 22:19 27:9
interesting 4:25
interface 19:1
internal 15:1
interrelated 12:16
intervened 7:7
intro 4:21
introduced 7:20
investors 2:12 18:20
involved 14:15
involvement 21:18
IRs 19:22
issue 7:24
issues 6:3
it'll 7:3 21:5

**J**
Jane 1:14,25 27:3,7
  27:14

January 9:16
Jazz 5:18,21 6:22 7:7
  8:5 18:2
job 21:14
journey 4:16
judge 5:9,25 6:3,15,17
  7:11,16,17 8:9
judge's 7:23
jump 18:4
June 25:12
jury 5:1,8,11,20 6:11

**K**
K 1:15
Kim 2:4 10:10 12:3
  13:6 14:16 15:18
  19:14,20 20:13 25:2
kind 5:2,10,13 8:18,21
  8:24 11:16 16:18
  17:19 18:12 19:7
  20:9 23:6,15 24:23
know 2:23 5:8,10,13
  5:16 6:4,6,7,9,16,25
  7:3,6,8,10,11,14,15
  7:18,22,22,25 8:1,1
  8:4,5,7,8,13,18 9:3,6
  9:7,9,10,12,13,14,17
  9:20,21,22,23 10:11
  10:19 11:14,23
  12:12,12,21 13:3,6
  13:12 14:10,11,12
  15:13,17,18 16:7,16
  16:18,23,24 17:2,4,8
  17:8,10,11,14,16,16
  17:17,19,21,24 18:2
  18:10,11,11,14,15
  19:11,14,20,21 20:7
  20:15 21:5,8,18 22:4
  22:6,6 23:5,7,10,23
  24:2,4,4,7,17,20
  25:2,19,24

**L**
label 19:12,15,17
  22:22 23:11
large 14:23
latest 7:1
launch 3:2 4:11 6:12
  8:16,20 18:12 19:25
  20:1 21:12
leadership 4:12,13,13
learn 25:10
learning 16:10
left 5:22
legal 4:10,22 6:22
letter 3:13
let's 11:20,21

level 2:15
leveraged 3:22
life 5:3
limited 22:20
line 3:2 5:11 18:20
listen 7:25 8:5 9:8
litigation 5:17 7:2 8:14
little 6:10,18,24,25
  8:16 10:2 11:10
  12:25 13:22 15:12
  20:11 21:4
lives 14:1
logistics 8:11
long 21:7 24:24
longitudinal 15:9
look 6:6 18:1 22:4,24
  23:5 25:5 26:6
looked 22:17
looking 8:3 16:11
  25:17
looks 25:11
lot 2:20 9:9 12:16
  16:25 20:3,25 25:9
  26:1
lower 15:10,15,24
  16:10,13 25:18
luck 26:7
LUMRYZ 2:16 3:2,3,6
  5:5 10:25 11:24
  13:25 14:2 15:9 17:3
  17:15,22 18:8 19:13
  19:17 20:1

**M**
maintaining 26:6
majority 10:12
making 23:25
MALE 18:23
managed 12:10
management 4:3
March 1:10 27:15
mark 15:11
market 11:17 13:2
  16:2 19:15 20:16
  23:17 24:25 26:1
marketing 19:11
marketplace 13:21
  14:6 21:2 25:25 26:3
massively 20:24
math 10:16 24:14
matter 1:1 6:22
matters 4:24
McHugh 2:5 16:22
  18:9 23:20 26:9
mean 4:21,25 5:4 8:11
  8:12 10:3 11:13
  14:16 15:7 16:3,17

Transcription of Audio  FINAL  March 18, 2024
Avadel Pharmaceuticals   UBS Virtual CNS Day

Page 30

18:1,3 19:9 23:4
24:19 25:2
**meaningful** 3:23 10:22
**meaningfully** 15:23
16:13
**mechanisms** 25:6
**medicine** 15:2
**mentioned** 16:16
**merits** 8:8
**metrics** 8:20 14:12
**middle** 3:10,16
**million** 8:23 9:8,18
23:21 24:13,15
**minute** 2:16
**minutes** 2:11 24:20
**mix** 11:4 12:25 14:25
25:16
**Mixel** 22:2
**momentum** 11:2
**month** 4:11 15:21
**months** 4:8 6:2 15:22
22:6,8 23:2
**move** 7:11,12
**moved** 6:25 7:9
**movement** 14:3

**N**

**naive** 10:8
**narcolepsy** 3:6,8 20:7
20:23 24:24 25:7,22
**navigated** 4:9
**need** 3:8,25 11:22
23:17
**neither** 27:7
**net** 5:19 9:21 16:16,24
17:9,18,24 18:10,15
24:8
**nets** 17:11
**neurologists** 14:14
**neurology** 14:25
**never** 13:25
**new** 7:20 12:24 13:3,4
13:25 17:22 19:24
**news** 12:9,21 14:3
**new-to-oxybate** 11:3
13:10,19
**night** 3:10,16
**nightly** 10:24
**nine** 19:2
**nocturnal** 3:20
**NT** 25:24,24
**number** 4:7 9:9,10,15
9:22,25 10:23 22:11
22:12
**numbers** 20:10,17

**O**

**obviously** 21:24 25:3
**occur** 24:3
**occurred** 23:5
**Officer** 2:4,5
**Okay** 8:10 18:18 19:5
23:13
**once** 16:11 19:22
20:22
**once-at-bedtime** 3:4
**one-month** 15:11
**open** 2:11 22:22 23:11
**open-ended** 2:20
**operating** 24:10,12
**opinion** 7:15
**opportunity** 2:19 4:18
22:21
**Orexin** 24:22 25:8
26:2
**originally** 7:6,8
**orphan** 3:14 6:23
**outcome** 7:2 27:10
**outcomes** 7:21,22 8:5
**overall** 11:4 13:2
25:23
**overview** 2:15
**oxybate** 3:4,9 10:14
10:24 11:15,20,21
12:7,14,17,22 14:1
14:18 20:8 25:25
**oxybates** 14:7 15:20
16:4,14

**P**

**part** 10:15 11:17 19:7
23:9
**particular** 4:7 7:23
**parties** 27:8
**patent** 5:17
**patient** 9:13,20 13:3
16:24 17:12,18,24
20:20 21:20 22:20
24:9 25:21,22
**patients** 3:15,17 4:2
9:11,14,16,23 10:3,5
10:8,14,16,23 11:3,4
11:8,14,19,25 12:6
12:13,24 13:5,10,19
14:7 15:17 16:3,5
17:3,14,21,22 19:12
19:19 20:5,7 21:6,12
24:6,16,17
**patientship** 10:13
**pause** 18:19
**pediatric** 2:24
**penetrated** 26:1
**people** 3:8 4:8,9 10:20
14:25 25:10,19

**percent** 5:20 6:7,8,9
6:14 12:7 14:18,19
14:21 15:10,20,21
25:25
**percentage** 6:12 11:4
**personally** 12:19
**perspective** 7:3 8:21
5:18
**Pharmaceuticals** 1:4
5:18
**pharmacy** 19:23
**Phase** 21:4,13
**phasing** 16:20 17:16
**phonetic** 22:3
**physical** 20:25
**physician** 14:14 22:18
**physicians** 14:10 16:3
20:4
**pie** 13:2
**piece** 13:21
**pitolisant** 22:2
**place** 23:21
**placebo** 22:21
**places** 14:23
**plan** 21:4
**planning** 21:12
**play** 5:2 9:21
**played** 17:6
**playing** 6:22
**pleasant** 15:2
**please** 18:24 19:2
**pleased** 15:3
**point** 4:24 6:7 15:22
17:4,20,23 19:15
20:14 23:17,23 24:4
24:4,18
**points** 15:25 16:12
21:9
**polypharmacy** 25:21
**pool** 12:2
**portion** 19:19
**position** 4:15
**positive** 4:2 23:16
**possible** 12:2 23:8
**potency** 25:18
**potential** 7:15,21,22
8:4 9:9,19,24
**prescribed** 14:10
**prescriber** 15:5
**prescribers** 12:22
14:9
**press** 19:2
**pretty** 8:6,25 21:9,25
**prevail** 8:6
**prevails** 8:6
**previous** 23:6
**previously** 2:23 10:19
11:15 12:14 14:4

21:11
**pre-launch** 16:2
**pricing** 9:22 16:16,21
**primarily** 14:10
**primary** 23:9,12
**prior** 11:15
**private** 14:23
**probably** 11:7 18:11
20:16 22:7 25:3
**Procedures** 7:17
**proceedings** 27:5,5
**process** 5:13
**product** 10:13 16:4
19:24
**profile** 25:10
**progress** 4:6 9:2,13
18:16
**projections** 22:10
23:19
**proposition** 3:24,25
**proud** 3:21 4:5
**provide** 2:16 19:10
**provider** 12:8
**providing** 17:13
**proxies** 22:7,23
**psychiatry** 15:1
**publicly** 22:15,16
**pulls** 16:19
**pulmonology** 15:1
**push** 16:19 25:14
**put** 6:9 20:17

**Q**

**quantified** 20:16
**quarter** 8:17 17:12
24:13
**question** 2:20 6:4
10:11,20 12:4 18:24
23:14 24:24 25:3
**questions** 2:12,17
18:20 19:4
**quickly** 17:17,24
**quite** 2:22 3:24 7:25
9:8 20:23 21:2
**Q&A** 2:11 18:23
**Q1** 18:11,17
**Q2** 18:11,17
**Q3** 11:5
**Q4** 11:2

**R**

**raise** 18:25 19:2
**raised** 19:4
**ramp** 9:4 20:15
**ran** 22:5
**range** 24:16
**rare** 3:17

**rate** 6:10 9:17 15:7,9
15:16,24 20:5,6
**rates** 16:9,13
**reactivation** 12:20
**ready** 21:15
**real** 5:3 10:21
**really** 2:18,22,25,25
3:1,6,25 4:1,5,12,13
4:15 5:24 7:11,14,20
18:12 19:21 21:11
22:5 23:21,22 25:13
**reason** 7:10 12:1
15:15
**reasonable** 22:7
**reasons** 12:13
**recap** 5:16
**received** 5:16
**receiving** 27:7
**recognizing** 22:9
**record** 7:19,24 27:4
**recorded** 27:5
**Recording** 2:1 26:11
**reengaged** 10:25
**refer** 19:22
**refers** 24:7
**refined** 22:11
**reimbursed** 24:17
**related** 5:17 27:8
**remaining** 24:20
**reported** 18:2
**Reporting** 1:14,25
27:3,7,14
**represent** 11:3
**representation** 11:11
**requests** 19:16
**required** 3:15
**research** 16:2 20:16
22:19
**reset** 17:13
**respect** 8:4
**result** 5:19
**revenue** 6:12 16:24
17:9,18,24 18:2,10
18:15 24:8
**Richard** 2:4 9:12 10:2
**Richard's** 4:12
**right** 6:20 10:17 11:17
12:3,9 13:3 14:16
15:11 16:11 17:5
19:13,23 20:2 23:2
26:4
**road** 6:2
**room** 25:20 26:2
**Rose** 1:14,25 27:3,7
27:14
**roughly** 23:2
**royalty** 5:5,19,22,23

6:5,10
ruling 6:3,16 7:24 8:1
run 9:17 21:8
running 15:9
Runtime 1:11

**S**

safe 22:16
sales 5:5 9:4
saw 11:2,3 12:25
Sawyer 1:15
seasonal 18:13
second 3:11,16 9:3
12:15,18 20:7 21:1
21:13,20
see 5:2,9 9:8,23,23
10:6 11:10 12:4,8,22
15:3,19 18:19 25:11
26:1
seeing 9:20 11:22
14:2 17:6 18:6 19:10
19:11,25 23:24
seeking 12:1
seen 10:12 12:20
15:22,23 16:12
19:16
segment 10:21,22
15:5
segments 10:18 11:6
11:11
sell 8:22 9:7
sense 5:4
separate 6:22
serve 25:7
session 18:24
shake 11:14 16:21
shakes 5:5
share 5:12 22:13
sheet 4:14 23:22
show 14:6
side 8:22 9:7
significant 3:7
significantly 15:10
similar 20:19
site 21:18 22:9
sites 22:1
six 19:3
sleep 3:18,20 12:8
13:8,13,17 14:13,24
25:12
sleepiness 3:5
slightly 11:3
sort 2:16 11:2 12:16
13:9,21 15:3,4,19
17:4 20:17 22:19
23:2,11,16 25:17
sorts 14:22

source 10:3
space 21:25
speak 22:12
specialist 13:8
specialists 13:17
specialty 19:23
specifically 21:19
24:2
spend 2:16
split 5:16
stages 21:11
stand 19:3
standalone 14:13
star 19:2,3
start 8:15 10:25 11:23
started 17:19
starting 3:2 11:10
stated 3:12 10:12
15:23
stick 25:24
stock 4:24
stopped 10:24
story 4:24 13:7 19:8
23:14
straightforward 13:18
strength 17:2
strengthen 4:14
strictly 7:16
strong 8:20
struggled 16:5
studied 21:24
study 21:8 22:2,3
stuff 4:20
subspecialties 14:25
substantial 19:18
substantive 20:12
sued 7:7
suffering 3:17
summarize 13:7
supply 21:17
sure 4:10 10:10
surprised 12:20
survey 20:20
switch 8:15 10:13
11:8

**T**

take 2:11 3:10,16
11:18 12:15 13:15
18:19 21:1,7
Takeda 24:23
talk 4:10,21 6:24 8:16
10:2 19:6 21:3
talked 10:4
talking 20:3
tap 12:1
targeting 16:23

team 21:14
technology 3:22
telephone 19:2
term 17:17,19 24:3,24
terms 7:21 14:8 17:21
18:15 21:21 22:14
23:7
Thank 26:5
thanks 2:7,8,9 4:18,20
10:10 26:8,9,10
therapeutic 16:7
therapies 10:17 25:6
therapy 3:18 9:11,15
9:16,23 13:12 24:6
24:16,17 25:16,20
thing 4:23 13:24 20:24
things 5:2,14 20:2
21:22 25:24
think 2:14 3:12 5:1 6:4
6:5,6,14 7:1,4 8:5,12
8:24,25 9:1,4 11:6,9
12:16 13:16,20 15:2
15:7,14,18 16:1
17:23 18:9,19 19:5
19:20,21,23 21:8
22:6,8,16,23 23:4,6
24:22,25 25:8,8,13
25:17,23
thinking 6:19 20:20
21:7 22:23
thought 17:20
three 10:4 11:6
time 2:10 4:1 6:1 7:13
13:20 14:5 15:24
16:12 19:4 22:13,20
23:18 26:5
timeline 5:12
times 20:25 22:1
timing 7:21 8:2 21:21
22:4
tipping 17:4,20 24:4
today 2:3 11:9 12:22
20:18 21:2 22:9
25:20,21,22,24 26:1
Tom 2:5 10:2 16:15
Tom's 4:11,13
top 12:12
topic 24:21
total 9:22
track 7:24
traction 10:9
transcribed 27:6
transcript 27:4
TRANSCRIPTION 1:8
27:1
Transcriptionist 1:15
transformed 2:25

treated 12:10
treatment 3:5,19 4:3
12:1
tremendous 4:6
trends 23:9,24
trial 5:1 21:6,14,25
22:8,14,24 23:1,10
trials 22:5 23:6
trickle 19:21
true 27:4
try 2:21
trying 11:16 20:13
twice 10:24
two 5:16 10:18 12:13
13:14 24:20
type 7:2 18:8,13 21:6
21:6
typical 15:10
typically 17:11

**U**

UBS 1:9 2:2
ultimately 8:9
underappreciated
19:7
underlying 16:25
understand 5:3 20:4
20:22
understanding 25:23
unmet 3:7,25
unmute 19:3
update 8:17
updates 4:22
upside 9:1,9,19,24
upwards 22:7
usage 14:20 15:4
use 14:9 17:17 19:12
24:3
uses 19:16,17
utilize 17:14
utilizing 17:22

**V**

value 3:23,24
variables 9:21
VERMA 2:2,9 4:20
6:21 8:10 10:1 11:13
12:24 14:8 15:6
16:15 18:1,18 19:5
19:18 20:2 21:3
22:25 23:13 24:19
26:4,10
versus 6:23 13:3
14:13 15:16 20:7
25:15,24
viable 11:7
Video 1:11 2:1 26:11

view 7:23 16:4 25:9
Virtual 1:9
VOICE 18:23
volume 14:18,19,21
18:5

**W**

wake 13:14 21:1
want 2:11 4:21 7:14
19:6
wanted 5:3
way 6:19 8:7 25:5
webcast 21:24
weeks 5:16
Wendy 1:15
we'll 4:10 14:5 17:23
18:23 22:12 23:25
25:11
we're 3:21 4:5 6:19 8:3
9:18,20 11:7,10 14:2
14:3 16:10,23 17:4,4
17:5,13,16,17,19
18:11 19:25 20:13
20:15 21:11 22:23
23:24,25 24:5 25:9
25:17
we've 2:25 4:8,9,9,13
7:7 8:12 10:11,12
12:19 13:20,24
14:20 15:2,8,23,23
16:12 17:23 20:3,19
20:21 21:10 22:16
whatnot 21:19 22:1
work 12:14 20:20
21:16
wouldn't 23:10
writers 13:25 14:17
written 7:19 13:25
14:2

**X**

Xyrem 10:15
Xyrem/Xywav 14:11
Xywav 10:15

**Y**

yeah 2:9 4:20,25 5:15
6:21,21 7:5 8:10,10
8:19 9:5 10:1,10,11
11:13 12:3,24 13:1,6
14:8,16 15:6,6,7,18
16:15,15 18:1,9,14
18:18 19:9,14,14
20:13 21:3,10 22:25
23:4,13 24:19 26:4,4
year 8:19 9:3,11 13:8
16:20,24 17:12,18

