# EXHIBIT 1

**Gabriel K. Bell**
Direct Dial: +1.202.637.2227
gabriel.bell@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C.  20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

September 4, 2024

## HIGHLY CONFIDENTIAL

Frank C. Calvosa
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Ave, 22nd Floor
New York, NY 10010
frankcalvosa@quinnemanuel.com

Re: *Jazz Pharmaceuticals, Inc. v. Avadel CNS Pharmaceuticals, LLC*,
Fed. Cir. No. 24-2274

Counsel:

We appreciate the call earlier today regarding Avadel's forthcoming motions asking the Federal Circuit to stay the district court's injunction pending appeal, to issue a temporary stay pending resolution of that stay request, and to expedite consideration of the appellate proceedings. Avadel agrees not to file those motions today while the parties attempt to reach agreement on certain issues, but may need to file motions with the Federal Circuit to address ongoing harm in the event that the parties cannot find agreement.

Based on today's call, Avadel's understanding is the following:

1. Jazz agrees to the following expedited schedule for Avadel's Federal Circuit appeal (and Jazz does intend to file a response):

   - Avadel's Opening Brief: September 30, 2024

   - Jazz's Responsive Brief: November 7, 2024

   - Avadel's Reply Brief: November 18, 2024

   - Appendix: November 19, 2024

   - Oral argument: December 2024 or January 2025 sitting

2. Jazz agrees to the following expedited schedule for Avadel's Federal Circuit motion for a stay pending appeal (and Jazz does intend to file a response):

   - Jazz's Response: September 11, 2024

September 4, 2024
Page 2

**LATHAM & WATKINS** LLP

- Reply by Avadel: September 13, 2024

3. Jazz agrees on the expedited schedules above on the condition that Avadel stays its pending trade secrets case against Jazz. Avadel will agree to such stay pending resolution of this appeal by the Federal Circuit.

4. Jazz opposes a temporary stay pending resolution of Avadel's district court and Federal Circuit motions to stay the injunction pending appeal.

5. In lieu of a temporary stay, Avadel has proposed the following: for the period in which Avadel's motions to stay are pending before the district court and/or Federal Circuit, Jazz will not contend that Avadel's activities for the ongoing clinical trial of Lumryz for IH—including enrolling additional patients in the trial and providing open-label extensions as part of the trial—constitute contempt. In our discussion earlier today, you indicated that Jazz does not agree. We believe that Avadel's proposal is a thoughtful compromise that will allow for input from the court(s) and mitigates the need for emergency motions practice, and again urge Jazz to agree to this proposal. We would appreciate a written response later today.

6. Jazz agrees that the district court's injunction does not enjoin Avadel's application for FDA approval of Lumryz for pediatric patients with narcolepsy, which the FDA is expected to act on shortly, and will not argue that Avadel's maintenance of its request to FDA is in contempt of the injunction. Thus, the parties presumptively will not need to address the pediatric narcolepsy issue in any future court filings.

We would appreciate written confirmation of Jazz's positions by noon ET tomorrow.

Sincerely,

/s/ *Gabriel K. Bell*

Gabriel K. Bell
of LATHAM & WATKINS LLP

EXHIBIT 2

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7569**

WRITER'S EMAIL ADDRESS
**frankcalvosa@quinnemanuel.com**

September 5, 2024

<u>**VIA EMAIL**</u>

Gabriel K. Bell                                          <u>**HIGHLY CONFIDENTIAL**</u>
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C., 20004
gabriel.bell@lw.com

Re:     *Jazz Pharmaceuticals, Inc. v. Avadel CNS Pharmaceuticals LLC,*
        <u>C.A. Nos. 21-691; 21-1138; 21-1594 (D. Del)</u>

Dear Mr. Bell:

        Thank you for your follow-up letter today.  With respect to the IH issue, we remind
Avadel that it is an adjudicated infringer of Jazz's valid patent, and that Avadel has been
enjoined by the Court pursuant to the language of the Court's August 27, 2024 Order.  Jazz has
been trying to work with Avadel to find a compromise position, if possible, but Avadel's
continued refusal to acknowledge this reality and lack of clarity regarding its activities with
respect to IH has made the parties' communications unnecessarily difficult.  In particular, with
respect to item # 5, your letter is not responsive to our request given that Avadel refuses to state
how many patients are currently enrolled in its IH clinical trial, how many patients in that study
are on drug (as opposed to placebo), and how many patients will be participating in the open
label extension portion of the study in the November 2024 to January 2025 time period.  In your
letter, you state that "Jazz has not articulated why it needs that information at this time."  This is
not the case and the statement is disappointing given our productive conversation yesterday.  As
we discussed, if Avadel were to provide the requested information, it would help Jazz to
determine whether the parties could resolve Avadel's apparent refusal to comply with the
Court's August 27, 2024 injunction Order.  It is obvious that Avadel is attempting to get around
the Court's injunction given Avadel's refusal to provide any specific information regarding its
activities with respect to IH.  We again reiterate our request that Avadel provide specific
information responsive to Jazz's request.

        With respect to item # 6, Jazz has agreed that it will not seek contempt proceedings with
regard to the pediatric indication for narcolepsy.  We do not understand the basis for your request
regarding FDA communications.  If the FDA has communicated with Avadel regarding the

**quinn emanuel urquhart & sullivan, llp**

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON |
LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO |
SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

**HIGHLY CONFIDENTIAL**

injunction (or vice versa), please provide those communications to us so that Jazz can consider Avadel's request with full context.

Sincerely,

/s/ *Frank Calvosa*

Frank Calvosa

EXHIBIT 3

1

1

2                    IN THE UNITED STATES DISTRICT COURT

3                    IN AND FOR THE DISTRICT OF DELAWARE

4
    JAZZ PHARMACEUTICALS, INC.,              )
5           Plaintiffs,                      )   C.A. No.
    v.                                       )   21-691-GBW
6                                            )
    AVADEL CNS PHARMACEUTICALS, LLC,         )
7           Defendant                        )
    -------------------------------          )
8                                            )   C.A. No.
    JAZZ PHARMACEUTICALS, INC., et al.,      )   21-1138-GBW
9           Plaintiffs,                      )
    v.                                       )
10                                           )
    AVADEL CNS PHARMACEUTICALS, LLC,         )
11  Defendant.                               )
    -------------------------------          )
12                                           )
    JAZZ PHARMACEUTICALS, INC., et al.,      )
13          Plaintiffs,                      )   C.A. No.
    v.                                       )   21-1594-GBW
14                                           )
    AVADEL CNS PHARMACEUTICALS, LLC,         )
15          Defendant.                       )

16

17                           - - - -

18                           Wilmington, Delaware
                             Thursday, June 6, 2024
19                           Permanent Injunction Transcript

20                           - - - -

21

    BEFORE:  HONORABLE GREGORY B. WILLIAMS
22           UNITED STATES DISTRICT COURT JUDGE

23                           - - - -

24

25
                             Michele L. Rolfe, RPR, CRR

**2**

APPEARANCES:

    MORRIS, NICHOLS, ARSHT & TUNNELL LLP
    BY: JEREMY A. TIGAN, ESQ.

        -and-

    QUINN EMANUEL URQUHART & SULLIVAN, LLP
    BY:  F. DOMINIC CERRITO, ESQ.
         NICHOLAS CERRITO, ESQ.
         FRANK C. CALVASA, ESQ.
         For the Plaintiff


    MCCARTER & ENGLISH, LLP
    BY: DANIEL M. SILVER, ESQ.

        -and-

    LATHAM & WATKINS LLP
    BY: KENNETH G. SCHULER, ESQ.
        MARC N. ZUBICK, ESQ.
        ALEX GRABOWSKI, ESQ.

    MORRISON FOERSTER
    BY: DARALYN DURIE, ESQ.
        KIRA DAVIS, ESQ.
        ADAM BRAUSA, ESQ.

        For Defendant


        - - - - -

        P R O C E E D I N G S
    (REPORTER'S NOTE:  The following permanent injunction
hearing was held in Courtroom 6B beginning at 9:00 a.m.)
        THE COURT:  Good morning.  You may be seated.
    We're here this morning for the hearing on

**3**

1  Jazz's preliminary -- motion for preliminary injunction.
2  Civil Action 21-691.  Let's start by having counsel put the
3  appearances on the record.
4          MR. TIGAN:  Good morning, Your Honor.  Jeremy
5  Tigan with Morris Nichols on behalf of Jazz.  I'm joined by
6  my colleagues from Quinn Emanuel today:  Nick Cerrito, Frank
7  Calvasa and Gabriel Brier at counsel table.
8          Behind them is Krista Rycroft and Tyler
9  Crudentaria.
10         And our client representative James Sicola is
11 here as well.
12         THE COURT:  Good morning.
13         MR. SILVER:  Good morning, Your Honor.  Dan
14 Silver from McCarter & English on behalf of Avadel.  I'm
15 joined by Daralyn Durie and Kira Davis from Morrison
16 Foerster.  Ken Schuler and Mark Zubick from Latham &
17 Watkins.
18         And behind the bar, Your Honor, we have Greg
19 Divis, Tom Cue and Craig Simon all from Avadel.
20         THE COURT:  All right.  Good morning all.
21         MR. CERRITO:  Before we begin, Your Honor, a
22 couple of housekeeping matters?
23         THE COURT:  Yes.
24         MR. CERRITO:  The parties have talked this
25 morning and we've agreed on the presentation order, if

**4**

1  that's okay with Your Honor.  We're going to do the PI
2  first, back and forth if you will, and then we'll move on to
3  the ongoing royalties, the second section.
4          THE COURT:  Okay.
5          MR. CERRITO:  Second issue was raised was
6  confidentiality, Your Honor.  Defendants don't seem to have
7  any issues here, we have quite a bit.  I'm not sure which --
8  how Your Honor would proceed here.
9          It's throughout our presentation, it includes
10 very sensitive, competitive information: the type of which
11 we talk about outside this courtroom somebody would say
12 we're colluding and price fixing.  So we simply cannot have
13 representatives from Avadel outside the protective order in
14 the courtroom.
15         MS. DURIE:  May I be heard?
16         THE COURT:  Yes.
17         MS. DURIE:  Thank you.  Your Honor, we
18 endeavored to meet and confer about this evening and we
19 offered to exchange that information.  Jazz refused to meet
20 and confer about it.
21         We have prepared our presentation mindful of
22 confidentiality restrictions.  We think that we can make the
23 arguments without the need to say the specifics of the
24 confidential information.  It's in the record, the Court can
25 look at it, but there's no reason we need to say it or

**5**

1  publish it.
2          This is a critically important case.  This is an
3  existential case for our company, which is why our CEO and
4  our CFO are here.  They have an interest in hearing these
5  proceedings.  The press is here as well.  We think this
6  should be a public hearing.  And to the extent that Jazz
7  wants to refer to confidential information, we think they
8  can simply direct the Court to it.
9          In the alternative, if we're going to clear the
10 courtroom, we think we should do that slide-by-slide not for
11 the entirety of the proceedings.  The Court may remember
12 Dr. Rainey's testimony at trial, the Court was cleared for
13 the entirety of that testimony and afterwards the Court
14 remarked that there was very little of it that was actually
15 highly confidential.
16         So our view is we should proceed.  We think the
17 parties ought to be able to handle it without the need to
18 clear the courtroom, but if they do it should be
19 slide-by-slide, and it should be on their time.
20         MR. CERRITO:  Your Honor, I'm happy to show Your
21 Honor the substantial amount of material that I'm talking
22 about.  It's not -- back and forth back and forth is going
23 to break up our presentation.  We have the burden of proof
24 here.  While defendants don't have any confidential
25 information they are worried about, they should, there's

58

1  We presented the evidence of medical professionals.  They
2  presented nothing to counter this.  And what we see in
3  Dr. Stern's declaration is that the improvements that we
4  see -- it's not just convenience.  The improvements in
5  patient compliance, which is to say many patients can't wake
6  up to take the second dose, but with Lumryz they don't need
7  to so they are more likely to get the full benefit of the
8  therapy, that leads to better outcomes, both in terms of
9  symptom control and quality of life.  Again, unrebutted
10  testimony.
11       We also provided the Courts with declarations
12  from a number of patients.  These are patients who are
13  attesting to their experience.
14       Now, I heard counsel suggest that, you know,
15  maybe patients shouldn't be trusted to report on their own
16  experience, but I would say in reading these declarations
17  these patients are clear and specific about why they have
18  benefited from Lumryz relative to Xyrem or Xywav and what a
19  powerful impact that has had.  Including the fact that in
20  this case a student who had problems not missing class on
21  prior therapy and has seen a big difference after switching
22  to Lumryz.  That includes patient two who had negative
23  experiences on Xywav and then started Lumryz and had a much
24  more positive experience.  The days were more consistent
25  because sleep was more consistent.

59

1       Patient three who, as a consequence of improved
2  sleep, is now able to keep a consistent schedule,
3  concentrate better and hold down a job.  That includes
4  patient S who talked about the fact that they are now --
5  that patient is now getting the best quality of sleep, in
6  their judgment, that is possible and that their quality of
7  life has improved.
8       And patient F who is a teacher who talked about
9  the problems that she had taking Xyrem and Xywav, that there
10  was the problem with waking up but not being able to take
11  the second dose, sleeping through the alarm and that this
12  patient has found Lumryz has allowed them to stay asleep all
13  through the night.  And that when they were on Xyrem or
14  Xywav not only would they wake up in the night, but they
15  would have these nighttime events: in this case eating in
16  the middle of the night that caused weight gain and made
17  them feel terrible.
18       Now, I want to be clear the only medical
19  evidence we have from any Jazz-affiliated doctor on this
20  point is what Dr. Bogan said at his deposition.  And what he
21  said at his deposition in this case, Jazz's expert, is that
22  as a clinician he would like to have once-nightly oxybate
23  available.
24       The evidence that we have put in on this point
25  is substantial, that doctors and patients see important

60

1  benefits, not merely convenience, but important benefits in
2  terms of symptom control, the ability to hold down a job,
3  the ability to go to classes as a function of being able to
4  sleep through the night due to Lumryz.
5       And, again, I want to note that everything that
6  you heard that counters this evidence is attorney argument
7  because Jazz put in no evidence to meet its burden on this
8  point.
9       Now, we had discussion about sodium-sensitive
10  patients.  And what I want to note with respect to
11  sodium-sensitive patients is -- I heard, I think, a
12  statement that FDA found that sodium-sensitive patients
13  should be on Xywav.  If I heard that correctly, that is not
14  what FDA found.  What FDA said is that although it is widely
15  accepted that everyone should limit sodium intake generally,
16  the warning on Lumryz's labeling regarding sodium is
17  directly only at patients sensitive to sodium intake, such
18  as those with heart failure, hypertension and renal
19  impairment.  And then with respect to those patients what
20  FDA found is for certain sodium-sensitive patients with
21  narcolepsy, the benefit offered by once-nightly dosing would
22  outweigh the risk of increased sodium intake for reasons; in
23  other words, having to wake up to take the second dose is
24  antithetical to oxybate's goal on improving sleep,
25  disrupting sleep contributes to chronic sleep loss, etc.,

61

1  with detrimental effects on both psychological and physical
2  health, and there are other ways such patients may reduce
3  such sodium in their diet.  So there is a clear benefit for
4  many patients whether sodium-sensitive or not to Lumryz.
5       Now, Jazz has tried to avoid, I think, the force
6  of this evidence by suggesting that they are only seeking a
7  limited injunction.  First point I want to make there was is
8  no reason that patients who are not yet on Lumryz are any
9  less deserving of those benefits than patients who already
10  have been prescribed the drug.  And we put in in a
11  declaration from Dr. Stern an explanation of who those
12  patients are.  Some of them haven't yet been diagnosed with
13  narcolepsy.  Some of them may not yet have gotten insurance
14  coverage to take Lumryz.  Some of them may not yet be 18.
15  Some of them not yet completed the process of going through
16  the risk, the REMS for Lumryz, the Risk Evaluation and
17  Mitigation System.  There are many reasons that patients may
18  not yet be on Lumryz, but still benefit from it, and those
19  patients are every bit deserving of the benefit.
20       Indeed, Nurse Practitioner Maggie Lavender put
21  in a declaration explaining that she has patients who she
22  can't get prescribed Lumryz, but she wants to; and that she
23  expects that those patients will benefit from it when it is
24  available for them, including in this example a patient who
25  has parasomnia symptoms, this twilight mode where you're

62

1    sort of half awake and half asleep on Xywav.  And actually
2    in one instance when he was in college, the patient drove to
3    a store and caused a disturbance in the middle of night not
4    being aware that they were in this parasomnia state, and
5    this is a really serious issue.  This patient deserves
6    access to Lumryz and deserves it every bit as much as the
7    patients who were currently on it.
8           Now, although Jazz has tried to suggest that the
9    injunctions that they seek are limited, we have put in
10   evidence that even a limited injunction is, in effect, an
11   injunction for everyone.  Avadel is a one product company.
12   Now, there's been a suggestion that's Avadel's own fault.
13   I'm going to talk about that, but the point I want to make
14   right now is whatever it is or isn't, it's not the patient's
15   fault.  I'm talking right now about public benefit.  And
16   from a public benefit point of view no patients will get
17   this benefit if there is an injunction that precludes Avadel
18   from being able to serve future patients.
19          THE COURT:  Well, let me ask you --
20          MS. DURIE:  Yes.
21          THE COURT:  -- the same question I asked
22   Mr. Cerrito:  From a you public interest perspective, isn't
23   there a difference between narcolepsy and IH?
24          MS. DURIE:  I'm glad that the Court asked that
25   because I was about to talk about IH.  And the answer is

63

1    there is a difference, but there is a strong public benefit
2    with respect to idiopathic hypersomnia too.
3           I think the most critical fact here is that
4    although Jazz's counsel says that Xywav is approved for
5    once-nightly, the evidence is that only about a quarter of
6    patients with idiopathic hypersomnia are taking Xywav
7    once-nightly and a quarter of it are taking twice-nightly,
8    and the reason for that --
9           THE COURT:  Even more basic than that because
10   public interest is two factors, okay.  You've got to public
11   interest in protecting intellectual property, which, you
12   know, encourages innovation: and then you've got the public
13   interest in having access to the drugs.  But one of the
14   distinctions -- is there a distinction here between
15   narcolepsy -- when it comes to access to the drugs, is there
16   a distinction between narcolepsy, which is with respect to
17   narcolepsy, there's been -- the FDA has said that Lumryz has
18   some clinical superiority.
19          MS. DURIE:  Correct.
20          THE COURT:  But it hasn't done that with respect
21   to IH.
22          MS. DURIE:  Not yet.  And the reason for the
23   "not yet" is that Avadel has not yet done the clinical trial
24   that would result in presenting that question to FDA.
25          THE COURT:  Okay.

64

1           MS. DURIE:  And one thing I want to note off the
2    bat, Avadel is not engaging in any infringing conduct with
3    respect to IH.  Right now Avadel is selling Lumryz with a
4    label for narcolepsy.
5           Your Honor referred to off-label usage.  There
6    is some, we don't promote it, we don't control it, we don't
7    have anything to do with it, we're not allowed to.  That is
8    a judgment being made by an individual doctor about whether
9    they're going to prescribe Lumryz for their IH patient.  We
10   don't do anything to encourage that.
11          And as the evidence shows, it's a very small
12   number of patients.  I think it's eleven patients, probably
13   because there's no insurance coverage for it in that
14   scenario.
15          Avadel has not yet started a clinical trial for
16   idiopathic hypersomnia, it intends to.  It intends to invest
17   $35-40 million in that clinical trial.  That clinical trial
18   will fall within the FDA's safe harbor.  That is infringing
19   activity because we have made a policy judgment that we
20   companies to conduct those clinical trials, regardless of
21   issues with respect to patent infringement.
22          After that clinical trial has been done, Avadel
23   will make a submission to FDA and FDA will then have an
24   opportunity to evaluate whether Lumryz makes the same major
25   contribution to patient care in idiopathic hypersomnia as it

65

1    does in narcolepsy.
2           Now, we have put in evidence as to why we think
3    the answer to that question will be yes, and that is because
4    we expect it to have the same benefit because most
5    idiopathic hypersomnia patients take Xywav or Xyrem
6    twice-nightly, and we think they will see the same benefits
7    on Lumryz of being able to take a single dose and sleep
8    through the night.
9           THE COURT:  Okay.  But infringement of Claims 14
10   and 24, its been said that Avadel doesn't currently do
11   anything that infringes the patent.  And one of the things
12   that Jazz is asking for is a permanent injunction with
13   regard to that.  So if the Court granted the permanent
14   injunction with respect to IH, that wouldn't put Jazz --
15   that wouldn't put Avadel out of business, right, because you
16   aren't doing anything?
17          MS. DURIE:  Well, I don't think that's
18   necessarily correct.  Avadel operates at a very substantial
19   loss right now.  It made huge investments in Lumryz well
20   before it knew about Claim 24 of the patent or could have
21   known.  It made huge investments in clinical trials to bring
22   a product to market with the hope that it would be able to
23   recoup those expenses and then be able to continue to sell
24   that product in a profitable way.
25          So actually Avadel does depend upon the ability

66

1  to grow and expand its business, that's part of the point of
2  Mr. Divis' declaration, generally, in order to be able to
3  continue to sell Lumryz.  But I want to make sort of a
4  fundamental point here:  Yes, Jazz is asking for a permanent
5  injunction.  Nothing that Avadel will do would be subject to
6  an injunction for a very long period of time, because Avadel
7  can't infringe right now:  it does haven't a FDA approval to
8  sell a product and it won't have that FDA approval for years
9  in the future.  I think the estimate was something like
10  three or four years, something on that order of magnitude.
11  That is the first point of time at which there would even be
12  a question about whether Avadel sales should be enjoined for
13  idiopathic hypersomnia, because before then Avadel would not
14  be infringing, it would be operating within this regulatory
15  safe harbor that allows for conduct that would otherwise
16  infringe if that conduct is intended to generate data for
17  submission to FDA.
18          And, again, we have -- there's a reason that
19  companies cannot infringe patents when they are conducting
20  clinical trials that is because we want to encourage
21  companies to do that.  And we want to encourage companies to
22  do that in order to generate the data that the Court would
23  then be able to look at --
24          THE COURT:  Right, but that's protected by
25  statute --

67

1          MS. DURIE:  That's protected by statute, that's
2  exactly right.
3          At that point FDA will look at the data and make
4  a decision about whether Lumryz offers a major contribution
5  to patient care.
6          Now, again, Jazz bears the burden on this point.
7  Jazz has put in, I will say, evidence about Xywav -- and I
8  will talk about that -- but we have put in evidence from
9  medical professionals explaining why there is a need now for
10  patients with idiopathic hypersomnia for Lumryz and,
11  therefore, why we expect that FDA is going to reach the same
12  conclusion at the conclusion of those clinical trials.
13          So the first point most idiopathic hypersomnia
14  patients take Xywav twice a night.  On the label it says
15  once a night or twice a night, most patients take it twice a
16  night.  So we put that in, that's evidence from Dr. Stern,
17  that's in the declaration from Nurse Practice Maggie
18  Lavender.  This is not merely anecdotal evidence, although
19  it is the only evidence from any medical professional on
20  this.  This is entirely unsurprising because this is what
21  was reflected in the clinical trial for Xywav.
22          Now, on the Xywav label it says that in the
23  clinical trial 23 percent of patients took Xywav
24  once-nightly with a median dose of 4.5 grams and 77 percent
25  of patients took it twice-nightly with a median dose of

68

1  7.5 grams.  I want to explain how this clinical trial was
2  structured because it's a little bit unusual.
3          Patients and their doctors were given the
4  opportunity to identify to select the dosing regimen that
5  they would be on, the one that as between these two Xywav
6  options was credible or least bad for them.  And as a result
7  of those individualized decisions between doctors and
8  patients, 77 percent of patients wound up taking Xywav
9  twice-nightly.  Then in the clinical trial aspect, half of
10  those patients stayed on that drug at the dose and the
11  dosing schedule that they had selected.  The other half were
12  switched to a placebo.  And in the study what they evaluated
13  was how much better patients did when they stayed on drug
14  relative to what happened when they switched to a placebo.
15          But the thing that's critical about this is
16  three-quarters -- more than three quarters of patents were
17  taking it twice-nightly, which makes it entirely
18  unsurprising the evidence we put in from doctors and from
19  Nurse Practitioner Lavender is consistent with that.
20          So why is it that if patients want to be able to
21  sleep through the night?  There are a number of reasons, but
22  one of them has to do with dose.  Xywav is an immediate
23  release product.  All of the drug that you take is
24  immediately going to hit your system.  For that reason, the
25  maximum dose of Xywav that you can take at once is 6 grams,

69

1  because it isn't safe to have more than 6 grams hit your
2  system at once.  So if you are a patient who needs more than
3  6 grams of oxybate in order to get sleep, you're not going
4  to get that with the once-nightly dose of Xywav.
5          Lumryz, by contrast, can be dosed up to 9 grams,
6  and that's because you have that two-phase release, half of
7  it releasing right away, half of it releasing later so it's
8  safe for you to take a higher dose.  And what we saw here on
9  the Xywav label 77 percent of patients were taking Xywav
10  twice-nightly median nightly dose of 7.5 grams, that's more
11  drug, which presumably they and their physician determined
12  that they needed than it would be possible for them to get
13  if they were taking Xywav once-nightly.
14          THE COURT:  Well, doesn't that also support the
15  casual nexus because that's the invention of Claim 24, the
16  immediate release and the modified release?
17          MS. DURIE:  So both immediate release and
18  modified release are elements of the claim, I agree with
19  that.  However, at trial, Jazz said with respect --
20  immediate release was in the prior art, everybody agrees
21  with that.
22          At trial Jazz said "modified release was in the
23  prior art."  And it pointed to its earlier prior art
24  disclosure of modified release in the '488 patent as
25  providing the support for that for Claim 24.

70

1    What Jazz said was not in the prior art, what it
2  said it had added was this idea of a thickener of a separate
3  acid and of putting it into a sachet.  Now I'll talk about
4  that more in a minute, but I think the fundamental point for
5  what did Jazz contribute, those are the things that it
6  contributed in Claim 24: not the ability to have
7  once-nightly dosing.
8         And in fact, as we'll see, Jazz was very clear
9  with Your Honor that Claim 24 was not about once-nightly
10  dosing.  They didn't invent it.  They couldn't do it.  They
11  didn't need to be able to do it because that's not what
12  Claim 24 was about.  The reason patients are taking Lumryz
13  is because of once-nightly dosing: it's because it allows
14  them to get all of the drug they need once at bedtime and be
15  able to sleep through the night.
16         And certainly with respect to public benefit for
17  idiopathic hypersomnia, the 77 percent of patients or so who
18  cannot take Xywav once-nightly because it doesn't provide
19  enough drug for them, who currently are taking it
20  twice-nightly just as with narcolepsy and are suffering all
21  the burdens that FDA ascribed to twice-nightly dosing and to
22  having to wake up in the middle of the night, those patients
23  are equally deserving of Lumryz.  That's why Avadel is
24  willing to invest $35-40 million dollars in a clinical trial
25  to prove those benefits to FDA.

