**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., | |
| *Plaintiff,* | C.A. No. 21-691-GBW |
| v. | ██████████████████ |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| *Defendant.* | |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| *Plaintiffs,* | C.A. No. 21-1138-GBW |
| v. | ██████████████████ |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| *Defendant.* | |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| *Plaintiffs,* | C.A. No. 21-1594-GBW |
| v. | ██████████████████ |
| AVADEL CNS PHARMACEUTICALS, LLC, | |
| *Defendant.* | |

**DEFENDANT'S REPLY IN SUPPORT OF**
**EMERGENCY MOTION FOR STAY PENDING APPEAL**

## TABLE OF CONTENTS

**Page**

I.  Jazz Incorrectly Frames The Controlling Legal Question ....................................................1

II. Jazz's Defense Of The Injunction Lacks Merit .................................................................3

    A.  Jazz Does Not Seriously Defend The Prohibition On Seeking FDA Approval ...........................................................................................................3

    B.  Jazz Misconstrues The Injunction As To Avadel's Ongoing IH Clinical Trial..............................................................................................................4

    C.  It Is Well Established That Any New Clinical Trials Would Be Protected By The Safe Harbor ....................................................................................4

III. Avadel Properly Asserted Its Safe-Harbor Argument At The Injunction Hearing And Jazz *Agreed* With That Argument..................................................................6

IV. The Equities And Public Interest Heavily Favor A Stay ....................................................8

    A.  Avadel Will Suffer Irreparable Harm Absent A Stay.............................................8

    B.  Jazz Has Not Identified Any Irreparable Harm Flowing From A Stay ..................9

    C.  The Public Interest Favors A Stay .......................................................................10

V.  Conclusion ......................................................................................................................10

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*,
  986 F.2d 476 (Fed. Cir. 1993) ................................................................................... 1, 3

*Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*,
  96 F.4th 1347 (Fed. Cir. 2024) .......................................................................................... 6

*Eli Lilly & Co. v. Medtronic, Inc.*,
  496 U.S. 661 (1990) ..................................................................................................... 4, 5

*Family Inada Co. v. FIUS Distributors LLC*,
  No. 19-925, 2019 WL 5295178 (D. Del. Oct. 18, 2019) ...................................................... 6

*Int'l Rectifier Corp. v. IXYS Corp.*,
  383 F.3d 1312 (Fed. Cir. 2004) ................................................................................... 1, 3

*Intermedics, Inc. v. Ventritex*,
  775 F. Supp. 1269 (N.D. Cal. 1991) ......................................................................... 5, 6, 7

*Intermedics, Inc. v. Ventritex*,
  991 F.2d 808 (Fed. Cir. 1993) .......................................................................................... 5

*Kim v. Hanlon*,
  99 F.4th 140 (3d. Cir. 2024) ............................................................................................. 8

*Merck KGaA v. Integra Lifesciences I, Ltd.*,
  545 U.S. 1936 (2005) ................................................................................................... 4, 5

*Nexell Therapeutics, Inc. v. AmCell Corp.*,
  199 F. Supp. 2d 197 (D. Del. 2002) ................................................................................. 5

*Proveris Sci. Corp. v. Innovasystems, Inc.*,
  536 F.3d 1256 (Fed. Cir. 2008) ..................................................................................... 3, 4

*Regenxbio Inc. v. Sarepta Therapeutics, Inc.*,
  No. 20-1226, 2022 WL 609141 (D. Del. Jan. 4, 2022) ..................................................... 3, 5

*Rogers v. Wilmington Tr. Co.*,
  No. 21-1473, 2022 WL 621690 (3d Cir. Mar. 3, 2022) ......................................................... 7

*Well Cell Glob. LLC v. Calvit*,
  No. 2023-1229, 2023 WL 6156082 (Fed. Cir. Sept. 21, 2023) .............................................. 7

*Wesley Jessen Corp. v. Basuch & Lomb Inc.*,
  235 F. Supp.2d 370 (D. Del. 2002) ............................................................................................. 5

**STATUTES**

35 U.S.C. § 271(e)(1) ............................................................................................. *passim*

**OTHER AUTHORITIES**

*Safety and Efficacy of FT218 in Idiopathic Hypersomnia (REVITALYZ)*, CLINICALTRIALS.GOV
  (July 29, 2024) ....................................................................................................................... 2

Jazz's opposition to Avadel's motion says nearly nothing of substance about the core problems with the injunction:  that it transgresses the safe harbor for activities connected with the FDA approval process and violates the First Amendment.  Instead, Jazz tries to characterize the motion as asserting a safe harbor "affirmative defense" that Avadel "waived."  Not so.  Submitting an FDA application is not infringing under § 271(a) even without the additional protection that the safe harbor provides in § 271(e)(1).  Moreover, it was *Jazz* that waived by affirmatively pleading that it was *not* accusing conduct covered by the safe harbor and then repeatedly telling this Court during and after the hearing that the injunction would not cover clinical trials.  Indeed, Jazz *admitted* that it had "never disputed that Avadel could conduct those studies."  D.I. 650 at n.1 (D.I. citations to C.A. No. 21-691 unless otherwise noted).  Jazz cannot backtrack now.  Avadel likewise repeatedly explained that seeking FDA approval and conducting clinical trials fall within the safe harbor and do not infringe.  The Court cannot enjoin those activities.  A stay should be granted.

## I.      JAZZ INCORRECTLY FRAMES THE CONTROLLING LEGAL QUESTION

Avadel's opening brief explained why this Court's injunction sweeps beyond its authority to grant injunctive relief under Federal Rule of Civil Procedure 65 and 35 U.S.C. § 283 and how Jazz's threats of contempt threaten Avadel with undue harm.  D.I. 671 at 6-10.  In a patent-infringement action, a court may enjoin a defendant to "prevent violation[s] of patent rights," but may not enjoin conduct that is entirely "non-infringing."  *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 986 F.2d 476, 479-80 (Fed. Cir. 1993).  "The question … [is] how to insure that overly broad injunctions do not issue in the first instance," *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004), as "Rule 65 has the added purpose of deterring unwarranted contempt proceedings altogether."  *Additive Controls*, 986 F.2d at 480.

As explained, the Order enjoins conduct that is non-infringing as a matter of law:  it expressly prohibits Avadel from: (1) "seek[ing] approval of LUMRYZ from the FDA for the

1

treatment of IH or for any indication that was not already part of LUMRYZ's approved product labeling as of March 4, 2024," and (2) making use of LUMRYZ in any IH clinical trials except for "*currently-ongoing* clinical trials and studies." D.I. 666 at 2-3 (emphasis added). The Order thus enjoins conduct that is specifically defined as non-infringing under the Patent Act's safe harbor for "the development and submission of information under a Federal law which regulates the … sale of drugs." 35 U.S.C. § 271(e)(1). Because the Order prohibits conduct that is non-infringing, it exceeds the scope of this Court's injunctive authority and will not withstand appeal.

