## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., | |
| Plaintiff, | |
| v. | C.A. No. 21-691-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | ████████████████ |
| Defendant. | ████████████ |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| Plaintiffs, | |
| v. | C.A. No. 21-1138-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | ████████████████ |
| Defendant. | ████████████ |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| Plaintiffs, | |
| v. | C.A. No. 21-1594-GBW |
| AVADEL CNS PHARMACEUTICALS, LLC, | ████████████████ |
| Defendant. | ████████████ |

## LETTER TO THE HONORABLE GREGORY B. WILLIAMS
## REGARDING ONGOING ROYALTY

Dear Judge Williams:

In its August 27 Opinion (D.I. 665), this Court found that Jazz is entitled to ongoing royalties for all sales of Lumryz for narcolepsy at a rate to be determined. Avadel addresses here the relevant factors to the determination of that ongoing royalty: (1) change in bargaining position; (2) changed economic circumstances; and (3) any post-verdict factors affecting a post-verdict hypothetical negotiation. D.I. 665 at 30-31. For the reasons that follow, there is no reason to depart from the 3.5% royalty amount determined by the jury; assuming *arguendo* there is a reason to depart from the jury's royalty determination, any upward adjustment must be limited.

Turning first to factors two and three, they squarely favor setting the ongoing royalty at the same 3.5% rate found by the jury, because little has changed since the pre-verdict hypothetical negotiation that led to that rate. Indeed, Jazz's damages theory at trial explicitly required the jury to consider the parties' predictions about how Lumryz would compete with Xyrem and Xywav in the period past the May 2023 hypothetical negotiation. The parties' predictions are holding true, as Dr. Mohan Rao confirms in his accompanying declaration ("Rao Decl."). Specifically, that Jazz and Avadel are now competitors in the market is not a changed economic circumstance; their competitor relationship was at the heart of Jazz's damages case at trial and resulted in the jury's 3.5% verdict. Nor are there any other changes falling under these two factors that favor a rate increase. Jazz previously tried to argue that Avadel is now a willful infringer—an alleged post-verdict change—but that is wrong. Jazz neither pled nor proved willful infringement, and "an enhancement for willfulness is not called for just because infringement continues after the entry of a verdict and judgment, otherwise enhanced damages would appear to be an appropriate factor in all decisions imposing a post-verdict ongoing royalty." *Philip Morris Prods. S.A. v. R.J. Reynolds Vapor Co.*, No. 1:20-cv393 (LMB/WEF), 2023 WL 2843796, at *12 (E.D. Va. Mar. 30, 2023), *appeal dismissed*, 2024 WL 413427 (Fed. Cir. Feb. 5, 2024).

Only the first factor—change in bargaining position—favors Jazz, and only slightly so. In this District, where the only difference post-verdict is a change in bargaining position, the jury's verdict will generally be given effect with no increase to the jury-awarded rate. Accordingly, Avadel respectfully proposes that the Court enter an order setting the ongoing royalty rate at **3.5%**.

Although Avadel believes that 3.5% is the most appropriate rate, Avadel is aware of cases that increase the jury-awarded rate solely due to the change in bargaining position. Avadel discusses those cases below. Those cases confirm that, to the extent the Court believes that a change in bargaining position justifies an increase in the jury-awarded royalty rate, an increase of more than a third of the jury-awarded rate would be excessive. Rather, should the Court determine that an increased rate is warranted—and Avadel submits that is not the case—that increase should be on the order of a ten- to twenty- percent increase, *i.e.*, the jury-awarded 3.5% rate should be increased to no more than **3.85%** (ten percent increase), **4.0%** (approx. fifteen percent increase), or, at most, **4.2%** (twenty percent increase).

## I.     The Jury-Awarded Royalty Rate Is the Correct Starting Point

As this Court held, "[g]enerally, the jury's damages award is a starting point for evaluating ongoing royalties." D.I. 665 at 31 (quotation omitted); *see also Vectura Ltd. v. GlaxoSmithKline LLC*, No. CV 16-638-RGA, 2019 WL 4346502, at *7 (D. Del. Sept. 12, 2019). In its original

motion, Jazz ignored the jury's verdict, instead advancing the same arguments that the jury considered and rejected. Those arguments should be summarily rejected. *See Vectura Ltd.*, 2019 WL 4346502, at *8 (declining to consider plaintiff's argument for an ongoing royalty that relied on same evidence considered and rejected by jury); *Purewick Corp. v. Sage Prods., LLC*, 666 F. Supp. 3d 419, 449 (D. Del. 2023) (awarding same jury-awarded 6.5% rate after rejecting patentee's argument that 6.5% rate set by jury "should be doubled because the jury's award is only a starting point").

Here, the jury-awarded rate was 3.5%.[1] That rate should be applied to net sales, which Jazz conceded at trial was the form of relief it was requesting—a running royalty applied to net sales. Ex.1 568:14-569:14.

## II.   The Changed Circumstance of Jazz's Stronger Bargaining Position Does Not Alone Warrant an Increase to the Jury-Awarded Rate

The Court found that "given Jazz's status as the prevailing party, the Court agrees that Jazz is in a stronger bargaining position." D.I. 665 at 31. As the Court further observed, courts "have increased the jury's royalty rate for ongoing infringement where 'there was evidence of changed economic circumstances, in addition to the patentee being in a stronger bargaining position.'" *Id.* (quoting *Purewick Corp.*, 666 F. Supp. 3d at 449). As a corollary, those cases also make clear that courts frequently do ***not*** increase the jury's royalty rate for ongoing infringement where the ***only*** changed circumstance post-verdict is the plaintiff's stronger bargaining position. In particular, while applying the Federal Circuit law holding that there is a change in bargaining position post-verdict, courts in this District have recognized that "the rationale behind this view is unclear given that the jury is required to award a rate negotiated by willing licensors and licensees who considered the patent(s) to be valid and infringed." *Purewick Corp.*, 666 F. Supp. 3d at 449 n.23; *see also Vectura Ltd.*, 2019 WL 4346502, at *7 n.10 ("[I]in the original hypothetical negotiation, the parties are assumed to be willing licensors and licensees and the patent is considered valid and infringed. After the trial, there is a jury verdict that the patent is valid and infringed. Thus, the jury verdict has not changed anything in that regard.").

*Purewick* is instructive. In *Purewick*, the court noted that "[a]lthough Plaintiff may be in a stronger bargaining position post-verdict, Plaintiff points to no other circumstances that indicate it would be able to negotiate a rate higher than the rate determined by the jury." 666 F. Supp. 3d at 449–50. The court accordingly set the ongoing royalty at the same 6.5% awarded by the jury. *Id.* Other cases in this District reached similar results:

- In *ArcherDx*, the court noted that there was no change post-verdict other than plaintiff's stronger bargaining position and accordingly set the ongoing royalty at the 7% rate awarded by the jury. *ArcherDX, LLC v. Qiagen Scis., LLC*, No. CV 18-1019 (MN), 2022 WL 4597877, at *15–16 (D. Del. Sept. 30, 2022).

---

[1] Avadel understands the Court to have considered and rejected Avadel's arguments that the Court could view the jury award as a fully-paid-up royalty, or as a determination that Avadel should pay a 3.5% royalty on 20% of Avadel sales. *See* D.I. 665 at 31-32. Avadel submits this letter brief with that understanding, while expressly preserving that argument for appeal.

- In *Vectura*, the court found that the only changed circumstance post-trial was that plaintiff was in a stronger bargaining position, and accordingly found that the 3% awarded by the jury was appropriate as an ongoing royalty. *Vectura Ltd.*, 2019 WL 4346502, at *7–8.

- In *EMC Corp.*, the court found "a lack of significant post-verdict change in economic circumstances between the parties counsels against increasing the royalty rate above the jury's award," such that the ongoing royalty should be set at the dollar amounts implied by the jury verdict. *EMC Corp. v. Zerto, Inc.*, C.A. No. 12-956 (GMS), 2017 WL 3434212, at *4 (D. Del. Aug. 10, 2017).

As explained *infra* Section III, this case fits this same fact pattern, and, accordingly, an ongoing royalty at the jury-awarded rate of 3.5% is appropriate.

Avadel acknowledges case law from other districts in which jury-awarded rates have been increased due to plaintiff's increased bargaining power. Those increases are, however, typically modest—on the order of an increase of ten to twenty percent, or, where the plaintiff decisively won on all issues at trial, by up to a third. For example, in *Philip Morris*, for one of two products at issue, the court found a change in bargaining position but no changed economic circumstances, and increased the royalty rate by ten percent, from 2% to 2.2%. *Philip Morris Prods. S.A*, 2023 WL 2843796, at *2, 12. As another example, in *Opticurrent*, the court increased the jury-awarded rate of 3% to 3.5%, *i.e.*, a roughly seventeen percent increase, which "adequately compensate[d] Opticurrent for its stronger post-verdict bargaining position." *Opticurrent, LLC v. Power Integrations, Inc*., No. 17-CV-03597-EMC, 2019 WL 2389150, at *18 (N.D. Cal. June 5, 2019), *aff'd*, 815 F. App'x 547 (Fed. Cir. 2020). Finally, a roughly twenty-two percent increase—from 2.88% to 3.5%—was awarded where the plaintiff's increased bargaining power supported an increase as did one *Georgia-Pacific* factor, with another factor favoring a decrease. *Mass Engineered Design, Inc. v. Planar Sys., Inc.*, No. 3:16-CV-1510-SI, 2018 WL 6059375, at *6 (D. Or. Nov. 19, 2018).

