IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | : | |
| **JAZZ PHARMACEUTICALS, INC.,** | : | |
| Plaintiff, | : | |
| *v.* | : | C.A. No. 21-691-GBW |
| **AVADEL CNS PHARMACEUTICALS, LLC,** | : | ██████████████ |
| Defendant. | : | |
| | : | |
| | : | |
| **JAZZ PHARMACEUTICALS, INC., et al.,** | : | |
| Plaintiffs, | : | |
| *v.* | : | C.A. No. 21-1138-GBW |
| **AVADEL CNS PHARMACEUTICALS, LLC,** | : | ██████████████ |
| Defendant. | : | |
| | : | |
| | : | |
| **JAZZ PHARMACEUTICALS, INC., et al.,** | : | |
| Plaintiffs, | : | |
| *v.* | : | C.A. No. 21-1594-GBW |
| **AVADEL CNS PHARMACEUTICALS, LLC,** | : | ██████████████ |
| Defendant. | : | |
| | : | |

DECLARATION OF MOHAN RAO, PH.D.

**Highly Confidential**

## Introduction

**1.** I am an economist and the Chief Executive Officer of Epsilon Economics. I previously submitted a declaration in connection with Avadel's Opposition to Jazz's Motion for an Injunction or Ongoing Royalty.[1]

**2.** On March 4, 2024, the jury verdict in this litigation found Avadel CNS Pharmaceuticals, LLC ("Avadel") liable for patent infringement, awarding damages to Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited (collectively, "Jazz") in the amount of $233,562.83.[2] The jury awarded damages based on applying a royalty rate of 3.5% to past infringing sales of LUMRYZ of $6,673,223.82.[3]

**3.** I understand that the Court has requested additional briefing and evidence from the parties regarding an appropriate ongoing royalty rate. I have been asked by counsel for Avadel to evaluate and opine on whether there are changed economic circumstances that would impact that rate between the hypothetical negotiation during May-June 2023 (the date range of Avadel's first infringement based on importation and sale, respectively) and March 2024 (the date of the jury verdict) and continuing through today.[4]

**4.** A list of the additional materials I have considered in forming the opinions set forth in this Declaration is attached as Tab 2.[5]

---

[1] Declaration of Mohan Rao, Ph.D., May 13, 2024 (D.I. 605).

[2] Verdict Form, Jazz v. Avadel, March 4, 2024, pages 11-12.

[3] Verdict Form, Jazz v. Avadel, March 4, 2024, page 11. I understand that, in response a jury question regarding the "Amount of Past Sales to Apply Royalty Rate," Judge Williams informed the jury that "Dr. Rainey testified that the amount of Net past sales of Lumryz since launch is $32,519,345. Avadel did not present a damages expert that contested that the amount of net past sales of Lumryz since launch is $32,519,345. It is up to the jury to decide whether to believe Dr. Rainey and how much weight to give his expert testimony"(Jury Questions & Answers, Jazz v. Avadel, March 1 and 4, 2024).

[4] *See, for example*, Expert Report of Mark Rainey, Ph.D., September 15, 2023, paragraphs 32-33 and Expert Report of Christine S. Meyer, Ph.D., October 16, 2023, paragraph 38; and Verdict Form, Jazz v. Avadel, March 4, 2024.

[5] Declaration of Mohan Rao, Ph.D., May 13, 2024, provides the initial list of materials I considered.

## Summary of Opinions

**5.** As set forth in greater detail below, I have formed the following opinions:

- Dr. Rainey's opinion of the royalty expressed at trial was premised upon an exclusive license from Jazz to Avadel. By contrast, the non-exclusive license granted by the Court would be worth about half as much as an exclusive license, putting downward pressure on any post-verdict royalty rate;

- There was extensive evidence and testimony at trial regarding competition between Avadel and Jazz such that post-verdict competition between the companies is not a changed economic circumstance;

- Dr. Rainey's royalty opinions are based on an arithmetic calculation that ███ ████████████████████████████████████████████████████████ ███████████████; and

- In light of the foregoing, it is my opinion that there are no changes to economic factors following the hypothetical negotiation date of May-June 2023 that would support an upward adjustment of the 3.5% royalty rate awarded by the jury.

## Dr. Rainey's Methodology & Royalty Rate Opinion

**6.** Dr. Rainey's methodology to determine his royalty rates relies on Jazz's internal narcolepsy forecast model, which calculates Jazz's forecasted future lost profits resulting from the entry of LUMRYZ. Dr. Rainey's royalty rate analysis can be summarized as:[6]

1. Forecast (annually for 2023 through February 2036): XYREM net revenue, XY-WAV net revenue, and XYREM AG royalties *with* LUMRYZ in the market;

---

[6]Trial Demonstrative, Jazz v. Avadel, PDX-6.19 (*see*, Tab 3); Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 591-593; and JTX-0147.

2. Forecast (annually for 2023 through February 2036): XYREM net revenue, XY-WAV net revenue, and XYREM AG royalties *without* LUMRYZ in the market;

3. Calculate Jazz's annual expected losses as Step 2 – Step 1;[7]

4. Forecast (annually for 2023 through February 2036): LUMRYZ net revenue;

5. Calculate the annual implied royalty rate as Step 3 ÷ Step 4; and

6. Determine a royalty rate for 2023-2025 (26.8%), 2026-2032 (12.8%), and 2033-2036 (3.4%).

**7.** Although Dr. Rainey's opinion is comprised of three royalty rates — 26.8%, 12.8%, and 3.4%, depending on the time period (rounded to 27%, 13% and 3.5% in his trial testimony)[8] — the jury awarded damages based on a 3.5% royalty rate.

### *Georgia-Pacific* Factors

**8.** I have been asked to evaluate if there have been any changes to the economic circumstances between the hypothetical negotiation during May-June 2023 through the jury verdict in May 2024 and continuing through today. Given the relatively short time period between the hypothetical negotiation date and today, most of the economic, commercial, and market circumstances are largely unchanged and thus would not indicate that any increase in the jury-determined royalty rate is warranted.

**9.** In the paragraphs below, I discuss various *Georgia-Pacific* factors and whether changed economic circumstances since the hypothetical negotiation date and verdict date support an adjustment of the jury-determined royalty rate.

---

[7]Expected Jazz Annual Loss = (XYREM net revenue without LUMRYZ × 84.1% + XYWAV net revenue without LUMRYZ × 84.1% + XYREM AG Royalties without LUMRYZ) – (XYREM net revenue with LUMRYZ × 84.1% + XYWAV net revenue with LUMRYZ × 84.1% + XYREM AG Royalties with LUMRYZ). To determine Jazz's losses stemming from XYREM and XYWAV lost net revenue, Dr. Rainey applies "Jazz's commercial contribution margin" of 84.1% (Trial Demonstrative, Jazz v. Avadel, PDX-6.19 (*see*, Tab 3); Expert Report of Mark Rainey, Ph.D., September 15, 2023, paragraph 151; and JTX-0151).

[8]Trial Demonstrative, Jazz v. Avadel, PDX-6.18 (*see*, Tab 3); and Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 590-594.

**Factor 3: The nature and scope of the license, as exclusive or non-exclusive; or as a restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold**

**10.** Dr. Rainey states in his expert report that, "[t]he license that results from the hypothetical negotiation would be an exclusive license (as to other third parties) in the U.S. for FDA-approved uses," and thus his royalty rates are based on an assumed exclusive license.[9] He further testified during trial that, "I determined...the license that they would negotiate would be exclusive as to third parties and all that means is that Jazz would grant Avadel a right to use the patents, Jazz would retain the right to use those patents itself, but then no other parties would be allowed to use those patents."[10]

**11.** In contrast, I would expect that the Court's ongoing compulsory license would not be exclusive, as this would penalize Jazz by "hand-cuffing" its future ability to further monetize its patent rights. For example, an exclusive compulsory license would foreclose Jazz from licensing its patents to additional companies seeking to commercialize a once-nightly oxybate product.

**12.** Based on a study that examined biopharma alliances between 2007 and 2018, royalty rates for non-exclusive licenses between corporate entities were approximately one-half of the royalty rates for exclusive licenses between corporate entities.[11]

**13.** If the Court were to determine that the ongoing compulsory license should be non-exclusive, this would put downward pressure on the jury-determined 3.5% royalty rate for an exclusive license.

---

[9]Expert Report of Mark Rainey, Ph.D., September 15, 2023, paragraph 70.

[10]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 572.

[11]Mark Edwards, "Recent Trends in Effective Royalty Rates of Biopharma Alliances," BioSci, February 5, 2019, Chart 1 (*see*, Tab 4).

**Factor 5: The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter**

**14.** During trial, there was extensive testimony about how Avadel and Jazz were direct competitors. For example, Dr. Rainey testified during trial that, "[t]hey are direct competitors" based on "information from Avadel, third parties" and "information we've heard testimony about the past couple of days."[12] Dr. Rainey further testified that Avadel predicted there would be "extensive competition between Avadel [and] Jazz because Lumryz was taking a big chunk of its patients from Jazz's products."[13] Gregory Divis (Avadel's Chief Executive Officer) testified during trial that switching patients from a twice-nightly oxybate product (such as Jazz's) to Avadel's once-nightly product was "one of [Avadel's] primary goals and strategies."[14]

**15.** Dr. Rainey also testified, responding to a question about how the fact that Jazz and Avadel are direct competitors affected the reasonable royalty, that "[i]t tends to increase the reasonable royalty."[15]

**16.** In light of the trial testimony, the fact that Jazz and Avadel are in direct competition (and thus whether an increased royalty rate would be warranted) is already subsumed in the jury-determined 3.5% royalty rate. Therefore, direct competition pre- and post-trial is not a changed economic circumstance that would provide an economic rationale to increase an ongoing compulsory royalty rate above the jury-determined 3.5% rate.

---

[12]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 575.

[13]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 579.

[14]Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 474 and 501.

[15]Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 577-578.

**Factor 8: The established profitability of the product made under the patent; its commercial success; and its current popularity**

17.  Dr. Rainey utilizes annual net revenue forecasts of LUMRYZ, XYREM, and XYWAV from 2023 through February 2036 as part of his analysis.[16] Having launched in June 2023, LUMRYZ has been on the market for a relatively short amount of time and only a small portion of Dr. Rainey's 12+ year forecast period.[17]

18. In connection with assessing the accuracy of the Jazz-provided forecast used by Dr. Rainey, 

19.

which would put downward pressure on the jury-determined 3.5% royalty rate.

---

[16]Trial Demonstrative, Jazz v. Avadel, PDX-6.19 (*see*, Tab 3); Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 591-593; and JTX-0147.

[17]Expert Report of Mark Rainey, Ph.D., September 15, 2023, paragraph 89; and Trial Transcript, Jazz v. Avadel, February 27, 2024, page 570.

[18]Trial Demonstrative, Jazz v. Avadel, PDX-6.19 (*see*, Tab 3); and Jazz Pharmaceuticals Plc, Form 10-K for fiscal year ended December 31, 2023, page 83 (*see*, Tab 5).

[19]Trial Demonstrative, Jazz v. Avadel, PDX-6.19 (*see*, Tab 3); and Jazz Pharmaceuticals Plc, Form 10-K for fiscal year ended December 31, 2023, page 83 (*see*, Tab 5).

