## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>AVADEL CNS PHARMACEUTICALS, LLC,<br><br>Defendant. | REDACTED PUBLIC VERSION<br>FILED OCTOBER 4, 2024<br><br>C.A. No. 21-691-GBW<br><br>████████████████████<br><br>█████████████ |
| JAZZ PHARMACEUTICALS, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>AVADEL CNS PHARMACEUTICALS, LLC,<br><br>Defendant. | C.A. No. 21-1138-GBW<br><br>████████████████████<br><br>█████████████ |
| JAZZ PHARMACEUTICALS, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>AVADEL CNS PHARMACEUTICALS, LLC,<br><br>Defendant. | C.A. No. 21-1594-GBW<br><br>████████████████████<br><br>█████████████ |

## RESPONSIVE LETTER TO THE HONORABLE GREGORY B. WILLIAMS REGARDING ONGOING ROYALTY

Dear Judge Williams:

Rather than start with the jury-awarded royalty rate, Dr. Rainey and Jazz cast it aside. Using the same damages model considered by the jury, Dr. Rainey and Jazz advance the same damages arguments from trial. Indeed, throughout his declaration, Dr. Rainey confirms that he is relying on the same circumstances on which he based his trial testimony about a pre-verdict reasonable royalty. *See, e.g.*, D.I. 689 ¶¶ 17-18, 24, 27, 34, 37, 40, 43, 48, 53. The jury rejected Jazz's arguments for a 27% royalty then, and the Court should reject them again now, because there are no changed circumstances that warrant the ongoing royalty rates Jazz seeks. In *ArcherDX*, the court rejected a similar do-over request from a plaintiff seeking to increase the jury's awarded rate from 7% to 10%. *ArcherDX, LLC v. Qiagen Scis., LLC,* No. CV 18-1019 (MN), 2022 WL 4597877, at *14-15 (D. Del. Sept. 30, 2022). Notably, the court found an increase was unwarranted despite plaintiff's changed status as the prevailing party because "***the jury considered all of the factors noted by Plaintiffs in making its royalty determination***." *Id.* (emphasis added); *see also DePuy Synthes Prods., LLC v. Globus Med., Inc.*, No. 11-652-LPS, 2014 U.S. Dist. LEXIS 61450, at *22 n.7 (D. Del. Mar. 25, 2014) (declining to consider evidence of same economic factors presented at trial). Indeed, it is an abuse of discretion to rely on the same evidence considered by the jury to alter the jury-awarded rate. *See XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1297 (Fed. Cir. 2018) (vacating decreased ongoing royalty that "essentially amounts to undoing a jury finding"). Here, even though Jazz prevailed at trial on the '782 patent, the resulting change in bargaining position alone does not justify Jazz's proposed royalty rates. Instead, in such scenarios, the ongoing royalty rate is frequently determined to be the ***same*** as the jury-awarded rate. *See* D.I. 690 at 2-3. And the modest increases sometimes granted are just that—modest. *See id.* at 3-4. For example, a jury-awarded rate of 3% might be increased to 3.5%. *Opticurrent, LLC v. Power Integrations, Inc.*, No. 17-CV-03597-EMC, 2019 WL 2389150, at *18 (N.D. Cal. June 5, 2019), *aff'd*, 815 F. App'x 547 (Fed. Cir. 2020). But as discussed below, there are no changed circumstances that would support a 757% increase in the jury's royalty award (through 2025) or a 286% increase in the jury's royalty aware (from 2026-2032) as Jazz proposes.

## I.       Jazz Overstates the Strength of Its Post-Verdict Bargaining Position

Jazz argues that it is in a stronger bargaining position and Avadel a weaker position at the post-verdict negotiation not just because of the verdict but because Lumryz remains Avadel's only product and Avadel is now considered a willful infringer. D.I. 687 at 2. Jazz is wrong on the facts and the law. On the facts, there is no difference pre-verdict and post-verdict in Avadel's product portfolio: the jury heard evidence that Lumryz is Avadel's only commercial product and that Avadel did not have a non-infringing alternative. Ex. 1 at 478:23-25, 588:24-589:16, 595:18-596:13; Reply "Rao Decl." ¶¶ 51, 55-56; *see also* D.I. 572 at 6.5 (jury instructions). That is unchanged. On the law, Jazz is wrong that Avadel is automatically, post-verdict, deemed a willful infringer who must pay higher damages than the jury's award. Jazz never accused Avadel of willful infringement. *See* D.I. 690 at 6-7. Post-verdict, Avadel's "continued infringement will be permitted pursuant to a court-ordered ongoing royalty," so Avadel "cannot be considered to have the 'specific intent to infringe.'" *Philip Morris Prods. S.A. v. R.J. Reynolds Vapor Co.*, No. 1:20-CV-393 (LMB/WEF), 2023 WL 2843796, at *13 (E.D. Va. Mar. 30, 2023). Jazz's cases are not to the contrary. Indeed, many of them were distinguished by cases Avadel cites. For example, *Purewick Corp. v. Sage Prods., LLC*, 666 F. Supp. 3d 419, 449 (D. Del. 2023) (cited by Avadel) is one of several decisions recognizing that increases in jury-awarded rates post-verdict are based

on factors *in addition* to the fact that one party prevailed at trial. *See id.* (distinguishing *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, *Inc.,* No. 03-577-PHX-MHM, 2010 WL 11484420, at *6 (D. Ariz. Sept. 9, 2010)). In sum, any increase in Jazz's bargaining position flowing from Jazz prevailing on one of the two asserted patents is accounted for by the jury-awarded rate or at most a modest enhancement. D.I. 690 at 2-4. Contrary to Jazz's argument, defendants in Avadel's position will not be incentivized "to fight each patent infringement case to the bitter end," D.I. 687 at 3, because there *is* a downside to losing—Avadel will owe Jazz an ongoing royalty until the '782 patent expires. And notably, Avadel prevailed on the '488 patent, which formed part of the basis for Jazz's damages demand at trial. This case is not one in which the plaintiff had a decisive victory. *See* D.I. 690 at 3-4 & n.2.

## II.    Jazz Misrepresents the Record on Post-Trial Economic Circumstances

Jazz's argument that the parties would "*merely presume*" possibilities at the pre-verdict hypothetical negotiation but would *know* allegedly new facts post-verdict runs headlong into the factual record. All of the "new" facts Jazz identifies are facts that Dr. Rainey testified would have been recognized by the parties at the pre-verdict hypothetical negotiation. Rao Decl. ¶¶ 32-62. For example, at trial Jazz made clear that "Avadel was expecting [Lumryz] to be a successful profitable product at the time." Ex. 1 at 585:18-25. And post-Lumryz launch, *i.e.*, after the May/June 2023 hypothetical negotiation, Dr. Rainey testified that "*things are going according to plan*." *Id.* at 588:14-20 (emphasis added). Dr. Rainey also testified Lumryz was causing Jazz to lose money, because of "the benefits of once-nightly, that Lumryz has and Jazz doesn't." *Id.* at 593:2-4.

Dr. Rainey's new declaration confirms that nothing has changed. At trial, Dr. Rainey proposed a tiered royalty rate of 27% (for 2023-2025), 13% (for 2026-2032) and 3.5% (for 2033-2036) based on Jazz's forecasts of product sales with and without Lumryz on the market. Ex. 1 at 591:1-5, 591:22-592:8; Ex. 2 at PDX-6.18, PDX-6.19; Rao Decl. ¶¶ 6-9. Dr. Rainey then determined "recoupment royalty" rates that correspond to the dollars necessary for Jazz to "recoup" its projected losses. Rao Decl. ¶¶ 8, 11 n.16. In his new declaration, Dr. Rainey relies on the exact same model, based on the exact same forecasts, to arrive at his "new" post-verdict royalty rate structure of 30%, 13%, and 3.5%. *Compare* D.I. 689 Ex. A *with* Ex. 2 at PDX-6.19; *see also* Rao Decl. ¶¶ 6-9. The only difference pre-verdict to post-verdict analysis is the *removal* of data from 2023 through Feb. 2024, which is why the rate increases from 27% to 30% for the first period. *Dr. Rainey uses no new data*. If economic circumstances had in fact changed, presumably Dr. Rainey would have used new data. His recycling of the same model that the jury considered and rejected thus confirms that Jazz is asking the Court to wholesale ignore the jury's determination. Jazz then refers to several other allegedly changed circumstances post-verdict, such as expanded insurance coverage for Lumryz. D.I. 687 at 3, 5-6. But that again is an issue that the parties would have considered as part of the pre-verdict hypothetical negotiation. *See* Rao Decl. ¶ 41. For example, on insurance, at Jazz's prompting, Mr. Divis testified that it is "fairly ordinary coursework . . . to try to get your drug reimbursed by insurance companies." Ex. 1 at 534:1-6.

Jazz also asserts that price erosion ███████████████ of Jazz's oxybates on formularies as a result of competition from Lumryz supports a drastic increase in ongoing royalty rate. But once again, there are no changed circumstances, because Jazz told the SEC in March 2023 (two months before the pre-verdict hypothetical negotiation) that it expected competition from Lumryz, as well as additional pressure from third party payors (i.e., PBMs) to "agree to

2

discounts, rebates or restrictive pricing terms." Ex. 3 at 34. At trial, Jazz then elicited testimony about Avadel pursuing a parity-pricing strategy for Lumryz. *See* D.I. 690 at 6. The accompanying declaration of Paul Weil, Avadel's Vice President of Market Access,  Weil Decl. ¶ 6. Mr. Weil also explains that

Weil Decl. ¶¶ 7-8. Thus, to the extent there has been any impact on the price of Jazz's oxybate products, that is based on circumstances that were known to Jazz as of the pre-verdict hypothetical negotiation date and remain unchanged post-verdict.

### A.    Jazz's Licensing History Does Not Support a Royalty Rate Increase

Jazz's discussion of its unwillingness to license its patents is neither a changed circumstance nor accurate. At trial, Jazz established that it did not want to license the '782 patent and argued that justified a 27% royalty. Ex. 1 at 572:5-9. According to Dr. Rainey's trial testimony, "because there's no noninfringing alternative, because the patents are key to the success of Lumryz, *in the absence of a license, Avadel's profits would be zero*." Ex. 1 at 597:17-598:7. In other words, Jazz contended that it would prefer that Avadel make no sales if Jazz did not get its 27% rate. Presented with that testimony, the jury awarded Jazz a royalty of 3.5% as fair compensation. *Joyal*, on which Jazz relies, does not support a drastic increase in the ongoing royalty on these facts; there, the increase was justified because the defendant "admitted to willful infringement . . . [and] never established a serious validity challenge." *Joyal Prods., Inc. v. Johnson Elec. N. Am., Inc.*, No. CIV. A. 04-5172 JAP, 2009 WL 512156, at *14 (D.N.J. Feb. 27, 2009). Here, an ongoing royalty rate at that same or a modestly increased rate will thus "adequately compensate" Jazz for the use of the '782 patent. *Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620, 630 (E.D. Tex. 2009). As for the licenses that Jazz has granted to various generic versions of Xyrem, the jury did not hear about them because Dr. Rainey deemed them not comparable and did not rely on them for their royalty rates. Ex. 4 at 46:8-47:2, 51:6-18; Ex. 5 ¶¶ 38-50; Rao Decl. ¶¶ 15-23. He is now changing his tune, but he has no basis to do so. Moreover, if Jazz believes that settlement agreements with generics are relevant despite its arguments to the contrary (the AG agreements are from settlements, Ex. 4 at 52:8-53:1), then Jazz should also recognize as relevant the settlements under which Jazz licensed generic Xyrem to be sold ▮▮▮▮▮▮▮▮▮▮. Ex. 4 at 58:1-59:8, 67:24-68:20; *see also* Rao Decl. ¶ 22.

### B.    Neither Direct Competition nor Lumryz's Success Is a Change

There was no dispute at trial that Jazz and Avadel are direct competitors. *See* D.I. 690 at 1, 5-6; Rao Decl. ¶¶ 32-36. Lumryz had been on sale for months when trial began, and Mr. Divis openly conceded that competition between Jazz and Avadel was ongoing. Ex. 1 at 531:20-532:16. Avadel only contended that *for Project Zeta*, in 2018, the parties would have had an inventor/promotor relationship. *Id.* at 606:22-607:17. It is also not a change that Jazz was expecting ▮▮▮▮▮▮▮▮▮▮ in sales to Lumryz, because this was part of Dr. Rainey's damages analysis then and remains part of it now. *Compare* D.I. 689 Ex. C *with* Ex. 2 at PDX-6.20 (column D). Nor is it a change that Avadel has a loan agreement under which it makes payments at a rate above 3.5%. Dr. Rainey admitted that the RTW agreement is a loan agreement, not a patent license, and is *not relevant* to the hypothetical negotiation. Ex. 5 ¶ 69; Ex. 4 at 112:9-16. RTW thus does not set a "market rate," and *Bard*, on which Jazz relies, is therefore inapposite.

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 670 F.3d 1171, 1193 (Fed. Cir. 2012).

As for the fact that there are now doctors that Avadel did not solicit prescribing Lumryz, Jazz provides no reason to think the bulk of those doctors' patients switched from Xyrem or Xywav. If anything, the opposite is more likely to be true, because at trial, Jazz argued that Avadel was specifically targeting doctors who were already prescribing Xyrem and Xywav and encouraging them to switch to Lumryz. Ex. 1 at 504:21-505:8. And it is not new that Avadel is not just treating "switch" patients, but also patients who discontinued treatment with Xyrem or Xywav. *Id.* at 504:21-505:14. Avadel becoming profitable this year is also not new; Dr. Rainey testified that it would happen in 2024. *Id.* at 588:11-13; *id.* at 587:22-588:2. As for "the specter of a permanent injunction," it is unclear what Jazz means. For narcolepsy, the parties understand that "an injunction is not proper under *eBay*." *Paice LLC*, 609 F. Supp. 2d at 624. Finally, on discontinuation rates, if the jury assumed anything, it was likely that Lumryz have lower rates, because, as Dr. Corser explained, many patients discontinue Xyrem and Xywav because of the burden of twice-nightly dosing, which Lumryz avoids. *See* Ex.1at 635:6-22, 636:13-637:4.

### C.    The Jury Considered Jazz's Argument that Lumryz as a Whole Infringes

Dr. Rainey already testified that the '782 patent, in his view, "cover[s] the formulation of Lumryz as a whole." Ex. 1 at 585:5-17. Jazz argues, however, that the Court should ***correct*** the weight given by the jury to this testimony in the ongoing royalty context. But that is not the purpose of an ongoing royalty analysis, *see supra* at p.1, particularly when there is no reason to believe the jury's 3.5% rate was a mistake. After hours of deliberation, it is entirely possible that the jury agreed with Jazz that the patent covers the formulation of Lumryz as a whole and yet agreed with Avadel that Jazz's ***inventive*** contributions were minimal, particularly compared to Avadel's investment in Lumryz. Contrary to Jazz's suggestion, there is no special higher ongoing royalty required when a patent covers the entire drug. *AstraZeneca* was a bench trial, not a post-jury-ongoing royalty decision, and Jazz ***permits*** the same behavior at issue in *AstraZeneca*— generic competition. *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015).

### D.    The Jury Already Considered the Lack of a Ready Design-Around

Jazz acknowledges that the jury was asked to consider Avadel's lack of an acceptable non-infringing alternative as part of the pre-trial hypothetical negotiation. D.I. 687 at 7. Because only ***changed*** circumstances need be considered, *see* D.I. 690 at 4, Jazz's arguments on this point cannot support the excessive increases it requests. Moreover, even where an increase due to lack of a non-infringing alternative is warranted, that increase will be modest. For example, in *Syntrix*, on which Jazz relies, the jury found decisively in plaintiff's favor in only 2.5 hours, ***and*** the defendant had no acceptable non-infringing alternative, yet the jury-awarded rate was increased by only thirty-three percent, from 6% to 8%, with a fifty-percent increase to 9% deemed ***too high***. *Syntrix Biosystems, Inc. v. Illumina, Inc.*, No. C10-5870 BHS, 2013 WL 3089448, at *2 (W.D. Wash. June 18, 2013). Putting aside the absence of a similar decisive jury verdict here, *see* D.I. 690 at 4, *Syntrix* would support increasing the rate from 3.5% to 4.65% at the most—not 30%.

### III.    Conclusion

Avadel respectfully requests entry of Avadel's Proposed Order, D.I. 690-2.

Respectfully submitted,

*/s/ Daniel M. Silver*

Daniel M. Silver (#4758)

cc:      All counsel of record (via CM/ECF and E-Mail)

# EXHIBIT 1

1

2                          IN THE UNITED STATES DISTRICT COURT

3                          IN AND FOR THE DISTRICT OF DELAWARE

4
   JAZZ PHARMACEUTICALS, INC.,              )
5           Plaintiffs,                     )      C.A. No.
   v.                                       )      21-691-GBW
6                                           )
   AVADEL CNS PHARMACEUTICALS, LLC,         )
7           Defendant                       )
   --------------------------------         )
8                                           )      C.A. No.
   JAZZ PHARMACEUTICALS, INC., et al.,      )      21-1138-GBW
9           Plaintiffs,                     )
   v.                                       )
10                                          )
   AVADEL CNS PHARMACEUTICALS, LLC,         )
11  Defendant.                              )
   --------------------------------         )
12                                          )
   JAZZ PHARMACEUTICALS, INC., et al.,      )
13          Plaintiffs,                     )      C.A. No.
   v.                                       )      21-1594-GBW
14                                          )
   AVADEL CNS PHARMACEUTICALS, LLC,         )
15          Defendant.                      )

16

17                                  - - - -

18                          Wilmington, Delaware
                            Tuesday, February 27, 2024
19                          Trial Day 2

20                              - - - -

21

      BEFORE:  HONORABLE GREGORY B. WILLIAMS
22               UNITED STATES DISTRICT COURT JUDGE

23                              - - - -

24

25
                                  Michele L. Rolfe, RPR, CRR

DIRECT EXAMINATION - GREGORY DIVIS

1    A.    Yes.

2    Q.    You held that role until May 2019; yes?

3    A.    Yes.

4    Q.    So an interim CEO is someone who leads a company for

5    a temporary time, correct?

6    A.    Yes.

7    Q.    And then in May, Avadel decided that your role was

8    not going to be temporary and they made you the full-time

9    CEO; true?

10   A.    Yes, that's true.

11   Q.    And that's the role that you currently have today;

12   yes?

13   A.    Yes.

14   Q.    Okay.  And now, although you're the CEO of a

15   pharmaceutical company, you don't have any degrees or formal

16   training in science or medicine, correct?

17   A.    Yes, that's correct.

18   Q.    Okay.  And you're not a medical doctor, right?

19   A.    I am not.

20   Q.    Okay.  And your degree is in communications; true?

21   A.    Yes.

22   Q.    And you came to Avadel from a private equity firm;

23   true?

24   A.    Yes, that's true.

25   Q.    Okay.  And now this trial, as you know, involves an

DIRECT EXAMINATION - GREGORY DIVIS

1    Q.      And your target bonus is about $360,000, correct?

2    A.      Yes.

3    Q.      So that's on top of your $600,000 base, correct?

4    A.      Yes.

5    Q.      And you own approximately 149,100 shares of Avadel's

6    shock; true?

7    A.      Yes.

8    Q.      And outside of those shares, one of the perks of your

9    job is that if Avadel's shares increase to a certain price,

10   you have the option to buy even more stock, correct?

11   A.      Yes.

12   Q.      Okay.  So you have an incentive for Avadel's share

13   price to rise; true?

14   A.      Yeah, that's true.

15   Q.      Okay.  And also, currently, part of your compensation

16   is based on the success of Avadel's Lumryz product; true?

