IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAZZ PHARMACEUTICALS, INC., | : | REDACTED PUBLIC VERSION |
| | : | FILED OCTOBER 4, 2024 |
| Plaintiff, | : | |
| *v.* | : | **C.A. No. 21-691-GBW** |
| AVADEL CNS PHARMACEUTICALS, LLC, | : | ████████████████ |
| Defendant. | : | ████████████████ |
| | : | |
| | : | |
| JAZZ PHARMACEUTICALS, INC., et al., | : | |
| Plaintiffs, | : | |
| *v.* | : | **C.A. No. 21-1138-GBW** |
| AVADEL CNS PHARMACEUTICALS, LLC, | : | ████████████████ |
| Defendant. | : | ████████████████ |
| | : | |
| | : | |
| JAZZ PHARMACEUTICALS, INC., et al., | : | |
| Plaintiffs, | : | |
| *v.* | : | **C.A. No. 21-1594-GBW** |
| AVADEL CNS PHARMACEUTICALS, LLC, | : | ████████████████ |
| Defendant. | : | ████████████████ |
| | : | |

REPLY DECLARATION OF MOHAN RAO, PH.D.

**Highly Confidential**

## Introduction

**1.** I am an economist and the Chief Executive Officer of Epsilon Economics. I previously submitted a declaration in connection with Avadel's Opposition to Jazz's Motion for an Injunction or Ongoing Royalty.[1] I also previously submitted a declaration at the Court's request for additional briefing and evidence from the parties regarding an appropriate ongoing royalty rate.[2]

**2.** I have been asked by counsel for Avadel to assess the opinions put forward by Jazz and Dr. Rainey related to an ongoing royalty rate.[3]

**3.** Additional materials I have considered in forming the opinions set forth herein are the Declaration of Mohan Rao, Ph.D., September 16, 2024 (including all materials considered in connection with that declaration); the Declaration of Mark Rainey, Ph.D., In Support of Ongoing Royalty, September 16, 2024; Memorandum Opinion, Jazz Pharmaceuticals Inc. v. Avadel Pharmaceuticals Plc et al., August 27, 2024; as well as materials cited herein.[4]

## Summary of Opinions

**4.** As set forth in greater detail below, I have formed the following opinions:

- Dr. Rainey acknowledges the Court's direction that "[g]enerally, the jury's damages award is a starting point for evaluating ongoing royalties," but then dismisses the jury's verdict, stating that the "jury's verdict does not change my opinions" and fails to properly use the jury's 3.5% royalty rate as a starting point in his analysis.[5] Rather, Dr. Rainey sets aside the 3.5% rate awarded by the jury and largely reissues the same royalty opinions he presented to the jury, with rates that the jury rejected. Dr. Rainey's asserted royalty rate of up to

---

[1] Declaration of Mohan Rao, Ph.D., May 13, 2024 (D.I. 605).

[2] Declaration of Mohan Rao, Ph.D., September 16, 2024.

[3] Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024.

[4] Declaration of Mohan Rao, Ph.D., May 13, 2024, provides the initial list of materials I considered.

[5] Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraphs 3 and 11.

██████████

30% represents a 757% increase ($= 30\% \div 3.5\% - 1$) over the rate awarded by the jury.

- Dr. Rainey attempts to justify setting aside the jury's 3.5% rate by asserting that there are changed economic circumstances since the May-June 2023 hypothetical negotiation date considered by the jury. I disagree that there are changed economic circumstances that support an upward adjustment of the royalty rate. Virtually all of the purportedly "new" circumstances that Dr. Rainey discusses in his declaration were already in the trial record and/or discussed in Dr. Rainey's expert report in connection with his trial opinions. Whatever remaining "changed" circumstances that might exist do not justify an increase in the royalty rates from a hypothetical negotiation performed after the jury verdict, much less the massive increase in the royalty rates that Dr. Rainey opined is appropriate.

- Dr. Rainey's royalty opinion continues to rely on an inaccurate Jazz projection of sales of its oxybate products and continues to be premised upon an exclusive license from Jazz to Avadel.

- There are no economic circumstances that merit any upward adjustment of the jury-awarded 3.5% royalty rate.

### Dr. Rainey's Modified Ongoing Royalty Rate Opinion

**5.** As Dr. Rainey acknowledges, the Court identified three considerations for the ongoing royalty rate: (1) the change in bargaining position between the parties; (2) changed economic circumstances; and (3) any post-verdict factors affecting a post-verdict hypothetical negotiation.[6]

---

[6]Memorandum Opinion, Jazz Pharmaceuticals Inc. v. Avadel Pharmaceuticals Plc et al., August 27, 2024, page 31.

**6.** Dr. Rainey maintains the same methodology to determine his ongoing royalty rates as the analysis he presented to the jury at trial.[7] He concludes that the jury's verdict awarding a 3.5% rate after he testified that a 27% rate was appropriate "does not change my opinions."[8]

**7.** Notably, Dr. Rainey continues to utilize the same Jazz internal narcolepsy forecast model, which appears to have been prepared in June 2023 (*i.e.*, Ex. JTX-147, "2023.06.26 Narc - FCST 2 Starting Model - LRP Base (JPION00480771).xlsx"), prior to any reported sales of LUMRYZ, for his post-trial hypothetical negotiation analysis. The only apparent difference from his original analysis is that his current analysis drops forecast data prior to March 2024 (to account for the date of the post-verdict hypothetical negotiation), resulting in a higher royalty rate for his first time period (*i.e.*, his previous royalty rate of 26.8% for 2023-2025 is now 29.8% for March 2024-December 2025, which Dr. Rainey rounds up to 30%).[9]

**8.** Dr. Rainey's updated royalty rate analysis can be summarized as:[10]

1. Forecast (annually for March 2024 through February 2036) XYREM net revenue, XYWAV net revenue, and XYREM AG royalties *with* LUMRYZ in the market;

2. Forecast (annually for March 2024 through February 2036) XYREM net revenue, XYWAV net revenue, and XYREM AG royalties *without* LUMRYZ in the market;

---

[7]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, Exhibit A; Trial Demonstrative, Jazz v. Avadel, PDX-6.19; and Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 591-593.

[8]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 3.

[9]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, Exhibit A; Expert Report of Mark Rainey, Ph.D., September 15, 2023, Exhibit 4A; and Trial Demonstrative, Jazz v. Avadel, PDX-6.19.

[10]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, Exhibit A. Dr. Rainey also performs an analysis based on a slightly later post-trial hypothetical negotiation date (Exhibit A.1). *See*, Trial Demonstrative, Jazz v. Avadel, PDX-6.19; Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 591-593; and JTX-0147 for Dr. Rainey's analysis presented at trial.

3. Calculate Jazz's annual expected losses as Step 2 – Step 1 (*i.e.*, profits for XYREM, XYWAV, and XYREM AG royalties *with and without* LUMRYZ in the market);[11]

4. Forecast (annually for March 2024 through February 2036) LUMRYZ net revenue;

5. Calculate the annual implied royalty rate as Step 3 ÷ Step 4; and

6. Determine a royalty rate for March 2024-2025 (29.8%), 2026-2032 (12.8%), and 2033-2036 (3.4%), which Dr. Rainey rounds to 30%, 13%, and 3.5%.[12]

**9.** Dr. Rainey's ongoing royalty opinion is comprised of three royalty rates — 30%, 13%, and 3.5%, depending on the time period.[13] In contrast, the jury-awarded damages were based on a 3.5% royalty rate.[14]

**10.** As shown in Tab 1, based on the LUMRYZ net sales forecast utilized by Dr. Rainey (March 2024 through February 2036), the royalty resulting from using Dr. Rainey's royalty rates (30%, 13%, and 3.5%) over the term of the '782 Patent is ████████. In contrast, the royalty resulting from using the jury-awarded rate (3.5%) is ████████.

