## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC.,<br><br>              Plaintiff,<br><br>       v.<br><br>AVADEL CNS PHARMACEUTICALS LLC,<br><br>              Defendant. | C.A. No. 21-691-GBW<br><br>███████████████ |
| JAZZ PHARMACEUTICALS, INC. and JAZZ PHARMACEUTICALS IRELAND LIMITED,<br><br>              Plaintiffs,<br><br>       v.<br><br>AVADEL CNS PHARMACEUTICALS LLC,<br><br>              Defendant. | C.A. No. 21-1138-GBW<br><br>███████████████ |
| JAZZ PHARMACEUTICALS, INC. and JAZZ PHARMACEUTICALS IRELAND LIMITED,<br><br>              Plaintiffs,<br><br>       v.<br><br>AVADEL CNS PHARMACEUTICALS LLC,<br><br>              Defendant. | C.A. No. 21-1594-GBW<br><br>███████████████ |

Jack B. Blumenfeld, Jeremy Tigan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE, F. Dominic Cerrito, Eric C. Stops, Evangeline Shih, Andrew S. Chalson, Gabriel P. Brier, Frank C. Calvosa, Catherine T. Mattes, Abigail DeMasi, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York.

       *Counsel for Plaintiffs*

Daniel M. Silver, Alexandra M. Joyce, MCCARTER & ENGLISH, LLP, Wilmington, DE, Kenneth G. Schuler, Marc N. Zubick, Alex Grabowski, Sarah W. Wang, LATHAM & WATKINS LLP, Chicago, IL, Herman H. Yue, Franco Benyamin, LATHAM & WATKINS LLP, New York, NY, Audra Sawyer, Alan J. Devlin, Ian Conner, Denise Laspina, LATHAM & WATKINS LLP, Washington, D.C., Daralyn J. Durie, Eric P. Berger, Rebecca E. Weires, Adam R. Brausa, Tannyr Pasvantis, MORRISON & FOERSTER LLP, San Francisco, CA, Kira A. Davis, Katherine E. McNutt, Rose S. Lee, MORRISON & FOERSTER LLP, Los Angeles, CA, David F. Kowalski, MORRISON & FOERSTER LLP, San Diego, CA, Andrew T. Jones, MORRISON & FOERSTER LLP, Washington, D.C.

       *Counsel for Defendant*

## MEMORANDUM OPINION

September 15, 2025
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

On May 12, 2021, Plaintiffs Jazz Pharmaceuticals Inc. and Jazz Pharmaceuticals Ireland Limited (collectively, "Plaintiffs" or "Jazz") sued Defendant Avadel CNS Pharmaceuticals LLC ("Defendant" or "Avadel") for patent infringement. D.I. 1.[1] Prior to trial, Avadel stipulated that its product, LUMRYZ, infringed claim 24 of U.S. Patent No. 11,147,782 ("the '782 patent"). Following a one-week trial, the jury awarded Jazz a reasonable royalty of 3.5% for Avadel's past infringement of the '782 patent. D.I. 665 at 30. Subsequently, Jazz submitted a Motion for a Permanent Injunction and for an Ongoing Royalty. D.I. 586. In its decision, the Court granted-in-part and denied-in-part Jazz's motion. Specifically, among other things, the Court denied "Jazz's request for a limited permanent injunction prohibiting the use of Lumryz for new patients in the narcolepsy market," and it granted "Jazz's motion for an ongoing royalty rate for future infringement in the narcolepsy market . . . pending additional briefing on the appropriate rate." D.I. 665 at 1. The parties submitted relevant briefing on the issue. D.I. 687; D.I. 690; D.I. 705; D.I. 707. Today, the Court finds that the appropriate rate for the ongoing royalty is 3.85%.

## I.   LEGAL STANDARD

Title 35 United States Code § 283 provides that a court may grant an injunction "to prevent the violation of any right secured by a patent, on such terms as the court deems reasonable." The Federal Circuit has interpreted that provision to permit a court to award an ongoing royalty for

---

[1] This order applies across three different cases with the identical issue: 21-691, 21-1138, and 21-1594. Consistent with this Court's past usage and with the parties' briefings, this Order uses the D.I. numbers from 21-691.