Transcription of Audio
Avadel Pharmaceuticals

FINAL

March 18, 2024
UBS Virtual CNS Day

Page 32

17:25 18:16 21:13
24:9 25:12
**years** 2:23 4:7 11:21
12:5

**Z**

**Zoom** 19:1

**$**

**$120,000** 16:25
**$155** 9:7

**0**

**0.7** 5:20 6:7,14,14,17
**0:28:04** 1:11

**1**

**1** 25:24
**1Q** 18:3,6
**1-800-825-3341** 1:25
**10** 12:5 25:25
**1000** 9:14
**105** 23:21
**12** 15:22 22:5
**120,000** 24:9
**1200** 9:15
**1300** 9:12 24:6,16
**15** 4:7 22:5
**15,000** 12:5
**1500** 24:6,16
**155** 8:23 9:18
**16,000** 14:6
**160** 4:8 24:15
**1600** 14:18
**18** 1:10 22:7 23:2
**180** 24:15
**19** 27:15

**2**

**2** 25:24
**2Q** 18:3,7
**20** 2:11
**2023** 9:14 23:20
**2024** 1:10 9:8 10:6,9
16:17 24:1,11 27:15
**24** 9:4
**25** 15:10,20
**27th** 7:9

**3**

**3** 6:8,9
**3.5** 6:15,18
**30** 4:8
**31st** 9:16

**4**

**4Q** 12:25
**40** 24:12
**45** 24:13
**4500** 14:17

**5**

**50** 14:19,21 15:21
**500** 14:19,20,21

**6**

**60** 7:24

**7**

**7.5** 17:3

**8**

**80** 14:18

**9**

**9th** 7:9
**99** 12:7

# EXHIBIT K



Follow The Pill:
Understanding the U.S. Commercial Pharmaceutical Supply Chain

Prepared for The Kaiser Family Foundation by:

The Health Strategies Consultancy LLC

March 2005

# Table of Contents

I.  **Executive Summary**

II.  **The Flow of Goods from Manufacturers to Consumers in the U.S. Pharmaceutical Supply Chain**
     *Pharmaceutical Manufacturers*
     *Wholesale Distributors*
     *Pharmacies*
     *Pharmacy Benefit Managers (PBMs)*

III. **The Flow of Money and Key Financial Relationships in the U.S. Pharmaceutical Supply Chain**
     *Pharmaceutical Manufacturers*
     *Wholesale Distributors*
     *Pharmacies*
     *Pharmacy Benefit Managers (PBMs)*

IV.  **Conclusion**

V.   **Appendix**

   A. **Special Pricing Rules Applicable to Federal Programs**
      *Medicaid*
      *Department of Veteran Affairs, Department of Defense, Public Health Service, Coast Guard*
      *Section 340B Drug Pricing Program*

   B. **Other Stakeholders in the U.S. Commercial Supply Chain**
      *Physicians*
      *Large Employers*
      *Health Plans*

VI.  **Key Acronyms and Glossary of Key Terms**

## I. Executive Summary

The pharmaceutical supply chain is the means through which prescription medicines are delivered to patients.  Pharmaceuticals originate in manufacturing sites; are transferred to wholesale distributors; stocked at retail, mail-order, and other types of pharmacies; subject to price negotiations and processed through quality and utilization management screens by pharmacy benefit management companies (PBMs); dispensed by pharmacies; and ultimately delivered to and taken by patients.  There are many variations on this basic structure, as the players in the supply chain are constantly evolving, and commercial relationships vary considerably by geography, type of medication, and other factors.

The intent of this paper is to demystify the U.S. pharmaceutical supply chain.  The first section of the paper describes each of the key players (i.e., industry segments) involved in the process of supplying prescription drugs to consumers.  The section begins with a discussion of what each player does and the role that it plays in the flow of pharmaceuticals from manufacturer to patient.  The second section of the paper describes the financial relationships between each of these key players and how the dollars flow between and among the segments, including the consumer.

Highlights from this paper about the key players and their financial relationships include:

*Pharmaceutical Manufacturers*:
- A relatively few large, multinational firms comprise the bulk of the brand pharmaceutical manufacturing industry today – the 10 largest pharmaceutical corporations, as measured by U.S. sales, accounted for almost 60 percent of total U.S. sales in 2004.
- Pharmaceutical manufacturers have the most influence over pharmaceutical prices, assessing expected demand, future competition, and projected marketing costs to establish the wholesale acquisition cost (WAC), which is the baseline price at which wholesale distributors purchase drug products.  Discounts and rebates may be applied, based on market share, volume, and prompt payment.

*Wholesale Distributors*:
- The wholesale distribution industry has consolidated in the last 30 years, with the number of wholesale distributors in the U.S. declining from approximately 200 in 1975 to fewer than 50 in 2000.  The top 3 wholesale distributors account for almost 90 percent of the wholesale market.
- Wholesale distributors typically sell drugs to pharmacies at WAC plus some negotiated percentage.  They may facilitate discounts negotiated between manufacturers and other customers.

*Pharmacies*:
- Although comprising a small overall percentage of total prescriptions filled (approximately 6.1 percent in 2004), mail-order pharmacy sales were the fastest-growing sector of the U.S. prescription drug retail market in 2004, increasing by 18 percent over the previous year.

- Pharmacies may negotiate with manufacturers or wholesalers for discounts and rebates based on volume sales or market share, and they may negotiate with PBMs for inclusion in their networks and for their reimbursement (drug cost plus dispensing fee).

*Pharmacy Benefit Managers (PBMs)*:
- Approximately two-thirds of all prescriptions written in the U.S. are processed by a PBM.
- PBMs may achieve savings for their customers by negotiating discounts and through cost containment programs, including use of formularies and cost sharing.

The Appendix briefly describes: (A) special pricing rules applicable to Medicaid and some other federal programs, and (B) the roles physicians, large employers, and health plans have in the pharmaceutical supply chain.

The pharmaceutical supply system is complex, and involves multiple organizations that play differing but sometimes overlapping roles in drug distribution and contracting. This complexity results in considerable price variability across different types of consumers, and the supply chain is not well understood by patients or policymakers. Increased understanding of these issues on the part of policymakers should assist in making rational policy decisions for the Medicare and Medicaid programs.

**Exhibit 1.  Flow of Goods and Financial Transactions Among Players in the U.S. Commercial Pharmaceutical Supply Chain**



Source:  The Health Strategies Consultancy LLC

## II.  The Flow of Goods from Manufacturers to Consumers in the U.S. Pharmaceutical Supply Chain

### *Pharmaceutical Manufacturers*

Manufacturers are the source of the prescription drugs in the pharmaceutical supply chain.  The pharmaceutical manufacturing industry is composed of two distinct business models:  manufacturers of brand-name drugs (e.g., Pfizer, Merck, and Novartis) and manufacturers of generic drugs (e.g., Mylan, Roxane, and Barr).  There are a few pharmaceutical companies that participate in both the branded and generic parts of the industry, and both models focus on the manufacturing and packaging of pharmaceutical products, but there are other important differences.  Most brand manufacturers devote a portion of their expenses to the scientific research and development of new drug therapies.  Generic drug manufacturers typically do not develop new drug therapies, but instead manufacture generic compounds that compete directly with the original branded version of a drug once the brand product's patent protection has expired.

Manufacturers manage the actual distribution of drugs from manufacturing facilities to drug wholesalers, and in some cases, directly to retail pharmacy chains, mail-order and specialty pharmacies, hospital chains, and some health plans.  Manufacturers may also distribute products directly to government purchasers, such as the Veterans Administration, AIDS Drug Assistance Programs (ADAPs), and Vaccines for Children (VFC), which typically receive the largest price discounts.  In a few rare cases, a manufacturer may distribute drugs directly to a self-insured employer with an on-site pharmacy, but the typical employer-sponsored plan does not follow this path.  Wholesale distributors are the manufacturers' largest purchasers.  Very few drugs are distributed directly to consumers.

At the most basic economic level, a pharmaceutical manufacturer supplies a quantity of its products that is equal to the demand for its products from consumers/patients (of course, consumer demand in this market is expressed through the medium of a prescribing physician or other licensed health care provider).  Manufacturers also play roles in stimulating demand for drug products through underwriting clinical studies designed to demonstrate the value proposition of pharmaceutical treatments compared to one another or compared to no clinical treatment at all; by engaging in the promotion and marketing of products to health care providers (including health plans and PBMs) and direct-to-consumer advertising; and by administering patient assistance programs that provide the firm's products at nominal cost to low-income consumers.

Manufacturers also play an important role in ensuring the safety of the pharmaceutical supply chain by producing informational labeling for prescribers and consumers that is consistent with the terms and conditions of a drug's approval by the U.S. Food and Drug Administration (FDA), and by using electronic bar-coding technology on drug packaging that may be used to track individual production lots, and to prevent prescribing errors.

*Overview of Pharmaceutical Manufacturing Industry*

Pharmaceutical manufacturing is a large global industry.  In 2003, worldwide pharmaceutical industry sales totaled $491.8 billion, an increase in sales volume of 9 percent over the preceding year.[1]  The U.S. represents the largest single national market for pharmaceuticals, accounting for 44 percent of global industry sales in 2003, or a total of $216.4 billion, which was an increase of approximately 12 percent from the previous year's figure.[2]

After a decade of significant mergers and acquisitions by drug companies, a relatively few large, multinational firms comprise the bulk of the brand pharmaceutical manufacturing industry today.  The ten largest pharmaceutical corporations, as measured by U.S. sales, accounted for almost 60 percent of total U.S. sales in 2004:

**Exhibit 2.  Top 10 Pharmaceutical Corporations by U.S. Sales, 2004**

| Rank | Corporation | U.S. Sales ($ Billions) | % Growth Over Previous Year | % Market Share |
|---|---|---|---|---|
| 1 | Pfizer | $30.7 | 5 | 13.1 |
| 2 | GlaxoSmithKline | 18.8 | 1 | 8.0 |
| 3 | Johnson & Johnson | 16.2 | 7 | 6.9 |
| 4 | Merck & Co. | 15.0 | 8 | 6.4 |
| 5 | AstraZeneca | 11.3 | 12 | 4.8 |
| 6 | Novartis | 10.2 | 7 | 4.3 |
| 7 | Sanofi-Aventis | 10.0 | 13 | 4.3 |
| 8 | Amgen | 9.5 | 23 | 4.1 |
| 9 | Bristol-Myers Squibb | 9.2 | -4 | 3.9 |
| 10 | Wyeth | 8.2 | 11 | 3.5 |
|  | Total, Top 10 | 139.1 | -- | 59.3 |

Source: IMS Health, IMS National Sales Perspectives,[TM] February 2005, accessed 2/28/05 at http://www.imshealth.com/ims/portal/front/articleC/0,2777,6599_49695983_69891374,00.html

---

[1]IMS Health, "Bruised But Triumphant," *Medical Marketing and Media*, May 2004, accessed at http://www.imshealth.com/vgn/images/portal/cit_40000873/23/12/55250930BruisedTriumphant081804.pdf
[2]IMS Health, "IMS Reports 11.5 Percent Dollar Growth in '03 U.S. Prescription Sales," February 17, 2004, accessed at http://www.imshealth.com/ims/portal/front/articleC/0,2777,6599_3665_44771558,00.html. Prescription sales figures reported by IMS Health represent manufacturer prices.

When measured by prescription volume, the "top 10" list is similar but not identical, as a few generic drug manufacturers appear on the list:

**Exhibit 3.  Top 10 Pharmaceutical Corporations by Total U.S. Dispensed Prescriptions, 2004**

| Rank | Corporation | U.S. Prescriptions (Millions) | % Growth Over Previous Year | % Market Share |
|------|-------------|-------------------------------|------------------------------|-----------------|
| 1 | Pfizer | 360.7 | -4 | 10.2 |
| 2 | Novartis | 225.5 | -2 | 6.4 |
| 3 | Teva* | 221.2 | 7 | 6.3 |
| 4 | Mylan Labs* | 215.2 | 4 | 6.1 |
| 5 | Watson* | 175.6 | 7 | 5.0 |
| 6 | GlaxoSmithKline | 138.8 | -13 | 3.9 |
| 7 | Merck & Co. | 129.5 | 3 | 3.7 |
| 8 | AstraZeneca | 100.4 | 11 | 2.9 |
| 9 | Johnson & Johnson | 95.6 | -9 | 2.7 |
| 10 | Abbott | 91.5 | -4 | 2.6 |
| | Total, Top 10 | 1754.0. | | 49.8 |

* Generic drug manufacturers
Source: IMS Health, National Prescription Audit[TM]Plus, January 2005, accessed 2/28/05 at http://www.imshealth.com/ims/portal/front/articleC/0,2777,6599_49695974_68913574,00.html

Exhibit 4 provides a description of the generic pharmaceutical market:

**Exhibit 4.  Top 10 Generic Manufacturers by Total Global Sales, 2003**

| Rank | Corporation | Global Sales ($ Millions) | % Growth Over Previous Year |
|------|-------------|---------------------------|------------------------------|
| 1 | Sandoz | $4,004.0 | |
| 2 | Teva Pharmaceutical Industries Limited | 3,276.4 | 30.1 |
| 3 | IVAX Corporation | 1,420.3 | 18.6 |
| 4 | Mylan Laboratories Inc. | 1,269.2 | 15.0 |
| 5 | Alpharma Inc. | 1,297.3 | 4.8 |
| 6 | Andrx Corporation | 1,046.3 | 35.7 |
| 7 | Barr Pharmaceuticals, Inc. | 902.9 | -24.1 |
| 8 | Par Pharmaceutical Companies, Inc. | 661.7 | 73.4 |
| 9 | American Pharmaceutical Partners, Inc. | 351.3 | 26.6 |
| 10 | Eon Labs, Inc. | 329.5 | 34.9 |

Source: Hoover's, Inc.  Hoover's Online, accessed 1/03/2005.

To convey the size of the pharmaceutical manufacturing industry from the perspective of individual products, the following tables present data on the biggest selling pharmaceutical products in the United States in 2004, measured by prescriptions dispensed and by sales in dollars.  Exhibits 5 and 6 are for individual drug products, while Exhibits 7 and 8 are for broader therapeutic classes of drugs.

**Exhibit 5.  Top 10 Products by Total U.S. Dispensed Prescriptions, 2004**

| Rank | Product | Manufacturer | Prescriptions (Millions) | % Growth Over Previous Year | % Market Share |
|---|---|---|---|---|---|
| 1 | Lipitor | Pfizer | 74.8 | 9 | 2.1 |
| 2 | HYCD/APAP | Mallinckrodt | 49.5 | 12 | 1.4 |
| 3 | Synthroid | Abbott | 47.4 | -5 | 1.3 |
| 4 | Norvasc | Pfizer | 38.3 | 5 | 1.1 |
| 5 | Toprol-XL | AstraZeneca | 35.0 | 18 | 1.0 |
| 6 | Zoloft | Pfizer | 33.1 | 1 | 0.9 |
| 7 | Zocor | Merck | 29.6 | 1 | 0.8 |
| 8 | HYCD/APAP | Watson | 29.0 | -2 | 0.8 |
| 9 | Albuterol | Warrick | 26.8 | 0 | 0.8 |
| 10 | Amoxicillin | Teva | 26.2 | -5 | 0.7 |

Source: IMS Health, National Prescription Audit[TM]Plus, January 2005, accessed 2/28/05 at
http://www.imshealth.com/ims/portal/front/articleC/0,2777,6599_49695974_68913594,00.html

**Exhibit 6.  Top 10 Products by U.S. Sales, 2004**

| Rank | Product | Manufacturer | U.S. Sales ($ Billions) | % Growth Over Previous Year | % Market Share |
|---|---|---|---|---|---|
| 1 | Lipitor | Pfizer | $7.7 | 14 | 3.3 |
| 2 | Zocor | Merck | 4.6 | 4 | 1.9 |
| 3 | Prevacid | TAP | 3.8 | -5 | 1.6 |
| 4 | Nexium | AstraZeneca | 3.8 | 23 | 1.6 |
| 5 | Procrit | Ortho Biotech | 3.2 | -3 | 1.4 |
| 6 | Zoloft | Pfizer | 3.1 | 8 | 1.3 |
| 7 | Epogen | Amgen | 3.0 | -4 | 1.3 |
| 8 | Plavix | Sanofi-Synthelabo | 3.0 | 33 | 1.3 |
| 9 | Advair Diskus | GlaxoSmithKline | 2.9 | 26 | 1.2 |
| 10 | Zyprexa | Eli Lilly | 2.8 | -10 | 1.2 |

Source: IMS Health, IMS National Sales Perspectives,[TM] February 2005, accessed 2-28-05 at
http://www.imshealth.com/ims/portal/front/articleC/0,2777,6599_49695983_69890103,00.html

**Exhibit 7.  Top 10 Therapeutic Classes by Total U.S. Dispensed Prescriptions, 2004**

| Rank | Therapeutic Class | Total Prescriptions (Millions) | % Growth over Previous Year | % Market Share |
|---|---|---|---|---|
| 1 | Codeine | 157.6 | 5 | 4.5 |
| 2 | SSRIs/SNRIs | 147.4 | 4 | 4.2 |
| 3 | ACE Inhibitors | 143.8 | 5 | 4.1 |
| 4 | HMG-COA Reductase Inhibitors (Statins) | 139.8 | 11 | 4.0 |
| 5 | Beta Blockers | 120.6 | 7 | 3.4 |
| 6 | Proton Pump Inhibitors | 93.1 | -2 | 2.6 |
| 7 | Thyroid Hormone, Synthetic | 90.0 | 6 | 2.6 |
| 8 | Calcium Blockers | 88.4 | 0 | 2.5 |
| 9 | Seizure Disorders | 84.8 | 7 | 2.4 |
| 10 | Oral Contraceptives | 82.5 | -3 | 2.3 |

Source: IMS Health, National Prescription Audit[TM]Plus, January 2005, accessed 2/28/05 at
http://www.imshealth.com/ims/portal/front/articleC/0,2777,6599_49695974_68914714,00.html

**Exhibit 8.  Top 10 Therapeutic Classes by U.S. Sales, 2004**

| Rank | Therapeutic Class | U.S. Sales ($ Billions) | % Growth Over Previous Year | % Market Share |
|------|-------------------|------------------------:|----------------------------:|---------------:|
| 1 | HMG-COA Reductase Inhibitors (Statins) | $15.5 | 12 | 6.6 |
| 2 | Proton Pump Inhibitors | 12.5 | -3 | 5.3 |
| 3 | SSRIs/SNRIs | 11.0 | 1 | 4.7 |
| 4 | Antipsychotics, Other | 9.1 | 12 | 3.8 |
| 5 | Seizure Disorders | 8.2 | 19 | 3.5 |
| 6 | Erythropoietins | 8.0 | 8 | 3.4 |
| 7 | Antiarthritics, COX-2 Inhibitors | 5.3 | 0 | 2.3 |
| 8 | Calcium Channel Blockers | 4.4 | 1 | 1.9 |
| 9 | Angiotensin II Antagonists | 4.4 | 24 | 1.9 |
| 10 | Ace Inhibitors | 3.9 | -5 | 1.7 |

Source: IMS Health, IMS National Sales Perspectives,[TM] February 2005, accessed 2/28/05 at
http://www.imshealth.com/ims/portal/front/articleC/0,2777,6599_49695983_69891394,00.html

### *Wholesale Distributors*

Wholesale distributors purchase pharmaceutical products from manufacturers and distribute them to a variety of customers, including pharmacies (retail and mail-order), hospitals, and long-term care and other medical facilities (e.g., community clinics, physician offices and diagnostic labs).  Some wholesalers sell to a broad range of potential clients while others specialize in sales of particular products (e.g., biologic products) or sales to particular types of customers (e.g., nursing homes).