71

1         Now, I want to say, what I just explained is
2  articulated in Dr. Stern's declaration.  He talks about the
3  maximum dose of Xywav being 6 grams as compared to 9 grams
4  for Lumryz and why that means that many patients, in fact
5  most patients, cannot get full symptom relief by taking
6  Xywav once-nightly and why in his opinion Lumryz is going to
7  be better for those IH patients in the same way that it has
8  been determined to be better for patients with narcolepsy.
9         And we put before the Court Greg Divis'
10  declaration explaining that the reason that Avadel is
11  proposing to do this trial is because physicians and the
12  sleep disorder community have been urging it to do so
13  because of the benefits that they expect will accrue from
14  being able to use Lumryz for idiopathic hypersomnia
15  patients.
16         Now, in substance, what the evidence shows is
17  that there may be 23 percent of patients, up to 23 percent
18  of patients who are doing okay on once-nightly Xywav, and
19  that's fine.  But here the question is whether there is a
20  patient population who will benefit substantially from
21  having Lumryz available.  It doesn't need to be all
22  patients, it is sufficient if it be some patients.  And if
23  one device is more suitable for some patients and another
24  device is more suitable for other patients, that is the
25  circumstance where patients should have that choice; that's

72

1  what the Court found in *Abbott v. Edwards Life Sciences*, and
2  that's what is true here because we have these very
3  differentiated products.  And there are patients who need
4  more than 6 grams of oxybate, need a second dose in the
5  middle of the night and should be able to get the same
6  life-changing benefits of that therapy in.
7         Now, I want to note that Jazz submitted some
8  declarations in connection with its reply brief.  It
9  submitted a declaration from Dr. Kryger.  He did not rebut
10  any of the things that I just said.  And I think it's
11  telling that they chose to put before the Court a
12  declaration from someone who is absolutely and without
13  question is a sleep expert.  What did he say?  I diopathic
14  hypersomnia and narcolepsy are not the same condition.
15  That's fine.  We're not saying they are same condition.
16  They exist on a spectrum.  Patients are sometimes diagnosed
17  with idiopathic hypersomnia and then rediagnosed with
18  narcolepsy.  But it doesn't matter because the point that
19  matters is that oxybate is a highly effective treatment for
20  idiopathic hypersomnia.  He doesn't disagree with that.
21         He also says idiopathic hypersomnia is
22  characterized by sleep inertia where the patient wakes up
23  irritable or very drowsy, that it is really hard to wake up.
24  That's true.  That's what Dr. Stern explained that it's even
25  harder for IH patients to wake up for that seconds dose when

73

1  they need that additional drug, and why it's even more
2  important for them to have a drug that they can take once at
3  bedtime and sleep through the night.  Dr. Kryger doesn't
4  disagree with that.
5         And finally he said narcolepsy is characterized
6  in many cases by disrupted nighttime sleep, but that's not
7  typically seen in idiopathic hypersomnia.  Same point.  I
8  think if anything that supports our position.  And, in fact,
9  what is shown in the documents associated with the Xywav
10  label is that patients were considered for twice-nightly
11  dosing if they reported disruptive nighttime sleep or
12  difficulty with sleep maintenance, and we know that was
13  77 percent of the patent population.
14         And, in fact, previously in a letter that he
15  submitted to FDA, Dr. Kryger surveyed the treatment
16  landscape at that point in time, which is to say
17  twice-nightly doses, said that patients having to awaken in
18  the middle of the night to take a second dose was an issue,
19  and described this as a cumbersome treatment that had not
20  changed in about 40 years.  So we can understand why it is
21  that they did not have Dr. Kryger articulate his views
22  responsive to the medical testimony that we put in.
23         Now, I want to note that there was a suggestion
24  in the reply papers that Xywav once-nightly is sort of
25  equivalent to Xywav twice-nightly at least for the

74

1   23 percent of patient who is are on a once-nightly regimen.
2   This is the actual data, and I want to note here this is
3   from the Xywav approval package, Figure 5.  And what it's
4   showing here is the range of the sort of median and then the
5   range of sort of outcomes from a statistical point of view
6   for the once-nightly treatment and the twice-nightly
7   treatment.  The score that goes from zero to negative-11 is
8   the Epworth sleepiness scale.  And what is this is showing
9   is how much better patients did or how much worse patients
10  did when they went off drug or how much better they did when
11  they stayed on drug, but the bigger the negative number the
12  bigger the impact when they switched to placebo.
13          So a more negative number is the drug was more
14  effective because there was a bigger effect, a bigger
15  worsening of symptoms when they switched to a placebo.  You
16  see the numbers that are reported by Jazz about minus-3,
17  which is a pretty big band for once-nightly, maybe minus-7.5
18  with a slightly smaller band, but still a significant one
19  for twice-nightly.  That's the data.  This is something Jazz
20  put in their reply brief.  For that reason we don't have a
21  declaration responding to it, but I would just note that
22  that data looks pretty different in terms of the
23  effectiveness of the once-nightly and the twice-nightly
24  Xywav regimens for idiopathic hypersomnia.
25          The fundamental point here, Your Honor, with

75

1   respect to idiopathic hypersomnia is that Jazz has not met
2   its burden, and it is its burden to show that these patients
3   would not benefit and that there is, for that reason, a
4   public benefit in precluding them from having access to this
5   potentially life-changing treatment.
6           And in the *United Therapeutics* case the Court
7   there found where at least some patients would likely suffer
8   negative consequences that was a reason to conclude that the
9   plaintiff has failed to do show that an injunction would be
10  in the public interest.  And I would suggest here we have
11  put in a great deal of evidence about why we plan to invest
12  money in a clinical trial and what we expect FDA's
13  determination will be, why we expect they will reach the
14  same conclusion, and essentially unrebutted evidence from
15  medical practitioners about why it makes sense.
16          THE COURT:  But isn't the difference here -- so
17  you said yourself, as of today there's a very small number
18  of patients that have -- that suffer from IH that have even
19  been prescribed Lumryz.
20          MS. DURIE:  That is true.
21          THE COURT:  Right.  And what was that number
22  again?
23          MS. DURIE:  I believe it's 11.
24          THE COURT:  Eleven.  All right.  So in these
25  cases where, you know, the differentiator of the product is

76

1   the basis to deny the permanent injunction the product has
2   actually been prescribed, right?
3           MS. DURIE:  No.  And actually this *United*
4   *Therapeutics* case is interesting because this was about
5   whether defendant should be enjoined from launching the
6   product for a particular medication.  So there the product
7   had not launched, and the Court said I'm not going to injoin
8   the product from launching because I think doing so would
9   mean that patients would likely suffer negative consequences
10  if that product didn't launch.
11          The point here, Your Honor -- I mean, it's true
12  Avadel has not yet done the clinical trial.  Part of why
13  Avadel didn't do the clinical trial yet was because of
14  Jazz's conduct which kept it off the market as a function of
15  the REMS patent and delayed the launch of Lumryz itself for
16  narcolepsy.  But be that as it may -- and I'll talk more
17  about that, but be that as it may, the fundamental point
18  idiopathic hypersomnia patients deserve access to the drug
19  that is best for them just as narcolepsy patients do.
20          The timing of the clinical trials is not
21  relevant to their need.  So the only question should be have
22  we -- has Jazz shown, has Jazz met its burden to show that
23  the health of those patients will not be adversely impacted
24  if the Court enters an injunction.
25          THE COURT:  That's not the only question.  The

77

1   question is does -- will the permanent injunction disserve
2   the public interest.  And, again, the public interest is two
3   factors:  The protection of intellectual property rights and
4   then the accompanying healthcare benefits of patients.  And
5   so that's -- you know, the Court has to look at both of
6   those factors and factor that in.  And so that's sort of the
7   state of -- sort of the use of the drug is different for
8   narcolepsy as it is for IH.
9           MS. DURIE:  Not in a way that I think is germane
10  to the decision the Court needs to make.  It is true in
11  every case that there's a public interest in patent rights.
12  What the Court's have said is we're not going to permanently
13  injoin activities that would injure the public health, that
14  the public health is sacrosanct.  Again, where there is a
15  differentiated impact that is a true public health impact.
16          So the timing and sort of what the status quo
17  is, I don't think is relevant to that public health
18  determination.  The question is:  Are those patients likely
19  to receive the same benefit?  And, again, I want to note
20  there's nothing to injoin now.  We're not doing anything in
21  idiopathic hypersomnia to infringe.  We need to run a
22  clinical trial.  There's nothing to injoin with respect to
23  the clinical trial, that's not infringing.
24          At that point, FDA will look at the data and
25  will make a decision.  At that point, I suppose, maybe Jazz

78

1    could come back and say now we want an injunction because we
2    don't think there's any benefit to public health and we
3    could make a showing, maybe they could make a showing then
4    that they are unable to make now.  But I would say on this
5    record, they have not made any showing that should cause
6    this court to prejudge what determination FDA is going to
7    make once the clinical trial is done and once FDA has the
8    benefit of looking at that evidence to see what the benefits
9    to idiopathic hypersomnia patients will be.  And I think the
10   public health benefit, from a public health point of view is
11   what is best for patients.  It doesn't matter whether the
12   therapy is already on the market or not.  The goal is to
13   make sure that patients can have the therapy that is best
14   for them.
15          THE COURT:  But if a competitor can, at any
16   time, just come in to court and say well, you know, we're
17   going -- we are coming up with a competitive drug that
18   infringes Company A's patent, but our drug is going to have
19   some differentiating feature that is going to more benefit
20   patients, if that -- and it doesn't matter whether that drug
21   was in the market being currently prescribed and would be
22   being taken away from patients as opposed to a drug that's
23   been in the market, has been prescribed to patients, you
24   know, if you don't put some limit on it at some point then
25   that's just opening the door for infringement.

79

1          MS. DURIE:  No, Your Honor.  And, one, I would
2    say there is no injunction factor that looks at whether the
3    product is already on the market; that's not one of the
4    injunction considerations in the permanent injunction
5    context that we have been looking at.  It is -- in terms of
6    a preliminary injunction, status quo can matter in terms of
7    determining the status quo, but here the test is public
8    interest not maintaining the status quo.
9          THE COURT:  Right.  Public interest, and public
10   interest includes protecting intellectual property right --
11          MS. DURIE:  It absolutely does.  But I would
12   say, Your Honor, this is why in part we have that regulatory
13   safe harbor.  We want companies to conduct the clinical
14   trials in order to develop the evidence that then allows the
15   Court to evaluate, at the point of launch, which is when
16   that is typically going to happen, whether there is a public
17   benefit in allowing the launch and allowing the product to
18   come on the market.
19          And, bear in mind, we have a safe harbor,
20   statutory safe harbor for the clinical trial, you're not
21   infringing.  We then also, when there are Orange Book listed
22   patents, as the Court knows, we have an automatic stay.  The
23   purpose of that automatic stay is to allow the patent
24   infringement issues to be adjudicated before launch.  And
25   the point of that is to give the Court the ability both to

80

1    have the benefits of the clinical trials and see what the
2    evidence is with respect to patient benefit and to be able
3    to make a determination before launch about whether that
4    launch should happen.
5          In that context the Courts look at the public
6    health and make a determination about whether the product
7    should be permitted to launch or should not be permitted to
8    launch, based on the showing with respect to all four of the
9    injunction factors, but, for this case critically, the
10   public health, public benefit factor and whether the public
11   benefit is going to be served by that launch.
12          Again, I think the reason that it is set up that
13   way is precisely because we don't want patients to suffer
14   just by the happenstance of when it is that companies
15   conducted clinical trials for particular indications.  We've
16   seen -- and the Court has evidence about -- just how
17   important and beneficial Lumryz is for narcolepsy patients.
18   If idiopathic hypersomnia patients get that same benefit, as
19   we expect them to do, a benefit that allows them to hold
20   down a job, allows them to go to classes, allows them not to
21   drive around unsafely in the middle of the night, they
22   should have those public health benefits too.
23          THE COURT:  Let me ask you this question:  Does
24   Avadel have noninfringing alternatives of Lumryz available?
25          MS. DURIE:  That is an excellent question and

81

1    there are two things I want to say about that:  First, I
2    would note, at trial Jazz argued over and over and over
3    again that there is no noninfringing alternative.  Their
4    experts said that over and over, and that was part of
5    Dr. Rainey's damage opinion that there was no noninfringing
6    alternative, no noninfringing alternative.
7          Two, this is an -- this situation -- we're not
8    selling a nail where you can just change the nail and all of
9    a sudden not infringe.  The problem here is the need to get
10   regulatory approval, so we can't just change our product and
11   start selling it.  Jazz had to make all of its product
12   decisions, conduct clinical trials with that product, get
13   that product approved by FDA and that is the product that we
14   have approval from FDA to sell.  So the answer is this is
15   what is called sometimes regulatory lockup or regulatory
16   holdup because we, as a practical matter, can't just make a
17   change to the product and start selling it without going to
18   FDA and without dealing with regulatory approval.
19          So Avadel made all of the decisions about what
20   its product was going to be before it knew about Claim 24;
21   in fact, before Jazz had applied for Claim 24.  At the point
22   in time where Avadel made all of those decisions, Claim 24
23   didn't exist, the application didn't exist.  Avadel had no
24   way to know that Jazz was going to claim that this was its
25   intellectual property.  And it made all of those investments

82

1    at that period of time leading up to FDA approval in good
2    faith and invested $150 million in getting that regulatory
3    approval to be able to bring this product to market.
4            So when Jazz says well, you should just switch,
5    what Jazz is really saying is scrap all of that, go back and
6    start all over again, reformulate a product, redevelop a
7    product, do whatever you need to do, go back to FDA do
8    whatever FDA says you need to do and then maybe some day FDA
9    will let you come out with a different product.  So that is
10   why there is this notion of regulatory holdup or regulatory
11   lockup, and I will -- when we get there, there's a case that
12   considered this precise question and found that is a
13   situation that weighs against entry of an injunction.  Note:
14   Jazz could have sought this claim back in 2016, it chose not
15   to.  Had Jazz done that in 2016 and allowed the fact of that
16   claim to publish, we would have been on notice that this is
17   something that Jazz claimed was its intellectual property
18   and we could have conducted ourselves accordingly.  Jazz
19   didn't do that.
20           Jazz waited to file this claim until after they
21   saw our patent application, as the Court knows, and even
22   then Jazz kept that claim a secret from us until the day
23   they sued us.  So Jazz affirmatively tried to prevent Avadel
24   from learning about this intellectual property so that
25   Avadel could continue -- would continue down the path that

83

1    it was on and would not make changes.  So for Jazz now to
2    come into court and say that we acted at our peril when Jazz
3    kept from us any information about their intellectual
4    property is, I would suggest, a little rich.
5            Avadel made its investments in good faith.  It
6    spend a lot of money to bring this product to patients and
7    it did so with absolutely no way of knowing that Jazz later
8    was going to claim something that it owned.
9            THE COURT:  All right.
10           MS. DURIE:  Now, I want to move on to the other
11   factors.  I want to touch briefly on balance of hardships.
12   So with respect to balance of hardships, the Court can
13   consider a number of things:  The party sizes, their
14   products and their revenue sources.  This is, again, one
15   respect in which this case is different from *Natera* because
16   in *Natera* the Court found that revenues from the product at
17   issue were a small fraction of Invitae's business.  Here
18   Lumryz is our only product and we've put forward evidence
19   that an injunction would bankrupt Avadel.
20           Now, just before I move on, I want to note,
21   again, Jazz's argument is well, you brought this on
22   yourselves.  We didn't.  At the point in time that we
23   investigated $150 million we had no way to know about
24   Claim 24.  At the point when Avadel became a one-product
25   company and said we need to provide this product to patents,

84

1    we need to put all of our resources into this product, that
2    was in 2019, that was before Jazz even filed for Claim 24;
3    so all of those decisions were already baked in and it had
4    already been made.  And the consequence of that and Jazz not
5    discussing the fact that it owned this intellectual property
6    is that Avadel finds itself in this situation where it would
7    be bankrupted.
8            Jazz, on the other hand, has said repeatedly in
9    public statements, on earnings calls that have to be
10   accurate as a matters of SCC rules, that notwithstanding
11   competition from our product, it expects Xywav to remain the
12   oxybate of choice, including the number one treatment for
13   narcolepsy.  Jazz has said it's confident in durability of
14   Xywav.  That it's well-positioned to achieve its goal of two
15   billion in sleep revenue in 2025.  That Xywav's revenues
16   increase 14 percent year-over-year, notwithstanding
17   competition from Lumryz, reenforcing its confidence, its
18   trajectory and durability.  What we are talking about on
19   Avadel's side is bankruptcy.  What we're talking about on
20   the Jazz side it is maybe instead of increasing 14 percent
21   year-over-year it would increase 17 percent or some -- but
22   that's what we're talking about when we're talk about the
23   harm on the Jazz side of the ledger.  Now I said we made
24   these investments in good faith.
25           In the *Hynix* case, the Court considered a

85

1    related kind of lock-in.  Now there it wasn't regulatory
2    lock-in from FDA, it was lock-in from being part of a
3    standards essential group with a standards essential patent.
4    But the point was the same.  The point said -- the Court
5    said:  Sure, generally if you elect to build a business on a
6    product found to infringe, you can't be heard to complain
7    about that.  But the Court said this was a different
8    situation because there was a lock-in and that lock-in
9    resulted from the fact that Rambus didn't disclose and in
10   fact didn't obtain the patents until after, in that case, it
11   had established RDRAM as an industry standard.  Here it's a
12   similar thing; in that, Jazz did not disclose or in fact
13   obtain the patents-in-suit until after Avadel had made all
14   of its investments in getting regulatory approval for
15   Lumryz.
16           THE COURT:  But, again, when you say there's --
17   the situation that Avadel is facing is bankruptcy, I get it
18   with respect to narcolepsy.  But with respect to IH
19   that's -- that can't be true because you're not in that
20   market substantially.
21           MS. DURIE:  So --
22           THE COURT:  And if you weren't allowed to
23   infringe their patent with respect to IH, then the money you
24   would spend on the FDA you would save.
25           MS. DURIE:  So -- well, so it is true that if

86

1   the Court were to decide now that no matter what benefits
2   FDA found for idiopathic hypersomnia patients, regardless of
3   the patient benefit it didn't matter and said now no matter
4   what FDA finds we're going to injoin sales of IH at the
5   conclusion of the clinical trials, so three or four years
6   from now, I think it's probably true that Avadel wouldn't
7   run a clinical trial if there was no way that it could sell
8   product at the conclusion of that clinical trial.  Although,
9   I would suggest there's no reason for the Court to make that
10  judgment now, rather than waiting to see what the result of
11  the clinical trial is and what the evidence actually is with
12  respect to patient benefit at that point in time.  That
13  doesn't mean, though, that Avadel can be successful only in
14  the narcolepsy market.  It's true that right now Avadel only
15  sells in narcolepsy.  Right now Avadel loses money.  Avadel
16  made a massive investment in developing Lumryz, totally in
17  good faith with no reason to know anything about Claim 24 of
18  the '782 patent, with the expectation that it would be able
19  to bring that product to market for the range of patients
20  who need it, including patients with idiopathic hypersomnia.
21  So I don't think the Court can conclude Avadel will be fine
22  if it is limited to the market for narcolepsy patients.
23         But my other main point, Your Honor, would just
24  be right now there is no basis for the Court to find that
25  the public health concerns with respect to idiopathic

87

1   hypersomnia are any different than they are for narcolepsy.
2   Jazz's arguments was well we've got once-nightly dosing for
3   Xywav, that's 21 percent of patients.  For the other
4   77 percent of patients, they're in the same situation as
5   narcolepsy patients.
6          So I would say if the Court -- we think that we
7   have made a sufficient showing today with respect to those
8   patients, but if the Court disagrees the right thing to do
9   is to wait.  Let us run a clinical trial, which does not
10  infringe.  Let us present the results of that clinical trial
11  to FDA, which does not infringe.  Let FDA make a judgment,
12  as they did with narcolepsy, about what the benefits are.
13  At that point the Court would have a record and Jazz could
14  make an argument that the evidence for idiopathic
15  hypersomnia is different than for narcolepsy.  It is
16  different, we don't think it is going to be, but we -- I
17  mean, we can't definitively -- right now we've got doctors
18  put in front of you saying we expect those patients will get
19  the same benefits.
20         At a minimum, if the Court doesn't find the
21  declarations of those doctors saying we've got idiopathic
22  hypersomnia patients, they're suffering, we expect them to
23  get the same benefits: if that's not sufficiently
24  compelling, then wait until we develop the evidence and FDA
25  has an opportunity and the experts at FDA have an

88

1   opportunity to look at that evidence to see what the
2   magnitude of that benefit really is before the Court
3   concludes that idiopathic hypersomnia patients don't deserve
4   access to that therapy.
5          THE COURT:  I understand your argument.
6          MS. DURIE:  And so the point here, Your Honor,
7   is simply that Jazz should not be permitted to suggest
8   credibly that it is Avadel's fault, that Avadel made these
9   investments when Avadel had no way of knowing that Jazz was
10  seeking this patent protection.  And, in fact, the original
11  date when FDA was anticipating approval, October 15th of
12  2021, was before the '782 patent even issued.  We'll get to
13  this, but had it not been for the whole REMS patent
14  situation, we might well have been on the market with
15  respect to narcolepsy and beginning clinical trials of
16  idiopathic hypersomnia before the '782 patent was even made
17  known to us.
18         THE COURT:  Right.  So the FDA process that was
19  going on during the time that '782 patent was not public had
20  to do with narcolepsy?
21         MS. DURIE:  Correct.  That's correct.  We had
22  not yet commenced a clinical trial in idiopathic hypersomnia
23  because we were waiting for FDA's determination with respect
24  to narcolepsy, which was supposed to come out in October of
25  2021, but didn't actually come out until 2023 because of the

89

1   Orange Book listing issue of which the Court, I know, is
2   well aware.
3          So in short, with respect to the balance of
4   hardship, we think this factor also is in Avadel's favor,
5   because we made our investment in good faith before we could
6   possibly know about the existence of Jazz's patent
7   application: because an injunction would bankrupt a company
8   that engaged in that good faith conduct; and because Jazz in
9   its own words expects that it will continue to be
10  successful, notwithstanding competition from Avadel.
11         I want to turn next to irreparable harm, which,
12  as the Court has noted, is a closely related factor.  First
13  point I want to make is that the Federal Circuit -- and this
14  is from a District Court case citing the Federal Circuit in
15  *Automated Merchandising*.  The Federal Circuit has found that
16  lost sales standing alone are insufficient to prove
17  irreparable harm, because if that was enough there would be
18  irreparable harm in every case.  So it is a factor, but it
19  is not sufficient.  And Courts in this district and the
20  District of Delaware have also found that courts have
21  routinely decided that market share and price erosion do not
22  amount to irreparable harm.  That's not sufficient either.
23         Why is that?  In part that is because there must
24  be a casual nexus.  I want to talk about that nexus
25  requirement.  The purpose of the causal nexus requirement is

# EXHIBIT 4

# FULLY REDACTED

# EXHIBIT 5

# FULLY REDACTED

# EXHIBIT 6

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7569**

WRITER'S EMAIL ADDRESS
**frankcalvosa@quinnemanuel.com**

September 5, 2024

**VIA EMAIL**

Gabriel K. Bell                                                  **HIGHLY CONFIDENTIAL**
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C., 20004
gabriel.bell@lw.com

Re:     *Jazz Pharmaceuticals, Inc. v. Avadel CNS Pharmaceuticals LLC,*
        C.A. Nos. 21-691; 21-1138; 21-1594 (D. Del)

Dear Mr. Bell:

        Thank you for the productive call yesterday and the letter last evening.  Jazz confirms the items enumerated 1-4 in your letter.  With respect to item number 6 in your letter, Jazz agrees that it will not argue that Avadel's application for FDA approval of Lumryz for pediatric patients with narcolepsy, and Avadel's maintenance of that request, is in contempt of the injunction, and we agree that the parties will not need to address the pediatric narcolepsy issue in any future court filings.  With respect to item number 5, in several phone calls with multiple of Avadel's counsel on Friday, August 30, Tuesday, September 3, and Wednesday, September 4, Jazz has repeatedly asked Avadel to provide information regarding: (a) how many patients are currently enrolled in Avadel's Idiopathic Hypersomnia clinical trial; (b) how many of those patients are currently on drug (as opposed to placebo); and (3) the number of patients currently on drug that would be subject to any proposed open label extension from November 2024 through January 2025.  Thus far, Avadel has not provided such information, but you indicated that you would check with your client to see if it would be willing to do so.  Please provide the requested information or confirm that Avadel refuses to do so.  Once we have your response, we will confer with our client and provide a prompt response on the request in item number 5 in your letter.

                                        Sincerely,

                                        /s/ *Frank Calvosa*

                                        Frank Calvosa

quinn emanuel urquhart & sullivan, llp

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

EXHIBIT 7

**Gabriel K. Bell**
Direct Dial: +1.202.637.2227
gabriel.bell@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C.  20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

## LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

September 5, 2024

Frank C. Calvosa
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Ave, 22nd Floor
New York, NY 10010
frankcalvosa@quinnemanuel.com

Re: *Jazz Pharmaceuticals, Inc. v. Avadel CNS Pharmaceuticals, LLC*,
Fed. Cir. No. 24-2274

Dear Mr. Calvosa:

Thank you for your prompt response to yesterday's letter.  Following up on item #5, Avadel confirms the following:

- Enrollment is ongoing and is anticipated to continue for approximately 12 months with a target of up to 150 participants enrolled and fewer than that actually finishing the trial.

- Enrollment numbers fluctuate day to day as new patients join the study and others leave the study.

- Some enrollees will be eligible for open label extensions as early as November 2024.

Regarding your questions on the number of current enrollees, Avadel's position is that (a) the current number of enrollees is not relevant, given that the overall targeted scope of the study is known and that, in Avadel's view, it is all protected activity under the safe harbor and part of an ongoing trial permitted by the Court's August 27th Order, and (b) Jazz has not articulated why it needs that information at this time.  In light of this, we would appreciate your prompt response on #5.

With regard to item #6, please also confirm, as requested in my prior letter, that "Jazz agrees that the district court's injunction does not enjoin Avadel's application for FDA approval of Lumryz for pediatric patients with narcolepsy[.]"  As a corollary, please confirm that Jazz has not and will not convey to the FDA that the district court's injunction order precludes FDA approval of Lumryz for pediatric patients with narcolepsy.

**LATHAM&WATKINS** LLP

Finally, we now see no reason why the parties' negotiations and contentions regarding the interpretation of the Court's August 27th Order should be designated pursuant to the Protective Order.  Accordingly, please confirm that your September 5th letter is not confidential under the Protective Order and may be shared within Avadel and publicly, as necessary.  We confirm the same as to my September 4th letter.

Thank you for the productive dialogue.

Sincerely,

/s/ *Gabriel K. Bell*

Gabriel K. Bell
of LATHAM & WATKINS LLP

EXHIBIT 8

| | |
|---|---|
| **From:** | Gabriel.Bell@lw.com |
| **Sent:** | Friday, September 6, 2024 1:16 PM |
| **To:** | Frank Calvosa; kristen.fechner@lw.com; Nick Cerrito; Gabriel Brier; Eric Stops; Evangeline Shih; Andrew Chalson; Jack Blumenfeld; JTigan@morrisnichols.com; JazzAvadel |
| **Cc:** | KENNETH.SCHULER@lw.com; Marc.Zubick@lw.com; Alex.Grabowski@lw.com; Herman.Yue@lw.com; Sarah.Wang@lw.com; DSilver@McCarter.com; ajoyce@mccarter.com; jazzpatentlitigation.lwteam@lw.com; amiller@mccarter.com; DDurie@mofo.com; AndrewJones@mofo.com; KiraDavis@mofo.com; RWeires@mofo.com; Charles.Dameron@lw.com; MoFo-Avadel-Jazz@mofo.com |
| **Subject:** | RE: Jazz Pharmaceuticals v. Avadel, Nos. 21-691, 21-1138-MN, 21-1594-MN |
| **Attachments:** | Jazz_Avadel 22-487_ Stipulation and Proposed Order Staying Case (15200579_2).docx |

**[EXTERNAL EMAIL from gabriel.bell@lw.com]**

Counsel:

Thank you for your response.  We understand your position and appreciate the prompt and productive correspondence in recent days.  We have now reached an impasse on the stay motion.  So, to ensure timely Federal Circuit consideration, we are filing the stay motion as presumptively opposed.  We are filing the expedition schedules as unopposed.  After Avadel's Federal Circuit motions are on file, Avadel agrees you may file the attached stipulation (as redlined here) to stay the trade secret case pending the Federal Circuit's resolution of these appeals.

Regards,

Gabe

**Gabriel K. Bell  |  LATHAM & WATKINS LLP  |  +1.202.637.2227**

---

**From:** Frank Calvosa <frankcalvosa@quinnemanuel.com>
**Sent:** Thursday, September 5, 2024 8:09 PM
**To:** Fechner, Kristen (SD) <kristen.fechner@lw.com>; Nick Cerrito <nickcerrito@quinnemanuel.com>; Gabriel Brier <gabrielbrier@quinnemanuel.com>; Eric Stops <ericstops@quinnemanuel.com>; Evangeline Shih <evangelineshih@quinnemanuel.com>; Andrew Chalson <andrewchalson@quinnemanuel.com>; Jack Blumenfeld <jblumenfeld@morrisnichols.com>; JTigan@morrisnichols.com; JazzAvadel <jazzavadel@quinnemanuel.com>
**Cc:** Schuler, Kenneth (CH) <KENNETH.SCHULER@lw.com>; Zubick, Marc (CH/NY) <Marc.Zubick@lw.com>; Grabowski, Alex (CH) <Alex.Grabowski@lw.com>; Yue, Herman (NY) <Herman.Yue@lw.com>; Wang, Sarah (CH) <Sarah.Wang@lw.com>; DSilver@McCarter.com; ajoyce@mccarter.com; #C-M JAZZ PATENT LITIGATION - LW TEAM <jazzpatentlitigation.lwteam@lw.com>; amiller@mccarter.com; DDurie@mofo.com; AndrewJones@mofo.com; KiraDavis@mofo.com; RWeires@mofo.com; Dameron, Charles (DC) <Charles.Dameron@lw.com>; Bell, Gabriel (DC) <Gabriel.Bell@lw.com>; MoFo-Avadel-Jazz@mofo.com
**Subject:** RE: Jazz Pharmaceuticals v. Avadel, Nos. 21-691, 21-1138-MN, 21-1594-MN

Counsel,

Please see attached.

Best,

**Frank Calvosa**
*Partner*
**Quinn Emanuel Urquhart & Sullivan, LLP**

51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7569 Direct
212-849-7000 Main Office Number
212-849-7100 FAX
frankcalvosa@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** kristen.fechner@lw.com <kristen.fechner@lw.com>
**Sent:** Thursday, September 5, 2024 2:41 PM
**To:** Nick Cerrito <nickcerrito@quinnemanuel.com>; Gabriel Brier <gabrielbrier@quinnemanuel.com>; Eric Stops <ericstops@quinnemanuel.com>; Evangeline Shih <evangelineshih@quinnemanuel.com>; Andrew Chalson <andrewchalson@quinnemanuel.com>; Frank Calvosa <frankcalvosa@quinnemanuel.com>; Jack Blumenfeld <jblumenfeld@morrisnichols.com>; JTigan@morrisnichols.com; JazzAvadel <jazzavadel@quinnemanuel.com>
**Cc:** KENNETH.SCHULER@lw.com; Marc.Zubick@lw.com; Alex.Grabowski@lw.com; Herman.Yue@lw.com; Sarah.Wang@lw.com; DSilver@McCarter.com; ajoyce@mccarter.com; jazzpatentlitigation.lwteam@lw.com; amiller@mccarter.com; DDurie@mofo.com; AndrewJones@mofo.com; KiraDavis@mofo.com; RWeires@mofo.com; Charles.Dameron@lw.com; Gabriel.Bell@lw.com; MoFo-Avadel-Jazz@mofo.com
**Subject:** Jazz Pharmaceuticals v. Avadel, Nos. 21-691, 21-1138-MN, 21-1594-MN

[EXTERNAL EMAIL from kristen.fechner@lw.com]

Counsel,

Please see the attached correspondence from Gabe Bell.

Thank you,

Kristen

**Kristen K. Fechner**

Senior Paralegal

**LATHAM & WATKINS LLP**

12670 High Bluff Drive

San Diego, CA 92130

Direct Dial: +1.858.523.3953

Email: kristen.fechner@lw.com

https://www.lw.com

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

# EXHIBIT 9

Case 1:21-cv-02886-JDB Document 367 Filed 05/17/25 Page 30 of 117 PageID # 20552

# Considerations for open-label clinical trials: design, conduct, and analysis

Karen M. Higgins, FDA/CDER/OTS/OB/DBIII, and Gregory Levin, FDA/CDER/OTS/OB
Center for Drug Evaluation and Research, Food and Drug Administration, Silver Spring, MD




## Abstract

Randomization and blinding are regarded as the most important tools to help reduce bias in clinical trial designs. Randomization is used to help guarantee that treatment arms differ systematically only by treatment assignment at baseline, and blinding is used to ensure that during the trial the two arms are treated the same with differences only arising from the treatment received and not, for example, the expectation or desires of people involved. However, there are times when it is not feasible or ethical to conduct fully blinded trials. This poster reviews what can be done to improve the trial when fully blinding a trial is not considered possible.

## Introduction

The benefits of blinding are well known. Randomization and blinding are regarded as the most important tools to help reduce bias in experimental designs.

- **Randomization** is used to help guarantee that treatment arms differ only by treatment assignment at baseline.
- **Blinding to subject treatment assignment** is used to ensure that during the trial the two arms are treated the same with differences only arising from the treatment received and not, for example, from expectations related to knowledge of the assigned treatment. It allows one to interpret evidence of differences between treatment arms as evidence of a causal effect of the treatment. *Along with being randomized, studies should be fully blinded whenever possible.*

Despite the known benefits of blinding, it is not used as often as it could be in clinical trials. There are times when open-label trials are unavoidable for various reasons. As is often the case in these situations, once a fully blinded trial is deemed infeasible or unethical, often no attempt at blinding is undertaken. However, even open-label trials should have some level of blinding and consideration should be given to enhance the integrity of the trial, rather than accepting that it will be of diminished quality compared to a fully blinded trial.