Jazz's opposition rests on the false premise that Avadel, by invoking the Patent Act's safe harbor, has belatedly asserted an "affirmative defense" that it failed to "plead" and "prove." D.I. 679 at 5-13. That misunderstands the posture in which this question arises. As discussed below, Jazz never previously accused Avadel of infringement through an IH clinical trial—nor could it have done so, since Avadel launched its inaugural IH clinical trial only recently. *Infra* at § III; *Safety and Efficacy of FT218 in Idiopathic Hypersomnia (REVITALYZ)*, CLINICALTRIALS.GOV (July 29, 2024), https://clinicaltrials.gov/study/NCT06525077?term=NCT06525077&rank=1; D.I. 672 at ¶¶ 4-5. Avadel therefore never had reason to plead or prove that an IH clinical trial would fall within the scope of the statutory safe harbor. Indeed, regardless of the safe harbor's scope, Avadel has no need to show that its currently ongoing IH clinical trial falls within the safe harbor because this Court's injunctive Order—by its plain terms—exempts any "currently-ongoing clinical trials and studies." D.I. 666 at 2. Thus, Jazz's arguments that Avadel somehow failed to "prove" that its ongoing IH clinical trial for LUMRYZ is protected by the Patent Act's safe harbor (D.I. 679 at 8-13) are badly misplaced (and wrong on the merits as discussed below, *infra* § II). This is not a case where a defendant sought dismissal or judgment on the ground that the accused conduct is non-infringing. *See Proveris Sci. Corp. v. Innovasystems, Inc.*, 536 F.3d

1256 (Fed. Cir. 2008); *Regenxbio Inc. v. Sarepta Therapeutics, Inc.*, No. 20-1226, 2022 WL 609141 (D. Del. Jan. 4, 2022).  Rather, it is a case where the Court's injunctive Order sweeps beyond the accused conduct and prohibits future conduct that was never litigated.

Properly understood, Avadel's emergency motion turns on two simple legal questions: (1) whether this Court may enjoin Avadel from seeking FDA approval for new indications for LUMRYZ; and (2) whether it may enjoin future clinical trials designed to produce data relevant to an FDA application.  Both of those—which the injunction facially prohibits—are in the safe harbor for the "development and submission of information" to the FDA.  § 271(e)(1).  Thus, the Order impermissibly reaches beyond Avadel's accused acts of infringement and prohibits Avadel from undertaking conduct that the Patent Act expressly permits.  Under Rule 65, that is reversible error.  *Int'l Rectifier*, 383 F.3d at 1316-17; *Additive Controls*, 986 F.2d at 479-80.

## II.     JAZZ'S DEFENSE OF THE INJUNCTION LACKS MERIT

### A.     Jazz Does Not Seriously Defend The Prohibition On Seeking FDA Approval

Jazz offers no response to Avadel's argument that "the Patent Act provides that seeking FDA approval is not infringing activity."  D.I. 671 at 8.  Indeed, Jazz acknowledges that injunctive relief must center on "making, using, or selling the infringing LUMRYZ dosage form," which is the only conduct regulated by § 271(a).  D.I. 679 at 13.  Yet submitting an application to FDA is *not* making, using, or selling LUMRYZ.  Thus, it is outside § 271(a) and the scope of what courts may enjoin—even without the additional protection the safe harbor provides in § 271(e)(1).  D.I. 671 at 6.  Avadel will likely succeed on appeal for this reason alone.

Nor does Jazz meaningfully address the point that the injunction poses an irreconcilable conflict with the First Amendment.  D.I. 679 at 9.  Jazz argues that Avadel's conduct falls outside the scope of the safe harbor—an argument that itself is wrong as § 271(e)(1) explicitly protects "submission of information" to an agency—but Jazz cites no authority for the suggestion that

3

Avadel's petitioning conduct is unprotected by the First Amendment, and none exists.  *Id*.

**B.      Jazz Misconstrues The Injunction As To Avadel's Ongoing IH Clinical Trial**

Jazz does not dispute that the injunction, on its own terms, exempts "ongoing clinical trials."  Yet Jazz still seeks to shut down Avadel's ongoing IH clinical trial by preventing the enrollment of new patients and barring the open label period of the trial *already approved by FDA*.  Jazz argues that Avadel has not shown that the ongoing IH trial falls within the safe harbor.  *Id.* at 8-13.  That misses the point:  again, the injunction on its face exempts the currently ongoing trial, and Jazz offers no response to the argument that, read as Jazz pretends, the injunction's exemption for clinical trials would be superfluous.  *See* D.I. 671 at 10; *supra* § I.  Avadel will likely succeed on appeal for this separate reason.  And in blatantly trying to stretch the injunction's already broad terms to sweep in even more lawful activity, Jazz seeks to inflict immediate and irreparable harm.

**C.      It Is Well Established That Any New Clinical Trials Would Be Protected By The Safe Harbor**

It is incontrovertible that the safe harbor protects clinical trials that a drug manufacturer reasonably undertakes in an effort to secure FDA approval.  *See Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193, 202 n.6 (2005); *Eli Lilly & Co. v. Medtronic, Inc*., 496 U.S. 661, 671 (1990).  Yet Jazz remarkably contends that the safe harbor does not protect *any* clinical trial that Avadel might now undertake to support an application for FDA approval of LUMRYZ as a treatment for IH.  D.I. 679 at 8-13.  Jazz's supporting arguments are entirely without merit.

*First*, Jazz contends that any IH trial should be excluded from the safe harbor because LUMRYZ is not a "patented invention" within the meaning of 271(e)(2).  *Id.* at 8 (citing *Proveris Sci. Corp. v. Innovasystems, Inc.*, 536 F.3d 1256 (Fed. Cir. 2008)).  But *Proveris*, which addressed whether a piece of laboratory equipment that was not subject to premarket approval was nonetheless protected by the safe harbor, is clearly inapposite.  536 F.3d at 1259, 1265.  *Regenxbio*

is similar:  the "products" at issue there were cultured cells whose use required no FDA approval.  *See Regenxbio Inc. v. Sarepta Therapeutics, Inc.*, No. 20-1226, 2022 WL 609141 at *4 (D. Del. Jan. 4, 2022).  LUMRYZ is not a piece of lab equipment or a petri dish of cells that may be freely sold or used without FDA approval.  It is a drug product whose uses require FDA approval—including with respect to any new indication.  Clinical studies of such products—including clinical studies as to new indications—fall easily in the safe harbor.  *Eli Lilly*, 496 U.S. at 670; *Wesley Jessen Corp. v. Basuch & Lomb Inc.*, 235 F. Supp.2d 370 (D. Del. 2002).[1]

*Second*, Jazz argues that Avadel failed to present evidence that its clinical studies are "reasonably related" to the development or submission of information to the FDA.  D.I. 679 at 10-13.  This argument is extraordinary.  Avadel's IH study is a precursor to FDA submission (D.I. 672 at ¶ 4), and such trials are the archetypal form of conduct protected by the safe harbor.  *See Merck*, 545 U.S. at 202 n.6.  And contrary to Jazz's assertion that Avadel must prove that its IH clinical trial is "required" for FDA approval of an IH indication, courts routinely find FDA-approved studies like Avadel's per se protected by the safe harbor.  *See Nexell Therapeutics, Inc. v. AmCell Corp.*, 199 F. Supp. 2d 197, 203-05 (D. Del. 2002); *see also Intermedics, Inc. v. Ventritex*, 775 F. Supp. 1269, 1282 (N.D. Cal. 1991), *aff'd* 991 F.2d 808 (Fed. Cir. 1993).  Nor

---

[1] Jazz's suggestion (D.I. 679 at 9) that LUMRYZ is no longer "subject to premarket regulatory approval" simply because it has received FDA approval for adult narcolepsy find no basis in the language of § 271(e)(1), which makes no mention of "approval," and instead specifies "the development and submission of information" relating to drugs.  Indeed, a similar argument was previously rejected by Judge Robinson in *Wesley Jessen*.  There, the defendant sought a 30-day extended use indication for a product already approved for two other indications.  235 F. Supp. 2d at 372.  The patentee argued the safe harbor did not apply because the product was already approved for other indications and defendant would "not be precluded from marketing its product for these uses after the expiration of the patent." *Id.* at 375.  The court found the approval of other indications "irrelevant":  "the fact that defendant does have other approved uses for its product does not preclude defendant from seeking approval for the full range of uses for its products within the bounds of 271(e)(1)." *Id.*  So too here.

must Avadel prove that the number of patients in its clinical study or the inclusion of an open-label

portion are *required* to obtain or maintain FDA approval for the same reason.  D.I. 679 at 11-12.