Avadel anticipates that Jazz may suggest that no bright-line rule exists proscribing an increase of more than 20% for a change in bargaining power. That is true. For example, in *I/P Engine, Inc.*, the court increased the jury-awarded rate of 3.5% to 4.6%, *i.e.*, by roughly thirty percent, as a result of changed circumstances relating to plaintiff's stronger bargaining position. *I/P Engine, Inc. v. AOL Inc.*, No. 2:11cv512, 2014 WL 309245, at *3–4 (E.D. Va. Jan. 28, 2014), *royalty vacated after patent invalidated on appeal*, No. 2:11-CV-512, 2016 WL 9667228 (E.D. Va. Jan. 29, 2016); *see also id.* at *4 (increasing jury-awarded 3.5% to 4.6% for bargaining position and increasing 4.6% rate by additional forty percent to 6.5% as willfulness enhancement, not applicable here). But the lack of bright line does not mean that Jazz can propose a nearly ***seven-hundred percent increase*** (3.5% adjusted to 27%) and suggest that increase merits serious consideration. Indeed, courts have rejected far smaller increases. For example, in *Opticurrent*, the court rejected plaintiff's requested two-thirds increase as "excessive" and instead awarded only a seventeen-percent increase, from 3% to 5%. 2019 WL 2389150, at *18. Similarly, in *Syntrix*, despite a decisive verdict completely in plaintiff's favor, the court rejected a fifty-percent increase, from 6% to 9%, instead awarding an 8% ongoing royalty, an increase of one-third. *Syntrix Biosystems, Inc. v. Illumina, Inc.*, No. C10-5870 BHS, 2013 WL 3089448, at *2 (W.D. Wash.

3

June 18, 2013).[2]   Stated differently, the fifty-percent increase that was too high in *Syntrix* corresponds to 5.25% being too high here.

Because the increase in bargaining position is the only post-verdict change here, as discussed below in Section III, Avadel submits that, consistent with *Purewick*, *Vectura*, *ArcherDx*, and *EMC Corp.*, the Court should award an ongoing royalty at a rate of 3.5%.   But if the Court concludes that an increase is warranted, then, as the cases above illustrate, that increase should be modest—an increase to 3.85%, 4%, or, at most, 4.2%.   This is not a case in which the jury decisively sided with the plaintiff.   To the contrary, jury deliberations were lengthy; the jury held one patent not infringed; and the jury awarded Jazz far less than it had sought in damages—a reasonable royalty in the amount of 3.5%, not the 27% that Jazz requested.

### III.   Post-Trial Economic Circumstances, Including Those Tied to a Post-Verdict Hypothetical Negotiation, Do Not Support an Increase to the Jury's Award

In considering changed economic circumstances, "the Court may consider the *Georgia-Pacific* factors."   *Purewick Corp.*, 666 F. Supp. 3d at 449.   But only ***changed*** circumstances are relevant.   *See Vectura Ltd.*, 2019 WL 4346502, at *7.   The parties should not "re-attack and re-litigate the evidence presented and considered in the pre-trial proceedings and at the trial in this case, as such evidence does not represent a changed circumstance between the parties."   *I/P Engine, Inc.*, 2014 WL 309245, at *3.

There are few relevant changed circumstances here, and none support an increase.

***First***, the hypothetical negotiation here occurred not years in the past, but a mere nine months before trial—late May 2023.   Ex.1 570:10-18 (Rainey).   That distinguishes this case from others in which years or a decade separated the hypothetical negotiation and the jury verdict, leading to markedly different circumstances as of the date of the verdict.   *See, e.g.*, *Genband US LLC v. Metaswitch Networks Corp.*, No. 2:14-CV-00033-JRG, 2018 WL 11357619, at *21 (E.D. Tex. Mar. 22, 2018) (adjusting jury-awarded royalty upwards by fifty percent due to greatly increased competition not anticipated as of 2005 hypothetical negotiation but present by 2016 verdict).

***Second***, Jazz posited at trial that the parties to the hypothetical negotiation would focus almost exclusively on ***future*** events, including future competition between Jazz and Avadel, and as a result, the jury heard and considered evidence about the economic circumstances expected to be present during the very same period of time covered by the ongoing-royalty motion.   As shown below, those predictions are proving accurate.   There is thus no economic reason to disturb the jury-awarded 3.5% rate.

---

[2] A decisive win for the plaintiff was likewise central to a roughly thirty-percent increase in *Plexxikon*, with the court increasing the 7% rate used by the jury to a rate of 9%.   *Plexxikon Inc. v. Novartis Pharms. Corp.*, 631 F. Supp. 3d 823, 851–52 (N.D. Cal. 2022)(taking into account large size of jury award (approx. $178m) when assessing plaintiff's post-trial bargaining power), *appeal dismissed*, 2023 WL 8931319 (Fed. Cir. Dec. 27, 2023).

4

*Georgia-Pacific* **Factor 3: Nature and Scope of the License, as Exclusive or Non-Exclusive.** At trial, Jazz's expert Dr. Rainey testified that at the hypothetical negotiation, the parties would negotiate over a license from Jazz to Avadel that "would be exclusive as to third parties" so that no third parties "would be allowed to use those patents." Ex.1 572:13-23. The court-ordered ongoing royalty is, however, a ***non-exclusive*** license—Jazz can grant licenses to other parties. Non-exclusive licenses are generally worth less than exclusive licenses. Rao Decl. ¶¶ 10-13. This changed circumstance favors ***lowering*** the ongoing royalty rate. Avadel is not asking for a rate below 3.5%; rather, this factor is yet another reason why no increase is warranted.

**Lumryz's Successes and Jazz's Failures (multiple *Georgia-Pacific* factors, including factors 9 & 10):** Lumryz has had a successful launch, and it is beginning to address the previously unmet need for a once-nightly oxybate. Rao Decl. ¶ 22. But that is not a changed circumstance. Dr. Rainey testified at trial that at the hypothetical negotiation, the parties were expecting Lumryz "to be a successful profitable product." Ex.1 585:18-586:2. As Dr. Rainey explained, as of the hypothetical negotiation, Lumryz was expected to fulfill a "serious unmet need for once-nightly dosing of sodium oxybate." Ex.1 586:10-14. The jury also heard that the May 2023 predictions were proving right through the time of trial—as of trial, "things [were] going according to plan" with the launch. Ex.1 588:14-20. Dr. Rao confirms that point. Rao Decl. ¶ 20.

The jury also heard extensive evidence that Jazz itself has never practiced the '782 patent and has no once-nightly product, which Dr. Rainey purported to take into account. Ex.1 602:13-16. Dr. Rainey agreed that as of the pre-trial hypothetical negotiation, Jazz was not contemplating selling its own once-nightly oxybate product in the future. Ex.1 602:25-603:6. That remains true today—based on public information, Jazz does not have a once-nightly oxybate product. *See* Rao Decl. ¶ 23. That is not a change, but is instead further confirmation that no increase to the rate is needed.

*Georgia-Pacific* **Factors 5 & 8: Whether Jazz and Avadel Are Competitors and Commercial Success Evidence.** Some courts have found changed circumstances where the parties unexpectedly began to compete after the hypothetical negotiation, *see, e.g.*, *Philip Morris Prods. S.A.*, 2023 WL 2843796, at *10 (finding it a significant changed circumstance under *GP #5* that plaintiff intended to "compete directly with [defendant] . . . , which was not considered in the first hypothetical negotiation"), but that consideration is not relevant here. Jazz's witnesses testified extensively at trial regarding Jazz's expectation that Avadel and Jazz would directly compete for narcolepsy patients, and Jazz asked the jury to take that competition into account when setting a rate. The fact that the parties are currently competing is therefore not a change in circumstances.

Indeed, Dr. Rainey labeled Jazz and Avadel "direct competitors." Ex.1 575:21-24. He pointed to statements by Avadel and others in the industry making clear that Lumryz competes with Xyrem, Xywav, and the authorized generic version of Xyrem, which is also a Jazz product. Ex.1 577:2-578:3. Dr. Rainey pointed jurors to Avadel predictions showing that "Lumryz was taking a big chunk of its patients from Jazz's products" many years into the future. Ex.1 579:1-15. Dr. Rainey testified that this direct competition should increase the reasonable royalty rate. Ex.1 578:4-6. The evidence on which Dr. Rainey relied about competition from Lumryz was not contested. Indeed, Avadel's CEO, Mr. Divis, forthrightly testified that "switching patients from" a Jazz product to Lumryz was "one of [Avadel's] primary goals and strategies." Ex.1 501:3-7.

Lumryz had been on sale for months as of the time Mr. Divis testified, and Mr. Divis openly conceded that competition between Jazz and Avadel was ongoing. Ex.1 531:20-532:16. Since trial, LUMRYZ continues to compete. *See* Rao Decl. ¶ 22. Dr. Rainey's predictions presented at trial have proved untrue in only one regard—███████████████████████████████ ████████████████ which puts downwards-pressure on the royalty rate. Rao Decl. ¶¶ 17-19.

Moreover, given Jazz's prior reliance on Pharmacy Benefit Manager ("PBM") pricing negotiations to show potential harm to Jazz, the fact of ongoing PBM negotiations is not a changed circumstance. At trial, Jazz elicited testimony that Avadel had reached agreements with the PBMs as to Lumryz. Ex.1 531:6-534:17 (Divis). Jazz highlighted a press release from Avadel from January 2024 noting that contracts were in place with 3 PBMs and that Lumryz had been given "preferred" status in some formularies. Ex.2; Ex.1 533:8-24. But on the subject of what the PBM negotiations meant for either Jazz's or Avadel's pricing, Jazz chose not to elicit any testimony either from Mr. Divis or from Jazz's witness, Mr. Honerkamp. Instead, Jazz chose to focus on the fact that "Avadel simply used the same price per gram as Jazz's drug Xywav to come up with its price for Lumryz" (Ex.1 536:4-9; *id.* at 509:23-510:15), in service of Jazz's trial theme that Avadel was "us[ing] Jazz's playbook" (Ex.1 530:7-8). Dr. Rainey then pointed to the entire body of Mr. Divis's testimony as supporting his view that Jazz and Avadel "are direct competitors." Ex.1 575:22-576:4. Having strategically chosen to present Avadel's pricing as "using Jazz's playbook" to the jury, Jazz cannot now claim that Avadel's continued use of those same pricing practices constitute a changed circumstance.