**Factor 9: The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results;**

and

**Factor 10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention**

**20.** Dr. Rainey testified at trial that, at the time of the hypothetical negotiation, Jazz and Avadel were expecting LUMRYZ to be a successful and profitable product, and demand for LUMRYZ was due to its meeting "the unmet need [a once-nightly product] that Avadel viewed Lumryz fulfilling."[20] Dr. Rainey further testified, responding to a question of his understanding if LUMRYZ has been performing as Avadel expected, that "things are going according to plan."[21]

**21.** Dr. Rainey also testified that Jazz has not commercialized a once-nightly oxybate product (to compete with LUMRYZ) and Jazz's forecast did not contemplate it selling its own once-nightly product in the future, and accounted for these facts in his analysis.[22]

**22.** Further, I note that Avadel's current estimates for peak LUMRYZ sales are consistent with evidence presented at trial. For example, Avadel's CEO Mr. Divis testified that LUMRYZ has the potential to exceed $1 billion in sales.[23] Dr. Rainey also testified about the $1 billion peak sales opportunity estimate.[24] Dr. Rainey further testified that, after LUMRYZ launched, "things are going according to plan. You know, they're still telling people, as we've just heard from Mr. Divis, that that peak sales opportunity of over a billion dollars..."[25] In its most recent earnings call presen-

---

[20]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 585.

[21]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 588.

[22]Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 602-603.

[23]Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 507 and 526.

[24]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 586; and PTX-0300.14.

[25]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 588.

tation in August 2024, Avadel provided the same "peak sales opportunity" estimate of greater than $1 billion that was presented at trial.[26] This indicates that Avadel's expected LUMRYZ sales remain generally consistent with the evidence presented at trial and, therefore, LUMRYZ sales expectations since the hypothetical negotiation date (or jury verdict) do not present an economic rationale to adjust the royalty rate upwards.

**23.** Based on my review of publicly available information (*e.g.*, Jazz's SEC filings), I am not aware of changes in Jazz's plans to not offer a once-nightly oxybate product to compete with LUMRYZ. In light of the trial testimony, the once-nightly dosing demand driver for LUMRYZ is already subsumed in the jury-determined 3.5% royalty rate. Therefore, the utility, advantages, and nature of the patented property and the commercial embodiment since the hypothetical negotiation (and trial) is not a changed economic circumstance that would provide an economic rationale to increase an ongoing compulsory royalty rate above the jury-determined 3.5% rate.

## Conclusion

**24.** In summary:

- Dr. Rainey's opinion of the royalty expressed at trial was premised upon an exclusive license from Jazz to Avadel. By contrast, the non-exclusive license granted by the Court would be worth about half as much as an exclusive license, putting downward pressure on any post-verdict royalty rate;

- There was extensive evidence and testimony at trial regarding competition between Avadel and Jazz such that post-verdict competition between the companies is not a changed economic circumstance; and

- Dr. Rainey's royalty opinions are based on an arithmetic calculation that ██

  ███████████████████████████████████████████████

  ███████████████

---

[26]Investor Presentation, Avadel Pharmaceuticals Plc, August 2024, pages 4 and 6 (*see*, Tab 6).

**25.** In light of the foregoing, it is my opinion that there are no changes to economic factors following the hypothetical negotiation date of May-June 2023 that would support an upward adjustment of the 3.5% royalty rate awarded by the jury.

_____

Mohan Rao, Ph.D.

September 16, 2024

Tab 1



## Mohan Rao, Ph.D.
Chairman

Epsilon Economics
111 South Wacker Drive, 50th Floor
Chicago, Illinois 60606

Direct: 312.637.2980
Main: 312.637.2950
mrao@epsiloneconomics.com

## Summary

Dr. Mohan Rao is the Chairman of Epsilon Economics and specializes in antitrust and intellectual property economics, with an emphasis on life sciences and technology. He has testified as an expert in U.S. and foreign courts and in arbitration proceedings.

Dr. Rao also serves as the Chief Executive Officer of Expression Therapeutics, a biotechnology firm based in Atlanta that is focused on developing advanced therapies for hematology and oncology. Dr. Rao previously taught at Northwestern University and UCLA and was a Teaching Fellow at Harvard University. He was appointed as the first "Executive in Residence" — a recognized leader in the technology community — by the McCormick College of Engineering at Northwestern University. Prior to Epsilon Economics, Dr. Rao was the head of Navigant Economics, a global economics consulting firm. He has a Bachelor of Science in Engineering from the University of Michigan, a pre-doctoral fellowship from Harvard University, and a Ph.D. from the University of Colorado.

Dr. Rao serves on the Board of Directors of Expression Therapeutics, Inc., Epsilon Xi LLC, the Children's Hospital of Chicago, the Stanley Manne Children's Research Institute, and the Economic Club of Chicago, on the Board of Trustees of the Chicago Symphony Orchestra, and is a member of the Chicago Club.



## Academic and Professional Experience

- **Epsilon Economics**
  Chairman/Chief Executive Officer, 2015-present

- **Expression Therapeutics**
  Chief Executive Officer/Partner, 2007-present

- **Navigant Economics**
  Managing Director, 2010–2015

- **LECG**
  Managing Director, 2005–2010

- **Northwestern University**
  McCormick School of Engineering and Applied Science
  Adjunct Professor, 2006–2020

- **Charles River Associates / InteCap, Inc.**
  Vice President, CRA, 2004–2005
  Managing Director, InteCap, 2004–2005
  Director, InteCap, 2000–2003

- **University of California, Los Angeles**
  Assistant Professor, 1994–2001

- **Harvard University**
  Fellow, Government Data Center, 1993–1994
  Teaching Fellow, 1993–1994

## Education

- B.S. (Engineering), 1989, **University of Michigan**

- Pre-Doctoral Fellow, 1993–1994, **Harvard University**

- Ph.D.; M.A. (Economics; Political Science), 1994, **University of Colorado**

## Selected Fellowships and Awards

- Cooley Award, University of Michigan College of Engineering

- Government Data Center Fellowship, Harvard University



- David Cattell Fellowship, UCLA
- Faculty Career Development Award, UCLA

## Selected Affiliations

- Member, American Economic Association
- Member, Licensing Executives Society
- Member, American Society of Gene & Cell Therapy
- Member, Institute of Electrical and Electronics Engineers (IEEE)

## Expert Testimony

1. Fortinet Inc. v. **Forescout Technologies, Inc.**
   U.S. District Court – Northern District of California (San Francisco Division)
   Case No. 3:20-cv-03343-EMC

2. Alexion Pharmaceuticals, Inc. et al v. **Samsung Bioepis Co. Ltd.**
   U.S. District Court – District of Delaware
   C.A. No. 1:24-cv-00005-GBW

3. The Sanborn Library LLC et al. v. **ERIS Information Inc. et al.**
   U.S. District Court – Southern District of New York
   No. 1:19-cv-02049-LAK-OTW

4. **Arbor Pharmaceuticals, LLC and Takeda Pharmaceutical Company Limited** v. Saba Ilac Sanayii Ve Ticaret As et al.
   U.S. District Court — District of Delaware
   Civil Action No. 20-353-MN

5. **Puma Biotechnology, Inc. et al** v. AstraZeneca Pharmaceuticals LP et al
   U.S. District Court — District of Delaware
   C.A. No. 21-1338-MFK

6. Amgen, Inc. et al v. **Sandoz Inc.**
   U.S. District Court — District of New Jersey
   C.A. No. 1:23-CV-02406-CPO-EAP



7. **Curia Global, Inc. et al.** v. Cyprium Therapeutics, Inc.
   American Arbitration Association
   Case No. 01-22-0003-4042

8. **300 North LaSalle LLC** v. Hines Interests Limited Partnership
   Federal Arbitration, Inc.
   Case No. F22-JW-A-DFG-0603

9. In re: Certain Selective Thyroid Hormone Receptor-Beta Agonists. Processes
   for Manufacturing or Relating to Same, and Products Containing Same
   On behalf of: **Viking Therapeutics, Inc.**
   United States International Trade Commission
   Investigation No. 337-TA-1352

10. **Azurity Pharmaceuticals, Inc.** v. Amneal Pharmaceuticals, LLC
    U.S. District Court — District of New Jersey
    Civil Action No. 3:21-cv-08717-FLW-DEA

11. **PhaseBio Pharmaceuticals, Inc.** v SFJ Pharmaceuticals X, Ltd.
    U.S. Bankruptcy Court — District of Delaware
    Case No. 22-10995 (LSS), Adv. Proc. No. 22-50456 (LSS)

12. Endo International plc et al. v **Nevakar, Inc., et al.**
    U.S. Bankruptcy Court — Southern District of New York
    Case No. 22-22549 (JLG), Adv. Proc. No. 22-07034 (ALG)

13. **Merck Sharp & Dohme Corp.** v Zydus Worldwide DMCC et al.
    U.S. District Court — District of Delaware
    No. 1:21-cv-00315-RGA

14. Novartis Pharma AG v **Incyte Corporation**
    U.S. District Court — Southern District of New York
    Civil Action No. 1:20-cv-00400-GHW

15. SmartSky Networks, LLC v. **Gogo Business Aviation, LLC et al.**
    U.S. District Court — District of Delaware
    C.A. No. 22-266 (VAC)

16. Celldex Therapeutics, Inc. v. **Shareholder Representative Services LLC**
    Court of Chancery — State of Delaware
    C.A. No. 2020-0682-MTZ

17. **Taiho Pharmaceutical Co., Ltd** v. Accord Healthcare Inc. et al
    U.S. District Court — District of Delaware



Civil Action Nos. 1:19-cv-02321 (CFC), 1:19-cv-02309 (CFC)
Civil Action Nos. 1:19-cv-02342 (UNA), 1:19-cv-02368 (UNA)

18. **Actelion Pharmaceuticals Ltd.** v. Mylan Pharmaceuticals Inc.
U.S. District Court — Northern District of West Virginia
Civil Action No. 1:20-CV-110 (Keeley)

19. Syngenta Crop Protection AG v. FMC Corporation
FMC Corporation v. Syngenta Crop Protection AG
American Arbitration Association
AAA Case No. 01-19-0002-4208, 01-19-0002-4192
**Neutral Expert to the Tribunal**

20. Novartis Pharma AG v. **Mitsubishi Tanabe Pharma Corporation**
International Court of Arbitration
Case No. 24256/PTA

21. **Wemade Co., Ltd. et al** v. Lansha Information Technology Co., Ltd. et al.
International Court of Arbitration
Case No. 22820/PTA/HTG

22. **Horizon Medicines LLC et al.** v. Dr. Reddy Laboratories Inc. et al.
U.S. District Court — District of New Jersey
Case No. 2:15-cv-03324 (SRC) (CLW)

23. Ravgen, Inc. v. **Natera, Inc. and NSTX, Inc.**
U.S. District Court — Western Division of Texas (Austin Division)
Civil Action No. 6-20-CV-00451

24. Seattle Genetics, Inc. v. **Daiichi Sankyo Co., Ltd.**
American Arbitration Association
Case No.: 01-19-0004-0115

25. **Humana Health Plan, Inc. et al.** v. Walgreen Co. et al.
American Arbitration Association
AAA Case 01-19-0002-5131

26. **Merck Sharp & Dohme Corp.** et al. v. Actavis Laboratories FL et al.
U.S. District Court — District of New Jersey
C.A. No. 2:15-CV-06541

27. Club Champion LLC v. **True Spec Golf LLC**
U.S. Patent and Trademark Office — Patent Trial and Appeal Board
Inter Partes Review No. IPR2019-01148



28. **Actelion Pharmaceuticals Ltd.** v. Zydus Pharmaceuticals (USA) Inc.
    U.S. District Court — District of New Jersey
    C.A. 18-1397 (FLW)(LHG)