17   A.      Yes, that's true.

18   Q.      Okay.  And your compensation going forward, including

19   in terms of stock, is also tied to the success of Avadel's

20   Lumryz product; right?

21   A.      Yes, in a meaningful part, yes.

22   Q.      Okay.  All right.  Let's talk some now about Lumryz.

23           Now, Mr. Divis, Avadel's only commercial product

24   as of today is Lumryz; true?

25   A.      Yes, that's true.

DIRECT EXAMINATION - GREGORY DIVIS

1    Q.    Okay.  And so in layman's terms, that means that the

2    FDA has never determined that Xyrem works better -- I'm

3    sorry, has never determined that Lumryz works better than

4    Xyrem and Xywav, correct?

5    A.    Not based on safety or efficacy, correct.

6    Q.    Okay.  Now, if you could turn with me to what's tab

7    number -- I'm sorry, JTX142 in your notebook, sir.

8              MR. PORTER:  And, Your Honor, I'd move to admit

9    JTX142 into evidence.  I don't believe that there's any

10   objection.

11             MS. DAVIS:  No objection.

12             THE COURT:  JTX142 is admitted.

13             (Exhibit admitted.)

14   BY MR. PORTER:

15   Q.    And if we go -- Mr. Divis, if you could go to -- you

16   see the little points there, like .1, .2, if you go to

17   142.34.

18   A.    .34?

19   Q.    Yes, sir.

20   A.    Yes.

21   Q.    Okay.  So we -- we see here, sir, that the FDA issued

22   a finding, as you noted, of clinical superiority for

23   Avadel's Lumryz product because it made a major contribution

24   to patient care over Jazz's Xyrem and Xywav products; is

25   that right?

DIRECT EXAMINATION - GREGORY DIVIS

1    A.      Yes, the FDA determined it to be clinically superior

2    to both Xyrem and Xywav on that basis of major contribution

3    to patient care.

4    Q.      Right, major contribution to patient care.

5            And that major contribution is that Lumryz, as a

6    once-nightly treatment, eliminates the need for patients to

7    have a nocturnal or a forced nighttime awakening to take a

8    second dose of oxybate, correct?

9    A.      Yes, that's what they said.

10   Q.      Right.  And -- and Jazz's Xyrem and Xywav are not

11   once-nightly treatments for symptoms of narcolepsy, correct?

12   A.      Correct, they're not.

13   Q.      Okay.  And to be clear, Lumryz is a once-at-bedtime?

14   A.      Yeah, once at bedtime.

15   Q.      Once at bedtime.  Okay.

16           Now, Avadel is able to achieve the

17   once-at-bedtime treatment of the symptoms of narcolepsy

18   through a combination of immediate-release and

19   controlled-release products in the Lumryz product, correct?

20   A.      Yeah, the microparticles, yes.

21   Q.      Okay.  And so in Avadel's view, because that helps

22   you to -- in other words, immediate release is you quickly

23   go to sleep, right?

24   A.      Yes, that's correct.

25   Q.      And then at some point later in the night, it's

DIRECT EXAMINATION - GREGORY DIVIS

1    from Houston, I talk fast.

2    A.    No worries.

3    Q.    Okay.  Now, switching patients from twice-nightly

4    oxybate product to Avadel's once-nightly oxybate product is,

5    in your words, certainly a goal for Avadel, isn't it?

6    A.    Yes, it's one of our primary goals and strategies,

7    amongst a few.

8    Q.    Right.  Because according to you, sir, it would be in

9    Avadel's financial benefit to switch as many of those

10   roughly 16,000 patients who are currently on twice-nightly

11   oxybate to once-nightly oxybate, correct?

12   A.    It certainly would, but, you know, ultimately that

13   decision is with the patient and physician, yes.

14   Q.    Right.  Right.  But the decision that would be made

15   would benefit Avadel financially, correct?

16   A.    Yes.

17   Q.    And also you personally, correct, because of the

18   bonus and the stocks?

19   A.    Yes.

20   Q.    Okay.  Now, Mr. Divis, one of the patient populations

21   Avadel targets, it's people who have never taken an oxybate,

22   right?

23   A.    Yes, that's correct.

24   Q.    Okay.  And another category would be people who tried

25   twice-nightly oxybates but stopped using them, correct?

DIRECT EXAMINATION - GREGORY DIVIS

1   A.      Yeah, it -- yes, definitely appears to be so.

2   Q.      Okay.  And if you would go with me to PTX300.7.  One

3   of the things that Avadel was talking about to investors at

4   this day was "addressing clear and indisputable unmet need,"

5   correct?

6   A.      That's correct.

7   Q.      Okay.  And the "unmet need" is the opportunity for

8   patients to not have to awaken in the middle of the night to

9   take a second dose of oxybate to get their full course of

10  treatment, right?

11  A.      In simple terms, yes, we're really referencing some

12  data and two different sources of data.

13  Q.      Fair enough.  And I'm not trying to fuss with you,

14  I'm just -- that's just -- that's what it is, right?

15  A.      It is, generally correct.

16  Q.      That's what Avadel says, right?

17  A.      Yes.

18  Q.      Okay.  And Avadel believes that its Lumryz product

19  addresses that unmet need, correct?

20  A.      We do.

21  Q.      Okay.  And part of Avadel's commercial strategy is to

22  drive demand for Lumryz with current high-volume oxybate

23  prescribers, true?

24  A.      Yeah, that's true.

25  Q.      Okay.  And so those are the doctors that Avadel was

1   going to prioritize going after, right?

2   A.      Yeah, we prioritized those physicians who are

3   experienced with oxybates.

4   Q.      Okay.  And those current high-volume oxybate

5   prescribers would be prescribers of Jazz's twice-nightly

6   oxybate products or the authorized generic version of

7   twice-nightly oxybate that's also made by Jazz, right?

8   A.      Yes, they would be.

9   Q.      Okay.

10  A.      And they were also the major sources of those who

11  previously discontinued.  Who had discontinued the oxybates,

12  we know that roughly half discontinued after starting within

13  the first year.

14  Q.      Right.

15  A.      And then that's where new patents really start as

16  well.

17  Q.      Okay.  Now if you could go with me to 300.100.  Okay.

18          Now, we see here that Avadel is telling

19  investors that even if generics for first generation

20  twice-nightly sodium oxybate enters in 2026, Lumryz expects

21  continued growth, right?

22  A.      We do think over the long-term, we will continue to

23  grow, yes.

24  Q.      Okay.  And, in fact, some of the sales

25  representatives that Avadel hired to sell its Lumryz product

DIRECT EXAMINATION - GREGORY DIVIS

1    even previously worked for Jazz, right?

2    A.    I do believe there are three of them.

3    Q.    Okay.

4    A.    Yes.

5    Q.    And if we could -- if you could go with me to

6    PTX300.108.

7          Okay.  And you see where -- this is basically

8    their kind of "in summary" page.  And it says that -- this

9    is what you're telling investors again, right, the money

10   people, right?

11   A.    Yeah, those --

12   Q.    Yeah.

13   A.    -- our investors.

14   Q.    Right.

15   A.    Potential investors, yes.

16   Q.    Right.

17         So investors would be either people who have

18   given you money or potential investors would be people, you

19   want their money, right?

20   A.    Well, as a publicly traded company --

21   Q.    Yeah.

22   A.    -- we don't necessarily get their money unless, you

23   know --

24   Q.    Yeah, not fussing with you, just asking.

25   A.    I understand.

DIRECT EXAMINATION - GREGORY DIVIS

1    Q.      Okay.  Now it states here that, "Lumryz is off to a

2    strong start," right?

3    A.      Yes.

4    Q.      Okay.  And Avadel says that, "Lumryz has the

5    potential to become the leading oxybate in narcolepsy and

6    exceed $1 billion in annual sales," correct?

7    A.      Yeah, that's what our research tells us.

8    Q.      Yeah.

9    A.      And we think that potential is there for us.

10   Q.      Right.  And this is what you're telling the people

11   who either you have their money or you want their money?

12   A.      Investors, yeah.

13   Q.      Yeah, there you go.

14           Now let's go back for a second to when Lumryz

15   was first approved by the FDA, I believe you -- again, you

16   were here yesterday and you recall seeing the document, the

17   May 1st, the May 1st, 2023 --

18           MR. PORTER:  I'm sorry, this is already in

19   evidence, Your Honor, we'll just pull it up, the press

20   release.

21   A.      Yes.

22   BY MR. PORTER:

23   Q.      Okay.  And Avadel sent out a press release that day

24   talking about Lumryz, right?

25   A.      Yes.

DIRECT EXAMINATION - GREGORY DIVIS

1           THE COURT:  JTX119 is admitted.

2           (Exhibit admitted.)

3    BY MR. PORTER:

4    Q.      Okay.  And Mr. Divis, you recognize this document?

5    A.      I do, yes.

6    Q.      Okay.  Avadel board of directors meeting, May 3rd,

7    2023?

8    A.      Yes.

9    Q.      Okay.  Now if you would go with me to JTX119.133.

10           It's on your screen, too.

11   A.      No, I got it, yeah.

12   Q.      Okay.  And so you see here, sir, that the -- as part

13   of the launch plan, the launch -- the Lumryz launch plan

14   overview, at this time Avadel had a reason to believe that

15   the overall body of evidence from market research and data

16   analytics and more supports that Lumryz will become a market

17   leader in a growing narcolepsy oxybate market, correct?

18   A.      Yes.

19   Q.      Okay.  That's what was told to the Board?

20   A.      Yes, it was.

21   Q.      Okay.  And if we could go to 119.137.  And the Board

22   was also provided with the results of market research

23   studies, right?

24   A.      Yes, they were.

25   Q.      Okay.  And the market research studies were conducted

DIRECT EXAMINATION - GREGORY DIVIS

1   from 2020 through 2023, I believe.

2   A.     Yes, that's correct.

3   Q.     Okay.  And they show that in May 2023, Avadel

4   expected Lumryz to capture 50 to 61 percent of oxybate

5   sales, correct?

6   A.     Well, the research at all these points in times were

7   done to present the product profile to physicians and then

8   ask them what their intentions were.  So, yes, that's

9   what -- that's a share of the market based upon

10  physician-stated intent to use Lumryz.

11  Q.     I think you kind of answered, but you had some

12  qualifications.

13  A.     Oh, I'm sorry.

14  Q.     No, no, it's fine.

15         So I just want to ask it again.

16  A.     Okay.

17  Q.     What we're looking at right here, as of -- what was

18  being presented in May of 2023, is that Avadel expected

19  Lumryz to capture 50 to 61 percent of oxybate sales; true?

20  A.     Well, of the -- of oxybate-treated patients based

21  upon physician feedback, yes, but...

22  Q.     Yeah.

23  A.     Yeah.

24  Q.     Of the people who would purchase the medicine, you

25  wanted 50 to 60 -- you expected to get 50 to 61 percent of

DIRECT EXAMINATION - GREGORY DIVIS

1   them?

2   A.    May I answer just -- answer just slightly different,

3   which is of -- of the patients that physicians were going to

4   put on a oxybate product in the future, the estimation

5   across those four or five different research projects was

6   they would expect Lumryz to get somewhere between 50 and

7   60 percent, and that the use of oxybates would grow

8   according to the bottom.

9   Q.    Now, Lumryz is currently FDA approved to treat -- I'm

10  sorry.  Again, Lumryz is currently approved for

11  once-nightly, correct -- once at bedtime?

12  A.    Yeah.  Interchangable, but once at bedtime, yes, sir.

13  Q.    Okay.  And it's currently FDA approved for the

14  treatment of cataplexy or excessive daytime sleepiness in

15  adults with narcolepsy, right?

16  A.    Yes, that's correct.

17  Q.    All right.  But currently, Lumryz does not have an

18  indication for treatment of narcolepsy in pediatric

19  patients, true?

20  A.    No, it doesn't, not yet.

21  Q.    Okay.  But Avadel is seeking a pediatric indication

22  now, isn't it?

23  A.    Yeah, we have filed our application with the FDA.

24  Q.    Okay.  And if you go with me to 119.63.

25        Whenever you're ready.

DIRECT EXAMINATION - GREGORY DIVIS

1   Q.      Okay.

2                MR. PORTER:   And if we could go to slide 43,

3   which is 122.43.

4   BY MR. PORTER:

5   Q.      Okay.  And, again, that's all data as of July 23rd,

6   except reach/frequency July 24th, right?

7   A.      Yes.

8   Q.      Okay.  Now, do you see a Lumryz source of business

9   row here?

10  A.      Yes, I do.

11  Q.      Okay.  And that tracks whether the patient switched

12  from twice-nightly oxybate, whether there was a

13  discontinuation patient, or whether the patient had never

14  taken oxybate before, correct?

15  A.      Yeah, that is correct.

16  Q.      Okay.  And at this point, I think that it -- right

17  here, sorry for -- it says that there's a 74 percent switch,

18  so 74 percent of Lumryz's patient enrollment were patients

19  that switched from other oxybate products, correct?

20  A.      That is correct.

21  Q.      Okay.  Now, as we've seen, Avadel was seeking to take

22  those patients from Jazz and switch them on to Lumryz,

23  correct?

24  A.      Well, it was a primary goal to target physicians to

25  educate them about possibly switching, but that's often a

DIRECT EXAMINATION - GREGORY DIVIS

1    physician and patient decision.

2    Q.      Right, but as we've established a little -- a long,

3    long time ago when we first started, you want to get as many

4    of the -- the patients who often take Jazz's products to use

5    Lumryz's product, that's just -- yeah.

6    A.      Yeah.

7    Q.      Okay.

8    A.      For eligible patients that a doctor --

9    Q.      Sure.

10   A.      -- decides is -- warrants the switch --

11   Q.      Right.

12   A.      -- yeah.

13   Q.      Yeah.  You don't want to give it to anybody who

14   doesn't need it.

15   A.      That is correct.

16   Q.      Right.  Now, moving forward in time, Avadel updated

17   its investor slides in early January 2024, correct?

18   A.      Yes.

19   Q.      Okay.  And if we could go to PTX1899, please.

20            MR. PORTER:  And, Your Honor, I'd like to move

21   to admit PTX1899 into evidence.

22            MS. DAVIS:  No objection.

23            THE COURT:  PTX1899 is admitted.

24            (Exhibit admitted.)

25   BY MR. PORTER:

DIRECT EXAMINATION - GREGORY DIVIS

1   Q.      And whenever you're ready, sir.

2   A.      Sure.

3   Q.      Okay.  Ready?

4   A.      Yes.

5   Q.      And this is the January -- this is January 2024,

6   correct?

7   A.      Yes.

8   Q.      Okay.  So just last month?

9   A.      Just last month, yes.

10  Q.      Okay.  And this document is a -- Avadel's

11  January 2024 investor slides, correct?

12  A.      Yes.

13  Q.      Okay.  And Avadel is, at this time -- well, let's

14  just go -- if you could go with me to 1899.7, yeah.

15          So Avadel is still reporting a greater than

16  $1 billion opportunity for Lumryz in the U.S., right?

17  A.      Yeah, same slides from the commercial day earlier --

18  Q.      Right.

19  A.      -- in June of 2023.

20  Q.      Right.  And -- but if something was off or wrong

21  about previous slides, you would update them.  You wouldn't

22  put incorrect information -- or keep incorrect information

23  in a slide deck, right?

24  A.      No, that's correct.

25  Q.      Okay.

DIRECT EXAMINATION - GREGORY DIVIS

1    A.      Yeah.

2    Q.      And Avadel also reported that based on market

3    research of healthcare professionals, it expects

4    50-60 percent share of oxybate sales, correct?

5    A.      Of patients being treated, right?  So that's how --

6    that's how share is captured --

7    Q.      Well, we --

8    A.      -- the same topic we discussed.

9    Q.      The market is the -- the market is the market, right?

10   A.      Correct.

11   Q.      And of that market, Avadel expected to get

12   50-60 percent.  That's -- I know you -- I'm just saying of

13   the market.

14   A.      Of the treated patient pool.

15   Q.      Right, but that's -- that's the market, right?

16   A.      So -- well, you have the big pie.

17   Q.      Okay.

18   A.      And then you have the treated pie.

19   Q.      Okay.

20   A.      And then amongst the treated pie, you have share

21   amongst the treated pie.

22   Q.      And so of the treated pie of the market, you want

23   50-60 -- you're expecting 50-60 percent?

24   A.      That's what our ATP reported market share said in

25   our -- in our research.

DIRECT EXAMINATION - GREGORY DIVIS

1   A.      Yes.

2   Q.      Okay.  And that would be patient segments for

3   narcolepsy, right?

4   A.      Yeah, these are patients who would -- who are

5   narcolepsy patients, people with narcolepsy.

6   Q.      Right.  Right.  Now, on January 8th, 2024, Avadel

7   issued a press release with some 2023 highlights, correct?

8   A.      Yes, we did.

9   Q.      Okay.  And if we could go to in your notebook

10  PTX1901.

11          MR. PORTER:  And, Your Honor, I'd like to now

12  move that into evidence.  I don't believe there's an

13  objection.

14          MS. DAVIS:  No objection, Your Honor.

15          THE COURT:  All right.  PTX1901 is admitted.

16          (Exhibit admitted.)

17          MR. PORTER:  And if we could blow that up there,

18  that would be great.

19  BY MR. PORTER:

20  Q.      And you see this is January 8th, 2024, and this is

21  the press release, sir?

22  A.      Yes, it is.

23  Q.      Okay.  And it has some -- some words here, that --

24  you know, that it's putting forth to the public, right?

25  A.      Yes.

DIRECT EXAMINATION - GREGORY DIVIS

1   Q.       It talks about more than 1,000 patients initiating

2   therapy through December 31st?

3   A.       Yes.

4   Q.       And that's December 31st of 2023, right, because this

5   is a look-back?

6   A.       Yes, it is.  Yeah.

7   Q.       Okay.  And Avadel also reported that "the majority of

8   Ryzup" -- R-Y-Z-U-P, or Ryzup, I'll call it -- "enrollments

9   and patients currently being treated with Lumryz are

10  patients who switched from first-generation oxybates,"

11  correct?

12  A.       Yeah, the majority of those patients enrolled and who

13  have initiated therapy have been switched patients.

14  Q.       Okay.  And, again, the "first-generation oxybate"

15  refers to Jazz's Xyrem and Xywav products, correct?

16  A.       And the authorized generic.

17  Q.       Okay.  And the press release also reports on certain

18  contracts being in place, correct?

19              MR. PORTER:  Your Honor, I think one of the

20  jurors needs a break.

21              THE COURT:  Okay.  All right.  We'll take a

22  break.  Let the jury use the bathroom.

23              Let's take a 10-minute break at this time.

24              All right.  We'll come back at 3:40 p.m.

25              (Recess taken.)

DIRECT EXAMINATION - GREGORY DIVIS

1          (Whereupon, the jury entered the room.)

2          MR. PORTER:  May it please the Court?

3          THE COURT:  Yes.

4          MR. PORTER:  Thank you, Your Honor.

5          If we could pull back up, I think we were on

6     PTX1901, Derreck.

7     BY MR. PORTER:

8     Q.    So, Mr. Divis, where -- we left off talking about

9     RYZUP and on the same page of this press release from

10    January, it also reports on certain contracts being in

11    place, correct?

12    A.    Yes, it does.

13          MR PORTER:  Okay.  If you could pull those up,

14    and scroll -- the sign.  There we go.  Perfect.

15    BY MR PORTER:

16    Q.    So there are terms here like GPO entities or

17    including, you know, Emisar that may be unfamiliar to some

18    people, but basically this means that Avadel has gotten

19    contracts in place relating to getting Lumryz covered by

20    insurance, right?