**11.** The essence of the reasonable royalty analysis is determining the incremental value provided by the patent in question (here, the '782 patent).[15] Presumably

---

[11]Expected Jazz Annual Loss = (XYREM net revenue without LUMRYZ × ████ + XYWAV net revenue without LUMRYZ × ████ + XYREM AG Royalties without LUMRYZ) – (XYREM net revenue with LUMRYZ × ████ + XYWAV net revenue with LUMRYZ × ████ + XYREM AG Royalties with LUMRYZ). To determine Jazz's losses stemming from XYREM and XYWAV lost net revenue, Dr. Rainey applies "Jazz's commercial contribution margin" of ████ (Trial Demonstrative, Jazz v. Avadel, PDX-6.19; Expert Report of Mark Rainey, Ph.D., September 15, 2023, paragraph 151; and JTX-0151).

[12]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 7 and Exhibit A.

[13]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 7 and Exhibit A. Dr. Rainey's royalty opinion presented in his initial Expert Report was comprised of three royalty rates — 26.8%, 12.8%, and 3.4%, depending on the time period. (rounded to 27%, 13% and 3.5% in his trial testimony). *See*, Trial Demonstrative, Jazz v. Avadel, PDX-6.18; and Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 590-594.

[14]Verdict Form, Jazz v. Avadel, March 4, 2024, pages 11-12.

[15]Landan Ansell, John Holzwarth, Vincent O'Brien, and William Scally, "Patent Infringement

██████████                                                                6

what Dr. Rainey tries to undertake is to determine the value of the '782 Patent to Avadel and determine a royalty rate for which it would be willing to pay. At some point in time, Dr. Rainey claims that value is a royalty rate of 3.5%. He does not explain how the *value to Avadel* for using the same '782 Patent would be 271% higher during his period of a 13% royalty rate or 757% higher during his period of a 30% royalty rate.[16]

### Dr. Rainey's Purportedly Changed *Georgia-Pacific* Factors

**12.** In his declaration, Dr. Rainey fails to use the 3.5% royalty rate awarded by the jury as a starting point for his ongoing royalty analysis, and instead largely repeats the same opinions that were previously rejected by the jury, under the guise of alleged changed economic circumstances. In the process, Dr. Rainey proposes increasing the jury-awarded 3.5% rate by 757% (in the case of his 30% royalty), and 271% (in the case of his 13% royalty).

**13.** Herein, I evaluate Dr. Rainey's arguments regarding alleged changed economic circumstances between the hypothetical negotiation during May-June 2023 through the jury verdict in March 2024 or through the Court's injunction order in August 2024 under the *Georgia-Pacific* factors he asserts would support an enhancement of the jury-determined royalty rate.[17] For the reasons set forth below, I disagree

---

Damages," in: Roman Weil, Daniel Lentz, and David Hoffman, Editors, LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT, Sixth Edition (John Wiley & Sons), 2017, Chapter 20.6 *Also, see for example, First Quality Tissue, LLC v. Irving Consumer Prod. Ltd.*, No. CV 19-428-RGA, 2022 WL 958089, at *12 (D. Del. Mar. 30, 2022), quoting *Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018).

[16]Dr. Rainey's report does not provide any discussion, analysis, and/or quantification of the benefits, improvements, or value provided by the inventions of the '782 Patent, but instead just provides the '782 Patent's title, owner, issue date, and expiration date (Expert Report of Mark Rainey, Ph.D., September 15, 2023, paragraphs 21-22 and 88). Indeed, Dr. Rainey admits that "[t]he royalty rates I have identified in my analysis are based on Jazz's expected losses from granting a license to Avadel, which do not depend on the number or identity of the Patents-in-Suit that are infringed" (Expert Report of Mark Rainey, Ph.D., September 15, 2023, paragraph 163).

[17]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 12. My analysis set forth in my declaration does not change based on whether one uses the March 2024 date of the jury verdict or the August 2024 date of the Court's order.

████████████                                                                     7

with Dr. Rainey's opinion that there are changed economic circumstances that support his increased royalty rates.

## Factor 1: The royalties received by the patentee for the licensing of the patents-in-suit, proving or tending to prove an established royalty

**14.** Dr. Rainey concludes that under *Georgia-Pacific* Factor 1, a combination of "economic factors that were not considered by the jury" and the "Court's reasoning" indicate "that the ongoing royalty rate for 2024 through 2032 should be significantly higher than the jury's 3.5% royalty rate."[18] I disagree.

**15.** The only "economic factors that were not considered by the jury" Dr. Rainey cites are two Jazz license agreements — with Hikma and Amneal — that were entered into well before the May-June 2023 hypothetical negotiation date and trial, were discussed in Dr. Rainey's 2023 initial expert report, and were discussed during Dr. Rainey's testimony at trial. The 2017 license agreement with Hikma Pharmaceuticals was the first to allow an authorized generic version of XYREM in the market, and the 2018 license agreement with Amneal Pharmaceuticals allowed the launch of an additional authorized generic version of XYREM.[19] These agreements were entered into on April 5, 2017 and October 11, 2018, respectively.[20]

**16.** Dr. Rainey admitted at trial that those licenses "wouldn't be comparable...for a couple of reasons."[21] For example, he testified that "the intellectual property that was licensed is very different...Another reason is that the circumstances regarding the negotiation of a license are different...[than] they would [be] at the 'hypothetical negotiation'."[22]

**17.** Consistent with his trial testimony, Dr. Rainey concluded in his expert

---

[18] Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 21.
[19] Expert Report of Mark Rainey, Ph.D., September 15, 2023, paragraphs 39 and 44.
[20] Expert Report of Mark Rainey, Ph.D., September 15, 2023, paragraphs 39 and 44.
[21] Trial Transcript, Jazz v. Avadel, February 27, 2024, page 573.
[22] Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 573-574.

███████████                                                                    8

report that "Jazz's settlement agreements with respect to Xyrem [which would in-
clude the Hikma and Amneal agreements] do not prove an established royalty for the
Patents-in-Suit for several reasons."[23] He also opined that "the patents licensed in
the Xyrem settlement agreements relate to Xyrem and, unlike the Patents-in-Suit,
do not cover an extended-release sodium oxybate"[24] and "the licenses in the Xyrem
settlement agreements were entered into as part of settlements of litigation between
Jazz and the generic manufacturers regarding the licensed patents."[25]

   **18.** Consistent with his trial testimony, Dr. Rainey also testified in his depo-
sition that he reviewed Jazz's settlement agreements relating to XYREM authorized
generics, and concluded that "Jazz's settlement agreements with respect to XYREM
do not prove and establish a royalty for the patents in suit."[26] When asked if any
of the XYREM settlement agreements were comparable license agreements, he re-
sponded, "[n]o, not in my opinion."[27]

   **19.** Another key difference rendering the Hikma and Amneal agreements not
probative for the hypothetical negotiation (whether during the May-June 2023 pe-
riod or post-verdict) is the nature of the commercial relationship between Jazz and
its authorized generics. The royalty rate of a hypothetical license for the '782 Patent
between Jazz and Avadel would provide Avadel with the right to practice the sub-
ject matter claimed in the '782 patent. It would not otherwise cover ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████  In contrast, under
the agreements between Jazz and its authorized generics, Jazz ███████████████████

████████████████████████████████████████████████████████████████████

---

[23]Expert Report of Mark Rainey, Ph.D., September 15, 2023, paragraph 47.
[24]Expert Report of Mark Rainey, Ph.D., September 15, 2023, paragraph 48.
[25]Expert Report of Mark Rainey, Ph.D., September 15, 2023, paragraph 49. The royalty rates
in the settlement agreements would reflect not only the value of the XYREM patents, but also the
value of avoiding costs associated with litigation.
[26]Deposition of Mark Rainey, Ph.D., November 17, 2023, page 46.
[27]Deposition of Mark Rainey, Ph.D., November 17, 2023, pages 46-47.