patent infringement in lieu of an injunction barring infringing conduct. *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1363 (Fed. Cir. 2017); *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314 (Fed. Cir. 2007) ("Under some circumstances, awarding an ongoing royalty for patent infringement in lieu of an injunction may be appropriate."). Although the award of an ongoing royalty is not automatic, "the Federal Circuit has indicated that a prevailing patentee should receive compensation for any continuing infringement." *Purewick Corp. v. Sage Products, LLC*, 666 F. Supp. 3d 419, 448 (D. Del. 2023), *appeal dismissed,* No. 2023-1868, 2023 WL 4230367 (Fed. Cir. June 28, 2023), and *appeal dismissed,* No. 2024-1184, 2024 WL 889332 (Fed. Cir. Mar. 1, 2024) (citing *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-cv-00630-LHK, 2014 WL 6687122, at *9 (N.D. Cal. Nov. 25, 2014)); *see Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1379 (Fed. Cir. 2010) ("An award of an ongoing royalty is appropriate because the record supports the district court's finding that Telcordia has not been compensated for Cisco's continuing infringement."). Ultimately, "[i]t is within the Court's equitable discretion to determine whether an ongoing royalty need be imposed. *Purewick Corp.*, 666 F. Supp. 3d at 448; *see, e.g., Genband US LLC v. Metaswitch Networks Corp.*, No. 2:14-cv-00033-JRG, 2018 WL 11357619, at *17 (E.D. Tex. Mar. 22, 2018) (The decision "whether to grant an ongoing royalty is a matter within the district court's discretion, and a court may decide that a forward-looking royalty is not appropriate in a particular case."); *see also Paice LLC*, 504 F.3d at 1314-15; *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 37 (Fed. Cir. 2012).

## II.  ANALYSIS

On August 27, 2024, the Court denied Jazz's motion seeking to enjoin Avadel from making, marketing, or selling LUMRYZ in the narcolepsy market. D.I. 665. In doing so, however, the Court recognized that an ongoing royalty would be necessary to compensate Jazz for Avadel's

future infringement.[2] *Id.* When assessing prospective damages for ongoing infringement, a district court should "take into account" changes since the pre-verdict hypothetical negotiation "resulting from the determination of liability" and set an ongoing royalty rate. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1343 (Fed. Cir. 2012) (citation omitted). In determining an appropriate ongoing royalty rate, a court should follow three steps. First, "the jury's damages award is a starting point for evaluating ongoing royalties." *Vectura Ltd. v. GlaxoSmithKline LLC*, No. 16-cv-638-RGA, 2019 WL 4346502, at *7 (D. Del. Sept. 12, 2019) (citing *Apple*, 2014 WL 6687122, at *14). Second, to determine if the appropriate ongoing royalty rate should depart from the jury's damages award, the Court must consider: (1) change in bargaining position; (2) changed economic circumstances; and (3) any post-verdict factors affecting a post-verdict hypothetical negotiation. *See Vectura Ltd.*, 2019 WL 4346502, at *7. A district court may "weigh[] the relevant *Georgia-Pacific* factors" to determine if the plaintiff "is entitled to an ongoing royalty amount higher than the jury rate." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1370 (Fed. Cir. 2017). Third, if any of the above factors exist, the Court should use those factors to determine what the new, ongoing royalty rate should be. *Id.*; *Vectura Ltd.*, 2019 WL 4346502, at *7.

Jazz contends that the Court should increase the ongoing reasonable royalty to a rate above the 3.5% reasonable royalty granted by the jury for past infringement. D.I. 665 at 30. Jazz seeks a reasonable royalty rate schedule of "30% through 2025, 13% from 2026 through 2032, and 3.5%

---

[2] The Federal Circuit has held that a "district court *may* wish to allow the parties to negotiate a license amongst themselves regarding future use of a patented invention before imposing an ongoing royalty." *Paice LLC*, 504 F.3d at 1315 (emphasis added). Because this Court has determined that negotiation would be fruitless, it is now "step[ping] in to assess a reasonable royalty in light of the ongoing infringement." *Id.*

[] from 2033 through the expiration" of the '782 patent. D.I. 687 at 1. Avadel, on the other hand, maintains that any ongoing royalty awarded by the Court should not exceed the jury's reasonable royalty rate of 3.5%. D.I. 690 at 1. For the following reasons, the Court increases the ongoing royalty rate to 3.85%.

### A. The Starting Point is the Jury's Reasonable Royalty Rate of 3.5%

The first step of determining the ongoing royalty rate is to start with the jury's damages award. *Vectura*, 2019 WL 4346502, at *7. In its damages award, the jury awarded Jazz a 3.5% royalty rate for past infringement. D.I. 665 at 30. Thus, the Court begins its determination of an ongoing reasonable royalty rate for Jazz at 3.5%.

### B. Identifying Relevant Post-Verdict Factors

In the second step of the ongoing reasonable royalty rate analysis, a court should consider "post-verdict factors . . . in determining whether such a rate should be different from the jury's rate." *XY, LLC v. Trans Ova Genetics, L.C.*, 890 F.3d 1282, 1297 (Fed. Cir. 2018) (citing *Arctic Cat*, 876 F.3d at 1370). The post-verdict factors a court should consider are (1) a change in bargaining position; (2) changed economic circumstances; and (3) any post-verdict factors affecting a post-verdict hypothetical negotiation. *See Vectura Ltd.*, 2019 WL 4346502, at *7. The Court will address each in turn.