In the past, wholesalers limited their operations to a traditional distribution function. They provided the link between manufacturers and pharmacies (and other entities, e.g., government sites and physicians) by warehousing products and managing inventory.  While "traditional" distribution services remain the cornerstone of the business, the industry has developed a more comprehensive list of services in response to the evolving

---

**Exhibit 9.  Wholesale Distribution Industry**

In 2004, the wholesaler distributor industry is valued at approximately $212 billion in annual U.S. sales.  The following three wholesalers represent 88% of the market:

**1) McKesson**
- Merged with health-care software giant HBO & Co. in 1998
- Rolling 12-month sales as of September 2004: $72.2 billion**;** Market Share: 34.1%

**2) Cardinal Health**
- From 1999 – 2002, Cardinal merged with many other wholesalers including Allegiance Corporation and Bindley Western Industries
- Rolling 12-month sales as of September 2004: $63.3 billion**;** Market Share: 29.9%

**3) AmerisourceBergen**
- Began operations in August 2001 following merger of AmeriSource Health Corporation and Bergen Brunswig Corporation
- Rolling 12-month sales as of September 2004: $52.4 billion**;** Market Share: 24.8%

Source: *GICS Sub-Industry Revenue Share (09/04/2004).*
Copyright © 2004 Standard & Poor's.

marketplace.  Today, wholesale distributors provide a number of specialized services, including specialty drug distribution, drug repackaging, electronic order services, reimbursement support, and drug buy-back programs.[3]

The wholesale distribution industry has gone through significant change and consolidation in the last 30 years, due in part to the increasing pressures to lower costs. Between 1975 and 2000, the number of wholesale distributors in the U.S. declined from approximately 200 to fewer than 50.[4]  The top three wholesale distributors, McKesson, Cardinal Health, and Amerisource-Bergen, account for almost 90 percent of the entire wholesale drug market.[5]

This consolidation has forced the industry to change its revenue model, evolving its core distribution business into a low-margin enterprise that makes money by maximizing economies of scale, creating physical efficiencies in the distribution system (such as "just-in-time" deliveries to customers), and realizing financial efficiencies (such as retaining discounts for prompt payment).  The industry has also extended and augmented its business model by moving into specialty pharmacy and disease management services.

### *Pharmacies*

Pharmacies are the final step on the pharmaceutical supply chain before drugs reach the consumer/patient.  Pharmacies purchase drugs from wholesalers, and occasionally directly from manufacturers, and then take physical possession of the drug products. After purchasing pharmaceuticals, pharmacies assume responsibility for their safe storage and dispensing to consumers.  Pharmacy operations include maintaining an adequate stock of drug products, providing information to consumers about the safe and effective use of prescription drugs, and facilitating billing and payment for consumers participating in group health benefit plans.

Pharmacies also serve as a vital information link between PBMs, drug manufacturers, and wholesale distributors.  Unlike most other sectors of the health care delivery system in the U.S., the pharmaceutical supply chain is highly automated and virtually all claims transactions are handled electronically, rather than on paper.  Since they are the final point of sale for pharmaceuticals and the interface between the supply chain and the consumer, pharmacies generate the prescription drug claims information that PBMs, as well as heath plans, employers, governments, and other payers, rely upon to measure consumer activity.  Other types of information, both quality-focused (e.g., drug-drug interaction warnings) and utilization management-based (e.g., formulary compliance

---

[3] Drug buy-back programs are offered by manufacturers and are facilitated by wholesale distributors.  Buy-back programs are intended to minimize the financial risk that pharmacies must assume in stocking products by allowing them to sell unused products or products with near-term expiration dates back to the manufacturer.

[4] Goldman Sachs Industry Report: Health Care Technology & Distribution, February 27, 2003.

[5] Standard & Poor's, *GICS Sub-Industry Revenue Share,* September 4, 2004.

messaging) can originate from other parts of the supply chain, in particular from PBMs, to the pharmacy as a prescription is being dispensed.  As the final actor in the supply chain, it is up to the pharmacy to take action based on the information provided.  For example, the pharmacy is expected to contact the prescribing physician if the drug prescribed is not on the patient's health plan's formulary or if a lower-cost therapeutic alternative is available.

There are several types of pharmacies, including independent pharmacies, chain drug stores, pharmacies in supermarkets and other large retail establishments, and mail-order pharmacies.  Most pharmacies purchase their drug supply from a wholesale distributor, although in some cases, large institutional and retail chain pharmacies, specialty pharmacies, and mail-order pharmacies obtain drugs directly from a manufacturer.  These organizations can deal directly with manufacturers because they already possess the operational infrastructure necessary to bypass wholesalers – warehousing facilities, distribution vehicles, and inventory control systems.  Once a pharmacy takes possession of the drug products, it distributes the products to physicians or directly to consumers.  In addition, there are specialty pharmacies, which specialize in the distribution of high-cost and more complex drug therapies (e.g., self-injectable drugs and biologics).

In 2003, there were 55,000 community retail pharmacies, including 19,000 independent drug stores, 21,000 chain drug stores, and 16,000 pharmacies in supermarkets and other retail merchants.[6]  In 2004, there were 3.5 billion prescriptions dispensed in the United States through community pharmacies, including about 1.8 billion filled at chain drug stores, 780 million filled at independent pharmacies, and 470 million filled in supermarkets.  Another 214 million prescriptions were filled through the mail.[7]

---

[6] National Association of Chain Drug Stores, http://www.nacds.org/user-assets/PDF_files/Retail_Outlets2003.pdf.
[7] IMS Health, National Prescription Audit[TM]Plus, January 2005, accesses 2/28/05 at http://www.imshealth.com/ims/portal/front/articleC/0,2777,6599_49695974_68913551,00.html

Page 10

Exhibits 10 and 11 depict the distribution of pharmaceuticals in the U.S. through the various types of "retail" pharmacy channels:



**Exhibit 10.  Number of Prescriptions by Pharmacy Distribution Channel, 2004**

Note:  Represents total dispensed prescriptions, including insulin dispensed through chain, food store, independent, long term care, and mail service pharmacies.
Source:  IMS Health, National Prescription Audit™ Plus, January 2005, accessed 2/28/05 at www.imshealth.com/ims/portal/front/articleC/0,2777,6599_49695974_68913551,00.html



**Exhibit 11.  Drug Sales by Pharmacy Distribution Channel, 2004**

Note:  Represents wholesale prices. Sales include prescription products only.
Source:  IMS Health, IMS National Sales Perspectives,™  February 2005, accessed 2/28/05 at http://www.imshealth.com/ims/portal/front/articleC/0,2777,6599_49695983_69891354,00.html

Like all other parts of the pharmaceutical supply chain, the pharmacy industry has gone through significant consolidation as well as diversification of its businesses over the past five to ten years. Several retail pharmacy chains have merged, primarily as a way to gain buying power for use in negotiations with drug manufacturers and wholesale distributors.

As shown in Exhibit 12, Walgreens, CVS, and Rite Aid were the top three retail pharmacy chains based on market capitalization:

**Exhibit 12. Top 5 Retail Pharmacy Chains in the U.S., By Market Capitalization**

| Rank | Pharmacy Chain | 2004 Market Cap |
|------|----------------|-----------------|
| 1 | Walgreens Company | $35.2 bil. |
| 2 | CVS Corporation | $16.1 bil. |
| 3 | Rite Aid | $2.6 bil. |
| 4 | Longs Drug Stores | $0.7 bil. |
| 5 | Duane Reade | $0.4 bil. |
| | Total for Industry | $103.0 bil. |

Source: Health Strategies Consultancy analysis of Pharmacy/Drug Store Industry based on market cap data obtained from Dow Jones (factiva.com)[8]

In addition to traditional retail pharmacy services, consumers have increasingly been using specialty and mail-order pharmacies over the past several years. Growth in the use of these types of pharmacies is expected to increase rapidly for the foreseeable future, as more payers adopt the view that these specialized retail distribution channels can be important components of their strategies to manage the rate of growth in their pharmacy benefit expenditures. Residents of long-term care facilities (LTC) rely almost exclusively on dedicated LTC pharmacies.

- ***Specialty pharmacies*** serve patients with chronic diseases by dispensing high-cost biotechnology drugs. Specialty pharmaceuticals typically are administered by injection or infusion (intravenously), and often, are administered by a clinical professional in a doctor's office. The diseases treated with specialty pharmaceuticals range from relatively common conditions, some of which are treated with multiple drug therapies, such as HIV/AIDS, multiple sclerosis, cancer, and rheumatoid arthritis, to rare diseases that are treated with a single drug therapy, such as hemophilia and growth hormone deficiency. The specialty pharmacy industry today is dynamic, with new companies entering continuously. Types of firms in the market range from publicly-traded stand-alone firms to subsidiaries of PBMs, retail pharmacies, and home health companies.[9,10]

---

[8] Market capitalization is the value of a company's outstanding shares of stock, which is measured by multiplying the number of shares outstanding by the current share price. Speaking very generally, the larger the market capitalization, the more financially stable the company.

[9] Credit Suisse First Boston, "Pharmacy Benefit Managers and Specialty Pharmacies: Initiating Coverage," July 14, 2003, p. 22.

[10] Raymond James & Associates, Inc., "Specialty Drug Distribution," July 16, 2002, p. 3.

- ***Mail-order pharmacies*** receive prescriptions by mail, fax, phone, or Internet at a central location; process the prescription in large, mostly automated centers; and mail the prescribed drugs back to the consumer.  An aging population, convenience, and the recent upswing in pharmaceutical treatments for common chronic ailments, such as diabetes and depression, are some of the driving forces behind the rapid growth in the use of mail-order pharmacies.[11]  While representing a small overall percentage of total prescriptions filled (approximately 6.1 percent in 2004[12]), mail-order pharmacy sales remained the fastest-growing sector of the U.S. prescription drug retail market in 2004, increasing by 18 percent over the previous year.[13]  The majority of mail-order facilities are owned and operated by PBMs, and a number of the large retail pharmacy chains also own mail-order pharmacies.[14]

- ***Long-term care pharmacies***, sometimes called institutional pharmacies, are a third type of specialized retail pharmacy.  Long-term care pharmacies address the special needs of nursing homes, providing packaging for controlled administration (called unit-dose supply or bubble packs), and special services that are more extensive than those provided by retail pharmacies.  These special services include: quality assurance checks, emergency drug kits and medication carts, regular and emergency (24-hour-a-day) delivery services, and in-service training programs for nurse aides, nurses, and other professional nursing facility staff.  Four national chains provide the bulk of institutional pharmacy services to nursing homes: Omnicare, PharMerica, NeighborCare, and Kindred Healthcare.  In 2003, these four chains served over two-thirds of all nursing home beds and had collective revenues of more than $6 billion.[15]  The two largest national long-term care pharmacies, Omnicare and PharMerica (which is a subsidiary of AmerisourceBergen, a wholesale distributor), provide drugs to over half of the nursing home beds in the United States.  Omnicare is the largest provider with over $3 billion in 2003 revenues.[16]

### *Pharmacy Benefit Managers (PBMs)*

According to one leading report on the PBM industry, PBMs currently manage prescription drug benefits for as much as 57 percent of the U.S. population,[17] and the

---

[11] National Health Policy Forum, *The ABCs of PBMs*, October 1999.
[12] IMS Health, National Prescription Audit™Plus, January 2005, accessed 2/28/05 at http://www.imshealth.com/ims/portal/front/articleC/0,2777,6599_49695974_68913551,00.html
[13] IMS Health, IMS National Sales Perspectives,™ February 2005, accessed 2/28/05, at http://www.imshealth.com/ims/portal/front/articleC/0,2777,6599_49695983_69891354,00.html
[14] California Health Care Foundation, *Navigating the Pharmacy Benefits Marketplace*, January 2003.
[15] Long-Term Care Pharmacy Association, 2003.
[16] Omnicare Annual Report, 2003.
[17] Atlantic Information Services (AIS), Inc., *A Guide to Drug Cost Management Strategies (2nd Edition)*, 2004, p. 329.  AIS states that its data are based on a quarterly survey that the firm has been using to track all publicly-traded and privately-held PBMs since 2000.

National Association of Chain Drug Stores estimates that approximately two-thirds of all prescriptions written in the U.S. are processed by a PBM.[18] While not a direct link in the physical supply chain for pharmaceutical products (PBMs in most instances do not take possession or control of prescription drugs), PBMs have become an integral part of most consumer drug purchases. PBMs work with third party payers (private insurers, self-funded employers and public health programs) to manage consumer drug purchases by defining which drugs will be paid for and the amounts that the pharmacy will receive and the consumer must pay out-of-pocket when the prescription is filled.

PBMs have evolved over the last three decades from basic claims administrators to more complex organizations offering a wide range of prescription drug management tools. In addition to offering their basic services – claims processing, record keeping, and reporting programs – PBMs offer their customers a wide range of services including drug utilization review, disease management, and consultative services. PBMs also assist clients with establishing their benefit structure. Options for plan design include: developing and maintaining a prescription drug formulary; developing a network of pharmacy providers; and providing mail order fulfillment services. A PBM's core services and tools include:

- **Formularies:** PBMs use formularies to negotiate deeper price discounts with manufacturers, set cost-sharing levels to influence beneficiary utilization rates, and encourage beneficiaries to use a mix of preferred or lower-cost covered products.

- **Rebates:** PBMs negotiate with pharmaceutical manufacturers for rebates on products selected for the formulary. Rebate amounts are based on the contracts negotiated between the PBM and plan sponsors and the PBM and manufacturers. Typically, contracts are structured so that PBMs retain a portion of the rebate in exchange for developing the formulary and negotiating with manufacturers.

- **Pharmacy Networks:** Pharmacy networks consist of pharmacies that have agreed to dispense prescription drugs and provide pharmacy services to a health plan's enrollees under specified terms and conditions. Pharmacy networks can be broad or narrow. These networks allow PBMs to lower prescription drug prices by negotiating the reimbursement rate and dispensing fee with pharmacies.

- **Mail-Order Pharmacy Service:** Almost all PBMs offer mail-order pharmacy service, especially targeted toward individuals with chronic medical conditions who take maintenance medications. The medications are dispensed typically in 90-day amounts per prescription, as opposed to the usual 30-day supply per prescription dispensed by a retail pharmacy. PBMs are able to lower the cost of pharmaceuticals to consumers and payers by using mail-order services to more successfully drive market share for particular products, based on the terms of

---

[18] Ibid., p. 331.

contracts negotiated with pharmaceutical manufacturers (e.g., encouraging generic and branded therapeutic substitution and other forms of managing formulary compliance), and (relative to the typical retail pharmacy operation) by automating dispensing processes.

- **Claims Adjudication:** All PBMs use a real-time, point-of-sale system linked to retail and mail-order pharmacies and distribution centers.  This process provides verification of coverage, formulary restrictions, drug interactions, and individual co-pay information.  This process also provides prescription drug information back at the PBM data warehouse, where it can be used for customized reporting and quality-focused clinical and intervention programs.

- **Generic and Therapeutic Substitution:** Generic substitution promotes the shift from brand to chemically equivalent generic drugs as a cost savings device.  Therapeutic interchange programs promote the use of preferred drugs (i.e., drugs on a plan's formulary) that are determined to be clinically similar.

- **Quality-Focused Programs:** PBMs develop programs that provide disease management, compliance strategies, and other clinical expertise promoting the safe, educated use of prescription drugs.

PBMs generally do not take physical possession of prescription drugs when performing their core pharmaceutical management functions.  However, in their mail-order and specialty-pharmacy businesses, PBMs buy drugs from wholesalers or manufacturers and dispense them directly to patients in a manner similar to other pharmacies.