## Definitions

- **Open-label trial:** a trial that is not completely blinded, typically in that subjects and physicians have knowledge of the assigned treatment. Importantly, it does not mean "uncontrolled" or "single-arm" which is often what the term "open-label" is used to describe.
- **Fully blinded trial:** a trial where no one knows the treatment assignment of individual subjects or has access to interim results that include treatment assignment information, outside of an independent statistician/pharmacist/DMC.
- **Double-blind:** often used to describe a fully blind trial, but the term double-blind is vague and, when used, should be clearly defined as to how blinding was conducted and who exactly was blinded both in the study protocol and in the report of the trial.

## Blind as much as possible

In situations where it is not possible to conduct a fully blinded trial, blind as many people associated with the trial as possible. Each subject's treatment assignment should be unknown to as many individuals as feasible. Candidates for blinding include

- subjects,
- caregivers,
- physicians,
- other healthcare personnel,
- laboratory personnel (i.e., microbiologists, pathologists),
- outcome assessors,
- central independent adjudication committees,
- data collectors
- anyone else involved in the trial.

Additionally, documents associated with the participants, such as digital images, case report forms, and laboratory reports should not contain treatment assignment information. The sponsor statistician/analyst should be blinded, i.e., not have knowledge of subjects' assignments, until the database is locked, and the study is officially unblinded. Exceptions can be made for the independent statistician(s) who conduct interim safety and efficacy analyses to facilitate monitoring by the DMC, as is done for fully blinded trials.

## Accumulating data kept confidential

It is critical to **prevent access to accumulating subject-level and group-level study data** that includes information on treatment assignment (either with the treatments identified or with codes such as "A" and "B") outside of an external independent DMC and a supporting independent statistician(s) who prepares interim reports.

Knowledge of comparative summary-level interim outcome results by subjects, investigators, the sponsor, or the public can negatively impact trial conduct (e.g., recruitment, adherence, and retention) and impair ultimate interpretation of results.

## Endpoint less prone to bias

Two considerations for endpoints for trials that are not fully blinded:

- **blinded endpoint assessor or committee:** The use of a blinded endpoint committee or blinded outcome assessors can be considered if the physician cannot be blinded and the outcome requires an assessment. Care should be given to the information provided to the committee or assessor so that they are not influenced by potential biases of the investigators.
- **objective endpoint:** If the outcome assessor cannot be blinded, then the outcome should be modified to remove any subjective components or a completely objective endpoint be used to reduce bias.

**Note,** it is important to consider whether the primary endpoint directly captures or reliably predicts how a subject feels, functions or survives. For example, it would not be appropriate to switch to an objective biomarker as the endpoint if the biomarker is not validated as a surrogate endpoint, i.e., has not been shown to reliably predict benefit in terms of how a subject feels, functions or survives.

## Trial conduct considerations

A critical requirement for open-label trials is **allocation concealment**, meaning that it should be impossible to know or to predict what assignment a subject will be given prior to randomization. For this reason, extreme care needs to be taken regarding how subjects are randomized in open-label trials and randomization methods should be clearly explained in the protocol, study report, and manuscript.

**Subject in the different treatment arms should be treated identically,** except for the treatment they are receiving, or in direct response to the treatment they are receiving. For example,

- Visit schedule and procedures should be the same.
- Adverse event data collection, blood collection, and inclusion/exclusion criteria should all be the same as well.
- The timing of primary endpoints for landmark analyses of open-label trials need to be the same amount of time from randomization for the various treatment arms, even if treatment duration is different across the arms.

Patient retention and follow-up of subjects may be different across treatment arms in an open-label trial. Subjects' knowledge of their assignment might make them more or less likely to drop out of the trial, leading to differential missing data across treatment arms. For these reasons, the **need to reduce the amount of missing data**, and to do this **equally across all arms**, is exceedingly important. Blinding as much as possible can help, as can clear guidelines for how to follow all subjects that can be implemented consistently across treatment arms. This should include plans to follow and ascertain complete outcome information in all randomized subjects who maintain consent, including those who prematurely discontinue treatment.

## Analysis considerations

**Subjects should not be excluded from the analysis for not receiving study medication.** In some trials, the primary analysis population is conducted in a pre-defined subset of the ITT population, the population defined as all randomized subjects and considered by many to be the gold standard for the analysis of clinical trials. A fairly commonly used reason for exclusion from an ITT population definition is not receiving study treatment. In a fully blinded trial, this exclusion will likely not lead to bias. However, in anything other than a fully blinded trial, there is a likelihood that a population composed of only subjects who received study medication may no longer be the same across treatment arms. An investigator, subject, or other individual involved in the trial might use knowledge of the treatment assignment of a subject to play into the decisions on whether or not that subject receives treatment.

**The completed study should be assessed for possible differences in the amount and type of missing data across randomized arms.** In open-label trials there is the possibility for missing data to be due to knowledge of assigned treatment and expectations of those involved in the trial. As with any trial, if the amount of missing data is large, it will not be clear if the overall trial result would have differed if the data were not missing.

Handling of intercurrent events should also be considered carefully in an open-label trial. Intercurrent events, such as receipt of additional medication or discontinuation of assigned treatment, could likely be influenced by knowledge of the treatment assignment by subjects or investigators that are not blinded. Consideration should be given to the use of a treatment policy strategy which does not consider those intercurrent events in the assessment of outcome.

**The protocol and statistical analysis plan should be finalized prior to the start of an open-label trial.** This will help to protect the integrity of the trial, so that it is clear that the ongoing trial results did not impact the protocol or statistical analysis plan.

## Conclusion

The advice provided is briefly outlined in Figure 1. The most important point is to conduct a fully blinded trial whenever at all feasible and, if not feasible, conduct the trial as if it were a fully blinded trial. Clearly state in the protocol, study report, and manuscript, who is and who is not blinded to subject treatment assignment and who has access to accumulating unblinded results and how that might impact the study. It is important to acknowledge the limitations and potential for bias due to the lack of having a fully blinded design and the steps taken to minimize the bias.

Trials should be conducted in a way to minimize the possibility of bias, both real and perceived. A major goal when conducting an open-label trial should be to minimize bias due to differential handling of the randomized arms arising from knowledge of assigned treatment.

Consider what might lead to biases in the trial at the design stage, during the conduct of the trial, and in the analysis, and what might be done to overcome those biases.

- **Design**
  - Blind as many individuals involved in the trial to individual subject treatment assignments as is possible
  - Consider endpoints that are less prone to bias (but still reliably reflect how subjects feel, function, or survive)
  - Consider blinded assessors or adjudication committees
- **Conduct**
  - Maintain confidentiality of interim results, typically by ensuring that an independent DMC and supporting statistician(s) have sole access to accumulating unblinded interim data and results
  - Use allocation concealment
  - Treat randomized arms identically
  - Use the same timing from randomization for the primary endpoint for all arms
  - Follow all subjects using standard guidelines to prevent missing data
- **Analysis**
  - Use an intent to treat analysis
  - Do not exclude subjects from the analysis for not taking randomized therapy
  - Make sure missing data handling considers potential biases, including those due to open label design
  - Finalize protocol and SAP prior to start of the trial
  - Assess the trial for compromised blinding

**Figure 1.** Considerations for open-label trials

# EXHIBIT 10

Education and debate

4   Akbar A. Warning over women's role in medicine backed by male peers. *Independent* 2004 Aug 3.
5   Higher Educational Funding Councils for England, Scotland and Wales. *Medical return from M3: intake of pre-clinical medical students at the beginning of the autumn term 2003.* London: HEFC, 2004.
6   Laurance J. President of Royal College speaks out on pressures for women in medicine. *Independent* 2004 Aug 3.
7   Department of Health. *Statistical bulletin 1994/10: hospital, public health medicine and community health services medical and dental staff in England, 1983-1993.* London: DoH, 1994.
8   Department of Health. *Statistical bulletin 2004/04: hospital, public health medicine and community health services medical and dental staff in England, 1993-2003.* London: DoH, 2004. www.dh.gov.uk (search for: 40025).
9   Department of Health. *Statistical bulletin 1994/3: statistics for general medical practitioners in England and Wales, 1983-1993.* London: DoH, 1994.
10  Department of Health. *Statistical bulletin 2004/03: Statistics for General Medical Practitioners in England, 1993-2003.* London: DoH, 2004. www.dh.gov.uk (search for: 40027).

11  Firth-Cozens J, Payne R. *Stress in health professionals.* Chichester: John Wiley, 1999.
12  Allen I, Paice E, Hale R, Herzberg J *Stress among consultants in North Thames.* London: Policy Studies Institute and North Thames Department of Postgraduate Medical and Dental Education, 1999.
13  Chief Medical Officer. Focus on academic medicine. In: *On the state of the public health 2003.* London: Department of Health 2004:36-43.
14  BMA Health Policy and Economic Research Unit. *Women in academic medicine: challenges and issues.* London: BMA, 2004.
15  Reichenbach L, Brown H. Gender and academic medicine: impacts on the health workforce. *BMJ* 2004;329:792-5.
16  Goldacre M, Davidson J, Lambert T. Country of training and ethnic origin of UK doctors: database and survey studies. *BMJ* 2004;329:597-600.
17  UK Health Departments. *Modernising medical careers: the next steps.* London: DoH, 2004.

*(Accepted 31 May 2005)*

# Open label extension studies: research or marketing?

G J Taylor, P Wainwright

Open label extension studies allow continued prescribing of unlicensed drugs after a randomised trial, but it is unclear whether patients or drug companies are benefiting the most

Research and Development Support Unit, School for Health, University of Bath, Bath BA1 3NG
G J Taylor
*senior medical statistician*

Faculty of Health and Social Care Sciences, Kingston University and St George's Hospital Medical School, London
P Wainwright
*professor of nursing*

Correspondence to: G J Taylor
G.J.Taylor@bath.ac.uk

*BMJ* 2005;331:572–4

Properly designed and conducted open label extension studies can provide rigorous information on long term safety and tolerability of potential new drugs. This in turn can benefit the licensing application for the drug by providing longer term data that would otherwise not be available until after the licence was approved. Nevertheless, the conduct of such studies raises several ethical and scientific concerns.[1][2] As with any research method, there are good and bad examples. However, open label extension studies seem particularly prone to the pressures of marketing over good research methods and research ethics. We revisit some of these issues and argue that we need to change our approach to the ethical review of such studies.

## Open label extension studies

Open label extension studies typically follow a double blind randomised placebo controlled trial of a new drug. At the end of the double blind phase, participants are invited to enrol in an extension study. The study will normally be longer than the randomised trial (two



Participants in open label extension studies need more information

years is not uncommon but they often continue until the drug is licensed). All participants in the extension study are given the study drug, and both they and the investigators know this. The objective is primarily to gather information about safety and tolerability of the new drug in long term, day to day use.

Use of open label studies after phase III trials is relatively common. In 2004, the multicentre research ethics committee for Wales reviewed three open label extension studies compared with 19 phase III studies of new drugs, a ratio of just over 6:1. However, a recent Medline search for studies between 2000 and 2004, produced only 86 open label studies but over 2000 phase III studies, a ratio of 23:1. This suggests that many open label studies are never published.

## Issues of consent

The way that open label extension studies recruit raises several questions about informed consent. Participants are invited to join the extension study as soon as their involvement in the randomised controlled phase III study is finished. They do not know whether they have been taking active or placebo treatment, and investigators will not normally unblind the study at this point. Participants will thus base their decision on their previous study experience. Given that participants in either arm of the trial may have had positive or negative outcomes, their experience during the trial and their perception of the efficacy of the treatment they have received cannot be a sound basis on which to make such a judgment. In addition, as the results of the phase III study are unavailable, participants will be receiving a drug without the evidence that the treatment is any better than the standard treatment; it may potentially be worse.

The clinical picture of some participants may also have changed during the phase III trial. Participants may no longer meet the inclusion criteria or may no longer require treatment. At the conclusion of a trial participants are normally reviewed by their doctor. Enrolment in an extension study could result in

Education and debate

participants taking a drug that was not clinically justified (and often for a long time).

Another problem is that participants in the phase III trial are often told of the possibility of the extension study at the time of recruitment. This raises a separate ethical concern about the validity of consent to the phase III trial. If patients who think their present treatment options are unsatisfactory are told that enrolment in a short randomised controlled trial will ensure the possibility of open label treatment with a new drug in the near future, this may induce them to consent to the initial study and might amount to coercion.

Further pressure may come from researchers trying to get a high recruitment rate. Researchers conducting an open label extension study can only recruit from the participants in the phase III study. They may therefore feel under pressure to recruit to ensure the scientific merit of the study and continued income from the funder. This may in turn encourage investigators to place pressure on participants to take part. Unless all of these possibilities are made clear to a potential participant during recruitment and the researcher is not under undue pressure, the validity of the participants' consent is in question.

## Scientific merit

The validity of data from open label extension studies raises further questions. Open label extension studies are commonly used to assess long term tolerability of a new drug. However, a proportion of the participants eligible for the study will have already taken the study drug. Those who are unable to tolerate it are therefore unlikely to take part in the extension study. The absence of this group of potential participants will introduce bias and increase the apparent tolerability of the new drug. Analysis strategies need to be developed and implemented to provide unbiased estimates of safety and tolerability.

All clinical research should have clear objectives and a clearly defined duration to which participants may consent. However, it is not uncommon to find protocols of open label extension studies that specify the duration of the study as "until licence approved." For some participants this could mean only a few weeks while for others it could be years, assuming the drug is ever licensed. Such studies seem to be designed only to promote the use of the study drug and serve no valid research purpose.

Dressing up marketing exercises as research lends them a spurious authority. It allows participants and clinicians to believe they are contributing something worthwhile to science rather than simply boosting market share for the relevant pharmaceutical company. As the guidelines of the Council for International Organisations of Medical Science state, "The ethical justification of biomedical research involving human subjects is the prospect of discovering new ways of benefiting people's health."[5] As marketing exercises clearly do not hold out any such prospect, they cannot count as ethical research activities. A key element of the ethical review of research is the appraisal of scientific merit, so the research ethics committee is placed in an invidious position by applicants seeking approval for such studies.

### Summary points

Open label extension studies are a common adjunct to double blind randomised controlled trials of new drugs

The aim of open label extension studies often seems to be to enable continued use of a new drug for marketing or compassionate purposes rather than to increase knowledge

The continued use of a new drug on compassionate grounds should not be considered within the research framework

Patients should have full information available before deciding whether to participate

Tighter criteria need to be applied to the ethical approval of extension studies

## Compassionate use

When a promising new drug is being tested for a serious problem, doctors and patients naturally want the drug to be available outside the period of the randomised controlled trial. Delay is inevitable between the completion of the trial and the granting of a product licence, and participants who do well on the study drug will want to continue to take it. Research ethics committees often feel obliged to approve extension studies as the only practicable way to provide continued beneficial treatment. However, prescribing a drug on compassionate grounds is not research, and research ethics are therefore not a valid structure through which to provide a treatment, however beneficial. Members of research ethics committees will have had training and experience in assessing the ethical acceptability of a research protocol, but they will not necessarily have the expertise to make ethical judgments about clinical decisions involving the long term use of novel treatments. This may be the role of the institutional review board in some countries, but it is not the role of the UK research ethics committee system. Apart from their lack of relevant expertise, the research ethics committee is an independent body with no authority over clinical practice and no responsibility for decisions about practice.

At the end of a participant's involvement in a phase III study a decision will need to be made about their continuing treatment. The new drug may have been of appreciable benefit to the patient, and a mechanism is needed for the patient to receive the drug even if it is not yet licensed, especially if there are few other treatment options. However, this is not the role of an open label extension study, and research should not be used to mask the limitations of current regulations and procedures in drug development. Research ethics committees should not be expected to connive in such practices, no matter how laudable the intention.

Prescribing for compassionate use is possible on a named patient basis, and much has been published on the prescription of unlicensed and "off label" drugs. If researchers and clinicians believe there are grounds for

Education and debate

the compassionate use of an as yet unlicensed product, drug manufactures should be prepared to supply the drug to the doctors of patients who have been shown to benefit. The costs would, arguably, be no greater than those for an open label study. Safety data would still be available from these patients through the usual monitoring systems.

## Future action

Some of our concerns may also apply to other trial designs, but our focus here is on the particular problems of open label extension studies. Several of the problems could be resolved by unblinding the allocation of participants as they complete the phase III study. Investigators object to this on the grounds that it may introduce bias, but participants could be informed of their status in the double blind trial by someone not involved in the analysis of the trial. It has been argued that unblinding should occur even if no open label study follows because the subsequent treatment of participants may be harmed if decisions are made about further management in ignorance of their response to the new drug.[4]

Open label extension studies are currently being misused for marketing purposes or to enable compassionate use of new drug. We recommend that recruitment and consent are dealt with more openly if the study follows a double blind trial and that potential participants are told which arm of the trial they were in before deciding whether to enrol. Research ethics committees should approve studies only if they address a genuine research question and have a clear rationale, end points, justification of sample size, time scale, and so on. If there is an argument for compassionate use, committees should advise use of mechanisms such as named patient prescriptions rather than open label extension studies.

We thank Susan Pope for providing information from the records of the multicentre ethics committee for Wales and the members of the committee for helping to form and challenge our opinions.

Contributors and sources: PJW was a member of the multicentre research ethics committee for Wales, and GJT is currently a member. GJT is also a member of the Bath local research ethics committee and a council member of the Association of Research Ethics Committees. The idea for the paper came from a discussion between the authors. GJT wrote the initial draft and both authors contributed to the final version. Both authors are guarantors.

Competing interests: None declared.

1   Micetich KC. The ethical problems of the open label extension study. *Camb Q Health Ethics* 1996;5:410-4.
2   Wainwright P. Consent to open label extension studies: some ethical issues. *J Med Ethics* 2002;28:373-6.
3   Council for International Organizations of Medical Sciences. *International ethical guidelines for biomedical research involving human subjects.* Geneva: World Health Organization, 2002.
4   Blader JC. Can keeping clinical trial participants blind to their study treatment adversely affect subsequent care? *Contemp Clin Trials* 2005;26: 290-9.

*(Accepted 19 June 2005)*

---

### bmjlearning.com

## The rules

"Dear Editor, I read with interest your reworking of my manuscript. Firstly here are a few things that you did well: you checked the spelling thoroughly and you did improve the grammar. Here's what you could have done better: it would have been better if you hadn't completely changed the tone and style and meaning of my sentences. Yours etc."

Pendleton's rules are rules that help trainers give balanced feedback to trainees.[1] The idea is that, when giving feedback, learners and teachers should concentrate on the positive first and then say what they thought could have been done better. If you've done an advanced cardiac life support course in Britain then you'll be familiar with the rules. In the past many trainers were thought to be too destructive in their criticisms, and Pendleton's rules are an attempt to correct this.

But the rules do have their critics. Many say that they add an *Alice in Wonderland* air to training. I've had a few complaints as an editor and as a clinician, but none of them ever read like the above letter. So why do we encourage doctors to give and receive feedback in a way that they will never experience in real life? It can also be difficult to think of positive things to say to trainees who are still in the low foothills of the learning curve or who, worse still, have turned up to courses without having done any preparatory work. How do you then "accentuate the positive"? Do you say, "Well, at least you turned up"? Perhaps the most annoying thing about the rules is the insistence of some training providers that you must follow them—regardless of the learning style of the learners or the teaching style of the teacher.

Is there an alternative? Silverman et al have described a new way of giving feedback—called agenda-led, outcomes based analysis.[2] In this method you start with the learners' agenda and ask them what problems they experienced and what help they would like. Then you look at the outcomes that they are trying to achieve. Next you encourage them to solve the problems and then get the trainer and eventually the whole group involved. Feedback should be descriptive rather than judgmental and should also be balanced and objective.

If you are involved in teaching and learning then you may be interested in finding out more about these concepts. At BMJ Learning we are building up a resource of modules on learning and teaching. You can find out how to run a course, give a lecture, or even give feedback. You can give your views also. If you disagree with Pendleton's rules or with Silverman's ones or would even prefer a return to a 19th century "gloves off" approach to feedback then we are delighted to hear your views and to encourage debate.

**Kieran Walsh** *clinical editor, BMJ Learning*
*(bmjlearning@bmjgroup.com)*

1   Pendleton D, Scofield T, Tate P, Havelock P. *The consultation: an approach to learning and teaching.* Oxford: Oxford University Press, 1984.
2   Silverman JD, Kurtz SM, Draper J. The Calgary-Cambridge approach to communication skills teaching. Agenda-led, outcome-based analysis of the consultation. *Educ Gen Pract* 1996;7:288-99.

EXHIBIT 11



## Avadel to Present New Data on Once-Nightly Sodium Oxybate at SLEEP 2019 Conference

June 4, 2019

DUBLIN, Ireland, June 04, 2019 (GLOBE NEWSWIRE) -- Avadel Pharmaceuticals plc (Nasdaq: AVDL), a company focused on developing FT218 for narcolepsy, today announced it will present two posters at the 33rd Annual Meeting of the Associated Professional Sleep Societies being held in San Antonio, Texas, from June 8-12, 2019. The posters highlight pharmacokinetic (PK) data for its investigational, once-nightly controlled-release sodium oxybate (FT218), including a head-to-head PK comparison to twice-nightly sodium oxybate and dose proportionality across three doses.

"Our once-nightly controlled-release sodium oxybate demonstrated lower overall peak plasma concentrations ($C_{max}$) and similar total exposures (AUC), compared to twice-nightly sodium oxybate in a head-to-head study," said Jordan Dubow, MD, Chief Medical Officer of Avadel Pharmaceuticals. "Furthermore, results from our dose proportionality study showed that FT218 exhibits predictable increases in plasma levels with increasing doses, consistent with the PK profile desired for a once-nightly sodium oxybate formulation. We are excited about the potential benefits of our once-nightly formulation and look forward to completion of the Phase 3 REST-ON trial, which is nearly two-thirds complete."

Poster Presentations:

Poster 0609, presented Sunday, June 9, 5:15 – 7:15 p.m. CDT
"Pharmacokinetics and Formulation Selection of FT218, an Investigational Controlled-Release Sodium Oxybate Formulation Designed for Once-Nightly Dosing"

Poster 0610, presented Sunday, June 9, 5:15 – 7:15 p.m. CDT
"Pharmacokinetics and Dose Proportionality of FT218, an Investigational Controlled-Release Sodium Oxybate Formulation Designed for Once-Nightly Dosing"

The pharmacokinetics and formulation selection pilot study was designed as a four-way crossover study in 16 healthy volunteers, evaluating three proprietary once-nightly formulations of Micropump™ controlled-release (CR) sodium oxybate (FT218) versus twice-nightly immediate-release (IR) sodium oxybate at a nightly dose of 4.5g (two doses of 2.25g for IR sodium oxybate). Each subject consumed a standard meal two hours prior to dosing. Subjects receiving the twice-nightly IR sodium oxybate, were administered the second dose 4 hours after the first dose. Two subjects dropped out of the study prior to the completion. The key data for the 14 evaluable subjects demonstrates:

- FT218 exhibited rapid initial absorption comparable to twice-nightly IR sodium oxybate
- FT218 demonstrated a lower overall $C_{max}$ than twice-nightly IR sodium oxybate
- FT218 mean blood concentrations (ug/ml) at 8 hours were similar to that of twice-nightly IR sodium oxybate
- Safety and tolerability were similar across administrations

The dose proportionality study was an open-label, single-dose, three-sequential-period study in 20 healthy volunteers. Subjects received three separate single-dose administrations of FT218 at bedtime, two hours post-evening meal, in a sequential order of 4.5g, 7.5g and 9g with a minimum 7-day washout between doses. PK profiles were assessed for dose proportionality across the three doses and the results demonstrated:

- FT218, at each dose, exhibited PK profiles consistent with those desired for once-nightly dosing
- Dose proportionality was maintained for $C_{max}$ across the dosage range
- Safety profile was consistent with what is known for sodium oxybate

The safety and efficacy of FT218 for the once-nightly treatment of excessive daytime sleepiness (EDS) and cataplexy in patients with narcolepsy is currently being evaluated in the Phase 3, multi-centered, double-blind, placebo-controlled REST-ON trial, which is expected to complete enrollment in 2020. Poster reprints and REST-ON information will be available at Avadel's Booth #1027 in the Exhibit Hall during the SLEEP 2019 conference.

**About Avadel Pharmaceuticals plc:**

Avadel Pharmaceuticals plc (Nasdaq: AVDL) is a branded specialty pharmaceutical company. The Company's primary focus is on the development and potential FDA approval for FT218, which is in a Phase 3 clinical trial for the treatment of narcolepsy patients suffering from excessive daytime sleepiness (EDS) and cataplexy. In addition, Avadel develops and markets a portfolio of sterile injectable drugs used in the hospital setting. For more information, please visit www.avadel.com.

**Cautionary Disclosure Regarding Forward-Looking Statements**

This press release may include "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These forward-looking statements relate to our future expectations, beliefs, plans, strategies, objectives, results, conditions, financial performance, prospects, or other events. In some cases, forward-looking statements can be identified by the use of words or phrases such as "will," "as we continue," "objective," "future success," "potential," "opportunity" and similar expressions, and the negatives thereof (if applicable).

Our forward-looking statements are based on estimates and assumptions that are made within the bounds of our knowledge of our business and operations and that we consider reasonable. However, our business and operations are subject to significant risks and as a result there can be no assurance that actual results of our research, development and commercialization activities and the results of our business and operations will not differ materially from the results contemplated in such forward-looking statements. Factors that could cause actual results to differ from expectations in our forward-looking statements include (i) the risk that we could experience failure or delay in completing the Phase 3 "REST-ON" clinical trial for our FT218 product, or that if the FDA ultimately approves such product, the approval may not include any period of market exclusivity; (ii) the risk that, even if we successfully complete the development of FT218 and begin its commercialization, it may not receive market acceptance, or new, announced alternative products in development may be approved and may be viewed as more effective than FT218 or otherwise receive greater market acceptance; (iii) the risk that servicing our $143.75 million Exchangeable Senior Notes due 2023 may require a significant amount of cash, and we may not have sufficient cash or the ability to raise the funds necessary to settle exchanges of such 2023 Notes in cash, repay the 2023 Notes at maturity, or repurchase the 2023 Notes as required following a "fundamental change" event described in the indenture governing the 2023 Notes; and (iv) the other risks and uncertainties described in the "Risk Factors" section of Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2018 which we filed with the Securities and Exchange Commission on March 15, 2019.

Forward-looking statements speak only as of the date they are made and are not guarantees of future performance. Accordingly, you should not place undue reliance on forward-looking statements. We do not undertake any obligation to publicly update or revise the forward-looking statements contained in this press release.

Contacts: Michael F. Kanan
Chief Financial Officer Phone: (636) 449-1844
Email: mkanan@avadel.com

Alex Gray
Burns McClellan Phone: (212) 213-0006
Email: agray@burnsmc.com

Source: Avadel Pharmaceuticals plc



Source: Avadel Pharmaceuticals plc

# EXHIBIT 12



*SLEEPJ*, 2022, 1–11

https://doi.org/10.1093/sleep/zsab200
Advance Access Publication Date: 6 August 2021
Original Article

Downloaded from https://academic.oup.com/sleep/article/45/6/zsab200/6343406 by guest on 09 September 2024

## ORIGINAL ARTICLE

# Once-nightly sodium oxybate (FT218) demonstrated improvement of symptoms in a phase 3 randomized clinical trial in patients with narcolepsy

Clete A. Kushida[1,•], Colin M. Shapiro[2], Thomas Roth[3], Michael J. Thorpy[4], Bruce C. Corser[5], Akinyemi O. Ajayi[6], Russell Rosenberg[7], Asim Roy[8], David Seiden[9,*], Jordan Dubow[9] and Yves Dauvilliers[10,*]

[1]Department of Psychiatry and Behavioral Sciences, Stanford University Medical Center, Redwood City, CA, USA, [2]University of Toronto, Toronto, ON, Canada, [3]Sleep Disorders and Research Center, Henry Ford Health System, Detroit, MI, USA, [4]Department of Neurology, Montefiore Medical Center, New York, NY, USA, [5]Sleep Management Institute, Cincinnati, OH, USA, [6]Florida Pediatric Research Institute, Winter Park, FL, USA, [7]Neurotrials Research, Inc., Atlanta, GA, USA, [8]Ohio Sleep Medicine and Neuroscience Institute, Dublin, OH, USA, [9]Avadel Pharmaceuticals, Chesterfield, MO, USA and [10]National Reference Centre for Orphan Diseases, Narcolepsy, Idiopathic Hypersomnia, Sleep Unit, Department of Neurology, Gui-de-Chauliac Hospital, CHU Montpellier, Univ Montpellier, INM INSERM, Montpellier, France

*Corresponding authors: David Seiden, Avadel Pharmaceuticals, 16640 Chesterfield Grove Road, Suite 200, Chesterfield, MO 63005. Email: dseiden@avadel.com; Yves Dauvilliers, Sleep Unit, Department of Neurology, 80 av Augustin fliche, Gui-de-Chauliac Hospital, CHU Montpellier, 34295 Montpellier, France. Email: y-dauvilliers@chu-montpellier.fr.

## Abstract

**Study Objectives:** To assess the efficacy and safety of FT218, a novel once-nightly formulation of sodium oxybate (ON-SXB), in patients with narcolepsy in the phase 3 REST-ON trial.

**Methods:** Narcolepsy patients aged ≥16 years were randomized 1:1 to uptitration of ON-SXB (4.5, 6, 7.5, and 9 g) or placebo. Three coprimary endpoints were change from baseline in mean sleep latency on the Maintenance of Wakefulness Test, Clinical Global Impression-Improvement rating, and weekly cataplexy attacks at 9, 7.5, and 6 g. Secondary endpoints included change from baseline on the Epworth Sleepiness Scale. Safety included adverse drug reactions and clinical laboratory assessments.

**Results:** In total, 222 patients were randomized; 212 received ≥1 dose of ON-SXB (n = 107) or placebo (n = 105). For the three coprimary endpoints and Epworth Sleepiness Scale, all three doses of ON-SXB demonstrated clinically meaningful, statistically significant improvement versus placebo (all p < 0.001). For ON-SXB 9 g versus placebo, increase in mean sleep latency was 10.8 versus 4.7 min (Least squares mean difference, LSMD [95% CI], 6.13 [3.52 to 8.75]), 72.0% versus 31.6% were rated much/very much improved on Clinical Global Impression-Improvement (OR [95% CI], 5.56 [2.76 to 11.23]), change in mean weekly number of cataplexy attacks was −11.5 versus −4.9 (LSMD [95% CI], −6.65 [−9.32 to −3.98]), and change in Epworth Sleepiness Scale was −6.5 and −2.7 (LSMD [95% CI], −6.52 [−5.47 to −2.26]). Common adverse reactions included nausea, vomiting, headache, dizziness, and enuresis.

**Conclusions:** ON-SXB significantly improved narcolepsy symptoms; its safety profile was consistent with SXB. ON-SXB conferred efficacy with a clearly beneficial single nighttime dose.