Whether Avadel's clinical trial is "reasonably related" to obtaining FDA approval for IH does not

depend on what FDA will ultimately require, but rather on what Avadel believes will contribute

to its request for approval from FDA.  *Intermedics*, 775 F. Supp. at 1282.  And Avadel is not

required to demonstrate that the "sole purpose" of its IH clinical study is FDA approval (although

it is).  D.I. 679 at 12.  The Federal Circuit has rejected that very argument.  *See Edwards*

*Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*, 96 F.4th 1347, 1352-53 (Fed. Cir. 2024).

## III.  AVADEL PROPERLY ASSERTED ITS SAFE-HARBOR ARGUMENT AT THE INJUNCTION HEARING AND JAZZ *AGREED* WITH THAT ARGUMENT

Rather than mounting a serious defense of the injunction on the merits, Jazz focuses on the

notion that Avadel somehow waived its challenge to the scope of the injunction.  That is wrong.

In the course of litigating Jazz's motion for injunction, Avadel explained—and Jazz *agreed*—that

an injunction could not run afoul of the express statutory safe harbor for activities relating to the

FDA approval process.  If there is any waiver here, it is Jazz's.

Avadel repeatedly brought the statutory safe harbor to this Court's attention at the hearing

on Jazz's Rule 65 motion for permanent injunction and thus preserved the issue.  *See Family Inada*

*Co. v. FIUS Distributors LLC*, No. 19-925, 2019 WL 5295178, at *7 (D. Del. Oct. 18, 2019) (issues

waived where the waiving party did not address the relevant issues "in its Answering Brief or at

the preliminary injunction hearing").  At that hearing, Avadel urged this Court:  "Let us run a

clinical trial, which does not infringe.  Let us present the results of that clinical trial to FDA, which

does not infringe."  Ex. D at 87:9-11.  Avadel explained that such conduct falls within the "safe

harbor, statutory safe harbor," *id.* at 79:19-21, or "regulatory safe harbor" for all "conduct [that] is

intended to generate data for submission to FDA," *id.* at 66:11-21.  Jazz made no claim of waiver

and instead *agreed*—thereby disclaiming the very injunctive relief it now seeks to defend.  At the injunction hearing, counsel for Jazz acknowledged that FDA approval of new indications for LUMRYZ would "require different clinical trials," *id.* at 16:19, and noted that "we're not seeking to [e]njoin … the judgment would not go to clinical trials," *id.* at 101:4-6.  And this Court appeared to agree that such conduct is expressly "protected by statute."  *Id.* at 66:24-25.  Thus, Jazz disclaimed any argument in support of the broad injunction entered by this Court.  *See Well Cell Glob. LLC v. Calvit*, No. 2023-1229, 2023 WL 6156082, at *4 (Fed. Cir. Sept. 21, 2023).

If there were any doubt as to the parties' agreement on this, their post-hearing submissions to this Court dispelled it.  Following the hearing, Avadel reiterated in a written submission that any clinical trials for IH and related submission to the FDA fall comfortably within the § 271(e)(1) safe harbor.  D.I. 647.  And Jazz replied by noting that it had "never disputed that Avadel could conduct those studies.  In fact, Jazz's requested injunction explicitly carves out clinical studies."  D.I. 650 at n.1.  That clear, written disavowal likewise amounts to waiver on *Jazz's* part.  *See Rogers v. Wilmington Tr. Co.*, No. 21-1473, 2022 WL 621690, at *1-2 (3d Cir. Mar. 3, 2022).

Indeed, until now, Jazz has never advanced any argument in this Court that Avadel's clinical trial work or its FDA submissions could constitute infringement subject to this Court's injunctive power.  From the beginning, Jazz's amended complaint asserted only that the "*commercial* manufacture, use, offer for sale, sale and/or importation" of LUMRYZ could constitute infringement.  C.A. No. 21-1594, D.I. 211 at ¶ 34 (emphasis added).  But the use of LUMRYZ in a clinical trial is, as a matter of law, non-commercial.  *See Intermedics*, 775 F. Supp. at 1288.  And, in recognition of that point, Jazz expressly carved out from its amended complaint all "acts expressly exempted by 35 U.S.C. § 271(e)(1)."  C.A. No. 21-1594, D.I. 211 at Prayer for Relief ¶ (D).  Jazz has always known that Avadel has a clear statutory right to seek FDA approval

for LUMRYZ for another indication and to use LUMRYZ in clinical trials reasonably related to such approval.  Jazz's representations before this Court at the injunction hearing confirmed that view.  *See generally supra.*  Jazz's argument that Avadel waived any reliance on the safe harbor is not only wrong; it is upside down.

## IV.    THE EQUITIES AND PUBLIC INTEREST HEAVILY FAVOR A STAY

### A.    Avadel Will Suffer Irreparable Harm Absent A Stay

Absent a stay, the injunction will irreparably harm Avadel.  D.I. 671 at 11-14.

1.    Jazz offers no response to the fact that "[t]he loss of First Amendment freedoms, for *even minimal periods of time, unquestionably constitutes irreparable injury*."  *Id*. at 14.  And Jazz would have Avadel muzzled for over a year.[2]  Although Jazz contends that Avadel's harm is not "imminent" (D.I. 679 at 14), that argument fails because a loss of First Amendment rights is an irreparable harm in and of itself.  *See Kim v. Hanlon*, 99 F.4th 140, 159 (3d. Cir. 2024).

2.    As to the threat of harm to Avadel's reputation resulting from Jazz's attempted interference with Avadel's clinical trial, Jazz argues that "Avadel created this situation by choosing to initiate the IH Trial at-risk."  D.I. 679 at 14.  But Jazz ignores its counsel's assurances at the injunction hearing that "the judgment would not go to clinical trials."  Ex. D at 101:5-6.  Far from beginning a trial "at-risk," Avadel began the trial only after Jazz represented to the Court on the record that clinical trials were not "at risk."  Jazz should be held to that representation.  Similarly, Jazz argues that any harm "would not stem from the injunction itself but rather from Avadel's decision to start the IH Trial at-risk" because "Avadel earned the 'reputation' of an adjudicated

---

[2] Jazz suggests there is no irreparable harm because the "appeal will be resolved well in advance" of ▉▉▉▉▉, the earliest Avadel expects to submit its application.  D.I. 679 at 14.  But that submission date could potentially accelerate depending on the clinical trial progress, and there is no guarantee that the Federal Circuit will resolve the appeal by then.  And the point is that the injunction presently bars Avadel from submitting an application for approval for IH to the FDA.

infringer." D.I. 679 at 15. But this is a merits argument masquerading as an irreparable harm argument. Any patent defendant that seeks to stay a permanent injunction pending appeal has been adjudged as an infringer. If that were a bar to irreparable harm, no patent defendant subject to an injunction could ever obtain a stay pending appeal. This factor addresses harm that Avadel would suffer from the injunction that could not be remedied by later overturning the injunction. Avadel's reputational damage is just such a harm.