In sum, and as Dr. Rao confirms, the evidence available today regarding competition between Jazz and Avadel is consistent with the evidence presented to and considered by the jury— there is not more competition than Jazz predicted when it asked the jury for 27% and was awarded 3.5%. Rao Decl. ¶¶ 14-16. Accordingly, because Jazz already presented extensive evidence to the jury about how competition from Avadel should factor into the jury's reasonable royalty calculation, the parties' continued competition is not a "*new* economic circumstances that the Court should account for when calculating the ongoing royalty rate." *Plexxikon Inc.*, 631 F. Supp. 3d at 851–52 (increased competition not a changed circumstance where the parties had accounted for that possibility in evidence presented to jury).

## IV.   There Are No Other Relevant Post-Verdict Factors Affecting a Post-Verdict Hypothetical Negotiation

There are no other relevant post-verdict factors that need be considered here.

Avadel expects that Jazz may again argue that the Court should treat Avadel as a willful infringer and deem that as a changed circumstance meriting a substantial increase in the royalty rate. Courts have repeatedly rejected that argument: "an enhancement for willfulness is not called for just because infringement continues after the entry of a verdict and judgment, otherwise enhanced damages would appear to be an appropriate factor in all decisions imposing a post-verdict ongoing royalty." *Philip Morris Prods. S.A.*, 2023 WL 2843796, at *12; *see also, e.g.*, *Mass Engineered Design, Inc.*, 2018 WL 6059375, at *6 ("merely because a jury found that Mass's patent is valid and Planar's products infringe, that does not automatically convert Planar's [post-verdict] conduct into willful conduct under *Halo*"). Rather, if Jazz wanted the ongoing royalty to be enhanced for willfulness, it was obligated to plead and prove willful infringement before the

jury, and then **also** show this Court through the application of the *Read* factors that an enhanced ongoing royalty was warranted.  *See Vectura Ltd.*, 2019 WL 4346502, at *8 (declining to enhance ongoing royalty against adjudicated willful infringer because the *Read* factors did not support enhancement).

Avadel, however, has never been accused of willful infringement in this case, as Jazz elected not to assert willful infringement, presumably due to Jazz's choice to keep the '782 patent a secret until the day that Jazz sued on it.  Ex.1 547:8-19.  Moreover, Avadel made its investment in Lumryz before the asserted claim 24 of the '782 patent even existed.  D.I. 665 at 13.  And "[e]ven if post-verdict infringement pursuant to a court-ordered ongoing royalty could be considered intentional or deliberate infringement, the standard for awarding enhanced damages has not been met because" Avadel's is not behaving egregiously, so as to "warrant[] the punitive sanction of enhanced damages."  *Philip Morris Prods. S.A.*, 2023 WL 2843796, at *12 (no enhancement to ongoing royalty because no egregious behavior); *see also Vectura Ltd.*, 2019 WL 4346502, at *8 (*Read* factors did not support enhancement).  Again, Avadel made its investment in Lumryz before claim 24 even existed—Avadel cannot possibly be said to be "'willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate.'"  *Mass Engineered Design, Inc.*, 2018 WL 6059375, at *6 (D. Or. Nov. 19, 2018) (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1928 (2016)).  The jury's verdict confirms the point.  The jury declined to award Jazz the 27% royalty rate it had requested; the jury's determination that "ordinary" damages suffice to compensate Jazz carries through to the post-trial phase as well.  *EMC Corp.*, 2017 WL 3434212, at *5 (declining to enhance ongoing royalty even after conclusion of merits appeal where defendant was not found a willful infringer at trial).

That Avadel was not found to be a willful infringer—and indeed was not even accused of willful infringement—distinguishes this case from those in which the ongoing royalty was increased more substantially.  For example, in *Joyal Products*, the court's 225% increase of the jury-awarded rate, from 8% to 26%, came about after the defendant **stipulated to willful infringement**; with "eight of the nine Read factors weigh[ing] in favor of enhanced damages."  *Joyal Prods., Inc. v. Johnson Elec. N. Am., Inc.*, No. CIV. A. 04-5172 JAP, 2009 WL 512156, at *9 (D.N.J. Feb. 27, 2009), *aff'd*, 335 F. App'x 48 (Fed. Cir. 2009); *see id.* at *13-14.

## V.  Conclusion

For the foregoing reasons, Avadel respectfully submits that the Court should enter an order setting the ongoing royalty rate at 3.5% of net sales.[3]  A proposed order providing for the timing of payments (payments made quarterly at set intervals following quarter-end) is submitted with this letter.

---

[3] The Court has set a schedule for briefing on judgment as a matter of law following entry of judgment.  If Avadel's forthcoming JMOL motion is granted, or if the jury's verdict on liability is overturned on appeal, no ongoing royalties would be due; Avadel makes it submission here without waiver of its JMOL and appeal arguments.

Respectfully submitted,

*/s/ Daniel M. Silver*

Daniel M. Silver (#4758)

cc:     All counsel of record (via CM/ECF and E-Mail)

# EXHIBIT 1

1

2                    IN THE UNITED STATES DISTRICT COURT

3                    IN AND FOR THE DISTRICT OF DELAWARE

4
    JAZZ PHARMACEUTICALS, INC.,              )
5            Plaintiffs,                      )      C.A. No.
    v.                                        )      21-691-GBW
6                                             )
    AVADEL CNS PHARMACEUTICALS, LLC,          )
7            Defendant                        )
    --------------------------------          )
8                                             )      C.A. No.
    JAZZ PHARMACEUTICALS, INC., et al.,       )      21-1138-GBW
9            Plaintiffs,                       )
    v.                                        )
10                                            )
    AVADEL CNS PHARMACEUTICALS, LLC,          )
11   Defendant.                               )
    --------------------------------          )
12                                            )
    JAZZ PHARMACEUTICALS, INC., et al.,       )
13           Plaintiffs,                       )      C.A. No.
    v.                                        )      21-1594-GBW
14                                            )
    AVADEL CNS PHARMACEUTICALS, LLC,          )
15           Defendant.                       )

16

17                          - - - -

18                      Wilmington, Delaware
                        Tuesday, February 27, 2024
19                      Trial Day 2

20                          - - - -

21
     BEFORE:   HONORABLE GREGORY B. WILLIAMS
22             UNITED STATES DISTRICT COURT JUDGE

23                          - - - -

24

25
                              Michele L. Rolfe, RPR, CRR

DIRECT EXAMINATION - GREGORY DIVIS

1    A.    Yes.

2    Q.    You held that role until May 2019; yes?

3    A.    Yes.

4    Q.    So an interim CEO is someone who leads a company for

5    a temporary time, correct?

6    A.    Yes.

7    Q.    And then in May, Avadel decided that your role was

8    not going to be temporary and they made you the full-time

9    CEO; true?

10   A.    Yes, that's true.

11   Q.    And that's the role that you currently have today;

12   yes?

13   A.    Yes.

14   Q.    Okay.  And now, although you're the CEO of a

15   pharmaceutical company, you don't have any degrees or formal

16   training in science or medicine, correct?

17   A.    Yes, that's correct.

18   Q.    Okay.  And you're not a medical doctor, right?

19   A.    I am not.

20   Q.    Okay.  And your degree is in communications; true?

21   A.    Yes.

22   Q.    And you came to Avadel from a private equity firm;

23   true?

24   A.    Yes, that's true.

25   Q.    Okay.  And now this trial, as you know, involves an

DIRECT EXAMINATION - GREGORY DIVIS

1   from Houston, I talk fast.

2   A.    No worries.

3   Q.    Okay.  Now, switching patients from twice-nightly

4   oxybate product to Avadel's once-nightly oxybate product is,

5   in your words, certainly a goal for Avadel, isn't it?

6   A.    Yes, it's one of our primary goals and strategies,

7   amongst a few.

8   Q.    Right.  Because according to you, sir, it would be in

9   Avadel's financial benefit to switch as many of those

10  roughly 16,000 patients who are currently on twice-nightly

11  oxybate to once-nightly oxybate, correct?

12  A.    It certainly would, but, you know, ultimately that

13  decision is with the patient and physician, yes.

14  Q.    Right.  Right.  But the decision that would be made

15  would benefit Avadel financially, correct?

16  A.    Yes.

17  Q.    And also you personally, correct, because of the

18  bonus and the stocks?

19  A.    Yes.

20  Q.    Okay.  Now, Mr. Divis, one of the patient populations

21  Avadel targets, it's people who have never taken an oxybate,

22  right?

23  A.    Yes, that's correct.

24  Q.    Okay.  And another category would be people who tried

25  twice-nightly oxybates but stopped using them, correct?

DIRECT EXAMINATION - GREGORY DIVIS

1   Q.      Okay.  Now it states here that, "Lumryz is off to a

2   strong start," right?

3   A.      Yes.

4   Q.      Okay.  And Avadel says that, "Lumryz has the

5   potential to become the leading oxybate in narcolepsy and

6   exceed $1 billion in annual sales," correct?

7   A.      Yeah, that's what our research tells us.

8   Q.      Yeah.

9   A.      And we think that potential is there for us.

10  Q.      Right.  And this is what you're telling the people

11  who either you have their money or you want their money?

12  A.      Investors, yeah.

13  Q.      Yeah, there you go.

14          Now let's go back for a second to when Lumryz

15  was first approved by the FDA, I believe you -- again, you

16  were here yesterday and you recall seeing the document, the

17  May 1st, the May 1st, 2023 --

18          MR. PORTER:  I'm sorry, this is already in

19  evidence, Your Honor, we'll just pull it up, the press

20  release.

21  A.      Yes.

22  BY MR. PORTER:

23  Q.      Okay.  And Avadel sent out a press release that day

24  talking about Lumryz, right?