29. **Treehouse Foods, Inc. et al.** v. Keurig Green Mountain, Inc.
    U.S. District Court — Southern District of New York
    No. 1:14-CV-00905-VSB

30. **Ingevity Corporation et al.** v. BASF Corporation
    U.S. District Court — District of Delaware
    Case No. 18-1391-RGA

31. Niazi Licensing Corporation v. **St. Jude Medical S.C., Inc.**
    U.S. District Court — District of Minnesota
    C.A. No. 017-cv-5096-WMT-BRT

32. Glaukos Corporation v. **Ivantis, Inc.**
    U.S. District Court – Central District of California
    C.A. No. 8:18-cv-00620-JVS-JDE

33. C.R. Bard, Inc. v. **Medline Industries, Inc.**
    U.S. Patent and Trademark Office — Patent Trial and Appeal Board
    Inter Partes Review No. IPR2019-00035
    Inter Partes Review No. IPR2019-00036
    Inter Partes Review No. IPR2019-00109

34. **Sandoz Inc. et al.** v. United Therapeutics Corporation et al.
    U.S. District Court — Northern District of New Jersey
    Case No. 3:19-cv-10170-BRM-LHG

35. Maverick Therapeutics, Inc. et al. v. **Harpoon Therapeutics, Inc.**
    Court of Chancery — State of Delaware
    C.A. No. 2019-0002-SG

36. **Koppers (Jiangsu) Carbon Chemical Company Limited** v. Fangda C-Chem (Jiangsu) Needle Coke Co., Ltd.
    China International Economic and Trade Arbitration Commission (CIETAC)
    Case No. G20180547

37. **Rockwell Automation, Inc.** v. Radwell International, Inc.
    U.S. District Court — District of New Jersey
    Civil Action No.: 15-cv-05246 (RBK) (JS)

38. Delcor Asset Corporation et al. v. **Taro Pharmaceutical Industries et al.**
    U.S. District Court — Southern District of New York



C.A. No.:1:17-cv-05405 (RJS)

39. Duke University and Allergan Sales, LLC v. **Sandoz, Inc.**
U.S. District Court — District of Colorado
Civil Action No.: 1:18-cv-00997-MSK-KLM

40. Juno Therapeutics, Inc. et al. v. **Kite Pharma, Inc.**
U.S. District Court — Central District of California
Case No.: 2:17-CV-07639

41. Välinge Innovation AB v. **Halstead International, The Home Depot, Inc.**
U.S. District Court — District of Delaware
C.A. No. 16-1082-LPS-CJB

42. In re: Merck Mumps Vaccine Antitrust Litigation
On behalf of: **Merck & Co., Inc.**
U.S. District Court — Eastern District of Pennsylvania
No. 2:12-cv-03555

43. Blue Cross Blue Shield Association, et al. v. **GlaxoSmithKline LLC.**
U.S. District Court — Eastern District of Pennsylvania
Civil Action No. 2:13-cv-4663-JS

44. In the Matter of Certain Programmable Logic Controllers (PLCs), Components
Thereof, and Products, Containing Same
On behalf of: **Rockwell Automation, Inc.**
United States International Trade Commission
Inv. No. 337-TA-1105

45. **Chuanqi IP Co., Ltd.** v. Zhejiang Huanyou Network Technology Co., Ltd.
International Court of Arbitration
Case No. 22593/PTA

46. Bio-Rad Laboratories, Inc. v. **Paladin III, L.P.**
Supreme Court of the State of New York — County of New York
Index No. 651641/2014

47. Tyntec Inc. et al. v. **Syniverse Technologies, LLC.**
U.S. District Court — Middle District of Florida (Tampa Division)
Case No. 8:17-CV-00591-RAL-MAP

48. **Gilead Sciences, Inc.** v. Roche Molecular Systems, Inc.
American Arbitration Association
AAA Case 01-16-0004-7625



49. Sanofi-Aventis US. LLC et al. v. **Merck Sharp & Dohme Corp.**
    U.S. District Court — District of Delaware
    C.A. No. 16-812-RGA

50. **Immunomedics, Inc.** v. Roger Williams Medical Center et al.
    U.S. District Court — District of New Jersey
    Civil Action No. 2:15-cv-04526

51. Purdue Pharma L.P. et al. v. **Amneal Pharmaceuticals, LLC**
    U.S. District Court — District of Delaware
    C.A. No. 15-1152-RGS-SRF

52. **KVK-Tech, Inc.** v. Valeant Pharmaceuticals International, Inc. et al.
    American Arbitration Association
    No. 01-15-0005-0393

53. Astrazeneca LP, et al. v. **Breath Limited, et al.**
    U.S. District Court — District of New Jersey
    08-cv-01512 (RMB) (AMD)

54. **Gilead Sciences, Inc.** v. Mylan Pharmaceuticals Inc.
    U.S. District Court — District of Delaware
    C.A. No. 1:16-cv-00192

55. **Bayer Consumer Care, AG., et al.** v. Belmora, LLC, et al.
    United States District Court — Eastern District of Virginia (Alexandria Division)
    Case No.: 1:14-cv-00847 (CMH)(JFA)

56. **Boehringer Ingelheim Pharma GmbH & Co. KG et al.** v. Teva Pharmaceuticals USA, Inc. et al.
    United States District Court — District of New Jersey
    No. 3:14-CV-7811 (MLC-TJB); No. 3:14-CV-1662 (MLC-TJB); No. 3:14-CV-7880 (MLC-TJB)

57. **Otsuka America Pharmaceutical, Inc.** v. Pfizer, Inc.
    American Arbitration Association
    Case No.: 01-16-0004-1233/01-16-0004-0951

58. **Momenta Pharmaceuticals, Inc., Sandoz Inc.** v. Amphastar Pharmaceuticals, Inc. et al.
    United States District Court — District of Massachusetts
    No. 1:11-CV-11681



59. **Dell Inc. and Dell Products L.P.** v. Hitachi, Ltd. et al.
United States District Court — Northern District of California
Case No. M:10-cv-02143-RD/3:13-cv-03350-RS

60. LG Display Co., Ltd. v. **Amtran Technology Co., Ltd. and Amtran Electronics (Suzhou) Co., Ltd. China**
International Court of Arbitration
Case No. 20946/CYK (c. 20963/CYK)

61. **Gilead Sciences, Inc. et al.** v. Watson Laboratories, Inc.
United States District Court — District of New Jersey
C.A. No. 15-CV-2350 (RMB) (JS)

62. **Copart, Inc.** v. Sparta Consulting, Inc.
United States District Court — Eastern District of California
No. 2:14-CV-00046-KJM-CKD

63. Elaine Ann Gold et al. v. **Dekalb County School District et al.**
Superior Court of Dekalb County — State of Georgia
Civil Action File No. 11-CV-3657-5

64. In re: Syngenta Litigation
County of Hennepin (Fourth Judicial District) — State of Minnesota
No. 27-CV-15-3785

65. **Sprint Communications Company L.P., et al.** v. Cox Communications, Inc., et al.
U.S. District Court — District of Delaware
Case No. 1:12-cv-00487-SLR

66. **Endo Pharmaceuticals Solutions Inc., Bayer Intellectual Property GMBH et al.** v. Paddock Laboratories, LLC et al.
U.S. District Court — District of Delaware
C.A. No. 14-1422-SLR

67. **GlaxoSmithKline LLC et al.** v. Pernix Therapeutics Holdings, Inc.
International Court of Arbitration
ICC Case No. 21284/RD

68. **Hospira, Inc. et al.** v. Eurohealth International SARL et al.
U.S. District Court — District of Delaware
Civil Action No. 1:14-cv-487-GMS

69. Nexus Display Technologies LLC v. **Dell Inc.**
U.S. District Court — District of Texas (Marshall Division)



Case No. 2:14-cv-00762

70. **Adidas AG et al.** v. Under Armour Inc. and MapMyFitness, Inc.
U.S. District Court — District of Delaware
C.A. No. 14-130 (GMS)

71. **Levi Strauss & Co.** v. Deloitte Consulting LLP et al.
Superior Court of the State of California — County of San Francisco
No. CGC-09-487219

72. Sanofi-Aventis U.S. LLC et al. v. **Eli Lilly and Company**
U.S. District Court — District of Delaware
Case No. 14-113-RGA-MPT

73. **Sprint Communications Company L.P.** v. Comcast Cable Communications, LLC, et al.
U.S. District Court — District of Kansas
Case No. 11-cv-2684 JWL/JPO

74. **Sprint Communications Company L.P.** v. Cable One, Inc.
U.S. District Court — District of Kansas
Case No. 11-cv-2685 JWL/JPO

75. **Sprint Communications Company L.P.** v. Time Warner Cable Inc. et al.
U.S. District Court — District of Kansas
Case No. 11-cv-2686 JWL/JPO

76. **Lavastone Capital LLC** v. Coventry First LLC, et al.
U.S. District Court — Southern District of New York
C.A. No.: 14-CV-7139 (Judge Jed S. Rakoff)

77. Pericor Therapeutics v. **Merck & Co., Inc.**
American Arbitration Association
AAA Arbitration No. 13 122 J03052

78. **Lufkin Industries, Inc.** v. International Business Machines et al.
District Court — Angelina County, Texas
Case No.: cv-02073-13-02

79. **Sunovion Pharmaceuticals Inc.** v. Takeda GMBH
International Court of Arbitration
ICC Case No. 19231/GFG

80. **LG Household and Health Care Limited** v. Akinari Ikka and Eri Ikka
International Court of Arbitration



ICC Arbitration No. 19421/CYK

81. **Mirowski Family Ventures, LLC.** v. Boston Scientific Corp. et al.
    Circuit Court — Montgomery County, Maryland (Judge Ronald B. Rubin)
    Civil No. 373798-V

82. **Dell Inc. et al** v. Hitachi, Ltd. et al.
    U.S. District Court — Northern District of California (San Francisco Division)
    Case No.: 3:13-cv-02171-SC

83. Purdue Pharma L.P. et al v. **Amneal Pharmaceuticals, LLC, Teva Pharmaceuticals USA, Inc.**
    U.S. District Court — Southern District of New York (Judge Stine)
    Case No. 13-cv-3372 (SHS)
    Case No. 13-cv-4606 (SHS)

84. **Gilead Sciences, Inc. and Emory University** v. Cipla Limited
    U.S. District Court — Southern District of New York
    Civil Action No. 12-CIV-6350 (RJS) (AJP)
    Civil Action No. 12-CV-6351 (RJS) (AJP)

85. **Gilead Sciences, Inc. and Emory University** v. Lupin Limited
    U.S. District Court — Southern District of New York
    Civil Action No. 12-CIV-6293 (RJS) (AJP)
    Civil Action No. 12-CV-6294 (RJS) (AJP)

86. Galderma Laboratories, L.P. et al v. **Actavis Mid Atlantic LLC**
    U.S. District Court — Northern District of Texas
    3:12-CV-2038

87. MPEG LA, L.L.C. v. **Dell Global B.V. and Dell Products, L.P.**
    Court of Chancery — The State of Delaware
    C.A. No. 7016-VCP

88. **Source Healthcare Analytics, Inc., Wolters Kluwer U.S. Corporation et al.** v. SDI Health LLC et al.
    Court of Common Pleas — Philadelphia County (Commerce Court Program)
    No. 02290

89. United States of America *ex rel.* Donald Gale v. **Omnicare, Inc.**
    U.S. District Court — Northern District of Ohio (Eastern Division)
    Case No. 1:10 CV-0127