21    A.    Yeah, I would think of it as the entity above, kind

22    of the contracting entity, that, then, you have to work down

23    through that entity to try to get actual coverage, but the

24    contract is first.

25    Q.    Right.  Okay.

DIRECT EXAMINATION - GREGORY DIVIS

1    **So, again, this is just further showing Avadel's**

2    **plan to move forward towards that potential greater than**

3    **$1 billion market?**

4    A.      I would define that as fairly ordinary coursework

5    that everyone in the industry does to try to get your drug

6    reimbursed by insurance companies.

7    Q.      But when you get reimbursed by a insurance company,

8    you're making revenue for Avadel, correct?

9    A.      That's correct.

10   Q.      That's money into the company, correct?

11   A.      Yes, it is.

12   Q.      And that's going to be money that will help you to

13   reach the goal of getting to over a billion dollars,

14   correct, in sales, that's just -- I'm not trying to dispute

15   where the money comes from but that is something that will

16   help you get to that target, right?

17   A.      It's a step in the process to build Lumryz.

18   Q.      Great.  All right.  Let's finish up on the

19   relationship between Jazz.

20          So at the end of the day, Mr. Divis, as we've

21   talk about over the course of the last hour or so, Avadel

22   admits that it did in fact try to get Jazz's help to work

23   with and develop Lumryz, right?

24   A.      Well, we entered into a mutual discussion to see if

25   there was a potential collaboration that we talked about

DIRECT EXAMINATION - GREGORY DIVIS

1    Q.      So this is a lot of text, so I'm going to ask you if

2    you can read for us, on the first line, the sentence that

3    begins at the end, starting "for narcolepsy patients."

4              Can you read that part?

5    A.      Read just the sentence?

6    Q.      Yes, read that sentence.

7    A.      "For narcolepsy patients who are not sensitive to

8    sodium intake, OOPD" -- which is the office of orphan

9    products, they are the office that makes this determination

10   at the FDA -- "concludes that a once-nightly dosed oxybate

11   drug will provide a significant therapeutic advantage."

12   Q.      Can you go on and read through to the sentence that

13   ends with the footnote 210?

14   A.      "It is true that patients who are not sensitive to

15   sodium could also benefit from a reduction in sodium, but we

16   consider the benefit offered by once-nightly dosing to

17   outweigh the risk of increased sodium intake in such

18   patients, because having to wake up to take a second dose is

19   antithetical to oxybate's goal of improving sleep.

20              "Disrupting sleep contributes to chronic sleep

21   loss, which is well known to cause reduced performance,

22   increased risk for accidents and death, and detrimental

23   effects on both psychological and physical health.  And

24   there are other ways such patients may reduce sodium in

25   their diet."

DIRECT EXAMINATION - MARK RAINEY

1    company that has patents but doesn't sell products, you

2    might want to go out and find companies that you could

3    license your patents to to make some money.  So that would

4    be a licensing program.

5    Q.    And does Jazz have a licensing program?

6    A.    No, we heard, I think it was Mr. Honerkamp,

7    yesterday, talk about that.  They're focussed on selling

8    their own products, developing and selling their own

9    products, not licensing patents.

10   Q.    And how does the fact that Jazz does not have a

11   licensing program affect the reasonable royalty analysis?

12   A.    That tends to affect the reasonable royalty.

13   Q.    And did you consider the nature and scope of the

14   license the parties would agree to as part of your

15   hypothetical negotiation analysis?

16   A.    Yes.

17   Q.    And what did you determine?

18   A.    I determined it would be -- the license that they

19   would negotiate would be exclusive as to third parties and

20   all that means is that Jazz would grant Avadel a right to

21   use the patents, Jazz would retain the right to use those

22   patents itself, but then no other parties would be allowed

23   to use those patents.

24   Q.    Are you aware of any customary royalty rate for

25   technologies like the patents we're talking about in this

DIRECT EXAMINATION - MARK RAINEY

1  case?

2  A.     No.

3  Q.     Did you review any licenses that would establish what

4  the royalty would be for the patents we're talking about

5  here?

6  A.     No, I didn't.

7  Q.     Why not?

8  A.     Because, you know, Jazz doesn't have a licensing

9  program, so they haven't licenses the patents-in-suit.

10 Q.     And in forming your opinion, did you review any Jazz

11 licenses at all?

12 A.     I did.

13 Q.     And what's an example of a license Jazz might have

14 given that it doesn't have a licensing program?

15 A.     So when you have litigation about patents, similar

16 like this, that can lead to settlement agreements which lead

17 to licenses, so Jazz has some of those.  You also can have

18 licenses between different divisions of the same company and

19 Jazz also has some of those.

20 Q.     And what did you determine about whether those

21 licenses are comparable to the license that would result

22 from a hypothetical negotiation?

23 A.     I determined they wouldn't be comparable.

24 Q.     And why not?

25 A.     And for a couple of reasons.  You know, one is just

DIRECT EXAMINATION - MARK RAINEY

1    that the intellectual property that was licensed is very

2    different.  As I said before, the patents-in-suit haven't

3    been licensed before.

4            Another reason is that the circumstances

5    regarding the negotiation of a license are different,

6    quote/unquote, that they would at the "hypothetical

7    negotiation."

8    Q.    And what about for any intercompany licenses that you

9    looked at?

10   A.    Yeah, there are big differences in the nature of the

11   relationship between the two parties to the license.  If

12   they are the divisions of the same company, they are working

13   together, they are cooperating.

14           Here, as we've heard, Jazz and Avadel are

15   competitors so that's a very different competitive

16   relationship.

17   Q.    And did you ever review any Avadel licenses in

18   forming your opinion?

19   A.    Yes, I did.

20   Q.    And what did you determine about whether any Avadel

21   licenses were comparable to the license that would result

22   from a hypothetical negotiation?

23   A.    I determined that they weren't comparable.

24   Q.    Okay.  Did you hear any testimony today or

25   throughout -- or yesterday, I guess, about Project Zeta?

1   A.      Yes, I think both days probably.

2   Q.      Did you look at Project Zeta in conducting your

3   analysis?

4   A.      Yeah, I considered it.

5   Q.      And what did you determine about the relevance of the

6   Project Zeta in negotiations to the reasonable royalty rate?

7   A.      Yeah, it didn't establish a royalty rate for the

8   patents-in-suit, you know, not comparable.

9   Q.      And if you heard or know, when did those Project Zeta

10  negotiations occur?

11  A.      Those occurred in 2018, so about 5 years prior to the

12  date of the hypothetical negotiation.

13  Q.      And in that negotiation, what was the proposed

14  relationship between Jazz and Avadel as opposed to their

15  relation in a hypothetical negotiation?

16  A.      Yeah, as we just heard Mr. Divis testify, it was more

17  of a partnership that they were considered in Project Zeta,

18  whereas, a hypothetical negotiation, the two companies would

19  be viewing each other as competitors; they'd be selling

20  competing products if a license were granted.

21  Q.      Okay.  Let me ask you about competing products.

22          In your opinion, what's the commercial

23  relationship between Jazz and Avadel?

24  A.      They are direct competitors.

25  Q.      And what are the facts that led you to conclude that?

DIRECT EXAMINATION - MARK RAINEY

1  A.      You know, information from Avadel, third parties, you

2  know, information we've heard testimony about the past

3  couple of days as well is all the type of information we've

4  considered.

5          MS. THOMPSON:  Your Honor, at this point in time

6  I would like to move into evidence Exhibit JTX113.

7          MS. DAVIS:  No objection.

8          THE COURT:  JTX113 is admitted.

9          (Exhibit admitted.)

10  BY MS. THOMPSON:

11  Q.      And, Dr. Rainey, what is this document?

12  A.      This is a document Avadel filed with the Securities

13  and Exchange Commission.

14  Q.      So it's a financial document filed with the

15  government?

16  A.      Yes, it has financial and business information.

17  Q.      And did you consider this document in forming your

18  opinion here?

19  A.      Yes.

20  Q.      All right.  Let's look at the date.  Can we go to

21  page 113.182, please.

22          And what is the date that Avadel submitted this

23  to the SEC?

24  A.      Yeah, the date of the signature there is March 29,

25  2023, so just a couple of months before the hypothetical

1    negotiation.

2    Q.    Okay.  And let's jump back to page 113.11.

3          And looking at that italicized heading at the

4    top there, what did Avadel tell the U.S. government in that

5    filing?

6    A.    It's -- they are telling the government that if

7    Lumryz is granted final FDA approval, it will compete with

8    the currently approved twice-nightly oxybate formulations,

9    which we know are Jazz's products, Xyrem and Xywav.

10         Later on in that paragraph, it says that they

11   are also -- it also would compete with the authorized

12   generic version of Xyrem, which is, again, another Jazz

13   product, Mr. Mindus talked about it, Avadel, I'll call it

14   Xyrem HE for short.

15   Q.    Okay.  And was Lumryz, in fact, approved before the

16   hypothetical negotiation?

17   A.    Yes.  Yeah, as we've heard, it was approved May 1st

18   of 2023.

19         MS. THOMPSON:  We can take that down, thank you.

20   BY MS. THOMPSON:

21   Q.    Did you consider any industry research reports from

22   the relevant time period discussing whether Jazz and Avadel

23   are direct competitors?

24   A.    Yes.

25   Q.    And what did those industry research reports say?

DIRECT EXAMINATION - MARK RAINEY

1    A.        They said the same thing as what Avadel was telling

2    the government, that Lumryz would be competing with Xyrem

3    and Xywav, Xyrem AG.

4    Q.        And how does the fact that Jazz and Avadel are direct

5    competitors affect the reasonable royalty?

6    A.        It tends to increase the reasonable royalty.

7    Q.        All right.  Did you consider Avadel's forecast for

8    Lumryz in forming your opinion as to the reasonable?

9    A.        Yes, I did.

10              MS. THOMPSON:  Let's go ahead and pull up PTX5.

11   BY MS. THOMPSON:

12   Q.        And this is a slide from Exhibit JTX129, Avadel's

13   May 2023 Lumryz forecast.

14              On this slide, what does conversion in this

15   context refer to?

16   A.        Yeah, so conversion is essentially -- we heard

17   Mr. Divis talked about switching, so patients being switched

18   from Jazz products to Lumryz.  That's what this conversion

19   category represents.

20   Q.        All right.

21              MS. THOMPSON:  Let's go to the next slide.

22   BY MS. THOMPSON:

23   Q.        Is this a chart you made based on Avadel's forecast

24   that -- on JTX129?

25   A.        Yes.

DIRECT EXAMINATION - MARK RAINEY

1  Q.      Okay.  And what does the conversion percent row in

2  this chart show?

3  A.      It just indicates of the total Lumryz patients in

4  their forecast from 2023 to '28, you know, what's the share

5  of total Lumryz patients that are conversion or switch

6  patients.

7  Q.      Okay.  And what is that percent?

8  A.      So it starts off at about 54 percent in 2023, and

9  then by 2028, it's about 40 percent.

10  Q.      Now, what is the relevance to the hypothetical

11  negotiation of the fact that Avadel was forecasting patients

12  would be switching from Xyrem and Xywav to Lumryz?

13  A.      It just indicates that there was extensive

14  competition between Avadel to Jazz because Lumryz was taking

15  a big chunk of its patients from Jazz's products.

16  Q.      Did you consider any other information showing

17  Avadel's targeting of switching patients from Xyrem and

18  Xywav?

19  A.      Yes.

20  Q.      All right.

21          MS. THOMPSON:  Let's go to the next slide.

22  BY MS. THOMPSON:

23  Q.      This is a slide from Exhibit PTX295, Avadel's May 1

24  Investor Day presentation from 2023.

25          Did you rely on this document in your analysis?

DIRECT EXAMINATION - MARK RAINEY

1  again, they are assumed to be valid and infringed.  And it's

2  also, again, my understanding that the patents are what

3  allow for that once-nightly formulation, which we've seen

4  is viewed as the key to success of Lumryz.

5  Q.    And what's your understanding of whether the value

6  that Jazz's patents-in-suit contribute to Lumryz can be

7  separated from the value of Lumryz as a whole?

8  A.    Yeah, I don't think it's really possible to do that

9  because my understanding is that the patents cover the

10  formulation of Lumryz as a whole.  So the only product that

11  exists that's FDA approved is the whole formulation of

12  Lumryz, it's not like Lumryz is a cell phone where you can

13  think about there being different components that you could

14  sell or put together, like a processor or a screen or a

15  camera, right, that goes onto your cell phone.

16          With Lumryz, it's just the whole formulation and

17  that's what is FDA approved.

18  Q.    Okay.  What would the parties have understood about

19  the likely success of Lumryz at the time the hypothetical

20  negotiation took place?

21  A.    They would expect -- they were expecting it to be a

22  successful profitable product at the time.

23  Q.    And why did Avadel think there would be a demand for

24  Lumryz, in your opinion?

25  A.    This relates to something we heard Mr. Divis talk

DIRECT EXAMINATION - MARK RAINEY

1   about, which is the unmet need that Avadel viewed Lumryz

2   fulfilling.

3   Q.      Okay.

4           MS. THOMPSON:  Let's go to the next slide, 14.

5   BY MS. THOMPSON:

6   Q.      This is showing excerpts from Exhibits PTX295 and

7   JTX137.  Did you rely on these documents in forming your

8   opinion?

9   A.      Yes.

10  Q.      And what does this show about Avadel's statements

11  regarding Lumryz addressing an unmet need?

12  A.      Yes, this is Avadel talking about there being a

13  serious unmet need for once-nightly dosing of sodium

14  oxybate.

15  Q.      And what was Avadel telling people --

16          MS. THOMPSON:  If we could go to the next slide.

17  BY MS. THOMPSON:

18  Q.      -- about the expected sales of Lumryz around the time

19  of the hypothetical negotiation?

20  A.      Yeah, as we've heard, they were telling investors

21  that the peak sales opportunity was over $1 billion a year.

22          MS. THOMPSON:  Can we go ahead to the next

23  slide, and this is showing excerpts of Exhibits JTX119 and

24  PTX300.

25  BY MS. THOMPSON:

1    Q.      What was Avadel saying at the time of the

2    hypothetical negotiation about the expected market share of

3    Lumryz?

4    A.      They were saying that they were expecting Lumryz to

5    become the market leader with a market share in the range of

6    50-60 percent.

7    Q.      What about Avadel's financial models with respect to

8    Lumryz's likely success?  Did you consider those?

9    A.      Yes.

10              MS. THOMPSON:  All right.  Let's go ahead and

11   look at Exhibit -- let's go to the next slide, I guess,

12   PDX17.

13   BY MS. THOMPSON:

14   Q.      And this is from Exhibit JTX130, and at the top, it

15   says, "May 2023 Avadel Financial Model."

16              Is that what that exhibit is?

17   A.      Yes.

18   Q.      Okay.  And what's Avadel forecasting here?

19   A.      They're forecasting revenues and various measures of

20   profit for Lumryz for the period that's shown here, which is

21   2023-2036.

22   Q.      As of May 2023, what was Avadel forecasting in that

23   revenue for Lumryz?

24   A.      They are forecasting net revenue to start off at

25   ██████████████████  in the launch year 2023, but significant

DIRECT EXAMINATION - MARK RAINEY

1   growth increasing to ███████████████ this year, 2024, and

2   increasing to █████████████████████

3   Q.     And just -- can you just explain, what is net revenue

4   as compared to gross revenue?

5   A.     Oh, sure, yeah.  So net revenue -- the difference

6   between gross revenue to net revenue is essentially

7   discounts and rebates.  So you can think about gross revenue

8   representing the list price, sticker price, but then after

9   discounts and rebates, you get net revenue, which is the

10  money actually coming into the door at Avadel.

11  Q.     Okay.  And as of May 2023, when was Avadel

12  forecasting that it would turn a profit?

13  A.     ████████████████.

14  Q.     And what's your understanding of whether after Lumryz

15  launched, Lumryz has been performing as Avadel expected?

16  A.     Yeah, my understanding is that things are going

17  according to plan.  You know, they're still telling people,

18  as we've just heard from Mr. Divis, that that peak sales

19  opportunity of over a billion dollars is still -- still part

20  of the plan.

21  Q.     And how does an expected profitability and success of

22  Lumryz affect the reasonable royalty?

23  A.     It tends to increase the reasonable royalty.

24  Q.     Now, in forming your opinions, did you consider

25  whether, instead of launching Lumryz, Avadel had any

DIRECT EXAMINATION - MARK RAINEY

1    noninfringing alternative?

2    A.      Yes, I did.

3    Q.      And what is meant in this context by a noninfringing

4    alternative?

5    A.      So in this context, a noninfringing alternative would

6    be another product that Avadel could sell, instead of

7    Lumryz, that had the same attributes as Lumryz.  It was

8    available for Avadel to sell, and it did not infringe Jazz's

9    patents.  Those are the characteristics.

10   Q.      And did Avadel and does Avadel have any noninfringing

11   alternative?

12   A.      No, they don't.

13   Q.      And what is the significance of Avadel not having a

14   noninfringing alternative?

15   A.      It means that at the hypothetical negotiation, they'd

16   be in a relatively weak bargaining position.

17   Q.      Aside from switching patients from Jazz's products to

18   Lumryz, what's your understanding of how Avadel plans to

19   benefit from Lumryz?

20   A.      Right, so there are the other patient segments we've

21   heard about -- discounted patients, patients who have never

22   taken oxybates -- and in addition, there's expanding the

23   patient population for Lumryz.

24   Q.      Okay.  Can we just look quickly at Exhibit PTX300, at

25   page 300.112.

DIRECT EXAMINATION - MARK RAINEY

1                    And you were here when Mr. Divis just testified?

2       A.      Yes.

3       Q.      Did you hear him talk about this slide here?

4       A.      Yes, I did.

5       Q.      And in your opinion, how does Avadel's plan and use

6       for Lumryz affect the reasonable royalty?

7       A.      Yeah, this means that there's -- there would have

8       been -- they -- Avadel would have viewed there'd be an

9       additional value in the future from this, which, again,

10      would tend to increase the reasonable royalty.

11      Q.      Okay.  Let's go back to your slides.

12                   Based on your analysis, did you conclude what a

13      reasonable royalty would be?

14      A.      Yes.

15      Q.      Okay.  Can we go to slide 18, please.

16                   And what does this slide show?

17      A.      This shows the royalty rates that I determined would

18      be the outcome of the hypothetical negotiation.

19      Q.      Okay.  And why are there three different royalty

20      rates?

21      A.      There's three different royalty rates for the three

22      different periods, and the three different periods differ in

23      their competitive conditions, and just the basic idea here

24      is in economics, competitive conditions affect royalty

25      rates.

DIRECT EXAMINATION - MARK RAINEY

1    Q.    Okay.  And it says here, 27 percent for the time

2    period 2023-2025, 13 percent for the time period 2026 to

3    2032, and 3.5 percent for the time period 2033 to 2036.

4              Is that the opinion that you reached?

5    A.    Yes.

6    Q.    And which of these royalty rates applies to past

7    damages for infringement at issue in this lawsuit?

8    A.    Yeah, that first one there, so -- so right now we're

9    just talking about 2023 and part of 2024, so 27 percent is

10   the relevant rate.

11   Q.    And what would be the full duration of the license

12   that was negotiated during the hypothetical negotiation?

13   A.    It would go to the expiration of the last valid

14   infringed patent claim.

15   Q.    In your opinion, why would Jazz agree to the royalty

16   rates we just discussed in that hypothetical negotiation?

17   A.    Because these royalty rates wouldn't make Jazz worse

18   off by entering into a license at those royalty rates.

19              MS. THOMPSON:  All right.  Can we go to the next

20   slide, 19.