████████████████

That is, the royalty paid by Hikma-Amneal to Jazz is for ██████████████████
████████████████████████████████████████████████████
███████████████. As Dr. Rainey testified in his deposition when asked about
the Jazz-Hikma/Amneal agreements, "I agree they're different circumstances."[28]

**20.** Further, as Dr. Rainey acknowledges, the Hikma and Amneal agreements
do not include rights to practice the '782 Patent, and instead license unrelated patents
applicable to Jazz's twice-nightly Xyrem product. Simply put, the Hikma and Amneal
agreements are settlement agreements entered into by Jazz related to authorized
generic versions of Jazz's twice-nightly Xyrem product that do not involve the '782
Patent at issue here, and they are not comparable to the circumstances of any court-
imposed ongoing royalty for the '782 Patent for Avadel's independently-developed
LUMRYZ product.

**21.** Notwithstanding Dr. Rainey's repeated assertions throughout his expert
report, deposition, and trial that the Hikma and Amneal settlement agreements are
not comparable, Dr. Rainey nevertheless now opines that "I understand that the
Court may consider evidence of parties' licenses to show a range of royalties actually
paid. Thus, in my opinion, certain Xyrem settlement agreements paid by generic
companies that, currently have twice-nightly high-sodium oxybate products on the
market are informative as to what post-verdict royalty rate Jazz would accept from
Avadel if forced to license its patent."[29]

**22.** I disagree with Dr. Rainey's new reliance on the Jazz-Hikma/Amneal li-
censes for several reasons. First, Dr. Rainey does not cite the source of his "under-
standing" regarding the relevance of licenses that he has repeatedly opined are not
comparable. Second, the authorized generic licenses with Hikma and Amneal are not
"informative as to what post-verdict royalty rate Jazz would accept from Avadel if
forced to license its patent," as discussed above. For example, the Jazz and Hikma-

---

[28]Deposition of Mark Rainey, Ph.D., November 17, 2023, pages 50-51.
[29]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024,
paragraph 19.

█████████                                                                    10

Amneal agreements ████████████████████████, while the Jazz and Avadel
agreement would be a ███████ patent license agreement; the products under the Jazz
and Hikma-Amneal agreements do not practice the '782 Patent at issue; and the prod-
ucts under the Jazz and Hikma-Amneal agreements are different than the product
that would be covered under the Jazz and Avadel agreement. Further, Dr. Rainey
only selected to highlight the authorized generic royalty rates for the Court to now
consider.[30]  Namely, he ignores the multisource generic elements of these settlement
agreements, which as he previously testified, ██████████████████████████.[31]

   **23.**  For the foregoing reasons, I disagree with Dr. Rainey's opinion that there
are relevant economic factors under *Georgia-Pacific* Factor 1 that were "not con-
sidered by the jury."  As discussed above, the Hikma and Amneal agreements were
discussed at trial by Dr. Rainey, and he admitted that they are not comparable.
Therefore, those licenses are not a changed economic circumstance, and even if they
were, they are not comparable and thus are not economically relevant in determin-
ing an ongoing royalty rate for the '782 Patent.  In any event, Dr. Rainey's opinions
relevant to this factor do not support a 757% increase of the jury rate from 3.5% to
30% or a 271% increase of the jury rate from 3.5% to 13%.


**Factor 2: The rates paid by the licensee for the use of other patents com-
parable to the patent-in-suit**


   **24.**  Dr. Rainey concludes that this factor does not impact the ongoing royalty
rate.[32]  I agree.

---

[30]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024,
paragraphs 19-20.

[31]Deposition of Mark Rainey, Ph.D., November 17, 2023, pages 53-59.  For example, as part of
the Jazz-Hikma settlement, ██████████████████.  *See*, License Agreement, Jazz and Roxane Laboratories, Inc., West-
Ward Pharmaceuticals Corp., April 5, 2017, JPION00470823–JPION00470838, Section 2.1; and
Authorized Generic Agreement, Jazz and Roxane Laboratories, Inc., West-Ward Pharmaceuticals
Corp., April 5, 2017, JPION00470654–JPION00470694.

[32]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, para-
graph 22.

██████████████                                                           11

**Factor 3: The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold**

25.  Dr. Rainey concludes that this factor does not impact the ongoing royalty rate because the hypothetical negotiations before and after the jury verdict would both result in exclusive licenses.[33]  I disagree.

26.  As discussed in my previous declaration, Dr. Rainey's opinion of the royalty expressed at trial was premised upon a license from Jazz to Avadel that would be exclusive to third parties.[34]  By contrast, if the Court were to grant a non-exclusive license, the license would be worth about half as much as an exclusive license, putting downward pressure on any post-verdict royalty rate.[35]  Dr. Rainey states in his recent declaration, however, that "[a]s I explained at trial, I determined that the license resulting from the May-June 2023 hypothetical negotiation would be exclusive as to third parties. . . The nature and scope of the license resulting from the post-verdict hypothetical negotiation would be the same.[36]  Thus, Dr. Rainey's view is that the hypothetical license, either pre- or post-trial, would be exclusive as to third parties.

27.  I disagree that the licenses arising from the two hypothetical negotiation periods would be exclusive.  Instead, I would expect that the Court's ongoing compulsory license would not be exclusive as to third parties.  If the Court were to determine that the compulsory Jazz-Avadel license were exclusive, this would penalize Jazz by "hand-cuffing" its future ability to further monetize its patent rights.  For example, an exclusive compulsory license would foreclose Jazz from licensing its '782 Patent to additional companies seeking to commercialize a product that embodied that patent. If the Court were to determine that the ongoing compulsory license should be non-

---

[33]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 23.

[34]Declaration of Mohan Rao, Ph.D., September 16, 2024, paragraph 10.

[35]Declaration of Mohan Rao, Ph.D., September 16, 2024, paragraphs 5, 10-13, 24, and Tab 4.

[36]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 23.

██████████                                                                    12

exclusive, this would put downward pressure on the jury-determined 3.5% royalty rate for an exclusive license.

## Factor 4: The licensor's established policy and marketing program to maintain [its] patent exclusivity by not licensing to others

**28.** In his declaration, Dr. Rainey notes that he testified at trial that Jazz does not have a licensing program.[37] He further notes that this circumstance has not changed, and that Jazz has not started a licensing program post-trial.[38]

**29.** Notwithstanding the admitted lack of changed circumstances, Dr. Rainey concludes that "this factor supports an ongoing royalty rate for 2024 through 2032 that is significantly higher than the jury's 3.5% royalty rate."[39] Dr. Rainey's apparent basis for this conclusion is that Jazz sought a "permanent injunction to enjoin Avadel from selling Lumryz to new patients being treated for narcolepsy and to enjoin any sales of Lumryz for the treatment of idiopathic hypersomnia."[40]

**30.** However, Dr. Rainey ignores that Jazz seeking injunctive relief is not a changed circumstance. To the contrary, Dr. Rainey previously testified that his analysis of the parties' hypothetical negotiation in May-June 2023 assumed that Jazz would prevent Avadel from entering the market absent a license to its patents (*i.e.*, that Jazz would seek an injunction). For example, Dr. Rainey testified at trial that "because there's no noninfringing alternative, because the patents are key to the success of Lumryz, in the absence of a license, Avadel's profits would be zero" because Avadel would be blocked from selling LUMRYZ.[41] Dr. Rainey further testified in his

---

[37]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 24.

[38]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 24. Dr. Rainey does not cite the basis for this understanding.

[39]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 26.

[40]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 25.

[41]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 597.

deposition that, in his opinion both parties at the hypothetical negotiation "would understand that Avadel could not launch LUMRYZ without a license to the patents in suit."[42]  Further, Dr. Rainey ignores that Jazz sought a permanent injunction in its Complaint.[43]  Thus, the fact that Jazz sought a permanent injunction post-trial, which it said it would do in its Complaint in this case, is not a changed economic circumstance.[44]

**31.**  For the foregoing reasons, I disagree with Dr. Rainey's opinion that this factor is a changed economic circumstance or supports an increase in the jury's 3.5% royalty rate.  In any event, Dr. Rainey's opinions relevant to this factor do not support a 757% increase of the jury rate from 3.5% to 30% or a 271% increase of the jury rate from 3.5% to 13%.