#### i. Changes in the Parties' Bargaining Positions May Support an Increase in Royalty Rate

In examining post-verdict factors, the district court should consider the "change in the parties' bargaining positions . . . resulting from the determination of liability." *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1362 (Fed. Cir. 2008). As the Federal Circuit has explained, "[w]hen patent claims are held to be not invalid and infringed, this amounts to a '*substantial shift in the bargaining*

4

*position of the parties.'" XY, LLC*, 890 F.3d at 1297 (emphasis added) (quoting *ActiveVideo Networks*, 694 F.3d at 1342). This substantial shift occurs because "[p]rior to judgment, liability for infringement, as well as the validity of the patent, is uncertain, and damages are determined in the context of that uncertainty. Once a judgment of validity and infringement has been entered, however, the [damages] calculus is markedly different because different economic factors are involved." *Amado*, 517 F.3d at 1362 (citation omitted); *see also Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, No. 2:17-cv-07639 SJO-KS, 2020 WL 2844410, at *16 (C.D. Cal. Apr. 2, 2020) ("The jury found the '190 Patent valid and infringed, which strengthens Plaintiffs' position. Although a hypothetical negotiation assumes a patent is valid and infringed, a determination on the merits can strengthen a party's position.").

According to Jazz, the Court should award ongoing royalties higher than the rate awarded by the jury because Jazz, as the prevailing party, is in a stronger bargaining position post-verdict. D.I. 687 at 2. Jazz also highlights the facts that Avadel has not made any attempt since the jury's verdict to stop infringing or design around the '732 patent. Because Avadel has not done so, Jazz contends that Avadel's continued infringement puts Jazz in a stronger bargaining position. *Id.* at 2-3; *see Telcordia Techs., Inc. v. Cisco Sys., Inc.*, No. 04-cv-876-GMS, 2014 WL 1457797, at *3 (D. Del. Apr. 14, 2014) (acknowledging plaintiff's argument that its bargaining position was strengthened by victory at trial because the defendant did not have any way to design around the infringed patents); *Creative Internet Advert. Corp. v. Yahoo! Inc.*, 674 F. Supp. 2d 847, 861 (E.D. Tex. 2009) (accepting plaintiff expert's opinion that the relationship between the parties changed post-verdict because the defendant did "not design around, or otherwise stop infringing" the asserted patent); *Syntrix Biosystems, Inc. v. Illumina, Inc.*, No. C10-5870 BHS, 2013 WL 3089448, at *2 (W.D. Wash. June 18, 2013) (noting that plaintiff was in a stronger bargaining position

because the defendant "has no readily apparent alternative if it seeks to continue its production and sale of the infringing product.").[3]

Although Avadel agrees that Jazz has a strengthened bargaining position, it contends that a strengthened bargaining position does not warrant increasing the ongoing reasonable royalty rate for two reasons. First, Avadel claims that, because the jury already considered Avadel's lack of an acceptable non-infringing alternative in deciding the reasonable royalty rate, the Court should not increase the jury's reasonable royalty rate determination. D.I. 705 at 4. However, courts have considered a lack of an acceptable non-infringing alternative as part of the plaintiff's strengthened bargaining position, even when it is not a changed circumstance and has already been considered by the jury in determining the reasonable royalty rate. *See Telcordia Techs.*, 2014 WL 1457797, at *3; *Creative Internet Advert. Corp.*, 674 F. Supp. 2d at 861; *Syntrix Biosystems*, 2013 WL 3089448, at *2. Thus, this factor should factor in the Court's evaluation of whether to increase the jury's reasonable royalty rate with respect to an ongoing royalty rate for continuing infringement.

Second, Avadel asserts that this factor only "slightly" favors Jazz. D.I. 690 at 1. Avadel relies on select cases from this district to support the notion that, when "the *only* changed circumstance post-verdict is the plaintiff's stronger bargaining position," courts frequently do not increase the jury's royalty rate for ongoing infringement. D.I. 690 at 2 (emphasis in original). For instance, Avadel highlights *Purewick Corp.* where the court decided that, "[a]lthough Plaintiff may

---

[3] Jazz's brief suggests that Avadel's lack of attempt to design around the '782 patent is a changed post-verdict factor instead of a change in the parties' bargaining position. *See* D.I. 687 at 7. However, Jazz's placement of this argument in determining an ongoing royalty is wrong for two reasons: 1) the caselaw Jazz cites for this argument states that a lack of a noninfringing alterative relates to the parties' bargaining strength and 2) Avadel's lack of a noninfringing alternative is not a "*changed* economic circumstance" because that circumstance was the same pre-verdict. *See XY, LLC*, 890 F.3d at 1297 (emphasis added).

be in a stronger position post-verdict, Plaintiff points to no other circumstances that indicate it would be able to negotiate a rate higher than the rate determined by the jury." 666 F.Supp. 3d at 449-50; *see also ArcherDX, LLC v. Qiagen Scis., LLC*, No, 18-cv-1019 (MN), 2022 WL 4597877, at \*15-16 (D. Del. Sept. 30, 2022) (noting that there was no change post-verdict other than plaintiff's stronger bargaining position and accordingly set the ongoing royalty rate at the rate awarded by the jury); *Vectura Ltd.*, 2019 WL 4346502, at \*7-8 (finding that the only changed circumstance post-trial was that plaintiff was in a stronger bargaining position and accordingly found that the rate awarded by the jury was appropriate as an ongoing royalty); *EMC Corp. v. Zerto, Inc.,* C.A. No. 12-956 (GMS), 2017 WL 3434212, at \*4 (D. Del. Aug. 10, 2017) (finding "a lack of significant post-verdict change in economic circumstances between the parties counsels against increasing the royalty rate above the jury's award").