During the 1990s, there was a great deal of jockeying within the PBM market, a highly penetrated market compared to just a decade ago.  In order to remain competitive, PBMs have merged and acquired new businesses.  Most recently, in March 2004, Caremark acquired AdvancePCS; in 2001, Express Scripts acquired National Prescription Administrators; in 2000, Medco Health Solutions acquired Provantage; and in 1998, Express Scripts acquired Value Rx.  As shown in Exhibit 13, the PBMs that controlled the most market share measured by prescriptions per year in 2003 were Medco Health Solutions, ACS State Healthcare, AdvancePCS/Caremark, and Express Scripts.[19]



Exhibit 13.  PBM Market Share by Number of Prescriptions per Year, 2003

Medco Health Solutions 18%
Other PBMs 17%
Wellpoint Pharmacy Mgmt. 4%
First Health Services 5%
MedImpact Healthcare Systems 6%
ACS State Healthcare 16%
Caremark & AdvancePCS 20%
Express Scripts 14%

*Note: Caremark acquired AdvancePCS in March 2004.
Source: AIS, *A Guide to Drug Cost Management Strategies*, 2nd Edition (2004), Fig. 12.13.

[19] Atlantic Information Services, Inc., *A Guide to Drug Cost Management Strategies*, 2nd Edition, 2004.

## III.  The Flow of Money and Key Financial Relationships in the U.S. Pharmaceutical Supply Chain

The flow of money between manufacturers and end-users is more complex than the physical distribution of drugs.  The manufacturer typically interacts with three primary entities when dealing with price: wholesale distributors, retail pharmacies, and pharmacy benefit managers.  Pharmaceutical manufacturers negotiate separate contracts with these entities and offer various discounts and rebates based largely on the entities' varying ability to influence the quantity of drugs that are sold. This section looks at these financial relationships and charts the flow of funds among the key players, starting with manufacturers, who play by far the most important role in establishing prices.

### *Pharmaceutical Manufacturers*

Manufacturers have the most influence over pharmaceutical prices.  They develop algorithms to account for expected demand for the product, future competition for the product, and projected marketing costs, and use those algorithms to establish the "wholesale acquisition cost" (WAC), which is the baseline price at which wholesale distributors purchase products.  After the WAC is established, the average wholesale price (AWP), or the retail list price, is established either by the manufacturer or by one of the companies that publishes price compendia.  The AWP, and sometimes the WAC, is listed in drug compendia published by a small number of private firms, such as the Red Book, published by Thomson Medical Economics, and First DataBank. The AWP has two purposes: (1) it is often used by public and private third-party payers as the basis for reimbursement, and (2) it often serves as the base price for negotiations between manufacturers and private sector purchasers of drugs (e.g., health plans, pharmacy benefit managers, self-insured employers, etc.).

The negotiation process and the price points on which negotiations are based are different for brand and generic manufacturers.  Brand manufacturers typically offer discounts based on a percentage of AWP or WAC, depending upon the purchaser.  End purchasers can typically acquire brand drug products for a price in a range of AWP minus 5 to 40 percent, depending upon their purchasing power or that of their designated agent, such as a PBM.  Generic pharmaceutical manufacturers operate in a more aggressive and dynamic negotiation environment than brand manufacturers and thus the prices for generic drugs change much more frequently, sometimes daily, in response to market forces.   The most common kinds of discounts and rebates include: retroactive rebates based on market share (i.e., rebates paid by the manufacturer to the pharmacy or PBM based on its ability to direct consumers to certain products); volume discounts (discounts that are triggered when predetermined sales volume targets are met); and "prompt pay" discounts (discounts that are triggered when the purchaser reimburses the manufacturer in an expedited fashion).

Pricing for prescription drugs purchased and dispensed by certain federal programs, including Medicaid and the Veterans Administration, are subject to special rules which

generally result in those programs getting lower prices than other purchasers.  These rules are outlined in the Appendix.

---

### *PRICING TERMS DEFINED*

- ***Average Manufacturer Price (AMP)***: The average price paid to a manufacturer by wholesalers for drugs distributed to retail pharmacies.  AMP was a benchmark created by Congress in 1990 in calculating Medicaid rebates and is not publicly available.  (See Appendix for additional discussion of pharmaceutical pricing in Medicaid).
- ***Average Sales Price (ASP)***: The weighted average of all non-Federal sales to wholesalers net of chargebacks, discounts, rebates, and other benefits tied to the purchase of the drug product, whether it is paid to the wholesaler or the retailer.  The basis for reimbursement for products covered under Medicare Part B changed under the Medicare Modernization Act of 2003 from AWP to ASP.
- ***Average Wholesale Price (AWP)***: Although not defined in statute, AWP is recognized as retail list price (sometimes referred to as a "sticker" price) and is currently used by some public and private third-party payers as the basis for reimbursement (e.g., AWP minus 5 or 25 percent).  AWP has been widely criticized as a price that is (1) not reflective of the true market price, and (2) easily manipulated.  The basis for reimbursement for products covered under Medicare Part B changed under the Medicare Modernization Act of 2003 from AWP to average sales price (ASP).
- ***Estimated Acquisition Cost (EAC)***: EAC is a state Medicaid Agency's best estimate of the price generally paid by pharmacies for a particular drug.
- ***Maximum Allowable Cost (MAC)***: MAC lists are designed to cap reimbursement for certain generic and multi-source brand products.  States and private payers with MAC programs typically publish lists of selected generic and multi-source brand drugs along with the maximum price at which the program will reimburse for those drugs.  In general, pharmacies will receive payment no higher than the MAC price when billing for drugs on a MAC list.
- ***Wholesale Acquisition Cost (WAC)***: The price paid by a wholesaler for drugs purchased from the wholesaler's supplier, typically the manufacturer of the drug.  Publicly disclosed or listed WAC amounts may not reflect all available discounts.

---

### *Wholesale Distributors*

Wholesale distributors purchase drugs from manufacturers.  For branded products, the purchase price is fairly uniform, with little negotiation on the part of the wholesale distributor.  The distributor typically purchases branded products for a discounted rate off of WAC.  Examples of discounts for branded products include volume discounts, prompt pay discounts, and discounts related to the sale of short-dated products (because the wholesaler is assuming a risk that the product will expire before it can be resold).  The wholesale distributor then sells the product to its end consumer, typically a pharmacy, at WAC plus some negotiated percentage.

For generic products, the purchase price is highly variable, largely depending upon competition in the class and the ability of the wholesale distributor to drive market share or increase the volume sold.  In this case, wholesale distributors play a larger role in the negotiation of the price of the product.  The price to the end consumer also is highly elastic depending upon the negotiated contracts with the retail pharmacies.

In some cases, the wholesale distributor may facilitate discounts negotiated between manufacturers and other customers. For example, wholesaler A may distribute drugs to pharmacy B based on negotiations between pharmacy B and manufacturer C. Although wholesaler A directly distributes the drugs to pharmacy B, it plays a minimal part in pricing negotiations for these drugs. In this case, wholesalers use an important pricing mechanism, *chargeback*, which allows them to carry products destined for customers paying very different prices to manufacturers. The wholesaler keeps track of sales to various customers under prices negotiated between the manufacturer and the customer. The wholesaler then "charges back" the manufacturer for any difference between the negotiated prices paid by the customer and the wholesaler's cost of goods (WAC).

### *Pharmacies*

Payment for prescription drugs flow from the pharmacy to the manufacturer according to a negotiated contract involving manufacturers, PBMs, and pharmacies. Retail pharmacies negotiate with manufacturers for discounts and rebates based on the pharmacy's ability to sell specific volumes of certain drugs or achieve a certain share of a specified market. As discussed in the wholesale distributor section, pharmacies may be able to negotiate discounts with manufacturers that are more substantial than the wholesale distributor's cost. In these instances, the wholesale distributor facilitates the discount and "charges back" the manufacturer for any difference between the negotiated prices paid by the customer and the wholesaler's cost of goods (WAC). Pharmacies also negotiate with PBMs for inclusion in a PBM's pharmacy network and for reimbursement for the cost of the drug plus dispensing fees.

Manufacturers may offer volume discounts on selected drugs to pharmacies when they achieve predetermined market share targets. These discounts provide an incentive for pharmacists to work with patients and physicians to switch products from a prescribed non-preferred drug to a preferred drug.

Pharmacies contract with PBMs to join their pharmacy network. This structure provides pharmacies with guaranteed, stable reimbursement from private payers and access to a greater number of customers. The network consists of a group of retail and independent pharmacies and serves to offer plan members with lower prescription drug costs. As part of the pharmacy network contract, retail pharmacies must agree to a guaranteed reimbursement formula for prescription drugs. For brand-name medications, the reimbursement formula is usually determined by subtracting a negotiated percentage from the drug's AWP and adding the dispensing fee. For generic drugs, reimbursement may be determined in the same way as for a brand drug (for less competitive generic drug classes), but more often is based on an amount specified referred to as the maximum allowable cost (MAC).

Smaller retail stores, such as independent pharmacies and smaller retail chains, either purchase directly from wholesalers – at a price significantly higher than retail pharmacies – or join group-purchasing organizations (GPOs). As members of a GPO, small

pharmacies receive the benefits of volume purchasing by leveraging their combined purchasing power to negotiate discount pricing from wholesalers or even in some cases from manufacturers.  Some of these groups further reduce their costs through direct rebate deals offered by manufacturers.

Mail-order and specialty pharmacy services are increasingly becoming a more attractive and demanded option for health plan sponsors and other payers seeking to rein in pharmaceutical expenditures for their members.  Mail-order and specialty pharmacies are able to generate increased savings by driving market share, streamlining the distribution chain, and automating drug dispensing processes.

- ***Specialty Pharmacy:*** Most specialty pharmacy providers manage the cost of specialty pharmaceuticals by negotiating directly with manufacturers and by running quality-focused programs intended to improve patient care and lower costs.  Large PBMs or retail pharmacy chains own a number of the specialty pharmacies, and in some cases these entities are able to negotiate greater discounts with manufacturers.[20]  Nearly all specialty pharmacies also administer programs designed to enforce patient compliance.  Industry representatives claim that these programs save the patient and health plan money by averting acute incidences.

- ***Mail-Order Pharmacy:*** In 2000, the U.S. Department of Health and Human Services estimated that mail-order pharmacies were able to generate savings between two and 35 percent compared to retail pharmacies.[21]  Representatives from the mail-order industry attribute these savings to their ability to "manage" prescriptions because the majority of mail-order prescriptions are filled in 90-day units (the equivalent of three prescriptions).[22]  The considerable lead time associated with filling a 90-day prescription gives the pharmacists and other clinical staff at a mail-order pharmacy the time to analyze whether the prescribed drug is on the client's (i.e., insurer's or health plan's) approved formulary, if there is a generic equivalent available, and if there are any potential interactions of the prescribed drug with other medications the member's physician or physicians may have also prescribed.

- ***Long-Term Care Pharmacy:*** LTC pharmacies have long-term, almost exclusive contracts with nursing homes to provide medications and services for residents.  LTC pharmacies capture a large volume of customers in this way.  LTC pharmacy chains have developed formularies and use them in many states that do not have Medicaid preferred drug lists (PDLs) applicable in the nursing home setting.  The large LTC pharmacy chains negotiate rebates with manufacturers in exchange for

---

[20] Berg, Kevin I. "Health Care Industry Report: The Down Low," *First Albany Corporation* 6 (2003): 1-153.

[21] Department of Health and Human Services, *Report to the President: Prescription Drug Coverage: Spending Utilization and Prices*, April 2000.

[22] California HealthCare Foundation, *Navigating the Pharmacy Benefits Marketplace*, January 2003.

moving market share on their formularies.  In addition to receiving rebates, many pharmacies are reimbursed at higher rates than acquisition costs, because they purchase drugs through wholesalers and group purchasing organizations.

### *Pharmacy Benefit Managers (PBMs)*

Although PBMs are a relatively unknown entity to the end consumer, they play a fundamental role in negotiating the price that is ultimately paid for the product through their relationships with other entities in the supply chain.

PBMs contract with health plans to manage their prescription drug costs.  Each contract is different between health plans and PBMs; however, there are generally three basic components of the payment negotiated between PBMs and their sponsors.  First, PBMs receive payment for the services they provide.  These services may include claims adjudication processing and disease management services.  Second, PBMs typically assume some type of performance risk in the contracts they negotiate.  Performance metrics can include: customer service (e.g., adequacy of pharmacy networks, timeliness of reporting), clinical quality measures (e.g., the number of people averted from taking inappropriate medications), and cost management techniques (e.g., the number of generic substitutions made in a given time period).  Third, PBMs also retain a portion of rebates they secure from manufacturers.

PBMs do not typically assume full insurance risk for drugs.  This type of risk is assumed when an insurer takes full or partial financial responsibility for claims incurred under a specified benefit.  Insurance risk can further be segmented into three sub-categories: price, utilization, and selection risk.  PBMs do not typically guarantee either the unit prices of drugs, the volume of drugs (utilization) or the kinds of patients that sign up for the drug plan (selection).  Insurance risk for drugs is often assumed by self-insured entities in the context of a full medical benefit.  For an entitiy to assume insurance risk, the entity must demonstrate that it has adequate financial reserves, be licensed and overseen by state insurance regulators, and be prepared for underwriting cycles.

While performance risk arrangements are very common for PBMs, insurance risk arrangements are not.  During the mid-1990s, some PBMs experimented with risk contracts.  ValueHealth, PCS, and Medco had contracts in which the PBM assumed full insurance risk.  The contracts typically contained actuarial carve-outs for new biotechnology products and unexpected changes in demographics, but put the PBM at risk for other drug utilization and cost.  Many of these contracts were with large manufacturing clients who were self-insured, concerned about drug spending, and bid out the pharmacy benefit competitively to multiple vendors.  The experience was uniformly negative from the PBM perspective.  The PBMs consistently lost money because they under-estimated the development and diffusion of new technology.  Many were able to negotiate out of these contracts, but some contracts persisted until the late 1990s.  Most, if not all, are now gone.

PBM relationships with manufacturers are governed under guidance from the Department of Health and Human Services (HHS) Office of the Inspector General, and subject to oversight by the Department of Justice for compliance with federal anti-kickback statutes. PBMs are further regulated in many states under consumer protection statutes.  In recent years, some industry practices, for example switching of medications and associated pricing issues, have come under scrutiny by state Attorneys General and the Department of Justice.  Allegations have also included accepting undisclosed incentives from pharmaceutical manufacturers, not passing manufacturer rebates through to plan sponsors, and driving beneficiaries unnecessarily to mail-order services for the benefit of the PBM.  False Claim Act lawsuits also have been filed by the federal government and several states.  Medco Health Solutions settled in April 2004 with twenty State Attorneys General on a case involving therapeutic interchange and price disclosure.  While this legal scrutiny has focused on a few industry practices, the typical business practices of PBMs have also been heavily scrutinized by plan sponsors, such as health plans and self-insured employers.  Further guidance from the HHS Office of the Inspector General on PBM operations and safe harbors under the anti-kickback statute is expected.[23]

According to a January 2003 study conducted by the federal Government Accountability Office (GAO), PBMs achieved significant discounts for drugs purchased at retail pharmacies (in comparison to cash-paying customers) and offered even greater discounts for their mail-order services.[24]  However, cost savings are largely driven by how restrictive or open the cost-containment programs are.  This is a point usually negotiated between the health plans and PBMs.  For example, open formularies (where consumers are free to access all prescription drugs) typically yield lower cost savings than closed formularies (where consumers are limited to certain drugs).  Cost sharing differences by the type of formulary also increase members' sensitivity to prescription drug costs and provides an incentive to use lower-cost or preferred products on the formulary.  Common private-sector, cost sharing tools include flat copayments, percent copayments with a minimum/maximum dollar amount, and front-end deductibles with a benefit maximum and/or stop loss.[25]

- ***Manufacturer-PBM Relationship:***  As discussed above, the relationship between manufacturers and PBMs is centered around inclusion of a drug on a plan's formulary and the PBM's ability to increase a manufacturer's market share for certain drugs through inclusion or exclusion on a formulary.  Manufacturers pay rebates to PBMs retroactively based on the PBM's ability to meet both of these goals.  These rebates are passed in whole or in part back to the employer.  According to the California HealthCare Foundation, PBMs are often able to secure rebates of 5-25 percent for branded drugs.[26]

---

[23] For more information about the Medco settlement, see *The Pink Sheet*, May 3, 2004, pages 22-30.
[24] U.S. Government Accountability Office, "Federal Employees' Health Benefits:  Effects of Using Pharmacy Benefit Managers on Health Plans, Enrollees, and Pharmacies," GAO-03-196, January 2003.
[25] Joanne Sica, "Managing prescription drug costs," *Employee Benefits Journal*, March 2001, pp. 35-40.
[26] California HealthCare Foundation, *Navigating the Pharmacy Benefits Marketplace*, January 2003.

- ***PBM-Pharmacy Relationship:*** As discussed above, PBMs negotiate with pharmacies for drug reimbursement and dispensing. The pharmacies negotiate for inclusion in a PBM's pharmacy network. There is often significant tension between the two entities because (1) in general, pharmacies are reimbursed by PBMs at levels below uninsured cash-paying customers and other government payers, like Medicaid, and (2) pharmacies are often required to perform more administrative tasks when filling a prescription for a PBM customer.

## IV.  Conclusion

Pharmaceuticals are a vital part of patient care, and their importance will only grow as the population ages and pharmaceutical innovation continues.  Understanding current pharmaceutical issues (including the sources of prescription drugs, pricing and discounts, cost containment methods, and brand/generic questions) requires knowledge about the various actors in the supply chain.  State and federal policymakers increasingly are looking to private sector financing strategies to shape the ways in which individuals with public coverage receive medications.  Passage of the Medicare Modernization Act of 2003 (MMA) makes knowledge about the pharmaceutical chain even more important as the large public Medicare program and its beneficiaries begin to access the chain, and pharmaceutical chain entities make changes in response to the new coverage.

The pricing of prescription drugs and the flow of money among the various links in the pharmaceutical supply chain is more complex than the physical distribution of drugs through the chain.  This complexity can result in substantial variations in what different purchasers pay for the same drugs.  As we have shown, the price of prescription drugs paid by the consumer is determined by a constellation of negotiated contracts between manufacturers, PBMs, wholesale distributors, pharmacies, and plan sponsors.  The price charged by each entity in the chain is largely driven by the ability of contracting entities to sell specific volumes of certain drugs or achieve a certain share of a specified market. It is also affected by the value each entity brings to the subsequent actors in the supply chain.