**Clinical Trial Registration:** ClinicalTrials.gov: NCT02720744, https://clinicaltrials.gov/ct2/show/NCT02720744.

---

### Statement of Significance

The results from the phase 3 REST-ON clinical trial demonstrated clinically meaningful improvements with FT218, a novel once-nightly formulation of sodium oxybate (SXB), in patients with narcolepsy and may represent a significant advancement in the standard of care for adults with narcolepsy compared to other SXB formulations by avoiding a second nightly dose.

---

Key words: narcolepsy; sodium oxybate; once-nightly; NT1/NT2; safety; modified release

Submitted: 14 May, 2021; Revised: 28 July, 2021
© The Author(s) 2021. Published by Oxford University Press on behalf of Sleep Research Society.
 This is an Open Access article distributed under the terms of the Creative Commons Attribution License
(http://creativecommons.org/licenses/by/4.0/), which permits unrestricted reuse, distribution, and
reproduction in any medium, provided the original work is properly cited.

**1**

Downloaded from https://academic.oup.com/sleep/article/45/6/zsab200/6343406 by guest on 09 September 2024

## Introduction

Narcolepsy is a chronic disease characterized by the symptom pentad of excessive daytime sleepiness (EDS), cataplexy, disrupted nighttime sleep (DNS), sleep paralysis, and hypnagogic/hypnopompic hallucinations [1, 2]. Narcolepsy is a debilitating condition affecting approximately 1 in 2,000 people [3] that can have severe health and economic consequences for patients, with reduced quality of life [4–7]. People with narcolepsy may experience difficulties with employment, school attendance, caring for their families, social situations, and relationships [8]. Patients report that narcolepsy is also associated with the stigma of being considered lazy, careless, or incapable by others in their lives [8].

Narcolepsy is categorized into two subtypes: narcolepsy type 1 (NT1; previously termed narcolepsy with cataplexy) and type 2 (NT2; previously called narcolepsy without cataplexy) [9]. Both are characterized by severe EDS, short sleep latency, and sleep-onset rapid eye movement periods on the multiple sleep latency test [9]. However, they differ in pathophysiology: NT1 is characterized by low cerebrospinal fluid (CSF) hypocretin-1 levels, whereas NT2 is characterized by normal CSF hypocretin-1 levels [9].

For people with narcolepsy, symptoms are typically managed both behaviorally and pharmacologically [10–12]. Treatment regimens consist of stimulant/wake-promoting drugs (modafinil, armodafinil, solriamfetol, methylphenidate, amphetamines) to decrease EDS; antidepressants (mostly serotoninergic and noradrenergic) for cataplexy; pitolisant for EDS and cataplexy; and sodium oxybate (SXB) for EDS, cataplexy, and DNS [12]. SXB, the sodium salt of $\gamma$-hydroxybutyrate (GHB), is the only drug that has demonstrated efficacy across multiple narcolepsy symptoms, including DNS [10–14]. Owing to its sedating nature, SXB is taken at the bedside [10]. Calcium, magnesium, potassium, and sodium oxybates, or "mixed-salts" oxybate, was introduced in 2020 [15]. At present, the only approved formulations of oxybate in the United States and Europe require twice-nightly dosing, with a second dose taken 2.5 to 4 h after the first dose [15, 16], attributable to the short GHB half-life of 30 min to 1 h and the immediate-release formulation.

Patient adherence to medication regimens is recognized to be inversely correlated to dosing frequency, as has been demonstrated across multiple disease states including depression, schizophrenia, epilepsy, type 2 diabetes mellitus, cardiovascular disease, and chronic obstructive pulmonary disease, as well as with HIV treatment [17–24]. These and other therapeutic areas are replete with once-daily options, as opposed to twice-daily or thrice-daily formulations, often due to the application of modified-release technology. Although a medication that is taken twice daily (i.e. morning and evening) is more challenging than a once-daily medication, it would be even more problematic for a chronic medication requiring middle-of-the-night awakening. For patients with narcolepsy, overall medication adherence is suboptimal. One study reported that good adherence (≥80%) was observed for only 55.2% of patients, while 12.9% were intermediately adherent (51%–79%) and 31.9% were poorly adherent (≤50%) [25].

This forced awakening is disruptive to some patients and bed partners, especially considering that patients with narcolepsy typically already experience sleep fragmentation and poor sleep quality [8, 26]. In a surveillance study of 670 EU patients receiving twice-nightly SXB, 27.1% did not take SXB according to the recommended time schedule (i.e. 2.5 to 4 h after the first dose) [27]. This nonadherence to the prescribed dosing regimen was reported to occur daily for 7.2% of participants, a few days per week for 6.4% of participants, and a few days per month or less for 13.3% of participants [27]. Treatment-emergent adverse events (TEAEs) rated by the investigator as being due to this nonadherence were nausea, decreased appetite, cataplexy, dizziness, somnolence, abnormal behavior, and night sweats [27]. A serious AE (SAE) resulting in hospitalization was reported due to accidentally ingesting the second dose of SXB immediately after the first dose. Similarly, inadvertent double dosing, also resulting in hospitalization, was reported for one patient in a more recent randomized clinical trial of mixed-salts oxybate (N = 201) [28]. Although the labeling advises patients to remain in bed to take the second dose, falls leading to injury, and in some cases, hospitalization, have been reported when patients rise from bed [15]. Given these concerns, development of new formulations that minimize these negative effects is warranted.

Despite the twice-nightly dosing regimen, treatment with SXB has been transformational for patients living with narcolepsy who are able to comply with the regimen [8]. Because of inherent challenges with the drug moiety, the ability to formulate a modified-release delivery has, until recently, been elusive. However, a proprietary drug delivery technology has now been successfully applied to SXB, validated by extensive phase 1 pharmacokinetic testing [29]. Briefly, this technology provides an early single peak, following by a gradual decline in GHB concentration, corresponding to the negligible blood levels 8 h after the single bedtime dose. Theoretically, the pharmacokinetic profile may more closely approximate "normal" sleep, allowing for more slow-wave sleep (SWS) in the first half of the night, in contrast to twice-nightly SXB, in which the second segment of the night, associated with the second maximum concentration ($C_{max}$), has more SWS [30]. FT218 is an investigational, extended-release, once-nightly formulation of SXB (ON-SXB) that uses this proprietary drug delivery technology. The premeasured dosing packets contain a mix of immediate-release and controlled-release microparticles of SXB. One 6-g dose of ON-SXB has been shown to be equivalent in systemic drug exposure to immediate-release SXB given as two separate 3-g doses [29]. This phase 3 trial evaluated the efficacy and safety of ON-SXB in patients with NT1 and NT2.

## Methods

### Study design

REST-ON was a phase 3, double-blind, placebo-controlled, 2-arm, multicenter, randomized clinical trial (NCT02720744) designed to investigate the efficacy and safety of ON-SXB for the treatment of EDS and cataplexy in patients with narcolepsy. The trial comprised a 3-week screening period, a 13-week treatment period, and a 1-week follow-up period (Figure 1). Participants were randomly assigned 1:1 to ON-SXB or placebo; randomization was stratified by narcolepsy type (NT1 or NT2). Participants initially received 4.5 g for 1 week, followed by 6 g for weeks 2 to 3, 7.5 g for weeks 4 to 8, and then 9 g for weeks 9 to 13. This study design allowed evaluation of efficacy and safety of each dose, within the same participants, with a titration scheme similar to that of the approved twice-nightly product.



**Figure 1.** Study design.

REST-ON is a 13-week, phase 3, double-blind, multicenter trial with a 1:1 randomization to ON-SXB vs. placebo. Participants receiving ON-SXB underwent a forced titration from 4.5 g (week 1) to 6 g (weeks 2–3) to 7.5 g (weeks 4–8), and finally 9 g (weeks 9–13). Randomization was stratified according to narcolepsy type (NT1/NT2). There was a 3-week baseline screening period before randomization. MWT, number of cataplexy attacks, ESS, and PSG were assessed at baseline and at weeks 3, 8, and 13 of treatment. Number of cataplexy attacks, hypnagogic hallucinations, and sleep paralysis events were recorded in the daily sleep and symptom diaries, which were reviewed at weeks 3, 8, and 13. CGI-S (for sleepiness) was recorded at baseline; CGI-I was recorded at weeks 3, 8, and 13. Adverse events were documented at weeks 3, 8, and 13, but could be reported at any time during the trial. CGI-I, Clinical Global Impression of Improvement; CGI-S, Clinical Global Impression of Severity; ESS, Epworth Sleepiness Scale; MWT, Maintenance of Wakefulness Test; NT1, narcolepsy type 1; NT2, narcolepsy type 2; ON-SXB, once-nightly sodium oxybate; PSG, polysomnography.

REST-ON was conducted in adherence to the ethical principles of the Declaration of Helsinki, Good Clinical Practice guidelines, International Council for Harmonisation guidelines, and any applicable national and local laws and regulatory requirements. The protocol was approved by the centers' investigational review boards. All participants provided written informed consent before participation; for participants 16 or 17 years of age, consent was obtained from both the participant and their legally authorized representative.

## Participants

Participants ≥16 years of age with documented evidence of a diagnosis of NT1 or NT2 as defined by the International Classification of Sleep Disorders-3 criteria [31] were eligible. Additional key inclusion criteria were current continuing presence of EDS as defined by patient report for the past 3 months, Epworth Sleepiness Scale (ESS) > 10, and current continuing presence of cataplexy as defined by patient report for the last 3 months (NT1 only). Concomitant stimulants were permitted if participants were on a stable dosing regimen for at least 3 weeks before screening and throughout the entire study period; anticataplexy drugs were not permitted, and participants who were on these medications were tapered off in a 3-week washout before the screening period. Female participants of childbearing potential must have agreed to practice effective methods of contraception. For randomization, participants were required to have baseline Maintenance of Wakefulness Test (MWT) mean sleep latency < 11 min following baseline polysomnography (PSG). Those with NT1 were required to demonstrate current continuing presence of cataplexy, as defined by an average of 8 reported cataplexy attacks per week in the screening/baseline sleep and symptom diary.

Concurrent use of the following was prohibited: experimental medications (e.g. pitolisant when REST-ON was conducted), sodium valproate, anticonvulsants, clonidine, selective serotonin reuptake inhibitors, serotonin-norepinephrine reuptake inhibitors, monoamine oxidase inhibitors, tricyclic antidepressants, hypnotics, anxiolytics, sedating antihistamines, and antipsychotics. Diagnosis of moderate and severe sleep apnea or other sleep disorder known to cause EDS, as determined by PSG and sleep history, including any PSG results indicating an apnea-hypopnea index (AHI) ≥ 15, or AHI < 15/h requiring continuous positive airway pressure, was exclusionary. Overnight PSG was performed in the clinic (not home study) at baseline to exclude AHI > 15. A hypopneic event was considered to occur when there was a peak signal excursion drop by >30% of pre-event baseline using nasal pressure or an acceptable alternative signal (e.g respiratory inductance plethysmography sum) lasting >10 s. The event must have had a >3% oxygen desaturation or the event was associated with an arousal. Additional key exclusion criteria were presence of any unstable or clinically significant medical and psychiatric disorders that may put the patient at risk; previous history or current suicidal ideation; history of drug or alcohol abuse; pregnancy or breastfeeding; smoking during the night; history of seizure disorder, head trauma, or past invasive intracranial surgery; severe chronic obstructive pulmonary disease; other underlying respiratory and/or other underlying condition or disorder that would potentiate risk of respiratory or central nervous system depression with concomitant use of SXB; and uncontrolled hypertension. Initially, prior use of SXB was exclusionary; the protocol was amended in 2018 to allow prior use of SXB ≤ 4.5 g per night for <2 weeks and ≥1 year before study entry (only one participant was enrolled who met these criteria). At the time that REST-ON was conducted, mixed-salts oxybate was investigational.

## Assessments

The primary objective of the trial was to assess the efficacy of 9, 7.5, and 6 g of ON-SXB versus placebo in treating EDS in participants with NT1 or NT2 and cataplexy in participants with NT1. The coprimary endpoints were change from baseline in mean sleep latency on the MWT, in investigator-assessed rating of "much improved" or "very much improved" on the Clinical Global Impression of Improvement (CGI-I), and in the mean weekly number of cataplexy attacks. Safety and efficacy assessments were taken at baseline and at weeks 3, 8, and 13. The MWT measured the mean sleep latency across five trials that were terminated after 30 min if no sleep onset occurred or immediately after sleep onset, defined as the first epoch of any stage of sleep, averaged over the test day. The 30-minute duration achieves the appropriate balance between the 20-minute and 40-minute intervals used in prior studies. PSG was performed the night before each MWT. CGI-I was the clinician's global impression of improvement in overall condition compared to baseline. CGI-I was evaluated on a 7-point Likert scale ranging from 1 ("very much improved") to 7 ("very much worse"). For participants with NT1, the number of cataplexy attacks per week was recorded daily in the sleep and symptom daily diary, with attacks recorded as 0, 1, 2, 3, 4, or ≥5 per day. The sleep diary was recorded on a mobile phone with a preloaded app. A minimum of three entries per week was required for the average to be considered an observation.

Secondary endpoints included other measures of efficacy (DNS, ESS, nocturnal arousals, sleep paralysis, hypnagogic

Downloaded from https://academic.oup.com/sleep/article/45/6/zsab200/6343406 by guest on 09 September 2024

4 | *SLEEPJ*, 2022, Vol. 45, No. 6

hallucination, and sleep quality) of 9, 7.5, and 6 g of ON-SXB versus placebo in patients with NT1 and NT2, and safety. The ESS is a questionnaire that evaluates extent of subjective sleepiness in everyday situations [32]. Patients were asked to rate their likelihood of dozing during eight activities on a scale from 0 ("never") to 3 ("high"). All other secondary endpoints, as well as post hoc analyses of efficacy and safety in the NT1 and NT2 cohorts, will be reported elsewhere.

### Statistical analysis

Participants were enrolled and randomly assigned to the ON-SXB or placebo arm to achieve the number of completers needed to reach 140 (70 per arm) for MWT/CGI-I and 100 (50 per arm) for cataplexy to reach a two-sided alpha of 0.05, which yielded an overall 81% power for all three endpoints. Efficacy was evaluated in the modified intent-to-treat population (mITT), defined as all randomized participants with ≥1 efficacy measurement after receiving the 6-g dose (ON-SXB or placebo). A mixed-effects model for repeated measures (MMRM) was used to analyze change from baseline for the MWT and cataplexy endpoints. Each model included treatment, time (visit at which the measurement was taken), treatment-by-time interaction, site (United States or non-United States) and baseline score as fixed effects, and participants as random effects. For CGI-I, a GLIMMIX model for binomial data with logit link was used to analyze the categorized CGI-I response, that is, the proportion of participants who were very much or much improved. The observed values for the categorized response were used as responses in the model. Similar to the MMRM, the GLIMMIX model included treatment, time (at which the measurement was taken), treatment-by-time interaction and site (United States or non-United States) as fixed effects and participants as random effects. In fitting the model, time ranged over the entire period of observations. Permutation tests were performed based on the primary MMRM model, and statistical significance was determined by the tails of the distribution of $p$ values. Least squares mean differences (LSMDs), odds ratios, associated 95% CIs, and $p$ values were calculated. All statistical tests were performed using the two-sided alpha level of 0.05 unless otherwise specified. Testing was performed in a hierarchical manner for MWT, then the CGI-I, and then cataplexy, in that order, at 9, 7.5, and 6 g. If the 9-g dose demonstrated efficacy ($p < 0.05$) for all three endpoints, the same sequence of testing was followed for the 7.5-g dose. If the 7.5-g dose demonstrated efficacy ($p < 0.05$) for all three endpoints, the same sequence of testing was followed for the 6-g dose.

All participants who received ≥1 dose of study drug were included in the safety population. Adverse event data were obtained at all study visits from the time of informed consent until 7 days after the last dose of study drug was taken. TEAEs were defined as those occurring or increasing in severity after the first dose of study drug was taken. Each TEAE was assessed as mild, moderate, or severe in intensity. The relationship of TEAEs to study drug was assessed by the investigators using the following categories: not related, unlikely related, possibly related, and related. They were summarized based on number and percentages of participants with any TEAEs, SAEs, adverse drug reactions (ADRs; defined as adverse events assessed by the investigator to be related or possibly related to study drug), and permanent withdrawal from the study. Vital signs were taken

at each study visit; clinical laboratory values were assessed at baseline and end of study.

## Results

### Patient disposition and demographics

REST-ON was conducted from November 17, 2016, to March 25, 2020, at 71 centers in Australia, Canada, Czech Republic, Denmark, Finland, France, Germany, Netherlands, Switzerland, United Kingdom, and United States. A total of 413 participants were assessed for eligibility. Of these, 191 were excluded for not meeting one or more screening or randomization criteria; common reasons for exclusion included not meeting randomization EDS confirmation criteria ($n = 59$), unwillingness to comply with study mandates and procedures ($n = 27$), sleep apnea ($n = 24$), history of drug or alcohol abuse ($n = 17$), not meeting cataplexy criteria at randomization ($n = 15$) or screening ($n = 14$), and not having documented evidence of NT1 or NT2 ($n = 14$). In total, 222 were randomized 1:1 to the ON-SXB or the placebo arm ($n = 111$ each; Figure 2); 212 received at least one dose of study drug. Sixty-four (30.2%) participants discontinued the trial (ON-SXB, $n = 38$ [35.5%]; placebo, $n = 26$ [24.8%]). The most common reasons for discontinuation were TEAEs (overall, $n = 24$ [11.3%]; ON-SXB, $n = 21$ [19.6%]; placebo, $n = 3$ [2.9%]) and participant withdrawal (overall, $n = 22$ [10.4%]; ON-SXB, $n = 11$ [10.3%]; placebo, $n = 11$ [10.5%]). In total, 148 (69.8%) participants completed the study (ON-SXB, $n = 69$ [64.5%]; placebo, $n = 79$ [75.2%]).

Baseline demographics were well balanced between the ON-SXB and placebo arms. The mean (SD) age was 31 (11) and 32 (11) years in the ON-SXB and placebo arms, respectively (Table 1). Most participants were female (ON-SXB, 64.5%; placebo, 71.4%) and white (ON-SXB, 74.8%; placebo, 76.2%). Approximately 75% of participants had NT1 (ON-SXB, 74.8%; placebo, 78.1%). During the trial, 171 (80.7%) participants were taking ≥1 concomitant medication; the most frequently reported concomitant medications were stimulants. In the mITT population, 66 participants in the ON-SXB arm and 53 in the placebo arm were taking concomitant stimulants (modafinil [ON-SXB, 21.5%; placebo, 21.0%], armodafinil [ON-SXB, 12.1%; placebo, 6.7%], amphetamine [various; ON-SXB, 10.3%; placebo, 5.7%], and methylphenidate [ON-SXB, 10.3%; placebo, 6.7%]). Other frequently reported concomitant medications were over-the-counter analgesics (ibuprofen, acetaminophen) and vitamins. Hypertension was not an exclusion criterion; approximately 8% of participants enrolled had a medical history of hypertension. Only one patient had received prior SXB treatment.

## Efficacy

### Coprimary endpoints

*Maintenance of Wakefulness Test.* Mean sleep latency on the MWT was similar between the ON-SXB and placebo arms at baseline (5.0 and 4.7 min, respectively). The increase in sleep latency was significantly greater with ON-SXB vs placebo at week 3 for the 6-g dose (least squares mean change from baseline, 8.1 vs. 3.1 min, respectively; LSMD [95% CI], 4.98 [2.90 to 7.05]; $P<0.001$); at week 8 for the 7.5-g dose (9.6 vs. 3.3 min, respectively; LSMD [95% CI], 6.21 [3.84 to 8.58]; $P<0.001$); and at week 13

Downloaded from https://academic.oup.com/sleep/article/45/6/zsab200/6343406 by guest on 09 September 2024

Downloaded from https://academic.oup.com/sleep/article/45/6/zsab200/6343406 by guest on 09 September 2024



**Figure 2.** Patient disposition.

CONSORT diagram of patient disposition. ON-SXB, once-nightly sodium oxybate.

*Terminated.

for the 9-g dose (10.8 vs. 4.7 min, respectively; LSMD [95% CI], 6.13 [3.52 to 8.75]; $p$ < 0.001) (all Figure 3A).

*Clinical Global Impression-Improvement.* The mean baseline CGI-Severity was 5.1 in both treatment arms, indicating that participants were markedly impaired. A significantly greater proportion of participants in the ON-SXB treatment arm versus placebo were rated much or very much improved on the CGI-I at week 3 for the 6-g dose (40.1% vs. 6.1%, respectively; odds ratio [95% CI], 10.29 [3.93 to 26.92]; $p$ < 0.001); at week 8 for the 7.5-g dose (62.6% vs. 22.8%, respectively; odds ratio [95% CI], 5.67 [2.82 to 11.40]; $p$ < 0.001); and at week 13 for the 9-g dose (72.0%

**Table 1.** Baseline demographics and disease characteristics (safety population)

| Characteristic | ON-SXB<br>$n$ = 107 | Placebo<br>$n$ = 105 |
|---|---|---|
| Mean age (range), years | 30.9 (16–72) | 31.6 (16–69) |
| Sex, $n$ (%) | | |
| Female | 69 (64.5) | 75 (71.4) |
| Male | 38 (35.5) | 30 (28.6) |
| Race, $n$ (%) | | |
| White | 80 (74.8) | 80 (76.2) |
| Black/African American | 21 (19.6) | 15 (14.3) |
| Asian | 3 (2.8) | 8 (7.6) |
| Other* | 3 (2.8) | 2 (1.9) |
| Region, $n$ (%) | | |
| United States | 63 (58.9) | 53 (50.5) |
| Rest of world | 44 (41.1) | 52 (49.5) |
| Median BMI (range), kg/m² | 26.1 (16.9–71.9) | 26.4 (18.1–46.5) |
| Mean BMI (SD), kg/m² | 28.1 (7.8) | 28.2 (6.6) |
| Narcolepsy type, $n$ (%) | | |
| NT1 | 80 (74.8) | 82 (78.1) |
| NT2 | 27 (25.2) | 23 (21.9) |
| Hypertension, $n$ (%) | 10 (9.3) | 6 (5.7) |

*Egyptian ($n$ = 2), white, American Indian/Alaska Native ($n$ = 1), half Asian, half white ($n$ = 1), and multiracial (white/African American/Native American, $n$ = 1). BMI, body mass index; NT1, narcolepsy type 1; NT2, narcolepsy type 2; ON-SXB, once-nightly sodium oxybate.

vs. 31.6%, respectively; odds ratio [95% CI], 5.56 [2.76 to 11.23]; $p$ < 0.001) (all Figure 3B).

*Number of cataplexy attacks.* The mean baseline number of weekly cataplexy attacks was similar in the ON-SXB and placebo arms (18.9 and 19.8, respectively). The decrease in least squares mean change from baseline in the number of weekly cataplexy attacks was significantly greater with ON-SXB vs placebo at week 3 for the 6-g dose (−7.4 vs. −2.6, respectively; LSMD [95% CI], −4.83 [−7.04 to −2.62]; $p$ < 0.001); at week 8 for the 7.5-g dose (−10.0 vs. −3.7, respectively; LSMD [95% CI], −6.27 [−8.74 to −3.81]; $p$ < 0.001); and at week 13 for the 9-g dose (−11.5 vs. −4.9, respectively; LSMD [95% CI], −6.65 [−9.32 to −3.98]; $p$ < 0.001) (all Figure 3C). Although not a prespecified endpoint, a post hoc analysis revealed that significantly greater least squares mean change from baseline was also observed at week 1 with 4.5 g ON-SXB vs placebo (least squares mean change, −4.4 vs. −1.7; LSMD [95% CI], −2.68 [−4.89 to −0.46]; $p$ < 0.05; Figure 3C).

### Secondary endpoint

*Epworth Sleepiness Scale.* At baseline, ESS score was similar in the ON-SXB and placebo arms (16.6 and 17.5, respectively). The decrease in least squares mean change from baseline was significantly greater with ON-SXB versus placebo at week 3 for the 6-g dose (−3.5 vs. −1.4, respectively; LSMD [95% CI], −2.06 [−3.23 to −0.89]; $p$ < 0.001); at week 8 for the 7.5-g dose (−5.3 vs. −2.2, respectively; LSMD [95% CI], −3.16 [−4.67 to −1.64]; $p$ < 0.001); and at week 13 for the 9-g dose (−6.5 vs. −2.7, respectively; LSMD [95% CI], −3.86 [−5.47 to −2.26]; $p$ < 0.001) (all Figure 4).

### Safety

In the safety population, 83 (77.6%) and 49 (46.7%) participants in the ON-SXB and placebo arms, respectively, experienced a TEAE

6   |   *SLEEPJ*, 2022, Vol. 45, No. 6



**Figure 3.** Change from baseline for the three coprimary endpoints (mITT population).

A mixed-effects model for repeated measures was used for MWT and cataplexy analyses. A GLIMMEX model was used for CGI-I analysis. (A) LSM change from baseline in the MWT for patients receiving ON-SXB or matching placebo. (B) Percentage of patients rated much or very much improved on the CGI-I for



**Figure 4.** Change from baseline in ESS (mITT population).

A mixed-effects model for repeated measures was used for the analysis. LSM change from baseline in the ESS for patients receiving ON-SXB or matching placebo. ESS, Epworth Sleepiness Scale; LSM, least squares mean; LSMD, least squares mean difference; mITT, modified intent to treat; ON-SXB, once-nightly sodium oxybate.

(Table 2). Of these, most were considered mild (ON-SXB, n = 32 [29.9]; placebo, n = 24 [22.9]) or moderate (ON-SXB, n = 40 [37.4]; placebo, n = 20 [19.0]) in severity. The most frequently reported TEAEs for all participants treated with ON-SXB, at rates higher than placebo, were nausea (22.4%), headache (18.7%), vomiting (17.8%), dizziness (15.9%), enuresis (15.9%), decreased appetite (12.1%), anxiety (7.5%), hyperhidrosis (5.6%), and decreased weight (5.6%). In the ON-SXB arm, when looking across the three dosing periods, rates of known SXB AEs (i.e. nausea, vomiting, somnolence, dizziness, enuresis) were low (Table 2) and there was no dose-response relationship, with the exception of enuresis (Figure 5). No participants in the ON-SXB arm and one participant in the placebo arm discontinued due to a TEAE of worsening sleep apnea. A post hoc analysis of PSG data showed a similar decrease from baseline in the AHI at all doses in both the ON-SXB and placebo arms.

Serious TEAEs were reported by seven participants (3.3%) overall (ON-SXB arm, n = 5 [4.7%]; placebo arm, n = 2 [1.9%]). The five SAEs in the ON-SXB arm occurred across dose groups (1 each in the 4.5-g [diabetes mellitus inadequate control], 6-g [paresthesia], 7.5-g [perirectal abscess], and 9-g [suicidal ideation] dose groups; 1 in the posttreatment follow-up period [hypertension]). Only the SAE in the 9-g dose group (suicidal ideation) was considered treatment-related. This participant had a history of depression and anxiety; study drug was discontinued and the participant spent two nights in a psychiatric ward, where she was treated with lorazepam and then discharged with a lorazepam prescription. One week after reporting suicidal ideation, she was evaluated by the investigator.

patients receiving ON-SXB or matching placebo. (C) LSM change from baseline in mean number of cataplexy attacks for patients receiving ON-SXB or matching placebo. CGI-I, Clinical Global Impression of Improvement; LSM, least squares mean; LSMD, least squares mean difference; mITT, modified intent to treat; MWT, Maintenance of Wakefulness Test; ON-SXB, once-nightly sodium oxybate; OR, odds ratio.

Downloaded from https://academic.oup.com/sleep/article/45/6/zsab200/6343406 by guest on 09 September 2024

**Table 2.** Safety summary (safety population)

| n (%) | Week 1 | | Weeks 2–3 | | Weeks 4–8 | | Weeks 9–13 | |
|---|---|---|---|---|---|---|---|---|
| | ON-SXB 4.5 g (n = 107) | Placebo (n = 105) | ON-SXB 6 g (n = 97) | Placebo (n = 102) | ON-SXB 7.5 g (n = 88) | Placebo (n = 88) | ON-SXB 9 g (n = 77) | Placebo (n = 80) |
| Any TEAE | 37 (34.6) | 14 (13.3) | 38 (39.2) | 21 (20.6) | 42 (47.7) | 24 (27.3) | 43 (55.8) | 20 (25.0) |
| Any serious AE | 1 (0.9) | 1 (1.0) | 1 (1.0) | 0 | 1 (1.0) | 0 | 2 (2.6) | 1 (1.3) |
| TEAE leading to discontinuation | 7 (6.5) | 1 (1.0) | 6 (6.2) | 1 (1.0) | 5 (5.7) | 1 (1.1) | 5 (6.5) | 0 |
| Any ADR* | 30 (28.0) | 9 (8.6) | 28 (28.9) | 4 (3.9) | 30 (34.1) | 6 (6.8) | 27 (35.1) | 4 (5.0) |
| ADR leading to discontinuation | 6 (5.6) | 0 | 4 (4.1) | 1 (1.0) | 4 (4.5) | 1(1.1) | 3 (3.9) | 0 |
| Common ADRs† | | | | | | | | |
| Vomiting | 3 (2.8) | 1 (1.0) | 3 (3.1) | 1 (1.0) | 5 (5.7) | 0 | 4 (5.2) | 0 |
| Nausea | 6 (5.6) | 1 (1.0) | 8 (8.2) | 2 (2.0) | 6 (6.8) | 0 | 1 (1.3) | 1 (1.3) |
| Weight decreased | 1 (0.9) | 0 | 0 | 0 | 0 | 0 | 3 (3.9) | 0 |
| Decreased appetite | 4 (3.7) | 0 | 4 (4.1) | 0 | 3 (3.4) | 0 | 2 (2.6) | 0 |
| Dizziness | 6 (5.6) | 0 | 4 (4.1) | 0 | 5 (5.7) | 0 | 4 (5.2) | 0 |
| Somnolence | 0 | 1 (1.0) | 1 (1.0) | 0 | 2 (2.3) | 0 | 3 (3.9) | 0 |
| Headache | 7 (6.5) | 4 (3.8) | 5 (5.2) | 1 (1.0) | 5 (5.7) | 1 (1.1) | 0 | 1 (1.3) |
| Enuresis | 2 (1.9) | 0 | 4 (4.1) | 0 | 8 (9.1) | 0 | 7 (9.1) | 0 |
| Anxiety | 3 (2.8) | 0 | 0 | 0 | 3 (3.4) | 1 (1.1) | 1 (1.3) | 0 |
| Somnambulism | 1 (0.9) | 0 | 2 (2.1) | 0 | 0 | 0 | 0 | 0 |

*ADRs defined as adverse events assessed by the investigator to be related or possibly related to study drug.
†Occurring in ≥2% of patients receiving ON-SXB and more frequently in the ON-SXB group vs. placebo.
ADR, adverse drug reaction; AE, adverse event; ON-SXB, once-nightly sodium oxybate; TEAE, treatment-emergent adverse event.