3.      Delays to Avadel's ongoing clinical trial also present the additional irreparable harm of delaying Avadel's research and development, which is time it cannot recover. D.I. 671 at 12-13. Jazz's opposition does not address that harm beyond its fact-free assertion that open-label studies are "[d]ressing up marketing exercises as research." D.I. 679 at 16. Regardless of Jazz's characterization, such open-label studies are still covered by the safe harbor (*supra* at § II.C). And, in all events, delaying the clinical trial will delay Avadel's research and development regarding LUMRYZ and thus delay Avadel's ability to pursue a new indication.

**B.      Jazz Has Not Identified Any Irreparable Harm Flowing From A Stay**

Jazz claims to be concerned that Avadel will "capture and define" the market for IH (D.I. 679 at 17), but Jazz fails to articulate how a stay pending appeal—which would allow Avadel to continue down the regulatory pathway—would cause such harm. While Jazz complains that Avadel has not provided information about the size of its clinical trial (*id.* at 16), Avadel has actually explained that it "expects the complete trial will enroll approximately 150 subjects." D.I. 672 at ¶ 5. Jazz presumably ignores this fact as it cannot substantiate the premise that a 150-person clinical trial could have an effect on the competitive market for Jazz's product. Avadel does not even charge those patients for their treatment, as Jazz should be well aware based on good clinical trial practice. Sept. 12, 2024 Gudeman Decl. at ¶¶ 2-3. This is no threat to Jazz's business. And the only other "harm" Jazz identifies is that the trials █████████████████████████

9

████████████████████████████████████  D.I. 679 at 18.  That argument is

speculative, as Avadel does not promote LUMRYZ for IH and may not do so without FDA

approval.

### C. The Public Interest Favors A Stay

Jazz does not dispute the important public interest served by the discovery of important

clinical data demonstrating the availability of a new—and potentially better—treatment for IH.

Jazz instead attempts to wave away this important public interest by baldly asserting that the Court

previously considered and rejected this consideration at the injunction hearing and in its injunction

Order.  D.I. 679 at 19.  That makes no sense.  As discussed above, Jazz never sought to enjoin

Avadel's clinical studies, and its injunction papers therefore never addressed the public interest in

the completion of such studies.  Indeed, Jazz's counsel expressly disavowed any effort by Jazz to

block Avadel's clinical studies.  *See supra* § IV.A.2.[3]  The Court therefore never considered the

public interest attendant to the completion of clinical studies, much less dismissed it, as Jazz

contends.  As Avadel explained, it has not yet had an opportunity to complete the necessary clinical

trials to demonstrate LUMRYZ's safety and potential superiority for IH.  D.I. 671 at 11.

Development of clinical data is unquestionably a public good, weighing strongly in favor of a stay.

## V. CONCLUSION

This Court should stay its injunction pending appeal to the Federal Circuit.

---

[3]  Jazz's assertion that the Court previously considered this argument similarly misrepresents the record.  Jazz was clear at the hearing it was not seeing to enjoin clinical trials, and Avadel was likewise clear that clinical study activities would not be infringing activity.  *See* Ex. D at 101:5-6; *see also id.* at 77:22-23 ("There's nothing to [e]njoin with respect to the clinical trial, that's not infringing.").  The language quoted by Jazz reflected the Court's consideration of *when* a court could consider whether a competitor's product would provide a differentiated benefit to patients.  Contrary to Jazz's contentions, the Court never grappled with whether the completion of clinical studies would serve the public interest.

Respectfully submitted,

Dated:  September 12, 2024

MCCARTER & ENGLISH, LLP

*Of Counsel*:
Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
Sarah W. Wang
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
kenneth.schuler@lw.com
marc.zubick@lw.com
alex.grabowski@lw.com
sarah.wang@lw.com

Herman Yue
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
herman.yue@lw.com

Daralyn J. Durie
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
(415) 268-6055
ddurie@mofo.com

Kira A. Davis
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017
(213) 892-5200
kiradavis@mofo.com

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Counsel for Defendant*

# EXHIBIT D

1

2                    IN THE UNITED STATES DISTRICT COURT

3                    IN AND FOR THE DISTRICT OF DELAWARE

4
     JAZZ PHARMACEUTICALS, INC.,              )
5           Plaintiffs,                       )   C.A. No.
     v.                                       )   21-691-GBW
6                                             )
     AVADEL CNS PHARMACEUTICALS, LLC,         )
7           Defendant                         )
     -------------------------------          )
8                                             )   C.A. No.
     JAZZ PHARMACEUTICALS, INC., et al.,      )   21-1138-GBW
9           Plaintiffs,                       )
     v.                                       )
10                                            )
     AVADEL CNS PHARMACEUTICALS, LLC,         )
11   Defendant.                               )
     -------------------------------          )
12                                            )
     JAZZ PHARMACEUTICALS, INC., et al.,      )
13          Plaintiffs,                       )   C.A. No.
     v.                                       )   21-1594-GBW
14                                            )
     AVADEL CNS PHARMACEUTICALS, LLC,         )
15          Defendant.                        )

16

17                              - - - -

18                         Wilmington, Delaware
                           Thursday, June 6, 2024
19                         Permanent Injunction Transcript

20                              - - - -

21
        BEFORE:  HONORABLE GREGORY B. WILLIAMS
22               UNITED STATES DISTRICT COURT JUDGE

23
                                - - - -
24

25
                               Michele L. Rolfe, RPR, CRR

14

1  speaking in a March 2024 BioPharma conference, and he
2  confirmed that the majority of Lumryz patients are still,
3  quote, switched patients.
4       And what's more, more of those patients are
5  switching from Jazz's low sodium Xywav then from Xyrem.
6       Avadel's opposition of its lawyer and its
7  declarant Mohan Rao that Jazz can't prove Lumryz's
8  prescriptions are coming from switched patients instead of
9  discontinued Jazz patients.
10       We have objected to the declaration of Dr. Rao
11  for a number of reasons, including he was not disclosed in
12  the pretrial order disclosures.  Never had an opportunity to
13  take his deposition, obviously it's hearsay.  Regardless,
14  it's entirely unsupported by the arguments.
15       Both Jazz and Avadel track separately, Jazz --
16  RX coming from switched and discontinued patients.  Here in
17  the same March 2024 presentation where Avadel's COO said
18  most prescriptions were from switched patients.  He also
19  made clear that Avadel distinguishes switched patients from
20  new patient who have previously discontinued.  And also
21  oxybate naive patients.
22       Hold on.  It's an internal Jazz document that's
23  coming up next.
24       THE COURT:  Okay.  Let me just take a look at
25  it.

15

1       MR. CERRITO:  14, Your Honor.
2       Maybe I can describe it to Your Honor?
3       THE COURT:  Yes.
4       MR. CERRITO:  So Jazz makes the same
5  distinctions in its internal documents, switched patients
6  versus other types of patients.  Here -- and what Your Honor
7  is looking at -- is a tracker.  Lumryz's prescription as of
8  the week ending April 1.  And you can see on the far
9  right-hand side there's sort of a median cliff there, the
10  reason it's one day, it's not the whole month it's just
11  April 1st.
12       If you drop off and you see -- that's the drop
13  off you see at the end.  But what you see here, the blue
14  line, the one at the top there, that's the -- most Lumryz's
15  prescriptions are switched from Xyrem, that's what blue
16  line shows.  The orange line shows Lumryz's prescriptions
17  that are switches from Xyrem.  The gray line at the bottom
18  switches from Xyrem AG that Jazz gets revenue from through a
19  royalty.  And the yellow are Lumryz prescriptions coming
20  from patients who previously discontinued Jazz products or
21  never took Jazz products at all.  The discontinuation can be
22  for any reason.
23       So Jazz is not -- so Jazz is no doubt losing
24  revenue from all patient switches; and new patient
25  opportunities and those that are oxybate naive.