25  A.      Yes.

DIRECT EXAMINATION - GREGORY DIVIS

1    for all eligible treated patients, increasing oxybate

2    utilization overall and importantly so, helping even more

3    patients in the $3 billion plus once-at-bedtime oxybate

4    market."

5            Did I read that correctly, sir?

6    A.    Yes.

7    Q.    That's what you said, right?

8    A.    That's what I said, yes.

9    Q.    Okay.  And now you know, you know who Mr. Richard Kim

10   is, as well, correct?

11   A.    I do.

12   Q.    He is Avadel's chief operating officer?

13   A.    He's our chief commercial officer.

14   Q.    Chief commercial officer, okay.

15           And Mr. Kim spoke at this as well, didn't he?

16   A.    Yes, he did.

17   Q.    Okay.  And we're going to go to -- if you go with me

18   to 118.6.

19   A.    Okay.

20   Q.    Okay.  If you see the fourth paragraph down starting

21   with, "Before I move on..."

22   A.    Yes.

23   Q.    Okay.  And do you see where Mr. Kim in that last

24   sentence he says, "We are pricing Lumryz on a per-gram basis

25   at parity with a branded twice-nightly mixed salt product to

DIRECT EXAMINATION - GREGORY DIVIS

1   be at $64.67 per gram"?

2   A.     Yes.

3   Q.     Okay.  And "by parity," he meant the same price per

4   gram, right?

5   A.     Yes.

6   Q.     Okay.  And so -- and the twice-nightly mixed salt

7   product he was referring to is owned by Jazz, right?

8   A.     Yes, it's Xywav.

9   Q.     Xywav, that's what he's talking about?

10  A.     Yes.

11  Q.     Okay.  So he's pricing Lumryz, which you take

12  once-nightly, the same as Xywav, which is the lower sodium

13  product -- Lumryz, you take once at bedtime; Xywav, which

14  you take twice, correct?

15  A.     Yes, that's correct.

16  Q.     Okay.  And Avadel also posted investor slides for the

17  May 1, 2023 call, correct?

18  A.     Yes.

19  Q.     Okay.

20  A.     We did.

21  Q.     If you'll go with me to PTX295.

22          MR. PORTER:  Your Honor, that may be in

23  evidence, but I move to admit now if not, and I don't think

24  there's an objection to that.

25          MS. DAVIS:  No objection.

DIRECT EXAMINATION - GREGORY DIVIS

1    Q.    And whenever you're ready, sir.

2    A.    Sure.

3    Q.    Okay.  Ready?

4    A.    Yes.

5    Q.    And this is the January -- this is January 2024,

6    correct?

7    A.    Yes.

8    Q.    Okay.  So just last month?

9    A.    Just last month, yes.

10   Q.    Okay.  And this document is a -- Avadel's

11   January 2024 investor slides, correct?

12   A.    Yes.

13   Q.    Okay.  And Avadel is, at this time -- well, let's

14   just go -- if you could go with me to 1899.7, yeah.

15         So Avadel is still reporting a greater than

16   $1 billion opportunity for Lumryz in the U.S., right?

17   A.    Yeah, same slides from the commercial day earlier --

18   Q.    Right.

19   A.    -- in June of 2023.

20   Q.    Right.  And -- but if something was off or wrong

21   about previous slides, you would update them.  You wouldn't

22   put incorrect information -- or keep incorrect information

23   in a slide deck, right?

24   A.    No, that's correct.

25   Q.    Okay.

DIRECT EXAMINATION - GREGORY DIVIS

1    Q.      Okay.  And do you see where it says that Avadel wants

2    to make a no-to-low-sodium once-at-bedtime?

3    A.      Yeah, we've been working, you know, on different

4    prototypes and formulations to see if we could offer a

5    once-at-bedtime option for those patients potentially as

6    well.

7    Q.      Okay.  So in addition to using Jazz's clinical work,

8    Avadel also uses Jazz's playbook too, right?

9    A.      Well, if you based the playbook on feedback from

10   physicians who say, When are you going to get pediatrics,

11   when were you going to study it in IH, when are you going to

12   do a low or no sodium for those -- you know, I think that

13   our customers help shape that as well.

14   Q.      But as does Jazz, because it's right here in your

15   presentation, right?

16   A.      They certainly have all of that, right.

17   Q.      And have helped Avadel along the way, right?

18   A.      Through the regulatory pathways --

19   Q.      Sure.

20   A.      -- that the FDA allows us to do, yes.

21   Q.      Yeah.  Okay.

22           Now, if we could go to 1899.22.  And do you see

23   where it talks about Lumryz market opportunity is greater

24   than 50,000 patients and is extremely well positioned in all

25   3 patient segments?

DIRECT EXAMINATION - GREGORY DIVIS

1    A.      Yes.

2    Q.      Okay.  And that would be patient segments for

3    narcolepsy, right?

4    A.      Yeah, these are patients who would -- who are

5    narcolepsy patients, people with narcolepsy.

6    Q.      Right.  Right.  Now, on January 8th, 2024, Avadel

7    issued a press release with some 2023 highlights, correct?

8    A.      Yes, we did.

9    Q.      Okay.  And if we could go to in your notebook

10   PTX1901.

11              MR. PORTER:  And, Your Honor, I'd like to now

12   move that into evidence.  I don't believe there's an

13   objection.

14              MS. DAVIS:  No objection, Your Honor.

15              THE COURT:  All right.  PTX1901 is admitted.

16              (Exhibit admitted.)

17              MR. PORTER:  And if we could blow that up there,

18   that would be great.

19   BY MR. PORTER:

20   Q.      And you see this is January 8th, 2024, and this is

21   the press release, sir?

22   A.      Yes, it is.

23   Q.      Okay.  And it has some -- some words here, that --

24   you know, that it's putting forth to the public, right?

25   A.      Yes.

DIRECT EXAMINATION - GREGORY DIVIS

1    Q.      It talks about more than 1,000 patients initiating

2    therapy through December 31st?

3    A.      Yes.

4    Q.      And that's December 31st of 2023, right, because this

5    is a look-back?

6    A.      Yes, it is.  Yeah.

7    Q.      Okay.  And Avadel also reported that "the majority of

8    Ryzup" -- R-Y-Z-U-P, or Ryzup, I'll call it -- "enrollments

9    and patients currently being treated with Lumryz are

10   patients who switched from first-generation oxybates,"

11   correct?

12   A.      Yeah, the majority of those patients enrolled and who

13   have initiated therapy have been switched patients.

14   Q.      Okay.  And, again, the "first-generation oxybate"

15   refers to Jazz's Xyrem and Xywav products, correct?

16   A.      And the authorized generic.

17   Q.      Okay.  And the press release also reports on certain

18   contracts being in place, correct?

19           MR. PORTER:  Your Honor, I think one of the

20   jurors needs a break.

21           THE COURT:  Okay.  All right.  We'll take a

22   break.  Let the jury use the bathroom.

23           Let's take a 10-minute break at this time.

24           All right.  We'll come back at 3:40 p.m.

25           (Recess taken.)

DIRECT EXAMINATION - GREGORY DIVIS

1          (Whereupon, the jury entered the room.)

2          MR. PORTER:  May it please the Court?

3          THE COURT:  Yes.

4          MR. PORTER:  Thank you, Your Honor.

5          If we could pull back up, I think we were on

6     PTX1901, Derreck.

7     BY MR. PORTER:

8     Q.    So, Mr. Divis, where -- we left off talking about

9     RYZUP and on the same page of this press release from

10    January, it also reports on certain contracts being in

11    place, correct?

12    A.    Yes, it does.

13          MR PORTER:  Okay.  If you could pull those up,

14    and scroll -- the sign.  There we go.  Perfect.

15    BY MR PORTER:

16    Q.    So there are terms here like GPO entities or

17    including, you know, Emisar that may be unfamiliar to some

18    people, but basically this means that Avadel has gotten

19    contracts in place relating to getting Lumryz covered by

20    insurance, right?

21    A.    Yeah, I would think of it as the entity above, kind

22    of the contracting entity, that, then, you have to work down

23    through that entity to try to get actual coverage, but the

24    contract is first.

25    Q.    Right.  Okay.

DIRECT EXAMINATION - GREGORY DIVIS

1              So, again, this is just further showing Avadel's

2    plan to move forward towards that potential greater than

3    $1 billion market?

4    A.    I would define that as fairly ordinary coursework

5    that everyone in the industry does to try to get your drug

6    reimbursed by insurance companies.

7    Q.    But when you get reimbursed by a insurance company,

8    you're making revenue for Avadel, correct?

9    A.    That's correct.

10   Q.    That's money into the company, correct?

11   A.    Yes, it is.

12   Q.    And that's going to be money that will help you to

13   reach the goal of getting to over a billion dollars,

14   correct, in sales, that's just -- I'm not trying to dispute

15   where the money comes from but that is something that will

16   help you get to that target, right?

17   A.    It's a step in the process to build Lumryz.

18   Q.    Great.  All right.  Let's finish up on the

19   relationship between Jazz.

20              So at the end of the day, Mr. Divis, as we've

21   talk about over the course of the last hour or so, Avadel

22   admits that it did in fact try to get Jazz's help to work

23   with and develop Lumryz, right?

24   A.    Well, we entered into a mutual discussion to see if

25   there was a potential collaboration that we talked about

DIRECT EXAMINATION - GREGORY DIVIS

1   you know, almost half of our kind of pie, so to speak, and

2   ultimately it's up to the physician of the patient to do

3   what's right for that patient.

4   Q.    And as we saw from your, I think chief commercial

5   officer or chief operating officer, Avadel simply used the

6   same price per gram as Jazz's drug Xywav to come up with its

7   price for Lumryz, right?

8   A.    We made a decision to price at parity to Xywav and

9   less than Xyrem, yes.