90. **Scienton Technologies, Inc.** v. Computer Associates International, Inc.
    U.S. District Court — Eastern District of New York



Case No. 04-CV-2652 (JS)(ETB)

91. In re Oxycontin Antitrust Litigation
U.S. District Court — Southern District of New York (Judge Stine)
Case No. 04-md-1603 (SHS)

92. **Avid Technology, Inc.** v. Harmonic Inc.
U.S. District Court — District of Delaware
Civil Action No. 1:11 CV-01040-GMS-SRF

93. **Gilead Sciences, Inc.** v. Sigmapharm Laboratories, LLC
U.S. District Court — District of New Jersey
C.A. No. 10-CV-4931 (SDW) (MCA)

94. **Bayer Healthcare LLC** v. Pfizer Inc.
U.S. District Court — Northern District of Illinois
Civil Action No. 1:12-cv-00630

95. Kimberly-Clark Corporation v. **Cardinal Health 200, LLC et al.**
U.S. District Court — Northern District of Georgia (Atlanta Division)
Civil Action No. 1:10 CV-0034-CAP

96. Multimedia Patent Trust v. **Apple Inc., LG Electronics, Inc. et al.**
U.S. District Court — Southern District of California
Case No. 10-CV-2618 JLS RBB

97. The Swatch Group Ltd. et al. v. **Tiffany and Company et al.**
Netherlands Arbitration Institute
NAI Case No. 3905

98. Boston Scientific Corporation et al. v. **Mirowski Family Ventures, LLC.**
U.S. District Court — Southern District of Indiana (Indianapolis Division)
Civil Action No. 1:11-cv-0736WTL DKL

99. **Tyco Healthcare Group LP et al.** v. Pharmaceutical Holdings Corp. et al.
U.S. District Court — District of New Jersey
C.A. No. 07-cv-1299 (SRC)(MAS)

100. Teva Neuroscience, Inc., et al. v. **Watson Laboratories, Inc., et al.**
U.S. District Court — District of New Jersey
C.A. No. 2:10-cv-05078 (CCC) (JAD); C.A. No. 2:11-cv-03076 (CCC) (JAD)

101. PSN Illinois, LLC. v. **Abbott Laboratories, Inc. and Abbott Bioresearch Center, Inc.**



U.S. District Court — Northern District of Illinois (Eastern Division)
Case No. 09-cv-05879

102. Hoffman-La Roche Inc. v. **Teva Pharmaceuticals USA, Inc. et al.**
U.S. District Court — New Jersey
Civ. Action No. 2:09-cv-05283; Civ. Action No. 2:09-cv-06335

103. Armando Plascencia et al. v. **Lending 1st Mortgage et al.**
U.S. District Court — Northern District of California
Case No. 4:07-cv-04485-CW

104. Aria Diagnostics, Inc. v. **Sequenom, Inc.**
U.S. District Court — Northern District of California
Case No. 3:11-cv-06391-SI

105. In re TFT-LCD (Flat Panel) Antitrust Litigation
On behalf of: **Dell Inc. and Dell Products L.P.**
U.S. District Court – Northern District of California (San Francisco Division)
Case No. 10 1064

106. MPEG-LA, L.L.C. v. **Audiovox Electronics Corporation et al.**
Supreme Court of the State of New York — County of Suffolk (Judge Emily Pines)
Index No. 24678/08

107. Genzyme Corporation v. **Seikagaku Corporation, Zimmer Holdings, Inc. et al.**
U.S. District Court — District of Massachusetts (Judge Douglas P. Woodlock)
C.A. NO.: 1:11-cv-1-636-DPW

108. Rembrandt Vision Technologies, LP et al. v. **Bausch & Lomb, Inc.**
American Arbitration Association
Case No. 14 122 Y 00403 09

109. **DSM Desotech Inc.** v. 3D Systems Corporation and 3D Systems, Inc.
U.S. District Court — Northern District of Illinois (Eastern Division)
Civil Case No. 08 C 1531

110. Onyx Pharmaceuticals, Inc. v. **Bayer Corporation et al.**
U.S. District Court — Northern District of California
Case No. 3:09-cv-02145-MHP

111. **Sanofi-Aventis Deutschland GMBH et al.** v. Glenmark Pharmaceuticals Inc., USA, et al.



U.S. District Court – District of New Jersey (Judge Dennis M. Cavanaugh)
C.A. No. 07-CV-05855 (DMC-JAD)

112. **Advanced Stent Technologies, Inc.** v. Boston Scientific Corporation
American Arbitration Association
Case Nos. 65 180 Y 00290 08 and 65 489 00292 08

113. Jayhawk Capital Management LLC, et al. v. **LSB Industries, Inc., et al.**
U.S. District Court – District of Kansas
Case No.: 08-CV-2561 EFM/JPO

114. Ortho-McNeil-Janssen Pharmaceuticals, Inc. et al. v. **Watson Laboratories, Inc., Sandoz, Inc., Lupin Pharmaceuticals, Inc. et al.**
U.S. District Court – District of New Jersey
Civil No.: 08-5103 (SRC)(MAS)

115. **Bristol-Myers Squibb Company (U.S.A.)** v. Daiichi Sankyo Company Limited (Japan)
International Court of Arbitration
ICC Case No. 15564/EC/VRO

116. Bayer Healthcare Pharmaceuticals, Inc. v. **Schering Corporation**
Court of Chancery of the State of Delaware
C.A. No. 3548-VCS

117. **LG Electronics U.S.A., Inc.** et al. v. Whirlpool Corporation et al.
U.S. District Court – District of Delaware (Judge Gregory M. Sleet)
Civil Action No.: 08-CV-234

118. **Microsoft Corporation** v. Franchise Tax Board
Superior Court of the State of California – For the County of San Francisco
Case No.: CGC 08-471260

119. Securities and Exchange Commission v. Biovail Corporation et al.
On behalf of: **John Miszuk**
U.S. District Court – Southern District of New York
Civil Action No.: 08 Civ. 02979(LAK)

120. **Claredi Corporation** v. SeeBeyond Technology Corporation
U.S. District Court – Eastern District of Missouri (Eastern Division)
Civil Action No.: 4:04-CV-1304RWS

121. **LG Electronics U.S.A., Inc.** v. Whirlpool Corporation
U.S. District Court – Northern District of Illinois (Eastern District)
Civil Action No.: 08 C 242



122. Unigene Laboratories, Inc. et al. v. **Apotex, Inc. et al.**
U.S. District Court – Southern District of New York
Civil Action No.: 06-CV-5571

123. Sanofi-Aventis Canada Inc. et al. v. **Novopharm Limited**
Federal Court of Canada – Toronto
Court File No. T-1161-07 Dated December 5, 2007

124. **3M Company et al.** v. Moldex-Metric, Inc.
U.S. District Court – District of Minnesota
Civil Action No.: 03-CV-5292 (MJD/AJB)

125. Boehringer Ingelheim Pharmaceuticals, Inc. v. **Abbott Laboratories et al.**
Private Arbitration — Chicago, Illinois

126. Thomas Johnson v. **Clark/McHugh/Rausch and Walsh/Riteway**
Circuit Court of Cook County, Illinois (County Department, Law Division)
Case No.: 03 L 015015

127. Aventis Pharma S.A. v. **Baxter Healthcare Corporation**
The International Institute for Conflict Prevention and Resolution
CPR File: G-08-05

128. In re K-DUR Antitrust Litigation
On behalf of: **Schering-Plough Corporation**
U.S. District Court – District of New Jersey
Civil Action No.: 01-1652 (JAG); MDL Docket No. 1419

129. The Procter & Gamble Company v. **Ultreo, Inc.**
U.S. District Court – Southern District of New York
Civil Action No. 07 CIV 8379 (HB) (Judge Richard Sullivan)

130. Church & Dwight Co., Inc. v. **Abbott Laboratories**
U.S. District Court – District of New Jersey
Civil Action No. 05 CV 2142 (GEB) (Judge Garrett E. Brown)

131. **Boehringer Ingelheim International GmbH and Boehringer Ingelheim Pharmaceuticals, Inc.** v. Barr Laboratories Inc.
U.S. District Court – District of Delaware
C.A. No. 05-700-(KAJ) (Judge Joseph J. Farnan, Jr.)

132. **The Dow Chemical Company** v. Shell Oil Company
Circuit Court of Cook County, Illinois (County Department, Law Division)
Civil Action No.: 00L13873



133. Fresenius Medical Care Holdings, Inc. and Nabi Biopharmaceuticals, Inc. v. **Roxane Laboratories, Inc.**
U.S. District Court – Southern District of Ohio (Eastern Division)
Case No.: C2 05 889

134. Dyson Technology Limited and Dyson, Inc. v. **Maytag Corporation**
U.S. District Court – District of Delaware
Civil Action No.: 05-434-GMS

135. Casmier Bobak and Jeanette Bobak v. **The City of Chicago et al.**
Circuit Court of Cook County, Illinois (County Department, Law Division)
Case No.: 02 L 6981

136. **Shuffle Master, Inc.** v. Yehia Awada and Gaming Entertainment, Inc.
U.S. District Court – Northern District of Illinois (Eastern Division)
Case No.: CV-S-05-1112-RCJ-RJJ

137. **Schering-Plough, Ltd.** v. Centocor, Inc.
American Arbitration Association
AAA No.: 50 181 T 00350 05 (Judge Edward N. Cahn)

138. Christopher Boyle et al. v. **Advanced Bio Prosthetic Surfaces, Ltd., ABPS Management, L.L.C., et al.**
American Arbitration Association
AAA No.: 70 180 Y 00655 04

139. Diodem, LLC v. **Biolase Technology, Inc.** et al.
U.S. District Court – Central Division of California (Western Division)
CV-03-2142 GAF (RCx)

140. Federal Trade Commission v. Mercury Marketing of Delaware, Inc. et al.
On behalf of: **Mercantile Capital LLC**
U.S. District Court – Eastern District of Pennsylvania
C.A. No. 00-CV-3281 (Judge Clifford Scott Green)

141. **Pfizer, Inc., Warner Lambert Company et al.** v. Ranbaxy Laboratories Limited et al.
U.S. District Court – District of Delaware
Case No.: 03-209-JJF (Judge Joseph J. Farnan, Jr.)

142. **ATI Systems, Inc.** v. PECO Energy Company
American Arbitration Association
AAA No.: 14 117 00892 03 (Judge John J. Gibbons)



143. In re Relafen Antitrust Litigation
    **Eon Labs, Inc.** v. GlaxoSmithKline PLC et al.
    U.S. District Court – District of Massachusetts
    Master File No.: 01-12239-WGY; Civil Action No.: 03-10506-WGY

## Preprints and Publications

1. "The Best Way to Value Biotech for Deal Making and Investments," *Intellectual Asset Magazine*, Autumn 2020 (with Grace Park).

2. "Econometric Analysis," *Litigation Services Handbook: The Role of the Financial Expert*, Sixth Edition, Roman L. Weil, Daniel G. Lentz, Elizabeth A. Evans, Editors, New York: John Wiley, 2017 (with Anna C. King and Christian D. Tregillis).

3. "Economic Analysis in Securities Class Certification," *Litigation Services Handbook: The Role of the Financial Expert*, Sixth Edition, Roman L. Weil, Daniel G. Lentz, Elizabeth A. Evans, Editors, New York: John Wiley, 2017 (with Michal A. Malkiewicz and Cathy M. Niden).

4. "Innovation Markets," *Market Definition in Antitrust: Theory and Case Studies*, American Bar Association, 2012, Chapter XIII (with Robert Maness).