21   BY MS. THOMPSON:

22   Q.    And what is the source of information for this slide?

23   A.    This is based off of Jazz's narcolepsy forecast

24   model, which we heard Mr. Mindus testify about earlier this

25   afternoon.

DIRECT EXAMINATION - MARK RAINEY

1    Q.      And what does this slide show?

2    A.      So, you know, as we heard Mr. Mindus say, you can use

3    Jazz's narcolepsy forecast model to forecast the revenue for

4    Jazz's products with Lumryz and without Lumryz.

5            So using that information and also the profit

6    information that Mr. Mindus also talked about, I'm

7    calculating the amount of money that Jazz expected to lose

8    if Lumryz launched.

9    Q.      Okay.  And what is column G here on this slide?

10   A.      Yeah, that's the amount of money that Jazz expected

11   to lose due to Lumryz's launch.

12   Q.      Okay.  What is column H?

13   A.      That's a forecast of Lumryz's net revenues that is

14   derived from Jazz's narcolepsy forecast model.

15   Q.      Okay.  And what is column I showing in that final

16   column?

17   A.      So that's showing on a year-by-year basis the royalty

18   rate you'd have to apply to forecast Lumryz's net revenues

19   in order to keep Jazz from being made worse off.

20   Q.      And why is it relevant to the hypothetical

21   negotiation to consider the revenue Jazz loses from its

22   twice-nightly products by licensing the patent to Lumryz's

23   once-nightly product?

24   A.      Because Jazz's losses are really tied very closely to

25   the incremental value of Jazz's patents, and that's because

DIRECT EXAMINATION - MARK RAINEY

1   Jazz's patents allow for the once-nightly formulation of

2   Lumryz.  And if you think about why Lumryz's entry is

3   causing Jazz to lose money, it is because of that, the

4   benefits of once-nightly, that Lumryz has and Jazz doesn't.

5   Q.      If we look at this average royalty rate calculation

6   at the bottom here, what is that?

7   A.      So, again, I'm -- those are those three periods with

8   the three different competitive conditions -- and I'm

9   calculating the average of the royalty rates in column I

10  across those three periods.

11  Q.      Now, why didn't you use a royalty rate of, say,

12  3.5 percent for the whole term of the license?

13  A.      It would be economically irrational for Jazz to enter

14  into such a license.

15  Q.      Economically irrational, you said?

16  A.      Irrational.

17          MS. THOMPSON:  Okay.  Can we go to the next

18  slide.

19  BY MS. THOMPSON:

20  Q.      Is this one of your calculations?

21  A.      Yes.

22  ██        ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ███████████████

25  ██        ████████████████████████████████████████

DIRECT EXAMINATION - MARK RAINEY

1

2

3

4

5

6

7

8   Q.     Okay.  Let's look at this from Avadel's perspective.

9          MS. THOMPSON:  Can we go to the next slide,

10   please.

11   BY MS. THOMPSON:

12   Q.     And this is citing to Exhibit JTX129.

13          Did you rely on that document in conducting your

14   analysis?

15   A.     Yes.

16   Q.     Okay.  And what is this showing here?

17   A.     So this is looking at things from Avadel's

18   perspective at the time of the hypothetical negotiation.  In

19   column B there, I have Avadel's forecast of Lumryz's

20   revenues during the licensing -- licensing period.  And then

21   column C is the royalty Avadel would expect to pay at my

22   reasonable royalty rates.

23   Q.     Okay.  And what is the -- how much revenue was Avadel

24   forecasting from Lumryz through the start of 2036 as of the

25   date of this forecast?

DIRECT EXAMINATION - MARK RAINEY

1    A.      Yeah, the total -- total forecast of Lumryz's revenue

2    is at the bottom of column B there, so that's a little over

3    ███████████

4    Q.      Okay.  And how much revenue would Avadel expect to

5    keep if it agreed to the royalty structure that resulted

6    from your analysis?

7    A.      So, yeah, to get that, you take the ████████ and

8    subtract the amount it would have expected to pay in

9    royalties, and that -- that amount, expected to pay in

10   royalties, is in column C, and that's just ██████

11   ████████████████████████████████████

12   ███████████.  That's the bottom of column D.

13   Q.      Okay.  So that's Avadel revenue net of royalty, how

14   much they would keep if they paid for the license to the

15   patents resulting from the hypothetical negotiation.

16   A.      Yeah, how much of the revenue they would keep after

17   the royalty.

18   Q.      And what does the analysis show about how much Avadel

19   will be compensated for any contributions it made to Lumryz?

20   A.      Yeah, well, I mean, let's -- I mean, first of all,

21   let's keep in mind that, you know -- my understanding is

22   that the patents cover this once-nightly formulation which

23   is -- Avadel viewed as key to the success of Lumryz.

24   Avadel -- if it covers the formulation, Avadel doesn't have

25   a noninfringing alternative, but it -- nevertheless, they

1  are still getting -- expecting to get, as a result of this

2  license,              in revenue net of royalty.

3  Q.      Okay.  And do your opinions on the reasonable royalty

4  rate change depending on which of the asserted patent claims

5  we're talking about?

6  A.      No, they don't.

7  Q.      And why not?

8  A.      Because those fundamental economic considerations I

9  just mentioned -- the lack of noninfringing alternative, the

10  fact that the patents cover the once-nightly formulation,

11  the fact that it's key to the success of Lumryz -- those

12  don't change depending on which of the claims are valid and

13  infringed.

14  Q.      Okay.  Did you assess whether Avadel would be better

15  off in agreeing to the royalty and therefore willing to

16  enter into the agreement at the royalty rates that you've

17  concluded would be appropriate?

18  A.      Yes, I did.

19  Q.      Let's go to your next slide.  What does that number

20  on the left-hand side there show?

21  A.      So this is Avadel's market capitalization near the

22  time of the hypothetical negotiations, so that's --

23  essentially it's stock market value.  And economically, you

24  can think about that as being kind of a conservative measure

25  of the present value of expected future profits for Avadel.

DIRECT EXAMINATION - MARK RAINEY

1  So it's going to take into account the market's expectations

2  of future revenues, you know, future costs, future tax

3  payments, future interest payments.  It will take all of

4  those into account.

5  Q.     Okay.  And what is that number on the right-hand

6  side?

7  A.     The number on the right-hand side is -- it's a

8  calculation of the present value of expected royalty

9  payments based on a market derived forecast of Lumryz's

10 revenues.

11 Q.     Okay.  And so this is an apples-to-apples comparison

12 based on public data?

13 A.     Yes, based on market data is the way I would describe

14 it.

15 Q.     Okay.  And what does the comparison between these two

16 numbers tell you?

17 A.     Right, so the thing to keep in mind is that, you

18 know, because there's no noninfringing alternative, because

19 the patents are key to the success of Lumryz, in the absence

20 of a license, Avadel's profits would be zero.

21         So to determine whether the deal makes Avadel

22 better off, you just have to compare these two numbers,

23 because by launching Lumryz, it has the present value of

24 expected profits, it's ███████████████, but you also have

25 to take into account that Avadel would be expecting to pay

1    royalties based on that 27 percent, 13 percent, 3.5 percent

2    royalty structure.

3            And the present value of those royalty payments

4    is the ███████████, so since ███████████████████████

5    ███████████████████████ in royalty payments, they are ████████

6    ███████████████████████ better off by entering into this

7    deal.

8    Q.    All right.  You mentioned market capitalization takes

9    into account ongoing expenses.

10           What about past expenses?

11   A.    No, it's a -- market capitalization, like a lot of

12   economic concepts, is fundamentally forward-looking.  So it

13   takes into account the markets expectations of Avadel's

14   future expenses but not things like some costs, which would

15   be costs that Avadel incurred in the past and can't recover.

16   Q.    And did you consider sunk costs in your hypothetical

17   negotiation?

18   A.    Yeah, I mean, I considered them, but I determined

19   that they are not appropriate to take into account at the

20   hypothetical negotiation, you know, neither Avadel's sunk

21   cost, nor Jazz's sunk costs, you know, they are both, in

22   some sense, "water under the bridge," and, hence, not

23   economically relevant.

24   Q.    Okay.  Let's go to the next slide.

25           So we looked at this slide earlier and we've

CROSS-EXAMINATION - MARK RAINEY

1          MS. DAVIS:  Could we get a little bit more of

2     Claim 14 and then I'll re-ask the question.

3               Scroll down just a little bit more, there we go.

4               Okay.  You can just leave that.

5     BY MS. DAVIS:

6     Q.    All right.  Let me try again.

7               Dr. Rainey, so you see at the end, it requires

8     the viscosity-enhancing agent and the acid are separate from

9     the immediate-release particles and the modified-release

10    particles, the last clause.

11              Do you see that?

12    A.    I see that language.

13    Q.    So you didn't try to figure out how much value there

14    is in having those things be separate as opposed to

15    together, correct?

16    A.    No, I focused on, you know, the formulation of

17    Lumryz.

18    Q.    You looked at Project Zeta documents, correct?

19    A.    I have looked at some, yes.

20              MS. DAVIS:  You can take that down.

21    BY MS. DAVIS:

22    Q.    I want to ask you about the relationship between Jazz

23    and Avadel during Project Zeta, that is something you

24    considered, correct?

25    A.    Yes.

REDIRECT EXAMINATION - MARK RAINEY

1    Q.      In your opinion, the relationship between Jazz and

2    Avadel proposed in the Project Zeta negotiations, was that

3    of innovator -- sorry, let me -- let me just start over.

4            In your opinion, Dr. Rainey, the relationship

5    between Jazz and Avadel proposed in the Project Zeta

6    negotiations, was that of inventor and promotor in that

7    Avadel would be responsible for the development of FT-218

8    through the end of Phase III clinical trial, Avadel is the

9    inventor, while Jazz would then take over responsibility for

10   submitting the NDA for FT-218 and commercializing FT-218

11   making Jazz the promoter, correct?

12   A.      Yeah, I mean, it was proposed as a, you know,

13   partnership, collaboration development agreement.

14   Q.      So in your opinion for Project Zeta, Avadel is the

15   inventor and Jazz is the promoter?

16   A.      I mean, they have an inventor/promotor relationship

17   as opposed to a competitor relationship.

18               MS. DAVIS:  No further questions, Your Honor.

19               THE COURT:  All right.  Redirect?

20               MS. THOMPSON:  Just very briefly, Your Honor.

21                    REDIRECT EXAMINATION

22   BY MS. THOMPSON:

23   Q.   You heard some questions about the patents at issue

24   in certain different claims there.

25               I just want to be clear, at the time of the

1    proceeding.

2                                   /s/ Michele L. Rolfe, RPR, CRR
                                        U.S. District Court
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    IN THE UNITED STATES DISTRICT COURT

3                    IN AND FOR THE DISTRICT OF DELAWARE

4
    JAZZ PHARMACEUTICALS, INC.,            )
5            Plaintiffs,                   )    C.A. No.
    v.                                     )    21-691-GBW
6                                          )
    AVADEL CNS PHARMACEUTICALS, LLC,       )
7            Defendant                     )
    -------------------------------        )
8                                          )    C.A. No.
    JAZZ PHARMACEUTICALS, INC., et al.,    )    21-1138-GBW
9            Plaintiffs,                   )
    v.                                     )
10                                         )
    AVADEL CNS PHARMACEUTICALS, LLC,       )
11  Defendant.                             )
    -------------------------------        )
12                                         )
    JAZZ PHARMACEUTICALS, INC., et al.,    )
13           Plaintiffs,                   )    C.A. No.
    v.                                     )    21-1594-GBW
14                                         )
    AVADEL CNS PHARMACEUTICALS, LLC,       )
15           Defendant.                    )

16

17                              - - - -

18                         Wilmington, Delaware
                           Wednesday, February 28, 2024
19                         Trial Day 3

20                            - - - -

21
      BEFORE:  HONORABLE GREGORY B. WILLIAMS
22             UNITED STATES DISTRICT COURT JUDGE

23                            - - - -

24

25
                              Michele L. Rolfe, RPR, CRR

DIRECT EXAMINATION - BRUCE CORSER

1  Q.      As a sleep doctor with 35 years of experience, do you

2  have an opinion as how oxybate therapies overall compare to

3  the other available therapies for narcolepsy?

4  A.      In my opinion, oxybate therapy is the single most

5  effective treatment for the symptoms of narcolepsy.

6  Q.      Do you know how many people in the United States are

7  diagnosed with narcolepsy, but not taking oxybate therapies?

8  A.      So to give you a rough idea, there's probably about

9  200,000 people in this country that have narcolepsy.  Only

10 about 16,000 of those people receive oxybate therapy.  So

11 oxybate therapy is greatly underutilized.  It's a very

12 effective treatment, but it's, unfortunately, very

13 underutilized for treatment of narcolepsy.

14 Q.      Do you have any views as to why that's the case?

15 A.      So part of it is the fact that up until recently

16 there's been a -- only -- the only option has been

17 twice-nightly treatment option; that is, people have to take

18 one dose of oxybate at bedtime and a second dose two and a

19 half to four hours later.  So this has not been appealing,

20 either for doctors or for patients.

21             So imagine having to wake up every night for the

22 rest of your life to take a second dose of medication.

23 Q.      You mentioned that you currently prescribe Lumryz?

24 A.      Yes, I do.

25 Q.      As a sleep doctor, do you believe that having Lumryz

DIRECT EXAMINATION - BRUCE CORSER

1     available as an option for patients could benefit patients

2     that are not currently taking oxybate?

3     A.      I do.

4     Q.      Why is that?

5     A.      So people like to have options, so it's nice to

6     have -- when you go to a physician, it's nice to have

7     various options.  As a doctor, I would be remiss if I don't

8     as least present to patients all of the options that are

9     available to them.

10            So, you know, up until recently, Lumryz was not

11    available.  But since it has been available, we have been at

12    least mentioning it as a treatment option for patients.

13    Q.      From your perspective, are there any benefits that

14    Lumryz might provide to some patients?

15    A.      Well, there's a couple.  One is that the medicine

16    that is prescribed a more frequent -- a more frequent

17    regimen; in other words, you have to take medicine two or

18    three times a day.  People are less adherent to that regimen

19    as compared to a once-daily or once-nightly regimen.  So

20    that's one.

21            And then, you know, when we treat narcolepsy,

22    the goal of therapy is to allow people to sleep well through

23    the night, sleep uninterrupted.  So we want to decrease the

24    number of awakenings and arousals during the night.

25            Having to wake up to take a second dose of

DIRECT EXAMINATION - BRUCE CORSER

1    medication is contrary to what we're trying to achieve with

2    treatment.  So a once-nightly regimen decreases or

3    eliminates this forced awakening in the middle of the night.

4    So for many patients, it is an attractive treatment option.

5    Q.      Do you know whether the FDA has weighed in on Lumryz

6    as compared to other oxybate therapies?

7    A.      Yes.

8    Q.      Do you know what the FDA's conclusion was?

9    A.      So the FDA deemed Lumryz superior to Xyrem and Xywav

10   based on the fact that it's a -- represents a major

11   contribution to patient care.  And the fact that it's a

12   once-nightly dosing regimen compared to twice-nightly dosing

13   regimen.

14   Q.      As a sleep doctor, do you agree with the FDA's

15   decision?

16   A.      Yes, I do.

17   Q.      Now, you've heard that Xyrem has higher sodium than

18   Xywav, correct?

19   A.      Correct.

20   Q.      And you're familiar with the sodium content of Xyrem,

21   Xywav, and Lumryz?

22   A.      Yes, I am.

23   Q.      Xyrem and Lumryz have the same amount of sodium?

24   A.      Correct.

25   Q.      Xyrem has been on the market since 2002?

REDIRECT EXAMINATION - WILLIAM CHARMAN

1    closings until Friday morning, you know.  In the event we

2    get done super early and, you know, we got time for both

3    closings, you know, we'll do that, but most likely, we won't

4    do closings until Friday morning.

5                  MR. CERRITO:  Thank you, Your Honor.

6                  MS. DURIE:  Thank you.

7                  THE COURT:  All right.  Anything else?

8                  MR. CERRITO:  Not from Plaintiffs, Your Honor.

9                  THE COURT:  All right.

10                 MS. DURIE:  I'm sorry, Your Honor.  I apologize.

11                 THE COURT:  Okay.  All right.  All right.  We

12   will be adjourned until tomorrow morning.

13                 (Whereupon, the following proceeding concluded

14   at 5:19 p.m.)

15                 I hereby certify the foregoing is a true

16   and accurate transcript from my stenographic notes in the

17   proceeding.

18                            /s/ Michele L. Rolfe, RPR, CRR
                                  U.S. District Court

19

20

21

22

23

24

25

# EXHIBIT 2

**Jazz Pharmaceuticals, Inc.**

**v.**

**Avadel CNS Pharmaceuticals, LLC**

*Civil Action Nos. 21-691, 21-1138, 21-1594*

# Direct Examination of
# Dr. Mark Rainey



# Proposed Royalty Rates



| Time Period | Royalty Rate |
| --- | --- |
| 2023-2025 | 27% |
| 2026-2032 | 13% |
| 2033-2036 | 3.5% |

PDX-6.18

# Recoupment Royalty Rate Calculation





| | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] |
|---|---|---|---|---|---|---|---|---|---|
| | | Forecast with Lumryz | | | Forecast without Lumryz | | | | |
| | Xyrem Net Revenue | Xywav Net Revenue | Xyrem AG Royalties | Xyrem Net Revenue | Xywav Net Revenue | Xyrem AG Royalties | Expected Jazz Losses | Lumryz Net Revenues | Recoupment Royalty Rate |
| 2023 | | | | | | | | | |
| 2024 | | | | | | | | | |
| 2025 | | | | | | | | | |
| 2026 | | | | | | | | | |
| 2027 | | | | | | | | | |
| 2028 | | | | | | | | | |
| 2029 | | | | | | | | | |
| 2030 | | | | | | | | | |
| 2031 | | | | | | | | | |
| 2032 | | | | | | | | | |
| 2033 | | | | | | | | | |
| 2034 | | | | | | | | | |
| 2035 | | | | | | | | | |
| 2036 (Jan-Feb) | | | | | | | | | |

Average Royalty Rate

| | | |
|---|---|---|
| [J] | 2023-2025 | 26.8% |
| [K] | 2026-2032 | 12.8% |
| [L] | 2033-2036 (Jan-Feb) | 3.4% |

PDX-6.19

# Impact on Jazz of a 3.5% Royalty Rate



| | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] |
|---|---|---|---|---|---|---|---|---|
| Year | Lumryz Net Revenues | Royalty Rate | Royalties | Expected Jazz Losses | Expected Jazz Losses Net of Royalties | After-Tax Expected Jazz Losses Net of Royalties | Discount Factor | PV of After-Tax Expected Jazz Losses Net of Royalties |
| 2023 | | 3.5% | | | | | 1.000 | |
| 2024 | | 3.5% | | | | | 0.893 | |
| 2025 | | 3.5% | | | | | 0.797 | |
| 2026 | | 3.5% | | | | | 0.712 | |
| 2027 | | 3.5% | | | | | 0.636 | |
| 2028 | | 3.5% | | | | | 0.567 | |
| 2029 | | 3.5% | | | | | 0.507 | |
| 2030 | | 3.5% | | | | | 0.452 | |
| 2031 | | 3.5% | | | | | 0.404 | |
| 2032 | | 3.5% | | | | | 0.361 | |
| 2033 | | 3.5% | | | | | 0.322 | |
| 2034 | | 3.5% | | | | | 0.287 | |
| 2035 | | 3.5% | | | | | 0.257 | |
| 2036 (Jan-Feb) | | 3.5% | | | | | 0.240 | |
| Total | | | | | | | | |





**Market Capitalization**

**May/June 2023**

## $1,107,300,000



# EXHIBIT 3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

---

# FORM 10-Q

---

**(Mark One)**

☒      **Quarterly report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the quarterly period ended March 31, 2023**

**or**

☐      **Transition report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the transition period from          to**

**Commission File Number: 001-33500**

# JAZZ PHARMACEUTICALS PUBLIC LIMITED COMPANY
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Ireland** | **98-1032470** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**Fifth Floor, Waterloo Exchange,**
**Waterloo Road, Dublin 4, Ireland D04 E5W7**
**011-353-1-634-7800**
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

---

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, nominal value $0.0001 per share | JAZZ | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**JAZZ PHARMACEUTICALS PLC**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**1. The Company and Summary of Significant Accounting Policies**

Jazz Pharmaceuticals plc is a global biopharmaceutical company whose purpose is to innovate to transform the lives of patients and their families. We are dedicated to developing life-changing medicines for people with serious diseases - often with limited or no therapeutic options. We have a diverse portfolio of marketed medicines and novel product candidates, from early- to late-stage development, in neuroscience and oncology. Within these therapeutic areas, we strive to identify new options for patients by actively exploring small molecules and biologics, and through innovative delivery technologies and cannabinoid science.