**Factor 5: The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter**

**32.**  As indicated in its public filings, Jazz was aware before the May-June 2023 hypothetical negotiation that it would be facing competition from Avadel.  For example, Jazz's 1Q-2023 filing states, "Xywav and Xyrem also face increased competition from new branded products for treatment of cataplexy and/or EDS in narcolepsy, such as Avadel's recently approved Lumryz, in the U.S. market" and "Avadel announced that it had received approval and orphan drug exclusivity through May 1,

---

[42]Deposition of Mark Rainey, Ph.D., November 17, 2023, page 40
[43]Complaint for Patent Infringement, Jazz Pharmaceuticals Inc. v. Avadel Pharmaceuticals PLC et al., May 12, 2021, page 22.
[44]Expert Report of Mark Rainey, Ph.D., September 15, 2023, paragraphs 10 and 170 — "I further understand that Jazz seeks a permanent injunction to prevent future sales by Avadel if Avadel is found liable for infringement and that, if the Court denies a permanent injunction, Jazz will seek ongoing royalties for Avadel's future infringement of the Patents-in-Suit" and "[f]urther, I understand that Jazz seeks a permanent injunction to prevent future sales by Avadel if Avadel is found liable for infringement and that, if the Court denies a permanent injunction, Jazz will seek ongoing royalties for Avadel's future infringement of the Patents-in-Suit."

2030 for Lumryz, a fixed-dose, high-sodium oxybate which uses its proprietary technology for the treatment of EDS and cataplexy in patients with narcolepsy, and we expect to begin to face competition from Avadel in the coming months."[45]

**33.** Notwithstanding Jazz's awareness before the May-June 2023 hypothetical negotiation that its products would be competing against Avadel's LUMRYZ, Dr. Rainey concludes that "this factor supports an ongoing royalty rate for 2024 through 2032 that is significantly higher than the jury's royalty rate."[46] He asserts that certain post-trial statements made by Avadel's Chief Commercial Officer, Avadel, and Wall Street analysts support the notion that there has been a change in the competitive relationship between Avadel and Jazz.[47]

**34.** The statements cited by Dr. Rainey provide no evidence of a post-trial change in the direct competitor relationship between Avadel and Jazz. Indeed, during trial, there was extensive testimony that Avadel and Jazz were direct competitors. For example, Dr. Rainey testified during trial that "[t]hey are direct competitors" based on "information from Avadel, third parties" and "information we've heard testimony about the past couple of days."[48] Dr. Rainey further testified that Avadel predicted there would be "extensive competition between Avadel [and] Jazz because Lumryz was taking a big chunk of its patients from Jazz's products."[49] Dr. Rainey also testified to "patients being switched from Jazz products to Lumryz."[50] Indeed, Dr. Rainey acknowledges in his most recent declaration that "I explained at trial that Jazz and Avadel were direct competitors at the pre-verdict hypothetical negotiations."[51] Gregory Divis (Avadel's Chief Executive Officer) testified during trial that

---

[45] Jazz Pharmaceuticals Plc, Form 10-Q for the quarterly period ending March 31, 2023, pages 34 and 45 (*see*, Tab 2).

[46] Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 32.

[47] Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraphs 29-31.

[48] Trial Transcript, Jazz v. Avadel, February 27, 2024, page 575.

[49] Trial Transcript, Jazz v. Avadel, February 27, 2024, page 579.

[50] Trial Transcript, Jazz v. Avadel, February 27, 2024, page 578.

[51] Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 27. Although Dr. Rainey asserts in his declaration that "Avadel argued that Jazz and Avadel

██████████                                                                          15

switching patients from a twice-nightly oxybate product (such as Jazz's) to Avadel's once-nightly product was "one of [Avadel's] primary goals and strategies" and affirmed that Avadel wanted to switch "patients who often take Jazz's products to use Lumryz's products."[52] Dr. Rainey also testified, responding to a question about how the fact that Jazz and Avadel are direct competitors affected the reasonable royalty, that "[i]t tends to increase the reasonable royalty."[53]

**35.** The statements cited by Dr. Rainey in his declaration allegedly demonstrating a change in the relationship between the parties generally relate to Avadel operational updates and comparisons to prior time periods, including prescriber data and patient switching data — information that does not evidence a change in the competitive relationship between Avadel and Jazz.[54]

**36.** In light of statements made by Jazz to its investors, Dr. Rainey's trial testimony, and other evidence cited above, direct competition pre- and post-trial is not a changed economic circumstance that would provide an economic rationale to increase an ongoing compulsory royalty rate above the jury-determined 3.5% rate. In any event, Dr. Rainey's opinions relevant to this factor do not support a 757% increase of the jury rate from 3.5% to 30% or a 271% increase of the jury rate from 3.5% to 13%.

**Factor 7: The duration of the patent and the term of the license**

**37.** Dr. Rainey concludes that this factor does not impact the ongoing royalty rate.[55] I agree.

---

had an inventor and promoter relationship with respect to the development of Lumryz" (paragraph 27), he cites no Avadel witness testimony regarding an inventor-promoter relationship between Avadel and Jazz.

[52] Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 474, 501, and 524-525.

[53] Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 577-578.

[54] Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraphs 29-31.

[55] Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 33.

█████████████                                                                16

**Factor 8: The established profitability of the product made under the patent; its commercial success; and its current popularity**

**38.** Dr. Rainey concludes that "this post-verdict factor supports an ongoing royalty rate for 2024 through 2032 that is significantly higher than the jury's royalty rate."[56] I disagree.

**39.** Dr. Rainey claims that "[p]ost-verdict information indicates that the expectations for the commercial success and profitability of Lumryz increased between the May-June 2023 hypothetical negotiation and the parties' post-verdict negotiation."[57] Dr. Rainey cites statements that:

- Avadel has said that the narcolepsy market, in particular the oxybate segment, is an "evolving and growing segment" and not a mature market;[58]

- Avadel has secured wider insurance coverage of LUMRYZ and expects to continue expanding;[59]

- Avadel has attracted more and more oxybate prescribers to prescribe LUMRYZ to their narcolepsy patients;[60]

- Avadel increased the pricing of LUMRYZ and expects LUMRYZ to generate significant cash;[61] and

- Avadel and Wall Street both believe that "future competitive conditions in

---

[56]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 41.

[57]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 34.

[58]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 35.

[59]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 36.

[60]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 37.

[61]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 38.

the narcolepsy market are not expected to meaningfully hinder LUMRYZ's growth."[62]

**40.**  As an initial point, Dr. Rainey's information is consistent with expectations regarding LUMRYZ's market potential (in excess of $1 billion), which was extensively discussed at trial. For example, Avadel's CEO Mr. Divis testified that LUMRYZ has the potential to exceed $1 billion in sales.[63]  Dr. Rainey also testified about the $1 billion peak sales opportunity estimate.[64]  Dr. Rainey further testified that, after LUMRYZ launched, "things are going according to plan.  You know, they're still telling people, as we've just heard from Mr. Divis, that that peak sales opportunity of over a billion dollars. . ."[65]  In its most recent earnings call presentation in August 2024, Avadel provided the same "peak sales opportunity" estimate of greater than $1 billion that was presented at trial.[66]  Thus, the occurrence of the various post-trial circumstances discussed by Dr. Rainey are aligned and consistent with LUMRYZ achieving its market potential are not a changed economic circumstance.

**41.**  Dr. Rainey's claimed post-verdict evidence to support a higher royalty rate is also consistent with and duplicative of testimony at trial, examples of which are provided below, and thus his evidence does not indicate a changed economic circumstance.

- There was extensive testimony at trial, as well as deposition testimony, regarding LUMRYZ growing the oxybate market for the treatment of narcolepsy.  For example, Dr. Rainey testified that "there's expanding the patient population for Lumryz."[67]  Dr. Rainey stated in his initial expert report that Avadel intends to expand the eligible population for LUMRYZ and that "Jazz also expected

---

[62]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 39.

[63]Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 507 and 526.

[64]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 586; and PTX-0300.14.

[65]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 588.

[66]Investor Presentation, Avadel Pharmaceuticals Plc, August 2024, pages 4 and 6.

[67]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 589.