In this case, besides a stronger bargaining position, which is debatable, at least one other changed economic circumstance post-verdict weighs in favor of increasing the ongoing royalty rate.

### ii. At Least One Changed Economic Circumstance Post-Verdict Factor Supports an Increase in the Royalty Rate

The second post-verdict factor courts should consider in determining an ongoing reasonable royalty rate is "changed economic circumstances, such as changes related to the market for the patented products." *XY, LLC*, 890 F.3d at 1297. In examining changed economic circumstances, courts can "weigh[] the relevant *Georgia-Pacific* factors and determine[] [if the plaintiff] is entitled to an ongoing royalty amount higher than the jury rate." *Arctic Cat*, 876 F.3d at 1370. Jazz asserts that there are various *Georgia-Pacific* factors that justify a higher royalty rate. D.I. 687 at 3-7. The Court addresses each in turn.

7

a. *Georgia-Pacific* Factors Numbers 1 and 4

Jazz contends that *Georgia-Pacific* factors numbers 1[4] and 4[5] support the Court increasing the jury's reasonable royalty rate.  D.I. 687 at 3.  First, Jazz claims that, because it remains unwilling to voluntarily license the '782 patent, it would demand a higher royalty in a post-verdict hypothetical negotiation.  *Id.* at 4.  Second, Jazz contends that its licenses for the Xyrem patents are instructional for a higher post-verdict royalty.  *Id.*  The Xyrem licenses cover a drug which competes with Avadel's drug LUMRYZ but are otherwise unrelated to this case.  Jazz insists the licensing of the Xyrem patents is relevant towards the post-verdict royalty rate because the jury did not hear about those patents.  *Id.*[6]

The Court disagrees with Jazz in this instance.  The asserted facts are not post-verdict changes and, thus, do not support an increase in the jury-awarded reasonable royalty rate.  Jazz has never been willing to license the '782 patent.  In its brief, Jazz supports this fact by stating that it "has not enter[ed] into any license for the '782 patent pre-verdict . . . nor has it entered into any license post-verdict."  D.I. 687 at 4.[7]  Also, although the jury did not hear about the Xyrem licenses,

---

[4] "The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty." *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1119 (S.D.N.Y.1970).

[5] "The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly." *Georgia-Pac. Corp.*, 318 F. Supp. at 1119.

[6] "In deciding the royalty rate for post-trial infringement, the court can properly consider 'any *new* evidence that was not before the jury.'" *EMC Corp.*, 2017 WL 3434212, at *4 (emphasis added) (quoting *Mondis Tech. Ltd. v. Chimei InnoLux Corp.*, 822 F. Supp. 2d 639, 647 (E.D. Tex. 2011), *aff'd sub nom. Mondis Tech. Ltd. v. Innolux Corp.*, 530 Fed.Appx. 959 (Fed. Cir. 2013)); *see LaserDynamics v. Quanta Computer*, 694 F.3d 51, 76 (Fed. Cir. 2012) ("In considering the fifteen *Georgia-Pacific* factors, it is presumed that the parties had full knowledge of the facts and circumstances surrounding the infringement at that time.").

[7] To support its argument that Jazz's unwillingness to license the '782 patent justifies an increase in the reasonable royalty rate, Jazz cites to the out-of-district case, *Joyal Products, Inc. v. Johnson Elec. N.A., Inc.*, No. CIV. A. 04-5172 JAP, 2009 WL 512156, (D.N.J. Feb. 27, 2009), *aff'd*, 335

8

those licenses did exist at the time of the verdict.  Jazz chose not to present them to the jury.  D.I. 689 ¶ 18 (Dr. Rainey, Jazz's damages expert, admitting that the licenses "were executed up to more than five years before the pre-verdict hypothetical negotiation between Jazz and Avadel").[8]  Just because the jury did not hear about the Xyrem licenses does not mean the licenses are changed circumstances.  Jazz cannot engineer a changed circumstance by now presenting facts that already existed during the pre-verdict hypothetical negotiation.  Thus, under the circumstances, *Georgia-Pacific* factors 1 and 4 do not warrant an increase of the jury-awarded rate of 3.5%.

b. *Georgia-Pacific* Factor Number 5

Jazz next asserts that *Georgia-Pacific* factor number 5[9] supports a higher ongoing royalty rate.  D.I. 687 at 5.  Jazz claims that *Georgia-Pacific* factor number 5 requires a higher royalty rate, if the parties are direct competitors, because Jazz would claim a higher royalty rate to prevent customers from "switching" to Avadel's products.  *Id.*  Jazz claims that this circumstance changed post-verdict because it was only after the jury verdict that Avadel "admitted that the companies are

---

Fed. Appx. 48 (Fed. Cir. 2009) (unpublished).  However, *Joyal* is not relevant here because, in *Joyal*, the court considered factors "where a district court concludes that an injunction is warranted, but is persuaded to stay the injunction pending an appeal."  *Id.* at *13 (citing *Amado*, 517 F.3d at 1362).