Rapid increases in spending on pharmaceuticals in recent years have led policymakers to more closely scrutinize drug pricing and the relationships among key actors in the marketplace, and the greatly enhanced federal role in the market brought about through the MMA will only intensify public interest in these areas.  Experiences with the Medicare price comparison website for the drug discount card has increased consumer and government interest in internet-based price comparisons.  The price differences highlighted by these and other analyses lead to questions about the basis for these pricing differentials.  Medicare's activities to detect and remedy fraud and abuse will also require continued oversight and need for transparency and fiscal accountability.  Public policy discussions regarding transparency and price disclosure are thus likely to continue to be active over the coming years.

## V.  Appendix

This Appendix briefly describes: (A) special pricing rules applicable to Medicaid and some other federal programs, and (B) the roles physicians, large employers, and health plans have in the pharmaceutical supply chain.

**A.      Special Pricing Rules Applicable to Federal Programs**

Several federal programs that are significant purchasers of prescription drugs have special rules for pricing.

### Medicaid

Federal rules require that states pay for brand name prescription drugs based on the lower of (1) the estimated acquisition cost (EAC) of a drug (the method most states use); or (2) the usual or customary charge to the public.  Most Medicaid programs use a drug's AWP to calculate the EAC, generally AWP minus some percentage.  An additional limit, known as the Federal Upper Limit (FUL), applies to the purchase of generic drugs.  Manufacturers who want to have their drugs covered by Medicaid also must provide rebates to state Medicaid programs.  For brand name drugs, the basic rebate is the larger of (1) 15.1% of the AMP (the average price paid to manufacturers by wholesalers for drugs distributed to retail pharmacies; the AMP is usually lower than the AWP); or (2) the difference between the AMP and the lowest price the manufacturer offers to most other purchasers.  An additional rebate is required if the price of brand name drugs rises faster than the change in Consumer Price Index.  Rebates for generic drugs are calculated by multiplying the AMP by 11%.

### Department of Veterans Affairs, Department of Defense, Public Health Service, Coast Guard

The Department of Veterans Affairs (VA) administers a program known as the Federal Supply Schedule (FSS), through which the VA and certain other government agencies can purchase prescription drugs at prices that are equal to or lower than the prices that drug manufacturers charge their "most-favored" private customers.  In addition, manufacturers must sell brand-name drugs to these agencies at a minimum of 24% off the AMP (known as the federal ceiling price).

### Section 340B Drug Pricing Program

Section 340B of the Public Health Service Act requires drug manufacturers, as a condition of having their drugs covered by Medicaid, to provide prescription drugs to certain nonfederal entities (public and disproportionate share hospitals, community health centers, certain grantees of Federal agencies, and health centers that serve migrant, homeless, public housing, and Native American populations)

at prices that are equal to or below the AMP reduced by the applicable Medicaid rebate percentage.

### B.    The Role of Physicians, Employers and Health Plans in Supply Chain

**Physicians**

Physicians play an important role in the pharmaceutical supply chain.  They are the first to interact with the consumer (i.e., patient), the end-user in the supply chain.  Doctors typically diagnose a patient's illnesses and prescribe a medication.  The physician is also responsible for ensuring the appropriate quantity and dosage of the prescribed medication.  If the prescribed drug is not covered under the patient's health plan, the physician may have to submit additional information substantiating the necessity of the specific medication for the treatment of the injury or illness.  This is called "prior authorization."  Once a drug is prescribed, patients typically fill prescriptions at their local retail pharmacies.  In some cases, the physician may administer the drug in their office (e.g., chemotherapy).

Historically, patient compliance with whatever treatment the doctor ordered was assumed as part of the physician-patient relationship; increasingly, however, patients are becoming more proactive in their interaction with physicians, particularly in the area of prescription drug treatment decisions.  Greater access to health information (fueled, in part, by widespread use of the Internet), the loosening of "direct-to-consumer" (DTC) advertising restrictions on drug manufacturers, and a general increase in the public's awareness of health care issues have helped transform many once-passive patients into inquiring and demanding consumers.[27]  This trend has affected physician choices of specific medications prescribed and the modes of delivery used, and it has increased the complexity of the information transmitted to physicians and consumers.  Now more than ever, physicians and patients/consumers play a large role in driving the market demand for pharmaceuticals.

**Large Employers**

Large employers that self insure their employees for health benefits generally negotiate contracts with PBMs (and sometimes with specialty pharmacy companies as well) to provide pharmaceutical coverage to employees.  Employers exercise control over the supply chain through the contracts they set with PBMs.  The contracts govern the prices of pharmaceuticals paid by the employer, the cost sharing to the insured population, the type of formularies that will be applied, the network standard for pharmacies, and what types of drug utilization review will be applied.  Employers pay PBMs either on an administrative services basis, or by

---

[27] *Health Affairs*, March/April 2000.

allowing the PBMs to retain a portion of manufacturer rebates.  Employers retain audit rights to exercise oversight of PBM operations.

**Health Plans**

Health plans employ the use of a range of strategies to manage prescription drug benefits, most of which involve the use of a PBM or PBM-like strategies.  There are a few remaining plans that compensate pharmacies on a fee-for-service basis, but plans are using this method less frequently, as it does not allow for use of cost-containment strategies to lower prescription drug costs.  More commonly, plans do one of the following: (1) outsource management to an external PBM, (2) operate their own PBM, or (3) outsource claims administration only.  Notable exceptions include certain group models, such as that of Kaiser Permanente, which has maintained control of pharmaceutical procurement.  Kaiser streamlines the distribution process by purchasing pharmaceuticals from manufacturers and dispensing the medications to consumers at on-site pharmacies.

Regardless of the strategy used, health plans often influence the cost-containment strategies utilized by PBMs.  For example, managed care organizations may negotiate a more restrictive formulary or more competitive pharmacy networks.  Managed care companies a greater ability to enforce formulary compliance and to drive consumers to a smaller number of pharmacies.

## VI.  Key Acronyms and Glossary of Key Terms

**AMP** – Average Manufacturer Price
**ASP** – Average Sales Price
**AWP** – Average Wholesale Price
**EAC** – Estimated Acquisition Cost
**MAC** – Maximum Allowable Cost
**PBM –** Pharmacy Benefit Manager
**WAC** – Wholesaler Acquisition Cost


**Average Manufacturer Price (AMP)** – The average price paid to a manufacturer by wholesalers for drugs distributed to retail pharmacies.  AMP was a benchmark created by Congress in 1990 in calculating Medicaid rebates and is not publicly available.

**Average Sales Price (ASP)** – The weighted average of all non-Federal sales to wholesalers net of chargebacks, discounts, rebates, and other benefits tied to the purchase of the drug product, whether it is paid to the wholesaler or the retailer.  The basis for reimbursement for products covered under Medicare Part B changed under the Medicare Modernization Act of 2003 from AWP to ASP.

**Average Wholesale Price (AWP)** – A national average of list prices charged by wholesalers to pharmacies.  AWP is sometimes referred to as a "sticker price" because it is not the actual price that larger purchasers normally pay.

**Estimated Acquisition Cost (EAC)** – EAC is a state Medicaid Agency's best estimate of the price generally paid by pharmacies for a particular drug

**Maximum Allowable Cost (MAC)** – MAC is a cap set by payers on reimbursement for certain generic and multi-source brand products.  States and private payers with MAC programs typically publish lists of selected generic and multi-source brand drugs along with the maximum price at which the program will reimburse for those drugs.  In general, pharmacies will receive payment no higher than the MAC price when billing for drugs on a MAC list.

**Medicaid Best Price** – The lowest price paid to a manufacturer for a brand name drug, taking into account rebates, chargebacks, discounts, or other pricing adjustments, excluding nominal prices.  Best price is a variable used in the Medicaid rebate statute to calculate manufacturer rebates owed to State Medicaid agencies.  Prices charged to certain governmental purchasers are statutorily excluded from best price including prices charged to the Veterans Administration, Department of Defense, Indian tribes, the Federal Supply Schedule, State Pharmaceutical Assistance Programs, Medicaid, Public Health Service "340B" entities, and Medicare Part D prescription drug plans (starting in 2006).  Best price data are reported by manufacturers to CMS, but are not publicly available.

**Reference Pricing** – System of fixed reimbursement for pharmaceuticals, in which the government or other third party payers establish a level at which they are willing to reimburse "interchangeable" products.  Manufacturers may charge above the reference price, but patients must pay the excess cost.

**Wholesale Acquisition Cost (WAC) –** The price paid by a wholesaler for drugs purchased from the wholesaler's supplier, typically the manufacturer of the drug. Publicly disclosed or listed WAC amounts may not reflect all available discounts.



The Henry H. Kaiser Family Foundation
2400 Sand Hill Road
Menlo Park, CA  94025
Phone: 650-854-9400   Fax: 650-854-4800

Washington Office:
1330 G Street, NW
Washington, DC 20005
Phone: 202-347-5270   Fax: 202-347-5274

www.kff.org

Individual copies of this publication (#7296) are available on the
Kaiser Family Foundation's website at www.kff.org

The Kaiser Family Foundation is a non-profit, private operating foundation dedicated to
providing information and analysis on health care issues to policymakers,
the media, the health care community, and the general public.
The Foundation is not associated with Kaiser Permanente or Kaiser Industries.

# EXHIBIT L

Bloomberg the Company & Its Products    |    Bloomberg Terminal Demo Request    |    Bloomberg Anywhere Remote Login    |    Bloomberg Customer Support

**Bloomberg**

Sign In    Subscribe

Live TV    Markets    Economics    Industries    Tech    Politics    Businessweek    Opinion    More

US Edition

BusinessweekBusiness

# Drug Benefit Firms Devise New Fees That Go to Them, Not Clients

Pharmacy benefit managers negotiate cheaper prices for employers and health plans. They also pocket drugmakers' cash.



A flagpole at Cigna Corp.'s headquarters in Bloomfield, Connecticut. *Photographer: Michael Nagle/Bloomberg*

By John Tozzi
August 22, 2023 at 5:00 AM EDT

Save

Pharmacy benefit managers (PBMs) arose in the 1960s to help health insurance plans control spending on prescription drugs. They were lauded early on as a counterweight to drug companies, able to bundle the purchasing power of thousands of employers and insurers to negotiate lower prices for medicines. But these days, they're frequently accused of being one of the causes of higher drug prices rather than a solution to them.

At issue are the side deals that the drug price negotiators have made with pharma companies, allowing PBMs to grab extra cash for themselves from the very parties they're supposed to be playing hardball against. Facing increasing pressure to pass along all the discounts they get from drugmakers back to their clients, PBMs have recently changed what that money is called in a way that makes it harder to trace.

That's made an already opaque payment system even murkier—and left PBMs under fire from all directions. Officials as diverse as Federal Trade Commission Chair Lina Khan and Florida Governor Ron DeSantis want more transparency from them. And Congress is advancing bills to force more disclosure about their deals with pharma companies.

**US Retail Prescription Drug Spending**

Source: Centers for Medicare & Medicaid Services

Most Americans may only have a hazy idea of what PBMs do, if any. But they influence what medications are available to almost everyone with health insurance and how much those drugs cost. The industry says it saves money for clients—employers and health plans—by getting discounts on the prices drugmakers set. Critics say PBMs' agreements with drug manufacturers warp their incentives, because they also get paid, in the form of often-undisclosed rebates and fees on the value of medicines sold, by the same pharma companies they're bargaining with on behalf of clients.

"PBMs are taking money from the parties with whom they're negotiating" that they don't disclose to their clients, says Lauren Vela, a consultant to the Purchaser Business Group on Health, a coalition of dozens of employers including Amazon, JPMorgan Chase and Walmart. "I don't know any other industry where that would be OK."

Read More: Health Insurers Don't Want You to Know Where Your Money Is Going

After years of consolidation, three companies dominate the PBM market: Cigna Group, CVS Health and UnitedHealth Group. Units of those companies process about 80% of prescription claims. Executives from the three say that they pass almost all the rebates they receive from drugmakers back to clients. Cigna's Express Scripts PBM unveiled a new "fully transparent" option in April that offers clients 100% of the rebates Express Scripts gets.

Still, some clients are losing faith. Blue Shield of California on Aug. 17 announced plans to replace some drug procurement services from CVS Health Corp.'s Caremark PBM with an amalgam of rival offerings, including Amazon.com Inc.'s nascent pharmacy business and an upstart venture from billionaire Mark Cuban. "We just need to start over," Blue Shield Chief Executive Officer Paul Markovich said.

CVS said in a statement that in the last two years it has held increases in drug spending to single digits as drugmakers hiked list prices an average of four times the rate of inflation, and that it earns trust from clients "by delivering results and being transparent about how their health care dollars are spent." Cigna has said its PBM and an affiliated purchasing group "help to lower the cost of prescription drugs for thousands of plan sponsors and millions of Americans." The leader of UnitedHealth's Optum Rx PBM said in Senate testimony earlier this year that competition to lower drug costs "squarely aligns the interests of pharmacy benefit companies with our clients and our consumers, not with the manufacturers that set the prices for prescription drugs." None of the companies directly answered detailed questions for this story.

Documents and industry insiders suggest that PBMs' pledges to pass the rebates they get from drugmakers back to their clients are a sleight of hand. In recent years, PBMs have changed what they call some of the money they take from pharma. Instead of rebates, these payments now go by such names as "administration fees," "data fees" or "inflation protection."

The shift allows PBMs to retain money from drugmakers while telling clients that they're fully passing along all the rebates, critics say. "They have all these junk fees," says Trond Waerness, founding president of Atna Consulting Services, which works with small and midsize pharmaceutical manufacturers. "They can then say that's not really a rebate." What's more, the fees are pegged to a drug's list price, even though the expense of handling a prescription "does not cost any more if the drug is $2,000 or $200," Waerness says. "It's the exact same work, but on one drug you're charging 10 times more."

Khan during a House Judiciary Committee hearing on July 13. *Photographer: Al Drago/Bloomberg*

The FTC is probing these arrangements. In 27-page long subpoenas sent to PBMs last year, the antitrust regulator asked for details not just of rebates but about "any other remuneration or consideration from drug manufacturers" and how much of that money they retain. More recently the FTC has subpoenaed affiliates of the PBMs called group purchasing organizations. These entities, formed in the last few years, have taken over some rebate negotiations, adding an extra layer to the convoluted path—and another tranche where fees could be collected—between companies that sell medicines and patients that take them.

Court records shed some light on the payments. Insys Therapeutics, the maker of a fentanyl spray called Subsys, filed for bankruptcy in 2019 after the company's founder and other executives were convicted in a racketeering case of bribing doctors to prescribe it. Throughout the turmoil, Cigna's Express Scripts continued to invoice the drugmaker for rebates and other fees connected with the fentanyl prescriptions that Express Scripts members filled.

Express Scripts got an administrative fee of 4.875% of the drug's list price for each prescription of Insys' products, according to a contract with the drugmaker that lawyers for Express Scripts filed at a Delaware bankruptcy court in 2021. The contract notes that the fee is "separate from the applicable rebate amount." Invoices filed in court show that administrative fees and "inflation protection" charges made up a quarter of what Express Scripts billed Insys for. Even if Express Scripts passed along all the rebate money to clients, that was only 75% of what it said Insys agreed to pay.

Investigators from the Senate Finance Committee, in a 2021 report on insulin costs, wrote that "PBMs have been collecting substantially greater revenue from administrative fees" as insulin prices went up. An agreement between UnitedHealth's Optum Rx PBM and Sanofi provided to the committee says Optum Rx's administrative fee is 4.75% of the drug's list price, and "it will not agree to pass through the administrative fee."

The bipartisan Senate report said the total value of these administrative fees "is not known" because the contracts are confidential. Because PBMs also get separate fees from their health plan clients for managing their pharmacy benefit plans, they're "essentially profiting from all sides of the transaction," according to the report.

States and municipalities have filed a series of lawsuits against the three largest PBMs and the three major makers of insulin— Eli Lilly & Co., Novo Nordisk and Sanofi—alleging that both sides worked together to drive up prices. One case filed by the city of Cleveland in the Northern District of Ohio in July alleges that PBMs profit by "retaining a significant, but undisclosed, share" of money from drugmakers. The lawsuit argues that such terms as "administrative fees," "service fees," "inflation fees" and "volume discounts" are "industry monikers designed to obfuscate the substantial sums being secretly exchanged" between PBMs and insulin manufacturers.

All three of the major insulin manufacturers say they work to help patients afford the medication. Sanofi says its pricing practices comply with the law. Setting PBM fees as a percentage of list prices "incentivizes higher list prices," a Sanofi spokesperson said, adding that some companies expect 8.5% in fees before rebates. The company doesn't know how PBMs or insurers use the rebates and fees it pays, or whether they're passed on to clients or patients.

A CVS pharmacy in Pinole, California. *Photographer: David Paul Morris/Bloomberg*

In a statement, a Novo Nordisk A/S spokesperson said the insulin lawsuits "are without merit" and that the company has offered patients help affording insulin. Lilly didn't comment on the litigation and has disputed the allegations in court filings. In response to questions, the company referred to comments CEO David Ricks made to Congress in May in which he advocated "delinking other actors' revenue streams from a medicine's list price" and making sure that a drug's rebate lowers the cost for people who take the medicines. Cigna, CVS and UnitedHealth have also disputed the allegations in insulin lawsuits in court and say they've worked to bring down insulin costs.

PBMs give clients "as much information and data as requested, all of which is negotiated in an arm's length contracting process," said Greg Lopes, a spokesperson for the Pharmaceutical Care Management Association trade group, in an email. Beyond rebates, "drug companies may choose to contract with PBMs for bona fide services," such as monitoring side effects.