**Figure 5.** Incidence of related TEAEs over time for ON-SXB.

ON-SXB, once-nightly sodium oxybate; TEAE, treatment-emergent adverse event.

Her Columbia Suicide Severity Rating Scale score was negative; as such, the SAE was considered resolved. No deaths were reported in the study.

Sixty-one (57.0%) participants in the ON-SXB arm and 17 (16.2%) participants in the placebo arm experienced ADRs. Overall, 17 (15.9%) participants in the ON-SXB arm and 2 (1.9%) participants in the placebo arm discontinued owing to ADRs. ADRs leading to discontinuation in ON-SXB–treated participants were dizziness (n = 5 [4.7%]); nausea (n = 3 [2.8%]); anxiety (n = 3 [2.8%]); headache (n = 2 [1.9%]); and vomiting, diarrhea, dysphagia, somnolence, abnormal dreams, delirium, depressed mood, depression, enuresis, restlessness, suicidal ideation, dyspnea, and painful respiration (n = 1 each [0.9%]). The most commonly reported ADRs (>5%) in the ON-SXB treatment arm at the

9-g dose were enuresis (9.1%), dizziness (5.2%), and vomiting (5.2%) (Table 2).

There were no clinically meaningful changes from baseline in clinical laboratory values, blood pressure, or heart rate for ON-SXB or clinically meaningful differences compared to placebo. Mean change from baseline in weight at week 13 was −1.29 kg and 0.19 kg in the ON-SXB and placebo arms, respectively. In a post hoc analysis, 17.5% of patients receiving ON-SXB versus 3.8% of patients receiving placebo had ≥5% weight loss at week 13. Least squares mean (SE) change from baseline to week 13 in body mass index was −0.51 (0.13) kg/m² for patients receiving ON-SXB and 0.08 (0.13) kg/m² for patients receiving placebo (LSMD [95% CI], −0.59 [−0.95 to −0.23]; p = 0.001).

Downloaded from https://academic.oup.com/sleep/article/45/6/zsab200/6343406 by guest on 09 September 2024

## Discussion

ON-SXB demonstrated statistically significant ($p < 0.001$) and clinically meaningful improvement for the three prespecified coprimary endpoints compared to placebo at all evaluated doses (6 g, 7.5 g, and 9 g): objective EDS assessed by MWT, frequency of cataplexy, and overall clinical condition as measured by the CGI-I. Statistically significant ($p < 0.001$) and clinically meaningful improvement was also demonstrated for the secondary endpoint of subjective EDS assessed by ESS in patients with narcolepsy with or without cataplexy. In contrast, in the 2002 twice-nightly SXB pivotal clinical trial, only the 9-g dose was statistically significant on EDS as measured by the ESS [33]. Newly released clinical practice guidelines from the American Academy of Sleep Medicine set a change from baseline compared to placebo of two or more minutes on the MWT, including the 95% CIs, as being the clinical significance threshold [34, 35]; ON-SXB achieved this standard for all three doses evaluated (Figure 3A). This is the first randomized controlled trial that demonstrated the efficacy and safety of a 7.5-g dose of SXB; given that the efficacy was nearly comparable to the 9-g dose compared to placebo, this may afford confidence for clinicians and patients that a lower dose can be effectively used in practice. Moreover, this is the first known publication describing a statistically significant reduction of cataplexy compared to placebo at week 1 with a 4.5-g dose of SXB. Supporting these prespecified findings in the overall narcolepsy cohort, post hoc analyses demonstrated consistent results for ON-SXB on EDS and overall condition, as assessed by MWT, ESS, and CGI-I, in both NT1 and NT2 subgroups and in subgroups of patients who were or were not receiving concomitant stimulant treatment [36, 37]; these analyses will be reported in future publications.

ON-SXB treatment (all doses, including at 3 weeks, with 6 g) was associated with significant improvement versus placebo on the ESS. In a recent study, change from baseline in the ESS score was shown to be significantly correlated with change in different measures of health-related quality of life, including the Functional Outcomes of Sleep Questionnaire, the Work Productivity and Activity Impairment questionnaire, and subscales of the Medical Outcomes Study 36-Item Short Form Health Survey, in patients with narcolepsy [5]. Thus, the improvement on the ESS scale observed with ON-SXB suggests that treatment with ON-SXB may correspond to improved quality of life for patients with narcolepsy; however, a direct measure of quality of life was not available for this study.

ON-SXB was generally well tolerated, with ADRs mostly rated mild or moderate in severity. Incidence of ADRs was higher early in the trial, increased with each dose increase, and then decreased over time, reflecting the attenuation of ADRs as participants adjusted to the medication (Table 2 and Figure 5). ADRs were consistent with known side effects of SXB [16, 33], and no new safety signals were observed. Enuresis was the only ADR with an apparent dose-response relationship, with a rate of 9.1% at the 9-g dose. Enuresis decreased as the time period and 9-g dosing period progressed. Although cross-trial comparisons should be interpreted with caution owing to different sample sizes and trial designs, labeling for the immediate-release oxybates reports a 3%–7% rate of enuresis [15, 16], and urine incontinence, which was reported as enuresis in most instances, occurred at a rate of 14.3% with the 9-g dose and 6.1% with the 6-g dose [33]. Other events that may result in discontinuation with conventional SXB are relevant. Among the known TEAEs

with SXB, rates of headache, dizziness, and nausea appear to be lower with ON-SXB than with twice-nightly SXB across doses (headache: ON-SXB, 4%–8% and twice-nightly SXB, 9%–31%; dizziness: ON-SXB, 4%–6% and twice-nightly SXB, 7%–34%; nausea: ON-SXB, 4%–9% and twice-nightly SXB, 6%–34%) [33, 38].

Potential for lower rates of ADRs with ON-SXB compared to twice-nightly SXB may be due to several factors, including the lower overall $C_{max}$, having only 1 $C_{max}$ with ON-SXB versus 2 with twice-nightly SXB [29], and the slower titration scheme in the REST-ON design. In the ON-SXB phase 1 studies, the known SXB ADRs mostly occurred around $C_{max}$ [39]. Therefore, having a single $C_{max}$ instead of 2, as with twice-nightly SXB, may lead to lower rates of ADRs [39]. As head-to-head studies are not required for regulatory approval in the United States, this pivotal study was placebo-controlled; there are no planned head-to-head studies with either formulation of immediate-release, twice-nightly oxybate. Clinical practice will likely elucidate patient preference between a single bedtime dose and a chronic regimen requiring middle-of-the-night awakening for a second dose.

There were no clinically meaningful changes from baseline in hematology or clinical laboratory values, blood pressure, or heart rate with ON-SXB treatment. Weight loss, as evidenced by change from baseline in body mass index, was greater for participants treated with ON-SXB versus placebo; thus, for those who are overweight, ON-SXB may have a beneficial metabolic effect. These findings provide further support of the safety and tolerability of ON-SXB in patients with narcolepsy.

This trial had some limitations. The design of the sleep diary limited the number of cataplexy events reported to "5 or more per day," which likely underreported the number of cataplexy attacks experienced by some participants and thus may have underestimated the effect of ON-SXB on this symptom. An increasing placebo effect was observed during the trial, which may have been due to investigator or patient expectation of benefit due to the increasing dose titration and a previously demonstrated dose-response relationship for efficacy with twice-nightly SXB. Although statistically significant improvement ($p < 0.001$ across all endpoints) was seen, this placebo effect may have resulted in underestimation of the effect of ON-SXB on the symptoms of narcolepsy. Approximately 70% of participants completed the 13-week trial. Dizziness, nausea, anxiety, and headache, which are well-known side effects of SXB, infrequently led to discontinuation. Sensitivity analyses using various methods of handling missing data affirmed the positive findings for all three doses and are planned to be further described in future publications. Of note, for the mixed-salts oxybate pivotal trial, the withdrawal design enrolled nearly 40% of participants who were already receiving, and therefore presumably tolerating, SXB [28]. Nevertheless, in the open-label titration phase and stable-dosing period, the discontinuation rate was 32% [28].

Modified-release formulations are commonly applied to therapeutics across disease states to decrease patient burden, improve adherence with a prescribed regimen, and ultimately enhance the overall patient experience [40, 41]. This is particularly important for chronic medical conditions such as narcolepsy, which is debilitating to every facet of a patient's life when not successfully treated. ON-SXB has received orphan drug designation from the US Food and Drug Administration (FDA) based on the plausible hypothesis that it may be clinically superior to the twice-nightly formulation of SXB already approved for

Downloaded from https://academic.oup.com/sleep/article/45/6/zsab200/6343406 by guest on 09 September 2024

the same indication. Once-nightly dosing may result in better medication adherence for patients and may have a beneficial effect on nocturnal sleep. Additionally, ON-SXB will avoid the patient potentially awakening a bed partner to self-administer the second dose of twice-nightly SXB. The plasma concentrations decline steadily after the first, and only, $C_{max}$, which occurs early in the night postdose, so patients can usually awaken when required for urination or other reasons. However, the reduced tendency to awaken at night may have some considerations. Patients should be advised to consider limiting fluid intake several hours before dosing, to void before dosing, and to stay in bed after dosing. In REST-ON, the protocol did not include these directions. Enuresis was reported at a rate of 9% in the 9-g dose; however, enuresis was largely limited to the first 2 weeks of the higher dose (Figure 5). Somnambulism occurred at a rate of 0.9% in the 4.5-g dose and 2.1% in the 6-g dose and was not reported with either the 7.5- or 9-g dose. In REST-ON, patients were instructed to stay in bed after dosing. However, two patients receiving ON-SXB and one receiving placebo experienced AEs of falls, which were nonserious in nature; it is unknown when these occurred in relation to dosing. With twice-nightly SXB, the US Prescribing Information was updated in 2014 to advise patients to stay in bed after they take the second dose of medication, with the recognition from postmarketing reports that falls have been reported when patients rise from bed [16, 42]. It is possible that ON-SXB may be less likely to cause these issues given the lower peak plasma concentration, the lower $C_{8h}$, and once-nightly dosing.

Among the available narcolepsy treatments, only SXB has demonstrated improvement on nocturnal symptoms. While improvements in DNS have been reported post hoc with the immediate-release twice-nightly SXB therapy [30, 43], there is a bifurcation of the PSG data owing to the second, middle-of-the-night dose [30]. Additional analyses and publications are planned to understand if ON-SXB approximates a more "normal" sleep architecture, with a predominance of SWS early in the night and lighter stages of sleep closer to awakening.

ON-SXB achieved efficacy and safety compared to placebo at all doses evaluated (9, 7.5, and 6 g) for the three coprimary endpoints with a single nighttime dose, thus obviating the need for patients to disrupt their sleep by awakening in the middle of the night for a second dose that is required with conventional, immediate-release formulations of SXB. Clinically meaningful improvement was observed with the 6-g dose; moreover, this trial demonstrates for the first time that SXB, given as the once-nightly formulation, is effective at the 7.5-g dose. Adverse reactions were consistent with the known side effect profile of SXB and were generally mild or moderate. ON-SXB is under review at the FDA for the treatment of EDS and cataplexy in adults with narcolepsy with a Prescription Drug User Fee Act date of October 15, 2021 [44]. If approved, ON-SXB may represent a major advance for patients experiencing the burdensome symptoms of narcolepsy and for physicians who manage their patients with this chronic, debilitating sleep disorder.

## Funding

This study was funded by Avadel Ireland. Avadel was involved in the study design; in the collection, analysis, and interpretation of data; in the writing of the report; and in the decision to submit the article for publication.

## Acknowledgments

The authors thank the REST-ON trial participants and their families. Statistical review of the manuscript was provided by Robert Flikkema, PhD, with funding from Avadel Pharmaceuticals (Chesterfield, MO). Medical writing support was provided by Jennifer Fetting, PhD, of The Curry Rockefeller Group, LLC (Tarrytown, NY), and was funded by Avadel Pharmaceuticals (Chesterfield, MO).

## Financial Disclosure Statement

**DS** is an employee of Avadel Pharmaceuticals.

**JD** is a consultant to, stockholder and former employee of Avadel Pharmaceuticals.

## Nonfinancial Disclosure Statement

**CAK** is a consultant of Avadel Pharmaceuticals and XW Pharma.

**CMS** is a consultant and has served on speakers bureaus for Avadel Pharmaceuticals and Jazz Pharmaceuticals.

**TR** is a consultant for Jazz Pharmaceuticals, Takeda Pharmaceutical Co., Orexo, Avadel Pharmaceuticals, Eisai, Merck & Co., and Idorsia.

**MJT** has served as a consultant or on advisory boards for Axsome Therapeutics, Balance Therapeutics, Eisai, Avadel Pharmaceuticals, Harmony Biosciences, Jazz Pharmaceuticals, NLS Pharmaceuticals, Suven Life Sciences Ltd., and Takeda Pharmaceutical Co.

**BCC** is a member of the speakers' bureau and has received honoraria from Jazz Pharmaceuticals, Eisai, and Harmony Biosciences. He is an advisor and has received consulting fees and honoraria from Avadel Pharmaceuticals. He is a member of the speakers' bureau for Merck & Co. Inc.

**AOA** is a consultant for Avadel Pharmaceuticals.

**RR** received research grant funding by Avadel Pharmaceuticals to conduct the current study. He has also received research grant support from Jazz Pharmaceuticals, Eisai, Merck & Co., Apnimed, Inc., Idorsia, Biohaven, and Suven Life Sciences Ltd. He has participated in advisory boards for Jazz Pharmaceuticals, Eisai, and Harmony Biosciences.

**AR** has received grant/research support for Jazz Pharmaceuticals, Suven, Inspire, Nyxoah, LivaNova, and Avadel Pharmaceuticals; is a consultant for Jazz Pharmaceuticals, Suven, Inspire, and Avadel Pharmaceuticals; and has served on speakers bureaus for Jazz Pharmaceuticals and Eisai.

**YD** has served as a consultant or on advisory boards for Avadel Pharmaceuticals, Jazz Pharmaceuticals, UCB, Takeda Pharmaceutical Co., Theranexus, Harmony Biosciences, Bioprojet Pharma, and Idorsia.

## Authors' Contributions

**TR**, **DS**, **YD**, and **JD** participated in study conception and design. **CAK**, **CMS**, **TR**, **MJT**, **BCC**, **AOA**, **RR**, **AR**, **DS**, **JD**, and **YD** participated in the acquisition and/or analysis of data. All authors participated in drafting a significant portion of the manuscript or figures.

## Data Availability

The data underlying this article will be shared on reasonable request to the corresponding author.

Downloaded from https://academic.oup.com/sleep/article/45/6/zsab200/6343406 by guest on 09 September 2024

# References

1. Kornum BR, *et al*. Narcolepsy. *Nat Rev Dis Primers.* 2017;**3**(1):16100.
2. Dauvilliers Y, *et al*. Narcolepsy with cataplexy. *Lancet.* 2007;**369**(9560):499–511.
3. Longstreth WT Jr, *et al*. The epidemiology of narcolepsy. *Sleep.* 2007;**30**(1):13–26. doi:10.1093/sleep/30.1.13.
4. Daniels E, *et al*. Health-related quality of life in narcolepsy. *J Sleep Res.* 2001;**10**(1):75–81.
5. Weaver TE, *et al*. Relationship between sleep efficacy endpoints and measures of functional status and health-related quality of life in participants with narcolepsy or obstructive sleep apnea treated for excessive daytime sleepiness. *J Sleep Res.* 2021;**30**(3):e13210.
6. Ingravallo F, *et al*. The burden of narcolepsy with cataplexy: how disease history and clinical features influence socio-economic outcomes. *Sleep Med.* 2012;**13**(10):1293–1300.
7. Dauvilliers Y, *et al*. Psychological health in central hypersomnias: the French Harmony study. *J Neurol Neurosurg Psychiatry.* 2009;**80**(6):636–641.
8. Center for Drug Evaluation and Research (CDER). *The Voice of the Patient: Narcolepsy.* US Food and Drug Administration; 2014.
9. Bassetti CLA, *et al*. Narcolepsy – clinical spectrum, aetiopathophysiology, diagnosis and treatment. *Nat Rev Neurol.* 2019;**15**(9):519–539.
10. Scammell TE. Narcolepsy. *N Engl J Med.* 2015;**373**(27):2654–2662.
11. Thorpy MJ. Recently approved and upcoming treatments for narcolepsy. *CNS Drugs.* 2020;**34**(1):9–27.
12. Thorpy MJ, *et al*. Clinical and practical considerations in the pharmacologic management of narcolepsy. *Sleep Med.* 2015;**16**(1):9–18.
13. Morgenthaler TI, *et al*. Practice parameters for the treatment of narcolepsy and other hypersomnias of central origin. *Sleep.* 2007;**30**(12):1705–1711. doi:10.1093/sleep/30.12.1705.
14. Barateau L, *et al*. Treatment options for narcolepsy. *CNS Drugs.* 2016;**30**(5):369–379.
15. Jazz Pharmaceuticals. *Xywav (Calcium, Magnesium, Potassium, and Sodium Oxybates). Full Prescribing Information.* Palo Alto, CA: Jazz Pharmaceuticals; 2020.
16. Jazz Pharmaceuticals. *Xyrem (Sodium Oxybate Oral Solution, CIII). Full Prescribing Information.* Palo Alto, CA: Jazz Pharmaceuticals; 2020.
17. Ágh T, *et al*. Factors associated with medication adherence in patients with chronic obstructive pulmonary disease. *Respiration.* 2011;**82**(4):328–334.
18. Medic G, *et al*. Dosing frequency and adherence in chronic psychiatric disease: systematic review and meta-analysis. *Neuropsychiatr Dis Treat.* 2013;**9**:119–131.
19. Nachega JB, *et al*. Lower pill burden and once-daily anti-retroviral treatment regimens for HIV infection: a meta-analysis of randomized controlled trials. *Clin Infect Dis.* 2014;**58**(9):1297–1307.
20. Stang P, *et al*. Persistence with once-daily versus twice-daily bupropion for the treatment of depression in a large managed-care population. *Am J Ther.* 2007;**14**(3):241–246.
21. Stang P, *et al*. Better patient persistence with once-daily bupropion compared with twice-daily bupropion. *Am J Ther.* 2007;**14**(1):20–24.
22. Pfeiffer PN, *et al*. Dosing frequency and adherence to antipsychotic medications. *Psychiatr Serv.* 2008;**59**(10):1207–1210.
23. Saini SD, *et al*. Effect of medication dosing frequency on adherence in chronic diseases. *Am J Manag Care.* 2009;**15**(6):e22–e33.
24. Srivastava K, *et al*. Impact of reducing dosing frequency on adherence to oral therapies: a literature review and meta-analysis. *Patient Prefer Adherence.* 2013;**7**:419–434.
25. Pérez-Carbonell L, *et al*. Adherence to wakefulness promoting medication in patients with narcolepsy. *Sleep Med.* 2020;**70**:50–54.
26. Roth T, *et al*. Disrupted nighttime sleep in narcolepsy. *J Clin Sleep Med.* 2013;**9**(9):955–965.
27. Mayer G, *et al*. Long-term compliance, safety, and tolerability of sodium oxybate treatment in patients with narcolepsy type 1: a postauthorization, noninterventional surveillance study. *Sleep.* 2018;**41**(9). doi:10.1093/sleep/zsy128.
28. Bogan RK, *et al*. Efficacy and safety of calcium, magnesium, potassium, and sodium oxybates (lower-sodium oxybate [LXB]; JZP-258) in a placebo-controlled, double-blind, randomized withdrawal study in adults with narcolepsy with cataplexy. *Sleep.* 2021;**44**(3). doi:10.1093/sleep/zsaa206.
29. Seiden D, *et al*. Pharmacokinetics of FT218, a once-nightly sodium oxybate formulation in healthy adults. *Clin Ther.* 2021;**43**(4):672.e1–672.e14.
30. Black J, *et al*. The nightly use of sodium oxybate is associated with a reduction in nocturnal sleep disruption: a double-blind, placebo-controlled study in patients with narcolepsy. *J Clin Sleep Med.* 2010;**6**(6):596–602.
31. American Academy of Sleep Medicine. *International Classification of Sleep Disorders.* 3rd ed. Darien, IL: American Academy of Sleep Medicine; 2014.
32. Johns MW. A new method for measuring daytime sleepiness: the Epworth Sleepiness Scale. *Sleep.* 1991;**14**(6):540–545. doi:10.1093/sleep/14.6.540.
33. U. S. Xyrem Multicenter Study Group. A randomized, double blind, placebo-controlled multicenter trial comparing the effects of three doses of orally administered sodium oxybate with placebo for the treatment of narcolepsy. *Sleep.* 2002;**25**(1):42–49. doi:10.1093/sleep/25.1.42.
34. Maski K, *et al*. Treatment of central disorders of hypersomnolence: an American Academy of Sleep Medicine clinical practice guideline. *J Clin Sleep Med.* 2021; epub ahead of print.
35. Maski K, *et al*. Treatment of central disorders of hypersomnolence: an American Academy of Sleep Medicine systematic review, meta-analysis, and GRADE assessment. *J Clin Sleep Med.* 2021; epub ahead of print.
36. Roy A, *et al*. Efficacy of FT218, a once-nightly sodium oxybate formulation, by narcolepsy subtype: a post hoc analysis from the REST-ON study. *Sleep.* 2021;**44**(Suppl 2). doi:10.1093/sleep/zsab072.490.
37. Roy A, *et al*. Efficacy of FT218, a once-nightly sodium oxybate formulation, by stimulant use: a post hoc analysis from the REST-ON study. *Sleep.* 2021;**44**(Suppl 2). doi:10.1093/sleep/zsab072.491.
38. Black J, *et al*. Sodium oxybate improves excessive daytime sleepiness in narcolepsy. *Sleep.* 2006;**29**(7):939–946. doi:10.1093/sleep/29.7.939.
39. Seiden D, *et al*. The pharmacokinetic adverse event relationship for FT218, a once-nightly sodium oxybate formulation. *Sleep.* 2020;**43**(Suppl 1). doi:10.1093/sleep/zsaa056.739.
40. Wheless JW, *et al*. A clinician's guide to oral extended-release drug delivery systems in epilepsy. *J Pediatr Pharmacol Ther.* 2018;**23**(4):277–292.
41. Wertheimer AI, *et al*. Drug delivery systems improve pharmaceutical profile and facilitate medication adherence. *Adv Ther.* 2005;**22**(6):559–577.

Downloaded from https://academic.oup.com/sleep/article/45/6/zsab200/6343406 by guest on 09 September 2024

42.  U.S. Food and Drug Administration. Center for Drug Evaluation and Research. Approval package for application number: NDA 21-196/S-019. Available at: https://www.accessdata.fda.gov/drugsatfda_docs/nda/2014/021196Orig1s019.pdf. Accessed July 1, 2021.

43.  Roth T, *et al*. Effect of sodium oxybate on disrupted nighttime sleep in patients with narcolepsy. *J Sleep Res*. 2017;**26**(4):407–414.

44.  Avadel Pharmaceuticals. Avadel Pharmaceuticals announces FDA acceptance of new drug application for FT218 in adults with narcolepsy for the treatment of excessive daytime sleepiness and cataplexy. Available at: https://investors.avadel.com/news-releases/news-release-details/avadel-pharmaceuticals-announces-fda-acceptance-new-drug-0. Accessed April 21, 2021.

Downloaded from https://academic.oup.com/sleep/article/45/6/zsab200/6343406 by guest on 09 September 2024

EXHIBIT 13

**AlphaSense** Highlighted Document

# Avadel Pharmaceuticals PLC

## Q2 2020 Avadel Pharmaceuticals PLC Earnings Call

Mon Aug 10 2020 Earnings Call Transcript

**Q2 2020 Avadel Pharmaceuticals PLC Earnings Call**

DUBLIN Aug 10, 2020 (Thomson StreetEvents) -- Preliminary Transcript of Avadel Pharmaceuticals PLC earnings conference call or presentation Monday, August 10, 2020 at 12:30:00pm GMT

CORPORATE PARTICIPANTS
    Gregory J. Divis, Avadel Pharmaceuticals plc - CEO & Director
    Jordan S. Dubow, Avadel Pharmaceuticals plc - Chief Medical Officer
    Thomas S. McHugh, Avadel Pharmaceuticals plc - Senior VP & CFO
CONFERENCE CALL PARTICIPANTS
    David A. Amsellem, Piper Sandler & Co., Research Division - MD & Senior Research Analyst
    François Daniel Brisebois, Oppenheimer & Co. Inc., Research Division - Research Analyst
    Oren Gabriel Livnat, H.C. Wainwright & Co, LLC, Research Division - MD & Senior Healthcare Analyst
    Paul Andrew Matteis, Stifel, Nicolaus & Company, Incorporated, Research Division - Co-Head of the Biotech Team, MD & Senior Analyst

**PRESENTATION**

**Operator**

Greetings, and welcome to the Avadel Pharmaceuticals Second Quarter 2020 Earnings Conference Call.

(Operator Instructions)

As a reminder, this conference is being recorded. It is now my pleasure to introduce your host, Tim McHugh, Chief Financial Officer. Thank you. Mr. McHugh, you may begin.

**Thomas S. McHugh**, Avadel Pharmaceuticals plc - Senior VP & CFO

Good morning, and thank you for joining us on our conference call. This morning, we issued our second quarter financial results news release. The release can be accessed on our website, www.avadel.com.

Reminder before we begin, the following presentation includes several matters that constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated in such forward-looking statements. These risks include risks that products in the development stage may not achieve scientific objectives, milestones or meet stringent regulatory requirements, uncertainties regarding market acceptance of products and the impact of competitive products and pricing.

These and other risks are described more fully in Avadel's public filings under the Exchange Act, including Form 10-K for the year ended December 31, 2019, which was filed on March 16, 2020,

and subsequent SEC filings. Except as required by law, Avadel undertakes no obligation to update or revise any forward-looking statements contained in this presentation to reflect new information, future events or otherwise.

On the call with me today are Greg Divis, our Chief Executive Officer; and Dr. Jordan Dubow, our Chief Medical Officer. At this time, I will turn the call over to Greg Divis.

**Gregory J. Divis**, Avadel Pharmaceuticals plc - CEO & Director

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

Thank you, Tom.

Good morning, everyone, and thank you for joining us on our second quarter 2020 conference call. I'll begin with a brief update on our business outlook, highlighting the significant progress, made in the key milestones achieved as we continue to transform Avadel. I will then turn the call over to Jordan to give an update on the FT218 program, followed by Tom, who will review the financial results for the quarter. And we'll conclude with a Q&A session.

So with that, let's get started. Our team is leaving Avadel through its most dynamic period in its history. As we move even closer to the NDA filing, potential FDA approval and launch of FT218, our investigational once-nightly formulation of sodium oxybate, designed to treat excessive daytime sleepiness and cataplexy in patients with narcolepsy.

We recently completed a successful pre-NDA meeting with the FDA. Post this critical milestone, our team remains confident that the highly clinically meaningful and statistically significant results from the REST-On clinical trial, combined with the additional development plans and actions we have taken places us on a direct path to advance FT218 to NDA submission. Jordan will touch more on the FT218 program during his remarks. We believe in our market research with physicians and patients confirm. That the clinical data collected to date support the potential for FT218 to provide a valuable advancement in the treatment of both excessive daytime sleepiness and cataplexy for patients with narcolepsy.

As such, we have taken very deliberate actions to ensure that Avadel has the resources in place to deliver on our strategy while also building long-term value for our shareholders.

In that context, let me dive a little deeper into our actions over the past several months. During the first half of 2020, the Avadel team has executed against the strategy we have in place for FT218.

This includes completing the pivotal Phase III REST-ON on study a year earlier than most had projected. The positive top line data from this study was announced in late April and showed that the 3 dose levels of FT218 That were tested, demonstrated statistically significant with p-values of less than 0.001 and a clinically meaningful improvement for all 3 co-primary endpoints compared to placebo.

What was at one-time a question mark is no longer. FT218's data is unequivocal and the announcement today, highlighting the secondary endpoints only continues to build our confidence in the clinically meaningful benefits we believe FT218 can potentially offer patients. Since the announcement of the very positive top line data, we've executed additional steps in line with our overall strategic plan that will support the development strategy for FT218, ensure we maintain optionality for FT218, with the goal of creating meaningful shareholder value.

As such, we have delivered on the following: First, in May, we completed a public offering with net proceeds of $117 million, which is in addition to the $60 million of net proceeds from the pipe we completed in February.

This cash infusion has further strengthened our balance sheet and positioned us to financially support FT218 remaining development and regulatory process as well as plan and execute its necessary market preparation work.

Second, on June 30, we completed the sale of our legacy portfolio of sterile injectable drugs, used in the hospital setting for a total of $42 million to Exela Sterile Medicines LLC.

The completion of this transaction improved both our overall cash position and further simplified and focus the company.

We believe this transaction is in alignment with our strategy, which is all geared toward ensuring we drive maximum value of FT218 for all stakeholders.

Third, in July, we announced the initiation of an open-label extension study for REST-ON and a switch study to evaluate patients switching from twice-nightly sodium oxybate to once-nightly dosing of FT218.

Although this study is just getting started, we are all in the middle of this pandemic. We are pleased with the high level of interest in our investigational once-nightly FT218.

With the completion of the equity offering and the sale of the hospital products, we ended the quarter with $239 million of cash. And based on current plans and time lines, we believe our cash on hand, along with the remaining $27.5 million to collect from the sale of the hospital products, provides us with sufficient liquidity to prepare for, and if approved, launch FT218, should we decide to launch the product on our own. This brings us to the next important steps in our strategic plans for FT218.

As I mentioned just a moment ago, today, we announced that the analysis of the full REST-ON data set is now complete, and we are quite pleased with the resulting data. Our recent analysis of the full REST-ON data set has

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

demonstrated that FT218 was also highly significant competitive placebo on other measures of daytime sleepiness, sleep architecture and other narcolepsy symptoms at all 3 doses. Jordan will elaborate more on these findings.

With this data and now post the pre-NDA meeting, we are full speed ahead toward NDA submission. Although there is still some additional work to complete in the preparation of our submission, I want to be very clear that filing the NDA for FT218 is our most immediate and single highest priority. We have built a world-class team, which has demonstrated the ability to consistently execute and deliver on or ahead of expectations.