16

1       Hold on this one as well.  It's okay.
2       Losing oxybate patients is significant to Jazz.
3  In 2023, Jazz's Xyrem and Xywav made up about 48 percent of
4  the company's entire revenue.  And as we discussed in the
5  brief because Xywav is still in its infancy, it is growing
6  in the market, this is a crucial point in its life cycle.
7       As I mentioned earlier, Xywav has a unique place
8  in the market.  Not only is it the first and only low sodium
9  oxybate product, it's also the first and only FDA-approved
10  treatment for IH.  Only one.
11       Now Avadel and its prescriber declarants, which
12  we again objected to, say that narcolepsy and IH are not
13  distinct diseases.  There's absolutely no support for that.
14  None.
15       We've included several peer-reviewed
16  publications definitively disproving Avadel's unsupported
17  assertion.  And obviously the FDA thinks they are different.
18  They have different indications than narcolepsy, they
19  require different clinical trials than narcolepsy: they're
20  different.  And when you look at the peer-reviewed articles,
21  the peer-reviewed articles make it plain.
22       17, please.  Here it says:  Idiopathic
23  hypersomnia, IH, has been distinguished from narcolepsy on
24  the basis of the presence of prolonged rather than short
25  durational sleep periods.  And the absence of both cataplexy

17

1  and episodes of rapid eye movement on the onset of sleep.
2  Nocturnal sleep is typically disrupted in narcolepsy whereas
3  idiopathic hypersomnia is prolonged.
4       And here on the next slide is is Avadel's CEO,
5  Mr. Divis again, acknowledging huge market opportunity and
6  how the only FDA-approved product Xywav is only in its
7  infancy: less then 10 percent market penetration.  But
8  there's a robust patient population and the market is
9  growing.  And it's consistent with the literature we just
10  looked at, Avadel's own CEO admits that IH is different than
11  narcolepsy.
12       And Jazz saw growth of Xywav and IH, and
13  specifically IH in 2023.  It increased to 59 percent from
14  2022.  That IH market continues to grow.
15       Like the *Illumina* case we cited, the Xywav
16  market and, in particular, IH is a crucial inflection point
17  and Jazz is suffering and will continue to suffer
18  irreparable harm if Avadel were allowed to capture the IH
19  market by using Jazz's Claim 24 technology.
20       We've also seen Avadel -- and you'll hear them
21  argue -- that Lumryz was supposedly to provide some
22  advantage over Xywav for IH, because Lumryz is a
23  once-nightly oxybate.  Guess what?  Xywav is already
24  approved for once-nightly.
25       There's no evidence that there's some kind of

66

1  to grow and expand its business, that's part of the point of
2  Mr. Divis' declaration, generally, in order to be able to
3  continue to sell Lumryz.  But I want to make sort of a
4  fundamental point here:  Yes, Jazz is asking for a permanent
5  injunction.  Nothing that Avadel will do would be subject to
6  an injunction for a very long period of time, because Avadel
7  can't infringe right now: it does haven't a FDA approval to
8  sell a product and it won't have that FDA approval for years
9  in the future.  I think the estimate was something like
10 three or four years, something on that order of magnitude.
11 That is the first point of time at which there would even be
12 a question about whether Avadel sales should be enjoined for
13 idiopathic hypersomnia, because before then Avadel would not
14 be infringing, it would be operating within this regulatory
15 safe harbor that allows for conduct that would otherwise
16 infringe if that conduct is intended to generate data for
17 submission to FDA.
18         And, again, we have -- there's a reason that
19 companies cannot infringe patents when they are conducting
20 clinical trials that is because we want to encourage
21 companies to do that.  And we want to encourage companies to
22 do that in order to generate the data that the Court would
23 then be able to look at --
24         THE COURT:  Right, but that's protected by
25 statute --

67

1         MS. DURIE:  That's protected by statute, that's
2  exactly right.
3         At that point FDA will look at the data and make
4  a decision about whether Lumryz offers a major contribution
5  to patient care.
6         Now, again, Jazz bears the burden on this point.
7  Jazz has put in, I will say, evidence about Xywav -- and I
8  will talk about that -- but we have put in evidence from
9  medical professionals explaining why there is a need now for
10 patients with idiopathic hypersomnia for Lumryz and,
11 therefore, why we expect that FDA is going to reach the same
12 conclusion at the conclusion of those clinical trials.
13         So the first point most idiopathic hypersomnia
14 patients take Xywav twice a night.  On the label it says
15 once a night or twice a night, most patients take it twice a
16 night.  So we put that in, that's evidence from Dr. Stern,
17 that's in the declaration from Nurse Practice Maggie
18 Lavender.  This is not merely anecdotal evidence, although
19 it is the only evidence from any medical professional on
20 this.  This is entirely unsurprising because this is what
21 was reflected in the clinical trial for Xywav.
22         Now, on the Xywav label it says that in the
23 clinical trial 23 percent of patients took Xywav
24 once-nightly with a median dose of 4.5 grams and 77 percent
25 of patients took it twice-nightly with a median dose of

68

1  7.5 grams.  I want to explain how this clinical trial was
2  structured because it's a little bit unusual.
3         Patients and their doctors were given the
4  opportunity to identify to select the dosing regimen that
5  they would be on, the one that as between these two Xywav
6  options was credible or least bad for them.  And as a result
7  of those individualized decisions between doctors and
8  patients, 77 percent of patients wound up taking Xywav
9  twice-nightly.  Then in the clinical trial aspect, half of
10 those patients stayed on that drug at the dose and the
11 dosing schedule that they had selected.  The other half were
12 switched to a placebo.  And in the study what they evaluated
13 was how much better patients did when they stayed on drug
14 relative to what happened when they switched to a placebo.
15         But the thing that's critical about this is
16 three-quarters -- more than three quarters of patents were
17 taking it twice-nightly, which makes it entirely
18 unsurprising the evidence we put in from doctors and from
19 Nurse Practitioner Lavender is consistent with that.
20         So why is it that if patients want to be able to
21 sleep through the night?  There are a number of reasons, but
22 one of them has to do with dose.  Xywav is an immediate
23 release product.  All of the drug that you take is
24 immediately going to hit your system.  For that reason, the
25 maximum dose of Xywav that you can take at once is 6 grams,

69

1  because it isn't safe to have more than 6 grams hit your
2  system at once.  So if you are a patient who needs more than
3  6 grams of oxybate in order to get sleep, you're not going
4  to get that with the once-nightly dose of Xywav.
5         Lumryz, by contrast, can be dosed up to 9 grams,
6  and that's because you have that two-phase release, half of
7  it releasing right away, half of it releasing later so it's
8  safe for you to take a higher dose.  And what we saw here on
9  the Xywav label 77 percent of patients were taking Xywav
10 twice-nightly median nightly dose of 7.5 grams, that's more
11 drug, which presumably they and their physician determined
12 that they needed than it would be possible for them to get
13 if they were taking Xywav once-nightly.
14         THE COURT:  Well, doesn't that also support the
15 casual nexus because that's the invention of Claim 24, the
16 immediate release and the modified release?
17         MS. DURIE:  So both immediate release and
18 modified release are elements of the claim, I agree with
19 that.  However, at trial, Jazz said with respect --
20 immediate release was in the prior art, everybody agrees
21 with that.
22         At trial Jazz said "modified release was in the
23 prior art."  And it pointed to its earlier prior art
24 disclosure of modified release in the '488 patent as
25 providing the support for that for Claim 24.