10  Q.    Yeah, okay.

11              Thank you, sir.

12              MR. PORTER:  Pass the witness.

13              MS. DAVIS:  Permission to approach with binders,

14  Your Honor?

15              THE COURT:  Okay.

16              MS. DAVIS:  May I proceed, Your Honor?

17              THE COURT:  You may.

18                     DIRECT-EXAMINATION

19  BY MS. DAVIS:

20  Q.    Good afternoon, my name is Kira Davis and I represent

21  Avadel.

22              Mr. Divis, to cover background, where are the

23  main Avadel offices?

24  A.    The main offices are just outside of St. Louis,

25  Missouri, in a little suburb called Chesterfield, Missouri.

DIRECT EXAMINATION - GREGORY DIVIS

1    A.      No, no.   Never.

2    Q.      During Project Zeta, did Jazz ever say anything about

3    having any patents that might apply to the formulation of

4    Lumryz?

5    A.      No, never.

6    Q.      Before this lawsuit started, was Avadel doing any

7    monitoring of Jazz patents?

8    A.      Yeah, I -- yeah, I think it's fairly standard in our

9    industry that people monitor what's going on in their

10   respective areas.

11   Q.      The '782 patent, when did you find out that Jazz had

12   the claims that are in that patent?

13   A.      I believe we found out when they sued us on that

14   patent.

15   Q.      Why didn't you find out earlier?

16   A.      As I understand, that patent was filed

17   confidentially, there's -- so not visible to the public.

18   There's -- you know, that's a pathway you could take, so we

19   had no idea.

20   Q.      What about the other patent, the '488 patent, did

21   Jazz ever mention that patent to you?

22   A.      No, they didn't.

23   Q.      So Project Zeta ends, what happened with the Lumryz

24   clinical trials after you made the decision to focus on

25   Lumryz?

DIRECT EXAMINATION - MARK RAINEY

1    133, 135, 136, 137, 138, 140, 142 and 266 are admitted.

2                    (Exhibit admitted.)

3                    MS. THOMPSON:  Thank you, Your Honor.

4    BY MS. THOMPSON:

5    Q.     Dr. Rainey, did you form an opinion as to the

6    appropriate amount of past damages that the jury should

7    award Jazz even if Avadel's found to have infringed?

8    A.     Yes, I did.

9    Q.     And did you prepare anything today to help the jury

10   understand your opinion.

11   A.     Yes, I prepared some slides.

12   Q.     Okay.  Well, let's take a look at the first slide,

13   it's PDX2.

14                    And what was your opinion as to the appropriate

15   royalty rate for past damages?

16   A.     It's shown there, it's 27 percent.

17   Q.     And how do you convert that royalty rate into a

18   monetary figure?

19   A.     In order to convert that into damages, you apply the

20   royalty rate to what's called a royalty base and here, I

21   determined that the appropriate royalty base was the net

22   sales of Lumryz since launch which is shown there is

23   about -- I calculated to be about $32.5 million.

24   Q.     And so using that royalty rate and royalty base, what

25   is your opinion as to the value of past damages?

DIRECT EXAMINATION - MARK RAINEY

1   A.      Yes, you multiply those two numbers together and you

2   get about $8.8 million.

3   Q.      Now, what is a reasonable royalty?

4   A.      You know, it's kind of those things with a reasonable

5   royalty as the royalty that a willing licensor and a willing

6   licensee would agree to for a license to patents if they got

7   together and negotiated about it.

8   Q.      And what exactly is a license?

9   A.      A license is when, if you own a patent, you grant

10  someone else the right to use that patent.

11  Q.      And why did you look at reasonable royalty in

12  assessing damages in this instance?

13  A.      Because the law surrounding patent damages says that

14  it's appropriate to look at a reasonable royalty.

15  Q.      Okay.  Let's go ahead to your next slide here.

16          Is this one of the laws you're talking about?

17  A.      Yes.

18  Q.      And why did you underline here "for the use made of

19  the invention by the infringer"?

20  A.      It's just because, you know, we've heard some

21  testimony in the past couple of days about how Jazz does not

22  have a once-nightly product or uses these patents.  But

23  really focuses on the use made of the invention by the

24  infringer and the alleged infringer here is Avadel, which is

25  accused of using the patents.

DIRECT EXAMINATION - MARK RAINEY

1  Q.      And what is the framework by which you assess what a

2  reasonable royalty would be?

3  A.      I use a framework called a hypothetical negotiation.

4  Q.      Okay.  And what is a hypothetical negotiation as a

5  general matter?

6  A.      Yeah, so a hypothetical negotiation is, you get the

7  patent owner, the accused infringer, you assume that they

8  got together at the time of first infringement and

9  negotiated a license to the patents-in-suit.

10 Q.      Okay.  Let's go to your next slide.

11         For the hypothetical negotiation you looked at

12 here, who are the parties to the negotiation?

13 A.      Yeah, the two parties are Jazz, which is the patent

14 owner, and Avadel, which is the accused infringer.

15 Q.      And what was the timing of the negotiation?

16 A.      It's at or about the time of first infringement,

17 which in this case is, you know, somewhere around late May,

18 early June of 2023.

19 Q.      And what do the parties assume at the time of the

20 hypothetical negotiation as to validity and infringement?

21 A.      Both parties would assume that the patents-in-suit

22 are valid, infringed and enforceable.

23 Q.      And what type of royalty did you consider in the

24 context of the hypothetical negotiation?

25 A.      Yeah, I determined that the parties would end up

DIRECT EXAMINATION - MARK RAINEY

1    company that has patents but doesn't sell products, you

2    might want to go out and find companies that you could

3    license your patents to to make some money.  So that would

4    be a licensing program.

5    Q.     And does Jazz have a licensing program?

6    A.     No, we heard, I think it was Mr. Honerkamp,

7    yesterday, talk about that.  They're focussed on selling

8    their own products, developing and selling their own

9    products, not licensing patents.

10   Q.     And how does the fact that Jazz does not have a

11   licensing program affect the reasonable royalty analysis?

12   A.     That tends to affect the reasonable royalty.

13   Q.     And did you consider the nature and scope of the

14   license the parties would agree to as part of your

15   hypothetical negotiation analysis?

16   A.     Yes.

17   Q.     And what did you determine?

18   A.     I determined it would be -- the license that they

19   would negotiate would be exclusive as to third parties and

20   all that means is that Jazz would grant Avadel a right to

21   use the patents, Jazz would retain the right to use those

22   patents itself, but then no other parties would be allowed

23   to use those patents.

24   Q.     Are you aware of any customary royalty rate for

25   technologies like the patents we're talking about in this

DIRECT EXAMINATION - MARK RAINEY

1    A.      Yes, I think both days probably.

2    Q.      Did you look at Project Zeta in conducting your

3    analysis?

4    A.      Yeah, I considered it.

5    Q.      And what did you determine about the relevance of the

6    Project Zeta in negotiations to the reasonable royalty rate?

7    A.      Yeah, it didn't establish a royalty rate for the

8    patents-in-suit, you know, not comparable.

9    Q.      And if you heard or know, when did those Project Zeta

10   negotiations occur?

11   A.      Those occurred in 2018, so about 5 years prior to the

12   date of the hypothetical negotiation.

13   Q.      And in that negotiation, what was the proposed

14   relationship between Jazz and Avadel as opposed to their

15   relation in a hypothetical negotiation?

16   A.      Yeah, as we just heard Mr. Divis testify, it was more

17   of a partnership that they were considered in Project Zeta,

18   whereas, a hypothetical negotiation, the two companies would

19   be viewing each other as competitors; they'd be selling

20   competing products if a license were granted.

21   Q.      Okay.  Let me ask you about competing products.

22           In your opinion, what's the commercial

23   relationship between Jazz and Avadel?

24   A.      They are direct competitors.

25   Q.      And what are the facts that led you to conclude that?

1   A.      You know, information from Avadel, third parties, you

2   know, information we've heard testimony about the past

3   couple of days as well is all the type of information we've

4   considered.

5              MS. THOMPSON:  Your Honor, at this point in time

6   I would like to move into evidence Exhibit JTX113.

7              MS. DAVIS:  No objection.

8              THE COURT:  JTX113 is admitted.

9              (Exhibit admitted.)

10  BY MS. THOMPSON:

11  Q.      And, Dr. Rainey, what is this document?

12  A.      This is a document Avadel filed with the Securities

13  and Exchange Commission.

14  Q.      So it's a financial document filed with the

15  government?

16  A.      Yes, it has financial and business information.

17  Q.      And did you consider this document in forming your

18  opinion here?

19  A.      Yes.

20  Q.      All right.  Let's look at the date.  Can we go to

21  page 113.182, please.

22              And what is the date that Avadel submitted this

23  to the SEC?

24  A.      Yeah, the date of the signature there is March 29,

25  2023, so just a couple of months before the hypothetical

DIRECT EXAMINATION - MARK RAINEY

1    negotiation.

2    Q.    Okay.  And let's jump back to page 113.11.

3          And looking at that italicized heading at the

4    top there, what did Avadel tell the U.S. government in that

5    filing?

6    A.    It's -- they are telling the government that if

7    Lumryz is granted final FDA approval, it will compete with

8    the currently approved twice-nightly oxybate formulations,

9    which we know are Jazz's products, Xyrem and Xywav.

10         Later on in that paragraph, it says that they

11   are also -- it also would compete with the authorized

12   generic version of Xyrem, which is, again, another Jazz

13   product, Mr. Mindus talked about it, Avadel, I'll call it

14   Xyrem HE for short.

15   Q.    Okay.  And was Lumryz, in fact, approved before the

16   hypothetical negotiation?

17   A.    Yes.  Yeah, as we've heard, it was approved May 1st

18   of 2023.

19         MS. THOMPSON:  We can take that down, thank you.

20   BY MS. THOMPSON:

21   Q.    Did you consider any industry research reports from

22   the relevant time period discussing whether Jazz and Avadel

23   are direct competitors?

24   A.    Yes.

25   Q.    And what did those industry research reports say?

DIRECT EXAMINATION - MARK RAINEY

1    A.      They said the same thing as what Avadel was telling

2    the government, that Lumryz would be competing with Xyrem

3    and Xywav, Xyrem AG.