5. "The Demise of the 25% Rule," *Intellectual Asset Management*, May/June 2011 (with Jonathan Tomlin).

6. "25 Percent Rule Rest in Peace," *Viewpoints*, Vol. XVIII No. 2, April 2011.

7. "Valuing Intellectual Property in Licensing Transactions," *The Licensing Journal*, June/July 2008.

8. "Economic Analysis in Securities Class Certifications," *Litigation Services Handbook: The Role of the Financial Expert*, 2008 Supplement, Roman L. Weil, Michael J. Wagner, and Peter B. Frank, Editors, New York: John Wiley, 2008 (with Cathy M. Niden).

9. "Econometric Analysis," *Litigation Services Handbook: The Role of the Financial Expert*, Fourth Edition, Roman L. Weil, Michael J. Wagner, and Peter B. Frank, Editors, New York: John Wiley, 2007 (with Christian Tregillis).

10. "A Primer on Trademarks and Trademark Valuation," *Economic Damages in Intellectual Property*, Daniel Slottje, Editor, New York: John Wiley, 2006 (with Michaelyn Corbett and David Teece).



11. "What Experts Should Fear Most," *Expert Alert*, Vol. 1, No. 1, Winter 2005, American Bar Association (with John Bone).

12. "Econometric Analysis," *Litigation Services Handbook: The Role of the Financial Expert*, 2003 Supplement, Roman L. Weil, Michael J. Wagner, and Peter B. Frank, Editors, New York: John Wiley, 2004 (with Christian Tregillis).

13. "Inferring Micro– from Macrolevel Change: Ecological Panel Inference in Surveys." Working Paper, UCLA and New York University, 2001 (with Alexander A. Schuessler).

14. "The Dynamics of the Democratic Peace," *Journal of Conflict Resolution*, Vol. 45(6), p. 818–833, 2001 (with Lars–Erik Cederman).

15. "Intellectual Property Protection Improves as India Implements the TRIPS Agreement," *India Business & Investment Report*, June 2000.

16. "TRIPS and Global Trade in Pharmaceuticals," Working paper, UCLA, 2000.

17. "Democratie et Commerce International," *Arès*, Vol. XVIII(46), November 2000 (with Michael D. Ward).

18. "Intellectual Property Rights and Foreign Direct Investment," Working paper, UCLA, 1998 (with Keith Maskus).

19. "Indian Defense Expenditures in a Changed Global Security Environment." *International Studies*, 1998.

20. "The Strategic Design of Trade Policy Outcomes," Working paper, UCLA, 1997 (with Susanne Lohmann).

21. "Patents and International Trade: An Empirical Study." In Robert M. Stern, Edward E. Leamer, and Keith E. Maskus, editors, *Quiet Pioneering*. Ann Arbor: University of Michigan Press, 1997 (with Keith E. Maskus).

22. "Market Openness and Trade Conflict," Working paper, UCLA, 1996.

23. "How Trade–Related are Intellectual Property Rights?" *Journal of International Economics*, Vol. 39, p. 227–248, 1995 (with Keith E. Maskus).

24. "Guns and Growth Around the Globe." *International Interactions*, Vol. 21(2), p. 181–201, 1995 (with Michael D. Ward et al).

25. "North American Trade in the Post Debt Crises Era." In Khosrow Fatemi, editor, *North American Free Trade Agreement: Opportunities and Challenges.* London: Macmillan, 1993, p. 84–97 (with Barry W. Poulson).



26. "Canons et croissance dans le monde," *Arès*, Vol. XIV(4), p. 15–31, 1993 (with Michael D. Ward).

27. "Economic Growth, Investment, and Military Spending in India." In Steve Chan and Alex Mintz, editors, *Defense, Welfare, and Growth.* London: Routledge, 1992, p. 119—136 (with Michael D. Ward et al).

28. "Military Spending in India." *Defence Economics*, Vol. 3, p. 41–64, 1991 (with Michael D. Ward et al).

## Presentations and Speeches

1. "Economics of Intellectual Property in Life Sciences Litigation," New York University School of Law, March 23, 2022 (with Anna King).

2. "The Coming Transformation of Medicine," Multidisciplinary Training Program in Child and Adolescent Health (TL1), Northwestern University Clinical and Translational Sciences Institute (NUCATS), December 13, 2021.

3. "Regression Analysis in Litigation," Revenue Estimation Case Study, AICPA & CIMA Forensic & Valuation Services Conference, November 9, 2020 (with Christian Tregillis).

4. "Disruptive Innovations in Biotechnology," Invited Speaker, IEEE Technology & Engineering Management Society, Chicago, June 29, 2018.

5. "The New World of Marketing and Finance," Shirley Ryan Lecture Series on "Big Data: Impact On Our Lives," Northwestern University, November 5, 2014.

6. "Role of the Expert After Apple v. Motorola," Litigating Patent Damages, Law Seminars International, San Francisco, May 29-30, 2014.

7. "Dealing with Uncertainty of Damages and Injunctive Relief in the World of IP," Annual Conference of the Association of Corporate Counsel, Wisconsin Chapter, Elkhart Lake, Wisconsin, May 9-10, 2013.

8. "Game Theory Applications to BioPharma Deal Negotiations," Annual Meetings of the Licensing Executives Society, Chicago, September 29, 2010.

9. "Valuing Pharmaceutical and Biotechnology Pipelines," a Professional Development Series Workshop at the Annual Meetings of the Licensing Executives Society, Chicago, September 26, 2010.



10. "Commercializing Technology Through the Power of IP Licensing," a Professional Development Series Course, Licensing Executives Society, Chicago, April 26, 2010.

11. "How to Value High Risk Early Stage Technologies," Mornings@McCormick, Northwestern University, Evanston, April 13, 2010.

12. "Valuation of Early Stage Pharmaceutical and Biotechnology Pipelines," Workshop at the Annual Meetings of the Licensing Executives Society, San Francisco, October 21, 2009.

13. "Valuation, Taxation, and Pricing Issues with Intellectual Property," Workshop at the Annual Meetings of the Licensing Executives Society, Orlando, October 19, 2008.

14. "Valuation of Early Stage Technologies," Indian School of Business, Hyderabad, India, August 19, 2008.

15. "Valuation of Intellectual Property," 2nd Annual Patent Law Institute, Practising Law Institute, New York, New York, January 14-15, 2008.

16. "Economic Analysis in Class Actions," Seminar on Innovative Strategies for Litigating Class Actions, Law Seminars International, Los Angeles, California, November 12–13, 2007.

17. Recent Key Developments in Intellectual Property Law and Applicability at the Global Level, XPRT Forum, Sonoma, California, October 3-6, 2007.

18. Effective Development and Presentation of Expert Testimony, Law Seminars International, Chicago, Illinois, September 24–25, 2007 (co-chair w/ Alan Silberman).

19. "Intellectual Asset Management: Valuation," a Professional Development Series Intermediate Course, Licensing Executives Society, Chicago, July 10, 2007.

20. "Intellectual Asset Management: Advanced Valuation Skills," a Professional Development Series Advanced Course, Licensing Executives Society, Philadelphia, June 13–14, 2007.

21. "Intellectual Asset Management: Valuation," a Professional Development Series Intermediate Course, Licensing Executives Society, Philadelphia, March 13, 2007.

22. "Intellectual Asset Management: Advanced Valuation Skills," a Professional Development Series Advanced Course, Licensing Executives Society, San Francisco, November 1–2, 2006.



23. "Implementing Valuation Methods," a Professional Development Series Intermediate Workshop at the Annual Meetings of the Licensing Executives Society, New York, September 12, 2006.

24. "Intellectual Asset Management: Valuation," a Professional Development Series Intermediate Course, Licensing Executives Society, San Francisco, April 25, 2006.

25. Effective Development and Presentation of Expert Testimony, Law Seminars International, Chicago, Illinois, March 20–21, 2006 (co-chair w/ Alan Silberman).

26. "Lost Profits When the Patent is Only Part of the Whole," Seminar on Calculating and Proving Patent Damages, Law Seminars International, San Francisco, California, February 27–28, 2006.

27. "The Use and Misuse of Statistics," The American Institute of Certified Public Accountants, Jersey City, New Jersey, December 2, 2005.

28. "Use of Statistics in IP Litigation" Presentation to McAndrews, Held & Malloy, Chicago, December 1, 2005.

29. "Intellectual Asset Management: The Deal," a Professional Development Series Fundamentals Course, Licensing Executives Society, Arlington, Virginia, November 8-9, 2005.

30. "Implementing Valuation Methods," a Professional Development Series Intermediate Workshop at the Annual Meetings of the Licensing Executives Society, Phoenix, October 18, 2005.

31. "Damages and Antitrust Issues in Intellectual Property Litigation" Presentation to Dykema Gossett, Chicago, July 21, 2005 (w/ Kathi Kedrowski).

32. "Intellectual Asset Management: Valuation," a Professional Development Series Intermediate Course, Licensing Executives Society, Chicago, July 19, 2005.

33. "Implementing Valuation Methods," a Professional Development Series Intermediate Workshop at the Annual Meetings of the Licensing Executives Society, Boston, October 17, 2004.

34. "Use of Surveys and Statistics in Litigation," Workshop at the Advanced Business Litigation Institute, Palm Springs, May 9, 2003.

35. "Real Option Valuation," Presented at the 2002 Winter Meeting of the Licensing Executives Society, Lake Las Vegas, February 14, 2002.



36. "Networked Computer Simulations," CyberSpace@UCLA, UCLA Anderson School of Management, Los Angeles, May 2, 2002.

37. "Improving IP Financial Performance." Presentation to Jones, Day, Reavis & Pogue, Los Angeles, June 20, 2001 (w/ David Haas).

38. "Intellectual Property: The New Global Currency," Jacob Marschak Colloquium, UCLA Anderson School of Management, June 8, 2001.

39. "Commerce and Democracy." Presented at the conference on Spatial Analysis for Political Methodology, University of Colorado, Boulder, March 2000.

40. "Determinants of International Trade Flows in an Era of Globalization." Presented at the UCLA Conference on International Institutions, Lake Arrowhead, February 2000.

41. "Exploring the Dynamics of Interstate Conflict." Presented at the Meetings of the International Studies Association, Des Moines, Iowa, October 1999.

42. "Exploring the Dynamics of Interstate Conflict." Presented at the UCLA Conference on Norms in International Relations, Los Angeles, October 1999.

43. "Globalization and the Decline of Power Politics." Presented at the Annual Meetings of the APSA, Atlanta, September 1999.

44. "Inferring Micro– from Macrolevel Change." Presented at the Annual Meetings of the MPSA, Chicago, April 1998 (with Alexander A. Schuessler).

45. "Overtime Inference in Cross Sectional Surveys." Presented at California Institute of Technology, November 7, 1997.

46. "Overtime Inference in Cross Sectional Surveys." Presented at UCLA, October 8, 1997.

47. "Ecological Inference in Cross Sectional Surveys." Presented at the Annual Meetings of the APSA, Washington, D.C., August 1997 (with Alexander A. Schuessler).

48. "Governance in a Multinational World." Presented at the Workshop on Global and Regional Governance, Institute of Global Conflict and Cooperation, UC San Diego, May 1997.

49. "The Strategic Design of Trade Policy Outcomes: The Politics of Section 301." Presented at the Annual Meetings of the APSA, San Francisco, August 1996 (with Susanne Lohmann).



50. "Polarization and Political Violence." Presented at the Summer Methods Conference, Ann Arbor, Michigan, July 1996 (with Patrick Asea).