Our lead marketed products are:

**Neuroscience**

- **Xywav® (calcium, magnesium, potassium, and sodium oxybates) oral solution**, a product approved by the U.S. Food and Drug Administration, or FDA, in July 2020 and launched in the U.S. in November 2020 for the treatment of cataplexy or excessive daytime sleepiness, or EDS, in patients with narcolepsy seven years of age and older, and also approved by FDA in August 2021 for the treatment of idiopathic hypersomnia, or IH, in adults and launched in the U.S. in November 2021. Xywav contains 92% less sodium than Xyrem®;

- **Xyrem (sodium oxybate) oral solution**, a product approved by FDA and distributed in the U.S. for the treatment of cataplexy or EDS in patients with narcolepsy seven years of age and older; Jazz also markets Xyrem in Canada for the treatment of cataplexy in patients with narcolepsy. Xyrem is also approved and distributed in the European Union, or EU (EU market authorizations include Northern Ireland), Great Britain and other markets through a licensing agreement; and

- **Epidiolex® (cannabidiol) oral solution**, a product approved by FDA and launched in the U.S. in 2018 by GW Pharmaceuticals plc, or GW, and currently indicated for the treatment of seizures associated with Lennox-Gastaut syndrome, or LGS, Dravet syndrome, or DS, or tuberous sclerosis complex, or TSC, in patients one year of age or older; in the EU and Great Britain (where it is marketed as Epidyolex®) and other markets, it is approved for adjunctive treatment of seizures associated with LGS or DS, in conjunction with clobazam (EU and Great Britain only), in patients 2 years of age and older and for adjunctive treatment of seizures associated with TSC in patients 2 years of age and older (select markets).

**Oncology**

- **Rylaze® (asparaginase erwinia chrysanthemi (recombinant)-rywn)**, a product approved by FDA in June 2021 and launched in the U.S. in July 2021 for use as a component of a multi-agent chemotherapeutic regimen for the treatment of acute lymphoblastic leukemia or lymphoblastic lymphoma in adults and pediatric patients aged one month or older who have developed hypersensitivity to *E. coli*-derived asparaginase;

- **Zepzelca® (lurbinectedin)**, a product approved by FDA in June 2020 under FDA's accelerated approval pathway and launched in the U.S. in July 2020 for the treatment of adult patients with metastatic small cell lung cancer, or SCLC, with disease progression on or after platinum-based chemotherapy; in Canada, Zepzelca received conditional approval in September 2021 for the treatment of adults with Stage III or metastatic SCLC, who have progressed on or after platinum-containing therapy;

- **Defitelio® (defibrotide sodium)**, a product approved in the U.S. and Brazil for the treatment of hepatic veno-occlusive disease, or VOD, with renal or pulmonary dysfunction following hematopoietic stem cell transplantation, or HSCT, and in Japan for the treatment of hepatic sinusoidal obstruction syndrome (hepatic VOD). It is currently approved in the EU, Great Britain and other markets for the treatment of severe hepatic VOD, also known as sinusoidal obstructive syndrome in HSCT therapy. It is indicated in adults and pediatric patients over 1 month of age; and

- **Vyxeos® (daunorubicin and cytarabine) liposome for injection**, a product approved in the U.S., Canada, EU, Great Britain and other markets (marketed as Vyxeos® liposomal in the EU, Great Britain and other markets) for the treatment of adults with newly diagnosed therapy-related acute myeloid leukemia, or t-AML, or AML with myelodysplasia-related changes, or AML-MRC. An expanded indication was granted in the U.S. for the treatment of newly diagnosed t-AML or AML-MRC in pediatric patients aged 1 year and older.

Table of Contents

| Product Candidates | Description |
|---|---|
| Zanidatamab | In previously treated metastatic HER2-expressing cancers in combination with select antineoplastic therapies (ongoing trial) |
| JZP341 (long-acting *Erwinia* asparaginase) | Solid tumors (licensed from Ligand Pharmaceuticals Incorporated, or Ligand) (ongoing trial) |
| **Preclinical** | |
| CombiPlex® | Hematology/oncology exploratory activities |
| JZP898 | Conditionally-activated IFNα INDUKINE™ molecule |
| Undisclosed target | Ras/Raf/MAP kinase pathway (collaboration with Redx) Oncology |
| Undisclosed targets | Oncology |

*Also known as DSP-0187

### Operational Excellence

We remain focused on continuing to build excellence in areas that we believe will give us a competitive advantage, including building an increasingly agile and adaptable commercialization engine and strengthening our customer-focused market expertise across patients, providers and payors. We are refining our approach to engaging our customers by strengthening alignment and integration across functions and across regions. This includes a more integrated approach to brand planning, a heightened focus on launch and operational excellence and multichannel customer engagement. We have fully adapted to reaching our key audiences through both in-person and virtual initiatives. This includes maintaining a virtual presence at scientific congresses, when appropriate, designed to ensure we can continue to provide promotional and non-promotional interactions and supporting our field-based teams with virtual customer interaction tools, training and content. These initiatives mark a significant operational evolution that is directly linked to our corporate strategy and are designed to better enable our teams to work collaboratively on an aligned and shared agenda through both virtual and in-person interactions. In most geographies, our teams are increasing the frequency of in-person interactions as medical congresses and healthcare practices begin to resume in-person activities, taking into account applicable public health authority and local government guidelines which are designed to ensure community and employee safety.

### Other Challenges, Risks and Trends Related to Our Business

Historically, our business has been substantially dependent on Xyrem and our financial results have been significantly influenced by sales of Xyrem. Our operating plan assumes that Xywav, with 92% lower sodium compared to Xyrem, depending on the dose, absence of a sodium warning and dosing titration option, will remain the treatment of choice for patients who can benefit from oxybate treatment. In June 2021, FDA recognized seven years of ODE for Xywav in narcolepsy through July 21, 2027 stating that Xywav is clinically superior to Xyrem by means of greater safety due to reduced chronic sodium burden. While we expect that our business will continue to be substantially dependent on oxybate product sales, there is no guarantee that we can maintain oxybate sales at or near historical levels, or that oxybate sales will continue to grow.

Our ability to successfully commercialize Xywav will depend on, among other things, our ability to maintain adequate payor coverage and reimbursement for Xywav and acceptance of Xywav by physicians and patients, including Xywav for the treatment of IH in adults. In an effort to support strong adoption of Xywav, we are focused on providing robust patient copay and savings programs and facilitating payor coverage for Xywav.

Xywav and Xyrem also face increased competition from new branded products for treatment of cataplexy and/or EDS in narcolepsy, such as Avadel's recently approved Lumryz, in the U.S. market.

In addition, in January 2023 our oxybate products began to face competition from an authorized generic, or AG, version of high-sodium oxybate pursuant to a settlement agreement we entered into with an abbreviated new drug application, or ANDA, filer, and, in the future, we expect our oxybate products to face competition from additional AG versions of high-sodium oxybate and from generic versions of high-sodium oxybate pursuant to settlement agreements we entered into with multiple ANDA filers. Generic competition can decrease the prices at which Xywav and Xyrem are sold and the number of prescriptions written for Xywav and Xyrem. Moreover, we have increasingly experienced pressure from third party payors to agree to discounts, rebates or restrictive pricing terms, and we cannot guarantee we will be able to agree to commercially reasonable terms with PBMs, or similar organizations and other third party payors, or that we will be able to ensure patient access and acceptance on institutional formularies. Entering into agreements with PBMs or similar organizations and payors to ensure patient access has and will likely continue to result in higher gross to net deductions.

Our financial condition, results of operations and growth prospects are also dependent on our ability to maintain or increase sales of Epidiolex/Epidyolex in the U.S. and Europe, which is subject to many risks and there is no guarantee that we

generic products rather than branded products when a generic version is available. This would result in reduction in sales of, and revenue from, Xyrem, although we would continue to receive royalties and other revenue based on sales of an AG Product in accordance with the terms of our settlement agreements.

Other companies may develop high-sodium oxybate products for treatment of narcolepsy, using an alternative formulation or a different delivery technology, and seek approval in the U.S. using a new drug application, or NDA, approval pathway under Section 505(b)(2) and referencing the safety and efficacy data for Xyrem. For example, on May 1, 2023, Avadel announced that it had received approval and orphan drug exclusivity through May 1, 2030 for Lumryz, a fixed-dose, high-sodium oxybate which uses its proprietary technology for the treatment of EDS and cataplexy in patients with narcolepsy, and we expect to begin to face competition from Avadel in the coming months. For additional information on litigation involving this matter, see "*Avadel Patent Litigation*" in Note 9, Commitments and Contingencies-Legal Proceedings of the Notes to Consolidated Financial Statements, included in Part I of our Quarterly Report on Form 10-Q for the quarter ended March 31, 2023. Xyrem and Xywav also face increased competition from other new branded entrants to treat EDS in narcolepsy such as pitolisant. Other companies have announced that they have product candidates in various phases of development to treat the symptoms of narcolepsy, such as Axsome Therapeutics, Inc.'s reboxetine, and various companies are performing research and development on orexin agonists for the treatment of sleep disorders.

We expect that Xywav for the treatment of both cataplexy and EDS in patients with narcolepsy will continue to face competition from generic or authorized generic high-sodium oxybate products or new branded entrants in narcolepsy such as Avadel's recently approved Lumryz notwithstanding FDA recognizing Orphan Drug Exclusivity for Xywav. For example, we received notice in June 2021 that Lupin filed an ANDA for a generic version of Xywav. Additional companies may file ANDAs seeking to market a generic version of Xywav which could lead to additional patent litigation or challenges with respect to Xywav.

Moreover, non-oxybate products intended for the treatment of EDS or cataplexy in narcolepsy or idiopathic hypersomnia, or IH, including new market entrants, even if not directly competitive with Xywav or Xyrem, could have the effect of changing treatment regimens and payor or formulary coverage of Xywav or Xyrem in favor of other products, and indirectly materially and adversely affect sales of Xywav and Xyrem. Examples of such new market entrants include pitolisant, a drug that was approved by FDA in 2019 for the treatment of EDS in adult patients with narcolepsy and approved by FDA in 2020 for the adult cataplexy indication in the U.S. Pitolisant has also been approved and marketed in Europe to treat adult patients with narcolepsy, with or without cataplexy, and to treat EDS in obstructive sleep apnea. Pitolisant is also in late stage development for the treatment of IH. In addition, we are also aware that prescribers often prescribe branded or generic medications for cataplexy, before or instead of prescribing oxybate therapy in Xywav and Xyrem, and that payors often require patients to try such medications before they will cover Xywav or Xyrem, even if they are not approved for this use. Examples of such products are described in "Business—Competition" in Part I, Item 1 of our Annual Report on Form 10-K for the year ended December 31, 2022.

We expect that the approval and launch of the Hikma AG Product, another AG Product or other generic version of Xyrem and the approval and launch of any other high-sodium oxybate product (including Avadel's recently approved Lumryz) or alternative product that treats narcolepsy could have a material adverse effect on our sales of Xywav and Xyrem and on our business, financial condition, results of operations and growth prospects.

**Item 2.**      **Unregistered Sales of Equity Securities and Use of Proceeds**

**Issuer Purchases of Equity Securities**

In November 2016, our board of directors authorized a share repurchase program and as of March 31, 2023 had authorized the repurchase of ordinary shares having an aggregate purchase price of up to $1.5 billion, exclusive of any brokerage commissions. Under this program, which has no expiration date, we may repurchase ordinary shares from time to time on the open market. During the three months ended March 31, 2023, we did not repurchase any of our ordinary shares. As of March 31, 2023, the remaining amount authorized under the share repurchase program was $431.2 million.

Under our share repurchase program, we are authorized to repurchase shares from time to time through open market repurchases. Such repurchases may be pursuant to Rule 10b-18 or Rule 10b5-1 agreements as determined by our management and in accordance with the requirements of the Securities and Exchange Commission.

45

# SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date: May 10, 2023

**JAZZ PHARMACEUTICALS PUBLIC LIMITED COMPANY**
(Registrant)

/s/ Bruce C. Cozadd
_____
Bruce C. Cozadd
*Chairman and Chief Executive Officer and Director*
*(Principal Executive Officer)*

/s/ Renée Galá
_____
Renée Galá
*Executive Vice President and Chief Financial Officer*
*(Principal Financial Officer)*

/s/ Patricia Carr
_____
Patricia Carr
*Senior Vice President, Chief Accounting Officer*
*(Principal Accounting Officer)*

**Exhibit 31.1**

**CERTIFICATION**

I, Bruce C. Cozadd, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Jazz Pharmaceuticals public limited company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 10, 2023

By:        /s/   Bruce C. Cozadd
_____
**Bruce C. Cozadd**
**Chairman and Chief Executive Officer and Director**

**Exhibit 31.2**

## CERTIFICATION

I, Renée Galá, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of Jazz Pharmaceuticals public limited company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 10, 2023

By:  _____/s/   Renée Galá_____

**Renée Galá**
**Executive Vice President and Chief Financial Officer**

**Exhibit 32.1**

## CERTIFICATION[(1)]

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. Section 1350), Bruce C. Cozadd, Chief Executive Officer of Jazz Pharmaceuticals public limited company (the "Company"), and Renée Galá, Executive Vice President and Chief Financial Officer of the Company, each hereby certifies that, to the best of his knowledge:

1.  The Company's Quarterly Report on Form 10-Q for the period ended March 31, 2023, to which this Certification is attached as Exhibit 32.1 (the "Periodic Report"), fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act; and

2.  The information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: May 10, 2023

/s/   Bruce C. Cozadd
_____
**Bruce C. Cozadd**
**Chairman and Chief Executive Officer and Director**

/s/   Renée Galá
_____
**Renée Galá**
**Executive Vice President and Chief Financial Officer**

_____

(1)  This certification accompanies the Quarterly Report on Form 10-Q to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Jazz Pharmaceuticals public limited company under the Securities Act of 1933, as amended, or the Exchange Act (whether made before or after the date of the Form 10-Q), irrespective of any general incorporation language contained in such filing. A signed original of this written statement required by Section 906 of the Sarbanes-Oxley Act of 2002 has been provided to Jazz Pharmaceuticals public limited company and will be retained by Jazz Pharmaceuticals public limited company and furnished to the Securities and Exchange Commission or its staff upon request.

# EXHIBIT 4



**Planet Depos**
We Make It *Happen*™

**HIGHLY CONFIDENTIAL**

# Transcript of Mark Rainey, Ph.D.

**Date:** November 17, 2023
**Case:** Jazz Pharmaceuticals, Inc., et al. -v- Avadel CNS Pharmaceuticals, LLC., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3    ------------------------------------x

4    JAZZ PHARMACEUTICALS, INC.,          :
                          Plaintiff,
5              v.                         :  C.A. No. 21-691-GBW
     AVADEL CNS PHARMACEUTICALS, LLC,
6                         Defendant.      :

7    ------------------------------------x

8    JAZZ PHARMACEUTICALS, INC., et al., :
                          Plaintiffs,
9              v.                         :  C.A. No. 21-1138-GBW
     AVADEL CNS PHARMACEUTICALS, LLC,
10                        Defendant.      :

11   ------------------------------------x

12   JAZZ PHARMACEUTICALS, INC., et al., :
                          Plaintiffs,
13             v.                         :  C.A. No. 21-1594-GBW
     AVADEL CNS PHARMACEUTICALS, LLC,
14                        Defendant.      :

15   ------------------------------------x

16

17             HIGHLY CONFIDENTIAL

18

19      Videotaped Deposition of MARK RAINEY, Ph.D.

20            Boston, Massachusetts

21          Friday, November 17, 2023

22                 9:03 a.m.

23   Job No.: 515237

24   Pages: 1 - 248

25   Reported By: Michelle Keegan, RMR, CRR, CSR

| | | |
|---|---|---|
| 1 | to that. | 09:50:54 |
| 2 | Q. In your view, at the hypothetical | 09:50:56 |
| 3 | negotiation Jazz has a number in mind.  And if | 09:51:05 |
| 4 | Jazz does not get that number, then Jazz can walk | 09:51:09 |
| 5 | away because it has the right to exclude.  Is that | 09:51:13 |
| 6 | fair? | 09:51:16 |
| 7 | A. The way I'm approaching this, analyzing | 09:51:17 |
| 8 | this hypothetical negotiation, is that both | 09:51:36 |
| 9 | parties are going to have -- going to seek a deal | 09:51:37 |
| 10 | that doesn't make them worse off. | 09:51:44 |
| 11 | And they're both going to be -- both going | 09:51:48 |
| 12 | to be -- both are going to walk away if they don't | 09:51:50 |
| 13 | get a deal that makes them -- they would walk away | 09:51:55 |
| 14 | if they got it, if the deal made them worse off. | 09:52:00 |
| 15 | Q. And it is relevant to your opinions on | 09:52:04 |
| 16 | that subject that Jazz could exclude LUMRYZ from | 09:52:08 |
| 17 | the market as an alternative to doing a deal? | 09:52:16 |
| 18 | MS. RYCROFT:  Objection, | 09:52:19 |
| 19 | mischaracterization. | 09:52:25 |
| 20 | A. As I explained in my reports, at the | 09:52:26 |
| 21 | hypothetical negotiation it's my opinion that both | 09:52:34 |
| 22 | parties would understand that Avadel could not | 09:52:36 |
| 23 | launch LUMRYZ without a license to the patents in | 09:52:43 |
| 24 | suit.  So if there's no deal, then LUMRYZ would | 09:52:46 |
| 25 | not launch.  That would be both parties' | 09:52:51 |

HIGHLY CONFIDENTIAL
Transcript of Mark Rainey, Ph.D.
Conducted on November 17, 2023                    46

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  We are back on the | 10:13:40 |
| 2 | record.  The time is 10:13. | 10:13:46 |
| 3 | BY MS. DAVIS: | 10:13:50 |
| 4 | Q. Okay.  Can you turn in your opening report | 10:13:50 |
| 5 | to page 9.  You have a section addressing Xyrem | 10:13:53 |
| 6 | settlement agreements.  Do you see that? | 10:14:05 |
| 7 | A. Yes. | 10:14:06 |
| 8 | Q. In connection with preparing your opinions | 10:14:06 |
| 9 | in this case, you reviewed Jazz's settlement | 10:14:09 |
| 10 | agreements relating to XYREM generic products.  Is | 10:14:15 |
| 11 | that correct? | 10:14:20 |
| 12 | A. Yes.  Along with other licenses as well, I | 10:14:20 |
| 13 | reviewed those. | 10:14:26 |
| 14 | Q. You ultimately concluded that the XYREM | 10:14:26 |
| 15 | agreements are not comparable licenses.  Is that | 10:14:31 |
| 16 | right? | 10:14:33 |
| 17 | A. Yeah.  Well, as I say in the report, | 10:14:33 |
| 18 | Paragraph 47, I concluded that Jazz's settlement | 10:14:44 |
| 19 | agreements with respect to XYREM do not prove and | 10:14:48 |
| 20 | establish a royalty for the patents in suit. | 10:14:51 |
| 21 | Q. Are you familiar with the concept of a | 10:14:55 |
| 22 | comparable license agreements for purposes of | 10:14:56 |
| 23 | calculating a reasonable royalty? | 10:15:00 |
| 24 | A. Yes, I am familiar with that terminology. | 10:15:02 |
| 25 | Q. Are any of the XYREM settlement agreements | 10:15:05 |