Lumryz's launch to expand the use of oxybates to treat narcolepsy."[68] Similarly, when asked during his deposition "Avadel is expanding the market. Is that true?," Dr. Rainey replied, "Yes. I account for that in my analysis."[69] Avadel's CEO Mr. Divis also testified that "use of oxybates would grow" and discussed that "Lumryz will become a market leader in a growing narcolepsy oxybate market.[70] He also confirmed that Avadel expects that over the long-term, LUMRYZ "will continue to grow."[71] In addition, Mr. Divis stated that Avadel is "doing clinical work on opportunities such as idiopathic hypersomnia and to expand potential patients who may want to try the benefit from a once-at-bedtime dose;"[72]

- Mr. Divis testified at trial that wider and expanding insurance coverage is "ordinary coursework that everyone in the industry does to try to get your drug reimbursed by insurance companies;"[73]

- Regarding new prescribers, Mr. Divis testified at trial that he agreed that "Avadel's commercial strategy is to drive demand for Lumryz with current high-volume oxybate prescribers...those are the doctors that Avadel was going to prioritize going after" and, thus, Avadel would subsequently target additional prescribers;[74] and

- There was extensive testimony at trial regarding LUMRYZ's expected profitability and market success. For example, Dr. Rainey testified that the parties "were expecting [LUMRYZ] to be a successful profitable product" and that there was a "peak sales opportunity of over one billion dollars."[75] In his trial

---

[68]Expert Report of Mark Rainey, Ph.D., September 15, 2023, paragraphs 127 and 148.
[69]Deposition of Mark Rainey, Ph.D., November 17, 2023, page 149.
[70]Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 515 and 517.
[71]Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 505, 515, and 517.
[72]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 555.
[73]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 534.
[74]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 504.
[75]Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 585 and 588.

testimony, Mr. Divis agreed that Avadel research indicates "Lumryz has the potential to become the leading oxybate in narcolepsy and exceed $1 billion in annual sales" and "Avadel expected to get 50-60 percent" of the treated patient pool.[76]

**42.** Dr. Rainey also discusses in his declaration the fact that Avadel's market capitalization increased from approximately $1.1 billion to $1.5 billion from May-June 2023 to March 2024.[77] I disagree with his opinion that an increase in market capitalization is relevant to the ongoing reasonable royalty analysis.

**43.** Dr. Rainey testified at trial that, at the time of the May-June 2023 hypothetical negotiation, Avadel's market capitalization was approximately $1.1 billion.[78] In his declaration, he states that, by the time of the post-verdict hypothetical negotiation, Avadel's market capitalization had increased to approximately $1.5 billion.[79] He concludes, as support for increasing the jury-determined royalty rate from 3.5% to 30%, that "if the present value of the ongoing royalty is less than that amount [$1.5 billion], the ongoing royalty does not make Avadel worse off."[80]

**44.** The use of market capitalization of a company as a basis to establish a "check" of the royalty that Avadel would pay Jazz is economically nonsensical. The market capitalization of a company is a value to the shareholders of the company, it is *not* an asset of the company itself. A company's ability to pay a royalty will be constrained by the profitability of its products (in this case, Avadel's sole commercialized product is LUMRYZ). Avadel cannot simply write a check to Jazz for the value of its market capitalization (an asset it does not own). Further, market capitalization also embodies the expected financial benefits from LUMRYZ sales outside the U.S.,

---

[76]Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 507, 526-527.

[77]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 40.

[78]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 596; and Trial Demonstrative, Jazz v. Avadel, PDX-6.22.

[79]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 40.

[80]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 69.

████████████                                                                        20

potential future non-LUMRYZ products, and other technologies owned by Avadel (*e.g.*, various drug delivery technologies), which have no relevance to determining the value of the royalty rate that Avadel should pay Jazz for use of the '782 patent in the United States.[81]

**45.** Therefore, Dr. Rainey's market capitalization methodology is an improper basis to assess the reasonable royalty rate. Even if one were to accept, for the sake of argument, the premise of Dr. Rainey's analysis, Avadel's market capitalization increased from approximately $1.107 billion at the time of the May-June 2023 hypothetical negotiation to $1.314 billion today — an increase of approximately 19 percent.[82] Increasing the jury-determined royalty rate of 3.5% by the 19 percent increase in Avadel's market capitalization results in a royalty rate of 4.2%.

**46.** In light of Dr. Rainey's prior trial testimony, considerations such as established profitability, commercial success, and current popularity do not constitute a changed economic circumstance that would provide an economic rationale to increase an ongoing compulsory royalty rate above the jury-determined 3.5% rate. In any event, Dr. Rainey's opinions relevant to this factor do not support a 757% increase of the jury rate from 3.5% to 30% or a 271% increase of the jury rate from 3.5% to 13%.

**Factor 9: The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results;**

and

**Factor 10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention**

---

[81] Avadel Pharmaceuticals Plc, Form 10-K for fiscal year ended December 31, 2023, page 8 (*see*, Tab 3).

[82] Trial Demonstrative, Jazz v. Avadel, PDX-6.22; and <www.finance.yahoo.com/quote/AVDL/>, as of September 18, 2024 (*see*, Tab 4).

**47.** Dr. Rainey concludes that "these post-verdict factors support an ongoing royalty rate for 2024 through 2032 that is significantly higher than the jury's royalty rate."[83] I disagree.

**48.** Dr. Rainey testified at trial that, at the time of the hypothetical negotiation, Jazz and Avadel were expecting LUMRYZ to be a successful and profitable product, and demand for LUMRYZ was due to its meeting "the unmet need [a once-nightly product] that Avadel viewed Lumryz fulfilling."[84] Dr. Rainey further testified, responding to a question of his understanding if LUMRYZ has been performing as Avadel expected, that "things are going according to plan."[85]

**49.** As a basis for support to increase the royalty rate, Dr. Rainey discusses certain post-trial information, including:

- Final data from Avadel's RESTORE study became available on September 3, 2024 that "demonstrates that people with narcolepsy prefer once-at-bedtime LUMRYZ versus a twice-nightly" and "94% preferred once-at-bedtime LUM-RYZ to twice-nightly dosing."[86] and

- LUMRYZ patients are more likely to stay on LUMRYZ for a longer duration when compared to twice-nightly oxybate products.[87]

**50.** None of the post-verdict information cited by Dr. Rainey demonstrates a change in economic circumstances. For example, Dr. Rainey points to data from the RESTORE study showing a 94% preference for once-at-bedtime dosing, but Dr. Rainey previously incorporated interim data from the same study showing the

---

[83]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 47.

[84]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 585.

[85]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 588.

[86]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 44.

[87]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 45.

same 94% preference in his expert report before trial.[88] In addition, the patient pref-
erence for a once-nightly formulation is consistent with the FDA's clinical superiority
findings for LUMRYZ, which found that once-nightly dosing constituted a major
contribution to patient care, which was discussed at trial.[89]

**51.** In his declaration, Dr. Rainey states, "I understand that Avadel has not
made any attempt since the jury's verdict to develop an alternative dosage form to
design around the '782 patent," and uses this as a basis to increase the ongoing
royalty rate.[90] However, Dr. Rainey admits in his declaration that "Avadel said in
an interrogatory response: We have no noninfringing alternative."[91] Further, when
asked at trial, "And did Avadel and does Avadel have any noninfringing alternative?,"
Dr. Rainey replied, "No, they don't."[92] Therefore, the absence of a non-infringing
alternative is also not a changed circumstance.

**52.** Dr. Rainey's claimed support for increasing the royalty rate provides no
new information that would materially impact the characterization presented at trial
that LUMRYZ's once-nightly dosing is desired by patients, and thus a key to LUM-
RYZ's success. Therefore, there is no changed economic circumstance under this
factor that would provide an economic rationale to adjust the jury's 3.5% royalty
rate. In any event, Dr. Rainey's opinions relevant to this factor do not support a
757% increase of the jury rate from 3.5% to 30% or a 271% increase of the jury rate
from 3.5% to 13%.