[8] Even if the Xyrem licenses were changed circumstances, the Court would be cautious in using them to calculate the ongoing royalty.  First, Dr. Rainey concedes that these licenses "would not be comparable to the license resulting from the May-June 2023 hypothetical negotiation."  D.I. 689 ¶ 18.  Second, the Xyrem licenses were "reached as part of litigation settlements," which the Federal Circuit has warned against using in calculating reasonable royalties.  *Id.*; *see LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012) ("The propriety of using prior settlement agreements to prove the amount of a reasonable royalty is questionable.");  *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078-79 (Fed. Cir. 1983) (refusing to consider "license fees negotiated in the face of a threat of high litigation costs" as "evidence of an established royalty").

[9] "The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promotor."  *Georgia-Pac. Corp.*, 318 F. Supp. at 1119.

direct competitors" in the narcolepsy market. *Id.* Jazz also claims that it would be

to continue using the jury-awarded royalty rate under this *Georgia-Pacific* factor because the parties expect Jazz to lose in sales of Xyrem and Xywav[10] [and] Avadel to make over $6 billion from its future net sales of Lumryz." *Id.* Jazz also claims that, because it is a direct competitor of Avadel, it would negotiate a higher royalty rate than the rate Avadel agreed to pay RTW - a financing firm and non-competitor. *Id.* (citing *Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, No. 03-cv-597-PHX-MHM, 2010 WL 11484420, at *3, *6 (D. Ariz. Sept. 9, 2010)).

However, direct competition between Jazz and Avadel is not a changed circumstance, given there has been no change in competition between the parties. Direct competition can be relevant to a post-verdict ongoing royalty calculation when the parties begin competing or increase competition after the verdict. *See Philip Morris Products S.A. v. R.J. Reynolds Vapor Co.*, No. 120CV393LMBWEF, 2023 WL 2843796, at *10 (E.D. Va. Mar. 30, 2023), *appeal dismissed sub nom. RAI Strategic Holdings, Inc. v. Altria Client Services LLC*, No. 2023-1892, 2024 WL 413427 (Fed. Cir. Feb. 5, 2024) (finding *Georgia-Pacific* factor No. 5 relevant to determining a post-verdict reasonable royalty rate because the plaintiff intended to begin competing directly with the defendant in the U.S.). Such is not the case in the instant action. Indeed, Jazz does not argue that the parties were not competing pre-verdict; instead, Jazz only contends that Avadel did not agree the parties were competing pre-verdict. A lack of agreement is not relevant to a hypothetical negotiation when the parties are assumed to have "full knowledge of the facts and circumstances." *LaserDynamics*, 694 F.3d at 76.

---

[10] Xyrem and Xywav are two oxybate products marketed by Jazz. *See* D.I. 132 at 3, 4.

Similarly, because direct competition between Jazz and Avadel is not a changed circumstance, Jazz's arguments about the RTW license rate do not warrant increasing the jury-awarded reasonable royalty of 3.5%. Jazz cites *Bard* for its argument that, in a hypothetical negotiation, the patent holder "is more likely to extract a greater royalty from a direct competitor in order to account for lost sales and profits." *Bard*, 2010 WL 11484420, at *3. However, that language from *Bard* does not justify increasing the royalty rate in this case for two reasons. First, that language is citing to the argument from the plaintiff in *Bard*, not the reasoning of the court.[11] Second, in *Bard*, the defendant "continue[d] to launch new surgical graft products to compete with [the plaintiff's] surgical grafts." *Id.* This fact reflected a change in "the competitive posture of the companies [that] ha[d] only increased over time." *Id.* Accordingly, the court in *Bard* increased the jury's reasonable royalty rate to "adequately compensate" the plaintiff for the increase in competition. *Id.* at *7; *see Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, 670 F.3d 1171, 1193 (Fed. Cir. 2012) (upholding the district court's decision regarding the ongoing reasonable royalty rate), *opinion vacated in part on reconsideration*, 682 F.3d 1003 (Fed. Cir. 2012), and *vacated in part on reh'g en banc*, 476 Fed. Appx. 747 (Fed. Cir. 2012) (unpublished). Again, in this case, direct competition between Jazz and Avadel is not a changed circumstance and has not increased.