In the fine print of their contracts with health plans and employers, PBMs make clear that they intend to profit from the drugmakers they're negotiating with. Express Scripts contracts with manufacturers "for its own account" and "may realize positive margin" from them, according to language from publicly available contracts with such groups as the Kentucky Teachers' Retirement System and the government of Jersey City. Express Scripts may get other compensation from drugmakers that "is not part of the formulary rebates or associated administrative fees," and may profit from it, the contract says.

Congress is considering tightening the rules. Committees in both houses are advancing bipartisan bills to regulate PBMs. One passed by the Senate Finance Committee would bar PBMs from charging drugmakers fees as a percentage of a drug's price. Instead, the fees would have to be flat dollar amounts reflecting fair market value of whatever services they're performing for pharma companies. It would only affect Medicare drug plans, though a separate bill would apply to private plans.

Severing the link between fees and drug prices "is probably the most significant thing" Congress could do to change how PBMs operate, says Spencer Perlman, a health-care analyst with Veda Partners. But he says there's no simple fix. "Lawmakers are always playing whack-a-mole," Perlman says, "and they're always a little bit behind."

Follow all new stories by **John Tozzi**

+ Get Alerts

☐ Save

Have a confidential tip for our reporters? **Get in Touch**

**Before it's here, it's on the Bloomberg Terminal**

**Most Read**

**Apple Plans to Overhaul Entire Mac Line With AI-Focused M4 Chips**

**O.J. Simpson, NFL Legend Acquitted of Double Murder, Dies at 76**

**Chinese Cement Maker Halted After 99% Crash in 15 Minutes**

**'Mag Seven' Power Stocks in Run-Up to US Earnings: Markets Wrap**

**New York City Airports Are No Longer the Worst in the US**

# Bloomberg

| Home | News | Work & Life | Market Data | Explore |
|------|------|-------------|-------------|---------|
| BTV+ | Markets | Wealth | Stocks | Newsletters |
| Market Data | Economics | Pursuits | Commodities | Explainers |
| Opinion | Technology | Businessweek | Rates & Bonds | The Big Take |
| Audio | Politics | CityLab | Currencies | Graphics |
| Originals | Green | Equality | Futures | Submit a Tip |
| Magazine | Crypto | Pursuits | Sectors | About Us |
| Events | AI | Work Shift | Economic Calendar | |

Get unlimited access today. **Explore Offer** →

| Terms of Service | | Careers · Made in NYC · Advertise · Ad Choices ▷ · Help |
| Do Not Sell or Share My Personal Information | Trademarks | ©2024 Bloomberg L.P. All Rights Reserved. |
| Privacy Policy | | |

Global news that uncovers a new tomorrow. Cancel anytime.

**Claim This Offer**

# EXHIBIT M

## FULLY REDACTED

# EXHIBIT N

## FULLY REDACTED

# EXHIBIT O





# Avadel Pharmaceuticals plc
## (NASDAQ: AVDL)

January 2024

©2023 Avadel. All rights reserved.

# Safe Harbor Statements

This presentation may include forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These forward-looking statements relate to our future expectations, beliefs, plans, strategies, objectives, results, conditions, financial performance, prospects, or other events. Such forward-looking statements include, but are not limited to, expectations regarding the potential therapeutic benefit of LUMRYZ; the Orphan Drug Exclusivity for LUMRYZ and potential benefits resulting from such exclusivity; US patent protection for LUMRYZ and the potential benefits of such patent protection; the commercial launch and success of such commercialization for LUMRYZ; the potential market impact of LUMRYZ; the anticipated market acceptance of LUMRYZ; the safety and efficacy data generated in the phase 3, REST-ON clinical trial; the long-term safety and maintenance of efficacy data generated from the RESTORE study; our projected financial performance, including, but not limited to projected revenues, expenses, and use of cash on hand. We do not undertake any obligation to publicly update or revise these forward-looking statements. In some cases, forward-looking statements can be identified by the use of words such as "will," "may," "could," "believe," "expect," "look forward," "on track," "guidance," "anticipate," "estimate," "project," "next steps" and similar expressions, and the negatives thereof (if applicable).  The Company's forward-looking statements are based on estimates and assumptions that are made within the bounds of our knowledge of our business and operations and that we consider reasonable. However, the Company's business and operations are subject to significant risks, and, as a result, there can be no assurance that actual results and the results of the company's business and operations will not differ materially from the results contemplated in such forward-looking statements. Factors that could cause actual results to differ from expectations in the Company's forward-looking statements include the risks and uncertainties described in the "Risk Factors" section of Part I, Item 1A of the Company's Annual Report on Form 10-K for the year ended December 31, 2022, which was filed with the Securities and Exchange Commission (SEC) on March 29, 2023, and subsequent SEC filings.  Forward-looking statements speak only as of the date they are made and are not guarantees of future performance. Accordingly, you should not place undue reliance on forward-looking statements. The Company does not undertake any obligation to publicly update or revise our forward-looking statements, except as required by law.



©2023 Avadel. All rights reserved.

**Avadel is a global biopharmaceutical company focused on transforming medicines to transform lives – starting with narcolepsy.**



# Accomplished Management Team with Strong Expertise



**Gregory Divis**

Chief Executive Officer, Board of Directors Member

   



**Jennifer Gudeman, PharmD**

Senior Vice President, Medical & Clinical Affairs

  



**Richard Kim**

Chief Commercial Officer



**Scott Macke**

Vice President, Supply Chain & Operations

 



**Tom McHugh**

Chief Financial Officer

 



**Jerad Seurer**

Senior Vice President, General Counsel

 



**Rosemarie Tully**

Vice President & General Manager, Europe

   



**Jason Vaughn, PhD**

Senior Vice President, Technical Operations

 



**Angela Woods**

Vice President, People & Culture





©2023 Avadel. All rights reserved.

# Avadel: All the Components for Long-Term Growth

## LUMRYZ™ 

a differentiated sodium oxybate product designed to be **taken once** at bedtime for the treatment of cataplexy or EDS in adults with narcolepsy

**Orphan Drug Exclusivity** through May 1, 2030; **Approval decision for pediatric narcolepsy** population expected in September 2024

OLE/switch **RESTORE Study** of LUMRYZ; **94% of switch patients prefer once-at-bedtime LUMRYZ dosing regimen**

**LUMRYZ U.S. commercial launch ongoing; > $1B peak sales opportunity**

Research shows majority of **BOTH** patients and physicians prefer once-at-bedtime dosing over all attributes (including sodium content) when choosing an oxybate

Demonstrated **clinically meaningful improvement** for the two cardinal symptoms of narcolepsy in **pivotal Phase 3 REST-ON trial**

**17 Orange Book** Listed patents; **18+ Years** Intellectual Property protection into early 2042

Future oxybate estimated **market value**:
**>$5B**
Represented by:
**> 50K Patients**





©2023 Avadel. All rights reserved.

# Landmark Moments for LUMRYZ



**LUMRYZ Milestones**

Market research and RESTORE study demonstrate patient & physician preference for **LUMRYZ** in a $5B+ market opportunity

**Full Approval Granted** May 1, 2023; **Orphan Drug Exclusivity** through May 1, 2030; **18+ Years** Intellectual Property Protection into early 2042

**LUMRYZ Launched** June 2023

**Submitted sNDA** for LUMRYZ for treatment of cataplexy or EDS in the pediatric narcolepsy population November 2023; approval decision expected in September 2024

**Robust and consistently positive LUMRYZ dataset** showing compelling improvements in clinical outcomes of people with narcolepsy



©2023 Avadel. All rights reserved.

6

# LUMRYZ has Significant Potential Future Peak Revenue Opportunity



| | |
|---|---|
| Addressable market opportunity | **50k+** patients |
| HCP reported market expansion[1] | **+35% - 113%** of new patients |
| Future oxybate-treated patients (est) | **Today 16k** → **Future 20-25k** |
| HCP reported market share[1] | **50-60%** |
| Potential future range of LUMRYZ treated patients | **>10k** |



Peak sales[2] opportunity

**>$1B**

Note: Figures above represent market opportunity, peak sales opportunity and potential patient opportunity based on available information and management's current beliefs regarding these opportunities but do not reflect estimates, expectations, guidance or plans. Actual results may differ materially from the opportunities disclosed above. Subject to change based on updated information and actual results.
Source: 1. Avadel proprietary market research (6 quantitative demand studies across ~700 oxybate prescribers) 2. Based on estimated current net pricing in the market, subject to change



# Success of LUMRYZ in Narcolepsy Offers Opportunity to Further Expand Franchise



**Strategically positioned to leverage the innovation and investment into LUMRYZ**



©2021-23 Avadel. All rights reserved.  /  Proprietary and Confidential



# Narcolepsy:  A Serious Unmet Need



©2023 Avadel. All rights reserved.

# Addressing Clear and Indisputable Unmet Need



Need identified **>40** years ago[1]

## Only Avadel has addressed the need

- ✓ **Most important attribute** for patients and HCPs – 1x at bedtime dosing[2]

- ✓ **94%** of patients who switched from first generation oxybates **prefer LUMRYZ dosing**[3]

- ✓ FDA found LUMRYZ to provide a **major contribution to patient care** (MCPC) over all 1st gen oxybates and rewarded Avadel with ODE[4]



Source: 1. Broughton R and Mamelak M. The Treatment of Narcolepsy-Cataplexy with Nocturnal Gamma-Hydroxybutyrate. *Can J Neurol Sci*. 1979 : 2. Dubow J, Avidan AY, Corser B, et al. Preferences for attributes of sodium oxybate treatment: a discrete choice experiment in patients with narcolepsy. Patient Prefer Adherence. 2022;16:937-947. 3. Roy A, Harsh J, Akinyemi AO, et al. Patient Preference and Nocturnal Experience With Oxybate Treatment for Narcolepsy: Interim Analysis of Data From RESTORE. Chest 2022, Oct 16-19, 2022: Nashville, TN.  4 . From FDA website: www.fda.gov/industry/designating-orphan-product-drugs-and-biological-products/clinical-superiority-findings

©2023 Avadel. All rights reserved.

# Narcolepsy

*An under-diagnosed, chronic neurological disorder that affects the brain's ability to control sleep-wake cycles*

**2 cardinal symptoms:**

➢ **Excessive daytime sleepiness** (EDS)

➢ **Cataplexy** (a sudden loss of muscle tone, which can be triggered by strong emotion)

**Patients With Narcolepsy experience disrupted nocturnal sleep**

**Current treatments also disrupt sleep:**
➢ Wake promoting agents and stimulants can cause insomnia
➢ Current twice nightly oxybates require patients to wake up during the middle of the night to take a second dose

**Oxybates are the current standard of care for both EDS and cataplexy**

**Traditional, immediate-release oxybate therapies have a short half-life and require twice nightly dosing, the 2nd dose being taken 2.5-4 hours after falling asleep**

 Avadel.

©2023 Avadel. All rights reserved.

# LUMRYZ Opportunity

*Middle of night dosing required by 2x-nightly oxybates creates challenges for patients & physicians*

## Current Challenges in the Narcolepsy Market

- At least 65%[1] of people with narcolepsy experience disturbances in nocturnal sleep

- The American Academy of Sleep Medicine (AASM) 2021 Clinical Practice Guidelines recognize insomnia as a common AE for daytime meds to treat narcolepsy

- Market research shows that only about half of eligible patients are receiving oxybates, citing physician perception for patients being unable to comply with twice nightly dosing

## What once-at-bedtime LUMRYZ can Offer to People with Narcolepsy

- Pivotal Phase 3 REST-ON trial data demonstrated clinically meaningful improvement for two cardinal symptoms of narcolepsy, EDS and cataplexy, as well as improvements in disturbed nocturnal sleep

- With once-at-bedtime dosing of LUMRYZ, patients will have the opportunity for an uninterrupted night sleep

## Patients and Physicians Prefer LUMRYZ

- 94% of patients participating in the RESTORE study who switched from twice-nightly prefer once-at-bedtime LUMRYZ

- Market research shows that LUMRYZ has the potential to grow oxybate usage by >50% with current and new prescribers

[1] Bassetti et al. Eur J Neurol 2021



©2023 Avadel. All rights reserved.

# PK Profile Optimized for Once-At-Bedtime Dosing



### Mean PK Profiles (6 g)

- LUMRYZ, n = 26
- 2x-nightly sodium oxybate, n=27

GHB Concentration (ug/mL) Mean and Standard Error

Time (h)



## Comparison to 2x-Nightly

| | |
|---|---|
| **Advantage** | Single pre-measured once-at-bedtime dose |
| **Advantage** | No middle-of-the-night dosing; eliminates potential of second dose taken too early, too late, or completely missed |
| **Similar** | Overall exposure (AUC) – bioequivalent to SoC |
| **Similar** | Onset time |



©2023 Avadel. All rights reserved.

# Pivotal Phase 3 REST-ON Trial Results
## Positive Results Across All Co-Primary Endpoints For All Doses



**Once-at-bedtime LUMRYZ:** 6, 7.5 and 9 g all demonstrated <0.001 compared to placebo, for each of the 3 co-primary endpoints



**Improvement of:**
1. Excessive daytime sleepiness (MWT)
2. Clinician's overall assessment of patient function (CGI-I)
3. Reduction in cataplexy attacks



LUMRYZ was generally well-tolerated;  commonly known sodium oxybate adverse reactions occurred at low rates even at the highest dose (9 g)

Pivotal publication for LUMRYZ Ph III study: Kushida et al. *Sleep.* 2022
Plain Language Summary by Kushida et al. *Future Neurology*. 2022



©2023 Avadel. All rights reserved.

14

# Pivotal Phase 3 REST-ON Trial Results
## LUMRYZ 9g was Generally Well-Tolerated

| | LUMRYZ (%) \| N=77 | Placebo (%) \| N=80 |
|---|---|---|
| Any Adverse Drug Reaction (ADR) | 35.1 | 5.0 |
| Any Serious ADR | 1.3 | 0.0 |
| ADR Leading To Discontinuation | 3.9 | 0.0 |
| **ADRs ≥2% and greater than placebo in LUMRYZ** | | |
| Decreased Weight | 3.9 | 0.0 |
| Vomiting | 5.2 | 0.0 |
| Decreased Appetite | 2.6 | 0.0 |
| Dizziness | 5.2 | 0.0 |
| Somnolence | 3.9 | 0.0 |
| Enuresis | 9.1 | 0.0 |



©2023 Avadel. All rights reserved.

15

# RESTORE
## Long-Term Study Designed to Evaluate Safety and Tolerability of LUMRYZ

- **94% of patients prefer once-nightly dosing**
- Low rate of discontinuation due to adverse reactions; largest cohort of switch patients
- Patients on twice-nightly oxybates report missing and/or taking second dose too late resulting in negative impacts on narcolepsy symptoms and patient quality of life





Roy et al. CHEST 2022.  Nashville TN



©2023 Avadel. All rights reserved.

16

# Data Suggests Patient Preference for Once-at-Bedtime LUMRYZ

**RESTORE study results demonstrate 94% of switch patients prefer once-at-bedtime LUMRYZ**

*"Taking twice nightly Oxybate is annoying, not only do I have to measure it out and put it in the medication cup and fill it up, I have to put it on my nightstand, if I oversleep, I can't take it if too close to getting kids up for school. Once at bedtime would simplify a lot."*

*— Oxybate Experienced Patient\**

\* Source: Based on proprietary in-depth commercial research conducted on behalf of Avadel



©2023 Avadel. All rights reserved.

# Physicians Prefer Once-at-Bedtime Dosing Regimen Over Twice Nightly Dosing

*"Looks like wouldn't be too hard to switch over. I would discuss [LUMRYZ] with all my patients and see if patients want it and I have no problem doing this if a patient asked to switch"*

*- Sleep Medicine Specialist HCP\**

*"I would use [LUMRYZ] even if patients are well controlled, because it's better to not have to wake up during the night and patients would be more compliant. Therefore, it's also more cost effective as [compliance is higher]"*

*-Sleep Medicine Specialist HCP\**



* Source: Based on proprietary in-depth commercial research conducted on behalf of Avadel

©2023 Avadel. All rights reserved.



# Commercial Strategy



©2023 Avadel. All rights reserved.

# LUMRYZ Launched in June 2023

## 4 pre-measured once-at-bedtime packets



- (4.5, 6, 7.5 or 9g) help ensure patients receive full therapeutic effects of their prescribed dose / ensure patients can reliably receive a consistent full dose
- Available in 7 and 30 counts

## LUMRYZ available at our specialty pharmacy network







©2023 Avadel. All rights reserved.

# We are focusing on three core elements for launch



| 1 | 2 | 3 |
|---|---|---|
| **Demand Generation** | **Reimbursement** | **Product Fulfillment** |

**Successful Launch**



©2023 Avadel. All rights reserved.

21

# LUMRYZ Market Opportunity is >50k patients and is Extremely Well Positioned in all 3 Patient Segments

## Market segments



**25,000+ patients** —  **Oxybate naïve**

**16,000 patients** —  **Patients that discontinued 1st gen oxybates**

**16,000 patients** —  **Currently treated with 1st gen oxybates**

## LUMRYZ opportunities in each segment

✓ Oxybate use will expand because of LUMRYZ, large opportunity for future growth

✓ Exclusively for LUMRYZ, high HCP and PWN interest

✓ Clear relative benefit, high HCP and PWN intent to use

 Avadel.

©2023 Avadel. All rights reserved.

# LUMRYZ is Well-Positioned to Lead Across All Narcolepsy Patient Segments

## Current 2X-nightly OXB (~16K patients)

- **70%+** of patient on current oxybates experience **"poor quality sleep"** several times a week*

- **High patient interest in LUMRYZ (80%+)***

- **Once at bedtime dosing preferred over all attributes** (including sodium content) for patients and physicians in 2021 Discrete Choice Experiment (DCE)

## Recently discontinued 2X nightly OXB (~10-15K patients)

- Current discontinuation rates are estimated to be **20-25% after month one, and 40-50% across first year***

- Many discontinued patients remain **highly interested in learning about LUMRYZ (60%+)***

- Discontinuations typically driven by a variety of **efficacy AND dosing related challenges**

## Annual New Oxybate Patients (~3K annually)

- **Inconvenient dosing** is the most frequently cited challenge as why patients decline to initiate current oxybates

- Patients express dissatisfaction with wake promoting agents and stimulant, **interest in LUMRYZ is high (70%+)***

- **New starts expected to grow** with introduction of LUMRYZ, potential for new starts to grow to **4-5K annually**



©2023 Avadel. All rights reserved.