As such, I am confident we have the right team and the right plans to deliver a robust and comprehensive NDA package. Furthermore, to ensure we are positioned to continue to maximize the full value of FT218, we are executing across many different work streams as we plan, build and execute our market preparation efforts. To support this, we have engaged with industry leading advisers to assist us in critical areas such as medical affairs, scientific communications, patient services, distribution, commercial analytics and RIMS, to name a few. This market preparation work is critical to build readiness for FT218 across all stakeholders and is both necessary and valuable for us and/or any potential partner. If approved, FT218 could be the first one site lease therapy to address both excessive day thank sleepiness and cataplexy in patients with narcolepsy. This would mean a tremendous opportunity for the company, our shareholders and as important, a new treatment option for the tens of thousands of narcolepsy patients who could potentially benefit from FT218. As I conclude my opening remarks, I want to express how proud I am of every team member's contributions to this effort, especially over the past several months, as the world has faced COVID-19. The actions taken and the level of execution has purposefully positioned the company at this point in time.

We are confident the company has the resource in terms of data, people and capital to support FT218 through the regulatory process and to take the necessary actions to ensure we build and sustain shareholder value while maintaining strategic options for FT218 and the company at large. If approved, we believe FT218 can make a meaningful difference for patients and providers and our shareholders deserve to be rewarded accordingly.

I will now turn the call over to Dr. Jordan Dubow, our Chief Medical Officer, to provide an update on the FT218 program. Jordan?

**Jordan S. Dubow**, Avadel Pharmaceuticals plc - Chief Medical Officer

Thank you, Greg, and good morning, everyone. As Greg mentioned, in April, we announced positive top line data from our pivotal Phase III REST-ON study. In this study, we had 3 co-primary endpoints: the maintenance of wakefulness test, clinical global impression improvement and mean weekly cataplexy attacks. While most studies are required to win on one primary endpoint, the REST-ON study had to win on all 3 of these co-primary endpoints. These 3 co-primary endpoints are important and that there are measures of both the underlying phenomenology of the disease, i.e., excessive daytime sleepiness and cataplexy as well as an overall functional outcome, the CGI, which serves as an anchor to show the clinical meaningfulness of the other 2 end points. We were excited by the results of this top line data, which showed that the 3 doses tested demonstrated statistically significant all p-values less than 0.001 and clinically meaningful improvement for all 3 co-primary endpoints compared to placebo.

I would also like to mention that as we continue to evaluate the data, we have been increasingly pleased by the results from this study, especially as it pertains to the secondary endpoints and sensitivity analyses of the 3 co-primary endpoints. We now have analyzed the full REST-ON data set in FT218 performance and tolerability were consistent with the top line data released in April. For all planned sensitivity analysis of the 3 primary endpoints, FT218, was highly significant compared to placebo for all 3 doses tested on all 3 co-primary endpoints.

Additionally, FT218 was highly significant compared to placebo for the following secondary endpoints at all 3 doses tested. The Epworth sleepy scale, disturbed nocturnal sleep and number of nocturnal arousals as measured by polysomnography, patient rated sleep quality, patient rated refreshing nature of sleep and sleep paralysis. FT218 did not differentiate from placebo in change in the number of hypnogogic hallucinations, which is consistent with previous sodium oxybate data and likely reflected the very low baseline numbers. We are excited that FT218 generated positive data for these underlying measures to sleep architecture as well as other patient-reported outcomes, reflecting excessive daytime sleepiness and sleep quality. From a safety perspective, all doses were generally well tolerated. Across the 3 doses tested, the most common adverse reactions were nausea, dizziness, enuresis, headache, decreased appetite, (inaudible) Approximately 5% of subjects had serious adverse events on FT218 compared to 2% on placebo. Only 1 serious adverse event on FT218 was deemed related to study drug.

With that said, in order to preserve our ability to present these data at an upcoming medical conference or peer review publication, we are not able to offer more specific data at this time. However, we look forward to presenting this data in detail as well as interesting post hoc data at upcoming conferences.

Most importantly, we believe the clinical data generated for FT218 to date will serve as a strong basis for a complete regulatory package.

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

In fact, we already had our pre-NDA meeting with the FDA to discuss the format and content of our submission and are working diligently to expeditiously file our NDA and bring this drug to patients.

The takeaway from that meeting is that my team and I are confident we are on track to move forward in line with our internal time lines. Looking beyond the NDA submission, we also just announced in July the initiation of an open-label extension study for REST-ON and a switch study to evaluate patients switching from twice nightly sodium oxybate to once-nightly FT218. These studies are important because they enable us to provide those patients who participated in the REST-ON study with continued access to FT218 in order to gather long-term data as well as generate data for physicians on both extended use of FT218 and patients switching from twice nightly sodium oxybate to once-nightly FT218. I want to again thank all the patients, investigators and study staff who have participated in the REST-ON study as well as the Avadel team from getting us to this exciting and pivotal time for the company and for the patients we serve.

With that, I would like to turn the call over to Tom to review the financials.

**Thomas S. McHugh**, Avadel Pharmaceuticals plc - Senior VP & CFO

Thank you, Jordan. I'll summarize a few financial highlights for the second quarter and then turn the call back to Greg for closing comments.

Our hospital products business generated revenue of $10.1 million compared to $17.6 million in the second quarter of 2019. The decline on a year-over-year basis was primarily attributed to lower overall sales volume across the company's hospital products as a result of increased market competition. As previously announced, on June 30, we completed the sale of the hospital sterile injectable drug portfolio. And as a result, we will not report sales for these products, starting in the third quarter of 2020. In conjunction with the sale, we recorded a pretax gain of $45.8 million, which is comprised of the $42 million transaction value adjusted for transaction fees and net liabilities are transferred to Exela. R&D expenses were $4.1 million in the second quarter of 2020 compared to $10.3 million in the second quarter of 2019. The decrease on a year-over-year basis was primarily attributed to the completion of the FT218 clinical study during the first quarter of 2020 As well as lower headcount due to the restructuring activities initiated during 2019. SG&A expenses were $7.1 million in the second quarter of 2020 compared to $6.8 million in the second quarter of 2019. The year-over-year increase is primarily the result of higher professional fees and market research costs related to FT218. Income tax provision was $5.3 million in the second quarter of 2020, compared to $1.8 million for 2019, and net income in the second quarter 2020 was $30.9 million, which includes the gain on the sale of the hospital products or $0.49 per diluted share compared to a net loss of $8.6 million or a loss of $0.23 per diluted share for the same period in 2019.

Cash, cash equivalents and marketable securities were $238.6 million as of June 30, 2020, which includes net proceeds of approximately $117 million related to the follow-on offering completed in May as well as a $14.5 million upfront payment associated with the sale of the hospital products portfolio. We expect to collect the remaining $27.5 million for the sale of hospital products by June of 2021. We believe our current cash on hand, along with that $27.5 million, will support our expected financial requirements to complete the NDA submission, to pile additional supporting scientific data to position FT218 in the market and ramp up our market preparation of FT218, which includes both preparing FT218 for the market and preparing the market for FT218. Now I'll turn the call back to Greg for closing remarks.

**Gregory J. Divis**, Avadel Pharmaceuticals plc - CEO & Director

Thanks, Tom. In closing, we are pleased with the progress we have made in the transformation of Avadel and the current position of the company as we prepare to submit the NDA for FT218.

As such, we remain fully focused on and committed to achieving the regulatory and market preparation milestones for FT218 and will maximize shareholder value and bring a potentially meaningful treatment option to the tens of thousands of narcolepsy patients who could benefit from FT218. I too want to thank our investigators, patients, shareholders and fellow employees for their contributions to our progress and support of our strategy. We look forward to providing investors and all stakeholders with further updates in the future.

So with that, I think we're ready to open the line for Q&A. Operator?

## QUESTIONS AND ANSWERS

**Answer – Operator:** (Operator Instructions)

Our first question comes from the line of Ami Fadia with Leerink.

---

**Analyst:** Unidentified Participant,

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

**Question – Unidentified Participant:** A couple of questions I had. Firstly, just with regards to your recent meeting with the FDA.

Can you characterize any feedback from the FDA? Any changes in direction that you may need to consider with your application? Or was it very much in line with your prior discussions with the FDA? Secondly, with regards to the Switch study, what are some of the end points that we'd be able to measure, would we be able to look at things like sleep architecture, et cetera, in the Switch study? And then maybe just remind us of some of the timing for the data readouts next year.

**Answer – Gregory J. Divis:** Thanks, Ani. Jordan, do you want to tackle those?

**Answer – Jordan S. Dubow:** Yes, sure. Yes. Thanks for the question. So first, with -- in terms of the pre-NDA meeting, I think what we've said prior to the meeting is that many of our questions related to a lot of the strategy we've asked and been answered. So we felt very comfortable with it. I think as we said in the script that we just discussed that we really discuss the format, the content of the NDA. We ask questions again in terms of -- we showed them the data of the Phase III trial, we got confirmation that the data from this trial is sufficient for us to file with. We asked about certain things in terms of what we need to integrate, what we don't need to integrate. So I think the meeting was very straightforward.

We felt very confident with all the answers we've gotten. But again, most of the questions that we kind of had the year had to answer going into the meeting.

In terms of the second question about the Switch study, or the extension study.

Yes. So with the extension patients we're capturing really just long-term maintenance of efficacy data, we're keeping it simple, looking at really, just daytime sleepiness as well as cataplexy data. For the Switch patients, we're really looking at just preference, right? So the main endpoint of the study is preference for which dosing regimen of sodium oxybate they prefer, the once-nightly regimen versus the twice nightly regimen.

We did not -- we decided we did not want to make a double-blind, double dummy study because that obviously takes away from the benefits of the once-nightly product. So that's the type of information that we're capturing.

In terms of your last question about what data we intend to present next year. And I think as we move forward to the main conferences next year, obviously, with the big neurology meeting, which, again, to be determined whether these will be in person or not in the late April time frame, the American Neurology meeting, we intend to present data. The ASM meeting have so the big sleep meeting in the U.S., we intend to present data at.

The World Sleep Meeting next year, we intend to present data at as well as other meetings throughout the year.

.

**Answer – Operator:** Our next question comes from the line of Paul Matteis with Stifel.

---

**Analyst:** Unidentified Analyst,

**Question – Unidentified Analyst:** This is Nate on for Paul.

Maybe just 1 on the pre-NDA meeting. Do you -- I'm assuming you touched it at some point on the REMS and DDI. And I'm just wondering if you have any updated thoughts. I know it's nothing finalized. But on the carve-out strategy? And if you could elaborate on that at all?

**Answer – Gregory J. Divis:** Yes. Thanks. This is Greg. Again, I think Jordan characterized the contacts and the content of the pre-NDA meeting very well.

And that most -- really all of the -- what we would characterize as the substantive issues that we felt needed to be addressed well in advance of a pre-NDA meeting, we have already engaged with the FDA on prior to a pre-NDA meeting. So the exchange, if you will, around those topics have occurred and have been ongoing well in advance of a pre-NDA meeting. So in that regard, the pre-NDA meeting didn't, I would say -- wasn't a requisite or prerequisite for us to gain or learn anything new, only because we had already and had been already engaged with the FDA.

And whether if there's anything different around that, I would say we've been pretty transparent and clear around that exchange -- those exchanges with the FDA in terms of our strategy and our approach, and that remains the course forward.

---

**Analyst:** Paul Andrew Matteis, Stifel, Nicolaus & Company, Incorporated, Research Division - Co-Head of the Biotech Team, MD & Senior Analyst

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

**Question – Paul Andrew Matteis:** That's helpful. And then maybe 1 more. What exactly -- is the bridging study, the last thing that's gating to the NDA? Or should we be paying attention to anything else?

**Answer – Gregory J. Divis:** No. I think that the longest pole in the tent, if you will, is just integrating all the data and putting it all together, right? So that's the -- if you will, the longest pull in the tent. As we've described as a few things we need to complete. We describe those as much more as kind of perfunctory in terms of in nature, in terms of what we need to do.

So we're confident we're going to get it done. And -- but I think the longest pole is just integrating and pulling all of the information together in the proper format as now we have clarity on that post the pre-NDA meeting.

**Answer – Operator:** Our next question comes from the line of François, Brisebois with Ladlaw.

---

**Analyst:** François Daniel Brisebois, Oppenheimer & Co. Inc., Research Division - Research Analyst

**Question – François Daniel Brisebois:** Now with Oppenheimer.

So I just had a couple of ones here. In terms of the pre-NDA meeting, it seems like there were discussions before that, and then it went according to plan. Can you help just remind us the time line in terms of NDA and then potentially launch and just kind of an update there. So we have a better idea when these things could happen?

**Answer – Gregory J. Divis:** Yes. Frank, thanks. And we haven't to date guided to our NDA timing really for what we would characterize as market-based reasons. We certainly know the window of our expected filing and appreciate the importance of this type of information for investors while we balance other considerations. So I believe it will a topic that we'll discuss more and have more to say on it as time progresses. But at this time, I would say that the way we described timing-wise, is that if you think about what may be standard in the industry or post data readout and complete data set between that point in time. And a submission, which in a really accelerated fashion, is 6 to maybe 9 months on the longer end of an accelerated fashion for up to 12-plus months. We would expect to be better-than-average overall from that perspective. We're confident that we're progressing at the right pace, and we'll get everything done, and we have every incentive to get it done as fast as we can.

**Question – François Daniel Brisebois:** Okay. Great. And then just lastly, I was just wondering, in terms of the new secondary endpoints that Jordan talked about a little bit more in detail today. Is there anything there that could potentially help differentiate on labels to kind of prevent some of that freedom to operate situation? Or -- and just a little more discussion maybe on the sleep architecture, the importance of that and the fact that it hit at 6 and 7.5 grams as well in terms of real-world setting, what that means to hit at all doses?

**Answer – Gregory J. Divis:** Jordan, you want to tackle that, please?

**Answer – Jordan S. Dubow:** Yes. I mean I can address the part, yes. I mean, again, that's related to (inaudible) to operate, but just related to the data at large. So obviously, we were extremely pleased with all of the data, right? The primary data, all of our secondary endpoints as well as, all the sensitivity analysis. I think the sleep architecture is critically important, right? I mean, I think we all know and we had out (inaudible) believe that waking up in the middle of the night is not great. It's better not to wake up in the middle of the night and to wake up in the middle of the night every night. And our sleep architecture data looks great. I mean, right? So looking at disturbed nocturnal sleep, which is clearly a problem in patients with narcolepsy, which really looks at transitions from kind of deep sleep to light sleep from sleep to wake, which really leads to that fragmented sleep, which theoretically makes people sleepy. So our data was unequivocally positive at all 3 doses with that.

And importantly, too, we've mentioned, and again, I don't want to get too much into the data. That's 1 where you clearly see placebo responses in the data we presented and expect to see the responses. When you really looked at our sleep architecture data, the really interesting thing was that in this, the placebo response actually worsened for sleep architecture, which one could argue. It's less impacted by placebo response and just reflects the underlying disease and what sodium oxybate does to that disease.

And FT218 clearly and robustly really, really improves the architecture. And so I think that's really important. And in total, what's really important, it's the sleep architecture, it's subjective measures, it's objective measures, it's doctor related, it's patient related. Every single 1 of those measures, FT218, improved. So that's what we feel really really good about.

**Answer – Gregory J. Divis:** Yes. Thanks, Jordan. I think, Franc, as it relates to this your question on Freeman operate, it doesn't change our strategy, our approach in that regard.

**Answer – Operator:** Our next question comes from the line of Oren Levant with H.C. Wainwright.

---

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

**Analyst:** Oren Gabriel Livnat, H.C. Wainwright & Co, LLC, Research Division - MD & Senior Healthcare Analyst

**Question – Oren Gabriel Livnat:** Congrats also on all the recent progress. So obviously, Jazz's got they by wave. They're low sodium version approved, and they seem to be very clear in their script highlighting the importance of low sodium, also flexible dosing, flexible dosing, which is clearly trying to differentiate from your fixed-dose sachet. And so I'm just wondering, what is your latest research tell you about both physician and patient preference on the sodium front versus once-nightly? And also, how important do you think that flexible dosing really is? And also, just, I guess speaking about sort of head-to-head. When you look at the market and you think about where your patients are going to come from, I'm sure you're obviously targeting existing oxybate prescribers. But do you think you're going to get patients from new starts or from switches? Would new starts, you think, primarily be naive patients or perhaps people that have prior failed or not being compliant on twice nightly dosing of Xyrem?

**Answer – Gregory J. Divis:** Yes. So thanks, Oren. Maybe I'll make a few comments and see if Jordan has anything he wishes to add to it. But I mean, listen, our research tells us, and when we do our research, we tested against all competitors in the space from that standpoint. And we feel very bullish and confident in the physician's reaction and patient reactions to our product profile that has now become much more precise relative to the data readout, which in and of itself, gives us a lot of confidence on the potential for FT218 regardless of what other products are in the marketplace or what other formulations of sodium oxybate or other product for narcolepsy. There is a clear interest in a high level of interest of a once night sodium oxybate product. I'll let Jordan talk about the salt aspect of this. We certainly are aware of the 258 product that's been approved as expected from that standpoint. And with regards to the flexible dosing, positioning that's been taken in the marketplace to date relative to their label. Again, I'll let Jordan make comments, but I think our reaction to that is that their way of trying to make it a once-nightly product, right? In other words give a little bit more at bedtime and a little less in the middle of the night, it sounds a lot like trying to emulate our once-nightly PK curve. That being said, where our focus is on building the readiness for FT218, executing toward an NDA submission and doing all we can to ensure in the best interest of our shareholders and patients to get FT218 to the market as fast as we can.

So Jordan, is there anything else you want to add to that?

**Answer – Jordan S. Dubow:** Yes. Just a couple of comments. I mean, I'd just add, let's not forget that the low-sodium, twice-nightly sodium oxybate product to twice-nightly.

Okay. There's clear benefit. There's clear benefits of not waking up in the middle of night, which we've spoken a lot to in terms of safety, compliance, awaking your bed partner or your caregiver every night.

So clearly, there's benefit that outweigh any theoretical risk of lower sodium, which I'll get to in a second. And the fact is when you talk to our constituents, I mean, I think between our investigators, between the (inaudible) groups, not once during the REST-ON trial or during the open-label study has any of them to ask what our sodium content is. So I think in our view, that tells us what may view the theoretical risk of salt or not salt. And I think, as I've said to many of you before, we've obviously studied the research extensively on salt, on the risk of salt. You can look at the published data, there's many years now of data of sodium oxybate.

And there's just no clear association. There's no association, right? We're still going to sodium oxybate in hypertension, risk of cardiovascular disease.

When you look at the salt literature, which again, I mentioned this before, we've studied at Nauseam, you look at the newer data that suggests there's au shape curve with the risk of salt and cardiovascular disease.

Some of it said less than 2 grams a day is actually associated with a worse outcome in greater than 6 grams a day is associated with a worse outcome. So in our view, we don't think salt is a big issue. When you actually look at our data, our baseline demographics, we did not exclude people for hypertension. We did not exclude people for hyperlipidemia. We did not exclude people with diabetes. And then we had about, I think, 7.5% of our patients at baseline had the diagnosis of hypertension, diabetes and hyperlipidemia together. The average age of our study was 31. The average blood pressure baseline was 120/77.

So I mean, I think that's our, right. I mean, clearly, the benefits of once-nightly outweigh any theoretical risk, which we don't believe you exist for whatever the salt content is.

**Answer – Gregory J. Divis:** Yes. And just to answer your last question, Oren, around source of business, although we haven't been precise in that regard in terms of our public disclosures, what we have said is that when we research this, we research it by patient segment. We test propositions for newly-diagnosed naive, current patients on therapy, previously treated patients who have discontinued because we do know that 44% of all twice-nightly patients who initiate discontinue within the first 12 months and approximately half of those patients are explicit in their prescription as due to dosing.

So when you think about that, the answer to your question is, yes, we think we're going to get patients from all segments and including those who were previously on, including those who are currently on, including those who are

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

newly diagnosed. I think some of those are easier to find than others from that standpoint. But nonetheless, all are really important, and obviously, something we are and remain very focused on.

**Answer – Operator:** Our next question comes from David Amsellem with Piper Jaffray.

---

**Analyst:** David A. Amsellem, Piper Sandler & Co., Research Division - MD & Senior Research Analyst

**Question – David A. Amsellem:** So just a couple. I wanted to pick your brain, Greg, on your thoughts on Jazz's decision to price Zywave, low-sodium oxybate at parity with Xyrem? Were you surprised by that? And how does that play into your thinking regarding pricing of FT218? And I joined late, I apologize if you may have addressed this in the prior Q&A, but I wanted to get your thoughts there. So that's number one. And then #2 is sort of a longer-term question as the narcolepsy, EDS cataplexy space becomes more varied with other entrants. Do you think that the pie in terms of the number of oxybate patients is going to be rather static? Or do you think you can grow the pie? Help us understand how you're thinking about it. Right now, we're at sort of this 15,000 patients.

Do you think it gets a lot bigger? Do you think it stays largely the same over the long term?

**Answer – Gregory J. Divis:** Yes. I don't -- David, thank you. I don't really have a view of Jazz's pricing strategy that's for them to consider. From that standpoint, it hasn't changed the way we've thought about it and what we've talked about consistently that we think that there's an opportunity here to bring an important treatment to patients who -- for these tens of thousands of narcoleptic patients. And our pricing -- our pricing strategy hasn't changed in terms of how we think -- what we thought about. Unequivocally, we won't be priced at a premium. I think we view pricing as something as kind of in the zone of where the sodium oxybate products are netting out at the point in time when we come to the marketplace from that standpoint. But nonetheless, as for Jazz, I really don't have a comment about what their strategy is.

Regarding the pie, so to speak, again -- and I'll let Jordan, if he has any additional comments, but clearly, more treatments and more promotion likely has the result of filling more at the top of the funnel, right? So in a category that predominantly for a long time, had one company promoting will now have more. Not only has the opportunity to yield more at the top of the funnel. And in the therapeutic category where sodium oxybate to date is unequivocally the standard of care, although it's used third line, we think that just bodes well for creating more treatment options for patients with sodium oxybate. And products like once-nightly FT218, we think will also create an opportunity for more potential patients who could -- who could go on sodium oxybate treatment as well. When you think about the static market today, let's just say, 15,000 sodium oxybate patients, just by having an influx of previously-treated patients automatically expands the market of what today's market is, right? That's not to factor in what it means for newly diagnosed, the number of newly-diagnosed patients or patients who otherwise wouldn't have gone on sodium oxybate because of other reasons that now may be candidates.

So yes, I do think the pie has the opportunity to grow from that standpoint. And more noise in the marketplace, I think, kind of fills more at the top of the funnel and the high tide, so to speak, will lift boats, if you will.

**Answer – Operator:** Our next question comes from the line of Matt Kaplan with Ladenburg Batman.

---

**Analyst:** Unidentified Analyst,

**Question – Unidentified Analyst:** This is Raymond in for Matt. Congrats on the quarter. Just perhaps just 2 quick questions. I was wondering perhaps maybe the first 1 would be, what kind of factors would you think would favor perhaps a partnership or versus watching your own? And my second question is, if -- I know you're presenting the upcoming medical meeting would you have any at the Sleep 2020 Conference (inaudible)?

**Answer – Gregory J. Divis:** Yes. So for Sleep 2020, which has been -- which was originally scheduled for early June and is now a virtual conference later this month. We're presenting some PK data and some information around our switch and REST-ON study in terms of design. The dates, if you will, to be able to get the more recent data published in that venue had passed by the time our data led out. But we will have a presence there. We will have a virtual booth, we will be engaging with health care professionals and others virtually during that conference. With regards to your comments about what are the factors that may or may not lead us to a partnership or not. I think we've been pretty clear and transparent publicly around our communication around this, and that we have an obligation to ensure we're in a position to maximize or pursue any optionality as it relates to FT218. And the lens that has to be worked through was really -- wasn't in the best interest of shareholders and how do we get the drug to patients faster, right, and in the fastest way possible. So from that standpoint, if those opportunities present themselves with the right strategic partner in some form or fashion, we are certainly open to those discussions. And we won't talk about whether we are or will or have or haven't in that regard. But nonetheless, I think what's most important to take away from this is that other (inaudible) value creation for shareholders and bringing this important treatment to patients as fast as we can.

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

**Answer – Operator:** We've reached the end of our question-and-answer session. I'd like to turn the floor back over to management for closing comments.

**Answer – Gregory J. Divis:** Thank you, operator, and thank you, everyone, for joining us on our call today. We wish you all the stay safe and be healthy and all the best. Thank you. Have a great rest of this day, and we look forward to taking follow-ups with you and communicate (inaudible) take care. Thank you.

**Answer – Operator:** This concludes today's teleconference. You may disconnect your lines at this time. Thank you for your participation, and have a wonderful day. .

---

StreetEvents transcripts content provided by Refinitiv

**REFINITIV**

Sentiment Analysis by **Alpha**Sense

©2017, AlphaSense, Inc. All Rights Reserved. AlphaSense is a service mark of AlphaSense, Inc. All other trademarks mentioned belong to their respective owners.

# EXHIBIT 14





# Avadel Pharmaceuticals plc
## (NASDAQ: AVDL)

August 2024

©2024 Avadel. All rights reserved.

# Safe Harbor Statements

This presentation may include forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These forward-looking statements relate to our future expectations, beliefs, plans, strategies, objectives, results, conditions, financial performance, prospects, or other events. Such forward-looking statements include, but are not limited to, expectations regarding the potential therapeutic benefit of LUMRYZ; the success of the commercialization of LUMRYZ; the anticipated market size, market demand and sales opportunity of LUMRYZ; the FDA's review of the sNDA for LUMRYZ in the pediatric narcolepsy population and timing related thereto; the Company's REVITALYZ idiopathic hypersomnia clinical study for LUMRYZ, including enrollment and timing related thereto; the Orphan Drug Exclusivity for LUMRYZ and potential benefits resulting from such exclusivity; US patent protection for LUMRYZ and the potential benefits of such patent protection; the safety and efficacy data generated in the phase 3, REST-ON clinical trial; the long-term safety and maintenance of efficacy data generated from the RESTORE study; the company's potential development of a low-/no-sodium, once-nightly oxybate formulation and timing thereof; and the Company's anticipated financial condition, expenses, uses of capital and other future financial results. We do not undertake any obligation to publicly update or revise these forward-looking statements. In some cases, forward-looking statements can be identified by the use of words such as "will," "may," "could," "believe," "expect," "look forward," "on track," "guidance," "anticipate," "estimate," "project," "next steps" and similar expressions, and the negatives thereof (if applicable).  The Company's forward-looking statements are based on estimates and assumptions that are made within the bounds of our knowledge of our business and operations and that we consider reasonable. However, the Company's business and operations are subject to significant risks, and, as a result, there can be no assurance that actual results and the results of the company's business and operations will not differ materially from the results contemplated in such forward-looking statements. Factors that could cause actual results to differ from expectations in the Company's forward-looking statements include the risks and uncertainties described in the "Risk Factors" section of Part I, Item 1A of the Company's Annual Report on Form 10-K for the year ended December 31, 2023, which was filed with the Securities and Exchange Commission (SEC) on February 29, 2024, and subsequent SEC filings.  Forward-looking statements speak only as of the date they are made and are not guarantees of future performance. Accordingly, you should not place undue reliance on forward-looking statements. The Company does not undertake any obligation to publicly update or revise our forward-looking statements, except as required by law.



©2024 Avadel. All rights reserved.

# Avadel is a global biopharmaceutical company focused on transforming medicines to transform lives – starting with narcolepsy



# Avadel: All the Components for Long-Term Growth

**LUMRYZ™ represents $1B+ peak sales opportunity in narcolepsy**

U.S net product revenue of **$41.5M for the second quarter** of 2024

More than **1,900 patients on LUMRYZ as** of Q2 2024

**Strong representation** across all narcolepsy patient segments

500 **top prescribers** compose 50% of prescription volume

**85% of top HCPs have prescribed LUMRYZ**

**sNDA** for LUMRYZ's use in **pediatric narcolepsy** under FDA review; target action date of **Sept 7**



**Initiated** Phase 3 **REVITALYZ™ trial** evaluating LUMRYZ for use in **Idiopathic Hypersomnia**

Future oxybate estimated **market value**:
**>$5B**
Represented by:
**> 50K Patients**





©2024 Avadel. All rights reserved.

# Landmark Moments for LUMRYZ

**Milestones Met & Upcoming**

Market research and RESTORE study demonstrate patient & physician preference for LUMRYZ

**FDA Approval** May 1, 2023; **Orphan Drug Exclusivity** through May 1, 2030; **17+ Years Intellectual Property Protection** into early 2042

**LUMRYZ launched** June 2023 and has since shown strong consistent uptake among narcolepsy patients

**Lifecycle management expansion** underway with first patient dosed in REVITALYZ™ Phase 3 trial in Idiopathic Hypersomnia

**FDA assigned target action date** of September 7, 2024 for sNDA for LUMRYZ in pediatric narcolepsy



©2024 Avadel. All rights reserved.

# LUMRYZ has Significant Potential Future Peak Revenue Opportunity



Addressable market opportunity

**50k+**
patients

HCP reported market expansion[1]

**+35% - 113%**
of new patient starts

Future oxybate-treated patients (est)

**Today** → **Future**
**16k** → **20-25k**

HCP reported market share[1]

**50-60%**

Potential future range
of LUMRYZ treated patients

**>10k**



Peak sales[2]
opportunity

**>$1B**



Note: Figures above represent market opportunity, peak sales opportunity and potential patient opportunity based on available information and management's current beliefs regarding these opportunities but do not reflect estimates, expectations, guidance or plans. Actual results may differ materially from the opportunities disclosed above. Subject to change based on updated information and actual results.
Source: 1. Avadel proprietary market research (6 quantitative demand studies across ~700 oxybate prescribers) 2. Based on estimated current net pricing in the market, subject to change

6

WHAT'S NEXT... LUMRYZ AS A PIPELINE-IN-A-PRODUCT

# Success of LUMRYZ in Narcolepsy Offers Opportunity to Further Expand Franchise



**Expand potential eligible population (2024+)**

- **Age** – Pediatric indication; sNDA target action date set for September 2024
- **Indication** – Idiopathic Hypersomnia (IH); first patient dosed in Phase 3 trial
- **Formulation** – No/low sodium once at bedtime; update by YE24

**Business development**
- Future opportunities

**Continued growth of LUMRYZ for treatment of narcolepsy**
- $1B+ opportunity

Wave 1

Wave 2

Wave 3

Revenue

Illustrative

Time

## Strategically positioned to leverage the innovation and investment into LUMRYZ



©2024 Avadel. All rights reserved.  /  Proprietary and Confidential



# Narcolepsy:  A Serious Unmet Need



©2024 Avadel. All rights reserved.