74

1    23 percent of patient who is are on a once-nightly regimen.
2    This is the actual data, and I want to note here this is
3    from the Xywav approval package, Figure 5.  And what it's
4    showing here is the range of the sort of median and then the
5    range of sort of outcomes from a statistical point of view
6    for the once-nightly treatment and the twice-nightly
7    treatment.  The score that goes from zero to negative-11 is
8    the Epworth sleepiness scale.  And what is this is showing
9    is how much better patients did or how much worse patients
10   did when they went off drug or how much better they did when
11   they stayed on drug, but the bigger the negative number the
12   bigger the impact when they switched to placebo.
13           So a more negative number is the drug was more
14   effective because there was a bigger effect, a bigger
15   worsening of symptoms when they switched to a placebo.  You
16   see the numbers that are reported by Jazz about minus-3,
17   which is a pretty big band for once-nightly, maybe minus-7.5
18   with a slightly smaller band, but still a significant one
19   for twice-nightly.  That's the data.  This is something Jazz
20   put in their reply brief.  For that reason we don't have a
21   declaration responding to it, but I would just note that
22   that data looks pretty different in terms of the
23   effectiveness of the once-nightly and the twice-nightly
24   Xywav regimens for idiopathic hypersomnia.
25           The fundamental point here, Your Honor, with

75

1    respect to idiopathic hypersomnia is that Jazz has not met
2    its burden, and it is its burden to show that these patients
3    would not benefit and that there is, for that reason, a
4    public benefit in precluding them from having access to this
5    potentially life-changing treatment.
6            And in the *United Therapeutics* case the Court
7    there found where at least some patients would likely suffer
8    negative consequences that was a reason to conclude that the
9    plaintiff has failed to do show that an injunction would be
10   in the public interest.  And I would suggest here we have
11   put in a great deal of evidence about why we plan to invest
12   money in a clinical trial and what we expect FDA's
13   determination will be, why we expect they will reach the
14   same conclusion, and essentially unrebutted evidence from
15   medical practitioners about why it makes sense.
16           THE COURT:  But isn't the difference here -- so
17   you said yourself, as of today there's a very small number
18   of patients that have -- that suffer from IH that have even
19   been prescribed Lumryz.
20           MS. DURIE:  That is true.
21           THE COURT:  Right.  And what was that number
22   again?
23           MS. DURIE:  I believe it's 11.
24           THE COURT:  Eleven.  All right.  So in these
25   cases where, you know, the differentiator of the product is

76

1    the basis to deny the permanent injunction the product has
2    actually been prescribed, right?
3            MS. DURIE:  No.  And actually this *United*
4    *Therapeutics* case is interesting because this was about
5    whether defendant should be enjoined from launching the
6    product for a particular medication.  So there the product
7    had not launched, and the Court said I'm not going to injoin
8    the product from launching because I think doing so would
9    mean that patients would likely suffer negative consequences
10   if that product didn't launch.
11           The point here, Your Honor -- I mean, it's true
12   Avadel has not yet done the clinical trial.  Part of why
13   Avadel didn't do the clinical trial yet was because of
14   Jazz's conduct which kept it off the market as a function of
15   the REMS patent and delayed the launch of Lumryz itself for
16   narcolepsy.  But be that as it may -- and I'll talk more
17   about that, but be that as it may, the fundamental point
18   idiopathic hypersomnia patients deserve access to the drug
19   that is best for them just as narcolepsy patients do.
20           The timing of the clinical trials is not
21   relevant to their need.  So the only question should be have
22   we -- has Jazz shown, has Jazz met its burden to show that
23   the health of those patients will not be adversely impacted
24   if the Court enters an injunction.
25           THE COURT:  That's not the only question.  The

77

1    question is does -- will the permanent injunction disserve
2    the public interest.  And, again, the public interest is two
3    factors:  The protection of intellectual property rights and
4    then the accompanying healthcare benefits of patients.  And
5    so that's -- you know, the Court has to look at both of
6    those factors and factor that in.  And so that's sort of the
7    state of -- sort of the use of the drug is different for
8    narcolepsy as it is for IH.
9            MS. DURIE:  Not in a way that I think is germane
10   to the decision the Court needs to make.  It is true in
11   every case that there's a public interest in patent rights.
12   What the Court's have said is we're not going to permanently
13   injoin activities that would injure the public health, that
14   the public health is sacrosanct.  Again, where there is a
15   differentiated impact that is a true public health impact.
16           So the timing and sort of what the status quo
17   is, I don't think is relevant to that public health
18   determination.  The question is:  Are those patients likely
19   to receive the same benefit?  And, again, I want to note
20   there's nothing to injoin now.  We're not doing anything in
21   idiopathic hypersomnia to infringe.  We need to run a
22   clinical trial.  There's nothing to injoin with respect to
23   the clinical trial, that's not infringing.
24           At that point, FDA will look at the data and
25   will make a decision.  At that point, I suppose, maybe Jazz

78

1 could come back and say now we want an injunction because we
2 don't think there's any benefit to public health and we
3 could make a showing, maybe they could make a showing then
4 that they are unable to make now.  But I would say on this
5 record, they have not made any showing that should cause
6 this court to prejudge what determination FDA is going to
7 make once the clinical trial is done and once FDA has the
8 benefit of looking at that evidence to see what the benefits
9 to idiopathic hypersomnia patients will be.  And I think the
10 public health benefit, from a public health point of view is
11 what is best for patients.  It doesn't matter whether the
12 therapy is already on the market or not.  The goal is to
13 make sure that patients can have the therapy that is best
14 for them.
15        THE COURT:  But if a competitor can, at any
16 time, just come in to court and say well, you know, we're
17 going -- we are coming up with a competitive drug that
18 infringes Company A's patent, but our drug is going to have
19 some differentiating feature that is going to more benefit
20 patients, if that -- and it doesn't matter whether that drug
21 was in the market being currently prescribed and would be
22 being taken away from patients as opposed to a drug that's
23 been in the market, has been prescribed to patients, you
24 know, if you don't put some limit on it at some point then
25 that's just opening the door for infringement.

79

1        MS. DURIE:  No, Your Honor.  And, one, I would
2 say there is no injunction factor that looks at whether the
3 product is already on the market; that's not one of the
4 injunction considerations in the permanent injunction
5 context that we have been looking at.  It is -- in terms of
6 a preliminary injunction, status quo can matter in terms of
7 determining the status quo, but here the test is public
8 interest not maintaining the status quo.
9        THE COURT:  Right.  Public interest, and public
10 interest includes protecting intellectual property right --
11        MS. DURIE:  It absolutely does.  But I would
12 say, Your Honor, this is why in part we have that regulatory
13 safe harbor.  We want companies to conduct the clinical
14 trials in order to develop the evidence that then allows the
15 Court to evaluate, at the point of launch, which is when
16 that is typically going to happen, whether there is a public
17 benefit in allowing the launch and allowing the product to
18 come on the market.
19        And, bear in mind, we have a safe harbor,
20 statutory safe harbor for the clinical trial, you're not
21 infringing.  We then also, when there are Orange Book listed
22 patents, as the Court knows, we have an automatic stay.  The
23 purpose of that automatic stay is to allow the patent
24 infringement issues to be adjudicated before launch.  And
25 the point of that is to give the Court the ability both to