4    Q.      And how does the fact that Jazz and Avadel are direct

5    competitors affect the reasonable royalty?

6    A.      It tends to increase the reasonable royalty.

7    Q.      All right.  Did you consider Avadel's forecast for

8    Lumryz in forming your opinion as to the reasonable?

9    A.      Yes, I did.

10          MS. THOMPSON:  Let's go ahead and pull up PTX5.

11   BY MS. THOMPSON:

12   Q.      And this is a slide from Exhibit JTX129, Avadel's

13   May 2023 Lumryz forecast.

14          On this slide, what does conversion in this

15   context refer to?

16   A.      Yeah, so conversion is essentially -- we heard

17   Mr. Divis talked about switching, so patients being switched

18   from Jazz products to Lumryz.  That's what this conversion

19   category represents.

20   Q.      All right.

21          MS. THOMPSON:  Let's go to the next slide.

22   BY MS. THOMPSON:

23   Q.      Is this a chart you made based on Avadel's forecast

24   that -- on JTX129?

25   A.      Yes.

DIRECT EXAMINATION - MARK RAINEY

1   Q.      Okay.  And what does the conversion percent row in

2   this chart show?

3   A.      It just indicates of the total Lumryz patients in

4   their forecast from 2023 to '28, you know, what's the share

5   of total Lumryz patients that are conversion or switch

6   patients.

7   Q.      Okay.  And what is that percent?

8   A.      So it starts off at about 54 percent in 2023, and

9   then by 2028, it's about 40 percent.

10  Q.      Now, what is the relevance to the hypothetical

11  negotiation of the fact that Avadel was forecasting patients

12  would be switching from Xyrem and Xywav to Lumryz?

13  A.      It just indicates that there was extensive

14  competition between Avadel to Jazz because Lumryz was taking

15  a big chunk of its patients from Jazz's products.

16  Q.      Did you consider any other information showing

17  Avadel's targeting of switching patients from Xyrem and

18  Xywav?

19  A.      Yes.

20  Q.      All right.

21          MS. THOMPSON:  Let's go to the next slide.

22  BY MS. THOMPSON:

23  Q.      This is a slide from Exhibit PTX295, Avadel's May 1

24  Investor Day presentation from 2023.

25          Did you rely on this document in your analysis?

DIRECT EXAMINATION - MARK RAINEY

1    again, they are assumed to be valid and infringed.  And it's

2    also, again, my understanding that the patents are what

3    allow for that once-nightly formulation, which we've seen

4    is viewed as the key to success of Lumryz.

5    Q.    And what's your understanding of whether the value

6    that Jazz's patents-in-suit contribute to Lumryz can be

7    separated from the value of Lumryz as a whole?

8    A.    Yeah, I don't think it's really possible to do that

9    because my understanding is that the patents cover the

10   formulation of Lumryz as a whole.  So the only product that

11   exists that's FDA approved is the whole formulation of

12   Lumryz, it's not like Lumryz is a cell phone where you can

13   think about there being different components that you could

14   sell or put together, like a processor or a screen or a

15   camera, right, that goes onto your cell phone.

16              With Lumryz, it's just the whole formulation and

17   that's what is FDA approved.

18   Q.    Okay.  What would the parties have understood about

19   the likely success of Lumryz at the time the hypothetical

20   negotiation took place?

21   A.    They would expect -- they were expecting it to be a

22   successful profitable product at the time.

23   Q.    And why did Avadel think there would be a demand for

24   Lumryz, in your opinion?

25   A.    This relates to something we heard Mr. Divis talk

DIRECT EXAMINATION - MARK RAINEY

1    about, which is the unmet need that Avadel viewed Lumryz

2    fulfilling.

3    Q.     Okay.

4             MS. THOMPSON:  Let's go to the next slide, 14.

5    BY MS. THOMPSON:

6    Q.     This is showing excerpts from Exhibits PTX295 and

7    JTX137.  Did you rely on these documents in forming your

8    opinion?

9    A.     Yes.

10   Q.     And what does this show about Avadel's statements

11   regarding Lumryz addressing an unmet need?

12   A.     Yes, this is Avadel talking about there being a

13   serious unmet need for once-nightly dosing of sodium

14   oxybate.

15   Q.     And what was Avadel telling people --

16            MS. THOMPSON:  If we could go to the next slide.

17   BY MS. THOMPSON:

18   Q.     -- about the expected sales of Lumryz around the time

19   of the hypothetical negotiation?

20   A.     Yeah, as we've heard, they were telling investors

21   that the peak sales opportunity was over $1 billion a year.

22            MS. THOMPSON:  Can we go ahead to the next

23   slide, and this is showing excerpts of Exhibits JTX119 and

24   PTX300.

25   BY MS. THOMPSON:

DIRECT EXAMINATION - MARK RAINEY

1   Q.      What was Avadel saying at the time of the

2   hypothetical negotiation about the expected market share of

3   Lumryz?

4   A.      They were saying that they were expecting Lumryz to

5   become the market leader with a market share in the range of

6   50-60 percent.

7   Q.      What about Avadel's financial models with respect to

8   Lumryz's likely success?  Did you consider those?

9   A.      Yes.

10          MS. THOMPSON:  All right.  Let's go ahead and

11  look at Exhibit -- let's go to the next slide, I guess,

12  PDX17.

13  BY MS. THOMPSON:

14  Q.      And this is from Exhibit JTX130, and at the top, it

15  says, "May 2023 Avadel Financial Model."

16          Is that what that exhibit is?

17  A.      Yes.

18  Q.      Okay.  And what's Avadel forecasting here?

19  A.      They're forecasting revenues and various measures of

20  profit for Lumryz for the period that's shown here, which is

21  2023-2036.

22  Q.      As of May 2023, what was Avadel forecasting in that

23  revenue for Lumryz?

24  A.      They are forecasting net revenue to start off at

25  about ████████ in the launch year 2023, but significant

DIRECT EXAMINATION - MARK RAINEY

1    growth ███████████████████████████ this year, 2024, and

2    increasing to ███████████████████

3    Q.     And just -- can you just explain, what is net revenue

4    as compared to gross revenue?

5    A.     Oh, sure, yeah.  So net revenue -- the difference

6    between gross revenue to net revenue is essentially

7    discounts and rebates.  So you can think about gross revenue

8    representing the list price, sticker price, but then after

9    discounts and rebates, you get net revenue, which is the

10   money actually coming into the door at Avadel.

11   Q.     Okay.  And as of May 2023, when was Avadel

12   forecasting that it would turn a profit?

13   A.     ██████████████████████

14   Q.     And what's your understanding of whether after Lumryz

15   launched, Lumryz has been performing as Avadel expected?

16   A.     Yeah, my understanding is that things are going

17   according to plan.  You know, they're still telling people,

18   as we've just heard from Mr. Divis, that that peak sales

19   opportunity of over a billion dollars is still -- still part

20   of the plan.

21   Q.     And how does an expected profitability and success of

22   Lumryz affect the reasonable royalty?

23   A.     It tends to increase the reasonable royalty.

24   Q.     Now, in forming your opinions, did you consider

25   whether, instead of launching Lumryz, Avadel had any

DIRECT EXAMINATION - MARK RAINEY

1            And you were here when Mr. Divis just testified?

2    A.    Yes.

3    Q.    Did you hear him talk about this slide here?

4    A.    Yes, I did.

5    Q.    And in your opinion, how does Avadel's plan and use

6    for Lumryz affect the reasonable royalty?

7    A.    Yeah, this means that there's -- there would have

8    been -- they -- Avadel would have viewed there'd be an

9    additional value in the future from this, which, again,

10   would tend to increase the reasonable royalty.

11   Q.    Okay.  Let's go back to your slides.

12            Based on your analysis, did you conclude what a

13   reasonable royalty would be?

14   A.    Yes.

15   Q.    Okay.  Can we go to slide 18, please.

16            And what does this slide show?

17   A.    This shows the royalty rates that I determined would

18   be the outcome of the hypothetical negotiation.

19   Q.    Okay.  And why are there three different royalty

20   rates?

21   A.    There's three different royalty rates for the three

22   different periods, and the three different periods differ in

23   their competitive conditions, and just the basic idea here

24   is in economics, competitive conditions affect royalty

25   rates.

DIRECT EXAMINATION - MARK RAINEY

1   Q.      Okay.  And it says here, 27 percent for the time

2   period 2023-2025, 13 percent for the time period 2026 to

3   2032, and 3.5 percent for the time period 2033 to 2036.

4            Is that the opinion that you reached?

5   A.      Yes.

6   Q.      And which of these royalty rates applies to past

7   damages for infringement at issue in this lawsuit?

8   A.      Yeah, that first one there, so -- so right now we're

9   just talking about 2023 and part of 2024, so 27 percent is

10  the relevant rate.

11  Q.      And what would be the full duration of the license

12  that was negotiated during the hypothetical negotiation?

13  A.      It would go to the expiration of the last valid

14  infringed patent claim.

15  Q.      In your opinion, why would Jazz agree to the royalty

16  rates we just discussed in that hypothetical negotiation?

17  A.      Because these royalty rates wouldn't make Jazz worse

18  off by entering into a license at those royalty rates.

19            MS. THOMPSON:  All right.  Can we go to the next

20  slide, 19.

21  BY MS. THOMPSON:

22  Q.      And what is the source of information for this slide?

23  A.      This is based off of Jazz's narcolepsy forecast

24  model, which we heard Mr. Mindus testify about earlier this

25  afternoon.

DIRECT EXAMINATION - MARK RAINEY

1    Q.    And what does this slide show?

2    A.    So, you know, as we heard Mr. Mindus say, you can use

3    Jazz's narcolepsy forecast model to forecast the revenue for

4    Jazz's products with Lumryz and without Lumryz.

5              So using that information and also the profit

6    information that Mr. Mindus also talked about, I'm

7    calculating the amount of money that Jazz expected to lose

8    if Lumryz launched.