51. "How Trade–Related are Intellectual Property Rights?" Presented at the International Economics Workshop, UCLA, April 3, 1996.

52. "The Politics of Section 301: Institutional Design and Policy Outcomes." Presented at the Annual Meetings of the International Studies Association, San Diego, March 1996 (with Susanne Lohmann).

53. "Military Spending in India." Presented at the Conference on Security in South Asia, Jawaharlal Nehru University, New Delhi, January 1996.

54. "Patents, Trade, and Foreign Direct Investment." Presented at the Annual Meetings of the Allied Social Science Associations, San Francisco, January 1996 (with Keith E. Maskus).

55. "Forecasting the Collapse of the Soviet Union." Presented at the Annual Meetings of the Peace Science Society International, Urbana–Champaign, November 1994 (with Michael D. Ward).

56. "Trade and Market Openness." Presented at the International Colloquium on Defining a New Partnership Between North America and Europe, Institute of Behavioral Science, Boulder, July 1994.

57. "Guns and Growth Around the World." Presented at the Annual Meetings of the International Studies Association, Washington, D.C., March 1994 (with Michael D. Ward).

58. "Trade and Patents: An Empirical Study." Presented at the National Bureau of Economic Research Universities Research Conference on International Trade Rules and Institutions, Cambridge, December 1993 (with Keith E. Maskus).

59. "The Trade Crises That Never Happened." Presented at the 6th Hispanic Symposium on Business and the Economy, Boulder, October 1992 (with Barry W. Poulson).

60. "Export Orientation and Economic Growth: Stylized Facts for Select Developing Countries." Presented at the Annual Meetings of the International Studies Association, Atlanta, April 1992 (with David R. Davis).

**Tab 2**

# List of Additional Materials Considered

***Defendant's Expert Reports***

1. Declaration of Mohan Rao, Ph.D., May 13, 2024 (including all materials considered in connection with that Declaration).

***SEC Documents***

1. Avadel Pharmaceuticals Plc, Form 10-Q for the quarterly period ending June 30, 2024.

2. Investor Presentation, Avadel Pharmaceuticals Plc, August 2024.

3. Jazz Pharmaceuticals Plc, Form 10-Q for the quarterly period ending June 30, 2024.

***Books, Articles and Other Information***

1. Mark Edwards, "Recent Trends in Effective Royalty Rates of Biopharma Alliances," BioSci, February 5, 2019.

**Trial Exhibits**

1. PDX-6

Tab 3

**Jazz Pharmaceuticals, Inc.**
**v.**
**Avadel CNS Pharmaceuticals, LLC**
*Civil Action Nos. 21-691, 21-1138, 21-1594*

# Direct Examination of
# Dr. Mark Rainey



PDX-6.1

# Proposed Royalty Rates



| Time Period | Royalty Rate |
|---|---|
| 2023-2025 | 27% |
| 2026-2032 | 13% |
| 2033-2036 | 3.5% |

PDX-6.18

# Recoupment Royalty Rate Calculation



| | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] |
|---|---|---|---|---|---|---|---|---|---|
| | | Forecast with Lumryz | | | Forecast without Lumryz | | | | |
| | Xyrem Net Revenue | Xywav Net Revenue | Xyrem AG Royalties | Xyrem Net Revenue | Xywav Net Revenue | Xyrem AG Royalties | Expected Jazz Losses | Lumryz Net Revenues | Recoupment Royalty Rate |
| 2023 | | | | | | | | | |
| 2024 | | | | | | | | | |
| 2025 | | | | | | | | | |
| 2026 | | | | | | | | | |
| 2027 | | | | | | | | | |
| 2028 | | | | | | | | | |
| 2029 | | | | | | | | | |
| 2030 | | | | | | | | | |
| 2031 | | | | | | | | | |
| 2032 | | | | | | | | | |
| 2033 | | | | | | | | | |
| 2034 | | | | | | | | | |
| 2035 | | | | | | | | | |
| 2036 (Jan-Feb) | | | | | | | | | |

Average Royalty Rate

| | | |
|---|---|---|
| [J] | 2023-2025 | 26.8% |
| [K] | 2026-2032 | 12.8% |
| [L] | 2033-2036 (Jan-Feb) | 3.4% |

Tab 4

*Alliance Trends*

# Recent Trends in Effective Royalty Rates of Biopharma Alliances



by **Mark Edwards**

📅 February 5, 2019

Share ⤴

> Over the past two years 300+ recent biopharma alliances have revealed their royalty and other financial terms via FOIA and other SEC filings. We've taken this opportunity to update our Effective Royalty Rate (EFR) analysis to reflect the most recent trends.

[ View Attached Document ]

## I. Introduction

In March 2017 BiosciBD published an article entitled Effective Royalty Rates in Biopharma Alliances: What They Are and Why Use Them in Negotiations. This article was based on an analysis of approximately 1,350 unredacted biopharma licenses and related agreements commenced between 1997 and 2016.

The 2017 analysis utilized effective royalty rates (EFRs) as the basis for evaluating post-commercialization terms of biopharma alliances. Briefly, the concept of EFR entails the application of an agreement's specific royalty rate provision to three assumed annual sales levels, namely $200M, $500M and $1 billion.

Approximately 60% (820) of the unredacted biopharma alliances in the 2017 analysis consisted of deals signed between 1997 and 2006, with the balance of the dataset fairly evenly divided between the 1987-96 (263) and 2007-16 (276) time periods. These agreements were obtained from the BioSci deal database (BiosciDB.com)

as material contracts filed with the SEC. To obtain unredacted versions, most of these agreements were retrieved by BioSci via Freedom of Information Act (FOIA) requests.

Among other findings, the 2017 analysis observed that for biopharma alliances signed since 2007, average EFRs declined by 2-3% of annual product sales as compared to 1997-06 deals for all but discovery stage and regional licenses. Given the time lag associated with obtaining unredacted contracts via FOIA requests, however, the 276 deals in the 2007-16 cohort of biopharma alliances were too few to permit a more nuanced analysis of recent trends in EFRs.

We revisited this analysis recently and found that the 2007+ cohort of biopharma alliances with known EFRs in the BioSci deal database has grown substantially – to 595 deals having one or more royalty rates expressed as a percentage of product sales. This larger cohort was sufficient to permit an analysis of recent trends in EFRs of biopharma alliances.

As compared to our 2017 analysis, corporate and university EFRs have continued to slide even as Deal Sizes have increased. In the most recent 2013-18 deal cohort, average EFRs were 2-3% lower than in the decade ending in 2006, while average Deal Sizes doubled or more for all but lead stage deals. Secondly, as compared to worldwide alliances, Phase I/II and Phase III regional deals retained their higher EFRs in recent years, while preclinical stage regional deals fell by 2% and preclinical stage worldwide alliances experienced a 3% drop. Thirdly, while the 18 Top Pharma outspent other licensee categories (i.e. Mid Tier Pharma & 14 Major Biotechs, Japanese Pharma, Other Licensees) substantially in average Deal Size, these other licensee categories paid higher EFRs for both preclinical and late stage deals relative to Top Pharma.

The remainder of this paper is divided into the following sections: Section II describes the methodology used in the selection, coding and analysis of biopharma alliances in the current analysis; Section III discusses findings for the 595 biopharma deals signed since January 2007 taken as a group; Section IV shows changes in EFRs over the 2007 and 2008-09 time intervals; Section V shows changes in EFRs over the 2010-12 and 2013-18 time intervals; and Section VI presents conclusions and suggestions for additional research.





## II. Methodology

As with the 2017 analysis, all of the biopharma agreements used in the current study were obtained from the BioSci deal database ( BiosciDB.com ). BiosciDB tracks biopharma alliances and acquisitions from the early 1980s to the present. The deal database currently consists of approximately 24,600 SEC-filed biopharma contracts and amendments, of which 9,300 are redacted and 15,300 are available on an unredacted basis.

For the current study, I searched for deals signed since January 2007 which are coded by BioSci's analysts as having an EFR @ $200M sales of at least 0.5%. This selection criterion eliminated most acquisition, asset purchase, co-promotion, distribution, joint venture and supply agreements, since such deals generally don't utilize royalty-based sales compensation.

Of the 595 biopharma alliances, 72% (431) were FOIA versions of SEC-filed contracts, 19% (114) were SEC-filed contracts that weren't redacted when filed, 8% (47) were redacted SEC-filed contracts wherein the EFRs weren't redacted, and 1% (3) came from financial notes or deal press release disclosures. For trend analysis, the dataset was split into four approximately equal cohorts, as follows: 26% (152) of the deals were signed in 2007; 24% (143) of the deals were signed in 2008-09; 27% (164) of the deals were signed in 2010-12; and 23% (136) of the deals were signed in 2013-18.

BioSci's definitions of the various financial terms included in this analysis are as follows:

1. EFR $200M – the Effective Royalty Rate (EFR) owed by licensee to licensor in the event that annual net sales reach $200M;

2. EFR $500M – the Effective Royalty Rate (EFR) owed by licensee to licensor in the event that annual net sales reach $500M;

3. EFR $1B – the Effective Royalty Rate (EFR) owed by licensee to licensor in the event that annual net sales reach $1 Billion;

4. Deal Size – a summation of all upfront, R&D and milestone payments, including any equity or loan amounts, to be paid to the licensor; and

5. Maximum Share ("Max Share") – the highest royalty tier, profit split and/or transfer price owed to the licensor.

## III. EFR Analysis of 2007-18 Deals

Chart 1 shows the average EFRs for 595 biopharma alliances signed between January 2007 and December 2018. 26% (157) of the deals in the dataset involve universities or other research institutions (including the NIH) as licensor. Average EFRs for these university deals are 3.0 to 3.3%, and increase only slightly based on exclusivity or higher assumed sales levels. By contrast, 74% (438) of the deals in the dataset involve corporate licensors. Approximately 9% (38) of the corporate deals are nonexclusive, and these have EFRs of 5%, increasing slightly with higher assumed sales levels. 91% (400) of the corporate deals are exclusive, with EFRs approximately double the nonexclusive rates.

For the subset of 2007-18 exclusive corporate deals involving compounds in preclinical or more advanced stages of development at signing, Chart 1 shows that EFRs increase by 3-4% from preclinical to Phase I/II stage deals, and again by about 5% from Phase I/II to Phase III stage. In each instance, "Max Share" refers to the impact of profit split or supply-based sales compensation on average EFRs due to certain deals having these elements.

Table 1 displays average and median EFRs, Max Share and Deal Size for 2007-18 worldwide and regional corporate deals by development stage at signing. As might be expected, EFRs increase, on both an average and median basis, by stage at time of signing for worldwide and regional deals, as does Deal Size. Regional deals have lower non-royalty financial consideration than worldwide deals, which is unsurprising, but higher EFRs for preclinical and Phase I/II stages, which is somewhat unexpected. Also surprising is that discovery stage deals outperform lead and preclinical stage alliances, both in terms of deal size and EFRs, on an average and median basis.

Chart 2 graphs average EFRs at assumed annual sales of $500M for 2007-18 corporate worldwide and regional deals, as well as for university exclusive deals, by development stage at signing. Worldwide corporate deals show gains to EFR with each advance in stage at signing, with the biggest gain associated with deals commenced at Phase III. Regional corporate deals have higher EFRs than worldwide deals at preclinical, Phase I/II and Phase III stages (there are insufficient regional corporate deals at the discovery or lead stages to analyze). University deals, by contrast, show little gains to EFRs associated with deal commencement at more advanced stages of development.