HIGHLY CONFIDENTIAL
Transcript of Mark Rainey, Ph.D.
Conducted on November 17, 2023                        47

| | | |
|---|---|---|
| 1 | comparable license agreements? | 10:15:11 |
| 2 | A. No, not in my opinion. | 10:15:12 |
| 3 | Q. You did consider the XYREM settlement | 10:15:16 |
| 4 | agreements to be relevant to your opinions in this | 10:15:21 |
| 5 | case with respect to certain principles | 10:15:25 |
| 6 | illustrated by them.  Is that right? | 10:15:31 |
| 7 | A. Yes. | 10:15:33 |
| 8 | Q. I want to start back on page 9, | 10:15:43 |
| 9 | Paragraph 39.  You talk about an authorized | 10:15:46 |
| 10 | generic agreement with Hikma.  Do you see that? | 10:15:53 |
| 11 | A. Yes. | 10:15:56 |
| 12 | Q. "Authorized generic," that term refers to | 10:15:57 |
| 13 | a specific thing.  Correct? | 10:16:02 |
| 14 | A. Yes. | 10:16:04 |
| 15 | Q. An authorized generic product is different | 10:16:04 |
| 16 | than a generic product? | 10:16:09 |
| 17 | A. Yes. | 10:16:11 |
| 18 | Q. An authorized generic product is one that | 10:16:14 |
| 19 | is -- strike that. | 10:16:18 |
| 20 | In this specific context, authorized | 10:16:19 |
| 21 | generic versions of XYREM are manufactured by Jazz | 10:16:25 |
| 22 | itself.  Is that right? | 10:16:32 |
| 23 | A. Yes. | 10:16:33 |
| 24 | Q. Would you say that it is fair to compare | 10:16:34 |
| 25 | an authorized generic to a store brand of product, | 10:16:41 |

HIGHLY CONFIDENTIAL
Transcript of Mark Rainey, Ph.D.
Conducted on November 17, 2023                    50

| | | |
|---|---|---|
| 1 | A. That's correct. | 10:20:48 |
| 2 | Q. And you believed that this set of | 10:20:48 |
| 3 | agreements is relevant to illustrate economic | 10:20:53 |
| 4 | principles applicable to this case.  Is that | 10:20:58 |
| 5 | right? | 10:21:03 |
| 6 | A. To a certain extent.  Yes. | 10:21:03 |
| 7 | Q. Now, in the authorized generic agreement | 10:21:09 |
| 8 | that is Exhibit 4, in the last whereas clause on | 10:21:15 |
| 9 | the first page, it is setting out that Jazz will | 10:21:21 |
| 10 | make the XYREM product, the authorized generic | 10:21:25 |
| 11 | version, and Roxane will purchase that from Jazz | 10:21:29 |
| 12 | and sell it.  Is that right? | 10:21:34 |
| 13 | A. Sorry.  Where are you? | 10:21:35 |
| 14 | Q. The last whereas clause on the first page. | 10:21:37 |
| 15 | A. Yes, I see that. | 10:21:48 |
| 16 | Q. That is very different from the set of | 10:21:49 |
| 17 | circumstances as between Jazz and Avadel where | 10:21:55 |
| 18 | Jazz is seeking a payment from Avadel for a | 10:22:00 |
| 19 | product that Avadel itself both makes and then | 10:22:04 |
| 20 | sells.  Would you agree? | 10:22:07 |
| 21 | A. Yes.  The supply arrangement is different | 10:22:09 |
| 22 | between the two circumstances. | 10:22:23 |
| 23 | Q. You agree that there is a significant | 10:22:27 |
| 24 | difference between the situation in which Jazz | 10:22:30 |
| 25 | makes the product and Hikma sells that product as | 10:22:34 |

| | | |
|---|---|---|
| 1 | an authorized generic, versus Avadel making its | 10:22:38 |
| 2 | own product and selling its own product? | 10:22:42 |
| 3 | A. I agree they're different circumstances. | 10:22:44 |
| 4 | How significant it is depends on what you're | 10:22:50 |
| 5 | looking at in terms of the agreements. | 10:22:55 |
| 6 | Q. You are not offering any opinion that the | 10:22:59 |
| 7 | economics of an authorized generic arrangement are | 10:23:03 |
| 8 | comparable to the economics that Jazz and Avadel | 10:23:08 |
| 9 | would consider at a hypothetical negotiation. | 10:23:12 |
| 10 | Correct? | 10:23:14 |
| 11 | MS. RYCROFT:  Objection, | 10:23:17 |
| 12 | mischaracterization, to the extent it calls for a | 10:23:18 |
| 13 | legal conclusion. | 10:23:20 |
| 14 | A. My opinion as stated in my report is that | 10:23:21 |
| 15 | the XYREM settlement agreements illustrate some | 10:23:30 |
| 16 | general principles about the way pharmaceutical | 10:23:35 |
| 17 | licenses work.  But I'm not -- that's the extent | 10:23:41 |
| 18 | to which I'm relying on them. | 10:23:47 |
| 19 | Q. Can we look at Exhibit 5, which is the | 10:23:48 |
| 20 | settlement agreement. | 10:23:53 |
| 21 | And this is one of the agreements that you | 10:23:59 |
| 22 | believe illustrates some of the general principles | 10:24:03 |
| 23 | about the way pharmaceutical licenses work.  Is | 10:24:06 |
| 24 | that correct? | 10:24:08 |
| 25 | A. Not the settlement agreement in | 10:24:08 |

HIGHLY CONFIDENTIAL
Transcript of Mark Rainey, Ph.D.
Conducted on November 17, 2023                    52

| | | |
|---|---|---|
| 1 | particular. | 10:24:33 |
| 2 | Q. Is the license agreement between Jazz and | 10:24:36 |
| 3 | Roxane one of the agreements that you believe | 10:24:43 |
| 4 | illustrates some of the general principles about | 10:24:46 |
| 5 | the way pharmaceutical licenses work? | 10:24:49 |
| 6 | A. No.  In my report I refer to the | 10:24:50 |
| 7 | authorized generic agreement. | 10:24:58 |
| 8 | Q. So in your opinion, the authorized generic | 10:25:02 |
| 9 | agreement between Jazz and Roxane is relevant to | 10:25:04 |
| 10 | this case, but the settlement agreement and the | 10:25:10 |
| 11 | license agreement between Jazz and Roxane are not | 10:25:13 |
| 12 | relevant to this case? | 10:25:15 |
| 13 | MS. RYCROFT:  Objection, | 10:25:17 |
| 14 | mischaracterization. | 10:25:18 |
| 15 | A. My opinion, as stated in my report, is | 10:25:22 |
| 16 | that the authorized generic agreement illustrates | 10:25:25 |
| 17 | some general economic principles that are relevant | 10:25:28 |
| 18 | to this case. | 10:25:31 |
| 19 | It should also be kept in mind that the | 10:25:37 |
| 20 | authorized generic agreement was entered into at | 10:25:40 |
| 21 | the same time as the settlement agreement and the | 10:25:43 |
| 22 | license agreement.  So they are in some sense a | 10:25:46 |
| 23 | package. | 10:25:50 |
| 24 | Q. All three agreements need to be considered | 10:25:51 |
| 25 | together? | 10:25:53 |

HIGHLY CONFIDENTIAL
Transcript of Mark Rainey, Ph.D.
Conducted on November 17, 2023                        53

| | | |
|---|---|---|
| 1 | A. In general, yes. | 10:25:54 |
| 2 | Q. Looking at the settlement agreement, so | 10:25:56 |
| 3 | Exhibit 5 to your deposition, can you turn to | 10:26:03 |
| 4 | page 2.  And on page 2, can you go to Heading | 10:26:05 |
| 5 | Number 3. | 10:26:19 |
| 6 | In connection with reaching a settlement | 10:26:20 |
| 7 | with Roxane, Jazz agreed to ████████████ | 10:26:22 |
| 8 | ████████████████████████████.  Is that correct? | 10:26:27 |
| 9 | A. Yes. | 10:26:29 |
| 10 | Q. And that is part of the package deal? | 10:26:32 |
| 11 | A. Yes. | 10:26:38 |
| 12 | Q. Now, can you pull up the license agreement | 10:26:41 |
| 13 | that is Exhibit 6.  So starting on the first page | 10:26:46 |
| 14 | in the recital section, do you see the second | 10:26:54 |
| 15 | recital, the whereas pursuant to the Roxane ANDA? | 10:26:57 |
| 16 | A. Yes. | 10:27:02 |
| 17 | Q. And so in this license agreement, the | 10:27:02 |
| 18 | parties are confirming that Roxane has sought and | 10:27:08 |
| 19 | obtained marketing authorization from the FDA to | 10:27:11 |
| 20 | market the Roxane generic product.  Is that right? | 10:27:15 |
| 21 | A. Yes. | 10:27:17 |
| 22 | Q. The Roxane generic product, that's not the | 10:27:18 |
| 23 | authorized generic.  Correct? | 10:27:22 |
| 24 | A. Correct. | 10:27:23 |
| 25 | Q. That is a true generic product that is | 10:27:23 |

| | | |
|---|---|---|
| 1 | date.  Are you there? | 10:31:31 |
| 2 | A. Yes. | 10:31:37 |
| 3 | Q. Now, the launch date has several different | 10:31:38 |
| 4 | paragraphs.  Is that right?  Or subparts? | 10:31:45 |
| 5 | A. Subparts, yes. | 10:31:47 |
| 6 | Q. Right now, you are expecting the launch | 10:31:48 |
| 7 | date for Roxane's generic product to be January 1, | 10:31:53 |
| 8 | 2026.  Is that right? | 10:32:00 |
| 9 | A. In my report, I assumed that multisource | 10:32:00 |
| 10 | generic entry for XYREM will occur January 1st, | 10:32:08 |
| 11 | 2026.  That's based off of the expectations of | 10:32:15 |
| 12 | both Jazz and Avadel. | 10:32:18 |
| 13 | Q. There is a possibility that multisource | 10:32:19 |
| 14 | generics could launch earlier than January 1, | 10:32:25 |
| 15 | 2026.  Correct? | 10:32:29 |
| 16 | A. Yes. | 10:32:29 |
| 17 | Q. Let me get another document for you. | 10:32:30 |
| 18 | (Rainey Exhibits 7 and 8 were marked for | 10:33:20 |
| 19 | identification and are attached to the | 10:33:20 |
| 20 | transcript.) | 10:33:21 |
| 21 | Q. You have Exhibits 7 and 8 in front of you? | 10:33:21 |
| 22 | A. Yes. | 10:33:32 |
| 23 | Q. And is Exhibit 7 a settlement agreement? | 10:33:32 |
| 24 | I was not looking when I handed the documents to | 10:33:40 |
| 25 | you. | 10:33:42 |

| | | |
|---|---|---|
| 1 | A. Exhibit 7 is the settlement agreement. | 10:33:43 |
| 2 | Q. Exhibit 8 is an authorized generic | 10:33:44 |
| 3 | agreement? | 10:33:47 |
| 4 | A. Yes. | 10:33:47 |
| 5 | Q. These are agreements with a different | 10:33:48 |
| 6 | company, Amneal.  Is that right? | 10:33:52 |
| 7 | A. Yes. | 10:33:56 |
| 8 | Q. And if you look at the settlement | 10:33:56 |
| 9 | agreement -- strike that. | 10:34:02 |
| 10 | These are also agreements that you | 10:34:05 |
| 11 | reviewed in connection with preparing your | 10:34:09 |
| 12 | opinions in this case.  Is that right? | 10:34:11 |
| 13 | A. Yes. | 10:34:12 |
| 14 | Q. Amneal, like Hikma, has an agreement where | 10:34:13 |
| 15 | it will sell an authorized generic version of | 10:34:21 |
| 16 | XYREM.  Is that right? | 10:34:26 |
| 17 | A. Yeah.  They have an agreement that gives | 10:34:27 |
| 18 | them the right to sell an authorized generic, | 10:34:30 |
| 19 | which they have taken advantage of. | 10:34:36 |
| 20 | Q. As with the Hikma authorized generic, the | 10:34:38 |
| 21 | Amneal authorized generic is, in fact, made by | 10:34:44 |
| 22 | Jazz and then sold by Amneal.  Is that right? | 10:34:48 |
| 23 | A. That's my understanding. | 10:34:50 |
| 24 | Q. Amneal then also has agreed with Jazz that | 10:34:52 |
| 25 | in the future Amneal can sell a generic version of | 10:35:06 |

HIGHLY CONFIDENTIAL
Transcript of Mark Rainey, Ph.D.
Conducted on November 17, 2023                    59

| | | |
|---|---|---|
| 1 | XYREM that Amneal makes.  Is that right? | 10:35:12 |
| 2 | A. Yes. | 10:35:15 |
| 3 | Q. Jazz agreed to license Amneal for the | 10:35:15 |
| 4 | generic version, not the authorized generic but | 10:35:22 |
| 5 | the regular generic, ███████████████████ | 10:35:25 |
| 6 | ████████████    Is that right? | 10:35:31 |
| 7 | A. Yes.  Along with the other multisource | 10:35:33 |
| 8 | generics. | 10:35:37 |
| 9 | Q. And the license that Amneal got for its | 10:35:38 |
| 10 | generic is nonexclusive? | 10:35:41 |
| 11 | A. Yes. | 10:35:43 |
| 12 | Q. Can you look at the settlement agreement | 10:35:43 |
| 13 | on page 2, under Heading 3.  Are you there? | 10:35:48 |
| 14 | A. Yes. | 10:35:56 |
| 15 | Q. Jazz has agreed ███████████ | 10:35:57 |
| 16 | ███████.  Is that right? | 10:36:04 |
| 17 | MS. RYCROFT:  Objection, | 10:36:05 |
| 18 | mischaracterization, the document speaks for | 10:36:06 |
| 19 | itself. | 10:36:08 |
| 20 | A. Yeah.  I see that it's -- Jazz agrees to | 10:36:08 |
| 21 | ████████████████████ | 10:36:15 |
| 22 | ██████████████████████ | 10:36:18 |
| 23 | ████████████████████████ | 10:36:20 |
| 24 | █████████████. | 10:36:23 |
| 25 | Q. I need to get two more documents. | 10:36:24 |

| | | |
|---|---|---|
| 1 | situation with the number of generic | 10:48:02 |
| 2 | manufacturers. | 10:48:04 |
| 3 | Q. And the circumstances in which these | 10:48:06 |
| 4 | agreements were reached that you just mentioned, | 10:48:10 |
| 5 | you referenced -- you meant what about that? | 10:48:13 |
| 6 | A. I mentioned that these were license | 10:48:20 |
| 7 | agreements that were entered into as part of the | 10:48:23 |
| 8 | settlement of litigation about the XYREM patents. | 10:48:25 |
| 9 | So there was uncertainty about, say, the validity | 10:48:28 |
| 10 | of the XYREM patents at the time these were | 10:48:33 |
| 11 | entered into. | 10:48:35 |
| 12 | Q. And the second item you mentioned was the | 10:48:35 |
| 13 | competitive situation with the number of generic | 10:48:38 |
| 14 | manufacturers.  Is that right? | 10:48:41 |
| 15 | A. Yes. | 10:48:41 |
| 16 | Q. And what did you mean by that? | 10:48:42 |
| 17 | A. So there are -- I think we're up to ten | 10:48:44 |
| 18 | generic manufacturers with this that have this | 10:48:50 |
| 19 | license agreement to sell generic XYREM. | 10:48:55 |
| 20 | And so in that competitive situation, | 10:49:01 |
| 21 | there are ten manufacturers selling a | 10:49:04 |
| 22 | nondifferentiated product.  So it's going to be a | 10:49:06 |
| 23 | highly competitive market. | 10:49:08 |
| 24 | Q. Jazz has granted ███████ nonexclusive | 10:49:09 |
| 25 | license to ten different manufacturers of generic | 10:49:15 |

| # | Text | Time |
|---|------|------|
| 1 | XYREM.  Is that right? | 10:49:21 |
| 2 | A. Yes.  As part of the settlements. | 10:49:22 |
| 3 | Q. Do you know with respect to Mallinckrodt, | 10:49:25 |
| 4 | ███████████████████████ | 10:49:30 |
| 5 | ████████████████████ | 10:49:32 |
| 6 | ███████████ | 10:50:00 |
| 7 | ███████████ | 10:50:04 |
| 8 | ███████████████████ | 10:50:06 |
| 9 | █████████████████████████ | 10:50:14 |
| 10 | ████████████████████████ | 10:50:16 |
| 11 | ██████████████ | 10:50:18 |
| 12 | ████████████████████████ | 10:50:23 |
| 13 | ██████████████ | 10:50:27 |
| 14 | ██████████████████████████ | 10:50:32 |
| 15 | ████████████████████ | 10:50:38 |
| 16 | ██████████ | 10:50:43 |
| 17 | MS. RYCROFT:  Objection, | 10:50:44 |
| 18 | mischaracterization. | 10:50:49 |
| 19 | A. As part of the settlement agreement, those | 10:50:50 |
| 20 | are the terms that were negotiated. | 10:50:55 |
| 21 | Q. Have you ever considered settlement | 10:50:57 |
| 22 | agreements in the past when -- specifically for | 10:51:00 |
| 23 | purposes of using their royalty rates when | 10:51:06 |
| 24 | conducting a damages analysis? | 10:51:09 |
| 25 | A. I don't recall specifically. | 10:51:11 |

HIGHLY CONFIDENTIAL
Transcript of Mark Rainey, Ph.D.
Conducted on November 17, 2023                    112

| | | |
|---|---|---|
| 1 | Q. And so in Paragraph 68 -- we mentioned | 12:16:16 |
| 2 | this earlier -- you agree that the Avadel | 12:16:19 |
| 3 | intercompany agreements are not relevant to the | 12:16:24 |
| 4 | hypothetical negotiation.  Correct? | 12:16:27 |
| 5 | A. Yes.  That's what I say there in | 12:16:29 |
| 6 | Paragraph 68. | 12:16:31 |
| 7 | Q. And that is your correct opinion? | 12:16:32 |
| 8 | A. Yes. | 12:16:36 |
| 9 | Q. And in Paragraph 69, you talk about an | 12:16:36 |
| 10 | agreement between Avadel and RTW royalty to DAC. | 12:16:40 |
| 11 | Do you see that? | 12:16:49 |
| 12 | A. Yes. | 12:16:50 |
| 13 | Q. It is your opinion that the agreement | 12:16:50 |
| 14 | between Avadel and RTW is also not relevant to the | 12:16:54 |
| 15 | hypothetical negotiation.  Correct? | 12:16:58 |
| 16 | A. That's correct. | 12:17:00 |
| 17 | Q. The next factor in your report in this | 12:17:02 |
| 18 | section, this is Georgia-Pacific Factor 3.  Is | 12:17:09 |
| 19 | that right? | 12:17:12 |
| 20 | A. Yes. | 12:17:12 |
| 21 | Q. Now, Georgia-Pacific Factor 3 relates to | 12:17:12 |
| 22 | the nature and scope of the license as exclusive | 12:17:18 |
| 23 | or nonexclusive or as restricted or nonrestricted | 12:17:23 |
| 24 | in terms of territory or with respect to whom the | 12:17:27 |
| 25 | manufactured product may be sold.  Is that right? | 12:17:30 |