**Factor 11: The extent to which the infringer has made use of the invention
and any evidence probative of the value of that use**

---

[88]Expert Report of Mark Rainey, Ph.D., September 15, 2023, paragraph 108.
[89]Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 492-493.
[90]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, para-
graph 46.
[91]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, para-
graph 43, footnote 71.
[92]Trial Transcript, Jazz v. Avadel, February 27, 2024, page 589.

**53.** Dr. Rainey concludes that "this factor supports an ongoing royalty rate for 2024 through 2032 that is significantly higher than the jury's royalty rate."[93] I disagree.

**54.** Dr. Rainey states, "[a]s I explained at trial, at the time of the May-June 2023 hypothetical negotiation, Avadel was targeting Jazz patients to 'switch' to Lumryz, but also using Jazz's claimed dosage form to gain new patients and patients that had previously discontinued twice-nightly oxybate products. Avadel was also planning to expand the patient population for Lumryz."[94]

**55.** As a basis for support to increase the royalty rate, Dr. Rainey discusses certain post-trial information, including:

- A March 2024 Avadel earnings call during which Avadel's CEO explained that continuing to sell LUMRYZ was a priority and that more LUMRYZ patients are switching from Xywav than from Xyrem or Xyrem AG products;[95] and

- "[B]ecause Lumryz remains Avadel's only commercial product, Avadel would be in a weaker position at the post-verdict hypothetical negotiation, and its ability to continue selling Lumryz to future patients for the treatment of narcolepsy is of utmost importance and extremely valuable to Avadel."[96]

**56.** The fact that LUMRYZ is Avadel's only commercial product is not a changed economic circumstance. At the time of the hypothetical negotiation, the parties would have understood that Avadel did not have any other commercial product, a fact that Dr. Rainey cited in his expert report and Avadel's CEO, Mr. Divis testified at trial.[97] As a result, the fact that LUMRYZ is currently Avadel's only com-

---

[93]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 51.

[94]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 48.

[95]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraphs 49 and 50.

[96]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 49.

[97]Expert Report of Mark Rainey, Ph.D., September 15, 2023, paragraph 14; and Trial Transcript, Jazz v. Avadel, February 27, 2024, page 478.

████████████                                                          24

mercial product does not constitute a change in economic circumstances and provides no basis to increase the royalty rate.

**57.** Similarly, I disagree with Dr. Rainey's assertion that Mr. Divis' comments in a March 2024 earnings call regarding switching patients from Xywav is a changed economic circumstance. Mr. Divis' statements made during the post-verdict earnings call are consistent with his trial testimony that switching patients from a twice-nightly oxybate product (including Xywav) to Avadel's once-nightly product was "one of [Avadel's] primary goals and strategies."[98]  He also testified at trial that Avadel wants to get as many of the patients who take Jazz's products to switch to LUMRYZ.[99] I am not aware that Dr. Rainey even attempted to analyze or quantify Xywav patients switching to LUMRYZ.

**58.** Therefore, there is no changed economic circumstance under this factor that would provide an economic rationale to adjust the jury's 3.5% royalty rate.  In any event, Dr. Rainey's opinions relevant to this factor do not support a 757% increase of the jury rate from 3.5% to 30% or a 271% increase of the jury rate from 3.5% to 13%.

**Factor 12: The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions**

**59.** Dr. Rainey concludes that this factor does not impact the ongoing royalty rate.[100]  I agree.

**Factor 13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manu-**

---

[98]Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 474 and 501.
[99]Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 524.
[100]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 52.

█████████████                                                          25

**facturing process, business risks, or significant features or improvements added by the infringer**

   **60.** Dr. Rainey concludes that "this factor supports an ongoing royalty rate for 2024 through 2032 that is significantly higher than the jury's royalty rate."[101] I disagree.

   **61.** Dr. Rainey states, "[a]s I explained at trial, it is not possible to separate the value that Jazz's patent contributes to Lumryz from the value of Lumryz as a whole."[102] He then states that since trial, the Court has found that LUMRYZ "wholly infringes Claim 24" and "it is impractical for Jazz to treat the infringing aspects of Lumryz 'as a small component part' of the overall drug."[103]

   **62.** Dr. Rainey's trial testimony and the Court's findings appear consistent with each other; therefore, there is no changed economic circumstance under this factor that would provide an economic rationale to adjust the jury's 3.5% royalty rate. In any event, Dr. Rainey's opinions relevant to this factor do not support a 757% increase of the jury rate from 3.5% to 30% or a 271% increase of the jury rate from 3.5% to 13%.

## Dr. Rainey's Methodology Remains Flawed

   **63.** As discussed in my previous declaration, Dr. Rainey's royalty opinion discussed at trial was based on an arithmetic calculation that assumed ███████████ ███████████████████████████████████████████████████████[104] In his

---

   [101]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 53.
   [102]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 53.
   [103]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 53.
   [104]Declaration of Mohan Rao, Ph.D., September 16, 2024, paragraphs 5, 17-19, 24, Tab 3, and Tab 5. As presented at trial, Dr. Rainey utilizes annual net revenue forecasts of LUMRYZ, XYREM, and XYWAV from 2023 through February 2036 as part of his analysis (Trial Demonstrative, Jazz v. Avadel, PDX-6.19; Trial Transcript, Jazz v. Avadel, February 27, 2024, pages 591-593; and JTX-0147). In connection with assessing the accuracy of the Jazz-provided forecast used by Dr. Rainey,

████████████                                                          26

declaration, Dr. Rainey continues to use the same data and methodology as pre-
viously used to determine the royalty rates, with one exception to account for the
post-verdict hypothetical negotiation date that results in an *increase* in his royalty
rates.[105]  That is, Dr. Rainey continues to rely on the same flawed forecasts (that
indicated XYREM and XYWAV's revenues have been less impacted than anticipated
by Dr. Rainey) as he presented at trial, which would put, in fact, downward pressure
on the jury-determined 3.5% royalty rate.

### Conclusion

**64.**  In summary:

- Dr. Rainey acknowledges the Court's direction that "[g]enerally, the jury's dam-
  ages award is a starting point for evaluating ongoing royalties," but then dis-
  misses the jury's verdict, stating that the "jury's verdict does not change my
  opinions" and fails to properly use the jury's 3.5% royalty rate as a starting
  point in his analysis.[106]  Rather, Dr. Rainey sets aside the 3.5% rate awarded
  by the jury and largely reissues the same royalty opinions he presented to the
  jury, with rates that the jury rejected. Dr. Rainey's asserted royalty rate of up
  to 30% represents a 757% increase ($= 30\% \div 3.5\% - 1$) over the rate awarded
  by the jury.

- Dr. Rainey attempts to justify setting aside the jury's 3.5% rate by assert-
  ing that there are changed economic circumstances since the May-June 2023
  hypothetical negotiation date considered by the jury. I disagree that there are

---

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████

[105]For the post-verdict negotiation time period, he starts his analysis in either March 2024 (the verdict date) or September 2024 (after the Court's Order) (Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, Exhibits A and A.1).

[106]Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, para-graphs 3 and 11.

changed economic circumstances that support an upward adjustment of the royalty rate. Virtually all of the purportedly "new" circumstances that Dr. Rainey discusses in his declaration were already in the trial record and/or discussed in Dr. Rainey's expert report in connection with his trial opinions. Whatever remaining "changed" circumstances that might exist do not justify an increase in the royalty rates from a hypothetical negotiation performed after the jury verdict, much less the massive increase in the royalty rates that Dr. Rainey opined is appropriate.

- Dr. Rainey's royalty opinion continues to rely on an inaccurate Jazz projection of sales of its oxybate products and continues to be premised upon an exclusive license from Jazz to Avadel.

**65.** In light of the foregoing, it is my opinion that there are no changes to economic factors following the hypothetical negotiation date of May-June 2023 that would support an upward adjustment of the 3.5% royalty rate awarded by the jury.

Mohan Rao, Ph.D.