---

[11] Although this language from the plaintiff in *Bard* itself quotes *Boston Scientific Corp. v. Johnson & Johnson*, No. C 02-00790 SI, 2009 WL 975424, at *7 (N.D. Cal. Apr. 9, 2009), it suffers from the same issue. The language is a statement from the plaintiff in *Boston Scientific*, and the parties did not dispute the underlying point, meaning the court did not analyze the issue itself. *Id.*

c. *Georgia-Pacific* Factor Number 8

Jazz asserts that the commercial success and profitability of LUMRYZ justify an increase in the jury-awarded reasonable royalty rate under *Georgia-Pacific* factor number 8.[12]  In support of this assertion, Jazz identifies several facts it claims show Avadel's commercial success and profitability are "evolving and growing."  D.I. 687 at 5 (citation omitted).  First, Avadel has reported that it expects to expand opportunities for greater sales.  *Id.*  Second, LUMRYZ has secured wider insurance coverage, and Avadel expects to continue expanding to "85% coverage in commercial increased insurance coverage [and] then begin to expand with more Medicare coverage" in 2025.  *Id.* at 5-6 (citation omitted).  Jazz's argument posits that, when more insurance plans cover LUMRYZ, more patients can afford and use LUMRYZ at the expense of Xyrem and Xywav.  As evidence, Jazz points to an Avadel report that states that over 100 new oxybate prescribers, whom Avadel never targeted during the launch and marketing of LUMRYZ, have begun prescribing LUMRYZ.  Jazz also highlights Avadel's own explanation that these new prescribers are opportunities for market expansion.  *Id.* at 6.  Third, Jazz highlights Avadel's current 95% gross profit margin on LUMRYZ sales.  *Id.*  Subsequently, Avadel increased "WAC pricing by 5%" and net pricing by 6%.  *Id.*  Fourth, Jazz notes Avadel's belief that future competitive conditions in the narcolepsy market will not meaningfully hinder LUMRYZ's growth.  *Id.*  Fifth, Jazz notes that Avadel's market capitalization has increased from $1.1 billion to approximately $1.5 billion since the verdict.  *Id.*  According to Jazz, this increase is a useful indicator because Avadel's market capitalization is a conservative measure of the present value of Avadel's expected

---

[12] "The established profitability of the product made under the patent; its commercial success; and its current popularity." *Georgia-Pac. Corp.*, 318 F. Supp. at 1119.

future profits and, since LUMRYZ is Avadel's only product, the increase is closely tied to the expected commercial success and profitability of the drug. *Id.*

These post-verdict changes in commercial success and profitability are relevant to *Georgia-Pacific* factor number 8. Because these factors show an increase in commercial success and profitability for Avadel, this factor does weigh in favor of the Court increasing the jury's reasonable royalty rate for continuing infringement.

Avadel does not contest the accuracy of the facts set forth by Jazz with respect to *Georgia Pacific* factor number 8. Instead, Avadel contends that the aforementioned facts do not demonstrate post-verdict changes or, if they do, those facts actually favor reducing the ongoing royalty rate. D.I. 690 at 5-6; D.I. 705 at 4. Each of those contentions by Avadel fails. First, Avadel points out that Jazz has not shown that the new LUMRYZ patients have switched from Xyrem and Xywav. Avadel claims that the new patients could have come from a different drug or no drug at all. D.I. 705 at 4. Avadel further claims that, since Xyrem and Xywav sales have been higher than Jazz's expert allowed for, there is justification to lower the royalty rate. D.I. 690 at 6. However, Avadel's argument about drug switching is irrelevant. *Georgia Pacific* factor number 8 is about the commercial success of the product at issue. It does not matter where that success comes from, only that the product has become more commercially successful post-verdict. Thus, what matters is LUMRYZ's success, not its success relative to Xyrem and Xywav.

Second, Avadel claims that the jury has already considered this factor, because Jazz's expert at trial testified that LUMRYZ would become profitable in 2024. D.I. 705 at 4.[13] Although the

---

[13] Avadel's brief argues that the jury heard that Avadel would become profitable. D.I. 705 at 4. However, since LUMRYZ remains Avadel's only product, the Court considers Avadel's profit to be LUMRYZ's profit.

jury did hear expert testimony that LUMRYZ would become profitable in 2024, the estimated amount of profitability has now changed. The jury heard that LUMRYZ would be a $3 billion opportunity, but Avadel now believes it will be worth $5 billion. D.I. 707 at 3.

Third, Avadel claims that LUMRYZ's pricing does not warrant an increase because it is not a changed circumstance. D.I. 690 at 6. To support this contention, Avadel asserts that, because Avadel was already conducting Pharmacy Benefit Manager ("PBM") pricing negotiations, the price of LUMRYZ is not a changed circumstance, regardless of what the ultimate price from the PBM turned out to be. However, Avadel is attempting to frame the change in pricing as already set in stone because the process of determining the price was already underway pre-verdict. This framing is not how this factor works. The ultimate price is what is important to determine the profit margin at which the products are sold. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1335 (Fed. Cir. 2009) (finding that a higher royalty rate was appropriate under *Georgia-Pacific* factor number 8 because the "products at issue are sold with an approximately 70–80% profit margin").

Thus, under *Georgia Pacific* factor number 8, a higher ongoing royalty rate is supported by post-verdict evidence of 1) Avadel expecting greater sales of LUMRYZ, 2) LUMRYZ securing wider insurance coverage, 3) Avadel's 95% gross profit margin on LUMRYZ sales, 4) Avadel's belief that future competitive conditions in the narcolepsy market will not meaningfully hinder LUMRYZ's growth, and 5) Avadel's increasing market capitalization.