23

* Source: Based on proprietary in-depth commercial research conducted on behalf of Avadel

# All Market Research Consistently Shows LUMRYZ Drives Market Expansion

## The Results



New-to-oxybate patient market expansion
(new to OXB patient starts)

# +35% to 113%
## Average: 58%

**All market research conducted prior to any promotional support and not tested with ODE LUMRYZ clinical superiority over 1st generation oxybates message**



Source: Avadel proprietary market research studies including 2020 Demand Study, HCP; 2020 Pre-launch Quant study - Patients; 2021 HCP ATU, Wave 1; 2022 HCP ATU, Wave 2; 2023 Qual Demand; 2023 HCP ATU, Wave 3

©2023 Avadel. All rights reserved.

24

# All Market Research Consistently Shows LUMRYZ with Highest Share

## The Results:  HCP oxybate market share given to LUMRYZ





*HCP projected share*

# 48-61%

*Average: 54%*



sodium oxybate for extended-release
oral suspension ℃

**All market research conducted prior to any promotional support and not tested with ODE LUMRYZ clinical superiority over 1st generation OXBs message**

Source: Avadel proprietary market research studies including 2020 Demand Study, HCP; 2020 Pre-launch Quant study - Patients; 2021 HCP ATU, Wave 1; 2022 HCP ATU, Wave 2; 2023 Qual Demand; 2023 HCP ATU, Wave 3

©2023 Avadel. All rights reserved.



# Concentrated U.S. HCP Universe
## Enables an Efficient Launch and Ability to Focus Resources on Sleep Specialists' Offices



**Concentrated Prescriber Base** (% oxybate total prescription volume)

- ~4,500 prescribers account for 100%
- ~1,600 prescribers account for 80%
- ~500 prescribers account for 50%

**U.S. Commercial Team: Building an exceptional customer-facing team**

- Salesforce of 49 Territory Business Managers (TBMs) allows complete coverage of oxybate prescribers
- Field Reimbursement Managers (FRMs) supporting offices to secure reimbursement and coverage
- National Account Directors (NADs) aligned to GPO/PBM/SP enterprises to enable more holistic support and solutions



©2023 Avadel. All rights reserved.

26

# LUMRYZ Demand Generation in Full Motion

## Sales Organization

- ✓ **Sales representatives are fully trained and out in territory**
- ✓ Covering all 4,500 active oxybate prescribers, initial focus on 1,600 (80% of total OXB Rxs)

## Promotion Campaign

- ✓ **LUMRYZ promotion campaign, "ONCE AT BEDTIME FOR THEIR DAYTIME" in full execution**
- ✓ Significant digital and media presence for patients and HCPs
- ✓ Re-directing eCRM enrolled PWN to LUMRYZ branded resources

## Education Programs

- ✓ **Full presence for LUMRYZ and Avadel at the APSS Sleep Meeting**
- ✓ Speaker programs for sleep specialists (and their staff)

### 1
**Demand Generation**







©2023 Avadel. All rights reserved.

# Payers: Excellent Progress Achieving Parity Access

**2**

**Reimbursement**



## Commercial coverage

✓ LUMRYZ payer channel mix initially estimated to be 80-90% commercial

## Progress with GPOs/PBMs

✓ **Contracts in place with all 3 PBM owned GPOs** (Ascent/ESI, Zinc/CVS, Emisar/Optum)
✓ **LUMRYZ moved to preferred status** within the CVS commercial formularies and Optum Select as of January 1, 2024
✓ **10 BCBS plans** have published prior authorization criteria at parity to other OXBs
✓ Coverage with **major multi-state integrated health system** at parity with other OXBs
✓ LUMRYZ distribution network includes all 3 GPO PBM owned specialty pharmacies

## Avoiding 1ˢᵗ gen step through

✓ Contracting strategy focused on securing LUMRYZ access to all OXB patient segments
✓ Previously exposed 1ˢᵗ generation OXB patients have already "stepped" through 2X nightly OXB (by far largest patient segment)

**PBM coverage listings typically 6-9 months post launch, prior to listing reimbursement will be through medical necessity**





©2023 Avadel. All rights reserved.

28

# Priority is Supporting LUMRYZ Prescriptions Being Fulfilled and Getting to PWN



| 3 |
|---|
| **Product Fulfillment** |



## Essential access & affordability programs

- **$0 commercial copay program**

- **Patient assistance program**

- **Temporary assistance program**

## Personalized support for PWN and offices

- Nurse Care Navigators (NCNs), all nurses by training

- **NCNs individually assigned to each PWN and office**

- Prior Authorization Certified Specialist 

> - **>100 years collective clinical experience**
> - **Ave 5+ years of reimbursement experience**

## In office pull through support

- **Field Reimbursement Managers out in territory**

- Integrated data platform triggers to field teams and RYZUP team

> - **>50 years collective reimbursement experience**
> - **Ave 15+ years of pharmaceutical experience**





©2023 Avadel. All rights reserved.



# Financial Summary



©2023 Avadel. All rights reserved.

# Financial Summary[1]
*($ and Shares in millions)*

| Nine Months Ended September 30, | 2023 | 2022 |
|---|---|---|
| Net Revenue | $ 8.5 | $ - |
| Gross Margin | $ 8.4 | $ - |
| Operating Expenses [2] | $ 121.3 | $ 72.0 |
| R&D Expense | 10.9 | 14.5 |
| SG&A Expense | 110.4 | 57.5 |
| Net (Loss) Income | $ (95.2) | $ (89.9) |
| *Ordinary Shares Outstanding* | *89.4* | *60.9* |
| Cash and Cash Equivalents (Proforma) [3] | $ 131.6 | $ 106.5 |
| Debt (Proforma) [3] | $ - | $ 143.8 |

*1) Refer to Forms 10-Q for quarters ended September 30, 2023 & 2022 filed on November 9, 2023, and November 9, 2022, respectively, for full financial statements and results of operations.*
*2) Includes only R&D and SG&A. Refer to Forms 10-Q for full operating expenses.*
*3) Balances at September 30, 2023 adjusted to reflect settlement of all remaining convertible notes on October 4, 2023*

 Avadel

# Investment Thesis

## Key Considerations

Market research and RESTORE study consistently demonstrate significant patient & physician preference for LUMRYZ

> $1B peak sales opportunity for LUMRYZ in a +$5B oxybate market

Orphan Drug Exclusivity Through May 1, 2030

Strong IP Protection - 17 Orange Book Listed Patents; 18+ Years Intellectual Property protection into early 2042

Strong balance sheet with no debt; Existing capital resources + cash receipts from sales sufficient to support LUMRYZ launch

Expansion Opportunities in Pediatric Narcolepsy Population and Idiopathic Hypersomnia



©2023 Avadel. All rights reserved.  /  Proprietary and Confidential





# Avadel Pharmaceuticals plc
## (NASDAQ: AVDL)

©2023 Avadel. All rights reserved.



# Appendix



©2023 Avadel. All rights reserved.

# Proprietary Drug Delivery Technology and Formulation

## The Advantages

- Controlled delivery of once-at-bedtime sodium oxybate

- Induces slow-wave sleep to enable a continuous & restorative night's sleep

- Potential to improve adherence and persistency, safety and clinical outcomes

## Avadel's Drug Delivery Technology

**Contains thousands of IR & CR microparticles**

- Each is a miniature delivery system

**Microparticulate design can be adapted to drug's specific challenges**

- Modify coatings / thickness



Micro particles

200x magnification

Inert core

Drug layer

Controlled release coating

20µm  60µm  70µm

200-500µm diameter



©2023 Avadel. All rights reserved.

35

35

# Extensive Additional Data Supports LUMRYZ Above and Beyond Positive Co-Primary Endpoints

Extensive Additional Data Supports LUMRYZ Above and Beyond Positive Co-Primary Endpoints

- Mean end-of-study Epworth Sleepiness Scale for LUMRYZ of 10.4, from baseline of 16.6
  - Scores of ≥16 characteristic of narcolepsy; scores of ≤10 **considered normal**
- Significant improvements in *disturbed nocturnal sleep (DNS);* DNS present in **~65%** of patients with narcolepsy
  - LUMRYZ, as measured by pre-specified endpoints:
    - Reduced nocturnal arousals
    - Reduced sleep stage shifts
    - Improved patient-reported visual analogue scales (VAS) sleep quality
    - Improved VAS on the refreshing nature of sleep
- LUMRYZ demonstrated efficacy in the stratified NT1 **and** NT2 subgroups, both in improving EDS and the clinician's overall assessment of functioning (CGI-I)
- LUMRYZ demonstrated improvement in narcolepsy symptoms in <u>both</u> those with and without concomitant stimulant use (post-hoc)
- LUMRYZ demonstrated modest weight loss reduction (post-hoc)

*Source: Phase 3 REST-ON Trial*



©2023 Avadel. All rights reserved.

# Phase 3 Efficacy: Epworth Sleepiness Scale (ESS) Secondary Endpoint



**Significantly reduced ESS scores were observed vs placebo across all LUMRYZ doses (*P*<0.001)**

**Baseline mean (SD)**
LUMRYZ (n=97): 16.6 (3.8)
Placebo (n=93): 17.5 (4.1)
Week 0

**Endpoint mean (SD)**
LUMRYZ (n=64): 10.4 (6.2)
Placebo (n=73): 14.9 (5.5)
Week 13 (9 g)

Week 3 (6 g)

Week 8 (7.5 g)

LSM Change From Baseline in ESS Score

Placebo: -1.42, -2.18, -2.66

LUMRYZ: -3.48, -5.34, -6.52

-2.06** 95% CI, -3.23 to -0.89
-3.16** 95% CI, -4.67 to -1.64
-3.86** 95% CI, -5.47 to -2.26

LUMRYZ — Placebo

**P<0.001.
Kushida et. al. Sleep. 2022;45(6):zsab200.

*Source: Phase 3 REST-ON Trial*



©2023 Avadel. All rights reserved.

37

# Phase 3 Efficacy: Maintenance of Wakefulness Test (MWT)



**Significant improvement in MWT at all LUMRYZ doses beginning as early as week 3 (*P*<0.001 vs placebo)**

LSM (SE) Change in MWT, min

6.13***
95% CI, 3.52–8.75

6.21***
95% CI, 3.84–8.58

4.98***
95% CI, 2.90–7.05

10.82
9.55
8.08
0

4.69
3.34
3.10

**Week 0**
**Baseline mean (SD)**
LUMRYZ: 5.0 (3.1)
Placebo: 4.7 (2.6)

Week 3 (6 g)

Week 8 (7.5 g)

**Week 13 (9 g)**
**Endpoint mean (SD)**
LUMRYZ: 15.5 (9.8)
Placebo: 9.4 (7.9)

LUMRYZ          Placebo

*\*\*\*P<0.001.*
Kushida et. al. Sleep. 2022;45(6):zsab200.

*Source: Phase 3 REST-ON Trial*

 Avadel

©2023 Avadel. All rights reserved.

# Phase 3 Efficacy: Clinical Global Impression-Improvement (CGI-I)



**Significantly higher proportion of patients receiving LUMRYZ were rated "much" or "very much" improved on CGI-I vs placebo at all doses ($P<0.001$)**

***$P<0.001$.
Odds ratio shown.
Kushida et. al. Sleep. 2022;45(6):zsab200.

*Source: Phase 3 REST-ON Trial*



©2023 Avadel. All rights reserved.

39

# Phase 3 Efficacy: Weekly Number of Cataplexy Attacks



**Significant reduction in mean weekly number of cataplexy attacks with all LUMRYZ doses beginning as early as week 1 (week 1, *P*<0.05 [post hoc]; weeks 3–13, *P*<0.001)**

Post-hoc analysis at week 1.
*P≤0.05. ***P<0.001.
Kushida et. al. Sleep. 2022;45(6):zsab200.

*Source: Phase 3 REST-ON Trial*



©2023 Avadel. All rights reserved.

40

# 20 Years of Sodium Oxybate Utilization Data Available

- Randomized Controlled Trials; 4 in adults (n=611); 1 in children (n=106)
  - No cardiovascular adverse events were reported
  - Clinical trials of sodium oxybate have not reported specific exclusion criteria for baseline hypertension

- Additional observational, open-label and post-marketing surveillance has not identified increased cardiovascular risk with sodium oxybate utilization

- Avidan and Kushida concluded: *"In the absence of data that specifically address CV risk with SO [sodium oxybate] based on its sodium content, the clinical evidence to date suggests that SO treatment does not confer additional CV risk in patients with narcolepsy."*

Avidan A. Kushida C. *Sleep Medicine* 2020.



©2023 Avadel. All rights reserved.

# 20 Years of Data on Sodium Oxybate Utilization

Sleep Medicine 75 (2020) 497–501



Contents lists available at ScienceDirect

# Sleep Medicine

journal homepage: www.elsevier.com/locate/sleep



Review Article

# The sodium in sodium oxybate: is there cause for concern?

Alon Y. Avidan [a], Clete A. Kushida [b, *]

[a] David Geffen School of Medicine at UCLA, 710 Westwood Boulevard, Room 4238 Reed Building, Los Angeles, CA, USA
[b] Stanford University Medical Center, 450 Broadway Street, MC 5704, Pavilion C, 2nd Floor, Redwood City, CA, USA

Medical writing assistance funded by Avadel.
Michael Alderman, MD, Professor Emeritus, Albert Einstein College of Medicine contributed/critically reviewed and is recognized for his expertise in sodium intake and health policy.



©2023 Avadel. All rights reserved.

# EXHIBIT P



Prescribing Information     Medication Guide           **SIGN UP**

**xywav®** ∞
(calcium, magnesium, potassium,
and sodium oxybates) oral solution ⓒⓘⓘ



**Menu**

JAZZCARES® FOR XYWAV

# JazzCares is your partner in supporting your patients throughout their treatment journey



**HAVE QUESTIONS?**





Making a difference in Patients' lives, one Patient at a time

---

## Important Safety Information          

WARNING: CENTRAL NERVOUS SYSTEM DEPRESSION and ABUSE AND MISUSE.

- **Central Nervous System Depression**
  XYWAV is a CNS depressant. Clinically significant respiratory depression and obtundation may occur in patients treated with XYWAV at recommended doses. Many patients who received XYWAV during clinical trials in narcolepsy and idiopathic hypersomnia were receiving CNS stimulants.

- **Abuse and Misuse**

JazzCares works directly with your office to help verify insurance coverage and support you and your staff through the insurance coverage process. The JazzCares Nurse Case Manager complements your office and will be with patients from the very beginning and will provide support throughout their treatment journey. The Field Nurse Educator can help your office keep track of your patients' progress and specific needs.



## ACCESS AND AFFORDABILITY*†

Our teams work directly with your office to **verify each patient's insurance coverage** and support you and your staff through the insurance coverage process. Several **financial assistance options** are also available for eligible patients.



## NURSE AND PHARMACY SUPPORT

A **JazzCares Nurse Case Manager** will be available for your patients from the very beginning and will provide **support throughout treatment.** A **pharmacist is also available 24/7** to answer patients' questions.

## Important Safety Information

**WARNING: CENTRAL NERVOUS SYSTEM DEPRESSION and ABUSE AND MISUSE.**

- **Central Nervous System Depression**
  **XYWAV is a CNS depressant. Clinically significant respiratory depression and obtundation may occur in patients treated with XYWAV at recommended doses. Many patients who received XYWAV during clinical trials in narcolepsy and idiopathic hypersomnia were receiving CNS stimulants.**
- **Abuse and Misuse**

**JazzCares for XYWAV** has the resources to help your patients by giving them **personalized information and support** throughout their treatment journey.



## POST-PRESCRIPTION PATIENT SUPPORT

Give your patients support after their first prescription. **JazzCares Nurse Educators** offer **collaborative care with your office following patient engagement** to discuss patient-specific insights and strategies. They'll help patients stay on track with treatment and provide comprehensive information about JazzCares patient support programs, like the Mentor Program and the myWAV app.

<u>Learn more</u> about JazzCares offerings

*Insurance coverage and plans may vary. The JazzCares program at Jazz Pharmaceuticals provides general information only and is not a guarantee of any coverage or reimbursement outcome. All treatment decisions rest solely with the treating physician or qualified healthcare professional.

†See <u>Terms and Conditions</u> for eligibility.

# XYWAV financial assistance programs through JazzCares

<u>Important Safety Information</u>

WARNING: CENTRAL NERVOUS SYSTEM DEPRESSION and ABUSE AND MISUSE.