# Addressing Clear and Indisputable Unmet Need



Need identified **>50** years ago[1]

## Only Avadel has addressed the need

- ✓ **Most important attribute** for patients and HCPs – 1x at bedtime dosing[2]

- ✓ **94%** of patients who switched from first generation oxybates **prefer LUMRYZ dosing**[3]

- ✓ FDA found LUMRYZ to provide a **major contribution to patient care** (MCPC) over all 1st gen oxybates and rewarded Avadel with ODE[4]

Source: 1. Broughton R and Mamelak M. The Treatment of Narcolepsy-Cataplexy with Nocturnal Gamma-Hydroxybutyrate. *Can J Neurol Sci*. 1979 . 2. Dubow J, Avidan AY, Corser B, et al. Preferences for attributes of sodium oxybate treatment: a discrete choice experiment in patients with narcolepsy. Patient Prefer Adherence. 2022;16:937-947. 3. Roy A, Harsh J, Akinyemi AO, et al. Patient Preference and Nocturnal Experience With Oxybate Treatment for Narcolepsy: Interim Analysis of Data From RESTORE. Chest 2022, Oct 16-19, 2022: Nashville, TN.  4 . From FDA website: www.fda.gov/industry/designating-orphan-product-drugs-and-biological-products/clinical-superiority-findings



©2024 Avadel. All rights reserved.

# Narcolepsy

*An under-diagnosed, chronic neurological disorder that affects the brain's ability to control sleep-wake cycles*

**2 cardinal symptoms:**

➢ **Excessive daytime sleepiness** (EDS)

➢ **Cataplexy** (a sudden loss of muscle tone, which can be triggered by strong emotion)

**Patients With Narcolepsy experience disrupted nocturnal sleep**

**Current treatments also disrupt sleep:**
➢ Wake promoting agents and stimulants can cause insomnia
➢ Current twice nightly oxybates require patients to wake up during the middle of the night to take a second dose

**Oxybates are the current standard of** care for both EDS and cataplexy

**First generation, immediate-release oxybate therapies have a short half-life and require twice nightly dosing, the 2nd dose being taken 2.5-4 hours after falling asleep**



©2024 Avadel. All rights reserved.

# LUMRYZ Opportunity

*Middle of night dosing required by 2x-nightly oxybates creates challenges for patients & physicians*

## Current Challenges in the Narcolepsy Market

- At least 65%[1] of people with narcolepsy experience disturbances in nocturnal sleep

- The American Academy of Sleep Medicine (AASM) 2021 Clinical Practice Guidelines recognize insomnia as a common AE for daytime meds to treat narcolepsy

- Market research shows that only about half of eligible patients are receiving oxybates, citing physician perception for patients being unable to comply with twice nightly dosing

## What Once-at-Bedtime LUMRYZ can Offer People with Narcolepsy

- Pivotal Phase 3 REST-ON trial data demonstrated clinically meaningful improvement for two cardinal symptoms of narcolepsy, EDS and cataplexy, as well as improvements in disturbed nocturnal sleep

- With once-at-bedtime dosing of LUMRYZ, patients have the opportunity for an uninterrupted night sleep

## Patients and Physicians Prefer LUMRYZ

- 94% of patients participating in the RESTORE study who switched from twice-nightly preferred the once-at-bedtime dosing of LUMRYZ

- 91% of participants in the RESTORE study reported being better able to sleep through the night with LUMRYZ and 89% would recommend LUMRYZ to a family or friend with narcolepsy

 Avadel

©2024 Avadel. All rights reserved.

11

[1] Bassetti et al. Eur J Neurol 2021

# PK Profile Optimized for Once-At-Bedtime Dosing



**Mean PK Profiles (6 g)**

- LUMRYZ, n = 26
- 2x-nightly sodium oxybate, n=27

GHB Concentration (ug/mL) Mean and Standard Error

Time (h)

## Comparison to 2x-Nightly

| | |
|---|---|
| **Advantage** | Single, pre-measured, once-at-bedtime dose |
| **Advantage** | No middle-of-the-night dosing; eliminates potential of second dose taken too early, too late, or completely missed |
| **Similar** | Overall exposure (AUC) – bioequivalent to SoC |
| **Similar** | Onset time |



©2024 Avadel. All rights reserved.

12

# Pivotal Phase 3 REST-ON Trial Results
## Positive Results Across All Co-Primary Endpoints For All Doses

Case 1:21-cv-00691-GBW Document 697 Filed 09/17/24 Page 73 of 117 PageID #: 37065



**Once-at-bedtime LUMRYZ:** 6, 7.5 and 9 g all demonstrated <0.001 compared to placebo, for each of the 3 co-primary endpoints



**Improvement of:**
1. Excessive daytime sleepiness (MWT)
2. Clinician's overall assessment of patient function (CGI-I)
3. Reduction in cataplexy attacks



LUMRYZ was generally well-tolerated; commonly known sodium oxybate adverse reactions occurred at low rates even at the highest dose (9 g)

Pivotal publication for LUMRYZ Ph III study: Kushida et al. *Sleep.* 2022
Plain Language Summary by Kushida et al. *Future Neurology.* 2022



©2024 Avadel. All rights reserved.

13

# Pivotal Phase 3 REST-ON Trial Results
## LUMRYZ 9g was Generally Well-Tolerated

| | LUMRYZ (%) \| N=77 | Placebo (%) \| N=80 |
|---|---|---|
| Any Adverse Drug Reaction (ADR) | 35.1 | 5.0 |
| Any Serious ADR | 1.3 | 0.0 |
| ADR Leading To Discontinuation | 3.9 | 0.0 |
| **ADRs ≥2% and greater than placebo in LUMRYZ** | | |
| Decreased Weight | 3.9 | 0.0 |
| Vomiting | 5.2 | 0.0 |
| Decreased Appetite | 2.6 | 0.0 |
| Dizziness | 5.2 | 0.0 |
| Somnolence | 3.9 | 0.0 |
| Enuresis | 9.1 | 0.0 |



©2024 Avadel. All rights reserved.

# RESTORE
## Long-Term Study Designed to Evaluate Safety and Tolerability of LUMRYZ

- **94% of patients prefer once-nightly dosing**
- Low rate of discontinuation due to adverse reactions; largest cohort of switch patients
- Patients on twice-nightly oxybates report missing and/or taking second dose too late resulting in negative impacts on narcolepsy symptoms and patient quality of life





Roy et al. CHEST 2022.  Nashville TN



©2024 Avadel. All rights reserved.

# Data Suggests Patient Preference for Once-at-Bedtime LUMRYZ

**RESTORE study results demonstrate 94% of switch patients prefer once-at-bedtime LUMRYZ**

*"Taking twice nightly Oxybate is annoying, not only do I have to measure it out and put it in the medication cup and fill it up, I have to put it on my nightstand, if I oversleep, I can't take it if too close to getting kids up for school. Once at bedtime would simplify a lot."*

*– Oxybate Experienced Patient\**

\* Source: Based on proprietary in-depth commercial research conducted on behalf of Avadel



©2024 Avadel. All rights reserved.

# Physicians Prefer Once-at-Bedtime Dosing Regimen Over Twice Nightly Dosing

*"Looks like wouldn't be too hard to switch over. I would discuss [LUMRYZ] with all my patients and see if patients want it and I have no problem doing this if a patient asked to switch"*

    *- Sleep Medicine Specialist HCP\**

*"I would use [LUMRYZ] even if patients are well controlled, because it's better to not have to wake up during the night and patients would be more compliant. Therefore, it's also more cost effective as [compliance is higher]"*

    *-Sleep Medicine Specialist HCP\**

\* Source: Based on proprietary in-depth commercial research conducted on behalf of Avadel



©2024 Avadel. All rights reserved.



# Commercial Strategy



©2024 Avadel. All rights reserved.

# LUMRYZ has an Addressable Market of >50k Patients

## MARKET SEGMENTS



**25,000+ patients** — **Oxybate naïve**

**16,000 patients** — **Patients that discontinued** *first generation oxybates*

**16,000 patients** — **Treated with first generation oxybates**

### LUMRYZ launch opportunities in each segment

 **Oxybate use will expand because of LUMRYZ, large opportunity for future growth**

 **Exclusively for LUMRYZ, high HCP and patient interest**

 **Clear relative benefit, high HCP and patient intent to use**

\* Source: Based on proprietary in-depth, pre-launch commercial research conducted on behalf of Avadel



# LUMRYZ is Well-Positioned to Lead Across All Narcolepsy Patient Segments

| Current 2X-nightly OXB (~16K patients) | Recently discontinued 2X nightly OXB (~10-15K patients) | Annual New Oxybate Patients (~3K annually) |
|---|---|---|
| • **70%+** of patient on current oxybates experience **"poor quality sleep"** several times a week* | • Current discontinuation rates are estimated to be **20-25% after month one, and 40-50% across first year*** | • **Inconvenient dosing** is the most frequently cited challenge why patients decline to initiate 2x-nightly oxybates |
| • **High patient interest in LUMRYZ (80%+)*** | • Many discontinued patients remain **highly interested in learning about LUMRYZ (60%+)*** | • Patients express dissatisfaction with wake promoting agents and stimulant, **interest in LUMRYZ is high (70%+)*** |
| • **Once at bedtime dosing preferred over all attributes** (including sodium content) for patients and physicians in 2021 Discrete Choice Experiment (DCE) | • Discontinuations typically driven by a variety of **efficacy, dosing and tolerability related challenges** | • **New starts expected to grow** with introduction of LUMRYZ, potential for new starts to grow to **4-5K annually** |

* Source: Based on proprietary in-depth, pre-launch commercial research conducted on behalf of Avadel



# LUMRYZ Can Become the Oxybate Market Leader and Grow the Market



**The Results:**
*HCP oxybate market share given to LUMRYZ*

*HCP projected share*
## 48-61%
*Average: 54%*

first generation oxybates



**The Results**

**New-to-oxybate patient market expansion**
*(new to oxybate patient starts)*

## +35% to 113%
**Average: 58%**

*All market research conducted prior to any promotional support and not tested with ODE LUMRYZ clinical superiority over first generation oxybates message*

Source: Avadel proprietary market research studies including 2020 Demand Study, HCP; 2020 Pre-launch Quant study - Patients; 2021 HCP ATU, Wave 1; 2022 HCP ATU, Wave 2; 2023 Qual Demand; 2023 HCP ATU, Wave 3



# Bringing LUMRYZ to the Narcolepsy Community has Focused on Three Core Elements for Continued Commercial Execution



| 1 | 2 | 3 |
|---|---|---|
| Demand Generation | Reimbursement | Product Fulfillment |

## Built a Strong Foundation for Continued Growth



©2024 Avadel. All rights reserved.

# LUMRYZ Launched in June 2023

## 4 pre-measured once-at-bedtime packets



- (4.5, 6, 7.5 or 9g) help ensure patients receive full therapeutic effects of their prescribed dose / ensure patients can reliably receive a consistent full dose
- Available in 7 and 30 counts

## LUMRYZ available at our specialty pharmacy network







©2024 Avadel. All rights reserved.

# LUMRYZ Commercial Execution

## LUMRYZ Outlook

- ✓ Project LUMRYZ's **potential beyond** the 16,000 individuals on 1st generation oxybates
- ✓ Forecast a total addressable narcolepsy population of **50,000 people across all 3 segments**

## Patient Segment Dynamics

- ✓ **Strong representation** across all three patient segments
- ✓ Switches from 1st generation oxybates make up a **significant portion** of patients on LUMRYZ
- ✓ Naïve population uptake **underscores LUMRYZ's potential** to **grow the market** beyond 1st generation oxybate limitations
- ✓ Previously discontinued twice nightly oxybate patients represent a **unique segment** for LUMRYZ

## Key Commercial Indicators

- ✓ **More than 1,900 patients on therapy** as of June 30th
- ✓ **Consistent growth** with 500 patients on therapy additions per quarter since December 31, 2023
- ✓ Approximately **3,800 patients enrolled in RYZUP™** and **greater than 2,400 patients initiated therapy** as of June 30th



©2024 Avadel. All rights reserved.

# Concentrated U.S. HCP Universe
## Foundation for Continued Efficient Commercial Expansion

Case 2:21-cv-00691-BRM Document 697   Filed 09/17/24   Page 85 of 117 PageID #: 37077



**Concentrated Prescriber Base (% oxybate total prescription volume)**

- ~4,500 prescribers account for 100%
- ~1,600 prescribers account for 80%
- ~500 prescribers account for 50%
  - 85% of ~500 prescriber population have written for LUMRYZ

**Launch Strategy**

- High volume oxybate prescribers are a core focus



©2024 Avadel. All rights reserved.

# Payers: Excellent Progress Achieving Parity Access

**2**

**Reimbursement**



## Commercial coverage

✓ LUMRYZ payer channel mix initially estimated to be more than 80% commercial

## GPOs/PBMs

✓ **Contracts in place with all 3 PBM-owned GPOs** (Ascent/ESI, Zinc/CVS, Emisar/Optum) covering 80-85% of commercial lives

✓ **LUMRYZ** commercial coverage at 85% of lives where there is a policy for LUMRYZ





©2024 Avadel. All rights reserved.

# Priority is Supporting LUMRYZ Patients



| **Essential access & affordability programs** | **Personalized support for patients and offices** | **In office pull through support** |
|---|---|---|

**Essential access & affordability programs**

- **$0 commercial copay program**

- **Patient assistance program**

- **Temporary assistance program**

**Personalized support for patients and offices**

- Nurse Care Navigators (NCNs), all nurses by training

- **NCNs individually assigned to each patient and office**

- NCNs are prior authorization certified 

- **>100 years collective clinical experience**
- **Avg 5+ years of reimbursement experience**

**In office pull through support**

- **Team of Field Reimbursement Managers directly supporting HCP offices**

- Integrated data platform triggers to field teams and RYZUP team

- **>50 years collective reimbursement experience**
- **Avg 15+ years of pharmaceutical experience**

**3**

**Product Fulfillment**







# Quarterly Growth in Patients on LUMRYZ



Patients on LUMRYZ Exiting Each Quarter



©2024 Avadel. All rights reserved.



# LUMRYZ Lifecycle Management Opportunities



©2024 Avadel. All rights reserved.

# Lifecycle Management: Pediatric Narcolepsy

Oxybate Treated Narcolepsy Population



Pediatric Narcolepsy Population — 5%

Adult Narcolepsy Population — 95%

## Pediatric Patient Opportunity

- Pursuing LUMRYZ's potential use in pediatric narcolepsy

- **September 7th FDA target action** date assigned for Supplemental New Drug Application (sNDA)

- Potential approval would **compliment** LUMRYZ's current approval in adult patients with narcolepsy and **validate** LUMRYZ's potential

- Unique ability to offer **undisrupted sleep** to children and their dedicated caregivers



©2024 Avadel. All rights reserved.

# Lifecycle Management: Idiopathic Hypersomnia (IH)



**12,000 patients** — Patients co-diagnosed with IH and narcolepsy

**30,000 patients** — Uniquely diagnosed IH patients

## IH Overview

- Potential to **improve IH treatment options** with a **once nightly, extended-release formulation**

- Opportunity to **expand LUMRYZ's potential** beyond narcolepsy

## Ongoing REVITALYZ™ Trial

- Double-blind, placebo-controlled randomized withdrawal, multicenter Phase 3 study

- Evaluating safety and efficacy of LUMRYZ

- Targeting to enroll 150 adults diagnosed with IH



©2024 Avadel. All rights reserved.



# Financial Summary



©2024 Avadel. All rights reserved.

# Financial Summary[1,2]

| ($ In Thousands) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| **Net Product Revenue** | **$41,504** | **$1,496** | **$68,682** | **$1,496** |
| **Gross Profit** | **$38,716** | **$1,460** | **$64,372** | **$1,460** |
| **Total Operating Expenses** | **$51,457** | **$51,001** | **$103,148** | **$79,299** |
| *Research & development expense* | *4,051* | *4,223* | *7,119* | *8,053* |
| *Selling, general & administrative expense* | *47,406* | *46,778* | *96,029* | *71,246* |
| **Operating Loss** | **($12,741)** | **($49,541)** | **($38,776)** | **($77,839)** |
| **Net Loss** | **($13,822)** | **($64,432)** | **($41,164)** | **($95,216)** |
| **Cash, Cash Equivalents & Marketable Securities** | **$71,382** | **$160,510** | **$71,382** | **$160,510** |

1) Refer to Forms 10-Q for quarters ended June 30, 2024 & 2023 filed on August 8, 2024, and August 9, 2023, respectively, for financial statements and management's discussion and analysis of financial condition and results of operations
2) Totals may not sum due to rounding



# GAAP vs. Non-GAAP Reconciliation

| ($ In Thousands) | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2024** | **2023** | **2024** | **2023** |
| **GAAP Operating Loss** | **($12,741)** | **($49,541)** | **($38,776)** | **($77,839)** |
| Stock Based Compensation Expense | 5,462 | 7,644 | 10,851 | 9,166 |
| Depreciation & Amortization [1] | 1,024 | 1,064 | 2,074 | 2,077 |
| Transaction Costs [2] | 5,013 | - | 5,468 | - |
| **Non-GAAP Operating Loss [3]** | **($1,242)** | **($40,833)** | **($20,383)** | **($66,596)** |

1) *Includes depreciation of fixed assets and amortization of prepaid expenses*
2) *Expenses incurred for the mandatory exchange of the Company's American Depository Shares for the underlying ordinary shares and the termination of the American Depository Receipt Program*
3) *Totals may not sum due to rounding*



# Investment Thesis

## Key Considerations

Market research and RESTORE study consistently demonstrate significant patient & physician preference for LUMRYZ

> $1B peak sales opportunity for LUMRYZ in +$5B oxybate market

Orphan Drug Exclusivity Through May 1, 2030

Strong IP Protection - Multiple Orange Book Listed Patents; 17+ Years Intellectual Property protection into 2042

Strong balance sheet with no debt; Existing capital resources + cash receipts from sales sufficient to support LUMRYZ launch

Expansion Opportunities in Pediatric Narcolepsy and Idiopathic Hypersomnia



©2024 Avadel. All rights reserved.  /  Proprietary and Confidential





# Avadel Pharmaceuticals plc
## (NASDAQ: AVDL)

©2024 Avadel. All rights reserved.

# EXHIBIT 15

REFINITIV STREETEVENTS

# EDITED TRANSCRIPT

AVDL.OQ - Q2 2024 Avadel Pharmaceuticals PLC Earnings Call

EVENT DATE/TIME: AUGUST 08, 2024 / 12:30PM GMT

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



**AUGUST 08, 2024 / 12:30PM, AVDL.OQ - Q2 2024 Avadel Pharmaceuticals PLC Earnings Call**

## CORPORATE PARTICIPANTS

**Austin Murtagh** *Stern Investor Relations - IR*

**Gregory Divis** *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

**Richard Kim** *Avadel Pharmaceuticals PLC - Chief Commercial Officer*

**Jennifer Gudeman** *Avadel Pharmaceuticals PLC - Senior Vice President, Medical & Clinical Affairs*

**Thomas McHugh** *Avadel Pharmaceuticals PLC - Chief Financial Officer*

## CONFERENCE CALL PARTICIPANTS

**Andrew Tsai** *Jefferies Financial Group Inc. - Analyst*

**François Brisebois** *Oppenheimer & Co. Inc. - Analyst*

**Ami Fadia** *Needham & Company Inc. - Analyst*

**David Amsellem** *Piper Sandler Companies - Analyst*

**Marc Goodman** *Leerink Partners LLC - Analyst*

**Fatima Amanat** *UBS Equities - Analyst*

**Oren Livnat** *H.C. Wainwright. & Co. LLC - Analyst*

**Myriam Belghiti** *LifeSci Capital LLC - Analyst*

**Matt Kaplan** *Ladenburg Thalman & Co. Inc - Analyst*

**Brandon Folkes** *Rodman & Renshaw - Analyst*

## PRESENTATION

**Operator**

Greetings, and welcome to Avadel Pharmaceuticals Second Quarter 2024 Earnings Call. (Operator Instructions) The question-and-answer session will follow the formal presentation. As a reminder, this conference is being recorded.

It is now my pleasure to introduce Austin Murtagh with Precision AQ. Thank you. You may begin.

---

**Austin Murtagh** *- Stern Investor Relations - IR*

Good morning, and thank you for joining us on our conference call to discuss Avadel's second quarter 2024 results. As a reminder, before we begin, the following presentation includes several matters that constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995.

Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated in such forward-looking statements.

These risks and uncertainties are described in Avadel's public filings under the Exchange Act included in the Form 10-K for the year ended December 31, 2023, which was filed on February 29, 2024, and subsequent SEC filings.

Except as required by law, Avadel undertakes no obligation to update or revise any forward-looking statements contained in this presentation to reflect new information, future events or otherwise.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



AUGUST 08, 2024 / 12:30PM, AVDL.OQ - Q2 2024 Avadel Pharmaceuticals PLC Earnings Call

On the call today are Greg Divis, Chief Executive Officer; Richard Kim, Chief Commercial Officer; Dr. Jennifer Gudeman, Senior Vice President of Medical and Clinical Affairs; and Tom McHugh, Chief Financial Officer.

At this time, I'll turn the call over to Greg.

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Thank you, Austin. Good morning, everyone, and thank you for joining us for this quarterly update. Following my opening remarks, Richard will provide an update on our launch progress, Jennifer will walk through our Phase 3 idiopathic hypersomnia or IH clinical trial, Tom will then review our second quarter financial results and we will conclude with a question-and-answer session.

The second quarter marked the one-year anniversary of introducing LUMRYZ to the market, and I'm immensely proud of the work done by our team and the impact we have made within the narcolepsy community.

From the start, we recognized that oxybate-eligible patients deserve a once-at-bedtime treatment option that address their needs where first-generation oxybates fell short. Our team's relentless determination in serving people with narcolepsy has been the driving force behind our tremendous progress.

Since launch last year, we have seen our pre-approval market insights materialize in real time, which when combined with the strong foundation we have built only reinforces our confidence in the significant opportunity that LUMRYZ offers in our pursuit of its potential $1 billion-plus opportunity.

Specifically, we point to the following. We have seen consistent strong uptake from patients switching from the twice-nightly, first-generation oxybate products, the majority coming from the mixed-salts formulation.

Demand is growing from both naive patients and patients who have previously tried and discontinued twice-nightly oxybates, a patient segment many had discounted; and the launch of LUMRYZ has resulted in the expansion of new oxybate prescribers who have previously never written an oxybate script and, additionally, physicians who are now treating more patients with oxybates, specifically with LUMRYZ, than prior to our launch, resulting in new patients coming into the oxybate market that prior to LUMRYZ were not accessible or potentially interested.

These important data points only confirm what our research informed us, that the oxybate market opportunity for LUMRYZ is both significantly larger than that of the first-generation oxybate and is unique primarily to LUMRYZ alone. With that, we are pleased to report that there were more than 1,900 patients on therapy at June 30, and we generated $41.5 million in net revenue during the second quarter of 2024.

Additionally, as Tom will cover during his review, based upon how we exited Q2, we currently expect that we will generate operating income in Q3, an important financial milestone we will have achieved during the first full calendar year of launch.

As announced last week, we dosed our first patient in our Phase 3 REVITALYZ trial, evaluating LUMRYZ's potential benefit in the adult IH population. Based on feedback from physicians and experts in the field, we believe LUMRYZ has strong potential to improve care for those living with IH through its unique extended release formulation.

In addition, we are expecting a potential approval decision by the FDA for our supplemental New Drug Application for LUMRYZ's use in the pediatric narcolepsy population. The target action date is set for September 7.

If approved, we believe LUMRYZ has the potential to address the needs of both pediatric narcolepsy patients, who could benefit from a full therapeutic dose of an oxybate given in a once-at-bedtime formulation; and the caregivers who currently have to awaken in the middle of the night, night after night, to administer a second dose of a first-generation oxybate to their children.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



Lastly, we continue our development work on a potential no- or low-sodium, once-at-bedtime oxybate formulation with a target profile that is bioequivalent to LUMRYZ. As previously stated, we expect to have an update by the end of 2024.

In summary, after one year of launch and with an eye on the future, we believe LUMRYZ is well positioned in its pursuit to become the preferred oxybate among patients and providers as we continue to positively impact the multibillion-dollar oxybate market opportunity.

I'll now turn the call over to Richard for details on our commercial developments. Richard?

**Richard Kim** - *Avadel Pharmaceuticals PLC - Chief Commercial Officer*

Thank you and good morning, everyone. As Greg mentioned, it's hard to believe that we have one year of launch behind us and what a year it's been. It has been amazing to witness LUMRYZ's transformative impact among people with narcolepsy, their families and health care providers.

Let me start with our new key piece of metric. As of the end of Q2, there were more than 1,900 patients on therapy. Additionally, for our leading indicators that we have provided quarterly since launch through June 30, approximately 3,800 patients were enrolled in our RYZUP patient support program and more than 2,400 total patients had initiated therapy.

With our second quarter numbers, you can see that we have continued the momentum with our launch and that there has been no slowdown in quarter-over-quarter patient demand for LUMRYZ.

Now, looking at our patient dynamics. We continue to have strong representation across our three patient segments including, those switching from or previously discontinued twice-nightly oxybates and those new to oxybates.

As expected at this stage, switch patients still make up a significant portion of patients on LUMRYZ. At the same time, it's been especially encouraging to see more new-to-oxybate patients being prescribed LUMRYZ.

Now, this in addition to LUMRYZ's use in previously discontinued, twice-nightly oxybate patients along with, new writers for LUMRYZ who have previously never prescribed an oxybate are important data points validating our market research that LUMRYZ can grow the oxybate market beyond its size from when it was just first-generation oxybates.

Now, our data continues to indicate, there are more than 4,500 HCPs who make up the current oxybate-prescribing universe. Importantly, from these HCPs almost 500 make up 50% of the total oxybate prescription volume. And to date, 85% of that group have written for LUMRYZ.

We are pleased with our continued capture of high-volume oxybate prescribers, as they represent a core component of our launch strategy. Transitioning to product fulfilment, our overall pull-through process continues to deliver with over 700 new patient starts in the second quarter.

These results are attributable to a number of factors including robust payer coverage, strong execution from our field reimbursement and RYZUP teams, along with HCPs continuing to gain clinical experience prescribing LUMRYZ.

Looking to the second half of the year. We have built a strong foundation; we believe will support LUMRYZ's ongoing uptake in the narcolepsy community. In particular, demand for LUMRYZ continues to be strong and our fulfilment systems are working to get patients initiated efficiently.

Paired with early signs that the oxybate market is growing, we remain highly confident in our belief that LUMRYZ is on track to become the preferred oxybate in the narcolepsy market.

And now, I will turn the call over to Jen to discuss the recent dosing of the first patient in our Phase III IH study.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



**AUGUST 08, 2024 / 12:30PM, AVDL.OQ - Q2 2024 Avadel Pharmaceuticals PLC Earnings Call**

**Jennifer Gudeman** - *Avadel Pharmaceuticals PLC - Senior Vice President, Medical & Clinical Affairs*

Thank you, Richard. Since the introduction of LUMRYZ, we have heard from patients and providers repeatedly about the transformative relief LUMRYZ has brought to their lives. LUMRYZ has not only provided patients with the opportunity for an uninterrupted night sleep, but we also often hear about what they characterize as a restored ability to live their lives on their own terms.

While we have been serving the narcolepsy community for more than a year with LUMRYZ, people living with IH have been severely constrained in a lack of approved treatment. In April, an externally led patient-focused drug development meeting was held with the FDA in SLEEP consortium, to inform patient needs for IH treatment.

Among more than 800 individuals living with IH, nearly two-thirds of respondents stated that their IH symptoms were not controlled or were poorly controlled. Patient testimonials underscore the need for additional therapeutics. Physicians and patients have been vocal in their demand to see LUMRYZ evaluated for IH, due to the deep sleep inertia associated with IH and we are now answering their call.

We are excited to have recently dosed the first patient in our clinical trial evaluating LUMRYZ for IH, as it is the first step to potentially bringing this important therapy to patients. Our study known as REVITALYZ, is a double-blind placebo-controlled, randomized withdrawal, multicenter Phase III study to evaluate the efficacy and safety of LUMRYZ as a once-nightly dose in IH patients.

Enrollment of approximately 150 participants will include both those switching from first-generation immediate-release oxybates, as well as those not on oxybate therapy at baseline. Our primary efficacy endpoint is to demonstrate a change in the Epworth Sleepiness Scale score, which is administered at week 14, after a two-week double-blind randomized withdrawal period.

Our key secondary endpoints are the Patient Global Impression of Change in the idiopathic hypersomnia severity scale, which is a validated multi-domain assessment of key IH symptoms. The primary efficacy analysis will occur after the 14-week portion of REVITALYZ is completed, and the study will be followed by an open-label extension. Initiating REVITALYZ is a key milestone for Avadel and most importantly, for the IH patient and medical community.

We have seen the positive impact that LUMRYZ has had on narcolepsy and are working diligently toward expansion in IH.

I'll turn the call over to Tom for a review of our financial results.

---

**Thomas McHugh** - *Avadel Pharmaceuticals PLC - Chief Financial Officer*

Thank you, Jen. Before I begin, please note that full financial results are available in the press release issued this morning and the 10-Q. I will also be reviewing non-GAAP financial results, which can be found on our Investor Relations website at investors.avadel.com.

I'll start with our top line results. In the quarter ended June 30, 2024, we reported net revenue of $41.5 million and gross profit of $38.7 million, both of which represent a greater than 50% increase from the quarter ended March 31, 2024.

The increase in net revenue was driven primarily by continued strong patient demand for LUMRYZ. Additionally, we estimate that there was about four weeks of inventory in the channel at the end of June versus approximately three weeks at March 31.

Turning to operating expenses. We reported $51.5 million of GAAP operating expenses for the second quarter, which includes a nonrecurring expense of $5 million related to the previously announced mandatory exchange of the company's American Depository Shares and termination of the American Depository Receipt program. As a result of the mandatory exchange, Avadel was added to the Russell 3000 Index at the beginning of July.

5

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



AUGUST 08, 2024 / 12:30PM, AVDL.OQ - Q2 2024 Avadel Pharmaceuticals PLC Earnings Call

The second quarter also included $6.5 million of non-cash charges comprised of stock-based compensation of $5.5 million and depreciation and amortization of $1 million. After adjusting for these items, which totaled $11.5 million, remaining cash operating expenses were approximately $40 million.

We expect that for the remainder of 2024 recurring quarterly cash operating expenses will be in the range of $40 million to $45 million and non-cash operating expenses will be in the range of $5 million to $7 million.

With respect to the balance sheet, we had $71.4 million of cash, cash equivalents and marketable securities as of June 30. The use of cash during the second quarter included the $5 million of expense related to the termination of the American Depository Receipt program.

I'll finish my remarks with a few comments regarding our expectations for the remainder of 2024. We continue to pay close attention to the sell-side estimates.

And at this time, we are comfortable with the current revenue consensus of approximately $168 million for the full year including the possibility that it could be higher if actual results such as the rate of increase in reimbursed patients, the total number of reimbursed patients who are treated with LUMRYZ and net pricing outperform the assumptions currently used by the sell-side analysts.