80

1 have the benefits of the clinical trials and see what the
2 evidence is with respect to patient benefit and to be able
3 to make a determination before launch about whether that
4 launch should happen.
5        In that context the Courts look at the public
6 health and make a determination about whether the product
7 should be permitted to launch or should not be permitted to
8 launch, based on the showing with respect to all four of the
9 injunction factors, but, for this case critically, the
10 public health, public benefit factor and whether the public
11 benefit is going to be served by that launch.
12        Again, I think the reason that it is set up that
13 way is precisely because we don't want patients to suffer
14 just by the happenstance of when it is that companies
15 conducted clinical trials for particular indications.  We've
16 seen -- and the Court has evidence about -- just how
17 important and beneficial Lumryz is for narcolepsy patients.
18 If idiopathic hypersomnia patients get that same benefit, as
19 we expect them to do, a benefit that allows them to hold
20 down a job, allows them to go to classes, allows them not to
21 drive around unsafely in the middle of the night, they
22 should have those public health benefits too.
23        THE COURT:  Let me ask you this question:  Does
24 Avadel have noninfringing alternatives of Lumryz available?
25        MS. DURIE:  That is an excellent question and

81

1 there are two things I want to say about that:  First, I
2 would note, at trial Jazz argued over and over and over
3 again that there is no noninfringing alternative.  Their
4 experts said that over and over, and that was part of
5 Dr. Rainey's damage opinion that there was no noninfringing
6 alternative, no noninfringing alternative.
7        Two, this is an -- this situation -- we're not
8 selling a nail where you can just change the nail and all of
9 a sudden not infringe.  The problem here is the need to get
10 regulatory approval, so we can't just change our product and
11 start selling it.  Jazz had to make all of its product
12 decisions, conduct clinical trials with that product, get
13 that product approved by FDA and that is the product that we
14 have approval from FDA to sell.  So the answer is this is
15 what is called sometimes regulatory lockup or regulatory
16 holdup because we, as a practical matter, can't just make a
17 change to the product and start selling it without going to
18 FDA and without dealing with regulatory approval.
19        So Avadel made all of the decisions about what
20 its product was going to be before it knew about Claim 24;
21 in fact, before Jazz had applied for Claim 24.  At the point
22 in time where Avadel made all of those decisions, Claim 24
23 didn't exist, the application didn't exist.  Avadel had no
24 way to know that Jazz was going to claim that this was its
25 intellectual property.  And it made all of those investments

86

1  the Court were to decide now that no matter what benefits
2  FDA found for idiopathic hypersomnia patients, regardless of
3  the patient benefit it didn't matter and said now no matter
4  what FDA finds we're going to injoin sales of IH at the
5  conclusion of the clinical trials, so three or four years
6  from now, I think it's probably true that Avadel wouldn't
7  run a clinical trial if there was no way that it could sell
8  product at the conclusion of that clinical trial.  Although,
9  I would suggest there's no reason for the Court to make that
10 judgment now, rather than waiting to see what the result of
11 the clinical trial is and what the evidence actually is with
12 respect to patient benefit at that point in time.  That
13 doesn't mean, though, that Avadel can be successful only in
14 the narcolepsy market.  It's true that right now Avadel only
15 sells in narcolepsy.  Right now Avadel loses money.  Avadel
16 made a massive investment in developing Lumryz, totally in
17 good faith with no reason to know anything about Claim 24 of
18 the '782 patent, with the expectation that it would be able
19 to bring that product to market for the range of patients
20 who need it, including patients with idiopathic hypersomnia.
21 So I don't think the Court can conclude Avadel will be fine
22 if it is limited to the market for narcolepsy patients.
23      But my other main point, Your Honor, would just
24 be right now there is no basis for the Court to find that
25 the public health concerns with respect to idiopathic

87

1  hypersomnia are any different than they are for narcolepsy.
2  Jazz's arguments was well we've got once-nightly dosing for
3  Xywav, that's 21 percent of patients.  For the other
4  77 percent of patients, they're in the same situation as
5  narcolepsy patients.
6      So I would say if the Court -- we think that we
7  have made a sufficient showing today with respect to those
8  patients, but if the Court disagrees the right thing to do
9  is to wait.  Let us run a clinical trial, which does not
10 infringe.  Let us present the results of that clinical trial
11 to FDA, which does not infringe.  Let FDA make a judgment,
12 as they did with narcolepsy, about what the benefits are.
13 At that point the Court would have a record and Jazz could
14 make an argument that the evidence for idiopathic
15 hypersomnia is different than for narcolepsy.  It is
16 different, we don't think it is going to be, but we -- I
17 mean, we can't definitively -- right now we've got doctors
18 put in front of you saying we expect those patients will get
19 the same benefits.
20      At a minimum, if the Court doesn't find the
21 declarations of those doctors saying we've got idiopathic
22 hypersomnia patients, they're suffering, we expect them to
23 get the same benefits: if that's not sufficiently
24 compelling, then wait until we develop the evidence and FDA
25 has an opportunity and the experts at FDA have an

88

1  opportunity to look at that evidence to see what the
2  magnitude of that benefit really is before the Court
3  concludes that idiopathic hypersomnia patients don't deserve
4  access to that therapy.
5      THE COURT:  I understand your argument.
6      MS. DURIE:  And so the point here, Your Honor,
7  is simply that Jazz should not be permitted to suggest
8  credibly that it is Avadel's fault, that Avadel made these
9  investments when Avadel had no way of knowing that Jazz was
10 seeking this patent protection.  And, in fact, the original
11 date when FDA was anticipating approval, October 15th of
12 2021, was before the '782 patent even issued.  We'll get to
13 this, but had it not been for the whole REMS patent
14 situation, we might well have been on the market with
15 respect to narcolepsy and beginning clinical trials of
16 idiopathic hypersomnia before the '782 patent was even made
17 known to us.
18      THE COURT:  Right.  So the FDA process that was
19 going on during the time that '782 patent was not public had
20 to do with narcolepsy?
21      MS. DURIE:  Correct.  That's correct.  We had
22 not yet commenced a clinical trial in idiopathic hypersomnia
23 because we were waiting for FDA's determination with respect
24 to narcolepsy, which was supposed to come out in October of
25 2021, but didn't actually come out until 2023 because of the

89

1  Orange Book listing issue of which the Court, I know, is
2  well aware.
3      So in short, with respect to the balance of
4  hardship, we think this factor also is in Avadel's favor,
5  because we made our investment in good faith before we could
6  possibly know about the existence of Jazz's patent
7  application: because an injunction would bankrupt a company
8  that engaged in that good faith conduct; and because Jazz in
9  its own words expects that it will continue to be
10 successful, notwithstanding competition from Avadel.
11      I want to turn next to irreparable harm, which,
12 as the Court has noted, is a closely related factor.  First
13 point I want to make is that the Federal Circuit -- and this
14 is from a District Court case citing the Federal Circuit in
15 *Automated Merchandising*.  The Federal Circuit has found that
16 lost sales standing alone are insufficient to prove
17 irreparable harm, because if that was enough there would be
18 irreparable harm in every case.  So it is a factor, but it
19 is not sufficient.  And Courts in this district and the
20 District of Delaware have also found that courts have
21 routinely decided that market share and price erosion do not
22 amount to irreparable harm.  That's not sufficient either.
23      Why is that?  In part that is because there must
24 be a casual nexus.  I want to talk about that nexus
25 requirement.  The purpose of the causal nexus requirement is