9    Q.    Okay.  And what is column G here on this slide?

10   A.    Yeah, that's the amount of money that Jazz expected

11   to lose due to Lumryz's launch.

12   Q.    Okay.  What is column H?

13   A.    That's a forecast of Lumryz's net revenues that is

14   derived from Jazz's narcolepsy forecast model.

15   Q.    Okay.  And what is column I showing in that final

16   column?

17   A.    So that's showing on a year-by-year basis the royalty

18   rate you'd have to apply to forecast Lumryz's net revenues

19   in order to keep Jazz from being made worse off.

20   Q.    And why is it relevant to the hypothetical

21   negotiation to consider the revenue Jazz loses from its

22   twice-nightly products by licensing the patent to Lumryz's

23   once-nightly product?

24   A.    Because Jazz's losses are really tied very closely to

25   the incremental value of Jazz's patents, and that's because

DIRECT EXAMINATION - MARK RAINEY

1    Jazz's patents allow for the once-nightly formulation of

2    Lumryz.  And if you think about why Lumryz's entry is

3    causing Jazz to lose money, it is because of that, the

4    benefits of once-nightly, that Lumryz has and Jazz doesn't.

5    Q.    If we look at this average royalty rate calculation

6    at the bottom here, what is that?

7    A.    So, again, I'm -- those are those three periods with

8    the three different competitive conditions -- and I'm

9    calculating the average of the royalty rates in column I

10   across those three periods.

11   Q.    Now, why didn't you use a royalty rate of, say,

12   3.5 percent for the whole term of the license?

13   A.    It would be economically irrational for Jazz to enter

14   into such a license.

15   Q.    Economically irrational, you said?

16   A.    Irrational.

17            MS. THOMPSON:  Okay.  Can we go to the next

18   slide.

19   BY MS. THOMPSON:

20   Q.    Is this one of your calculations?

21   A.    Yes.

22   ▮      ████████████████████████████████████████████████

23   ██████████████████████████████████████████

24   █████████████

25   ▮      ████████████████████████████████████████

DIRECT EXAMINATION - MARK RAINEY

1   ██████████████████████████████████████████████

2   ████████████████████████████████████████████████

3   ███████████████████████████████████████████

4   ████████████████████████████████████████

5   █████████████████████████████████████

6   ████████████████████████████████████████████████

7   ███████

8   Q.    Okay.  Let's look at this from Avadel's perspective.

9            MS. THOMPSON:  Can we go to the next slide,

10  please.

11  BY MS. THOMPSON:

12  Q.    And this is citing to Exhibit JTX129.

13           Did you rely on that document in conducting your

14  analysis?

15  A.    Yes.

16  Q.    Okay.  And what is this showing here?

17  A.    So this is looking at things from Avadel's

18  perspective at the time of the hypothetical negotiation.  In

19  column B there, I have Avadel's forecast of Lumryz's

20  revenues during the licensing -- licensing period.  And then

21  column C is the royalty Avadel would expect to pay at my

22  reasonable royalty rates.

23  Q.    Okay.  And what is the -- how much revenue was Avadel

24  forecasting from Lumryz through the start of 2036 as of the

25  date of this forecast?

CROSS-EXAMINATION - MARK RAINEY

1   Q.    So when Jazz's lawyer was asking you questions, you

2   talked about patients who were going to switch from Xyrem

3   and Xywav to Lumryz.

4           Do you recall that testimony?

5   A.    Yes.

6   Q.    Now, you agree that Lumryz is being used with

7   patients who would not otherwise be taking Xyrem or Xywav,

8   correct?

9   A.    That's part of the Lumryz patient population.

10  Q.    Avadel has the only once-nightly oxybate product for

11  narcolepsy available today, correct?

12  A.    That's correct.

13  Q.    So now let's talk about what Jazz has.

14          You agree that Jazz to date has not

15  commercialized a once-nightly oxybate product, correct?

16  A.    Yes, and I accounted for that in my analysis.

17  Q.    You used Jazz internal projections to come up with

18  your opinions; is that correct?

19  A.    Yeah, and then I checked them against, you know, for

20  instance, Avadel's projections as well.

21  Q.    The Jazz's projections were created by Jazz, correct?

22  A.    Yes, in their ordinary course of business, yes.

23  Q.    You assumed that Jazz tried to be accurate?

24  A.    Yes.

25  Q.    The projections you were using from Jazz, those were

CROSS-EXAMINATION - MARK RAINEY

1    created after this lawsuit began, correct?

2    A.    I don't recall off the top of my head when this --

3    ██    ███████████████████████████████████████████████

4    ████████████████████████████████████████████████

5    ████████████████████████████████████████████

6    ██    █████████████████

7    Q.    Now, you are of the view that the parties at the

8    hypothetical negotiation would agree to three different

9    royalty rates for three different periods of time; is that

10   right?

11   A.    Yes.

12   Q.    The trigger for the second period is the entry of

13   multisource generic Xyrem, correct?

14   A.    Yes, that's the change in competitive conditions.

15   Q.    "Multisource generics" means not just the authorized

16   generic that is actually a product made by Jazz, but also

17   generics made by companies other than Jazz; is that right?

18   A.    Yes.

19   ██    ████████████████████████████████████████████████

20   ████████████████████████████████████

21   ██    █████████████████████████████████

22   Q.    And your royalty rate for that third period of time

23   is 3.5 percent, correct?

24   A.    Yes.

25   Q.    Now, you're not saying that the reason that the rate

1    proceeding.

2                                    /s/ Michele L. Rolfe, RPR, CRR
                                      U.S. District Court
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 2



Jazz Pharmaceuticals, Inc. v.
Avadel CNS Pharmaceuticals LLC

**PTX-1901**

C.A. No. 21-691 (GBW), 21-1138(GBW),
21-1594 (GBS)



## Avadel Pharmaceuticals Announces Strong LUMRYZ Launch Performance and Provides Preliminary Fourth Quarter and Full Year 2023 Financial Highlights

January 8, 2024 at 7:00 AM EST

*-- Approximately $19 million and $28 million of net revenue from sales of LUMRYZ™ estimated for the fourth quarter and full year 2023, respectively --*

*-- Generated continued robust demand for LUMRYZ with greater than 1,900 patients enrolled in RYZUP™ and more than 1,000 patients initiating therapy through December 31 --*

*-- Signed Emisar (Optum Rx GPO) contract, all 3 PBM owned GPO contracts now finalized for 2024 --*

*-- Supplemental New Drug Application (sNDA) for LUMRYZ in the pediatric narcolepsy population accepted by FDA; approval decision expected in September 2024 --*

DUBLIN, Ireland, Jan. 08, 2024 (GLOBE NEWSWIRE) -- Avadel Pharmaceuticals plc (Nasdaq: AVDL), a biopharmaceutical company focused on transforming medicines to transform lives, today provided a business update including preliminary estimates of fourth quarter and full year net revenue and cash, cash equivalents and marketable securities.

"2023 was transformational for Avadel defined by significant growth and continued execution of milestones critical to Avadel's success, beginning with the FDA approval and receipt of Orphan Drug Exclusivity for LUMRYZ. The LUMRYZ launch has thus far been marked by robust demand and overwhelmingly positive feedback from the narcolepsy community, health care providers and payers. Our team is proud of the momentum built this year, and looking toward 2024, we are excited to see LUMRYZ's continued impact across the narcolepsy community," said  Greg Divis, Chief Executive Officer of Avadel Pharmaceuticals.

**Launch Progress Through December 31, 2023:**

- Greater than 1,900 patients enrolled in Avadel's RYZUP patient support services:
  - More than 1,000 patients initiated therapy.
  - The majority of RYZUP enrollments and patients currently being treated with LUMRYZ are patients who switched from first generation oxybates, with the balance made up of patients who previously tried and discontinued a first generation oxybate and patients who are new to oxybate treatment.
- Signed contract with Emisar (Optum Rx GPO)
  - Contracts now in place with all 3 PBM owned GPOs (Ascent/ESI, Zinc/CVS and Emisar/Optum).
  - LUMRYZ moved to preferred status within the CVS commercial formularies and Optum Select as of January 1, 2024.
- Nearly 1,800 health care providers have completed the LUMRYZ REMS certification process, including both experienced oxybate prescribers as well as providers who have never previously prescribed an oxybate.

**Financial Highlights:**

- Approximately $19 million and $28 million of net product revenue, respectively, estimated for the quarter and year ended December 31, 2023. Net product revenue consists of LUMRYZ product sales, which was launched in the U.S. on June 5, 2023.
- Approximately $105 million of cash, cash equivalents and marketable securities at December 31, 2023.

Results reported above are preliminary, unaudited and are subject to change, perhaps materially, upon the audit of the Company's financial statements for the year ended December 31, 2023. The Company expects to announce its full results for the twelve months ended December 31, 2023 on or before February 29, 2024.

**Pipeline Update:**

- Supplemental New Drug Application (sNDA) for LUMRYZ in the pediatric narcolepsy population accepted by FDA:
  - LUMRYZ has the potential to significantly alleviate the burden placed on families and caregivers of children with narcolepsy who are responsible for waking up in the middle of the night to administer a second dose of twice-nightly oxybate.
  - Pediatric patients currently represent approximately 5% of all oxybate treated narcolepsy patients.

**About LUMRYZ ™(sodium oxybate) for extended-release oral suspension**

LUMRYZ, is an extended-release sodium oxybate medication approved by the FDA on May 1, 2023, as the first and only once-at-bedtime treatment for cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy.

AVDL_01451097

**PTX-1901.1**

The FDA approval of LUMRYZ was supported by results from REST-ON, a randomized, double-blind, placebo-controlled, pivotal Phase 3 trial in adults with narcolepsy. LUMRYZ demonstrated statistically significant and clinically meaningful improvements in the three co-primary endpoints: EDS, clinicians' overall assessment of patients' functioning (CGI-I) and cataplexy attacks, for all three evaluated doses when compared to placebo.