Finally with respect to the 2007-18 dataset, Chart 3 shows that the average and median Deal Size for compound-based alliances involving 18 Top Pharma licensees is 2-7 fold higher than for other categories of commercialization partners, but these other licensees agreed to higher EFRs than did Top Pharma for preclinical and late stage deals.

## IV. EFR Analysis of 2007 Versus 2008-09 Deals

Chart 4 shows the average EFRs for 152 biopharma alliances signed during 2007, while Chart 5 has an equivalent analysis for 143 deals signed between January 2008 and December 2009. 72% (109) of the deals in the 2007 cohort involve corporate licensors, of which 59% (64) involve worldwide rights and 32% (34) are for one or two major geographic regions. The 2008-09 cohort has 73% (104) of alliances involving corporate licensors, of which 52% (54) are for worldwide rights and 39% (41) are for one or two major regions.

Average EFRs for 2008-09 worldwide corporate deals are 1.5% higher than for 2007, but regional corporate deals have lower EGFs in 2008-09 by 1-2%. For the subset of 2008-09 exclusive corporate deals involving compounds in preclinical or more advanced stages of development at signing, Charts 4 & 5 show that EFRs increased 1.5% for Phase I/II deals, increased slightly for Phase III deals, and decreased by 1-2% for Preclinical stage deals.

Case 1:21-cv-00691-GBW    Document 716    Filed 10/02/24    Page 46 of 63 PageID #: 37528

With respect to alliances involving universities or other research institutions as licensors, Charts 4 & 5 show that EFRs increased by 0.5% for exclusive licenses at Preclinical stage, but decreased by a similar percentage for exclusive licenses signed at lead stage of development.

## V. EFR Analysis of 2010-12 Versus 2013-18 Deals

Chart 6 shows the average EFRs for 164 biopharma alliances signed between January 2010 and December 2012, while Chart 7 has an equivalent analysis for 136 deals signed between January 2013 and December 2018. 69% (113) of the deals in the 2010-12 cohort involve corporate licensors, of which 63% (71) involve worldwide rights and 29% (33) are for one or two major geographic regions. The 2013-18 cohort has 82% (112) of alliances involving corporate licensors, of which 65% (73) are for worldwide rights and 27% (30) are for one or two major regions.

Average EFRs for 2013-18 worldwide corporate deals are 1% higher than for 2010-12 (but 3.5% lower than for the 2008-09 cohort, as noted above), while regional corporate deals also have 1% higher EGFs for the most recent period, and have returned to the EFR rates seen in 2007. For the subset of 2013-18 exclusive corporate deals involving compounds in preclinical or more advanced stages of development at signing, Charts 6 & 7 show that EFRs increased 1.5% for preclinical and Phase I/II deals but decreased by 1.5% for Phase III stage deals.

With respect to alliances involving universities or other research institutions as licensors, Charts 6 & 7 show that EFRs decreased slightly for exclusive licenses at both the lead and preclinical stages.

## VI. Conclusion & Additional Research

As noted in our 2017 analysis, effective royalty rates (EFRs) provide an easily understood tool for rendering tiered royalty rates comparable across various deal structures without losing the specific financial implications of each deal's royalty provision. When combined with other components of total deal consideration, such as upfronts and milestones, obtained from unredacted agreements, EFRs become a cornerstone of reliable benchmarking for negotiation, transfer pricing and reasonable royalty determination purposes. We intend to undertake additional analyses of recent trends in EFRs as more biopharma contracts become available through SEC filings and FOIA releases.

© 2021 BIOSCI. ALL RIGHTS RESERVED.

# *Recent Trends in Effective Royalty Rates of Biopharma Alliances*

Mark G. Edwards

Managing Director



# Chart 1:  Effective Royalty Rates (EFRs) for Biopharma Alliances Commenced Between 2007 and 2018

**For 595 Biopharma Alliances signed between 2007 and 2018, EFRs Increased on the basis of (i) Clinical stage at signing, (ii)  Corporate vs. University licensor, & (iii) Exclusive vs. Nonexclusive license**

| | | EFR $200M | EFR $500M | EFR $1B | Max Share |
|---|---|---|---|---|---|
| **By Stage (Corp & Excl)** | • Phase III (N=52) | 14.50 | 15.76 | 16.67 | 22.00 |
| | • Phase I/II (N=109) | 9.67 | 10.20 | 11.01 | 15.18 |
| | • Preclinical (N=85) | 6.51 | 6.89 | 7.39 | 10.20 |
| **Corporate** | • All (N=438) | 9.37 | 9.83 | 10.37 | 14.01 |
| | • Exclusive* (N=400) | 9.79 | 10.29 | 10.88 | 14.62 |
| | • Nonexclusive (N=38) | 5.02 | 5.05 | 5.06 | 7.71 |
| **University** | • All (N=157) | 3.21 | 3.22 | 3.27 | 3.44 |
| | • Exclusive (N=139) | 3.26 | 3.28 | 3.33 | 3.53 |
| | • Nonexclusive (N=16) | 3.00 | 3.00 | 3.00 | 3.00 |

\* Corporate exclusive licenses include 6 semi-exclusive deals for data aggregation purposes



# Table 1:  2007-18 Regional Deals Have Higher EFRs But Lower Deal Size than Worldwide Corporate Deals

| | EFR $200M | EFR $500M | EFR $1B | Max Share | Deal Size $M |
|---|---|---|---|---|---|
| **Discovery** | 6.45 Average | 6.71 Average | 7.15 Average | 13.19 Average | $267.2M Average |
| **WW (N=31)** | 7.00 Median | 7.00 Median | 7.50 Median | 10.00 Median | $204.6M Median |
| **Lead Stage** | 4.66 Average | 4.80 Average | 5.03 Average | 7.39 Average | $108.1M Average |
| **WW (N=25)** | 4.00 Median | 4.00 Median | 4.00 Median | 5.00 Median | $28.7M Median |
| **Preclinical** | 6.11 Average | 6.47 Average | 6.98 Average | 10.05 Average | $151.5M Average |
| **WW (N=72)** | 6.00 Median | 6.30 Median | 7.35 Median | 10.00 Median | $83.0M Median |
| **Regional (N=13)** | 8.73 Average | 9.22 Average | 9.65 Average | 11.04 Average | $36.4M Average |
| | 8.70 Median | 9.40 Median | 9.70 Median | 10.00 Median | $19.0M Median |
| **Phase I/II** | 9.37 Average | 9.77 Average | 10.59 Average | 15.27 Average | $291.6M Average |
| **WW (N=79)** | 10.00 Median | 10.00 Median | 10.50 Median | 12.00 Median | $114.4M Median |
| **Regional (N=30)** | 10.47 Average | 11.31 Average | 12.08 Average | 14.97 Average | $149.1M Average |
| | 10.00 Median | 10.20 Median | 10.95 Median | 14.00 Median | $85.0M Median |
| **Phase III** | 12.58 Average | 13.83 Average | 14.60 Average | 22.06 Average | $367.1M Average |
| **WW (N=17)** | 14.00 Median | 15.90 Median | 17.45 Median | 20.00 Median | $180.0M Median |
| **Regional (N=35)** | 15.43 Average | 16.64 Average | 17.61 Average | 21.97 Average | $194.4M Average |
| | 14.50 Median | 15.40 Median | 17.00 Median | 20.00 Median | $80.0M Median |

# Chart 2:  2007-18 Average EFRs by Stage of Development, Type of Licensor & Licensed Territory*



* Average Effective Royalty Rate (EFR) calculated for assumed annual sales of $500M/yr



# Chart 3: Top Pharma Spent More Cash for Compound Deals, But Other Licensees Gave Higher EFRs at Preclinical & Late Stages



**Deal Size for Preclinical to Phase III Alliances – 2007-18 ($M)**

Legend: Average (blue), Median (red)

| | Mid Tier & Major Bio (N=35) | Japanese (N=16) | Other Biotech (N=119) | Top Pharma (N=76) |
|---|---|---|---|---|
| Average | $221 | $126 | $64 | $451 |
| Median | $127 | $89 | $26 | $351 |

| | Average | Median | Average | Median | Average | Median | Average | Median |
|---|---|---|---|---|---|---|---|---|
| **Preclinical** | 7.5% | 6.5% | 8.8% | 9.3% | 7.0% | 6.2% | 6.0% | 7.0% |
| **Phase I/II** | 10.4% | 10.2% | 13.7% | 14.5% | 8.5% | 7.6% | 12.4% | 12.0% |
| **Phase III** | 16.0% | 16.0% | 13.8% | 14.0% | 16.4% | 15.6% | 15.3% | 16.2% |

\* Average & Median Effective Royalty Rate (EFR) calculated for assumed annual sales of $500M/yr



# Chart 4:  Effective Royalty Rates (EFRs) for Biopharma Alliances Commenced in 2007

**For 152 Biopharma Alliances signed in 2007, EFRs were higher than for the full 2007-18 period across most types of deals & stages of development**

| | | EFR $200M | EFR $500M | EFR $1B | Max Share |
|---|---|---|---|---|---|
| By Stage (Corp & Excl) | •Phase III (N=14) •Phase I/II (N=29) •Preclinical (N=19) | 14.33 9.97 8.12 | 15.99 10.71 8.76 | 17.28 11.42 9.48 | 23.14 17.62 11.29 |
| Corporate | •All (N=109) •Worldwide (N=64) •Regional (N=34) | 9.82 8.38 14.12 | 10.53 8.82 15.51 | 11.13 9.31 16.52 | 14.36 12.48 20.84 |
| University | •All Exclusive (N=35) •Excl Preclinical (N=8) •Excl Lead Stage (N=14) | 3.32 4.25 3.17 | 3.38 4.39 3.18 | 3.43 4.51 3.19 | 3.51 4.63 3.25 |



# Chart 5:  Effective Royalty Rates (EFRs) for Biopharma Alliances Commenced Between 2008 and 2009

**For 143 Biopharma Alliances signed between 2008 and 2009, EFRs Increased 1.5% Relative to 2007 Worldwide & Phase I/II Deals, but Decreased 1-2% for Regional and Preclinical Stage Deals**

| | | EFR $200M | EFR $500M | EFR $1B | Max Share |
|---|---|---|---|---|---|
| By Stage (Corp & Excl) | •Phase III (N=15)<br>•Phase I/II (N=29)<br>•Preclinical (N=15) | 15.03<br>11.50<br>6.88 | 16.28<br>12.09<br>7.20 | 17.05<br>13.61<br>7.47 | 23.47<br>20.16<br>12.27 |
| Corporate | •All (N=104)<br>•Worldwide (N=54)<br>•Regional (N=41) | 10.49<br>9.87<br>12.91 | 10.99<br>10.29<br>13.59 | 11.7<br>11.18<br>14.23 | 17.09<br>19.27<br>16.74 |
| University | •All Exclusive (N-35)<br>•Excl Preclinical (N=7)<br>•Excl Lead Stage (N=12) | 3.33<br>5.18<br>2.50 | 3.34<br>5.03<br>2.54 | 3.40<br>5.12<br>2.59 | 3.95<br>7.50<br>2.69 |