HIGHLY CONFIDENTIAL

Transcript of Mark Rainey, Ph.D.
Conducted on November 17, 2023                          149

| | | |
|---|---|---|
| 1 | how many prescriptions -- strike that. | 13:55:27 |
| 2 | You agree that LUMRYZ has, in fact, been | 13:55:32 |
| 3 | prescribed by physicians who were not Tier 1 and | 13:55:39 |
| 4 | Tier 2 physicians.  Correct? | 13:55:43 |
| 5 | A. Yes.  Just this pie chart here shows that | 13:55:44 |
| 6 | Tier 1 and Tier 2 accounted for 75 percent of the | 13:55:54 |
| 7 | LUMRYZ writers. | 13:56:00 |
| 8 | Q. Have you done anything to figure out how | 13:56:03 |
| 9 | many LUMRYZ sales up through the period where you | 13:56:07 |
| 10 | have information were to Tier 1 and Tier 2 | 13:56:10 |
| 11 | prescribers? | 13:56:14 |
| 12 | A. I haven't looked at that.  I've focused | 13:56:14 |
| 13 | more on a -- sort of a more direct way of looking | 13:56:21 |
| 14 | at competition, which is the share of LUMRYZ | 13:56:25 |
| 15 | business actually sourced from switches.  And as I | 13:56:29 |
| 16 | explain in my report, that was -- that's been well | 13:56:34 |
| 17 | over 50 percent. | 13:56:39 |
| 18 | Q. You agree that some of the patients taking | 13:56:43 |
| 19 | LUMRYZ are patients who would not otherwise be | 13:56:47 |
| 20 | taking XYREM, XYWAV, or authorized generic XYREM. | 13:56:50 |
| 21 | Correct? | 13:56:56 |
| 22 | A. Yes.  I account for that in my analysis. | 13:56:57 |
| 23 | Q. Avadel is expanding the market.  Is that | 13:57:01 |
| 24 | true? | 13:57:03 |
| 25 | A. Yes.  I account for that in my analysis. | 13:57:03 |

```
1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2         I, MICHELLE KEEGAN, Registered Merit

3    Reporter and Notary Public in and for the

4    Commonwealth of Massachusetts, the officer before

5    whom the foregoing deposition was taken, do hereby

6    certify that the foregoing transcript is a true

7    and correct record of the testimony given; that

8    said testimony was taken by me stenographically

9    and thereafter reduced to typewriting under my

10   direction; that reading and signing was requested;

11   and that I am neither counsel for, related to, nor

12   employed by any of the parties to this case and

13   have no interest, financial or otherwise, in its

14   outcome.

15        IN WITNESS WHEREOF, I have hereunto set my

16   hand and affixed my notarial seal this 20th day of

17   November, 2023.

18   My commission expires May 15, 2026.

19

20

21

22   _____

23   NOTARY PUBLIC IN AND FOR

24   THE COMMONWEALTH OF MASSACHUSETTS

25
```

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> AVADEL CNS PHARMACEUTICALS, LLC, <br><br> Defendant. | C.A. No. 21-691-GBW <br><br> **HIGHLY CONFIDENTIAL INFORMATION** |
| JAZZ PHARMACEUTICALS, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> AVADEL CNS PHARMACEUTICALS, LLC, <br><br> Defendant. | C.A. No. 21-1138-GBW <br><br> **HIGHLY CONFIDENTIAL INFORMATION** |
| JAZZ PHARMACEUTICALS, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> AVADEL CNS PHARMACEUTICALS, LLC, <br><br> Defendant. | C.A. No. 21-1594-GBW <br><br> **HIGHLY CONFIDENTIAL INFORMATION** |

**Expert Report of Mark Rainey, Ph.D.**

10. My present calculations for past damages account for Avadel's infringement through September 6, 2023, the latest period for which Avadel has produced sales data. I will account for Avadel's infringement for any period between September 6, 2023 and trial after Avadel produces sales data for that period and as ordered by the Court. I further understand that Jazz seeks a permanent injunction to prevent future sales by Avadel if Avadel is found liable for infringement and that, if the Court denies a permanent injunction, Jazz will seek ongoing royalties for Avadel's future infringement of the Patents-in-Suit. If asked to do so by the Court or counsel, I will calculate any ongoing royalties or other remedies as appropriate.

## III.    Relevant Facts and Background

### A.    The Parties

#### 1.    Jazz

11. The plaintiffs in this case, Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited, are subsidiaries of Jazz Pharmaceuticals plc.[1] Jazz Pharmaceuticals plc is a biopharmaceutical company that develops and markets medicines in the therapeutic areas of neuroscience and oncology.[2] In 2022, Jazz's two largest products by net sales were medicines used to treat sleep disorders with the brand names Xyrem and Xywav.[3]

12. Xyrem (twice-nightly sodium oxybate) received U.S. Food and Drug Administration ("FDA") approval in July 2002 and is indicated for the treatment cataplexy or excessive daytime sleepiness ("EDS") in patients seven years of age or older with narcolepsy.[4] Jazz has filed patent lawsuits against multiple companies that filed abbreviated new drug applications ("ANDAs") seeking to market generic versions of Xyrem and has reached settlements with nine of those companies.[5] Pursuant to those settlements, Hikma launched an authorized

---

[1] Jazz Pharmaceuticals plc Form 10-K for the period ended December 31, 2022, Exhibit 21.1 (JPION00472408-663 at 659; AVDL_01393581-836 at 832).
[2] Jazz Pharmaceuticals plc Form 10-K for the period ended December 31, 2022, p. 5 (JPION00472408-663 at 413; AVDL_01393581-836 at 586).
[3] Jazz Pharmaceuticals plc Form 10-K for the period ended December 31, 2022, p. 80 (JPION00472408-663 at 488; AVDL_01393581-836 at 661); Oxybate Revenues (JPION00525062) (Mindus Ex. 14); see also U.S. Contribution Statement (JPION0052064) (Mindus Ex. 16); Oxybate Sales Volumes (JPION00525063) (Mindus Ex. 15).
[4] Jazz Pharmaceuticals plc Form 10-K for the period ended December 31, 2022, p. 10 (JPION00472408-663 at 418; AVDL_01393581-836 at 591).
[5] Jazz Pharmaceuticals plc Form 10-Q for the period ended June 30, 2023, p. 48.

generic ("AG") version of Xyrem on January 1, 2023 and Amneal launched an AG version of Xyrem on July 1, 2023, and Jazz receives a royalty on sales of those AG products.[6]  The companies with which Jazz has reached settlements have the right to launch their own generic sodium oxybate products no later than December 31, 2025.[7]

13.    Xywav (calcium, magnesium, potassium, and sodium oxybates) received FDA approval in July 2020 and, like Xyrem, is indicated for the twice-nightly treatment of cataplexy or EDS in patients seven years of age and older with narcolepsy.[8]

### 2.    Avadel

14.    The defendant in this case, Avadel CNS Pharmaceuticals, LLC, is a subsidiary of Avadel Pharmaceuticals plc.[9]  Avadel Pharmaceuticals plc is a biopharmaceutical company whose only commercialized product is Lumryz, formerly known as FT218.[10]  Lumryz is an extended-release formulation of sodium oxybate that is indicated to be taken once at bedtime for the treatment of cataplexy or EDS in adults with narcolepsy.[11]  Avadel's promotional materials explain that its extended-release formulation is a "blend of immediate-release and controlled-release granules."[12]  Lumryz was approved by the FDA on May 1, 2023, and Avadel began shipping Lumryz to customers in June 2023.[13]

---

[6] Jazz Pharmaceuticals plc Form 10-Q for the period ended June 30, 2023, pp. 48-49.

[7] Jazz Pharmaceuticals plc Form 10-Q for the period ended June 30, 2023, p. 49.

[8] Jazz Pharmaceuticals plc Form 10-K for the period ended December 31, 2022, p. 10 (JPION00472408-663 at 418; AVDL_01393581-836 at 591).  In August 2021, Xywav also received an indication for the treatment of idiopathic hypersomnia in adults.

[9] Avadel Pharmaceuticals plc Form 10-Q for the period ended June 30, 2023, p. 10 (JPION00524077-119 at 087).

[10] Avadel Pharmaceuticals plc Form 10-Q for the period ended June 30, 2023, p. 23 (JPION00524077-119 at 100).

[11] Avadel Pharmaceuticals plc Form 10-Q for the period ended June 30, 2023, p. 23 (JPION00524077-119 at 100).

[12] See, e.g., HCP Optimized Evolved iVA (AVDL_01434093-146 at 098) (Pound Ex. 27).

[13] Avadel Pharmaceuticals plc Form 10-Q for the period ended June 30, 2023, p. 25 (JPION00524077-119 at 102); Defendant's Response to Interrogatory No. 9; Defendant's First Supplemental Response to Interrogatory No. 13.

B.      **Narcolepsy Treatments**

15.      Narcolepsy is a sleep disorder characterized by EDS and in some cases cataplexy (sudden episodes of muscle weakness).[14]   The only products currently approved by the FDA for the treatment of narcolepsy with cataplexy are the oxybate products discussed above (Xyrem, Xywav, and Lumryz) and Wakix (pitolisant), a histamine 3 antagonist marketed by Harmony Biosciences.[15]   Other medications that are not indicated for the treatment of narcolepsy with cataplexy, but are indicated for the treatment of narcolepsy or EDS, are Sunosi (solriamfetol), wake-promoting agents such as modafinil and armodafinil, and stimulants such as dextroamphetamine and methylphenidate.[16]   In addition, some antidepressants that are not FDA-approved for the treatment of narcolepsy (such as tricyclic antidepressants, selective serotonin reuptake inhibitors, or selective norepinephrine reuptake inhibitors) are sometimes used by prescribers to treat symptoms of narcolepsy.[17]

C.      **The Patents-in-Suit**

16.      The '488 Patent issued on September 1, 2020, and is titled "Controlled Release Dosage Forms for High Dose, Water Soluble and Hygroscopic Drug Substances."

17.      The '885 Patent issued on October 27, 2020, and is titled "Controlled Release Dosage Forms for High Dose, Water Soluble and Hygroscopic Drug Substances."

18.      The '956 Patent issued on March 30, 2021, and is titled "Controlled Release Dosage Forms for High Dose, Water Soluble and Hygroscopic Drug Substances."

19.      The '931 Patent issued on April 6, 2021, and is titled "Controlled Release Dosage Forms for High Dose, Water Soluble and Hygroscopic Drug Substances."

20.      The '079 Patent issued on August 3, 2021, and is titled "GHB Formulation and Method for its Manufacture."

---

[14] IPD Analytics, New Drug Review: Lumryz, p. 3 (AVDL_01429326-339, p. 328).  Narcolepsy that occurs with cataplexy is referred to as narcolepsy type 1, while narcolepsy in the absence of cataplexy is referred to a narcolepsy type 2.

[15] IPD Analytics, New Drug Review: Lumryz, p. 5 (AVDL_01429326-339, p. 330); Avadel Narcolepsy Training Module: Treatment Landscape, p. 36 (AVDL_01433267-324 at 303).

[16] Avadel Narcolepsy Training Module: Treatment Landscape, p. 36 (AVDL_01433267-324 at 303).

[17] Jazz Pharmaceuticals plc Form 10-K for the period ended December 31, 2022, p. 19 (JPION00472408-663 at 427; AVDL_01393581-836 at 600); Avadel Narcolepsy Training Module: Treatment Landscape, p. 36 (AVDL_01433267-324 at 303).

21.     The '782 Patent issued on October 19, 2021, and is titled "GHB Formulation and Method for its Manufacture."

22.     I understand that the '488 Patent, '885 Patent, '956 Patent, and '931 Patent are owned by Jazz Pharmaceuticals, Inc. and expire on March 24, 2031.  I understand that the '079 Patent and '782 Patent are owned by Jazz Pharmaceuticals Ireland Limited and expire on February 18, 2036.

23.     I further understand that the asserted claims of the Patents-in-Suit cover sustained, controlled, and/or modified release oxybate formulations and methods for using them to treat excessive daytime sleepiness or cataplexy in narcolepsy.  I understand that other Jazz experts have opined on the technical scope of the asserted claims.

### D.     The Accused Product

24.     Avadel's Lumryz is the product that is accused of infringing the Patents-in-Suit. As noted above, Lumryz is an extended-release formulation of sodium oxybate indicated to be taken once at bedtime for the treatment of cataplexy or EDS in adults with narcolepsy, and was approved by the FDA on May 1, 2023.[18]  Avadel began shipping Lumryz to its customers in June 2023 and net sales of Lumryz in the period ending June 30, 2023 totaled approximately $1.5 million.[19]

## IV.     Approach to Damages

25.     Damages in patent infringement cases are governed by 35 U.S.C. § 284, which states:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

26.     Two categories of damages available to compensate for patent infringement are (1) lost profits and (2) a reasonable royalty.  The total damages awarded must be "adequate to

---

[18]  Avadel Pharmaceuticals plc Form 10-Q for the period ended June 30, 2023, p. 10 (JPION00524077-119 at 087).
[19]  Avadel Pharmaceuticals plc Form 10-Q for the period ended June 30, 2023, p. 25 (JPION00524077-119 at 102).

**Factor 1: The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty.**

36.     Jazz has not received any royalties for licensing the Patents-in-Suit because Jazz has not licensed the Patents-in-Suit.  There is accordingly no evidence supporting or tending to prove an established royalty.

37.     Although Jazz has not licensed the Patents-in-Suit, in the remainder of this section I consider other Jazz agreements and negotiations relating to potentially comparable intellectual property to determine whether they provide evidence relevant to the hypothetical negotiation.

### 1.      Xyrem Settlement Agreements

38.     As I discussed above, Jazz has filed and settled patent lawsuits with multiple companies that sought to market generic versions of Xyrem.  As part of those settlements, Jazz granted licenses to patents related to Xyrem.  In this section I discuss those settlements and licenses.

39.     On April 5, 2017, Jazz entered into a Settlement Agreement, Authorized Generic Agreement, and License Agreement with a subsidiary of Hikma Pharmaceuticals PLC ("Hikma").[23]  The Authorized Generic Agreement gave Hikma the right to sell an authorized generic version of Xyrem starting no later than January 1, 2023, with options to continue selling Xyrem AG through the end of 2027.  During the Initial Sales Period (i.e., January 1, 2023 until July 1, 2023), Hikma pays a royalty to Jazz ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████[24]  The royalty rate ████████████████████████████████

████████████████████████████████████████████████████████████,

---

[23] Hikma Settlement Agreement, April 5, 2017 (JPION00470839-864); Hikma Authorized Generic Agreement, April 5, 2017 (JPION00470654-694); Hikma License Agreement, April 5, 2017 (JPION00470823-838). ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

[24] Hikma Authorized Generic Agreement, April 5, 2017, Sections 1.53 and 5.2.1 (JPION00470654-694 at 660, 672-673).

██████████████████████████████████████████████████████
█████████████████████████████████

40.     If Hikma elects to continue selling AG product during the Remaining Sales Period (i.e., July 1, 2023 until January 1, 2024), the royalty rate is ████████████████████████████████████████
████████████████████████████████[26]

41.     If Hikma elects to continue selling AG product during the Extended Sales Period (i.e., January 1, 2024 through at latest the end of 2027), the royalty rate is ████[27]

42.     After Hikma stops selling AG product, Hikma receives a non-exclusive ████████ ██ license under patents related to Xyrem to sell its own generic version of Xyrem.[28]

43.     Hikma started selling Xyrem AG on January 1, 2023 and has ██████████████ ████████████████████████████████.[29]

44.     On October 11, 2018, Jazz entered into a Settlement Agreement, Authorized Generic Agreement, and License Agreement with Amneal Pharmaceuticals LLC ("Amneal").[30] The Authorized Generic Agreement gave Amneal the right to sell an authorized generic version of Xyrem starting no later than July 1, 2023 and ████████████████████████████.[31] Because Amneal's AG launched in 2023, ███████████████████████████████████

---

[25] Hikma Authorized Generic Agreement, April 5, 2017, Section 5.2.1 (JPION00470654-694 at 672-673).

[26] Hikma Authorized Generic Agreement, April 5, 2017, Section 5.2.2 (JPION00470654-694 at 674).

[27] Hikma Authorized Generic Agreement, April 5, 2017, Section 5.2.3 (JPION00470654-694 at 674).

[28] Hikma License Agreement, April 5, 2017, Sections 1.10 and 2.1 (JPION00470823-838 at 824, 826).

[29] Jazz Pharmaceuticals plc Form 10-Q for the period ended June 30, 2023, pp. 48-49; Hikma Extension Notice, August 14, 2023 (JPION00524390-392).

[30] Amneal Settlement Agreement, October 11, 2018 (JPION00470695-718; Amneal Authorized Generic Agreement, October 11, 2018 (JPION00470533-560); Amneal License Agreement, October 11, 2018 (JPION00470621-636). ████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████ ██ ██████ █████ ██ ████ ████ ██ ████████.

[31] Amneal Authorized Generic Agreement, October 11, 2018, Sections 1.4, 1.41 (JPION00470533-560 at 534, 539); Amneal License Agreement, October 11, 2018, Section 1.13 (JPION00470621-636 at 622).

███████████████████████████████████████████████████ ████████

██████████████████████████████████████████████████████████

████████████ [33]   After Amneal's AG sales period ends, Amneal receives a non-exclusive,

████████ license under patents related to Xyrem to sell its own generic version of Xyrem.[34]

Amneal started selling Xyrem AG in July 2023.[35]

45.    Jazz entered into Settlement Agreements, Authorized Generic Agreements, and

License Agreements with Lupin, Inc. ("Lupin") and Par Pharmaceutical, Inc. ("Par") that ████

████████████████████████████████████████████.[36]   Neither Lupin nor Par have elected to start

selling Xyrem AG.[37]

46.    Jazz also entered into Settlement Agreements with five additional generic

manufacturers.[38]   In these agreements, generally speaking, Jazz granted each generic manufacturer

a non-exclusive, ████████ license under patents related to Xyrem to sell its own generic version

of Xyrem no later than December 31, 2025 assuming the generic manufacturer has obtained final

FDA approval of its respective ANDA.

47.    Jazz's settlement agreements with respect to Xyrem do not prove an established

royalty for the Patents-in-Suit for several reasons.

48.    First, the patents licensed in the Xyrem settlement agreements relate to Xyrem and,

unlike the Patents-in-Suit, do not cover an extended-release sodium oxybate.

---

[32] Amneal Authorized Generic Agreement, October 11, 2018, Section 1.30 (JPION00470533-560 at 538).

[33] Amneal Authorized Generic Agreement, October 11, 2018, Section 5.1 (JPION00470533-560 at 545).

[34] Amneal License Agreement, October 11, 2018, Section 2.1 (JPION00470621-636 at 624-625).

[35] Jazz Pharmaceuticals plc Form 10-Q for the period ended June 30, 2023, p. 49.

[36] Par Settlement Agreement, January 9, 2018 (JPION00470760-822; Par Authorized Generic Agreement, January 9, 2018 (JPION00470591-620); Par License Agreement, January 9, 2018 (JPION00470719-733); Lupin Settlement Agreement, June 12, 2018 (JPION00470734-759; Lupin Authorized Generic Agreement, June 12, 2018 (JPION00470561-590); Lupin License Agreement, June 12, 2018 (JPION00470637-653).