September 23, 2024

# Tab 1

# LUMRYZ Royalties
### *(March 2024 through February 2036)*



| Description | 2024 Mar-Dec | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 Jan-Feb | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ($ in millions) | | | | | | | | | | | | | | |
| **Dr. Rainey's Royalty Rates** | | | | | | | | | | | | | | |
| Lumryz Net Revenues [1] | | | | | | | | | | | | | | |
| Dr. Rainey Royalty Rates [2] | 30% | 30% | 13% | 13% | 13% | 13% | 13% | 13% | 13% | 3.5% | 3.5% | 3.5% | 3.5% | |
| **Royalty** | | | | | | | | | | | | | | |
| **Jury-Determined Royalty Rate** | | | | | | | | | | | | | | |
| Lumryz Net Revenues [1] | | | | | | | | | | | | | | |
| Jury Royalty Rate [3] | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | |
| **Royalty** | | | | | | | | | | | | | | |

**Sources & Notes:**

[1] Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, Exhibit A.
[2] Declaration of Mark Rainey, Ph.D. In Support of Ongoing Royalty, September 16, 2024, paragraph 7.
[3] Verdict Form, Jazz v. Avadel, March 4, 2024, page 11.

Tab 1

Tab 2

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 10-Q

---

**(Mark One)**

☒     **Quarterly report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the quarterly period ended March 31, 2023**

**or**

☐     **Transition report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the transition period from          to**

**Commission File Number: 001-33500**

# JAZZ PHARMACEUTICALS PUBLIC LIMITED COMPANY
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Ireland** | **98-1032470** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**Fifth Floor, Waterloo Exchange,**
**Waterloo Road, Dublin 4, Ireland D04 E5W7**
**011-353-1-634-7800**
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

---

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, nominal value $0.0001 per share | JAZZ | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Table of Contents

| Product Candidates | Description |
| --- | --- |
| Zanidatamab | In previously treated metastatic HER2-expressing cancers in combination with select antineoplastic therapies (ongoing trial) |
| JZP341 (long-acting *Erwinia* asparaginase) | Solid tumors (licensed from Ligand Pharmaceuticals Incorporated, or Ligand) (ongoing trial) |
| **Preclinical** | |
| CombiPlex® | Hematology/oncology exploratory activities |
| JZP898 | Conditionally-activated IFNα INDUKINE™ molecule |
| Undisclosed target | Ras/Raf/MAP kinase pathway (collaboration with Redx) Oncology |
| Undisclosed targets | Oncology |

*Also known as DSP-0187

### Operational Excellence

We remain focused on continuing to build excellence in areas that we believe will give us a competitive advantage, including building an increasingly agile and adaptable commercialization engine and strengthening our customer-focused market expertise across patients, providers and payors. We are refining our approach to engaging our customers by strengthening alignment and integration across functions and across regions. This includes a more integrated approach to brand planning, a heightened focus on launch and operational excellence and multichannel customer engagement. We have fully adapted to reaching our key audiences through both in-person and virtual initiatives. This includes maintaining a virtual presence at scientific congresses, when appropriate, designed to ensure we can continue to provide promotional and non-promotional interactions and supporting our field-based teams with virtual customer interaction tools, training and content. These initiatives mark a significant operational evolution that is directly linked to our corporate strategy and are designed to better enable our teams to work collaboratively on an aligned and shared agenda through both virtual and in-person interactions. In most geographies, our teams are increasing the frequency of in-person interactions as medical congresses and healthcare practices begin to resume in-person activities, taking into account applicable public health authority and local government guidelines which are designed to ensure community and employee safety.

### Other Challenges, Risks and Trends Related to Our Business

Historically, our business has been substantially dependent on Xyrem and our financial results have been significantly influenced by sales of Xyrem. Our operating plan assumes that Xywav, with 92% lower sodium compared to Xyrem, depending on the dose, absence of a sodium warning and dosing titration option, will remain the treatment of choice for patients who can benefit from oxybate treatment. In June 2021, FDA recognized seven years of ODE for Xywav in narcolepsy through July 21, 2027 stating that Xywav is clinically superior to Xyrem by means of greater safety due to reduced chronic sodium burden. While we expect that our business will continue to be substantially dependent on oxybate product sales, there is no guarantee that we can maintain oxybate sales at or near historical levels, or that oxybate sales will continue to grow.

Our ability to successfully commercialize Xywav will depend on, among other things, our ability to maintain adequate payor coverage and reimbursement for Xywav and acceptance of Xywav by physicians and patients, including Xywav for the treatment of IH in adults. In an effort to support strong adoption of Xywav, we are focused on providing robust patient copay and savings programs and facilitating payor coverage for Xywav.

Xywav and Xyrem also face increased competition from new branded products for treatment of cataplexy and/or EDS in narcolepsy, such as Avadel's recently approved Lumryz, in the U.S. market.

In addition, in January 2023 our oxybate products began to face competition from an authorized generic, or AG, version of high-sodium oxybate pursuant to a settlement agreement we entered into with an abbreviated new drug application, or ANDA, filer, and, in the future, we expect our oxybate products to face competition from additional AG versions of high-sodium oxybate and from generic versions of high-sodium oxybate pursuant to settlement agreements we entered into with multiple ANDA filers. Generic competition can decrease the prices at which Xywav and Xyrem are sold and the number of prescriptions written for Xywav and Xyrem. Moreover, we have increasingly experienced pressure from third party payors to agree to discounts, rebates or restrictive pricing terms, and we cannot guarantee we will be able to agree to commercially reasonable terms with PBMs, or similar organizations and other third party payors, or that we will be able to ensure patient access and acceptance on institutional formularies. Entering into agreements with PBMs or similar organizations and payors to ensure patient access has and will likely continue to result in higher gross to net deductions.

Our financial condition, results of operations and growth prospects are also dependent on our ability to maintain or increase sales of Epidiolex/Epidyolex in the U.S. and Europe, which is subject to many risks and there is no guarantee that we

generic products rather than branded products when a generic version is available. This would result in reduction in sales of, and revenue from, Xyrem, although we would continue to receive royalties and other revenue based on sales of an AG Product in accordance with the terms of our settlement agreements.

Other companies may develop high-sodium oxybate products for treatment of narcolepsy, using an alternative formulation or a different delivery technology, and seek approval in the U.S. using a new drug application, or NDA, approval pathway under Section 505(b)(2) and referencing the safety and efficacy data for Xyrem. For example, on May 1, 2023, Avadel announced that it had received approval and orphan drug exclusivity through May 1, 2030 for Lumryz, a fixed-dose, high-sodium oxybate which uses its proprietary technology for the treatment of EDS and cataplexy in patients with narcolepsy, and we expect to begin to face competition from Avadel in the coming months. For additional information on litigation involving this matter, see "*Avadel Patent Litigation*" in Note 9, Commitments and Contingencies-Legal Proceedings of the Notes to Consolidated Financial Statements, included in Part I of our Quarterly Report on Form 10-Q for the quarter ended March 31, 2023. Xyrem and Xywav also face increased competition from other new branded entrants to treat EDS in narcolepsy such as pitolisant. Other companies have announced that they have product candidates in various phases of development to treat the symptoms of narcolepsy, such as Axsome Therapeutics, Inc.'s reboxetine, and various companies are performing research and development on orexin agonists for the treatment of sleep disorders.

We expect that Xywav for the treatment of both cataplexy and EDS in patients with narcolepsy will continue to face competition from generic or authorized generic high-sodium oxybate products or new branded entrants in narcolepsy such as Avadel's recently approved Lumryz notwithstanding FDA recognizing Orphan Drug Exclusivity for Xywav. For example, we received notice in June 2021 that Lupin filed an ANDA for a generic version of Xywav. Additional companies may file ANDAs seeking to market a generic version of Xywav which could lead to additional patent litigation or challenges with respect to Xywav.