,

d.  *Georgia-Pacific* Factor Numbers 9 and 10

Jazz contends that *Georgia-Pacific* factors numbers 9[14] and 10[15] support increasing the jury's reasonable royalty rate. D.I. 687 at 6.  First, Jazz presents evidence that the claimed dosage form had "the added advantage and benefit of lower rates of discontinuation/higher rates of persistency compared to twice-nightly oxybate products." *Id.*  According to Jazz, this advantage translates to LUMRYZ patients staying on LUMRYZ longer than Jazz's products, equating to greater sales of LUMRYZ over a greater period of time. *Id.*  Second, Jazz claims that post-verdict evidence shows that Avadel could have designed around claim 24 of the '782 patent but did not. D.I. 707 at 4.  Because Avadel did not design around claim 24, Jazz asserts that the patented dosage from the '782 patent is technically superior or not as cost prohibitive as alternatives. *Id.* (citing *Apple*, 2014 WL 6687122, at *16-17).

The Court does not find Jazz's arguments persuasive.  The first contention appears to be another argument about LUMRYZ's commercial success because Jazz's ultimate conclusion is that LUMRYZ is generating more sales.  Moreover, if Jazz's contention is based on the fact that LUMRYZ has the benefit of being a once nightly product, then that is an argument that was already presented to the jury.  D.I. 705 at 4; Tr. 635:6-22, 636:13–637:4.  Further, any attempted reliance by Jazz on *Apple* does not warrant increasing the jury-awarded reasonable royalty rate.  In *Apple*, the court, in determining an ongoing royalty rate, found relevant the fact that the defendant continued to infringe because defendant's "witnesses repeatedly told the jury that design-arounds

---

[14] "The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results." *Georgia-Pac. Corp.*, 318 F. Supp. at 1119.
[15] "The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention." *Georgia-Pac. Corp.*, 318 F. Supp. at 1119.

would be simple or already exist." 2014 WL 6687122, at *17. As a result, the court saw "little reasons for [the defendant] to continue any infringement." *Id.* That circumstance is not present in the instant action. In Jazz's own words, "Avadel admits that it would be an uncertain, time-consuming undertaking" to develop a design-around to claim 24. D.I. 707 at 4. Thus, the court's conclusion in *Apple* does not warrant increasing the ongoing royalty rate in the instant case.

e. *Georgia-Pacific* Factor Number 11

Under this factor[16] (and also factor 8), Jazz claims that, because LUMRYZ remains Avadel's only commercial product, the Court should increase the ongoing royalty rate. D.I. 687 at 6; D.I. 707 at 4. In Jazz's view, the "specter of a permanent injunction" would weigh heavily on Avadel during the post-verdict hypothetical negotiation. D.I. 687 at 6. However, Jazz has not shown how LUMRYZ being Avadel's only product is a changed circumstance. On the contrary, Jazz's brief confirms that it is not a changed circumstance: "Lumryz remains Avadel's only commercial product." D.I. 707 at 4.

f. *Georgia-Pacific* Factor Number 13

Jazz asserts that the inventive contribution of claim 24 of the '782 patent to LUMRYZ supports a higher ongoing royalty under *Georgia-Pacific* factor number 13.[17] D.I. 687 at 7. Jazz claims that the jury likely credited Avadel's argument that claim 24's inventive contribution was minimal. *Id.* Jazz also contends there has been a post-verdict change allegedly because the Court agreed with Jazz in finding that "Avadel intends to offer and sell a wholly infringing product" and

---

[16] "The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." *Georgia-Pac. Corp.*, 318 F. Supp. at 1119.

[17] "The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer." *Georgia-Pac. Corp.*, 318 F. Supp. at 1119.

the "infringing aspects of Lumryz" should not be treated "as a small component part of the overall drug." *Id.* (internal quotations marks omitted).

Contrary to Jazz's claims, there has not been a post-verdict change. First, in the Court's opinion, the Court refuted Avadel's argument that the jury award was a "fully-paid-up royalty" i.e., that Avadel did not owe an ongoing royalty to Jazz. D.I. 665 at 30 (citation omitted). Jazz takes the Court's words out of context. In context, the language Jazz cites notes that an ongoing royalty is appropriate because Avadel continues to sell an "infringing product" and Avadel owes future damages for the infringing product it continues to sell. *Id.*

Second, Jazz provides no support for its assertion that the jury "credited" Avadel's argument. D.I. 687 at 7. Jazz's only argument for its assertion is that the jury determined the reasonable royalty to be 3.5%. *Id.* Jazz provides no reason for why that determination means the jury credited Avadel's assertion. Thus, Jazz fails to show there has been a post-verdict change in the inventive contribution of claim 24. Accordingly, this factor does not warrant an increase of the jury-awarded reasonable royalty rate of 3.5%.