- <u>Central Nervous System Depression</u>
  **XYWAV is a CNS depressant. Clinically significant respiratory depression and obtundation may occur in patients treated with XYWAV at recommended doses. Many patients who received XYWAV during clinical trials in narcolepsy and idiopathic hypersomnia were receiving CNS stimulants.**
- **Abuse and Misuse**



### The XYWAV Coupon Program

Did you know that >99% of all commercial patients **can pay as little as $5 for XYWAV?[a,b]**



### The XYWAV Quick Start Voucher

Waiting for your patients' coverage? Your patients **could receive a free 1-month supply of XYWAV with the Quick Start Voucher.[a]**



### The XYWAV Bridge Program

Your patient **may be eligible for up to 120 days of free XYWAV while waiting for coverage approval.[a]**

<u>**Important Safety Information**</u>

---

**WARNING: CENTRAL NERVOUS SYSTEM DEPRESSION and ABUSE AND MISUSE.**

- <u>**Central Nervous System Depression**</u>
  **XYWAV is a CNS depressant. Clinically significant respiratory depression and obtundation may occur in patients treated with XYWAV at recommended doses. Many patients who received XYWAV during clinical trials in narcolepsy and idiopathic hypersomnia were receiving CNS stimulants.**

- <u>**Abuse and Misuse**</u>

---

**The XYWAV Patient Assistance Program**

The JazzCares Patient Assistance Program **may be able to help when insurance coverage is an issue.**

Our Patient Assistance Program has helped hundreds of eligible patients get access to free medication.[c,d]

**GET STARTED WITH JAZZCARES**

[a]Applies only to eligible, commercially insured patients enrolled in the XYWAV and XYREM REMS.
[b]Eligible patients pay as little as $5. Subject to annual maximum benefit.
[c]Subject to financial and other eligibility criteria. Must be enrolled in the XYWAV and XYREM REMS.
[d]The Patient Assistance Program application is available online at www.jazzcares.com/xywav

Jazz Pharmaceuticals reserves the right to terminate or modify at any time with or without notice. Other Terms and Conditions apply.

## Have additional questions?

Contact your Jazz Pharmaceuticals Access and Reimbursement Manager, visit **JazzCares.com**, or call **1-866-997-3688**, Monday – Friday, 7 AM – 8 PM CT.

## Important Safety Information

**WARNING: CENTRAL NERVOUS SYSTEM DEPRESSION and ABUSE AND MISUSE.**

- **Central Nervous System Depression**
  XYWAV is a CNS depressant. Clinically significant respiratory depression and obtundation may occur in patients treated with XYWAV at recommended doses. Many patients who received XYWAV during clinical trials in narcolepsy and idiopathic hypersomnia were receiving CNS stimulants.

- **Abuse and Misuse**



<span style="color:red">**WATCH VIDEO**</span>

## myWAV: Smart support at your patients' fingertips

Watch this video to find out how the myWAV app can offer your patients educational resources and individualized support throughout their treatment journey.

### For patients who've been prescribed XYWAV, myWAV offers continued support

**myWAV is easy to use and**

- **HELPS** your patients get started and track their symptoms

- **ORGANIZES** instructions for use, support programs, treatment tips, and more

<u>**Important Safety Information**</u>

> **WARNING: CENTRAL NERVOUS SYSTEM DEPRESSION and ABUSE AND MISUSE.**
>
> - <u>**Central Nervous System Depression**</u>
>   **XYWAV is a CNS depressant. Clinically significant respiratory depression and obtundation may occur in patients treated with XYWAV at recommended doses. Many patients who received XYWAV during clinical trials in narcolepsy and idiopathic hypersomnia were receiving CNS stimulants.**
>
> - <u>**Abuse and Misuse**</u>



All third-party product, company names and logos are trademarks™ or registered® trademarks and remain the property of their respective holders.

## INDICATIONS AND USAGE

XYWAV® (calcium, magnesium, potassium, and sodium oxybates) oral solution, 0.5 g/mL total salts (equivalent to 0.413 g/mL of oxybate) is indicated for the treatment of cataplexy or excessive daytime sleepiness (EDS) in patients 7 years of age and older with narcolepsy, and for the treatment of idiopathic hypersomnia (IH) in adults.

## Important Safety Information

<div style="border:1px solid black; padding:1em;">

### WARNING: CENTRAL NERVOUS SYSTEM DEPRESSION and ABUSE AND MISUSE.

- **<u>Central Nervous System Depression</u>**
  **XYWAV is a CNS depressant. Clinically significant respiratory depression and obtundation may occur in patients treated with XYWAV at recommended doses. Many patients who received XYWAV during clinical trials in narcolepsy and idiopathic hypersomnia were receiving CNS stimulants.**

- **<u>Abuse and Misuse</u>**
  **The active moiety of XYWAV is oxybate or gamma-hydroxybutyrate (GHB). Abuse or misuse of illicit GHB, either alone or in combination with other CNS depressants, is associated with CNS adverse reactions, including seizure, respiratory depression, decreases in the level of consciousness, coma, and death.**

**Because of the risks of CNS depression and abuse and misuse, XYWAV is available only through a restricted program under a Risk Evaluation and Mitigation Strategy (REMS) called the XYWAV and XYREM REMS.**

</div>

### <u>Contraindications</u>

XYWAV is contraindicated

- in combination with sedative hypnotics or alcohol and

## Important Safety Information

### WARNING: CENTRAL NERVOUS SYSTEM DEPRESSION and ABUSE AND MISUSE.

- **<u>Central Nervous System Depression</u>**
  **XYWAV is a CNS depressant. Clinically significant respiratory depression and obtundation may occur in patients treated with XYWAV at recommended doses. Many patients who received XYWAV during clinical trials in narcolepsy and idiopathic hypersomnia were receiving CNS stimulants.**

- **Abuse and Misuse**

depressants, may increase the risk of respiratory depression, hypotension, profound sedation, syncope, and death. If use of these CNS depressants in combination with XYWAV is required, dose reduction or discontinuation of one or more CNS depressants (including XYWAV) should be considered. In addition, if short-term use of an opioid (eg, post- or perioperative) is required, interruption of treatment with XYWAV should be considered.

After first initiating treatment and until certain that XYWAV does not affect them adversely (eg, impair judgment, thinking, or motor skills), caution patients against hazardous activities requiring complete mental alertness or motor coordination such as operating hazardous machinery, including automobiles or airplanes. Also caution patients against these hazardous activities for at least 6 hours after taking XYWAV. Patients should be queried about CNS depression-related events upon initiation of XYWAV therapy and periodically thereafter.

## Abuse and Misuse
XYWAV is a Schedule III controlled substance. The active moiety of XYWAV is oxybate, also known as gamma-hydroxybutyrate (GHB), a Schedule I controlled substance. Abuse of illicit GHB, either alone or in combination with other CNS depressants, is associated with CNS adverse reactions, including seizure, respiratory depression, decreases in the level of consciousness, coma, and death. The rapid onset of sedation, coupled with the amnestic features of GHB particularly when combined with alcohol, has proven to be dangerous for the voluntary and involuntary user (eg, assault victim). Physicians should carefully evaluate patients for a history of drug abuse and follow such patients closely.

## XYWAV and XYREM REMS
- Because of the risks of central nervous system depression and abuse and misuse, XYWAV is available only through a restricted distribution program called the XYWAV and XYREM REMS.

Notable requirements of the XYWAV and XYREM REMS include the following:

- Healthcare Providers who prescribe XYWAV are specially certified

- XYWAV will be dispensed only by the central pharmacy that is specially certified

- XYWAV will be dispensed and shipped only to patients who are enrolled in the XYWAV and XYREM REMS with documentation of safe use

Further information is available at www.XYWAVXYREMREMS.com or 1-866-997-3688.

## Important Safety Information

---

**WARNING: CENTRAL NERVOUS SYSTEM DEPRESSION and ABUSE AND MISUSE.**

- **Central Nervous System Depression**
  **XYWAV is a CNS depressant. Clinically significant respiratory depression and obtundation may occur in patients treated with XYWAV at recommended doses. Many patients who received XYWAV during clinical trials in narcolepsy and idiopathic hypersomnia were receiving CNS stimulants.**

- **Abuse and Misuse**

---

obese patients, in men, in postmenopausal women not on hormone replacement therapy, and among patients with narcolepsy.

### Depression and Suicidality

In Study 1, the randomized-withdrawal clinical trial in adult patients with narcolepsy (n=201), depression and depressed mood were reported in 3% and 4%, respectively, of patients treated with XYWAV. Two patients (1%) discontinued XYWAV because of depression. In most cases, no change in XYWAV treatment was required.

In Study 2, the randomized-withdrawal clinical trial in adult patients with idiopathic hypersomnia (n=154), depression and depressed mood were reported in 1% and 3%, respectively, of patients treated with XYWAV. All patients continued XYWAV treatment.

Two suicides and two attempted suicides occurred in adult clinical trials with oxybate (same active moiety as XYWAV). One patient experienced suicidal ideation and two patients reported depression in a pediatric clinical trial with oxybate. These events occurred in patients with and without previous histories of depressive disorders. The emergence of depression in patients treated with XYWAV requires careful and immediate evaluation. Monitor patients for the emergence of increased depressive symptoms and/or suicidality while taking XYWAV.

### Other Behavioral or Psychiatric Adverse Reactions

In Study 1, confusion and anxiety occurred in 1% and 5% of patients with narcolepsy treated with XYWAV, respectively. One patient experienced visual hallucinations and confusion after ingesting approximately 9 grams of XYWAV.

In Study 2, confusion and anxiety occurred in 3% and 16% of patients with idiopathic hypersomnia, respectively. One patient experienced visual hallucinations, which led to discontinuation of XYWAV.

Other neuropsychiatric reactions reported with oxybate (same active moiety as XYWAV) in adult or pediatric clinical trials and in the postmarketing setting include hallucinations, paranoia, psychosis, aggression, agitation, confusion and anxiety. The emergence or increase in the occurrence of behavioral or psychiatric events in patients taking XYWAV should be carefully monitored.

### Parasomnias

Parasomnias can occur in patients taking XYWAV.

### Important Safety Information

---

**WARNING: CENTRAL NERVOUS SYSTEM DEPRESSION and ABUSE AND MISUSE.**

- **Central Nervous System Depression**
  **XYWAV is a CNS depressant. Clinically significant respiratory depression and obtundation may occur in patients treated with XYWAV at recommended doses. Many patients who received XYWAV during clinical trials in narcolepsy and idiopathic hypersomnia were receiving CNS stimulants.**

- **Abuse and Misuse**

---

Episodes of sleepwalking should be fully evaluated and appropriate interventions considered.

## Most Common Adverse Reactions

The most common adverse reactions (occurring in ≥5% of XYWAV-treated patients in adult clinical trials in either narcolepsy or IH) were nausea, headache, dizziness, anxiety, insomnia, decreased appetite, hyperhidrosis, vomiting, diarrhea, dry mouth, parasomnia, somnolence, fatigue, and tremor.

In the pediatric clinical trial with XYREM (same active moiety as XYWAV) that included pediatric patients 7 to 17 years of age with narcolepsy, the most common adverse reactions (≥5%) were nausea (20%), enuresis (19%), vomiting (18%), headache (17%), weight decreased (13%), decreased appetite (9%), dizziness (8%), and sleepwalking (6%). The overall adverse reaction profile of XYREM in the pediatric clinical trial was similar to that seen in the adult clinical trial program. The safety profile in pediatric patients with XYWAV is expected to be similar to that of adult patients treated with XYWAV and to that of pediatric patients treated with XYREM.

## Additional Adverse Reactions

Adverse reactions that occurred in 2-<5% of adult patients treated with XYWAV in the Open-Label Titration and Stable Dose Periods of the randomized-withdrawal study in adult patients with narcolepsy with cataplexy (Study 1) were fatigue, dry mouth, depressed mood, enuresis, irritability, paresthesia, depression, tremor, somnolence, and muscle spasms. Adverse reactions occurring in 2-<5% of patients treated with XYWAV in the IH study include balance disorder, muscle spasms, fall, paresthesia, snoring, weight decreased, bruxism, confusional state, depressed mood, feeling drunk, and irritability.

Adverse reactions that occurred in ≥2% of patients in clinical studies with oxybate (but not in Study 1) and which may be relevant for XYWAV, were pain, feeling drunk, pain in extremity, cataplexy, disturbance in attention, sleep paralysis, and disorientation.

Discontinuation: In Study 1, 9 of 201 patients (4%) reported adverse reactions that led to withdrawal from the study (anxiety, decreased appetite, depressed mood, depression, fatigue, headache, irritability, nausea, pain in extremity, parasomnia, somnolence, and vomiting). The most common adverse reaction leading to discontinuation was nausea (1.5%). In Study 2, 17 of 154 (11%) patients across all study periods (excluding placebo during the DB RWP) (up to 42 weeks) reported adverse reactions that led to withdrawal from the study (anxiety, nausea, insomnia, vomiting, fatigue, feeling abnormal, fall, decreased appetite, dizziness, paresthesia, tremor, parasomnia, confusional state,

## Important Safety Information

> **WARNING: CENTRAL NERVOUS SYSTEM DEPRESSION and ABUSE AND MISUSE.**
>
> - **Central Nervous System Depression**
>   XYWAV is a CNS depressant. Clinically significant respiratory depression and obtundation may occur in patients treated with XYWAV at recommended doses. Many patients who received XYWAV during clinical trials in narcolepsy and idiopathic hypersomnia were receiving CNS stimulants.
>
> - **Abuse and Misuse**

## Drug Interactions

XYWAV is contraindicated in combination with alcohol or sedative hypnotics. Use of other CNS depressants may potentiate the CNS-depressant effects of XYWAV.

Concomitant use of sodium oxybate with divalproex sodium results in an increase in systemic exposure to GHB, which was shown to cause a greater impairment on some tests of attention and working memory in a clinical study. A similar increase in exposure is expected with concomitant use of XYWAV and divalproex sodium; therefore, an initial dose reduction of XYWAV is recommended when used concomitantly with divalproex sodium. Prescribers are advised to monitor patient response closely and adjust dose accordingly if concomitant use of XYWAV and divalproex sodium is warranted.

## Pregnancy and Lactation

There are no adequate data on the developmental risk associated with the use of XYWAV or sodium oxybate in pregnant women. XYWAV should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus. GHB is excreted in human milk after oral administration of sodium oxybate. There is insufficient information on the risk to a breastfed infant, and there is insufficient information on milk production in nursing mothers. The developmental and health benefits of breastfeeding should be considered along with the mother's clinical need for XYWAV and any potential adverse effects on the breastfed infant from XYWAV or from the underlying maternal condition.

## Pediatric Use

The safety and effectiveness of XYWAV for the treatment of cataplexy or excessive daytime sleepiness in pediatric patients 7 years of age and older with narcolepsy have been established. XYWAV has not been studied in a pediatric clinical trial for narcolepsy or IH. Use of XYWAV in pediatric patients 7 years of age and older with narcolepsy is supported by evidence from an adequate and well-controlled study of sodium oxybate in pediatric patients 7 to 17 years of age, a study in adults showing a treatment effect of XYWAV similar to that observed with sodium oxybate, pharmacokinetic data of sodium oxybate from adult and pediatric patients, and pharmacokinetic data of XYWAV from healthy adult volunteers.

Safety and effectiveness of XYWAV in pediatric patients below the age of 7 years with narcolepsy have not been established.

Safety and effectiveness of XYWAV for the treatment of idiopathic hypersomnia in pediatric patients have not been established.

## Important Safety Information

> **WARNING: CENTRAL NERVOUS SYSTEM DEPRESSION and ABUSE AND MISUSE.**
>
> - **Central Nervous System Depression**
>   XYWAV is a CNS depressant. Clinically significant respiratory depression and obtundation may occur in patients treated with XYWAV at recommended doses. Many patients who received XYWAV during clinical trials in narcolepsy and idiopathic hypersomnia were receiving CNS stimulants.
> - **Abuse and Misuse**

starting dosage in patients with hepatic impairment is one-half of the original dosage per night, administered orally, divided into two doses.

### Dependence and Tolerance

There have been case reports of withdrawal, ranging from mild to severe, following discontinuation of illicit use of GHB at frequent repeated doses (18 g to 250 g per day) in excess of the recommended dosage range. Signs and symptoms of GHB withdrawal following abrupt discontinuation included insomnia, restlessness, anxiety, psychosis, lethargy, nausea, tremor, sweating, muscle cramps, tachycardia, headache, dizziness, rebound fatigue and sleepiness, confusion, and, particularly in the case of severe withdrawal, visual hallucinations, agitation, and delirium. These symptoms generally abated in 3 to 14 days. In cases of severe withdrawal, hospitalization may be required.

In the clinical trial experience with XYREM in narcolepsy/cataplexy patients at recommended doses, two patients reported anxiety and one reported insomnia following abrupt discontinuation at the termination of the clinical trial; in the two patients with anxiety, the frequency of cataplexy had increased markedly at the same time. In the XYWAV clinical trial in adult narcolepsy/cataplexy patients at recommended doses, one patient reported insomnia following abrupt discontinuation of XYWAV. In the XYWAV clinical trial in adult idiopathic hypersomnia patients at recommended doses, six patients reported insomnia, two patients reported early insomnia, and one patient reported visual and auditory hallucinations following abrupt discontinuation of XYWAV.

Tolerance to XYWAV has not been systematically studied in controlled clinical trials. There have been some case reports of symptoms of tolerance developing after illicit use at dosages far in excess of the recommended XYWAV dosage regimen.

**Please see full <u>Prescribing Information</u>, including BOXED Warning.**





Narcolepsy

### Important Safety Information

**WARNING: CENTRAL NERVOUS SYSTEM DEPRESSION and ABUSE AND MISUSE.**

- **Central Nervous System Depression**
  XYWAV is a CNS depressant. Clinically significant respiratory depression and obtundation may occur in patients treated with XYWAV at recommended doses. Many patients who received XYWAV during clinical trials in narcolepsy and idiopathic hypersomnia were receiving CNS stimulants.

- **Abuse and Misuse**



**JazzCares® for XYWAV**

SIGN UP FOR INFO

Privacy Statement

Contact Us

Site Map

Terms of Use

Jazz Pharmaceuticals

This site is intended for US residents only.
© 2024 Jazz Pharmaceuticals plc or its subsidiaries
US-XYW-2200207 Rev0124

## Important Safety Information

> WARNING: CENTRAL NERVOUS SYSTEM DEPRESSION and ABUSE AND MISUSE.
>
> - **Central Nervous System Depression**
>   XYWAV is a CNS depressant. Clinically significant respiratory depression and obtundation may occur in patients treated with XYWAV at recommended doses. Many patients who received XYWAV during clinical trials in narcolepsy and idiopathic hypersomnia were receiving CNS stimulants.
> - **Abuse and Misuse**