Lastly with respect to our time line to reaching breakeven, we were very close to achieving this during the second quarter, when comparing $38.7 million of gross profit to approximately $40 million of recurring cash operating expenses, which resulted in an adjusted operating loss of approximately $1.2 million.

Based on our current plans and assumptions, we expect that adjusted operating income will be positive, beginning in the third quarter and continue to be positive for the remainder of 2024. Our expectations regarding adjusted operating income are based on a number of factors including the number of reimbursed patients on LUMRYZ, net pricing of LUMRYZ and recurring cash operating expenses.

And with that I will turn the call back to Greg for closing remarks.

---

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Thank you, Tom. Before we wrap up, I want to take a moment to comment on our publicly reported launch metrics and what to expect moving forward. This quarter we added a new metric. The total number of patients on therapy.

With the full year of launch now behind us going forward we intend to report only this patient metric and of course, revenue, as we believe these two metrics are the most important as our launch matures. We believe we are well positioned to execute our business priorities including our ongoing launch of LUMRYZ and our life-cycle management opportunities both of which are focused on our primary business objectives, maximizing the full value of LUMRYZ.

So in conclusion, we're very pleased with our progress and our growth thus far recognizing that we have much more to accomplish. We thank you for your support and look forward to providing future updates on our progress.

And with that, we will open the call for questions. Operator?

---

## QUESTIONS AND ANSWERS

**Operator**

Thank you. At this time we will conduct the question and answer session. (Operator Instructions)

6

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



**AUGUST 08, 2024 / 12:30PM, AVDL.OQ - Q2 2024 Avadel Pharmaceuticals PLC Earnings Call**

Andrew Tsai, Jefferies.

**Andrew Tsai** - *Jefferies Financial Group Inc. - Analyst*

Hi. Good morning. Congrats on the strong launch and appreciate you sharing the metrics. Thanks for taking our question. So the first one is if we were to take another look at data cut as of July or even early August, how does the slope of uptake looks so far?

Should we be factoring in some kind of summer seasonality due to holidays occasions this quarter? Or should we expect slope of patient additions and so forth to remain unchanged or even increase this quarter? Thanks.

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Thanks, Andrew. I think we would qualitatively characterize it as our trends remain consistent. As we've seen to date, this is our first summer that we've been in the marketplace. So whether there's seasonality or not, we'll have a chance to assess that for LUMRYZ specifically as we get through the period. But at this point, I think we would describe it as continuing to be consistent as to what we've seen.

**Andrew Tsai** - *Jefferies Financial Group Inc. - Analyst*

Great. And then secondly speaking of just the slope being consistent, pediatric could be approved in a month from now. So that's 5% of the current oxybate users. So is it fair to assume there could be a nice little bolus coming from that approval? Or could the uptake in the subpopulation be slower than what we're thinking? Thanks.

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Yes. I think as we think about it, it's an important addition to our label because we hear quite a lot from parents who wake up in the middle of night, night after night. Again, it's a relatively small patient population.

So I think over time, we have an opportunity to both convert patients as well as potentially even expand the use in the pediatric market over time based upon some of our insights. I think as we think about the balance of 2024, it's modestly or marginally incremental at this point but longer term we think it's really important.

**Andrew Tsai** - *Jefferies Financial Group Inc. - Analyst*

Great. Thank you so much.

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Thank you

**Operator**

François Brisebois, Oppenheimer.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



AUGUST 08, 2024 / 12:30PM, AVDL.OQ - Q2 2024 Avadel Pharmaceuticals PLC Earnings Call

**François Brisebois** - *Oppenheimer & Co. Inc. - Analyst*

Hi. Thanks for taking the questions. I was just wondering in terms of reimbursement where we stand now and just the impact there of if you kind of cut it as a revenue per patient and obviously, I appreciate the new metric and the look back at that new metric and what it meant ?

But if we're thinking about revenue per patient, is there any impact expected from reimbursement here in the second half?

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Maybe Richard you can cover reimbursement and Tom kind of value per patient.

**Richard Kim** - *Avadel Pharmaceuticals PLC - Chief Commercial Officer*

Franc, thanks for the question. Yeah, we're super pleased with how our market access team has performed. Today, we have about 85% of commercially covered lives where our LUMRYZ policy exists. So it's been really strong which has really helped to drive us being able to get patients initiated.

So Tom, do you want to sort of take the revenue per patient?

**Thomas McHugh** - *Avadel Pharmaceuticals PLC - Chief Financial Officer*

Yeah. So thanks, Frank. The revenue per patient last quarter we had talked about exiting the quarter at about $120,000 per reimbursed patient. We've seen some improvement in that. That net pricing heading into Q2, let's say it's natural to some extent because Q1 is pretty heavily impacted by gross net adjustments. So we're -- we do see some improvement in Q2.

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

I think the only other comment I would add regarding reimbursement is that the other segment of our business which represents 15% to 20% of enrollments are really noncommercial, predominantly Medicare and Medicaid.

And as we get into 2025 where a lot of those decisions will be made for LUMRYZ which we weren't eligible in 2024 especially for Medicare, we'll get a better sense of how our coverage evolves beyond the commercial coverage as we go closer to the end of this calendar year.

**François Brisebois** - *Oppenheimer & Co. Inc. - Analyst*

Thank you. And then maybe just lastly in terms of new prescribers to oxybate that weren't prescribers before the 4,000 or greater than 4,500 I know it's concentrated, but did you guys approach these docs? Is it surprising that these docs who never prescribed oxybates for over 20 years have started based on the once-nightly? Is it just more awareness? Where do these docs come from?

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Richard?

**Richard Kim** - *Avadel Pharmaceuticals PLC - Chief Commercial Officer*

Thanks, Frank. So for the vast majority of those providers, we have not called on them. So I think this really speaks to the really tremendous value proposition that LUMRYZ brings. And in our prelaunch market research when we tested our profile with high-use narcolepsy prescribers who don't

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



**AUGUST 08, 2024 / 12:30PM, AVDL.OQ - Q2 2024 Avadel Pharmaceuticals PLC Earnings Call**

use oxybate, half of them said with the profile of LUMRYZ they would want to prescribe LUMRYZ compared to what they haven't done with the first-generation oxybates.

So we think it's a really positive sign and something for us to build upon going forward.

---

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Yes. I'll just add to Richard's comments is that it's really interesting to us that we're getting demand without any really true effort on our part directly in terms of promotion. So it's something we're evaluating to see if it's there's some more we can do there for sure.

---

**François Brisebois** - *Oppenheimer & Co. Inc. - Analyst*

Great. Thank you and congrats.

---

**Operator**

Ami Fadia, Needham & Company.

---

**Ami Fadia** - *Needham & Company Inc. - Analyst*

Hi. Good morning. Thanks for taking my question. Can you give us a sense of what percent of patients that are currently on LUMRYZ either came from one of the other oxybates versus previously discontinued and as well as never on oxybate before? Any updates?

And then if you could give us any updates on pull-through at the payer level across the three GPOs that you have contracts with perhaps any color on Humana or some of the other Optum plans would be helpful. Thank you.

---

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Richard?

---

**Richard Kim** - *Avadel Pharmaceuticals PLC - Chief Commercial Officer*

Yes, thanks for the question, Ami. So as far as sort of like percentage of switch versus sort of never on an oxybate before, the biggest chunk of our patients that we have right now are still being sourced from switch patients from first-generation oxybate with the highest percentage of those being from the mixed salt overall as well.

So what we are seeing at the same time though is that the new-to-oxybate patients are starting to increase their representation as well. I mean we really see that as a very positive sign really to sort of continue to support the value proposition of LUMRYZ.

So, the biggest chunk is still SWITCH patients, but we are starting to see a bit of an increase in the representation of new patients tired of the oxybates. And as far as the GPO representation is concerned, I think traditionally what we start to see is the Zinc CVS Emisar and the -- Ascent Emisar are the biggest chunk with Optum being smaller.

And I think what we're seeing in general is the channel is being representative of the size of those GPO contracts with the Zinc being the largest Ascent being the second largest and then the Emisar-Optum business being the smallest of the three. So, pretty consistent with the sizing opportunity of those three contracts that we have.

9

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



**AUGUST 08, 2024 / 12:30PM, AVDL.OQ - Q2 2024 Avadel Pharmaceuticals PLC Earnings Call**

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Yes, I think the only other comment I would add to that is that I think it's fair to say that the significant majority of the lives underneath those GPO umbrellas have established policy coverage decisions now not all of them with regards to LUMRYZ.

So, I think getting to your question we've got policy coverage decisions in place and pulled through those through the GPO contracts.

**Ami Fadia** - *Needham & Company Inc. - Analyst*

Okay, great. If I may ask one more question can you just sort of walk us through or give us an update on the cadence of when you expect decisions from the ongoing IP cases?

And specifically on the Jazz versus FDA case can you walk us through the upside downside; and how we should think about in a downside scenario the ability to keep LUMRYZ on the market should a decision go in favor of Jazz?

Thank you.

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Well, in terms of timing, I think it's our view that the next decision will likely come out of the APA case in D.C. followed by the patent case in Delaware. So, when that is? We don't know and they could come in a different order I guess but that's ultimately at the discretion of the judge from that perspective. And we -- again our position hasn't changed we're very confident in our views.

And even if the decision were unexpectedly go against us in that regard, we're prepared to take whatever steps necessary to ensure that LUMRYZ stays on the market to be able to treat patients accordingly and we believe that will be the case.

But I'll close out again on the litigation matters that we're highly confident in our position. And I'll remind all of our investors that there's other cases that are coming after this as well including our antitrust case which has been set for November of next year for which we are pursuing requisite damages for the unnecessary delay of LUMRYZ's approval due to the inappropriate listed (technical difficulty)

But in terms of timing, it's really at the discretion of the judge and we're prepared to act accordingly.

**Ami Fadia** - *Needham & Company Inc. - Analyst*

Thank you.

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Thanks Ami.

**Operator**

David Amsellem, Piper Sandler

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



AUGUST 08, 2024 / 12:30PM, AVDL.OQ - Q2 2024 Avadel Pharmaceuticals PLC Earnings Call

**David Amsellem** - *Piper Sandler Companies - Analyst*

Hi thanks. Just a couple for me. I know you're going to have more updates on the low-sodium product. But can you talk to generally the IP situation on that formulation and your level of confidence that you're not going to run a foul of Jazz's intellectual properties surrounding their low-sodium oxybate product? So, that's number one.

Then number two is, is it fair to say that with the bioequivalence pathway for that that there's a relatively rapid path to market for that formulation?

And then lastly on IH, are you thinking about that opportunity as something where you can expand the market? Or do you see switching away from Xywav to LUMRYZ in the IH setting? Or is it a little bit of both? Thanks.

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Thanks David. I'll try to tick those off one at a time. Again, I think when it comes to our development strategy and our approach to a low- or no-sodium formulation, we have to understand what's in the past landscape for sure. And so we would be pursuing that.

Of course you should assume that we're pursuing our direction accordingly in that -- with that being considered appropriately in our development plan. If it was as simple as just formulating something similar to what's in the market today it would have already been done by now from that standpoint.

So, again, we're very conscious of what the patent landscape is out there and navigating it appropriately. Number two, on your question about the development pathway using a bioequivalence that ultimately is the decision by the FDA to agree with us on that approach.

But we do believe that there is a pathway based upon other products that have been approved that a bioequivalent-only pathway is a viable pathway assuming we can demonstrate bioequivalence and the FDA agrees with that.

And lastly, in terms of IH, I think right now you've heard Jen talk about the research and the symposium that the FDA held specifically where 800 patients talked about the need for more therapeutic options. Their symptoms are not controlled with the current available treatments.

So, from our perspective just the narcolepsy patients may choose due to the nature of this condition to want to switch to LUMRYZ to be approved.

Our view is we think it's important to add another treatment option. We think the nature of this condition is such that a once-a-bedtime option in the form of LUMRYZ is very, very compelling to patients and we hear that all the time in particular from physicians and key opinion leaders who as Jen, I think noted are very, very bullish on the prospects of what LUMRYZ could offer for their patients primarily because these patients struggle with the ability to wake up full stop, right can take their second dose.

So again, for us, it's an option for all patients whether they're on therapy today. And what we know today is that there's depending upon what data set you look at there's anywhere from 30,000 to 40,000 patients with a unique diagnosis code related to idiopathic hypersomnia and a small percentage of those are actually being treated with the only FDA-approved drug today. We think LUMRYZ offers a really great option for them as well.

So thank you.

**Operator**

Marc Goodman, Leerink.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



**AUGUST 08, 2024 / 12:30PM, AVDL.OQ - Q2 2024 Avadel Pharmaceuticals PLC Earnings Call**

**Marc Goodman** - *Leerink Partners LLC - Analyst*

Tom, I know you talked (technical difficulty) about kind of the cost or anything. Can you just give us a sense of free goods? Just how much -- what percent of free goods both the second quarter maybe just the direction you're moving in there and the impact?

And just more broadly on the market, what's your sense of the total number of (technical difficulty) oxybate patients? Like how much did it grow versus before you launched?

Thanks.

**Thomas McHugh** - *Avadel Pharmaceuticals PLC - Chief Financial Officer*

Yeah. Marc, you're a little bit breaking up. So I just want to make sure, your first question is, I believe, the patients who are on free product right?

**Marc Goodman** - *Leerink Partners LLC - Analyst*

Yes.

**Thomas McHugh** - *Avadel Pharmaceuticals PLC - Chief Financial Officer*

Relative to the total. And then, the second is just how we're viewing the market trending? So

**Marc Goodman** - *Leerink Partners LLC - Analyst*

Yeah. How much the markets changed exactly, before you launched then now?

**Richard Kim** - *Avadel Pharmaceuticals PLC - Chief Commercial Officer*

Yes. I know. Thanks for the questions, Marc. For us, where we are with LUMRYZ in the launch right now we think the single-most important thing that can happen is HCPs and patients get experience with LUMRYZ. And the feedback thus far has been terrific. And we really see three products as an investment in our launch overall.

What we hear from other specialty sort of chronic product launches is sort of free products being used in about that 20% to 25% range of total patient usage. We think that's a pretty good proxy when you think about things. And for our business over 80% of our business is commercial today.

I think Greg had commented that part of our business, we would anticipate getting more of our CMS especially Medicare patients being picked up in 2025.

So we do believe that things will improve for us. But once again it really comes down to us doing free products as an investment and getting HCP and patient experience and ultimately we are also able to convert some of these patients using our programs either our bridging program or our temporary assist program our permanent affordability programs on to reimburse patients as well.

So -- and as far as the overall market size is concerned we've had -- with our claims data provider it's been a little bit messier in the second quarter for us overall. But what we see overall in the marketplace Marc is a few good leading indicators for why we believe the market is growing for oxybates.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



**AUGUST 08, 2024 / 12:30PM, AVDL.OQ - Q2 2024 Avadel Pharmaceuticals PLC Earnings Call**

The first is the previously discontinued patients to twice-nightly oxybates, we believe are uniquely a LUMRYZ opportunity. And we're getting a good portion of those starting an initiating therapy with LUMRYZ.

The second is we are getting more new to naive patients initiating on LUMRYZ. That's consistent with the market research that we've heard prior to launch that LUMRYZ would open the doors for more new-to-oxybate patients considering going out on oxybate.

The third thing that we talked about earlier was that we are getting unique prescribers who had never prescribed the first-generation oxybates that are now prescribing LUMRYZ as well. So we view these as all early positive signs that the market is growing beyond where the first-generation oxybate market was.

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Yeah. I just want to emphasize a couple of points, Richard made. Again, I'll just restate it. Number one is that, we don't think LUMRYZ is going to dramatically be different in terms of its percentage of free drug versus kind of other products.

But what we've seen which I think is a really positive, is we've seen patients when a coverage policy decision comes into play as Richard noted, we've been able to convert them to a in essence a paying patient. So that's something that our team is focused on. And we'll continue to do that.

And again, I think, the way I think about the notion of what's happening with the market because kind of the secondary data sources are a little choppy right now is that patients that were getting added to LUMRYZ sources of business were getting added to LUMRYZ, as new starts they're not in the denomination of kind of the legacy market, right?

Those patients weren't there before. So from our perspective that is a great sign in terms of what are the prospects one year into launch of what the potential future holds for our ability to really grow this market.

**Marc Goodman** - *Leerink Partners LLC - Analyst*

Thanks.

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Thank you, Marc.

**Operator**

Ashwani Verma, UBS.

**Fatima Amanat** - *UBS Equities - Analyst*

Hi. Good morning. It's Fatima, on behalf of Ash Verma at UBS. Thanks for taking my question. Just like very quickly, can you talk about what you are seeing in terms of discontinuation persistence rates? Any change from what we've seen early in the launch? And just a quick second question, are you seeing any impact in the second quarter from Xyrem being removed from certain formularies? Thank you.

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Thank you very much. Richard?

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



**AUGUST 08, 2024 / 12:30PM, AVDL.OQ - Q2 2024 Avadel Pharmaceuticals PLC Earnings Call**

**Richard Kim** - *Avadel Pharmaceuticals PLC - Chief Commercial Officer*

Yes. No. Thanks for the questions, Fatima. So as far as discontinuation, what we see holistically is LUMRYZ has lower discontinuation rates than the first-generation oxybates when we compare that at time mesh cohorts of patients through the launch.

What we do know historically is discontinuation rates for oxybate tend to be higher earlier in treatment and they tend to subside overtime. And that's also what we see with LUMRYZ once again lower than first-generation oxybates.

And the discontinuation rate is probably driven a little bit more from naive patients and previously discontinued patients that do have a higher discontinuation rate than the switch patients do over time.

But we've also learned a lot like we have in other components of our launch. We're learning a lot of -- from HCPs and patients. We're learning how to intervene differently when to intervene how to intervene how to specialize things depending on which patient type.

So we know that every product does have dropouts and that's true of any chronic medication. But we worked really hard to get these patients started and we're going to be working really hard to make sure that the right patients stay on therapy as well.

And as far as your second question about the impact from Xyrem yes I mean, clearly, there was some changes in some formularies that happened earlier this year. We did benefit from some of those patients going on to LUMRYZ.

But we also know that our value proposition is very strong against all first-generation twice-daily oxybates. So those switch patients as we mentioned before remain an important source of our business in addition to the other two segments as well as we go forward.

**Fatima Amanat** - *UBS Equities - Analyst*

Great. Thank you.

**Operator**

Oren Livnat, H.C. Wainwright.

**Oren Livnat** - *H.C. Wainwright. & Co. LLC - Analyst*

Thanks. I appreciate it. Clearly, you have plenty of room to grow in narcolepsy but you're pretty aggressively pushing into IH. And I have just a couple of questions there. First, what's the reasoning behind trying to get in there right away now while that market is maybe not as developed?

Is there any reason to maybe let your competitor with twice-nightly continue to make the investments and do the leg work probably the tougher lifting to grow that market first and get oxybate established as a therapy versus getting in there ASAP?

And also do you believe you have IP aside a freedom to operate there given I think there's some different labeling on the Xywav side and some of the arguments your competitor is making on that front in court? And I have a follow-up there.

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Oren, whatever the competitor is doing they're doing it right from that perspective. But it's clear to us and our feedback from physicians and patients that there is an unequivocal need for LUMRYZ in this category in this patient population.

14

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



And we're not going to wait for someone else to do whatever they're going to do to serve this community and help expand and build our franchise. And regardless of what's in their label or what arguments they make or don't make, it doesn't matter to us, because we believe if we're going to introduce LUMRYZ to this patient population, it will be well received it will serve and have its rightful place and has the opportunity to make a difference. And arguably, we're the market leader in this category as well.

So, we believe, we have full rights to operate accordingly. And at the end of the day, the market has spoken to us in the form of patients and physicians, who said, get us LUMRYZ as fast as you can. That's what we're trying to do.

**Oren Livnat** - *H.C. Wainwright. & Co. LLC - Analyst*

Okay. And it's really impressive that you guys are projecting adjusted breakeven next quarter and I think OpEx was actually lower than I had modeled excluding that item this quarter. Can you just talk about -- you're growing revenue really rapidly OpEx not so much or at all now. How does that look going forward?

Are you right-sized for continued dramatic growth from here IH aside? Or do you think you need to invest more on this product along with revenues?

And also, I'm curious about cash conversion going forward too. Obviously and it's not surprising accounts receivables are accumulating as this product grows rapidly but do you expect that to reverse in the second half?

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

I'll save the second question for Tom. In terms of your comment about do we need to invest more on the launch, here's how we would describe it. Again, we're constantly evaluating our source of business and where opportunities are to try to accelerate the launch of LUMRYZ.

I would say that, we are generally well deployed and well-resourced to maximize the primary opportunity in LUMRYZ. But we are not the least bit shy of deploying more capital or investing in opportunities, if we believe it has an opportunity to really grow both the speed and the peak of what LUMRYZ can achieve from that standpoint.

So it's something, we're always looking at. I will point to the comment that we made earlier today that we're seeing patients go on LUMRYZ from physicians who we are not actively calling on. So we've been trying to understand that and what are the profile of those physicians and is there an opportunity to pursue that more aggressively and accelerate that segment?

We believe -- we've always believed longer term that was going to be something we were going to pursue overtime, but it has moved faster maybe than what we had assumed which we think is positive and it's something we're looking at.

So I think at the end of the day it doesn't change our outlook in terms of our view on profitability and generating operating income in the second half of this year and going forward. But it does -- it is something we're always looking at because at the end of the day maximizing LUMRYZ is our primary objective.

**Thomas McHugh** - *Avadel Pharmaceuticals PLC - Chief Financial Officer*

Yes. Oren, thanks for the question. Listen, we believe we're going to hit cash flow breakeven this year. You picked up on a key point and it's not surprising that as we grow our working capital will increase primarily in the form of accounts receivable. But what you see sitting on the balance sheet at June 30, we'll convert to cash in Q3.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



AUGUST 08, 2024 / 12:30PM, AVDL.OQ - Q2 2024 Avadel Pharmaceuticals PLC Earnings Call

**Oren Livnat** - *H.C. Wainwright. & Co. LLC - Analyst*

Perfect. Thanks. Appreciate it.

---

**Thomas McHugh** - *Avadel Pharmaceuticals PLC - Chief Financial Officer*

Thanks, Oren.

---

**Operator**

Myriam Belghiti, LifeSci Capital

---

**Myriam Belghiti** - *LifeSci Capital LLC - Analyst*

Thank you and congrats on the quarter and launch progress. Just a quick question for me. For the Phase 3 IH study, how should we be thinking about success here? And how do you think LUMRYZ's performance will compare to data shared from the RD-approved product?

---

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Well again I'll make some comments and Jen feel free to weigh in. I think at the end of the day we have an excellent proxy in terms of narcolepsy in terms of how LUMRYZ performed in our pivotal trial relative to the first-generation oxybates, right?

We believe that gives us high confidence that LUMRYZ will be successful in our IH trial that we've initiated. So we're highly confident that we'll demonstrate a highly statistically significant benefit to patients. And from that standpoint we remain highly confident. Anything you want to add to that?

---

**Jennifer Gudeman** - *Avadel Pharmaceuticals PLC - Senior Vice President, Medical & Clinical Affairs*

The only thing I will add is that the enthusiasm from the investigators who are participating in this trial certainly underscores everything that Greg has said. There is a long-overdue unmet need to be able to provide an extended release form of sodium oxybate for IH which only LUMRYZ will provide if it's approved.

---

**Myriam Belghiti** - *LifeSci Capital LLC - Analyst*

Got it. Thank you for taking my questions.

---

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Thanks, Myriam.

---

**Operator**

Matt Kaplan, Ladenburg Thalmann.

---

16

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



AUGUST 08, 2024 / 12:30PM, AVDL.OQ - Q2 2024 Avadel Pharmaceuticals PLC Earnings Call

**Matt Kaplan** - *Ladenburgh Thalman & Co. Inc - Analyst*

Hi. Good morning, guys. Congrats on the strong quarter results. Just to stay on the IH theme a little bit can you talk about maybe it's a little bit early since you just started the trial but the time line for the Phase 3? And then also the regulatory pathway do you think you'll need two studies?

Or will one be sufficient for an NDA filing?

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

I'll take the first part of that and Jen feel free to weigh in on the second point. Matt, I think you made a good point which is that it's early in the trial. We're just getting our sites initiated -- our early sites initiated. We haven't reached our let's call it our full run rate or steady state.

We're very pleased with the fact that in a very short order from a site initiation we've seen patients move into prescreening and patients go on therapy -- go on treatment. So we're -- by the early data points we're excited about that but we haven't reached our -- if you will it's going to take a while before we're at our full capacity.

So I think it's difficult to project how long we think it's going to take. We've always said that we believe the best proxy right now is kind of how long it's taken the other products the other oxybate products to get through their Phase 3.

And that was let's just call it 15 to 18 months. We think that's the right proxy for us now. And to be clear our assessment our assumptions around that changes we'll be sure to communicate accordingly as and when we're up and running more at kind of full steam and steady state.

So in terms of regulatory pathway, Jen?

**Jennifer Gudeman** - *Avadel Pharmaceuticals PLC - Senior Vice President, Medical & Clinical Affairs*

Sure, happy to comment to that. We're very pleased with the engagement that we've had with the FDA. This will be a supplemental New Drug Application. And of course there's the prior precedent where there was only one pivotal trial to achieve approval in idiopathic hypersomnia.

So we very much believe that's our pathway as well.

**Matt Kaplan** - *Ladenburgh Thalman & Co. Inc - Analyst*

Great. Thanks.

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Thanks, Matt.

**Operator**

Thank you (Operator Instructions)

Brandon Folkes, Rodman & Renshaw.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



**Brandon Folkes** - *Rodman & Renshaw - Analyst*

Hi. Thanks for taking my question and congratulations on a very good quarter. Maybe just two follow-ups from earlier questions for me. Just coming back to the pediatric population how does the educational awareness compare in this population to get a patient or to get a caregiver to switch and convince them to move a pediatric patient off a therapy that may not be as good as LUMRYZ, but in their minds may be adequate perhaps compared to what they've tried in the past?

And then similarly just given the way base dosing there some sort of focus will the pediatric population be for the sales force given the runway in the added population?

---

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Thanks, Brandon. Richard, do you want to comment on the pediatric opportunities?

---

**Richard Kim** - *Avadel Pharmaceuticals PLC - Chief Commercial Officer*

Yes. As Greg said earlier the opportunity is about 5% of the overall marketplace today. For us right now when we think about sales force coverage, the vast majority of the pediatric patients are seen by physicians that we call on that treat both adults and pediatric patients today.

So incrementally we're only adding a few physicians who are specifically focused on pediatric sleep disorders. So I think our label will be very clear about the ability to switch patients as it is for adults today as well.

And we've just heard consistent feedback from providers and families about how this could really be a changer for their families because remember it's not only the patients who have to wake up but it's generally the entire family that's disrupted during the middle of the night.

So it's a modest opportunity as far as numbers or percentage is concerned, but we think it's a very important opportunity for us to execute against going forward as well. So we're super excited about the opportunity that lays ahead.

---

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Yeah. I think the only thing I would add is that, I don't think today where we think it's going -- the market for pediatric patients is going to perform any different than how we see adults today in that physicians see patients in the ordinary course when they come in for their follow-up whether it's three times a year or twice a year or whatever it may be that the opportunity to discuss LUMRYZ will come up.

And, of course, it's imperative for us which we'll be doing is doing our related investment in marketing and awareness campaigns to the pediatric population to try to spur patient activation accordingly from a parent's perspective. But again that's no different than I think how we see the adult population today.

---

**Brandon Folkes** - *Rodman & Renshaw - Analyst*

Great. Thanks. And then maybe just a follow-up on the discontinuation rate. If I look at the metrics you gave and thanks for all the additional metrics, it looks like we had an additional 700 patients in the shared therapy during the quarter and an additional 500 patients on therapy at the end of the quarter.

Is that a fair way to think about obviously there's a lot of moving pieces around that but just at a higher level do you think that at this stage for every 700 patients starting therapy 500 will stay on LUMRYZ?

---

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



**AUGUST 08, 2024 / 12:30PM, AVDL.OQ - Q2 2024 Avadel Pharmaceuticals PLC Earnings Call**

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Richard?

---

**Richard Kim** - *Avadel Pharmaceuticals PLC - Chief Commercial Officer*

Yeah. Thanks Brandon. Right now we're still relatively early on the launch. And as we know historically more discontinuations tend to happen earlier or after a patient initiation. So we haven't really sort of got our full base of steady-state longer term usage.

So we think discontinuations are earlier in launch maybe higher represented than they are going to be later on in the launch. So I don't think we've quite got to our steady state so it's a bit dynamic right now. And it's hard to say exactly what's happened in the past will reflect the rates going forward.

We know that there will be more discontinuation rates over time, but the rates may be different going forward.

---

**Brandon Folkes** - *Rodman & Renshaw - Analyst*

Thanks. Very helpful. And then the last one if I may just on IH. Xywav does have the potential to dose once nightly. Do you believe LUMRYZ will take market share from both the twice-nightly patients and once-nightly IH patients? And so do you have any sense of what percentage of patients, of IH patients are currently making use of that once-nightly dosing on Xywav?

And that's it for me. Thank you.

---

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Thanks. Richard?

---

**Richard Kim** - *Avadel Pharmaceuticals PLC - Chief Commercial Officer*

Yeah. What we know right now from the Xywav label is 23% of patients were did take a single dose. Keep in mind those are patients from being in a study who are unable to take the two doses that the study started off with. And also keep in mind that the maximum dose of those patients is six grams that they can take.

We know that oxybate use for adults tends to migrate more towards 7.5 to 9 grams of total usage. So it's really one of the predominant things that we hear about our opportunity in IH is that a lot of patients are incapable of waking up to take that second dose.

And we believe that the opportunity for LUMRYZ is quite substantial from both those patients who are taking two doses and those patients who may be taking a single dose to potentially have a higher therapeutic option in LUMRYZ as well. So we really see the opportunity within the existing oxybate patients today and as Greg mentioned before to grow beyond that as well.

---

**Brandon Folkes** - *Rodman & Renshaw - Analyst*

Great. Thank you very much, and congratulations on the strong execution again.

---

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Thanks, Brandon.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



**AUGUST 08, 2024 / 12:30PM, AVDL.OQ - Q2 2024 Avadel Pharmaceuticals PLC Earnings Call**

**Operator**

Thank you. I'm showing no further questions at this time. I would now like to turn it back to Greg Divis for closing comments.

**Gregory Divis** - *Avadel Pharmaceuticals PLC - Chief Executive Officer, Director*

Thank you. And thank you everyone for your time in joining us today on our second quarter 2024 earnings call. We wish you all a great day and look forward to providing updates in the future.

**Operator**

This does conclude the program. You may now disconnect.

**DISCLAIMER**

Refinitiv reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES REFINITIV OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2024, Refinitiv. All Rights Reserved.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