98

1  directly took on the issue and said Xywav was effective for
2  once-nightly treatment for IH.  And he also went on to say
3  that waking up once a night is not material in IH patients
4  and talks about the adverse events that I had mentioned
5  earlier, so there is testimony from him.
6          What we didn't hear is any reason why they
7  couldn't make a noninfringing alternative.  What we heard
8  was well, we spent a lot of money.  Okay.  Some costs,
9  irrelevant.  In both -- I got two case cites for you on
10 that.  Sorry.  I have to get those cites.  *Acumed* and *i4I*.
11 It matter what happens at the time not what happened in the
12 past.  So they haven't said they couldn't do it, they
13 clearly can and they've chosen not to.
14         Interestingly enough, on the IH -- it was a very
15 good question Your Honor asked:  How could you possibly go
16 bankrupt when you don't have the IH approval now?  Because
17 it's nonsense.  And if that was true, I would expect the
18 disclosures from this company, public disclosures making
19 that statement in their -- it's nowhere to be found.  It's
20 nowhere to be found.  They don't say anywhere in their SCC
21 disclosures if we don't get IH approval, we will go
22 bankrupt.  Never said that.  And if it is true, I guess
23 they'll be making disclosures this afternoon.
24         The fact is that there's noninfringing
25 alternatives, they chose not to do it.  It's because --

99

1  whatever reason they knew before they went into this case,
2  before this trial started, they launched at risk.  They had
3  the ability to change, they chose not to, and they chose to
4  do it at risk any way.
5          On the casual nexus, it's a formulation patent,
6  it's not a method-of-use patent.
7          For administrability and stability, it is the
8  formulation that causes that: there would be no product
9  without that formulation.  It does not exist without that
10 formulation.
11         It's interesting, counsel complained we didn't
12 have any evidence that somehow it imparted -- I forgot the
13 phrase she used -- certain benefits to patients.  Patient
14 number two that counsel put in says there was a benefit to
15 the sachet because she doesn't like carrying the bottles for
16 Xyrem.  Sounds like a benefit.  Their own patient put in
17 that testimony.
18         THE COURT:  Let me ask you a question.
19         MR. CERRITO:  Yes, Your Honor.
20         THE COURT:  Does generic Xyrem compete with
21 Xywav?
22         MR. CERRITO:  No, they are not substitutable.
23         And let's go back to that, there is no license.
24 Just so I'm 100 percent clear -- counsel I think misquoted
25 me.  I never said the word "patents" that covered it, I said

100

1  there is no license to Xywav.  We have none.  We've given
2  none and we will not give any.
3          THE COURT:  So the statement is that Jazz was
4  willing to license patents that cover Xyrem and Xywav, U.S.
5  Patent number 8,772,6306 and 9,050,302, do they cover Xyrem
6  and Xywav?
7          MR. CERRITO:  I apologize, I don't know the
8  numbers off the top of my head.  We do have patents that
9  cover both products.  We only licensed them to settle
10 litigation on Xyrem.  We have never licensed them with
11 regard to Xywav.
12         The settlement of litigations -- the Acumed?
13         (Discussion held off the record.)
14         *Acumed, Sanofi, Douglas Dynamics* all talk about
15 settling litigations and licensing patents -- not even the
16 patent-in-suit here, by the way.  But doing that and
17 settling litigation should not go against the entry of a
18 permanent injunction.  Again, it's not even the patent that
19 we're here talking about.
20         I want to go back for a second -- and we're
21 going to talk about IH for just minute.  But the idea that
22 somehow they -- it's an interesting question, and it sort of
23 struck me when she said it that they'd be under safe harbor
24 to perform clinical trials for IH.  I don't think that's
25 accurate.  She's an adjudicated -- she, sorry.  Their

101

1  company is an adjudicated infringer.  I'm not sure they get
2  around -- I don't think they get a safe harbor provision
3  when you're an adjudicated infringer.
4          Having said that, we're not seeking to injoin
5  the injunction -- the judgment would not go to clinical
6  trials, we don't have a problem -- but I'm not sure they get
7  a free ride for that after having been adjudicated an
8  infringer.
9          Having said that, we heard quite a bit, quite a
10 bit about how great Lumryz is for IH.  We don't even know if
11 it's going to get approval.  We don't even know at what
12 dosage strengths it would get approval.  We don't know what
13 the IH indication would look like: is it going to be
14 different, is it going to be same?  There's a lot of
15 speculation that they would get some kind of superiority.
16 It's all speculation.  They have no evidence of it
17 whatsoever.  Not a single shred.  To say that they would
18 automatically get this superior approval, there's no basis
19 for that.
20         THE COURT:  How do you respond to the statements
21 and argument by Avadel pointing out that during the trial
22 Jazz represented that Claim 24 had nothing to do with
23 once-nightly dosing?
24         MR. CERRITO:  It has -- it does not because it's
25 not a method-of-use claim, that's correct.  But that product

130

1  with respect to whether or not an injunction, a permanent

2  injunction is granted.  The Court is going to decide the

3  issue.  I'm going to -- with respect to the ongoing royalty,

4  that may be something that I defer until I get the

5  post-trial motions because even Jazz says that, you know, it

6  plans to file.  I'm not saying that's what I'm going to do,

7  but I'm going to think about that more.  But I will rule on

8  whether a permanent injunction should be granted or not, but

9  I don't need a proposed findings of fact and conclusions of

10  law.

11         MR. TIGAN:  That's helpful, Your Honor.  Those

12  were due next week so that's good to know.

13         MR. CERRITO:  Thank you, Your Honor.

14         THE COURT:  All right.  Well, thank both sides

15  for your presentations.  The Court will take the matter

16  under advisement and issue a ruling.

17         Now there was -- I think Jazz had made a request

18  to hear some additional motions on the antitrust and trade

19  secret --

20         MR. CERRITO:  We did, Your Honor.

21         THE COURT:  But I denied that.

22         MR. CERRITO:  You did.  Yeah, you're just

23  reminding us of the denial, Your Honor.

24         (Laughter.)

25         THE COURT:  No.  But once I rule on the

131

1  permanent injunction, I might look at it again to see

2  whether it's something a hearing to be scheduled or argument

3  on that, whether it makes sense or not.  I don't have it in

4  my head to understand whether -- you know, what the sort of

5  connections are at this time, but it did occur to me that I

6  might look at that after dealing with these issues.

7         MR. CERRITO:  Understood, Your Honor.

8         THE COURT:  All right.

9         (Whereupon, the following proceeding concluded

10  at 12:47 p.m.)

11              I hereby certify the foregoing is a true

12  and accurate transcript from my stenographic notes in the

13  proceeding.

14              /s/ Michele L. Rolfe, RPR, CRR

                    U.S. District Court

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that true and correct copies of the foregoing document were caused to be served on September 12, 2024 on the following counsel in the manner indicated below.

### <u>VIA EMAIL:</u>

Jack B. Blumenfeld
Jeremy Tigan
Cameron Clark
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
cclark@morrisnichols.com

F. Dominic Cerrito
Eric C. Stops
Evangeline Shih
Andrew S. Chalson
Gabriel P. Brier
Frank C. Calvosa
Catherine T. Mattes
Abigail DeMasi
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
nickcerrito@quinnemanuel.com
ericstops@quinnemanuel.com
evangelineshih@quinnemanuel.com
andrewchalson@quinnemanuel.com
gabrielbrier@quinnemanuel.com
frankcalvosa@quinnemanuel.com
catherinemattes@quinnemanuel.com
abigaildemasi@quinnemanuel.com

*Attorneys for Plaintiffs*

Dated:  September 12, 2024

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)