With its approval, the FDA also granted seven years of Orphan Drug Exclusivity to LUMRYZ for the treatment of cataplexy or EDS in adults with narcolepsy due to a finding of clinical superiority of LUMRYZ relative to currently available oxybate treatments. In particular, the FDA found that LUMRYZ makes a major contribution to patient care over currently available, twice-nightly oxybate products by providing a once-nightly dosing regimen that avoids nocturnal arousal to take a second dose.

**About Avadel Pharmaceuticals plc**

Avadel Pharmaceuticals plc (Nasdaq: AVDL) is a biopharmaceutical company focused on transforming medicines to transform lives. Our approach includes applying innovative solutions to the development of medications that address the challenges patients face with current treatment options. Avadel's commercial product, LUMRYZ, was approved by the U.S. Food & Drug Administration (FDA) as the first and only once-at-bedtime oxybate for the treatment of cataplexy or excessive daytime sleepiness (EDS) in adults with narcolepsy. For more information, please visit www.avadel.com.

**IMPORTANT SAFETY INFORMATION**

---

**WARNING: Taking LUMRYZ™ (sodium oxybate) with other central nervous system (CNS) depressants, such as medicines used to make you fall asleep, including opioid analgesics, benzodiazepines, sedating antidepressants, antipsychotics, sedating anti-epileptic medicines, general anesthetics, muscle relaxants, alcohol or street drugs, may cause serious medical problems, including trouble breathing (respiratory depression), low blood pressure (hypotension), changes in alertness (drowsiness), fainting (syncope) and death.**

**The active ingredient of LUMRYZ (sodium oxybate) is a form of gamma hydroxybutyrate (GHB), a controlled substance. Abuse or misuse of illegal GHB alone or with other CNS depressants (drugs that cause changes in alertness or consciousness) have caused serious side effects. These effects include seizures, trouble breathing (respiratory depression), changes in alertness (drowsiness), coma and death. Call your doctor right away if you have any of these serious side effects.**

**Because of these risks, LUMRYZ is available only by prescription and filled through certified pharmacies in the LUMRYZ REMS. You must be enrolled in the LUMRYZ REMS to receive LUMRYZ. Further information is available at www.LUMRYZREMS.com or by calling 1-877-453-1029.**

---

**INDICATIONS**

LUMRYZ (sodium oxybate) for extended-release oral suspension is a prescription medicine used to treat the following symptoms in adults with narcolepsy:

- sudden onset of weak or paralyzed muscles (cataplexy)
- excessive daytime sleepiness (EDS)

It is not known if LUMRYZ is safe and effective in people less than 18 years of age.

**Do not take LUMRYZ if you take** other sleep medicines or sedatives (medicines that cause sleepiness), drink alcohol or have a rare problem called succinic semialdehyde dehydrogenase deficiency.

Keep LUMRYZ in a safe place to prevent abuse and misuse. Selling or giving away LUMRYZ may harm others and is against the law. Tell your doctor if you have ever abused or been dependent on alcohol, prescription medicines or street drugs.

Anyone who takes LUMRYZ should not do anything that requires them to be fully awake or is dangerous, including driving a car, using heavy machinery or flying an airplane, for at least six (6) hours after taking LUMRYZ. Those activities should not be done until you know how LUMRYZ affects you.

Falling asleep quickly, including while standing or while getting up from the bed, has led to falls with injuries that have required some people to be hospitalized.

**LUMRYZ can cause serious side effects, including the following:**

- **Breathing problems, including** slower breathing, trouble breathing and/or short periods of not breathing while sleeping (e.g., sleep apnea). People who already have breathing or lung problems have a higher chance of having breathing problems when they take LUMRYZ.
- **Mental health problems**, including confusion, seeing or hearing things that are not real (hallucinations), unusual or disturbing thoughts (abnormal thinking), feeling anxious or upset, depression, thoughts of killing yourself or trying to kill yourself, increased tiredness, feelings of guilt or worthlessness and difficulty concentrating. Tell your doctor if you have or had depression or have tried to harm yourself. **Call your doctor right away if you have symptoms of mental health problems or a change in weight or appetite.**
- **Sleepwalking.** Sleepwalking can cause injuries. Call your doctor if you start sleepwalking.

Tell your doctor if you are on a salt-restricted diet or if you have high blood pressure, heart failure or kidney problems. LUMRYZ contains a lot of sodium (salt) and may not be right for you.

The most common side effects of LUMRYZ in adults include nausea, dizziness, bedwetting, headache and vomiting. Your side effects may increase

AVDL_01451098

**PTX-1901.2**

when you take higher doses of LUMRYZ. LUMRYZ can cause physical dependence and craving for the medicine when it is not taken as directed. These are not all the possible side effects of LUMRYZ.

**For more information, ask your doctor or pharmacist. Call your doctor for medical advice about side effects.**

You are encouraged to report negative side effects of prescription drugs to the FDA. Visit www.fda.gov/medwatch, or call 1-800-FDA-1088.

**Please see full Prescribing Information, including BOXED Warning.**

**Cautionary Disclosure Regarding Forward-Looking Statements**

This press release includes "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These forward-looking statements relate to our future expectations, beliefs, plans, strategies, objectives, results, conditions, financial performance, prospects or other events. Such forward-looking statements include, but are not limited to, expectations regarding the potential therapeutic benefit of LUMRYZ; the success of the commercialization of LUMRYZ; the anticipated market availability, demand and sales opportunity of LUMRYZ; the potential benefits of payor coverage, including preferred status; and the Company's expectations regarding its financial results for the fourth quarter and full year 2023. In some cases, forward-looking statements can be identified by the use of words such as "will," "may," "could," "believe," "expect," "look forward," "on track," "guidance," "anticipate," "estimate," "project," "next steps" and similar expressions and the negatives thereof (if applicable).

The Company's forward-looking statements are based on estimates and assumptions that are made within the bounds of our knowledge of our business and operations and that we consider reasonable. However, the Company's business and operations are subject to significant risks, and, as a result, there can be no assurance that actual results and the results of the company's business and operations will not differ materially from the results contemplated in such forward-looking statements. Factors that could cause actual results to differ from expectations in the Company's forward-looking statements include final audit adjustments and other developments that may arise that would cause the Company's expectations with respect to the fourth quarter and full year 2023 revenue estimates and cash as of December 31, 2023 to differ, perhaps materially, from the financial results that will be reflected in the Company's audited consolidated financial statements for the fiscal year ended   December 31, 2023, and the risks and uncertainties described in the "Risk Factors" section of Part I, Item 1A of the Company's Annual Report on Form 10-K for the year ended   December 31, 2022, which was filed with the Securities and Exchange Commission (SEC) on March 29, 2023, and subsequent SEC filings.

Forward-looking statements speak only as of the date they are made and are not guarantees of future performance. Accordingly, you should not place undue reliance on forward-looking statements. The Company does not undertake any obligation to publicly update or revise our forward-looking statements, except as required by law.

**Investor Contact:**
Courtney Mogerley
Stern Investor Relations, Inc.
Courtney.Mogerley@sternir.com
(212) 698-8687

**Media Contact:**
Lesley Stanley
Real Chemistry
lestanley@realchemistry.com
(609) 273-3162



Source: Avadel Pharmaceuticals plc

AVDL_01451099

**PTX-1901.3**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., | |
| Plaintiff, | |
| v. | |
| AVADEL CNS PHARMACEUTICALS, LLC, | C.A. No. 21-691-GBW |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| Plaintiffs, | |
| v. | |
| AVADEL CNS PHARMACEUTICALS, LLC, | C.A. No. 21-1138-GBW |
| Defendant. | |
| JAZZ PHARMACEUTICALS, INC., et al., | |
| Plaintiffs, | |
| v. | |
| AVADEL CNS PHARMACEUTICALS, LLC, | C.A. No. 21-1594-GBW |
| Defendant. | |

**[PROPOSED] ORDER REGARDING ONGOING ROYALTY**

WHEREAS the Court granted the motion of Plaintiffs Jazz Pharmaceuticals, Inc., et al. ("Jazz") for an ongoing royalty by its order on August 27, 2024, and at the same time ordered additional briefing on the appropriate ongoing rate (D.I. 666);

Having considered the parties' additional briefing, the court HEREBY ORDERS this _____ day of _____, 2024, that Defendant Avadel CNS Pharmaceuticals, LLC ("Avadel") shall pay ongoing royalties to Jazz in the amount of 3.5% on net sales of Lumryz made or sold within the United States prior to the expiration of the '782 patent. Royalty payments shall be made quarterly, due 45 days after the end of the first, second, and third quarters, and 75 days after the end of the calendar year. Avadel shall provide to Jazz a report on quarterly U.S. sales of Lumryz at the time of each royalty payment.


_____
The Honorable Gregory B. Williams

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that true and correct copies of the foregoing document were caused to be served on September 16, 2024 on the following counsel in the manner indicated below.

### <u>VIA EMAIL:</u>

Jack B. Blumenfeld
Jeremy Tigan
Cameron Clark
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
cclark@morrisnichols.com

F. Dominic Cerrito
Eric C. Stops
Evangeline Shih
Andrew S. Chalson
Gabriel P. Brier
Frank C. Calvosa
Catherine T. Mattes
Abigail DeMasi
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
nickcerrito@quinnemanuel.com
ericstops@quinnemanuel.com
evangelineshih@quinnemanuel.com
andrewchalson@quinnemanuel.com
gabrielbrier@quinnemanuel.com
frankcalvosa@quinnemanuel.com
catherinemattes@quinnemanuel.com
abigaildemasi@quinnemanuel.com

*Attorneys for Plaintiffs*

Dated:  September 16, 2024                                    */s/ Daniel M. Silver*
                                                                              Daniel M. Silver (#4758)