# Chart 6:  Effective Royalty Rates (EFRs) for Biopharma Alliances Commenced Between 2010 and 2012

**For 164 Biopharma Alliances signed between 2010 and 2012, EFRs Decreased Relative to 2008-09 Deals, with the Greatest Declines in Phase I/II and Preclinical Stage Deals**

| | | EFR $200M | EFR $500M | EFR $1B | Max Share |
|---|---|---|---|---|---|
| **By Stage (Corp & Excl)** | • Phase III (N=12) | 14.59 | 15.90 | 16.91 | 24.67 |
| | • Phase I/II (N=25) | 7.68 | 7.96 | 8.46 | 10.19 |
| | • Preclinical (N=25) | 5.06 | 5.27 | 5.69 | 7.91 |
| **Corporate** | • All (N=113) | 8.14 | 8.52 | 9.02 | 11.45 |
| | • Worldwide (N=71) | 6.37 | 6.66 | 7.08 | 9.03 |
| | • Regional (N=33) | 12.56 | 13.16 | 13.98 | 18.09 |
| **University** | • All Exclusive (N=46) | 3.32 | 3.32 | 3.37 | 3.42 |
| | • Excl Preclinical (N=15) | 3.43 | 3.42 | 3.45 | 3.37 |
| | • Excl Lead Stage (N=12) | 3.25 | 3.28 | 3.28 | 3.29 |



# Chart 7:  Effective Royalty Rates (EFRs) for Biopharma Alliances Commenced Between 2013 and 2018

**For 136 Biopharma Alliances signed between 2013 and 2018, EFRs Increased 1% Relative to 2010-12 Worldwide & Regional Deals;  EFRs for Preclincal & Phase I/II Deals Increased 1.5%, While Phase III Fell 1.5%**

| | | EFR $200M | EFR $500M | EFR $1B | Max Share |
|---|---|---|---|---|---|
| By Stage (Corp & Excl) | • Phase III (N=11)<br>• Phase I/II (N=26)<br>• Preclinical (N=26) | 13.90<br>9.20<br>6.51 | 14.63<br>9.73<br>6.92 | 15.13<br>10.19<br>7.44 | 15.64<br>11.90<br>10.44 |
| Corporate | • All (N=112)<br>• Worldwide (N=73)<br>• Regional (N=30) | 9.14<br>7.32<br>14.56 | 9.44<br>7.74<br>14.63 | 9.80<br>8.22<br>14.80 | 13.43<br>12.02<br>16.55 |
| University | • All Exclusive (N-23)<br>• Excl Preclinical (N=10)<br>• Excl Lead Stage (N=6) | 2.95<br>3.21<br>3.17 | 2.96<br>3.24<br>3.17 | 2.99<br>3.27<br>3.17 | 3.12<br>3.41<br>3.33 |



# Tab 5

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-K

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2023**

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**Commission File Number: 001-33500**

# JAZZ PHARMACEUTICALS PUBLIC LIMITED COMPANY
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Ireland** | **98-1032470** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**Fifth Floor, Waterloo Exchange**
**Waterloo Road, Dublin 4, Ireland D04 E5W7**
**011-353-1-634-7800**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, nominal value $0.0001 per share | JAZZ | The Nasdaq Stock Market LLC |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ | Non-accelerated filer | ☐ | Smaller reporting company | ☐ | Emerging growth company | ☐ |
|---|---|---|---|---|---|---|---|---|---|

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐    No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant, as of June 30, 2023, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $7,659,805,500 based upon the last sale price reported for the registrant's ordinary shares on such date on The Nasdaq Global Select Market. The calculation of the aggregate market value of voting and non-voting common equity excludes 1,610,713 ordinary shares of the registrant held by executive officers, directors and shareholders that the registrant concluded were affiliates of the registrant on that date. Exclusion of such shares should not be construed to indicate that any such person possesses the power, direct or indirect, to direct or cause the direction of the management or policies of the registrant or that such person is controlled by or under common control with the registrant.

As of February 21, 2024, a total of 62,345,283 ordinary shares, nominal value $0.0001 per share, of the registrant were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Certain information required by Part III, Items 10-14 of this Form 10-K is incorporated by reference to the registrant's definitive Proxy Statement for the 2024 Annual General Meeting of Shareholders to be filed with the Securities and Exchange Commission pursuant to Regulation 14A. If such Proxy Statement is not filed within 120 days after the end of the fiscal year covered by this Form 10-K, such information will be included in an amendment to this Form 10-K to be filed within such 120-day period.

Table of Contents

*Revenues*

The following table presents product sales, royalties and contract revenues, and total revenues for the years ended December 31, 2023, 2022 and 2021 (in thousands except percentages):

| | 2023 | Change | 2022 | Change | 2021[1] |
|---|---|---|---|---|---|
| Xywav | $ 1,272,977 | 33 % | $ 958,425 | 79 % | $ 535,297 |
| Xyrem | 569,730 | (44)% | 1,020,453 | (19)% | 1,265,830 |
| Epidiolex/Epidyolex | 845,468 | 15 % | 736,398 | 59 % | 463,645 |
| Sativex | 19,668 | 17 % | 16,825 | 32 % | 12,707 |
| Sunosi[3] | — | N/A(2) | 28,844 | (50)% | 57,914 |
| Total Neuroscience | 2,707,843 | (2)% | 2,760,945 | 18 % | 2,335,393 |
| Rylaze | 394,226 | 40 % | 281,659 | 229 % | 85,629 |
| Zepzelca | 289,533 | 7 % | 269,912 | 9 % | 246,808 |
| Defitelio/defibrotide | 184,000 | (5)% | 194,290 | (2)% | 197,931 |
| Vyxeos | 147,495 | 15 % | 127,980 | (5)% | 134,060 |
| Erwinaze/Erwinase | — | — | — | N/A(2) | 69,382 |
| Total Oncology | 1,015,254 | 16 % | 873,841 | 19 % | 733,810 |
| Other | 13,846 | 108 % | 6,643 | (32)% | 9,798 |
| Product sales, net | 3,736,943 | 3 % | 3,641,429 | 18 % | 3,079,001 |
| High-sodium oxybate AG royalty revenue | 75,918 | N/A(2) | — | — | — |
| Other royalty and contract revenues | 21,343 | 19 % | 17,945 | 18 % | 15,237 |
| Total revenues | $ 3,834,204 | 5 % | $ 3,659,374 | 18 % | $ 3,094,238 |

(1)  The results of operations of the GW business have been included from the closing of the acquisition of GW on May 5, 2021.
(2)  Comparison to prior period is not meaningful.
(3)  Net product sales of Sunosi U.S. are included until the date of divestment to Axsome of May 9, 2022.

*Product Sales, Net*

Xywav product sales increased in 2023 compared to 2022, primarily due to increased sales volumes of 28% and, to a lesser extent, a higher selling price. Xywav product sales were positively impacted by Xywav for IH as we see continued growth of new prescribers since its launch in late 2021 and by educational initiatives around the benefit of lowering sodium intake. Exiting 2023, there were 9,525 patients taking Xywav for narcolepsy and 2,775 taking Xywav for IH, an increase of approximately 11% and 59%, respectively, compared to 2022. Xywav product sales increased in 2022 compared to 2021, primarily due to increased sales volumes of 76% due to the positive impact of the launch of Xywav for IH in late 2021 and strong adoption in narcolepsy. Xyrem product sales decreased in 2023 compared to 2022, primarily due to decreased sales volumes of 49%, reflecting the strong adoption of Xywav by existing Xyrem patients and the impact of high-sodium oxybate competition, offset by a higher selling price and lower gross to net deductions. Xyrem product sales decreased in 2022 compared to 2021, primarily due to a decrease in sales volume of 23% reflecting adoption of Xywav by existing Xyrem patients, partially offset by a higher selling price. Epidiolex/Epidyolex product sales increased by 15% in 2023 compared to 2022, primarily due to increased sales volumes of 15% due to increased demand and expansion in European markets and, to a lesser extent, a higher selling price, partially offset by higher gross to net deductions. Epidiolex/Epidyolex product sales increased by 59% in 2022 compared to 2021, which included product sales from the closing of the GW Acquisition on May 5, 2021 to December 31, 2021. On a pro forma basis, Epidiolex/Epidyolex product sales increased by 12% in 2022 compared to 2021, primarily due to an increase in sales volumes of 16% and, to a lesser extent, a higher selling price, partially offset by higher gross to net deductions. Sunosi product sales decreased in 2022 as compared to 2021 as we completed the U.S. divestment of Sunosi in May 2022.

Rylaze product sales increased in 2023 compared to 2022, primarily due to increased sales volumes of 37% and, to a lesser extent, a higher selling price, offset by higher gross to net deductions. The increased sales volumes reflect the significant unmet patient need for a high-quality, reliable supply of Erwinia asparaginase for patients with ALL. Rylaze product sales increased in 2022 compared to 2021, primarily due to increased sales volumes following its launch in the U.S. in July 2021. Zepzelca product sales increased by 7% in 2023 compared to 2022, primarily due to a higher selling price and increased sales volumes, offset by higher gross to net deductions. Zepzelca product sales increased by 9% in 2022 compared to 2021, primarily due to a higher selling price and higher sales volumes. Defitelio/defibrotide product sales decreased by 5% in 2023

83

Tab 6





# Avadel Pharmaceuticals plc
## (NASDAQ: AVDL)

August 2024

©2024 Avadel. All rights reserved.

# Avadel: All the Components for Long-Term Growth

**LUMRYZ™ represents $1B+ peak sales opportunity in narcolepsy**

U.S net product revenue of **$41.5M for the second quarter** of 2024

More than **1,900 patients on LUMRYZ as** of Q2 2024

**Strong representation** across all narcolepsy patient segments

500 **top prescribers** compose 50% of prescription volume

**85% of top HCPs have prescribed LUMRYZ**

**sNDA** for LUMRYZ's use in **pediatric narcolepsy** under FDA review; target action date of **Sept 7**



**Initiated** Phase 3 **REVITALYZ™ trial** evaluating LUMRYZ for use in **Idiopathic Hypersomnia**

Future oxybate estimated **market value:**
**>$5B**
Represented by:
**> 50K Patients**





©2024 Avadel. All rights reserved.

# LUMRYZ has Significant Potential Future Peak Revenue Opportunity

Addressable market opportunity

**50k+**
patients

HCP reported market expansion[1]

**+35% - 113%**
of new patient starts

Future oxybate-treated patients (est)

**Today**       **Future**
**16k**  ▶  **20-25k**

HCP reported market share[1]

**50-60%**

Potential future range
of LUMRYZ treated patients

**>10k**



Peak sales[2]
opportunity

**>$1B**

Note: Figures above represent market opportunity, peak sales opportunity and potential patient opportunity based on available information and management's current beliefs regarding these opportunities but do not reflect estimates, expectations, guidance or plans.  Actual results may differ materially from the opportunities disclosed above.  Subject to change based on updated information and actual results.
Source: 1. Avadel proprietary market research (6 quantitative demand studies across ~700 oxybate prescribers) 2. Based on estimated current net pricing in the market, subject to change



6

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that true and correct copies of the foregoing document were caused to be served on September 16, 2024 on the following counsel in the manner indicated below.

### VIA EMAIL:

Jack B. Blumenfeld
Jeremy Tigan
Cameron Clark
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
cclark@morrisnichols.com

F. Dominic Cerrito
Eric C. Stops
Evangeline Shih
Andrew S. Chalson
Gabriel P. Brier
Frank C. Calvosa
Catherine T. Mattes
Abigail DeMasi
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
nickcerrito@quinnemanuel.com
ericstops@quinnemanuel.com
evangelineshih@quinnemanuel.com
andrewchalson@quinnemanuel.com
gabrielbrier@quinnemanuel.com
frankcalvosa@quinnemanuel.com
catherinemattes@quinnemanuel.com
abigaildemasi@quinnemanuel.com

*Attorneys for Plaintiffs*

Dated: September 16, 2024

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)