[37] Jazz Pharmaceuticals plc Form 10-Q for the period ended June 30, 2023, p. 49.

[38] Wockhardt Settlement Agreement, April 18, 2016 (JPION00470902-939); Ranbaxy-Sun Settlement Agreement, May 9, 2016 (JPION00470461-496); Ascent Settlement Agreement, August 22, 2017 (JPION00470425-460); Watson Settlement Agreement, March 30, 2018 (JPION00470865-901); Mallinckrodt Settlement Agreement, June 4, 2018 (JPION00470497-532).

49.     Second, the licenses in the Xyrem settlement agreements were entered into as part of settlements of litigation between Jazz and the generic manufacturers regarding the licensed patents.  As a result, at the time these licenses were entered into, there was no shared assumption that the licensed patents were valid, enforceable, and infringed.  In contrast, in the hypothetical negotiation for the Patents-in-Suit, both parties would assume that the patents were valid, enforceable, and infringed.

50.     Although the Xyrem settlement agreements do not prove an established royalty for the Patents-in-Suit, they do illustrate the general economic principle that royalty rates are affected by competitive conditions.  In particular, during the Initial Sales Period of the Hikma Authorized Generic Agreement, Hikma's AG product was the only direct generic oxybate competitor to Xyrem, and Jazz and Hikma agreed to a royalty rate that ███████████████████████ ████████████████████████. In contrast, during Hikma's Remaining Sales Period, the royalty rate ████████████████████████████████████████ ████████.

### 2.     Jazz Intercompany Licenses



12

68.     Neither of the Flamel-Avadel CNS agreements are relevant to the hypothetical negotiation between Jazz and Avadel.  Jazz and Avadel are independent companies that, as I discuss below, are and were direct competitors at the time of the hypothetical negotiation.  In contrast, Flamel and Avadel CNS are subsidiaries of the same company, and rather than selling competing products they are involved in different steps of the development, manufacture, and sale of a single product.[70]  Moreover, the July 2023 agreement was signed after this litigation began and after Jazz requested damages from Avadel.  Further, as Avadel's CEO Mr. Divis explained, the Flamel-Avadel CNS agreements were entered into for tax-related purposes.[71]

69.     I have also reviewed an agreement between Avadel CNS and RTW Royalty II DAC ("RTW") dated March 29, 2023.[72]  Pursuant to this agreement, Avadel CNS sold to RTW the right to receive royalties on Lumryz sales in exchange for up to $75 million in cash.[73]  Although this agreement relates to a royalty paid by Avadel on sales of Lumryz, it is not relevant to the hypothetical negotiation between Jazz and Avadel because no patent rights (or any other type of intellectual property rights) are licensed in the agreement.  Instead, the agreement reflects Avadel raising cash to help fund the commercialization of Lumryz.[74]

> **Factor 3: The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.**

70.     The license that results from the hypothetical negotiation would be an exclusive license (as to other third parties) in the U.S. for FDA-approved uses.  An exclusive license would provide value to Avadel because although Avadel has patents that it represents cover Lumryz, the validity of those patents is uncertain.  In contrast, at the hypothetical negotiation the Patents-in-

---

[70] According to Avadel, Flamel and Avadel CNS are not competitors but instead are working together in bringing Lumryz to the market (Divis Dep., pp. 29-30).

[71] See, e.g., Divis Dep., pp. 28-30, 216-218.

[72] RTW-Avadel CNS Purchase and Sale Agreement (AVDL_01429064-134).

[73] Avadel Pharmaceuticals plc Form 8-K/A dated March 29, 2023 (JPION00471386-455 at 388-389).

[74] Avadel Pharmaceuticals plc Press Release dated May 4, 2023 (JPION00471511-515 at 511 ("Entered into a royalty agreement with RTW Investments (RTW) for up to $75 million to support the commercialization of LUMRYZ")).  According to Avadel, under the agreement RTW provides cash to Avadel upfront in exchange for royalties on sales of Avadel's products, and RTW does not license the Orange Book-listed patents for Lumryz from Avadel as part of that agreement.  Divis Dep., pp. 33-34; see also Defendant's Response to Interrogatory No. 15.

**Factor 6: The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.**

87.     I am not currently aware of any derivative or convoyed sales for either Jazz or Avadel.  This factor has a neutral impact on the reasonable royalty.

**Factor 7: The duration of the patent and the term of the license.**

88.     Four of the Patents-in-Suit (the '488, '885, '956, and '931 Patents) expire on March 24, 2031, while the '079 and '782 Patents expire on February 18, 2036.  The term of the hypothetical license would begin on the date of the hypothetical negotiation and would end on the expiration date of the last-to-expire Patent-in-Suit with a valid, enforceable, and infringed claim. Because I conclude (as explained below in Factor 15) that the reasonable royalty would take the form of a running royalty, as opposed to a lump sum, this factor would have a neutral impact on the reasonable royalty.

**Factor 8: The established profitability of the product made under the patent; its commercial success; and its current popularity.**

89.     Having launched in June 2023, Lumryz has only been on the market for a relatively short period of time.  However, as I discuss in this section, prior to Lumryz's launch Avadel expected Lumryz to be a successful and profitable product, and based on Lumryz's launch to date, Avadel continues to believe that Lumryz will be a successful and profitable product.  The more profitable and commercially successful a patented product is or is expected to be, the higher the reasonable royalty would tend to be.

90.     Prior to Lumryz's launch, Avadel expected Lumryz to become the market leader among narcolepsy treatments.  According to a May 2023 investor presentation, "LUMRYZ is Well-Positioned to Lead Across All Narcolepsy Patient Segments," including "Current 2X-nightly OXB (~16K patients)," "Recently discontinued 2X nightly OXB (~10-15K patients)," and "Annual New Oxybate Patients (~3K annually)."[106]  Avadel also explained that there is a "patient & physician preference for LUMRYZ in a $3B+ once-at-bedtime market opportunity."[107]

---

[106] Avadel Pharmaceuticals plc Presentation, May 2023, p. 16 (JPION00471458-488 at 473).

[107] Avadel Pharmaceuticals plc Presentation, May 2023, p. 21 (JPION00471458-488 at 478); May 1, 2023 Transcript, p. 5 (JPION00473114-128 at 118) ("[O]ur analytics suggests the market

who recently discontinued oxybates, and oxybate-naïve patients.[184]  Avadel has told investors that Lumryz can become the preferred treatment choice for all three of these patient segments.[185]  This expansion in the number of oxybate-treated patients is a key element in Avadel's claim that Lumryz's peak sales opportunity exceeds $1 billion.[186]  Avadel expects the share of Lumryz business in the other two segments to increase over time.[187]

127.    Avadel further intends to make use of Jazz's inventions by expanding the eligible population for Lumryz.  As Avadel explained to investors at the Lumryz Commercial Day, the "[s]uccess of LUMRYZ in narcolepsy offers potential optionality to further expand franchise," including by "[e]xpand[ing] potential eligible population."[188]  Avadel is currently planning at least two expansions to the Lumryz-eligible patient population.  First, Avadel is planning to file a supplemental NDA for Lumryz for the treatment of narcolepsy in the pediatric (17 years or younger) population.[189]  According to Avadel, this population represents approximately 5% of the current narcolepsy market opportunity.[190]  Avadel is currently planning to file its supplemental NDA in November 2023.[191]  If approved, the patient population that could take Lumryz would be expanded.[192]

---

[184] Divis Dep., pp. 66-67.

[185] Avadel LUMRYZ Commercial Day, June 29, 2023, pp. 81-84 (AVDL_01409880-10000 at 960-963); see also Avadel LUMRYZ Commercial Day Transcript, June 29, 2023, p. 21 (JPION00524122-152 at 142) ("there is opportunity beyond the first generation oxybate marketplace… And we clearly see from the market research[,] the work that we've done[,] that we can win in all three patient segments").

[186] Avadel LUMRYZ Commercial Day, June 29, 2023, p. 107 (AVDL_01409880-10000 at 986).

[187] AVDL_01411486 ("Total Market" tab); Avadel Q2 2023 Earnings Call Transcript, August 9, 2023, p. 12 (JPION00524393-407 at 404) ("there are more patients who have been on an oxybate than the other segments right now… I think over time we will start to see a little bit more of a balance across the three different segments there").

[188] Avadel LUMRYZ Commercial Day, June 29, 2023, p. 112 (AVDL_01409880-10000 at 991).

[189] Avadel LUMRYZ Commercial Day, June 29, 2023, p. 113 (AVDL_01409880-10000 at 992); see also Avadel Board of Directors Meeting, May 3, 2023, pp. 62-64 (AVDL_01427354-586 at 415-417); Avadel Board of Directors Meeting, August 1-2, 2023, pp. 102-103 (AVDL_01435409-602 at 510-511).

[190] Avadel LUMRYZ Commercial Day, June 29, 2023, p. 113 (AVDL_01409880-10000 at 992).

[191] Avadel Board of Directors Meeting, August 1-2, 2023, p. 103 (AVDL_01435409-602 at 511).

[192] Divis Dep., p. 139.

model that assumes that Lumryz does not launch, both of these events are switched off.[205]  Thus, to obtain forecasts from the June 2023 model for the scenario in which Lumryz does not launch, I switch Events 7 and 8 off.

147.   The effect of Lumryz's entry on treated patient shares in the narcolepsy marketplace in Jazz's June 2023 base-case narcolepsy forecast model is shown in Table 1.

**Table 1: Oxybate Product Shares of Treated Narcolepsy Patients**

|  | Xyrem | Xywav | Xyrem AG | Lumryz | Total |
|---|---|---|---|---|---|
| Peak share without events | ■ | ■ | ■ | ■ | ■ |
| Peak share accounting for Event 7 | ■ | ■ | ■ | ■ | ■ |
| Peak share accounting for Events 7 and 8 | ■ | ■ | ■ | ■ | ■ |

148.   As Table 1 shows, Jazz expected the launch of Lumryz to have two effects that partially offset one another.  Jazz expected competition from Lumryz to reduce the share of its products, as illustrated by the decline in peak shares for Xyrem, Xywav, and Xyrem AG due to Event 8.[206]  However, Jazz also expected Lumryz's launch to expand the use of oxybates to treat narcolepsy.  This market expansion effect is illustrated in the increase in Xyrem, Xywav, and Xyrem AG peak shares due to Event 7, as well as by the fact that in Event 8 Lumryz's launch is forecast to expand the total oxybate share of treated narcolepsy patients.  As a comparison of the first and last rows of Table 1 shows, the expected net effect of Lumryz's launch is to decrease the peak shares of Xyrem, Xywav, and Xyrem AG.

149.   In **Exhibit 4A**, I compare estimated revenues and royalties from Jazz's June 2023 base-case forecast model (which assumes Lumryz launches in June 2023) to the revenues and royalties that are estimated by the model when Events 7 and 8 are switched off (which reflects the scenario in which Lumryz does not launch).  Columns [A]-[B] of Exhibit 4A show Jazz's forecast of Xyrem revenue and Xywav revenue from the June 2023 base-case forecast model in each year

---

[205]  2023.03.30 Narcolepsy 2+10 FCST1 Base – FT218 June 2023 (JPION00476985).xlsx; 2023.03.30 Narcolepsy 2+10 FCST1 Base – No FT218 (JPION00476986).xlsx
[206] Jazz based its estimates of the share erosion caused by Lumryz on market research as well as expert opinion within the organization.  See Mindus Dep., pp. 119-120, 156.

from 2023 through 2036.[207]  Column [C] of Exhibit 4A shows a modified version of Jazz's forecast of Xyrem AG royalties over that period.  As discussed above, under the Xyrem settlement agreements Hikma has the right to sell Xyrem AG no later than the end of 2027, while Amneal has the right to sell Xyrem AG no later than the end of 2025.  Thus, in column [C] I set Xyrem AG royalties ████████████████████████████████████████████████████████ ████████████████████████████████████████ .

150.    Columns [D]-[E] of Exhibit 4A show the forecast of Xyrem revenue and Xywav revenue assuming that Lumryz does not launch.  Column [F] of Exhibit 4A shows the forecast of Xyrem AG royalties assuming that Lumryz does not launch, with the same modification as described in the previous paragraph ████████████████████████████████████ ████████████████████████████████████████████████████ .

151.    In order to convert lost revenues from lower sales into lost profits, it is necessary to apply Jazz's variable profit margin on its sales of Xyrem and Xywav.  To estimate Jazz's variable profit margin, I use Jazz's commercial contribution margin (including share-based compensation costs) for its oxybate products as of the first half of 2023, ████████████ (as shown in **Exhibit 5**).[208]  Jazz's expected annual losses due to the launch of Lumryz, which are equal to lost profits on sales of Xyrem and Xywav plus lost royalties on Xyrem AG, are shown in column [G] of Exhibit 4A.

152.    In my opinion, the parties to the hypothetical negotiation would have agreed to a reasonable royalty structured as a running royalty rate on net sales of Lumryz.  As the agreements I discussed above in Factors 1 and 2 illustrate, agreements in the pharmaceutical industry are frequently structured to include a running royalty on net sales of a product.  For example, the proposed agreement Jazz and Avadel discussed during Project Zeta included a running royalty based on net sales of FT218.  Furthermore, at the hypothetical negotiation Jazz and Avadel would have recognized that a running royalty would help them share the risk associated with the uncertainty in future sales of Lumryz.  A royalty structured as a fixed lump-sum payment would

---

[207] To account for the expiration of the last of the Patents-in-Suit in February 2036, only the first two months of 2036 are included.

[208] This measure is likely a conservative measure of Jazz's variable profit margin because it includes some costs that likely do not vary with sales of Xyrem and Xywav.  For example, some of the costs included in this measure are allocated general and administrative costs relating to human resources and information technology.  See Mindus Dep., p. 213.

be patients who switched from Xywav.  Because both Avadel and Jazz assumed that multi-source Xyrem generics would launch in 2026, some portion of the Xyrem switches would be from multi-source generic Xyrem and hence not generate a loss to Jazz.[213]  However, at the hypothetical negotiation, Avadel would recognize that during this 2026-2028 period it was expecting approximately 25% of Lumryz patients to have switched from Xywav, and hence represent a loss to Jazz.

162.    Jazz's and Avadel's forecasts indicate that at the hypothetical negotiation, the parties would have agreed that a substantial royalty rate would be necessary to compensate Jazz for granting a license to Avadel, and that this royalty rate would decrease as multi-source generics entered for Xyrem and ███████████████.  Thus, at the hypothetical negotiation the parties would have agreed to a royalty rate on net sales of Lumryz that depended on subsequent market events.  Given the circumstances of the hypothetical negotiation, the parties would have agreed on rates derived from Jazz's base-case June 2023 forecast model.  Rounding the figures from Exhibit 4A to the nearest half-percentage point, the resulting royalty rates are 27.0% in the first period (prior to the entry of multi-source generics), 13.0% in the second period (after the entry of multi-source Xyrem generics), and 3.5% in the third period ████████████████████ ███████).  This royalty schedule would compensate Jazz for its expected base-case losses from licensing Avadel.  In the second and third periods, these rates would compensate Jazz for its expected base-case losses, and would have the potential to make Jazz better off under Jazz's alternative assumptions about future scenarios.

163.    The royalty rates I have identified in my analysis are based on Jazz's expected losses from granting a license to Avadel, which do not depend on the number or identity of the Patents-in-Suit that are infringed.  Accordingly, the royalty rates I have identified apply as long as one or more claims of the Patents-in-Suit are valid, infringed, and enforceable.[214]

164.    The reasonable royalty resulting from the hypothetical negotiation must be at least at a level that compensates Jazz for its expected losses from licensing Avadel, because otherwise

---

[213] O'Brien Dep., pp. 100-101 (Avadel's May 2023 forecast model assumes multi-source generic entry in January 2026).

[214] However, to the extent that I am asked by the Court or counsel to calculate any ongoing royalties after trial, the royalty rates discussed in this report may change, for example, due to new or different economic circumstances or a change in the parties' bargaining positions that would impact what the hypothetical negotiation would look like after an infringement verdict.

## VI.    Damages

168.    Based on the above analysis, I have concluded that a reasonable royalty for Avadel's past infringement would be a royalty on net sales of Lumryz equal to 27% in the period before multi-source generic Xyrem entry.  Because multi-source generic entry has not yet occurred, the royalty rate that applies to Lumryz sales to date is 27%—i.e., the applicable royalty rate for past damages, including damages through and including the trial that is currently scheduled to begin on February 26, 2024.  As shown in **Exhibit 8**, for the period through September 6, 2023, Lumryz net sales have totaled ███████, which results in a reasonable royalty of ███████.[223]

169.    I reserve the right to update my analysis based on additional financial data produced by Avadel addressing the period extending through trial.

170.    A prevailing patent owner in a patent infringement case is generally entitled to an award of pre-judgment interest on the damages it suffered.  Since the amount of damages that will be awarded is not known at this time, I have not prepared a determination of pre-judgment interest.  Further, I understand that Jazz seeks a permanent injunction to prevent future sales by Avadel if Avadel is found liable for infringement and that, if the Court denies a permanent injunction, Jazz will seek ongoing royalties for Avadel's future infringement of the Patents-in-Suit  If asked to do so by the Court or counsel, I will calculate any ongoing royalties or other remedies as appropriate.

## VII.    Reservation of Rights

171.    This report is based on information currently known to me and analyses performed to date.  To the extent new and/or additional information becomes available in the course of the litigation, I reserve the right to review such information to determine whether it impacts the opinions and conclusions set forth above.  I further reserve the right to rely upon such information and, if necessary, to supplement or amend my report to reflect such information and its impact, if

---

[223] For the period through Q2 2023, I rely on the Lumryz net sales reported in Avadel Pharmaceuticals plc Form 10-Q for the period ended 6/30/2023, p. 4 (JPION00524077-119 at 081).  To estimate Q3 2023 Lumryz net sales through September 6, 2023, I rely on the actual gross sales reported in the Lumryz Weekly Sales Report as of September 6, 2023 (AVDL_01436520_HIGHLY CONFIDENTIAL.xlsx).  I note that what Avadel refers to as "actual sales" includes both shipments and open orders (compare "Projected Gross Sales" and "QTD Data" tabs, and see Divis Dep., p. 279).  To convert gross sales to net sales, I use Avadel's forecast gross-to-net for Q3 2023 (Avadel Board of Directors Meeting, August 1-2, 2023, p. 25 (AVDL_01435409-602 at 433).

any, on my opinions and/or conclusions in this case.  I further reserve the right to create or modify exhibits or other materials, such as demonstratives, to aid my testimony in this case.  I further reserve the right to supplement or amend my opinions and testify in rebuttal to any issues raised by Avadel's fact and expert witnesses, including in my reply report and at trial.

Dated: September 15, 2023

_____
Mark Rainey, Ph.D.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that true and correct copies of the foregoing document were caused to be served on September 23, 2024 on the following counsel in the manner indicated below.

### <u>VIA EMAIL:</u>

Jack B. Blumenfeld
Jeremy Tigan
Cameron Clark
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
cclark@morrisnichols.com

F. Dominic Cerrito
Eric C. Stops
Evangeline Shih
Andrew S. Chalson
Gabriel P. Brier
Frank C. Calvosa
Catherine T. Mattes
Abigail DeMasi
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
nickcerrito@quinnemanuel.com
ericstops@quinnemanuel.com
evangelineshih@quinnemanuel.com
andrewchalson@quinnemanuel.com
gabrielbrier@quinnemanuel.com
frankcalvosa@quinnemanuel.com
catherinemattes@quinnemanuel.com
abigaildemasi@quinnemanuel.com

*Attorneys for Plaintiffs*

Dated: September 23, 2024

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)

ME1 50129869v.1