Moreover, non-oxybate products intended for the treatment of EDS or cataplexy in narcolepsy or idiopathic hypersomnia, or IH, including new market entrants, even if not directly competitive with Xywav or Xyrem, could have the effect of changing treatment regimens and payor or formulary coverage of Xywav or Xyrem in favor of other products, and indirectly materially and adversely affect sales of Xywav and Xyrem. Examples of such new market entrants include pitolisant, a drug that was approved by FDA in 2019 for the treatment of EDS in adult patients with narcolepsy and approved by FDA in 2020 for an adult cataplexy indication in the U.S. Pitolisant has also been approved and marketed in Europe to treat adult patients with narcolepsy, with or without cataplexy, and to treat EDS in obstructive sleep apnea. Pitolisant is also in late stage development for the treatment of IH. In addition, we are also aware that prescribers often prescribe branded or generic medications for cataplexy, before or instead of prescribing oxybate therapy in Xywav and Xyrem, and that payors often require patients to try such medications before they will cover Xywav or Xyrem, even if they are not approved for this use. Examples of such products are described in "Business—Competition" in Part I, Item 1 of our Annual Report on Form 10-K for the year ended December 31, 2022.

We expect that the approval and launch of the Hikma AG Product, another AG Product or other generic version of Xyrem and the approval and launch of any other high-sodium oxybate product (including Avadel's recently approved Lumryz) or alternative product that treats narcolepsy could have a material adverse effect on our sales of Xywav and Xyrem and on our business, financial condition, results of operations and growth prospects.

## Item 2.        Unregistered Sales of Equity Securities and Use of Proceeds

### Issuer Purchases of Equity Securities

In November 2016, our board of directors authorized a share repurchase program and as of March 31, 2023 had authorized the repurchase of ordinary shares having an aggregate purchase price of up to $1.5 billion, exclusive of any brokerage commissions. Under this program, which has no expiration date, we may repurchase ordinary shares from time to time on the open market. During the three months ended March 31, 2023, we did not repurchase any of our ordinary shares. As of March 31, 2023, the remaining amount authorized under the share repurchase program was $431.2 million.

Under our share repurchase program, we are authorized to repurchase shares from time to time through open market repurchases. Such repurchases may be pursuant to Rule 10b-18 or Rule 10b5-1 agreements as determined by our management and in accordance with the requirements of the Securities and Exchange Commission.

# Tab 3

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM 10-K**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended** December 31, 2023

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period _____ to _____**

**Commission file number: 001-37977**

# AVADEL PHARMACEUTICALS PLC
**(Exact name of registrant as specified in its charter)**

| Ireland | 98-1341933 |
|---|---|
| **State or other jurisdiction of incorporation or organization** | **(I.R.S. Employer Identification No.)** |

| 10 Earlsfort Terrace<br>Dublin 2, Ireland<br>D02 T380 | Not Applicable |
|---|---|
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: +353-1-901-5201**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class* | Trading Symbol (s) | Name of exchange on which registered |
|---|---|---|
| American Depositary Shares* | AVDL | The Nasdaq Global Market |
| Ordinary Shares, nominal value $0.01 per share** | AVDL | The Nasdaq Global Market |

\*   American Depositary Shares may be evidenced by American Depository Receipts. Each American Depositary Share represents one (1) Ordinary Share.

\*\*   Not for trading, but only in connection with the listing of American Depositary Shares. on The Nasdaq Global Market.

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes  ☒     No  ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes  ☐     No  ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes  ☒     No  ☐

Indicate by check mark whether the registrant has submitted electronically, every Interactive Data File required to be submitted and pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes  ☒     No  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer", "accelerated filer", "smaller reporting company", and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒        Accelerated filer ☐
Non-accelerated filer ☐        Smaller reporting company ☐
Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements.  ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes  ☐     No  ☒

background survey for both patients and clinicians, which showed that dosing frequency was noted as a significant stressor by both patients and clinicians.

Additional peer-reviewed publications have included data on improvement on disturbed nocturnal sleep ("DNS"), the first DCE and a Plain Language Summary reviewing sodium oxybate and cardiovascular health, which did not identify a signal of cardiovascular disease in the over twenty years that sodium oxybate has been available.

At the 2023 SLEEP meeting, additional LUMRYZ data, including post-hoc analyses from the pivotal REST-ON trial, interim data from the open-label RESTORE study and real-world evidence regarding sodium oxybate utilization and co-morbidities were presented. At the World Sleep meeting in October 2023, these data were presented as encores, along with new post-hoc analyses from the REST-ON trial showing additional clinical efficacy data for LUMRYZ.

A second DCE among clinicians was published in May 2023, showing the dosing regimen was the most important driver of choice, with once-nightly preferred. Post-hoc analyses of narcolepsy Type 1 ("NT1") and Type 2 ("NT2") were also published, demonstrating consistent improvements regardless of narcolepsy type. A third plain language summary has been published; most recently evaluated the improvements of LUMRYZ on DNS.

We believe LUMRYZ has the potential to demonstrate improved dosing compliance, safety, and patient satisfaction over other treatment options for cataplexy or EDS in patients with narcolepsy.

**Our Drug Delivery Technologies**

We own drug delivery technologies that address formulation challenges, potentially allowing the development of differentiated drug products for administration in various forms (e.g., capsules, tablets, sachets or liquid suspensions for oral use; or injectables for subcutaneous administration) that could be applied to a broad range of drugs.

A brief discussion of each of our drug delivery technologies is set forth below.

- MICROPUMP. Our MICROPUMP technology allows for the development of modified release solid, oral dosage formulations of drugs. A version of our MICROPUMP technology is being employed in LUMRYZ.

- LIQUITIME. Our LIQUITIME technology allows for development of modified release oral products in a liquid suspension formulation, which may make such formulations particularly well suited for children and/or patients having issues swallowing tablets or capsules. Although we own this technology, we are currently not pursuing any commercial pharmaceutical drug development opportunities using it.

- MEDUSA. Our MEDUSA technology allows for the development of modified-release injectable dosage formulations of drugs (e.g., peptides, polypeptides, proteins, and small molecules). Although we own this technology, we are currently not pursuing any commercial pharmaceutical drug development opportunities using it.

**Competition**

Competition in the pharmaceutical and biotechnology industry continues to be intense and is expected to increase. We compete with academic laboratories, research institutions, universities, joint ventures, and other pharmaceutical and biotechnology companies, including other companies who have approved, or who are developing, niche branded or generic specialty pharmaceutical products or drug delivery platforms. Furthermore, major technological changes can happen quickly in the pharmaceutical and biotechnology industries. Such rapid technological change, or the development by our competitors of technologically improved or differentiated products, could render our products, product candidates, or drug delivery platforms obsolete or noncompetitive.

LUMRYZ competes with twice-nightly oxybate formulations, as well as a number of daytime wake promoting agents including lisdexamfetamine, detroamphetamine, methylphenidate, amphetamine, modafinil, and armodafinil, which are widely prescribed, as well as solriamfetol and pitolisant. Generic pharmaceutical products will continue to play a large role in the U.S. healthcare system. LUMRYZ may face competition from manufacturers of generic twice-nightly oxybate formulations. In January 2023, Hikma Pharmaceuticals plc, announced that it launched an authorized generic version of Jazz Pharmaceuticals plc's ("Jazz") Xyrem (sodium oxybate). In July 2023, Amneal Pharmaceuticals, Inc. announced that it launched an authorized generic version of Jazz's Xyrem (sodium oxybate).

Tab 4



## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that true and correct copies of the foregoing document were caused to be served on September 23, 2024 on the following counsel in the manner indicated below.

### VIA EMAIL:

Jack B. Blumenfeld
Jeremy Tigan
Cameron Clark
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
cclark@morrisnichols.com

F. Dominic Cerrito
Eric C. Stops
Evangeline Shih
Andrew S. Chalson
Gabriel P. Brier
Frank C. Calvosa
Catherine T. Mattes
Abigail DeMasi
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
nickcerrito@quinnemanuel.com
ericstops@quinnemanuel.com
evangelineshih@quinnemanuel.com
andrewchalson@quinnemanuel.com
gabrielbrier@quinnemanuel.com
frankcalvosa@quinnemanuel.com
catherinemattes@quinnemanuel.com
abigaildemasi@quinnemanuel.com

*Attorneys for Plaintiffs*

Dated:  September 23, 2024

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)

ME1 50129869v.1