Also, Jazz's request that this Court fix the jury's determination is not an appropriate argument for this motion. This motion is properly focused on determining post-verdict changes, not to "undo[] a jury finding." *XY, LLC*, 890 F.3d at 1297.

In summary, *Georgia-Pacific* factor number 8 favors increasing the jury's reasonable royalty rate determination, while the other identified factors are either neutral or do not warrant increasing the jury-awarded reasonable royalty rate of 3.5%. Next, the Court will proceed in determining the ongoing royalty rate. *See Vectura Ltd.*, No. 16-cv-638-RGA, at *7.

17

## C. Determining the Ongoing Royalty Rate

In determining the appropriate rate, the ongoing rate must be "adequate to compensate for the infringement." 35 U.S.C. § 284; *see Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620, 630 (E.D. Tex. 2009), *dismissed,* 455 Fed. Appx. 955 (Fed. Cir. 2010) (unpublished) (stating that "the law must ensure that an adjudged infringer who voluntarily chooses to continue his infringing behavior must adequately compensate the patent holder for using the patent holder's property").

Jazz requests a reasonable royalty rate schedule of "30% through 2025, 13% from 2026 through 2032, and 3.5% [] from 2033 through the expiration" of the '782 patent. D.I. 687 at 1. In proposing this ongoing rate schedule, Jazz's expert, Dr. Rainey, consulted two licenses that he admits "would not be comparable to the license resulting from the May-June 2023 hypothetical negotiation" but nevertheless contends that those licenses are evidence "to show a range of royalties actually paid." D.I. 689 ¶¶ 18-19. The first of these licenses, according to Dr. Rainey, requires the licensee to "currently pay[] Jazz a royalty rate of ████ on [] net sales of its authorized generic Xyrem product ████████████████." *Id.* at ¶ 20. The second license requires the license to "pay[] Jazz a royalty rate of ████ applied to net sales ████████." *Id.*

Avadel, on the other hand, maintains that any ongoing royalty awarded by the Court should not exceed the jury awarded reasonable royalty of 3.5%. D.I. 690 at 1. In the alternative, Avadel contends that, if the Court were to raise the ongoing royalty rate, the increase should be modest. D.I. 690 at 3. Avadel argues that any increase should be ten to twenty percent and no more than a third. *Id.*; *see Philip Morris Prods. S.A.*, 2023 WL 2843796, at *1, *12 (where the court found a change in bargaining position and change in *Georgia-Pacific* factors 5 and 8, it increased the royalty rate from 0.6% to 1.8%, an increase by a factor of 3); *Opticurrent, LLC v. Power Integrations, Inc.*, No. 17-cv-03597-EMC, 2019 WL 2389150, at *18 (N.D. Cal. June 5, 2019)

18

(increasing the jury-awarded rate by roughly seventeen percent, from 3% to 3.5%, to "adequately compensate Opticurrent for its stronger post-verdict bargaining position").

Although the Court has found that *Georgia-Pacific* factor number 8 favors increasing the jury's reasonable royalty rate of 3.5%, the Court finds that any increase in the royalty rate should be modest. Jazz's requested royalty rate schedule is excessive and not supportable for three reasons. First, Jazz cites no cases where a court has implemented an ongoing royalty schedule like the one that Jazz proposes under circumstances similar to those in this action. Second, Jazz supported its requested ongoing royalty schedule by claiming eight different *Georgia-Pacific* factors warrant increasing the ongoing royalty rate. The Court has found that only one of those factors actually supports an increase of the jury-awarded reasonable royalty rate - factor number 8. Third, Jazz's support for its requested royalty schedule includes two licenses that this Court has determined are not relevant to calculating an ongoing royalty. *See supra* Section II.A.ii.a.

Thus, although *Georgia-Pacific* factor number 8 supports increasing the royalty rate for continuing infringement, it does not warrant an increase in the amount that Jazz is requesting. The Court also notes that the burden of proving damages for an ongoing royalty remains with Jazz, the patentee. *VB Assets, LLC v. Amazon.com Services LLC*, No. 19-cv-1410 (MN), 2024 WL 5090650, at *2 (D. Del. Dec. 12, 2024), *appeal dismissed,* No. 2025-1113, 2025 WL 752344 (Fed. Cir. Mar. 10, 2025) (citing *Creative Internet Adver. Corp. v. Yahoo! Inc.*, 674 F. Supp. 2d 847, 855 (E.D. Tex. 2009)); *see Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) ("The burden of proving damages falls on the patentee.").

Therefore, upon consideration of the arguments of Jazz and Avadel, the pertinent case law and circumstances of the instant case, the Court finds that the ongoing reasonable royalty rate shall increase to 3.85%, a ten percent (10%) increase of the jury's reasonable royalty rate for past

19

infringement by Avadel. The increase factors in the debatable increase in Jazz's bargaining position post-verdict and the Court's analysis of the alleged changed economic circumstances and post-verdict factors affecting a post-verdict hypothetical negotiation.

## III.    CONCLUSION

For the foregoing reasons, the Court increases the ongoing royalty rate to 3.85%. An Order consistent with this Memorandum Opinion will be entered.